*D*

United States District Court
Southern District of Texas
FILED

AUG 2 5 1999

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO GUILLERMO SALINAS | § | |
| AND ELISA HERNANDEZ HERRERA | § | |
| SALINAS | § | |
| | § | |
| V. | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| R.D. MOORE; | § | |
| AND | § | |
| JIM SCHOEPNER | § | |

## PLAINTIFF SALINAS' SUPPLEMENTAL RESPONSE
## TO DEFENDANTS' SECOND SUPPLEMENTAL BRIEF

TO THE HONORABLE JUDGE TAGLE, U.S. DISTRICT COURT:

Come now the Plaintiffs, pursuant to the Court's request, and file this SUPPLEMENTAL RESPONSE to Defendants' Second Supplemental Brief in Support of the Defendants' Motions to Dismiss under F.R.C.P. 12(b)(6) and Individual Defendants' Motion to Dismiss under F.R.C.P. 12(b)(6) based on qualified immunity. After discussing the Defendants' objections to the affidavit testimony offered by Plaintiffs, the Court at the hearing held on August 12, 1999, considered the arguments of counsel and requested briefing on three topics: whether Defendant Moore acted under color of law, was there a special relationship between the Defendants and the Plaintiffs, and what further distinctions could be made between the facts of the case at bar and those of the *Saenz* case.

# I. RUBIO AFFIDAVIT

At the hearing held on August 12th, the Defendants objected to the Affidavit of HPD Lt. Jose Rubio, Jr. urging that the Court not consider affidavits or testimony outside of the pleadings. As it became apparent at the hearing, some discussion of the evidence is necessary to a complete understanding of the allegations made in the Plaintiffs' amended complaint. Defendants' objection is not effectual since the issues involving a special relationship and state-created danger necessarily turn on the facts and circumstantial evidence. At Defendants' insistence there has not yet been discovery in this case, thus Plaintiffs should be entitled to proffer the sworn testimony of an officer within the Harlingen Police Department. As a senior ranking officer, Lieutenant Rubio's testimony is relevant and germane as it relates to common and proper procedure within the department. The evidence is in a form allowed to be presented in a summary judgment procedure, and thus certainly is relevant and allowable in a 12(b)(6) hearing. In *Celotex Corp v. Catrett,* 477 U.S. 317, 324; 106 S.Ct. 2548, 2553 (1986), the Supreme Court held:

> We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56( c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.

## II. OFFICER R.D. MOORE ACTED UNDER COLOR OF LAW.

An off-duty peace officer who observes a crime in progress immediately becomes an on-duty officer. *Laughlin v. Olszewski,* 102 F.3d 190, 192 n.1 (5th Cir.1996); *Villegas v. Griffin Indus.,* 975 S.W.2d 745, 754 (Tex.App. – Corpus Christi 1998, writ denied); *Wallace v, Moberly,* 947 S.W.2d 273, 277 (Tex.App. – Fort Worth 1997, no writ); *City of Dallas v. Half Price Books, Records, Magazines, Inc.,* 883 S.W.2d 374, 377 (Tex.App. – Dallas 1994, no writ). A police officer is not

relieved of his duty to prevent crime when he witnesses an illegal act simply because he is off-duty. *See Blackwell v. Harris County*, 909 S.W.2d 135, 139 (Tex.App. – Houston [14th Dist.] 1995, writ denied) (*citing Moore v. State*, 562 S.W.2d 484, 486 (Tex.Crim.App.1978)).

It is the nature of the act performed, not the clothing of the actor or even the status of being on-duty or off-duty, which determines whether an officer has acted under color of law for purposes of civil rights statutes. *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975). There Belcher, an off-duty officer, involved himself in an altercation in a bar. As a result he killed two people and paralyzed a third with a handgun assigned to him. Belcher contended that his actions were taken as a private citizen because he was engaged in private social activity, was out of uniform, off-duty, and never identified himself as a police officer at any time. However, the court held that while shooting the three men, Belcher was acting under the color of law because the police regulations required him to carry a gun at all times, and further, the police chief testified that the office regulations required an officer to take action in any type of police or criminal activity 24 hours a day. *Belcher*, 522 F.2d at 441. An off-duty police officer who performs an actual or apparent duty of his office is acting under the color of law. In *City of Dallas v. Half Price Books, Records, Magazines, Inc.*, 883 S.W.2d 374, 377 (Tex. App. – Dallas 1994, no writ), the court held that an off-duty police officer who observes a crime immediately becomes an on-duty police officer. An officer who is present at the scene of an arrest and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under civil right statutes. *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 (1st Cir. 1990), *cert. denied*, 500 U.S. 956.

In the present case officers are required, under the Departmental Directives of the Harlingen Police Department, (hereinafter referred to as "Directives" and attached hereto as Exhibit "B")[1], to

---

[1] The subsections of the directives quoted herein are attached hereto as Exhibit "B" and incorporated herein for all purposes.

swear to enforce federal and state laws, and local ordinances (Subsection 6.08.002). They have the following duties:

  (1)   to "protect and serve" the community by complying with their lawful duty to preserve the peace, protect life and property, and to deter and prevent crime while detecting and apprehending criminals (Subsection 6.07);

  (2)   to take action and report upon all violations coming to their attention, as well as all information they receive about any actual or suspected violation of the law (Subsection 6.07.001);

  (3)   to make arrests when necessary to enforce laws and to protect the public (Subsection 6.08); and

  (4)   to make appropriate arrests when witnessing or receiving information of violations of the law (Subsection 6.08.001).

The Directives instruct off-duty officers:

  (1)   to carry their badges and police identification with them (Subsection 4.05.001);

  (2)   to take proper police actions in matters coming to their attention (Subsection4.01.005); and

  (3)   to report to the Police Department information of a law violation they received when practical. If the situation requires immediate action, the officers take the proper action and make written reports (Subsection 4.05).

Therefore, under the Directives, Officer R.D. Moore is required to take police action to stop or investigate criminal activity 24 hours a day regardless of whether he is on-duty or off-duty.

In the present case, Officer Moore should have at least suspected that his son, Ernest Moore, had committed some crime long before Cameron County Deputy Rodriguez and Border Patrol Officers Salinas and Rodriguez pulled into Officer Moore's driveway around 7:00 a.m. on July 7, 1998 -- the day of the incident in question -- based on the following facts:

  (1)   Patsy Moore, Officer Moore's wife, told the Department of Public Safety investigator that at approximately 6:00 a.m. of the day of the incident in question, she heard Ernest Moore's bedroom door slam open. She looked for Ernest both in and outside the house. When she opened Ernest's pickup truck door, ammunition fell out. She then returned inside, woke up her husband Officer Moore, and told him that

something was wrong because Ernest's pickup was outside and the gun safe was open. Officer Moore went to Ernest's room and observed that the gun safe was opened and noticed that the AR-15 was missing. He then went outside and saw that Ernest's pickup was damaged. (Page 18 of Texas Department of Public Safety Investigation Report, Exhibit "C"); and

(2)  In his Affidavit, which is attached hereto as Exhibit "A," Lieutenant Jose Rubio Jr. stated under oath that:

> On July 14, 1998, Sergeant Foist submits an e-mail to Caliber Press in reference to the Border Patrol Shootings. The e-mail points is important because Foist makes it appear that Ernest Moore had a conversation with RD Moore and Ernest said, "I'm in deep shit now, Dad" as he headed out the door. RD Moore then notices the AR-15 is missing from the safe. . ..

Under the Directives mentioned, Officer Moore should have taken action to investigate what his son had done. Officer Moore should have, at the very least, detained his son for questioning. Instead, Officer Moore not only allowed his son to flee from his house, but in fact he assisted his son in his escape from arrest by the Cameron County authorities. In his affidavit, Officer Rubio stated (emphasis added):

> On Tuesday, July 7, 1998, I was on day shift and I was scheduled to instruct a class on Mental Health Education for Police Officers. My two shift supervisors were also scheduled to attend this class and Sergeant Miguel Garcia was to cover my shift for the day. As I was preparing to leave for the Harlingen Police Department, I received a phone call from Officer Matthew Manning around 7:15 a.m. informing me that RD Moore's son, Ernest, had just shot two Border Patrol officers and a sheriff's deputy. **He further informed me that Sgt. Foist and Sgt. Garcia had been called out to RD Moore's house in San Benito. . . . I was informed the reasons behind both Sergeant Foist and Sergeant Garcia being there at the scene were a request by the Cameron County Sheriff's Department. Apparently, RD Moore had denied permission to the Sheriff deputies to search the house for Ernest Moore and had been rude to them. . .**

Moreover, when Officer Moore discovered that the AR-15 rifle was missing from the gun safe, he should have pursued his son and particularly should have informed the deputies and Salinas and Rodriguez that his son had a deadly assault rifle. Instead, Officer Moore did neither. Officer Moore's failure to take proper police action against his son and his concealment of information from other officers at the scene were in direct violation of these Directives and clearly constituted actions under color of law.

