## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

**MAR 2 0** 2000

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ARTURO GUILLERMO SALINAS | § | |
| AND ELISA HERNANDEZ HERRERA | § | |
| SALINAS | § | |
| | § | |
| V. | § | CIVIL  ACTION NO. B-98-162 |
| | § | |
| | § | **JURY DEMANDED** |
| CITY OF HARLINGEN, TEXAS | § | |
| AND | § | |
| R.D. MOORE AND | § | |
| JIM SHEOPNER | § | |

# PLAINTIFFS' REPLY TO
# DEFENDANTS' ASSERTION OF QUALIFIED IMMUNITY

Respectfully submitted

BROADUS A. SPIVEY
SPIVEY & AINSWORTH, P.C.
48 East Avenue
Austin, TX  78701
512+474-6061
fax: 512+474-1605

Richard Pena
Michael Greenberg
Law Offices of Richard Pena, P.C.
Barton Oaks Plaza Two
901 MoPac, Suite 325
Austin, Texas 7746-5747

**ATTORNEYS FOR PLAINTIFFS**

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS..............................................................ii

INDEX OF AUTHORITIES.......................................................iv

PLAINTIFF' REPLY TO
DEFENDANTS' ASSERTION OF QUALIFIED IMMUNITY...............................1

I.   Standard for Ruling on Motion under Fed. R. Civ. P. 12(b)(6) .........................1

II.  Statement of Facts ..................................................................2

III. Burden of Proof    ..................................................................5

IV.  Possession of the AR-15 by Police Chief Schoepner and Detective Moore
     was Illegal and Outside the Scope of Their Discretionary Authority.............6

V.   Permitting Ernest Moore to Have Access to the AR-15 was Illegal and
     Outside the Scope of the Discretionary Authority of Police Chief
     Schoepner and Detective Moore .........................................7

VI.  Allowing Earnest Moore to Escape, Police Chief Schoepner And
     Detective Moore Knowingly Violated Their Law Enforcement Officer's
     Duty, and They did not have the Discretionary Authority to do so...............7

VII. The Facts Alleged Above are Sufficient to Support
     Plaintiffs' 1983 Cause of Action .........................................11

     A.   Defendants Create the Dangerous Situation....................................13

     B.   Defendants Know the Situation Is Dangerous....................................13

     C.   The Dangerous Situation Created An Opportunity, for
          Ernest Moore to Commit  a Crime, which would not
          Otherwise Have Existed, .........................................13

     D.   Chief Schoepner and Detective Moore Affirmatively Placed
          the U. S. Border Patrol Officers in a Position of Danger in
          Such a Way as to Strip Officers of their Ability to Self Defend .................14

CIitPDF - www.fasiio.com

VIII. Further Distinguishing *Saenz v. Heldenfels Brothers, Inc.,*
183 F3d 389 (5th Cir. 1999)………………………………………………………    15

IX.   Evidentiary Matter-- HPD Lt. Jose Rubio's Affidavit………………………………    19

X.    Request for Limited Discovery …………………………………………………    20

PRAYER………………………………………………………………………………    20

iii

CutePDF - www.fxsia.com

# INDEX OF AUTHORITIES

<u>Cite</u>                                                                                                   <u>Page</u>

*Baker v. Putnql,*
    75 F.3d 190, 196 (5th Cir. 1996)………………………………………..                    1

*Barker v. Norman,*
    651 F.2d 1107, 1120 (5th Cir. 1981)………………………………….                         6

*Blackwell v. Harris County,*
    909 S.W.2d 135, 139 (Tex.App. – Houston [14th Dist.] 1995, writ denied)……     8

*Blair v. National Construction Company of the South, Inc.,*
    611 F.2d 80, 82 (5th Cir. 1980)………………………………………..                     2

*Byrd v. Bates,*
    220 F.2d 480, 482 (5th Cir. 1955)………………………………….                          2

*Celotex Corp v. Catrett,*
    477 U.S. 317, 106 S.Ct. 2548 (1986)………………………………..                      19

*City of Dallas v. Half Price Books, Records, Magazines, Inc.,*
    883 S.W.2d 374, 377 (Tex.App. – Dallas 1994, no writ)……………………    8, 9

*Conley v. Gibson,*
    355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957)………………………………      2

*Doe v. Hillsboro Independent School District,*
    113 F.3d 1412 (5th Cir. 1997)………………………………………       12

*DeShaney v. Winnebago County Department of Social Services,*
    489 U.S. 189, 109 S.Ct. 998 (1989)………………………………….                       18

*Gaudreault v. Municipality of Salem,*
    923 F.2d 203, 207 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991)…………     9

*Hitt v. City of Pasadena,*
    561 F.2d 606, 608 (5th Cir. 1977)…………………………………….                        2

*Johnson v. Dallas Independent School District,*
    38 F.3d 198 (5th Cir. 1994)………………………………………       12

iv

*Laughlin v. Olszewski,*
    102 F.3d 190, 192 n.1 (5th Cir.1996)............................................................ 8

*Leffall v. Dallas Independent School District,*
    28 F.3d 521 (5th Cir. 1994)............................................................ 12

*Meadowbriar Home For Children, Inc. v. G.B. Gunn,*
    81 F.3d 521, 529 (5th Cir. 1996)............................................................ 1

