IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

**JUL 2 8 2000**

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, TEXAS, ET AL | { | JURY DEMANDED |
| | { | |
| and | { | |
| | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |
| | { | |
| and | { | |
| | { | |
| RAUL RODRIGUEZ | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

TOM LOCKHART
Admissions ID No. 2257
Texas State Bar No. 12473500
ROGER W. HUGHES
Admissions ID No. 5950
Texas State Bar No. 10229500
P. O. Drawer 1429
Harlingen, TX 78551-1429

**ORAL HEARING
IS REQUESTED**

Attorney-in-Charge    for    Defendants, CITY OF
HARLINGEN, TEXAS; R.D. MOORE and JIM
SCHOEPNER

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I. NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. SUMMARY JUDGMENT EVIDENCE AND GROUNDS . . . . . . . . . . . . . . . . . . . . 2

III. SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV. BACKGROUND EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     A.   Subject Rifle Issued to R.D. Moore . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     B.   Storage of the Rifle at R.D. Moore's Residence . . . . . . . . . . . . . . . . . . . . . . 5

     C.   CCSD's Chase and Call For Backup to BP to Apprehend Ernest . . . . . . . . . . . 6

     D.   CCSD Leads the Law Enforcement Team to Search
         Area for and Apprehend Ernest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

         1.   CCSD Takes Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

         2.   Law Enforcement Team Learned They Were in Immediate
             Vicinity of a Heavily Armed and Homicidal Suspect . . . . . . . . . . . . . . . 9

         3.   The Shootings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     E.   Harlingen Police Department . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

VI. ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     A.   Summary Judgment Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . 15

     B.   Law and Facts of this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

         1.   State-Created Danger Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2.    If "State-Created" Danger Theory is Viable,
      It is Not Applicable in this Case . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

3.    No City Policy Or Policymaker's Decision Caused the Shootings . . . . . .   21

4.    State Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

5.    Exemplary Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

CVsPDF - www.fasiso.com

## INDEX OF AUTHORITIES

Page

**Cites:**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249-250,
106 S.Ct. at 2510-11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Anderson v. Nosser,* 456 F.2d 835 (5th Cir. 1972)
(en banc), *cert. denied,* 409 U.S. 845 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bd. of County Comm. of Bryan County v. Brown,*
520 U.S. 397, 117 S.Ct. 1382, 138 L.Ed.2d 227 (1997) . . . . . . . . . . . . . . . . . . . . . . . . 18

*Brandon v. Holt,* 469 U.S. 464,
105 S.Ct. 873, 83 L.Ed.2d 878 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Celotex Corp. v. Garrett,* 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Cities Service,* 391 U.S., at 289 . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*City of Gladewater v. Pike,* 727 S.W.2d 514 (Tex. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*City of Newport v. Fact Concerts, Inc.,*
453 U.S. 247 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*DeShaney v. Winnebago County Dept. of Soc. Serv.,*
489 U.S. 189 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Doe v. Hillsboro ISD,* 113 F.3d 1412 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Doe v. Sullivan County, Texas,* 956 F.2d 545 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Fields v. City of South Houston, Texas,*
922 F.2d 1183 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Hart v. O'Brien,* 127 F.3d 424, (5th Cir. 1997),
*reh. denied,* 154 F.3d 419 (5th Cir. 1998),
*cert. denied,* 525 U.S. 1103 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

*Johnson v. Dallas ISD,* 38 F.3d 198
(5th Cir. 1994), *cert. denied,* 514 U.S. 1017 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Lavespere v. Niagara Machine & Tool Works, Inc.,*
910 F.2d 167 (5th Cir. 1990), *re-hearing denied,*
920 F.2d 259 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lefall v. Dallas ISD,* 28 F.3d 521 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Martinez v. California,* 444 U.S. 277 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Missouri Pac. RR Co. v. American Statesman*, 552 S.W.2d 99 (Tex. 1977) . . . . . . . . . . . . . . . . 24

*Monell v. New York City Dept. of Soc. Serv.*,
436 U.S. 658, 98 S.Ct. 2018, 63 L.Ed.2d 61 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mosley v. Excel Corp.*, 109 F.3d 1006 (5th Cir. 1997),
*reh. denied*, 114 F.3d 1185 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Mt. Healthy School Dist. v. Doyle*, 429 U.S. 274 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Randolph v. Cervantes*, 130 F.3d 727 (5th Cir. 1997)
*cert. denied* 525 U.S. 822 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Reimer v. Smith*, 663 F2d 1316 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Rodriguez-Cirilo v. Garcia*, 115 F.3d 50 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 19, 22, 23

*Saenz v. Heldenfels Bros., Inc.*, 183 F.3d 389 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 18

*Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir. 1992),
*cert. denied*, 506 U.S. 825 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16


Texas Practices & Remedies Code:

§ 101.0215(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
§ 101.024 (Vernon Supp. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24


Federal Statutes:

42 U.S.C., § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 17


Federal Rules of Civil Procedure:

56(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Rule 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendant, **CITY OF HARLINGEN** ("Harlingen"), and files this its Rule 56 Motion for and Brief in Support of Summary Judgment and would show the Court as follows:

### I. NATURE AND STAGE OF THE PROCEEDINGS

The families of deceased Border Patrol Agents S. Rodriguez and Ricardo Salinas sued Defendants Harlingen, Scheopner, and Moore for wrongful death under (1) 42 U.S.C., § 1983 and (2) state tort law. Plaintiff Raul Rodriguez (a Cameron County Deputy Sheriff) sued the same defendants for bodily injury under (1) § 1983 and (2) state tort law.

The Court, by Orders dated March 31, 2000 and by Nunc Pro Tunc Order dated April 11, 2000:

    (a)    granted Defendant Moore and Scheopner's Rule 12(b)(6) Motions based on qualified immunity;

    (b)    denied Harlingen's Rule 12(b)(6) Motions directed to the Plaintiffs' § 1983 federal "state created" danger claims;

    (c)    granted Harlingen's Rule 12(b)(6) Motions as to the remaining § 1983 claims; and

    (d)    denied Harlingen's Rule 12(b)(6) Motions directed to the Plaintiffs' Texas Tort Claims Act cause of action.

All Plaintiffs and Defendants have filed an Agreed Motion to Dismiss with Prejudice any remaining claims against the Defendants Scheopner and Moore in their *individual* capacity.

