Case 1:98-cv-00162   Document 100   Filed in TXSD on 06/19/2001   Page 1 of 32

*100*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 1 9 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | JURY DEMANDED |
| | { | |
| and | { | |
| | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |
| | { | |
| and | { | |
| | { | |
| RAUL RODRIGUEZ | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |

---

## DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

---

TOM LOCKHART
Admissions ID No. 2257
Texas State Bar No. 12473500
ROGER W. HUGHES
Admissions ID No. 5950
Texas State Bar No. 10229500
P. O. Drawer 1429
Harlingen, Texas 78551-1429


Attorney-in-Charge for Defendant,
CITY OF HARLINGEN

# TABLE OF CONTENTS

                                                                                    Page

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

I. NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II. SUMMARY JUDGMENT EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

III. STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT . . . . . . . . . . . .   2

IV. SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

V. BACKGROUND EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

    A.   Subject Rifle Issued to R.D. Moore . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

    B.   Storage of the Rifle at R.D. Moore's Residence . . . . . . . . . . . . . . . . . . . . . . .   5

    C.   CCSD's Chase and Call For Backup to BP to Apprehend Ernest . . . . . . . . . . . .   6

    D.   CCSD Leads the Law Enforcement Team to Search
        Area for and Apprehend Ernest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

        1.   CCSD Takes Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

        2.   Law Enforcement Team Learned They Were in Immediate
               Vicinity of a Heavily Armed and Homicidal Suspect . . . . . . . . . . . . . . .   8

        3.   The Shootings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

    E.   Harlingen Police Chief Scheopner had No Information
        That Law Enforcement Team Did Not Already Have . . . . . . . . . . . . . . . . . . . .   12

    F.   Determination that Ernest Moore Acted Alone . . . . . . . . . . . . . . . . . . . . . . . .   13

VI. ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

    A.   Summary Judgment Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

    B.   Law and Facts of this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

        1.   State-Created Danger Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

        2.   If "State-Created" Danger Theory is Viable, It is
               Not Applicable in this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

3.      No Deliberately Indifferent Harlingen Policy Decision
        or Policymaker Action Caused the Shootings ..................... 19

4.      State Claims ......................................... 23

5.      Exemplary Damages .................................... 24

CONCLUSION ........................................................ 24

iii

# INDEX OF AUTHORITIES

Page

Cites:

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Anderson v. Nosser*, 456 F.2d 835 (5th Cir. 1972)
(en banc), *cert. denied*, 409 U.S. 845 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Bd. of County Comm. of Bryan County v. Brown*,
520 U.S. 397 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Celotex Corp. v. Garrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*City of Canton v. Harris*, 489 U.S. 378 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*City of Gladewater v. Pike*, 727 S.W.2d 514 (Tex. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*City of Newport v. Fact Concerts, Inc.*,
453 U.S. 247 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*DeShaney v. Winnebago County Dept. of Soc. Ser.*,
489 U.S. 189 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Doe v. Dallas I.S.D.*, 153 F.3d 211 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Doe v. Hillsboro ISD*, 113 F.3d 1412 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Doe v. Sullivan County, Texas*, 956 F.2d 545 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Farmer v. Brennan*, 511 U.S. 825 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Fields v. City of South Houston, Texas*,
922 F.2d 1183 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*First National Bank v. Cities Serv. Co.*, 391 U.S. 253 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hart v. O'Brien*, 127 F.3d 424, (5th Cir. 1997),
*reh. denied*, 154 F.3d 419 (5th Cir. 1998),
*cert. denied*, 525 U.S. 1103 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21, 22

*Huffman v. County of Los Angeles*,
147 F.3d 1054 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Johnson v. Dallas ISD*, 38 F.3d 198
(5th Cir. 1994), *cert. denied*, 514 U.S. 1017 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Kennedy v. Baird*, 682 S.W.2d 377
(Tex. App.- El Paso 1984, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Lavespere v. Niagara Machine & Tool Works, Inc.,*
910 F.2d 167 (5th Cir. 1990), *reh. denied,*
920 F.2d 259 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Martinez v. California,* 444 U.S. 277 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 22, 23

*Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Missouri Pac. RR Co. v. American Statesman,* 552 S.W.2d 99 (Tex. 1977) . . . . . . . . . . . . . . . . . 23

*Monell v. New York City Dept. of Soc. Serv.,*
436 U.S. 658, 98 S.Ct. 2018, 63 L.Ed.2d 61 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Mosley v. Excel Corp.,* 109 F.3d 1006 (5th Cir. 1997),
*reh. denied,* 114 F.3d 1185 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Mt. Healthy School Dist. v. Doyle,* 429 U.S. 274 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Piotrowski v. City of Houston,* 237 F.3d 567
(5th Cir. 2001), *petition for cert. filed,*
__U.S.L.W.__ (U.S. June 5, 2001) (No. 00-1811) . . . . . . . . . . . . . . . . . . . . . . . . 15-17, 19

*Randolph v. Cervantes,* 130 F.3d 727 (5th Cir. 1997)
*cert. denied* 525 U.S. 822 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Reimer v. Smith,* 663 F2d 1316 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Rodriguez-Cirilo v. Garcia,* 115 F.3d 50 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 17, 21-23

*Saenz v. Heldenfels Bros., Inc.,* 183 F.3d 389 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*Shrum v. Kluck,* 249 F.3d 773 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Snyder v. Trepagnier,* 142 F.3d 791, (5th Cir. 1998),
cert. dism'd, 119 S.Ct. 1493 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Story Serv., Inc. v. Ramirez,* 863 S.W.2d 491
(Tex. App.-El Paso 1993, write denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23


Texas Civil Practices & Remedies Code:

§ 101.0215(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
§ 101.024 (Vernon Supp. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24


Federal Statutes:

42 U.S.C., § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14

CforPDF - www.texio.com

Federal Rules of Civil Procedure:

Rule 12(b)(6)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Rule 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1


Federal Rules of Evidence:

Rule 803(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CutePDF - www.fastio.com

## DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendant **CITY OF HARLINGEN** ("Harlingen") and files its Rule 56 Second

Motion for and Brief in Support of Summary Judgment and would show the Court as follows:

### I. NATURE AND STAGE OF THE PROCEEDINGS

The families of deceased Border Patrol Agents Susan Rodriguez and Ricardo Salinas sued

Defendants Harlingen, Scheopner, and Moore for wrongful death under (1) 42 U.S.C., § 1983 and (2) state

tort law. Plaintiff Raul Rodriguez (a Cameron County Deputy Sheriff) sued the same defendants for

bodily injury under (1) § 1983 and (2) state tort law.

Previously, the Court granted the individual defendants qualified immunity against the federal

claims and dismissed the § 1983 claims against Harlingen, except for the "state created" danger claims.

Orders signed March 31 and April 11, 2000; Docket Entry No. 43. The Court denied Harlingen's Rule

12(b)(6) Motion as to Plaintiffs' § 1983 "state created" danger claim and state law claims. Orders signed

March 31 and April 11, 2000; Docket Entry No. 43. The Court later dismissed all remaining claims

against the individual defendants. Order signed July 31, 2000; Docket Entry No. 61.

Harlingen moves for summary judgment on the only remaining claims: (1) a § 1983 "state-created"

danger claim and (2) negligence claims under state tort law.

