*101*

United States District Court
Southern District of Texas
FILED

JUL 0 2 2001

Michael N. Milby
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL. | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS. | § | |

## MOTION TO COMPEL DEFENDANT CITY OF HARLINGEN TO PRODUCE THE JAMES ROBERSON REPORT FILED BY PLAINTIFFS ARTURO GUILLERMO SALINAS, ET AL. AND GILBERTO M. RODRIGUEZ, ET AL.

COME NOW ARTURO GUILLERMO SALINAS, ET AL. AND GILBERTO M.

RODRIGUEZ, ET AL., Plaintiffs in the above-styled and numbered cause, and, pursuant to Fed.

R. Civ. P. 37, request the Court to compel Defendant, CITY OF HARLINGEN, Texas, to

produce the James Roberson Report.

3163D.074—Motion to Compel Defendant, City of Harlingen, Texas to Produce
James Robenson Report filed by Plaintiffs, Arturo Guillermo Salinas, et al. and
Gilberto M. Rodriguez, et al.                                                          Pg 1

## A. INTRODUCTION

1.      On July 7, 1998, United States Border Patrol Agents Susan Rodriguez and Ricardo Salinas were killed and Deputy Sheriff Raul Rodriguez of Cameron County, Texas, was seriously injured by Ernest Moore with an AR-15 assault rifle in San Benito, Texas.

2.      The assault rifle had been delivered by a concerned citizen, Mrs. Sylvia Pirtle, to the Harlingen Police Department (HPD) for destruction. R. D. Moore, an HPD police officer, took possession of that assault rifle for HPD, assuring the citizen that it would be destroyed. The rifle is a military assault rifle, which carries a high capacity of ammunition and fires ultra high velocity anti-personnel ammunition. However, the assault rifle was not destroyed as requested. Instead, HPD Police Chief Jim Scheopner illegally took possession of the rifle and issued it to R. D. Moore.

3.      Beneficiaries of deceased U.S. Border Patrol Agents Susan Rodriguez and Ricardo Salinas on behalf of themselves and the estates of Susan Rodriguez and Ricardo Salinas, deceased, and Raul Rodriguez, a Deputy Sheriff of Cameron County, Texas, brought suits against the City of Harlingen, Texas, pursuant to 42 USC §1983 and the Texas Tort Claims Act (TEX. CIV. PRAC. & REM. CODE ANN., Chap. 101).

4.      After the tragic shooting incident, The City of Harlingen, through its City Manager Natalie F. Prim, employed Mr. James Roberson, an outside consultant, to review the city's investigation of matters relating to the shooting incident and Mr. Roberson's investigation resulted in a written report. (Ms. Prim's deposition, p. 13, l. 20 to p. 18 l. 5)[1].

5.      In the deposition of Ms. Prim, former city manager of the City of Harlingen, when Plaintiffs attempted to ask about the matters stated in the Roberson Report, Mr. Tom Lockhart,

attorney for the City of Harlingen, instructed Ms. Prim not to answer on the grounds that "that is privileged information in anticipation of litigation" and requested the witness " to honor that privilege and not respond." (Ms. Prim's deposition, p. 21, l. 4 to 25).

6.      In her deposition, Ms. Prim assigned her former assistant manager, Joseph D. LaBeau, who supervised the police department, to investigate the shooting incident. (Ms. Prim's deposition, p. 9, l. 15 to p. 10, l. 14). Subsequent to Ms. Prim's deposition, Plaintiffs took the deposition of Mr. LaBeau. In his deposition, Mr. LaBeau testified that Mr. Roberson worked in an office fairly adjacent to him and would call him in and discuss the investigation with him. (Mr. LaBeau's deposition, p. 63, l. 21 to 24; p. 66, l. 4 to 7)[2]. Because of Mr. Lockhart's assertion of privilege as to matters related to Mr. Roberson's work, in LaBeau's deposition, Plaintiffs did not ask Mr. LaBeau any question concerning Mr. Roberson's work.

## B. ARGUMENT & AUTHORITIES

7.      Plaintiffs are entitled to access to the Roberson Report for the reasons that the privilege asserted by the Defendant is not valid because the Roberson Report was not trial preparation material protected under Fed. R. Civ. P. 26(b)(3), and Plaintiffs have substantial need of the materials in the preparation of their cases and are unable to obtain the substantial equivalent of the materials by other means under Fed. R. Civ. P. 26(b)(3).

8.      The Roberson Report was a third-party review of the city's own investigation. (Ms. Prim's deposition, p. 14, l. 5 to p. 16 l. 7). Ms. Prim hired Mr. Roberson to review whether the Harlingen Police Department had complied with the standards for police procedures. (Ms. Prim's deposition, p. 85, l. 2 to p. 90 l. 24).

---

[1]    All Ms. Prim's testimony cited in this motion is collected in the excerpt of her deposition and attached hereto as Exhibit "A."

[2]    All Mr. LaBeau's testimony cited in this motion is collected in the excerpt of his deposition and attached hereto as Exhibit "B."

3163D.074—Motion to Compel Defendant, City of Harlingen, Texas to Produce
James Robenson Report filed by Plaintiffs, Arturo Guillermo Salinas, et al. and
Gilberto M. Rodriguez, et al.                                                      Pg 3

9.     The Roberson Report was not prepared for the litigation. (Ms. Prim's deposition, p. 87, l. 13 to p. 89 l. 25). The report was prepared with public funds. (Ms. Prim's deposition, p. 55, l. 18-20). The expenses for defending this Defendant are paid by its insurance company. If the report were prepared for the litigation, it would have been paid for by the insurance company.

10.     Moreover, Mr. Roberson was the only person ever employed to accomplish the recommendations set forth in Ms. Prim's Report to the City Commission, which is attached to her deposition as Exhibit "1." (Ms. Prim's deposition, p. 87, l. 10-12). Mr. LaBeau also testified that no other person was hired to check the HPD's policies and procedures and see if they comported with best practices. (Mr. LaBeau's deposition, p. 76, l. 7 to 9).

