LAW OFFICES OF

# ADAMS & GRAHAM, L.L.P.

AFFILIATED WITH HILL GILSTRAP RIGGS ADAMS & GRAHAM, L L P

222 E. VAN BUREN, WEST TOWER
P. O. DRAWER 1429
HARLINGEN, TEXAS 78551
TEL. (956) 428-7495     FAX (956) 428-2954
adamsgraham.com

**TOM LOCKHART**
Partner

**AFFILIATE OFFICES**
AUSTIN
CHICAGO
DALLAS/FORT WORTH
LITTLE ROCK

July 9, 2001

Mr. Michael Milby
**UNITED STATES DISTRICT CLERK**
600 East Harrison, Room #101
Brownsville, Texas  78523-7114

**Via Hand Delivery**

United States District Court
Southern District of Texas
RECEIVED

JUL 0 9 2001

Michael N. Milby, Clerk

Re:     **Civil Action No. B-98-162**
        **Arturo Guillermo Salinas, et al. v. City of Harlingen,** et al.
        **Gilberto M. Rodriguez, et al. v. City of Harlingen, et al.**
        **Raul Rodriguez v. City of Harlingen, et al.**
        **Our File: H-1023**

Dear Mr. Milby:

Pursuant to the Local Rules of Federal Procedure, please find enclosed for filing among the papers in the above referenced cause, the original and one (1) copy of **RESPONSE TO PLAINTIFFS' MOTION TO COMPEL DEFENDANT CITY OF HARLINGEN TO PRODUCE THE JAMES ROBERSON (sic) REPORT**.

Also, enclosed please find a proposed **ORDER** which we request be presented to Judge Tagle.

By copy hereof, we are forwarding a copy of same to all counsel of record as indicated below.

Thank you for your time and consideration in this matter.

Sincerely yours,

**ADAMS & GRAHAM, L.L.P.**

TOM LOCKHART

TL:mm
Enclosures

---

July 9, 2001
Mr. Michael Milby
Arturo Guillermo Salinas, et al. v. City of Harlingen, et al.
Gilberto M. Rodriguez, et al. v. City of Harlingen, et al.
Raul Rodriguez v. City of Harlingen, et al.
Our File: H-1023; Page 2

cc (w/encl.):

Mr. Broadus Spivey                          <u>**Via CMRRR# Z 258 001 188**</u>
**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, Texas  78701-4320

Ms. Sonia Lopez                             <u>**Via CMRRR# Z 258 001 160**</u>
**LAW OFFICES OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, Texas  78539

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | JURY DEMANDED |
| | { | |
| and | { | |
| | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |
| | { | |
| and | { | |
| | { | |
| RAUL RODRIGUEZ | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |

---

## ORDER

---

**WHEREAS**, the Court has considered Plaintiffs' Motion to Compel Defendant City of Harlingen to Produce the James Roberson(sic) Report and Defendant's Response to Plaintiffs' Motion to Compel Defendant City of Harlingen to Produce the James Roberson(sic) Report and the record and is of the opinion that Plaintiffs' motion should be DENIED.

**IT IS SO ORDERED.**

**SIGNED** on _____, 2001, at Brownsville, Texas

_____
Judge Presiding

cc:

Mr. Broadus A. Spivey
**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, Texas  78701-4320

Mr. Tom Lockhart
**ADAMS & GRAHAM, L.L.P.**
P. O. Drawer 1429
Harlingen, Texas 78551

Ms. Sonia Lopez
**LAW OFFICES OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, Texas  78539

105

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUL 09 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | JURY DEMANDED |
| | { | |
| and | { | |
| | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |
| | { | |
| and | { | |
| | { | |
| RAUL RODRIGUEZ | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |

---

**RESPONSE TO PLAINTIFFS' MOTION TO COMPEL
DEFENDANT CITY OF HARLINGEN TO PRODUCE
THE JAMES ROBERSON(sic) REPORT**

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendant **CITY OF HARLINGEN** ("Harlingen") and responds to

Plaintiffs' Motion to Compel Defendant City of Harlingen to Produce the James Roberson(sic)

Report and in support thereof would show the Court as follows:

# I.  FACTUAL BACKGROUND

| DATES | EVENTS |
|---|---|
| August 19, 1998 | Plaintiffs' Notice of Injury and Claims for Damages to Harlingen.  Exh. A and Exh. B. |
| November 9, 1998 | Harlingen's Retention of consultant expert James Robenson.  Exh. C-1. |
| January 6, 1999 | Valley Morning Star request for Robenson report.  Exh. D-1. |
| January 15, 1999 | Harlingen's request for Attorney General decision on protection of Robenson report.  Exh. D-2. |
| February 9, 1999 | Attorney General decision.  Exh. D-3. |
| September 5, 2000 | Harlingen attorney's letter to Plaintiffs' counsel asserting protection of Robenson report from discovery.  Exh. C-2. |
| March 5, 2001 | Court Order lifting stay on discovery. |
| April 25, 2001 | Natalie Prim deposition.  Excerpts Exh. E; production of November 4, 1998 report Exh. F. |
| May 3, 2001 | Plaintiffs' expert criminologist provides report.  Exh. G. |
| May 15, 2001 | Joe LaBeau's deposition.  Excerpts Exh. H; production of October 14, 1998 report Exh. I. |
| May 31, 2001 | Discovery deadline. |

Exhibits F, G and I are offered for the limited purpose of showing that Plaintiffs have no substantial need for Robenson's report, that no exceptional circumstances exist, and that Plaintiffs can obtain the same information from other sources.  They are not offered as proof of the contents of the reports.

## II.  ARGUMENT AND AUTHORITIES

A.    Robenson's Retention and Report Were In Anticipation of Litigation

Documents prepared in anticipation of litigation by or for a party or that party's representative (e.g., the party's attorney, consultant, etc.) can be obtained only upon a showing that the requesting party has substantial need for the materials and the requesting party is unable to obtain the substantial equivalent of the materials without undue hardship.  FED. R. CIV.

PROC. 26(b)(3). The facts and opinions known to an expert retained or specially employed by a party in anticipation of trial who is not expected to be a witness at trial can be obtained by another party only upon a showing of exceptional circumstances under which it is impracticable for the requesting party to obtain facts or opinions on the same subject by other means. FED. R. CIV. PROC. 26(b)(4)(B). Under Rule 26(b)(3), (b)(4)(A), Harlingen has the burden to show that the status of the report and the consultant were "in anticipation of litigation. *Ager v. Jane C. Stormont Vail Hosp. & Training School for Nursing,* 622 F.2d 496, 502 (10th Cir. 1980). *In camera* inspection of the document is an appropriate means to determine that status. *Id.* at 502.

Harlingen will not call Robenson as a witness at trial. Although the Attorney General Opinion protecting Robenson's report from disclosure under the Open Records Act is not binding on this Court, the City Attorney Brendan Hall's statement to and request for the AG decision, in addition to Defendant's September 5, 2000 letter asserting privilege, establishes Harlingen's continued and consistent position that Mr. Robenson is a privileged non testifying consultant. The City Manager Natalie Prim testified that a purpose for Mr. Robenson's retention and consultant work was in anticipation of litigation. Exh. E, pp. 18, (l. 3) - p. 19, (l. 21); p. 87, (l. 13) - p. 88, (l. 15). The retention occurred on November 9, 1998 (Exh. C-1), after notice of claims were given to Harlingen (Exhs. A and B) and the same day this suit was filed. Harlingen's attorney of record signed the retention agreement and Robensen gave his written report directly to him because of his role as counsel for the shooting case. Exhs. C-1, E, pp. 18 (l. 17) - 19 (l. 21). The Assistant City Manager Joe LaBeau deferred to Natalie Prim on the purpose of James Robenson's work. Exh. H, p. 69, (ll. 6-14).

This evidence more than substantiates the retention and the report were in anticipation of litigation. *Compare, Durflinger v. Artiles,* 727 F.2d 888, 891 (10th Cir. 1989)(in personal

injury case, evidence that plaintiff's counsel retained medical expert, that report was made after suit filed, and that counsel designated the expert as a consultant certainly showed report was in anticipation of litigation).  Whether Harlingen's liability insurer did or did not pay Robensen's fees is not critical.  *Compare, Dominguez v. Syntex Lab., Inc.,* 149 F.R.D. 148 (S.D. Ind. 1993)(fact plaintiff's private health policy paid for doctor's visit was not material to whether consultation was in anticipation of litigation).

Likewise, that Harlingen may have used the report for a general self-evaluation does not mean the report was not prepared in anticipation of litigation.  The Federal Court's have recognized "dual purpose" consulting experts for protective purposes under Fed. R. Civ. Pr. Rule 26(b)(4).  *Hermsdorfer v. American Motors Corp.,* 96 FRD 13, 15 (W.D.N.Y. 1982); *Grindell v. American Motors Corp.,* 108 FRD 94, 95 (W.D.N.Y. 1985); *Santos v. Rando Machine Corp.,* 151 FRD 19, 21 (D.R.I. 1993); *In Re: Shell Oil Refinery,* 132 FRD 437 (E.D.La. 1990) *modified at* 34 FRD 148, 150 (E.D.La. 1990); and *United States v. Hooker Chem. and Plastics Corp.,* 112 FRD 333, 337 (W.D.N.Y. 1986).

   B.    <u>No Exceptional Circumstance or Substantial Needs Exist
         to Defeat the Privilege</u>

Plaintiffs bear the burden under Rule 26(b)(3) to prove that they have a substantial need for the materials and that they cannot obtain the substantial equivalent of the materials by other means without undue hardship.  *In re Intern'l Systems and Controls Corp. Securities Litigation,* 693 F.2d 1235, 1240 (5th Cir. 1982); *Fletcher v. Union Pac. R.R.,* 194 F.R.D. 666, 671, 674,-75 (S.D.Cal. 2000).  Conclusory claims of substantial need, hardship, etc., are insufficient to carry that burden; the moving party must make a particularized showing.  *In re Internat'l Systems,* 693 F.2d at 1240-41.  The purpose is to prevent freeloading and encourage independent preparation. *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co., Inc.,* 967 F.2d 980, 985 (4th

Cir. 1992). It is not permitted merely to help counsel prepare for trial or to ensure counsel he has overlooked nothing. *Republic Gear Co. v. Borg-Warner Corp.*, 381 F.2d 551, 557 (2nd Cir. 1967); *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 190 F.R.D. 532, 600 (S.D.Ind. 1999)(fact that plaintiff did not have enough time before trial to interview witnesses is not a "substantial need" to get their statements from the defendant).