## III.  SPECIAL RELATIONSHIP

As the Court observed at the August 12th hearing, two exceptions have emerged in the case law which permit the bringing of a civil rights cause of action against a public entity for conduct by a private tort feasor. These two exceptions focus on the special relationship that may exist between the victim and the State actors and the State-created danger that resulted in the victim's injury.

In *Schuster v. City of New York*, 5 N.Y. 2d 75, 154 N.E. 2d 534, 180 N.Y.2d 265 (1958) the Plaintiff was killed while attempting to assist the police department in the apprehension of a suspected murderer. The Court recognized that a police officer owes a special duty to use reasonable care for the protection of persons who have collaborated with it in the arrest or prosecution of criminals. As the Plaintiffs have alleged in their amended complaint, the facts in the case at bar are analogous to *Schuster*.

In the instant case the Border Patrol Agents were a part of a coordinated, integrated law enforcement effort that involved city, county, and federal agencies. Exhibit "D" attached hereto is a Memorandum to Jose E. Garza, Chief Patrol Agent from Hector Gonzales, Supervisory Border Patrol Agent. As the memo indicates: "at approximately 6:41 a.m. the Cameron County Sheriff's Department contacted McAllen Sector's Communication Center and requested Air Operation's assistance in locating the suspect. LECA John Cantu contacted Harlingen Supervisory Border Patrol

Agent Doug Spielman who dispatched some Harlingen Agents to assist in the search and in coordinating the Air Ops assistance." Based on this request, Border Patrol Agents went to Detective Moore's house to assist in the search. The Agents were confronted by R.D. Moore who stated "Hold up Border Patrol. I don't want Border Patrol in my house, my son is not an illegal alien." Id.

The coordinated, integrated nature of the multi-force effort to apprehend the suspect made it foreseeable that Border Patrol agents like Rodriguez and Salinas would be present at the Moore home. The involvement of the Border Patrol Agents in this law enforcement effort establishes a special relationship between the agents and state actors such that the agents were entitled to have been shielded from harm. Instead, the state actor R.D. Moore took deliberate steps to withhold information from the Agents that would have assisted in their protection, and he deliberately sent the Agents into harm's way. Clearly such actions, when made under color of law, abrogate the standards established in the *Schuster* decision.

## IV.    FURTHER DISTINGUISHING THE *SAENZ* CASE

In addition to qualifying under the special relationship exception, the facts of this case support the Plaintiffs' pleadings alleging that the state actors created a danger which resulted in a constitutional deprivation of the Plaintiffs' civil rights.

In *Saenz v. Heldenfels Brothers, Inc.. et al,* _____ F3d _____, 1999 WL 556440 (5th Cir. 1999), the Fifth Circuit held that the state-created danger line of cases were "factually inapplicable" to the evidence in *Saenz*. The Court held that a state actor does not "offend due process by permitting an intoxicated driver to remain on the highway, thereby increasing the risk of harm to unidentified and unidentifiable members of the public." Id. Conversely, in the instant case it was foreseeable to the state actors that the perpetrator would act to injure identifiable persons.

First, it was foreseeable that a dangerous situation would present itself. Officer Moore had specific knowledge about his son that made it probable and highly likely that there was imminent and unreasonable danger to Decedents Salinas and Rodriguez:

(1) Officer Moore knew that his son was psychologically unstable, the recipient of prescription psychological drugs, and a cocaine user;

(2) Officer Moore knew that his son's bedroom was filled with Nazi paraphernalia;

(3) Officer Moore knew that his son had taken the AR-15 from the rifle safe before Decedents Salinas and Rodriguez were called for assistance;

(4) Officer Moore knew that given his son's racist beliefs, that Decedents Salinas and Rodriguez – both minority law enforcement officers who were called to assist in the arrest of Ernest Moore, would be targets; and

(5) Officer Moore failed to abide by the Directives of the Harlingen Police Department to protect the lives and property of Decedents Salinas and Rodriguez.

Second, the dangerous situation was the direct result of the state actors placing a dangerous instrumentality into the perpetrator's hands. This case involves a military assault weapon which was turned over to the state actors for destruction because of the nature of the weapon. The weapon had the capacity to fire numerous rounds in rapid succession at great distances with extreme accuracy. Unlike the standard issue police revolver, the AR-15 assault rifle presented a significant risk of danger for many individuals within a wide range of the user of the weapon. Also, unlike the typical officer revolver, this weapon was brought to the police department to be destroyed. The unique circumstances by which this specific weapon found its way into the hands of this particular perpetrator distinguishes this case from other instances involving shootings with police weapons. And more importantly the unique circumstances of this case involving an extremely dangerous

instrumentality that was within the control of the state actors distinguishes this case from *Saenz*. One must assume that the Fifth Circuit would have been less reticent to apply the state-created-danger line of cases to the *Saenz*' facts if the perpetrator in *Saenz* had been driving a state-owned vehicle.

Third, the victims in the case at bar were identifiable before the event occurred. As discussed above, the state actors had reason to know before the shooting that Border Patrol Agents would be assisting in the coordinated effort to apprehend the suspect. In addition, Ernest Moore was already known by his father, Officer R.D. Moore, and the Harlingen Police Department to be psychologically unstable, the recipient of prescription psychological drugs, and a cocaine user.[2] It was also known that Ernest Moore's bedroom was filled with Neo-Nazi paraphernalia.

In his affidavit, Lieutenant Rubio testified:

> On [Monday, July 13, 1999], for the first time, I hear about the Neo-Nazi paraphernalia found inside the bedroom of Ernest Moore. This shocks me initially because I can't believe that a police officer would allow his son to have the Neo-Nazi paraphernalia. Part of our law enforcement training under mandatory T.C.L.E.O.S.E. regulations covers culture diversity which addresses hate crimes and racist groups. The State of Texas governing body has made a tremendous effort to attempt to address the issues of hate crimes and racial prejudice to law enforcement officers by having a mandatory culture diversity class every two years. It would be against departmental policy for Officer Moore to condone the behavior of his son by allowing Ernest Moore to be involved in Neo-Nazi activities.

Officer Moore had to know that his son had the "Neo-Nazi mentality" of hatred against minorities since Ernest Moore lived with his father, and Officer Moore knew that the Neo-Nazi paraphernalia was in his son's room. Thus, Officer Moore should have known that minority law enforcement officers would be his son's first targets on the day of the incident in question since only law enforcement officers would, as a matter of fact, be present around the perimeter of his house to search for his son.

---

[2] Plaintiffs' First Amended Complaint, ¶22.

In light of Chief Jim Schoepner's close friendship with Officer Moore and the telephone conversation he had with Officer Moore at the critical moment before the tragic incident in question, Chief Schoepner also, in all reasonable probability, had to know that minority law enforcement officers would be Ernest Moore's first targets

After responding to the call and going to the scene, the U.S Border Patrol Agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas were entrapped and it was too late for them to back out because they were already under Ernest Moore's murderous eye. This situation was created by the failure of Officer Moore and Chief Schoepner to fulfill their police duties under Subsection 6.07 of the Directives, which provides that:

> Officers "protect and serve" the community by complying with their lawful duty to, preserve the peace, protect life and property, and to deter and prevent crime while detecting and apprehending criminals.

Had the Defendants fulfilled their duty under the Directive quoted above by warning Salinas and Rodriguez about the imminently dangerous situation and having them seek cover, Officers Rodriguez and Salinas would not have been killed by Ernest Moore. Therefore, Officer Moore and Chief Schoepner were responsible for the deaths of Officers Rodriguez and Salinas under civil right statutes. *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 202, 109 S.Ct. 998, 1005 (1989); *Schuster v. City of New York*, 5 N.Y.2d 75, 81, 154 N.E.2d 534, 537 (1958). This court can, and should, take judicial notice of the Nazi and Neo-Nazi mentality, the corresponding attitude of intensely despising minorities, and the predisposition of such "hate groups" to use violence to injure and kill minorities.