*Moore v. State,*
    562 S.W.2d 484 (Tex.Crim.App.1978)............................................ 8

*Piotrowski v. City of Houston,*
    51 F.3d 512 (5th Cir. 1995)............................................................ 12

*Randolph v. Cervantes,*
    130 F.3d 727 (5th Cir. 1997)............................................................ 12

*Saenz v. Heldenfels Brothers, Inc.,*
    183 F.3d 389 (5th Cir. 1998)............................................................ 12, 15

*Salas v.Carpenter,*
    980 F.2d 299 (5th Cir. 1992)............................................................ 5, 12, 14

*Schuster v. City of New York,*
    5 N.Y. 2d 75, 154 N.E. 2d 534, 180 N.Y.2d 265 (1958)......................... 14, 18

*Stengel v. Belcher,*
    522 F.2d 438 (6th Cir. 1975)............................................................ 8

*Villegas v. Griffin Indus.,*
    975 S.W.2d 745 (Tex.App. – Corpus Christi 1998, writ denied)................. 8

*Wallace v, Moberly,*
    947 S.W.2d 273 (Tex.App. – Fort Worth 1997, no writ)......................... 8

United States Statutes
    42 U.S.C. § 1983............................................................ 12, 14

Federal Rules of Civil Procedure
    Rule 12(b)(6)............................................................ 1

3163P.022A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO GUILLERMO SALINAS | § | |
| AND ELISA HERNANDEZ HERRERA | § | |
| SALINAS | § | |
| | § | |
| V. | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| | § | JURY DEMANDED |
| CITY OF HARLINGEN, TEXAS | § | |
| AND | § | |
| R.D. MOORE AND | § | |
| JIM SHEOPNER | § | |

# PLAINTIFFS' REPLY TO
# DEFENDANTS' ASSERTION OF QUALIFIED IMMUNITY

TO THE HONORABLE JUDGE TAGLE, U.S. DISTRICT COURT:

Pursuant to the Court's Order of March 2, 2000 to respond to Defendants' assertion of qualified immunity in their motion to dismiss [Docket No. 8], Plaintiffs Arturo Guillermo Salinas and Elisa Hernandez Herrera Salinas respectfully file this reply as follows:

## I.
### Standard for Ruling on Motion under Fed. R. Civ. P. 12(b)(6)

In considering a motion to dismiss under Fed. R.Civ. P. 12(b)(6), the court must accept the allegations as true and must view them in the light most favorable to the plaintiff, drawing all reasonable inferences in favor of the pleader. *Baker v. Putnql*, 75 F.3d 190, 196 (5th Cir. 1996). Dismissal under Rule 12(b)(6) is correct when it appears that no relief could be granted under any set of facts that could be proven consistent with the allegations. *Meadowbriar Home For Children, Inc. v. G.B. Gunn*, 81 F.3d 521, 529 (5th Cir. 1996). A court may not grant a motion to dismiss "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of

his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957). In other words, even if the complaint fails to state a claim, a court ordinarily should not dismiss the complaint until plaintiff has every opportunity to state a claim. *Blair v. National Construction Company of the South, Inc.*, 611 F.2d 80, 82 (5th Cir. 1980); *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977); *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955).

## II.
## Statement of Facts

Defendant City of Harlingen, Texas, directs and supervises the City of Harlingen Police Department. Defendant Jim Schoepner was employed by the City of Harlingen Police Department for twenty-six years, and, at all times relevant, served as its Chief of Police, more specifically from 1993 to 1999. Defendant R. D. Moore is employed by the City of Harlingen Police Department and is, and at all times relevant was, employed as a Detective. Police Chief Schoepner and Detective R.D. Moore worked together for over twenty years and were close personal friends.

On July 7, 1998, U.S. Border Patrol Agent Ricardo (Rick) Salinas was ambushed and killed by Ernest Moore, Detective R. D. Moore's son with an AR-15 semi-automatic assault rifle, which is identified as a Frankfort Arsenal, model MX 177, 223 caliber, assault-type rifle, serial #FA0698, and had been owned and registered to Dr. Emmett Pirtle. Ernest Moore acquired and became proficient in the use of the AR-15 semi-automatic assault rifle he used to kill Agent Ricardo Salinas, through the illegal and negligent acts and practices of the Harlingen Police Department and its higher-ranking employees, including Jim Scheopner, and R. D. Moore.

During Jim Schoepner's tenure as Harlingen Police Department's Chief of Police, he abused of his authority and position, by fashioning a broad range of policies and practices inconsistent with, in violation of, and with disregard for state and federal laws, and Harlingen

CibiPDF - www.fenito.com

Police Department Directives.  He allowed other favored high-ranking officers to circumvent, skirt, and outright violate laws. Through this display of favoritism and disregard, he created a system which ultimately lead to a federally regulated semi-automatic assault rifle to come into the hands of persons who could not legally possess such a firearm.

On numerous occasions, City of Harlingen's officers were made aware of Harlingen Police Departments' violations of policies and practices inconsistent with state and federal law and Police Department Directives, yet they refused to thoroughly investigate and act in an appropriate manor to would bring the department into compliance.