Harlingen moves for summary judgment on the only remaining claims: (1) a § 1983 "state-created" danger claims and (2) negligence claims under state tort law.

### II. SUMMARY JUDGMENT EVIDENCE AND GROUNDS

As summary judgment evidence, Harlingen relies upon and incorporates herein by reference the following:

    (a)    Plaintiffs' Complaints and Defendant's Answers;

    (b)    Excerpts from deposition of Sgt. Ronald K. Saenz (Exhibit "A");

CSkPDF - www.fasiso.com

(c)     Excerpts from deposition of Michael Riley (Exhibit "B");

(d)     Excerpts from deposition of George A. Hupp (Exhibit "C");

(e)     Excerpts from deposition of Orlando Sanchez (Exhibit "D");

(f)     Excerpts from deposition of James Joseph Scheopner (Exhibit "E");

(g)     Excerpts from deposition of Ralph Dwayne Moore (Exhibit "F");

(h)     Deposition Exhibit 5 (Exhibit "G"); and

(i)     Deposition Exhibit 30 (Exhibit "H").

Harlingen is entitled to summary judgment that all Plaintiffs take nothing against it on the following grounds:

(a)     Harlingen's employees did not intentionally create any dangerous situation which would not have otherwise existed;

(b)     Harlingen's employees did not thrust Border Patrol Agents S. Rodriguez and Ricardo Salinas or Plaintiff Raul Rodriguez into that danger or strip them of the ability to defend themselves;

(c)     The law enforcement team, Cameron County Sheriff Department ("CCSD") and U.S. Border Patrol ("BP"), knew of the danger;

(d)     No Harlingen policy decision nor policymaker action was a proximate cause of the deprivation, deaths, and injuries at issue;

(e)     There is no proximate cause to support the state law claims.

### III.  SUMMARY OF THE ARGUMENT

If "state created" danger is ever recognized, it is not applicable to this tragic case.  None of Harlingen's alleged policies or decisions caused or could have prevented the unfortunate events.  Harlingen did not cause Ernest Moore, adult son of R.D. Moore, to take the rifle or give him the means and opportunity to commit these crimes which he did not already have.  Harlingen did not force the BP or the CCSD to go to R.D. Moore's residence.  Harlingen did not strip them of the means to defend themselves or to escape.  There is no proximate cause for either the federal or state claims.

On July 7, 1998, Ernest was the suspect in violent homicides committed with an AK-47 rifle in Rio Hondo; his vehicle was found near his father's house, south of San Benito. The CCSD began a manhunt for his arrest, summoning the BP to assist in a search of R.D. Moore's residence and the area around it. Whenever Ernest took the rifle from the gun safe at R.D. Moore's house, the HPD AR-15 was only one of many guns in the safe. Among the other guns were Ernest's own AR-15, two other high powered semi-automatic rifles, and a riot 12 gauge shotgun.

The CCSD and BP came to R.D. Moore's residence to search for the suspect because they thought he was there. They came well armed with protective gear. The BP carried a high- powered assault rifle. This law enforcement team knew Ernest had killed others in Rio Hondo, was armed with a high-powered rifle, could kill again, and was believed to be in the area. The BP Agents all agreed Ernest could even be in the cornfield across the street from the Moore residence. Everyone took the necessary precautions, believing Ernest was close at hand. The team then began to organize a search of the surrounding fields and resaca. CCSD cautiously searched the truck in the driveway and Moore residence to find him.

Some time after the search of the Moore house ended, Ernest stepped out of the cornfield across the street and opened fire. He was 20-25 feet from the BP Agents and almost as close to Deputy Raul Rodriguez at the house. Any gun he could have taken from the safe could kill at that range.

## IV.  BACKGROUND EVIDENCE

### A.  **Subject Rifle Issued to R.D. Moore**

Scheopner became a Harlingen Police Department ("HPD") officer on June 16, 1972. Exh. E p. 12, (ll. 1 and 2). R.D. Moore was already an HPD officer; Scheopner had known him his entire career, worked with him in the HPD detective division, and observed him qualify with a handgun when Scheopner was the training officer and range master during 1985 to 1988. Exh. E, p. 31, (l. 22) - p. 32, (l. 22). Scheopner knew:  R.D. Moore was extremely professional and had a good reputation; his knowledge of and proficiency and maturity with weapons; and his training on sniper rifles including the AR-15 at the FBI Academy at Quantico, Virginia. Exh. E, p. 32, (l. 3) - p. 33, (l. 12), p. 34, (l. 7) - p. 36, (l. 6), p. 75, (ll. 2-16), p. 157, (l. 19), - p. 159, (l. 12); Exh. F, p. 131, (l. 18) - p. 132, (l. 18). He

3

also knew that: R.D. Moore had been a member of the HPD SWAT team until it was disbanded in the early 1980's; the prior Police Chief then assigned R.D. Moore and Capt. Vasquez as designated sharpshooters[1]; and they had been called out on prior incidents for these assigned duties. Exh. E, p. 29, (ll. 7-18), p. 32, (ll. 19-21), p. 38, (ll. 13-21), p. 45, (l. 15) - p. 46, (l. 14).

In 1993 or 1994, Scheopner again designated R.D. Moore and Capt. Vasquez as HPD sharpshooters. Exh. E, p. 27, (l. 18) - p. 28, (l. 7), p. 38, (l. 22) - p. 39, (l. 2) and p. 45, (ll. 6-9). Exh. F, p. 96, (ll. 8-15), p. 119, (l. 11) - p. 120, (l. 10). In the first part of 1997, R.D. Moore was assigned the subject AR-15 and started carrying it home with him because of his status as a sharpshooter. Exh. F, p. 98, (l. 19) - p. 99, (l. 17), p. 120, (ll. 11-20), p. 140, (l. 20) - p. 142, (l.17). He was responsible for the care, maintenance and safe keeping of the rifle and was instructed to stay proficient. Exh. E, p. 26, (l. 1) - p. 28, (l. 18), p. 37, (l. 19) - p. 39, (l. 19).

## B.    Storage of the Rifle at R.D. Moore's Residence

R.D. Moore kept the HPD AR-15 in a gun safe at his house because it was the safest place for it. Exh. E, p. 48, (l. 17) - p. 49, (l. 2); Exh. F, p. 227, (l. 22) - p. 228, (l. 11). He and Ernest jointly purchased the gun safe because it was so expensive. Exh. F, p. 227, (l. 22) - 228, (l. 3).