### II. SUMMARY JUDGMENT EVIDENCE

As summary judgment evidence, Harlingen relies upon and incorporates herein by reference the

following:

(a)     Excerpts from deposition of Sgt. Ronald K. Saenz (Exhibit "A");

(b)     Excerpts from deposition of Michael Riley (Exhibit "B");

(c)     Excerpts from deposition of George A. Hupp (Exhibit "C");

(d)     Excerpts from deposition of Orlando Sanchez (Exhibit "D");

(e)     Excerpts from deposition of James Joseph Scheopner (Exhibit "E");

1

(f)     Excerpts from deposition of Ralph Dwayne Moore (Exhibit "F");

(g)     Deposition Exhibit 5 (Exhibit "G");

(h)     Deposition Exhibit 30 (Exhibit "H");

(i)     Excerpts from deposition of Joseph Bennett Vasquez (Exhibit "I");

(j)     Raul Rodriguez Sworn Statement and attached drawing (Exhibit "J");

(k)     Rodolfo C. Jaramillo's FED. R. EVID. 803(8) Investigative Records Affidavit with REPORTS OF INVESTIGATION and Scale Drawings (Exhibit "K");

(l)     Javier Reyna's FED. R. EVID. 803(8) Investigative Records Affidavit with Case Report (Exhibit "L");

(m)     Excerpts from deposition of Melody Matlock (Exhibit "M");

(n)     Excerpts from deposition of Patsy Gail Moore (Exhibit "N");

(o)     Excerpts from deposition of Kris Ledesma (Exhibit "O"); and

(p)     Three volumes of certified transcript of Cameron County Sheriff Department Dispatch (Exhibit "P" - 1, 2 and 3).

## III.  STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

Harlingen is entitled to summary judgment that all Plaintiffs take nothing against it on the following grounds:

- ■  No Harlingen policy decision or policymaker action created an opportunity that would not have otherwise existed for the shootings to occur because Ernest had access to privately owned equally powerful rifles;

- ■  No Harlingen policy decision or policymaker action effectively stripped Agents S. Rodriguez and Salinas and Deputy Raul Rodriguez of their ability to defend themselves or cut off potential sources of private aid because the law enforcement team, Cameron County Sheriff Department ("CCSD") and U.S. Border Patrol ("BP"), were at the scene to capture a heavily armed homicidal suspect and the team was fully aware of the danger of being shot;

2

CISAPDF - www.fasisa.com

■     No Harlingen policy decision was made or policymaker action taken with knowledge of an immediate danger to known victims; Harlingen did not know Ernest Moore was going to shoot Agents S. Rodriguez and Salinas and Deputy Raul Rodriguez with an HPD rifle;

■     No Harlingen policy decision or policymaker action was done with deliberate indifference to a substantial risk of serious harm to Agents S. Rodriguez and Salinas and Deputy Raul Rodriguez;

■     No Harlingen policy decision or policymaker action was a proximate cause of the deprivation, deaths, and injuries at issue;

■     There is no proximate cause to support the state law claims;

■     There is no negligent entrustment of the subject rifle to support the state law claims.

Conversely, there is no evidence of the foregoing elements of Plaintiffs' federal and state law claims. The deadline for discovery in this case was May 31, 2001. 15 depositions have been taken; 11 at the request of Plaintiffs. The absence of evidence to support the non-parties' cases is sufficient grounds for granting summary judgment.

## IV. SUMMARY OF THE ARGUMENT

If "state created" danger is ever recognized, it is not applicable to this tragic case. None of Harlingen's alleged policies or decisions caused or could have prevented the unfortunate events. Harlingen did not cause Ernest Moore, R.D. Moore's adult son, to take the HPD rifle or give him the means and opportunity to commit these crimes which he did not already have. Harlingen did not force the BP or the CCSD to go to R.D. Moore's residence. Harlingen did not strip them of the means to defend themselves or to escape. Harlingen Police Chief, Jim Scheopner, did not know these victims were at the scene or were in immediate danger of being shot and Scheopner did not fail to tell them anything the CCSD or BP did not already know or believe. There is no proximate cause for either the federal or state claims.

On July 7, 1998, Ernest was the suspect in violent homicides committed with an AK-47 rifle in Rio Hondo. When CCSD found his vehicle near his father's house, south of San Benito, it began a manhunt to capture Ernest and summoned the BP to assist. Whenever Ernest took the rifle from the gun

safe at R.D. Moore's house, the HPD AR-15 was only one of many equally powerful guns in the safe. Among the other rifles in the same safe were a privately owned AR-15, and two other high powered semi-automatic rifles.

The CCSD and BP came to R.D. Moore's residence to search for Ernest because they thought he was there. They came well armed with protective gear. The BP carried a high- powered assault rifle. This law enforcement team knew Ernest had killed others in Rio Hondo, he had a high-powered rifle, could kill again, and was believed to be in the area. The BP believed Ernest could even be in the cornfield across the road from the Moore residence. Everyone took the necessary precautions, believing Ernest was close at hand. CCSD cautiously searched the truck and Moore residence to find him. The team began search of the surrounding fields and resaca.

Ernest stepped out of the cornfield across the road and opened fire. He was 20-50 feet from BP Agents Salinas and S. Rodriguez and approximately 80 feet from Deputy Raul Rodriguez. Other private guns which Ernest could have taken from the safe could kill just as easily.

## V. BACKGROUND EVIDENCE

### A.    Subject Rifle Issued to R.D. Moore

Scheopner became a Harlingen Police Department ("HPD") officer on June 16, 1972. Exh. E p. 12, (ll. 1 and 2). R.D. Moore was already an HPD officer; Scheopner had known him his entire career, worked with him in the HPD detective division, and observed him qualify with a handgun when Scheopner was the training officer and range master during 1985 to 1988. Exh. E, p. 31, (l. 22) - p. 32, (l. 22). Scheopner knew: R.D. Moore was extremely professional and had a good reputation; R.D. Moore had knowledge of, proficiency, and maturity with weapons; and his training on sniper rifles included the AR-15 type rifle at the FBI Academy at Quantico, Virginia. Exh. E, p. 32, (l. 3) - p. 33, (l. 12), p. 34, (l. 7) - p. 36, (l. 6), p. 75, (ll. 2-16), p. 157, (l. 19), - p. 159, (l. 12); Exh. F, p. 131, (l. 18) - p. 132, (l. 18). He also knew that: R.D. Moore had been a member of the HPD SWAT team until it was disbanded in the early 1980's; the prior Police Chief then assigned R.D. Moore and Capt. Vasquez as HPD's

4

CUtePDF - www.texla.com

sharpshooters[1]. Exh. E, p. 29, (ll. 7-18), p. 32, (ll. 19-21), p. 38, (ll. 13-21), p. 45, (l. 15) - p. 46, (l. 14).

In 1993 or 1994, Scheopner designated R.D. Moore and Capt. Vasquez again as HPD sharpshooters. Exh. E, p. 27, (l. 18) - p. 28, (l. 7), p. 38, (l. 22) - p. 39, (l. 2) and p. 45, (ll. 6-9). Exh. F, p. 96, (ll. 8-15), p. 119, (l. 11) - p. 120, (l. 10). Because of this designation, Capt. Vasquez assigned R.D. Moore the subject AR-15 in 1997. Exh. F., p. 98, (l. 19) - p. 99, (l. 17), p. 120, (ll. 11-20), p. 140, (l. 20) -p. 142, (l.17). Exh. I, p. 59, (l. 13) - p. 61, (l. 21), p. 76, (l. 18) - p. 77, (l. 1). R.D. Moore was responsible for the care, maintenance and safe keeping of the rifle and was instructed to stay proficient. Exh. E, p. 26, (l. 1) - p. 28, (l. 18), p. 37, (l. 19) - p. 39, (l. 19).