11.     Nowhere in her deposition did Ms. Prim ever testify that the employment of Mr. Roberson was in anticipation of the litigation. Ms. Prim's testimony clearly establishes that the employment of Mr. Roberson was intended to review the Harlingen Police Department's policies and procedures in connection with the tragic shooting incident, not to prepare for litigation.

## C. CONCLUSION

12.     Because the City of Harlingen has refused to comply with all rules requiring production of the Roberson Report, the Court should compel the City to produce the report. Further, the Court should permit follow-up telephone depositions of Ms. Prim and Mr. LaBeau regarding the Roberson Report because the City's prior refusal to permit such deposition questions was without substantial justification.

## D. PRAYER

13.     For these reasons, Plaintiffs request the Court to compel the City of Harlingen to produce the Roberson Report and to order follow-up telephone depositions of Ms. Prim and Mr. LaBeau regarding the Roberson Report.

Respectfully Submitted,

**SPIVEY & AINSWORTH, P.C.**

48 East Avenue
Austin, TX 78701
512+474-6061
512+474-1605 (fax)

By _____
Broadus Spivey
State Bar No. 1895500
Federal I.D. No. 11146
Price Ainsworth
State Bar No. 00950300
Federal I.D. No. 8065
Francis Pan
State Bar No. 15443300
Federal I.D. No. 26385

## CERTIFICATE OF CONFERENCE

I certify that on June 20, 2001, I conferred with opposing counsel, Tom Lockhart, and that he opposes Plaintiffs' Motion to Compel.

_____
Price Ainsworth

## CERTIFICATE OF SERVICE

I hereby certify that the original of the above and foregoing document was forwarded on this 20th day of June 20, 2001, to the following counsel of record and interested parties via facsimile and certified mail, return receipt requested:

Mr. Tom Lockhart                     **Via Fax: 956+428-2954**
Mr. Roger W. Hughes                  **Via CMRRR# 7000 1670 0004 0279 7255**
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429
ATTORNEYS FOR DEFENDANT

3163D.074—Motion to Compel Defendant, City of Harlingen, Texas to Produce
James Robenson Report filed by Plaintiffs, Arturo Guillermo Salinas, et al. and
Gilberto M. Rodriguez, et al.                                                    Pg 5

Mr. Roman Garcia                    **Via Fax: 956+381-0825**
Ms. Sonia Lopez                     **Via CMRRR# 7000 1670 0004 0279 7262**
LAW OFFICES OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, Texas 78539
ATTORNEY FOR PLAINTIFF RAUL RODRIGUEZ

Price Ainsworth

3163D.074—Motion to Compel Defendant, City of Harlingen, Texas to Produce
James Robenson Report filed by Plaintiffs, Arturo Guillermo Salinas, et al. and
Gilberto M. Rodriguez, et al.                                        Pg 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILE DIVISION

ARTURO G. SALINAS, ET AL     * CIVIL ACTION NO. B-98-162
                                *
v.                                     *
                                *
CITY OF HARLINGEN, TEXAS, ET AL; *
                                *
and                                *
                                *
GILBERTO M. RODRIGUEZ, ET AL     *
                                *
v.                                     * CIVIL ACTION NO. B-98-162
                                *
CITY OF HARLINGEN, TEXAS, ET AL; *
                                *
and                                *
                                *
RAUL RODRIGUEZ                     *
                                *
v.                                     *
                                *
CITY OF HARLINGEN, TEXAS, ET AL. * CIVIL ACTION NO. B-98-162

Videotaped Deposition of NATALIE F. PRIM, taken by attorney for the Plaintiffs at the offices of Wierzbicki & Stephenson, 220 West Garden Street, Suite 801, Pensacola, Florida, commencing at 11 a.m. on the 25th day of April, 2001, before Gina Hawkins, Registered Professional Reporter and Notary Public.


PLAINTIFF'S EXHIBIT

2

1                         APPEARANCES

2
FOR THE PLAINTIFF:        PRICE AINSWORTH, ESQUIRE
3                         Spivey & Ainsworth, P.C.
                          48 East Avenue
4                         Austin, Texas 78701

5  FOR THE DEFENDANT:     TOM LOCKHART, ESQUIRE
                          Adams & Graham, L.L.P.
6                         222 E. Van Buren, West Tower
                          Harlingen, Texas 78551-1429
7

8  VIDEOGRAPHER:          TOMMY GRICE

9  ─────────────────────────────────────────────────

                         INDEX OF WITNESS
10
NATALIE F. PRIM                                  PAGE
11
       DIRECT EXAMINATION BY MR. AINSWORTH         3
12
CERTIFICATE OF OATH                              100
13 CERTIFICATE OF REPORTER                        101

14 ─────────────────────────────────────────────────

15                       INDEX OF EXHIBITS

16 PLAINTIFF'S NO.:

17     1 - City Manager's Report to the City
           Commission                             13
18
       2 - Statement from the City Manager        51
19

20

21

22

23

24

25

              Wierzbicki & Stephenson Court Reporting Service

100

## CERTIFICATE OF OATH

STATE OF FLORIDA  )

COUNTY OF ESCAMBIA)


        I, the undersigned authority, certify that

NATALIE F. PRIM, appeared personally before me and was duly

sworn.

        WITNESS my hand and official seal this 26th day of

April, 2001.



                    Gina Hawkins, RPR


                    Gina Hawkins
                    Commission # CC 948887
                    Expires Aug. 5, 2004
                    Bonded Thru
                    Atlantic Bonding Co., Inc.

Wierzbicki & Stephenson Court Reporting Service

## CERTIFICATE OF REPORTER

STATE OF FLORIDA   )

COUNTY OF ESCAMBIA)

     I, Gina Hawkins, Registered Professional Reporter, certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true record of the testimony given by the witness; that the witness did not waive reading and signing.

     I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in this action.

Gina Hawkins
Registered Professional Reporter

Wierzbicki & Stephenson Court Reporting Service

1      A      We didn't have a police chief at the time I

2  left.  We had an acting.