For Plaintiffs to have a "substantial need" for the report, they must show that it bears on an essential element of their case and they cannot obtain those facts from other sources. *In re Internat'l Systems,* 693 F.2d at 1241; *Fletcher,* 194 F.R.D. at 671. There is no "substantial need" or "undue hardship" for evidence that simply corroborates other evidence or witnesses. *Director, Office of Thrift Supervision v. Vinson & Elkins,* 124 F.3d 1304, 1308 (D.C.Cir. 1997); *Fletcher,* 194 F.R.D. at 671, 674. The possibility that the statement will impeach other witnesses is also insufficient. *Spruill v. Winner Ford of Dover, Ltd.,* 175 F.R.D. 194, 202 (D.Del. 1997). The movant must identify new and unique information he expects to find. *Director,* 124 F.3d at 1308; *Fletcher,* 194 F.R.D. at 671.

The second prong under Rule 26(b)(3) requires a particularized showing that the substantial equivalent cannot be obtained from other sources without undue hardship. *In re Internat'l Systems,* 693 F.2d at 1240. "Substantial equivalent" focuses on the quality and importance of the evidence. *Fletcher,* 194 F.R.D. at 674. Undue hardship means something more than the ordinary expenses of deposing or interviewing witnesses. *In re Internat'l Systems,* 693 F.2d at 1241.

Plaintiffs also have the heavy burden under Rule 26(b)(4)(B) to prove that "exceptional circumstances" exist and that they cannot obtain the substantial equivalent of the expert's facts or opinions by other means. *Ager v. Jane C. Stormont Vail Hosp. & Training School for Nurses,* 622 F.2d 496, 502 (10th Cir. 1980); *Hoover v. United States Dept. of Interior,* 611 F.2d

1132, 1142 (5th Cir. 1980). The purpose is based on the unfairness of allowing the movant to build his case on the opponent's superior diligence in preparation. *Ager.* 622 F.2d at 502; *Hoover*, 611 F.2d at 1142 n. 13. "Exceptional circumstances" means a basic inability of the moving party to obtain facts or opinions on the subject matter. *Santos,* 151 F.R.D. at 21; *Hartford Fire Ins. Co. v. Pure Air on the Lake, Ltd.,* 154 F.R.D. 202, 208 (N.D.Ind. 1993). Plaintiffs must show they are not able to obtain similar non-privileged, relevant information through discovery. *Maloney v. Sisters of Charity Hosp. of Buffalo, N.Y.,* 165 F.R.D. 25, 30-31 (W.D.N.Y. 1995). It is unlikely the moving party can succeed if it already has an expert on the same subject. *Durflinger,* 727 F.2d at 891; *Santos,* 151 F.R.D. at 22. The moving party must do more than offer a "generalized" statement of what they need from the report. *Hartford Fire Ins.,* 154 F.R.D. at 210.

Plaintiffs cursory claim that they have a substantial need for Robensen's report and cannot obtain its substantial equivalent fails. First, they make only conclusory allegations which are whole insufficient to carry their burden under Rules 26(b)(3), (b)(4)(B).

Second, the record disproves substantial need, exceptional circumstance, and inability to obtain similar information from other sources. The court should consider that:

a.    Plaintiffs have retained their own criminologist expert, George L. Kirkham, and provided a report from him dated May 3, 2001, Exh. G;

b.    Plaintiffs' do not argue their expert cannot form an opinion without some specific material in Robensen's report;

c.    Plaintiffs have deposed former Police Chief Scheopner, Capt. Joe Vasquez, Det. R.D. Moore, the former City Manager Natalie Prim and Assistant City Manager Joe LaBeau and obtained copies of Harlingen's City Management investigative reports, Exhs. F and I;

d.  Plaintiffs do not identify anything in Robensen's report that they did not or could not have learned from those depositions and the investigative reports;

e.  Plaintiffs do not identify a *specific* subject or fact that likely is in Robensen's report that bears directly on an essential element of their case;

f.  Plaintiffs do not identify what fact is in the report that is unique and new.

### III. IN-CAMERA INSPECTION

Plaintiffs have alleged an exception to the protective status of this report by claiming they "have substantial need of the materials in the preparation of their cases and are unable to obtain the substantial equivalent of the materials by other means" (¶ 7 of Motion).  In response to and denial of such allegation, Harlingen is submitting Robenson's report separately and directly to this Court for *in camera* inspection.  Harlingen requests the document submitted for *in camera* inspection be returned to its counsel when the Court rules on this motion.

**WHEREFORE, PREMISES CONSIDERED**, Defendant prays that the Court protect Robenson's report from disclosure or alternatively, if the Court orders it produced, deny Plaintiffs' request for follow up telephonic depositions of Prim and LaBeau since such request is not timely.

Respectfully submitted,

By: 

TOM LOCKHART
Admissions ID No. 2257
Texas State Bar No. 12473500
ROGER W. HUGHES
Admissions ID No. 5950
Texas State Bar No. 10229500
P. O. Drawer 1429
Harlingen, Texas 78551-1429
956/428-7495; FAX: 956/428-2954
Attorney-in-Charge for Defendant,
CITY OF HARLINGEN

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document was forwarded on this 9th day of July, 2001, to the following counsel of record and interested parties:

Attorneys-in-Charge for Plaintiffs, GILBERTO M. RODRIGUEZ, et al and
ARTURO GUILLERMO SALINAS, et al:

Mr. Broadus A. Spivey                    **Via CMRRR# Z 258 001 188**
**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, Texas  78701-4320

Attorney-in-Charge for Plaintiff, RAUL RODRIGUEZ:

Ms. Sonia Lopez                          **Via CMRRR# Z 258 001 160**
**LAW OFFICES OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, Texas  78539

TOM LOCKHART

# APPENDIX
## TABLE OF CONTENTS

| **EXHIBIT REF.** | **EXHIBITS** |
|---|---|
| A | PLAINTIFFS' NOTICE OF INJURY AND CLAIMS FOR DAMAGES TO HARLINGEN |
| B | PLAINTIFFS' NOTICE OF INJURY AND CLAIMS FOR DAMAGES TO HARLINGEN |
| C | AFFIDAVIT OF TOM LOCKHART |
| C-1 | HARLINGEN'S RETENTION OF CONSULTANT EXPERT JAMES ROBENSON |
| C-2 | HARLINGEN ATTORNEY'S LETTER TO PLAINTIFFS' COUNSEL ASSERTING PROTECTION OF ROBENSON REPORT FROM DISCOVERY |
| D | AFFIDAVIT OF BRENDAN HALL |
| D-1 | VALLEY MORNING STAR REQUEST FOR ROBENSON REPORT |
| D-2 | HARLINGEN'S REQUEST FOR ATTORNEY GENERAL DECISION ON PROTECTION OF ROBENSON REPORT |
| D-3 | ATTORNEY GENERAL DECISION |
| E | EXCERPTS FROM DEPOSITION OF NATALIE F. PRIM |
| F | NOVEMBER 4, 1998 REPORT |
| G | PLAINTIFFS' EXPERT CRIMINOLOGIST REPORT |
| H | EXCERPTS FROM DEPOSITION OF JOSEPH D. LABEAU |
| I | OCTOBER 14, 1998 REPORT |

LAW OFFICES OF

# RICHARD PENA, P.C.

SINCE 1976

BARTON OAKS PLAZA TWO

901 SOUTH MOPAC, SUITE 325 AUSTIN, TEXAS 78746-5747

512/327-6884    FAX 512/327-8354

MICHAEL GREENBERG
ADMITTED IN TEXAS AND HAWAII

August 19, 1998

CMRRR Z 358 922 490

Ms. Natalie Prim, City Manager
City of Harlingen Texas
118 E. Tyler Street
Harlingen, Texas  78550

Connie DeLaGarza, Mayor
City of Harlingen Texas
118 E. Tyler Street
Harlingen, Texas  78550

Re: Arturo  G.  Salinas  and  Elisa  Salinas,  surviving
    beneficiaries of the deceased Ricardo Guillermo Salinas

Dear Ms. Prim & Mr. DeLaGarza:

This Notice of Injury and Claim for damages is in compliance
with Section 5 of the Charter of the City of Harlingen, Texas.

Arturo G. Salinas and Elisa Salinas, are the natural parents
of the deceased, Arturo Guillermo Salinas who both actually reside
at 8179 Sunshine Trail San Antonio, Texas  78244 at the date of
presenting this claim and for the six months immediately preceding
July 7, 1998.

The occurrence giving rise to this claim took place on July 7,
1998 in or near San Benito, Cameron County, Texas on Gamble Road at
and surrounding the residence of Mr. R.D. Moore, a police officer
employed by the City of Harlingen, Texas Police Department.

The incident occurred when a rifle, believed to be an AR-15
assault rifle, which had been turned in to the Harlingen Police
Department to be destroyed was instead placed in the possession of
Harlingen police officer R.D. Moore and taken to Officer Moore's
home and stored in Officer Moore's home.  The rifle was taken and
used by Officer Moore's son, Ernest Moore, age 25, a resident of
Officer Moore's home, to shoot to death Susan Lynn Rodriguez, a
U.S. Border Patrol Agent on duty as a Border Patrol Agent.

1

DEFENDANT'S
EXHIBIT

A

HARLINGEN
Jefferson Plaza
1822 West Jefferson
Harlingen, Texas 78550
(956) 428-0881
fax (956) 412-3839

MCALLEN
Crosspointe Center
4417 N McColl Rd
McAllen, Texas 78504
(956) 972-1825
fax (956) 972-1019

BROWNSVILLE
Corporate Suites
302 Kings Highway
Brownsville, Texas 78521
(956) 548-2550
fax (956) 544-6829

Claimants demand all damages allowed under the Texas Wrongful Death statute, including damages for loss of income from the deceased throughout her life expectancy and for all intangible damages such as loss of love, care, counsel and companionship in the amount exceeding five million dollars or the statutory maximum allowed under applicable law.