WHEREFORE, Plaintiffs respectfully request this Court to deny Defendants' Motions to Dismiss and allow Plaintiffs to proceed immediately with preparation for a speedy and just trial

Respectfully submitted,

BROADUS A. SPIVEY
SPIVEY & AINSWORTH, P.C.
48 East Avenue
Austin, TX 78701
512+474-6061
fax: 512+474-1605

Mr. Richard Pena
Mr. Michael Greenberg
Law Offices of Richard Pena, P.C.
Barton Oaks Plaza Two
901 MoPac, Suite 325
Austin, Texas 7746-5747

By _____
Broadus A. Spivey
State Bar No. 18955000

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the above and foregoing document was forwarded on August 24, 1999, to all counsel of record and interested parties via facsimile and U.S. mail:

Mr. Tom Lockhart
Mr. Jim Denison
Mr. Roger W. Hughes
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429
ATTORNEYS FOR DEFENDANT

Mr. Walter J. Passmore
PASSMORE, WALKER & TWENHAFEL, L.L.P.
2424 North 10th St, Suite 201
McAllen, Texas 78501
ATTORNEYS FOR DEFENDANT

Broadus A. Spivey



PLAINTIFF'S
EXHIBIT
"A"

**STATE OF TEXAS**
**COUNTY OF CAMERON**

**BEFORE ME, the undersigned authority, a notary public in and for Cameron County, Texas on this day personally appeared Jose Rubio Jr. who, after by being duly sworn did depose and say:**

My name is Jose Rubio Jr. and I am a police officer for the City of Harlingen. I am 38 years old and I am a resident of Harlingen, Cameron County, Texas. I am writing this statement in a particular style where initially I introduce myself so as the reader can understand my background, education and experience. I will then describe in detail the events that happened concerning the death of the two Border patrol agents, Susan Rodriguez and Ricardo Salinas.

I started with the Harlingen Police Department on September 14, 1981. I currently hold the rank of lieutenant and I am assigned to the patrol division as a shift supervisor. I am a certified instructor for the Harlingen Police Department and I have taught the following courses to police officers:

- 3737 T.C.L.E.O.S.E. Supervisor's Course
- Personnel Evaluations for Police Officers
- Mental Health Education for Police Officers
- Arrest, Search, and Seizure
- Legal Update
- Police Photography
- Instructor's Course for New Instructors

A month after I graduated Harlingen High School in 1978, I joined the United States Army. I attended training to become a military police officer and I was assigned to Fort Myer, Virginia. I left the military in July of 1981 and shortly thereafter joined the Harlingen Police Department.

Over the last 17 years of service, I have managed to attend several schools of quality instruction and have also attended college. I received my Associates Degree in 1986 from Texas Southmost College in Criminal Justice. I have approximately 118 college hours in an effort to obtain my degree in police administration. Unfortunately due to the shift work, I have been unable to obtain my degree. I hold a Masters Peace Officers Certificate issued by the Texas Commission of Law Enforcement Standards and Education. I am a certified intoxilyzer operator and I am a certified

**SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.**

Notary Public in and for Cameron County Texas

Roberto Silva        04-29-2000
Name ( printed of typed)    Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

instructor.   I have attended a wide variety of numerous continuing education police schools instructed by a variety of instructors. They were sponsored by several different agencies such as the FBI, TEXAS A&M, the International Chiefs of Police, the Lower Rio Grande Valley Police Academy, and so on.  The schools that I have attended have enhanced my knowledge in my chosen profession of law enforcement.

I was assigned to the detective division in October of 1988 to crimes against property.  I worked a variety of cases gaining invaluable experiences during the time that I was assigned to detectives. In January of 1990, I was promoted to sergeant after placing first in a civil service examination.  I was assigned to the patrol division and worked under Lieutenant Scheopner until November 1990. I was then assigned to the Traffic Division of the Harlingen Police Department.  I was placed in charge of not only the officers assigned to that division but the dispatchers and jailers were also added to my list of responsibilities.  I held that position until May of 1993 when the new police chief, Jim Scheopner, reassigned me to the patrol division.  In June of 1993, I placed first in the lieutenant's civil service examination and after I was promoted, I was assigned to be in charge of a patrol shift.  The responsibilities are varied in this position but are closest associated with that of a "watch-commander."  I supervise two sergeants and depending on shift strengths, up to nineteen patrol officers.  Part of my responsibilities are to approve reports and ensure that investigations are carried out in proper fashion at crime scenes.  I also carry out the administrative responsibilities of my position.

In July of 1992, I assumed the role of President of the Harlingen Police Officer's Association.  I would serve on the board of directors for the next six years until my departure in January of 1999.  I was the President of the Association on the day of the tragic shootings of the Border Patrol Officers and the Morin family in Rio Hondo.

On Tuesday, July 7, 1998, I was on day shift and I was scheduled to instruct a class on Mental Health Education for Police Officers.  My two shift supervisors were also scheduled to attend this class and Sergeant Miguel Garcia was to cover my shift for the day.  As I was preparing to leave for the Harlingen Police Department, I received a phone call from Officer Matthew Manning around 7:15 a.m. informing me that RD Moore's son, Ernest, had just shot two Border Patrol officers and a sheriff's deputy.  He further informed me that Sgt. Foist and Sgt. Garcia had been called out to RD Moore's house in San Benito.  He told me there was chaos out there because of the shootings and there was a massive manhunt for two other suspects.  I left immediately to the Harlingen Police Department.  When I arrived, I met up with Matthew and other officers at the rear of the station.

**SWORN AND SUBSCRIBED TO BEFORE ME,** on this 4th day of June, 1999.

Notary Public in and for Cameron County Texas

Roberto Silva          04-29-0
Name ( printed of typed)     Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

(Scheopner, Archer, Vasquez) that we eventually gave up on the notion that we would develop a new set of departmental directives or a set of policies and procedures.

On Wednesday, July 8, 1998, the news media was still carrying the Border Patrol shootings as priorities. CNN, Fox News, and the San Antonio Express are the non-valley news media that have joined the local news media in making the story a priority. There were rumors surfacing that RD Moore had the right to carry the gun because of his on-call status. That afternoon, I paid a visit to Commissioner Rick Rodriguez about my concerns. Rick Rodriguez is a lawyer, prior prosecutor and I have known him for a long time. Since I didn't know all the facts and there were plenty of rumors circulating around such as the AR-15 being fully automatic and RD Moore being on call, I informed Rick Rodriguez that I suspected there would be some sort cover up. Rick Rodriguez at the time was a brand new City Commissioner and he was just getting his feet wet. When I left his office, I informed him that I would be in touch with him if anything substantial developed.

On Thursday, July 9, 1998, the Valley Morning Star reported that drugs were linked to the shooting spree. It also reported that Ernest had traces of cocaine, marijuana, and alcohol and that a Mac-90 assault rifle was used. I kept thinking that all this would come back to haunt the police department. The United States Attorney General, Janet Reno, and the INS Chief, announced they would attend the funeral for the slain agents, Ricardo Salinas and Susan Rodriguez. On page A4 of the Valley Morning Star, there was a picture of Sergeant Andy Muniz carrying an assault rifle with a scope. I know that he was out there trying to help but I also know that he is not qualified to carry an assault rifle. The father of slain agent Ricardo Salinas, Art Salinas, made a public statement about the corrupted sheriffs in the Rio Grande Valley. KGBT Dave Johnson repeated his statement on the news.

On Friday, July 10, 1998, I assisted in the funeral of Susan Rodriguez at the Queen of Peace Church. I assigned four of my officers to join the rest of the officers who are providing traffic control. After I cleared from 13th and 77, I stopped by the Queen of Peace Church. I could not bring myself to enter the church and I left after a while. At 6 p.m., I was at home and turned on the news to Channel 5 ABC news. Peter Torgerson, news anchor, came on and announced the AR-15 used to kill the agents was registered to the Harlingen Police Department. The weapon was assigned to Detective RD Moore because of his on-call status. At that point, I went into a shock because I could not believe what was just announced. This was the beginning of a cover up in the use of our weapon to kill the agents and to justify why RD Moore had access to the weapon. My phone rang immediately after the announcement and it was Dennis Zamarron. He also could not believe what

SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.

Notary Public in and for Cameron County Texas

Roberto Silva          04-29-2000
Name ( printed of typed)     Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

At this point, I learned that an AR-15 belonging to RD Moore had been used in the shootings. I also learned that Sergeant Foist had been involved in the shooting and that several officers had shot Ernest Moore. I was informed the reasons behind both Sergeant Foist and Sergeant Garcia being there at the scene were a request by the Cameron County Sheriff's Department. Apparently, RD Moore had denied permission to the Sheriff deputies to search the house for Ernest Moore and had been rude to them. From what I also gathered, Chief Scheopner was called and he contacted RD Moore over the phone. The facts were trickling in slowly about how the shooting started and the events prior to the shooting. I was informed that two other people had died in Rio Hondo and another person had been taken to VBMC as a result of being shot.

Around 10 a.m., Officer Foist came in to the Harlingen Police Department. He described what happened and he stated that "It was suicide by cop." He tells me that he was forced to take cover behind a boat when the shooting started. He described the scene saying it was like "Rambo" when Ernest Moore came out of his hiding place and started to unload the AR-15. He believes he struck Ernest due to his proximity and stated, "I had to shoot RD's kid." A few minutes later, Sgt. Mike Garcia returned from San Benito and the stress of the incident was evident on his face. We learn that he had to hold RD Moore's wife down to protect her from the flying bullets. He went home due to the stress. Officers Chris Read and Steve Mayer (Harlingen K-9 officers) returned from the scene about an hour later. Chris describes the scene as chaotic as it appears no one is in charge. We continue attending the class but it was hard to instruct and keep up with what was going on. The search for the two suspects had made nationwide news and the search was called off around 2 p.m.