The City of Harlingen Police Department took possession of the AR-15 as temporary trustee on June 23, 1995, when a local citizen, Mrs. Sylvia Pirtle, submitted the assault rifle, along with a 9mm. semi-automatic pistol, to the Harlingen Police Department for the sole purpose of having it destroyed.  Detective R. D. Moore, acting for the Harlingen Police Department, took custody of the weapons from Mrs. Pirtle and assured her he would take care of it.  He didn't.  Instead of assuring the destruction of the AR-15, He kept it, at first in his office, and later in his son Ernest Moore's bedroom.  The assault rifle was illegally possessed by the Defendants.

Ernest Moore had been treated for mental illness with Prozac and was a drug user until his death on July 7, 1998.  His bedroom was decorated with Nazi and Hitler posters, a full military uniform of Nazi Germany, and contained many other Nazi and Neo-Nazi material.

On July 7, 1998, at approximately 4:30 A.M., Ernest Moore, son of Defendant Detective R. D. Moore, shot and killed Delia Moran and her daughter Maria, and wounded her son Dan with another illegally possessed rifle, an AK-47 at 311 Catherine Street in Rio Hondo, Texas. After that rifle was wrestled away from him by others in the house, Ernest fled the house in his

white pickup truck. The witnesses in the house, including Ernest's ex-girlfriend, called 911 to report the shooting and positively identified Ernest Moore as the assassain.

At approximately 5:20 A.M., the Cameron County Sheriff's Department responded to the shooting. The suspect was identified as Ernest Moore and a description of the vehicle and license plate numbers were obtained and put on a "Look Out" to all law enforcement agencies in the area. See Memorandum of Hector Gonzalez, Supervisory Border Patrol Agent to Jose E. Garza, Chief Patrol Agent, McAllen, Texas, dated 27, 1998 (hereinafter referred to as Gonzalez's Memo), a copy of which is attached hereto as Appendix "A" and incorporated herein as part of this reply.

At approximately 5:31 a.m., Cameron Country Deputy Robert Rodriguez pursued Ernest Moore's white pickup truck heading south on FM 345 at high speed. Deputy Rodriguez lost Ernest Moore in the vicinity of the Hudson and Gamble Road intersection. See Gonzalez's Memo [Exhibit "A"]

Ernest fled home, parked in the driveway and entered the Moore house. Ernest told his father that he was, "in deep shit." See E-Mail entitled, "Calibre Press Street Suvival Newsline No. 288, a copy of which is attached to as Appendix "B" and incorporated herein as part of this reply. Ernest took the AR-15 assault rifle and left the house with the AR-15.

As County Deputies and U. S. Border Patrol Agents arrived at Detective Moore's house, Detective Moore met them outside and refused to permit the County Deputies to search his house for Ernest. After talking to Police Chief Schoepner via telephone, he let the County deputies in but refused entrance to U. S. Border Patrol agents, saying that his son was not an illegal alien and they had no business with him. Detective Moore never gave the officers even a general warning

regarding the whereabouts of his son, or notified the officers that he was armed with the AR-15 assault rifle.

While officers were standing in the front of the Moore house discussing the situation, Ernest Moore walked out from the cornfield opposite the road in front of the Moore house and fired the AR-15 at the U. S. Border Patrol Agents.  His first shots struck Agent Ricardo (Rick) Salinas in the rear of the skull.  The next shots struck Agent Susan Lynn Rodriguez.  The law enforcement officers started to shoot back at Ernest and an exchange of shots ensued.  A Cameron County Deputy was wounded.  Shortly after, Ernest was shot and ceased firing.

Neither Detective Moore nor Chief Scheopner was ever disciplined.   Scheopner eventually resigned at Lieutenant's pay.

A private consultant, Arnold Rodriguez, had previously been employed by the City of Harlingen to evaluate city policies and procedures.  A draft report, pre-dating the shootings, noted that there were no chain of custody procedures in the police evidence room and the Standard Operating Procedures were entirely insufficient.  That report was given to the Assistant City Manager in the presence of Chief Scheopner.  The Assistant City Manager said he was not concerned as it was a police matter, and the Chief responded, "that was the way things had been and the ways things were going to stay."  A copy of that draft report is attached as Appendix "F."

### III.
### Burden of Proof

In the Fifth Circuit, the qualified immunity defense involves a shifting burden of proof. Before the burden shifts to the plaintiff to rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law, the defendant official must initially plead his good faith and **establish that he was acting within the scope of his discretionary authority**.  *Salas v.Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992).  In other words, qualified

CVAPDF - www.tenina.com

immunity from section 1983 liability is an affirmative defense in the sense that it must be pleaded by the defendant. The burden is on the defendant, not just to plead, but also to establish his entitlement to claim official immunity in the first instance. *Barker v. Norman*, 651 F.2d 1107, 1120 (5th Cir. 1981).

## IV.
### Possession of the AR-15 by Police Chief Schoepner and Detective Moore was Illegal and Outside the Scope of Their Discretionary Authority

The AR-15 semi-automatic assault rifle used by Ernest to kill Ricardo Gullermo Salinas and Susan Lynn Rodriguez, U. S. Border Patrol officers had been owned by and registered to Dr. Emmett Pirtle. On June 23, 1995, Dr. Pirtle's wife, Mrs. Sylvia Pirtle took the rifle to the Harlingen Police Department, for only one--purpose: **to destroy it** --because there had been a rash of burglaries in her neighborhood and she wanted to prevent the weapon from getting into the wrong hands. Mrs. Pirtle gave the AR-15 to Detective Moore and informed him that she wanted the weapon destroyed.