Ernest was twenty-five years old and had always lived at his parents' house. Exh. F, p. 6, (ll. 5-16). When he was about 19 or 20, he had a problem with drugs and was in rehab for approximately two weeks. Exh. F, p. 80, (ll. 10-19), p. 81, (ll. 14-20). R.D. Moore trusted his son implicitly and he was not aware of any mental problems. Exh. F, p. 144, (ll. 3-9), p. 146, (l. 23) - p. 147, (l. 16). Ernest had not been in trouble with the law and had no criminal record. Exh. F, p. 106, (l. 22) - p. 107, (l. 1).

On the day of the shootings, the gun safe at the R. D. Moore house contained several powerful guns besides the subject HPD AR-15.[2] These included the following firearms *privately* owned by Ernest: *(1) another AR-15*; (2) a semi automatic AK-47; (3) two other semi automatic rifles; and (4) a 12 gauge

---

[1]    In case of a hostage or tactical situation.

[2]    The safe also had contained Ernest's privately owned AK-47 which he used in the Rio Hondo shootings. Exh. A, p. 7 (l. 22) - p. 8, (l. 1).

Riot Shotgun. Exh. F, p. 12, (l. 21) - p. 14, (l. 22), p. 208, (l. 11) -p. 211, (l. 20) and Exh. G. Ernest could have used his own AR-15 and the *other semi automatic rifles and shotgun* just as easily to commit this tragedy. Exh. F, p. 209, (l. 24) - p. 210, (l. 2) and p. 212, (l. 21) - p. 212, (l. 7).

**C.  CCSD's Chase and Call For Backup to BP to Apprehend Ernest**

At about 5:40 a.m. on July 7, 1998, sheriff's dispatchers notified CCSD Senior Sgt. Saenz that there was an ongoing pursuit involving a subject who had killed two persons in Rio Hondo. Exh. A, p. 6, (l. 20) - p. 7, (l. 4). Sgt. Saenz, Plaintiff Deputy Raul Rodriguez and other deputies responded to the Rio Hondo location. Exh. A, p. 7, (ll. 4-15).

Between 6:00 and 6:30 a.m., R.D. Moore was awakened by his wife, Patsy, who had heard a door slam and was concerned that something was wrong with Ernest. Exh. F, p. 5, (ll. 3-15), p. 8, (ll. 3-13), p. 16, (ll. 8-12), p. 33, (l. 22) - p. 34, (l. 18), p. 189, (l. 4) - p. 190, (l. 9). Not knowing what had occurred, they searched for Ernest but could not find him. Exh. F, p. 5, (l. 20) - p. 6, (l. 4), p. 8, (l. 17) - p. 9, (l. 5), p. 15, (l. 24) - p. 23, (l. 15), p. 33, (l. 5) - p. 34, (l. 25), p. 101, (l. 5) - p. 103, (l. 25), p. 163, (l. 5) - p. 166, (l. 5).

While on duty at the river, BP Agents Mike Riley and S. Rodriguez (Decedent) received a BP radio transmission advising of a double homicide with vehicle headed south and suspect who was armed. Exh. B, p. 6, (l. 14) - p. 7, (l. 13). BP Agents Orlando Sanchez and Ricardo Salinas (Decedent) were advised of the double homicide in Rio Hondo at their pre-shift briefing. Exh. D, p. 8, (ll. 3-22).

CCSD Deputy Robert Rodriguez radioed the sheriff's dispatcher that he had located the truck involved in the homicide which he had been pursuing. Exh. A, p. 8, (ll. 2-10), p. 38, (l. 4) - p. 39, (l. 6). His radio transmissions were overheard by Sgt. Saenz and Deputy Raul Rodriguez. Exh. A p. 66, (ll. 1-8). Sgt. Saenz sent Deputy Raul Rodriguez to go for back up; then Sgt. Saenz also headed to the location of the truck on Gamble Road, south of San Benito, because they were now looking for three individuals that may have been armed. Exh. A, p. 8, (l. 11) - p. 9, (l. 2) and p. 39, (ll. 7-15).

BP radio dispatch advised that the truck had been found and requested assistance; BP Agent Hupp went to the armory and took a "selective fire" M-4 rifle, capable of semi automatic and automatic fire;

5

his partner Agent Ed Kelly took a shotgun; and they went to the scene. Exh. C, p. 11, (l. 1) - p. 12, (l. 5). The standard issue weapon for BP Agents was the Beretta 40 caliber. Exh. B, p. 19, (l. 23) - p. 20, (l. 3).

Agents Riley and S. Rodriguez also received the radio call for back up on the double homicide; as the senior agent, S. Rodriguez decided she and Riley should go. Exh. B, p. 7, (l. 14) - p. 8, (l. 22). BP Agents Sanchez and Salinas were directed to go to Gamble Road to assist the CCSD who was in charge of this manhunt. Exh. D, p. 8, (l. 23) - p. 11, (l. 1).

Agent Hupp described that all BP agents went through several months of academy training with relatively extensive firearms training, including the M-4 rifle which is similar to the M-16 and AR-15 series. Exh. C, p. 11, (l. 8-11), p. 30, (l. 15) -p. 33, (l. 7). Although Ricardo Salinas was in trainee status, he had already attended the Academy and been on the line for six months. Exh. D, p. 31, (ll. 13-19) and p. 40, (ll. 9-14).

CCSD Deputy Robert Rodriguez requested a HPD supervisor be called to get R.D. Moore's cooperation. Exh. A, p. 9, (ll. 3-13) and p. 69, (ll. 4-12).[3/]  R.D. Moore questioned the Deputy Sheriffs about his son Ernest; the Deputy Sheriffs advised that people had been injured or shot in Rio Hondo and they had chased the truck to R.D. Moore's house; and R.D. told them there was an AK-47 rifle missing from the safe and his son was a very good shot. Exh. F, p. 36, (l. 4) - p. 37, (l. 9).