**B.     Storage of the Rifle at R.D. Moore's Residence**

Capt. Vasquez instructed R.D. Moore to safeguard the rifle at night by taking it out of his vehicle and placing it in his home. Exh. I, p. 59, (ll. 1-8), p. 65, (l. 1) - p. 67, (l. 16). R.D. Moore kept the HPD AR-15 in a gun safe at his house because it was the safest place for it. Exh. E, p. 48, (l. 17) - p. 49, (l. 2); Exh. F, p. 227, (l. 22) - p. 228, (l. 11). He and Ernest jointly purchased the gun safe because it was so expensive. Exh. F, p. 227, (l. 22) - 228, (l. 3). Ernest was twenty-five years old and had always lived at his parents' house. Exh. F, p. 6, (ll. 5-16). Ernest had not been in trouble with the law and had no criminal record. Exh. F, p. 106, (l. 22) - p. 107, (l. 1).

On the day of the shootings, the gun safe at the R. D. Moore house contained several powerful rifles besides the subject HPD AR-15.[2] These included the following firearms *privately* owned:

(1)     *another AR-15;*

(2)     a semi automatic SKS;

(3)     a semi automatic M-1 Carbine.

---

[1]  **In case of a hostage or tactical situation.**

[2]  **The safe also had contained Ernest's privately owned AK-47 which he used in the Rio Hondo shootings. Exh. A, p. 7 (l. 22) - p. 8, (l. 1).**

Exh. F, p. 12, (l. 21) - p. 14, (l. 22), p. 208, (l. 11) -p. 211, (l. 20) and Exh. G. These guns were fully functional and operational and equally available to Ernest Moore. Exh. F, p. 209, (l. 19) - p. 210, (l. 2) Ernest was proficient in the use, operation and shooting of these guns. Exh. F, p. 211, (ll. 21-23). Ernest could have used the privately owned semi automatic rifles just as easily to commit this tragedy. Exh. F, p. 211 (l. 24) - p. 212, (l. 7). [The Gun Inventory List (Exh. G) shows ammunition was present and available for the privately owned SKS and M-1 Carbine semi automatic rifles.]

HPD Capt. Joseph Vasquez (who is also a licensed firearms dealer) testified to his background and experience with firearms. Exh. I, p. 24, (l. 25) - p. 26, (l. 10), p. 88 (ll. 1-9), p. 133, (l. 24) - p. 137, (l. 23) and p. 147, (l. 21) - p. 148, (l. 3). Vasquez is familiar with the AR-15 by training and extensive use of his privately owned AR-15s. Exh. I, p. 138, (l. 3) - p. 141, (l. 16). The Moore privately owned AR-15 and the HPD clone AR-15 had exchangeable parts, with the same caliber and fire power, and utilized the same clips and magazines. Exh. I, p. 142, (ll. 2-24). Capt. Vasquez has owned eight to ten SKS semi automatic rifles, shot them all at target practice and estimates he has shot a couple of thousand rounds with such model gun. Exh. I, p. 142, (l. 25) - p. 144, (l. 22). The SKS was a military rifle used by the Vietnamese during the Vietnam War. Exh. I, p. 144, (ll. 2-22). He has owned about five M-1 Carbines and has shot over a thousand rounds with this semi automatic rifle. Exh. I, p. 144, (l. 23) - p. 145, (l. 15). If Ernest had taken the privately owned AR-15 or the SKS or M-1 in the same vault, Ernest could have as easily and effectively killed BP Agents Salinas and S. Rodriguez and seriously wounded Deputy Sheriff Raul Rodriguez. Exh. I, p. 145, (l. 16) - p. 147, (l. 19), p. 148, (ll. 4-17).

C.    **CCSD's Chase and Call For Backup to BP to Apprehend Ernest**

At about 5:40 a.m. on July 7, 1998, sheriff's dispatchers notified CCSD Senior Sgt. Saenz that there was an ongoing pursuit involving a subject who had killed two persons in Rio Hondo. Exh. A, p. 6, (l. 20) - p. 7, (l. 4). Sgt. Saenz, Plaintiff Deputy Raul Rodriguez and other deputies responded to the Rio Hondo location. Exh. A, p. 7, (ll. 4-15).

Between 6:00 and 6:30 a.m., R.D. Moore was awakened by his wife, Patsy, who had heard a door slam and was concerned that something was wrong with Ernest. Exh. F, p. 5, (ll. 3-15), p. 8, (ll. 3-13),

p. 16, (ll. 8-12), p. 33, (l. 22) - p. 34, (l. 18), p. 189, (l. 4) - p. 190, (l. 9). They searched for Ernest but could not find him. Exh. F, p. 5, (l. 20) - p. 6, (l. 4), p. 8, (l. 17) -p. 9, (l. 5), p. 15, (l. 24) - p. 23, (l. 15), p. 33, (l. 5) - p. 34, (l. 25), p. 101, (l. 5) - p. 103, (l. 25), p. 163, (l. 5) - p. 166, (l. 5).

CCSD Deputy Raul Rodriguez stated "we had requested Border Patrol assistance ... they were advised to use caution and that the suspect was extremely armed and dangerous." Exh. J, p. 1. BP Agents Mike Riley and S. Rodriguez (Decedent) received a BP radio transmission advising of a double homicide with vehicle headed south and suspect who was armed. Exh. B, p. 6, (l. 14) - p. 7, (l. 13). BP Agents Orlando Sanchez and Ricardo Salinas (Decedent) were advised of the double homicide in Rio Hondo at their pre-shift briefing. Exh. D, p. 8, (ll. 3-22).

CCSD Deputy Robert Rodriguez radioed the sheriff's dispatcher that he had located the truck involved in the homicide which he had been pursuing. Exh. A, p. 8, (ll. 2-10), p. 38, (l. 4) - p. 39, (l. 6). His radio transmissions were overheard by Sgt. Saenz and Deputy Raul Rodriguez. Exh. A p. 66, (ll. 1-8). Sgt. Saenz sent Deputy Raul Rodriguez to go for back up; then Sgt. Saenz also headed to the location of the truck on Gamble Road, south of San Benito. Exh. A, p. 8, (l. 11) - p. 9, (l. 2) and p. 39, (ll. 7-15).

BP dispatch advised that the truck had been found and assistance was requested by CCSD; BP Agent Hupp secured a "selective fire" M-4 rifle, capable of automatic fire; his partner Agent Ed Kelly took a shotgun; and they went to the scene. Exh. C, p. 11, (l. 1) - p. 12, (l. 5).

Agents Riley and S. Rodriguez also received the radio call for back up on the double homicide; as the senior agent, S. Rodriguez decided she and Riley should go. Exh. B, p. 7, (l. 14) - p. 8, (l. 22). BP Agents Sanchez and Salinas were directed to go to Gamble Road to provide ground to air communications between the CCSD and the BP helicopter assisting in the manhunt. Exh. D, p. 8, (l. 23) - p. 11, (l. 1).

Agent Hupp described that all BP agents went through several months of academy training with relatively extensive firearms training, including the M-4 rifle which is similar to the M-16 and AR-15 series. Exh. C, p. 11, (l. 8-11), p. 30, (l. 15) -p. 33, (l. 7). Although Ricardo Salinas was in trainee

CUtePDF - www.tacro.com

status, he had already attended the Academy and been on the line for six months. Exh. D, p. 31, (ll. 13-19) and p. 40, (ll. 9-14).