3      Q      Who was the acting police chief?

4      A      Robert Archer.

5      Q      During the time that you were city manager, can

6  you tell me, in chronological order, who the mayors of

7  Harlingen would have been?

8      A      It was Bill Card, Mayor Bill Card, from 1993

9  until 1998.  And then Mayor de la Garza, Connie de la Garza,

10  was voted in as mayor in 1998 until the time I left.

11      Q      All right.  You know this case involves a

12  shooting where a couple of border patrol agents, or I guess

13  actually three border patrol agents were injured and killed

14  in a shooting on July 7th of 1998.

15             It's my understanding that various entities,

16  including the City of Harlingen, investigated that

17  incident.

18             Were you involved at all in an investigation of

19  that incident?

20      A      Yes.

21      Q      And how would you describe that involvement?

22  Were you the investigator, or were folks reporting the

23  results of their investigation to you?

24      A      Well, once after the occurrence the assistant

25  city manager, who supervised the police department, went

Wierzbicki & Stephenson Court Reporting Service

1 down there to begin an investigation.

2      Subsequently it came up to my level, and then I

3 went ahead and did some review and went from there.

4      But for a period of months it was under Joe

5 Labeau, and then it got to my level.

6      Q    And was that because you had assigned

7 Mr. Labeau to it or just because a function of his job

8 duties was to oversee the police department or for them to

9 report to him?

10      A    Both.

11      Q    Okay.  Was there a team assisting Mr. Labeau in

12 his review of this incident, or did he put together a team;

13 do you recall?

14      A    No, he did not.

15      Q    Do you recall the results of his investigation?

16      A    Yes, somewhat.

17      Q    Did it result in a written report?

18      A    I can't recall.  I believe that may have --

19 there may have been one, but I don't recall.  Yes.  Yes,

20 there was something.  There was a memo or something he had

21 written up on it.

22      Q    Would the memo be directed to you or to the --

23 was it a city council or city commission?

24      A    It was -- well, they're called a city

25 commission, but they serve the same function as the city

1    council.

2         Q     Yes, ma'am.  Would Mr. Labeau's report have

3    been to the city commission or to you; do you recall?

4         A     I believe he would have sent it to me and the

5    mayor, city council.  I'm just not -- I just haven't seen

6    it.

7         Q     And I'm here today in 2001 taking your

8    deposition in Pensacola.  I take it that these aren't files

9    that you would have brought with you to work with the

10   Chamber of Commerce Department here in Pensacola?

11        A     Correct.

12        Q     Have you had a chance to review any of your

13   files from back at the time when you were the city manager

14   in preparation for your deposition today?

15        A     Today?

16        Q     Yes.

17        A     No.  I reviewed one document with Mr. Lockhart.

18        Q     Okay.  Back at the time in 1998, of course you

19   would have been familiar with such documents?

20        A     Well --

21        Q     As they were made?

22        A     Sure, as they were appearing or came to the

23   desk, yes.

24        Q     But in preparation for today's deposition,

25   you've not really gone back and said, "I need to look at

                    Wierzbicki & Stephenson Court Reporting Service

1    Mr. Labeau's report" or anything like that?

2         A    No.

3         Q    Okay.  You said you've reviewed one document

4    today?

5         A    That's correct.

6         Q    Can you tell me, just in general terms without

7    telling me what it is --

8              MR. LOCKHART:  I'll tell you what it is.  Y'all

9         had sent, and I think in response to interrogatories

10        y'all had, it's called City Manager's Report to the

11        City Commission, and y'all had, it was a bad copy and

12        it had "Draft" stamped on it.

13             MR. AINSWORTH:  Yes, sir.

14             MR. LOCKHART:  And I compared it to the actual

15        report that was given to the city commission, and

16        it's the same as your draft, so I thought it might

17        simplify things if you had a better copy that didn't

18        have "Draft" stamped on top of it.  So, that's the

19        document she's talking about.

20   BY MR. AINSWORTH:

21        Q    Let me then -- Mr. Lockhart's been kind enough

22   to hand me a document that's titled City Manager's Report to

23   the City Commission.

24             It looks like it's dated November 4th, 1998; is

25   that right?

                  Wierzbicki & Stephenson Court Reporting Service

A       That's correct.

MR. AINSWORTH:  Let me get the court reporter

to stop and put exhibit sticker No. 1 on that,

please.

(Plaintiff's Exhibit No. 1 was marked for

identification.)

MR. AINSWORTH:  Okay.  We're rolling now.

We've actually got an exhibit.

Q       This is -- Exhibit No. 1, is that the document

that you reviewed today with Mr. Lockhart in preparation for

your deposition?

A       Yes.

Q       Have you seen that document prior to today?

A       No, not since leaving the city.

Q       That's what I mean.  Did you see it back at the

time it was created, purportedly?

A       In 1998.

Q       In November of '98?

A       Definitely.

Q       Well, I want to ask you about how the report

was prepared.  Let me find out a little bit more about the

investigations that you know about that were made pursuant

to this July 7th, '98, shooting.

Other than Mr. Labeau's work, are you aware

of any other entities or governmental agencies that were

1  involved in investigating the shooting?

2      A    Subsequent to the report or prior to the

3  report?

4      Q    Or even at the same time, yes, ma'am.

5      A    Subsequent to the report we did ask a

6  third-party expert to come on and to review.

7      Q    Yes, ma'am.  And I'll get to that in just a

8  second.  But what about like, I guess the Texas Rangers may

9  have investigated?

10     A    I didn't see anything.  I don't recall.

11     Q    Or the Federal Bureau of Investigation, do you

12  recall anything about their work?

13     A    No,

14     Q    Were there other police entities, other than

15  the City of Harlingen Police, that were involved in the

16  investigation?

17     A    I don't know.  I know that the City of

18  Harlingen was, but some of these other agencies, you know,

19  may have been involved because of where it occurred or their

20  role.

21     Q    Yes, ma'am.  Or what about the county, were you

22  aware of any county investigation?

23     A    No.

24     Q    So, really, when we talk about your knowledge

25  regarding the investigation of the July 7th, '98, shooting

1  involving my clients, Rodriguez and Salinas, the

2  investigation you're familiar with is that that we could

3  call the Labeau investigation; is that fair enough?