The names and addresses of all witnesses to establish this claim now known to claimants are:

1.  Gilberto M. Rodriguez
    1810 Redbird Lane
    Harlingen, Texas  78550

2.  Megan Suzanne Rodriguez
    1810 Redbird Lane
    Harlingen, Texas  78550

3.  Stephen L. Williams
    926 Paint Rock Valley Road
    Philadelphia, Tennessee  37846

4.  Robyn S. Williams
    926 Paint Rock Valley Road
    Philadelphia, Tennessee  37846

4.  Arturo Salinas
    8179 Sunshine Trail
    San Antonio, Texas  78244

5.  Elisa Salinas
    8179 Sunshine Trail
    San Antonio, Texas  78244

6.  Jason Wallace
    902 S. 499 Loop Apt. E7
    Harlingen, Texas
    440-8788

7.  Robert Reed
    Rt. 8, Box 777
    La Feria, Texas
    412-9601

8.  Danielle Le Bleu
    Rt. 1, 615 Liberty Lane
    La Feria, Texas
    797-1560

9.  Rudy Cavazos
    300 N. Dowling Street
    San Benito, Texas

2

10.   Antonio Medina
      Rt. 1 Box 50
      San Benito, Texas   78586
      399-2976

11.   Julian Sanchez
      L&W Service
      1630 N. 77 Sunshine Strip
      Harlingen, Texas   78550
      423-2851

12.   Alex Madrigal
      DPS Lab
      1414 N. Bicentennial
      McAllen, Texas   78501
      682-5556

13.   Danny Carpenter
      ATF Agent
      1701 Business Hwy. 83
      McAllen, Texas   78501
      687-5207

14.   Orlando Sanchez
      U.S. Border Patrol Agent
      1713 W. 4th Street, #4
      Weslaco, Texas   78596
      968-8229

15.   Joe Vasquez, Captain
      Harlingen P.D.
      1102 S. Commerce Street
      Harlingen, Texas   78550
      427-8755

16.   Michael James Riley
      108 E. Capeche
      South Padre Island, Texas   78597
      761-1054

17.   George A. Hupp
      901 Rangerville Road
      Harlingen, Texas   78550

18.   Daniel Diaz
      315 Regency Lane, #5
      Weslaco, Texas   78596
      973-1549

19.   Doel Nicholas Anders
      422 E. Caffery
      Pharr, Texas   78577

3

20. Bob Marshall
    1701 Business Hwy. 83
    McAllen, Texas   78501
    682-5556

21. Frank Chambers
    Special Crimes Service
    Sherman, Texas
    (903)893-8833

4

## VERIFICATION

My name is Michael Greenberg I am the Attorney for Claimants. I have personal knowledge of the matters of fact stated in the above Notice of Claim and they are all true and correct.

MICHAEL GREENBERG

SWORN TO AND SUBSCRIBED before me, the undersigned authority, on this the 19th day of August, 1998, to certify which witness my hand and seal of office.

Notary Public, State of Texas

6/19/99

My Commission Expires

5

LAW OFFICES OF

# RICHARD PENA, P.C.

SINCE 1976
BARTON OAKS PLAZA TWO
901 SOUTH MOPAC, SUITE 325 AUSTIN, TEXAS 78746-5747

512/327-6884    FAX 512/327-8354

MICHAEL GREENBERG
ADMITTED IN TEXAS AND HAWAII

August 19, 1998

CMRRR Z 358 922 498

Ms. Natalie Prim, City Manager
City of Harlingen Texas
118 E. Tyler Street
Harlingen, Texas  78550

Connie DeLaGarza, Mayor
City of Harlingen Texas
118 E. Tyler Street
Harlingen, Texas  78550

 Re: Gilberto M. Rodriguez, individually and on behalf of his minor daughter, Megan Suzanne Rodriguez, age 2 and Stephen L. Williams and wife, Robyn S. Williams, surviving beneficiaries of the deceased, Susan Lynn Rodriguez

Dear Ms. Prim & Mr. DeLaGarza:

 This Notice of Injury and Claim for damages is in compliance with Section 5 of the Charter of the City of Harlingen, Texas.

 The injured parties are the statutory beneficiaries of the deceased, Susan Lynn Rodriguez.  They are the surviving husband, Gilberto M. Rodriguez whose actual residence at the date of presenting this claim and for the six months immediately preceding July 7, 1998 is 1810 Redbird Lane, Harlingen, Texas  78550, P.O. Box 530476; Megan Suzanne Rodriguez, age 2, the natural daughter of the deceased, Susan Lynn Rodriguez, represented by her natural father, Gilberto M. Rodriguez whose actual residence at the date of presenting this claim and for the six months immediately preceding July 7, 1998 is 1810 Redbird Lane, Harlingen, Texas 78550:

 Stephen L. Williams and Robyn S. Williams are the natural parents of the deceased, Susan Lynn Rodriguez who both actually reside at 926 Paint Rock Valley Road, Philadelphia, Tennessee, 37846 at the date of presenting this claim and for the six months immediately preceding July 7, 1998.

 The occurrence giving rise to this claim took place on July 7, 1998 in or near San Benito, Cameron County, Texas on Gamble Road at and surrounding the residence of Mr. R.D. Moore, a police officer employed by the City of Harlingen, Texas Police Department.

1

HARLINGEN
Jefferson Plaza
1822 West Jefferson
Harlingen, Texas 78550
(956) 428-0881
fax (956) 412-3839

MCALLEN
Crosspointe Center
4417 N. McColl Rd
McAllen, Texas 78504
(956) 972-1825
fax (956) 972-1019

BROWNSVILLE
Corporate Suites
302 Kings Highway
Brownsville, Texas 78521
(956) 548-2550
fax (956) 544-6829



DEFENDANT'S
EXHIBIT

B

The incident occurred when a rifle, believed to be an AR-15 assault rifle, which had been turned in to the Harlingen Police Department to be destroyed was instead placed in the possession of Harlingen police officer R.D. Moore and taken to Officer Moore's home and stored in Officer Moore's home.  The rifle was taken and used by Officer Moore's son, Ernest Moore, age 25, a resident of Officer Moore's home, to shoot to death Susan Lynn Rodriguez, a U.S. Border Patrol Agent on duty as a Border Patrol Agent.

Claimants demand all damages allowed under the Texas Wrongful Death statute, including damages for loss of income from the deceased throughout her life expectancy and for all intangible damages such as loss of love, care, counsel and companionship in the amount exceeding five million dollars or the statutory maximum allowed under applicable law.

The names and addresses of all witnesses to establish this claim now known to claimants are:

1. Gilberto M. Rodriguez
   1810 Redbird Lane
   Harlingen, Texas  78550

2. Megan Suzanne Rodriguez
   1810 Redbird Lane
   Harlingen, Texas  78550

3. Stephen L. Williams
   926 Paint Rock Valley Road
   Philadelphia, Tennessee  37846

4. Robyn S. Williams
   926 Paint Rock Valley Road
   Philadelphia, Tennessee  37846

4. Arturo Salinas
   8179 Sunshine Trail
   San Antonio, Texas  78244

5. Elisa Salinas
   8179 Sunshine Trail
   San Antonio, Texas  78244

6. Jason Wallace
   902 S. 499 Loop Apt. E7
   Harlingen, Texas
   440-8788

7. Robert Reed
   Rt. 8, Box 777
   La Feria, Texas
   412-9601

8. Danielle Le Bleu
   Rt. 1, 615 Liberty Lane
   La Feria, Texas
   797-1560

9. Rudy Cavazos
   300 N. Dowling Street
   San Benito, Texas

10. Antonio Medina
    Rt. 1 Box 50
    San Benito, Texas   78586
    399-2976

11. Julian Sanchez
    L&W Service
    1630 N. 77 Sunshine Strip
    Harlingen, Texas   78550
    423-2851

12. Alex Madrigal
    DPS Lab
    1414 N. Bicentennial
    McAllen, Texas   78501
    682-5556

13. Danny Carpenter
    ATF Agent
    1701 Business Hwy. 83
    McAllen, Texas   78501
    687-5207

14. Orlando Sanchez
    U.S. Border Patrol Agent
    1713 W. 4th Street, #4
    Weslaco, Texas   78596
    968-8229

15. Joe Vasquez, Captain
    Harlingen P.D.
    1102 S. Commerce Street
    Harlingen, Texas   78550
    427-8755

16. Michael James Riley
    108 E. Capeche
    South Padre Island, Texas   78597
    761-1054

17. George A. Hupp
    901 Rangerville Road
    Harlingen, Texas   78550

18. Daniel Diaz
    315 Regency Lane, #5
    Weslaco, Texas  78596
    973-1549

19. Doel Nicholas Anders
    422 E. Caffery
    Pharr, Texas  78577

20. Bob Marshall
    1701 Business Hwy. 83
    McAllen, Texas  78501
    682-5556

21. Frank Chambers
    Special Crimes Service
    Sherman, Texas
    (903)893-8833

4

## VERIFICATION

My name is Michael Greenberg I am the Attorney for Claimants. I have personal knowledge of the matters of fact stated in the above Notice of Claim and they are all true and correct.

_____
MICHAEL GREENBERG

SWORN TO AND SUBSCRIBED before me, the undersigned authority, on this the 19th day of August , 1998, to certify which witness my hand and seal of office.

_____
Notary Public, State of Texas

6/19/99
_____
My Commission Expires

5

CImPDF - www.fasfsc.com

**THE STATE**       )
                           :

**OF TEXAS**        )

**BEFORE ME**, the undersigned Notary Public in and for the State of Texas, on this day personally appeared **TOM LOCKHART**, known to me to be the person whose name is subscribed hereto, who being first duly sworn in the manner provided by law, on oath stated as follows:

"My name is **TOM LOCKHART**.  I am over the age of twenty-one (21) years; am in all respects competent to testify about and have personal knowledge of the following facts:

I am a practicing attorney licensed by the State Bar of Texas in May 1975.

On July 16, 1998, I was retained to represent the City of Harlingen on the July 7, 1998 Ernest Moore shooting incident.

The attached Retention Agreement with James Robenson dated November 9, 1998 (Exh. C-1) is a true, accurate and complete copy of the original Retention Agreement.

The attached September 5, 2000 letter to Plaintiffs' counsel (Exh. C-2) is a true, accurate and complete copy of the letter faxed to Plaintiffs' counsel on such date."

Further affiant sayeth not.

_____
**TOM LOCKHART**

**SWORN TO AND SUBSCRIBED** before me, the undersigned authority, by the said **TOM LOCHKART** on the ___9th___ day of July, 2001, to certify which witness my hand and seal of office.