I got the feeling that the shootings were going to come back and haunt the department. RD Moore has had access to the evidence room for over twenty years. A few years ago, I saw him playing around with a Colt Ar-15 rifle in the evidence room and I knew that he liked to shoot guns. At that time, he stated the AR-15 was his personal weapon. I had also heard stories that he had problems with his son, Ernest. I knew the department had very lax policies and procedures and had very little accountability. One of the areas of concern that I had was the evidence room which had no regular audits or set of rules for proper disposal of evidence or other items turned into the evidence room. During the course of the last two years, we had tried through the Association to develop a new set of departmental directives to cover areas of weaknesses and /or strengthen the policies we did have. There were to many word of mouth policies with no documented procedures. There was so much resistance by the administrative staff of the Harlingen Police Department

**SWORN AND SUBSCRIBED TO BEFORE ME**, on this <u>4th</u> day of <u>June, 1999,</u>

Notary Public in and for Cameron County Texas

<u>Roberto Silva</u>        <u>04-29-200</u>
Name ( printed of typed)     Commission Exp

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

we just heard and he asked me, "What are we going to about it." I told him that I was going to make some phone calls and I will be in touch with him. The phone rang a second time. This time it was Sergeant Shawn Foist. He is pissed-off and states the Chief is lying about what he is saying about the gun. He states that he knows what really happened and that he has information to use against the Chief. I ask him what is the information that he has and he refuses to divulge it stating that he will release it when needed. I know Foist's character well and I know that he won't do anything. I get pissed off at him because he was almost killed in a shooting by a jail escapee. He laid partial blame on the department and he raised the issue of lax procedures which led to his shooting but he never followed up on his threats. I call him a "pussy" and told him that he was part of the problem because of his failure to speak out and tell the truth. I hung up on him. I get another phone call and it is from Lieutenant Ramon Vela. He is on duty and Officer Jose Angel Villarreal is next to him. They express their concerns over the lie that the Chief Scheopner just made to the media to cover up the gun. They are both having difficulty trying to understand why the Chief would say that RD Moore was on call and part of a SWAT team that does not exist. I know and they know that RD Moore was not on call and we know that he is not the department sniper. He also asked me what was I going to do about the lie that Chief Scheopner had created to justify the our department weapon being used during the shooting of the two agents. I told him that I was working on it. I then called Harlingen City Commissioner Rick Rodriguez on his mobile phone. He told me that he was at Tropi-Casa having a beer. He states, "You were right, we are in trouble. Deep shit trouble." He told me that he had plans so he can't talk any further. I decided to call the Valley Morning Star police newspaper reporter, Laura Martinez, who I have known for a number of years. Laura is really familiar with the Harlingen Police Department as she has been covering issues and the operations of the Harlingen Police department for a number of years. As soon as she heard my voice, she stated, "Lieutenant, I knew it was you. I know why you are calling. I was expecting your call. I guess you heard ." She then asked me what I thought about what the Chief said. I told her that I thought it was important to reverse the question back to her and asked her what she thought. She stated that she wanted me to first answer the question. I told her it was important to hear her opinion first because she covered the police department and was familiar with it. She replied, "The Chief is lying. It's obvious. RD Moore is not on call. I know you all don't have a SWAT team." She was upset about the lie and did not understand why Scheopner would lie. I explained that probably to cover up the use of the weapon and the weapon not being issued properly. I further explained that he and RD Moore were friends and went way back over twenty five years. I told her that we can't let the Chief get away with this lie. She asked me what can she do. I tell her to reinterview the Chief and commit him to some answers and he will hang himself. She promised to do that but she already has him committed to his story. * Note: Laura Martinez

SWORN AND SUBSCRIBED TO BEFORE ME, on this <u>4th</u> day of <u>June, 1999.</u>

Notary Public in and for Cameron County Texas

Roberto Silva                04-29-2000
Name ( printed of typed)      Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

would leave the Valley Morning Star in another week and this left a void in the investigative department of the newspaper to continue following up properly.

I then called up Dennis Zamarron and told him that I would see what we can do and I will drop by his house. I can't figure out who to call next at that this point because the Chief is involved and the City manager, Natalie Prim, and Joe LaBeau, the Assistant City Manager, are not the type of persons you can trust to do the right thing.

Around 7:30 p.m., that same night, I decide to see my FBI friend by the name of Armando Fernandez. I have known Armando for a number of years and I also know his wife, Rosie. I stopped by their house and Rosie tells me that Armando should be on his way home from Brownsville. She calls Armando on the phone and I briefly explain to Armando that I have some concerns over the Border Patrol shootings. He tells me that he will be home in about twenty minutes and I tell him that I will return. I go to Dennis Zamarron's house and I give him the latest news of my upcoming meeting with Armando Fernandez. We decide to go over to his house together. Upon arriving at Armando's house, he tells me that he called David Church, a fellow FBI agent who is a case agent working on the Border Patrol shooting. David arrives a few minutes later. In the next hour or so, we are going to express our concerns and explain our procedures on our weapons. I explain to David that since I am a patrol lieutenant, I would know if one of my resources available to me for emergency purposes would be a SWAT officer. I explain the fact that I am familiar with on-call procedures and Detective RD Moore is not on the on-call roster that some detectives are assigned to. Further the fact that he is being called the department SWAT officer is a total surprise to me and the rest of the other officers. We explain checkout procedures if you want to borrow a weapon from the police department arsenal. Of course, we explain this is limited to detectives and only handguns. The procedure used to be a 3x5 card which is signed out by the evidence custodian but we seriously doubt at this point, that any sort of procedures are in existence. The procedures that I mentioned were under Chief Anderson's regime and there was no set of procedures implemented by Chief Scheopner when he took over in March of 1993. Bottom line, we tell David Church that RD Moore should not have possessed the weapon used to kill the Border Patrol agents. I also conveyed my concerns that we should have a detailed inventory of the Harlingen Police Department arsenal as I suspect other weapons will probably be missing. In addition, we should also try to see if we can identify the weapons at RD Moore's house to see if any of them belonged to the Harlingen Police Department. David was very receptive to our concerns and we exchanged ideas on the manner to proceed with a detailed investigation. David assured us that a follow up would be made. We tell him that he needs to move on it by Monday because there has not been enough time to cover their

**SWORN AND SUBSCRIBED TO BEFORE ME**, on this <u>4th</u> day of <u>June, 1999.</u>

_____
Notary Public in and for Cameron County Texas

<u>Roberto Silva</u>    <u>04-29-2</u>
Name ( printed of typed)    Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

tracks on the issue of the weapon and other weapons. When I left Armando's house, I felt a heavy burden was lifted and I felt relieved. Dennis Zamarron expressed the same feelings and I dropped him off at home.

On Monday, July 13, 1999, RD Moore returned to work. During the next two days, Chief Scheopner, Assistant Chief Archer, Captain Vasquez, and Detective RD Moore went behind closed doors. We suspected they were discussing their stories so as they would corroborate. At one point, through the rumor mill we heard that Captain Vasquez was afraid the statement was not factual and he did not want to go to jail. Never the less, this was the opportune time for them to discuss their stories and set them straight. I was wondering why we had not heard or seen anything of a follow up by the FBI or the Texas Rangers at the police department. On this day, for the first time I hear about the Neo-Nazi paraphernalia found inside the bedroom of Ernest Moore. This shocks me initially because I can't believe that a police officer would allow his son to have the Neo-Nazi paraphernalia. Part of our law enforcement training under mandatory T.C.L.E.O.S.E. regulations covers culture diversity which addresses hate crimes and racist groups. The State of Texas governing body has made a tremendous effort to attempt to address the issues of hate crimes and racial prejudice to law enforcement officers by having a mandatory culture diversity class every two years. It would be against departmental policy for Officer Moore to condone the behavior of his son by allowing Ernest Moore to be involved in Neo-Nazi activities.

That same morning, July 13, 1998, I paid a visit to Nat Lopez, a Harlingen City Commissioner. I expressed my concerns over the lies told by Scheopner in regards to the weapon and the creation of a convenient SWAT team to justify the weapon. He has a budget workshop scheduled for noon concerning police benefits. He assures me that he will bring it up during the workshop in one way or another. I attend the budget workshop and Mr. Lopez brings up the issue of our weapon being used to kill the two Border Patrol agents. He asks for a formal inquiry to be made. The City Manager, Natalie Prim, is squirming in her seat as she is very uncomfortable and upset that Nat Lopez brought up the subject during the public workshop. She assures him that they will look into the matter. *Note: Two days later, on July 15, 1998, the Valley Morning Star would have a story about Mr. Lopez's comments. The Valley Morning also mentioned in the story that the rifle used to kill the two agents was donated to the Harlingen Police Department by a private citizen. Scheopner is asked three times if the weapon was turned in for destruction. He refuses to answer the question after he is asked three times.