Instead of following Mrs. Pirtle's request, Detective Moore took the AR-15 home for himself. It was illegal for Harlingen Police Department or Detective Moore to posess the rifle. There has been no documentation produced indicating that the rifle changed ownership from Dr. Pirtle to the Harlingen Police Department through any proper legal procedure.

After this tragic event, Police Chief Schoepner lied to the news media and claimed that the rifle had been assigned to Detective Moore, "...because he was a member of the SWAT team." It was blatantly dishonest for Police Chief Schoepner to make that statement. He, better than anyone, knew the Harlingen Police Department did not have a SWAT team. Further the rifle is not the type of rifle used by members of a SWAT team. Detective Moore was not certified to use the AR-15, a civilian version of the M-16 military rifle. Additionally the police

department provided no ammunition for this rifle. The Harlingen Police Department had no legitimate reason whatsoever to keep the rifle and should have destroyed it immediately after it was turned in. See Harlingen Police Association's Letter to the citizens of this community, a copy of which is attached hereto as Appendix "C" and incorporated herein as part of this reply.

It is apparent that the lie was an attempt to cover up the illegal possession of the rifle because the illegal possession of the rifle was a serious violation of Harlingen Police Department's Directives.

## V.
### Permitting Ernest Moore to have Access to the AR-15 was Illegal and Outside the Scope of the Discretionary Authority of Police Chief Schoepner and Detective Moore

The rifle was supposedly assigned to Detective Moore as a member of the non-existing Police Department's SWAT team. The rifle, under any circumstances, would have been for official use only. However, the evidence shows that Detective Moore made the rifle easily accessible to Ernest Moore by placing the rifle in the personal gun shelf in his son, Ernest's, bedroom. Detective Moore permitted his son, Ernest Moore, to use the rifle for target practice. Ernest Moore became a good shot with this rifle. See Harlingen Police Association's Letter to the citizens of this community [Appendix "C"].

## VI.
### Allowing Earnest Moore to Escape, Police Chief Schoepner and Detective Moore Knowingly Violated Their Law Enforcement Officer's Duty, and They did not Have the Discretionary Authority to do so

The tragic events that led to this lawsuit started with the double homicide at Rio Hondo. At approximately 4:30 a.m. on July 7, 1998, Ernest Moore shot and killed Delia Morin and her daughter, Maria, and wounded her son, Dan, with an AK-47. After others in the house wrestled the rifle away from him, Ernest fled the house in his white pickup truck. The witnesses in the

house, including Ernest's ex-girlfriend, called 911 to report the shooting and gave a positive identification of Ernest as the shooter.

Ernest fled to his parents' home, parked in the driveway, and entered the Moore house. He told his father, Detective Moore that he was, "in deep shit." He took the AR-15 assault rifle with him and left the house. Detective Moore did not even try to stop him.

An off-duty peace officer who observes a crime in progress immediately becomes an on-duty officer. *Laughlin v. Olszewski*, 102 F.3d 190, 192 n.1 (5th Cir.1996); *Villegas v. Griffin Indus.*, 975 S.W.2d 745, 754 (Tex.App. – Corpus Christi 1998, writ denied); *Wallace v, Moberly*, 947 S.W.2d 273, 277 (Tex.App. – Fort Worth 1997, no writ); *City of Dallas v. Half Price Books, Records, Magazines, Inc.*, 883 S.W.2d 374, 377 (Tex.App. – Dallas 1994, no writ). A police officer is not relieved of his duty to prevent crime when he witnesses an illegal act simply because he is off-duty. *See Blackwell v. Harris County*, 909 S.W.2d 135, 139 (Tex.App. – Houston [14th Dist.] 1995, writ denied) (*citing Moore v. State*, 562 S.W.2d 484, 486 (Tex.Crim.App.1978)).

It is the nature of the act performed, not the clothing of the actor or even the status of being on-duty or off-duty, which determines whether an officer has acted under color of law for purposes of civil rights statutes. *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975). In *Stengel*, Belcher, an off-duty officer, involved himself in an altercation in a bar. As a result he killed two people and paralyzed a third with a handgun assigned to him. Belcher contended that his actions were taken as a private citizen because he was engaged in private social activity, was out of uniform, off-duty, and never identified himself as a police officer at any time. However, the court held that while shooting the three men, Belcher was acting under the color of law because the police regulations required him to carry a gun at all times, and further, the police

chief testified that the office regulations required an officer to take action in any type of police or criminal activity 24 hours a day. *Belcher*, 522 F.2d at 441. An off-duty police officer who performs an actual or apparent duty of his office is acting under the color of law. In *Half Price Books,* 883 S.W.2d at 377, the court held that an off-duty police officer who observes a crime immediately becomes an on-duty police officer. An officer who is present at the scene of an arrest and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under civil right statutes. *Gaudreault v. Municipality of Salem,* 923 F.2d 203, 207 (1st Cir. 1990), *cert. denied,* 500 U.S. 956.