**D.    CCSD Leads the Law Enforcement Team to Search
        Area for and Apprehend Ernest**

**1.    CCSD Takes Control**

The CCSD was in charge of the manhunt and Sgt. Saenz was the supervising officer in command. Exh. A, p. 14, (l. 24) - p. 15, (l. 9). Sgt. Saenz arrived on Gamble Road (south of the City of San Benito) north of the Moore residence at approximately 6:45 a.m.; he observed BP cars near the Moore residence and Deputy Robert Rodriguez outside his car talking to R.D. Moore. Exh. A, p. 8, (l. 22) - p. 9, (l. 2),

---

[3/] **HPD did not have the same radio system that the CCSD used. Exh. A, p. 55, (l. 18) - p. 56, (l. 7).**

p. 9, (l. 14) - p. 10, (l. 3).  Sgt. Saenz approached and advised R.D. Moore that there were two people dead in Rio Hondo, possibly a third was going to die, that Ernest was the main suspect and they had chased the vehicle to R.D. Moore's residence.  Exh. F, p. 37, (l. 23) - p. 38, (l. 3).  When Sgt. Saenz told R.D. Moore that his son had killed two women in Rio Hondo, R.D. Moore put his head down and appeared to have been shocked by the information; his reaction made it clear to Sgt. Saenz that it was R.D. Moore's first knowledge of what was going on.  Exh. A, p. 10, (ll. 4-14).

### 2. Law Enforcement Team Learned They Were in Immediate Vicinity of a Heavily Armed and Homicidal Suspect

Agents Riley and S. Rodriguez followed one of the CCSD vehicles to the location.  Exh. B, p. 8, (l. 23) - p. 9, (l. 5).  They saw eight or nine officers at the scene but because they had "a lot of tactical gear on... it was hard to determine who was who" but the identifiable uniforms were those of BP and CCSD.  Exh. B, p. 9, (ll. 6-11), p. 11, (l. 25) - p. 12, (l. 11).  Agents Hupp and Kelly arrived shortly after Agents Riley and S. Rodriguez.  Exh. B, p. 9, (l. 25) - p. 10, (l. 2).  When the BP Agents first arrived, someone "told us that there were three suspects armed, they had just killed two people, that they don't care about killing anybody else or they weren't afraid of taking their own lives".  Exh. B, p. 10, (ll. 11-15), p. 16, (ll. 9-12).

Agent S. Rodriguez was the senior Agent on the scene; under the BP's paramilitary command structure "the person with the most experience or the highest rank assumes command of the troops so everybody is not running around like a chicken without any guidance or direction".  Exh. C, p. 12, (ll. 6-19).  Therefore, she assumed command of the BP Agents at the scene and advised them about the information she had obtained from the CCSD, including they were up against three people who had committed murder with an AK-47 rifle and were believed to have more weapons.  Exh. C, p. 14, (ll. 5-21).

Agent S. Rodriguez directed Agents Hupp and Kelly (along with the dog handler Agent Dan Diaz) to go to the other side of a treeline (resaca) to secure it because they had the big guns.[4/] Exh. C, p. 14, (l. 25) - p. 15, (l. 3) and p. 67, (ll. 15-18). Agent Hupp said "it stood to reason that, you know, if he was likely to be hiding in the treeline, he could perhaps snipe at us from there, or whatever". Exh. C, p. 15, (ll. 4-6). The BP Agents wanted to secure the area of the incident, wait for more backup and then determine how to search the area where they thought the suspect was, but to make sure it was contained so that the suspect did not escape. Exh. C, p. 15, (ll. 6-11). Agent S. Rodriguez advised the other BP Agents that they were "only there to back up the [CCSD] deputies and give them a little extra muscle" and that they should wait until they "were sure of where the good guys were before hunting bad guys". Exh. C, p. 13, (ll. 4-6) and p. 15, (ll. 19-23).

Someone amongst the BP Agents said (probably S. Rodriguez and if not, said in her presence) "that the suspect might be anywhere, even in the cornfields adjacent to the road we were on". Exh. C, p. 15, (l. 24) - p. 16, (l. 14). They believed that this suspect had already been involved in a couple of murders, was armed, and could be as close as in the cornfield.[5/] Exh. C, p. 66, (ll. 14-21). Agent Hupp remembers "that moment because that was when I looked at Ed [Kelly] and Ed looked at I and we both decided to chamber a round" meaning they put a round into the chambers of their weapons, the M-4 and shotgun; they didn't know where the guy was, something might be imminent, anything could happen, and there was a sense of urgency or immediacy of the danger that the suspect might be right beside them. Exh. C, p. 16, (l. 15) - p. 17, (l. 16) and p. 67, (ll. 1-11). Agent S. Rodriguez also knew something could happen at any moment. Exh. C, p. 67, (ll. 12-14).

Sgt. Saenz advised R.D. Moore they needed to search the house and he agreed. Exh. A, p. 10, (ll. 15-18). Sgt. Saenz checked Ernest's truck before entering the house because "we were concerned that

---

[4/] **R.D. Moore had said that "he might be in the resaca tree line, where he often liked to pass time". Exh. C, p. 14, (ll. 22-24).**

[5/] **The irony of this struck Agent Hupp later when in fact this was exactly where Ernest Moore was. Exh. C, p. 66, (ll. 21-25).**

8

individuals could be anywhere at that point". Exh. A, p. 77, (l. 21) - p. 78, (l. 9). R.D. Moore denied

entrance to BP Agents. Exh. B, p. 12, (ll. 12-24); Exh. F, p. 38, (l. 18) - p. 40, (l. 13). Sgt. Saenz and

three or four Deputy Sheriffs went in to search the house; they searched the entire residence to his

satisfaction. Exh. A, p. 11, (l. 6) - p. 12, (l. 25).

Sgt. Saenz's primary focus and primary concern was looking for three individuals that might have

been armed. Exh. A, p. 83, (l. 23) - p. 84, (l. 7). Sgt. Saenz made sure R.D. Moore was behind him in

the search of the house because if Ernest was inside the house and armed, he did not want someone else

to get hurt. Exh. A, p. 84, (l. 23) - p. 85, (l. 8).

After the BP was denied entrance to the house, Agent Riley told Agent S. Rodriguez "let's get

out of here". Exh. B, p. 14 (ll. 1-6). He believed the BP Agents were in an unsecured, dangerous area

based upon the information that "there were three suspects that had just killed two people and that weren't

afraid of taking more lives or taking their own lives. They had -- I guess at the time we were already told

that they had AK-47s and M-16s, pretty powerful weapons". Exh. B, p. 16, (ll. 1-22), p. 17, (l. 22) - p.