CCSD Deputies Robert Rodriguez and Cody Mitchell first arrived at the Moore house and spoke with R.D. Moore. Exh. F, p. 37, (ll. 1-25). Kris Ledesma was the CCSD Dispatcher on duty. Exh. O, p. 10, (l. 14) - p. 11, (l. 6). CCSD Deputy Robert Rodriguez radioed "subject is in the area and just be advised he is armed heavily. He is in the area, advised by the father". Exh. O, p. 99, (l. 4) - p. 100, (l. 2), p. 101, (ll. 13-20). CCSD criminal investigator Javier Reyna radioed CCSD dispatch that he had gathered information from a female in Rio Hondo that Ernest had an arsenal of weapons and to be careful. Exh. O, p. 108, (l. 23) - p. 110, (l. 6). The manhunt for Ernest Moore was a Code 3 which is the highest level of warning the dispatcher can give. Exh. O, p. 98, (ll. 6-18).

**D.      CCSD Leads the Law Enforcement Team to Search Area for and Apprehend Ernest**

**1.      CCSD Takes Control**

The CCSD was in charge of the manhunt and Sgt. Saenz was the supervising officer in command. Exh. A, p. 14, (l. 24) - p. 15, (l. 9). Sgt. Saenz arrived on Gamble Road (south of the City of San Benito) north of the Moore residence at approximately 6:45 a.m.; he observed BP cars near the Moore residence and Deputy Robert Rodriguez outside his car talking to R.D. Moore. Exh. A, p. 8, (l. 22) - p. 9, (l. 2), p. 9, (l. 14) - p. 10, (l. 3). Sgt. Saenz approached and advised R.D. Moore that there were two people dead in Rio Hondo, possibly a third was going to die, that Ernest was the main suspect and they had chased the vehicle to R.D. Moore's residence. Exh. F, p. 37, (l. 23) - p. 38, (l. 3); Exh. A, p. 10, (ll. 4-14).

**2.      Law Enforcement Team Learned They Were in Immediate Vicinity of a Heavily Armed and Homicidal Suspect**

Agents Riley and S. Rodriguez followed one of the CCSD vehicles to the location. Exh. B, p. 8, (l. 23) - p. 9, (l. 5). They saw eight or nine officers at the scene but because they had "a lot of tactical gear on... it was hard to determine who was who" but the identifiable uniforms were those of BP and CCSD. Exh. B, p. 9, (ll. 6-11), p. 11, (l. 25) - p. 12, (l. 11). Agents Hupp and Kelly arrived shortly

after Agents Riley and S. Rodriguez. Exh. B, p. 9, (l. 25) - p. 10, (l. 2). When the BP Agents first arrived, someone "told us that there were three suspects armed, they had just killed two people, that they don't care about killing anybody else or they weren't afraid of taking their own lives". Exh. B, p. 10, (ll. 11-15), p. 16, (ll. 9-12).

Agent S. Rodriguez was the senior Agent on the scene; under the BP's paramilitary command structure "the person with the most experience or the highest rank assumes command of the troops so everybody is not running around like a chicken without any guidance or direction". Exh. C, p. 12, (ll. 6-19). Therefore, she assumed command of the BP Agents at the scene and advised them about the information she had obtained from the CCSD, including they were up against three people who had committed murder with an AK-47 rifle and were believed to have more weapons. Exh. C, p. 14, (ll. 5-21).

Agent S. Rodriguez directed Agents Hupp and Kelly to go to the other side of a treeline (resaca) to secure it because they had the big guns. Exh. C, p. 14, (l. 25) - p. 15, (l. 3) and p. 67, (ll. 15-18). Agent Hupp said "it stood to reason that, you know, if he was likely to be hiding in the treeline, he could perhaps snipe at us from there, or whatever". Exh. C, p. 15, (ll. 4-6). The BP Agents wanted to secure the area so Ernest could not escape, wait for more backup and then determine how to search the area where they thought the suspect was. Exh. C, p. 15, (ll. 6-11).

Someone amongst the BP Agents said (probably S. Rodriguez and if not, said in her presence) "that the suspect might be anywhere, even in the cornfields adjacent to the road we were on". Exh. C, p. 15, (l. 24) - p. 16, (l. 14). They believed that this suspect had already been involved in a couple of murders, was armed, and could be as close as in the cornfield. Exh. C, p. 66, (ll. 14-21). Agent Hupp remembers "that moment because that was when I looked at Ed [Kelly] and Ed looked at I and we both decided to chamber a round" meaning they chambered a round in their weapons, the M-4 and shotgun; they didn't know where the guy was, something might be imminent, anything could happen, and there was a sense of urgency or immediacy of the danger that the suspect might be right beside them. Exh. C, p. 16, (l. 15) - p. 17, (l. 16) and p. 67, (ll. 1-11). The irony of this struck Agent Hupp later when in fact

9

this was exactly where Ernest Moore was.  Exh. C, p. 66, (ll. 21-25).  Agent S. Rodriguez also knew something could happen at any moment.  Exh. C, p. 67, (ll. 12-14).

Sgt. Saenz advised R.D. Moore they needed to search the house and he agreed.  Exh. A, p. 10, (ll. 15-18).  Sgt. Saenz checked Ernest's truck before entering the house because "we were concerned that individuals could be anywhere at that point".  Exh. A, p. 77, (l. 21) - p. 78, (l. 9).  Sgt. Saenz and three or four Deputy Sheriffs went in to search the house for Ernest; they searched the entire residence to his satisfaction.  Exh. A, p. 11, (l. 6) - p. 12, (l. 25).

Agent Riley told Agent S. Rodriguez "let's get out of here".  Exh. B, p. 14 (ll. 1-6).  He believed the BP Agents were in an unsecured, dangerous area based upon the information that "there were three suspects that had just killed two people and that weren't afraid of taking more lives or taking their own lives.  They had -- I guess at the time we were already told that they had AK-47s and M-16s, pretty powerful weapons".  Exh. B, p. 16, (ll. 1-22), p. 17, (l. 22) - p. 18, (l. 6).  After Riley told S. Rodriguez "let"s get out of here", they could have left and in fact, Riley kept walking down towards his patrol unit.[3/]  Exh. B, p. 14, (ll. 7-12).  Because Agent S. Rodriguez was the senior agent, it was up to her to stay or leave; she held back to talk to a deputy sheriff.  Exh. B, p. 14, (l. 17) - p. 15, (l. 3).

After searching the house, Sgt. Saenz spoke to Agent S. Rodriguez and provided all the information, i.e., the suspect was Ernest who had a high powered rifle and plenty of ammunition.  Exh. A, p. 16, (l. 20) - p. 17, (l. 10).  CCSD, who was in charge of the manhunt, never ruled out the possibility of Ernest being anywhere outside the residence where he could hide, including in the cornfield; CCSD assumed, based upon good law enforcement techniques and practices, that Ernest could have been anywhere outside the residence where he could hide.  Exh. A, p. 14, (l. 24) - p. 15, (l. 20) and p. 16, (ll. 11-19).  All of the law enforcement, based upon good police techniques, believed for purposes of securing the area, that Ernest was still in the area.  Exh. A, p. 104, (ll. 7-12).