4      A      Somewhat, yes.

5      Q      What did you call it at the time?

6      A      Just the review, the internal review.

7      Q      Okay.  And did that result in a written report?

8      A      Yes, it did.

9      Q      And is that what you have in front of you there

10 that we've marked as Exhibit No. 1?

11     A      Yes.

12     Q      Now, then after the written report, was a

13 second investigation or a supplemental investigation

14 performed involving this third party that you mentioned

15 a moment ago?

16     A      Yes.

17     Q      How was it that a decision was made to

18 incorporate this review by the third party?

19     A      Well, my report comes to a conclusion where

20 it's requesting a third-party review.  I talked to a couple

21 of my city manager friends, but one in particular that said

22 that when they had these kind of things happen sometimes

23 that was a good -- good thing to do.

24     Q      And who was the third party that was contacted?

25     A      Jim Robinson.

1    Q    Was that the kind of thing that you would

2  submit out for bids, or how was Mr. Robinson selected?

3    A    Through a recommendation of another city

4  manager.

5    Q    And did you interview Mr. Robinson about his

6  capacity to perform this review?

7    A    Yes, I did.

8    Q    And do you recall approximately when it was

9  that you would have talked to him?

10    A    I believe I talked to him in the fall of 1998,

11  maybe October, November, you know.  It was right around this

12  time frame.

13    Q    And what did you understand to be his expertise

14  in this area?

15    A    He had a career in law enforcement for 25

16  years.  He had held the position of, you know, everything

17  from patrolman all the way to chief in, I believe Pasadena,

18  California, but he was a consultant who had moved to the

19  Texas area.

20    Q    And do you recall where it was he was living,

21  roughly?

22    A    San Antonio area.

23    MR. LOCKHART:  Let me just state for the

24    record, if I can, Price, we have taken the position

25    that he is a privileged consultant, and we have made

Wierzbicki & Stephenson Court Reporting Service

1    that known to your firm.  I don't know if you're

2    aware of it.

3        But I didn't object to you asking about his

4    identity, which is obviously privileged, too, just

5    because you already knew who he was, but I just

6    wanted to make that for the record.

7        MR. AINSWORTH:  And we'll get to it.  I don't

8    mean to protract the depo or whatever, but there may

9    be, from time to time, I understand you may need to

10   make objections or whatever.  I'll be sure and pause

11   for those.

12   BY MR. AINSWORTH:

13       Q    The time that you talked to Mr. Robinson,

14   did you interview him, or do you recall who interviewed

15   him?

16       A    I believe I interviewed him, along with Joe,

17   yes.

18       Q    And did he have a copy of the Exhibit No. 1

19   that -- when you say Joe, you mean Joe Labeau?

20       A    Yes.

21       Q    And did you provide Mr. Robinson with a copy of

22   Exhibit No. 1?

23       A    Yes, I believe so.

24       Q    And then he performed an investigation separate

25   from the investigation that's reported in Exhibit No. 1; is

1    that right?

2         A    Yes.

3         Q    Did that investigation result in a written

4    report?

5         A    Yes.

6         Q    And do you know to whom -- when was the written

7    report provided; do you know?

8         A    I believe it was provided sometime -- well, it

9    was after this date in November of '98, and it was probably

10   provided in, you know, the weeks following.

11             It seemed to me that he worked within a month

12   of time.

13        Q    So, roughly before January of '99?

14        A    Yes.

15        Q    Or about then?

16        A    Yes.

17        Q    And do you know to whom that report would have

18   been given?

19        A    It was given to Mr. Lockhart.

20        Q    Okay.  I mean, did Mr. Robinson give it

21   directly to Mr. Lockhart, or did he give it to you, or do

22   you recall?

23        A    He gave it directly to Mr. Lockhart.

24        Q    And why was that?

25        A    Well, it was just, so many things were

1 happening by this time period. We had notice of

2 litigation. We had just, you know, growing public

3 sentiment about what's happened and why. We had questions

4 from the media on an ongoing basis.

5      And then my assistant had gone in and reviewed

6 some of the department, and it just seemed to be the right

7 thing to do.

8     Q    Well, I didn't ask that very well. How was it

9 that Mr. Lockhart was provided the report as opposed to,

10 say, you or Mr. Labeau or somebody like that? Why was

11 Mr. Lockhart involved?

12     A    Because we had litigation notice. I believe

13 the litigation notices came over the summer, if I recall.

14 And so, you know, clearly it was the method chosen.

15     Q    And was Mr. Lockhart retained as outside

16 counsel for the city?

17     A    Absolutely.

18     Q    And so he was provided a copy of that pursuant

19 to his role as outside counsel for the city relative to this

20 July 7th, '98, shooting incident?

21     A    Yes.

22     Q    How was Mr. Robinson compensated for his work

23 in preparing the report?

24     A    He was paid, I believe, on a lump-sum basis and

25 gave me an estimate of his time. I think it was time and

1   hours, and I believe that's what it was, not to exceed.

2   And we came to an agreement, and he submitted his hours for

3   the amount of time into the report preparation.

4       Q    And then he was paid by the City of Harlingen

5   directly?

6       A    Yes.

7       Q    Is that something that you have to submit the

8   bills to the city commission, or how does that work?

9       A    I had the authority, the discretion to spend

10  funds, and I -- I don't remember even how much it was, but

11  it was, you know, $5,000, somewhere on that basis maybe,

12  and it was not unusual for me to hire people to do things

13  as needed.

14      Q    Okay.  But these are public funds as opposed to

15  some sort of private funds?

16      A    Right.  Right.

17      Q    And then as it falls within your administrative

18  duties and budget, you were able to hire Mr. Robinson to

19  perform the investigation?

20      A    Correct.

21      Q    He prepared a written report that was submitted

22  to outside counsel sometime before the turn of the year, you

23  think, in '99?

24      A    It seemed to me to happen within a matter of

25  weeks after this report came out.