MARIA S. MARTINEZ
Notary Public
State of Texas
Comm. Exp. 11-14-2004

[Notary Seal]

Notary Public in and for THE STATE OF TEXAS
Print Name: ___Maria S. Martinez___
My Commission Expires: ___11-14-2004___

**DEFENDANT'S EXHIBIT**

C

November 9, 1998

RETENTION AGREEMENT

This Agreement confirms the retention by THE CITY OF HARLINGEN of Mr. James M. Robenson to act as a consultant in the investigation of the chain of custody and circumstances surrounding a Harlingen Police Department rifle used in a shooting incident on July 7, 1998 in San Benito.

Mr. Robenson's usual and customary fee for this task is $125.00 per hour, which the CITY hereby agrees to pay  The CITY upon presentation of a receipt or invoice shall pay the necessary costs of fees, travel, accommodations, meals, mailings, and other relevant expenses resulting from this Agreement within thirty (30) days to Mr. Robenson.

The time parameters to conduct this investigation are from Thursday, November 5, 1998 to Monday, November 30, 1998.  Should this date be exceeded there will be no additional cost to the CITY.

_____                    _____
JAMES M. ROBENSON                              TOM LOCKHART
Consultant                                     For the CITY OF HARLINGEN

**DEFENDANT'S EXHIBIT**

C–1

LAW OFFICES OF

# ADAMS & GRAHAM, L.L.P.

AFFILIATED WITH HILL GILSTRAP RIGGS ADAMS & GRAHAM, L.L.P.

222 E. VAN BUREN, WEST TOWER
P. O. DRAWER 1429
HARLINGEN, TEXAS 78551
TEL (956) 428-7495    FAX (956) 428-2954
adamsgraham.com

AFFILIATE OFFICES
AUSTIN
CHICAGO
DALLAS/FORT WORTH
LITTLE ROCK

TOM LOCKHART
Partner

September 5, 2000

Mr. Broadus Spivey                                    Via Fax No. 512/474-1605
**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, Texas  78701-4320

Ms. Sonia Lopez                                       Via Fax No. 956/381-0825
**LAW OFFICES OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, Texas  78539

Re:   Civil Action No. B-98-162
      Arturo Guillermo Salinas, et al. v. City of Harlingen, et al.
      Civil Action No. B-98-163
      Gilberto Rodriguez, et al. v. City of Harlingen, et al.
      Civil Action No. B-99-070
      Raul Rodriguez v. City of Harlingen, et al.
      Our File No.        :    H-1023

Dear Folks:

While not waiving the Discovery Stay Order, we are asserting the following privileges
with regard to certain documents referenced in your August 2, 2000 and August 3, 2000
letters, respectively.  First, liability insurance is protected from discovery by authority of
TCPRC § 101.104.

The report by James Robensen is protected from discovery by FRCP 26(b)(3) and (4).
Mr. Robensen is a privileged non testifying consultant retained by the City of Harlingen.
(See enclosed Retention Agreement.)  The report, which was completed on December
2, 1998, is protected from disclosure.

Concerning the request for statements given by R.D. Moore, we have determined that
there was a written statement given by R.D. Moore on September 3, 1999 to Harlingen
Police Department Internal Affairs' officers Lt. Danny Castillo and Det. Investigator David



**DEFENDANT'S
EXHIBIT**

C-2

[3] C:\files\H1023\Spivey.022

Mr. Broadus Spivey
Ms. Sonia Lopez
Re:   Gilberto Rodriguez, et al. v. City of Harlingen, et al.
      Guillermo Salinas, et al. v. City of Harlingen, et al.
      Raul Rodriguez, et al. v. City of Harlingen, et al.
September 5, 2000
Page 2


Means and a written statement given by R.D. Moore on November 5, 1995 to Internal Affairs Det. Investigator David Means.   We are asserting a governmental official information privilege and a self critical analysis privilege on these statements.   There is a tape recording of an interview of R.D. Moore by Jim Robensen on November 10, 1998, which is likewise protected from discovery under FRCP 26(b)(3) and (4).   Additionally, we are asserting Mr. Moore's individual rights of privacy privileges for all statements given by him.

Mr. Robensen's report is in my possession.   The R.D. Moore statements taken by HPD Internal Affairs remains in their possession.   The tape of Mr. Robensen's interview of R.D. Moore remains in Mr. Robensen's possesion.

Sincerely yours,

**ADAMS & GRAHAM, L.L.P.**

TOM LOCKHART

TL/mm
Enclosure

cc:   (w/encl.)
      Mr. Richard Pena                                    Via Fax No. 512/327-8354
      **LAW OFFICES OF RICHARD PENA, P.C.**
      Barton Oaks Plaza Two
      901 MoPac, Suite 325
      Austin, Texas  78746-5747

      Mr. Walter J. Passmore                              Via Fax No. 956/686-1276
      **PASSMORE, WALKER & TWENHAFEL, L.L.P.**
      P. O. Drawer 3766
      McAllen, Texas  78502-3766

**THE STATE**            )
                                    :

**OF TEXAS**             )

**BEFORE ME**, the undersigned Notary Public in and for the State of Texas, on this day personally appeared **BRENDAN HALL**, known to me to be the person whose name is subscribed hereto, who being first duly sworn in the manner provided by law, on oath stated as follows:

"My name is **BRENDAN HALL**. I am over the age of twenty-one (21) years; am in all respects competent to testify about and have personal knowledge of the following facts:

I am a practicing attorney licensed by the State Bar of Texas in May 1975 and I have been the City Attorney for the City of Harlingen since November 1994.

The attached letter dated January 6, 1998 (sic) from the Valley Morning Star to the City of Harlingen (Exh. D-1), the January 15, 1999 letter from me to the Attorney General of the State of Texas (Exh. D-2) and the February 9, 1999 letter to me from the Office of the Attorney General (Exh. D-3) are true, accurate and complete copies of the original letters, without enclosures."

Further affiant sayeth not.

_____
**BRENDAN HALL**

**SWORN TO AND SUBSCRIBED** before me, the undersigned authority, by the said **BRENDAN HALL** on the _27th_ day of June, 2000, to certify which witness my hand and seal of office.

[Notary Seal]

ANA MARIE VILLARREAL
NOTARY PUBLIC
State of Texas
Comm. Exp. 10-29-2001

**DEFENDANT'S EXHIBIT**

D

_____
Notary Public in and for THE STATE OF TEXAS
Print Name: _Ana Marie Villarreal_
My Commission Expires: _10-29-2001_

Laura B. Martinez
Assistant City Editor
Valley Morning Star
1310 S. Commerce Street
Harlingen, Texas
(956) 430-6281


Jan. 6, 1998

City of Harlingen
City Manager Natalie Prim
118 E. Tyler Ave.
Harlingen, Texas 78550


Dear Officer for Public Records:

This request is made under the Texas Public Information Act, Chapter 552, Texas Government Code, which guarantees the public's access to information in the custody of governmental agencies. I respectfully request copies of the following information.

A copy of the written report made by consultant James Robenson, who was hired by the city in November. Robenson was contracted by the City of Harlingen to review the way the Harlingen Police Department handled the July 1998 shooting of two U.S. Border Patrol agent, and recommend steps to standardize department policies and procedures.
The consultant was hired with taxpayers' money, and therefore his report is public information. Also, there is great community interest in the operation of the Harlingen Police Department and its importance to public safety.
For that additional reason, the consultant's report needs to be made public.

In the interest of expediency, and to minimize the research and/or duplication burden of your staff, I would be pleased to personally examine the relevant records if you would grant me immediate access to the requested material. Additionally, and since time is a factor, please communicate with me by telephone rather than mail. My telephone number is 430-6281.

Disclosure of this information is in the public interest because providing a copy of the information primarily benefits the general public. I therefore request a waiver of all fees and charges pursuant to Section 552.267 of the act.

I shall look forward to hearing from you promptly, as specified in the law. Thank you for your cooperation.

Sincerely,

Laura B. Martinez



DEFENDANT'S
EXHIBIT

D-1



CITY OF
HARLINGEN

CAPITAL OF THE LOWER RIO GRANDE VALLEY
"WORKING AS A TEAM TO PROVIDE QUALITY SERVICE WITH RESPECT AND FAIRNESS TO ALL CITIZENS"

January 15, 1999

**Via Certified Mail, RRR**
**# Z 348 019 102 and Via**
**Fax No. 512/463-2092**

To the Attorney General
State of Texas
Open Records Division
P. O. Box 12548
Austin, Texas  78711-2548
Phone No. 512/936-6736

### Request for Attorney General Decision
### Pursuant to § 552.301 of the Government Code

The City of Harlingen has received a written request from the Valley Morning Star for a copy of the written report made by consulting expert, James Robenson. (Request enclosed.) The City of Harlingen asks for the Attorney General's decision on this request. The City of Harlingen, through its attorneys of record, states that the information requested is not subject to the Open Records Act or is excepted from the requirements of the Open Records Act based upon §§ 552.101; 552.103; 552.107 and 552.111 of the Government Code.

On July 7, 1998, a shooting incident took the lives of Border Patrol agents, Susan Lynn Rodriguez and Arturo Guillermo Salinas, wounded a Cameron County Deputy Sheriff, and allegedly caused personal or emotional injuries to five other Deputy Sheriffs. The assailant used a rifle belonging to the Harlingen Police Department.

Notice of injury and claims for damages were given to the City of Harlingen by the families of the two decedents by letters dated August 19, 1998 (enclosures). Notices and claims were also received from the six Deputy Sheriffs (enclosures). On November 9, 1998, the families of the slain Border Patrol agents filed lawsuits in Federal Court in Brownsville, Texas (Complaints enclosed). The City of Harlingen's attorney of record in defense of these Complaints is Tom Lockhart of Adams & Graham, L.L.P. (Motions to Dismiss under FRCP 12b 6 and Original Answers enclosed.) Although suit has been threatened by the Deputy Sheriffs, they have not been filed.

*"Recipient Of Keep Texas Beautiful Governor's Achievement Award"*

118 E. TYLER    •    P.O. BOX 2207    •    HARLINGEN, TEXAS 78551    •    (956) 427-

**DEFENDANT'S**
**EXHIBIT**
D-2

To The Attorney General
State of Texas
Open Records Division
January 15, 1999
Page 2

James Robenson was retained by the City of Harlingen as a consulting expert relating to the civil litigation.  (Retention Letter enclosed for <u>in-camera inspection only</u>.)