On July 14, 1998, Sergeant Foist submits an e-mail to Caliber Press in reference to the

SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.

Notary Public in and for Cameron County Texas

Name ( printed of typed)      Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

Border Patrol Shootings. The e-mail points is important because Foist makes it appear that Ernest Moore had a conversation with RD Moore and Ernest said, " I'm in deep shit now, Dad" as he headed out the door. RD Moore then notices the AR-15 is missing from the safe. Chief Scheopner was upset at Foist for his e-mail going out on the world wide web. Scheopner considered suspending Foist for two weeks and after he talked to him, the suspension was reduced to a day. Foist told me during this episode that he was willing to fight the two week suspension based on the severity of the suspension and it would give him an opportunity to have a full hearing where everything would come out. Since he was only suspended for one day, he took his medicine and did not appeal the suspension. Foist also asked me if he was in good standing with the Association as far as legal coverage and I told him that he was. Foist was worried about a polygraph test that the Texas Rangers had asked him to take to clarify the issue of whether RD Moore had warned his son. Two days later, Foist would tell me that word had been handed down from Washington that the polygraph was canceled and he would have to take the polygraph test.

The organization chart of the Harlingen Police Department provides Captain Luciano Rubio, my younger brother, is in charge of the training division. Luciano and I had discussed the weapon and his role as a Captain and obligation to look into the matter. The fact that we both knew that RD Moore had not ever qualified with an AR-15 and his training records reflected his lack of qualifications to carry the rifle, would eventually surface in any sort of inquiry. This would be a major concern in his role as a supervisor of that division. Detective Gilbert Gonzalez, was the department custodian of evidence, and therefore, he would have knowledge of whether the weapon used to kill the two agents was properly checked out. It would be Detective Gonzalez's responsibility to have the documentation for the weapon to be checked out. When Luciano asked Gilbert about the weapon, he became nervous and did not cooperate in his inquiry. Later, on July 15, 1998, Chief Archer asked Luciano to join him in a cup of coffee across the street at Rosita's Restaurant. Archer paid for Luciano's taco and coffee. When they were walking back, Assistant Chief Archer told Luciano not to meddle in the Border Patrol shooting. When me and Luciano talked, we could not figure out why Gilbert Gonzalez would run to Scheopner and tell him about the inquiry that he had made. Archer's warning was a strong message to Captain Rubio because he did not want a probe even though Luciano had all rights by his position.

On the evening of the 15th of July, I was contacted by Dennis Zamarron at home. He relayed an encounter that happened with RD Moore. Dennis was at the copier located between the detective division and Moore's office. Mario Arreola (narcotics investigator) was at the computer that is generally used to check for mug shots. RD Moore walked in with a camouflaged gun sheath

SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.

Notary Public in and for Cameron County Texas

Roberto Silva        04-29-2000

Name ( printed of typed)    Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

and a small caliber rifle was inside the bag. RD Moore had a surprise look on his face and dropped off his package inside his office. Dennis called me immediately afterwards and I told him at this point it was just another thing that we would have to tackle as a problem. **Note: During the Lockhart attorney's meeting on October 9, 1998, this issue was addressed and explained as RD Moore holding a weapon for a friend.**

By that same afternoon on July 15, 1998, I had heard rumors that the FBI agents had "ratted" us out to Scheopner. The rumor was there would be no probe because "Union Politics" were being blamed. I was on midnight shift and I left home early because of the fear of retaliation. I had become a target on different occasions because of my Association activities and I knew they were capable of making my life uncomfortable by singling you out any minor thing. The police department had staff meetings every Thursday afternoon to discuss issues. On occasion, these meetings were used as opportunities to take some "cheap shots" at certain individuals. The staff meetings were held on a weekly basis because we had some "communication" problems and turmoil between some of the younger administrative members. I decided to skip the staff meeting of July 16,1998. Around 4:30 p.m., Lieutenant Ramon Vela contacted me at home and told me the results of the staff meeting. He told me that Scheopner, Archer, and Captain Vasquez were pissed off about some officers going to the FBI. He told me that Archer had said they wanted to fire people. He said Captain Vasquez called us "bastards" and that we should be fired. Vasquez would repeat this statement several times. Vela also told me that Scheopner had also said that we did not understand the details on the Border Patrol shooting and we should mind our own business. The meeting was generally attended by the two captains (Rubio and Vasquez), the four lieutenants (Rubio, Vela, Castillo, and Leal), and both Chief Scheopner and Assistant Chief Archer. At this meeting, every one should have been there for the exception of my brother who was on vacation.

That same night, July 16, 1998, I came into work on the midnight shift at 11 p.m. and I saw that Captain Vasquez was waiting for me. As soon as I finished my briefing to the shift, I was summoned by Captain Vasquez to his office. The first thing that he asked me was why I did not show up to the staff meeting. I told him I was not feeling well, that my stomach was in knots. He proceeded to go over some issues discussed during the staff meeting. He blasted the "Blue Shield" which was an Association newsletter. The Blue Shield had an article on pay issues and Captain Vasquez told me that as supervisors we should be able to take care of pay issues. Then he asked me if I knew the two persons who went to the FBI in regards to the Border Patrol Shooting. I told him that I did not know who went to the FBI. He asked me again and I again responded that I did not know. He then stated that the FBI had contacted the Chief (Scheopner) and they had informed him

SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.

Notary Public in and for Cameron County Texas
La Berta Silva          04-29-

**Name ( printed of typed)     Commission Expires**

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

that two supervisors had gone to the FBI. He stated that these two supervisors were circulating rumors and that we had no fault in the shooting. He then stated that his position was to fire these two individuals and he asked me if I understood. I told him that I understood. "No, he says, I don't think you understand." I told him that I understood and I got the point, "You want to fire the two individuals who went to the FBI.." Captain Vasquez proceeded to explain they had friends in the FBI and they would eventually find out who went to the FBI. He further explained there is a loyalty to Chief Scheopner from the FBI because he attended the FBI academy and there is a loyalty built up when you attend the FBI academy. He then asked me again if I understood that we are going to fire the individuals who went to the FBI. I told him, "Whatever it takes, Captain." He continued talking about pay issues, evaluations, and people leaking stories to the newspaper concerning the police department. He then told me that he is going to shift the days off to the lieutenants in the near future. This is an obvious "power play" message to tell me he is command and can arbitrarily change my days off whenever he wants. This has never happened before as the lieutenant controls the days off for the shift. **\*Note: This will be last staff meeting due to the perception that we were back stabbers.**

In the early part of August and continuing through the month, a newsletter emerged anonymously called "The Blue Cow." The Association would publish an informative newsletter called the "Blue Shield" that would address issues. The Blue Cow was making fun of officers past and present in their outcry of issues. The writing was malicious and could easily be traced to one or two individuals due to the story contents and writing style. The Blue Cow was delivered to a Lion Club's meeting by Chief Archer and passed around City Hall by Chief Scheopner. After the third Blue Cow came out, some officer came out with an anonymous newsletter called "The Tainted Brass." The officer in the newsletter blasted the fact that we had covered up the use of a missing gun that was used in the Border Patrol shooting. It also blasted the administration of the department with all type of allegations of wrong doing. The "Tainted Brass" also made its way to City Hall. Joe LaBeau, the Assistant City Manager, came around the police department and he contacted several officers trying to find out who wrote the "The Tainted Brass." He stated that he was concerned about some of the contents and there would be no retaliation from his part if the officer stepped forward. No one came forward. Joe LaBeau would later on confirm to me that Chief Archer had authored "The Blue Cow."

I have been appointed to the Cameron County Emergency Services Board. In August, there were several meetings to discuss the upcoming taxes and distribution of funds to the fire departments and EMS. There was an issue as to who should pick up the "floaters" in the Rio

**SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.**

Notary Public in and for Cameron County Texas

Name ( printed of typed)   Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 200?