In the present case, officers are required to swear to enforce federal and state laws, and local ordinances under Subsection 6.08.002 of the Departmental Directives of the Harlingen Police Department, (hereinafter referred to as "Directives") [1], a copy of which is attached hereto as Exhibit "B" and incorporated herein as part of this reply. The police officers have the following duties:

(1) to "protect and serve" the community by complying with their lawful duty to preserve the peace, protect life and property, and to deter and prevent crime while detecting and apprehending criminals (Subsection 6.07);

(2) to take action and report upon all violations coming to their attention, as well as all information they receive about any actual or suspected violation of the law (Subsection 6.07.001);

(3) to make arrests when necessary to enforce laws and to protect the public (Subsection 6.08); and

(4) to make appropriate arrests when witnessing or receiving information of violations of the law (Subsection 6.08.001).

The Directives instruct off-duty officers:

(1) to carry their badges and police identification with them (Subsection 4.05.001);

(2) to take proper police actions in matters coming to their attention (Subsection4.01.005); and

---

[1] The subsections of the directives quoted herein are attached hereto as Exhibit "B" and incorporated herein for all purposes.

(3)     to report to the Police Department information of a law violation they received when practical. If the situation requires immediate action, the officers take the proper action and make written reports (Subsection 4.05).

Therefore, under the Directives, Detective Moore is required to take police action to stop or investigate criminal activity 24 hours a day regardless of whether he is on-duty or off-duty.

In the present case, Detective Moore knew that Ernest Moore had committed some crime long before Cameron County Deputy Robert Rodriguez knew based on Detective Moore's statements quoted in Gonzalez's Memo [Appendix "A"] as follows:

> After returning to the area where he last saw the suspect vehicle, Deput Rodriguez found the suspect vehicle parked at a residence on the corner of Gamble and Resaca Road. As he approached the residence, he observed a person, later identified as R. D. Moore, a Harlingen, Texas Police Officer, step out of the garage and state to Deputy Rodriguez "*I know my son did something, I want to know what.*" R. D. Moore also stated that his son was upset at two drug dealers that had turned his girlfriend on to cocaine and that his son was going to take care of that. He also stated that he was missing two weapons, an AK-47 and a rifle. He further stated that "*his son was probably contemplating suicide and that he hoped he would commit suicide, because if he didn't his son would come back and kill us*" and stated that his son was a "*damn good shot.*"

According to the E-Mail [Exhibit "B"] sent out by Sgt. Foist, who talked to Detective Moore prior to the shooting, Detective Moore's statement confirmed that he had prior knowledge of his son's involvement in the shooting at Rio Hondo and access to the AK-15. Under the Directives mentioned, Detective Moore should have taken action to investigate what his son had done. Detective Moore should have, at the very least, detained his son for questioning. Specifically, he knew his son's extremely dangerous propensity. Instead, Detective Moore chose not only allowed his son to flee from his house, but he actually assisted his son in escaping arrest by the Cameron County authorities. In his affidavit, Lt. Jose Rubio of Harlingen Police Department stated:

> On Tuesday, July 7, 1998, I was on day shift and I was scheduled to instruct a class on Mental Health Education for Police Officers. My two shift supervisors

were also scheduled to attend this class and Sergeant Miguel Garcia was to cover my shift for the day. As I was preparing to leave for the Harlingen Police Department, I received a phone call from Officer Matthew Manning around 7:15 a.m. informing me that RD Moore's son, Ernest, had just shot two Border Patrol officers and a sheriff's deputy. **He further informed me that Sgt. Foist and Sgt. Garcia had been called out to RD Moore's house in San Benito. . . . I was informed the reasons behind both Sergeant Foist and Sergeant Garcia being there at the scene were a request by the Cameron County Sheriff's Department. Apparently, RD Moore had denied permission to the Sheriff deputies to search the house for Ernest Moore and had been rude to them. . .**

(Emphasis added). A copy of Lt. Rubio's Affidavit is attached hereto as Appendix "E" and incorporated herein as part of this reply.

Moreover, when Detective Moore discovered that the AR-15 rifle was missing from the gun safe, he had the duty to pursue his son, to arrest him, and he should have informed all the law enforcement officers, including the deputies and Salinas and Rodriguez, that his son was in possession of a deadly, assault rifle. Detective Moore did not pursue either of these actions. Detective Moore's failure to take proper police action against his son and his concealment of information from other officers at the scene were in direct violation of these Directives.

Before the shooting, Police Chief Schoepner had a telephone conversation with Detective Moore and other Harlingen police officers. Police Chief Schoepner must have had knowledge that Ernest Moore escaped with the AR-15. See Sgt. Foist's E-Mail [Exhibit "B"] He should have ensured the information regarding Ernest Moore and the extremely dangerous AR-15 was known to all law enforcement involved. There is no evidence to show that this ever occurred.

## VII.
### The Facts Alleged Above are Sufficient to Support Plaintiffs' 1983 Cause of Action

In the present case, Plaintiffs seek the recovery of their damages resulting from their child's death under "state-created danger" theory.