18, (l. 6). After Riley told S. Rodriguez "let"s get out of here", they could have left and in fact, Riley

kept walking down towards his patrol unit.[6/] Exh. B, p. 14, (ll. 7-12). Because Agent S. Rodriguez was

the senior agent, it was up to her to stay or leave; she held back to talk to a deputy sheriff. Exh. B, p.

14, (l. 17) - p. 15, (l. 3).

After searching the house, Sgt. Saenz spoke to Agent S. Rodriguez and provided all the

information, i.e., the suspect was Ernest who had a high powered rifle and plenty of ammunition. Exh.

A, p. 16, (l. 20) - p. 17, (l. 10). CCSD, who was in charge of the manhunt, never ruled out the possibility

of Ernest being anywhere outside the residence where he could hide, including in the cornfield; CCSD

assumed, based upon good law enforcement techniques and practices, that Ernest could have been

anywhere outside the residence where he could hide. Exh. A, p. 14, (l. 24) - p. 15, (l. 20) and p. 16, (ll.

11-19). All of the law enforcement team there before the shooting, based upon good police techniques,

---

[6/] **This was when BP Agents Rolando Sanchez and Ricardo Salinas drove by Riley. Exh. B, p. 14, (ll. 13-16).**

9

believed for purposes of investigating and securing the area, that Ernest was still in the area. Exh. A, p. 104, (ll. 7-12).

As Agents Saenz and Salinas approached the scene one of the BP Agents posted by S. Rodriguez at the resaca, spoke with them and told them to go to the residence and report to the officers in charge. Exh. D, p. 11, (ll. 2-20); Exh. C, p. 67, (l. 22) - p. 68, (l. 2). Agent Hupp remembers some brief, to the point, discussion with the agents at the resaca about three bad guys with rifles who could be in the tree line and the suspect's father's house being searched. Exh. C, p. 69, (l. 11) - p. 70, (l. 17). It would be good BP practice to alert newly arriving agents to what was going on and Hupp was sure that he or one of the other agents did that when Agents Sanchez and Salinas were stopped. Exh. C, p. 70, (ll. 9-14).

Agents Sanchez and Salinas proceeded towards the house and parked "just shy of the residence" next to the cornfield. Exh. D, p. 13, (l. 9) - p. 14, (l. 4). Agents Sanchez and Salinas exited their vehicle and walked towards Agent S. Rodriguez (in-charge agent at the scene) so she could brief them on "what was going on, what needed to be done, and to get coordinated also with officers that were in charge." Exh. D, p. 14, (l. 8) - p. 16, (l. 6). Agent S. Rodriguez told Agent Sanchez to come back with her towards his parked vehicle so she could brief him on what was going on. Exh. D, p. 14, (ll. 19-22).

3.     **The Shootings**

As Agents S. Rodriguez and Sanchez walked backed towards the Sanchez vehicle, the shots were fired. Ex. D, p. 16, (ll. 7-12). Ernest was located in the corner of the cornfield. Exh. D, p. 35, (l. 25) - p. 36, (l. 2). Agents S. Rodriguez and Salinas were shot adjacent to Agent Sanchez's vehicle. Exh. D, p. 31, (l. 20) - p. 32, (l. 3). and p. 35, (ll. 3-24). Agents Sanchez and Hupp estimated the distance between Ernest and Agents Salinas and S. Rodriguez at approximately 20 to 25 feet. Exh. D, p. 19, (ll. 10-19); Exh. C, p. 50, (ll. 2-22); Exh. B, p. 22, (l. 4) - p. 23, (l. 7); Exh. H.

Sgt. Saenz estimates that the shots were fired 10 and 20 minutes after searching the house and that the house search took 5-10 minutes. Exh. A, p. 18, (l. 20) - p. 19, (l. 10). Agent Hupp estimated the shooting occurred 7-8 minutes after the discussions with Agent S. Rodriguez that the armed murderers might be as close as the cornfield next to the road they were on. Exh. C, p. 67, (l. 19) - p. 68, (l. 21).

Agent Hupp estimated the shooting occurred 3-5 minutes after he, or Agents Diaz or Kelly briefed Agents Sanchez and Salinas.  Exh. C, p. 70, (ll. 18-21).

Agent Sanchez, in his peripheral vision, saw Agent Salinas fall immediately.  Exh. D, p. 16, (ll. 13-15).  Agent Sanchez retreated, pulled his pistol and shot at (and he thinks hit) Ernest.  Exh. D, p. 17, (l. 6) - p. 18, (l. 12), p. 19, (l. 24) - p. 20, (l. 11).  Agent S. Rodriguez who had been running side by side with Agent Sanchez up along side the vehicle, rounded the right rear corner and went into a kneeling position to engage (return fire to) the gunman when she was hit.  Exh. D, p. 16, (l. 15) - p. 17, (l. 5) and p. 35, (l. 16) - p. 36, (l. 15).  When the shootings started Deputy Raul Rodriguez was right beside Sgt. Saenz in the middle of the front yard of the Moore residence and after just leaving a conversation with Agent S. Rodriguez.  Exh. A, p. 42, (ll. 3-15).

**E.    Harlingen Police Department**

A little before 7:00 a.m. on July 7, 1998, HPD Dispatch called Scheopner at his home and advised that the CCSD requested assistance to get R.D. Moore to cooperate with them to search the house.  Exh. E, p. 92, (l. 10) - p. 93, (l. 5) and p. 106, (l. 14) - p. 107, (l. 22).  HPD Sgts. Foist and Garcia headed to R.D. Moore's home to get him to cooperate with the CCSD.  Exh. E, p. 95, (l. 17) - p. 96, (l. 20).  The communication between Scheopner and R.D. Moore on July 7, 1998, before the shootings, concerned: R.D. Moore's cooperation with the CCSD, Scheopner being in transit to the scene; and the Harlingen Police Department's Sgts. in transit and arriving at R.D. Moore's home.  Exh. E, p. 94, (l. 10) - p. 95, (l. 16), p. 96, (l. 21) - p. 100, (l. 10); Exh. F p. 205, (l. 1) - p. 206, (l. 16).