---

[3/]  **This was when Agents Rolando Sanchez and Ricardo Salinas drove by Riley.  Exh. B, p. 14, (ll. 13-16).**

As Agents Saenz and Salinas (deceased) approached the scene one of the BP Agents posted by S. Rodriguez at the resaca told them to go to the residence and report to the officers in charge. Exh. D, p. 11, (ll. 2-20); Exh. C, p. 67, (l. 22) - p. 68, (l. 2). Agent Hupp remembers some brief, to the point, discussion with the agents at the resaca about three bad guys with rifles who could be in the tree line and the suspect's father's house being searched. Exh. C, p. 69, (l. 11) - p. 70, (l. 17). It would be good BP practice to alert newly arriving agents to what was going on and Hupp was sure that he or one of the other agents did that when Agents Sanchez and Salinas were stopped. Exh. C, p. 70, (ll. 9-14).

Agents Sanchez and Salinas parked their vehicle and walked towards Agent S. Rodriguez so she could brief them on "what was going on, what needed to be done, and to get coordinated also with officers that were in charge." Exh. D, p. 13, (l. 9) - p. 16, (l. 6). Agent S. Rodriguez told Agent Sanchez to come back with her towards his parked vehicle so she could brief him on what was going on. Exh. D, p. 14, (ll. 19-22).

### 3.    The Shootings

As Agents S. Rodriguez and Sanchez walked backed towards the Sanchez vehicle, the shots were fired. Ex. D, p. 16, (ll. 7-12). Ernest was located in the corner of the cornfield. Exh. D, p. 35, (l. 25) - p. 36, (l. 2). Sgt. Saenz estimates that the shots were fired 10 and 20 minutes after searching the house and that the house search took 5-10 minutes. Exh. A, p. 18, (l. 20) - p. 19, (l. 10). Agent Hupp estimated the shooting occurred 7-8 minutes after the discussions with Agent S. Rodriguez that the armed murderers might be as close as the cornfield next to the road they were on. Exh. C, p. 67, (l. 19) - p. 68, (l. 21). Agent Hupp estimated the shooting occurred 3-5 minutes after he, or one of the other agents briefed Agents Sanchez and Salinas. Exh. C, p. 70, (ll. 18-21).

Agents S. Rodriguez and Salinas were shot adjacent to Agent Sanchez's vehicle. Exh. D, p. 31, (l. 20) - p. 32, (l. 3). and p. 35, (ll. 3-24). Agents Sanchez and Hupp estimated the distance between Ernest and Agents Salinas and S. Rodriguez at approximately 20 to 25 feet. Exh. D, p. 19, (ll. 10-19); Exh. C, p. 50, (ll. 2-22). According to the DPS scale drawings, the distances were approximately 44 and 50 feet, between Ernest and BP Agents Salinas and S. Rodriguez, respectively. Exh. K-last two pages.

Agent Sanchez saw Agent Salinas fall immediately. Exh. D, p. 16, (ll. 13-15). Agent Sanchez retreated and shot at (and he thinks hit) Ernest. Exh. D, p. 17, (l. 6) - p. 18, (l. 12), p. 19, (l. 24) - p. 20, (l. 11). Agent S. Rodriguez who had been running side by side with Agent Sanchez up along side the vehicle, rounded the right rear corner and went into a kneeling position to return fire to the gunman when she was hit. Exh. D, p. 16, (l. 15) - p. 17, (l. 5) and p. 35, (l. 16) - p. 36, (l. 15). When the shootings started Deputy Raul Rodriguez was right beside Sgt. Saenz in the middle of the front yard of the Moore residence and after just leaving a conversation with Agent S. Rodriguez. Exh. A, p. 42, (ll. 3-15). According to the DPS scale drawing which was initialed by Raul Rodriguez on August 6, 1998, Ernest Moore was approximately 75-80 feet from Raul Rodriguez. Exh. J, attached drawing; Exh. K - ¶ 160 on p. 39.

**E.    Harlingen Police Chief Scheopner had No Information That Law Enforcement Team Did Not Already Have**

On July 7, 1998, Scheopner first learned of Ernest Moore's alleged illegal activities at about 6:50 a.m. through a telephone call from the dispatcher who advised that CCSD wanted assistance to get R.D. Moore to cooperate. Exh. A, p. 9, (ll. 3-13), p. 69, (ll. 4-12); Exh. E, p. 92, (l. 10) - p. 93, (l. 5) and p. 106, (l. 14) - p. 107, (l. 22) and Exh. M, p. 225, (l. 4) - p. 227, (l. 3) and p. 233 (ll. 22-24). Exh. P-2, p. 17, (ll. 2-15). HPD Sgts. Foist and Garcia headed to R.D. Moore's home to get him to cooperate with the CCSD. Exh. E, p. 95, (l. 17) - p. 96, (l. 20). Scheopner called HPD Sgt. Foist and then Scheopner called the Moore home. Exh. E, p. 95, (l. 21) - p. 96, (l. 22). Patsy Moore answered the phone and told Scheopner that R.D. Moore was down the road talking to the deputy sheriffs; Patsy asked Scheopner what was going on and said they had been looking for Ernest but did not know where he was; Scheopner gave Patsy his number so that R.D. Moore could call him after R.D. came back to the house from talking to the deputies. Exh. E, p. 96, (l. 22) - p. 98, (l. 1); Exh. N, p. 161, (ll. 4-10) and p. 162, (ll. 13-16). When R.D. Moore returned with Sgt. Saenz and the two deputies to search the house, R.D. Moore returned Scheopner's call; the conversation was short because the Moore's cordless phone battery went dead; the brief conversation concerned only: R.D. Moore cooperating with the CCSD, Scheopner being in transit

12

to the scene; and the HPD Sgts. in transit and arriving at R.D. Moore's home.  Exh. E, p. 94, (l. 10) - p. 95, (l. 16), p. 96, (l. 21) - p. 100, (l. 10); Exh. F p. 205, (l. 1) - p. 206, (l. 16); Exh. N, p. 161, (l. 11) - p. 162, (l. 2), p. 162, (l. 24) - p. 163, (l. 18).

When the shooting started, Scheopner was stopped at a CCSD roadblock on the other side of a canal or resaca bank approximately 200 yards from the Moore house; he could not see the house; could not and did not see any law enforcement personnel at the house; he did not know that BP Agent S. Rodriguez, BP Agent Salinas or Deputy Sheriff Raul Rodriguez were at the house.  Exh. E, p. 110, (l. 11) - p. 111, (l. 11), p. 338, (l. 7) - p. 339, (l. 10), p. 339, (l. 18) - p. 340, (l. 3), p. 340, (l. 6-14). Scheopner had not seen Ernest Moore, did not know where in the area around the house Ernest Moore was or even for sure if he was in the area and did not know what kind of gun, if any, Ernest had.  Exh. E, p. 340, (l. 4, 5 and ll. 15-23).  All pertinent information Scheopner received before the shootings was transmitted from CCSD personnel either directly or indirectly.  Exh. E, p. 341, (l. 12) - p. 342, (l. 1).

R.D. Moore's residence was outside the City limits and jurisdiction of the City of Harlingen and the HPD.  Exh. E, p. 264, (l. 20 and 21); p. 270, (ll. 10-13).  HPD had no jurisdiction over this manhunt; the CCSD was the law enforcement agency with jurisdiction.  Exh. E, p. 342, (ll. 16-22).  Harlingen did not request or direct the BP, Agent S. Rodriguez, Agent Salinas, CCSD or Deputy Raul Rodriguez to assist or be present.  Exh. E, p. 342, (l. 23) - p. 343, (l. 3).  Harlingen did not have any authority to direct the activities of the BP, Agent S. Rodriguez, Agent Salinas, CCSD or Deputy Raul Rodriguez.  Exh. E, p. 343, (ll. 4-9).