1      Q      Okay.  Now, you've not reviewed that report in

2  preparation for your deposition today?

3      A      No.

4      Q      And anything you remember from it would be just

5  based on your review of it back at the time it was prepared;

6  is that right?

7      A      Correct.

8      Q      So, understanding we're going to need to pause

9  for objections, can you tell me what the report said?

10          MR. LOCKHART:  And I will instruct the witness

11          that that is privileged information in anticipation

12          of litigation and request the witness to honor that

13          privilege and not respond.

14  BY MR. AINSWORTH:

15      Q      Along those same lines, can you tell me how

16  the report, if it did, differed from that that's marked

17  Exhibit 1 here today?

18          MR. LOCKHART:  And I would make the same

19          objection and instruction.

20          MR. AINSWORTH:  And I think it's pretty clear

21          that whatever I ask her about, what I'll call the

22          Robinson report, the argument here today is that's

23          privileged and that I'm not going to be permitted to

24          discuss it with her today.

25          MR. LOCKHART:  Exactly.

1  BY MR. AINSWORTH:

2       Q     So, with that understanding, let me ask you

3  about the report I can ask you about then.

4            Other than the report that we've marked as

5  Exhibit No. 1 and the Robinson report, do you know of any

6  other reports you've read that constitute a summary of the

7  investigation performed of the July 7th, '98, shooting in

8  which the border patrol agents, Rodriguez and Salinas, were

9  killed?

10      A     The only one I knew about was Joe Labeau's memo

11  or whatever his document was when he went in to discuss it

12  at the department.

13      Q     And how is that different from Exhibit No. 1

14  that you have there?

15      A     Well, I don't have that.  So, I would just

16  say here that, you know, I did a review of some of the

17  department's documents, inventory and some of their memos,

18  et cetera, and policies, et cetera.  That's what I recall.

19  And then I wrote my report based on that.

20      Q     Okay.  So, you had Mr. Labeau's report when you

21  prepared Exhibit No. 1?

22      A     Yes.  Yes.

23      Q     Okay.  When I said how is it different from,

24  what I was trying to get to, what does it look like?  Is it

25  a process where he's interviewed folks at the police

1  department, or what is it?

2      A     Well, I don't have it.  It's been some time

3  since I've looked at it, but it seemed to me that he went

4  into the department, and you know, wrote a memo on what he

5  thought the situation in the department was in terms of

6  policies, maybe procedures, et cetera, and then, you know,

7  tried to review the circumstances to the best his knowledge.

8      Q     And do you recall approximately when

9  Mr. Labeau's report would have been prepared?

10     A     Well, it would have been prior to November 4th.

11     Q     Do you recall approximately when he would have

12  begun his investigation?

13     A     I believe -- well, it would have been after the

14  incident.

15     Q     Like immediately or --

16     A     Well, I believe that Tom Lockhart was already

17  on the case.  So, it would have been, you know, after the

18  incident within a certain amount of time I don't recall.

19     Q     Was that report in any way supplemented

20  after it was provided to you?  Was there a subsequent

21  supplementation or anything that you know of?

22     A     No, I don't remember.

23     Q     What would have been Mr. Labeau's training as

24  of the time that he began this investigation that resulted

25  in his report?

1      A      Well, he was an assistant city manager, and he

2  basically supervised the department, so on the basis of

3  responsibility.

4      Q      So, he had some experience with supervision of

5  the department?

6      A      He had supervised it, I think, for several

7  years, yes.

8      Q      Did he have any law enforcement training that

9  you know of?

10     A      No.

11     Q      Had he ever served as a police officer or

12 police chief or captain?

13     A      No.

14     Q      He fell more in the administrative role, and

15 oversight of the department came under his agents; is that

16 right?

17     A      Oversight of the department, along with about

18 seven or eight others.  So, it was one department out of a

19 group.

20     Q      Seven or eight other departments, like fire

21 department or something like that?

22     A      Planning, that type of thing, yes.

23     Q      Okay.  And then you utilized his report in the

24 preparation of your report; is that right?

25     A      Somewhat.  I believe I had some documents come

1     up from the police department, and I just started reviewing

2     things on my own.

3              I would say that it was there, but I wanted to

4     know myself, what does the inventory say, what do memos say,

5     what do policies say, so I asked for some of those documents

6     to come up.  I looked at it myself and wrote this.

7        Q     And I didn't mean to restrict.  That wasn't the

8     only thing you reviewed in preparing your report; correct?

9        A     Correct.

10       Q     But it was one of the items that you reviewed?

11       A     True.

12       Q     Did he submit his report to anybody else other

13    than you, Mr. Labeau?

14       A     To Mr. Lockhart.

15       Q     Would it be the kind of thing that was

16    presented to the city commission?

17       A     No.

18       Q     It was prepared for you; is that right?

19       A     Prepared for me and I believe Mr. Lockhart to

20    some degree.  Again, I just haven't seen it, so I don't

21    remember.

22       Q     Okay.  And do you know if a copy of it was kept

23    there in the City of Harlingen files?

24       A     No.  I believe it was given to Mr. Lockhart.

25       Q     And as far as you know, no other copies were

1    on.

2              That was your statement to the press and the

3    city commissioners back at that time?

4         A    Correct.

5         Q    Now, when you're talking about an

6    "administrative report," what are you talking about?

7         A    Well, I believe we meant -- we meant this

8    report here; that we would have something to return back

9    to the public, and saying that we were looking at the

10   circumstances and as much of the information as possible.

11        Q    The video camera will pick it up, but you're

12   pointing to Exhibit No. 1 there?

13        A    Yes.

14        Q    As opposed to the report that was made by

15   Mr. Robinson to you?

16        A    Right.  It was prior to that.  This was prior

17   to that.

18        Q    Now, the Robinson report is prepared with

19   public funds?

20        A    Correct.

21        Q    But as far as you know, it's never been made

22   available to the public?

23        A    That's correct.

24        Q    It discusses the role of folks that are like

25   the chief of police and Detective R.D. Moore that were under

Wierzbicki & Stephenson Court Reporting Service

1    on.