The information requested by the Valley Morning Star is also enclosed for <u>in-camera inspection only</u> and the City of Harlingen, through its attorneys, states that the above referenced exceptions apply to this information in total.  [With regard to § 552.103 see, *University of Texas Law School v. Texas Legal Foundation*, 958 SW2d 479 *(Tex.App. Austin 1997) no writ.*]

Sincerely yours,

Brendan Hall
City Attorney
City of Harlingen

BH/mm
Enclosures



OFFICE OF THE ATTORNEY GENERAL · STATE OF TEXAS
JOHN CORNYN



February 9, 1999

Mr. Brendan Hall
City Attorney
City of Harlingen
P.O. Box 2207
Harlengen, Texas 78851

OR99-0378

Dear Mr. Hall:

You ask whether certain information is subject to required public disclosure under the Open Records Act, chapter 552 of the Government Code. Your request was assigned ID# 123312.

You assert that section 552.103 of the Government Code excepts from disclosure the requested information. Section 552.103(a) of the Government Code reads as follows:

> (a) Information is excepted from [required public disclosure] if it is information:
>
> (1) relating to litigation of a civil or criminal nature or settlement negotiations, to which the state or a political subdivision is or may be a party or to which an officer or employee of the state or a political subdivision, as a consequence of the person's office or employment, is or may be a party; and
>
> (2) that the attorney general or the attorney of the political subdivision has determined should be withheld from public inspection.

A governmental body has the burden of providing relevant facts and documents to show the applicability of an exception in a particular situation. The test for establishing that section 552.103(a) applies is a two-prong showing that (1) litigation is pending or reasonably anticipated, and (2) the information at issue is related to that litigation. *University of Tex. Law Sch. v. Texas Legal Found.*, 958 S.W.2d 479 (Tex. App.–Austin, 1997, no pet.); *Heard v. Houston Post Co.*, 684 S.W.2d 210 (Tex. App.--Houston [1st Dist.] 1984, writ ref'd n.r.e.);

DEFENDANT'S EXHIBIT

D-3

Mr. Brendan Hall - Page 2

Open Records Decision No. 588 (1991). In this instance, you have made the requisite showing that the requested information relates to litigation for purposes of section 552.103(a).[1] The requested records therefore may be withheld from public disclosure.

We note that if the opposing party in the litigation has seen or had access to any of the information in these records, there is no section 552.103(a) interest in withholding that information from the requestor. Open Records Decision Nos. 349 (1982), 320 (1982). In addition, the applicability of section 552.103(a) ends once the litigation concludes. Attorney General Opinion MW-575 (1982); Open Records Decision No. 350 (1982). However, if the records contain information that is confidential by law, you must not release such information even at the conclusion of the litigation. Gov't Code §§ 552.101, .352

In light of our conclusion under section 552.103(a), we need not address the applicability of other exceptions, if any. We are resolving this matter with this informal letter ruling rather than with a published open records decision. This ruling is limited to the particular records at issue under the facts presented to us in this request and may not be relied upon as a previous determination regarding any other records. If you have questions about this ruling, please contact our office.

Yours very truly,

Yen-Ha Le
Assistant Attorney General
Open Records Division

YHL/nc

Ref.:  ID# 123312

Enclosures:  Submitted documents

cc:  Ms. Laura B. Martinez
     Valley Morning Star
     1310 S. Commerce Street
     Harlingen, Texas
     (w/o enclosures)

---

[1] If a governmental body submits to this office a "representative sample" of the requested records, we assume that the sample submitted is truly representative of the requested records as a whole. *See* Open Records Decision Nos. 499 (1988), 497 (1988) (where requested documents are numerous and repetitive, governmental body should submit representative sample; but if each record contains substantially different information, all must be submitted). When a representative sample of the requested information is submitted to this office, the open records letter ruling does not reach, and therefore does not authorize the withholding of any other requested records to the extent that those records contain substantially different types of information than that submitted to this office.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILE DIVISION


ARTURO G. SALINAS, ET AL          * CIVIL ACTION NO. B-98-162
                                  *
v.                                *
                                  *
CITY OF HARLINGEN, TEXAS, ET AL;  *
                                  *
and                               *
                                  *
GILBERTO M. RODRIGUEZ, ET AL      *
                                  *
v.                                * CIVIL ACTION NO. B-98-162
                                  *
CITY OF HARLINGEN, TEXAS, ET AL;  *
                                  *
and                               *
                                  *
RAUL RODRIGUEZ                    *
                                  *
v.                                *
                                  *
CITY OF HARLINGEN, TEXAS, ET AL.  * CIVIL ACTION NO. B-98-162



        Videotaped Deposition of NATALIE F. PRIM, taken

by attorney for the Plaintiffs at the offices of Wierzbicki

& Stephenson, 220 West Garden Street, Suite 801, Pensacola,

Florida, commencing at 11 a.m. on the 25th day of April,

2001, before Gina Hawkins, Registered Professional Reporter

and Notary Public.



E

```
1                              APPEARANCES

2
      FOR THE PLAINTIFF:        PRICE AINSWORTH, ESQUIRE
3                               Spivey & Ainsworth, P.C.
                                48 East Avenue
4                               Austin, Texas 78701

5     FOR THE DEFENDANT:        TOM LOCKHART, ESQUIRE
                                Adams & Graham, L.L.P.
6                               222 E. Van Buren, West Tower
                                Harlingen, Texas 78551-1429

7

8     VIDEOGRAPHER:             TOMMY GRICE

9     ─────────────────────────────────────────────────────
                            INDEX OF WITNESS
10
      NATALIE F. PRIM                                    PAGE
11
           DIRECT EXAMINATION BY MR. AINSWORTH             3
12
      CERTIFICATE OF OATH                                100
13    CERTIFICATE OF REPORTER                            101

14    ─────────────────────────────────────────────────────

15                          INDEX OF EXHIBITS

16    PLAINTIFF'S NO.:

17         1 - City Manager's Report to the City
                Commission                                13
18
           2 - Statement from the City Manager            51
19

20

21

22

23

24

25
```

1    that right?

2          A     Yes.

3          Q     Did that investigation result in a written

4    report?

5          A     Yes.

6          Q     And do you know to whom -- when was the written

7    report provided; do you know?

8          A     I believe it was provided sometime -- well, it

9    was after this date in November of '98, and it was probably

10   provided in, you know, the weeks following.

11                It seemed to me that he worked within a month

12   of time.

13         Q     So, roughly before January of '99?

14         A     Yes.

15         Q     Or about then?

16         A     Yes.

17         Q     And do you know to whom that report would have

18   been given?

19         A     It was given to Mr. Lockhart.

20         Q     Okay.  I mean, did Mr. Robinson give it

21   directly to Mr. Lockhart, or did he give it to you, or do

22   you recall?

23         A     He gave it directly to Mr. Lockhart.

24         Q     And why was that?

25         A     Well, it was just, so many things were

                    Wierzbicki & Stephenson Court Reporting Service

1   happening by this time period.  We had notice of

2   litigation.  We had just, you know, growing public

3   sentiment about what's happened and why.  We had questions

4   from the media on an ongoing basis.

5              And then my assistant had gone in and reviewed

6   some of the department, and it just seemed to be the right

7   thing to do.

8        Q    Well, I didn't ask that very well.  How was it

9   that Mr. Lockhart was provided the report as opposed to,

10  say, you or Mr. Labeau or somebody like that?  Why was

11  Mr. Lockhart involved?

12       A    Because we had litigation notice.  I believe

13  the litigation notices came over the summer, if I recall.

14  And so, you know, clearly it was the method chosen.

15       Q    And was Mr. Lockhart retained as outside

16  counsel for the city?

17       A    Absolutely.

18       Q    And so he was provided a copy of that pursuant

19  to his role as outside counsel for the city relative to this

20  July 7th, '98, shooting incident?

21       A    Yes.

22       Q    How was Mr. Robinson compensated for his work

23  in preparing the report?

24       A    He was paid, I believe, on a lump-sum basis and

25  gave me an estimate of his time.  I think it was time and

1    Mr. Labeau have done the appropriate investigation so

2    far?

3          A      For full information, yes.

4          Q      Yeah.  And then to recommend any steps which

5    would be necessary to standardize department policies and

6    procedures; is that right?

7          A      Yes.

8          Q      And then do it timely; is that right?

9          A      Yes.

10         Q      Was anybody, other than Mr. Robinson, ever

11   employed to accomplish these recommendations?

12         A      No.  No.  Mr. Robinson, and that was it.

13         Q      And I don't see any discussion under

14   "Recommendation" that Mr. Robinson be retained or any other

15   person be retained in an effort to provide information

16   pursuant to the anticipated litigation that you had been

17   given notice of over the course of that summer back in

18   1998.

19               Do you see any mention of that here in

20   Exhibit No. 1?

21         A      No.  We didn't discuss the litigation in this.

22   It wouldn't have been appropriate with the report.

23         Q      Isn't it fair to say, Ms. Prim, that you wanted

24   the policies and procedures there at the Harlingen Police

25   Department brought up to best practices whether or not any

Wierzbicki & Stephenson Court Reporting Service

1  lawsuits were ever filed?

2       A    Well, the incident is what brought it all

3  about.  The department was managed by the assistant city

4  manager and there had been, you know, certainly some, you

5  know, issues from time to time that I felt that we had

6  already -- we had a crisis on our hands.  We had the public

7  wanting to know.  We had the press calling us every day.

8            We had -- the lawsuits, I think, happened

9  within the first couple of months right after the incident

10  occurred.  So, you know, we just had a real crisis on our

11  hands and we had to respond, and I felt like -- I really

12  felt like I'm not qualified to get to the bottom of this and

13  know all these agencies and understand how to walk through

14  an investigation, and I felt that that's why we needed to

15  have expert advice, and I wanted to know the truth.

16       Q    Well, you're doing better than I would have

17  done because I can't remember what TCLSE stands for, but

18  the point is that based on the fact that you're the city

19  administrator as opposed to the city police department

20  chief, I guess you may have concerns as to whether or not

21  the police department was adhering to best practices, but as

22  to what is the appropriate practice, what do other cities do

23  under the same or similar circumstances, you really didn't

24  know one way or the other?

25       A    I didn't really know much in terms of detailed

# DO NOT WRITE ON TRANSCRIPT – ENTER CHANGES HERE

In Re: Salinas vs City of Harlington

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 89 | 10 | "my" — should be "me" |
| 96 | 18 | "in" — ? delete |

Under Penalties of perjury, I declare I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.