Grande River or in other bodies of waters in Cameron County. Sheriff Lucio had been asked to attend the meetings to discuss the issue. In one of the meetings in mid August, he showed up and we asked for his ideas on the issue. After the meeting was over, Sheriff Lucio and I started to talk. He invited me over to his office and I joined him. Being that Sheriff Lucio was a Harlingen Police Officer for over 34 years, he was familiar with our policies and practices. We started to discuss the Border Patrol shooting and how the weapon used to kill the agents and wound his deputy came to be in RD Moore's hands. He agreed at that point it was a lie created by Scheopner to cover the use of the weapon. I asked him if he was going to do anything about it since he knew the truth and he said the FBI and Texas Rangers were in charge of the investigation. **Note: On at least another occasion, around October, I asked him again about the weapon and he walked away not wanting to address the issue.**

On September 4, 1999, I stopped by City Hall to make an open records request. I ran into Joe LaBeau and he asked to talk to me. He wanted to know if I knew the author of the Tainted Brass and I told him no. He pointed there were several issues in the newsletter that concerned him. He wanted to know about the issue of the weapon. I told him that I was uncomfortable talking about the issue of the weapon. He became angry demanding that I tell him what I knew about the weapon. Since Captain Vasquez had made it clear that anyone talking about the Border Patrol shooting would be fired, I felt that I could not tell Mr. LaBeau anything without the fear of retaliation. Mr. LaBeau did not have the best reputation among City employees and employees were fearful of him and mistrusted him. Joe LaBeau was trying to fix the problems at the police department but there was to much opposition and political power plays by Chief Scheopner to do an effective job. I told Joe LaBeau there would be a time and place that we would talk but not today. I did give him a hint and I told him that he needed to check T.C.L.E.O.S.E. regulations concerning the qualifications of officers carrying assault rifles. He was not familiar with T.C.L.E.O.S.E. and I had to give him another hint that the rules would be posted on the Internet by searching the web site. That same afternoon, I went to work and I submitted a memorandum to Captain Vasquez and Chief Scheopner in regards to my encounter with Joe LaBeau. I outlined in the memorandum the details and that Joe LaBeau had requested to talk to me about the Border Patrol Shooting and that I felt uncomfortable because I was under the threat of being fired if we talked about the Border Patrol Shooting. About two days later, I ran into Chief Scheopner and he made a casual remark about the memorandum and Joe LaBeau. He did not give me permission to discuss the case with Joe LaBeau. I did not ask for permission because I knew better and the continuing conflict in the department over the issue of the Border Patrol shooting and the conflict with management (Joe LaBeau) was the not the right atmosphere where permission would be granted. It did become obvious to me at this point of the

SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.

_____
Notary Public in and for Cameron County, Texas

_____
Name ( printed of typed)     Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

lack of expertise of any City administrator to conduct a formal inquiry into the weapon. Two months later and no one had gone into the evidence room and made a formal audit or inventory of all weapons.

In the latter part of September, I went to the Texas State Conference of the *"The Fraternal Order of Police"* in Corpus Christi. I met up with several police officers at this conference in which there is an estimated 200 officers in attendance. Dennis Zamarron had been asking me all along when were we going to go public with the issue of the deception and cover-up. I told him that I would discuss the issue with some of the officers at the conference so as we get a direction to take. I discussed the issue at full length with two officers. One was Randy Malone from the Austin Police Department. Randy gave me some advice and informed that if I went public with the issue of the lies/cover-up, we would be protected under the "Texas Whistle Blowers's Act." Randy is 25 year veteran of the police department. I then discussed the issue with Gil Gallegos who is the National President of the Fraternal Order of Police (270,000 nation wide members). Gil is a retired Deputy Chief of the Albuquerque, New Mexico Police Department. He participates in a narcotics task force and sits on a Congressional committee that addresses Border States issues. Part of the committee is Janet Reno, the United States Attorney General, along with other Senators. When I discussed the issue of the Border Patrol shooting and the deception/cover-up by Chief Scheopner and other officers, he described it as "corruption at its worse." He informed me that I had an obligation to tell the truth. He informed me that if I needed any assistance, to contact him and he would try to help out through Janet Reno.

I came back after the conference and I made an appointment with Roberto Garcia (Edinburg-Garcia, Lopez, and Wood) who is the Harlingen Police Association Attorney. We discussed the issue and we settled on two approaches. I told him that I would draft two letters asking for a formal inquiry from the City Commission pursuant to City Charter and one from the Civil Service Commission. I had already discussed the issue with Cesar Maldonado who is the Chairman of the Harlingen Civil Service Commission. We did not go into specifics because I knew they may make a ruling on any inquiry but I did express my concerns about having the door open for the inquiry. Cesar informed that if the inquiry had anything to do with Civil Service or a Civil Service violation, he would at least allow us the opportunity to be addressed as an agenda item. On October 5, 1998, the Association Executive Board decided to sign off on the two inquiries and formally present them to the news media so as to lay a claim on the Whistle Blower's Act if anything resulted. The signing members of both letters, one addressed to the Harlingen City Commission and the other to the Harlingen City Civil Service Commission, are

**SWORN AND SUBSCRIBED TO BEFORE ME**, on this 4th day of June, 1999.

Notary Public in and for Cameron County Texas

Name ( printed of typed)     Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

as follows:

1. Jose Rubio Jr., President, 17 year veteran
2. Dennis Zamarron, Vice-President, 18 year veteran
3. Antonio Sanchez, Treasurer, 18 year veteran
4. Roberto Silva, Secretary, 17 year veteran.

The draft letters were approved by Mr. Garcia and we contacted the news media. On the 6th of October, we called for a press conference at 6 p.m. at Antonio's Restaurant. Dennis had been contacted by Chief Scheopner several times during the day and warned that he was subject to disciplinary action if he broke departmental directives. Dennis eventually had to tell Chief Scheopner to lay off him because he was harassing him and he understood that he was subject to disciplinary action. Zamarron invited Scheopner to the press conference. Antonio Sanchez was contacted on that day by Scheopner but he did not reveal any details. I came back from the attorney's office and there was a message from Captain Vasquez on my recorder to contact him and there was another message left by Chief Scheopner. Chief Scheopner called my home around 4:30 p.m. again and my wife informed him that I was busy with the attorneys and he quit calling afterwards. At 4:50 p.m., we delivered our letters to City Hall and we started our press conference at 6:00 p.m. We were all nervous and scared. Each one of us had talked to our wives and explained that we subject to disciplinary action and could be fired as a result of our actions. At the point that we delivered the press conference and letters, we had given up hope on any law enforcement agency coming out and investigating fully the Border Patrol shootings. The administration was about to target those individuals who had gone to the FBI because no action was being taken against them.

On October 8th, 1998, Tom Lockhart and Natalie Prim had their structured press conference. After their press conference, Tom Lockhart, Dennis Zamarron and I went behind closed doors. I informed Mr. Lockhart that I was upset at the callous disregard of the City not to conduct a thorough investigation and then have someone like Scheopner threaten to fire us if we went to the FBI. At this time, he claimed that he had no knowledge of Scheopner's actions.

On October 9th, 1999, we had a round table discussion with our Association attorney present, Bobby Garcia, and Tom Lockhart. Tom had tried to interview us separately and we had agreed that we would not be interviewed separately. A non retaliation agreement was signed before we started our discussion. I had prepared for this meeting by having fifty two questions

**SWORN AND SUBSCRIBED TO BEFORE ME**, on this 4th day of June, 1999.

Notary Public in and for Cameron County Texas

Roberto Silva          04-29-2000
Name ( printed of typed)     Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

that I wanted to discuss and possibly answered. Mr. Lockhart did not answer many of the questions due to the pending litigation but we were able to decipher some of the answers through the conversation that we had for numerous hours. The greatest bit of knowledge that we did learn at this meeting was the role of Captain Vasquez. He had released the weapon to RD Moore to take home and have it in his vehicle for emergency purposes. We discussed this theory of how the weapon was being used by RD Moore and their story is full of holes.

All though the City Commission and the Civil Service Commission failed to initiate a probe into the Border Patrol shootings, it has become obvious through the follow up stories by the media and the facts that have been trickling in, that we were right in our suspicions. The weapon was turned in for destruction purposes and all though law enforcement can utilize a weapon of such caliber and design for legitimate purposes, no documented or formal steps were taken to put the weapon into use. The weapon is an assault rifle and not the type of weapon that should be used for sniper duties. There are departmental directives and T.C.L.E.O.S.E. regulations that were not followed by the Harlingen Police Department. The fact that not one law enforcement agency at the point of this statement has stepped forward and pursued a detailed, thorough investigation into how the weapon, used to kill two Federal Agents, **Susan Rodriguez and Ricardo Salinas**, and wound a Cameron County Deputy, came to be in RD Moore's hands is truly demoralizing. There is a loss of understanding of why the many law enforcement agencies that have jurisdiction in this tragedy can look the other way is appalling. I have paid the price in both my personal life and professional life by bringing this matter forward when no else would. Emotionally and physically, I have paid the price. This matter will only come to a closure when the lawsuits are settled and to some of us, there will never be a closure.

**SWORN AND SUBSCRIBED TO BEFORE ME**, on this **4th** day of **June, 1999.**

Notary Public in and for Cameron County Texas

_Roberto Silva_    _04-29-2000_
Name ( printed of typed)   Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000



PLAINTIFF'S
EXHIBIT
"B"

# HARLINGEN POLICE DEPARTMENT
# DEPARTMENTAL
# DIRECTIVES

## REVISED 11-01-94



# Law Enforcement Code of Ethics

As a Law Enforcement Officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all men to liberty, equality and justice.