Although the Fifth Circuit Court has not formally recognized "state-created danger"

claims, the Court has dealt with such claims in the following cases: *Leffall v. Dallas Independent School District*, 28 F.3d 521 (5th Cir. 1994), *Johnson v. Dallas Independent School District*, 38 F.3d 198 (5th Cir. 1994), *Piotrowski v. City of Houston*, 51 F.3d 512 (5th Cir. 1995), *Doe v. Hillsboro Independent School District*, 113 F.3d 1412 (5th Cir. 1997), *Randolph v. Cervantes*, 130 F.3d 727 (5th Cir. 1997), and *Saenz v. Heldenfels Brothers, Inc.*, 183 F.3d 389 (5th Cir. 1998). In these cases except *Piotrowski*, the Court found that the defendants lacked the requisite culpability for a constitutional violation (applciating the theory of "state-created danger"). In *Piotrowski,* the Court did not reach the question whether plaintiff's allegations satisfy the Rule 12(b)(6) threshold for alleging a "state-created danger". *Piotrowski*, 51F.3d at 516, FN9. The fact that the Court did not outright reject the "state-created danger" implies that the Fifth Circuit Court would adopt the theory if there is a case meeting the elements described by the Court as following:

1. The government officials must create the dangerous situation;

2. They must know the situation is dangerous;

3. The danger must create an opportunity for a third party to commit a crime which would not otherwise exist; and

4. They must affirmatively place the plaintiff in a position of danger in such a way as to strip the plaintiff of his ability for self defense.

*Randolph*, 130 F.3d at 731; *Johnson*, 38 F.3d at 201.

In the present case, the tragic event made the basis of this lawsuit was a result of repetitive abuse of police power by Defendants Chief Schoepner and Detective Moore. Had there not been abuses of police power by the Defendants, the tragic event would not have occurred. Conduct of a state actor, more culpable than negligence, may constitute denial of due process sufficient to support an action under 42 U.S.C. § 1983. *Salas*, 980 F.2d at 307.

Defendants' abuse of police power not only knowingly created a dangerous environment to Plaintiffs' son, but was also a deliberate neglect of the Plaintiffs' decedent's safety.

All the elements of "state-created danger" are present here.

## A. Defendants Create the Dangerous Situation

Through the abuse of police power set forth above, Defendants created a dangerous situation for the U. S. Border Patrol Agents.

## B. Defendants Know the Situation is Dangerous

There is no doubt that Chief Schoepner and Detective Moore knew of the volatile and hazardous nature of the situation. First, that Ernest Moore had possession of the AR-15 semi-automatic rifle with ample ammunition. Secondly, that Ernest Moore's mental status was not stable. Thirdly, that Ernest Moore was an experienced marksman. According to Gonzalez's Memo [Appendix "A"], Detective Moore knew his son was on the verge of committing suicide, or killing someone. Before the shooting, Police Chief Schoepner had a telephone conversation with Detective Moore. Detective Moore was known to be one of Police Chief Schoepner's "cronies." Detective Moore would obviously had related to Police Chief Schoepner the same thing he told Deputy Sheriff Rodriguez --that, *"his son was probably contemplating suicide and that he hoped he would commit suicide, because if he didn't his son would come back and kill us."* See Gonzalez's Memo [Exhibit "A"].

## C. The Dangerous Situation Created the Opportunity for Ernest Moore to Commit a Crime which Would not Otherwise Have Existed

By not informing these U. S. Border Patrol Officers that Ernest Moore had the AR-15 semi-automatic rifle; that he was near the house; and by failing to advise these officers that they were "taking cover", Chief Schoepner and Detective Moore gave Ernest Moore the opportunity to ambush the U. S. Border Patrol Agents.

**D.  Chief Schoepner and Detective Moore Affirmatively Placed the U. S. Border Patrol Officers in a Position of Danger in Such a Way as to Strip Officers of Their Ability to Self Defend**

By not informing the U. S. Border Patrol Officers that Ernest Moore had the AR-15 semi-automatic rifle; that he was near the house; and by failing to advise these officers that they had "taken cover", Chief Schoepner and Detective Moore left the Border Patrol Agents completely vulnerable to Ernest Moore's open fire.

Conduct of a state official, more culpable than negligence, may constitute denial of due process sufficient to support an action under 42 U.S.C. § 1983. *Salas*, 980 F.2d at 307. The conduct of the individual defendants, Detective R.D. Moore and Police Chief Jim Sheopner, according to the amendment, is more culpable than negligence.

In *Schuster v. City of New York*, 5 N.Y. 2d 75, 154 N.E. 2d 534, 180 N.Y.2d 265 (1958) the Plaintiff was killed while attempting to assist the police department in the apprehension of a suspected murderer. The Court recognized that a police officer owes a special duty to use reasonable care for the protection of persons who have collaborated with the police department in the arrest or prosecution of criminals. As the Plaintiffs have alleged in their amended complaint, the facts in the case at bar are closely analogous to *Schuster*.

In the instant case, the Border Patrol Agents were a part of a coordinated, integrated law enforcement effort that involved city, county, and federal agencies. Exhibit "A" attached hereto is a Memorandum to Jose E. Garza, Chief Patrol Agent from Hector Gonzales, Supervisory Border Patrol Agent. As the memo indicates: "at approximately 6:41 a.m. the Cameron County Sheriff's Department contacted McAllen Sector's Communication Center and requested Air

Operation's assistance in locating the suspect. LECA John Cantu contacted Harlingen Supervisory Border Patrol Agent Doug Spielman who dispatched some Harlingen Agents to assist in the search and in coordinating the Air Ops assistance." Based on this request, Border Patrol Agents went to Detective Moore's house to assist in the search. The Agents were confronted by Harlingen Police Dectective Moore who stated "Hold up Border Patrol. I don't want Border Patrol in my house, my son is not an illegal alien." Id.