When the shooting started, Scheopner:  had not reached the Moore house; was stopped at a CCSD roadblock on the other side of a canal or resaca bank approximately 200 yards from the Moore house; could not see the house; could not and did not see any law enforcement personnel at the house; and specifically did not see BP Agent S. Rodriguez, BP Agent Salinas or Deputy Sheriff Raul Rodriguez. Exh. E, p. 110, (l. 11) - p. 111, (l. 11), p. 338, (ll. 7) - p. 339, (l. 10), p. 339, (l. 18) - p. 340, (l. 3).

R.D. Moore's residence was outside the City limits and jurisdiction of the City of Harlingen and the Harlingen Police Department.  Exh. E, p. 264, (l. 20 and 21); p. 270, (ll. 10-13).  HPD had no

jurisdiction over this manhunt; the CCSD was the law enforcement agency with jurisdiction. Exh. E, p. 342, (ll. 16-22). Neither the Harlingen Police Chief nor the HPD requested or directed the BP, Agent S. Rodriguez, Agent Salinas, CCSD or Deputy Raul Rodriguez to assist or be present. Exh. E, p. 342, (l. 23) - p. 343, (l. 3). Neither the Harlingen Police Chief nor the HPD had any authority to direct the activities of the BP, Agent S. Rodriguez, Agent Salinas, CCSD or Deputy Raul Rodriguez. Exh. E, p. 343, (ll. 4-9).

## VI. ARGUMENT AND AUTHORITIES

**A.** **Summary Judgment Standard of Review**

Summary judgment shall be granted when there is not a genuine issue as to any material fact, and a moving party is entitled to judgment as a matter of law. *Fields v. City of South Houston, Texas*, 922 F.2d 1183, 1187 (5th Cir. 1991); *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 177-78 (5th Cir. 1990), *re-hearing denied*, 920 F.2d 259 (5th Cir. 1990). There is no genuine material fact issues, if no reasonable trier of fact could have found for the plaintiff or the evidence favoring the plaintiffs is insufficient to enable a reasonable jury to return a verdict for them. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249-250, 106 S.Ct. at 2510-11; *Lavespere*, 910 F.2d at 178. To satisfy this burden, Harlingen must either (1) submit evidence or documents that negate the existence of some material element of plaintiffs' claims, or (2) point out that the evidentiary documents in the record contain insufficient proof concerning any essential element of the plaintiffs' claims. *Celotex Corp. v. Garrett*, 477 U.S. 317, 325 (1986); *Lavespere*, 910 F.2d at 178.

Once the moving party has carried that burden, the burden then shifts to the non-moving party to show that summary judgment is not appropriate. *Fields*, 922 F.2d at 1187; *Lavespere*, 910 F.2d at 178. The non-moving party cannot discharge this burden by referring to the mere allegations or denials of their pleadings; rather, that party must, either by submitting opposing evidentiary documents or by referring to evidentiary documents already in the record, set out specific facts showing that a genuine issue exists. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Fields*, 922 F.2d at 1187; and Fed.R.Civ.P. 56(e). Mere conclusions or

allegations are not competent summary judgment evidence and are insufficient to defeat a Motion for Summary Judgment. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992).

Merely raising some metaphysical doubt regarding material facts does not create a genuine issue of material fact. *Matsushita*, 475 U.S. at 586. The existence of a scintilla of evidence in support of the non-movant's position will not be sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "'genuine issue for trial.'" *Cities Service*, 391 U.S., at 289; *Matsushita*, 475 U.S. at 586.

**B.    Law and Facts of this Case**

    **1.    State-Created Danger Claim**

The Court's rulings have dismissed all § 1983 claims against Harlingen, save for a potential "state created" danger claim under Substantive Due Process. In *DeShaney*[7/], the Supreme Court stated that the 14th Amendment's Due Process Clause is triggered only by affirmative government action and put no duty on government officials to act to prevent a third party from harming the claimant. 489 U.S. at 196-197, 109 S.Ct. at 1004. The court neither approved nor disapproved of a rule imposing liability if the State created the risk of harm to which it forced the claimant to suffer, i.e., an exception for "stated-created" danger. *Id.*

Though often asked to do so, the Fifth Circuit has consistently declined to adopt the "state-created" danger rule. *Randolph v. Cervantes*, 130 F.3d 727, 731 (5th Cir. 1997), *cert. denied*, 525 U.S. 822 (1998); *Doe v. Hillsboro ISD*, 113 F.3d 1412, 1415 (5th Cir. 1997) (en banc); *Johnson v. Dallas ISD*, 38 F.3d 198, 201 (5th Cir. 1994), *cert. denied*, 514 U.S. 1017 (1995). The Fifth Circuit has cast doubt on whether "state created" danger is a viable exception to *DeShaney*. *Lefall v. Dallas ISD*, 28 F.3d 521, 530 (5th Cir. 1994). The rationale for any

---

[7/] *DeShaney v. Winnebago County Dept. of Soc. Serv.*, 489 U.S. 189 (1989).

13

exception is that the state exercises its authority to restrain the individual's liberty so as to render him unable to protect himself. *DeShaney*, 489 U.S. at 200.  In *Johnson*, the Court questioned whether it could ever meet the "demanding standard for constitutional liability." 38 F.3d at 201.

This Court's Order of March 31, 2000, noted the other circuits were split on recognizing "state created" danger as an exception to *DeShaney*.  Out of prudence and caution, the Court concluded that some factual development was needed before finally deciding the issue.

Although the Fifth Circuit has not adopted the "state-created" danger exception to the *DeShaney* Rule, in *Randolph*, it outlined the elements:

- ■ the environment created by the state actors must be dangerous;

- ■ the state actors must know that it is dangerous;

- ■ the state actors must have used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur; and,

- ■ the state must have effectively stripped a person of her ability to defend herself, or cut off potential sources of private aid.

130 F.3d at 731 (citing *Johnson*, 38 F.3d at 201).  The "state created" danger doctrine will not apply where the government actor is not aware of any immediate danger facing a known victim. *Saenz v. Heldenfels Bros., Inc.*, 183 F.3d 389, 392 (5th Cir. 1999).  There, the Fifth Circuit clearly stated that the "state created" danger theory is inapposite without a known victim.  183 F.3d at 392.