F.    **Determination that Ernest Moore Acted Alone**

The manhunt conducted by the law enforcement agencies and the follow up investigation eliminated the existence of other suspects.  Exh. K, ¶ 26, p. 6; ¶ 36, p. 7; p. 12; ¶ 55, p. 13; ¶¶ 102-106, P. 30; Exh. L, p. 6.

# VI.  ARGUMENT AND AUTHORITIES

A.    <u>Summary Judgment Standard of Review</u>

Summary judgment shall be granted when there is not a genuine issue as to any material fact, and a moving party is entitled to judgment as a matter of law. *Fields v. City of South Houston, Texas*, 922 F.2d 1183, 1187 (5th Cir. 1991); *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 177-78 (5th Cir. 1990), *reh. denied,* 920 F.2d 259 (5th Cir. 1990).  There is no genuine material fact issues, if no reasonable trier of fact could have found for the plaintiff or the evidence favoring the plaintiffs is insufficient to enable a reasonable jury to return a verdict for them. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986); *Lavespere,* 910 F.2d at 178.  To satisfy this burden, Harlingen must either (1) submit evidence or documents that negate the existence of some material element of plaintiffs' claims, or (2) point out that the evidentiary documents in the record contain insufficient proof concerning any essential element of the plaintiffs' claims. *Celotex Corp. v. Garrett*, 477 U.S. 317, 325 (1986); *Lavespere,* 910 F.2d at 178.

Merely raising some metaphysical doubt regarding material facts does not create a genuine issue of material fact. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The existence of a scintilla of evidence in support of the non-movant's position will not be sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252.  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "'genuine issue for trial.'" *First National Bank v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968); *Matsushita,* 475 U.S. at 586.

B.    <u>Law and Facts of this Case</u>

1.    **State-Created Danger Claim**

The Court has dismissed all § 1983 claims against Harlingen, save for a potential "state created" danger claim under Substantive Due Process.  The Supreme Court stated that the 14th Amendment's Due Process Clause is triggered only by affirmative government action and put no duty on government officials to act to prevent a third party from harming the claimant. *DeShaney v. Winnebago County Dept. of Soc. Ser.*, 489 U.S. 189, 196-97 (1989).  The court neither approved nor disapproved of a rule imposing

14

liability if the State created the risk of harm to which it forced the claimant to suffer, i.e., an exception for "stated-created" danger. *Id.*

Though often asked to do so, the Fifth Circuit has consistently declined to adopt the "state-created" danger rule. *Piotrowski v. City of Houston*, 237 F.3d 567, 584 (5th Cir. 2001), *petition for cert. filed*, __U.S.L.W.__ (U.S. June 5, 2001) (No. 00-1811); *Randolph v. Cervantes*, 130 F.3d 727, 731 (5th Cir. 1997), *cert. denied*, 525 U.S. 822 (1998); *Doe v. Hillsboro ISD*, 113 F.3d 1412, 1415 (5th Cir. 1997) (en banc); *Johnson v. Dallas ISD*, 38 F.3d 198, 201 (5th Cir. 1994), *cert. denied*, 514 U.S. 1017 (1995). The rationale for any exception is that the state exercises its authority to restrain the individual's liberty so as to render him unable to protect himself. *DeShaney*, 489 U.S. at 200; *Piotrowski*, 237 F.3d at 584. In *Johnson*, the Court questioned whether it could ever meet the "demanding standard for constitutional liability." 38 F.3d at 201.

Although the Fifth Circuit has not adopted the "state-created" danger exception to the *DeShaney* Rule, it outlined the elements:

■ the environment created by the state actors must be dangerous;

■ the state actors must know that it is dangerous;

■ the state actors must have used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur;

■ the state must have effectively stripped a person of her ability to defend herself, or cut off potential sources of private aid; and

■ the action must be done with deliberate indifference.

130 F.3d at 731 (citing *Johnson*, 38 F.3d at 201); *Piotrowski*, 237 F.3d at 585. The "state created" danger doctrine will not apply where the government actor is not aware of any immediate danger facing a known victim. *Saenz v. Heldenfels Bros., Inc.*, 183 F.3d 389, 392 (5th Cir. 1999). There, the Fifth Circuit clearly stated that the "state created" danger theory is inapposite without a known victim. 183 F.3d at 392. The state does not create risk if the private citizen's threat existed before the state's action. *Piotrowski*, 237 F.3d at 584. There is no

15

deliberate indifference if the City did not deliberately create the risk of private violence or prevent the victims from protecting themselves. *Id.* at 585.

Harlingen is not vicariously liable for the acts of its employees. *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 694 (1978). To hold Harlingen liable, Plaintiffs must show that a final policymaker adopted a "policy" that caused the deprivation. *Bd. of County Comm. of Bryan County v. Brown*, 520 U.S. 397, 403, (1997). Municipal liability requires three elements: a policy maker, an official policy, and a violation of constitutional rights whose "moving force" is the policy. *Piotrowski*, 237 F.3d at 578. Plaintiffs allege that Police Chief Scheopner is the policymaker for the HPD. The policymaker must either expressly adopt the policy or there must be a widespread practice of city police officers so common and well-settled that it fairly represents a policy known to and adopted by the policymaker. *Id.* at 579, 581. The "policy" must be unconstitutional on its face or adopted with deliberate indifference to the certainty that a constitutional deprivation will result. *Id.; Snyder v. Trepagnier*, 142 F.3d 791, 795-96 (5th Cir. 1998), cert. dism'd, 119 S.Ct. 1493 (1999). Ordinary or heightened negligence will not meet the test of deliberate indifference. *Id.* at 579-580. The official must be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and he must actually draw that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The failure to have a policy cannot be a "policy" unless the failure amounts to an intentional choice, not merely an unintentional oversight. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *Doe v. Dallas I.S.D.*, 153 F.3d 211, 217 (5th Cir. 1998).

Furthermore, the City's policy must have proximately caused the violation of the plaintiffs' federal rights. *Martinez v. California*, 444 U.S. 277, 285 (1980); *Doe v. Sullivan County, Texas*, 956 F.2d 545, 550 (5th Cir. 1992); *Reimer v. Smith*, 663 F2d 1316, 1322 (5th Cir. 1981). Implicit in the 'deprivation' of liberty or property is a causal link between the

16

constitutional violation and the deprivation. *Mt. Healthy School Dist. v. Doyle*, 429 U.S. 274, 286 (1977); *Martinez*, 444 U.S. at 285; *Reimer*, 663 F.2d at 1322. First, the constitutional violation must not be too remote from the injury. *Martinez*, 444 U.S. at 285. Second, the deprivation must be a foreseeable result. *Anderson v. Nosser*, 456 F.2d 835, 841 (5th Cir. 1972)(en banc), *cert. denied*, 409 U.S. 845 (1972). Third, it must be the 'cause-in-fact' of the deprivation. *Rodriguez-Cirilo v. Garcia*, 115 F.3d 50, 52 (1st Cir. 1997). This means that the deprivation would not have occurred 'but-for' the constitutional violation. *Mt. Healthy School Dist.*, 429 U.S. at 287; *Hart v. O'Brien*, 127 F.3d 424, (5th Cir. 1997), *reh. denied*, 154 F.3d 419 (5th Cir. 1998), *cert. denied*, 525 U.S. 1103 (1999). Causation is especially important in the context of state-created danger exception cases, where frequently it is difficult to identify to what extent the danger faced by the plaintiff was caused by the state versus a private actor.