2              That was your statement to the press and the

3    city commissioners back at that time?

4         A    Correct.

5         Q    Now, when you're talking about an

6    "administrative report," what are you talking about?

7         A    Well, I believe we meant -- we meant this

8    report here; that we would have something to return back

9    to the public, and saying that we were looking at the

10   circumstances and as much of the information as possible.

11        Q    The video camera will pick it up, but you're

12   pointing to Exhibit No. 1 there?

13        A    Yes.

14        Q    As opposed to the report that was made by

15   Mr. Robinson to you?

16        A    Right.  It was prior to that.  This was prior

17   to that.

18        Q    Now, the Robinson report is prepared with

19   public funds?

20        A    Correct.

21        Q    But as far as you know, it's never been made

22   available to the public?

23        A    That's correct.

24        Q    It discusses the role of folks that are like

25   the chief of police and Detective R.D. Moore that were under

                Wierzbicki & Stephenson Court Reporting Service

1  enforcement entities suggest as the proper guidelines for

2  the assignment of weapons; is that right?

3        A    Well, I looked at TCLSE, but it was to review

4  their guidelines and their criteria for weapons, if you

5  will, and weapons training.

6        Q    And the reason you looked at TCLSE was because

7  you knew that to be an accepted standard for such things,

8  the assignment of weapons, that type of thing?

9        A    Yes.

10       Q    And you used the internal policies that were

11 in place, as well as these TCLSE standards, in coming to a

12 review of the policies and procedures that were in place and

13 that should be in place at the City of Harlingen; is that

14 right?

15       A    That's right.

16       Q    Okay.  And then in the second part of your

17 report, it comes under the heading City Management's Police

18 Department Review; is that right?

19       A    Yes.

20       Q    And so what you're doing then is, you've looked

21 at the standards and then you're comparing whether or not

22 the police department, in this instance, has complied with

23 what you would assume to be the accepted procedures and

24 policies for the assignment of weapons and that type of

25 thing?

1    A    That's true.

2    Q    In an effort to determine that, you felt like

3  it was necessary to retain somebody specialized in the area

4  to assist you in making this inquiry about what's the

5  ordinary city doing with regard to the usual course of its

6  handling of weapons; is that right?

7    A    Yes.

8    Q    And you indicate there that "Finally, because

9  of the highly specialized nature of law enforcement,

10  management concludes that -- concludes the need for

11  expert assistance in evaluating and reviewing the above,"

12  is that right?

13    A    Yes.

14    Q    And you recommend that the department -- that

15  the department practices should be brought to the level of

16  best practices in law enforcement; is that right?

17    A    Correct.

18    Q    And that you recommended using an independent

19  expert professional with a background in law enforcement and

20  police operations in order to achieve best practices; is

21  that right?

22    A    Correct.

23    Q    And you would charge that individual with

24  review of the incident, review of the inquiry made thus far,

25  recommending any steps that might be necessary to

1    standardize department policies and procedures and then

2    complete the task in a timely fashion; is that right?

3           A     Yes.

4           Q     Now, in fact, what you're suggesting there in

5    that recommendation is that somebody like Mr. Robinson be

6    retained to comply with these recommendations; is that

7    right?

8           A     I think to come in and do the review, yes,

9    and to provide advice, yes.

10          Q     And the advice was pertinent to this review of

11   what happened in the San Benito shooting where the border

12   patrol agents were killed; right?

13          A     Yes, he reviewed that.

14          Q     And that's what you mean by "Review of the

15   initial incident"?

16          A     Yes.

17          Q     You also would have wanted somebody in

18   Mr. Robinson's role to review what steps had been done up

19   to November 4th, '98, in the investigation of the events?

20          A     Say that again.

21          Q     You suggest here that this individual will be

22   charged with a "Review" -- I'm inserting the word "of the

23   inquiry thus far and to make any further necessary inquiry."

24          I guess what you're asking is that whoever is

25   retained, that he be asked to make sure that you and

1  Mr. Labeau have done the appropriate investigation so

2  far?

3          A     For full information, yes.

4          Q     Yeah.  And then to recommend any steps which

5  would be necessary to standardize department policies and

6  procedures; is that right?

7          A     Yes.

8          Q     And then do it timely; is that right?

9          A     Yes.

10         Q     Was anybody, other than Mr. Robinson, ever

11  employed to accomplish these recommendations?

12         A     No.  No.  Mr. Robinson, and that was it.

13         Q     And I don't see any discussion under

14  "Recommendation" that Mr. Robinson be retained or any other

15  person be retained in an effort to provide information

16  pursuant to the anticipated litigation that you had been

17  given notice of over the course of that summer back in

18  1998.

19               Do you see any mention of that here in

20  Exhibit No. 1?

21         A     No.  We didn't discuss the litigation in this.

22  It wouldn't have been appropriate with the report.

23         Q     Isn't it fair to say, Ms. Prim, that you wanted

24  the policies and procedures there at the Harlingen Police

25  Department brought up to best practices whether or not any

1  lawsuits were ever filed?

2      A    Well, the incident is what brought it all

3  about.  The department was managed by the assistant city

4  manager and there had been, you know, certainly some, you

5  know, issues from time to time that I felt that we had

6  already -- we had a crisis on our hands.  We had the public

7  wanting to know.  We had the press calling us every day.

8          We had -- the lawsuits, I think, happened

9  within the first couple of months right after the incident

10 occurred.  So, you know, we just had a real crisis on our

11 hands and we had to respond, and I felt like -- I really

12 felt like I'm not qualified to get to the bottom of this and

13 know all these agencies and understand how to walk through

14 an investigation, and I felt that that's why we needed to

15 have expert advice, and I wanted to know the truth.

16     Q    Well, you're doing better than I would have

17 done because I can't remember what TCLSE stands for, but

18 the point is that based on the fact that you're the city

19 administrator as opposed to the city police department

20 chief, I guess you may have concerns as to whether or not

21 the police department was adhering to best practices, but as

22 to what is the appropriate practice, what do other cities do

23 under the same or similar circumstances, you really didn't

24 know one way or the other?