5/21/01
Date

_Natalie Prim_
Deponent: Natalie Prim

# CERTIFICATE OF OATH

STATE OF FLORIDA  )

COUNTY OF ESCAMBIA)


    I, the undersigned authority, certify that

NATALIE F. PRIM, appeared personally before me and was duly

sworn.

    WITNESS my hand and official seal this 26th day of

April, 2001.



Gina Hawkins, RPR


Gina Hawkins
Commission # CC 948887
Expires Aug. 8, 2004
Bonded Thru
Atlantic Bonding Co., Inc.

## CERTIFICATE OF REPORTER

STATE OF FLORIDA  ;

COUNTY OF ESCAMBIA)

     I, Gina Hawkins, Registered Professional Reporter, certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true record of the testimony given by the witness; that the witness did not waive reading and signing.

     I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in this action.


Gina Hawkins
Registered Professional Reporter

Wierzbicki & Stephenson Court Reporting Service

# CITY MANAGER'S REPORT
# To The CITY COMMISSION

## CONCERNING THE 7TH OF JULY, 1998 SHOOTING INCIDENT

## Wednesday
## 4 November, 1998

On July 7, 1998, a very tragic incident took place in which two Border Patrol Agents *(Susan Lynn Rodriguez and Ricardo Salinas)* were killed and Deputy Sheriff, Raul Rodriguez, wounded. Following the incident, it was learned the rifle used by the assailant, 25 year old Ernest Moore, was a Harlingen Police Department (HPD) semi-automatic AR-15. This rifle was assigned to Harlingen Police Detective R. D. Moore by Moore's supervisor.

The HPD rifle had been placed in a locked gun vault along with five privately owned semi-automatic rifles. Ernest, without permission from R. D. Moore, removed the HPD rifle from the locked safe, instead of one of the remaining privately owned semi-automatic rifles. It appears this tragic event would still have occurred had Ernest Moore selected one of the other remaining semi-automatic rifles instead of the HPD rifle.

City representatives undertook an immediate and thorough investigation of this HPD weapons handling issue. In regards to this incident, this report provides management findings and recommendations in two major areas:

I— Review of the July 7th Shooting, and

II— City's Management's Police Department Review.

**DEFENDANT'S EXHIBIT**

F

Case 1:98-cv-00162   Document 105   Filed in TXSD on 07/09/2001   Page 44 of 69

# I.   REVIEW OF THE JULY 7TH SHOOTING

## BACKGROUND

In the days following the shooting, the Chief of Police communicated to the Assistant City Manager and City Manager that Detective Moore was in possession of the weapon in order to respond to tactical situations to fulfill assigned sharpshooter responsibilities. Management was advised Detective Moore's practice was to transport the weapon daily to and from work and in the evening secure the weapon in his personal gun vault.

Police Chief's review of the incident stated:

- several agencies had reviewed the shooting,

- the only person responsible for this tragedy was the assailant, and

- no departmental violations had occurred.

## MANAGEMENT INQUIRY

Our administrative review has identified the following areas of concern:

- Reports and information surrounding this incident.

- Policies, procedures, and practices.

- Application of management practices.

CutePDF - www.fastio.com

## II. CITY MANAGEMENT'S POLICE DEPARTMENT REVIEW

## BACKGROUND

The Assistant City Manager inspected the Department evidence rooms, weapons, and lockers in late July. Copies of policies and procedures were requested and reviewed by the City Manager. Some activities were without written policies or procedures, thus not providing the benefit of written administrative guidelines for the department.

The following observations were made:

- An inspection of department records produced a handwritten inventory of weapons, but did not reveal Moore's sign out of the weapon.

- Hundreds of weapons, mostly handguns, are stored in stacked bins with tags relating to cases.

- No current written procedure addresses disposal of stockpiled weapons. Many weapons have been in storage for years.

## MANAGEMENT INQUIRY

Management's preliminary findings reveal serious concerns and questions regarding the adequacy of:

- records,

- weapon handling policies,

- inventory and disposition controls, and

- management practices.

Because of management's concern, documentation for HPD weapons need to be reviewed, particularly in the areas of receipt, handling, inventorying, storage, disposition, assignment and training

Case 1:98-cv-00162   Document 105   Filed in TXSD on 07/09/2001   Page 46 of 69

# CONCLUSION

1. Management has concerns whether department policies, procedures and practices are in conformance with professional "best practices".

2. In addition, there may be a range of actions required to ascertain the appropriate "policy, procedure and practices" standards required to maintain and support the City of Harlingen Police Department.

3. Finally, because of the highly specialized nature of law enforcement, management concludes the need for expert assistance in evaluating and reviewing the above.

# RECOMMENDATION

1. Bring department practices to the level of "best practices" in law enforcement.

2. Management recommends using an independent, expert professional with a background in law enforcement and police operations in order to achieve "best practices". This action will also assure department personnel, city residents, taxpayers and others of the highest professional standards in determining improvements. This individual will be charged with:

   a) review of the initial incident;

   b) review the inquiry thus far and make any further necessary inquiry;

   c) recommend any steps which may be necessary to standardize department policies and procedures, and

   d) finally, complete this task in a timely fashion.

CibPDF - www.fasiio.com



**The Florida State University**
Tallahassee, Florida 32306
*School of Criminology*

May 3, 2001

Mr. Price Ainsworth
Spivey & Ainsworth, P.C.
Attorneys at Law
48 East Avenue
Austin, TX 78701-4320

Ms. Sonia Lopez
Law Offices of Ramon Garcia
222 West University Drive
Edinburgh, TX 78539

Re: *Salinas, et al. v. City of Harlingen, consolidated with
Gilberto Rodriguez, et al. v. City of Harlingen, and
Raul Rodriguez, et al. v. City of Harlingen*

Dear Mr Ainsworth and Ms. Lopez:

Please accept the following as a report of my observations and opinions in the above-styled case. In preparing this report, I have reviewed a number of documents and exhibits relating to the incident in question, including:

The pleadings of Plaintiffs and Defendants;
Transcripts of the depositions of Orlando Sanchez, Michael James Riley, George A Hupp, James Joseph Scheopner, Ralph Dewayne Moore, Ronald K. Saenz, Larry Dewayne Moore, Patsy Gail Moore, Miguel P. Garcia, and Melody Matlock;
Copies of the transcription of Cameron County Sheriff's Department tapes 1-3; and
Deposition exhibits:
   Scheopner Exhibits 1-14 and 22-27;
   Moore Exhibit 28;
   Riley Exhibit 30;
   Saenz exhibit 31.

I base my findings on my review of these materials, as well as my experience as a criminologist, a former law enforcement officer, and an expert in the field of law enforcement policies and practices. I reserve the right to supplement or amend this report as other information becomes available.



**DEFENDANT'S EXHIBIT**

G

CutePDF - www.foxie.com

Enclosed with this report is a copy of my fee schedule, as well as a list of cases in which I have been retained as an expert witness in the past four years.

On July 7, 1998, Ernest Moore shot and killed two Border Patrol agents and wounded a Cameron County deputy sheriff outside his parents' home in Harlingen, Texas. The weapon used to shoot these law enforcement officers was an Olympic Arms .223 caliber rifle belonging to the Harlingen Police Department. The weapon had been issued to Harlingen Police Officer R.D. Moore, Ernest's father, who had stored it in a gun safe in his home.

In my opinion, it was a gross deviation from widely-accepted law enforcement standards and practices to issue this weapon to R.D. Moore and to allow him to keep it in his home. The rifle originally was turned in to the Harlingen Police Department in 1995. Its owner, Mrs. Sylvia Pirtle, clearly intended for it to be destroyed. Det. R.D. Moore was the officer who received the rifle from Mrs. Pirtle. He later arranged with his chain of command to have this weapon issued to him in his role as a "sharpshooter" for the Harlingen Police Department. The Police Department made no record of the assignment of this rifle to Det. Moore. Moore apparently kept the weapon in his office for a while, and then moved it to a gun safe located inside his home. Moore and his son Ernest, who lived with him at the time of the incident in question, owned a number of weapons that were stored in this gun safe; both men had access to the contents of the safe.

The rifle in question never should have been placed into the hands of R.D. Moore. From the statement of Mrs. Pirtle, it is clear that her intent was for this weapon to be destroyed; any other use or disposition of this weapon is improper. Det. Moore knew that his son Ernest suffered from depression, had a problem with drug and alcohol abuse, and apparently had a fascination with Nazi memorabilia. Assuming, arguendo, that the rifle in question had properly been issued to Det. Moore, no prudent, well-trained peace officer would have stored such a weapon in a manner which allowed ready access by any other person, particularly an obviously troubled young man such as Det. Moore's son. Det. Moore was more than just the father of Ernest, he was a law enforcement officer as well. Moore knew that his son was unstable, and he also knew that his son had ready access to the Olympic Arms rifle belonging to the Police Department. As an agent of the Police Department, Det. Moore clearly had a responsibility to keep this weapon out of reach of any unauthorized person, especially one with a history such as Ernest's. In my opinion, the City of Harlingen Police Department had a duty to ascertain the dangerous situation created by Det. Moore at his home, and via the knowledge attributable to Det. Moore himself it had the means to know of such danger. What R. D. Moore knew as a homeowner and father, he also knew as an officer of the Harlingen PoliceDepartment, and as such he had a duty to ameliorate the dangerous condition he had created, as well as to warn others of the danger.

Det. Moore further exacerbated the danger to other law enforcement officers and citizens by failing to notify proper authority that his son was at large near his home, that he was armed and on foot. Both Moore and his wife knew that something was amiss when they awoke on the morning of July 7; Ernest's freshly-damaged truck was parked in their

CVISPDF - www.testo.com

garage, the gun safe was open, and weapons were missing. Det. Moore chose to drive around looking for Ernest, rather than promptly summoning sheriff's deputies to their home, thus delaying and hampering official efforts to locate Ernest after the Rio Hondo shooting incident.

Further, I find that the danger created by allowing this rifle to be placed in the home of Det. Moore is directly attributable to the failure of the Harlingen Police Department and its chief, James Scheopner, to implement and enforce proper policies and procedures to prevent such an occurrence. Both Chief Scheopner and Det. Moore testified in deposition that, at the time of the incident in question, the Harlingen Police Department had no policies, either written or verbal, regarding the receipt, issuance or storage of weapons such as the Olympic Arms rifle. As noted above, there was no documentation that this particular weapon had been issued to Det. Moore. Indeed, Mrs. Pirtle asserts that, until she insisted on getting a receipt, Det. Moore had not planned to even document the receipt of this weapon from her.