I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession ... law enforcement.

Compliments of Texas Commission on Law Enforcement Officer Standards and Education

# HARLINGEN POLICE DEPARTMENT
# MISSION STATEMENT

"To protect life, property, the constitutional rights of individuals, and promote a feeling of security within the community through the prevention and deterrence of crime, and the apprehension of law offenders, while providing total quality police service."

# SECTION 4    PROFESSIONAL CONDUCT AND COMMUNITY RELATIONS

4.01        INTERACTION WITH THE PUBLIC
            Police personnel interact constantly with the public they serve.  It is the
            goal of the Department to maintain an ongoing professional relationship
            with the community.  A relationship built on respect, courtesy and
            professional conduct will help achieve that goal.

4.01.001    ETHICS
            The Department and all officers abide by the Law Enforcement Code of
            Ethics.

4.01.002    INTEGRITY
            Officers act promptly, with courage, firmness and fairness in the face of
            crime, disorder, or other incident requiring police action.  Department
            personnel do not give out information or facts to unauthorized persons.
            When requested, officers give their names and badge numbers
            respectfully.  All employees live up to their obligations and do not make
            promises they cannot keep.

4.01.003    ATTITUDE
            Officers maintain a soldierly bearing and avoid slouchy, slovenly and
            solicitous attitudes of mind or body.  They remain quiet in their conduct
            and deportment, being civil, orderly and courteous in all situations.
            Employees avoid answering questions rudely or abruptly, and give the
            greatest possible attention and courtesy.  Further, they refrain from harsh,
            violent, crude or profane language on or off duty.

4.01.004    ATTENTIVENESS TO DUTY
            All employees show interest in their work by attentiveness to their official
            duties, alertness in mind, and by observing the rules and regulations.
            They do not engage in idle conversations with anyone, loiter, engage in
            non police activity or sleep on duty.

4.01.005    OFF DUTY
            Officers off duty take proper police actions in matters coming to their
            attention.  When off duty, but in uniform, officers conduct themselves as
            though they were on duty.  If an officer is off duty, and has consumed an
            alcoholic beverage within the previous four hours, the officer acts as a
            civilian in all police matters.

4.04.004    CARRYING WEAPONS
Always, while on duty, officers carry their Department issued pistols, or approved weapon.  An officer never relinquishes a weapon to an assailant voluntarily.

An officer carrying a handgun conspicuously on duty, wears his badge prominently displayed.  When off duty, officers carrying a weapon, carry it inconspicuously and concealed.

4.04.005    USE OF WEAPONS
Officers do not display or brandish a weapon as a threat unless the actual use of the weapon is a legal option.  However it is permissible, when anticipated, to ready a weapon for use.

Normally, a firearm is not drawn in public except during inspections or for lawful use.   Officers discharge firearms only under the following conditions:

▶ During range practice or authorized competitive events.

▶ To destroy an animal that represents a threat to public safety, or as a humanitarian measure where the animal is seriously injured.

▶ When justified by the Texas Penal Code, and Chapter 6 of these Directives.

4.04.006    REPORTS ON WEAPON USE
An officer using a weapon or firing a gun, accidentally or intentionally, except on the firing range or while at a legitimate sporting event, reports the incident in writing.

4.05    ENFORCEMENT OFF DUTY
Any off duty officer receiving information of a law violation, reports the violation to the Department when practical.  If the situation requires immediate action, the officer takes the proper action and makes a written report.  An off duty officer under the influence of an alcoholic beverage or medication, avoids taking any official police action if possible.

4.05.001    IDENTIFICATION
Off duty officers carry their badges and police identification with them.

4.05.002    ENFORCEMENT ACTION
Officers making arrests off duty, operate under the same laws that govern private citizens when making arrests.

6.07        LAW ENFORCEMENT
            Officers "protect and serve" the community by complying with their lawful
            duty to, preserve the peace, protect life and property, and to deter and
            prevent crime while detecting and apprehending criminals.

6.07.001    ENFORCEMENT ACTION
            Officers take action and report upon all violations coming to their
            attention, as well as all information they receive about any actual or
            suspected violation of the law.

            Officers immediately report to their supervisors, in detail, any information
            coming to their attention, regarding a felony, or person wanted for a
            felony.

6.07.002    RESTORING ORDER
            Whenever possible, officers use persuasion to restore order and disperse
            crowds.  If persuasion fails then reasonable force is used to arrest the
            individuals involved.

6.08        ARREST
            Officers make arrests when necessary to enforce laws and to protect the
            public.

6.08.001    RIGHT TO ARREST
            Officers witnessing or receiving information of violations of the law may
            make appropriate arrests.  When making an arrest, officers follow existing
            state law stated in the Texas Code of Criminal Procedure.

6.08.002    ENFORCEMENT BY ARREST
            Officers are sworn to enforce federal and state laws, and local
            ordinances.  In carrying out these duties, officers have discretion in
            selecting the best solution for any given situation.  Except when
            mandated by law, or these directives, officers may choose arrest as an
            alternative course of action when seeking the best solution.

            When conducting arrests, officers follow the law and ensure the civil
            rights and privileges of all prisoners.

6.08.003    RELEASE OF PRISONERS ON BOND
            When the Municipal Court is not in session, prisoners charged with Class
            "C" misdemeanors may be released on bond in accordance with fees set
            by the Municipal Court.

DATE: 10-12      PAGE: 18

| FILE TITLE | MASTER FILE | FILE NO. RD098338 | TYPE O | PROGRAM CODE Criminal |
|---|---|---|---|---|

1 Capital Murder - FC - 1900
2 San Benito, Cameron County, 031
J RICARDO GUILLERMO SALINAS, W/M, 04-29-74
4 07-07-98

ACTIVE X  INACTIVE__ CLOSED__ RESTRICT__

BY: RODOLFO C. JARAMILLO, Sergeant # 5801

A.  Her son had kicked COX out of their house two weeks prior to the shooting.

B.  On Monday 07-06-98, at approximately 7:00 PM, MOORE called the house and spoke to her inquiring about COX calling the house looking for him. MOORE told her that he would be at REED'S house drinking.

C.  That MOORE had called the house about four (4) different times asking if COX had called.

D.  The last time he called was at 11:00 PM. MOORE was still at REED'S residence. MOORE stated that he was going to spend the night because he had drank too much. PATSY MOORE stated that MOORE sounded like he was drunk.

E.  A little before 6:00 AM, MOORE'S bedroom door slammed open. She walked around inside the house looking for MOORE. She went outside and saw his pickup parked outside. She went back inside to look for him, but could not find him. She walked back outside and when she opened the door to his (MOORE'S) pickup, ammunition fell out.

F.  She called out for MOORE, but he didn't respond. She went back inside to wake up Detective MOORE. Detective MOORE and herself went riding around looking for him.

G.  After they got back from searching for MOORE, Cameron County Deputies started arriving in front of their house. Her husband (R. D.) had gone out to talk to the deputies and then came back inside and spoke to Harlingen Police Chief JIM SCHEOPNER on the telephone.

H.  That she was standing outside talking with some of the officers from the Harlingen Police Dept. and Cameron County Sheriff's Office.

I.  All of a sudden she heard gunfire and she saw everyone taking cover. Harlingen Police Sergeant MIGUEL GARCIA, who took her to cover, protected her.

J.  After the shooting, she got up and saw her son (MOORE) laying at the edge of the cornfield. She went out to MOORE and spoke to him but he did not talk to her.

Rev. 12/88

PLAINTIFF'S
EXHIBIT
"C"



PLAINTIFF'S
EXHIBIT
"D"



**U.S. Department of Justice**
Immigration and Naturalization Service

MCA 50/8.9

_2301 S. Main_
_McAllen, Texas 78503_

_July 27, 1998_

MEMORANDUM FOR  Jose E. Garza. Chief Patrol Agent, McAllen, Texas

FROM:        Hector Gonzalez
             Supervisory Border Patrol Agent

SUBJECT:     San Benito Shooting Report

On July 7, 1998, I was assigned the San Benito Shooting Crime Scene Investigation.  I am currently one of three McAllen Sector Crime Scene Investigators.

I arrived at the crime scene on Gamble Road  and Resaca Road, San Benito, Texas at approximately 8:15  a.m. and made contact with Harlingen PAIC John Brinning and Supervisory Border Patrol Agent Doug Spielman, who briefed me on the circumstances leading to the shooting of Agents Susan Rodriguez and  Ricardo Salinas and Cameron County Sheriff's Deputy Raul Rodriquez.   I also made contact with FBI Agents, Texas Rangers and Cameron County Sheriff's Department Investigator's, who were to conduct the shooting investigation.  I was informed that the scene was not properly secured as it was suspected that two other suspects were hiding in a corn field adjacent to the crime scene.  The immediate area of the shooting was subsequently secured and  it was decided that the Texas Department of Public Safety Field Crime Scene Investigative Unit would conducted the crime scene investigation.