The coordinated, integrated nature of the multi-force effort to apprehend the suspect made it unquestionably foreseeable that Border Patrol agents like Rodriguez and Salinas would be present at the Moore home. The involvement of the Border Patrol Agents in this law enforcement effort establishes a special relationship between the agents and state actors such that the agents were entitled to have been shielded from harm. Instead, the state actor Detective Moore took deliberate steps to withhold information from the agents that would have assisted in their protection, and he knowingly and deliberately sent the agents into harm's way. Clearly such actions, when made under color of law, abrogate the standards established in the *Schuster* decision.

### VIII.
### Further Distinguishing *Saenz v. Heldenfels Brothers, Inc.*, 183 F3d 389 (5th Cir. 1999).

By comparing the latest case discussing the "state-created danger" theory to the present case, the applicability of the doctrine to current facts will be ever clearer.

In *Saenz*, the Fifth Circuit held that the state-created danger line of cases were "factually inapplicable" to the evidence in *Saenz*. The Court held that a state actor does not "offend due process by permitting an intoxicated driver to remain on the highway, thereby increasing the risk of harm to unidentified and unidentifiable members of the public." Id. Conversely, in the instant

case, it was foreseeable to the state actors that the perpetrator would act to injure identifiable persons.

First, it was foreseeable that a dangerous situation would present itself. Detective Moore had specific knowledge about his son that made it probable and highly likely that there was imminent and unreasonable danger to decedents Salinas and Rodriguez:

(1) Detective Moore knew that his son was psychologically unstable, was the recipient of prescription psychological drugs, and a cocaine user;

(2) Detective Moore knew that his son's bedroom was filled with Nazi paraphernalia;

(3) Detective Moore knew that his son had taken the "illegal" AR-15 from the rifle safe before Decedents Salinas and Rodriguez were called for assistance;

(4) Detective Moore knew that, given his son's extreme racist beliefs, that Decedents Salinas and Rodriguez – both minority law enforcement officers who were called to assist in the arrest of Ernest Moore would be prime targets; and

(5) Detective Moore failed to abide by the Directives of the Harlingen Police Department to protect the lives and property of decedents Salinas and Rodriguez.

Second, the dangerous situation was the direct result of the state actors placing a dangerous instrumentality into the perpetrator's hands. This case involves a military assault weapon which was turned over to the state actors for destruction because of the unusually dangerous nature of the weapon. This weapon had an unusual capacity to fire numerous rounds in rapid succession at great distances with extreme accuracy. Unlike the standard issue police revolver or rifle, the AR-15 assault rifle presented a significant risk of danger for many individuals within a wide range of the user of the weapon. Also, unlike the typical officer revolver, this weapon was brought to the police department to be destroyed. The unique

circumstances by which this specific weapon found its way into the hands of this particular perpetrator distinguishes this case from other instances involving shootings with "police weapons". Most importantly, the unique circumstances of this case, as it involves an extremely dangerous instrumentality within the control of the state, actors distinguishes this case from *Saenz*. One must assume that the Fifth Circuit would have been less reticent to apply the state-created danger line of cases to the *Saenz*' facts if the perpetrator in *Saenz* had been driving a state-owned vehicle.

Third, the victims in the case at bar were identifiable before the event occurred. As discussed above, the state actors had reason to know before the shooting that Border Patrol Agents would be assisting in the coordinated effort to apprehend the suspect. In addition, Ernest Moore was already known by his father, Detective Moore, and the Harlingen Police Department to be psychologically unstable, the recipient of prescription psychological drugs, and a cocaine user.[2] It was also known that Ernest Moore's bedroom was filled with Neo-Nazi paraphernalia.

In his affidavit, Lt. Rubio testified:

> On [Monday, July 13, 1999], for the first time, I hear about the Neo-Nazi paraphernalia found inside the bedroom of Ernest Moore. This shocks me initially because I can't believe that a police officer would allow his son to have the Neo-Nazi paraphernalia. Part of our law enforcement training under mandatory T.C.L.E.O.S.E. regulations covers culture diversity which addresses hate crimes and racist groups. The State of Texas governing body has made a tremendous effort to attempt to address the issues of hate crimes and racial prejudice to law enforcement officers by having a mandatory culture diversity class every two years. It would be against departmental policy for Officer Moore to condone the behavior of his son by allowing Ernest Moore to be involved in Neo-Nazi activities.

Detective Moore had to know that his son had "Neo-Nazi mentality" and hatred of minorities since Ernest Moore lived with his father. Detective Moore knew that the Neo-Nazi paraphernalia was in his son's room. Thus, Detective Moore should have known that minority

---

[2] Plaintiffs' First Amended Complaint, ¶22.

law enforcement officers would be his son's first targets on the day of the incident in question since only law enforcement officers would, as a matter of fact, be present around the perimeter of his house to search for his son.

In light of Chief Jim Schoepner's close friendship with Detective Moore and the telephone conversation he had with Detective Moore at the critical moment before the tragic incident in question, Chief Schoepner also, in all reasonable probability, had to know that minority law enforcement officers would be Ernest Moore's first targets

After responding to the call and going to the scene, U.S Border Patrol Agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas were entrapped, and it was too late for them to back out because they were already under Ernest Moore's murderous eye. This situation was created by the failure of Detective Moore and Chief Schoepner to fulfill their police duties under Subsection 6.07 of the Directives, which provides that:

> Officers "protect and serve" the community by complying with their lawful duty to preserve the peace, protect life and property, and to deter and prevent crime while detecting and apprehending criminals.