Harlingen is not vicariously liable for the acts of its employees. *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 694 (1978).  To hold Harlingen liable, Plaintiffs must show that a final policymaker adopted a "policy" that caused the deprivation. *Bd. of County Comm. of Bryan County v. Brown*, 520 U.S. 397, 403, (1997).  To the extent the Complaint asserts claims against Schoepner and R.D. Moore in their "official capacities," then this suit is treated

14

as one against Harlingen alone, for which Plaintiffs must still prove the injuries resulted from a City "policy." *Brandon v. Holt*, 469 U.S. 464, 471-472 (1985).

Furthermore, the City's policy must have proximately caused the violation of the plaintiffs' federal rights. *Martinez v. California*, 444 U.S. 277, 285 (1980); *Doe v. Sullivan County, Texas*, 956 F.2d 545, 550 (5th Cir. 1992); *Reimer v. Smith*, 663 F2d 1316, 1322 (5th Cir. 1981). Implicit in the 'deprivation' of liberty or property is a causal link between the constitutional violation and the deprivation. *Mt. Healthy School Dist. v. Doyle*, 429 U.S. 274, 286 (1977); *Martinez*, 444 U.S. at 285; *Reimer*, 663 F.2d at 1322. First, the constitutional violation must not be too remote from the injury. *Martinez*, 444 U.S. at 285. Second, the deprivation must be a foreseeable result. *Anderson v. Nosser*, 456 F.2d 835, 841 (5th Cir. 1972)(en banc), *cert. denied*, 409 U.S. 845 (1972). Third, it must be the 'cause-in-fact' of the deprivation. *Rodriguez-Cirilo v. Garcia*, 115 F.3d 50, 52 (1st Cir. 1997). This means that the deprivation would not have occurred 'but-for' the constitutional violation. *Mt. Healthy School Dist.*, 429 U.S. at 287; *Hart v. O'Brien*, 127 F.3d 424, (5th Cir. 1997), *reh. denied*, 154 F.3d 419 (5th Cir. 1998), *cert. denied*, 525 U.S. 1103 (1999). Causation is especially important in the context of state-created danger exception cases, where frequently it is difficult to identify to what extent the danger faced by the plaintiff was caused by the state versus a private actor.

### 2.    If "State-Created" Danger Theory is Viable, It is Not Applicable in this Case

Elements of "state created" danger theory do not exist as a matter of law. First, Harlingen did not create a dangerous environment that provided an opportunity which otherwise would not have existed for Ernest to murder Agents S. Rodriguez and Salinas and wound Deputy Sheriff Raul Rodriguez. It did not give Ernest the chance to use a rifle when he otherwise would not have had access to a rifle. Any access to the rifle safe gave him equal access to his privately owned AR-15 and other rifles equally capable of killing people. This tragedy would have

happened whether or not the HPD's AR-15 was in the gun safe. The same opportunity existed for the crimes to occur whether or not the HPD gun was in the safe.

Second, Harlingen did not thrust Agents S. Rodriguez and Salinas and Dep. Raul Rodriguez into the situation.

Third, Harlingen did not deprive them of means to escape or otherwise protect themselves. The Court's March 31, 2000 and April 11, 2000, Orders reason that the BP Agents and CCSD might have been cut off from means of escape or self-defense if Chief Scheopner failed to warn the "law enforcement team" surrounding the house to take necessary precautions to secure their safety (at p. 21). However, the law enforcement team already knew or assumed that: Ernest was close by, including the very area (cornfield) where he actually was; he was carrying a powerful assault weapon[8/]; and was homicidal.

Here is what is known about the law enforcement team surrounding the house:

- there were two law enforcement agencies:

  - CCSD was in charge of the manhunt with Sgt. Saenz in command;

  - BP, as back up and assist, with Senior Agent S. Rodriguez in command;

- the team knew they were chasing armed murderers;

- when the BP Agents Riley and S. Rodriguez arrived at the scene, the members of the team already present had so much tactical gear on it was difficult to identify the uniforms;

- when BP Agents Riley and S. Rodriguez first arrived they were advised and it was known by the law enforcement team that there were three suspects armed who had just killed two people and they did not care about killing themselves or anybody else;

- the law enforcement team learned that the suspects had high powered military assault rifles;

---

[8/] One of the type weapons described was a M-16 which is similar to both the M-4 used by the BP and the AR-15 which was, in fact, in the possession of Ernest.

16

- the law enforcement team assumed Ernest could be anywhere, including exactly where he was (in the cornfield);

- the law enforcement team assumed they could be harmed or shot;

- HPD neither brought the law enforcement team to the scene of the shootings nor held them there.

- HPD did not strip the law enforcement team of their ability to defend themselves.

In summary, the evidence conclusively negates elements of the "state created" danger doctrine as a matter of law.

### 3.    No City Policy Or Policymaker's Decision Caused the Shootings

Under § 1983, Plaintiffs must prove causation.  Harlingen's acts are not the cause in fact of the deprivation of life or liberty, unless the shootings would not have occurred 'but for' the constitutional violations.

The Court noted two alleged City actions that could support the Plaintiffs' 1983 claims:

- "The policies of the City of Harlingen allowed a civilian version of a military assault rifle to fall into the hands of a person who was not a police officer and who was extremely dangerous."

- "If Defendant Scheopner knew of the real threat posed by E. Moore before [decedents were killed and Plaintiff was injured], he could have avoided the danger he created by warning the law enforcement teams surrounding the house to take necessary precautions to secure their safety."  (at p. 21 of Orders and Nunc Pro Tunc Order)

Neither of these alleged City actions can be the proximate cause of these shootings.  As a matter of law any alleged policies that allowed the rifle to fall into Ernest's hands are not the cause-in-fact of the shootings and are too remote.

First, neither action can be the "but for" cause. Whether or not the HPD rifle was in the gun safe, Ernest could have seized a powerful rifle or shotgun just as capable of inflicting death and injury as the HPD rifle. If the HPD AR-15 had been absent, Ernest would have taken his own AR-15 or one of his other semi-automatic rifles or a 12 gauge Riot gun. At the close range of these shootings (20-25 feet), Ernest's own AR-15 or the other weapons in the gun safe would have inflicted the same deaths and injuries.

The second alleged policy decision (Scheopner's alleged failure to warn, i.e., the law enforcement team) is not the cause-in-fact of the events and injuries. Whether or not he failed to tell them whatever he knew, they already knew or assumed that Ernest was homicidal, carrying an assault rifle, and close by. The law enforcement team took the precautions they deemed best in light of that information; no lack of precaution resulted from any lack of information.