### 2. If "State-Created" Danger Theory is Viable, It is Not Applicable in this Case

No Harlingen policy decision or policymaker action created any opportunity that would not have otherwise existed for the shootings to occur. Harlingen did not give Ernest the HPD rifle or encourage him to take it. Any access to the rifle safe gave him equal access to the privately owned AR-15, SKS and M-1 Carbine rifles, equally capable of killing people. He would have had a rifle of equal firepower when the CCSD and BP arrived, whether or not HPD's AR-15 had been in the safe. *Compare, Piotrowski*, 237 F.3d at 584 (city did not create risk that boyfriend would harm plaintiff where his violent tendencies and threats of violence preceded alleged police protection of boyfriend).

No Harlingen policy decision or policymaker action effectively stripped Agents S. Rodriguez and Salinas and Deputy Raul Rodriguez of their ability to escape or defend themselves.

17

The law enforcement team, CCSD and BP, were at the scene to capture a heavily armed homicidal suspect; the team was fully aware of the danger of being shot.

Specifically, here is what is known about the law enforcement team surrounding the house:

- ■ there were two law enforcement agencies:

  - ▪ CCSD was in charge of the manhunt with Sgt. Saenz in command;

  - ▪ BP, to back up and assist, with Senior Agent S. Rodriguez in command;

- ■ the team knew they were chasing an armed murderer;

- ■ when the BP Agents Riley and S. Rodriguez arrived at the scene, the members of the team already present had so much tactical gear on it was difficult to identify the uniforms;

- ■ when BP Agents Riley and S. Rodriguez first arrived they were advised and it was known by the law enforcement team that there were as many as three suspects armed who had just killed two people and they did not care about killing themselves or anybody else;

- ■ the law enforcement team learned that the suspects had high powered military assault rifles;

- ■ the law enforcement team assumed Ernest could be anywhere, including exactly where he was (in the cornfield);

- ■ the law enforcement team assumed they could be harmed or shot;

- ■ Harlingen neither brought the law enforcement team to the scene of the shootings nor held them there;

- ■ the law enforcement team knew or assumed as much or more than Scheopner; Scheopner's only pertinent information came directly or indirectly from CCSD;

18

CitiPDF - www.texiss.com

■    the BP agents at the scene debated moving to a safer location but decided to remain based upon a calculated decision to pursue arrest assuming the risk Ernest was near by, not because of ignorance of the risk.

No means of escape was cut off; they remained because they were part of manhunt to find Ernest. *Compare, Piotrowski*, 237 F.3d at 585 (police did not strip plaintiff of means of escape or defense when she knew her ex-boyfriend's intent to harm her and they did not prevent her from protecting herself).

Harlingen did not know of any immediate danger to a known victim, nor did it intentionally create the risk. When the rifle was issued to R.D. Moore, it was not known that several months later Ernest Moore would take the rifle to aid in his escape from apprehension for homicide. That morning, Police Chief Schoepner did not know who was at the Moore house or where Ernest was. Scheopner did not know Agents S. Rodriguez and Salinas and Deputy Raul Rodriguez were at the scene or in immediate danger of being shot. *Compare, Saenz*, 183 F.3d at 392. There the officers failed to arrest a drunk driver who, a few minutes later, hit and killed the plaintiffs. *Id.* at 390. The possibility that the officers might have anticipated harm to unidentifiable members of the public on the road was insufficient. *Id.* at 392. Due Process was not violated by increasing the risk to an unidentifiable person. *Id.*

No Harlingen policy decision or policymaker action was done with deliberate indifference to a substantial risk of serious harm to Agents S. Rodriguez and Salinas and Deputy Raul Rodriguez (see argument following in ¶ 3.).

### 3. No Deliberately Indifferent Harlingen Policy Decision or Policymaker Action Caused the Shootings

The Court, in refusing to dismiss novel legal claims at the pleadings stage, noted two alleged City actions which could colorably support a state created danger claim:

19

■ "The policies of the City of Harlingen allowed a civilian version of a military assault rifle to fall into the hands of a person who was not a police officer and who was extremely dangerous."

■ "If Defendant Scheopner knew of the real threat posed by E. Moore before [decedents were killed and Plaintiff was injured], he could have avoided the danger he created by warning the law enforcement teams surrounding the house to take necessary precautions to secure their safety."  (Orders March 31 and April 11, 2000, p. 21 and 22; Docket Entry No. 43.)

The evidence shows that neither alleged action is a "policy" that caused the shootings. Even if Chief Scheopner is a city "policymaker," he did not adopt either with deliberate indifference to a substantial risk of serious harm.  Neither alleged "policy" was a proximate cause of the shootings; neither is the cause-in-fact of the shootings.

There is no evidence that Chief Scheopner is a Harlingen policymaker.  If he is a policymaker, neither of the alleged polices were adopted by him with deliberate indifference to a known or obvious risk that a private citizen would take an HPD rifle without permission and use it to harm others.  The first alleged policy rests on the assignment of the rifle to R.D. Moore and an alleged failure to instruct on safeguarding it.  The point is that policy must focus on rifle *safeguarding*; therefore, R.D. Moore's proficiency to *use* the weapon is not relevant.  There is no evidence that a widespread problem existed with private citizens stealing HPD weapons, or that R.D. Moore had been irresponsible about safeguarding other assigned weapons.  Likewise, the failure to have policies that forbid storing weapons at home was not intentionally adopted with deliberate indifference to any known or obvious risk they would be stolen to commit crimes. *Compare, Huffman v. County of Los Angeles,* 147 F.3d 1054, 1060 (9th Cir. 1998) (county policy

20

to require deputies to carry weapon at all times without warning them to not carry guns while drunk and off-duty, held not adopted with deliberate indifference).

The second "policy" fails for the same reason. Chief Scheopner had no reason to think that CCSD had need of information or lacked fire power or means of defense. He knew nothing about the tactical situation at the Moore residence, and he did not know Agents S. Rodriguez and Salinas and Deputy Raul Rodriguez were there. *Compare Shrum v. Kluck*, 249 F.3d 773, 780-81 (8th Cir. 2001) (school's decision to give a neutral reference letter to teacher dismissed on charges of child molestation, held not to be deliberate indifference when school lacked concrete proof teacher would molest children in the future). Most important, CCSD was in charge, not Scheopner. The whole manhunt was outside his jurisdiction.

Third, neither action can be the "but for" cause. If the HPD AR-15 had been absent from Moore's safe, Ernest could have taken the privately owned AR-15, SKS or M-1 Carbine. These privately owned weapons would have inflicted the same deaths and injuries.

The second alleged policy decision (Scheopner's alleged failure to warn, i.e., the law enforcement team) is not the cause-in-fact of the events and injuries. Whether or not he failed to tell them whatever he knew, they already knew or assumed that Ernest was homicidal, carrying an assault rifle, and close by. The law enforcement team took the precautions they deemed best in light of that information; no lack of precaution resulted from any lack of information.

*Compare, Hart*, 127 F.3d at 446; *Rodriguez-Cirilo*, 115 F.3d at 52. In *Hart*, a DPS trooper O'Brien arrested Hart and took him before the magistrate for arraignment. O'Brien told the magistrate that Hart had a federal warrant out (which was untrue) which caused the magistrate to deny Hart bail; the next day the magistrate set bail for Hart, but Hart was unable to raise the bond for two weeks. 127 F.3d at 434. The Fifth Circuit found that there was no cause-in-fact

for any unlawful detention caused by the false statement; had a reasonable bond been set, Hart could not have met it and would have remained in jail. *Id.* at 446.