25     A    I didn't really know much in terms of detailed

1   police operations.

2         Q     You're more trained in it than the average

3   person on the street, obviously, because you're involved in

4   the day-to-day oversight of the police department, but what

5   you felt like was that it was necessary for you to have some

6   input from a professional trained in that area to review

7   what are the standards for police procedures in this context

8   and how do they relate to what was actually being done in

9   Harlingen?

10         A     Run that by my again.

11         Q     You felt like you needed professional expertise

12   in the area of deciding what are the standards for police

13   procedures in this area and whether or not Harlingen was

14   complying with those standards or needed improvement?

15         A     Yes.

16         Q     And really that didn't relate to whether or

17   not the city was going to be sued or wasn't going to be

18   sued.  You wanted the practices themselves to be brought

19   up to best practices if they were deficient or at least to

20   satisfy yourself that the practices were as good as they

21   could be?

22         A     I wanted to know, yes, from an expert.

23         Q     And after some review, you fell upon

24   Mr. Robinson as that person; is that right?

25         A     Yes.

                Wierzbicki & Stephenson Court Reporting Service

1  Q  He was in Texas at the time?

2  A  Yes.

3  Q  He had the right background, it looked like,

4 for the job?

5  A  Yes.

6  Q  And he eventually agreed to make the review;

7 is that right?

8  A  Yes.

9  Q  Did he in fact review, without telling me

10 exactly what he said or anything like that, did he review

11 the initial incident?

12  A  Yes.

13  Q  Did he review the inquiry that you and

14 Mr. Labeau had made up to November 4th of 1998?

15  A  I believe he had whatever we had in our files

16 at his disposal, yes, but he basically took it on for a

17 month or whatever time period it was to apprise us.

18  Q  And was part of his assignment to recommend

19 any steps which might be necessary to standardize department

20 policies and procedures when compared to other city police

21 departments?

22  A  I believe we asked him to look at the incident

23 and then, you know, give us some feedback and some advice,

24 yes.

25    MR. LOCKHART:  How we doing on time, Price?

Wierzbicki & Stephenson Court Reporting Service

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHWESTERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3   ARTURO G. SALINAS, ET AL  )  CIVIL ACTION NO. B-98-162
     VS.                       )
 4   CITY OF HARLINGEN, TEXAS, )
     ET AL;                    )
 5   AND                       )
     GILBERTO M. RODRIGUEZ,    )
 6   ET AL.                    )
     VS.                       )  CIVIL ACTION NO. B-98-163
 7   CITY OF HARLINGEN, TEXAS, )
     ET AL;                    )
 8   AND                       )
     RAUL RODRIGUEZ            )
 9   VS.                       )  CIVIL ACTION NO. B-99-70
     CITY OF HARLINGEN, TEXAS, )
10   ET AL                     )

11   ----------------------------------------------------

12                    ORAL DEPOSITION OF

13                    JOSEPH D. LaBEAU

14                      MAY 15, 2001

15   ----------------------------------------------------

16        ORAL DEPOSITION of JOSEPH D. LaBEAU, produced as a

17   witness at the instance of the PLAINTIFFS ARTURO G.

18   SALINAS and GILBERTO M. RODRIGUEZ, and duly sworn, was

19   in the above-styled and numbered cause on May 15, 2001,

20   at 1:23 p.m., before CHERIE HOLLAND, CSR, in and for the

21   State of Texas, reported by machine shorthand at the

22   offices of the City Hall of Midlothian, 104 West

23   Avenue E, Midlothian, Texas, pursuant to the Federal

24   Rules of Civil Procedure and the provisions stated on

25   the record or attached hereto.
```

PLAINTIFF'S

1                    **A P P E A R A N C E S**

2   FOR THE PLAINTIFFS ARTURO G. SALINAS and
    GILBERTO M. RODRIGUEZ

3        Price Ainsworth
         SPIVEY & AINSWORTH, P.C.

4        48 East Avenue
         Austin, Texas  78701-4320

5

6   FOR THE PLAINTIFF RAUL RODRIGUEZ
         Ramon Garcia (No appearance)

7        LAW OFFICES OF RAMON GARCIA, P.C.
         222 West University Drive

8        Edinburg, Texas 78539

9   FOR THE DEFENDANT
         Tom A. Lockhart
         ADAMS & GRAHAM, L.L.P.

10       222 E. Van Buren Street, West Tower
         Harlingen, Texas 78551-1429

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   STATE   OF   TEXAS )
    COUNTY OF TARRANT )
2

3       I, Cherie Holland, Certified Shorthand Reporter of

4   the State of Texas, certify that the foregoing

5   deposition of JOSEPH D. LaBEAU, was reported

6   stenographically by me at the time and place indicated,

7   said witness having been placed under oath by me, and

8   that the deposition is a true record of the testimony

9   given by the witness.

10      I further certify that I am neither counsel for nor

11  related to its outcome.

12      Given under my hand and seal of office on this the

13  24th day of May, 2001.

14

15

16

17  CHERIE HOLLAND, Texas CSR 574, RPR-CM
    Expiration 12-31-02
18

19

20

21

22

23

24

25
```

```
1   _____
2   _____
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13
14
15
16              JOSEPH D. LaBEAU
17
18  STATE    OF    TEXAS          )
                                  )
19  COUNTY OF Ellis               )

20      SUBSCRIBED AND SWORN to before me by the said JOSEPH
    D. LaBEAU, on this the 30 day of May            ,
21  A.D., 2001.

22
23      LINDA SIBLEY           Notary Public in and for
        NOTARY PUBLIC          Ellis      County, Texas
24      STATE OF TEXAS         My Commission Expires: 2-6-04
        My Comm Exp. 02-06-2004
25
```