Once the rifle had been placed into the hands and into the home of Det. Moore, the Harlingen Police Department had the continuing duty to assure that this dangerous instrumentality did not fall into the wrong hands. Chief Scheopner made no effort to ascertain that the rifle issued to Det. Moore was safely and properly stored, nor did he take steps to assure that Det. Moore was properly trained in the use of this weapon. Chief Scheopner testified that he merely instructed Det. Moore to "stay proficient, stay ready" (Scheopner depo, p. 73). It appears that the only actual training Det. Moore received in the use of such weapons was at an FBI school Moore attended in 1978.

The failure of the Harlingen Police Department and Chief Scheopner to implement and enforce proper weapons policies and procedures did, in my opinion, create a danger to the community that would not otherwise have existed. Considering the great and foreseeable harm that could result if weapons such as the rifle in question fell into the wrong hands, I find the conduct of Chief Scheopner and Det. Moore in this matter, as well as the total absence of proper policies and procedures designed to prevent such harm, to be shocking and unconscionable

Please feel free to contact me if you have any questions or need additional input in this regard.

Sincerely,

*George L. Kirkham* (PJ)

George L. Kirkham
Professor Ementus

**Signed** in Dr. Kirkham's
**Absence** to Avoid Delay
in Mailing

3

1

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHWESTERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION

 3  ARTURO G. SALINAS, ET AL  )  CIVIL ACTION NO. B-98-162
    VS.                       )
 4  CITY OF HARLINGEN, TEXAS, )
    ET AL;                    )
 5  AND                       )
    GILBERTO M. RODRIGUEZ,    )
 6  ET AL.                    )
    VS.                       )  CIVIL ACTION NO. B-98-163
 7  CITY OF HARLINGEN, TEXAS, )
    ET AL;                    )
 8  AND                       )
    RAUL RODRIGUEZ            )
 9  VS.                       )  CIVIL ACTION NO. B-99-70
    CITY OF HARLINGEN, TEXAS, )
10  ET AL                     )

11  ----------------------------------------------------

12                    ORAL DEPOSITION OF

13                    JOSEPH D. LaBEAU

14                      MAY 15, 2001

15  ----------------------------------------------------

16       ORAL DEPOSITION of JOSEPH D. LaBEAU, produced as a

17  witness at the instance of the PLAINTIFFS ARTURO G.

18  SALINAS and GILBERTO M. RODRIGUEZ, and duly sworn, was

19  in the above-styled and numbered cause on May 15, 2001,

20  at 1:23 p.m., before CHERIE HOLLAND, CSR, in and for the

21  State of Texas, reported by machine shorthand at the

22  offices of the City Hall of Midlothian, 104 West

23  Avenue E, Midlothian, Texas, pursuant to the Federal

24  Rules of Civil Procedure and the provisions stated on

25  the record or attached hereto.
```

DEFENDANT'S
EXHIBIT

H

1                    **A P P E A R A N C E S**

2   FOR THE PLAINTIFFS ARTURO G. SALINAS and
    GILBERTO M. RODRIGUEZ
3        Price Ainsworth
         SPIVEY & AINSWORTH, P.C.
4        48 East Avenue
         Austin, Texas  78701-4320
5
    FOR THE PLAINTIFF RAUL RODRIGUEZ
6        Ramon Garcia (No appearance)
         LAW OFFICES OF RAMON GARCIA, P.C.
7        222 West University Drive
         Edinburg, Texas 78539
8
    FOR THE DEFENDANT
9        Tom A. Lockhart
         ADAMS & GRAHAM, L.L.P.
10       222 E. Van Buren Street, West Tower
         Harlingen, Texas 78551-1429
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

14:45:49   1   report.  I mean, you're telling me it was not used in

2   that particular context?

3        A.   I did not -- I never had the impression that

4   Mr. Roberson was going to conduct a disciplinary

14:46:02   5   hearing, no, sir.

6        Q.   Okay.  Now, if -- my argument also is that if

7   the report is to be used to bring the procedures at the

8   police department up to national standards that I'm

9   entitled to, do you know if the report was used in any

14:46:14  10   way to review policies and procedures at the Department

11   in order to see if they comported with the National

12   Standards for weapons handling and weapons training?

13        A.   I don't know.  The City Manager hired Jim and

14   she's the one who determined the purpose of his report.

14:46:37  15        Q.   The City Manager issued a couple of statements

16   regarding this July 7th shooting; is that right?

17        A.   Yes.

18        Q.   Okay.  And have a -- you may have a couple of

19   those in front of you there.

14:46:48  20        A.   Okay.

21             MR. AINSWORTH:  Let's mark the next one as

22   No. 6, is that what it is?

23             (Exhibit Nos. 6 and 7 marked.)

24        Q.   (BY MR. AINSWORTH)  Okay.  Now, the first thing

14:47:19  25   we are looking at as -- is marked Exhibit No. 6, do you

1    I, JOSEPH D. LaBEAU, have read the foregoing

2  deposition and hereby affix my signature that same is

3  true and correct, except as noted herein.

4    CORRECTIONS AND/OR CHANGES AND SIGNATURE

5  PAGE      LINE        CORRECTION        REASON FOR CHANGE

| PAGE | LINE | CORRECTION | REASON FOR CHANGE |
|---|---|---|---|
| 36 | 2 | "what is" to "that" | correction of error |
| 36 | 5 | comma after "is" | read correctly |
| 36 | 7 | Question mark after "department" | read correctly |
| 36 | 8 | dashes to "me" | correction |
| 52 | 1 | dashes to "mean" | word missing |
| 60 | 15 | "is" after understanding | word missing |
| 63 | 1 | Never to "ever" | correction |
| 63 | 22 | "I" to "He" | correction |
| 73 | 7 | dashes to full statement | words missing |
| 73 | 8 | "made" deleted + correct word put in | |
| 73 | 24 | dashes replaced with correct words | |
| 75 | 15 | "me" to "Jim" | what I said |
| 75 | 16 | "of" before which | what I said |
| 75 | 21 | dashes to full statement | words missing |
| 84 | 20 | "it" after support | word missing |
| 84 | 24 | "we've" to "we'd have" | what I said |

22  _____

23  _____

24  _____

25  _____

1  _____

2  _____

3  _____

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13

14

15

16  _____
    JOSEPH D. LaBEAU

17

18  STATE   OF   TEXAS        )
                             )
19  COUNTY OF Ellis           )

20      SUBSCRIBED AND SWORN to before me by the said JOSEPH
    D. LaBEAU, on this the **30** day of May _____,
21  A.D., 2001.

22

23  ┌─────────────────────────┐    _____
    │   LINDA SIBLEY          │    Notary Public in and for
    │  NOTARY PUBLIC          │    Ellis _____ County, Texas
24  │  STATE OF TEXAS         │    My Commission Expires: 2-6-04
    │ My Comm. Exp. 02-06-2004│
    └─────────────────────────┘
25