During this time the area as converged upon by numerous law enforcement personnel from all local, state and federal agencies in the area..  A tactical plan was established and at

approximately 2:00 P.M. a search of the area determined that there were no more suspects in the area.

The following is a chronology of the events that transpired on the morning of July 7, 1998:

At approximately 5:20 a.m. the Cameron County Sheriff's Department responded to a shooting at 311 Catherine Street in Rio Hondo, Texas. Two people were shot to death and a third was seriously wounded. The suspect was identified as Ernest Moore and a description of the vehicle and license plate numbers were obtained and put on a "Look Out" to all law enforcement agencies in the area.

At approximately 5:31 a. m., Cameron County Sheriff's Deputy Robert Rodriguez located a vehicle matching the description on the "Look Out", heading south on FM 345 in San Benito. A high speed pursuit ensued and Deputy Rodriguez lost sight of the vehicle in the vicinity of Hudson and Gamble Rd. During this pursuit Deputy Rodriguez thought he observed three occupants in the suspect vehicle. After terminating the pursuit Deputy Rodriguez returned to the county barn to refuel his vehicle.

After returning to the area where he last saw the suspect vehicle, Deputy Rodriguez found the suspect vehicle parked at a residence on the corner of Gamble and Resaca Road. As he approached the residence, he observed a person, later identified as R. D. Moore, a Harlingen, Texas Police Officer, step out of the garage and state to Deputy Rodriguez *"I know my son did something, I want to know what."* R. D. Moore also stated that his son was upset at two drug dealers that had turned his girlfriend on to cocaine and that his son was going to take care of that. He also stated that he was missing two weapons, an AK-47 and a rifle. He further stated that *"his son was probably contemplating suicide and that he hoped he would commit suicide, because if he didn't his son would come back and kill us"* and stated that his son was a *"damn good shot"*.

At approximately 6:41 a.m. the Cameron County's Sheriff's Department contacted McAllen Sector's Communication Center and requested Air Operation's assistance in locating the suspect. LECA John Cantu contacted Harlingen Supervisory Border Patrol Agent Doug Spielman who dispatched some Harlingen Agents to assist in the search and in coordinating the Air Ops assistance. The Cameron County Sheriff's Department does not have the Border Patrol radio frequency.

Among the first Border Patrol Agents to arrive at the area were George Hupp, and his partner Edward Kelly and Daniel Diaz, Harlingen Canine Handler. Agents Susan Rodriguez and her partner Michael Riley were returning to the station at about 6:50 a.m. and decided to respond after hearing the radio traffic. Agent Rodriguez met with Agents Hupp and Kelly and were briefed by Cameron County Deputies on the information R.D. Moore had provided them. Agent Rodriguez, being the senior Agent, assigned Agent Hupp and Kelly to provide a perimeter at the

Case 1:98-cv-00162  Document 35  Filed in TXSD on 08/25/1999  Page 36 of 39


far-east side of Hudson Road. She and her partner Michael Riley then proceeded to walk to the residence where R. D. Moore was. The Sheriff's Deputies had obtained consent to search the Moore residence and as Agents Rodriguez and Riley attempted assist in the search, they were confronted by R. D. Moore who stated " Hold up Border Patrol. I don't want Border Patrol in my house, my son is not an illegal alien." At that point Agent Rodriguez and Riley began to walk back to their vehicle which was parked approximately 100 years east of the residence on Gamble Road. Susan then stopped to talk to a Deputy and was approached by Agents Orlando Sanchez and Ricardo Salinas. Agents Sanchez and Salinas had driven their vehicle to a point caddy-corner of the Moore residence. (see photo and sketch) They met with Agent Rodriguez and as all three of them converged at the left front corner of Sanchez' vehicle the shooting erupted. Agent Salinas received a fatal shot to the back of the skull and another shot entering the back of his left thigh. Agent's Salinas' body came to rest at the left front corner of the vehicle. Agent Rodriguez ran around the vehicle and was shot on the upper right thigh and left neck. Her body came to rest approximately three feet to the right of the rear right fender of the vehicle. (Neither Agent Salinas nor Agent Rodriguez drew their Service weapons from their holsters.) Agent Sanchez temporarily sought cover behind his vehicle and then ran east into a sorghum field to gain distance from the shooter. As he ran he was fired at numerous times. He finally located an area with limited concealment, and returned fire. He fired a total of nine rounds from his Service issued revolver. The shooting suspect, later identified as Ernest Lane Moore also fired at Agent Riley and several other Cameron County Sheriff's Deputies. He hit Cameron County Sheriff's Department Corporal Raul Rodriguez in the left arm area. That bullet traveled into his upper torso area, causing extensive damage. Corporal Rodriguez is expected to fully recover from his wound. Ernest Moore was shot eight times during this encounter by numerous officers at the scene. He died later that afternoon as a results of these wounds. The ballistic results are pending, however five slugs were recovered from his body (four 9 mm rounds and one 40 caliber round).

This investigation revealed that Ernest Moore, the 24 year old suspect, was upset over losing his girl friend. Julie Cox. He was described by his father as mentally unstable and taking PROZAC. Interview of witnesses reveals that Ernest Moore was at a friends house, drinking excessively and abusing cocaine and marijuana from about 6:00 p.m. July 6. 1998 to when they last saw him at about 2:00 a.m. July 7, 1998. (toxicology reports indicated he tested positive for cocaine and marijuana and had an alcohol level of .092.)

The weapon Ernest Moore use at this shooting was property of the Harlingen Police Department. It was a Frankfort Arsenal , model MX 177, 223 caliber, assault type rifle, serial # FA0698 . The weapon had been donated to the Police Department by Thomas Emmett Pirtle. The weapon was then issued to Detective R. D. Moore by Harlingen Police Chief Jim Scheopner.

Attached is a Table of Content and all reports required in the Shooting Incident Report as per Administrative Manual Section 20.012-INS Firearms Policy.

CutePDF - www.fastio.com

Case 1:98-cv-00162   Document 35   Filed in TXSD on 08/25/1999   Page 37 of 39

Jose E. Garza, Chief Patrol Agent
San Benito Shooting

July 27, 1998

Questions regarding this investigation can be directed to Field Operations Supervisor
Hector Gonzalez at 901 Rangerville Road Harlingen, Texas, Phone # 956 427-8611.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO GUILLERMO SALINAS | § | |
| AND ELISA HERNANDEZ HERRERA | § | |
| SALINAS | § | |
| | § | |
| V. | § | CIVIL  ACTION NO. B-98-162 |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| R.D. MOORE; | § | |
| AND | § | |
| JIM SCHOEPNER | § | |

### PLAINTIFF SALINAS' SUPPLEMENTAL RESPONSE
### TO DEFENDANTS' SECOND SUPPLEMENTAL BRIEF

TO THE HONORABLE JUDGE TAGLE, U.S. DISTRICT COURT:

Come now the Plaintiffs, pursuant to the Court's request, and file this SUPPLEMENTAL RESPONSE to Defendants' Second Supplemental Brief in Support of the Defendants' Motions to Dismiss under F.R.C.P. 12(b)(6) and Individual Defendants' Motion to Dismiss under F.R.C.P. 12(b)(6) based on qualified immunity. After discussing the Defendants' objections to the affidavit testimony offered by Plaintiffs, the Court at the hearing held on August 12, 1999, considered the arguments of counsel and requested briefing on three topics: whether Defendant Moore acted under color of law, was there a special relationship between the Defendants and the Plaintiffs, and what further distinctions could be made between the facts of the case at bar and those of the *Saenz* case.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO GUILLERMO SALINAS | § | |
| AND ELISA HERNANDEZ HERRERA | § | |
| SALINAS | § | |
| | § | |
| V. | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| R.D. MOORE; | § | |
| AND | § | |
| JIM SCHOEPNER | § | |

## PLAINTIFF SALINAS' SUPPLEMENTAL RESPONSE
## TO DEFENDANTS' SECOND SUPPLEMENTAL BRIEF

TO THE HONORABLE JUDGE TAGLE, U.S. DISTRICT COURT:

Come now the Plaintiffs, pursuant to the Court's request, and file this SUPPLEMENTAL RESPONSE to Defendants' Second Supplemental Brief in Support of the Defendants' Motions to Dismiss under F.R.C.P. 12(b)(6) and Individual Defendants' Motion to Dismiss under F.R.C.P. 12(b)(6) based on qualified immunity. After discussing the Defendants' objections to the affidavit testimony offered by Plaintiffs, the Court at the hearing held on August 12, 1999, considered the arguments of counsel and requested briefing on three topics: whether Defendant Moore acted under color of law, was there a special relationship between the Defendants and the Plaintiffs, and what further distinctions could be made between the facts of the case at bar and those of the *Saenz* case.