Had the Defendants fulfilled their duty under the Directive quoted above by warning Salinas and Rodriguez about the imminently dangerous situation and having them seek cover, Officers Rodriguez and Salinas would not have been killed by Ernest Moore. Therefore, Detective Moore and Chief Schoepner were responsible for the deaths of Officers Rodriguez and Salinas under civil right statutes. *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 202, 109 S.Ct. 998, 1005 (1989); *Schuster*, 5 N.Y.2d at 81, 154 N.E.2d at 537. This court can, and should, take judicial notice of the Nazi and Neo-Nazi mentality, the corresponding attitude of intensely despising minorities, and the predisposition of such "hate groups" to use violence to injure and kill minorities.

## IX.
## Evidentiary Matter-- HPD Lt. Jose Rubio Affidavit

At the hearing held on August 12th, the Defendants objected to the affidavit of HPD Lt.

Jose Rubio, Jr. urging that the Court not consider affidavits or testimony outside of the pleadings.

It became apparent, at the hearing, that some discussion of evidence is necessary for a complete

understanding of the allegations made in the Plaintiffs' amended complaint. Defendants'

objection is not effectual since the issues involving a special relationship and state-created

danger necessarily turn on the facts and circumstantial evidence. Per the Defendants' insistence

there has not been discovery in this case, thus Plaintiffs should be entitled to proffer the sworn

testimony of an officer within the Harlingen Police Department. As a senior ranking officer,

Lieutenant Rubio's testimony is relevant and germane as it relates to common and proper

procedure within the department. The evidence is also in a form allowed to be presented in a

summary judgment procedure, thus is relevant and permissable in a 12(b)(6) hearing. In *Celotex*

*Corp v. Catrett,* 477 U.S. 317, 324; 106 S.Ct. 2548, 2553 (1986), the Supreme Court held:

> We do not mean that the nonmoving party must produce evidence in a form that would be
> admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not
> require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper
> summary judgment motion to be opposed by any of the kinds of evidentiary materials
> listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one
> would normally expect the nonmoving party to make the showing to which we have
> referred.

## X.
## Request for Limited Discovery

.        In case this Court finds that the facts alleged in this reply is insufficient to refute Defendants' qualified immunity, Plaintiffs hereby respectfully request that the Court allow for limited discovery in this case. The facts upon which Defendants rely in their Motions to Dismiss Based on Qualified Immunity are genuine issues of fact that are disputed in this case. Plaintiffs cannot determine the sufficiency of the facts or bring proper clarification to their validity since Defendants are in control of the facts that surround the tragic events made the basis of this lawsuit. Defendants' qualified immunity defense rests entirely on the disputed facts in this case. It is necessary to determine the veracity of the facts in dispute before addressing Defendants' qualified immunity defense.

## PRAYER

WHEREFORE, Plaintiffs respectfully request this Court to deny Defendants' Motions to Dismiss and allow Plaintiffs to proceed immediately with preparation for a speedy and just trial, or alternatively, to allow limited discovery before making a ruling.

Respectfully submitted,

BROADUS A. SPIVEY
SPIVEY & AINSWORTH, P.C.
48 East Avenue
Austin, TX  78701
512+474-6061
fax: 512+474-1605

Richard Pena
Michael Greenberg
Law Offices of Richard Pena, P.C.
Barton Oaks Plaza Two
901 MoPac, Suite 325
Austin, Texas 7746-5747

By _____
        Broadus A. Spivey
        State Bar No. 18955000

**ATTORNEYS FOR PLAINTIFFS**


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the above and foregoing document was forwarded on March 17th, 2000 to all counsel of record and interested parties via U.S. mail:

Mr. Tom Lockhart
Mr. Jim Denison
Mr. Roger W. Hughes
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429
ATTORNEYS FOR DEFENDANT

Mr. Walter J. Passmore
PASSMORE, WALKER & TWENHAFEL, L.L.P.
2424 North 10th St, Suite 201
McAllen, Texas 78501
ATTORNEYS FOR DEFENDANT

_____
Broadus A. Spivey

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **ARTURO GUILLERMO SALINAS** | § | |
| **AND ELISA HERNANDEZ HERRERA** | § | |
| **SALINAS** | § | |
| | § | |
| **V.** | § | **CIVIL  ACTION NO. B-98-162** |
| | § | |
| | § | **JURY DEMANDED** |
| **CITY OF HARLINGEN, TEXAS** | § | |
| **AND** | § | |
| **R.D. MOORE AND** | § | |
| **JIM SHEOPNER** | § | |

# APPENDIXES TO PLAINTIFFS' REPLY
# TO DEFENDANTS' ASSERTION
# OF QUALIFIED IMMUNITY

A.    Memorandum of Hector Gonzalez, Supervisory Border Patrol Agent to Jose E. Garza, Chief Patrol Agent, McAllen, Texas, dated 27, 1998

B.    E-Mail entitled "Calibre Press Street Survival Newsline No. 288

C.    Harlingen Police Association's Letter to the citizens of this community

D.    Departmental Directives of the Harlingen Police Department

E.    Affidavit of Lt. Jose Rubio of Harlingen Police Department

F.    Draft Report of Arnold Rodriquez

3163P.022B