*Compare, Hart,* 127 F.3d at 446; *Rodriguez-Cirilo,* 115 F.3d at 52. In *Hart,* a DPS trooper O'Brien arrested Hart and took him before the magistrate for arraignment. O'Brien told the magistrate that Hart had a federal warrant out (which was untrue) which caused the magistrate to deny Hart bail; the next day the magistrate set bail for Hart, but Hart was unable to raise the bond for two weeks. 127 F.3d at 434. The Fifth Circuit found that there was no cause-in-fact for any unlawful detention caused by the false statement; had a reasonable bond been set, Hart could not have met it and would have remained in jail. *Id.* at 446.

In *Rodriguez-Cirilo,* after Francisco Cirilo had threatened to kill himself or his brother, Celso, family members obtained a order requiring Francisco to be detained at a local hospital for 2 days for psychiatric testing. 115 F.3d at 51. Police officers declined to enforce the arrest order and told the family to take Francisco to the hospital, but he refused to go. *Id.* at 51. Two weeks later he argued with Celso and stabbed him. The First Circuit found no causation. There was no showing that, but-for the failure to arrest, Francisco would not have stabbed Celso. Because

18

the order was for only two days and there was nothing to show he would have been held longer, there was no proof Francisco would not have been released before the stabbing. *Id.* at 53.

Second, any decision or "policy" that somehow allowed the HPD rifle to fall into Ernest's hands was too remote. The assignment of the weapon to R.D. Moore occurred over a year before the shooting. *Compare, Martinez,* 444 U.S. at 285; *Rodriguez-Cirilo,* 115 F.3d at 52. In *Martinez* plaintiffs sued the state board of pardons over the murder of a girl by a parolee. The criminal had been convicted as an insane, violent sex offender, with a recommendation against parole; after 5 years the board paroled him, with full knowledge of his history and the likelihood he would commit violent crimes. *Id.* at 279. Five months after his release, he tortured and murdered plaintiff's daughter. *Id.* at 280. The Supreme Court sustained a state court judgment that the pleadings failed to state a claim. The Court concluded that the release five months earlier was too remote in time to be a proximate cause of deprivation, i.e. her death was too remote a consequence of the decision to release. *Id.* at 285.

In *Rodriguez-Cirilo,* family members had obtained an order to detain Francisco Cirilo for two days of pscyhological exams because he had threatened his brother; two weeks after police refused to enforce the order and arrest Francisco, he stabbed his brother. 115 F.3d at 51. The First Circuit concluded the two week delay between the failure to arrest and the stabbing made the cause or link too remote. *Id.* at 52, citing *Martinez* 444 U.S. at 285.

### 4.    State Claims

The Plaintiffs have alleged state claims under Texas Tort Claims Act based upon negligence. To prevail on a negligence cause of action Defendant must prove proximate cause. The state law definition of proximate cause parallels the federal definition. Plaintiffs must prove cause in fact which requires proof that "but for" and "without which" defendant's conduct, the event would not have occurred and plaintiffs must prove that defendant's conduct is not too

remote from the event. *Missouri Pac. RR Co. v. American Statesman,* 552 S.W.2d 99, 103-4 (Tex. 1977); *Mosley v. Excel Corp.,* 109 F.3d 1006, 1009 (5th Cir. 1997), *reh. denied,* 114 F.3d 1185 (5th Cir. 1997). As discussed in the previous section entitled Federal Claims, plaintiffs in this case, as a matter of law, cannot establish proximate cause between any action of the city or its employees, and the tragic events that occurred on July 7, 1998.

### 5.     Exemplary Damages

Exemplary Damages (as claimed by Raul Rodriguez) cannot be recovered against a municipality under federal or state law.   Exemplary damages are not available under § 1983 against a municipality. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247 (1981).

The Texas Tort Claims Act does not waive sovereign immunity for punitive damages for the state law claims against a city arising from the exercise of governmental functions. *City of Gladewater v. Pike,* 727 S.W.2d 514, 519 (Tex. 1987); Tex. Civ. Pr. & Rem. Code Ann., § 101.024 (Vernon Supp. 2000).   The  Tort Claims Acts lists police protection and control as a 'governmental function.' Tex. Civ. Prac. & Rem. Code, § 101.0215(a)(1).

**WHEREFORE, PREMISES CONSIDERED**, Defendant moves for summary judgment that the remaining claims of all Plaintiffs in these causes be dismissed and they take nothing against Defendant.

Respectfully submitted,

By: _____

TOM LOCKHART
Admissions ID No. 2257
Texas State Bar No. 12473500
ROGER W. HUGHES
Admissions ID No. 5950
Texas State Bar No. 10229500
P. O. Drawer 1429
Harlingen, TX 78551-1429
956/428-7495; FAX: 956/428-2954

Attorney-in-Charge for Defendants, CITY OF
HARLINGEN, TEXAS; R.D. MOORE and JIM
SCHOEPNER

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document

was forwarded on this 28th day of July, 2000, to the following counsel of record and interested

parties:

Attorneys of record for Plaintiffs, GILBERTO M. RODRIGUEZ, et al and
ARTURO GUILLERMO SALINAS, et al:

Mr. Broadus A. Spivey                  VIA CMRRR# 7099 3220 0001 0358 1266
**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, Texas  78701-4320

Mr. Richard Pena                       VIA CMRRR# 7099 3220 0001 0358 1259
**LAW OFFICES OF RICHARD PENA, P.C.**
Barton Oaks Plaza Two
901 MoPac, Suite 325
Austin, Texas  78746-5747

21

Attorney of record for Plaintiff, RAUL RODRIGUEZ:

    Mr. Ramon Garcia               VIA CMRRR# 7099 3220 0001 0358 1242
    **LAW OFFICES OF RAMON GARCIA, P.C.**
    222 West University Drive
    Edinburg, Texas  78539

Attorney of record for Defendants, R.D. Moore and Jim Scheopner,
in Their Individual Capacities:

    Mr. Walter J. Passmore             VIA REGULAR MAIL
    **PASSMORE, WALKER & TWENHAFEL, L.L.P.**
    2424 North 10th St., Suite 201; 78501
    P. O. Drawer 3766
    McAllen, Texas  78502-3766

    TOM LOCKHART