In *Rodriguez-Cirilo,* after Francisco Cirilo had threatened to kill himself or his brother, Celso, family members obtained a order requiring Francisco to be detained at a local hospital for 2 days for psychiatric testing. 115 F.3d at 51. Police officers declined to enforce the arrest order and told the family to take Francisco to the hospital, but he refused to go. *Id.* at 51. Two weeks later he argued with Celso and stabbed him. The First Circuit found no causation. There was no showing that, but-for the failure to arrest, Francisco would not have stabbed Celso. Because the order was for only two days and there was nothing to show he would have been held longer, there was no proof Francisco would not have been released before the stabbing. *Id.* at 53.

Second, any decision or "policy" that somehow allowed the HPD rifle to fall into Ernest's hands was too remote. The assignment of the weapon to R.D. Moore occurred in 1997, several months before the shooting. *Compare*, *Martinez*, 444 U.S. at 285; *Rodriguez-Cirilo*, 115 F.3d at 52. In *Martinez* plaintiffs sued the state board of pardons over the murder of a girl by a parolee. The criminal had been convicted as an insane, violent sex offender, with a recommendation against parole; after 5 years the board paroled him, with full knowledge of his history and the likelihood he would commit violent crimes. *Id.* at 279. Five months after his release, he tortured and murdered plaintiff's daughter. *Id.* at 280. The Supreme Court concluded that the release five months earlier was too remote in time to be a proximate cause of her death. *Id.* at 285.

In *Rodriguez-Cirilo*, family members had obtained an order to detain Francisco Cirilo for two days of pscyhological exams; two weeks after police refused to enforce the order or arrest Francisco, he stabbed his brother. 115 F.3d at 51. The First Circuit concluded the two week

22

delay between the failure to arrest and the stabbing made the causal link too remote. *Id.* at 52, citing *Martinez* 444 U.S. at 285.

### 4.    State Claims

To prevail on a Texas negligence cause of action Defendant must prove proximate cause. The state law definition of proximate cause parallels the federal definition. Plaintiffs must prove cause in fact which requires proof that "but for" and "without which" defendant's conduct, the event would not have occurred and plaintiffs must prove that defendant's conduct is not too remote from the event. *Missouri Pac. RR Co. v. American Statesman,* 552 S.W.2d 99, 103-4 (Tex. 1977); *Mosley v. Excel Corp.,* 109 F.3d 1006, 1009 (5th Cir. 1997), *reh. denied,* 114 F.3d 1185 (5th Cir. 1997).   As discussed above, plaintiffs in this case, as a matter of law, cannot establish proximate cause between any action of the city or its employees, and the tragic events that occurred on July 7, 1998.

The undisputed evidence conclusively negates negligent entrustment or alternatively there is no evidence of negligent entrustment of the subject rifle to Ernest Moore.   The main alleged act of R.D. Moore was storing the rifle where his son could take it.   Texas cases have held that negligent entrustment of a firearm to an incompetent user may be actionable. *Kennedy v. Baird*, 682 S.W.2d 377, 388 (Tex. App.- El Paso 1984, no writ).   However, *Kennedy* does not state that there can be liability for failing to prevent the weapon from being taken without permission.   By analogy, Texas does not impose a duty to safeguard car keys to prevent a thief from stealing the car and hitting a third party. *See discussion, Story Serv., Inc. v. Ramirez*, 863 S.W.2d 491, 497-98 (Tex. App.-El Paso 1993, writ denied).   The same rationale should apply to rifles.   Otherwise, every rifle and handgun owner in Texas is exposed to potential liability to victims of violent crimes perpetrated by a gun thief.

ChilPDF - www.fastio.com

5.      **Exemplary Damages**

Exemplary Damages cannot be recovered against a municipality under federal or state law.

Exemplary damages are not available under § 1983 against a municipality.   *City of Newport v.*

*Fact Concerts, Inc.,* 453 U.S. 247 (1981).

The Texas Tort Claims Act does not waive sovereign immunity for punitive damages for

the state law claims against a city arising from the exercise of governmental functions.   *City of*

*Gladewater v. Pike,* 727 S.W.2d 514, 519 (Tex. 1987); TEX. CIV. PRAC. & REM. CODE ANN.,

§ 101.024 (Vernon Supp. 2000).   The Tort Claims Acts lists police protection and control as a

'governmental function.'   TEX. CIV. PRAC. & REM. CODE, § 101.0215(a)(1).

**CONCLUSION**

**WHEREFORE, PREMISES CONSIDERED,** Defendant moves for summary judgment

that the remaining claims of all Plaintiffs in these causes be dismissed and they take nothing

against Defendant.

Respectfully submitted,

By: _____
TOM LOCKHART
Admissions ID No. 2257
Texas State Bar No. 12473500
ROGER W. HUGHES
Admissions ID No. 5950
Texas State Bar No. 10229500
P. O. Drawer 1429
Harlingen, Texas  78551-1429
956/428-7495; FAX: 956/428-2954

Attorney-in-Charge for Defendant,
CITY OF HARLINGEN

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document was forwarded on this 19th day of June, 2001, to the following counsel of record and interested parties:

Attorneys-in-Charge for Plaintiffs, GILBERTO M. RODRIGUEZ, et al and
ARTURO GUILLERMO SALINAS, et al:

    Mr. Broadus A. Spivey         **Via CMRRR# 7000 1670 0013 4635 2203**
    **SPIVEY & AINSWORTH, P.C.**
    48 East Avenue
    Austin, Texas  78701-4320

Attorney-in-Charge for Plaintiff, RAUL RODRIGUEZ:

    Ms. Sonia Lopez         **Via CMRRR# 7000 1670 0013 4635 2210**
    **LAW OFFICES OF RAMON GARCIA, P.C.**
    222 West University Drive
    Edinburg, Texas  78539

    TOM LOCKHART

# EXHIBITS TABLE OF CONTENTS

**EXHIBIT REF.**                    **EXHIBITS**

A            EXCERPTS FROM DEPOSITION OF SGT. RONALD K. SAENZ

B            EXCERPTS FROM DEPOSITION OF MICHAEL RILEY

C            EXCERPTS FROM DEPOSITION OF GEORGE A. HUPP

D            EXCERPTS FROM DEPOSITION OF ORLANDO SANCHEZ

E            EXCERPTS FROM DEPOSITION OF JAMES JOSEPH SCHEOPNER

F            EXCERPTS FROM DEPOSITION OF RALPH DWAYNE MOORE

G            DEPOSITION EXHIBIT 5

H            DEPOSITION EXHIBIT 30

I            EXCERPTS FROM DEPOSITION OF JOSEPH BENNETT VASQUEZ

J            RAUL RODRIGUEZ SWORN STATEMENT & ATTACHED DRAWING

K            RODOLFO C. JARAMILLO'S FED. R. EVID. 803(8) INVESTIGATIVE
             RECORDS AFFIDAVIT WITH REPORTS OF INVESTIGATION
             AND SCALE DRAWINGS

L            JAVIER REYNA'S FED. R. EVID. 803(8) INVESTIGATIVE
             RECORDS WITH AFFIDAVIT WITH CASE REPORT

M            EXCERPTS FROM DEPOSITION OF MELODY MATLOCK

N            EXCERPTS FROM DEPOSITION OF PATSY GAIL MOORE

O            EXCERPTS FROM DEPOSITION OF KRIS LEDESMA

P-1, 2 & 3   THREE VOLUMES OF CERTIFIED TRANSCRIPT OF
             CAMERON COUNTY SHERIFF DEPARTMENT DISPATCH