SHARP HOLLAND
METRO (817) 731-1377

Case 1:98-cv-00162   Document 101   Filed in TXSD on 07/02/2001   Page 41 of 45

| | | |
|---|---|---|
| 14:34:48 | 1 | never made, to my knowledge, a disciplinary study of -- |
| | 2 | of this incident. |
| | 3 | Q.   After your report dated October 14th, 1998, was |
| | 4 | given to Ms. Prim, was Chief Scheopner disciplined in |
| 14:35:13 | 5 | the manner that you suggested in the report, where he |
| | 6 | would be relieved of duty at once and appointed to his |
| | 7 | former rank of lieutenant? |
| | 8 | A.   Eventually, he was, sir, yes. |
| | 9 | Q.   Was -- as far as you know, was any other |
| 14:35:32 | 10 | investigation conducted prior to the time that |
| | 11 | Chief Scheopner was reduced to the rank of lieutenant |
| | 12 | between when your report came out and when he was |
| | 13 | reduced? |
| | 14 | A.   There was an independent investigation done by |
| 14:35:46 | 15 | a consultant, yes, sir. |
| | 16 | Q.   Okay.  Was that the report that was done by |
| | 17 | this fellow Roberson? |
| | 18 | A.   Yes, Jim Roberson. |
| | 19 | Q.   Did you review that report? |
| :35:56 | 20 | A.   Not -- not in entirety or even a reasonable |
| | 21 | draft of it.  Jim worked in an office fairly adjacent to |
| | 22 | mine.  I worked rather independently, but from time to |
| | 23 | time, he would call me in and discuss the case with me. |
| | 24 | I guess he was questioning me as well. |
| 6:20 | 25 | Q.   Did -- do you know when Mr. Roberson completed |

| | | |
|---|---|---|
| 14:42:14 | 1 | your deposition today, you don't remember seeing a |
| | 2 | report that you drafted dated after October 14th, 1998? |
| | 3 | A.   No. |
| | 4 | Q.   I glean from your previous response that from |
| 14:42:23 | 5 | time to time Mr. Roberson might talk to you in pursuant |
| | 6 | to his own investigation? |
| | 7 | A.   Right. |
| | 8 | Q.   As to whether or not the Roberson report came |
| | 9 | out before the police chief was demoted, do you have |
| 14:42:37 | 10 | recollection one way or the other? |
| | 11 | A.   I really don't know. |
| | 12 | Q.   Now, in your report, you talk about a -- on the |
| | 13 | last page of the report that the Acting Chief be |
| | 14 | instructed to appoint an objective expert third party to |
| 14:43:01 | 15 | review the existing investigatory material, make |
| | 16 | appropriate further inquiry and hold separate |
| | 17 | disciplinary hearings.   Do you see that discussion? |
| | 18 | A.   Yes, sir. |
| | 19 | Q.   Okay.   And what you're suggesting there, is it |
| 4:43:15 | 20 | fair for me to understand, that the Police |
| | 21 | Chief Scheopner should step down -- |
| | 22 | A.   Right. |
| | 23 | Q.   -- a new Acting Chief should be appointed, |
| | 24 | correct? |
| 43:24 | 25 | A.   Right. |

1    I, JOSEPH D. LaBEAU, have read the foregoing

2 deposition and hereby affix my signature that same is

3 true and correct, except as noted herein.

4    CORRECTIONS AND/OR CHANGES AND SIGNATURE

5 PAGE     LINE       CORRECTION        REASON FOR CHANGE

6  36    2    "What is" to "that"    correction of error

7  36    5    comma after "is"    read correctly

8  36    7    Question mark after "department"    read correctly

9  36    8    dashes to "me"    correction

10 52    1    dashes to "mean"    word missing

11 60    15    "is" after understandery    word missing

12 63    1    Never to "ever"    correction

13 63    22    "I" to "He"    correction

14 73    7    dashes to full statement    words missing

15 73    8    "made" deleted + correct word put in

16 73    24    dashes replaced with correct words

17 75    15    "me" to "Jim"    what I said

18 75    16    "of" before which    what I said

19 75    21    dashes to full statement    words missing

20 84    20    "it" after support    word missing

21 84    24    "we've" to "we'd have"    what I said

22 _____

23 _____

24 _____

25 _____

1    I, JOSEPH D. LaBEAU, have read the foregoing

2   deposition and hereby affix my signature that same is

3   true and correct, except as noted herein.

4          CORRECTIONS AND/OR CHANGES AND SIGNATURE

5   PAGE      LINE        CORRECTION        REASON FOR CHANGE

6   36      2     "what is" to "that"       correction of error

7   36      5     comma after "is"          read correctly

8   36      7     question mark after "department"   real correct

9   36      8     dashes to "me"            correction

10  52      1     dashes to "mean"          word missing

11  60      15    "is" after understandy    word missing

12  63      1     Never to "ever"           correction

13  63      22    "I" to "He"               correction

14  73      7     dashes to full statement  words missed

15  73      8     "made" deleted + correct word put in

16  73      24    dashes replaced with correct words

17  75      15    "me" to "Jim"             what I said

18  75      16    "of" before which         what I say

19  75      21    dashes to full statement  words missing

20  84      20    "it" after support        word missing

21  84      24    "we've" to "we'd have"    what I said

22  _____

23  _____

24  _____

25  _____

1  it.

2      Q.    No, I'm giving you a hard time.

3      A.    Yeah.

4      Q.    As of November 1998 --

5      A.    Yes, sir.

6      Q.    -- anybody other than Roberson hired to check

7  the policies and see if they comported with best

8  practices?

9      A.    No, no.

14:55:30  10      Q.    Okay.  Now, if we go back to your report that's

11  marked as Exhibit No. 3, as best you can recollect, your

12  original report just had 13 pages; is that right?

13      A.    I -- I can't say.

14      Q.    Okay.  Were there any attachments to the -- any

14:55:57  15  interoffice memorandum that we've marked as

16  Exhibit No. 3?

17      A.    I can't say.  I do not recall.

18      Q.    Now, as we go through the report there will be

19  gaps --

14:56:08  20      A.    Yes, sir.

21      Q.    -- like at the bottom of page 2 and before

22  page 3.

23      A.    Uh-huh.

24      Q.    Now, is there a report somewhere that has those

:56:21  25  gaps filled in?

SHARP HOLLAND
METRO (817) 731-1377