```
 1   STATE   OF    TEXAS )
     COUNTY OF TARRANT )
 2
 3      I, Cherie Holland, Certified Shorthand Reporter of
 4   the State of Texas, certify that the foregoing
 5   deposition of JOSEPH D. LaBEAU, was reported
 6   stenographically by me at the time and place indicated,
 7   said witness having been placed under oath by me, and
 8   that the deposition is a true record of the testimony
 9   given by the witness.
10      I further certify that I am neither counsel for nor
11   related to its outcome.
12      Given under my hand and seal of office on this the
13   24th day of May, 2001.
14
15
16                      Cherie Holland
17                   _____
                     CHERIE HOLLAND, Texas CSR 574, RPR-CM
18                   Expiration 12-31-02
19
20
21
22
23
24
25
```

# interoffice
## MEMORANDUM

to:    Natalie Flores Prim, City Manager

from:  Joseph D. LaBeau, Assistant City Manager

re:    Shooting Incident / Recommendations for Action

date:  October 14, 1998

On July 7, 1998, two Border Patrol agents were killed with a weapon belonging to the Harlingen Police Department. The basic facts surrounding this case are that Detective R. D. Moore had a Harlingen Police Department semi-automatic AR-15 rifle locked in a gun safe at his home. Sometime during the early morning hours of July 7, 1998 Detective Moore's 25 year old son, Ernest Moore, retrieved the department weapon from the gun safe and subsequently shot and killed the agents, possibly also wounding a Cameron County Deputy Sheriff

Representations by the Chief of Police

On the day of the shooting the Chief of Police told the City Manager and the Assistant City Manager that Detective Moore was in possession of the weapon in order to respond to tactical situations as a part of his official responsibilities as a department sharp-shooter. Chief Scheopner also assured management that Detective Moore's practice was to carry weapon to and from work every day and secure it in the evening in his personal gun vault. Chief Scheopner prepared a memorandum on July 14, 1998 entitled, "Officer Involved Shooting," which stated that several agencies had reviewed the shooting and it had "been determined by everyone that no one did anything wrong at all, and that the only person that was responsible for this extraordinary tragedy was the assailant". The memorandum

1



I

goes on to say that the rifle was assigned to Detective Moore by Captain Vasquez to be carried by him for tactical purposes. The memo further states that he is on call 24 hours a day, that he carries the rifle to and from work in his pick-up truck and that he secures it every evening in his gun vault at home. The memo represents that Detective Moore went above and beyond normal procedures to secure the weapon and that Moore's son clandestinely stole a key to the gun vault and broke into the vault to obtain the weapons.

Investigation by Assistant City Manager

Due to a mutual concern about this very tragic event, the City Manager directed the Assistant City Manager to pursue the matter diligently and ensure that their was full accountability for departmental policies and procedures. On July 15, 1998, the Assistant City Manager issued a memorandum entitled, "Officer Possession and Loss of Assault Rifle." This memorandum made specific inquiry into the normal administrative documentation regarding equipment sign-out, assignment and duty, training and supervisory practices that would be expected to be found in a professionally administered local government department.

2

Interview of Detective R. D. Moore and Supervisors

This interview took place on July 21, 1998. Present were the Assistant City Manager, the Chief of Police, the Assistant Chief of Police, Captain Joseph Vasquez, Detective R. D. Moore,                         During the interview the following points emerged:

- The Chief had made no formal investigation of the matter and had allowed Moore to work without interruption or questioning.

- Captain Vasquez had allowed Moore to take the weapon home for the general purpose of a "duty weapon"

- There was no substantiation in practice or in documentation that Moore served the department in a "sharp-shooter role."

- Moore had had the weapon in his possession for over a year, and his possession of the weapon was undisciplined sometimes leaving it in his pick-up truck, other times behind the door of his office

- The inventory procedures in the department were informal and not uniformly applied to all officers.

- Moore had not had formal training on the weapon since 1976.

3

- Moore did not qualify annually with the weapon, but instead practiced shooting it in his yard at home.

- On at least one occasion Moore had allowed his son to use the weapon.

- The weapon in question had been delivered to the department for "disposal".

- No records exist of training or actual call-out for Moore in his supposed duty as a sharp shooter.

- Departmental policies (see sections 4.04 - 4.04.006) appeared to this reviewer to have been violated.

- The Chief asserted that no departmental violation had been violated, nor had any TCLEOSE requirements been violated.

- The Chief presented an inventory which he represented as showing all weapons present and accounted for, except the AR-15 which had never been signed-out and was now in custody with other agencies as evidence.

Inspection of the Department

Immediately following the interview on July 21, 1999, the Assistant City Manager inspected the Department evidence rooms, weapons, lockers, and Moore's office.  The following findings were made:

- A handwritten inventory of weapons issued existed, but did not show Moore's sign-out of the AR-15.

4

CitePDF - www.fasoo.com

- Hundreds of weapons, mostly handguns, were stored in stacked bins with tags which relate to case documentation. Many of these weapons have been in storage for years, some decades.

- A wide assortment of various rifles were stored in various secured rooms. Some of these were owned by the Department. Others were marked as "evidence".

- Over the years, some of the weapons have been put in service, usually with permission from the Chief.

- No current effort has been made to dispose of stock-piled weapons.

- It was Moore's practice to store the AR-15 behind his office door, even after he no longer had weapons safe-keeping duties.

Officer Concerns

On August 27, 1998 the Assistant City Manager met with Officer Rhonda Mitchell concerning a grievance she had about an assignment. During the meeting, Officer Mitchell raised the issue of the Chief's credibility and honesty. Among the examples raised by Officer Mitchell was her assertion that the Chief had lied about Moore's possession of the AR-15 and that there was no "sharp shooter" position, and that instead Moore's possession of the weapon was evidence of special treatment among a ring of good-ol-boys who were allowed to take department property for personal purposes. Officer Mitchell stated that there was an impression among members of the department that this group existed. She illustrated her point by presenting a copy of a newsletter entitled, "The Tainted Brass" in which the department is characterized as having an unprofessional approach to checking-out AR-15's from the evidence room. Officer Mitchell suggested that the Assistant City Manager verify her complaint by contacting Command Staff officers

5

CitiPDF - www.fesho.com

Within the next few days the Assistant City Manager separately interviewed Captain Luciano Rubio, Lieutenant Joe Rubio, Lieutenant Leal, and Lieutenant Vela and asked them if they had any knowledge of a swat/sharp shooter function in the department. Captain Rubio, Lieutenant Rubio and Lieutenant Vela each said that they did not have any knowledge of such a function and that should such a function exist, they as Senior Command Staff would certainly have been aware of it. Lieutenant Leal did recognize that Captain Vasquez might be called for such a duty, but had no knowledge that Detective Moore served in this capacity

At a separate meeting on September 22, 1998 Lt. Jose Rubio advised the Assistant City Manager that TCLEOSE regulations had been violated.

6

Follow-up Action

On October 1, 1998 the Chief wrote a memo in which he specified follow-up action that he had taken with regards to departmental weapons.   In the memo the Chief once again asserts that the department adheres to its policies as well as TCLEOSE standards.  In the same memorandum the Chief reports an in-house audit indicates that seven officers

CutePDF - www.tevloz.com

including R. D. Moore were not in compliance with annual firearm qualification requirements.

## Intimidation Complaints

On October 6, 1998 the City received notice that the Harlingen Police Association had made complaints that certain of their members had been threatened with termination if they reported departmental wrongdoing or impropriety  On October 9, 1998 the Assistant City Manager met with representatives of the Harlingen Police Officers Association and reviewed their concerns in detail. The only specific report of intimidation to arise from that meeting was a statement allegedly made by Captain Joseph Vasquez that anyone speaking out about this case would be fired. On the same date I interviewed Captain Vasquez and informed him of the complaint. Captain Vasquez denied making this statement and said that he had said anyone who gave misinformation or undermined the ongoing criminal investigation should be fired.  Captain Vasquez flatly denies that he in any way intimidated anyone from making good faith reports of factual information to any appropriate agency. Nevertheless, this group of HPOA officers vigorously assert that they were indeed threatened.

## Findings and Action

After a review of the foregoing the following findings are presented;

1       The Chief failed to initiate an objective departmental review of the circumstances, policies and procedures by which Moore came to possess the AR-15.

2.      The Chief of Police made false statements and reports regarding the assignment of the AR-15 to R. D. Moore.

3.  A review of the departmental policies and procedures identifies a number of apparent violations:

> 4.04. Authorized Weapons: *The Department authorizes officers to carry certain weapons, and authorizes the use of those weapons only when necessary to lawfully accomplish departmental goals. Officers carry and use only those weapons approved and authorized by the Department.*

> Captain Vasquez reported that he approved this weapon for R. D. Moore without written notification to the Chief.  However, the weapon was taken home and placed in a gun vault.  Also, R. D. Moore stated he would practice with the weapon by shooting it in the yard of his residence and on one occasion, R. D. Moore knew his son had discharged the weapon because he had allowed his son to do so.

> 4.04.001 Approved Weapons and Ammunition: *The Department authorizes officers to carry and use only Department issued or approved handguns, shotguns, ammunition, chemical agents and batons. The chief approves all weapons and ammunition. Under special conditions of limited duration, the Commanding Officer on duty may authorize the use of other weapons. A commanding officer taking this action justifies the decision in writing to the Chief.*

> Captain Vasquez reported that he did not follow any procedure *(in issuing the weapon)* and did not obtain the Chief's approval  Captain Vasquez reported that he did not discuss with Detective Moore any specific duties when issuing the weapon.

> 4.04.002 Training: *An officer must undergo Department approved training*

9

*and display proficiency in the use of any authorized weapon the officer carries. Additionally, officers must comply with all* <u>*continuing proficiency training*</u> *required by the Department.*

Detective Moore reported that he was last trained in 1976 for this type weapon. Detective Moore reported that he did not comply *with all continuing proficiency training required* by the Department and TCLEOSE standards (TAC, Title 37, Part VII, Chapter 211, Section 211.104).

4. A review of departmental training requirements records shows no record of mandated annual training by Moore with the AR-15. In fact, Moore and several other officers have not event met annual proficiency requirements (TCLEOSE) for use of their side arms.

5. It is clear there <u>are no detailed policies and procedures</u> for the handling of weapons, and there has been inadequate weapons practice and training. The <u>department lacks proper documentation</u> of weapons training and qualification. Weapons control and inventory practices are inadequate and unprofessional. In addition, there has been <u>no formal assignment</u> by any officer to duties of sharpshooter, although there may be a few officers who are proficient marksmen.

### Administration Actions

Remedial action needs to be taken at once to improve Department practices.

- The Chief has been directed to implement the <u>National Law Enforcement Standards</u> This action will lead to national professional accreditation of the Department's policies and practices. This is a minimal first step toward preventing further exposure from any incidents arising due to inadequate standards and/or

CMPDF - www.fastio.com

unprofessional practices within the Department.

- Chief Jim Scheopner: Civil Service Law (Local Government Code Chapter 143, Subchapter A, paragraph 143.013 allows that an appointing official may remove the Department Head afterwhich, that person shall be placed in a position with a rank not lower than that held by the department head immediately before appointment.

Administrative action should be taken immediately regarding Chief Jim Scheopner. Clearly, Chief Scheopner failed to properly investigate and objectively report to the Assistant City Manager the facts surrounding this matter. Contradictions in Chief Scheopner's written and oral statements arose in meetings and in interviews, indicating the *"sharp shooter duty"* story is a major situation embellishment. The Chief is directly responsible for the undisciplined and unprofessional environment described in this report. Furthermore, the Chief has already been placed on a probationary performance status for a number of other performance discrepancies. These are detailed in a 9/15/98 memorandum entitled, "Performance Discrepancies / Improvement Plan." Key performance discrepancy areas noted are:

- Professionalism

- Responsiveness and Reliability, and

- Management Practices

In sum, it is clear that the Chief has an overwhelming loss of credibility with management and with the leadership of his own Department. Therefore.

- The Chief should be relieved of duty at once and appointed to his former rank of Lieutenant.

- An acting Chief of Police should be appointed immediately.   Due to the Departmental unrest, I would suggest that the acting Chief be removed from involvement in the incident and free from reputation for antagonistic, partisan practices in the Department.  Unfortunately, Assistant Chief Archer has himself reported that he wrote an inflammatory newsletter entitled "The Blue Cow," which attacked labor interests in the Department.  Such past partisan activity makes it unlikely that he could be successful in restoring confidence among those most expressive of dissatisfaction. Therefore, I recommend Captain Luciano Rubio be appointed, as he is the ranking officer not involved and has demonstrated good police administrative skills, and has avoided partisan activities in his personal conduct.  Another prudent option would be for a credible professional outside of the Department to be appointed as interim Chief.  In any case, I would urge swift action be taken.

Captain Vasquez and Detective Moore:

These two individuals are alleged to have permitted or to have caused serious violations of policy and professional practice with regard to weapons.  Departmental unrest will persist and their work effectiveness will be curtailed until their conduct is subjected to proper disciplinary review.  For the sake of the morale and good-order of the Department, I recommend these individuals be placed on paid administrative leave pending the outcome of the disciplinary review (recommended below).

Disciplinary Actions

By Civil Service law, (Local Government Code Chapter 143, Subchapter D) only the "Department Head" (Chief of Police) may discipline members of a Civil Service

12

CVISPDF – www.fastio.com

Department.  Therefore, the following actions are recommended:

1)   The Acting Chief be instructed to appoint an objective, expert, third party to review the existing investigatory material, make appropriate further inquiry, and hold separate disciplinary hearings for:

- Captain Vasquez
- Detective Moore
- Other officers identified as responsible for rule violations or unprofessional weapons practices.

This third party reviewer should then make recommendations as to disciplinary action

2)   The Acting Chief should then take appropriate disciplinary action for all violations that he believes occurred relative to Civil Service Code 143, Subchapter D.

cc    .    Jim Scheopner, Chief of Police

13