# SPIVEY & AINSWORTH, P.C.

BROADUS A. SPIVEY
BOARD CERTIFIED
PERSONAL INJURY TRIAL LAW

PRICE AINSWORTH
BOARD CERTIFIED
PERSONAL INJURY TRIAL LAW

FRANCIS PAN
ATTORNEY AT LAW

ATTORNEYS AT LAW
48 EAST AVE.
AUSTIN, TEXAS 78701-4320

Ph 512+474-6061
Fx 512+474-1605
Email: bas@spain-attys.com

HOUSTON OFFICE:
CHARLES AINSWORTH
ATTORNEY AT LAW
3700 MONTROSE BLVD
HOUSTON, TX 77006-4624
Ph 713+874-0800
Fx 713+874-0815

July 9, 2001

3163C 282

Mr. Michael N. Milby
United States District Clerk
600 E. Harrison, #101
Brownsville, Texas 78520

United States District Court
Southern District of Texas
RECEIVED

JUL 1 0 2001

Michael N. Milby, Clerk of Court

Re:   Civil Action No. B-98-162; *Salinas, et al. v. City of Harlingen, et al.*;
      United States District Court, Southern District of Texas, Brownsville Division
                                    and
      Civil Action No. B-98-163; *Rodriguez, et al. v. City of Harlingen et al.*;
      United States District Court, Brownsville Division

Dear Mr. Milby:

Please find enclosed for filing among the papers in the above referenced cause, the original and one copy of:

**Plaintiffs' Response to Defendant's Second Motion for Summary Judgment and Proposed Order.**

Please return a file-stamped copy to me in the enclosed stamped and addressed envelope.

A copy of the above-enclosed document is being furnished to all counsel of record.

Sincerely,

Broadus A. Spivey
BAS/dh
Enclosures
cc:   Mr. Tom Lockhart
      Adams & Graham, L.L.P.
      222 E. Van Buren, West Tower
      Harlingen, Texas 78551-1429

      Mr. Roman Garcia
      Ms. Sonia Lopez
      LAW OFFICES OF RAMON GARCIA, P.C.
      222 West University Dr.
      Edinburg, Texas 78539

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS. | § | |

## ORDER

BE IT REMEMBERED, that on _____, 2001, the Court considered the Defendant's Second Motion for Summary Judgment in the above-referenced causes.  After considering the motion and the response, the Court DENIES the motion in all respects.

DONE at Brownsville, Texas, this _____ day of _____, 2001.

_____
Hilda G. Tagle
United States District Judge

1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS. | § | |

## ORDER

BE IT REMEMBERED, that on _____, 2001, the Court considered the Defendant's Second Motion for Summary Judgment in the above-referenced causes. After considering the motion and the response, the Court DENIES the motion in all respects.

DONE at Brownsville, Texas, this _____ day of _____, 2001.

_____
Hilda G. Tagle
United States District Judge

106

United States District Court
Southern District of Texas
FILED

JUL 1 0 2001

Michael N. Milby
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS. | § | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S
## SECOND MOTION FOR SUMMARY JUDGMENT

Broadus Spivey
State Bar No. 00000076
Federal I.D. No. 11146
Price Ainsworth
State Bar No. 00950300
Federal I.D. No. 8065
Francis Pan
State Bar No. 15443300
Federal I.D. No. 26385
SPIVEY & AINSWORTH, P.C.
48 East Avenue
Austin, TX  78701

Richard Pena
Law Offices of Richard Pena, P.C.
Barton Oaks Plaza Two
901 MoPac, Suite 325
Austin, Texas 7746-5747

ATTORNEYS FOR PALINTIFFS

CitsPDF – www.fastio.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ iii

INDEX OF AUTHORITIES ................................................................................... iv

I. NATURE AND STAGE OF THE PROCEEDINGS .......................................... 1

II. SUMMARY JUDGMENT EVIDENCE .......................................................... 2

III. SUMMARY OF THE ARGUMENT ............................................................. 3

IV. BACKGROUND EVIDENCE ...................................................................... 9

V. ARGUMENT AND AUTHORITIES .............................................................. 15

    A.    State-Created Danger ............................................................................ 15

        1.    City of Harlingen's Liability is Predicated upon the Conduct of Chief Shoepner; a Custom at no Safe Weapons-Handling Procedures; and a Nexus between the Custom and the Tragic Shooting ................................................................................ 15

        2.    The Summary Judgment Evidence is Sufficient to Support Plaintiffs' State-Created Danger Cause of Action ............................ 20

            (A)    Defendant Harlingen Created the Dangerous Situation ........ 21

            (B)    Defendant Knew the Situation was Dangerous .................... 30

            (C)    The Dangerous Situation Created the Opportunity for Ernest Moore to Commit a Crime which Would not Otherwise Have Existed ........................................................ 30

            (D)    Chief Scheopner and Detective Moore Affirmatively Placed the U.S. Border Patrol Officers in a Position of Danger in Such a Way as to Strip the Officers of Their Ability to Self Defend ............................................................ 30

        3.    Recent Cases Do Not Preclude the Application of the State-Created Danger Theory Here. .......................................................... 33

    B.    State Claim .............................................................................................. 36

PRAYER ................................................................................................................ 44

CMPDF - www.texis.com

# INDEX OF AUTHORITIES

**STATE CASES**                                                                    **PAGE**

*Blackwell v. Harris County,*
   909 S.W.2d 135, 139 (Tex.App. – Houston [14th Dist.] 1995, writ denied) ............   22

*City of Dallas v. Half Price Books, Records, Magazines, Inc.,*
   883 S.W.2d 374, 377 (Tex.App. – Dallas 1994, no writ) ................................   22, 23

*Kennedy v. Baird,*
   682 S.W.2d 377, (Tex. App.-El Paso 1984, no writ) .......................................   10, 36

*Moore v. State,*
   562 S.W.2d 484, 486 (Tex.Crim.App.1978) .................................................   22

*Praether v. Brandt,*
   1998 WL 754644, *4 (Tex.App.-Houston [1st Dist.] 1998, no pet) .....................   10

*Villegas v. Griffin Indus.,*
   975 S.W.2d 745, 754 (Tex.App. – Corpus Christi 1998, writ denied) ...................   22

*Wallace v, Moberly,*
   947 S.W.2d 273, 277 (Tex.App. – Fort Worth 1997, no writ) ...........................   22


**FEDERAL CASES**                                                                  **PAGE**

*Bowers v. Devito,*
   686 F.2d 616, 618 (7th Cir. 1982) .......................................................   5

*Caoaritta v. Entergy Corporation,*
   168 F.3d 754, 755 (5th Cir 1999) ........................................................   28

*Cornelius v. Town of Highland Lake, Al.,*
   880 F.2d 348, 353 (11th Cir. 1989) ......................................................   5

*DeShaney v. Winnebago County, Wi.,*
   489 U.S. 189, 109 S.Ct. 998 (1989) ......................................................   4, 5, 32

*Doe v. Hillsboro Independent School District,*
   81 F.3d 1395 (5th Cir. 1996) ............................................................   4, 5, 6

*Gaudreault v. Municipality of Salem,*
   923 F.2d 203, 207 (1st Cir. 1990), *cert. denied,* 500 U.S. 956 ...........................   23

*Grandstaff v. City of Borger,*
   767 F.2d 161 (5th Cir 1985) ………………………………………………..    9, 16
*John Doe v. Hillsboro I.S.D.,*
   81 F.3d 1395, 1402 (5th Cir. 1996)…………………………………………    4, 6

*Johnson v. Dallas I.S.D.,*    6, 8, 20,
   38 F.3d 198 (5th Cir. 1994) …………………………………………………    34

*Jones v. Phyfer,*
   761 F.2d 642 (11th Cir. 1985) ………………………………………………    5

*Laughlin v. Olszewski,*
   102 F.3d 190, 192 n.1 (5th Cir.1996)……………………………………………    22

*Leffall v. Dallas Independent School District,*
   28 F.3d 512, 525 (5th Cir. 1994) ……………………………………………    4, 6

*Palmer v. City of San Antonio,*
   810 F.2d 514, 516 (5th Cir. 1987)…………………………………………….    18

*Pembaur. v. City of Cincinnati,*
   475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) …………………………    9, 16

*Piotrowski v. City of Houston,*
   51 F.3d 512 (5th Cir. 1995) …………………………………………………    5

*Piotrowski v. City of Houston,*    5, 6, 18,
   237 F.3[rd] at 567 fn. 33 (5th Cir. 2001) ……………………………………    33, 34

*Randolph v. Cervantes,*
   130 F.3d 727, 731 (5th Cir. 1997) …………………………………………    20

*Salas v. Carpenter,*
   980 F.2d at 299, 307 (5th Cir. 01992) ……………………………………..    20

*Saenz v. Heldenfels Bros., Inc.*
   183 F.3[rd] 389 (5th Cir. 1999) ……………………………………………    34

*Schuster v. City of New York,*
   5 N.Y.2d at 81, 154 N.E.2d at 537 …………………………………………    32

*Stengel v. Belcher,*
   522 F.2d 438, 441 (6th Cir. 1975) ……………………………………………    22, 23

*Tennant v. Peoria & P.U. Ry. Co.*,
    321 U.S. 29, 35 (1944) ……………………………………………………...   29

*Thomas v. Sams*,
    734 F.2d 185, 192, (5th Cir. 1984), cert. denied, 472 U.S. 893 (1985)………………   16

*Turner v. Upton County, Texas*,
    915 F.2d 133, 136 (5th Cir. 1990) ………………………………………………   9, 16

*Vick v. Texas Employment Commission*,
    514 F.2d 734, 737 (5th Cir 1975)……………………………………………...   28

*Webster v. City of Houston*,
    735 F.20 838, 841 (5th Cir. 1984)(en banc) ……………………………………   19

*Wideman v. Shallowford Community Hospital, Inc.*,
    826 F.2d 1030, 1035 (11th Cir. 1987) …………………………………………...   6

## TEXAS STATUES, AND RULES               PAGE

Texas Code of Criminal Procedure art. 18.19. …………………………………   11

Texas Commission on Law Enforcement Officer Standards and Education
    (TCLEOSE) Rules ……………………………………………………………   11, 40, 41

Tex. Penal Code §1.07(a)(11)(A) (Vernon 1974) ………………………………..   36

Texas Tort Claims Act §101.021 ………………………………….………………   9

## U.S. CODE                           PAGE

42 U.S.C. § 1983 ……………………………………………………………………   6, 18, 20

CIMPDF - www.texia.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS. | § | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S
## SECOND MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE TAGLE, U.S. DISTRICT COURT:

COME NOW Plaintiffs and file this Response to Defendant's Second Motion for Summary Judgment.

## I. NATURE AND STAGE OF THE PROCEEDINGS

After the Court denied the Defendant City of Harlingen's Rule 12(b)(6) Motion to Dismiss Plaintiffs' state-created danger allegations and Texas Tort Claims Act cause of action (*See* pp. 20-24 of March 21, 2000 Orders and pp. 20-24 of April 11, 2000 Nunc Pro Tunc Order), the Defendant City of Harlingen moved for summary judgment to dismiss the two

remaining causes of action on July 28, 2000. The motion was to have been submitted on August 17, 2000; however, on August 8, 2000, Plaintiffs, pursuant to Fed. R. Civ. P. 56(f), requested this Court continue the submission until the completion of discovery in this matter. On March 5, 2001, this Court granted Plaintiffs' motion and denied the City's summary judgment motion without prejudice as to re-filing. The Court further ordered that the City re-file its motion by June 20, 2001, and that Plaintiffs' file their response by July 10, 2001.

## II. SUMMARY JUDGMENT EVIDENCE

As summary judgment evidence, Plaintiffs rely upon and incorporate herein by reference the following:

a.  Excerpts from Deposition of James Joseph Scheopner (Exhibit "A")

b.  Sylvia Pirtle's Sworn Statement [Scheopner's Deposition Exhibit 9-L] (Exhibit "B")

c.  Excerpts from Deposition of Joseph Bennett Vasquez (Exhibit "C")

d.  TCLEOSE § 211.104 Minimum Standards for Annual Firearms Proficiency (Exhibit "D)

e.  Sgt T. Hushen's Memo to Captain L. Rubio (Exhibit "E")

f.  Excerpts from Deposition of Ralph Dwayne. Moore (Exhibit "F")

g.  Arnold Rodriguez's Affidavit (Exhibit "G")

h.  Excerpts from Deposition of Sgt. Ronald K. Saenz (Exhibit "H")

i.  Shawn Foist's Sworn Statement [Scheopner's Deposition Exhibit 9-N] (Exhibit "I")

j.  Shawn Foist's Sworn Statement [Scheopner's Deposition Exhibit 9-U] (Exhibit "J")

k.  Calibre Press Street Survival Newsline No. 288 [Scheopner's Deposition Exhibit 22] (Exhibit "K")

l.  Computer Printout [Melody Matlock's Deposition Exhibit 47] (Exhibit "L")

m.      Excerpts from Deposition of Miguel P. Garcia (Exhibit "M")

n.      Albert Daniel Perry's Sworn Statement [Scheopner's Deposition Exhibit 9-E] (Exhibit "N")

o.      Harlingen Police Department Departmental Directives (Exhibit "O")

p.      Memorandum for Jose E. Garza, Chief Patrol Agent, McAllen, Texas from Hector Gonzalez, San Benito shooting Report [Scheopner's Deposition Exhibit 9-DD] (Exhibit "P")

q.      Robert Rodriguez's Sworn Statement [Scheopner's Deposition Exhibit 9-CC] (Exhibit "Q")

r.      Jose Rubio, Jr.'s Sworn Statement signed on June 4, 1999 (Exhibit "R").

s.      Paul Ginsberg's Affidavit

t.      Jose Rubio, Jr.'s Affidavit (Exhibit "T")

u.      Affidavit and Report of Dr. George L. Kirkam (Exhibit "U")

v.      Tom Lockhart's Letter to the Undersigned Attorneys (Exhibit "V")

w.      Labels of Tape Housing [Gale Lynn Jones' Deposition Exhibits 61-A and B, and 62] (Exhibit "W")

x.      Texas Department of Public Safety's Report of Investigation Regarding Rio Hondo and San Benito Shootings (Exhibit "X")

y.      Excerpts from Deposition of Pasty Gail Moore (Exhibit "Y")

z.      Raul Rodriguez's Sworn Statement [Scheopner's Deposition Exhibit 9-P] (Exhibit "Z")

aa.     Natalie Flores Prim's Deposition (Exhibit "AA") with attachments

bb.     Joseph D. LaBeau's Deposition (Exhibit "BB") with attachments

## III. SUMMARY OF THE ARGUMENT

Evidence adduced in discovery and offered here in support of this response is sufficient to raise genuine issues of material fact regarding Plaintiffs' allegations that they have been

denied constitutional protections by those acting under color of law as well as their personal injury and wrongful death claims made under the Texas Tort Claims Act.  With regard to the civil rights claims, the Plaintiffs' amended complaints allege a deprivation of the right to life guaranteed by the Due Process Clause of the Fourteenth Amendment in violation of 42 U.S.C. §1983.  To establish a claim under §1983, "a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of law." *John Doe v. Hillsboro I.S.D.*, 81 F.3d 1395, 1402 (5th Cir. 1996) (*citing Leffall v. Dallas Independent School District*, 28 F.3d 512, 525 (5th Cir. 1994)).

The Amended complaints allege the violation of United States Border Patrol Agent Susan Lynn Rodriguez's and Ricardo Salinas' Fourteenth Amendment Protection against deprivation of life without due process of law.  *See* Rodriguez and Salinas Complaints at ¶¶ 1, 40.  The Complaints allege that the City of Harlingen's actions and policies, established by police Chief Jim Scheopner, proximately caused the violation of Border Patrol Agents Rodriguez' and Salinas' right to life. *Id.* at ¶¶ 35-41.

Plaintiffs' summary judgment evidence establishes facts sufficient to raise genuine issues of material fact as to whether the Defendant Harlingen's conduct proximately caused the deaths of Agents Rodriguez and Salinas.  These peculiar, aggravated facts trigger a "state-created danger" exception to the general principle that §1983 does not recognize third-party liability under the color of law. *See DeShaney v. Winnebago County, Wi.*, 489 U.S. 189, 109 S.Ct. 998 (1989).  Though not expressly adopted, the Fifth Circuit has explained and applied the state-created danger exception. *Doe v. Hillsboro Independent School District*, 81 F.3d 1395 (5th Cir. 1996).  In its most recent pronouncement on the state-created danger theory of recovery, the

Fifth Circuit was careful to reject an effort to dismiss the case for failure to state a claim (see *Piotrowski v. City of Houston*, 51F.3d 512 (5th Cir. 1995) ("Pietrowski I"), and the court dismissed on summary judgment only after distinguishing the facts of that case from other cases around the country that have recognized the theory. (See *Piotrowski v. City of Houston*, 237 F.3[rd] at 567 fn. 33 (5th Cir. 2001) ("Piotrowski II") ("Piotrowski's case is, therefore, markedly different from cases in other jurisdictions in which the municipal employees created the dangerous situation and precluded the plaintiff from protecting herself ... [citations omitted]).

Under the state-created danger analysis, a duty exists on the state's part under § 1983 when the state was aware that the plaintiff faced a special danger that the general public did not face. *Bowers v. Devito*, 686 F.2d 616, 618 (7th Cir. 1982); *Jones v. Phyfer*, 761 F.2d 642 (11th Cir. 1985); *Cornelius v. Town of Highland Lake, Al.*, 880 F.2d 348, 353 (11th Cir. 1989). Judge Posner, two years after writing the initial Seventh Circuit opinion for *DeShaney*, revisited the idea of third-party actors clothed in the color of law, holding, **"[i]f the state puts a man in a position of danger and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."** *Bowers* at 618.

The Fifth Circuit has repeatedly discussed the third-party exception based on a state-created danger though it has never sustained liability based on the state-created danger exception, because of each prior case's own factual deficiencies. *Doe v. Hillsboro I.S.D.,* , 113 F. 3d 1412, 1414 (5th Cir. 1997)(en banc).

As Fifth Circuit Judge Edith Jones observed, "The key to the state-created danger cases lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off

potential sources of private aid." (*quoting Wideman v. Shallowford Community Hospital, Inc.,* 826 F.2d 1030, 1035 (11th Cir. 1987). Judge Jones continued, "Thus, the environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable they must have used their authority to create an opportunity that would not otherwise have existed for the third-party's crime to occur." The Fifth Circuit has applied the state-created danger doctrine and has "assumed arguendo that it recognizes the claim," in *Leffall.* In subsequent cases quoting *Leffall,* it simply found that the facts of those cases did not to fall within the state-created danger exception. *Doe v. Hillsboro I.S.D.,* 153 F.3d 1412, 1414 (5th Cir. 1997); *Johnson v. Dallas I.S.D.,* 38 F.3d 198 (5th Cir. 1994); *Piotrowski,* 237 F.3d 585 at fn. 33.

Here, however, the summary judgment evidence establishes facts that should warrant the application of the state-created danger doctrine and give rise to liability under 42 U.S.C. § 1983. Such facts include the following:

- Defendant *knew* the AR-15 semi-automatic assault rifle was turned in to the Harlingen Police Department for only one purpose: **to be destroyed**.

- Defendant *knew* that it was a dangerous weapon.

- Defendant *knew* that the weapon was not destroyed (as was required by state and local guidelines), but was transferred to Detective Moore, at his request, even though:

  - Detective Moore was not trained in its use.

  - Detective Moore did not demonstrate his proficiency in its use and operation.

  - Detective Moore was supposed to, but did not, keep the assault rifle in his police unit. Instead, he kept it in his residence, where his son, Ernest Moore, lived and had access to the weapon.

•The City of Harlingen issued the AR-15 semi-automatic assault rifle, to Detective Moore, in accordance the city's Police Department custom, without training, contrary to state administrative laws for issuing firearms.

• On the morning of July 7, 1998, Defendant *knew* that Ernest Moore was the suspect in a double homicide in Rio Hondo that lead law enforcement directly to the residence of Detective Moore, where Ernest Moore lived, in search of Ernest Moore.

• Defendant *knew* that Moore's son was nearby; that his son was in serious trouble; that the AR-15 semi-automatic assault rifle entrusted to Detective Moore was missing and, in all reasonable probability, was in the possession of his son; and that Ernest Moore was proficient with that rifle – all before Border Patrol Agents Salinas and Rodriguez arrived at the scene.

• Detective Moore, after discussing the situation with Chief Schoepner, refused to permit the Border Patrol Agents from entering his home to search for his son.  Of course, this action put the agents directly in harm's way.

• Nevertheless, the Defendant did absolutely nothing to warn law enforcement officers, including Border Patrol Agents Salinas and Rodriguez, of the missing weapon that had disappeared along with Ernest Moore.

• Defendant *knew* of the dangerous position into which their actions placed officers, but the Defendant did nothing to warn or protect them from this specific danger that the Defendant created for these two officers.

• These Decedents held a special relationship with Ernest Moore because they intended to confront, apprehend, and arrest Ernest Moore for an earlier shooting in Rio Hondo.

This relationship was one of direct confrontation and was unique and distinct from the public at large.

• These officers, who were duty bound to confront, apprehend, and arrest Ernest Moore, faced special danger because Detective R.D. Moore permitted Ernest Moore, access to the Harlingen owned AR-15.

As Judge Jones observed, "When state actors knowingly place a person in danger, the due process clause of the constitution has been held to render them accountable for the foreseeable injuries that result from their conduct, whether or not the victim was in formal state custody." *Johnson v. Dallas I.S.D.*, 38 F.3d 198 (5th Cir. 1994).

Detective Moore had to know that his method of storing the AR-15 semi-automatic assault rifle allowed Ernest Moore to arm himself with the unusually dangerous weapon; that Ernest was in the vicinity of the Moore house; that Ernest had the "city's" AR-15; that Ernest posed a violent threat as he was proficient with the weapon; that law enforcement officers including identification of Border Patrol Agents were arriving at the scene and would attempt to apprehend the Ernest Moore; and that the Defendant had not warned the Plaintiffs' Decedents, or other officers of those dangers.

Knowing all of this, Detective Moore spoke telephonically with Harlingen Police Chief Jim Scheopner, before the Plaintiffs and the other law enforcement Border Patrol Agents arrived at the Moore house, but the Defendant warned none of the officers before or after they arrived at the scene that Ernest Moore had the City of Harlingen Ar-15 semi-automatic rifle. The Plaintiffs' Decedents and other law enforcement officers faced special danger because of their special relationship to Ernest Moore. The Plaintiff's Decedents and the other law enforcement officers were intending to confront, apprehend, and arrest Ernest Moore for the Rio Hondo shooting.

Plaintiffs must prove injury from a city policy or custom in order to hold to the City of Harlingen liable. A municipality's final policymakers are held effectively to have made policy or condoned creation of a custom by ratifying the unconstitutional or illegal actions of subordinate officers or employees. *See Pembaur. v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). *Turner v. Upton County, Texas*, 915 F.2d 133, 136 (5th Cir. 1990). When an officer commits unconstitutional acts and is never disciplined, the municipality implicitly ratifies and adopts that unconstitutional conduct as official policy, and municipal liability then results. *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir 1985). The disposition of the policymaker must be inferred circumstantially from conduct of the officer and the policymaker. *Id.* at 171. Following any catastrophic and incompetent performance, where there are no reprimands, no discharges, no admissions of error, and no changes made in policy, the court and jury can accept that this is "the way things are done" in that municipality. *Id.* Here, the City of Harlingen ratified Detective R.D. Moore's conduct, as is evidenced by the city's failure to censure, discipline, or reprimand Detective Moore after he improperly received, possessed, and stored the AR-15 and after he failed to warn fellow law officers of a known, avoidable danger.

Plaintiffs clearly alleged acts of negligence in the use of tangible personal property by the City of Harlingen that proximately caused this incident, and the discovery in this matter has established beyond a preponderance of the evidence that the City was negligent in its handling of the AR-15 and that such negligence was a proximate cause of the deaths of the Border Patrol agents. Proximate cause includes and embraces both foreseeability and cause in fact and does not have to be asserted more specifically. Defendants cannot challenge the application of §101.021 of the Texas Tort Claims Act to Harlingen's liability, in a situation in which a

municipality negligently failed to prevent a weapon from being taken from the municipality. *Kennedy v. Baird*, 682 S.W.2d 377, 388 (Tex. App.-El Paso 1984, no writ); *Praether v. Brandt*, 1998 WL 754644, *4 (Tex.App.-Houston [1st Dist.] 1998, no pet). The City's negligent handling of the assault weapon was a proximate cause of the tragic death of the Border Patrol agents.

## IV. BACKGROUND EVIDENCE

Defendant City of Harlingen, Texas, directs and supervises the City of Harlingen Police Department. James Joseph Scheopner was employed by the City of Harlingen Police Department for twenty-eight years, and served as its Chief of Police from 1993 to 1999. (Exh. A, 12-1 to 8; 13-3 to 8). City Chief Scheopner was the highest police authority in the City of Harlingen and the buck stopped with him. (Exh. A, 19-8 to 20). He had the total authority to discipline any of his officers. (Exh. A, 152-19 to 153-5; 208-22 to 209-2). Ralph Dwayne Moore is employed by the City of Harlingen Police Department as a Detective. (Exh. F, 108-18 to 23). City Chief Scheopner and Detective Moore worked together for over twenty years. (Exh. A, 31-24 to 32-2).

On July 7, 1998, U.S. Border Patrol Agents Susan Lynn Rodriguez and Ricardo (Rick) Salinas, and Cameron County Deputy Sheriff Raul Rodriguez were ambushed by Ernest Moore, Detective Moore's son, with an AR-15 semi-automatic assault rifle, which has been identified as a Frankfort Arsenal, model MX 177, .223 caliber, assault-type rifle, serial #FA0698. Agents were killed and Deputy Rodriguez was seriously injured.

The AR-15 assault rifle had been delivered by a concerned citizen, Mrs. Sylvia Pirtle, to the HPD for destruction on June 23, 1995. (Exh. B). The City of Harlingen Police Department took possession of the AR-15 as temporary trustee on June 23, 1995. Detective Moore, acting

for the Harlingen Police Department, received of the weapon from Mrs. Pirtle and assured her he would take care of it. (Exh. B). He didn't. Instead of assuring the destruction of the AR-15, Detective Moore kept it – at first in his office, and later in his son Ernest Moore's bedroom. (Exh. F, 121-9 to 12; 50-11 to 12). The weapon was given to the department for destruction and should have been put in the evidence locker until it was destroyed. It was never officially the department's property for department use because HPD never explored any procedure (such as forfeiture) to obtain legal appropriation of the weapon in question. (Exh. U). In order to use a seized weapon, a law enforcement agency has to seek an order from the court to forfeit the weapon to the state for use by the law enforcement agency holding the weapon. Texas Code of Criminal Procedure art. 18.19.

Initially after the incident, the City took the position publicly that the rifle was supposedly assigned to Detective Moore in his purported role as a "sharpshooter" for HPD. (Exh. A, 27-18 to 19). There is no documentation for the establishment by HPD of a 24 hour, on-call sharpshooter team. (Exh. A, 71-10 to 25). Harlingen Police Officers are governed under the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE) rules. (Exh. A, 244-20 to 245-12). The rules stipulate that any law enforcement officer who uses a rifle must comply with the yearly qualifications at a 100-yard range with the minimum of twenty duty rounds. (Exh. D). The Harlingen Police Department borrows the indoor MMA gun range to comply with the yearly qualifications with the department-issued Beretta 9mm handgun and the department issued shotguns assigned to the patrol units and to detectives. HPD has no 100-yard range to comply with the requirements and no records exist that Detective Moore complied with the rules regarding the AR-15. (Exh. E). Detective Moore has now admitted that he was not qualified to carry the AR-15. (Exh. F, 131-10 to 12).

The assault rifle, under any circumstances, should have been available for official use only. (Exh. A, 69-16 to 70-6). However, Detective Moore made the rifle easily accessible to his son, Ernest Moore, by placing the rifle in the gun cabinet in his son's bedroom. (Exh. F, 87-25 to 88-2). Ernest had a key to the gun cabinet. (Exh. F, 50-20 to 51-8). Detective Moore permitted his son, Ernest Moore, to use the rifle for target practice. (Exh. F, 142-18 to 19). Ernest Moore acquired and became proficient in the use of the AR-15 semi-automatic assault rifle he used to commit the crime, through the illegal and negligent acts and practices of Chief Scheopner and Detective Moore.

On July 10, 1998, Chief Scheopner told news media that the AR-15 was registered to the HPD. (Exh. T). Purportedly, the rifle was assigned to Detective Moore because he was on-call 24 hours a day as the department's sharpshooter and was on the Special Weapons and Tactics (SWAT) team. Discovery has revealed that Chief Scheopner's statement was not true. A Harlingen Police Association's Letter to the citizens of this community (Exh. T) establishes the following facts:

- There was no SWAT [Special Weapons and Tactics] team in the Harlingen Police Department on the 7th of July 1998. In 1993, Chief Scheopner officially disbanded the ERT (Emergency Response Team) due to FLSA (Fair Labor Standards Act) problems, and Detective RD Moore was not a part of the ERT then.
- Detective RD Moore was not on 24-hour call for emergency purposes. He carried no pager and no one was aware that he was on call. There is no documentation within the Harlingen Police Department directing supervisors and or subordinates indicating that Moore was the department's sharpshooter by Chief Scheopner and or Captain Joseph Vasquez.
- The rifle and the caliber do not lend itself for sharpshooter's responsibilities. The rifle had no scope and the Harlingen Police Department did not supply the ammunition for the rifle. The common calibers accepted by law enforcement sharpshooters are the 308 caliber or the 30.06 caliber. The 223 caliber is not adequate for sharpshooter's responsibilities. The AR-15 rifle may be used as assault rifle but only after meeting the qualifications set forth by TCLEOSE and proper approval by the department head. It would require the development of departmental policy (rules) so as to avoid vicarious liability. We have no such policy in place.

The fact that the weapon was turned in for disposal and then issued by Captain Vasquez to Detective RD Moore goes against the original request by the person asking us to properly dispose of the weapon. (Exh. B; Exh. F, 53-4 to 11).

During Chief Scheopner's tenure as Harlingen Police Department's Chief of Police, he abused his authority and position by fashioning a broad range of policies and practices inconsistent with, in violation of, and with disregard for state and federal laws and Harlingen Police Department Directives. He allowed favored, high-ranking officers to circumvent, skirt, and outright violate laws. Through this display of favoritism and disregard, he created a system that ultimately lead to a federally regulated, semi-automatic assault rifle to come into the hands of a person who could not legally possess such a firearm.

Chief Scheopner allowed officers to keep weapons in their vehicles and homes. (Exh. A, 29-22 to 30-3). Presumably, he would not allow the weapons to be kept for personal use. (Exh. A, 69-16 to 70-6). Detective Moore took the AR-15 home on daily basis. (Exh. F, 142-15 to 17). Yet there were no instructions, written or oral, as to the safekeeping of such weapons. (Exh. A, 30-17 to 31-21; 70-7 to 12). The only instruction Chief Scheopner gave to Detective Moore was "to stay readily available and proficient with rifles." (Exh. A, 30-13 to 16).

On numerous occasions, City of Harlingen's officers were made aware of Harlingen Police Departments' violations of policies and practices inconsistent with state and federal law and Police Department Directives, yet they refused to investigate thoroughly or to act in an appropriate manner to bring the department into compliance. (Exh. G).

Ernest Moore had been treated for mental illness with Prozac and was a drug user until his death on July 7, 1998. (Exh. A, 91-6 to 14; Exh. F, 144-14 to 20). His bedroom was decorated with Nazi posters, a Nazi military uniform, and contained other Nazi and Neo-Nazi

items. (Exh. H, 87-21 to 23).

On July 7, 1998, at approximately 4:30 a.m., Ernest Moore, son of Defendant Detective R. D. Moore, shot and killed Maria Morin and her daughter Delia, and wounded her son Dan with another rifle, an AK-47, at 311 Catherine Street in Rio Hondo, Texas. (Exh. X). After that rifle was wrestled away from him by others in the house, Ernest fled the house in his white pick-up truck. The witnesses in the house, including Ernest's ex-girlfriend, called 911 to report the shooting and positively identified Ernest Moore as the assassin. (Exh. X).

At approximately 5:20 a.m., the Cameron County Sheriff's Department responded to the shooting. The suspect was identified as Ernest Moore and a description of the vehicle and license plate numbers were obtained and issued a "look-out" to all law enforcement agencies in the area. (Exh. X).

Ernest fled home and parked his truck in the driveway alongside the City's truck assigned to Detective Moore. The City vehicle was equipped with HPD's mobile radio. Reportedly, Ernest told his father at that time that he was "in deep shit." (Exhs. I, J and K). Ernest then took the AR-15 assault rifle and left the house.

At 6:06 a.m., HPD dispatcher received the information "look-out" and sent it out. (Exh. L). At approximately 6:30 a.m., after reading the teletype, Sgt. Miguel P. Garcia realized that Ernest Moore was Detective Moore's son. (Exh. M, 55-11 to 56-9). Within a minute, Sgt Shawn Foist came to the office and told Sgt. Garcia the same thing. (Exh. M, 59-21 to 60-3). Immediately thereafter, Sgt. Foist had a phone conversation with Chief Scheopner who told him to go to Detective Moore's house because Detective Moore was not cooperative. (Exh. M, 62-13 to 68-5). On the way to Detective Moore's house, Sgt. Foist had a couple of phone conversations with Chief Scheopner. (Exh. M, 68-8 to 69-9).

As County Deputies and United States Border Patrol Agents arrived at Detective Moore's house, Detective Moore met them outside and initially refused to permit the County Deputies to search his house for Ernest. After talking to Chief Scheopner via telephone, he let in the County deputies into his home, but refused entrance to the Border Patrol agents, saying that his son was not an illegal alien and they had no business with him. (Exh. F, 39-15 to 40-13). Detective Moore never gave the Border Patrol Agents even a general warning regarding the whereabouts of his son, or notified the Agents that his son was armed with the AR-15 assault rifle. (Exh. F, 40-14 to 41-23). His refusal to permit the Agents to enter his home effectively placed the Agents directly in harm's way.

While the officers were standing in the front of the Moore house discussing the situation, Ernest Moore walked out from the cornfield across the road that passed in front of the Moore house and fired the AR-15 at Agents and Deputy Rodriguez. (Exh. H, 71-8 to 15; Exh. X). His first shots struck Agent Salinas in the rear of the skull. A second volley struck Agent Rodriguez. A third group of shots struck Deputy Rodriguez. (Exh. X). The law enforcement officers started to shoot back at Ernest. Ernest was shot and ceased firing. (Exhs. X and Z).

Chief Scheopner did not discipline Detective Moore (Exh. A, 87-15 to 18). Chief Scheopner did not recommend that Detective Moore be disciplined. (Exh. A, 89-14 to 17) The City and Chief Scheopner insist, to this day, that they are free of fault and deserve no blame.

## V. ARGUMENT AND AUTHORITIES

**A.    State-Created Danger**

    **1.    City of Harlingen's Liability is Predicated upon the Conduct of Chief Shoepner; a Custom of no Safe Weapons-Handling Procedures; and a Nexus between the Custom and the Tragic Shooting**

Chief Scheopner was the highest police authority in the City of Harlingen and the buck stopped with him. (Exh. A, 19-8 to 20). He had the total authority to discipline any of his officers. (Exh. A, 152-19 to 153-5; 208-22 to 209-2). Chief Scheopner had final authority to make and establish a policy governing the operation of the City of Harlingen Police Department and the conduct of its officers and personnel. Chief Shoepner at all times acted in bona fide pursuance of his general authority to act for the City of Harlingen in the area of law enforcement, which acts were and are imputed to the City of Harlingen. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, (1986); *Thomas v. Sams*, 734 F.2d 185, 192, (5th Cir. 1984), cert. denied, 472 U.S. 893 (1985).

A municipality's final policymakers are held effectively to have made policy or condoned creation of a custom by ratifying the unconstitutional or illegal actions of subordinate officers or employees. *See Pembaur. v. City of Cincinnati*, 475 U.S. 469, (1986). *Turner v. Upton County, Texas*, 915 F.2d 133, 136 (5th Cir. 1990). When an officer commits unconstitutional acts and is never disciplined, the municipality implicitly ratifies and adopts that unconstitutional conduct as official policy, and municipal liability then results. *Grandstaff v. City of Borger*, 767 F.2d 161, 171-72 (5th Cir 1985). An injured plaintiff is not likely to document proof of policy or disposition, either of the policymaker or throughout the police force. *Id* at 171. The court must accept that the plaintiff may encounter difficulties in making that proof, because of the lack of credible witnesses and the avenues for dispute and distraction over the actual facts of each specific incident. *Id.* The disposition of the policymaker must be inferred circumstantially from conduct of the officer and the policymaker. *Id.* Following any catastrophic and incompetent performance, when there are no reprimands, no discharges, no admissions of error, and no changes made in policy, the court and jury can accept that this is "the way things are done" in

that municipality. *Id.* If prior policy had been violated, a court and jury could expect to see a different reaction; if officers' conduct is not acceptable to a police chief, a court and jury expects to see changes made. *Id.*

Interestingly, even the City's own investigation of the incident and Chief Scheopner's actions was critical of the Chief for his having "made no formal investigation of the matter and [the fact that he] had allowed Moore to work without interruption or questioning." (Exh. BB, attached as Exhibit 3 (report) to LaBeau deposition at p. 3). The internal investigation concluded that, "The Chief failed to initiate an objective departmental review of the circumstances, policies and procedures by which Moore came to possess the AR-15." *Id.* at p. 4. It is this admitted failure by the Chief to reprimand Moore and to investigate the tragic events that the law recognizes as evidence of a custom or policy sufficient to warrant the imposition of § 1983 liability.

The rifle was supposedly assigned to Detective Moore as a sharpshooter for HPD. (Exh. A, 27-18 to 19). The rifle, under any circumstances, should have been used for official purposes only. (Exh. A, 69-16 to 70-6). When Chief Scheopner was asked why the rifle fell into Ernest Moore's hands, Chief Scheopner said that Detective Moore told him his son stole his gun cabinet key. (Exh. A, 103-4 to 6). However, the evidence proves otherwise. The City did not maintain an Emergency Response Team comprised of sharpshooter. (Exh. T). Detective Moore made the rifle easily accessible to his son, Ernest Moore, by placing the rifle in the gun cabinet in his son's bedroom. (Exh. F, 87-25 to 88-2). Ernest had a key to the gun cabinet, which was purchased by Detective Moore and his son together. (Exh. F, 50-20 to 51-15). Detective Moore even permitted his son, Ernest Moore, to use the assault rifle for target practice. (Exh. F, 142-18 to 19).

The danger created by allowing the assault rifle to be placed in the home of Detective Moore is directly attributable to the failure of the Harlingen Police Department and Chief Scheopner, to implement and enforce proper policies and procedures to prevent such an occurrence. (Exh. U).

After the tragic shooting, all of the initial deceptions and cover-ups made by Chief Scheopner, Captain Vasquez, and Detective Moore (such as the destruction of the AR-15, Ernest stealing Detective Moore's key to the gun safe, allowing Ernest Moore to use the AR-15 for target practice, and failure to comply the requirement of proficiency) came to light. Even after acknowledging the truth, Chief Scheopner never disciplined Detective Moore. (Exh. A, 89-14 to 17; 209-16 to 18; 210-17 to 211-15). In *Palmer v. City of San Antonio*, 810 F.2d 514, 516 (5th Cir. 1987), the Court stated that if officers know at the time of their action the use of excessive force in arresting person will be approved by the policymakers, then the causation requirement has been met.

In a recent case in which the Fifth Circuit refused to permit recovery for an individual in suit against a municipality based on alleged 42 U.S.C. § 1983 allegations involving facts whereby police officers supplied information about a target to a privately hired assassin, the court was sharply critical of the claimant's efforts to identify "an official policy" that was the moving force in the violation of a constitutional right. *Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001). The court noted that, for purposes of § 1983 liability, such a policy may be evidenced by custom, that is:

> ... a persistent widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy ....

*Piotrowski*, 237 F.3d 567, 579 (*quoting Webster v. City of Houston*, 735 F.20 838, 841 (5th Cir.

1984)(en banc)).  It would appear that the Harlingen City official designated to investigate the

means by which the City's assault rifle fell into Ernest Moore's hands had the court's language

in mind when he drafted his conclusions upon inspecting the Harlingen Police Department's

evidence rooms, weapons, lockers and Detective Moore's office.  Mr.LaBeau, the Assistant City

Manager, in his report dated October 14, 1998, regarding the July 7, 1998, incident "in which

"two Border Patrol agents were killed with a weapon belonging to the Harlingen Police

Department" observed that

- A handwritten inventory of weapons issued existed, but did not show
  Moore'sign-out of the AR-15.

- Hundreds of weapons, mostly handguns, were stored in stacked bins with tags
  which relate to case documentation.  Many of these weapons have been in
  storage for years, some decades.

- A wide assortment of rifles were stored in various secured rooms.  Some of
  these were owned by the Department.  Others were marked as "evidence."

- Over the years, some of the weapons have been put in service, usually with
  permission of the Chief.

- No current effort has been made to dispose of the stockpiled weapons.

- It was Moore's practice to store the AR-15 behind his office door, even after he
  no longer had weapons safekeeping duties.

(Exh. BB, attached as Exhibit 3 (report) to deposition of Joseph D. LaBeau pp. 4-5) (discussed at

pp. 19 et seq. of deposition).  Mr. LaBeau concluded that "a review of the departmental policies

and procedures identifies a number of apparent violations" which he lists.  These violations

included violations of use of unauthorized weapons and inadequate training in weapons use.  *Id.*

at p. 9-10.  Most importantly, he observed that "[it] is clear there are no detailed policies and

procedures for the handling of weapons, and there has been inadequate weapons practice and

training...weapons control and inventory practices are inadequate and unprofessional. In addition there has been <u>no formal assignment</u> by any officer to duties of sharpshooter... ." *Id.* at 10 (emphasis in original).

It is this widespread custom of failing to maintain safe weapons-handling procedures that is the moving force behind the constitutional deprivations alleged in this case. If the assault rifle had been disposed of as originally intended or assigned and stored in a proper manner, the weapon would not have been used to kill Agents.

### 2. The Summary Judgment Evidence is Sufficient to Support Plaintiffs' State Created Danger Cause of Action

The fact that the Fifth Circuit Court did not reject outright the state-created danger doctrine implies that the Court would adopt the theory if presented with a case meeting the elements described by the Court. The elements of such a cause of action are as follows:

1.  The government officials must create the dangerous situation;

2.  They must know the situation is dangerous;

3.  The danger must create an opportunity for a third party to commit a crime which would not otherwise exist; and

4.  They must affirmatively place the plaintiff in a position of danger in such a way as to strip the plaintiff of his ability for self-defense.

*Randolph v. Cervantes*, 130 F.3d 727, 731 (5th Cir. 1997); *Johnson v. Dallas Independent School District*, 38 F.3d 198, 201 (5th Cir. 1994).

In the present case, the tragic event made the basis of this lawsuit was a result of repetitive abuse of police power by Chief Scheopner and Detective Moore. Had there not been abuses of police power by Chief Scheopner, the tragic event would not have occurred. Conduct of a state actor, more culpable than negligence, may constitute denial of due process sufficient to support an action under 42 U.S.C. § 1983. *Salas v. Carpenter*, 980 F.2d 299, 307 (5th Cir.

01992).  Chief Scheopner's abuse of police power not only knowingly created a dangerous environment for Agents, but it was also a deliberate neglect of their safety.  All the elements of "state-created danger" are present here.

### (A)    Defendant Harlingen Created the Dangerous Situation

The rifle, under any circumstances, should have been used for official purposes only. (Exh. A, 69-16 to 70-6).  Detective Moore placed the assigned rifle in the gun cabinet to which Ernest had a key because the cabinet was purchased by Detective Moore and his son together. (Exh. F, 50-20 to 51-8).  Detective Moore placed the cabinet in his son's bedroom.  (Exh. F, 87-25 to 88-2).  The arrangement of the cabinet made the assault rifle easily accessible to his son, Ernest Moore.

The failure of the Harlingen Police Department and Chief Scheopner to implement and enforce proper weapons policies and procedures did create a danger to the community that would not otherwise have existed.  Great and foreseeable harm would result if weapons such as the assault rifle in question fell into the wrong hands.  The total absence of proper policies and procedures designed to prevent such harm is shocking and unconscionable.  (Exh. U).

The tragic events that led to this lawsuit started with the double homicide at Rio Hondo. At approximately 4:30 a.m. on July 7, 1998, Ernest Moore shot and killed Maria Morin and her daughter, Delia, and wounded her son, Dan, with an AK-47.  (Exh. X).  After others in the house wrestled the rifle away from him, Ernest fled in his white pick-up truck.  (Exh. X).  The witnesses in the house, including Ernest's ex-girlfriend, called 911 to report the shooting and gave a positive identification of Ernest as the shooter.  (Exh. X).

Ernest fled to his parents' home.  Shortly before 6:00 a.m., Pasty Moore, his mother, noticed that he was home because she heard Ernest's bedroom door slam shut.  (Exh. Y, 131-17

to 133-4). Detective Moore and his wife walked to Ernest's truck. (Exh, F, 20-2 to 20). Mrs. Moore showed Detective Moore the inside of the truck and he saw that there was ammunition on the floorboard. Detective Moore's assigned City vehicle, which was equipped with the HPD's mobile radio, was parked alongside Ernest's truck in the driveway. (Exh. F, 18- 22). Detective Moore must have turned on the mobile radio to learn that his son committed the homicides. Otherwise, Daniel Perry, Ernest's foreman, would not have been told by Mrs. Moore (when Perry called between 6:15 to 6:30 a.m. regarding whether or not Ernest would be coming to work that day) that, "[he] probably was not that he, Ernie, was in a lot of trouble that he had shot somebody". (Exh. N). Sgt. Foist's statement that Ernest Moore told his father, Detective Moore, that he was "in deep shit" before leaving the house with the assault rifle must be true despite R. D. Moore's assertion later that he did not speak to his son that morning. (Exh. I, J, and K).

An off-duty peace officer who observes a crime in progress immediately becomes an on-duty officer. *Laughlin v. Olszewski*, 102 F.3d 190, 192 n.1 (5th Cir.1996); *Villegas v. Griffin Indus.*, 975 S.W.2d 745, 754 (Tex.App. – Corpus Christi 1998, writ denied); *Wallace v, Moberly*, 947 S.W.2d 273, 277 (Tex.App. – Fort Worth 1997, no writ); *City of Dallas v. Half Price Books, Records, Magazines, Inc.*, 883 S.W.2d 374, 377 (Tex.App. – Dallas 1994, no writ). A police officer is not relieved of his duty to prevent crime when he witnesses an illegal act simply because he is off-duty. *See Blackwell v. Harris County*, 909 S.W.2d 135, 139 (Tex.App. – Houston [14th Dist.] 1995, writ denied) (*citing Moore v. State*, 562 S.W.2d 484, 486 (Tex.Crim.App.1978)).

It is the nature of the act performed, not the clothing of the actor or even the status of being on-duty or off-duty, which determines whether an officer has acted under color of law for purposes of the civil rights statutes. *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975). In

*Stengel*, Belcher, an off-duty officer, involved himself in an altercation in a bar. As a result he killed two people and paralyzed a third with a handgun assigned to him. Belcher contended that his actions were taken as a private citizen because he was engaged in private social activity, was out of uniform, off-duty, and never identified himself as a police officer at any time. However, the court held that while shooting the three men, Belcher was acting under the color of law because the police regulations required him to carry a gun at all times, and further, the police chief testified that the office regulations required an officer to take action in any type of police or criminal activity 24 hours a day. *Belcher*, 522 F.2d at 441. An off-duty police officer who performs an actual or apparent duty of his office is acting under the color of law. In *Half Price Books,* 883 S.W.2d at 377, the court held that an off-duty police officer who observes a crime immediately becomes an on-duty police officer. An officer who is present at the scene of an arrest and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under civil rights statutes. *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 (1st Cir. 1990), *cert. denied*, 500 U.S. 956.

In the present case, officers are required to swear to enforce federal and state laws, and local ordinances under Subsection 6.08.002 of the Departmental Directives of the Harlingen Police Department, (hereinafter referred to as "Directives") (Exh. O). The police officers have the following duties:

(1)     to "protect and serve" the community by complying with their lawful duty to preserve the peace, protect life and property, and to deter and prevent crime while detecting and apprehending criminals (Subsection 6.07);

(2)     to take action and report upon all violations coming to their attention, as well as all information they receive about any actual or suspected violation of the law (Subsection 6.07.001);

(3)     to make arrests when necessary to enforce laws and to protect the public (Subsection 6.08); and

(4)     to make appropriate arrests when witnessing or receiving information of violations of the law (Subsection 6.08.001).

The Directives instruct off-duty officers:

(1)    to carry their badges and police identification with them (Subsection 4.05.001);

(2)    to take proper police actions in matters coming to their attention (Subsection4.01.005); and

(3)    to report to the Police Department information of a law violation they received when practical.  If the situation requires immediate action, the officers take the proper action and make written reports (Subsection 4.05).

Under these Directives, Detective Moore is required to take police action to stop or investigate criminal activity 24 hours a day regardless of whether he is on-duty or off-duty.

In the present case, Detective Moore knew that Ernest Moore had committed some crime (long before Cameron County Deputy Robert Rodriguez knew).  Detective Moore was quoted in Hector Gonzalez's Memo (Exh. P) provided to Jose E Garza, Chief Patrol Agent, McAllen, Texas, as follows:

After returning to the area where he last saw the suspect vehicle, Deput Rodriguez found the suspect vehicle parked at a residence on the corner of Gamble and Resaca Road.  As he approached the residence, he observed a person, later identified as R. D. Moore, a Harlingen, Texas Police Officer, step out of the garage and state to Deputy Rodriguez "*I know my son did something, I want to know what.*"  R. D. Moore also stated that his son was upset at two drug dealers that had turned his girlfriend on to cocaine and that his son was going to take care of that.  He also stated that he was missing two weapons, an AK-47 and a rifle. He further stated that "*his son was probably contemplating suicide and that he hoped he would commit suicide, because if he didn't his son would come back and kill us*" and stated that his son was a "*damn good shot.*"

The summary is supported by Detective Moore's testimony.  (Exh. F, 34-22 to 37-9) and Cameron Couty Deputy Sheriff Robert Rodriguez's Sworn Statement (Exh. Q)

According to Sgt. Foist's sworn statements and the e-mail he sent out (Exh. I, J, and K), Detective Moore's statement confirmed that he had knowledge of his son's involvement in the shooting at Rio Hondo and access to the AR-15 well before the shooting at the Moore's home. Under the Directives mentioned, Detective Moore should have taken action to investigate what

his son had done. Detective Moore should have, at the very least, detained his son for questioning. He knew his son's extremely dangerous propensities. Instead, Detective Moore chose not only to allow his son to flee from his house, but he actually assisted his son in escaping arrest by the Cameron County authorities. In his affidavit, Lt. Jose Rubio of Harlingen Police Department stated:

> On Tuesday, July 7, 1998, I was on day shift and I was scheduled to instruct a class on Mental Health Education for Police Officers. My two shift supervisors were also scheduled to attend this class and Sergeant Miguel Garcia was to cover my shift for the day. As I was preparing to leave for the Harlingen Police Department, I received a phone call from Officer Matthew Manning around 7:15 a.m. informing me that RD Moore's son, Ernest, had just shot two Border Patrol officers and a sheriff's deputy. **He further informed me that Sgt. Foist and Sgt. Garcia had been called out to RD Moore's house in San Benito. . . . I was informed the reasons behind both Sergeant Foist and Sergeant Garcia being there at the scene were a request by the Cameron County Sheriff's Department. Apparently, RD Moore had denied permission to the Sheriff deputies to search the house for Ernest Moore and had been rude to them. . .**

(Exh. R) (emphasis added).

Moreover, when Detective Moore discovered that the AR-15 rifle was missing from the gun safe, he had the duty to pursue his son, to arrest him, and to have informed all of the law enforcement officers, including Border Patrol Agents Rodriguez and Salinas, that Detective Moore's son was in possession of a deadly assault rifle. Detective Moore did not pursue any of these actions. Detective Moore's failure to take proper police action against his son and his concealment of information from other officers at the scene were in direct violation of the Directives that were to have prescribed his duties.

Chief Scheopner attempts to limit the City's liability by asserting that he first learned about Ernest Moore's involvement in the Rio Hondo shooting at approximately 6:50 a.m. However, the evidence suggests differently. HPD received a "Look Out" for Ernest Moore at 6:06 a.m. At approximately 5:30 a.m., Sgt. Mike Garcia and Sgt. Foist already knew that Ernest

Moore was Detective Moore's son, and they knew his license plate number. (Exh. M, 55-11 to 60-3). Around that time, Chief Scheopner had several telephone conversations with Sgt. Foist, and Scheopner ordered Sgt. Garcia and Sgt. Foist to go to Detective Moore's house because Detective Moore was not being cooperative. (Exh. M, 62-13 to 69-9). Since Chief Scheopner and Detective Moore denied having knowledge of Ernest Moore's involvement in the Rio Hondo shooting before Detective Moore was told by Sgt. Saenz of the Cameron County Sheriff's Office at around 6:45 a.m., the radio recording of such conversation would be important in verifying the truthfulness of their testimony.

In the March 21, 2000 Orders and the April 11, 2000 Nunc Pro Tunc Order, this Court observed the following with regard to the state-created danger cause of action and the proof necessary to establish that theory:

> . . . In addition, one can reasonably infer that the police department's final policymaker, Defendant Scheopner, knew that E. Moore posed a real threat to the decedent. Given that Defendant Moore told the first person who walked up to his house that his son was on the verge of killing himself or a third person, had taken his father's missing weapon and had committed a prior crime, it would be reasonable to infer that he conveyed the same information to Defendant Scheopner, a long-time friend, in the telephone conversation they had before the decedent was killed. **If Defendant Scheopner knew of the real threat posed by E. Moore before the decedent was killed, he could have avoided the danger he created by warning the law enforcement team surrounding the house to take necessary precautions to secure their safety.** It is common sense that the decedent would have proceeded very differently if he had known that E. Moore was close by, carrying an assault rifle, and homicidal. Without information on the suspect's location, weapon and state of mind, the decedent had no reason to take special steps such as donning protective gear or staying out of open areas. The decedent was effectively stripped of the ability to defend himself, and became an easy target. **If Defendant Scheopner had the ability to warn the decedent of the very real danger created by his own policies and procedures, and did not, his actions were outrageous and shock the conscience.**

(*See* pp. 21-22 of the Orders and p. 22 of the Nunc Pro Tunc Order) (emphasis added).

The Court's opinion recognizes that Police Chief Scheopner's knowledge of the danger at Moore's house and his actions in dealing with that danger are critical evidentiary points which Plaintiffs need to establish their state-created danger claims.  In other words, any communication between Chief Scheopner and his Harlingen Police Department (HPD) officers are critically important to Plaintiffs' state-created danger claims.

Discovery reveals that the HPD dispatcher received the information concerning the Rio Hondo shooting at 6: 06 a.m.  However, the tapes and transcripts of the 911 calls, the officers' radio traffic, and EMS calls that the Defendant produced show only the events that transpired immediately after the San Benito shooting, which occurred at approximately 7:13 a.m.  The Defendant did not produce tapes and transcripts of the 911 calls, the officers' radio traffic, and EMS calls during the critical time between 6:06 a.m. and 7:13 a.m.  When Plaintiffs asked for the original master tape or tapes, Defendant informed Plaintiffs that the original master tape or tapes had been re-used.  (Exh. W).  It is impossible to retrieve "recorded-over" material from such tapes since the same particles on the tapes now are in a configuration that represents the most recent recording. (Exh. S).

The destruction of the original master tape or tapes has hindered Plaintiffs' ability to prove their claims.  After taking depositions of the dispatchers and officers involved in both the Rio Hondo and San Benito shootings, Plaintiffs are unable to reconstruct conclusively (though the circumstantial evidence is compelling) the chronology of events that transpired on the morning of July 7, 1998, and to discover Chief Scheopner's knowledge of the danger at Moore's house and his action in dealing with the danger.  Chief Scheopner testified that he did not know about the situation until 6:50 a.m.  (Defendant's Second Motion for Summary Judgment at 12).  Unbelievably, Scheopner would have us accept that he did not turn on his portable radio, which

would have enabled him to get the Rio Hondo Shooting information.  (Ex. A, 169-22 to 178-16).

However, evidence reveals that Chief Scheopner communicated with Sgt. Foist at approximately

6:35 a.m.  (Exh. A, 62-13 to 68-5).  Chief Scheopner does not recall exactly what he told Sgt.

Foist. (Exh. A, 180-6 to 17).  Chief Scheopner opted not to communicate with Detective Moore

through radio transmission purportedly because he thought Detective Moore's radio would not

be on, but Chief Scheopner testified that, contrary to what logic would dictate, he did not even

try the radio.  (Exh. A, 183-12 to 22).  Sgt. Garcia testified that after Scheopner obtained the

information from the radio, he never used the radio to communicate with other officers.  (Exh.

M, 80-5 to 12).  Detective Moore had a HPD radio in the assigned city vehicle.  He also testified

that he did not use it.  (Exh. F, 162-24 to 163-15).  Whether he told the truth could have been

verified by the radio recording, but now those recordings have been destroyed.

There were two tapes purportedly recording the radio traffic on July 7, 1998.  One was

re-used on April 27, 1999, and the other one was re-used on August 22, 1998, February 5, 1999.

and October 5, 1999 (according to the label on the tape housing).  (Exh. W).  On the day after the

San Benito shooting, Chief Scheopner knew the City was going to be sued because of the

involvement of the City's rifle.  (Exh. A, 49-7).  On August 12, 1998, the City was first formally

notified by Plaintiffs of potential litigation.  (Exh. A, 204-18).  Plaintiffs' original complaint was

filed on November 9, 1998.  After five and one-half months of litigation, the City re-used the

tape on April 27. 1999.  The City's re-use of the tape recording of the HPD's radio traffic must

be presumed to have been done in bad faith because it was re-used after the City had been sued.

Therefore, the law entitles the Plaintiffs to an adverse evidentiary inference against the City.

*Caoaritta v. Entergy Corporation*, 168 F.3d 754, 755 (5th Cir 1999); *Vick v. Texas Employment*

*Commission*, 514 F.2d 734, 737 (5th Cir 1975).  At the very least, the fact of the re-use of the

tapes should be admitted for the jury to weigh with the other evidenced in the case. *Caoaritta*, 168 F.3d at 756. The deliberate reuse of the tapes and the spoliation of the tapes' content create a jury issue regarding that content.

The City's causation argument that the summary judgment evidence suggests that other weapons were available to Detective Moore's son misses the point. The AR-15 was the weapon that Ernest Moore chose to use when he was on the run after his first shootings of the day. It was a weapon which Detective Moore previously had allowed Ernest Moore to practice shooting. Ernest's proficiency with the weapon made it a logical – and a predictable – choice from among the other firearms that were available to Ernest Moore – a choice which Detective Moore should have anticipated prior to the time that Ernest Moore left the house with the assault rifle.

Furthermore, whether Ernest Moore would have picked another rifle if the assault rifle in question was not available to him is a matter of pure speculation. He ran, and he may or may not have taken another gun with him. "It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences." *Tennant v. Peoria & P.U. Ry. Co.*, 321 U.S. 29, 35 (1944).

The Defendant suggests that Ernest Moore would have selected an alternative weapon if the AR-15 had not been made available to him. While the Defendant has the burden of proof on this point, it has not offered any evidence that would establish as a matter of law that the Defendant's suggested scenario would have taken place. The fact remains that Ernest Moore only took the City-owned AR-15 when preparing to confront the law officers that were on their way to apprehend him. It is the City's failure to have destroyed the weapon that created the

opportunity for Ernest Moore to have access to the weapon that he, in fact, chose when taking the lives of Rodriguez and Salinas.

### (B)    Defendant Knew the Situation was Dangerous

There is no doubt that Chief Scheopner and Detective Moore knew of the volatile and hazardous nature of the situation:  first, that Ernest Moore had possession of the AR-15 semi-automatic rifle with ample ammunition; second, that Ernest Moore's mental status was not stable; and third, that Ernest Moore was an experienced marksman.  Detective Moore knew his son was on the verge of committing suicide or killing someone.  (Exh. Q).  Before the shooting, Police Chief Scheopner had a telephone conversation with Detective Moore.  Detective Moore was known to be one of Police Chief Scheopner's "cronies."  It is logical that Detective Moore would have related to Police Chief Scheopner the same thing he told Deputy Sheriff Rodriguez -- that, *"his son was probably contemplating suicide and that he hoped he would commit suicide, because if he didn't his son would come back and kill us."*  (Exh. Q).

### (C)    The Dangerous Situation Created the Opportunity for Ernest Moore to Commit a Crime which Would not Otherwise Have Existed

By failing to safeguard the rifle, to prevent Ernest Moore from taking the rifle, to arrest Ernest Moore, or to inform the Border Patrol agents that Ernest Moore had the AR-15 semi-automatic rifle and that he was near the house, Chief Scheopner and Detective Moore gave Ernest Moore the opportunity to ambush the law enforcement officers.

### (D)    Chief Scheopner and Detective Moore Affirmatively Placed the U. S. Border Patrol Officers in a Position of Danger in Such a Way as to Strip the Officers of Their Ability to Self Defend

The victims in the case at bar were identifiable before the event occurred.  The state actors had reason to know before the shooting that Border Patrol Agents would be assisting in the coordinated effort to apprehend the suspect.  (Defendant's Second Motion for Summary

Judgment at 3). In addition, Ernest Moore was already known by his father, Detective Moore, and the Harlingen Police Department to be psychologically unstable, the recipient of prescription psychiatric drugs, and a cocaine user. (Exh. A, 91-6 to 14; Exh. F, 144-14 to 20). It was also known that Ernest Moore's bedroom was filled with Neo-Nazi paraphernalia.

In his affidavit (Exhibit R), Lt. Rubio testified:

> . . . On this day [Monday, July 13, 1999], for the first time, I hear about the Neo-Nazi paraphernalia found inside the bedroom of Ernest Moore. This shocks me initially because I can't believe that a police officer would allow his son to have the Neo-Nazi paraphernalia. Part of our law enforcement training under mandatory T.C.L.E.O.S.E. regulations covers culture diversity which addresses hate crimes and racist groups. The State of Texas governing body has made a tremendous effort to attempt to address the issues of hate crimes and racial prejudice to law enforcement officers by having a mandatory culture diversity class every two years. It would be against departmental policy for Officer Moore to condone the behavior of his son by allowing Ernest Moore to be involved in Neo-Nazi activities.

Detective Moore had to know that his son had a "Neo-Nazi mentality" and hatred of minorities since Ernest Moore lived with his father. Detective Moore knew that the Neo-Nazi paraphernalia was in his son's room. Detective Moore should have been concerned that minority law enforcement officers would be his son's first targets.

In light of Chief Jim Scheopner's close working relationship with Detective Moore and the telephone conversation he had with Detective Moore at the critical moment before the tragic incident in question, Chief Scheopner also, in all reasonable probability, had reason to know that minority law enforcement officers would be Ernest Moore's first targets.

After responding to the call and going to the scene, Agents were entrapped, and it was too late for them to back out of harm's way because they were already under Ernest Moore's murderous eye. This situation was created by the failure of Detective Moore and Chief Scheopner to fulfill their police duties under Subsection 6.07 of the Directives, which provides that: "Officers 'protect and serve' the community by complying with their lawful duty to

preserve the peace, protect life and property, and to deter and prevent crime while detecting and apprehending criminals." Had Chief Scheopner or Detective Moore fulfilled their this Directive by warning Susan Rodriguez and Ricardo Salinas about the imminently dangerous situation and having them seek cover, Officers would not have been killed by Ernest Moore. Therefore, Detective Moore and Chief Scheopner were responsible for the deaths of Officers Rodriguez and Salinas under the civil rights statutes. This Court can, and should, take judicial notice of the Nazi and Neo-Nazi mentality, the corresponding attitude of intensely despising minorities, and the predisposition of such "hate groups" to use violence to injure and kill minorities. *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 202, 109 S.Ct. 998, 1005 (1989); *Schuster v. City of New York*, 5 N.Y.2d at 81, 154 N.E.2d at 537.

In *Schuster* the Plaintiff was killed while attempting to assist the city police department in the apprehension of a suspected murderer. The Court recognized that a police officer owes a special duty to use reasonable care for the protection of persons who have collaborated with the police department in the arrest or prosecution of criminals. As the Plaintiffs have alleged in their amended complaint, the facts in the case at bar are closely analogous to *Schuster*.

In the instant case, the Border Patrol Agents were a part of a coordinated, integrated law enforcement effort that involved city, county, and federal agencies. (Exh. P). As the memo indicates: "at approximately 6:41 a.m. the Cameron County Sheriff's Department contacted McAllen Sector's Communication Center and requested Air Operation's assistance in locating the suspect. LECA John Cantu contacted Harlingen Supervisory Border Patrol Agent Doug Spielman who dispatched some Harlingen Agents to assist in the search and in coordinating the Air Ops assistance." Based on this request, Border Patrol Agents went to Detective Moore's house to assist in the search. The Agents were confronted by Dectective Moore who stated,

"Hold up the Border Patrol.  I don't want Border Patrol in my house, my son is not an illegal alien." (Exh. P).

The coordinated, integrated nature of the multi-force effort to apprehend the suspect made it unquestionably foreseeable that Border Patrol agents like would be present at the Moore home.  The involvement of the Border Patrol Agents in this law enforcement effort establishes a special relationship between the agents and state actors such that the agents were entitled to have been shielded from harm.  Instead, the state actor Detective Moore took deliberate steps to withhold information from the agents that would have assisted them in their own protection, and he knowingly and deliberately sent the agents into harm's way.   Clearly such actions, when made under color of law, abrogate the standards established in the *Schuster* decision.

### 3.   Recent Cases Do Not Preclude the Application of the State-Created Danger Theory Here

In the Fifth Circuit's most recent discussion of the state-created danger theory, the court indicated that, "even if we were to adopt the theory in that case, the Plaintiff could not recover." *Piotrowski v. City of Houston*, 237 F.3d 567, 584 (5th Cir. 2001).   The court noted that "Piotrowski alleged that the City created a danger by allowing its employees to affirmatively assist Bell [a privately paid assassin] in carrying out the attack on her...  The initial problem is that no matter what official protection Bell received, the City actors did not create the danger she faced." *Id.*

Conversely, in the case at bar the Plaintiffs have alleged that the City created a danger through its policy of not destroying weapons intended for destruction and permitting officers to take such weapons home and store them as their own.  Such a policy was the moving force in the chain of events that placed the assault rifle in the disturbed assailant's hands.

The *Piotrowski* court also observed that "depending on the facts, some cases interpret the state-created danger theory to result in § 1983 liability if government actors increase the danger of harm to a private citizen by third parties," but the court reviews the facts in that case and determines that no increase in danger was manifested by the City's actions. *Id.* at 584-85. Here the City's actions have the effect of placing a high-powered, semi-automatic assault rifle in the perpetrator's hands. Such a fact (as compared to the state-actors providing the assailant a mug-shot of the victim prior to the assault) is directly linked to the assault itself as the state's dangerous instrumentality was provided to the assailant by virtue of the City's widespread policy of ignoring safe-weapons-handling practices.

Finally, the Fifth Circuit in *Piotrowski* notes that, "the City did not act with deliberate indifference. To establish deliberate indifference, '[t]he environment created by the state-actors must be dangerous; they must know it is dangerous; and....they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur'." *Id.* at 585 (quoting *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994)). Here the City's blatant disregard for safe-weapons-handling practices results in an extremely dangerous weapon (one that all admit was known by the City to be dangerous) in the hands of an unstable individual. More importantly, it is the fact that Chief Scheopner, Captain Vasquez and Detective Moore are employed by the City as police officers that cloaks them in the authority to take the weapon out of the line for disposal; re-issue the weapon to R. D. Moore; let him keep it behind his file cabinet, or in his pick-up truck, or in a cabinet in his deranged son's bedroom. But for this authority conferred upon them by the City of Harlingen, these state-actors would not have been in a position "to create an opportunity that would not otherwise have existed for the third-party's crime to occur."

As it later held in *Piotrowski II*, the Fifth Circuit in *Saenz v. Heldenfels Bros., Inc.* 183 F.3rd 389 (5th Cir. 1999) held that the state-created danger line of cases were "factually inapplicable" to the evidence in *Saenz*. The Court held that a state actor does not "offend due process by permitting an intoxicated driver to remain on the highway, thereby increasing the risk of harm to unidentified and unidentifiable members of the public." *Id.* In the instant case, however, it was foreseeable to the state actors that the perpetrator would act to injure identifiable persons.

First, it was foreseeable that a dangerous situation would present itself. Officer Moore had specific knowledge about his son that made it probable and highly likely that there was imminent and unreasonable danger to Decedents Rodriguez and Salinas. Second, the dangerous situation was the direct result of the state actors placing a dangerous instrumentality into the perpetrator's hands. This case involves a military assault weapon which was turned over to the state actors for destruction because of the nature of the weapon. The weapon had the capacity to fire numerous rounds in rapid succession. Unlike the standard issue police revolver, the AR-15 assault rifle presented a significant risk of danger for many individuals within a wide range of the user of the weapon. Also, unlike the typical officer revolver, this weapon was brought to the police department to be destroyed. The unique circumstances by which this specific weapon found its way into the hands of this particular perpetrator distinguishes this case from other instances involving shootings with police weapons. And more importantly the unique circumstances of this case involving an extremely dangerous instrumentality that was within the control of the state actors distinguishes this case from *Saenz*. One must assume that the Fifth Circuit would have been less reticent to apply the state-created-danger line of cases to the *Sanez'* facts if the perpetrator in *Saenz* had been driving a state-owned vehicle. Third, the victims in the

case at bar were identifiable before the event occurred. The state actors had reason to know before the shooting that Border Patrol Agents would be assisting in the coordinated effort to apprehend the suspect. Ernest Moore was already known by his father, R. D. Moore, and the Harlingen Police Department to be psychologically unstable.

**B.**      **State Claim**

The City argues that there was no negligent entrustment of the rifle to Ernest Moore because the rifle was taken by Ernest Moore without permission. However, the evidence shows otherwise.

"A firearm is a deadly weapon per se, Tex. Penal Code sec. 1.07(a)(11)(A) (Vernon 1974), and under certain circumstances, the owner may be charged with responsibility for the use made of it where the control of the weapon has passed to another." *Kennedy v. Baird*, 682 S.W.2d 377, 378 (Tex. App. – El Paso 1984, no writ)

Discovery in this matter has established that the defendant's handling of the weapon in question violated all standards for prudent conduct including its own. After the tragic debacle in which the two Border Patrol agents were killed, the City launched an investigation to determine why a weapon capable of such destruction and belonging to the City would find its way into the hands of such a disturbed young man. The results of that inquiry depict what would be described as a comedy of errors if it were not so horrible.

At the time of the shootings, Natalie Flores Prim was the City Manager of Harlingen. Her deposition is attached as Exhibit "AA" and incorporated herein. She assigned the Assistant City Manager Joseph D. LaBeau to perform an internal review of the incident. (Exch. AA at pp. 14-15). Mr. LaBeau's duties precluded administrative oversight of the City police department. *Id.* at 24. Ms. Prim testified that, based upon her understanding of Mr. LaBeau's investigation,

the City of Harlingen's internal procedures for the assignment of weapons (which was to have followed a written voucher system) was not adhered to with regard to the assignment of the AR-15 to R. D. Moore. *Id.* at p. 34-35. However, Chief Scheopner was aware that R. D. Moore was keeping the weapon even before the shooting. *Id.* Apparently the Chief initially took the position after the shooting that R. D. Moore had been assigned the assault rifle as a member of the City's SWAT team, but the "unit" had been disbanded long before the incident. *Id.* p. 34-35. While the Chief knew that the City no longer maintained such a unit, he also knew that R. D. Moore was keeping the weapon at his home. *Id.* at 44.

Ms. Prim's report to the City in November, 1998, was based in large part on Mr. LaBeau's investigation. Ms. Prim admits that the weapon was assigned to R. D. Moore without regard to the City's written weapon assignment system and kept in a gun safe at Mr. Moore's home. *Id.* at p. 57-60. She knew at the time of her report that the gun had been brought in to the department by a private citizen, assigned to Moore under the guise of his serving on a City SWAT team even though the City no longer maintained such a unit, and kept at Moore's home. *Id.* Ms. Prim acknowledged that the assignment of the weapon in this fashion abrogated the City's internal policies and procedures. *Id.* at p. 79-80. <u>After</u> the deaths of the Border Patrol agents and the City's investigation of the weapons handling practices, a voluminous, detailed policy procedures manual was issued by the City that addressed the assignment and storage of police department weapons. *Id.* at 91-93.

While Ms. Prim's deposition establishes that the City abrogated its own policies and procedures regarding the handling of the AR-15, the deposition of the Assistant City Manager LaBeau proves that the City also violated standards and rules in this area that are generally applicable throughout this state. His deposition is attached as Exhibit "BB" and incorporated

herein.  He was assigned by Ms. Prim to review the administrative procedures in the City's

police department after the tragic shooting of the Border Patrol agents.  (Exh. BB at p. 11-12).

Exhibit 3 to his deposition is Mr. LaBeau's October 14, 1998, memo to Ms. Prim that sets forth

his findings and recommendations for action.  Id. at 13-14.

In his report at p. 3, Mr. LaBeau recorded the following points based upon his interviews

of Detective R. D. Moore and his supervisors:

- The Chief had made no formal investigation of the matter and had allowed Moore to work without interruption or questioning.

- Captain Vasquez had allowed Moore to take the weapon home for the general purpose of a "duty weapon."

- There was no substantiation in practice or in documentation that Moore served the department in a "sharp-shooter role."

- Moore had had the weapon in his possession for over a year, and his possession of the weapon was undisciplined sometimes leaving it in his pick-up truck, other times behind the door of his office.

- The inventory procedures in the department were informal and not uniformly applied to all officers.

- Moore had not had formal training on the weapon since 1976.

- Moore did not qualify annually with the weapon, but instead practiced shooting it in his yard at home.

- On at least one occasion Moore had allowed his son to use the weapon.

- The weapon in question had been delivered to the department for "disposal."

- No records exist of training or actual call-out for Moore in his supposed duty as a sharp shooter.

- Department policies (see secions 4.04 – 4.04.006) appeared to this reviewer to have been violated.

- The Chief asserted that no departmental violation had been violated, nor had any TCLEOSE requirements been violated.

- The Chief presented an inventory which he represented a showing all weapons present and accounted for, except the AR-15 which had never been signed-out and was now in custody with other agencies as evidence.

*Id.* at Exhibit 3 to LaBeau deposition (report) pp. 3-4.   After his interviews, Mr. LaBeau proceeded to inspect the police department's evidence rooms, weapons, lockers, and Detective Moore's office.  His report lists the following observations made during that inspection:

- A handwritten inventory of weapons issued existed, but did not show Moore's signout of the AR-15.

- Hundreds of weapons, mostly handguns, were stored in stacked bins with tags which relate to case documentation.  Many of these weapons have been in storage for years, some decades.

- A wide assortment of various rifles were stored in various secured rooms. Some of these were owned by the Department.  Others were marked as "evidence."

- Over the years, some of the weapons have been put in service, usually with permission from the Chief.

- No current effort has been made to dispose of stockpiled weapons.

- It was Moore's practice to store the AR-15 behind his office door, even after he no longer had weapons safekeeping duties.

*Id.* at Exhibit 3 to LaBeau depo. (report) p. 4-5.

Ultimately, Mr. LaBeau reached the following conclusions pursuant to his assignment to investigate the matter on behalf of the City:

1. The Chief failed to initiate an objective departmental review of the circumstances, policies and procedures by which Moore came to possess the AR-15.

2. The Chief of Police made false statements and reports regarding the assignment of the AR-15 to R. D. Moore

3. A review of the departmental policies and procedures identifies a number of apparent violations:

4.04.  Authorized Weapons:  The Department authorizes officers to carry certain weapons, and authorizes the use of those weapons only when necessary to lawfully accomplish departmental goals.  Officers carry and use only those weapons approved and authorized by the Department.

Captain Vasquez reported that he approved this weapon for R. D. Moore without written notification to the Chief.  However, the weapon was taken home and placed in a gun vault.  Also, R. D. Moore stated he would practice with the weapon by shooting it in the yard of his residence and on one occasion, R. D. Moore knew his son had discharged the weapon because he had allowed his son to do so.

4.04.001 Approved Weapons and Ammunition:  The Department authorizes officers to carry and use only Department issued or approved handguns, shotguns, ammunition, chemical agents and batons.  The chief approves all weapons and ammunition.  Under special conditions of limited duration, the Commanding Officer on duty may authorize the use of other weapons.  A commanding officer taking this action justifies the decision in writing to the Chief.

Captain Vasquez reported that he did not follow any procedure (in issueing the weapon) and did not obtain the Chief's approval.  Captain Vasquez reported that he did not discuss with Detective Moore any specific duties when issuing the weapon.

4.04.002 Training:  An officer must undergo Department approved training and display proficiency in the use of any authorized weapon the officer carries.  Additionally, officers must comply with all continuing proficiency training required by the Department.

Detective Moore reported that he was last trained in 1976 for this type weapon.  Detective Moore reported that he did not comply *with all continuing proficiency training required* by the Department and TCLEO standards (TAC, Title 37, Part VII, Chapter 211, Section 211.104).

4.  A review of departmental training requirements records shows no record of mandated annual training by Moore with the AR-15.  In fact, Moore and several other officers have not event [sic] met annual proficiency requirements (TCLEOSE) for use of their side arms.

5.  It is clear there are no detailed policies and procedures for the handling of weapons, and there has been inadequate weapons practice and training.  The department lacks proper documentation of weapons training and qualification.  Weapons control and inventory practices are inadequate and unprofessional.  In addition, there has been no formal assignment by any officer to duties of sharpshooter, although there may be a few officers who are proficient marksmen.

*Id.* at Exhibit 3 to LaBeau depo. (report) at pp. 8-10.

Mr. LaBeau's report makes numerous references to Harlingen Police Department standards as well as "TCLEOSE" guidelines. As he explained in his deposition, it was Mr. LaBeau's determination that the City's policies were intended to adhere to the Texas Commission on Law Enforcement Officers Standards and Education ("TCLEOSE") guidelines before the July, 1998 shootings. LaBeau depo. at pp. 39-40. The paragraph references to which Mr. LaBeau refers in delineating in his report the Harlingen Police Department violations are thus city and state standards for reasonable, prudent conduct that (by the city's own admission) have been abrogated in the handling, assignment, and storage of the AR-15 in question.

Plaintiffs' retained expert George L. Kirkham, Professor Emeritus at the Florida State University's School of Criminology, puts Mr. LaBeau's findings regarding the Harlingen Police Department's violations of internal and state standards for police department conduct into context in his affidavit and report attached here as Exhibit "U" Mr. Kirkham makes it clear that

> In my opinion, it was a gross deviation from widely accepted law enforcement standards and practices to issue this weapon to R. D. Moore and to allow him to keep it in his home. The rifle originally was turned in to the Harlingen Police Department in 1995. It's owner, Mrs. Sylvia Pirtle, clearly intended for it to be destroyed. Det. R. D. Moore was the officer who received the rifle from Mrs. Pirtle. He later arranged with his chain of command to have this weapon issued to him in his role as a "sharpshooter" for the Harlingen Police Department. The Police Department made no record of the assignment of this rifle to Det. Moore. Moore apparently kept the weapon in his office for a while, and then moved it to a gun safe located inside his home. Moore and his son Ernest, who lived with him at the time of the incident in question, owned a number of weapons, which were stored in this gun safe; both men had access to the contents of the safe.
>
> The rifle in question never should have been placed into the hands of R. D. Moore. From the statement of Mrs. Pirtle, it is clear that her intent was for this weapon to be destroyed; any other use or disposition of this weapon was improper. Det. Moore knew that his son Ernest suffered from depression, had a problem with drug and alcohol abuse, and apparently had a fascination with Nazi memorabilia. Assuming, arguendo, that the rifle in question had properly been issued to Det. Moore, no prudent, well-trained peace officer would hae stored such a weapon in a manner which allowed ready access by any other person, particularly an obviously troubled young man such as Det. Moore's son.

Further, I find that the danger created by allowing this rifle to be placed in the home of Det. Moore is directly attributable to the failure of the Harlingen Police Department and its chief, James Scheopner, to implement and enforce proper policies and procedures to prevent such an occurrence. Both Chief Scheopner and Det. Moore testified in deposition that, at the time of the incident in question, the Harlingen Police Department had no policies, either written or verbal, regarding the receipt, issuance or storage of weapons such as the Olympic Arms rifle. As noted above, there was no documentation that this particular weapon had been issued to Det. Moore. Indeed, Mrs. Pirtle asserts that, until she insisted on getting a receipt, Det. Moore had not planned to even document the receipt of this weapon from her.

In addition, Chief Scheopner made no effort to ascertain that the rifle issued to Det. Moore was safely and properly stored, nor did he take steps to assure that Det. Moore was properly trained in the use of this weapon. Chief Scheopner testified that he merely instructed Det. Moore to "stay proficient, stay ready" (Scheopner depo. p. 73). It appears that the only actual training Det. Moore received in the use of such weapons was at an FBI school Moore attended in 1978.

The failure of the Harlingen Police Department and Chief Scheopner to implement and enforce proper weapons policies and procedure did, in my opinion, create a danger to the community that would not otherwise have existed. Considering the great and foreseeable harm that could result if weapons such as the rifle in question fell into the wrong hands, I find the conduct of Chief Scheopner and Det. Moore in this matter, as well as the total absence of proper policies and procedures designed to prevent such harm, to be shocking and unconscionable.

Faced with the overwhelming evidence regarding its negligence (which includes the testimony of its own City Manager, the conclusions of its own investigation by its Assistant City Manager, and the opinions of the only independent expert identified to assess the issue), the City of Harlingen in its most recent summary judgment attempt abandons any effort to defend its actions concerning weapons-handling-policy violations and adheres merely to a flimsy proximate cause argument. The Plaintiffs' response is clear—if the gun had been destroyed when brought into the police department by a Harlingen citizen then it wouldn't have been in Detective Moore's disturbed son's hands at the time of the shooting. Mr. LaBeau admitted as much on deposition when he responded to the following question:

Q. Well, if we go back step-by-step and look, first of all, at when Ms. Pirtle brought the gun in. I guess, if the gun had been destroyed at that point rather than distributed, then it wouldn't have been available to Mr. Moore, would it, to Ernest Moore?

A. No, certainly not.

(Exh. "BB" at p. 85).

While this fact may seem obvious, there are those in the City's service who continue to try and "explain-away" the City's failure to destroy the weapon. Interestingly these are the same individuals who initially tried to have the public believe that Detective Moore, though untrained with the weapon, was assigned a rapid-fire assault rifle without a scope pursuant to his duties as a sharpshooter in (what we now know to be a non-existent) SWAT Team. Captain Vasquez, in a deposition taken as recently as this past May, continued to assert that the reference on the receipt pursuant to which Mrs. Pirtle delivered the AR-15 to the Harlingen Police Department on 6-23-95, says "for disposal" but "it means reissue." (Exh. C at pp. 34-5; 79-81). When asked whether the language on that receipt referred to "disposal" or "donation," Mr. LaBeau was careful to point out that the person who originally brought the weapon into the police department believed the weapon was going to be destroyed rather than be reissued. Mr. LaBeau remarked "that the Pirtle's thought that it was going to be destroyed, it goes without question. I think everybody stipulates that is so...." (Exh. BB at p. 36). Apparently it would have been more accurate for Mr. LaBeau to have said, "everybody except the person in charge of assigning the weapon would stipulate that Ms. Pirtle wanted the gun destroyed."

If the gun had been destroyed as Ms. Pirtle intended, it would not have been used to kill the Border Patrol agents. To suggest that some other gun might have been used is only speculation on the City's part - speculation on a point that is essential to the City's argument that is in the nature of an affirmative defense that a third-party was responsible for causing the event.

Plaintiffs do not have to establish that the City's failure to destroy, assign, or store the weapon in accordance with state and local standards was <u>the</u> proximate cause of the killing; they need only show that it was <u>a</u> proximate cause.  Given the fact that his police-officer father had shown him how to use the weapon, there is at least a genuine issue of material fact presented as to why Ernest Moore selected the illegally stored AR-15 to assault and kill the law enforcement officers who had come to his home to assist in his arrest.

## PRAYER

WHEREFORE, Plaintiffs respectfully request this Court to deny Defendants' Motions to Dismiss and allow Plaintiffs to proceed immediately with preparation for a speedy and just trial.

Respectfully submitted,

**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, TX  78701
512+474-6061
512+474-1605 (fax)

By _____
Broadus Spivey
State Bar No. 00000076
Federal I.D. No. 11146
Price Ainsworth
State Bar No. 00950300
Federal I.D. No. 8065
Francis Pan
State Bar No. 15443300
Federal I.D. No. 26385

Richard Pena
Law Offices of Richard Pena, P.C.
Barton Oaks Plaza Two
901 MoPac, Suite 325
Austin, Texas 7746-5747
512+327-6884
512+327-8354 (fax)
**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of the above and foregoing document was forwarded on July _____, 2001, to all counsel of record and interested parties via facsimile and U.S. mail:

Mr. Tom Lockhart
Mr. Jim Denison
Mr. Roger W. Hughes
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429
ATTORNEYS FOR DEFENDANT

RAMON GARCIA
SONJA LOPEZ
LAW OFFICES OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, TX 78539

Broadus A. Spivey

## EXHIBITS TABLE OF CONTENTS

| **EXHIBIT REF.** | **EXHIBITS** |
|---|---|
| A. | Excerpts from Deposition of James Joseph Scheopner |
| B. | Sylvia Pirtle's Sworn Statement [Scheopner's Deposition Exhibit 9-L] |
| C. | Excerpts from Deposition of Joseph Bennett Vasquez |
| D. | TCLEOSE § 211.104 Minimum Standards for Annual Firearms Proficiency |
| E. | Sgt T. Hushen's Memo to Captain L. Rubio |
| F. | Excerpts from Deposition of Ralph Dwayne. Moore |
| G. | Arnold Rodriguez's Affidavit |
| H. | Excerpts from Deposition of Sgt. Ronald K. Saenz |
| I. | Shawn Foist's Sworn Statement [Scheopner's Deposition Exhibit 9-N] |
| J. | Shawn Foist's Sworn Statement [Scheopner's Deposition Exhibit 9-U] |
| K. | Calibre Press Street Survival Newsline No. 288 [Scheopner's Deposition Exhibit 22 |
| L. | Computer Printout [Melody Matlock's Deposition Exhibit 47] |
| M. | Excerpts from Deposition of Miguel P. Garcia |
| N. | Albert Daniel Perry's Sworn Statement [Scheopner's Deposition Exhibit 9-E] |
| O. | Harlingen Police Department Departmental Directives |
| P. | Memorandum for Jose E. Garza, Chief Patrol Agent, McAllen, Texas from Hector Gonzalez, San Benito shooting Report [Scheopner's Deposition Exhibit 9-DD] |
| Q. | Robert Rodriguez's Sworn Statement [Scheopner's Deposition Exhibit 9-CC] |

R.          Jose Rubio, Jr.'s Sworn Statement signed on June 4, 1999

S.          Paul Ginsberg's Affidavit

T.          Jose Rubio, Jr.'s Affidavit

U.          Affidavit and Report of Dr. George L. Kirkam

V.          Tom Lockhart's Letter to the Undersigned Attorneys

W.          Labels of Tape Housing [Gale Lynn Jones' Deposition Exhibits
            61-A and B, and 62]

X.          Texas Department of Public Safety's Report of Investigation
            Regarding Rio Hondo and San Benito Shootings

Y.          Excerpts from Deposition of Pasty Gail Moore

Z.          Raul Rodriguz's Sworn Statement [Scheopner's Deposition
            Exhibit 9-P]

AA.         Natalie Flores Prim's Deposition with attachments

BB.         Joseph D. LaBeau's Deposition with attachments

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ARTURO GUILLERMO SALINAS      ) (
AND ELISA HERNANDEZ           ) (
HERRERA SALINAS               ) (
                              ) (
VS.                           ) ( CIVIL ACTION NO. B-98-162
                              ) (
CITY OF HARLINGEN, TEXAS,     ) (
R.D. MOORE, AND               ) (
JIM SCHEOPNER                 ) (
                              ) (
        AND                   ) (
                              ) (
GILBERTO M. RODRIGUEZ,        ) (
INDIVIDUALLY AND ON           ) (
BEHALF OF HIS MINOR           ) (
DAUGHTER, MEGAN SUZANNE       ) (
RODRIGUEZ, AND STEPHEN L.     ) (
WILLIAMS AND WIFE, ROBYN      ) (
S. WILLIAMS, SURVIVING        ) (
BENEFICIARIES OF THE          ) (
DECEASED                      ) (
                              ) (
VS.                           ) ( CIVIL ACTION NO. B-98-163
                              ) (
CITY OF HARLINGEN, TEXAS,     ) (
R.D. MOORE, AND               ) (
JIM SCHEOPNER                 ) (
                              ) (
AND                           ) (
                              ) (
RAUL RODRIGUEZ                ) (
                              ) (
VS.                           ) ( CIVIL ACTION NO. B-99-070
                              ) (
CITY OF HARLINGEN,            ) (
R.D. MOORE, AND               ) (
JIM SCHEOPNER                 ) (

- - - - - - - - - - - - - - - - - - - - - - - - - - -
     VIDEOTAPED DEPOSITION OF JAMES JOSEPH SCHEOPNER
                   MAY 18, 2000
                   VOLUME 1          ORIGINAL
- - - - - - - - - - - - - - - - - - - - - - - - - - -

REPORTED BY MAUREEN STINGLEY, CERTIFIED COURT REPORTER

BRYANT & STINGLEY, INC.
   McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

<u>APPEARANCES</u>

COUNSEL FOR PLAINTIFFS ARTURO GUILLERMO SALINAS
AND ELISA HERNANDEZ HERRERA SALINAS; and GILBERTO
M. RODRIGUEZ, INDIVIDUALLY AND ON BEHALF OF HIS
MINOR DAUGHTER, MEGAN SUZANNE RODRIGUEZ, AND
STEPHEN L. WILLIAMS AND WIFE, ROBYN S. WILLIAMS,
SURVIVING BENEFICIARIES OF THE DECEASED:

    BROADUS A. SPIVEY
    SPIVEY & AINSWORTH
    48 East Avenue
    Austin, Texas 78701

COUNSEL FOR PLAINTIFF RAUL RODRIGUEZ:

    SONIA LOPEZ
    LAW OFFICES OF RAMON GARCIA
    222 West University Drive
    Edinburg, Texas 78539

COUNSEL FOR DEFENDANTS CITY OF HARLINGEN, TEXAS,
JIM SCHEOPNER, AND R.D. MOORE:

    TOM LOCKHART
    ADAMS & GRAHAM, L.L.P.
    222 East Van Buren, West Tower
    Harlingen, Texas 78550

COUNSEL FOR DEFENDANT R.D. MOORE, INDIVIDUALLY:

    WALTER J. PASSMORE
    PASSMORE, WALKER & TWENHAFEL, L.L.P.
    2424 North 10th, Suite 200
    McAllen, Texas 78502

    ALSO PRESENT:   Wally Gonzalez, Videographer
                     Stephen Williams
                     Gilberto M. Rodriguez
                     Gilberto Rodriguez
                     Arturo G. Salinas
                     R. D. Moore
                     Linda San Miguel

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

Videotaped deposition of JAMES JOSEPH

SCHEOPNER, who resides in Cameron County, Texas, taken

by BROADUS A. SPIVEY, Attorney for PLAINTIFFS ARTURO

GUILLERMO SALINAS AND ELISA HERNANDEZ HERRERA SALINAS;

and GILBERTO M. RODRIGUEZ, INDIVIDUALLY AND ON BEHALF

OF HIS MINOR DAUGHTER, MEGAN SUZANNE RODRIGUEZ, AND

STEPHEN L. WILLIAMS AND WIFE, ROBYN S. WILLIAMS,

SURVIVING BENEFICIARIES OF THE DECEASED; reported by

MAUREEN STINGLEY, Certified Court Reporter in and for

the State of Texas, on MAY 18, 2000, in the offices of

ADAMS & GRAHAM, L.L.P., 222 East Van Buren, West Tower,

Harlingen, Texas, pursuant to the Federal Rules of

Civil Procedure.

INDEX

Appearances ..................................... 2

Examination by Mr. Spivey ..................... 8

Examination by Ms. Lopez ..................... 117

Errata Sheet/Signature Page ................... 213

Reporter's Certificate ....................... 214

Attached to the end of the transcript:  Stipulations

DOCUMENTARY EVIDENCE

| SCHEOPNER Ex. No. | Description | Iden. |
|---|---|---|
| 1-A | Personnel file of R. D. Moore | |

BRYANT & STINGLEY, INC.

| McAllen | Harlingen | Brownsville |
|---|---|---|
| (956) 618-2366 | (956) 428-0755 | (956) 542-1020 |

10:18  1    Q.   When did you first become a police officer?

10:18  2    A.   June 16, 1972.

10:18  3    Q.   And what police group was it that you joined

10:18  4  then?

10:18  5    A.   The Harlingen Police Department.

10:18  6    Q.   Okay.  Have you been employed by Harlingen

10:18  7  Police Department since that time?

10:18  8    A.   Yes, sir.

10:18  9    Q.   What is your title or responsibility at this

10:18  10  time?

10:18  11    A.   Lieutenant assigned to patrol division.

10:19  12    Q.   When did you -- your designation change?  You

10:19  13  were at one time captain; is that correct?

10:19  14    A.   No, sir.

10:19  15    Q.   What was your title at the time of this

10:19  16  incident?

10:19  17    A.   Chief of police.

10:19  18    Q.   All right.  Give me the steps you took up to

10:19  19  becoming chief of police.

10:19  20    A.   Police officer rank, then promoted to sergeant,

10:19  21  promoted to lieutenant, appointed chief of police, and

10:19  22  then I resigned the position and took the old

10:19  23  lieutenant's position back.

10:20  24    Q.   Okay.  When did you become sergeant?

10:20  25    A.   I believe it was 1981.

10:20  1    Q.   Okay.  And when did you become lieutenant?

10:20  2    A.   1988.

10:20  3    Q.   And police chief?

10:20  4    A.   1993.

10:20  5    Q.   And what was the date of your resignation as

10:20  6    chief?

10:20  7    A.   The first part of January -- I believe it was

10:20  8    January 4, 1999.

10:20  9    Q.   What were -- tell me the purpose or why you

10:20 10    resigned.

10:20 11    A.   My wife had been asking me to retire.  We had

10:20 12    some stressors in the family.  There were some civil

10:20 13    suits filed against me, and newspaper coverage, and I

10:21 14    was just tired of the media hounding my family in the

10:21 15    newspaper.  And I didn't need the day-to-day stressors.

10:21 16              We had some bills paid off.  She hadn't

10:21 17    been working.  She was a homemaker.  I liked that.  She

10:21 18    liked that.  Since we didn't need the extra money, and

10:21 19    I still truly enjoy law enforcement in Harlingen, I

10:21 20    decided to resign from the chief's position, and under

10:21 21    civil service, I resumed my old rank of lieutenant.

10:21 22    Q.   So you got basically 28 years; am I correct in

10:21 23    that?

10:21 24    A.   Next month, 28 years, yes, sir.

10:21 25    Q.   And could you retire today at full retirement?

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755      (956)542-1020

10:28  1          A.   Not that I know of, no, sir.

10:29  2          Q.   Let's go off the record just a second.

       3                    (Off the record)

10:30  4          Q.   Let me get the precise time you were police

10:30  5     chief.  From when in '93 until '99?

10:30  6          A.   April 1st, '93 to -- I believe it was January

10:30  7     4th, '99.

10:30  8          Q.   All right.  During that entire period of time

10:30  9     as police chief, am I correct in assuming that you were

10:30 10     the highest police authority in the City of Harlingen?

10:30 11          A.   Yes, sir.

10:30 12          Q.   That is, there was no police commissioner, no

10:30 13     governmental agent or entity designated to whom you had

10:30 14     to specifically report other than to the City of

10:30 15     Harlingen, of course?

10:30 16          A.   I was the highest police officer in the city,

10:30 17     and I reported directly to the assistant city manager.

10:30 18          Q.   Okay.  As Harry Truman said, the buck stopped

10:31 19     there?

10:31 20          A.   Yes, sir.

10:31 21          Q.   With you, okay.  Now, did you have an operating

10:31 22     manual of any sort that you used as a guideline or you

10:31 23     were required to refer to or that you did refer to in

10:31 24     making decisions?

10:31 25          A.   Yes, sir.

10:44  1    in the hands of a person such as Captain Vasquez or

10:44  2    Officer Moore?

10:44  3        A.  Well, yes, the city is always responsible, but

10:44  4    the employee is assigned a piece of equipment.  It's

10:44  5    city property.  It has a value, and it still belongs to

10:44  6    the city.  So that employee must take care of it.

10:44  7        Q.  What I'm asking is are you telling me there

10:44  8    were no other instructions or restrictions other than,

10:44  9    "You're responsible for this weapon"?

10:44 10        A.  Which weapon?

10:44 11        Q.  Say the AR-15 in question.

10:45 12        A.  Okay.

10:45 13        Q.  Do you know, Officer Moore --

10:45 14        A.  The .223 Olympic Arms.

10:45 15        Q.  I'm sorry?

10:45 16        A.  The .223 Olympic Arms.

10:45 17        Q.  Okay.

10:45 18        A.  He was assigned that, and I told him he was

10:45 19    going to be one of the two designated sharpshooters, if

10:45 20    we ever needed one that he would be called out, to stay

10:45 21    proficient with the weapon, sight it in, be familiar

10:45 22    with it, stay proficient.  Those were instructions

10:45 23    directly to him by me.

10:45 24        Q.  When did you give him those instructions?

10:45 25        A.  1993, I told he and -- him and Captain Vasquez

10:47  1    or keeping those weapons out of the hands that didn't

10:47  2    belong on them?

10:47  3        A.   They knew they were city-owned property, and as

10:47  4    with all city-owned property, they were responsible for

10:47  5    their safekeeping and maintenance and that they

10:47  6    wouldn't get lost or damaged.

10:47  7        Q.   How did you know that?

10:47  8        A.   Because they had a copy of the written

10:47  9    directives, and they are professional police officers.

10:47 10    They had the assignment prior to me giving the -- by

10:47 11    the former administration, they had that assignment.

10:47 12        Q.   A written assignment?

10:47 13        A.   I don't believe it was written.  I don't know.

10:47 14        Q.   How do you know they had that assignment from a

10:47 15    previous administration?

10:47 16        A.   Because I had worked with these individuals and

10:47 17    knew that they had been called out on prior incidents

10:48 18    for those assigned duties.

10:48 19        Q.   Were they allowed to keep the weapons in their

10:48 20    office?

10:48 21        A.   In their office or at their homes.

10:48 22        Q.   And that's one of my next questions.  Were they

10:48 23    allowed to keep these weapons, these rifles, these

10:48 24    high-powered rifles, in their vehicles?

10:48 25        A.   Yes, sir.

10:48  1    Q.  Were they allowed to keep these high-powered

10:48  2  rifles in their homes?

10:48  3    A.  As far as I know, yes, sir.

10:48  4    Q.  What were the restraints, if any, or the

10:48  5  requirements, if any, of Captain Vasquez and Officer

10:48  6  Moore about maintaining the weapons such as the AR-15

10:48  7  at home?

10:48  8         MR. LOCKHART:  Are you talking about

10:48  9  during his tenure?

10:48  10        MR. SPIVEY:  Yes, during --

10:48  11        MR. LOCKHART:  Or previous tenure?

10:48  12   Q.  During your tenure?

10:48  13   A.  My instructions to them were to stay readily

10:48  14  available and proficient with rifles in case we needed

10:48  15  a sharpshooter for an assignment.  That is the only

10:48  16  instructions I give them.

10:48  17   Q.  You never gave them any instructions about not

10:49  18  keeping the gun out in the open?

10:49  19   A.  No, sir.

10:49  20   Q.  Did you ever give them any instructions about

10:49  21  not allowing other persons to handle the weapons?

10:49  22   A.  No, sir.

10:49  23   Q.  Did you ever give them any instructions that

10:49  24  children shouldn't be allowed to handle the weapons?

10:49  25   A.  No, sir.

10:49 1    Q.  Did you ever give them any instructions that
10:49 2  strangers shouldn't be allowed to handle the weapons?
10:49 3    A.  No, sir.
10:49 4    Q.  Did you ever give them any instructions that
10:49 5  other family members of theirs, their family members
10:49 6  were not to handle these weapons?
10:49 7    A.  No, sir.
10:49 8    Q.  Were you -- did you ever give them any
10:49 9  instructions that there was to be any limitation on
10:49 10  access or any safekeeping of these weapons in their
10:49 11  home environment?
10:49 12    A.  No, sir.
10:49 13    Q.  Were there any written guidelines or
10:49 14  instructions from the City of Harlingen Police
10:50 15  Department or the City of Harlingen in any way that
10:50 16  covered weapons to be kept or maintained at the home of
10:50 17  an officer?
10:50 18    A.  No, sir.
10:50 19    Q.  Did you ever perceive the need for any such
10:50 20  restrictions or instructions?
10:50 21    A.  No, sir.
10:50 22    Q.  Did you -- how well did you know Captain
10:50 23  Vasquez and Officer Moore?
10:50 24    A.  They were both employed at the police
10:50 25  department before I started.  So I have known them my

10:50  1    entire career and worked with them when I was assigned

10:50  2    to the detective division.

10:50  3         Q.  Did you know them well enough to have any sense

10:50  4    about how responsible they were with the handling of

10:50  5    weapons?

10:50  6         A.  Yes, sir.  From, I believe, 1985 to 1988, I was

10:50  7    assigned as a training officer.  I was also the range

10:51  8    master.  I took every officer out to the firing range

10:51  9    where they qualified with a handgun, and both Captain

10:51 10    Vasquez and Detective Moore were the best shots from

10:51 11    the department, and they were most responsible with the

10:51 12    weapons.  I knew that they were extremely professional

10:51 13    and I knew about their weapons capabilities.

10:51 14              I also knew that they were assigned by the

10:51 15    former administration to attend a two-week special

10:51 16    weapons and tactics school at the FBI national academy

10:51 17    -- FBI Academy at Quantico, Virginia, where they did

10:51 18    qualify with sniper rifles, AR-15 and other caliber

10:51 19    weapons.  That's why they had been assigned to these

10:51 20    specific duties prior to me becoming chief.  That's why

10:51 21    I put them back in that assignment.  I knew their

10:51 22    proficiency.  I knew their maturity with weapons.

10:51 23         Q.  You knew that they had been specifically

10:51 24    trained -- let me rephrase that.  You knew that

10:52 25    captain -- or Officer Moore had been specifically

11:15 1    times, living way out in the country.  So he would take

11:15 2    it home and put it in the gun safe."

11:15 3             He said, "His boy grabbed that gun and

11:15 4    used it in the shooting."

11:15 5             And I said, "Okay.  Well, let's get all of

11:15 6    the documentation on that," because my initial thought

11:15 7    was "The city was going to be sued, the police

11:16 8    department was going to be sued.  A city gun was used.

11:16 9    We had better start getting all kinds of documents."

11:16 10            That's when I called the city hall and the

11:16 11    city attorney and all of that.  I said, "Let's start

11:16 12    getting documentation on the weapon because they are

11:16 13    going to be needing it, the lawyers will."

11:16 14            So they went and found the initial

11:16 15    receipt.  That's the first time I had seen the receipt.

11:16 16    It was with the gun paperwork in the vault.  And then I

11:16 17    heard later that the family that had turned it in said

11:16 18    it was for destruction, to be destroyed.

11:16 19            The information I had from Detective Moore

11:16 20    was he took it in because they no longer wanted it at

11:16 21    their house and said, "Do with it what you want."

11:16 22            And I only talked to Moore about the

11:16 23    weapon after the July 7th shooting.  So I went back and

11:16 24    tried to trace how the weapon got to the police

11:17 25    department and realized that Detective Gonzalez, who

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

13:42 1    taken.  Now, can we just agree on a starting time for

13:42 2    his deposition, say tomorrow morning at 9:00?

13:42 3                MS. LOPEZ:  I don't think that we will be

13:42 4    through --

13:42 5                MR. LOCKHART:  Okay.

13:42 6                MS. LOPEZ:  -- by then.  Probably maybe in

13:42 7    the afternoon, right around 1:00, we can probably get

13:42 8    started on his.

13:42 9                MR. LOCKHART:  All right.

13:42 10               MR. SPIVEY:  And we will just carry him

13:42 11   over until Monday.  If we have got somebody Monday, we

13:42 12   will push him down.

13:42 13               MR. PASSMORE:  Works for me.  I'll tell

13:42 14   R. D. to be back here tomorrow at 1:00, and if he has

13:42 15   to wait at 1:00, we will wait.  Are you going to be

13:42 16   ready to start at 1:00 or 1:30 or --

13:42 17               MR. SPIVEY:  We will try to do it at 1:00.

13:42 18               MR. LOCKHART:  Okay, very good.

      19               (Brief recess)

13:44 20       Q.  Did you tell any police officers that they

13:45 21   would be fired if they talked to anyone about the

13:45 22   incidents related to the July the 7th, 1998 deaths?

13:45 23       A.  No, sir.

13:45 24       Q.  I asked you earlier about a record for

13:45 25   Mr. Ernest Moore, and I think your answer was no

13:45 1    criminal record.  Did Ernest Moore have any arrest

13:45 2    record?

13:45 3        A.  I don't know, sir.

13:45 4        Q.  You do not know as you sit here today whether

13:45 5    Ernest Moore had any record of any arrests?

13:45 6        A.  No, sir.

13:45 7        Q.  Did you know Ernest Moore?

13:46 8        A.  No, sir.

13:46 9        Q.  You had never met Ernest Moore?

13:46 10       A.  Yes, sir, as a child.

13:46 11       Q.  Had any of your police officers ever arrested

13:46 12   Ernest Moore, to your knowledge?

13:46 13       A.  No, sir.

13:46 14       Q.  Had -- have you heard of any other police

13:46 15   authority having arrested Ernest Moore prior to his

13:46 16   death?

13:46 17       A.  No, sir.

13:46 18       Q.  Now, was -- during your tenure as chief, was

13:46 19   there a particular room assigned for the storage of

13:47 20   weapons?

13:47 21       A.  Not a particular room.

13:47 22       Q.  Did you store weapons in more than one room?

13:47 23       A.  Yes, sir.

13:47 24       Q.  Did -- how many people had access to those

13:47 25   weapons?

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

13:47 1      A.   The evidence custodian, training officer, and

13:47 2   then Moore and Captain Vasquez.

13:47 3      Q.   Okay.   What do officers have to do before they

13:47 4   are issued a weapon?   By that, I mean what requirements

13:47 5   are made of an officer, police officer, before they are

13:47 6   issued a weapon during your tenure?

13:47 7      A.   The officers were issued a side arm, and they

13:47 8   received some instruction on how to use it and then

13:48 9   fired it before we got the brand new issue weapons, the

13:48 10   9 millimeters.   Each vehicle has a -- not every

13:48 11   vehicle, but most all patrol and some unmarked cars

13:48 12   have a shotgun installed but that's not issued to the

13:48 13   officer.   It's part of the equipment in the car.

13:48 14      Q.   Are the officers required to have any weapons

13:48 15   training for the use of the side arms and for the

13:48 16   shotgun?

13:48 17      A.   Yes, sir.

13:48 18      Q.   And is that training procedure written?

13:48 19      A.   No, sir.

13:48 20      Q.   All officers are trained on side arms, are

13:48 21   they?

13:48 22      A.   Yes, sir.

13:48 23      Q.   Are all officers trained on shotguns?

13:48 24      A.   Yes, sir.

13:48 25      Q.   Are they trained on -- are officers trained on

13:49 1    any other kind of guns in particular?

13:49 2        A.  No, sir.

13:49 3        Q.  What kind of -- what measures during your

13:49 4    tenure were in place to ensure officers weren't

13:49 5    assigned weapons that they are not trained to use?

13:49 6        A.  When an officer is hired, he is issued the 9

13:49 7    millimeter Beretta side arm, and during a two-week

13:49 8    orientation for all new hires, they are given training

13:49 9    on that weapon and show proficiency on it.  That's when

13:49 10   they are also shown the pump shotgun that the PD has.

13:49 11   Then they qualify at least once a year with the

13:50 12   handgun.  That's the only qualifications I believe

13:50 13   there were.

13:50 14       Q.  Did you ever see, during your entire tenure as

13:50 15   chief of police, that Captain Vasquez or Officer Moore

13:50 16   had -- did you ever receive written confirmation that

13:50 17   either of them or both of them had received training in

13:50 18   the use of the semi-automatic rifle, such as the AR-15?

13:50 19       A.  Did I ever receive written confirmation that

     20    they had --

13:50 21       Q.  Yes.

13:50 22       A.  -- training?  I don't believe so, no, sir.

13:50 23       Q.  Have you to this day seen such written

13:50 24   confirmation?

13:50 25       A.  No, sir.

13:51  1      Q.   Now, if I understand it, all police officers

13:51  2   are issued a 9 millimeter side arm weapon, are they

13:51  3   not?

13:51  4      A.   Yes, sir.

13:51  5      Q.   Before they are issued any other particular

13:51  6   type of weapon, are they required to have training to

13:51  7   use that other particular weapon?

13:51  8      A.   The handgun and the shotgun.

13:51  9      Q.   Okay.   During your tenure as police chief, what

13:51 10   procedures did you have or what protocol did you or

13:52 11   your department have, the police department, for the

13:52 12   acceptance, reception and retention of weapons turned

13:52 13   in by citizens?

13:52 14      A.   Not evidence, just turned in?

13:52 15      Q.   Yes.

13:52 16      A.   We had no written provisions about that.

13:52 17      Q.   Did you have any standing oral provisions?

13:52 18      A.   No, sir.

13:52 19      Q.   Did you have any written provisions for

13:52 20   confiscated weapons during your tenure?

13:52 21      A.   I think there was something in the directives

13:52 22   about evidence in confiscating.

13:52 23      Q.   What is your recollection about that?

13:52 24      A.   That they be dealt with according to the rules

13:52 25   in place regarding evidence and seized weapons.

13:52   1        Q.   Which were what?

13:53   2        A.   From the Code of Criminal Procedures, the Texas

13:53   3   Code of Criminal Procedures.

13:53   4        Q.   Would it entail that they be maintained as

13:53   5   weapons -- maintained as exhibits throughout the life

13:53   6   of a case?

13:53   7        A.   Yes, sir, it's lengthy.  It's in the code.

13:53   8        Q.   All right, but what happens upon the

13:53   9   disposition of the underlying criminal case?

13:53  10        A.   Again, that could vary.  The weapons could be

13:53  11   ordered by the court to be destroyed.  It could become

13:53  12   property of the police department for law enforcement

13:53  13   purposes and used by the department.  It could be

13:53  14   ordered to be given back to the individual.

13:53  15        Q.   Have you or the department ever destroyed guns

13:53  16   pursuant to either court order or statute?

13:53  17        A.   I remember one destruction, yes, sir.

13:53  18        Q.   And how was that destruction carried out?

13:53  19        A.   That was -- that was back in the early '80s.

13:53  20   It was a lengthy process of notifying owners, doing

13:53  21   checks through ATF, getting various court documents,

13:54  22   court orders.  We did it to clean out the vault.  We

13:54  23   were running out of space.  And it was a very lengthy

13:54  24   process.  They were taken over to the city shop next

13:54  25   door and had a bunch of people witnessing the

13:54  1    destruction of the weapons, the guns, by cutting them

13:54  2    up with acetylene torch and saws.

13:54  3        Q.  Okay.  When Sylvia Pirtle turned that AR-15 in

13:54  4    question and the 9 millimeter pistol in, what -- tell

13:54  5    me what happened to that rifle from the moment when she

13:54  6    turned in the rifle, received the receipt and left?

13:54  7        A.  I don't have knowledge of what exactly happened

13:54  8    with that.

13:54  9        Q.  Who would?

13:54 10        A.  Detective Moore.  He is the one on the receipt

13:54 11    that took the weapon in.

13:55 12        Q.  Okay.  Now, as I understand it, you directly

13:55 13    issued that gun in question, the AR-15, to Mr. Moore;

13:55 14    is that correct, Officer Moore?

13:55 15        A.  Through Captain Vasquez.

13:55 16        Q.  By that, do you mean -- did Captain Vasquez

13:55 17    seek your permission before he did it or tell you after

13:55 18    he had done the act?

13:55 19        A.  Before he did it.

13:55 20        Q.  And you approved the issuance of that weapon to

13:55 21    R. D. Moore before Vasquez actually allowed him to take

13:55 22    the gun?

13:55 23        A.  Yes.

13:55 24        Q.  And that would be before R. D. Moore removed

13:55 25    that gun from the physical premises of the Harlingen

13:55  1    Police Department?

13:55  2        A.   Yes.

13:55  3        Q.   When would that have been?

13:55  4        A.   Somewhere in '95 or early '96.

13:56  5        Q.   What chain of custody procedures were in place

13:56  6    to document R. D. Moore's receipt of the weapon?

13:56  7        A.   None.

13:56  8        Q.   You have told us about four weapons that were

13:56  9    given to two officers, Vasquez and Moore, to take

13:56 10    home -- or to have in their possession; is that

13:56 11    correct?

13:56 12        A.   They were assigned weapons, yes, sir.

13:56 13        Q.   And was that assigned to them for their

13:56 14    official use?

13:56 15        A.   Yes, sir.

13:56 16        Q.   And were they allowed to use them for their

13:56 17    personal use?

13:56 18        A.   No, sir.

13:56 19        Q.   How would you distinguish in a case of a rifle

13:56 20    such as an AR-15 between official use and personal use?

13:56 21        A.   It's city property.  No city property is

13:56 22    allowed to be used for personal use.

13:56 23        Q.   If I were a friend of R. D. Moore and went to

13:57 24    his house and said, "Gosh, I like that AR-15, I would

13:57 25    like to go shoot it out on the range," would that be an

13:57 1    appropriate use of that rifle?

13:57 2        A.  No, sir.

13:57 3        Q.  If R. D. Moore's son said, "Pop, I would like

13:57 4    to take that rifle out and shoot it," would that be an

13:57 5    acceptable use of that weapon?

13:57 6        A.  No, sir.

13:57 7        Q.  Were any instructions, written or oral, given

13:57 8    to R. D. Moore, to not allow his son to use that weapon

13:57 9    or anybody else?

13:57 10       A.  No, sir, not by me.

13:57 11       Q.  By anybody?

13:57 12       A.  Not to my knowledge, no, sir.

13:57 13       Q.  At all times while you were chief, did R. D.

13:57 14   Moore's job title remain the same as detective police

13:57 15   officer?

13:58 16       A.  His job title?

13:58 17       Q.  Uh-huh.

13:58 18       A.  Yes, sir, I believe so.

13:58 19       Q.  And his assignments remained the same?

13:58 20       A.  No, sir.  I believe right when I took over, I

13:58 21   believe he was still evidence custodian and working on

13:58 22   the finger print computer, which was very

13:58 23   time-consuming.  So I moved Detective Gilbert Gonzalez

13:58 24   in as evidence custodian and put Moore in charge of the

13:58 25   AFIS, the Automated Fingerprint Identification System,

13:58   1    full-time.

13:58   2        Q.  Okay.  Did he have any job responsibilities

13:58   3    other than the -- what do you call it -- A --

13:58   4        A.  AFIS.

13:58   5        Q.  -- AFIS?

13:59   6        A.  Did he have any other job responsibilities?

13:59   7        Q.  Yes, sir.

13:59   8        A.  I assigned him to be one of the sharpshooters

13:59   9    on -- to be called out on my call only.

13:59  10        Q.  Is there any documentation of that order?

13:59  11        A.  No, sir.

13:59  12        Q.  Is there any proof existent or extant anywhere

13:59  13    other than your testimony today as you sit here that

13:59  14    you so made that assignment?

13:59  15             MR. LOCKHART:  I'm going to object just to

13:59  16    the extent that's confusing.

13:59  17        A.  Is there any documentation other than my word?

13:59  18        Q.  Uh-huh.

13:59  19        A.  There's no written documentation that I can

13:59  20    remember.

13:59  21        Q.  Okay.  Any dictation into a recording machine,

13:59  22    any computer recitation?

13:59  23        A.  No, sir.

14:00  24        Q.  Any personal notes to that effect?

14:00  25        A.  No, sir.

14:26 1    ever needed.

14:26 2        Q.   Is that it?

14:26 3        A.   Yes, sir.

14:26 4        Q.   Did you tell them that he had been issued that

14:26 5    gun because he was a member of the SWAT team?

14:26 6        A.   No, sir.

14:26 7        Q.   Did you tell them that he was issued that AR-15

14:26 8    because he had been a member of the SWAT team?

14:26 9        A.   He was issued weapons, guns, rifles, because he

14:27 10   had been a member of a SWAT team.

14:27 11       Q.   What disciplinary action, if any, did the City

14:27 12   of Harlingen take against you as a result of this

14:27 13   incident in question?

14:27 14       A.   None.

14:27 15       Q.   What disciplinary action, if any, did the City

14:27 16   of Harlingen take against Mr. R. D. Moore as a result

14:27 17   of or as a consequence of the incidents in question?

14:27 18       A.   None.

14:27 19       Q.   Did you inform the public through a press

14:27 20   release that the Harlingen Police Department had a SWAT

14:27 21   team and that Mr. Moore possessed the weapon because he

14:27 22   was on call 24 hours, on 24-hour call as a sharpshooter

14:28 23   for that team?

14:28 24       A.   I believe that was on July 10, to reporter Lara

14:28 25   Martinez, where I said he was on 24-hour call as a

14:30  1      A.  My wife's.

14:30  2      Q.  Only yours and your wife's?

14:30  3      A.  And my two daughters.

14:30  4      Q.  Nobody in the city played any role in that?

14:30  5      A.  That's correct.

14:30  6      Q.  Nobody in the city encouraged you to resign?

14:30  7      A.  That's true.

14:30  8      Q.  Did the resignation and the undertaking of the

14:30  9  position as lieutenant involve a decrease in pay, or

14:30 10  did your pay stay the same?

14:30 11      A.  A decrease.

14:30 12      Q.  How much?

14:30 13      A.  About $17,000 a year.

14:30 14      Q.  Did you recommend any disciplinary action be

14:30 15  taken against R. D. Moore for his allowing his son

14:31 16  access to the police department weapon, the AR-15?

14:31 17      A.  No, sir.

14:31 18      Q.  Would you classify Ernest Moore as an unstable

14:31 19  person?

14:31 20      A.  Would I classify him?  When, today?

14:31 21      Q.  No, when he was alive.

14:31 22      A.  I had not seen him since he was about five

14:31 23  years old nor heard anything about him until July 7,

14:31 24  '98.  So I couldn't make a determination.

14:31 25      Q.  Knowing what you know today, would he be

14:33  1    unstable person is.  You don't have any concept of what

14:33  2    an unstable person is?

14:33  3        A.  My -- from my understanding of his condition,

14:33  4    as you put it, I wouldn't use the word unstable.  He

14:33  5    had some problems.

14:33  6        Q.  Was he using cocaine?

14:33  7        A.  I understand the autopsy report showed cocaine

14:33  8    in his system.

14:33  9        Q.  How long had he been using cocaine?

14:33  10       A.  I have no idea, sir.

14:33  11       Q.  Had he had trouble controlling his temper over

14:33  12   a long period of time?

14:33  13       A.  I have heard that.  And I have heard that he

14:34  14   was put on Prozac for that.

14:34  15       Q.  Wouldn't -- would you agree with me that a

14:34  16   person on Prozac who has problems that require him to

14:34  17   be on Prozac should not be entrusted with an AR-15

14:34  18   rifle?

14:34  19       A.  I -- no, sir.  It would vary on the situation.

14:34  20   I don't have an AR-15 rifle at my house.  I have got a

14:34  21   loaded shotgun there in the closet.  My wife is on

14:34  22   Prozac.  She is not unstable.

14:34  23       Q.  She certainly doesn't use cocaine, does she?

14:34  24       A.  No, sir.

14:34  25       Q.  If a person is on Prozac and is using cocaine,

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

14:48  1      A.   Vasquez, Moore, Garcia, Foist.  I think that

14:48  2  was it.

14:49  3      Q.   Did you talk to the Texas Rangers?

14:49  4      A.   Yes, sir, I talked to Jaramillo.

14:49  5      Q.   Okay.  Did anybody suggest to you at any time

14:49  6  that Officer Moore might be somewhat at fault for

14:49  7  having that AR-15 in a place where his son had access

14:49  8  to it?

14:49  9      A.   No, sir.

14:49  10     Q.   He did keep that rifle.  You found it in a

14:49  11 place where his son had access to it, didn't you?

14:49  12     A.   Yes, sir.

14:49  13     Q.   Tell us where he kept it.

14:49  14     A.   In a gun vault in -- I think his son's bedroom

14:49  15 in their house.

14:49  16     Q.   Are you satisfied that R. D. Moore knew about

14:49  17 the instability of his son?

14:49  18     A.   From what I know today, I believe Moore knew

14:49  19 that his son had some problems several years before

14:50  20 July 7, 1998, was having a few minor problems about

14:50  21 that time with a girlfriend.  From what I know, Moore

14:50  22 didn't -- he protected that rifle as best he could.

14:50  23     Q.   How?

14:50  24     A.   Well, it was assigned city problem.

14:50  25     Q.   How did he protect it?

14:50  1      A.  He locked it in a gun safe and he had a key.

14:50  2      Q.  But the gun safe was in his son's room?

14:50  3      A.  But he had the key.

14:50  4      Q.  How did his son get the cabinet open?

14:50  5      A.  He tells me that his son stole the key from him

14:50  6  apparently that morning.

14:50  7      Q.  Does that surprise you?

14:50  8      A.  Does it surprise me?  Really, nothing surprises

14:50  9  me anymore.  It's very unfortunate.  The key stolen off

14:51 10  a man's key ring.  He had no prior indicators, from

14:51 11  what I understand, that his son was going to do

14:51 12  anything like this.

14:51 13      Q.  When did his son steal it from him?  What did

14:51 14  your investigation show?

14:51 15      A.  Apparently between midnight and 5:00 a.m. on

14:51 16  July 7th.

14:51 17      Q.  What did R. D. Moore know at midnight or

14:51 18  midnight plus one minute on July the 7th, 1998, about

14:51 19  his son and his son's condition?

14:51 20      A.  That his son wasn't home yet.  He went to bed.

14:51 21      Q.  And that's all he knew?

14:51 22      A.  I don't know.  You will have to ask him what he

14:51 23  knew.

14:51 24      Q.  That's all you know he knew?

14:51 25      A.  That's all I know he knew.

16:10  1    Sergeant Shawn Foist was mainly inform him of what had

16:10  2    occurred and discipline him?

16:10  3        A.  And advise him, "Don't do this again."

16:11  4        Q.  Again, Sergeant Shawn Foist works under a

16:11  5    lieutenant; isn't that correct?

16:11  6        A.  Yes, ma'am.

16:11  7        Q.  And who is that lieutenant?

16:11  8        A.  Whoever would have been his shift lieutenant at

16:11  9    that time, and I have no idea who that would have been.

16:11  10       Q.  And it was not the lieutenant or the captain's

16:11  11   duty to discipline him, not yours?

16:11  12       A.  Only the chief of police can issue suspensions

16:11  13   without pay.

16:11  14       Q.  Okay.  But isn't that only based upon -- let me

16:11  15   ask you this.  Can you discipline someone based solely

16:11  16   upon your investigation and not upon any

16:11  17   recommendation?

16:11  18       A.  Pardon me?

16:11  19       Q.  Can you discipline a Harlingen Police

16:11  20   Department officer without being informed by their

16:11  21   captain or lieutenant of a suspension?

16:11  22       A.  Yes, ma'am.

16:11  23       Q.  So you don't have -- in order to discipline an

16:11  24   employee, you don't have to seek the recommendation of

16:12  25   the lieutenant or the captain under which that police

16:12  1    officer rank is working?

16:12  2        A.   That is correct.

16:12  3        Q.   You can do that entirely at your own

16:12  4    discretion?

16:12  5        A.   Yes, ma'am.

16:12  6        Q.   How many times have you done that?

16:12  7        A.   Done what?

16:12  8        Q.   Have you ever suspended or disciplined an

16:12  9    employee without a captain or lieutenant recommending

16:12  10   such?

16:12  11       A.   Yes, ma'am.

16:12  12       Q.   How many times have you done that?

16:12  13       A.   Maybe two or three.

16:12  14       Q.   What were those two other incidents involving?

16:12  15       A.   When information was brought to me directly

16:12  16   instead of coming up from the supervisors or an

16:12  17   employee would bring me some information immediately

16:12  18   and directly, I would take charge of it.  I remember

16:12  19   two of them that I took charge of the investigation,

16:13  20   didn't even consult with the supervisors, their

16:13  21   immediate supervisors.  One was an officer that was

16:13  22   seen by another officer of forcing someone in a cell

16:13  23   and hitting him, and I fired that officer.  Another --

16:13  24       Q.   Who was that officer?  Excuse me.

16:13  25       A.   That was a man by the name of Claro Rocha.

16:32  1    or something involving this case, and I was

16:33  2    investigated by the Cameron County Sheriff's Department

16:33  3    and DA's office, and that was no-billed by the grand

16:33  4    jury.  Those are the only ones that I can think of

16:33  5    where I have been investigated personally by an agency.

16:33  6        Q.  At the time of the incident in question, how

16:33  7    many hours did you work on any given week?  What was

16:33  8    your working hours?

16:33  9        A.  Normal day, about 11 hours, about 60 hours a

16:33 10    week.

16:33 11        Q.  What time do working hours begin for you?

16:34 12        A.  Basically my day was 7:00 to 6:00, with at

16:34 13    least one meeting a week at night.  7:00 a.m. to 6:00

16:34 14    p.m. with at least one meeting at night.

16:34 15        Q.  Who lives with you?

16:34 16        A.  My wife and one child right now.

16:34 17        Q.  Have you ever had a CB in your home?

16:34 18        A.  CB?

16:34 19        Q.  Uh-huh, CB radio?

16:34 20        A.  Yes, ma'am, when I was -- back around 1965,

16:34 21    '66.

16:34 22        Q.  Do you have any other electronic means of

16:34 23    communicating with the Harlingen Police Department from

16:34 24    your home?

16:34 25        A.  Oh, I have got a portable radio that's

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755    (956) 542-1020

16:34   1   assigned, but I don't turn it on unless I'm at work.

16:34   2      Q.   Would this portable radio that you were talking

16:34   3   about that's assigned to you, what all can you listen

16:35   4   to --

16:35   5      A.   Harlingen --

16:35   6      Q.   -- when you turn it on?

16:35   7      A.   Harlingen Police Department.

16:35   8      Q.   Okay.

16:35   9      A.   Fire department, city maintenance crews.

16:35   10      Q.   Can you listen to Cameron County Sheriff's --

16:35   11      A.   No, ma'am.

16:35   12      Q.   -- Department --

16:35   13      A.   They are --

16:35   14      Q.   -- communications?

16:35   15      A.   They are on a totally different radio

16:35   16   frequency.   It's a different system entirely.

16:35   17      Q.   Are there any agencies, law enforcement

16:35   18   agencies that you can listen to via your portable

16:35   19   radio?

16:35   20      A.   We have got the 800 trucking system, and the

16:35   21   way that works, it's -- no, ma'am.   Just Harlingen PD.

16:35   22      Q.   Now, with respect to the Harlingen PD and the

16:35   23   communications that you can listen to, are those merely

16:35   24   incoming calls to the dispatcher and outgoing calls

16:35   25   from the dispatcher?

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

16:35  1      A.   Right.  We can talk and they can talk back.

16:35  2      Q.   Okay.  Can you have this radio on and listen to

16:35  3  other people's conversations with the dispatcher?

16:36  4      A.   Yes.

16:36  5      Q.   Okay.  So by merely turning on this portable

16:36  6  radio, if a call is being made to the dispatcher about

16:36  7  an impending crime, you can have the opportunity to

16:36  8  listen to what is transpiring?

16:36  9      A.   Yes, ma'am.

16:36  10     Q.   At the time of the incident in question, did

16:36  11  you have a portable radio in your home?

16:36  12     A.   Yes, ma'am.

16:36  13     Q.   This portable radio, how large is it?

16:36  14     A.   Standard walkie-talkie, about three inches by

16:36  15  two inches by eight inches.

16:36  16     Q.   Is there any mechanism by which calls may be

16:36  17  recorded by you through this portable radio?

16:36  18     A.   All radio traffic, be it portable radio or unit

16:36  19  radio, is recorded at the dispatch center.

16:36  20     Q.   Okay.  What is your -- what is the reason for

16:37  21  you having a portable radio in your home?

16:37  22     A.   I just -- every officer is assigned a portable

16:37  23  radio.  That way, they don't have to fight for them at

16:37  24  shift change, and you have got communications.

16:37  25     Q.   Could you -- with this portable radio, could

16:37 1    you have communications merely to the Harlingen Police

16:37 2    Department, or could you actually call a police officer

16:37 3    in their police unit?

16:37 4        A.  You could do that.

16:37 5        Q.  What else can you do?  Besides calling the

16:37 6    Harlingen Police Department dispatcher and calling a

16:37 7    police officer in a patrol unit, what other calls can

16:37 8    you make?

16:37 9        A.  That's it.  You would be talking to everyone on

16:37 10   that frequency that has got that radio turned on, which

16:37 11   would mean I can talk to any officer that has got that

16:37 12   radio on or a dispatcher, or vice versa.

16:37 13       Q.  If you were to communicate with someone through

16:37 14   this portable radio, would other police officers be

16:38 15   privy to your conversations?

16:38 16       A.  Yes, ma'am.

16:38 17       Q.  So you're privy to all conversations being

16:38 18   conducted via this portable radio?

16:38 19       A.  Yes, ma'am.

16:38 20       Q.  On the date of the incident in question, on

16:38 21   July 7, 1998, did you listen to any conversations via

16:38 22   your portable radio?

16:38 23       A.  Yes, ma'am.

16:38 24       Q.  When was that?

16:38 25       A.  After the shooting stopped, that's when I heard

16:38  1    Sergeant Foist radioing in and hollering that "There's
16:38  2    an officer shot, suspect was down, send an ambulance,
16:38  3    send air care."
16:38  4        Q.  Mr. Scheopner, is it your testimony that you
16:38  5    for the first time listened to communications via your
16:38  6    portable radio after the shooting had begun?
16:38  7        A.  Yes, ma'am.
16:38  8        Q.  So although you had been informed of a double
16:39  9    homicide in Rio Hondo, you did not turn on your
16:39 10    portable radio?
16:39 11        A.  No, ma'am, it was on.  We don't have the same
16:39 12    frequency as Cameron County.
16:39 13        Q.  I understand that.  But then going back to my
16:39 14    question, when was the first time that you had this
16:39 15    portable radio on the incident in question?
16:39 16        A.  Well, when I go to work, I have got a radio in
16:39 17    the car.  The radio is turned on.  I also have a
16:39 18    portable radio on me.  Okay.  If the radio in the car
16:39 19    is on, I don't need to turn the portable radio on.
16:39 20    It's like turning on two AM radios.  Why.  Okay?  I
16:39 21    didn't have the portable radio on at all.  I had the
16:39 22    mobile radio, which was working the same, and there was
16:39 23    no dispatching traffic about this incident on there.
16:39 24        Q.  When you talk about the mobile radio, are you
16:39 25    referring to the mobile radio in your car?

16:40  1      A.   Yes, ma'am, the police radio, the police band

16:40  2   radio.

16:40  3      Q.   And that was the first time that you had turned

16:40  4   on that mobile radio?

16:40  5      A.   When I got out in the car.  I received a phone

16:40  6   call at home.  I ran out, got in the car.  And I had

16:40  7   the radio turned on.  But the first radio traffic about

16:40  8   this incident was after the shooting, which would have

16:40  9   been about 15, 20 minutes after I left my house.

16:40  10     Q.   Okay.  So is it your testimony to this jury

16:40  11  that after you were called by the dispatcher informing

16:40  12  you about a double homicide, you did not turn on your

16:40  13  portable radio that you had on you?

16:40  14     A.   I did not turn on the portable radio, that's

16:40  15  correct.

16:40  16     Q.   Why did you not think that it would be prudent

16:40  17  to turn on your portable radio?

16:40  18     A.   Because I left the house about a minute later,

16:40  19  and I turned on the mobile radio.

16:40  20     Q.   So it's your testimony to this jury that within

16:40  21  a minute after you received that call, that you left in

16:41  22  your unit and turned on this mobile radio?

16:41  23     A.   Yes, ma'am.

16:41  24          THE VIDEOGRAPHER:   I need to go off record

16:41  25  to change my tape.

1           (Off the record)

16:51   2           (Brief recess)

16:51   3      Q.  Mr. Scheopner, we were talking a little bit

16:51   4  before break about the first time that you turned on

16:51   5  your mobile radio, portable radio.  Would you state to

16:51   6  the jury when that was again, please?

16:51   7      A.  When I left my house about five minutes until

16:51   8  7:00 on July 7th, 1998.

16:51   9      Q.  So is it your testimony that immediately after

16:51  10  receiving a telephone call from the dispatcher, you

16:51  11  left to -- you went in your car on your way to the

16:51  12  Harlingen Police Department?

16:51  13      A.  No, ma'am.  I got in the car and went toward

16:51  14  R. D. Moore's house in San Benito.

16:52  15      Q.  Do you have any objection to someone calling

16:52  16  you on the telephone in your home?

16:52  17      A.  No, ma'am.

16:52  18      Q.  Is there any reason why the dispatcher called

16:52  19  you on the telephone and not via the portable radio?

16:52  20      A.  Because the radio was turned off.

16:52  21      Q.  Okay.  After you received this telephone call,

16:52  22  when was the next time that you heard any communication

16:52  23  on the mobile radio with regards to the incident in

16:52  24  question?

16:52  25      A.  Right after the shootings.

16:52  1      Q.   So is it your testimony that from the time the

16:52  2  dispatcher contacted you to the time that you were in

16:52  3  your car, you heard no communications on that mobile

16:52  4  radio until after the shooting had taken place?

16:52  5      A.   Yes, ma'am.

16:52  6      Q.   So there was no communications by any police

16:53  7  officers, no calls being made to the Harlingen police

16:53  8  during that period of time?

16:53  9      A.   I don't recall any.  That was right about shift

16:53  10  change.

16:53  11     Q.   Okay.  You also testified earlier that the

16:53  12  first people that you contacted after receiving the

16:53  13  dispatcher's call was to the Harlingen Police

16:53  14  Department; is that correct?

16:53  15     A.   No, ma'am.

16:53  16     Q.   Who was that to?

16:53  17     A.   To Sergeant Foist directly.

16:53  18     Q.   And how did you -- where did you contact him

16:53  19  at?  Where was Sergeant Foist?

16:53  20     A.   On the cell phone that the sergeants carry.

16:53  21     Q.   Okay.  So besides having a portable radio,

16:53  22  police officers also carry cell phones?

16:53  23     A.   We have a cell phone in each patrol sergeant

16:53  24  and patrol lieutenants' vehicles.

16:53  25     Q.   Okay.  And are these cell phones the type of

16:53  1   cell phones that you can carry on your person?

16:54  2        A.  Yes, ma'am, portable.

16:54  3        Q.  Okay.  Now, what is your recollection as far as

16:54  4   where Sergeant Shawn Foist was at when you communicated

16:54  5   with him?

16:54  6        A.  He and Sergeant Garcia were in a police car

16:54  7   driving from the police station towards R. D. Moore's

16:54  8   house in San Benito.

16:54  9        Q.  So it's your testimony to this jury that when

16:54  10  you had communication with Sergeant Foist it was when

16:54  11  he was en route with Mike Garcia to the crime scene?

16:54  12       A.  Yes, ma'am.

16:54  13       Q.  Okay.  Is there any reason why you contacted

16:54  14  him via cell phone and not mobile radio?

16:54  15       A.  Yes, ma'am.

16:54  16       Q.  What was that?

16:54  17       A.  I could talk longer, more freely.  In case they

16:54  18  needed a police radio for any emergencies, they could

16:54  19  use it.  We would be tying it up, and I could get more

16:54  20  information without everybody hearing what was going

16:54  21  on.

16:54  22       Q.  And by doing that, other people would not

16:54  23  listen to what you were stating to these -- to the

16:55  24  sergeant?

16:55  25       A.  Right.

BRYANT & STINGLEY, INC.
McAllen          Harlingen         Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

16:55 1  Q. And you opted to communicate with them via the

16:55 2 cell phone?

16:55 3  A. Right.

16:55 4  Q. When you communicated with them via the cell

16:55 5 phone, were there any communications going on on your

16:55 6 mobile radio that you could hear?

16:55 7  A. No, ma'am, not that I remember.

16:55 8  Q. Okay. What cell phone number did Sergeant

16:55 9 Shawn Foist have at that time?

16:55 10  A. The sergeants carry 290-1381.

16:55 11  Q. Was Mike Garcia and Shawn Foist driving in the

16:55 12 same vehicle en route to the crime scene?

16:55 13  A. Yes, ma'am.

16:55 14  Q. Okay. Was it -- Sergeant Shawn Foist the first

16:55 15 person that you spoke to in that conversation?

16:55 16  A. Yes, ma'am.

16:56 17  Q. Is there a log of the phone calls that are made

16:56 18 out of your cell phone, the cell phone that is assigned

16:56 19 to you?

16:56 20  A. It comes on the bill.

16:56 21  Q. Okay. And what company, telephone company, is

16:56 22 the one that bills for those services?

16:56 23  A. Southwestern Bell Mobile Systems.

16:56 24  Q. And so if I were to go back into July of 1998,

16:56 25 I would see the calls that you placed from your cell

16:57 1    A.   No, ma'am, I do not.

16:57 2    Q.   Do you remember how long your conversation was

16:57 3  with Shawn Foist?

16:57 4    A.   Oh, a minute and a half, two minutes.

16:57 5    Q.   Okay.  Would you tell the jury again, please,

16:57 6  what exactly it was that you told Sergeant Shawn Foist.

16:57 7    A.   I don't know exactly, but the gist of it was to

16:58 8  verify the information that the dispatcher had given

16:58 9  me.  I asked him what was going on, and he said they

16:58 10  had a teletype there it was a double murder, shooting

16:58 11  in Rio Hondo, and that Ernest Moore, R. D. Moore's son,

16:58 12  was a suspect, and that the sheriff's department had

16:58 13  requested they come out to Moore's house because the

16:58 14  sheriff's department was out there.  They wanted to

16:58 15  search Moore's house.  Moore was not cooperating.  They

16:58 16  found Ernest's pickup there and figured he was in the

16:58 17  area.

16:58 18         They also requested that I go out there.

16:58 19  I told them, "You're going to get out there before I

16:58 20  am, I am just now leaving my house.  Tell Moore to

16:58 21  cooperate."

16:58 22         I asked them if Moore knew what was going

16:58 23  on.  And he said, Foist said, "I don't think he does."

16:58 24  I said, "Well, tell them to tell him exactly what was

16:58 25  what."

17:01 1    Q.   After you spoke to Sergeant Foist.

17:01 2    A.   Then I called R. D.'s phone, his home number

17:01 3    and got ahold of his wife.

17:01 4    Q.   Okay.  So immediately after your conversation

17:01 5    with Sergeant Foist, you called R. D. Moore?

17:01 6    A.   Yes, ma'am.

17:01 7    Q.   And how had you obtained his phone number?

17:01 8    A.   From the dispatcher.

17:01 9    Q.   And had you obtained that earlier in the first

17:01 10   conversation with the dispatcher?

17:01 11   A.   Yes, ma'am.

17:01 12   Q.   Again, you opted to communicate with R. D.

17:01 13   Moore via your cell phone and his cordless phone and

17:01 14   not portable radio?

17:01 15   A.   Yes, ma'am.

17:01 16   Q.   Or not mobile radio?

17:01 17   A.   I didn't think he would have a radio on.

17:01 18   Q.   You didn't think he would turn on the radio

17:01 19   after he had learned what had just transpired?

17:02 20   A.   I didn't think so, no, ma'am.

17:02 21   Q.   But you did not try?

17:02 22   A.   No, ma'am.

17:02 23   Q.   Did you ever have any conversations with the

17:02 24   range master about R. D. Moore's proficiency with an

17:02 25   AR-15?

17:29  1    the City of Harlingen?

17:29  2                MR. LOCKHART:  But -- I'm going to object

17:29  3    to that.  That's -- now you have gotten awful broad.  I

17:30  4    mean, are you talking about lawyers?  What are you

17:30  5    talking about?

17:30  6                MS. LOPEZ:  Let me go back.

17:30  7        Q.  Prior to being served with the notice of suit

17:30  8    in this case --

17:30  9        A.  Okay.

17:30  10       Q.  -- did you ever have any communications with

17:30  11   anyone besides the city manager, besides the city

17:30  12   attorney and the assistant city manager about the

17:30  13   incident in question?

17:30  14               MR. LOCKHART:  And I think that's a fair

17:30  15   question, but let me tell you, we're taking the

17:30  16   position -- and I think it's a very solid position,

17:30  17   that once we got notice of the claims, that that's

17:30  18   sufficient, and I think that was on August 12th is when

17:30  19   we got the first notice.

17:30  20               MS. LOPEZ:  Okay, I'm --

17:30  21               MR. LOCKHART:  So --

17:30  22               MS. LOPEZ:  -- I'm not going to ask him

17:30  23   about --

17:30  24               MR. LOCKHART:  Yeah.

17:30  25               MS. LOPEZ:  -- those conversations.

17:33  1  A. Regarding this incident?

17:33  2  Q. Yes.

17:33  3  A. No, ma'am.

17:34  4  Q. Do you know if anyone else besides yourself had

17:34  5 any communication with individuals with the Texas

17:34  6 Municipal League?

17:34  7  A. Let's back up -- pardon me -- for that last

17:34  8 question.  Have I ever talked to any individuals about

17:34  9 this --

17:34  10  Q. Were there any other individuals that you know

17:34  11 of that had any communications --

17:34  12  A. Well, I --

17:34  13  Q. -- with people at the Texas Municipal League?

17:34  14  A. -- we -- yes, ma'am.  It was last year we went

17:34  15 to a mediation in Austin, and there were Texas

17:34  16 Municipal League personnel there.  I talked to them

17:34  17 about the case.

17:34  18  Q. Besides that, Mr. Scheopner, do you know of

17:34  19 anyone else at any other time?

17:34  20  A. No, ma'am, other than the last time was at that

17:34  21 mediation that fell through in Austin.

17:34  22  Q. You mentioned earlier that you have -- or

17:34  23 you're in charge of disciplining people that worked

17:35  24 with the Harlingen Police Department, as chief of

17:35  25 police?

17:35   1     A.   As chief of police, I'm the only one that can

17:35   2     discipline the civil service employees, yes, ma'am.

17:35   3     Q.   Tell me some of the reasons that you have ever

17:35   4     had to discipline an employee.

17:35   5     A.   Drunk off duty, wrecking a police vehicle,

17:35   6     AWOL, abuse of sick leave, unnecessary force, those.

17:35   7     Q.   You have also disciplined employees of yours

17:36   8     for pushing prisoners in cell units?

17:36   9     A.   Unnecessary use of force, yes, ma'am.

17:36 10     Q.   And you have also disciplined another employee,

17:36 11     Shawn Foist, for communicating about the incident in

17:36 12     question?

17:36 13     A.   For basically making a media release, without

17:36 14     authorization, of a crime that was under investigation,

17:36 15     yes, ma'am.

17:36 16     Q.   Did you ever discipline R. D. Moore for

17:36 17     obtaining the AR-15?

17:36 18     A.   No, ma'am.

17:36 19     Q.   Do you feel that R. D. Moore violated any

17:36 20     written policies of the Harlingen Police Department?

17:36 21     A.   No, ma'am.

17:36 22     Q.   Did you violate any written policies of the

17:36 23     Harlingen Police Department?

17:36 24     A.   No, ma'am.

17:36 25     Q.   Who is in charge of disciplining you, if that's

BRYANT & STINGLEY, INC.
McAllen       Harlingen       Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

17:37 1   at all possible, if there are any violations by the

17:37 2   chief of police that are made?

17:37 3        A.   The city manager is.

17:37 4        Q.   You have also disciplined an employee for

17:37 5   spitting on a prisoner?

17:37 6        A.   I did?  I don't remember that.

17:37 7        Q.   Do you recall doing that?

17:37 8        A.   For spitting on a prisoner?

17:37 9        Q.   Yes.

17:37 10       A.   I don't recall that.

17:37 11       Q.   Okay.

17:37 12       A.   I may have.

17:37 13       Q.   Okay.  Do you feel that it was a violation of

17:37 14  the directive for R. D. Moore to not demonstrate

17:37 15  proficiency in the AR-15?

17:37 16       A.   No, ma'am.

17:37 17       Q.   You didn't think that he violated one of the

17:37 18  directives that requires proficiency in the operation

17:37 19  of a weapon?

17:37 20       A.   The way I read the directives -- I'll need to

17:38 21  see them again, but I don't see where he violated

17:38 22  anything.

17:38 23       Q.   Is it your testimony to this jury that you

17:38 24  don't have to show proficiency in the operation of a

17:38 25  weapon before it is issued?

17:38  1     A.   You don't have to show proficiency in a weapon
17:38  2   before it is issued.  You have a one -- 12 month, one
17:38  3   calendar year span of time to show proficiency per
17:38  4   TCLEOSE regulations.
17:38  5     Q.   And R. D. Moore never showed that proficiency,
17:38  6   did he?
17:38  7     A.   He did not by the time he was assigned to carry
17:38  8   that weapon, no.
17:38  9     Q.   And at the time of the incident in question, he
17:38 10   still had not shown proficiency?
17:38 11     A.   Correct.
17:38 12     Q.   And you did not feel that he violated the
17:38 13   Harlingen PD's departmental directives in not doing so?
17:38 14     A.   Our policies say that you must -- no, ma'am, I
17:38 15   don't.
17:39 16     Q.   Did you ever provide any documentation to the
17:39 17   FBI or to the Texas Rangers?
17:39 18     A.   I don't recall.  If they asked for something,
17:39 19   they were furnished it immediately.
17:39 20     Q.   Were you ever provided any documentation by the
17:39 21   FBI and the Texas Rangers?
17:39 22     A.   I got some copies of some affidavits.  I
17:39 23   believe it was just Foist's and Garcia's and Moore's
17:39 24   from them that I needed for my internal investigations.
17:39 25     Q.   Was there anything else that you obtained?

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

215

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
2                  BROWNSVILLE DIVISION

3  ARTURO GUILLERMO SALINAS   )(
   AND ELISA HERNANDEZ         )(
4  HERRERA SALINAS             )(
                               )(
5  VS.                         )(  CIVIL ACTION NO. B-98-162
                               )(
6  CITY OF HARLINGEN, TEXAS,   )(
   R.D. MOORE, AND             )(
7  JIM SCHEOPNER               )(
                               )(
8          AND                 )(
                               )(
9  GILBERTO M. RODRIGUEZ,      )(
   INDIVIDUALLY AND ON         )(
10 BEHALF OF HIS MINOR         )(
   DAUGHTER, MEGAN SUZANNE     )(
11 RODRIGUEZ, AND STEPHEN L.   )(
   WILLIAMS AND WIFE, ROBYN    )(
12 S. WILLIAMS, SURVIVING      )(
   BENEFICIARIES OF THE        )(
13 DECEASED                    )(
                               )(
14 VS.                         )(  CIVIL ACTION NO. B-98-163
                               )(
15 CITY OF HARLINGEN, TEXAS,   )(
   R.D. MOORE, AND             )(
16 JIM SCHEOPNER               )(
                               )(
17         AND                 )(
                               )(
18 RAUL RODRIGUEZ              )(
                               )(
19 VS.                         )(  CIVIL ACTION NO. B-99-070
                               )(
20 CITY OF HARLINGEN,          )(
   R.D. MOORE, AND             )(
21 JIM SCHEOPNER               )(

22 - - - - - - - - - - - - - - - - - - - - - - - - - -
          VIDEOTAPED DEPOSITION OF JAMES JOSEPH SCHEOPNER
23                 MAY 19, 2000
                   VOLUME 2
24 - - - - - - - - - - - - - - - - - - - - - - - - - -

25   REPORTED BY MAUREEN STINGLEY, CERTIFIED COURT REPORTER

                    BRYANT & STINGLEY, INC.
      McAllen         Harlingen         Brownsville
   (956)618-2366   (956)428-0755   (956)542-1020

00 JUN -1   P 2: 02

APPEARANCES

1

2  COUNSEL FOR PLAINTIFFS ARTURO GUILLERMO SALINAS
   AND ELISA HERNANDEZ HERRERA SALINAS; and GILBERTO
3  M. RODRIGUEZ, INDIVIDUALLY AND ON BEHALF OF HIS
   MINOR DAUGHTER, MEGAN SUZANNE RODRIGUEZ, AND
4  STEPHEN L. WILLIAMS AND WIFE, ROBYN S. WILLIAMS,
   SURVIVING BENEFICIARIES OF THE DECEASED:
5
        BROADUS A. SPIVEY
6       SPIVEY & AINSWORTH
        48 East Avenue
7       Austin, Texas 78701

8
   COUNSEL FOR PLAINTIFF RAUL RODRIGUEZ:
9
        SONIA LOPEZ
10      LAW OFFICES OF RAMON GARCIA
        222 West University Drive
11      Edinburg, Texas 78539

12
   COUNSEL FOR DEFENDANTS CITY OF HARLINGEN, TEXAS,
13 JIM SCHEOPNER, AND R.D. MOORE:

14      TOM LOCKHART
        ADAMS & GRAHAM, L.L.P.
15      222 East Van Buren, West Tower
        Harlingen, Texas 78550
16

17      ALSO PRESENT:   Wally Gonzalez, Videographer
                        Stephen Williams
18                      Gilberto M. Rodriguez
                        Gilberto Rodriguez
19                      Arturo G. Salinas

20

21

22

23

24

25

1    Videotaped deposition of JAMES JOSEPH

2    SCHEOPNER, who resides in Cameron County, Texas, taken

3    by BROADUS A. SPIVEY, Attorney for PLAINTIFFS ARTURO

4    GUILLERMO SALINAS AND ELISA HERNANDEZ HERRERA SALINAS;

5    and GILBERTO M. RODRIGUEZ, INDIVIDUALLY AND ON BEHALF

6    OF HIS MINOR DAUGHTER, MEGAN SUZANNE RODRIGUEZ, AND

7    STEPHEN L. WILLIAMS AND WIFE, ROBYN S. WILLIAMS,

8    SURVIVING BENEFICIARIES OF THE DECEASED; reported by

9    MAUREEN STINGLEY, Certified Court Reporter in and for

10   the State of Texas, on MAY 19, 2000, in the offices of

11   ADAMS & GRAHAM, L.L.P., 222 East Van Buren, West Tower,

12   Harlingen, Texas, pursuant to the Federal Rules of

13   Civil Procedure.

14                           INDEX

15   Appearances ................................... 216

16   Examination by Ms. Lopez ...................... 218
     Examination by Mr. Spivey ..................... 321
17   Examination by Ms. Lopez....................... 327
     Examination by Mr. Spivey...................... 337
18   Examination by Mr. Lockhart.................... 338
     Examination by Ms. Lopez....................... 345
19   Examination by Mr. Spivey...................... 347

20   Errata Sheet/Signature Page.................... 350

21   Reporter's Certificate......................... 351

22                   DOCUMENTARY EVIDENCE
     SCHEOPNER
23   Ex. No.    Description                          Iden.

24     27       Calibre Press Street Survival Newsline
               No. 288 (with yellow highlighting) ... 343

25

BRYANT & STINGLEY, INC.
McAllen            Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

10:03 1     A.  Yes, ma'am.

10:03 2     Q.  But nonetheless they must have some training?

10:03 3     A.  Yes, ma'am.

10:03 4     Q.  Okay.  Now, with the respect to the training

10:03 5  there is required, are there any state laws that

10:03 6  require that a certain amount of training be obtained

10:03 7  before a weapon is issued?

10:03 8     A.  No, ma'am.

10:03 9     Q.  Okay.  Are there any federal laws that require

10:03 10  that a certain amount of training be obtained before a

10:03 11  weapon is issued?

10:03 12     A.  No, ma'am.

10:03 13     Q.  Are there any laws or any other policies that

10:03 14  you're aware of that would require that a certain

10:04 15  amount of training be done before a weapon is issued?

10:04 16     A.  No, ma'am.

10:04 17     Q.  So there are no guidelines with respect to the

10:04 18  amount of training that someone must have?

10:04 19     A.  That's correct.

10:04 20     Q.  Now, with respect to an officer being able to

10:04 21  show proficiency in the use of an authorized weapon,

10:04 22  are there guidelines with respect to what is necessary

10:04 23  in order to show proficiency?

10:04 24     A.  Yes, ma'am.

10:04 25     Q.  And what are those guidelines?

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

10:04 1     A.   The Texas Commission on Law Enforcement

10:04 2  Officers, Standards and Education has some guidelines

10:04 3  on proficiency.

10:04 4     Q.   And there are also some guidelines -- there are

10:04 5  also some guidelines that require that continuing

10:04 6  proficiency training be maintained by that police

10:04 7  officer?

10:04 8     A.   By the police department the officer is

10:04 9  employed by.

10:04 10    Q.   And that is -- would be in compliance with the

10:04 11 TCLEOSE rules, as well?

10:04 12    A.   Yes, ma'am.

10:04 13    Q.   And R. D. Moore had never received any training

10:05 14 in the Olympic Arms which is the subject of this

10:05 15 incident by the Harlingen Police Department?

10:05 16    A.   That's correct.

10:05 17    Q.   And you have no knowledge that he had, in the

10:05 18 20 years prior to the issuance of the Olympic Arms,

10:05 19 that he had received any training in the operation of

10:05 20 the Olympic Arms?

10:05 21    A.   He had received training on an extremely

10:05 22 similar weapon, just a different make, same model.

10:05 23    Q.   Okay, and what make was that?

10:05 24    A.   That was on an AR-15.

10:05 25    Q.   Okay, and when was that?

# TEXAS DEPARTMENT OF PUBLIC SAFETY
## TEXAS RANGER DIVISION

### VOLUNTARY STATEMENT

**STATE OF TEXAS**

**COUNTY OF CAMERON**

My name is Sylvia Pirtle and my address is 2609 Lotus Harlingen, Texas and my phone number is 956-425-7032. I was born in San Antonio Texas on 02-03-56.
I am not employed, I am a House wife. I wish to state the following information:

I would like to state that for about 3 or 4 years off and on I have discussed with my husband ( Dr. Thomas Emmett Pirtle, III) about getting rid of some weapons that we had in our house. We live on 2609 Lotus in Harlingen, Texas and there had been break ins in the neighborhood and it made me uneasy having assault type weapons in the house. I did not want to take a chance in anyone breaking into our home and the weapons getting into the wrong hands. My husband and I agreed that we should get rid of the two assault type weapons which were the 9 mm Luger Interdynamic Model # KG-99, Serial # L 5588 Semi Automatic Pistol and Cal. 556 Nato-Olympic Arms Model # XM-177EZ, Serial # FA-0698, Semi Automatic Rifle.

On June 23, 1995 at approximately 4:00 PM, I went to the Harlingen Police Department and spoke to the lady which I believe was a dispatcher, and asked her I wanted to speak to a detective. The lady contacted a detective in which I met in the lobby area of the Police Dept.. I informed the detective that I had two weapons in my car that I wanted to turn in. I don't remember if I went out to the car and brought in the weapons to him or if the detective went with me to get the weapons.

I followed the detective (whom I can't recall who he was) to the evidence room. In the evidence room is where Moore took over the weapons. I was in the evidence room for about 15 minutes, just talking about the evidence room because I found it to be fascinating. I told him that I wanted the weapons to be destroyed, I don't recall what he said but, he implied that he would take care of it. It appeared that we were through with the transaction and It appeared that he expected me to leave. I asked him for a receipt, I don't know the exact words he used but he stated something to the effect that I did not need one. I told him that I was not leaving until I received one. Moore then filled out a receipt and gave it to me with the information on the weapons. He also signed the receipt on the bottom part of it. At approximately 1:20 PM on 07-16-98, Texas Ranger Rodolfo C. Jaramillo displayed three (3) photographs of assault rifles and asked me and my husband to look at and see if we could identify as the weapon I turned into the Harlingen Police Department. We both picked out the weapon we recognized as the AR-15. My husband and I both signed the back of the photograph and stated the time and date.

Witness _____  Witness _____

Signature of Witness _____

Date: 07/16/98   Time: 1:29 PM

Property; is that right?

A.  We don't have -- we did not have any type of form made up for receiving.  This is a receipt for return of property, but if you'll look down at the bottom line, it says, "Both weapons turned over to HPD for disposal."

Q.  Yes, sir.

A.  We quite frequently use the same receipt because we didn't have a receipt for receiving them. We weren't set up for it.

Q.  But that's what was happening here, is a civilian was bringing in a couple of weapons to the police department, right?

A.  Yes, sir.

Q.  And there wasn't -- what you're telling me was that there wasn't a form already in existence for accepting those weapons like that?

A.  No, sir.  We had no form in existence for receiving them.

Q.  But this officer filling out this form is utilizing an existing form to indicate that a local civilian --

A.  That was the common practice, yes, sir.

Q.  -- had brought in weapons and he was making a note of that?

15:19  1    or Moore and that we were to be ready if he called on

15:20  2    us.  And I take that to mean, you know, get your

15:20  3    equipment ready, have it ready.  I mean, you can't take

15:20  4    guns out and sight them in when they say they need --

15:20  5    they've have got a bank downtown that's just being

15:20  6    robbed.

15:20  7        Q.  Right.  Now, back on Exhibit No. 4, it looks

15:20  8    like that when he took these weapons in, Detective

15:20  9    Moore wrote down, "Both weapons turned over to HPD for

15:20 10    disposal."  Is that what it looks like to you?

15:20 11        A.  Yeah, I believe so.  That's what it looks like

15:20 12    it says.

15:20 13        Q.  And do you know why the Olympic Arms rifle was

15:20 14    not disposed of?

15:20 15        A.  I thought it was disposed of when it was issued

15:21 16    to him.

15:21 17        Q.  What do you mean by that?  I mean, he wants it

15:21 18    destroyed.

15:21 19        A.  No one said it needed to be destroyed.  Do you

15:21 20    know what disposal means?  It means reissue.

15:21 21        Q.  Is that what it means to you?

15:21 22        A.  You had better look it up in the dictionary

      23    because it's the last thing on the file -- before we

15:21 24    sign it, it says, "The purchaser must sign this form"

15:21 25    -- this is an assault rifle -- "before it is to be

# Title 37. PUBLIC SAFETY AND CORRECTIONS

019327

## Part VII. TEXAS COMMISSION ON LAW ENFORCEMENT OFFICER STANDARDS AND EDUCATION

### Chapter 211. ADMINISTRATION DIVISION

#### § 211.104 Minimum Standards for Annual Firearms Proficiency

(a) For purposes of this section, the term "firearms" shall mean any kind of handgun, shotgun, rifle, or fully automatic weapon that is carried by the individual officer in an official capacity on or off duty, and shall not include any other firearm weapon or any baton, tear gas, restraining or non-lethal stunning device, animal, or other nonfirearm weapon. The term "kind" means caliber or gauge and action type. The term "duty ammunition" means only that ammunition required or permitted by the agency to be carried on duty.

(b) This section does not prevent an agency from establishing weapons proficiency standards that exceed the minimum standards of the commission.

(c) The minimum standards for any annual proficiency course of fire shall be:

(1) use of any target capable of being scored;

(2) a minimum passing score of 70% of the total possible score;

(3) for handguns, a minimum of 50 rounds, including at least five rounds of duty ammunition, fired at ranges from point-blank to at least 15 yards with at least 20 rounds at or beyond seven yards, including at least one timed reloading;

(4) for shotguns, a minimum of five rounds of duty ammunition fired at a range of at least 15 yards;

(5) for rifles, a minimum of 20 rounds of duty ammunition fired at a range of at least 100 yards, however an agency may, in its discretion, allow a range of less than 100 yards but not less than 50 yards if the minimum passing score is raised to 90%;

(6) for fully automatic weapons, a minimum of 30 rounds of duty ammunition fired at ranges from seven to at least 10 yards, including at least one timed reload, with at least 25 rounds fired in full automatic, short bursts of two or three rounds, and at least five rounds fired semi-automatic, if possible with the weapon;

(7) demonstration of proficiency in the care and cleaning of the weapon used; and

(8) in external inspection by the control officer or a range officer, firearms instructor, or gunsmith designated by that control officer to determine the safety and functioning of the weapon.

(d) Any standard contained in this section may, upon agency request, be waived by the executive

CNSPDF - www.fineist.com

019028

director or, if denied and upon petition, may be the subject of an administrative hearing held to determine waiver based upon proof by the agency that its proposal meets or exceeds the commission's standards. Specifically, the annual proficiency course of fire may consist of different short courses that may be fired on one or more days as long as they cumulatively meet or exceed the standards found in this section.

(e) Each agency or entity that employs three or more peace officers shall:

(1) appoint a firearms proficiency control officer who must meet only those qualifications set by that agency;

(2) require each peace officer that it employs to demonstrate firearms proficiency to that control officer at least once each calendar year; and

(3) maintain records of this proficiency which shall not be forwarded to the commission.

(f) The first calendar year to demonstrate firearms proficiency shall be 1988. An amendment to this section only affects an annual proficiency course of fire that begins after the effective date of the amendment.

(g) The effective date of this section is January 5, 1988.

**Source:** The provisions of this § 211.104 adopted to be effective January 5, 1988, 12 TexReg 4855; amended to be effective February 1, 1989, 13 TexReg 6273.

## Return to Section Index

# Memo

**To:**       Captain L.Rubio

**From:**     Sgt.T.Hushen

**Subject:**  Training Records

**Date:**     October 15, 1998

This is memo is in response to the one issued on 10-15-98. Attached to this memo you will find a list of all of our officers and the weapons that they have qualified with. According to T.C.L.E.O.S.E. Rule and regulations and Department Rules and Regulations each officer must qualify with his on and off duty weapon every calender year, (See attached rules and regulations.) According to my records all officers are up to date on their requirements. For certification with our shotgun T.C.L.E.O.S:E. requires that an officer fire five rounds into a target at 15 yards. This requirement has been fulfilled. When an officer qualifies with his handgun he will then be sent out to fire a shotgun.

When the department switched handguns in 1996 from the Smith and Wesson 9mm to the Berreta 9MM, every officer was given a transition course. Since the department has not changed weapons, no other transition course has been given. Attached you will find a copy of the transition course.

According to my files I do not have any records indicating that any officer has qualified with an automatic or semi-automatic rifle. Since according to T.C.L.E.O.S.E. rules and regulations the minimum standards for qualification with a rifle we must have a range that is at least 50 yards the range that we are currently using is only 15 yards long. Hopefully with the recently acquired land we hope to build our new range and this will no longer pose a problem.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ARTURO GUILLERMO SALINAS    )(
AND ELISA HERNANDEZ         )(
HERRERA SALINAS             )(
                            )(
VS.                         )(   CIVIL ACTION NO. B-98-162
                            )(
CITY OF HARLINGEN, TEXAS,   )(
R.D. MOORE, AND             )(
JIM SCHEOPNER               )(
                            )(
        AND                 )(
                            )(
GILBERTO M. RODRIGUEZ,      )(
INDIVIDUALLY AND ON         )(
BEHALF OF HIS MINOR         )(
DAUGHTER, MEGAN SUZANNE     )(
RODRIGUEZ, AND STEPHEN L.   )(
WILLIAMS AND WIFE, ROBYN    )(
S. WILLIAMS, SURVIVING      )(
BENEFICIARIES OF THE        )(
DECEASED                    )(
                            )(
VS.                         )(   CIVIL ACTION NO. B-98-163
                            )(
CITY OF HARLINGEN, TEXAS,   )(
R.D. MOORE, AND             )(
JIM SCHEOPNER               )(
                            )(
AND                         )(
                            )(
RAUL RODRIGUEZ              )(
                            )(
VS.                         )(   CIVIL ACTION NO. B-99-070
                            )(
CITY OF HARLINGEN,          )(
R.D. MOORE, AND             )(
JIM SCHEOPNER               )(

- - - - - - - - - - - - - - - - - - - - - - - - - -
    VIDEOTAPED DEPOSITION OF RALPH DWAYNE MOORE
              MAY 19, 2000
               VOLUME 1
- - - - - - - - - - - - - - - - - - - - - - - - - -

  REPORTED BY MAUREEN STINGLEY, CERTIFIED COURT REPORTER

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

APPEARANCES

COUNSEL FOR PLAINTIFFS ARTURO GUILLERMO SALINAS
AND ELISA HERNANDEZ HERRERA SALINAS; and GILBERTO
M. RODRIGUEZ, INDIVIDUALLY AND ON BEHALF OF HIS
MINOR DAUGHTER, MEGAN SUZANNE RODRIGUEZ, AND
STEPHEN L. WILLIAMS AND WIFE, ROBYN S. WILLIAMS,
SURVIVING BENEFICIARIES OF THE DECEASED:

       BROADUS A. SPIVEY
       SPIVEY & AINSWORTH
       48 East Avenue
       Austin, Texas 78701

COUNSEL FOR PLAINTIFF RAUL RODRIGUEZ:

       SONIA LOPEZ
       LAW OFFICES OF RAMON GARCIA
       222 West University Drive
       Edinburg, Texas 78539

COUNSEL FOR DEFENDANTS CITY OF HARLINGEN, TEXAS,
JIM SCHEOPNER, AND R.D. MOORE:

       TOM LOCKHART
       ADAMS & GRAHAM, L.L.P.
       222 East Van Buren, West Tower
       Harlingen, Texas 78550

COUNSEL FOR DEFENDANT R.D. MOORE, INDIVIDUALLY:

       WALTER J. PASSMORE
       PASSMORE, WALKER & TWENHAFEL, L.L.P.
       2424 North 10th, Suite 200
       McAllen, Texas 78502


       ALSO PRESENT:   Wally Gonzalez, Videographer
                       Stephen Williams
                       Gilberto M. Rodriguez
                       Gilberto Rodriguez
                       Arturo G. Salinas

1    Videotaped deposition of RALPH DWAYNE MOORE,

2    who resides in Cameron County, Texas, taken by BROADUS

3    A. SPIVEY, Attorney for PLAINTIFFS ARTURO GUILLERMO

4    SALINAS AND ELISA HERNANDEZ HERRERA SALINAS; and

5    GILBERTO M. RODRIGUEZ, INDIVIDUALLY AND ON BEHALF OF

6    HIS MINOR DAUGHTER, MEGAN SUZANNE RODRIGUEZ, AND

7    STEPHEN L. WILLIAMS AND WIFE, ROBYN S. WILLIAMS,

8    SURVIVING BENEFICIARIES OF THE DECEASED; reported by

9    MAUREEN STINGLEY, Certified Court Reporter in and for

10   the State of Texas, on MAY 19, 2000, in the offices of

11   ADAMS & GRAHAM, L.L.P., 222 East Van Buren, West Tower,

12   Harlingen, Texas, pursuant to the Federal Rules of

13   Civil Procedure.

14

15

16                              INDEX

17   Appearances ................................... 2

18   Examination by Mr. Spivey ..................... 4

19   Errata Sheet/Signature Page ................... 66

20   Reporter's Certificate ........................ 67

21                   DOCUMENTARY EVIDENCE
     SCHEOPNER
22   Ex. No.      Description                    Iden.

23      28        Diagram of R. D. Moore's house ....... 9

24

25

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

14:01  1    being near-sighted.  I have got her beat.  Okay, so

14:01  2    den, the door opens into the den.  You opened that door

14:01  3    and went into the garage?

14:01  4        A.  Yes, sir.

14:01  5        Q.  All right.  Now, what was the purpose of going

14:01  6    through the garage or to the garage?

14:01  7        A.  I don't know.

14:01  8        Q.  Okay.

14:01  9        A.  We went in through the garage, and he wasn't

14:01  10   out there.

14:01  11       Q.  Okay.  And then where did you go?

14:01  12       A.  We walked out to his pickup truck, which was

14:01  13   parked approximately right here.

14:01  14       Q.  Okay.  You might just put PU or something in

14:01  15   there so we will know what that is.

14:02  16       A.  There's two trucks.

14:02  17       Q.  Okay.

14:02  18       A.  This is E., Ernest's truck and this is --

       19       Q.  Okay.

14:02  20       A.  -- the city's truck.

14:02  21       Q.  The two trucks pretty well side by side?

14:02  22       A.  Yes.

14:02  23       Q.  And what kind of vehicle did he have at that

14:02  24   time?

14:02  25       A.  He had a '97 Chevrolet pickup.

14:03  1    door out -- did you go first to his vehicle?

14:03  2         A.  Yes, I walked out to his pick up.

14:03  3         Q.  And tell us what you did then.

14:03  4         A.  I noticed that it had been damaged.

14:03  5         Q.  How -- tell us how you noticed that.

14:03  6         A.  By observing the front fenders and the rearview

14:03  7    mirrors being bent.

14:03  8         Q.  All right.  What did that indicate to you?

14:03  9         A.  That he had wrecked his vehicle.

14:03 10         Q.  Was it a pretty serious dent or damage, or was

14:03 11    it something that would indicate --

14:03 12         A.  No, it's -- it was fairly light damage.

14:03 13         Q.  Okay.  Now, so that I don't just have to keep

14:04 14    saying what happened next, just kind of carry me

14:04 15    through what happened following that.  Just tell me

14:04 16    what happened.

14:04 17         A.  You want me to tell it to you in --

14:04 18         Q.  Yeah, yeah.

14:04 19         A.  -- narrative form?

14:04 20         Q.  Yes, narrate it to me, please.

14:04 21         A.  As I walked out there and I observed the pickup

14:04 22    truck, I could see that it was damaged.  My wife showed

14:04 23    me the inside of the truck, and I could see that there

14:04 24    was ammunition of the 7.65 by 39 caliber on the

14:04 25    floorboard.  At this point I did become concerned.  I

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755      (956)542-1020

14:29  1      A.   I just did.

14:29  2      Q.   All right.   Where were you and where were they?

14:29  3      A.   They were in my garage.   We were standing next

14:29  4    to this door inside the garage getting ready to go in

14:29  5    the house.

14:29  6      Q.   Was it before the search of the house?

14:29  7      A.   Yes.

14:29  8      Q.   All right.   When were you first aware that

14:29  9    there were any Border Patrol people on your -- on or

14:29 10    near your premises?

14:29 11      A.   They were showing up everywhere.   I knew they

14:29 12    were there.   I know Border Patrol.

14:29 13      Q.   Okay.   Now, what did you say specifically to

14:29 14    the Border Patrol?

14:30 15      A.   It was in -- it was in the process of going

14:30 16    into the house to search for Ernest.   And I have a

14:30 17    small house, maybe 15 or 1,600 square feet.   And the

14:30 18    rooms are not all that big.   You get too many people in

14:30 19    there and it would be chaos if something was to

14:30 20    actually start.   And we started to enter the house, and

14:30 21    two Border Patrol agents walked up into the garage and

14:30 22    started to just walk into my house, and I didn't feel

14:30 23    at that time there was any federal violations

14:30 24    committed, and my son was not an illegal alien, and I

14:30 25    asked them if they could not enter.

14:30  1      Q.  All right, now, what specific words did you

14:30  2  use?

14:30  3      A.  I don't recall.  "You can't enter.  I don't

14:30  4  want you to enter."  I don't really know.

14:30  5      Q.  Did you tell them that, "My son is not an

14:30  6  illegal alien"?

14:30  7      A.  Yes, I'm sure I did.

14:30  8      Q.  Did you make a comment one way or the other

14:30  9  about whether the Border Patrol had jurisdiction?

14:30  10     A.  No.  I just asked them not to enter.

14:31  11     Q.  And when you asked them not to enter, did they

14:31  12  comply?

14:31  13     A.  Yes, they did.  They complied.

14:31  14     Q.  Did you tell them anything about your

14:31  15  suspecting your son was somewhere around the premises?

14:31  16     A.  No.

14:31  17     Q.  Did you tell the Border Patrol anything about

14:31  18  your son may be armed and dangerous?

14:31  19     A.  Those are the only two Border Patrol that I had

14:31  20  a confrontation with.  It was an Anglo male and a

14:31  21  female.

14:31  22     Q.  Okay.  And do you know now who that female was?

14:31  23     A.  Not precisely, no.

14:31  24     Q.  Who do you think it was?

14:31  25     A.  Possibly it was Susan Rodriguez.

14:31   1       Q.   Okay, and who do you know now that Anglo male

14:31   2   to be?

14:31   3       A.   I believe it was Hupp.   Do you recall?

14:32   4       Q.   George Hupp, would that be?

14:32   5       A.   One of them, or Riley.   I think it was Hupp.

14:32   6       Q.   Okay.   Did you know that officer?

14:32   7       A.   No.

14:32   8       Q.   Did you know either officer?

14:32   9       A.   No.

14:32  10       Q.   Were you acquainted with any of the Border

14:32  11   Patrol?

14:32  12       A.   No.

14:32  13       Q.   Now, when you told them they could not enter,

14:32  14   did you say anything else to them other than they could

14:32  15   not enter?

14:32  16       A.   That my son wasn't an illegal alien.

14:32  17       Q.   Okay, did you tell them to get off your

14:32  18   premises?

14:32  19       A.   No.

14:32  20       Q.   Did you tell them anything else besides that

14:32  21   they could not enter your premises and that your son

14:32  22   was not an illegal alien?

14:32  23       A.   No.

14:32  24       Q.   What did they do after you told them that?

14:32  25   What did the Border Patrol agents do when you told them

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

14:42  1    A.  I just -- I saw the Colt.  I grabbed it, but

14:42  2  there was no clips.

14:42  3    Q.  Okay.

14:42  4    A.  I immediately set it down and went for my

14:42  5  service pistol.

14:42  6    Q.  Okay, did you notice that the other AR-15 was

14:42  7  missing?

14:42  8    A.  No.

14:42  9    Q.  Had you placed all those guns in the cabinet,

14:42 10  or had your son placed some of them in there?

14:42 11    A.  Well, I placed the AR-15 and the Olympic in

14:42 12  there, yes.

14:42 13    Q.  All right, had your son placed some of the

14:42 14  other weapons in there?

14:42 15    A.  Yes.

14:42 16    Q.  Did he own some of the weapons, or were they

14:42 17  all yours?

14:42 18    A.  No, he owned most -- some of them, I owned some

14:42 19  of them.

14:42 20    Q.  All right.  Did both of you keep the weapons in

14:42 21  that cabinet for safekeeping?

14:43 22    A.  Yes.

14:43 23    Q.  Did both of you have access to that cabinet?

14:43 24    A.  Yes.

14:43 25    Q.  Did anybody besides you and he have a key to

14:43  1    the gun cabinet?

14:43  2        A.  No.

14:43  3        Q.  How about your wife?

14:43  4        A.  No.

14:43  5        Q.  But you did have a key?

14:43  6        A.  Yes.

14:43  7        Q.  And your son had a key?

14:43  8        A.  Yes.

14:43  9        Q.  How long had you had a key to that gun cabinet?

14:43  10       A.  From the time we purchased it.

14:43  11       Q.  All right.  When you say "We purchased it," who

14:43  12   is the "we"?

14:43  13       A.  We -- my son and I purchased it together.

14:43  14       Q.  Okay.

14:43  15       A.  It was split, a split venture.

14:43  16       Q.  Where did you get that?

14:43  17       A.  The safe?

14:43  18       Q.  Yes.

14:43  19       A.  I believe it was purchased at Johnny's True

14:43  20   Value.

14:43  21       Q.  I'm sorry?

14:43  22       A.  Johnny's True Value.

14:43  23       Q.  Okay.  In where?  What time?

14:43  24       A.  In Harlingen.

14:43  25       Q.  Harlingen.  And is that business still in

14:45 1    A.   Yes.

14:45 2    Q.   Shot guns and rifles?

14:45 3    A.   Yes.

14:45 4    Q.   Deer?

14:45 5    A.   Yes.

14:45 6    Q.   Did you have any trophies, stuffed animals?

14:45 7    A.   None to speak of.  No -- well, they are too

14:45 8    expensive to mount.  So we don't mount them.

14:45 9    Q.   Did you have any mounts?

14:45 10   A.   We have got one set of mounts that my wife

14:45 11   shot.

14:45 12   Q.   Okay.  How many times would you say you had

14:45 13   been hunting with your son?

14:45 14   A.   It would be a guess.

14:45 15   Q.   Okay.

14:45 16   A.   Oh, hundreds, I guess you could say.

14:45 17   Q.   And I think I asked you, but would that include

14:45 18   some bird hunting too, with shotguns?

14:46 19   A.   Yes.

14:46 20   Q.   Was he a good shot with a shotgun?

14:46 21   A.   Fair, I would say.

14:46 22   Q.   How about yourself?

14:46 23   A.   No, I'm bad.

14:46 24   Q.   Did you say words -- these words or words to

14:46 25   this effect to anybody, that your gun had said -- that

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ARTURO GUILLERMO SALINAS    )(
AND ELISA HERNANDEZ         )(
HERRERA SALINAS             )(
                            )(
VS.                         )(   CIVIL ACTION NO. B-98-162
                            )(
CITY OF HARLINGEN, TEXAS,   )(
R.D. MOORE, AND             )(
JIM SCHEOPNER               )(
                            )(
         AND                )(
                            )(
GILBERTO M. RODRIGUEZ,      )(
INDIVIDUALLY AND ON         )(
BEHALF OF HIS MINOR         )(
DAUGHTER, MEGAN SUZANNE     )(
RODRIGUEZ, AND STEPHEN L.   )(
WILLIAMS AND WIFE, ROBYN    )(
S. WILLIAMS, SURVIVING      )(
BENEFICIARIES OF THE        )(
DECEASED                    )(
                            )(
VS.                         )(   CIVIL ACTION NO. B-98-163
                            )(
CITY OF HARLINGEN, TEXAS,   )(
R.D. MOORE, AND             )(
JIM SCHEOPNER               )(
                            )(
AND                         )(
                            )(
RAUL RODRIGUEZ              )(
                            )(
VS.                         )(   CIVIL ACTION NO. B-99-070
                            )(
CITY OF HARLINGEN,          )(
R.D. MOORE, AND             )(
JIM SCHEOPNER               )(

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ORAL DEPOSITION OF RALPH DWAYNE MOORE
MAY 23, 2000
VOLUME 2                    ORIGINAL

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

REPORTED BY MAUREEN STINGLEY, CERTIFIED COURT REPORTER

BRYANT & STINGLEY, INC.
McAllen            Harlingen           Brownsville
(956) 618-2366   (956) 428-0755      (956) 542-1020

APPEARANCES

COUNSEL FOR PLAINTIFFS ARTURO GUILLERMO SALINAS
AND ELISA HERNANDEZ HERRERA SALINAS; and GILBERTO
M. RODRIGUEZ, INDIVIDUALLY AND ON BEHALF OF HIS
MINOR DAUGHTER, MEGAN SUZANNE RODRIGUEZ, AND
STEPHEN L. WILLIAMS AND WIFE, ROBYN S. WILLIAMS,
SURVIVING BENEFICIARIES OF THE DECEASED:

> BROADUS A. SPIVEY
> SPIVEY & AINSWORTH
> 48 East Avenue
> Austin, Texas 78701

COUNSEL FOR PLAINTIFF RAUL RODRIGUEZ:

> SONIA LOPEZ
> LAW OFFICES OF RAMON GARCIA
> 222 West University Drive
> Edinburg, Texas 78539

COUNSEL FOR DEFENDANTS CITY OF HARLINGEN, TEXAS,
JIM SCHEOPNER, AND R.D. MOORE:

> TOM LOCKHART
> ADAMS & GRAHAM, L.L.P.
> 222 East Van Buren, West Tower
> Harlingen, Texas 78550

COUNSEL FOR DEFENDANT R.D. MOORE, INDIVIDUALLY:

> WALTER J. PASSMORE
> PASSMORE, WALKER & TWENHAFEL, L.L.P.
> 2424 North 10th, Suite 200
> McAllen, Texas 78502

Oral deposition of RALPH DWAYNE MOORE, who resides in Cameron County, Texas, taken by BROADUS A. SPIVEY, Attorney for PLAINTIFFS ARTURO GUILLERMO SALINAS AND ELISA HERNANDEZ HERRERA SALINAS; and GILBERTO M. RODRIGUEZ, INDIVIDUALLY AND ON BEHALF OF HIS MINOR DAUGHTER, MEGAN SUZANNE RODRIGUEZ, AND STEPHEN L. WILLIAMS AND WIFE, ROBYN S. WILLIAMS, SURVIVING BENEFICIARIES OF THE DECEASED; reported by MAUREEN STINGLEY, Certified Court Reporter in and for the State of Texas, on MAY 23, 2000, in the offices of ADAMS & GRAHAM, L.L.P., 222 East Van Buren, West Tower, Harlingen, Texas, pursuant to the Federal Rules of Civil Procedure.

### INDEX

Appearances .................................... 69

Examination by Mr. Spivey .................... 71

Examination by Ms. Lopez ..................... 105

Examination by Mr. Lockhart .................. 204

Examination by Mr. Spivey .................... 212

Examination by Ms. Lopez ..................... 227

Errata Sheet/Signature Page .................. 236

Reporter's Certificate ....................... 237

### DOCUMENTARY EVIDENCE

| SCHEOPNER Ex. No. | Description | Iden. |
| --- | --- | --- |

(No exhibits marked for identification)

BRYANT & STINGLEY, INC.

| McAllen | Harlingen | Brownsville |
| --- | --- | --- |
| (956)618-2366 | (956)428-0755 | (956)542-1020 |

13:32  1    A.  My house had been burglarized several times

13:32  2  back in the early or mid '70s, after I bought the

13:32  3  house.

13:32  4    Q.  Okay, any guns taken in any of those?

13:33  5    A.  No.  The first time I caught the individual

13:33  6  that did it and got the property back.  The second time

13:33  7  was a motorcycle.  The third time they took TVs and

13:33  8  VCRs.  I didn't get that property back.  And they -- at

13:33  9  that time they did take a .22 single action, which I

13:33  10  did get back later, and a pump BB gun, if I recall.

13:33  11    Q.  In that first burglarization, did they take any

13:33  12  weapons?

13:33  13    A.  No, the juveniles, I don't -- if they did, I

13:33  14  wasn't aware of it because my service pistol was

13:33  15  hanging on the door.  They took the handcuffs out of

13:33  16  the gun belt but they didn't take the revolver.

13:33  17    Q.  What about -- you told me the other day when

13:33  18  you bought that Remington gun safe.  But when was that?

13:34  19    A.  I don't recall the date that I bought it, but

13:34  20  we did buy it from Johnny's True Value.

13:34  21    Q.  And I don't have my notes handy, but how --

13:34  22  about how long had you had that?

13:34  23    A.  Several years.

13:34  24    Q.  When your wife woke you up, you put on your

13:34  25  shorts, went in Ernest's room and saw the gun cabinet

13:34  1    open.

13:34  2         A.  Yes.

13:34  3         Q.  You realized, I think you told us the other

13:34  4    day, that the AK-47 was gone?

13:34  5         A.  Yes.

13:34  6         Q.  Now, how did you come in possession of that

13:34  7    gun?

13:35  8         A.  How did I come in possession of it?

13:35  9         Q.  Yes.

13:35  10        A.  I purchased it through Captain Vasquez.

13:35  11        Q.  Through who?

13:35  12        A.  Captain Vasquez.

13:35  13        Q.  Okay.  Did you use it in your line of duty, or

13:35  14   was it just kept for personal use?

13:35  15        A.  No, I did not use it in the line of duty.  I

13:35  16   purchased it for Ernest, with his money.

13:35  17        Q.  Okay.  Do you still have that weapon?

13:35  18        A.  No.

13:35  19        Q.  Do you know where it is?

13:35  20        A.  I think the Texas Department of Public Safety

13:35  21   has it in their laboratories in Austin.

13:35  22        Q.  When you saw -- I believe you told us that you

13:35  23   noticed the AK-47 was missing.  Did you notice anything

13:35  24   else was missing at that time?

13:35  25        A.  No, I didn't do an inventory.  I just knew that

CutePDF - www.tw.lexsla.com

14:03  1    officer in La Feria, and I was at his house on many
14:03  2    occasions, picking his father up or dropping his father
14:03  3    up and just visiting his father.
14:03  4         Q.  Okay, how about recently, in the 1990s, had you
14:03  5    been to his home, or in the late 80s?
14:03  6         A.  It has been a long time.  I don't recall in the
14:03  7    last 10 years that I have been there.
14:03  8         Q.  What kind of activities did you all engage in
14:03  9    outside your professional relationship that you have?
14:03 10         A.  Before he was chief, as a patrolman, we had
14:04 11    been fishing together on occasion, but once he became
14:04 12    chief, we had no more social life with each other.
14:04 13         Q.  And why was that?
14:04 14         A.  I guess boss and employee relationship.
14:04 15         Q.  Did he tell you that he could no longer have a
14:04 16    friendship or personal relationship with you, or did
14:04 17    you just both understand that that was improper?
14:04 18         A.  Well, back in the '70s, I became a detective,
14:04 19    and so did he close to the same period of time, and we
14:04 20    were closer then because we talked more.  But we didn't
14:04 21    visit each other or have parties with each other.
14:04 22              But then when he made sergeant, he went
14:04 23    back to patrol and I stayed a detective.  And so that
14:04 24    kind of severed our ties for many, many years until he
14:04 25    made chief.  So that relationship with Chief Scheopner

14:38 1    weapon?

14:38 2        A.  I believe it refers to shotguns and pistols,

14:38 3    and then it's up to the chief of police to decide on

14:38 4    any other weapon, or the supervisor in charge.

14:38 5        Q.  So then you're not aware that, whenever a

14:38 6    weapon is issued to you, you must receive training in

14:38 7    its use?

14:38 8        A.  No.

14:38 9        Q.  Are you aware --

14:38 10       A.  I was aware that you needed to qualify with

14:38 11   that particular weapon, which I was going to attempt to

14:38 12   do, which I never got around to doing.

14:38 13       Q.  Okay.  When you say qualify, do you mean the

14:38 14   same thing as show proficiency, or does that mean two

14:38 15   different things to you?

14:38 16       A.  Just to show proficiency, it was all

14:38 17   qualification things.

14:38 18       Q.  And you were not proficient in the use of the

14:38 19   AR-15 at the time?

14:38 20       A.  Yes, I was very proficient.

14:38 21       Q.  What kind of training had you had besides

14:38 22   attending a training session in Quantico, Virginia, in

14:39 23   1978?

14:39 24       A.  I was in the United States Navy from 1965 to

14:39 25   1969, where we shot guns regularly off the fan tail of

14:53  1    this, and it might be beneficial to the department and

14:54  2    to the citizens of Harlingen if I were to be ready and

14:54  3    available with it.

14:54  4        Q.  But did you specifically ask him whether you

14:54  5    could carry the AR-15 into your home or take it to your

14:54  6    home?

14:54  7        A.  Yes.

14:54  8        Q.  And what was his response?

14:54  9        A.  He didn't see any problem why not.

14:54  10       Q.  The Mini 14, did you also keep it in your home

14:54  11   at times?

14:54  12       A.  No.

14:54  13       Q.  You never took it home?

14:54  14       A.  It was kept there at the police department.

14:54  15       Q.  How many times had you taken the AR-15 to your

14:54  16   home?

14:54  17       A.  It was on a daily basis.

14:54  18       Q.  How many times did your son fire the AR-15?

14:54  19       A.  Once that I am aware of.

14:54  20       Q.  Had he ever mentioned to you that he had

14:54  21   borrowed your AR-15?

14:54  22       A.  No.

14:54  23       Q.  Did you ever have any reason to suspect that he

14:55  24   had used your AR-15 on a prior occasion?

14:55  25       A.  No.

16:01  1    service.  He hadn't seen it himself.  He was just

16:01  2    informed that this was out there and it was available

16:01  3    to anyone in the world, and so I got myself -- I

16:01  4    located it, subscribed to the service, and I pulled it

16:01  5    up myself on my own computer.

16:01  6        Q.  So you looked it up?

16:01  7        A.  Yes, ma'am.

16:01  8        Q.  Did you print it out?

16:01  9        A.  Yes, ma'am.

16:01 10        Q.  And who did you provide a copy to?

16:01 11        A.  Sergeant Foist.  I provided a copy to the Texas

16:01 12    Ranger that was investigating the case.  I provided a

16:01 13    copy to the investigator with the sheriff's department.

16:01 14    I think that's it.

16:01 15        Q.  Did you provide a copy to the City of

16:02 16    Harlingen?

16:02 17        A.  I don't think so.

16:02 18        Q.  You didn't provide a copy to the city manager?

16:02 19        A.  No, ma'am.

16:02 20        Q.  Were you ever asked to conduct an investigation

16:02 21    involving the incident in question?

16:02 22        A.  Which incident?

16:02 23        Q.  The incident in question, the July 7, 1998

16:02 24    incident.

16:02 25        A.  Yes, ma'am.

15:33  1    probably have been to my home.

15:33  2         Q.   Which one has been there the most?

15:33  3         A.   None.   They are all there at the same amount of

15:33  4    time.

15:33  5         Q.   When was the last time prior to 1998 that

15:33  6    someone had been there at your home?

15:33  7         A.   Okay, the last time, it was the year before the

15:33  8    incident, in July of '98, the annual police department

15:33  9    fishing tournament.   We always have the fish fry at my

15:33 10    house, and all the officers that fish in that bring

15:33 11    their wives, and we will fry the fish up we caught.

15:33 12         Q.   Now, these police officers that came to your

15:33 13    home in 1997, were these non-ranking police officers or

15:34 14    ranking and non-ranking?

15:34 15         A.   Ranking and non-ranking.

15:34 16         Q.   Was Chief Scheopner one of those people?

15:34 17         A.   No.

15:34 18         Q.   Was Captain Vasquez one of those people?

15:34 19         A.   No.

15:34 20         Q.   Was Shawn Foist one of those people?

15:34 21         A.   No.

15:34 22         Q.   Was Mike Garcia one of those people?

15:34 23         A.   Yes.

15:34 24         Q.   Did you have a mobile unit in your -- in the

15:34 25    pickup truck that was assigned to you by the Harlingen

15:34 1    Police Department?

15:34 2        A.  A radio?

15:34 3        Q.  Yes.

15:34 4        A.  Yes.

15:34 5        Q.  At what time was it when you went out to search

15:35 6    for Ernest on the date of the incident in question?

15:35 7        A.  It was before daylight.

15:35 8        Q.  Around what time was that?

15:35 9        A.  I'm guessing 6:30.  It might have been 6:00 to

15:35 10   6:30.

15:35 11       Q.  Who accompanied you?

15:35 12       A.  My wife.

15:35 13       Q.  Did you turn on the mobile unit, the mobile

15:35 14   radio?

15:35 15       A.  We searched in my personal truck.

15:35 16       Q.  I understand that, sir, but my question is did

15:35 17   you turn on your mobile radio?

15:35 18       A.  I don't have a mobile radio in my truck.

15:35 19       Q.  Okay.  What is it that you have in your truck?

15:35 20       A.  It's a standard '97 Dodge extended cab pickup

15:35 21   truck.

15:35 22       Q.  So you're saying that the truck that you used

15:35 23   in order to search for your son was not the truck that

15:35 24   was assigned to you by the Harlingen Police Department?

15:36 25       A.  That's correct.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS, ET AL; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL. | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS, ET AL; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS, ET AL. | § | |

STATE OF TEXAS     §
                      §
COUNTY OF _Hidalgo_    §

### AFFIDAVIT

Before me, the undersigned notary, on this day, personally appeared Arnold Rodriguez, a person whose identity is known to me. After I administered an oath to him upon his oath, he said:

"My name is Arnold Rodriguez. I am competent to make this affidavit, and I have personal knowledge of the facts stated below:

1.     I was the Human Resources Director of the City of Harlingen, Texas, from **2/96** to **1/00** .

2.     I met 2 times a week with Chief Scheopner, the command staff, and representatives from the Harlingen Police Officers Association (HPOA). After I found out that **Police Chief Scheopner was a part of the problem of the Harlingen Police Department (HPD)**, I kept recommending to City Manager Natalie Prim that she send Assistant Manager Joe LaBeau to the HPD to spend time with the officers because Chief Scheopner reported to Mr. LaBeau.

2.   However, City Manager Natalie Prim did not send Assistant Manager Joe LaBeau to the Harlingen Police Department (HPD) to investigate the shooting incident. Throughout 1996 and 1997 she kept Mr. LaBeau out of the police department.

3.   Mr. LaBeau's absence from the HPD was very obvious in 1996 and 1997. Mr. LaBeau purposely kept away from the problems in the HPD and Ms. Prim refused to send him to the HPD. In Ms. Prim's executive staff meetings Chief Scheopner would give his account of the HPOA and he plotted against them. Ms. Prim and Mr. LaBeau acted on Chief Scheopner's statements, even though I kept telling them to go and find out for themselves **because Chief Scheopner was a part of the problem.** Mr. LaBeau even avoided the meetings.

4.   All of sudden after the tragic shooting death of U. S. Border Patrol Agents Susan Rodriguez and Ricardo Salinas by Ernest Moore, son of HPD Detective Moore, with the HPD's rifle at Detective Moore's residence in San Benito, Texas. Ms. Prim believed it was important enough to send Mr. LaBeau to the HPD, and **Mr. LaBeau "discovers" what has been there and repeatedly reported to him for 2 years!**

5.   **Ms. Prim and Mr. LaBeau knew about the problems but they avoided them because they were afraid to confront Chief Scheopner.** Mr. LaBeau on several occasions broke into tears when confronted by others; he did this in meetings outside the HPD and with the HPD command staff. He could not take confrontational pressure. Ms. Prim just did not want to know the truth because it would force her hand, and for whatever reason she could not take the right and necessary action. The lack of action was a link to the eventual failure to destroy the Pirtle weapon.

6.   There was no internal discipline within the city organization due to Ms. Prim's and Mr. LaBeau's obvious deficiencies and Chief Scheopner took advantage of this, big time. But if you tried to tell Ms. Prim that there were some big problems, you became the problem. She loved to kill the messenger. These people are responsible because they failed to fulfill their duties and obligations beyond a reasonable scope. Their actions were extreme and outrageous and knowingly wrong. I think it goes beyond bad management to negligent management. Their failure to perform their duty contributed to the tragic San Benito shooting."

x _____

Arnold Rodriguez

SWORN TO and SUBSCRIBER before me by Arnold Rodriguez on _____July 5th_____, 2001.

_____

Notary Public in and for
the State of Texas

GABRIEL R. SANCHEZ
Notary Public
STATE OF TEXAS
My Comm Exp 01-10-2004

1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   ARTURO GUILLERMO SALINAS   )(
     AND ELISA HERNANDEZ        )(
 4   HERRERA SALINAS            )(
                                )(
 5   VS.                        )(  CIVIL ACTION NO. B-98-162
                                )(
 6   CITY OF HARLINGEN, TEXAS,  )(
     R.D. MOORE, AND            )(
 7   JIM SCHEOPNER              )(
                                )(
 8         AND                  )(
                                )(
 9   GILBERTO M. RODRIGUEZ,     )(
     INDIVIDUALLY AND ON        )(
10   BEHALF OF HIS MINOR        )(
     DAUGHTER, MEGAN SUZANNE    )(
11   RODRIGUEZ, AND STEPHEN L.  )(
     WILLIAMS AND WIFE, ROBYN   )(
12   S. WILLIAMS, SURVIVING     )(
     BENEFICIARIES OF THE       )(
13   DECEASED                   )(
                                )(
14   VS.                        )(  CIVIL ACTION NO. B-98-163
                                )(
15   CITY OF HARLINGEN, TEXAS,  )(
     R.D. MOORE, AND            )(
16   JIM SCHEOPNER              )(
                                )(
17   AND                        )(
                                )(
18   RAUL RODRIGUEZ             )(
                                )(
19   VS.                        )(  CIVIL ACTION NO. B-99-070
                                )(
20   CITY OF HARLINGEN,         )(
     R.D. MOORE, AND            )(
21   JIM SCHEOPNER              )(
```

00 JUN 1  P 2:04

```
22   - - - - - - - - - - - - - - - - - - - - - - - - - -
              ORAL DEPOSITION OF RONALD K. SAENZ
23                     MAY 23, 2000
     - - - - - - - - - - - - - - - - - - - - - - - - - -
24
       REPORTED BY MAUREEN STINGLEY, CERTIFIED COURT REPORTER
25
```

COPY

1   APPEARANCES

2   COUNSEL FOR PLAINTIFFS ARTURO GUILLERMO SALINAS
    AND ELISA HERNANDEZ HERRERA SALINAS; and GILBERTO
3   M. RODRIGUEZ, INDIVIDUALLY AND ON BEHALF OF HIS
    MINOR DAUGHTER, MEGAN SUZANNE RODRIGUEZ, AND
4   STEPHEN L. WILLIAMS AND WIFE, ROBYN S. WILLIAMS,
    SURVIVING BENEFICIARIES OF THE DECEASED:

5
        BROADUS A. SPIVEY
6       SPIVEY & AINSWORTH
        48 East Avenue
7       Austin, Texas 78701

8
    COUNSEL FOR PLAINTIFF RAUL RODRIGUEZ:
9
        SONIA LOPEZ
10      LAW OFFICES OF RAMON GARCIA
        222 West University Drive
11      Edinburg, Texas 78539

12
    COUNSEL FOR DEFENDANTS CITY OF HARLINGEN, TEXAS,
13  JIM SCHEOPNER, AND R.D. MOORE:

14      TOM LOCKHART
        ADAMS & GRAHAM, L.L.P.
15      222 East Van Buren, West Tower
        Harlingen, Texas 78550
16

17          Oral deposition of RONALD K. SAENZ, who resides

18  in Cameron County, Texas, taken by TOM LOCKHART,

19  Attorney for DEFENDANTS; reported by MAUREEN STINGLEY,

20  Certified Court Reporter in and for the State of Texas,

21  on MAY 23, 2000, in the offices of ADAMS & GRAHAM,

22  L.L.P., 222 East Van Buren, West Tower, Harlingen,

23  Texas, pursuant to the Federal Rules of Civil

24  Procedure.

25

11:11  1      A.  Let's go back just one step here.  I did have

11:11  2  another conversation with R. D. Moore, and that was

11:11  3  inside that room.

11:11  4      Q.  Okay.

11:11  5      A.  Okay.  So before really noticing -- I mean, I

11:11  6  noticed the Nazi paraphernalia.  My focus was trying to

11:11  7  find Ernest Moore.  R. D. later walked in.  He looked

11:11  8  at a gun safe, and he told me there were some rifles

11:11  9  that were missing.

11:11 10      Q.  He told you what?

11:11 11      A.  He told me that there were some rifles that

11:11 12  were missing from the safe.  Okay, he didn't go into

11:12 13  the specifics of what type of rifles, but there were

11:12 14  rifles that were missing from the safe, and ammunition

11:12 15  was also missing.

11:12 16          And that's when I started looking around

11:12 17  the room to try to get an idea as to who we may be

11:12 18  dealing with here, maybe looking for alcohol,

11:12 19  narcotics, you know, something, something that would

11:12 20  help me and provide information to the other officers

11:12 21  who were also assisting.  And this is where I found

11:12 22  this Nazi paraphernalia.  It was basically everywhere,

11:12 23  on the dresser, in the closet.

11:12 24      Q.  Were you in there by yourself before R. D.

11:12 25  Moore went into Ernest Moore's bedroom?

10:44  1    A.  No.

10:44  2    Q.  Okay.  Do you know what he was wearing?

10:44  3    A.  Slacks and a pullover shirt.  I remember it was

10:44  4    a pullover shirt, slacks and a pullover shirt, and I

10:44  5    remember him holding a cup of coffee.

10:44  6    Q.  A cup of coffee?

10:44  7    A.  I remember that.

10:44  8    Q.  That area, that corn field where he was

10:44  9    standing in front of you, was that the area ultimately

10:44  10   where R. D. Moore would later be shooting from?

10:44  11   A.  Yes.

10:44  12        MR. LOCKHART:  I'm going to object.  You

10:44  13   said R. D. Moore.

10:44  14   Q.  Ernest Moore.

10:44  15   A.  Yes.  Ernest Moore.  I'm sorry.

10:44  16   Q.  How far from where he was standing do you

10:45  17   recall Ernest Moore firing his shots from?

10:45  18   A.  Where we found Ernest Moore after being shot in

10:45  19   relationship to where I first encountered R. D. Moore,

10:45  20   the distance between the two was maybe about 30 yards.

10:45  21   Q.  Okay.  At that time, was the corn field plowed

10:45  22   at that time?

10:45  23   A.  No.

10:45  24   Q.  Could you see those 30 yards of distance that

10:45  25   you have mentioned, would you have been able to see

11:33 1  Department?  Who would possess that information?

11:33 2      A.  The persons that -- well, let me put it this

11:33 3  way.  The person that should have access to all records

11:33 4  relating to criminal activity or investigations would

11:33 5  be the person in charge of the criminal investigation

11:33 6  division, which during that time would have been Javier

11:33 7  Reyna.

11:33 8      Q.  Are you doubting it would have been Mr. Reyna,

11:33 9  given that he was trying to conduct an investigation

11:33 10 into the Rio Hondo crime scene?

11:33 11     A.  Am I doubting?

11:33 12     Q.  Uh-huh.

11:33 13     A.  No.

11:33 14     Q.  Do you believe that R. D. Moore knew where his

11:33 15 son was prior to law enforcement arriving at his

11:34 16 residence?

11:34 17             MR. LOCKHART:  And I'm going to object.

11:34 18 That calls for speculation.

11:34 19     A.  After everything that has happened and having

11:34 20 time to look at certain events involving this incident,

11:34 21 I have also asked myself the same thing, and weighing

11:34 22 everything out that had happened, you want to believe

11:34 23 that R. D. Moore knew if his son was there that morning

11:35 24 or left.  My feelings about that was that I believe

11:35 25 that he did.

# TEXAS DEPARTMENT OF PUBLIC SAFETY
# TEXAS RANGER DIVISION

## VOLUNTARY STATEMENT

STATE OF TEXAS

COUNTY OF CAMERON

My name is Shawn Ray Foist and my address is _____ __ __ _____, , as and my phone number is _____ . I was born in Fort Monmouth, New Jersey on ( I am employed by Harlingen Police Dept. as a Patrol Seargent and the phone number there is 956-427-8750. I wish to state the following information:

I would like to add to the statement I provided the Texas Rangers on 07-08-98:

That on 07-07-98, whenever myself and Sgt. MIKE GARCIA met with R.D.MOORE, I remember talking to R.D.MOORE about the sitution that had happen (my thought was reference the Rio Hondo shooting). Present were the above officers and R.D.Moore's wife (PATSY). I believe I heard R.D. MOORE state that ERNEST MOORE had gone into the house making a racket. R.D. MOORE communicated with ERNEST though spoken words and was advised by ERNEST that he was" in deep or a lot of shit". Since talking to Texas Rangers Jaramillo and Castaneda I stated to them, that they had created some doubt about R.D. MOORE communicating with ERNEST that morning. I do want to state that I believe I heard R.D. MOORE say this.

I have created my own time line from what was said about the shooting and I feel ERNEST went home and re-armed himself and proceeded into the corn field. Also during my conversation with R.D.MOORE, I feel he (R.D.) was not aiding ERNEST in his attempt to escape because the things R.D. MOORE was saying and the way he was acting.

I HAVE GIVEN THIS STATEMENT VOLUNTARILY TO TEXAS RANGERS SGTS. RODOLFO C. JARAMILLO AND ROLANDO CASTANEDA.

THIS STATEMENT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

_____
Witness

_____
Witness

_____
Signature of Witness

Date:  09/01/98   Time:  11:38 AM

Scheopner

EXHIBIT NO. 9 N
5-18-00
Maureen Stingley

THE STATE OF TEXAS　　§

COUNTY OF CAMERON　　§



EXHIBIT NO 9 U
5-18-00
Maureen Stingley

　　　　BEFORE ME, the undersigned authority in and for Cameron County, Texas, on this the 8th day of JULY , 1998, A.D., did personally appear:

　　SHAWN RAY FOIST　　, who after being by me duly sworn, did depose and say:

My name is Shawn Ray Foist. I am 29 years of age and my date of birth 　　　 . My home is located 　　　　　　　　　　　　 ;. I am presently employed by the Harlingen Police Department as a Patrol Sergeant. My home phone number is

On Monday, 07-06-98, I started my tour of duty with the Harlingen P.D. My shift was supposed to end on Tuesday, 07-07-98 at 7:00 a.m. At about 6:00 a.m., on 07-07-98, I was out at Valley International Airport in Harlingen, Texas and speaking to Harlingen PD K-9 officer Steve Mayer. We were standing in front of the Airport by my police unit, when the Harlingen PD dispatcher broadcast that there was a double homicide that had just taken place in Rio Hondo, Texas. The dispatcher further broadcasted that we were to be on the lookout for a white Chevrolet extended cab pickup which was seen leaving the scene of the homicide. I got in my patrol unit in search of the white pickup and traveled to the intersection of Loop 509 and Harrison. On my way to this location I was attempting to gather additional information in reference the homicides and the vehicle involved, so I could pass it on to my officers. I got to the intersection parked, turned off my headlights and sat there attempting to locate the white vehicle. Our dispatcher further dispatched that the white vehicle would be occupied by three males. I did observe several white pickup's but the drivers of the vehicle did not fit the above description. About 6:45 a.m., I left the location and proceeded back to the Harlingen PD. As I was driving in while heading west on Harrison, I heard the dispatcher that the vehicle was last seen traveling south on GAMBLE Road towards San Benito.

Before I arrived at the Police Department the dispatcher broadcasted that one of subject involved was possibly Ernest Moore. I arrived at the police station and Sgt. Mike Garcia was preparing a schedule for the incoming patrol detail. Sgt. Garcia had a piece of paper with information about the double murder. He (Mike) also advised me that Ernest Moore was Harlingen PD Detective R.D. Moore's son who drives a white pickup and they live off Gamble Road. Our dispatcher called me over the radio and wanted me to meet her (Melody Matlock) at the dispatcher's office. Melody advised me that the Cameron County Sheriff's Department wanted to speak to the patrol supervisor. So I got on the phone (I don't recall the callers name). He advised me that they had their officers (sheriff's)

at Detective Moore's home on Gamble Road and he was not cooperating. I advised Sgt. Garcia of the situation and we proceeded to RD Moore residence. I also advised the dispatcher to contact the Chief and advised him about the situation. Both Sgt. Garcia and I proceeded to the location. I drove and Sgt. Garcia was the passenger.

When we arrived at the location, we observed that three Cameron County Sheriff's unit's were on Gamble road, so I parked approximately 100 yards from the residence. By this time Chief Scheopner contacted me by telephone and advised me that Detective Moore would cooperate with the Sheriff's Department. We walked up the road to RD Moore's house and observed him to be on a cordless phone. I observed several deputies standing around the driveway. Mike and I walked up to Detective Moore and shook his hand and Detective Moore gave us a run down of the situation. He told us that he had spoken to Ernest (I don't remember if in person or by phone) and Ernest had stated that he was in a " lot of shit". Detective Moore also advised that his AK-47 was missing from his house and that Ernest was probably in the corn field. Detective Moore further stated that he thought Ernest would probably kill himself, but he didn't know but he's a damn good shot.

A short time later, I heard gunshots coming from the area of the corn field. I was standing in the driveway near the white truck. I remember standing there and looked to my right and saw a male subject with no shirt and black pants pointing a rifle towards the north in the direction of the Border Patrol truck and firing rapidly. Detective Moore grabbed me and we went into the garage and hid behind a boat parked in the garage. I radioed my station and advised them that shots were being fired. I heard or felt what appeared to be rounds hitting the house. I could see the deputies firing towards the corn field. I remember hearing the deputy yelling "I'm hit, I'm hit". Detective Moore jumped up and ran into the house and I made another radio transmission about shots being fired. I got up and drew my weapon and I observed Detective Moore come out of his house with his service semi-automatic pistol. Detective Moore ran out of the garage and I moved towards the front of the boat, with my weapon drawn to see where the subject shooting was. I could not see Detective Moore at this time, I could see the male subject through the tree. I then shot two rounds in the direction of the subject shooting. He did not go down but made a jerking movement. I fired an additional three rounds and that when Sgt. Garcia yelled "He's down, cease fire". There were rounds still being shot and suddenly it just stopped. Detective Moore ran towards the corn field and knelt in front of his son and hugged him. I could see a male Border Patrol agent in a sleeping fetal position and could see the feet of another Border Patrol agent under the Border patrol unit. I remember seeing a wounded sheriff's deputy near a tree.

*P.n.C*

Sgt Garcia pulled Detective Moore away from his son and went back towards the driveway. Someone yelled there's another one and I took cover around Detective Moore's trucks. I contacted my dispatchers and requested ambulances for the wounded officers. I later learned that the male subject that was shooting was Ernest, Detective Moore's son.

I did not see nor know if Detective Moore shot his service pistol.

I have given this statement voluntarily to Texas Ranger Sgt. Rolando Castaneda and FBI Special Agent Freddie Vela.

This statement is true and correct to the best of my knowledge and ability.

Sworn and subscribed to before me on this the ___8th___ day of __July_____, 1998, A.D.

JAVIER REYNA
NOTARY PUBLIC
State of Texas
Comm. Exp. 03/18/00

Notary Public for Cameron County, Texas

Case 1:98-cv-00162   Document 106   Filed in TXSD on 07/10/2001   Page 148 of 550



[Prev]   [New Search]                    [Next]

# Cops Become the Hunted!
**Sent: 7/14/98**



EXHIBIT NO.
Maureen Stingley

Calibre Press Street Survival Newsline No. 288

--Please Do Not Forward Electronically--

=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=

In the Line of Duty, sponsor of Calibre Press Street Survival Newsline
No. 288,
is producing an important training program dealing with police canine
units. The
company is seeking excellent video of canine response and will be pleased
to pay for
such video. If you have footage you think they may be interested in,
please call Ron or
Don right away at: (800)462-5232 or e-mail Don at dlimbo@aol.com

Also, be sure to check out the In the Line of Duty Web site at:
http://www.lineofduty.com
=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=

WHEN THE HUNTERS BECOME THE HUNTED
NEWSLINE MEMBER SHARES FIRST-HAND ACCOUNT OF AGENTS'
MURDERS

You'll recall that in Calibre Press Street Survival Newsline No. 287
[transmitted 7/10/98] we discussed the shooting deaths of 2 U.S. Border
Patrol agents last week. Newsline member Sgt. Shawn Foist with Harlingen
(TX) PD was there when the agents were killed and he contacted us to share
his first-hand account of the incident in the hopes that the information
he shares will help keep other Newsline members safe.

Here's Shawn's insider account of what happened last week, including a
tactical training point to keep in mind:

Last Tuesday (7/7/98), a mother and one of her daughters were shot and
killed and one of the mother's sons was seriously wounded when 24-year-old
Ernest Moore, the son of a well-respected Harlingen (TX) PD investigator,
burst into their home before dawn and fired on them with an AK-47. It's
believed Moore intended to shoot his ex-girlfriend who was hiding in the
house. She was not hit.

For reasons that are yet unclear, Ernest stopped firing after shooting the
3, at which time his ex-girlfriend and another brother who was also in the
house wrestled the rifle from his hands. Ernest then fled the home, jumped
in a white pickup truck and drove to a house he was sharing with his
father.

"When Ernest got home, he ran inside and at some point had fleeting contact with his father," Shawn told the Newsline. "While Ernest was rummaging around the house, he apparently said something like, 'I'm in deep shit now, Dad' and headed out the door.

"After his son left, our investigator noticed that one of his guns, a semi-automatic AR-15 rifle, was missing from the gun cabinet. He didn't yet know that his son was suspected of killing two people so he didn't know how serious that missing gun was going to turn out to be."

Officers had been told that the suspected shooter in the double homicide had fled the murder scene in a white pickup truck. Not long after Ernest left his father's house, officers spotted the white pickup truck that matched the description they'd been given in the investigator's driveway.

"The officers pulled up to the house and began knocking on the door," says Shawn. "Our investigator answered and the officers told him they wanted to search his house but wouldn't tell him why. Not knowing the severity of the situation, he denied them access until he could find out more about what or who they were looking for.

"A short time later, a troop of backup officers arrived including the Border Patrol agents who were later killed. Our chief called Ernest's father to explain the situation and when he found out what was going on, the father told the officers to do whatever they had to do to get his son. That must have been extremely difficult for him to do."

Officers confirmed that Ernest was no longer in the house and called a USBP helicopter to report to the scene and begin searching the surrounding area.

"While we were waiting for the helicopter to arrive, the 2 USBP agents who were soon killed were standing by their truck which was parked in the road in front of our investigator's house," says Shawn. "About 15 others of us were standing in our investigator's driveway talking. His house was directly across from a field that was filled with thick sunflower stalks. They were so thick the field almost looked like a cornfield. You couldn't see past the first row...an easy hiding place.

"At some point during our conversation, Ernest's father warned us that his son was a good shot," Shawn continues. "That's when all hell broke loose. It was like a movie scene. We heard, 'My son's a good shot' and all of a sudden we heard rifle fire."

Ernest had stepped out of the thick foliage in the field shouldering the AR-15 and began firing. A round from the first volley of shots hit 28-year-old USBP Agent Susan Rodriguez in the neck. Another round hit 24-year-old Agent Ricardo Salinas in the head. In the one second it took Shawn and the other officers he was talking with in the driveway to realize what was happening, both agents who were standing away from the crowd were down. Ricardo was dead at the scene and Susan was DOA after being transported to a local hospital.

While the firestorm continued, officers ran for cover and began returning fire. When the smoke cleared, at least 250 rounds had been fired and

Ernest Moore had been seriously wounded. He died of his injuries later that night.

"We still don't know why he decided to fire on us," Shawn told the Newsline. "Maybe he was trying to get us away from his truck in the driveway so he could run to it and drive away? He was just standing boldly in the middle of the road without cover and firing on us. The incident even had some characteristics of a suicide-by-cop situation. Did he want us to kill him? We don't know...and now we never will.

"As horribly tragic as this incident was, it actually could have been even worse," Shawn told the Newsline. "The fact that Ernest fired on the 2 agents who were standing away from the crowd first may actually have saved some lives. When we heard the rifle fire, we had a second to react. Had he fired on the group of us packed together in the driveway first, he easily could have shot at least 5 of us before we even had a chance to realize what was going on."

Looking back, Shawn realizes there is an important training point to be learned from this tragedy.

"When we went to the Moore house, we were looking for Ernest. WE were after HIM. It never dawned on us that HE might be after US, too. Officers need to remember that just because the suspect has left the scene doesn't mean he or she won't be coming back.

"Officers need to constantly stay aware of their surroundings and be prepared to deal with a sudden switch from being on the offense to being on the defensive--from being the hunter to being the hunted."

Stay safe!

(C)1998 By Calibre Press Street Survival Newsline; (800) 323-0037, e-mail: Newsline@calibrepress.com, Web: www.calibrepress.com. ALL RIGHTS RESERVED.



**CALIBRE PRESS, Inc.**
666 Dundee Road., Suite 1607
Northbrook, IL 60062-2760

**800-323-0037**
www.calibrepress.com
newsline@calibrepress.com
fax: 847-498-6869

```
HARLINGEN POLICE DEPARTMENT                                              PL1020D2
ORI #: TX0310300 HPD              Incident Processing                    INQUIRE
7/08/98                                                                  98-00034970

Date        .  .  :       Call            Dispatch        Arrive           Clear
Time        .  .  :  7/07/98           7/07/98          7/07/98          7/07/98
Location    .  .  :  6:06:20           6:06:20          6:06:20          8:31:00        Phone Number
Cross Street   .  :  , , HARLINGEN AREA, , ,
Nature Of Call:  ,,,
Caller      .  .  :  DOUBLE HOMICIDE POSS TRIPLE-SUBJ FLED IN TK-WHT EXTENDED CAB
Complainant .  .  :  CAMERON COUNTY SO, , ,
Bureau      .  .  :  RIO HONDO POLICE, , ,
Area        .  .  :  PATROL
Unit 1 #    .  .  :  EAST SIDE      Section : 140
Unit 2 #    .  .  :  ALL            ID # 1 :                       DOW .   .  :  TUESDAY
Dispatch ORI #:  TX0310300 HPD      ID # 2 :                       Grid .  .  :
Recv. By ID #:   MATLOCK,MELODY,    ID # 3 :                       ID # 2 :
Incident Type :  ATL P ATMP LOCAT                                  ID # 4 :
Source      .  .  :  911 CALL                  Disposition .  :  FEL ASSIST
Priority    .  .  :  1        Area Car: NO     Dispatch By ID #: MATLOCK,MELODY,
                                               Report Required :  YES
                                               Shift Code   .  :  2300-0700
                                               Operator     .  :  MATLOCK

F3=Exit      F7/F8=Pri/Nxt Inc   F12=Cancel      F9=Cases       F14=Stat/Disp
F15=Susp Veh  F16=Caller   F17=Complt  F18=Rad Log   F23=Case Doc   F24=Doc
```

Matlock
EXHIBIT NO. 47
Maureen Stingley

Case 1:98-cv-00162   Document 106   Filed in TXSD on 07/10/2001   Page 152 of 550

New World Systems Corporation                                    AU230S1
7/08/98    Incident: 00034970         Work With Documents
Year: 98
Type options, press Enter.
  2=Revise   3=Copy    4=Delete    5=View     6=Print    7=Rename   8=Details
  9=Print Options   10=Send    11=Spell    12=Print Remote   13=Paginate
  14=Authority    15=Merge    16=Finalize

Opt Document Description                       Revised Type Authority
  5  INFO                                       7/07/98  RF
  5  INFO                                       7/07/98  RF
  5  Free Form Document                                          AU2346S1
  5  SUBJS IN TK KILLED-TWO POSS THREE SUBJS
  5  LAST SEEN IN RIO HONDO ON GAMBLE RD
  5  FLED IN WHITE EXTENDED CAB TK-OCCX3 MLS WITH TINTED WINDOWS
  5  ACTOR POSS A EARNEST MOORE-FROM HARLINGEN AREA
     REQ K-9 BE ON STAND BY
     ANGLO MLS/ONE WEARING WHITE T-SHIRT BLUE JEANS
     HEADED SOUTH ON GAMBLE

     POSS LPS-FIRST-TW LAST 3-007  SO REQ THAT 101 BE CONT@653

F    F3=Exit    F12=Cancel

Case 1:98-cv-00162   Document 106   Filed in TXSD on 07/10/2001   Page 153 of 550

New World Systems Corporation        Work with Documents                    AU2300S1
7/08/98
Year: 98   Incident: 00034970
Type options, press Enter.
  2=Revise  3=Copy   4=Delete   5=View    6=Print   7=Rename   8=Details
  9=Print Options  10=Send  11=Spell  12=File Remote  13=Paginate
 14=Authority  15=Merge  16=Finalize

Opt Document Description                          Revised Type Authority
    INFO                                         7/07/98  RF
    INFO                                         7/07/98  RF
    Free Form Document
    105/2591  AND 161 HEADED TO RIO HONDO...10x8 @0831
    RIO HONDO REQ-K-9  AT 659-196/197 ENROUTE RESACA/GAMBLE DR

                                                          AU2346S1

F       F3=Exit     F12=Cancel

```
New World Systems Corporation                                              AU2300S1
7/08/98                        Work With Documents
Year: 98  Incident: 00034970
Type options, press Enter.
  2=Revise   3=Copy   4=Delete   5=View    6=Print   7=Rename   8=Details
  9=Print Options  10=Send  11=Spell  12=File Remote  13=Paginate
 14=Authority  15=Merge  16=Finalize

Opt  Document Description                        Revised Type Authority
 5   INFO                                        7/07/98  RF
 5   INFO                                        7/07/98  RF
 5   Free Form Document                                          AU2346S1
 5   X17 @0715
 5   REQ EMS AND AIRCARE...OFFICERS SHOT
 5   UNIT AT HUDSON AND SAM HOUSTON TO LEAD IN EMS




F    F3=Exit   F12=Cancel
```

```
New World Systems Corporation                                    AU2300S1
  7/08/98               Work With Documents
Year: 98   Incident: 00034970
Type options, press Enter.
 2=Revise   3=Copy   4=Delete   5=View    6=Print   7=Rename   8=Details
 9=Print Options  10=Send   11=Spell  12=File Remote  13=Paginate
14=Authority  15=Merge  16=Finalize

Opt Document Description                      Revised Type Authority
 5   INFO                                      7/07/98  RF
 5   INFO                                      7/07/98  RF
 5   Free Form Document                                          AU2346S1
 5   TWO SUSPECTS IN CORN FIELD STILL LOOSE
 5
 5


F   F3=Exit   F12=Cancel
```

New World Systems Corporation                                          AU2300S1
7/08/98              Work With Documents
Year: 98   Incident: 00034970
Type options, press Enter.
 2=Revise   3=Copy   4=Delete   5=View   6=Print   7=Rename   8=Details
 9=Print Options  10=Send  11=Spell  12=File Remote  13=Paginate
14=Authority  15=Merge  16=Finalize

Opt Document Description                       Revised Type Authority
 5  INFO                                       7/07/98  RF
 5  INFO                                       7/07/98  RF        AU2346S1
 5  Free Form Document
 5  LYDIA TREVINO REQ OFFICER TO STAND BY DUE TO SUSPECT
 5  AT LOCATION.....

    142 NELSON WILL BE DISPATCHED TO ER ... @0832 released by VBMC
    COUNTY PRISONER AND THEY WILL HAVE A 24 HOUR GUARD

F   F3=Exit   F12=Cancel

```
New World Systems Corporation                                              AU2300S1
7/08/98                       Work With Documents
Year: 98   Incident: 00034970
Type options, press Enter.
  2=Revise   3=Copy   4=Delete   5=View    6=Print   7=Rename   8=Details
  9=Print Options  10=Send  11=Spell  12=File Remote  13=Paginate
 14=Authority  15=Merge  16=Finalize

Opt Document Description                         Revised Type Authority
 5   INFO                                        7/07/98  RF
 5   INFO                                        7/07/98  RF
 5   Free Form Document                                   AU2346S1
 5   101 ADVISED TO LEAVE K-9 AND HAVE EVERYONE ELSE RETURN TO STATION
 5   @0823
 5

F    F3=Exit   F12=Cancel
```

1

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                      BROWNSVILLE DIVISION

3    ARTURO GUILLERMO SALINAS    )(
     AND ELISA HERNANDEZ         )(
4    HERRERA SALINAS             )(
                                 )(
5    VS.                         )(  CIVIL ACTION NO. B-98-162
                                 )(
6    CITY OF HARLINGEN, TEXAS,   )(
     R.D. MOORE, AND             )(
7    JIM SCHEOPNER               )(
                                 )(
8          AND                   )(
                                 )(
9    GILBERTO M. RODRIGUEZ,      )(
     INDIVIDUALLY AND ON         )(
10   BEHALF OF HIS MINOR         )(
     DAUGHTER, MEGAN SUZANNE     )(
11   RODRIGUEZ, AND STEPHEN L.   )(
     WILLIAMS AND WIFE, ROBYN    )(
12   S. WILLIAMS, SURVIVING      )(
     BENEFICIARIES OF THE        )(
13   DECEASED                    )(
                                 )(
14   VS.                         )(  CIVIL ACTION NO. B-98-163
                                 )(
15   CITY OF HARLINGEN, TEXAS,   )(
     R.D. MOORE, AND             )(
16   JIM SCHEOPNER               )(
                                 )(
17   AND                         )(
                                 )(
18   RAUL RODRIGUEZ              )(
                                 )(
19   VS.                         )(  CIVIL ACTION NO. B-99-070
                                 )(
20   CITY OF HARLINGEN, R. D.    )(
     MOORE, AND JIM SCHEOPNER    )(
21   - - - - - - - - - - - - - - - - - - - - - - - - - -
22            ORAL DEPOSITION OF MIGUEL P. GARCIA
                       MARCH 28, 2001
23   - - - - - - - - - - - - - - - - - - - - - - - - - -

24    REPORTED BY MAUREEN STINGLEY, CERTIFIED COURT REPORTER

25
```

1          Oral deposition of MIGUEL P. GARCIA, who

2    resides in Cameron County, Texas, taken by SONIA LOPEZ,

3    Attorney for the Plaintiffs, reported by MAUREEN

4    STINGLEY, Certified Court Reporter in and for the State

5    of Texas, on MARCH 28, 2001, in the offices of ADAMS &

6    GRAHAM, L.L.P., 222 East Van Buren, West Tower,

7    Harlingen, Texas, pursuant to the Federal Rules of

8    Civil Procedure.

9

10                         APPEARANCES

11

     COUNSEL FOR PLAINTIFFS ARTURO GUILLERMO SALINAS
12   AND ELISA HERNANDEZ HERRERA SALINAS; and GILBERTO
     M. RODRIGUEZ, INDIVIDUALLY AND ON BEHALF OF HIS
13   MINOR DAUGHTER, MEGAN SUZANNE RODRIGUEZ, AND
     STEPHEN L. WILLIAMS AND WIFE, ROBYN S. WILLIAMS,
14   SURVIVING BENEFICIARIES OF THE DECEASED:

15        FRANCIS PAN
          SPIVEY & AINSWORTH, P.C.
16        48 East Avenue
          Austin, Texas 78701
17
          SONIA LOPEZ
18        LAW OFFICES OF RAMON GARCIA
          222 West University Drive
19        Edinburg, Texas  78539

20   COUNSEL FOR DEFENDANT CITY OF HARLINGEN, TEXAS:

21        TOM LOCKHART
          ADAMS & GRAHAM, L.L.P.
22        222 East Van Buren, West Tower
          Harlingen, Texas 78550
23

24

25

A.  Yes.

Q.  Okay.

A.  Let me add on to that.  If it's a priority
call --

Q.  Yes, sir.

A.  -- they will let the oncoming supervisors know
that there is a unit out at a priority call.

Q.  Was there a unit out on a priority call at the
time that you arrived at the station on July 7, 1998?

A.  I don't recall her -- or she didn't mention it.

Q.  When you arrived at the dispatcher's office on
July 7, 1998, who was there?

A.  Melody.

Q.  Was there anyone else there?

A.  No.

Q.  Were you hearing a radio communication that was
occurring when you arrived there?

A.  When I arrived, she had the teletype in her
hand, and I asked her, "What's going on?  I caught the
tail end of it."  And she goes, "Double homicide that
occurred in Rio Hondo."  I said, "Let me take a look
at it," and she hands it to me and I read it.

Q.  Did she tell you anything else?

A.  She told me that the vehicle was last seen
leaving Rio Hondo and was en route to Gamble Road, and

16:06 1   she told me it was between Rio Hondo and San Benito.  I

16:06 2   told her, "No, Gamble Road is way over on the south

16:06 3   side of San Benito."

16:06 4       Q.  Was there anything else that she told you,

16:06 5   Sergeant?

16:06 6       A.  I remember after I read it, I read the whole

16:06 7   lookout.  There was Ernest Moore that was written on

16:06 8   there.  I made the statement to her, "Man, this sounds

16:06 9   like R. D. Moore's kid.  Get me R. D. Moore's home

16:06 10  phone."

16:06 11      Q.  And what did she tell you?

16:06 12      A.  She said, "Okay."   I --

16:07 13      Q.  Go ahead.

16:07 14      A.  I grabbed the logs, grabbed the information,

16:07 15  and then I went back to the lieutenant -- or to the

16:07 16  supervisor's office.

16:07 17      Q.  Okay, who was that?  Who was that?

16:07 18      A.  That was me.  I went to the supervisor's

16:07 19  office.

16:07 20      Q.  And who was the supervisor?

16:07 21      A.  I was.

16:07 22      Q.  Okay.

16:07 23      A.  That day, the lieutenant and the sergeant had

16:07 24  been assigned to a school so I had been taken off of my

16:07 25  regular schedule and put to work patrol.  That's why I

16:07  1  was going in so early.  I usually would go in at 8:00.

16:07  2  That's why I was going in at 6:30.  So I walked over

16:07  3  from the dispatcher's office, over to the supervisor's

16:07  4  office to fill out the schedule and to prepare myself

16:08  5  for the morning shift, to prepare for the briefing.

16:08  6      Q.  And did you call R. D. Moore?

16:08  7      A.  No, ma'am.

16:08  8      Q.  Why did you not call R. D. Moore?

16:08  9      A.  I didn't have his number at the time.

16:08  10      Q.  Had you requested it?

16:08  11      A.  Yes, ma'am.

16:08  12      Q.  And were you expecting it?

16:08  13      A.  Yes, ma'am.

16:08  14      Q.  Do you know why it wasn't given to you?

16:08  15      A.  I presume she got busy or she was looking for

16:08  16  it.  I went back to get ready for my tour and to

16:08  17  prepare for, you know, for the morning briefing.

16:08  18      Q.  So although you had gone in there and read the

16:08  19  teletype, had got information of a suspect for a double

16:08  20  homicide, and believing that it was R. D. Moore's son,

16:08  21  you went ahead and you filled out your schedule?

16:09  22      A.  Yes.  I walked back over there, and I sat down

16:09  23  and I started filling out the schedule.

16:09  24      Q.  How long did it take you to fill out the

16:09  25  schedule?

16:09  1    A.  I wasn't even done when Sergeant Foist walked

16:09  2    in.  I hadn't even started.  I would say I had been in

16:09  3    the office for about 15 to 30 seconds.

16:09  4    Q.  Before we go on, when you told Melody, "This

16:09  5    sounds like R. D. Moore's kid," what did she tell you?

16:09  6    A.  If I was sure, and I said, "Well, he has got a

16:09  7    truck that matches that description, and I believe they

16:09  8    are the only Moores that live out there on Gamble

16:09  9    Road."

16:09 10    Q.  And what else did she tell you, sergeant?

16:10 11    A.  She asked me if I wanted to have that telephone

16:10 12    number, and I said, "Yes, pop it up for me, please."

16:10 13    And I walked out.

16:10 14    Q.  Why didn't you wait there for the telephone

16:10 15    number?

16:10 16    A.  I don't know why I didn't wait.

16:10 17    Q.  Okay.

16:10 18    A.  I wasn't sure if that was Ernest or not.

16:10 19    Q.  You said that you knew that the Moores lived

16:10 20    out on Gamble, that the person's name was Ernest.  You

16:10 21    mentioned license plates; is that correct?

16:10 22    A.  Uh-huh.

16:10 23    Q.  Had you run a license plate check on that

16:10 24    number?

16:10 25    A.  No.

16:10  1      Q.  Then what about the license plate told you that
16:10  2  it was R. D. Moore's son or made you believe that it
16:10  3  was R. D. Moore's son?
16:10  4      A.  I never said that the license plates -- I never
16:10  5  said that, that the license plates led me to believe
16:11  6  that it was R. D.'s kid.
16:11  7      Q.  Okay.  Do you know whether a license plate
16:11  8  check had been run on the license plate that you got
16:11  9  the tail end of the number before you arrived to the
16:11  10  dispatcher's office?
16:11  11      A.  No, ma'am.
16:11  12      Q.  If such a search had been run, was there
16:11  13  somewhere where you could have gone in the dispatcher's
16:11  14  office to see if such a search had been made?
16:11  15      A.  If it was documented on the log sheets, on the
16:11  16  call sheets, yeah, then I would have been aware of it.
16:11  17      Q.  Okay, when you got there and you read the
16:11  18  teletype and you got the log sheets that you have
16:11  19  mentioned, what did you read in the log sheets, or what
16:11  20  did the log sheets tell you?
16:11  21      A.  Like I said, I hadn't even started going
16:11  22  through the log sheets.  I hadn't even started the
16:12  23  scheduling when Sergeant Foist walked in.
16:12  24      Q.  And what did he tell you?
16:12  25      A.  He said something to the effect, "Hey, did you

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

16:12  1  hear all that shit that went on, that double homicide,"
16:12  2  and when he said that, I said, "Man, I have got a gut
16:12  3  feeling that this is R. D. Moore's kid."   I said,
16:12  4  "Melody should be popping up this telephone number.
16:12  5  Why don't you run over there and grab it."
16:12  6     Q.  And what did he do?
16:12  7     A.  He said "Okay."  He said something to the
16:12  8  effect, "Are you kidding me?  Are you shitting me, or
16:12  9  what?"  I said, "No, they have got a truck, a
16:12 10  white-colored truck, and I believe they are the only
16:12 11  Moores that live out there."
16:12 12     Q.  How did you know, Sergeant, that they were the
16:12 13  only Moores that lived out there?
16:12 14     A.  I said I believed that they were the only
16:12 15  Moores that lived out there.  There's -- out there on
16:12 16  Gamble Road where they lived at, there ain't that many
16:13 17  houses out there.
16:13 18     Q.  And how did you know that, Sergeant?
16:13 19     A.  I have been over there before.
16:13 20     Q.  And why had you been out there before?
16:13 21     A.  I played baseball -- softball with R. D.  We
16:13 22  have had our annual PD fishing tournament, and our fish
16:13 23  fries were done over at his house.  Gatherings have
16:13 24  been done over at his house.
16:13 25     Q.  And when these annual PD gatherings or annual

16:15  1    at the station until the time that Sergeant Foist spoke

16:15  2    to you, were the only two people that you spoke to at

16:15  3    that time Melody Matlock and Sergeant Foist?

16:15  4        A.  Yes, ma'am.

16:15  5        Q.  Okay.  After Sergeant Foist left, did you have

16:15  6    any communication with anyone?

16:15  7        A.  No, ma'am.

16:15  8        Q.  Did anyone attempt to have any communication

16:15  9    with you?

16:15  10       A.  No, ma'am.

16:15  11       Q.  Okay.  What happened next after Sergeant Foist

16:15  12   left?

16:15  13       A.  He wasn't gone but -- it was like he left and

16:15  14   he was right back, and he was on the cell phone, and he

16:15  15   says, "It is R. D.'s kid.  There's some shit going down

16:16  16   over at his house," and he is talking, and he goes, "We

16:16  17   need to go," and he is pointing.  He is pointing at

16:16  18   himself and me, saying, "We need to go."   And so I

16:16  19   told him, "Well, wait a minute.  I'm having to start

16:16  20   looking for a senior officer to take control, take over

16:16  21   the detail while I'm gone."   I just couldn't leave and

16:16  22   leave that detail unsupervised.  So I looked for a

16:16  23   senior officer to take over for me while I was gone.

16:16  24       Q.  Who was Sergeant Foist speaking to on the cell

16:16  25   phone?

16:16  1     A.   At the time, I didn't know who he was talking

16:16  2   to.  I was later made aware that it was Chief Jim

16:17  3   Scheopner at the time.

16:17  4     Q.   Do you know whether the cell phone that

16:17  5   Sergeant Foist was utilizing, was that his assigned

16:17  6   cell phone?

16:17  7     A.   That was a cell phone that was assigned to the

16:17  8   patrol division.

16:17  9     Q.   Was he working the patrol division?

16:17 10     A.   Sergeant Foist?

16:17 11     Q.   Yes.

16:17 12     A.   Yes, ma'am.

16:17 13     Q.   Do you know how many cell phones were assigned

16:17 14   to the patrol division?

16:17 15     A.   I believe at that time there was only one.

16:17 16     Q.   Are you sure about that?

16.17 17     A.   I said I believe.  I may be wrong.  I'm not

16:17 18   sure.

16:17 19     Q.   If a cell phone is to be assigned, who would be

16.17 20   the person in charge of assigning the cell phones?

16.17 21     A.   It would be the chief.

16:17 22     Q.   The chief of police?

16.17 23     A.   Yes, ma'am.

16.17 24     Q.   Did the chief of police at that time have an

16.17 25   assigned or self-assigned cell number?

16:18  1      A.   I'm sure he did.

16:18  2      Q.   Did he have an assigned pager?

16:18  3      A.   I don't recall that, ma'am.

16:18  4      Q.   Did you ever, before July 7th of 1998, call to

16:18  5  Scheopner's pager?

16:18  6      A.   No, ma'am.

16:18  7      Q.   Did you ever call him on the cell phone?

16:18  8      A.   I may have called him several times on his cell

16:18  9  phone, yes.

16:18  10     Q.   And when you wanted to know what his cell phone

16:18  11  number was, where did you obtain it?

16:18  12     A.   At the time, like I said, I was in charge of

16:18  13  traffic, so I probably had a listing that is made of

16:18  14  officer personnel.  So I probably had a listing of it.

16:19  15     Q.   I know you just told us, Sergeant, that when

16:19  16  Sergeant Foist came back, almost immediately after he

16:19  17  had left the office where you were at, I know you said

16:19  18  that he said, "It's R. D.'s kid," and I know you said

16:19  19  he pointed at himself and you saying, "We have got to

16:19  20  go."   Did you hear what he was saying to the other

16:19  21  person on that cell phone?

16:19  22     A.   When he said, "We have got to go," and he

16:19  23  pointed at me and you -- like "Me and you have got to

16:19  24  go," I got up.  I didn't stay there listening to that

16:19  25  conversation.  I immediately had to look for somebody

16:19 1 else to take over my duties, and so I found a senior

16:19 2 officer and told him what he had to do, and I told him,

16:19 3 "This is where we're going, and I have got to go.

16:20 4 Finish up. Do the morning briefing, and as soon as we

16:20 5 can, I will be back."

16:20 6     Q. And who was that, Sergeant?

16:20 7     A. That was Carlos Cantu.

16:20 8     Q. And was he a sergeant, as well?

16:20 9     A. No, ma'am, he was a patrolman.

16:20 10     Q. Did you tell Officer Cantu where you were

16:20 11 going, who the suspect was?

16:20 12     A. I told him that we were heading out to R. D.

16:20 13 Moore's house. At the time I didn't know what was

16:20 14 going on. I didn't know the conversation that Foist

16:20 15 was having with the other person. At the time I didn't

16:20 16 know who the other person was that he was on the phone

16:20 17 with, but I told Cantu that there was a problem over at

16:20 18 R. D.'s, and it was probably on that double homicide.

16:20 19 And so --

16:21 20     Q. And, again, you cannot recall what Sergeant

16:21 21 Foist was saying to the other person on that cell

16:21 22 phone?

16:21 23     A. Like I said, I didn't stay there in the office

16:21 24 when he was talking to the other person on the phone.

16:21 25 I immediately left the office to look for a senior

16:21  1    officer.  I didn't stay there to listen to the
16:21  2    conversation.
16:21  3        Q.  So am I correct in stating that Sergeant Foist
16:21  4    was still talking to the other person on the cell phone
16:21  5    when you left the office?
16:21  6        A.  Yes, ma'am.
16:21  7        Q.  Did Sergeant Foist stay in that office?
16:21  8        A.  Yes, ma'am.
16:21  9        Q.  Where did you go, Sergeant?
16:21 10        A.  I probably went -- you have got the office.
16:21 11    Then you have got the briefing room, and then right
16:21 12    next to it is the report writing room, and adjacent to
16:21 13    it is the men's dressing room.  I went throughout those
16:22 14    two rooms looking for a senior officer, and I finally
16:22 15    found Carlos.
16:22 16        Q.  After you informed Officer Cantu about what you
16:22 17    were about to do and where you were going, what did you
16:22 18    do next, Sergeant?
16:22 19        A.  I took him -- he went back with me to the
16:22 20    office.  I gave him the schedule.
16:22 21        Q.  I'm sorry.  When you talk about "went back to
16:22 22    the office," do you mean back to the office where you
16:22 23    were previously at?
16:22 24        A.  Yes, ma'am, back to the supervisor's office.
16:22 25    And I took him back there and said, "Here is the

16:22  1    schedule, here is the logs," and then Foist was going,

16:22  2    "Let's go, let's go.  We have got to go."

16:22  3        Q.  Was Sergeant Foist still on the phone at that

16:22  4    time?

16:22  5        A.  I believe so.

16:23  6        Q.  Approximately how long from the time that you

16:23  7    had arrived at the dispatcher's office to the time that

16:23  8    you left Sergeant Foist had it been?

16:23  9        A.  From the time I got to the dispatcher's office

16:23  10   to the time Foist walked in?

16:23  11       Q.  To the time that you and Foist left the

16:23  12   station.

16:23  13       A.  I don't know.  I would say five to ten minutes.

16:23  14       Q.  Were things moving pretty quickly at the time?

16:23  15       A.  I had to scramble to look for a senior guy.

16:23  16   The majority of the officers wouldn't get there until

16:23  17   maybe a quarter till.  They don't have to report until

16:23  18   7:00.

16:24  19       Q.  I understand.  After you went back with Carlos

16:24  20   Cantu to the office and you saw Sergeant Foist still

16:24  21   there on the telephone call, do you recall what he was

16:24  22   saying to the other person?

16:24  23       A.  My deal was more with Carlos Cantu, telling

16:24  24   him, "This is what you need to do.  Go over this," and

16:24  25   as soon as we did that, we were gone.

16:24  1      Q.  And I guess just for the jury's purposes, is it
16:24  2  fair to say, then, that you do not recall what
16:24  3  conversation Sergeant Foist was having with the person
16:24  4  on the other line at that time?
16:24  5      A.  That is correct.
16:24  6      Q.  After that occurred, Sergeant, what happened
16:24  7  next?
16:24  8      A.  We left.  Sergeant Foist is driving, and I'm in
16:24  9  the passenger's seat.
16:24 10      Q.  And are you in his patrol unit?
16:24 11      A.  Yes.
16:25 12      Q.  Was he still on the cell phone at the time?
16:25 13      A.  He was on the cell phone a couple of more
16:25 14  times.
16:25 15      Q.  Had he hung up that first --
16:25 16      A.  Yes, because when we walked out -- yes, he had
16:25 17  already hung up.
16:25 18      Q.  Okay, and you said that he was -- once he hung
16:25 19  up, did he tell you anything, or what did he tell you
16:25 20  after he hung up?
16:25 21      A.  He said that the Border Patrol had been over at
16:25 22  R. D.'s house and that he was being uncooperative --
16:25 23  and apparently that they were looking for Ernest, and
16:25 24  that he was being uncooperative with them, and so
16:25 25  whoever he was talking to told him that for me and him

16:25  1    to go over there.  And then later on I find out that

16:25  2    one of the persons -- or the person that he had spoken

16:25  3    to was to Jim Scheopner, chief of police at the time.

16:26  4        Q.  And he had told him to go over to R. D. Moore's

16:26  5    home?

16:26  6        A.  Right, for me and him to go.  And my

16:26  7    understanding from Foist was that I was to go because I

16:26  8    was a friend of R. D.'s, and I could probably control

16:26  9    R. D. better than Foist because I know R. D.

16:26 10        Q.  Was there anything about Sergeant Foist's

16:26 11    method of dealing with people that just didn't allow

16:26 12    for him to be able to communicate or to calm R. D.

16:26 13    Moore down or to deal with Mr. Moore?

16:26 14        A.  You have got to know -- you have got to know

16:26 15    Foist.  He has got a temper himself.  I really never

16:26 16    worked with him, but I joked around a lot with him, and

16:27 17    there's just a demeanor that you have got to understand

16:27 18    somewhat to get along with him, and --

16:27 19        Q.  What is that demeanor?

16:27 20        A.  I don't know.  Sometimes he would be joking

16:27 21    around, and then he would turn on you and be serious,

16:27 22    no longer could you joke with him.  So you have just

16:27 23    got to understand him.

16:27 24        Q.  How long had Sergeant Foist been at the

16:27 25    Harlingen PD?

16:44  1    if it was already daylight or whether it was just

16:44  2    barely going into daylight or whether --

16:44  3         A.   It was daylight.

16:44  4         Q.   Okay.  When you got there -- let me ask you

16:44  5    this before that.  On your way to R. D. Moore's home,

16:44  6    did you hear any radio communication on the unit

16:45  7    regarding anything involving this incident?

16:45  8         A.   No, ma'am.

16:45  9         Q.   Did you hear any radio communication on your

16:45 10    way to R. D. Moore's home?

16:45 11         A.   I don't recall if there was any radio

16:45 12    communication on there or not.

16:45 13         Q.   Sergeant, do you know why no one else besides

16:45 14    yourself and Sergeant Foist went out to R. D. Moore's

16:45 15    home?

16:45 16         A.   I couldn't answer that.  I don't know why only

16:45 17    us two.

16:45 18         Q.   Was there anyone else that went out there?

16:45 19         A.   Other than us two, no.

16:45 20         Q.   And when you went out there, you had been

16:45 21    authorized by Chief Scheopner?

16:46 22         A.   That's what Sergeant Foist said, yes.

16:46 23         Q.   When you got there, who did you speak to first?

16:46 24         A.   We walked by -- we got up there, and some of

16:46 25    the deputies were there.  Saenz, Ronnie Saenz, was

THE STATE OF TEXAS          §

COUNTY OF CAMERON          §



EXHIBIT NO. 9E
5-18-00
Maureen Stingley

BEFORE ME, the undersigned authority in and for Cameron County, Texas, on this the 10 TH DAY OF _____JULY_____, 1998, A.D., did personally appear: __ALBERT DANIEL PERRY__, who after being by me duly sworn, did depose and say:

MY NAME IS DANIEL PERRY, MY DATE OF BIRTH IS SEPTEMBER 5,1961, I RESIDE AT RT 1 BOX 227 STUART PLACE RD. HARLINGEN, TEXAS, AND I CAN BE REACHED AT 956- 412-5783.

I AM EMPLOYED BY BALLENGER CONSTRUCTION COMPANY AT THE ASPHALT PLANT LOCATED WEST EXPRESSWAY 83 AND ALTAS PALMAS RD. I AM A FOREMAN THERE. ONE OF THE EMPLOYEES IS ERNEST MOORE. THE OTHER DAY, JULY 7,1998 I WENT TO WORK AT 5:00 A.M., THAT'S THE NORMAL TIME THAT I GO TO WORK. THE REST OF THE CREW USUALLY SHOWS UP AT 5:30 A.M. ERNEST MOORE DID NOT SHOW UP ON TIME SO I PUT ANOTHER MAN IN HIS PLACE. I ASKED MY PLANT OPERATOR, ARMANDO COREA, IF HE KNEW WHERE ERNEST MIGHT BE. HE TOLD ME THAT HE GONE WITH NICK ANDERS AND ROB REED TO GO SWIMMING AND TO DRINK A FEW BEERS THE EVENING BEFORE. I FIGURED THAT HE MIGHT BE HUNG OVER AND STILL IN BED SO AT ABOUT 6:15 A.M. TO 6:30 A.M. I CALLED HIS HOUSE TO SEE IF HE WAS THERE. A MAN ANSWERED THE PHONE AND I THINK THAT IT WAS HIS BROTHER AND I ASKED IF HE WAS THERE. I ASKED IF ERNIE WAS COMING INTO WORK AND HE TOLD ME THAT HE PROBABLY WAS NOT THAT HE, ERNIE, WAS IN A LOT OF TROUBLE THAT HE HAD SHOT SOMEBODY. THEN PATSY, HIS MOTHER , GOT ON THE PHONE AND ASKED ME IF I WAS SURE HE WASN'T AT WORK. SHE SAID THAT THE POLICE WERE THERE AND THEY COULDN'T FIND ERNIE. WE HUNG UP AND ABOUT FIFTEEN MINUTES LATER SHE CALLED ME BACK AND ASKED ME IF I KNEW WHO HE, ERNIE, MIGHT HAVE BEEN WITH. I TOLD HER THAT HE HAD BEEN WITH ROB AND THAT ROB WAS NOT AT THE PLANT.

I STARTED LOOKING AROUND FOR THE CREW TO SEE WHO WAS THERE TO SEE

PAGE ONE OF TWO

## PAGE TWO OF TWO

IF ANYONE ELSE WAS NOT AT WORK. I TOLD ARMANDO THAT ERNIE HAD SHOT
SOMEONE AND LATER I TOLD NICK THE SAME THING. ABOUT TWENTY MINUTES
LATER, ROB CAME INTO WORK. I RECEIVED A CALL FROM THE MAIN OFFICE LATER
THAT THE SHERIFF'S DEPARTMENT WANTED TO TALK WITH ROB

The above is a true and correct statement to the best of my knowledge and ability.

Sworn and subscribed to before me on this the _10_ day of _____, 1998, A.D.

JOHN C. FRIZZELL
Notary Public, State of Texas
My Commission Expires
11-20-2001

Notary Public for Cameron County, Texas

# HARLINGEN POLICE DEPARTMENT
## DEPARTMENTAL
## DIRECTIVES

REVISED 11-01-94

CNtPDF - www.fasiio.com

# HARLINGEN POLICE DEPARTMENT
# MISSION STATEMENT

"To protect life, property, the constitutional rights of individuals, and promote a feeling of security within the community through the prevention and deterrence of crime, and the apprehension of law offenders, while providing total quality police service."

# TABLE OF CONTENTS

I.              Law Enforcement Code Of Ethics

II.             Introduction

III.            Goals

IV.             **Written Directives**

**SECTION 1**       **GENERAL PROVISIONS**
1.01            Development And Revision Of Written Directives.
1.02            Application Of Directives

**SECTION 2**       **ORGANIZATION**
2.01            Organizational Relationships

**SECTION 3**       **MANAGEMENT OF PERSONNEL**
3.01            Reporting For Licensing
3.02            Corrective Measures And Discipline
3.03            Training
3.04            Grievances
3.05            Citizen Complaints Against Personnel

**SECTION 4**       **PROFESSIONAL CONDUCT AND COMMUNITY RELATIONS**
4.01            Interaction With The Public

6.07        Law Enforcement

6.08        Arrest

6.09        Handcuffs

6.10        Transporting Prisoners

6.11        Juvenile Offenders

6.12        Evidence

6.13        Recovered Property

6.14        Vehicle Impoundment, Inventory And Towing

6.15        Domestic Disturbances/Family Violence

6.16        Mentally Ill Persons

6.17        Call Back

6.18        Use Of Force

6.19        Use Of Deadly Force

6.20        Injury to Officer

6.21        Exposure to Reportable Communicable
            Diseases

**SECTION 7          INTRA-AGENCY MANAGEMENT**

7.01        Interaction Among Department Personnel

7.02        Harassment

7.03        Medical And Psychological Exams

7.04        Drug Test

# INTRODUCTION

The law establishes the authority of the Harlingen Police Department. Members of the Harlingen Police Department serve the citizens of the community whose personal conduct they regulate. Representatives of these citizens pass the laws and ordinances the Harlingen Police Department must enforce.

The mission of the Harlingen Police Department is to protect life, property and liberty, preserve the peace, prevent crime, and serve the citizens of Harlingen. To achieve this mission, the Department must enforce laws and ordinances, apprehend and prosecute law violators, while systematically directing and coordinating a large number of people and other resources effectively. Materials contained in this manual work to serve this end.

State and Federal Statutes dictate what a police officer must do to faithfully discharge the obligations imposed by his oath of office. The law does not encompass every consequence that arises from it's application. It is not possible to anticipate every situation or prescribe the specific course of action required for each case. To apply the law equitably and effectively, the Department must rely upon the exercise of common sense and good judgment in such situations.

An understanding of human behavior and an application of common sense will go far toward the realization of the primary police mission. These two qualities alone are not sufficient to insure the standard of quality governing the conduct of personnel. Materials contained in this manual serve this end.

While direction is necessary, personnel must also have discretion to adapt to unusual and unpredictable situations. The intent of this manual is to compensate for the flexibility needed while providing the guidance required. Written directives help balance the required direction and the need for discretion. They also vary in style and the amount of discretion allowed. The contents of this manual include the definitions of those different styles of directives.

II

# WRITTEN DIRECTIVES

In working toward the Harlingen Police Department's objectives and goals, many activities and situations occur repeatedly. Examples include booking prisoners, driving vehicles, and using force. These recurring activities can be beneficial or detrimental to the success of the Department depending on their outcome or results. Written directives work well for directing personnel toward a beneficial result. Written directives are also considered when it appears that such directives would contribute to improve work quality or quantity or improve working environment for personnel.

As noted earlier, different types of directives provide the direction required and the discretion personnel need to adjust to peculiar situations. The types of directives used in the manual are:

## POLICIES

Policies identify the desired result, outcome, or purpose of an activity or situation. They tell "what" to accomplish when encountering a specified activity or situation. If the reason for a particular result is not obvious, the policy should clearly state what it is, and why.

## PROCEDURES

Procedures tell "how" to accomplish policy goals. The procedures, which accompany a policy, tell how to accomplish the desired result under normal circumstances.

Some unanticipated cases may occur where the prescribed procedures will not effectively and efficiently accomplish the desired result. Good judgment and clear thinking by personnel are essential. Personnel have the discretion to use other means when required. Personnel should have a reasonable explanation for resorting to procedures other than those specified. Deviations from standard procedures should stay in harmony with the goals of the Department and not conflict with the accomplishment of other policies.

IV

# SECTION 1          GENERAL PROVISIONS

1.01.        DEVELOPMENT AND REVISION OF WRITTEN DIRECTIVES
             The Chief of Police finds it beneficial to incorporate written directives,
             policy statements, procedures and rules into one general manual. This
             requires a systematic approach to ensure the manual contains only
             information necessary to carry out department goals. It is desirable that
             all directives be clear and concise, without conflict or unnecessary
             duplication.

1.01.001     RECOMMENDATIONS FOR DIRECTIVES
             Department employees may recommend the development or revision of
             written directives to the Chief. He reviews these recommendations for
             development or revision and decides if action is necessary.

1.01.002     DEVELOPMENT OR REVISION
             The Chief initiates formal development or revision of written directives by
             establishing research and writing assignments. He may also require
             written reports to keep him informed of the progress of these
             assignments. Before approving new directives or revisions to current
             directives, the Chief reviews them for approval, rejection or further
             revision.

1.02         APPLICATION OF DIRECTIVES
             Ready availability of written directives and a clear understanding of them
             by all personnel is essential.

1.02.001     DISTRIBUTION OF DIRECTIVES
             The Chief approves all written directives for distribution to the personnel.
             All personnel must sign an acknowledgment showing they received and
             understand the directives.

1.02.002     PLACEMENT OF DIRECTIVES IN MANUAL
             Personnel receiving new or revised directives promptly place them in their
             manual in proper numerical order. Personnel must delete and remove all
             superseded directives.

1.002.003    HISTORICAL MANUAL AND ACKNOWLEDGMENT RECORD
             The Administration maintains a loose leaf file of all written directives and
             changes.. This file also contains the acknowledgment sheet for each
             policy issued and for any subsequent additions or revisions.

Case 1:98-cv-00162   Document 106   Filed in TXSD on 07/10/2001   Page 184 of 550

4. **Back-up.** In addition to the department-issued or approved alternate duty weapon, an officer may carry one additional weapon on-duty as a back-up provided he qualifies with the weapon and: (Revised 02-15-87)  (A 01.03.08)

    a. the weapon meets standards developed by the Rangemaster; and

    b. if the back-up weapon is a semi-automatic pistol, the officer must successfully complete a one-hour course of instruction in the use of the weapon as a back-up conducted by the Department Firearms Instructor or such firearms instructors as he shall designate. This requirement shall be waived if the officer has successfully completed the 24-hour (or 8-hour prior to December 15 1989) semi-automatic pistol course for alternate weapons. (Revised 12-15-89)

5. **Off-duty Use.** An officer may carry weapons other than those issued or approved for duty use off-duty if he has met department qualification standards with the weapon and the weapon meets standards developed by the Rangemaster. All such weapons approved for use off-duty must be registered by serial number with the Department. (Revised 02-15-87)  (A 01.03.06)

6. **Approved Weapons List.** A list of approved alternate on-duty, back-up, and off-duty weapons will be maintained by the Rangemaster and posted at the police pistol range.  (A 01.03.06)

    a. Officers seeking approval of a weapon not included on the approved list must submit a written request to the Rangemaster to have the weapon added to the approved list. After appropriate research and testing, the Rangemaster will submit the officer's request and the results of his research, along with his recommendation, to the Police Chief for decision. (A 01.03.08)

    b. Denial of approval of a weapon by the Rangemaster is subject to reversal only by the Police Chief. (A 01.03.08)

    c. In order for a weapon to be considered for approval as a back-up or off-duty weapon, it must meet the following standards:  (Effective 02-15-87)

        1) be a double-action revolver or a single-action or double-action semi-automatic pistol;

        2) have the capacity of at least 5 shots without reloading;

        3) be of a caliber ranging from .22 caliber to .45 caliber, excluding .41 and .44 calibers;

        4) be of sufficient reputation and quality that its use would be considered reliable by law enforcement standards.

7. **Ammunition Standards.** Only ammunition meeting standards developed by the Rangemaster shall be used in any approved weapon. In approving ammunition for use, the Rangemaster will consider the following:  (Effective 02-15-87)  (A 01.03.06; 01.03.12)

    a. research published by the Dallas County Forensic Laboratory;

    b. manufacturers' published specifications and recommendations;

    c. such testing as is deemed necessary by department policy.

    d. no reloaded, remanufactured, or handloaded ammunition will be recommended or approved for use other than training or practice. (Revised 12-15-89)

8. **Approved Ammunition List.** A list of approved ammunition for all categories of approved weapons will be maintained by the commander of the Training Division or his designee. Copies of the list will be posted at each Patrol briefing site, on the bulletin board near the mail room on the third floor of the Public Safety Building, and at the pistol range at the Training Center. (Revised 12-31-90)  (A 01.03.06)

9. **Structural Modifications.** No structural modifications of the department-issued or approved alternate duty weapon, the approved back-up weapon, or an approved off-duty weapon may be made without the approval of the department armorer.

10. **Restriction on Use of Department-issued Weapons.** Department-issued revolvers are to be used only for on-duty police and off-duty police-related activities. Use of the department-issued weapons by anyone other than a commissioned Arlington police officer is prohibited.

Case 1:98-cv-00162   Document 106   Filed in TXSD on 07/10/2001   Page 185 of 550

B. **Weapons Qualification** A

1. **Standards.** All commissioned police personnel, including reserve police officers, are required to qualify with any firearm they expect to carry by virtue of their status as a police officer. (Revised 04-03-89)  (A 01.03.10; 01.03.11; 16.04.09; 33.05.01)

    a. Qualification frequency with the duty weapon (whether department-issued or approved alternate) will be at least twice yearly. More frequent qualification can be set by the Rangemaster upon direction of the Police Chief. (Revised 12-15-89)

    b. Regular officers must qualify on a yearly basis with any weapon they expect to carry off-duty.

    c. Qualification with on-duty weapons other than handguns will be on an annual basis. (Effective 04-03-89)

    d. Regular and Reserve officers will qualify with their back-up weapons, if any, on an annual basis. (Effective 12-15-89)

2. **Failure to meet minimum qualification standards:**  (A 01.03.10)

    a. with the duty weapon or approved back-up weapon, if any, will result in scheduling of a one-on-one on-duty practice session supervised by the Rangemaster. After the practice session, a retest will be given.

        1) Failure of the retest with the duty weapon will subject the officer to termination of employment as a police officer for failure to maintain an acceptable level of performance.

        2) Failure of the retest with a back-up weapon will result in the officer's being prohibited from carrying that weapon.

    b. Failure to meet minimum qualification standards with an off-duty weapon will result in the officer's being prohibited from carrying the weapon until minimum qualification standards are met. Any required practice sessions will be conducted off-duty. (Effective 02-15-87)

3. **Ammunition.** All commissioned personnel qualifying with any weapon as required or authorized in this Order shall do so with the ammunition they will utilize in the weapon at least annually and otherwise as specified by the Rangemaster.

4. **Range Limitations.** No firearms will be allowed on the Department Range other than Department-owned or approved alternate weapons and back-up and off-duty weapons approved by the Rangemaster. No .38 caliber ammunition manufactured using aluminum casings are allowed to be used on the Department Range. (Revised 12-13-85)

5. **Persons Limitations.** Only Arlington police officers are allowed on the Department Range unless others are approved by the Rangemaster or by direction of the Police Chief. No one other than Arlington police officers will fire on the Arlington pistol range without first signing a Waiver of Liability form. (Revised 03-24-86)

6. **Use of Force Policy.** Prior to being authorized to carry a firearm, all sworn personnel will be issued a copy of and instructed in the department written policy on use of force. (Effective 03-31-87)

7. **Mechanical Failure.** In the event of possible mechanical failure of a weapon during qualification, the weapon will be immediately surrendered to the line officer and/or Rangemaster for inspection and the officer issued a replacement weapon. The replacement weapon will be used for qualification and must be used until the officer's weapon is certified by the Rangemaster as being in proper working order, when it will be returned to the officer and the replacement weapon turned in. (Effective 03-01-88)

F. **Special Weapons.** Department special weapons and ammunition are maintained by the Special Operations Division. No personnel shall utilize or have access to any department special weapon or ammunition unless specifically authorized according to published regulations. (Revised 02-15-87)

G. **Duty to Report Firearms Discharge.** An Apparatus or Firearm Usage Report, along with any supporting documentation, will be submitted through the chain of command to the employee's Bureau commander at any time an officer discharges his service revolver, any other firearm used in connection with his police duties, or whenever an officer discharges any chemical agents.

   1. The term "chemical agents" as used in this section does not include fire extinguishers. (Revised 03-01-88)
   2. This regulation applies to all such discharges, whether intentional or accidental.

H. **Replacement Weapons** (Effective 11-18-85)

   1. **When Duty Weapon Taken.** An officer involved in a shooting incident who has his duty weapon collected pursuant to the investigation, yet who does not have his law enforcement authority temporarily suspended, will be allowed the use of a city-issued weapon to continue performance of his duties. (Revised 03-30-92)

      a. Two weapons and appropriate leather gear will be kept for this purpose in a locker in the crime scene office. The key to the locker will be maintained by the crime scene supervisor. (Revised 09-15-89)
      b. Upon approval of the appropriate Division commander, the officer involved may be allowed to utilize one of the stored weapons as a replacement weapon. (Revised 09-15-89)
      c. The officer must qualify with the replacement weapon before returning to duty. (Revised 04-01-90)
      d. The crime scene supervisor or his designee will be responsible for signing out the weapon and leather gear to the officer. (Revised 09-15-89)
      e. Upon return of the officer's regular duty weapon to him, he will return the replacement weapon and leather gear in clean and serviceable condition to the crime scene supervisor or his designee, who will return the replacement weapon and leather gear to the locker and sign them back in on the log. (Revised 09-15-89)
      f. Should more than two replacement weapons be needed, additional weapons utilized under this provision shall be made available by Fiscal and Personnel Services Division personnel. Sign-out and check-in of the weapons will be made by the crime scene supervisor or his designee under the same circumstances as that of the replacement weapons stored in the crime scene office locker. (Revised 09-15-89)

   2. **When Alternate Weapon Requires Service or Duty Weapon Requires Inspection.** An officer who elects to carry an approved alternate duty weapon whose approved weapon requires repair or service or an officer whose issued weapon is surrendered for inspection as the result of possible mechanical failure during qualification will be allowed the use of a city-issued replacement weapon to continue performance of his duties. (Revised 03-01-88)

      a. A sufficient number of weapons and leather gear will be kept at the Training Center under the control of the Rangemaster for this purpose.
      b. Upon approval of an on-duty supervisor of the rank of sergeant or above, the officer requiring a replacement weapon may be allowed to check out one of the weapons stored at the Training Center as a replacement weapon.
      c. The officer must qualify with the replacement weapon before returning to duty. (Revised 04-01-90)
      d. The Rangemaster or his designee will log out the replacement weapon and leather gear to the officer. Upon completion of repair or service of the approved alternate or issued weapon, the officer will return the replacement weapon and leather gear, clean and in serviceable condition, to the Training Center, where it will be logged back in by the Rangemaster or his designee.

   3. (Deleted 04-01-90)

# SECTION  2                    ORGANIZATION

2.01        ORGANIZATIONAL RELATIONSHIPS
            The Chief of Police requires that personnel in the various organizational
            positions interact in a way which best contributes to the goals of the
            Police Department.

2.01.001    AUTHORITY
            Authority is the legitimate power given to the Chief to manage the
            Department's personnel and resources.  He delegates authority to other
            personnel as he believes will best serve the department's goals.

2.01.002    ACCOUNTABILITY
            Persons receiving authority over another person or receiving authority to
            carry out a specific job  are accountable to the Chief of Police. The
            accountability is direct or indirect as suggested by their job, rank, or by
            special instructions from the Chief of Police.

2.01.003    RESPONSIBILITY
            Personnel of the Department accept responsibility for the duties stated in
            the job description of their position and as directed by their supervisor.
            Additionally, personnel receive guidance for their duties from the policies,
            procedures and rules contained in this manual.

2.01.004    COMMANDING AND SUBORDINATE PERSONNEL
            Commanding personnel of divisions or details are in full charge and
            directly responsible to the Chief for the efficiency, discipline and morale of
            their personnel.  Commanding Officers are responsible for carrying out
            the duties imposed upon them by the "Rules for Grading Police
            Personnel" as set forth in the local Civil Service rules for Civil Service
            employees, and by the Personnel Policy for all other City employees.

            Subordinate personnel, through the Chain of Command, are directly
            responsible to the Commanding Officer of their division.   The Ranking
            Officer  on duty is in charge of all officers.

2.01.005    VERBAL DIRECTIVES
            Personnel promptly obey all lawful instructions and orders of superior
            officers.

2.01.006    DISPATCHER INSTRUCTIONS
            Personnel, whatever rank, follow directions given them by the dispatcher.
            If the directions seem unjust, they are first performed, then questioned
            through the Chain of Command.

3.02.002   SUSPECTED CRIMINAL ACTS
When an employee is suspected of having committed a criminal act, the supervisor immediately notifies the Chief or next available officer in the Chain of Command.  The supervisor follows the instructions of the Officer in Command.  The rights of the suspected employee remain intact as any other criminal suspect.

3.02.003   DISCIPLINARY ACTIONS
Disciplinary actions include:

▶ Counseling or training.

▶ Oral reprimands.

▶ Special duty assignments.

▶ Change in duty assignments.

▶ Written reprimands.

▶ Release from duty. (pending other recommendation)

▶ Suspension without pay.

▶ Demotion.

▶ Indefinite Suspension without pay of Civil Service personnel.

▶ Dismissal of non Civil Service personnel.

Once a supervisor decides a subordinate is responsible for a violation, he selects the appropriate disciplinary action.

All supervisors have the authority to counsel, train, give oral or written reprimands, relieve subordinates from duty and to file criminal charges. Supervisors must submit written documentation on any disciplinary action taken other than counseling.   A supervisor can recommend any other disciplinary action.

3.02.004   REVIEW OF RECOMMENDED ACTIONS
Disciplined employees may request, in writing, a review of the discipline taken.  The review process is through the Chain of Command with the Chief having the final review.  He decides to uphold, modify or deny the recommendations, then informs the persons involved.

# SECTION 3        MANAGEMENT OF PERSONNEL

3.01        REPORTING FOR LICENSING
The Department complies with all legal provisions and rules governing the hiring and retention of peace officers.  Specifically of concern are the Texas Local Government Code and the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE) Rules and Regulations.

3.01.001    APPLICATION AND DOCUMENTATION
The Department maintains a current copy of the TCLEOSE Rules and Regulations and reviews all applicant documentation to ensure compliance with TCLEOSE standards.

3.01.002    REPORTING FOR LICENSING
All reports for licensing follow the TCLEOSE License Reporting Guide.

3.01.003    RULE VIOLATIONS
It is the responsibility of the Administration to notify TCLEOSE of any TCLEOSE rule violations by a Department licensee.

3.02        CORRECTIVE MEASURES AND DISCIPLINE
The Administration promotes the accomplishment of the Department's Goals and Objectives through compliance with the Department's policies, rules and regulations.  Positive interaction and mutual respect promote team work and compliance.

At times, to insure internal integrity and community respect, it becomes necessary to take corrective measures or disciplinary action.  The aim of these measures is to deter violations caused by actions or omissions inconsistent with the operation of the Department.

These procedures provide guidelines for supervisors in deciding violations.  They also aid in the selection of appropriate recommendations or disciplinary actions necessary to deter repeated violations.

3.02.001    VIOLATIONS
Violations include any action or inaction that violates a rule and inhibits the accomplishment of a Department goal or policy.  An employee's immediate supervisor usually investigates possible rule infractions and violations.  Before reaching a conclusion, the supervisor considers all attainable information to arrive at an unbiased finding.

3.03.001   TRAINING COORDINATOR
The Training Coordinator is responsible for the development of lesson plans, scheduling classes and for the instruction of in-service classes. Further, it is the responsibility of the Training Coordinator to maintain permanent records of all professional training provided for officers. Additionally the Training Coordinator transmits required correspondence and documentation to TCLEOSE. The Training Coordinator and class room instructors act as supervisors for all students, despite rank, while they are in class.

3.03.002   SUPERVISORS TO HELP TRAINING COORDINATOR
Supervisors work with the Training Coordinator in recommending officers to attend particular classes. Supervisors have the responsibility of seeing subordinate officers under their direction attend  classes.

3.03.003   OFFICERS ATTENDING CLASSES
Officers scheduled to attend training classes deport themselves professionally.  They report to classes punctually and in proper attire. They refrain from loud and contentious remarks, displaying poor attitudes or sleeping in class.

3.03.004   TRAINING ON HIV/AIDS
All officers and jail personnel periodically receive training on HIV/AIDS based on current, accurate and scientific information.  The training includes information concerning modes of HIV transmission, methods of prevention, and illegal behavior likely to  expose a person to HIV. Further, the training must include components relating to the confidentiality of prisoners' medical conditions and the legal rights of employees exposed to communicable diseases.  Additionally, the training must include first aid for HIV/AIDS infected persons and proper infection control procedures.

3.04   GRIEVANCES
Events sometimes occur when an employee believes a condition of employment or a decision is unjust or inequitable.  The Department deals with grievances quickly, fairly and directly.  Employee morale and the maintenance of departmental teamwork require immediate resolution of these problems.

3.04.001   GRIEVANCE PROCEDURE
Generally, a frank discussion of the facts between an employee and his immediate supervisor will resolve most problems.  If informal communications fail, the employee follows the procedures set forth in the Harlingen Personnel Policy.

Following the receipt of a complaint, the Chief or his designee decides the nature of the complaint and pursues all reasonable leads to find out the accuracy of the complaint.  If the complaint warrants further investigation, an internal investigation and/or a criminal investigation are conducted.

In conducting internal investigations into allegations of misconduct and rule violations, the Department may compel an employee to truthfully cooperate to the extent the employee jeopardizes further employment. The Department may require an employee to give a sworn statement or take a polygraph examination.

An employee has the right to answer and respond to accusations of misconduct and rule violations before the Chief reaches a conclusion in an internal investigation.

In conducting a criminal investigation, the Department informs the employee of his legal rights and conducts the investigation as in any criminal proceeding.

At his discretion, the Chief may order both internal and criminal investigations into a complaint.  Investigators conducting the internal investigation act independently of the criminal investigation.  Information or evidence secured because of the internal investigation may not enter the criminal investigation.  Information and evidence discovered by the criminal investigators may enter the internal investigation.

3.05.006     DISPOSITION
Upon conclusion of the investigation, the investigator files a written report of the facts and makes a recommendation.  The Chief reviews the information and makes a finding from the following:

▶ Unfounded complaint.

▶ The employee was not involved, separated from complaint.

▶ The employee is exonerated.

▶ The complaint is not sustained.

▶ Insufficient information.

▶ The complaint is sustained.

# SECTION 4    PROFESSIONAL CONDUCT AND COMMUNITY RELATIONS

4.01    INTERACTION WITH THE PUBLIC
Police personnel interact constantly with the public they serve.  It is the goal of the Department to maintain an ongoing professional relationship with the community.  A relationship built on respect, courtesy and professional conduct will help achieve that goal.

4.01.001    ETHICS
The Department and all officers abide by the Law Enforcement Code of Ethics.

4.01.002    INTEGRITY
Officers act promptly, with courage, firmness and fairness in the face of crime, disorder, or other incident requiring police action.  Department personnel do not give out information or facts to unauthorized persons.  When requested, officers give their names and badge numbers respectfully.  All employees live up to their obligations and do not make promises they cannot keep.

4.01.003    ATTITUDE
Officers maintain a soldierly bearing and avoid slouchy, slovenly and solicitous attitudes of mind or body.  They remain quiet in their conduct and deportment, being civil, orderly and courteous in all situations. Employees avoid answering questions rudely or abruptly, and give the greatest possible attention and courtesy.  Further, they refrain from harsh, violent, crude or profane language on or off duty.

4.01.004    ATTENTIVENESS TO DUTY
All employees show interest in their work by attentiveness to their official duties, alertness in mind, and by observing the rules and regulations. They do not engage in idle conversations with anyone, loiter, engage in non police activity or sleep on duty.

4.01.005    OFF DUTY
Officers off duty take proper police actions in matters coming to their attention.  When off duty, but in uniform, officers conduct themselves as though they were on duty.  If an officer is off duty, and has consumed an alcoholic beverage within the previous four hours, the officer acts as a civilian in all police matters.

Officers at the scene of any incident where it appears the City of Harlingen holds any degree of liability,     notifies a supervisor to conduct a thorough investigation.  The supervisor has the responsibility to gather evidence, identify witnesses, and direct subordinate officers to write reports.

4.02.002     LAW ENFORCEMENT AGENCIES
Personnel cooperate and help with all Law Enforcement Agencies, in emergencies, or when approved by a supervisor.

4.02.003     OTHER AGENCIES
Personnel cooperate and help other non law enforcement agencies, public and private, when it serves the best interest of the Department. The Chief or Commanding Officer on duty approves request from non law enforcement agencies.

4.03          APPEARANCE AND UNIFORMS
Personnel maintain a clean and neat appearance when in public, in or out of uniform, on or off duty.

4.03.001     UNIFORMED PERSONNEL
Employees wearing uniforms report for duty in clean, neat and well-pressed regulation uniforms.  Employees do not wear conspicuous jewelry, or any civilian attire  with the uniform.  Officers wear only equipment or insignia issued by the Department, unless otherwise approved by the Chief. Additionally, officers do not remove any part of the uniform, except the cap, while in public.  An officer may remove the cap when inside the police unit, or inside a building.

Uniformed officers keep a high polish on footwear, leather gear, and metal equipment.

4.03.002     CIVILIAN CLOTHING
Unless some assignment requires wearing other clothing, non uniformed personnel wear clean, neat, conservative clothing while on duty.

4.03.003     PERSONAL GROOMING
Officers, with facial hair, shave daily. Officers with mustaches and sideburns keep them neat and well trimmed.  For reasons of safety and appearance, hair must be neat, off the collar, behind the ears and worn in a style not easy to grab.

**4.04.004**  **CARRYING WEAPONS**
Always, while on duty, officers carry their Department issued pistols, or approved weapon.  An officer never relinquishes a weapon to an assailant voluntarily.

An officer carrying a  handgun conspicuously on duty, wears his badge prominently displayed.  When off duty, officers carrying a weapon, carry it inconspicuously and concealed.

**4.04.005**  **USE OF WEAPONS**
Officers do not display or brandish a weapon as a threat unless the actual use of the weapon is a legal option.  However it is permissible, when anticipated, to ready a weapon for use.

Normally, a firearm is not drawn in public except during inspections or for lawful use.   Officers discharge firearms only under the following conditions:

▶ During range practice or authorized competitive events.

▶ To destroy an animal that represents a threat to public safety, or as a humanitarian measure where the animal is seriously injured.

▶ When justified by the Texas Penal Code, and Chapter 6 of these Directives.

**4.04.006**  **REPORTS ON WEAPON USE**
An officer using a weapon or firing a gun, accidentally or intentionally, except on the firing range or while at a legitimate sporting event, reports the incident in writing.

**4.05**  **ENFORCEMENT OFF DUTY**
Any off duty officer receiving information of a law violation, reports the violation to the Department when practical.  If the situation requires immediate action, the officer takes the proper action and makes a written report.  An off duty officer under the influence of an alcoholic beverage or medication, avoids taking any official police action if possible.

**4.05.001**  **IDENTIFICATION**
Off duty officers carry their badges and police identification with them.

**4.05.002**  **ENFORCEMENT ACTION**
Officers making arrests off duty, operate under the same laws that govern private citizens when making arrests.

▶ Any employment, including any investigations for the private sector, which might require the employee to have access to police information, files, records or services.

▶ Any employment, in police uniform, not contracted through the City.

▶ Any employment that aids the case preparation, for the defense, in any criminal or civil action or proceeding.

▶ For a business or labor group that is struck.

▶ In occupations regulated or licensed by the Department.

▶ At establishments which sell pornographic books, magazines, sexual devices, or videos, or otherwise provide entertainment or services as a sexually oriented business.

▶ Any employment involving the sale, manufacture or transportation of alcoholic beverages as the principal business.

▶ Any gambling establishment not exempted by law.

4.06         PUBLIC SPEECH
The Department reserves the right to limit the speech and conduct of it's employees while on duty, or when representing themselves as employees of the City.

4.06.001      POLICE PERSONNEL AND CITY OFFICIALS
While on duty, in uniform, or when representing themselves as City employees, employees refrain from:

▶ Publicly criticizing the actions or inactions of the Department, it's members, or any other City official.

▶ Publicly expressing any opinions on local political issues or other questions, the nature of which are controversial.

▶ Campaigning for or against candidates for any Municipal office.

▶ Distributing or erecting literature or materials of a political or controversial nature regarding Municipal issues.

**4.07.006**     COURT TESTIMONY
Officers attend court when notified, and testify truthfully without desire or design to influence the result.

CN>PDF - www.fxiso.com

**5.03.001      DESK, LOCKERS AND FILING CABINETS SUBJECT TO INSPECTION**
Desk, lockers, filing cabinets and other storage areas within the
Department are for official police business only.  The Department retains
the right to inspect them for maintenance, compliance with these
directives or the retrieval of files, documents and materials under the
control of the Department.
Except for purses or bags containing strictly personal effects, all boxes,
containers, briefcases, envelopes and folders stored within are also
subject to inspection.

**5.03.002      PROCEDURE FOR INSPECTION**
Where the Department maintains a keyed or combination lock for any
desk, locker, filing cabinet, or other storage device or area, no other lock
may be used.

If an employee changes a lock on Department controlled equipment, one
copy of the new key is turned over to the Chief so the Department can
maintain access.

If, during an inspection a locked personal container is found, the
employee will be asked to open the container or remove it.

If a criminal action is suspected, the Department follows all search and
seizure laws and Constitutional guidelines.

**5.04          JAIL OPERATION**
The Harlingen City Jail is a short-term detention facility for use by
authorized agencies.  The jail operates under state and federal guidelines
concerning inmate housing, control, and privileges.

**5.04.001      AUTHORIZED AGENCIES**
The City Jail houses adult prisoners arrested by Harlingen officers,
federal officers, state officers, and Cameron County Sheriffs officers.
Additionally, the Chief may authorize holding prisoners from any other
agency on a case by case basis.

**5.04.002      SHORT-TERM DETENTION**
The jail accepts persons arrested for all degrees of crime for temporary
detention.  If a person is arrested for a crime greater than a Class "C"
misdemeanor and after arraignment is unable to post bond, the person is
transferred to another facility promptly.

5.04.003    JAIL CONTROL
During regular business hours, the jail is under the control of the booking
officer and the detective supervisor.  At other times, the jail is the
responsibility of the booking officer and the on duty patrol supervisor.

5.04.004    INTAKE AND RELEASE
A Harlingen police officer or booking officer is present when a prisoner is
booked and incarcerated, released or transferred.  This insures that the
prisoner is handled properly.

5.04.005    TELEPHONE USE
A prisoner has the privilege of using the telephone to communicate to
someone his location, charge, and to attempt to secure lawful release.

5.04.006    JAIL MONITORING
Booking officers check occupied cells at least every thirty minutes.  In the
absence of a booking officer, the duty supervisor ensures that the
schedule is followed.  The communications section also continuously
monitors the jail section by microphone and video camera.

5.04.007    VISITATION OF PRISONER
Attorneys, medical personnel, and the clergy may visit prisoners at any
time.  Other visitors adhere to the set visiting hours unless a supervisor or
person in charge of the jail grants visiting privileges.

5.04.08     RECEIVING PROPERTY FOR PRISONERS
The Department allows a prisoner to receive approved medication, a
change of clothing and legal documents.  Food, beverages, and tobacco
products are not accepted or held for prisoners.

5.04.009    BONDSMEN AND ATTORNEYS
Employees do not directly or indirectly recommend the employment of any
person as an attorney or bondsman to any prisoner or suspect.  Further,
employees do not post or make bond for any prisoner.

5.05        PRISONER CARE
Prisoners in the City Jail are treated in a humane and civil manner
regarding their health, safety, privileges, and civil rights.

5.05.001    PRISONER SAFETY
The arresting officer is responsible for the safety of a prisoner until the
prisoner placed in a cell.  Once incarcerated, the prisoner becomes the
responsibility of the booking officers and the officer in charge.

5.05.014   TESTING PRISONERS FOR HIV/AIDS
Upon the advice of a physician or public health officer, the Chief has the authority to test prisoners for HIV/AIDS. Documentation of such test, and the medical and behavioral necessity for the test, is confidential and a permanent part of the prisoners record. The Department complies with all counseling protocols established by the Texas Department of Health when testing prisoners for HIV/AIDS.

5.05.015   HIV/AIDS INFORMATION AVAILABILITY TO PRISONERS
The Department maintains a poster in the booking area written in English and Spanish containing information about HIV/AIDS. Information contained in the poster relates to mode and methods of infection, behaviors that place a person at risk of infection, and behaviors that violate Texas Criminal laws.

5.05.016   HIV/AIDS INFECTION CONTROL SUPPLIES AND EQUIPMENT
The Department maintains a HIV/AIDS first aid and clean up kits in the booking area of the jail. the kits contain supplies required by the Texas Department of Health.

5.05.017   REPLACEMENT OF SUPPLIES
Employees using materials from the HIV/AIDS first aid or clean up kits must document in writing all materials used. The equipment officer keeps the kits replenished.

5.05.018   EVACUATION OF THE JAIL
The booking officers and officer in charge have the responsibility of evacuating the jail in the event of an emergency threatening the jail. Depending upon the nature and extent of the emergency, the order of relocation assembly points are:

▶ The training room.

▶ The Municipal Court.

▶ The covered sallyport outside the jail.

▶ Any other place of safety determined by the person in charge.

5.06   CARE OF PRISONER'S PROPERTY
The arresting officer has the responsibility for a prisoner's property until it is turned over to the booking officer or other responsible authority. The booking officer is responsible for securing any property placed in his custody.

5.08.002   COMPOUND SECURITY
The gates to the compound are kept shut when not in use.  Officers
challenge any non police personnel found in the compound if they are not
accompanied by an officer.

CutePDF - www.fwino.com

6.03.001    AUTHORIZED POLICE VEHICLE
An authorized police vehicle is any mode of transportation utilized in the necessary carrying on of official police functions, that is authorized by a division supervisor or the Chief of Police.

6.03.002    LAWFUL OPERATION
Police vehicles are operated in a manner to conform to state laws and city ordinances when making routine calls and when patrolling.

When responding to emergency calls, the vehicle and it's related emergency equipment are operated in accordance with the existing state laws and local ordinances.

6.03.003    SAFE OPERATIONS
An officer is never relieved of the duty to drive with "due regard" for the safety of all persons and property, nor is the officer protected from the consequence of any reckless disregard for safety.

6.03.004    SPEED
An authorized police vehicle is operated at a safe speed under all circumstances: a speed that is prudent and one which allows the operator to be in full control of the vehicle at all times.

6.03.005    PASSENGERS
A police vehicle is an official vehicle and is operated by an on duty officer. Further, a police vehicle is used to transport persons to accomplish the Department's goals.  Persons allowed to ride in a police vehicle are:

▶ Distressed persons.

▶ Stranded motorists.

▶ Complainants.

▶ Victims.

▶ Witnesses.

▶ Prisoners.

▶ Off duty Harlingen police officers who have the on duty supervisor's permission.

Any other passengers must have written permission from the Chief of Police.

6.05.001     DEFINITIONS
▶ Vehicular Stop: The use of an authorized emergency vehicle by an officer to stop or apprehend a person or persons.

▶ Continued Attempt To Stop: An active attempt by an officer in an authorized emergency vehicle to stop or apprehend a suspect or suspects who refuse to stop.

▶ Pursuit: An active attempt by an officer in an authorized emergency vehicle to apprehend a fleeing suspect or suspects attempting to avoid apprehension through evasive tactics.

6.05.002     VEHICULAR STOPS
An officer may initiate a vehicular stop under the following conditions:

▶ For any observed violation of the law.

▶ When probable cause exists that a violation of the law has occurred or is about to occur.

▶ To investigate suspicious persons or circumstances.

▶ To inspect license, registration and documents relating to a person's privilege to drive.

▶ To insure the welfare of individuals in or operating vehicles.

▶ To coordinate, direct, and control traffic.

6.05.003     CONTINUED ATTEMPT TO STOP
An officer may continue an attempt to stop a vehicle refusing to stop under the following conditions:

▶ All emergency equipment is activated.

▶ The officer communicates all essential information related to the attempt to stop, including location, direction of travel, description of the vehicle and occupants, and the reason for the attempt.

▶ The immediate need to stop the vehicle is greater than the hazard created by the attempt to stop. This decision is arrived at based on the seriousness of the situation, road conditions, weather conditions, location, time of day, visibility, vehicular and pedestrian traffic.

▶ The attempt does not continuously involve excessive speed.



▶ Other officers have the duty to control traffic if they are in advance of the pursuit, but may not lead or parallel the pursuit.

▶ The pursuing officers will follow the fleeing vehicle at a safe distance.

▶ Officers strictly observe the rules governing the "use of force" and the "use of deadly force."

▶ Officers will not use their vehicles to intentionally bump or ram the fleeing vehicle.

▶ Road blocks may not be used to stop a fleeing vehicle.

▶ Officers may box in a fleeing vehicle only when expressly authorized by a field supervisor.

▶ Officers will not pursue a vehicle the wrong way on an expressway or one way highway.

▶ Firearms may not be readied or discharged from a pursuit vehicle while in motion.

▶ Officers engaged in the pursuit drive in a manner exercising reasonable care for the safety of themselves, all persons, and property within the pursuit area.

6.05.006     DUTY OF DISPATCHER
Upon notification of a pursuit the dispatcher has the following responsibilities:

▶ To immediately inform the ranking field supervisor of the pursuit.

▶ Record all incoming information regarding the pursuit.

▶ Control all radio traffic clearing all non-emergency calls.

▶ Obtain information on vehicle and suspects.

▶ Coordinate and dispatch backup.

▶ Notify neighboring jurisdictions when pursuit may extend into their locality.

6.05.008    REMOVAL FROM PURSUIT
Individual officers or units are removed from the pursuit for the following
reasons:

▶ The officer no longer feels safe in continuing the pursuit.

▶ The unit is damaged.

▶ The emergency equipment or video equipment mal- functions.

▶ At the direction of any other officer involved in the pursuit.

6.05.009    TERMINATION OF PURSUIT
A decision to terminate a pursuit may be the most rational means of
preserving the lives and property of the public, the officers, and suspects
engaged in the pursuit. A pursuit may be terminated by the pursuing
officer, the pursuit supervisor or any command level supervisor.

Pursuits are terminated under the following circumstances:

▶ Weather or traffic conditions substantially increase the danger of
pursuit beyond the worth of apprehending the suspect.

▶ The danger posed by continued pursuit to the public, the officers and
the suspect is greater than the value of apprehending the suspect.

▶ The distance between the pursuit and fleeing vehicles is so great that
further pursuit is useless.

▶ The pursuing officers lose sight of the fleeing vehicle.

▶ The pursuit goes beyond the jurisdiction of the City of Harlingen, and
does not appear to be near an immediate conclusion.

▶ The pursuit is joined by emergency vehicle(s) from other agencies, that
have not been requested by the pursuit supervisor, and who continue with
the pursuit when requested to cease.

▶ When the fleeing vehicle is about to cross an international boundary.

▶ When directed by the pursuit supervisor or a command supervisor.

6.07        LAW ENFORCEMENT
            Officers "protect and serve" the community by complying with their lawful
            duty to, preserve the peace, protect life and property, and to deter and
            prevent crime while detecting and apprehending criminals.

6.07.001    ENFORCEMENT ACTION
            Officers take action and report upon all violations coming to their
            attention, as well as all information they receive about any actual or
            suspected violation of the law.

            Officers immediately report to their supervisors, in detail, any information
            coming to their attention, regarding a felony, or person wanted for a
            felony.

6.07.002    RESTORING ORDER
            Whenever possible, officers use persuasion to restore order and disperse
            crowds.  If persuasion fails then reasonable force is used to arrest the
            individuals involved.

6.08        ARREST
            Officers make arrests when necessary to enforce laws and to protect the
            public.

6.08.001    RIGHT TO ARREST
            Officers witnessing or receiving information of violations of the law may
            make appropriate arrests.  When making an arrest, officers follow existing
            state law stated in the Texas Code of Criminal Procedure.

6.08.002    ENFORCEMENT BY ARREST
            Officers are sworn to enforce federal and state laws, and local
            ordinances.  In carrying out these duties, officers have discretion in
            selecting the best solution for any given situation.  Except when
            mandated by law, or these directives, officers may choose arrest as an
            alternative course of action when seeking the best solution.

            When conducting arrests, officers follow the law and ensure the civil
            rights and privileges of all prisoners.

6.08.003    RELEASE OF PRISONERS ON BOND
            When the Municipal Court is not in session, prisoners charged with Class
            "C" misdemeanors may be released on bond in accordance with fees set
            by the Municipal Court.

**6.09.002    HANDCUFF TECHNIQUES**

Maximum security is achieved by handcuffing a prisoner's hands behind the back. The key-way on each cuff should face upward.  Whenever possible, handcuffs should be laced through the prisoner's belt. Officers double lock handcuffs whenever possible.

Handcuffed prisoners have limited control of their balance.  Officers assist handcuffed prisoners walking, entering and exiting vehicles, and when sitting and rising . Further, handcuffed prisoners should be seat belted in when transported in a vehicle.  When transporting handcuffed prisoners, officers avoid rapid acceleration, stops, and sudden turning movements. Handcuffs are removed soon as practical for the safety of all concerned.

**6.10       TRANSPORTING PRISONERS**

Officers, transporting prisoners from an arrest scene, take the most direct route to the jail without delay.    Officers do not accompany prisoners to their homes or elsewhere unless authorized by a supervisor.

When transporting a prisoner to the county jail or any location outside the city limits, the transporting officer uses full restraining cuffs and chains to secure the prisoner.  Likewise, full restraints are used on high risk felony prisoners any time they are removed from the Department.

**6.10.001    VEHICLE SECURITY**

For security reasons, officers thoroughly search their units when going on duty.  The area used to transport prisoners is searched prior to and immediately after transporting a prisoner.

Prisoners are thoroughly searched before being placed in the police vehicle, all weapons and contraband are seized.

**6.11       JUVENILE OFFENDERS**

Juvenile offenders are handled in accordance and in compliance with the rules set forth in the Texas Family Code.  Officers advise the Juvenile Probation Department when a juvenile is arrested.

**6.11.001    JUVENILE CUSTODY AND RECORDS**

Juvenile records are kept separately, and a juvenile in custody is processed away from adult prisoners.  Juveniles are not incarcerated in the jail.

Additionally, the Department pro-actively supports victims of family violence by working with other agencies and groups who may provide help, aid, and assistance.

6.15.001    DEFINITIONS
The terms Family Violence, Family Member and Member of the Household have those meanings assigned to them in Chapter 71 of the Texas Family Code.

6.15.002    DUTY TO PROTECT
Officers responding to domestic disturbances and family violence calls have the duty to protect any potential victims of family violence, to enforce the law and make lawful arrests of violators.

6.15.003    IMMEDIATE RESPONSE
Because of the great potential for violence, and the need to protect possible victims, domestic disturbance and family violence call are dispatched on a priority basis.

6.15.004    DISPATCHER INFORMATION
Whenever possible the dispatcher should obtain information relating to:

▶ Whether anyone is injured.

▶ The presence of weapons.

▶ If there is a protective order for the residence or any person involved.

▶ The number of persons at the scene.

▶ If drugs or alcohol are involved.

▶ If an assailant has fled the scene, a description of the subject and his vehicle.

▶ History of any violence.

The dispatcher should direct the caller to leave the line open, if possible, until the arrival of police officers.

6.15.005    ADEQUATE RESPONSE
Because of the unpredictable nature of this class of calls, two officers should be assigned to every domestic disturbance or family violence call. Supervisors have the responsibility to routinely check on officers assigned to these calls.

6.15.011   LOCATE AND APPREHEND
When probable cause exists to arrest and the violator has fled, a diligent search is made to locate and arrest the offender. The responding officers advise the victim that charges may be filed regardless of the officers immediate success in apprehending the suspect.

6.15.012   DUAL ARREST
Officers arrest both parties only when it is absolutely necessary to ensure the safety of all parties. When an officer considers making a dual arrest, the officer takes into consideration:

▶ The seriousness of the offenses.

▶ Evidence of self-defense.

▶ The degree of violence.

▶ The identity of the principal aggressor.

▶ The welfare of minor children.

▶ Alternative courses of action including, arresting one and citing into court the other.

6.15.013   EVIDENCE
Officers conducting first response and follow-up investigations of family violence collect and preserve all evidence necessary to support prosecution.

6.15.014   PROPER CHARGES
Officers making arrest in cases of family violence file charges appropriate to the law and severity of the offense. All Class "C" misdemeanors are filed in the Harlingen Municipal Court. All other misdemeanors and felonies are magistrated and filed in the proper courts.. Only the District Attorney's Office may reduce a charge from one court to a lower court.

6.15.015   DISMISSAL OF CHARGES
Charges relating to acts of family violence are not dismissed sooner than seventy-two hours from the time they are filed. Additionally, if charges have not been filed, a case is not exceptionally cleared for a period of seventy-two hours after the initial report is made. These provisions apply even if an affidavit of non-prosecution is filed by the victim. A decision to dismiss, or no longer pursue charges is made with the following considerations:

**6.15.021**   FOLLOW UP INVESTIGATION
Investigators follow up on offense reports, with a family violence designation, on a priority basis. In addition, investigators make contact with each victim on an ongoing basis and notify them of pending court dates. Further, it is the responsibility of the investigator to notify a victim of the final disposition of their case.

**6.15.022**   RIGHT TO FILE CHARGE
Victims of family violence have a right to file charges. Officers having contact with victims inform them of their right to prosecution. Officers do not attempt to persuade victims from filing charges, or dropping charges once the are filed.

**6.15.023**   RIGHT TO BE ACCOMPANIED BY COUNSEL
Victims of family violence or sexual assault have a right to be accompanied by legal counsel, or any other advocate during all interviews, investigations, while giving statements, or when filing charges.

**6.15.024**   CONFIDENTIALITY OF SHELTER LOCATION
The location of the women's shelter is confidential. Employees do not give out the address or telephone number of the shelter. Victims needing shelter are transported to the shelter by shelter personnel, or by officers after permission is received from the Family Crisis Center.

**6.15.25**   RESIDENCE IN SHELTER IS CONFIDENTIAL
Employees do not confirm the identity of anyone staying at the shelter. Friends and family members seeking information on the victim are instructed to contact the Family Crisis Center.

**6.16**   MENTALLY ILL PERSONS
Officers coming in contact with mentally ill persons make all attempts to protect the person and get them help.

**6.16.001**   COMMITMENT PAPERS
Officers serving mental health commitment papers are in plane clothes and in an unmarked car whenever possible.

**6.17**   CALL BACK
Employees are always subject to call from their superiors.

**6.17.001**   ADDRESSES AND PHONE NUMBERS
Employees immediately report any changes in address or telephone numbers to the Chief's secretary. Employees without telephones list the nearest telephone where they can be reached.

6.18.002     **DETERMINATION FOR USE**
When non-deadly force is called for, officers should assess the incident to determine which non-deadly technique or weapon will best de-escalate the incident and bring it under control safely. In determining the amount and degree of force in attaining control, to effect arrest, or to protect the public's safety the officer considers:

▶ The nature and seriousness of offense.

▶ The need for immediate resolution.

▶ The subject against whom the force is to be used.

▶ Physical conditions and surroundings.

▶ The safety of third parties.

▶ The actions by third parties.

6.18.003     **APPLICATION**
It is the officer's responsibility to keep the amount of force used in proportion with the resistance encountered. An officer exhausts every reasonable means of employing the minimum amount of force or control before escalating to a more sever application of force to control the situation.

This does not mean an officer must engage in a prolonged struggle or hand to hand combat. An officer may resort to the method that will most safely and quickly control the situation, if the force used is reasonable.

6.18.004     **AUTHORIZED USE OF NON-DEADLY FORCE**
Under no circumstances is the force used greater than necessary. Unnecessary force is not used when making an arrest, dealing with a prisoner, or dealing with any person.

Officers are authorized to use non-deadly techniques for the resolution of the following:

▶ To protect themselves or another from physical harm.

▶ To restrain or subdue a resistant individual while making or assisting in making a lawful arrest.

▶ To overcome unlawful resistance while conducting or assisting in a lawful search.

▶ Side of the neck.

▶ Throat.

▶ Arm pit.

▶ Chest cavity.

▶ Groin area.

6.18.006    TRAINING REQUIRED
Officers may carry and use side-handle batons and oleoresin capsicum spray, only if they have completed a recognized training course in their use, and have current certification.

6.18.007    REPORTING REQUIREMENTS
In any case where force, physical control, or violence is used, a written report is made by the officer utilizing the force.

Officers observing a situation where they believe more force than necessary was used have a duty to report the incident to a supervisor. Officers failing to report an incident are subject to the same level of discipline as the officer using excessive force.

6.18.008    RESPONSIBILITIES
Officers are responsible for their actions in the use of force. The careful use of force is permitted by law, and at times officers are required to exercise force. Although one must remember the unnecessary use of force is unlawful. Officers exceeding their authority place the Department and themselves in a position of civil and criminal liability.

Provisions for the use of force are found in Chapter 9 of the Texas Penal Code. The fact that conduct is justified under Chapter 9 does not abolish or impair any remedy for the conduct that is available in a civil suit.

6.19    USE OF DEADLY FORCE
The authority for the use of deadly force given to police officers by the law is a grave responsibility. In establishing that authority, the law places restrictions on the circumstances where officers may use deadly force. This balancing of authority and restriction is done to protect the officer, the community interest and the rights of all persons.

▶ When necessary to protect a third person from the use or attempted use of unlawful deadly force.

▶ When immediately necessary to prevent the commission of:

    ▶ Aggravated kidnapping.

    ▶ Murder.

    ▶ Sexual assault or aggravated  sexual assault.

    ▶ Robbery or aggravated robbery.

6.19.005    FIREARMS
Officers are permitted to fire their weapons under the following circumstances:

▶ During range practice or authorized competitive events.

▶ To destroy an animal that represents a threat to public safety, or as a humanitarian measure where the animal is seriously injured.

▶ In those situations and circumstances where the use of deadly force is authorized.

The following restrictions apply to the use and carrying of firearms:

▶ Except for maintenance or during training, officers do not draw or display a firearm unless circumstances create a reasonable cause to believe that it may be necessary to use the weapon in conformance with these directives.

▶ Officers do not fire their weapons:

    ▶ As warning shots.

    ▶ From moving vehicles.

    ▶ In misdemeanor cases.

    ▶ At persons known or believed to be under the age of seventeen (17) years of age, except in the defense of life.

6.21.001    REPORTS FORWARDED
It is the responsibility of the Department to forward reports, of possible exposures to a reportable communicable disease, to the Texas Department of Health within seventy-two (72) hours of the suspected exposure.

6.21.002    REQUEST FOR TESTING FOR REPORTABLE COMMUNICABLE DISEASE
It is the right of every employee who believes they have been exposed to a reportable communicable disease by another person, as a result of their employment, to request free testing.  The Texas Department of Health reviews the circumstances and determines whether to test the employee, the person posing the possible exposure or both.

6.21.003    DEPARTMENT RESPONSIBILITY
It is the responsibility of the Department to explain the procedures and legal aspects of making a request for testing, and to facilitate that request if made.

7.01.005     LOAFING
Employees on or off duty do not loaf or congregate around the
Department.  Employees gather for official business or for a purpose to
further the Department's goals.

7.02     HARASSMENT
The Department recognizes the right of all employees to work in an
environment free from all forms of harassment.  The Department does not
condone, and will not tolerate, any form of harassment.  It is the policy of
the Department to take direct and immediate action to prevent such
behavior, and to remedy all reported instances of harassment, sexual or
otherwise

7.02.001     DEFINITIONS
▶ Harassment: (1) To explicitly or implicitly, by word  spoken or written,
physically by touch or gesture, or graphically however produced, ridicule,
deride, belittle, tease, torment or annoy, any person in any manner. (2) To
goad, heckle, bait, badger, mock, mistreat or taunt a person. (3)
Harassment includes but is not limited to, practical jokes, hazing, and
name calling which is likely to embarrass or humiliate a person.

▶ Sexual Harassment: Sexual harassment is defined as unwelcome
sexual advances, request for sexual favors, and other verbal or physical
conduct of a sexual nature when:

     ▶ Submission to such conduct is made either explicitly or implicitly
     a term or condition of employment; or

     ▶ Submission to or rejection of such conduct by an employee is
     used as the basis for employment decisions affecting the
     employee; or

     ▶ Such conduct has the purpose or effect of unreasonably
     interfering with an employee's work performance or creating an
     intimidating, hostile, or offensive working environment.

7.02.002     PROHIBITED ACTIVITY
Employees do not participate in or allow any form of harassment of
another employee, a prisoner, or any other person.

7.02.003     EMPLOYEE RESPONSIBILITY
Every employee has the responsibility for helping to prevent harassment
through the following acts:

All complaints alleging harassment are turned over to the Chief for review and investigation.

7.02.006    RIGHT TO FILE COMPLAINT
Every employee, has a right to file a complaint if they are harassed. The Department does not permit retaliation against any employee for filing a harassment complaint, or helping, testifying, or participating in the investigation of such a complaint.

7.03    MEDICAL AND PSYCHOLOGICAL EXAMS
Employees may be required to submit to, and pass, more than the minimal medical and psychological examinations required by TCLEOSE guidelines.

7.03.001    MEDICAL EXAMS
If deemed necessary by the Chief, an employee may be required to submit to, and pass, a medical physical examination, other than the required yearly examination. Such an examination being conducted by a qualified physician.

7.03.002    PSYCHOLOGICAL EXAM
If deemed necessary by the Chief, an employee may be required to submit to and pass, a psychological examination, other than the required entry level examination. Such an examination being conducted by a qualified psychologist or psychiatrist.

7.04    DRUG TEST
The critical mission of law enforcement justifies maintenance of a drug free work environment through the use of a reasonable employee drug testing program.

The law enforcement profession has several uniquely compelling interest that justify the use of employee drug testing. The public has a right to expect that those who are sworn to protect them are at all times both physically and mentally prepared to assume these duties. There is sufficient evidence to conclude that the use of controlled substances, and other forms of drug abuse will seriously impair an employee's physical and mental health, and thus their job performance.

When law enforcement officers participate in illegal drug use and drug activity, the integrity of the law enforcement profession, and public confidence in it are destroyed. This confidence is further eroded by the potential for corruption created by drug use.

▶ Any officer who unintentionally ingest, or is made to ingest a controlled substance shall immediately report the incident to their supervisor so that appropriate medical steps may be taken to ensure the officer's health and safety.

▶ Any officer having a reasonable basis to believe that another employee is illegally using, or in possession of any controlled substance shall immediately report the facts and circumstances to their supervisor.

7.04.004   DETERMINATION FOR TESTING
Officers will be required to take drug tests as a condition of employment in order to ascertain prohibited drug use, as follows:

▶ The Chief may order an officer to take a drug test upon documented reasonable suspicion that the employee has been using drugs. A summary of the facts supporting the order shall be made available to the employee prior to the actual test.

▶ A drug test may be administered as part of any regular physical examination required by the Department.

▶ All officers may be uniformly tested during any unannounced, mass/mandatory testing required by the Department. Such testing may be unit by unit or the Department as a whole. The Chief determines the frequency and timing of such test.

▶ A drug test may be considered as a condition of acceptance and/or continued assignment to a specialized unit within the Department. When the test are conducted as a condition of continued assignment, the Chief determines the frequency and timing of such test.

7.04.005   CONDITIONS OF TESTING
The following conditions and procedures may be required as part of the drug testing process:

▶ Officers may be observed by a member of the same sex while producing the urine sample.

▶ When requested, an officer may be permitted no more than eight hours to give a sample for testing. Failure to submit a sample shall be considered a refusal to submit a sample.

▶ Whenever there is reason to believe that the officer may have altered or substituted the specimen to be provided, a second specimen shall be obtained immediately, under direct observation of the testing personnel.

# SECTION 8              SPECIAL OPERATIONS

8.01        CANINE OPERATIONS
The use of the police canine is a legitimate tool in law enforcement. Although their greatest value lies in the deterring effect of their presence, the use of canines in making or maintaining an arrest is authorized when the circumstances in a case justify such use.

All members of the Department must bear in mind the use of canines is making or maintaining an arrest constitutes the use of force, or the implied use of force.  The canine handler should be made aware of all of the facts and circumstances of a situation before deciding to use the canine in an arrest situation.

A police canine may be used in other non force situations, including school presentations, narcotic and explosive searches and tracking lost persons. During these circumstances the handler maintains direct control of the canine on a leash.

The handler is responsible for the amount of force used to make and maintain an arrest or overcome resistance in those situations which justify the use of force.

Some of the principle advantages in the use of a police canine are:

► The psychological effect of dogs in preventing disorderly conduct in crowd control situations.

► As a deterrent in preventing criminal activity.

► Assisting officers in detecting the presence of and capturing suspects, particularly at night, and in searching alleys, back yards, enclosed premises, large fields and wooded areas.

► Narcotic and explosive searches.

► The protection of officers.

► Positive police public relations.

It is the goal of the Department to utilize police canines to provide quality and cost efficient police protection.

8.01.004     **TRAINING**

The Chief designates a Training Director. The major function of the Training Director is to insure the proper training and development or handlers and their canines. The Training Director reviews the training and performance of all handlers and canines, and insures proper documentation is kept on all training. The Training Director may recommend to the Chief that a handler or canine be placed out of canine service or undergo remedial training.

It is the responsibility of the handler to conduct regular and ongoing physical and proficiency training with his canine. Each handler conducts training at least monthly, with emphasis on obedience and those areas for which the canine is certified.

Each handler maintains a training log to document all training activities and proficiency certifications. The Training Director may review the training logs at any time.

All officers who are likely to come in contact with a police canine as part of their regular duties must attend canine in-service training. This training includes demonstrations and simulated building searches in which the student officers take part. Supervisors receive, in addition, training in the strategy and tactics of police canine deployment.

8.01.005     **OPERATING PROCEDURES**

The handler and police canine work as a team. Generally, the canine team is assigned to the Patrol Division with regular patrol duties, or assigned as an adjunct to the Narcotics Division.

Strategically, the authority to use the police canine in situations which might result in the use of force resides with the duty supervisor or a person of higher rank. However, the handler may use the canine in immediate defense of life or serious bodily injury to himself or a third person, when justified by law and these directives.

When making a decision to use the canine team, the duty supervisor should consider the following:

▶ The seriousness of the situation.

▶ Is the suspect armed?

▶ Is there a potential for violence?

▶ Is the use of force authorized and appropriate for the situation?

**8.01.006**   DOCUMENTATION OF USE

The handler is responsible to complete a detailed written report of each tactical use of his police canine.  In cases where the canine bites a suspect or other person, a full investigation is completed by the duty supervisor.  The investigation includes, where appropriate, copies of:

▶ Offense reports.

▶ Causality reports.

▶ Color photographs of the injured areas.

▶ Statements from all witnesses.

▶ Jail cards.

When completed, the findings of the investigation are turned over to the Chief for review.

**8.01.007**   GUIDELINES FOR ALL LAW ENFORCEMENT PERSONNEL

Police canines are trained to be aggressive.  When in their presence, officers should be careful not to take any action which might provoke a reaction.  All personnel should keep in mind:

▶ Canines are trained to protect their handler.  Anyone making a threatening move toward a handler risk being injured.  Even gestures such as a pat on the back or a loud greeting might cause a police canine to react.  A handler should not be approached from behind without warning.

▶ Under no circumstances should a police canine be agitated by anyone.  Employees refrain from horse play in the presence of a canine.  If a canine is tied or in a vehicle, it is normal for it to act aggressive when approached by a stranger.  A police canine does not recognize a police uniform, so police personnel are no exception.  Personnel should ignore a canine in these situations and continue about their regular business.  A police canine should not be talked to or petted unless approved by the handler.

▶ If a canine is alone and acting in an unusual manner because of illness or injury, the handler should be located and advised.  Other employees should not attempt to correct the problem.

▶ From any seized controlled substance property or plant with a pending criminal court case, at least five random and representative samples from the total amount of the property or plant will be preserved as evidence. The remaining controlled substance, property or plant may then be summarily destroyed.  However, sufficient quantity will be preserved to provide for discovery by parties entitled to discovery.  Such samples will be properly tagged and turned over to the Harlingen Police evidence custodian for storage.

If the property consist of a single container of liquid, taking and preserving one representative sample will satisfy these procedures.  All such samples will be preserved until the case is properly disposed of in court and the suspect's appeal process has been exhausted, or an order of destruction is issued by the court of venue.  One year from the date of final disposition of the criminal case, the samples, along with any amount held for discovery may be summarily destroyed.

▶ Any controlled substance property or plant seized with no known suspect(s) may be summarily destroyed after taking at least five random and representative samples from the total amount.  If the property consist of a single container of liquid, taking and preserving one representative sample will satisfy these procedures.  Such samples will be properly tagged and turned over to the Harlingen Police evidence custodian and preserved for a period of one calendar year.  If no suspect(s) have been revealed after the end of one calendar year, such samples may also be summarily destroyed.

▶ Photographs will be taken to reasonably demonstrate the total amount of controlled substance property or plant scheduled for destruction.

▶ The gross weight or liquid measure of the property or plant is determined, either by actually weighing or measuring the property or plant, or by estimating the weight or measurement after making dimensional measurements of the total amount seized.

▶ The Chief may order the immediate destruction of the following materials that constitute an environmental hazard or cannot be safely stored:

   ▶ Controlled substances.

   ▶ Hazardous waste.

   ▶ Chemical residuals.

# SECTION 9                    RULES

9.01        PROFESSIONAL CONDUCT
            It is the expectation of the Department that all employees conduct
            themselves in a professional manner both on and off duty.  Likewise, it
            should be the expectation of every employee to be treated as a
            professional, while at the same time holding themselves and others to that
            standard.

9.01.001    CONFORMANCE TO LAWS
            All employees shall obey and enforce all appropriate  Federal and State
            laws, and local ordinances.

9.01.002    CONFORMANCE TO DIRECTIVES
            All employees shall comply with the goals, directives, policies, and rules
            of the Department.

9.01.003    MISCONDUCT OR NEGLECT OF DUTY
            An employee may be guilty of misconduct or neglect of duty, or conduct
            unbecoming an officer, though such act may not be specifically mentioned
            in the directives, policies, or rules of this manual.

_____
JAMES SCHEOPNER
CHIEF OF POLICE
HARLINGEN POLICE DEPARTMENT
NOVEMBER 1, 1994



PLAINTIFF'S
EXHIBIT
"D"

U.S. Department of Justice
Immigration and Naturalization Service

MCA 50/8.9

*2301 S. Main
McAllen, Texas 78503*

*July 27, 1998*

. MEMORANDUM FOR Jose E. Garza. Chief Patrol Agent, McAllen, Texas

FROM:         Hector Gonzalez
              Supervisory Border Patrol Agent

SUBJECT:      San Benito Shooting Report

        On July 7, 1998, I was assigned the San Benito Shooting Crime Scene Investigation.  I am currently one of three McAllen Sector Crime Scene Investigators.

        I arrived at the crime scene on Gamble Road  and Resaca Road, San Benito, Texas at approximately 8:15  a.m. and made contact with Harlingen PAIC John Brinning and Supervisory Border Patrol Agent Doug Spielman, who briefed me on the circumstances leading to the shooting of Agents Susan Rodriguez and  Ricardo Salinas and Cameron County Sheriff's Deputy Raul Rodriquez.   I also made contact with FBI Agents, Texas Rangers and Cameron County Sheriff's Department Investigator's, who were to conduct the shooting investigation.  I was informed that the scene was not properly secured as it was suspected that two other suspects were hiding in a corn field adjacent to the crime scene.  The immediate area of the shooting was subsequently secured and  it was decided that the Texas Department of Public Safety Field Crime Scene Investigative Unit would conducted the crime scene investigation.

        During this time the area as converged upon by numerous law enforcement personnel from all local, state and federal agencies in the area..  A tactical plan was established and at

Scheopner
EXHIBIT NO. 9-DD
5-/8-00
Maureen Stingley

approximately 2:00 P.M. a search of the area determined that there were no more suspects in the area.

The following is a chronology of the events that transpired on the morning of July 7, 1998:

At approximately 5:20 a.m. the Cameron County Sheriff's Department responded to a shooting at 311 Catherine Street in Rio Hondo, Texas. Two people were shot to death and a third was seriously wounded. The suspect was identified as Ernest Moore and a description of the vehicle and license plate numbers were obtained and put on a "Look Out" to all law enforcement agencies in the area.

At approximately 5:31 a. m., Cameron County Sheriff's Deputy Robert Rodriguez located a vehicle matching the description on the "Look Out", heading south on FM 345 in San Benito. A high speed pursuit ensued and Deputy Rodriguez lost sight of the vehicle in the vicinity of Hudson and Gamble Rd. During this pursuit Deputy Rodriguez thought he observed three occupants in the suspect vehicle. After terminating the pursuit Deputy Rodriguez returned to the county barn to refuel his vehicle.

After returning to the area where he last saw the suspect vehicle, Deputy Rodriguez found the suspect vehicle parked at a residence on the corner of Gamble and Resaca Road. As he approached the residence, he observed a person, later identified as R. D. Moore, a Harlingen, Texas Police Officer, step out of the garage and state to Deputy Rodriguez "*I know my son did something, I want to know what..*" R. D. Moore also stated that his son was upset at two drug dealers that had turned his girlfriend on to cocaine and that his son was going to take care of that. He also stated that he was missing two weapons, an AK-47 and a rifle. He further stated that "*his son was probably contemplating suicide and that he hoped he would commit suicide, because if he didn't his son would come back and kill us*" and stated that his son was a "*damn good shot*".

At approximately 6:41 a.m. the Cameron County's Sheriff's Department contacted McAllen Sector's Communication Center and requested Air Operation's assistance in locating the suspect. LECA John Cantu contacted Harlingen Supervisory Border Patrol Agent Doug Spielman who dispatched some Harlingen Agents to assist in the search and in coordinating the Air Ops assistance. The Cameron County Sheriff's Department does not have the Border Patrol radio frequency.

Among the first Border Patrol Agents to arrive at the area were George Hupp, and his partner Edward Kelly and Daniel Diaz, Harlingen Canine Handler. Agents Susan Rodriguez and her partner Michael Riley were returning to the station at about 6:50 a.m. and decided to respond after hearing the radio traffic. Agent Rodriguez met with Agents Hupp and Kelly and were briefed by Cameron County Deputies on the information R.D. Moore had provided them. Agent Rodriguez, being the senior Agent, assigned Agent Hupp and Kelly to provide a perimeter at the

CVAPDF - www.texto.com



far-east side of Hudson Road. She and her partner Michael Riley then proceeded to walk to the residence where R. D. Moore was. The Sheriff's Deputies had obtained consent to search the Moore residence and as Agents Rodriguez and Riley attempted assist in the search, they were confronted by R. D. Moore who stated " Hold up Border Patrol. I don't want Border Patrol in my house, my son is not an illegal alien." At that point Agent Rodriguez and Riley began to walk back to their vehicle which was parked approximately 100 years east of the residence on Gamble Road. Susan then stopped to talk to a Deputy and was approached by Agents Orlando Sanchez and Ricardo Salinas. Agents Sanchez and Salinas had driven their vehicle to a point caddy-corner of the Moore residence. (see photo and sketch) They met with Agent Rodriguez and as all three of them converged at the left front corner of Sanchez' vehicle the shooting erupted. Agent Salinas received a fatal shot to the back of the skull and another shot entering the back of his left thigh. Agent's Salinas' body came to rest at the left front corner of the vehicle. Agent Rodriguez ran around the vehicle and was shot on the upper right thigh and left neck. Her body came to rest approximately three feet to the right of the rear right fender of the vehicle. (Neither Agent Salinas nor Agent Rodriguez drew their Service weapons from their holsters.) Agent Sanchez temporarily sought cover behind his vehicle and then ran east into a sorghum field to gain distance from the shooter. As he ran he was fired at numerous times. He finally located an area with limited concealment, and returned fire. He fired a total of nine rounds from his Service issued revolver. The shooting suspect, later identified as Ernest Lane Moore also fired at Agent Riley and several other Cameron County Sheriff's Deputies. He hit Cameron County Sheriff's Department Corporal Raul Rodriguez in the left arm area. That bullet traveled into his upper torso area, causing extensive damage. Corporal Rodriguez is expected to fully recover from his wound. Ernest Moore was shot eight times during this encounter by numerous officers at the scene. He died later that afternoon as a results of these wounds. The ballistic results are pending, however five slugs were recovered from his body (four 9 mm rounds and one 40 caliber round).

This investigation revealed that Ernest Moore, the 24 year old suspect, was upset over losing his girl friend, Julie Cox. He was described by his father as mentally unstable and taking PROZAC. Interview of witnesses reveals that Ernest Moore was at a friends house, drinking excessively and abusing cocaine and marijuana from about 6:00 p.m. July 6, 1998 to when they last saw him at about 2:00 a.m. July 7, 1998. (toxicology reports indicated he tested positive for cocaine and marijuana and had an alcohol level of .092.)

The weapon Ernest Moore use at this shooting was property of the Harlingen Police Department. It was a Frankfort Arsenal , model MX 177, 223 caliber, assault type rifle, serial # FA0698 . The weapon had been donated to the Police Department by Thomas Emmett Pirtle. The weapon was then issued to Detective R. D. Moore by Harlingen Police Chief Jim Scheopner.

Attached is a Table of Content and all reports required in the Shooting Incident Report as per Administrative Manual Section 20.012-INS Firearms Policy.

CIMPDF - www.fenito.com

Jose E. Garza, Chief Patrol Agent
San Benito Shooting

July 27, 1998

Questions regarding this investigation can be directed to Field Operations Supervisor
Hector Gonzalez at 901 Rangerville Road Harlingen, Texas, Phone # 956 427-8611.

THE STATE OF TEXAS      §

COUNTY OF CAMERON      §



BEFORE ME, the undersigned authority in and for Cameron County, Texas, on this the 7 DAY OF JULY, 1998, A.D., did personally appear: ROBERT RODRIGUEZ_____, who after being by me duly sworn, did depose and say:

MY NAME IS ROBERT RODRIGUEZ, MY DATE OF BIRTH IS JUNE 6, 1968 I AM 30 YEARS OF AGE. I AM EMPLOYED WITH THE CAMERON COUNTY SHERIFF'S OFFICE AS A PATROL DEPUTY. I HAVE BEEN EMPLOYED WITH THE SHERIFF'S DEPARTMENT FOR A YEAR AND FOUR MONTHS. MY BUSINESS ADDRESS IS 954 EAST HARRISON STREET, BROWNSVILLE TEXAS 78520, AND I CAN BE REACHED AT MY BUSINESS PHONE WHICH IS (956) 550-7290 OR 544-0860.

ON JULY 7, 1998 AT 5:20 A.M. I WAS WORKING DISTRICT 6 AND I HAD JUST FINISHED PROCESSING A PRISONER AT THE CAMERON COUNTY JAIL. I WAS LEAVING THE COUNTY JAIL WHEN I WAS ADVISED VIA RADIO BY THE DISPATCHER TO RESPOND WITH LIGHTS AND SIREN TO 311 CATHERINE STREET IN RIO HONDO REGARDING SHOTS FIRED COMING FROM SAID RESIDENCE AND THAT THERE WERE TWO SUBJECTS DOWN. I ACTIVATED MY EMERGENCY EQUIPMENT AND I STARTED TO DRIVE TOWARDS THE LOCATION. WHILE EN ROUTE TO THE CALL, ARRIVING OFFICERS AT THE SCENE CONFIRMED VIA RADIO THAT THERE WERE TWO SUBJECTS DOWN AND THAT ONE OF THEM WAS ALREADY DEAD. ONE OF THE OFFICERS, I DO NOT REMEMBER WHO, ADVISED OVER THE RADIO THAT THE LAST NAME OF THE SUSPECT WAS MOORE. I THEN MADE CONTACT WITH THE OFFICERS AT THE SCENE OVER MY RADIO AND I ASKED THEM IF THERE WAS ANY DESCRIPTION OF THE SUSPECT'S VEHICLE. I WAS THEN ADVISED VIA RADIO BY OFFICERS AT THE LOCATION THAT THE SUSPECT VEHICLE WAS A WHITE CHEVY TRUCK WITH BLACK TINTED WINDOWS. I THEN EXITED ON TO BUSINESS 77 AND I TRAVELED TOWARDS F.M. 345 (SAM HOUSTON) WITH LIGHTS AND SIRENS ACTIVATED AS I MADE MY WAY TO THE CRIME SCENE LOCATED AT 311 CATHERINE. I TURNED NORTH BOUND ON F.M. 345 FROM BUSINESS 77 AND APPROXIMATELY ONE QUARTER MILE NORTH ON F.M. 345, I OBSERVED A WHITE CHEVY PICK UP TRUCK WITH TINTED WINDOWS THAT MATCHED THE DESCRIPTION OF THE SUSPECT VEHICLE GIVEN BY THE OFFICERS THAT WERE AT THE SCENE. I NOTICED THAT THE VEHICLE WAS

TRAVELING SOUTH BOUND ON F.M. 345 AT A VERY HIGH RATE OF SPEED. I THEN TURNED MY PATROL CAR AROUND AND I ATTEMPTED TO CATCH UP TO THE PICK UP TRUCK. AT THAT TIME MY EMERGENCY EQUIPMENT WAS STILL ACTIVATED AND I GOT BEHIND THE TRUCK. THE PICK UP TRUCK THEN BEGAN TO WEAVE IN AND OUT OF TRAFFIC, THE DRIVER OF SAID VEHICLE WAS FAILING TO YIELD AND HE DISREGARDED THE RED LIGHT SIGNAL THAT IS LOCATED AT THE INTERSECTION OF F.M. 345 AND BUSINESS 77. BY THAT TIME IT WAS APPROXIMATELY 5:31 A.M. AND I ADVISED THE DISPATCHER VIA RADIO THAT I WAS IN PURSUIT WITH WHAT COULD POSSIBLY BE THE SUSPECT VEHICLE. I WAS BEHIND THE SUSPECT VEHICLE AND BY THAT TIME THE DRIVER WAS DISREGARDING MY ATTEMPT TO PULL HIM OVER AND WE REACHED SPEEDS IN EXCESS OF 90 MILES HOUR WHILE HE STILL CONTINUED SOUTH BOUND DISREGARDING TRAFFIC LIGHTS. WE CONTINUED SOUTH BOUND ON F.M. 345 WHICH TURNED INTO F.M. 2520 AS SOON AS WE CROSSED THE EXPRESSWAY 77 OVERPASS. AT THAT POINT I POINTED MY SPOT LIGHT TOWARDS THE CAB OF THE PICK UP TRUCK AND IT WAS AT THAT TIME THAT I OBSERVED THREE SILHOUETTES THAT WERE INSIDE THE TRUCK. THE THREE INDIVIDUALS INSIDE THE TRUCK APPEARED TO BE MALES WITH SHORT HAIR CUTS. WE STILL CONTINUED SOUTH BOUND OF F.M. 2520 AND THE DRIVER MERGED INTO THE NORTH BOUND LANE OF TRAFFIC STILL DRIVING SOUTH BOUND. I THEN OBSERVED THAT THE DRIVER ATTEMPTED TO TURN EAST BOUND ON HUDSON ROAD, BUT HE OVER RAN HUDSON ROAD AND DROVE FOR A FEW FEET AND THEN HE TURNED EAST BOUND ON TO A PRIVATE DRIVE WAY. WE CONTINUED EAST BOUND ON THE DRIVE WAY FOR ABOUT FORTY YARDS AND THEN I SAW THAT THE TRUCK HIT A FENCE AND CONTINUED EAST THROUGH A PRIVATE PROPERTY. WHEN THIS HAPPENED THE TRUCK PICKED UP A LOT OF DUST AND I HIT A POLE, AT WHICH TIME I REVERSED MY UNIT AND I OBSERVED THAT THE PICK UP TRUCK WAS RUNNING OVER ANOTHER FENCE THAT WAS TO THE REAR OF THE PROPERTY. AFTER I BACKED UP I CONTINUED PURSUIT THROUGH THE PROPERTY AND THAT IS WHEN I OBSERVED THAT THERE WAS A FARM ACCESS ROAD THAT RUNS ALONG A CANAL. AT THIS POINT I OBSERVED THAT THE DRIVER WAS ALREADY A GOOD TWO HUNDRED YARDS IN FRONT OF ME. I COULD SEE THAT THE DRIVER OF THE PICK UP TRUCK WAS APPLYING HIS BRAKES BECAUSE THE REAR BRAKE LIGHTS WOULD TURN ON. THE CANAL THEN TURNED INTO A FORTY DEGREE ANGLE AND IT WAS AT THAT TIME THAT I LOST VISUAL CONTACT OF THE VEHICLE. AT THAT

TIME I APPROACHED GAMBLE ROAD AND I STOPPED ON GAMBLE ROAD. I THEN LOOKED TO THE LEFT AND THEN TO THE RIGHT BUT I COULD NO LONGER SEE THE WHITE TRUCK. WHEN I LOOKED TO THE RIGHT, I NOTICED THE BRAKE LIGHTS OF A VEHICLE. AT APPROXIMATELY 5:35 A.M. I ADVISED DISPATCH THAT I WAS TERMINATING MY PURSUIT. AFTER TERMINATION OF THE PURSUIT, I PROCEEDED SOUTH ALONG GAMBLE IN THE DIRECTION OF THE PREVIOUSLY OBSERVED BRAKE LIGHTS. I CAUGHT UP TO THE VEHICLE AND OBSERVED A NEW MODEL, MAROON FORD EXPLORER, WITH GOLD TRIM ALONG THE BOTTOM AND TEXAS PLATES. I OBSERVED THE MAROON EXPLORER TURN WEST ON JOINS ROAD. WHEN I REALIZED THAT IT WAS NOT THE SUSPECT VEHICLE, I PROCEEDED TO LEAVE THE AREA. I WAS OUT OF GAS AND I WENT TO GO FUEL UP AT THE SAN BENITO COUNTY BARN, AND AFTER I FINISHED FUELING UP I THEN RETURNED TO THE GENERAL AREA TO RE-TRACE THE ROUTE OF THE PURSUIT. I WENT DOWN THROUGH THE ROAD AFTER THE PRIVATE DRIVE WAY TO CHECK THE AREA WHERE I HAD LAST SEEN THE VEHICLE AND I THEN DECIDED TO TURN AROUND AND I HEADED BACK TO GAMBLE ROAD. BY THIS TIME IT WAS DAYLIGHT AND I HAD BETTER VISUAL CONTACT OF THE AREA  FROM THE DIRT ROAD I TURNED SOUTH ON GAMBLE AND AT APPROXIMATELY 6:45 A.M. I LOCATED THE SUSPECT VEHICLE. THE VEHICLE WAS PARKED ON THE SOUTH EAST CORNER OF RESACA DRIVE AND GAMBLE ROAD IN THE DRIVE WAY OF A BROWN BRICK RESIDENCE. I THEN ADVISED DISPATCH THAT THE WHITE CHEVY PICK UP TRUCK WAS DISPLAYING TEXAS LICENSE PLATES (WS6-007) AND AT THAT TIME DISPATCHER C-2 CHRIS ADVISED ME VIA RADIO THAT THIS WAS THE SUSPECT VEHICLE. AT THAT POINT I OBSERVED THAT A WHITE MALE SUBJECT STEPPED OUT OF THE GARAGE WITH BOTH OF HIS HANDS UP IN THE AIR. AT THAT POINT I CALLED FOR BACK UP AND I REVERSED MY PATROL CAR TO A LOCATION ABOUT 75 YARDS AWAY FROM THE RESIDENCE. I EXITED MY PATROL CAR AND I DREW MY WEAPON A (9 M.M. BERETTA) AND HELD IT AT MY SIDE. THE WHITE MALE SUBJECT APPROACHED MY PATROL CAR AND HE IDENTIFIED HIMSELF AS R.D. MOORE, A HARLINGEN POLICE OFFICER. I THEN ASKED THE SUBJECT IF HE HAD ANY WEAPONS AND HE STATED "NO." I THEN ASKED HIM FOR HIS CREDENTIALS AT WHICH TIME HE DISPLAYED THEM TO ME AND I IDENTIFIED HIM AS R.D. MOORE, A POLICE OFFICER. R.D. MOORE THEN ASKED ME WHAT WAS GOING ON, AND HE PROCEEDED TO STATE TO ME " I KNOW MY SON DID SOMETHING, I WANT TO KNOW WHAT." WHILE I WAS

TALKING TO THIS PERSON BACK UP DEPUTIES WERE ARRIVING AT MY LOCATION. I THEN ASKED MR MOORE IF HIS SON ERNEST MOORE WAS IN THE HOUSE, AND HE SAID "NO." I THEN ADVISED MR. MOORE THAT MY SUPERVISOR WAS ON HIS WAY AND THAT HE WOULD TALK TO HIM. MR. MOORE THEN WENT BACK TO HIS HOUSE, AND HE RETURNED A SHORT TIME LATER. I THEN ASKED MR. MOORE WHAT WAS WRONG WITH HIS SON, AND HE REPLIED THAT HIS SON WAS UPSET AT TWO DRUG DEALERS FROM RIO HONDO, BECAUSE THEY HAD TURNED HIS GIRLFRIEND ON TO COCAINE, AND THAT HIS SON WAS GOING TO TAKE CARE OF THAT. I THEN ASKED MR. MOORE IF HE HAD ANY WEAPONS IN HIS RESIDENCE AND HE STATED THAT HE HAD ALL OF HIS WEAPONS WITH THE EXCEPTION OF TWO, AN AK-47, AND A RIFLE. I THEN ASKED HIM A SECOND TIME WHAT WAS GOING ON WITH HIS SON, AND HE STATED THAT HIS SON WAS NOT MENTALLY STABLE AND THAT HE WAS TAKING PROZAC. I ASKED MR. MOORE IF ANYBODY WAS WITH HIS SON, TO WHICH HE RESPONDED THAT HIS SON WAS A LONER. MR. MOORE THEN STATED TO ME THAT HE HAD HEARD A COMMOTION AT 6:00 A.M. AND HE WAS NOT CLEAR ON WHAT IT WAS, BUT HE GRABBED A RIFLE AND A SPOT LIGHT AND HE WENT LOOKING FOR HIS SON WITHIN THE GENERAL AREA. I THEN ASKED MR. MOORE IF HIS SON WAS STILL IN THE AREA." MR. MOORE SAID "YES." MR. MOORE ALSO TOLD ME THAT HIS SON WAS PROBABLY CONTEMPLATING SUICIDE. MR. MOORE THEN STATED THAT HE HOPED THAT HIS SON WOULD COMMIT SUICIDE BECAUSE IF HE DIDN'T, HIS SON COULD COME BACK AND KILL US. HE TOLD ME NOT TO WORRY UNLESS HIS SON IS CLOSE BY, BECAUSE HE HAD BOTH SCOPES IN HIS SAFE, BUT HE SAID THAT HIS SON WAS A DAM GOOD SHOT. I IMMEDIATELY GAVE A BROADCAST TO THE BACK UP DEPUTIES AT THE SCENE THAT WE HAD ONE ARMED MALE SUBJECT THAT WAS IN THE AREA. BY THIS TIME SENIOR SERGEANT SAENZ ARRIVED AT THE SCENE AND HE BEGAN TO SPEAK WITH R.D. MOORE. SHORTLY AFTER, I BELIEVE IT WAS 7:00 A.M. WHEN THREE BORDER PATROL UNITS ARRIVED AT THE SCENE. AT THAT POINT, SENIOR SERGEANT SAENZ ASKED MR. R.D. MOORE IF IT WAS OK FOR US TO SEARCH HIS HOUSE, AND MR MOORE VERBALLY AGREED TO THE SEARCH. I THEN ADVISED DISPATCH VIA RADIO FOR THEM TO CONTACT THE HARLINGEN POLICE DEPARTMENT, SO THAT THEY COULD SEND ONE OF THEIR IMMEDIATE SUPERVISORS TO THE R.D. MOORE RESIDENCE. AT THAT POINT A BORDER PATROL AGENT BY THE NAME OF S RODRIGUEZ APPROACHED ME AND SHE ASKED ME WHAT TYPE OF ASSISTANCE WE NEEDED FROM THEM. I BRIEFED HER ON THE

SUSPECT INFORMATION AND I ADVISED HER TO STAND BEHIND MY PATROL UNIT UNTIL WE SECURED THE RESIDENCE. MYSELF, DEPUTY ALBERT GARCIA , AND ANOTHER DEPUTY I DO NOT KNOW, SEARCHED THE R.D. MOORE RESIDENCE ALONG WITH SENIOR SERGEANT SAENZ AT APPROXIMATELY 7:06 A.M. WE CHECKED THE RESIDENCE AND FOUND IT TO BE CLEAR. DURING THE CONSENSUAL SEARCH, MR. MOORE POINTED TO HIS SON'S ROOM. I LOOKED IN THE ROOM AND I OBSERVED VARIOUS NAZI PARAPHERNALIA. I NOTICED THE SUSPECT WAS NOT THERE AND WE EXITED THROUGH THE GARAGE TOWARDS THE FRONT YARD. AT THAT POINT, HARLINGEN POLICE SERGEANT FOIST AND HARLINGEN POLICE SERGEANT GARCIA ARRIVED AT THE SCENE, AND THEY WERE TALKING TO R.D. MOORE. I THEN BEGAN TO TALK TO SERGEANT FOIST IN FRONT OF THE SUSPECT'S VEHICLE WHICH WAS IN THE DRIVEWAY IN FRONT OF THE GARAGE. AT THAT POINT, AT APPROXIMATELY 7:15 A.M., I HEARD SOME SHOTS BEING FIRED AND I THEN SAW A WHITE MALE SUBJECT WHO WAS WEARING BLACK PANTS WITH NO SHIRT STANDING ON THE EDGE OF THE CORN FIELD LOCATED ACROSS THE ROAD-WAY FROM THE HOUSE. THE SUBJECT WAS FIRING A BLACK ASSAULT-TYPE WEAPON TOWARDS THE BORDER PATROL AGENTS    I DREW MY WEAPON AND I SAW THAT DEPUTY RAUL RODRIGUEZ WAS DOWN ON THE GROUND AND HE WAS SHOUTING " I AM HIT, MY ARM, MY ARM." IN THE BACKGROUND I SAW THAT A MALE BORDER PATROL AGENT WAS DOWN. THE SHOTS STOPPED FOR A FEW SECONDS. THE SUBJECT BEGAN TO FIRE THE WEAPON AGAIN, AND AT THAT TIME I RETURNED FIRE AT THE SUBJECT EMPTYING MY FIRST MAGAZINE WHICH CONSISTED OF FIFTEEN ROUNDS. I THEN LOADED ANOTHER MAGAZINE. THE SUBJECT THEN STOOD UP A THIRD TIME AND BEGAN TO FIRE. I THEN EMPTIED MY SECOND MAGAZINE. WHILE I WAS LOADING MY THIRD MAGAZINE I HEARD A LOUD POPPING NOISE TO MY RIGHT. WHEN I LOOKED TO THE RIGHT, I NOTICED THAT R.D. MOORE WAS FIRING AN ASSAULT TYPE WEAPON AT THE SUBJECT, WHILE WALKING TOWARD THE SUBJECT. I FIRED THREE ROUNDS FROM MY THIRD MAGAZINE DURING THE SAME EXCHANGE. AT THAT POINT, THE SUBJECT DROPPED. I FOLLOWED R.D. MOORE AS HE RAN TO WHERE THE SUBJECT DROPPED. I OBSERVED R.D. MOORE PUT DOWN HIS WEAPON, FALL ON HIS KNEES AND CRADLE THE SUBJECT. R.D. MOORE WAS SAYING TO THE SUBJECT, "YOU FOOL, WHY DID YOU DO THIS?" I THEN REALIZED THAT THE SUBJECT WAS R.D. MOORE'S SON. I THEN PICKED UP THE SUBJECT'S WEAPON AND RAN BACK TO MY PATROL UNIT IN



ORDER TO SECURE THE WEAPON. ON THE WAY TO MY UNIT, I NOTICED THAT THE
FEMALE BORDER PATROL AGENT WAS DOWN AND SHOT. SHE WAS LAYING
TOWARD THE REAR OF HER BORDER PATROL VEHICLE. I SECURED THE SUBJECT'S
WEAPON IN MY PATROL CAR AND WAITED FOR ADDITIONAL BACK-UP AND
EMERGENCY MEDICAL PERSONNEL.

I STATE THAT I HAVE GIVEN THIS STATEMENT TO INVESTIGATOR ROBERT
RODRIGUEZ JR. OF THE CAMERON COUNTY SHERIFF'S OFFICE ON MY OWN FREE
WILL. I STATE THAT I HAVE NOT BEEN THREATENED, FORCED, OR PROMISED
ANYTHING IN RETURN FOR THIS STATEMENT. I ALSO GAVE THIS STATEMENT IN
THE PRESENCE OF F.B.I. AGENTS JEFFERY P. SCHIRMER AND TRACY CORLEY.

The above is a true and correct statement to the best of my knowledge and ability.

Sworn and subscribed to before me on this the ___7___ day of ___July___, 1998, A.D.

Notary Public for Cameron County, Texas

ROBERT RODRIGUEZ JR
NOTARY PUBLIC
State of Texas
Comm. Exp. 04/07/01



STATE OF TEXAS
COUNTY OF CAMERON

**BEFORE ME, the undersigned authority, a notary public in and for Cameron County, Texas on this day personally appeared Jose Rubio Jr. who, after by being duly sworn did depose and say:**

My name is Jose Rubio Jr. and I am a police officer for the City of Harlingen. I am 38 years old and I am a resident of Harlingen, Cameron County, Texas. I am writing this statement in a particular style where initially I introduce myself so as the reader can understand my background, education and experience. I will then describe in detail the events that happened concerning the death of the two Border patrol agents, Susan Rodriguez and Ricardo Salinas.

I started with the Harlingen Police Department on September 14, 1981. I currently hold the rank of lieutenant and I am assigned to the patrol division as a shift supervisor. I am a certified instructor for the Harlingen Police Department and I have taught the following courses to police officers:

- 3737 T.C.L.E.O.S.E. Supervisor's Course
- Personnel Evaluations for Police Officers
- Mental Health Education for Police Officers
- Arrest, Search, and Seizure
- Legal Update
- Police Photography
- Instructor's Course for New Instructors

A month after I graduated Harlingen High School in 1978, I joined the United States Army. I attended training to become a military police officer and I was assigned to Fort Myer, Virginia. I left the military in July of 1981 and shortly thereafter joined the Harlingen Police Department.

Over the last 17 years of service, I have managed to attend several schools of quality instruction and have also attended college. I received my Associates Degree in 1986 from Texas Southmost College in Criminal Justice. I have approximately 118 college hours in an effort to obtain my degree in police administration. Unfortunately due to the shift work, I have been unable to obtain my degree. I hold a Masters Peace Officers Certificate issued by the Texas Commission of Law Enforcement Standards and Education. I am a certified intoxilyzer operator and I am a certified

**SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999,**

Notary Public in and for Cameron County Texas

Roberto Silva        04-29-2000

**Name ( printed of typed)     Commission Expires**

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

At this point, I learned that an AR-15 belonging to RD Moore had been used in the shootings. I also learned that Sergeant Foist had been involved in the shooting and that several officers had shot Ernest Moore. I was informed the reasons behind both Sergeant Foist and Sergeant Garcia being there at the scene were a request by the Cameron County Sheriff's Department. Apparently, RD Moore had denied permission to the Sheriff deputies to search the house for Ernest Moore and had been rude to them. From what I also gathered, Chief Scheopner was called and he contacted RD Moore over the phone. The facts were trickling in slowly about how the shooting started and the events prior to the shooting. I was informed that two other people had died in Rio Hondo and another person had been taken to VBMC as a result of being shot.

Around 10 a.m., Officer Foist came in to the Harlingen Police Department. He described what happened and he stated that "It was suicide by cop." He tells me that he was forced to take cover behind a boat when the shooting started. He described the scene saying it was like "Rambo" when Ernest Moore came out of his hiding place and started to unload the AR-15. He believes he struck Ernest due to his proximity and stated, "I had to shoot RD's kid." A few minutes later, Sgt. Mike Garcia returned from San Benito and the stress of the incident was evident on his face. We learn that he had to hold RD Moore's wife down to protect her from the flying bullets. He went home due to the stress. Officers Chris Read and Steve Mayer (Harlingen K-9 officers) returned from the scene about an hour later. Chris describes the scene as chaotic as it appears no one is in charge. We continue attending the class but it was hard to instruct and keep up with what was going on. The search for the two suspects had made nationwide news and the search was called off around 2 p.m.

I got the feeling that the shootings were going to come back and haunt the department. RD Moore has had access to the evidence room for over twenty years. A few years ago, I saw him playing around with a Colt Ar-15 rifle in the evidence room and I knew that he liked to shoot guns. At that time, he stated the AR-15 was his personal weapon. I had also heard stories that he had problems with his son, Ernest. I knew the department had very lax policies and procedures and had very little accountability. One of the areas of concern that I had was the evidence room which had no regular audits or set of rules for proper disposal of evidence or other items turned into the evidence room. During the course of the last two years, we had tried through the Association to develop a new set of departmental directives to cover areas of weaknesses and /or strengthen the policies we did have. There were to many word of mouth policies with no documented procedures. There was so much resistance by the administrative staff of the Harlingen Police Department

**SWORN AND SUBSCRIBED TO BEFORE ME,** on this 4th day of June, 1999.

Notary Public in and for Cameron County Texas

Name ( printed of typed)    Commission Exp____

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

we just heard and he asked me, "What are we going to about it." I told him that I was going to make some phone calls and I will be in touch with him. The phone rang a second time. This time it was Sergeant Shawn Foist. He is pissed-off and states the Chief is lying about what he is saying about the gun. He states that he knows what really happened and that he has information to use against the Chief. I ask him what is the information that he has and he refuses to divulge it stating that he will release it when needed. I know Foist's character well and I know that he won't do anything. I get pissed off at him because he was almost killed in a shooting by a jail escapee. He laid partial blame on the department and he raised the issue of lax procedures which led to his shooting but he never followed up on his threats. I call him a "pussy" and told him that he was part of the problem because of his failure to speak out and tell the truth. I hung up on him. I get another phone call and it is from Lieutenant Ramon Vela. He is on duty and Officer Jose Angel Villarreal is next to him. They express their concerns over the lie that the Chief Scheopner just made to the media to cover up the gun. They are both having difficulty trying to understand why the Chief would say that RD Moore was on call and part of a SWAT team that does not exist. I know and they know that RD Moore was not on call and we know that he is not the department sniper. He also asked me what was I going to do about the lie that Chief Scheopner had created to justify the our department weapon being used during the shooting of the two agents. I told him that I was working on it. I then called Harlingen City Commissioner Rick Rodriguez on his mobile phone. He told me that he was at Tropi-Casa having a beer. He states, "You were right, we are in trouble. Deep shit trouble." He told me that he had plans so he can't talk any further. I decided to call the Valley Morning Star police newspaper reporter, Laura Martinez, who I have known for a number of years. Laura is really familiar with the Harlingen Police Department as she has been covering issues and the operations of the Harlingen Police department for a number of years. As soon as she heard my voice, she stated, "Lieutenant, I knew it was you. I know why you are calling. I was expecting your call. I guess you heard ." She then asked me what I thought about what the Chief said. I told her that I thought it was important to reverse the question back to her and asked her what she thought. She stated that she wanted me to first answer the question. I told her it was important to hear her opinion first because she covered the police department and was familiar with it. She replied, "The Chief is lying. It's obvious. RD Moore is not on call. I know you all don't have a SWAT team." She was upset about the lie and did not understand why Scheopner would lie. I explained that probably to cover up the use of the weapon and the weapon not being issued properly. I further explained that he and RD Moore were friends and went way back over twenty five years. I told her that we can't let the Chief get away with this lie. She asked me what can she do. I tell her to reinterview the Chief and commit him to some answers and he will hang himself. She promised to do that but she already has him committed to his story. * Note: Laura Martinez

**SWORN AND SUBSCRIBED TO BEFORE ME**, on this <u>4th</u> day of <u>June, 1999.</u>

Notary Public in and for Cameron County Texas

Roberta Silva       04-29-2000

Name ( printed of typed)     Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

tracks on the issue of the weapon and other weapons. When I left Armando's house, I felt a heavy burden was lifted and I felt relieved. Dennis Zamarron expressed the same feelings and I dropped him off at home.

On Monday, July 13, 1999, RD Moore returned to work. During the next two days, Chief Scheopner, Assistant Chief Archer, Captain Vasquez, and Detective RD Moore went behind closed doors. We suspected they were discussing their stories so as they would corroborate. At one point, through the rumor mill we heard that Captain Vasquez was afraid the statement was not factual and he did not want to go to jail. Never the less, this was the opportune time for them to discuss their stories and set them straight. I was wondering why we had not heard or seen anything of a follow up by the FBI or the Texas Rangers at the police department. On this day, for the first time I hear about the Neo-Nazi paraphernalia found inside the bedroom of Ernest Moore. This shocks me initially because I can't believe that a police officer would allow his son to have the Neo-Nazi paraphernalia. Part of our law enforcement training under mandatory T.C.L.E.O.S.E. regulations covers culture diversity which addresses hate crimes and racist groups. The State of Texas governing body has made a tremendous effort to attempt to address the issues of hate crimes and racial prejudice to law enforcement officers by having a mandatory culture diversity class every two years. It would be against departmental policy for Officer Moore to condone the behavior of his son by allowing Ernest Moore to be involved in Neo-Nazi activities.

That same morning, July 13, 1998, I paid a visit to Nat Lopez, a Harlingen City Commissioner. I expressed my concerns over the lies told by Scheopner in regards to the weapon and the creation of a convenient SWAT team to justify the weapon. He has a budget workshop scheduled for noon concerning police benefits. He assures me that he will bring it up during the workshop in one way or another. I attend the budget workshop and Mr. Lopez brings up the issue of our weapon being used to kill the two Border Patrol agents. He asks for a formal inquiry to be made. The City Manager, Natalie Prim, is squirming in her seat as she is very uncomfortable and upset that Nat Lopez brought up the subject during the public workshop. She assures him that they will look into the matter. *Note: Two days later, on July 15, 1998, the Valley Morning Star would have a story about Mr. Lopez's comments. The Valley Morning also mentioned in the story that the rifle used to kill the two agents was donated to the Harlingen Police Department by a private citizen. Scheopner is asked three times if the weapon was turned in for destruction. He refuses to answer the question after he is asked three times.

On July 14, 1998, Sergeant Foist submits an e-mail to Caliber Press in reference to the

_____

**SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.**

_____
Notary Public in and for Cameron County Texas

_____
Name ( printed of typed)        Commission Ex

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

and a small caliber rifle was inside the bag. RD Moore had a surprise look on his face and dropped off his package inside his office. Dennis called me immediately afterwards and I told him at this point it was just another thing that we would have to tackle as a problem. **Note: During the Lockhart attorney's meeting on October 9, 1998, this issue was addressed and explained as RD Moore holding a weapon for a friend.**

By that same afternoon on July 15, 1998, I had heard rumors that the FBI agents had "ratted" us out to Scheopner. The rumor was there would be no probe because "Union Politics" were being blamed. I was on midnight shift and I left home early because of the fear of retaliation. I had become a target on different occasions because of my Association activities and I knew they were capable of making my life uncomfortable by singling you out any minor thing. The police department had staff meetings every Thursday afternoon to discuss issues. On occasion, these meetings were used as opportunities to take some "cheap shots" at certain individuals. The staff meetings were held on a weekly basis because we had some "communication" problems and turmoil between some of the younger administrative members. I decided to skip the staff meeting of July 16, 1998. Around 4:30 p.m., Lieutenant Ramon Vela contacted me at home and told me the results of the staff meeting. He told me that Scheopner, Archer, and Captain Vasquez were pissed off about some officers going to the FBI. He told me that Archer had said they wanted to fire people. He said Captain Vasquez called us "bastards" and that we should be fired. Vasquez would repeat this statement several times. Vela also told me that Scheopner had also said that we did not understand the details on the Border Patrol shooting and we should mind our own business. The meeting was generally attended by the two captains (Rubio and Vasquez), the four lieutenants (Rubio, Vela, Castillo, and Leal), and both Chief Scheopner and Assistant Chief Archer. At this meeting, every one should have been there for the exception of my brother who was on vacation.

That same night, July 16, 1998, I came into work on the midnight shift at 11 p.m. and I saw that Captain Vasquez was waiting for me. As soon as I finished my briefing to the shift, I was summoned by Captain Vasquez to his office. The first thing that he asked me was why I did not show up to the staff meeting. I told him I was not feeling well, that my stomach was in knots. He proceeded to go over some issues discussed during the staff meeting. He blasted the "Blue Shield" which was an Association newsletter. The Blue Shield had an article on pay issues and Captain Vasquez told me that as supervisors we should be able to take care of pay issues. Then he asked me if I knew the two persons who went to the FBI in regards to the Border Patrol Shooting. I told him that I did not know who went to the FBI. He asked me again and I again responded that I did not know. He then stated that the FBI had contacted the Chief (Scheopner) and they had informed him

SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.

Notary Public in and for Cameron County Texas

Name ( printed of typed)    Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

Grande River or in other bodies of waters in Cameron County. Sheriff Lucio had been asked to attend the meetings to discuss the issue. In one of the meetings in mid August, he showed up and we asked for his ideas on the issue. After the meeting was over, Sheriff Lucio and I started to talk. He invited me over to his office and I joined him. Being that Sheriff Lucio was a Harlingen Police Officer for over 34 years, he was familiar with our policies and practices. We started to discuss the Border Patrol shooting and how the weapon used to kill the agents and wound his deputy came to be in RD Moore's hands. He agreed at that point it was a lie created by Scheopner to cover the use of the weapon. I asked him if he was going to do anything about it since he knew the truth and he said the FBI and Texas Rangers were in charge of the investigation. **Note: On at least another occasion, around October, I asked him again about the weapon and he walked away not wanting to address the issue.**

On September 4, 1999, I stopped by City Hall to make an open records request. I ran into Joe LaBeau and he asked to talk to me. He wanted to know if I knew the author of the Tainted Brass and I told him no. He pointed there were several issues in the newsletter that concerned him. He wanted to know about the issue of the weapon. I told him that I was uncomfortable talking about the issue of the weapon. He became angry demanding that I tell him what I knew about the weapon. Since Captain Vasquez had made it clear that anyone talking about the Border Patrol shooting would be fired, I felt that I could not tell Mr. LaBeau anything without the fear of retaliation. Mr. LaBeau did not have the best reputation among City employees and employees were fearful of him and mistrusted him. Joe LaBeau was trying to fix the problems at the police department but there was to much opposition and political power plays by Chief Scheopner to do an effective job. I told Joe LaBeau there would be a time and place that we would talk but not today. I did give him a hint and I told him that he needed to check T.C.L.E.O.S.E.  regulations concerning the qualifications of officers carrying assault rifles. He was not familiar with T.C.L.E.O.S.E. and I had to give him another hint that the rules would be posted on the Internet by searching the web site. That same afternoon, I went to work and I submitted a memorandum to Captain Vasquez and Chief Scheopner in regards to my encounter with Joe LaBeau. I outlined in the memorandum the details and that Joe LaBeau had requested to talk to me about the Border Patrol Shooting and that I felt uncomfortable because I was under the threat of being fired if we talked about the Border Patrol Shooting. About two days later, I ran into Chief Scheopner and he made a casual remark about the memorandum and Joe LaBeau. He did not give me permission to discuss the case with Joe LaBeau. I did not ask for permission because I knew better and the continuing conflict in the department over the issue of the Border Patrol shooting and the conflict with management (Joe LaBeau) was the not the right atmosphere where permission would be granted. It did become obvious to me at this point of the

_____

**SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999,**

Notary Public in and for Cameron County Texas

Roberto Silva               04-29-
_____
Name ( printed of typed)    Commission Ex

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

as follows:

1.  Jose Rubio Jr., President, 17 year veteran
2.  Dennis Zamarron, Vice-President, 18 year veteran
3.  Antonio Sanchez, Treasurer, 18 year veteran
4.  Roberto Silva, Secretary, 17 year veteran.

The draft letters were approved by Mr. Garcia and we contacted the news media. On the 6th of October, we called for a press conference at 6 p.m. at Antonio's Restaurant. Dennis had been contacted by Chief Scheopner several times during the day and warned that he was subject to disciplinary action if he broke departmental directives. Dennis eventually had to tell Chief Scheopner to lay off him because he was harassing him and he understood that he was subject to disciplinary action. Zamarron invited Scheopner to the press conference. Antonio Sanchez was contacted on that day by Scheopner but he did not reveal any details. I came back from the attorney's office and there was a message from Captain Vasquez on my recorder to contact him and there was another message left by Chief Scheopner. Chief Scheopner called my home around 4:30 p.m. again and my wife informed him that I was busy with the attorneys and he quit calling afterwards. At 4:50 p.m., we delivered our letters to City Hall and we started our press conference at 6:00 p.m. We were all nervous and scared. Each one of us had talked to our wives and explained that we subject to disciplinary action and could be fired as a result of our actions. At the point that we delivered the press conference and letters, we had given up hope on any law enforcement agency coming out and investigating fully the Border Patrol shootings. The administration was about to target those individuals who had gone to the FBI because no action was being taken against them.

On October 8th, 1998, Tom Lockhart and Natalie Prim had their structured press conference. After their press conference, Tom Lockhart, Dennis Zamarron and I went behind closed doors. I informed Mr. Lockhart that I was upset at the callous disregard of the City not to conduct a thorough investigation and then have someone like Scheopner threaten to fire us if we went to the FBI. At this time, he claimed that he had no knowledge of Scheopner's actions.

On October 9th, 1999, we had a round table discussion with our Association attorney present, Bobby Garcia, and Tom Lockhart. Tom had tried to interview us separately and we had agreed that we would not be interviewed separately. A non retaliation agreement was signed before we started our discussion. I had prepared for this meeting by having fifty two questions

**SWORN AND SUBSCRIBED TO BEFORE ME,** on this **4th** day of **June, 1999.**

Notary Public in and for Cameron County Texas

Roberto Silva          04-29-2000

**Name ( printed of typed)     Commission Expires**

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

STATE OF TEXAS
COUNTY OF CAMERON

**BEFORE ME, the undersigned authority, a notary public in and for Cameron County, Texas on this day personally appeared Jose Rubio Jr. who, after by being duly sworn did depose and say:**

My name is Jose Rubio Jr. and I am a police officer for the City of Harlingen. I am 38 years old and I am a resident of Harlingen, Cameron County, Texas. I am writing this statement in a particular style where initially I introduce myself so as the reader can understand my background, education and experience. I will then describe in detail the events that happened concerning the death of the two Border patrol agents, Susan Rodriguez and Ricardo Salinas.

I started with the Harlingen Police Department on September 14, 1981. I currently hold the rank of lieutenant and I am assigned to the patrol division as a shift supervisor. I am a certified instructor for the Harlingen Police Department and I have taught the following courses to police officers:

- 3737 T.C.L.E.O.S.E. Supervisor's Course
- Personnel Evaluations for Police Officers
- Mental Health Education for Police Officers
- Arrest, Search, and Seizure
- Legal Update
- Police Photography
- Instructor's Course for New Instructors

A month after I graduated Harlingen High School in 1978, I joined the United States Army. I attended training to become a military police officer and I was assigned to Fort Myer, Virginia. I left the military in July of 1981 and shortly thereafter joined the Harlingen Police Department.

Over the last 17 years of service, I have managed to attend several schools of quality instruction and have also attended college. I received my Associates Degree in 1986 from Texas Southmost College in Criminal Justice. I have approximately 118 college hours in an effort to obtain my degree in police administration. Unfortunately due to the shift work, I have been unable to obtain my degree. I hold a Masters Peace Officers Certificate issued by the Texas Commission of Law Enforcement Standards and Education. I am a certified intoxilyzer operator and I am a certified

**SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.**

Notary Public in and for Cameron County Texas

Roberto Silva                    04-29-2
**Name ( printed of typed)      Commission Exp**

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS, ET AL; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL. | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS, ET AL; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS, ET AL. | § | |

| | |
|---|---|
| STATE OF NEW YORK | § |
| | § |
| COUNTY OF Rockland | § |

## AFFIDAVIT

Before me, the undersigned notary, on this day, personally appeared Paul Ginsberg, a person whose identity is known to me. After I administered an oath to him upon his oath, he said:

"My name is Paul Ginsberg. I am competent to make this affidavit, and I have personal knowledge of the facts stated below:

1. I am a citizen and resident of Rockland County, New York. A copy of my resume is attached hereto and incorporated herein as Exhibit A.

2. I am President of Professional Audio Laboratories, a corporation specializing in the examination, enhancement, transcription and presentation of tape-recorded evidence for criminal and civil litigation. I have over 27 years experience in this field. I have participated in more than 1600 cases, including the World Trade bombing and numerous undercover and Title III intercept cases on behalf of almost all federal law enforcement agencies, including the F.B.I., Customs, D.E.A. and A.T.F.

3. I received two original Dictaphone logger cartridges from Bryant and Stingley in a sealed FedEx envelope. The two tape housings were labeled '61-A' and '62-A' and the tapes were labeled '61-B' and '62-B.'

4. Tape housing '61-A' was observed to have been labeled 6-26-98 – 7/20/98 and also 4/27/99 – 5/21/99. Tape housing '62-A' was observed to have been labeled 1-14-98 14:54 – 1-25-98 18:40, 5/28/98 17:52 – 7/20/98, 8/22/98 19:36 – 9/28/98 14:40, 10/5/99 10:23 – 10/5/99 22:40, and 2/5/99 – 2/18/99.

5. Tapes of this kind are generally reused periodically by recording over previously recorded material. The Dictaphone machine in normal operation erases all previously recorded material and records new recordings using the same magnetic particles on the tape. As a result, the previously recorded material does not exist after a new recording has been made.

6. Tapes '61-B' and '62-B' were placed in a working, aligned Dictaphone Guardian/ProLog logger machine to determine the contents of each tape. Tape '61-B' was found to have recorded material spanning 4/27/99 at 12:13:23 through 5/21/99 at 17:11:45. Tape '62-B' was found to have recordings spanning 10/5/99 at 10:23:42 thorough 10/5/99 at 22:42:11.

7. Both tapes were observed to have been recorded with the full 32-channel format, the maximum configuration for a recorder of this type. Both tapes were observed to be DDS-2 120 meter tapes, each with a capacity of 640 channel-hours. Tape '61-B' was observed to have been recorded to 93% capacity. Tape '62-B' was observed to have been recorded to 100% capacity.

8. Each tape was played at random times and channels throughout their lengths. They both exhibited characteristics consistent with that of tapes recorded on a functioning Dictaphone logger recorder.

9. No recordings were observed other than those in the time windows specified in paragraph # 6 above.

10. There is no way to retrieve over-recorded material from a tape since the same particles on the tape now are in a configuration that represents the most recent recording. Thus, previous recordings do not now exist on tapes '61-B' and '62-B.'"

_____
Paul Ginsberg

SWORN TO and SUBSCRIBER before me by Paul Ginsberg on ⎯July 3⎯⎯⎯, 2001.

_____
Notary Public in and for
the State of New York

RICHARD J. D'ANTONO
Notary Public, State of New York
Qualified in Rockland Co.  No. 04DA6039231
Commission Expires March 27, 200⎯

# PROFESSIONAL AUDIO LABORATORIES
## 7 SKYLARK DRIVE
## SPRING VALLEY, N.Y. 10977

PAUL GINSBERG
PRESIDENT

www.proaudiolabs.com

(845) 354-2229
Fax (845) 354-9222

## Professional Audio Laboratories In The News






# *PROFESSIONAL AUDIO LABORATORIES*
### *7 SKYLARK DRIVE*
### *SPRING VALLEY, N.Y. 10977*

*PAUL GINSBERG*
*PRESIDENT*

*(845) 354-2229*
*Fax (845) 354-9222*

## Partial List of Clients and Sources of Recordings Enhanced and Examined by Professional Audio Laboratories

The White House
U.S. Senate Special Committee on Investigations
U.S. Senate Committee on Governmental Affairs
U.S. District Court Judges
25 Offices of the United States Attorney
U.S. Department of Justice – Antitrust Division
Drug Enforcement Administration
Federal Bureau of Investigation
U.S. Customs Service
Secret Service
Immigration and Naturalization Service
Alcohol, Tobacco, and Firearms
Internal Revenue Service
Department Of Agriculture
U.S. Postal Inspection Service
Securities and Exchange Commission
State and Local Law Enforcement

Skadden, Arps, Slate, Meagher & Flom
Sullivan and Cromwell
Williams and Connolly
Paul, Weiss, Rifkind
Debevoise and Plimpton
Rogers and Wells
Wachtell, Lipton, Rosen & Katz
Cravath, Swaine and Moore
King and Spalding
McCarter and English

Domestic and Foreign Brokerage Houses and Banks
Various Fortune 500 Corporations
Private Litigants

# *PROFESSIONAL AUDIO LABORATORIES*
### *7 SKYLARK DRIVE*
### *SPRING VALLEY, N.Y. 10977*

*PAUL GINSBERG*
*PRESIDENT*

*(845) 354-2229*
*FAX (845) 354-9222*

## SERVICES

1. ENHANCEMENT of audio and videotaped evidence. We've done it longest, and we simply do it best. That's why we continually enhance tapes for all Federal investigative agencies using state-of-the-art equipment and techniques. And now, with PCAP digital processing we know that our enhanced copies are the clearest, most intelligible that can be produced, regardless of the format or speed of the original tape

2. EXAMINATION of taped evidence to determine authenticity and continuity to refute claims of tampering, erasures, etc. We can perform complete electronic examinations of tape-recorded evidence and provide supporting expert testimony at trial.

3. DICTAPHONE LOGGER TAPES can now be scanned automatically by computer to yield a print-out of dates, times, and channels of calls to specific telephone numbers.
No more looking for a needle in a haystack. Useful for financial investigations.

4. DUPLICATION of tapes for review, transcription, and discovery. Incidentally, our high speed duplication equipment has been modified to filter offending hum and noise, if necessary; something you won't find elsewhere.

5. REDACTION of tape copies for efficient presentation of selected relevant portions of conversations.

6. TRANSCRIPTION of tapes using our specially designed speech enhancement equipment so as to ensure that transcripts are as accurate and complete as possible. Foreign language tapes can also be accommodated.

7. REPAIR of accidentally damaged tapes. Occasionally a tape, usually a cassette or micro-cassette jams and breaks. Our expert "electronic surgical team" can repair damaged tapes and fully document the operation. We have complete evidence-handling facilities, including evidence safe, heat-seal evidence envelopes and labels to preserve chain of custody for all tapes.

8. EXPERT TESTIMONY on all phases of electronic surveillance and tape-recorded evidence. Court-qualified on over 160 occasions in 25 Federal districts, as well as in     Canada.

9. VIDEOTAPE DUPLICATION with sound-track enhancement so as to provide the best possible tapes for you at hearings and trials.

10. PRESENTATION OF TAPES at proceedings, as well as for review or transcription.

CVisPDF - www.fenix.com

# Paul Ginsberg

PERSONAL:        Born July 8, 1945; Married, four children

EDUCATION:      Received Master's Degree (Electrical Engineering) in 1969
from College of the City of New York.

Received Bachelor's Degree (Electrical Engineering) in
1968 from College of the City of New York.

Participated in Seminars in Signal Processing Techniques
sponsored by Massachusetts Institute of Technology and
Bell Telephone Laboratories

PUBLICATIONS:   Authored booklets entitled, *"A Prosecutor's Guide to the Use of
Audio Taped Evidentiary Material"*, and *"An Agent's Guide to
the Use of Audio Taped Evidentiary Material"*

PROFESSIONAL
SOCIETIES:      Institute of Electrical and Electronic Engineers, Society of
Broadcast Engineers, Audio Engineering Society, and
American Board of Forensic Examiners

JOB-RELATED
EXPERIENCE:    1974-Present  President of Professional Audio Laboratories,
Inc. a corporation specializing in enhancement, forensic
examination, authentication, duplication, transcription, and
courtroom presentation of audio and video taped
evidence

Has been retained as consultant by all Federal investigative
agencies, U.S. State Department, U.S. Senate, Special
Committee on Investigations, as well as the intelligence
community. Currently holds TOP SECRET clearance.

1968-1974  Consultant with all three major broadcasting
networks and 25 news gathering agencies and studios
designing, constructing and maintaining sophisticated
electronic processing equipment

COURT-RELATED
EXPERIENCE     Court-qualified expert in the areas of audio and video tapes,
enhancement, authentication, transcription and all areas
relating to electronic tape recorded evidence

Has participated in over 1650 trials in 26 Federal districts and in
Canada, and has been Court-qualified on 160 occasions

# Paul Ginsberg

PERSONAL:           Born July 8, 1945; Married, four children

EDUCATION:        Received Master's Degree (Electrical Engineering) in 1969
                       from College of the City of New York.

                       Received Bachelor's Degree (Electrical Engineering) in
                       1968 from College of the City of New York.

                       Participated in Seminars in Signal Processing Techniques
                       sponsored by Massachusetts Institute of Technology and
                       Bell Telephone Laboratories

PUBLICATIONS:     Authored booklets entitled, *"A Prosecutor's Guide to the Use of
Audio Taped Evidentiary Material"*, and *"An Agent's Guide to
the Use of Audio Taped Evidentiary Material"*

PROFESSIONAL
SOCIETIES:         Institute of Electrical and Electronic Engineers, Society of
                       Broadcast Engineers, Audio Engineering Society, and
                       American Board of Forensic Examiners

JOB-RELATED
EXPERIENCE:      1974-Present  President of Professional Audio Laboratories,
                       Inc. a corporation specializing in enhancement, forensic
                       examination, authentication, duplication, transcription, and
                       courtroom presentation of audio and video taped

evidence

                       Has been retained as consultant by all Federal investigative
                       agencies, U.S. State Department, U.S. Senate, Special
                       Committee on Investigations, as well as the intelligence
                       community. Currently holds TOP SECRET clearance.

                       1968-1974  Consultant with all three major broadcasting
                       networks and 25 news gathering agencies and studios
                       designing, constructing and maintaining sophisticated
                       electronic processing equipment

COURT-RELATED
EXPERIENCE       Court-qualified expert in the areas of audio and video tapes,
                       enhancement, authentication, transcription and all areas
                       relating to electronic tape recorded evidence

                       Has participated in over 1650 trials in 26 Federal districts and in
                       Canada, and has been Court-qualified on 160 occasions

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS, ET AL; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL. | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS, ET AL; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS, ET AL. | § | |

| | |
|---|---|
| STATE OF FLORIDA | § |
| | § |
| COUNTY OF PALM BEACH | § |

## VERIFICATION

On this day, George Kirkham. appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he said he was the author of the report, a copy of which is attached hereto as Exhibit "A," and the facts and opinion stated in it are within his personal knowledge and are true and correct.

_____
George Kirkham

SWORN TO and SUBSCRIBER before me by George Kirkham on _____, 2001.

_____
Notary Public in and for
the State of Florida

Sunday  November 29, 1998  V.M.S.

# HARLINGEN POLICE ASSOCIATION
*"To Protect & To Serve"*
422 E. Harrison • Harlingen, Texas 78550
(956) 412-8267

0 3643

### Letter to the citizens of this community

We would like to take this opportunity to explain why the Executive Board of the Harlingen Police Officers Association went public on the issue of the tragic Border Patrol shootings that occurred on July 7, 1998. A private citizen turned in a weapon (an AR-15) to the Harlingen Police Department for disposal on June 23, 1995. This same weapon was used in the shootings of the Border Patrol Officers, Susan Lynn Rodriguez and Raul Salinas. On July 10, 1998, the news media reported the weapon was registered to the Harlingen Police Department and Chief Scheopner gave a press release announcing why detective RD Moore was in possession of the AR-15. Chief Scheopner reported that Detective RD Moore was on-call 24 hours a day as the department's sharpshooter and that he was on the Special Weapons and Tactics (SWAT) team. This statement would trigger the events that have lead to us asking for a formal inquiry into how the weapon came to be in Detective RD Moore's residence. The following are the facts that have surfaced as of this date:

- There was no SWAT team in the Harlingen Police Department on the 7th of July 1998. In 1993, Chief Scheopner officially disbanded the ERT (Emergency Response Team) due to FLSA (Fair Labor Standards Act) problems, and DetectiveRD Moore was not a part of the ERT then.
- Detective RD Moore was not on 24-hour call for emergency purposes. He carried no pager and no one was aware that he was on call. There is no documentation within the Harlingen Police Department directing supervisors and or subordinates indicating that Moore was the department's sharpshooter by Chief Scheopner and or Captain Joseph Vasquez.
- Harlingen Police Officers are governed under the Texas Commission of Law Enforcement Standards and Education rules. The rules stipulate that any law enforcement officer who uses a rifle must comply with the yearly qualifications at a 100-yard range with the minimum of twenty duty rounds. The Harlingen Police Department borrows the indoor MMA gun range to comply with the yearly qualifications with the department issued Beretta 9mm handgun and the department issued shotguns assigned to the patrol units and to detectives. Any officer not complying with the rules is subject to having his peace officer's license revoked. We have no 100-yard range to comply with the requirements and no records exist that Detective RD Moore complied with the rules.
- The rifle and the caliber does not land itself for sharpshooter's responsibilities. The rifle had no scope and the Harlingen Police Department did not supply the ammunition for the rifle. The common calibers accepted by law enforcement sharpshooters are the 308 caliber or the 30.06 caliber. The 223 caliber is not adequate for sharpshooter's responsibilities. The AR-15 rifle may be used as an assault rifle but only after meeting the qualifications set forth by TCLEOSE and proper approval by the department head. It would require the development of departmental policy (rules) so as to avoid vicarious liability. We have no such policy in place.
- The fact that the weapon was turned in for disposal and then issued by Captain Vasques to Detective RD Moore goes against the original request by the person asking us to properly dispose of the weapon.
- There were numerous violations of the Harlingen Police Department Departmental Directives committed by persons associated with this tragic incident and yet no one has been disciplined as of this date.
- In March of 1996 during a joint meeting between the Association and the Harlingen City Commission, the Harlingen Police Association asked for the Harlingen Police Departmental Directives to be revised. Assignments were made by City management to revise the directives, the resistance by Chief Scheopner not to revise the directives led us to forego this issue in 1997.

Each one of us in the Harlingen Police Department that has any knowledge of any wrongdoing has a responsibility to bring forward the truth in this matter. There should be limits on loyalty. When an officer engages in unethical or inappropriate behavior, all of us are tainted in the same manner. Unfortunately, those who would hide behind the banner of "loyalty at all costs" are misguided. There are no winners in this tragedy. Doing the right thing is not always popular and it often places a heavy burden on us. Quoting from FBI Director Freeh, "Ultimately, it is the public that must demand from their elected officials and law enforcement executives an absolute commitment to integrity." Our inquiry has asked for accountability and the truth to be told.

Jose Rubio Jr. /President
Harlingen Police Association

Dennis M. Zamarron/Vice President
Harlingen Police Association

Robert Silva /Secretary
Harlingen Police Association

Antonio Sanchez/Treasurer
Harlingen Police Association

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS, ET AL; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL. | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS, ET AL; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS, ET AL. | § | |

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF _____ | § |

## VERIFICATION

On this day, Jose Rubio, Jr. appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he said he read the "Letter to the citizens of this community," a copy of which is attached hereto as Exhibit "A," and the facts stated in it are within his personal knowledge and are true and correct.

_____
Jose Rubio, Jr.

SWORN TO and SUBSCRIBER before me by Jose Rubio, Jr.on _____, 2001.

_____
Notary Public in and for
the State of Texas



**The Florida State University**
Tallahassee, Florida 32306
*School of Criminology*

May 3, 2001

Mr. Price Ainsworth
Spivey & Ainsworth, P.C.
Attorneys at Law
48 East Avenue
Austin, TX 78701-4320

Ms. Sonia Lopez
Law Offices of Ramon Garcia
222 West University Drive
Edinburgh, TX 78539

Re: *Salinas, et al. v. City of Harlingen, consolidated with*
    *Gilberto Rodriguez, et al. v. City of Harlingen, and*
    *Raul Rodriguez, et al. v. City of Harlingen*

Dear Mr Ainsworth and Ms. Lopez:

Please accept the following as a report of my observations and opinions in the above-styled case. In preparing this report, I have reviewed a number of documents and exhibits relating to the incident in question, including:

The pleadings of Plaintiffs and Defendants;
Transcripts of the depositions of Orlando Sanchez, Michael James Riley, George A. Hupp, James Joseph Scheopner, Ralph Dewayne Moore, Ronald K. Saenz, Larry Dewayne Moore, Patsy Gail Moore, Miguel P. Garcia, and Melody Matlock;
Copies of the transcription of Cameron County Sheriff's Department tapes 1-3; and
Deposition exhibits:
      Scheopner Exhibits 1-14 and 22-27;
      Moore Exhibit 28;
      Riley Exhibit 30;
      Saenz exhibit 31.

I base my findings on my review of these materials, as well as my experience as a criminologist, a former law enforcement officer, and an expert in the field of law enforcement policies and practices. I reserve the right to supplement or amend this report as other information becomes available.

Enclosed with this report is a copy of my fee schedule, as well as a list of cases in which I have been retained as an expert witness in the past four years.

On July 7, 1998, Ernest Moore shot and killed two Border Patrol agents and wounded a Cameron County deputy sheriff outside his parents' home in Harlingen, Texas. The weapon used to shoot these law enforcement officers was an Olympic Arms .223 caliber rifle belonging to the Harlingen Police Department. The weapon had been issued to Harlingen Police Officer R.D. Moore, Ernest's father, who had stored it in a gun safe in his home.

In my opinion, it was a gross deviation from widely-accepted law enforcement standards and practices to issue this weapon to R.D. Moore and to allow him to keep it in his home. The rifle originally was turned in to the Harlingen Police Department in 1995. Its owner, Mrs. Sylvia Pirtle, clearly intended for it to be destroyed. Det. R.D. Moore was the officer who received the rifle from Mrs. Pirtle. He later arranged with his chain of command to have this weapon issued to him in his role as a "sharpshooter" for the Harlingen Police Department. The Police Department made no record of the assignment of this rifle to Det. Moore. Moore apparently kept the weapon in his office for a while, and then moved it to a gun safe located inside his home. Moore and his son Ernest, who lived with him at the time of the incident in question, owned a number of weapons that were stored in this gun safe; both men had access to the contents of the safe.

The rifle in question never should have been placed into the hands of R.D. Moore. From the statement of Mrs. Pirtle, it is clear that her intent was for this weapon to be destroyed; any other use or disposition of this weapon was improper. Det. Moore knew that his son Ernest suffered from depression, had a problem with drug and alcohol abuse, and apparently had a fascination with Nazi memorabilia. Assuming, arguendo, that the rifle in question had properly been issued to Det. Moore, no prudent, well-trained peace officer would have stored such a weapon in a manner which allowed ready access by any other person, particularly an obviously troubled young man such as Det. Moore's son. Det. Moore was more than just the father of Ernest; he was a law enforcement officer as well. Moore knew that his son was unstable, and he also knew that his son had ready access to the Olympic Arms rifle belonging to the Police Department. As an agent of the Police Department, Det. Moore clearly had a responsibility to keep this weapon out of reach of any unauthorized person, especially one with a history such as Ernest's. In my opinion, the City of Harlingen Police Department had a duty to ascertain the dangerous situation created by Det. Moore at his home, and via the knowledge attributable to Det. Moore himself it had the means to know of such danger. What R. D. Moore knew as a homeowner and father, he also knew as an officer of the Harlingen Police Department, and as such he had a duty to ameliorate the dangerous condition he had created, as well as to warn others of the danger.

Det. Moore further exacerbated the danger to other law enforcement officers and citizens by failing to notify proper authority that his son was at large near his home, that he was armed and on foot. Both Moore and his wife knew that something was amiss when they awoke on the morning of July 7; Ernest's freshly-damaged truck was parked in their

2

garage, the gun safe was open, and weapons were missing. Det. Moore chose to drive around looking for Ernest, rather than promptly summoning sheriff's deputies to their home, thus delaying and hampering official efforts to locate Ernest after the Rio Hondo shooting incident.

Further, I find that the danger created by allowing this rifle to be placed in the home of Det. Moore is directly attributable to the failure of the Harlingen Police Department and its chief, James Scheopner, to implement and enforce proper policies and procedures to prevent such an occurrence. Both Chief Scheopner and Det. Moore testified in deposition that, at the time of the incident in question, the Harlingen Police Department had no policies, either written or verbal, regarding the receipt, issuance or storage of weapons such as the Olympic Arms rifle. As noted above, there was no documentation that this particular weapon had been issued to Det. Moore. Indeed, Mrs. Pirtle asserts that, until she insisted on getting a receipt, Det. Moore had not planned to even document the receipt of this weapon from her.

Once the rifle had been placed into the hands and into the home of Det. Moore, the Harlingen Police Department had the continuing duty to assure that this dangerous instrumentality did not fall into the wrong hands. Chief Scheopner made no effort to ascertain that the rifle issued to Det. Moore was safely and properly stored, nor did he take steps to assure that Det. Moore was properly trained in the use of this weapon. Chief Scheopner testified that he merely instructed Det. Moore to "stay proficient, stay ready" (Scheopner depo, p. 73). It appears that the only actual training Det. Moore received in the use of such weapons was at an FBI school Moore attended in 1978.

The failure of the Harlingen Police Department and Chief Scheopner to implement and enforce proper weapons policies and procedures did, in my opinion, create a danger to the community that would not otherwise have existed. Considering the great and foreseeable harm that could result if weapons such as the rifle in question fell into the wrong hands, I find the conduct of Chief Scheopner and Det. Moore in this matter, as well as the total absence of proper policies and procedures designed to prevent such harm, to be shocking and unconscionable.

Please feel free to contact me if you have any questions or need additional input in this regard.

Sincerely,

*George L. Kirkham (pd)*

George L  Kirkham
Professor Emeritus

**Signed** in Dr. Kirkham's
**Absence to Avoid Delay**
**in Mailing**

## Trial Testimony

In the event that a case is not settled and proceeds to the stage of trial, my fee for expert witness testimony is $5,000, plus whatever travel and per diem expenses are associated with my court appearance. As in the case of depositions, I will provide your firm with a detailed written invoice reflecting this sum. The full invoice amount must be paid prior to my actual courtroom testimony.

In the majority of cases, I will plan on arriving at your location during the afternoon or early evening preceding the day on which I am scheduled to testify. This will afford us an opportunity to meet and discuss your case in depth as well as my proposed testimony. Such pretrial conference activitiy is reckoned as part of the previously mentioned trial testimony fee and no additional sum is due; however, it must be understood that should I be unable to testify for any reason on the scheduled date after already arriving at your location, there will be an additional trial testimony fee of $5,000 for each unanticipated day or any portion thereof. The fee of an additional trial activity day is due and payable at the time it is incurred.

I realize that with all the logistical problems inherent in any trial it is often difficult to specify in advance a particular date and time for the testimony of an expert witness. Rest assured that my office will work closely with you in this regard and will make every reasonable effort to accommodate even last minute scheduling changes.

Because of the omnipresent possibility of a last minute settlement, continuance, or mistrial on the date of my scheduled departure, it is my practice to maintain pager contact with my office until I actually board a flight. Consequently, no charge will be incurred in the event that I am notified prior to my departure of a cancellation. Failing such a timely notification, however, all trial testimony fees and expenses are in effect and must be paid on my arrival.

ANY OFFICIAL LISTING OR DESIGNATION OF ME AS AN EXPERT IN A CASE WITHOUT MY EXPRESS PERMISSION AND FORMAL RETENTION IS STRICTLY PROHIBITED.

## Dr. George Kirkham and Associates, Inc.

### Criminal Justice Consultants

## Fee and Expense Policies

5596 WESTERN WAY
LAKE WORTH, FL 33463
(561) 432-9312
Fax: (561) 432-9313
(800) 488-9231

## A Word About My Work

I have sought over the years to cultivate a reputation for integrity and objectivity. You can accordingly expect nothing less than a thorough assessment of both the strengths and weaknesses of your case against a backdrop of currently prevailing national standards. You can similarly anticipate meticulous guidance from the point of contact to resolution of your case through settlement or trial.

While it is of course impossible to predict the outcome of any case, I do feel that my predominantly successful involvement as a case analyst and expert witness in well over 1,500 civil ctions in 49 states to date has given me a sound understanding of the elements which are usually necessary for a plaintiff or defendant to prevail in this kind of litigation.

## Case Preparation

I am always pleased to participate without charge in telephone discussions and correspondence with attorneys for plaintiff or defense who are seeking to determine the viability of a given case. Indeed, I typically find that such preliminary interaction is necessary for me as a consultant and potential expert witness in order to determine whether or not to become involved in a particular case, assuming that a firm wishes to engage my services.

I utilize a flat fee formula for each of my professional services. It is my practice, once I have been formally requested to participate in a case, and have agreed to do so, to require remittance of a $5,000.00 case preparation fee. This sum covers in its entirety whatever research, analysis and preparation I may have to engage in to effectively prepare for trial. While this figure is based upon an estimate of the average amount of time consumed by the majority of cases, no additional fees will accrue should your particular case require a substantially greater amount of professional time. The aforementioned flat case preparation fee encompasses my formal analysis of all case documents, any conference calls which you may wish to schedule for purposes

of discussing my findings or obtaining guidance during the various stages of the discovery process, and the preparation of any requested affidavits, written reports, or response to expert interrogatories.

I encourage you to contact me as often as you wish throughout the development of your case. Let me emphasize that all telephonic and written communications with regard to substantive issues in your case will be with me personally. Even on those occasions when I am out of town, I maintain close contact with my office. You should never experience any significant delay in response to a pressing problem or emergency associated with your case.

## Depositions

In the event that opposing counsel elect to depose me, they have the option of doing so at my location or having me travel to theirs. I charge a flat fee of $2,500 for depositions conducted at my Florida office. Depositions conducted at the location of opposing counsel involve a fee of $5,000 plus travel and per diem expenses. My office will reserve the physical facilities for any deposition conducted at my location. It will be necessary, however, for opposing counsel to make all necessary arrangements relative to securing court reporters. I require that all fees and air travel in connection with a deposition be paid in full at the time the deposition is taken. In order to facilitate this, I will provide your office with an itemized invoice reflecting the required sum prior to a scheduled deposition. I rely upon the firm with which I am working to communicate my fee policies to opposing counsel and to assure in advance that all payment arrangements are made.

## Video-Taped Depositions

It is my practice to charge a flat fee of $5,000 for any video-taped deposition which is intended for use at trial in lieu of my personal appearance.

(continued)

Cases in which Dr. George Kirkham has served as an expert witness
<u>1997</u>

Hernandez v. Auspicious Venture, et al.
In the 334th District Court of Harris County, Texas
Case No. 95-08966

D'Alessandro v. City of Marion, et al.
U.S. District Court, Western Division of North Carolina
Shelby Division
Case No. 4:95CV70

Abbott v. Moss, et al.
U.S. District Court, Eastern District of North Carolina
Eastern Division
Case No. 4:96-CV-101-H(1)

Emily v. City of Grandville, et al.
Circuit Court for the County of Kent, Michigan
Case No. 94-3960 NI

David Strong v. Fidelity Bank
Court of Common Pleas, Philadelphia County, PA
Case No. 2746

Swans v. City of Lansing
U. S. District Court, Western District of Michigan
Southern Division
Case No. 5:96-CV-56

Beard, et al. v. Deibel, et al.
U.S. District Court, Southern District of South Carolina
Columbia Division
Case No. 5-96-1899-6

Barnes v. State of Alaska, et al.
Superior Court for the State of Alaska
Third Judicial District at Anchorage
Case No. 3AN-95-2134

Palmer, et al. v. Baines, et al.
U.S. District Court for the Eastern District of Arkansas
Case No. LR-C-96-57

Brown, et al. v. Sonitrol Alarm Company, et al.
Superior Court of the State of California
For the County of Los Angeles
Case No. YC026390

Ricky Collins, et al. v. City of Chicago Police Department, et al.
U.S. District Court, Northern District of Illinois, Eastern Division
Case No. 95 C 4231

Arnold v. City of Fredericksburg
U.S. District Court, Eastern District of Virginia
Richmond Division
Case No. 3:97cv74

Dooley v. Lutheran Healthcare Network, et al
Superior Court of Maricopa County, Arizona
County Department, Law Division
Case Nos. CV 97-01575, CV 96-14735, CV 96-92310

Blocker v. Harmon
Circuit Court of the Twentieth Judicial Circuit
Lee County, Florida
Case No. 97-636-CA-WCM

Brian Ludwick v. Tarrant County, Texas, et al.
Case No. 4:96-CV-269-E

Susan Bauer v. Fashion Bug, et al.
In the Common Pleas Court
Greene County, Ohio
Case No. 96 CV 0218

Teresa Moore, et al. v. Andrew Thompson, et al.
U.S. District Court, Northern District of Mississippi
Delta Division
Case No. 2:96-CV-30-B-B

Granados, et al. v. Texas Commerce Bank-El Paso, et al.
District Court of El Paso County, Texas
346th Judicial District
Case No. 93-3728

Kronemeyer v. Lexington Drive Limited Partnership, L.L.P., et al.
U.S. District Court, Eastern District of Texas
Beaumont Division
Case No. 1:97-CV-00120

Gray v. B.G. Brooks Associates of Houston, L.L.P., et al.
District Court of Harris County, Texas
295th Judicial District
Case No. 96-30578

2

Stiller, et al. v. Arnold, et al.
U.S. District Court, Northern District of Indiana
Case No. 3:94 CV 99 JM

Ekanem v. CS, Inc.
District Court of Harris County, Texas
269th Judicial District
Case No. 94-53977

John Ford, Jr. v. City of Marlin, et al.

Kunkel v. Neumann, et al.

1998

Viola Taylor v. City of Mobile, et al.
Circuit Court of Mobile County, Alabama
Case No. CV 97-1517

Newhouse v. Skeen
U.S. District Court, Southern District of West Virginia
Case No. 2:97-0116

Bolden v. City of Cincinnati, et al.
U.S. District Court, Southern District of Ohio
Western Division
Case No. C-1-97-592

Johnson v. City of Cincinnati, et al.
U.S. District Court, Southern District of Ohio
Western Division
Case No. C-1-97-593

Pfefferkorn, et al. v. Riviera Beach Police Department
Labor Arbitration Hearing
Palm Beach County, Florida

Ward v. Jackson County, Mississippi, et al.
U.S.District Court
Soutern District of Mississippi
Case No. 1:97CV299BrR

State of North Carolina v. Kwame Lloyd Hayes

Jackson-Pinkney v. District of Columbia, et al.
Superior Court of the District of Columbia
Civil Division
Case No. 96-9823

3

Eloy Gonzalez v. Ron Ashley, et al.
U.S. District Court, Western District of Kentucky
Paducah Division
Case No. 5:97CV-15-R

Harvey v. Taco Bell, Inc., et al.
Circuit Court, 13th Judicial Circuit
State of Florida
Case No. 93-9391

Stanek v. Burlington County Bridge Commission, et al.
Court of Common Pleas
Philadelphia County, PA
Case No. 1895

Holmes, et al. v. City of Paterson, et al.
U.S. District Court
District of New Jersey
Case No. 95-5431(JAG)

Polly Johnson v. WalMart, Inc.
Superior Court of Gwinnett County, Georgia

Haynes, et al. v. Pesano, et al.
Superior Court of the State of Arizona
County of Pima
Case No. C-309039

Rowan v. Borough of Paramus, et al.
Superior Court of New Jersey
Law Division - Bergen County
Case No. BER-L-4459-94

Johnson, et al. v. City of Milwaukee, et al.
U.S. District Court
Eastern District of Wisconsin
Case No. 98-C-149

Jane Doe v. Wal-Mart Stores, Inc., et al.
In the Circuit Court of Raleigh County, West Virginia
Case No. 95-C-918-B

J.M. Hull v. Stephen Shey, et al.
Circuit Court of the Eighth Judicial Circuit
Alachua County, Florida
Case No. 97-3200-CA

4

Ruby L. Tyler v. David W. Garcia, et al.
Circuit Court for Anne Arundel County, Maryland
Case No. C-97-40280 OC

1999

Schestag & Barringer v. Kent County Sheriff's Department, et al.

Brown v. Wilson County, et al.
U.S. District Court
Western District of Texas, San Antonio Division
Case No. SA-97-CA-1473-OG

Davis v. City of Clarksdale, Mississippi, et al.
Circuit Court of Coahoma County, Mississippi
Case No. CI-14-96-0051

Protzman v. Woodrey, et al.
U.S. District Court
Southern District of Ohio, Western Division
Case No. C-1-96-185

Johnston v. Township of Delran, et al.
United States District Court
District of New Jersey
Case No. 96-CV-4468 (JAR)

State of Florida v. Walter Steven Norris
Circuit Court of the Tenth Judicial Circuit
Polk County, Florida
Case No. CF97-01374A-XX

Estate of Luis McIntire, Jr. et al. v. City of Boulder, et al.
United States District Court
District of Colorado
Case No. 98 S 1368

J.S. Precious Stones, Inc., et al. v. Diapori Realty, Inc., et al.
District Court of Harris County, Texas
133rd Judicial District
Civil Action No. 97-16884

5

2000

Crowley v. City of Detroit, et al.
U.S. District Court
Eastern District of Michigan, Southern Division
Case No. 98-CV-74882-DT
Attorney: Andrew W. Mychalowych

Molands v. Sekely, et al.
U.S. District Court
Eastern District of Michigan, Northern Division
Case No. 99-CV-10051
Attorney: John Garrett

Rayburn v. Bi-Lo, Inc.
U.S. District Court
Northern District of Georgia, Rome Division
Case No. 4:99-CV 0182-HLM
Attorney: David Allen

Carpenter v. City of Cincinnati, et al.
U.S. District Court
Southern District of Ohio, Western Division
Attorney: Kenneth L. Lawson

Joers v. Hilton Inn, Inc.
U.S. District Court
Northern District of Florida
Case No. 5:99-CV316-SPM
Attorney: L. Charles Hilton, Jr.

Varriale v. Pesenti, et al.
Superior Court of New Jersey
Law Division, Passaic County
Case No. PAS-L-462-98
Attorney: Marc C. Saperstein

Scott v. City of Lansing, et al.
U.S. District Court
Western District of Michigan, Southern Division
Case No. 1:99-CV-793
Attorney Richard Foster

Seymour v. City of Houston, et al.
U.S. District Court
Southern District of Texas, Houston Division
Case No. H-99-2198
Attorney Clint Wells, Jr.

6

Shorter, et al. v. District of Columbia, et al.
U.S. District Court, District of Columbia
Case no. 1:00 CV 00657 (RWR)
Attorney: Gregory Lattimer

Sharen Heaston, as Administratrix of the Estate of Medlin v. City of Monroe
U.S. District Court, Western District of North Carolina
Case No. 3 99 CV 105-MU
Attorney: Thomas McNeely

Holliday, et al. v. State of Louisiana, et al.
19th Judicial District Court
Parish of East Baton Rouge
Case No. 436,167 Div. I
Attorney: B. Scott Andrews

Johnson v. EMC Insurance Companies, Inc., et al.
Iowa District Court, Johnson County
Case No. LACV059101
Attorney: Thomas Riley

2001

Harris v. District of Columbia, et al.
U.S. District Court, District of Columbia
Case No. 99-CV-02917 (CKK)
Attorney: Gregory L. Lattimer

Swidriski v. City of Houston, et al.
U.S. District Court, Southern District of Texas
Houston Division
Case No. H-00-1074
Attorney: Robert Rosenberg

Nash, et al. v. City of Goose Creek, et al.
U.S. District Court, District of South Carolina
Charleston Division
Case No. 2-00-1792-18
Attorney: Ray P. McClain

Jackson v. City of Montgomery
U.S. District Court, Middle District of Alabama
Case No. CV-98-A-97-N
Attorney: Griffin Sikes

Bost v. Jordan, et al.
North Carolina General Court of Justice
Superior Court Division
Case No. 99 CVS 5464
Attorney: Corrie Pauling

Cogswell v. Amorello, et al.
Broward County, Florida Circuit Court
17th Judicial Circuit
Case No. 96 039 82 (14)
Attorney: Jonathan Davis

Holloway, et al. v. City of Enid, et al.
U.S. District Court
Western District of Oklahoma
Case No. CIV-99-1333-R
Attorney: Fred Southern, Jr.

Williams, et al. v. JGER Realty Co., et al.
U.S. District Court
Middle District of Louisiana
Case No. 00-0052
Attorney: Frederick A. Stolzle, Jr.

Wittenberg., et al. v. Hill, et al.
Hamilton County, OH Court of Common Pleas
Case No. A9907589
Attorney: R. Craig McLaughlin

Cooper, et al. v. Marlow, et al.
County of Mecklenburg, NC General Court
Case No. 98-CVS-16670
Attorney: Corie Pauling

Fineberg, et al. v. Eckerd Corp. of Florida, Inc.
Circuit Court, 15th Judicial Circuit
Palm Beach County, florida
Case No. CL 00-1965 AB
Attorney: Rebecca Larson

00JUN 23 P2: 12

LAW OFFICES OF

# ADAMS & GRAHAM, L.L.P.

AFFILIATED WITH HILL GILSTRAP ADAMS & GRAHAM, L L P

222 E. VAN BUREN, WEST TOWER
P.O. DRAWER 1429
HARLINGEN, TEXAS 78551
TEL (956) 428-7495    FAX (956) 428-2954
www.adamsgraham.com

TOM LOCKHART
Partner

AFFILIATE OFFICES
AUSTIN
CHICAGO
DALLAS/FORT WORTH
LITTLE ROCK

June 22, 2000

Mr. Broadus Spivey                    Via CMRRR# 7099 3220 0001 0358 1143
**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, Texas  78701-4320

Ms. Sonia Lopez                       Via CMRRR# 7099 3220 0001 0358 1150
**LAW OFFICES OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, Texas  78539

Re:   **Civil Action No. B-98-162**
      **Arturo Guillermo Salinas, et al. v. City of Harlingen, et al.**
      **Civil Action No. B-98-163**
      **Gilberto Rodriguez, et al. v. City of Harlingen, et al.**
      **Civil Action No. B-99-070**
      **Raul Rodriguez v. City of Harlingen, et al.**
      **Our File No.      :     H-1023**

Dear Folks:

At the deposition of Scheopner the other day, we produced a cassette tape and 7-page dispatcher log. This cassette tape was obtained by copying the cassette tape in the possession of Texas Ranger Rudy Jaramillo. By way of history, at the request of the Texas Rangers or the Department of Public Safety, the cassette tape was copied from the master tape. I am enclosing a xerox copy of the handwriting on the cassette tape in the possession of the Texas Rangers and the Harlingen Police Department miscellaneous report, receipt, property tag and index card referencing such cassette tape and the dispatcher log. I now have in my possession a transcription of the cassette tape from Ranger Jaramillo's file and I am enclosing the same, along with a transcript of the cassette tape prepared by the Harlingen Police Department. In the routine course of business of HPD Communications, it appears that the master tape or tapes in use on July 7. 1998, have been reused, during subsequent periods of time.

Mr. Broadus Spivey
Ms. Sonia Lopez
Re:   Gilberto Rodriguez, et al. v. City of Harlingen, et al.
      Guillermo Salinas, et al. v. City of Harlingen, et al.
      Raul Rodriguez, et al. v. City of Harlingen, et al.
June 22, 2000
Page 2


Additionally, we have now located and I enclose the teletype transmission received from the Cameron County Sheriff's Department.

Sincerely yours,

**ADAMS & GRAHAM, L.L.P.**


TOM LOCKHART

TL/mm
Enclosures

cc:   (w/encl.)
      Mr. Richard Pena              Via CMRRR# 7099 3220 0001 0358 1167
      **LAW OFFICES OF RICHARD PENA, P.C.**
      Barton Oaks Plaza Two
      901 MoPac, Suite 325
      Austin, Texas  78746-5747

      Mr. Walter J. Passmore              VIA REGULAR MAIL
      **PASSMORE, WALKER & TWENHAFEL, L.L.P.**
      P. O. Drawer 3766
      McAllen, Texas  78502-3766

Case 1:98-cv-00162    Document 106    Filed in TXSD on 07/10/2001    Page 266 of 550

HARLINGEN POLICE RECEIPT FOR RETURN OF PROPERTY    CASE 98-00034970

LOCATION Harlingen Police Dep't    TIME 10:0 A.M., P.M.    DATE 7-08-98

ITEMS: 7 pages of 911 log print-out of shooting incident from initial call in Rio Hondo To officers shooting in San Benito. 1 Cassette recorded tape of the same traffic of 7-07-98

JA Cisneros - 423-1168

_____ #1128    OFFICER _____ DPS.    RECEIVER

C34PDF - www.fasiio.com

# 00285  D  PROPERTY TAG

Time _9:00 A_ M   Date _7-08-98_   Case# _98-00034970_

Evidence ☐   Suspect ☐
Personal Prop. ☐   Victim ☐        _911 Traffic_
Found Prop. ☐   Reportee ☑

(Offense)

F-1 2 3 S
M-A B C
(Grade-Circle One)

D.O.B. _10-15-46_

NAME ONLY _Lt. Espiridion Leal_
Address _1102 S. Commerce - Harlingen, Tx_
Description (Incl. Ser #'s) _7 pages of 911 log print-out of_
_shooting and initial call in Rio Hondo To officers_
_shooting in San Benito. One Cassette recording of_
_the same traffic of 7-07-98_
Officer _Fredland #1128_
Returned by _J.F. Deal_    Destroyed by _____
Transferred to _Joe Cisneros DP_ Time_10.00 A_M Date _7-8-98_

**FILL OUT BOTH PROPERTY AND INDEX CARDS FULLY & ALIKE**

# 00285  D  INDEX CARD

Time _9:00 A_ M   Date _7-08-98_   Case# _98-00034970_

Evidence ☑   Suspect ☐
Personal Prop. ☐   Victim ☐        _911 traffic_
Found Prop. ☐   Reportee ☑

(Offense)

F-1 2 3 S
M-A B C
(Grade-Circle One)

D.O.B. _10-15-46_

NAME ONLY _Lt. Espiridion Leal_
Address _1102 S. Commerce - Harlingen, Tx_
Description (Incl. Ser #'s) _7 pages of 911 log print-out of_
_shooting and initial call in Rio Hondo To officers_
_shooting in San Benito. One Cassette recording of_
_the same traffic of 7-07-98_
Officer _Lt of leal #1128_
Returned by _____    Destroyed by _____
Transferred to _____ Time _____ M Date _____

**FILL OUT BOTH PROPERTY AND INDEX CARDS FULLY & ALIKE**

CMPDF - www.fxxic.com



CVisPDF - www.fastio.com

'98    E. Moore - Homicide

A - Radio      SideB - Phone —

SONY





GARANTIE A VIE DE SONY

# HARLINGEN POLICE DEPARTMENT

## Case # 98-00034970

## MISCELLANEOUS REPORT

**Nature of Incident** :     911 LOG PRINTOUT AND RECORDING        **Location of Incident:** RIO HONDO AND SAN BENITO, TX.

**Name of Complainant:** LT. E. LEAL 1128     **Address:** HPD

**Details:** ON 07-08-98 AT 9:00AM 911 MANAGER G. JONES TRANSFERRED SOME 911 LOG DOCUMENTS CONCERNING A RIO HONDO SHOOTING AND OFFICERS SHOOTING IN SAN BENITO . DOCUMENTS WERE TAGGED #00285D AND PLACED IN EVIDENCE. LATER AT 10:00AM THEY WERE TURNED OVER TO DPS TROOPER JOE CISNEROS ON 07-08-98.

**Assignment Completed:** 9:00AM         **Date** : 07-08-98

proved by _____          **Officer** :  LT. E. LEAL 1128

Transcription of Radio Traffic 07/07/98

NOTE:  X, XX, and XXX denote unidentified person(s) to transcriptionist.

| | |
|---|---|
| 713 | We have shots fired! |
| Dispatcher | 713 |
| 713 | We have shots fired! |
| Dispatcher | Clear, shots fired, 713. |
| 713 | (Inaudible) shots fired! |

X          Get, send EMS out here Headquarters!  We are going to need at least two or three of them!

X          OK we got (inaudible) ...officers down...(inaudible)OK it's going to be closer, (inaudible) three EMS, probably the  AirCare if they can send it.

| | |
|---|---|
| Dispatcher | Three EM—three EMS and AirCare—10-4 |
| X | Go ahead and get us the Air Care, we got two Border Patrol down, bad! |
| Dispatcher | In custody (inaudible)? |
| X | Yeah, he's got two. |
| X | Ok. |
| XX | Clear headquarters  need a couple of ambulances and AirCare, south of |

San Benito, south, two miles from the Expressway south, and about a mile east.

| | |
|---|---|
| X | We're going to need at least  three ambulances. |
| Dispatcher | EMS has been advised. |
| XX | Take a look through the overheads, about two miles south of the |

Expressway on Sam Houston about a mile east.

XX          Tell EMS there will be a unit down at Sam Houston south and Hudson Road to ah, lead the ground units in.

| | |
|---|---|
| Dispatcher | 10-4. |
| XX | (inaudible;)  you got those units rolling? |
| Dispatcher | 10-4 Sir. |

Dispatcher          (inaudible) looks like a minor 10-31 at ah, .(inaudible).

XX          (inaudible)  we'll be out here a while, we got two more in this cornfield supposedly armed and on the loose.

Dispatcher          (inaudible)

| | |
|---|---|
| Dispatcher | 150. |
| XX | go ahead. |
| Dispatcher | (inaudible) this 31. |
| Dispatcher | 10-4, 34976, 34976 at 718. |
| XX | 10-4 thank you. |

| | |
|---|---|
| XX | 150 I'm 10-8 |
| Dispatcher | 10-4 150 |

| | |
|---|---|
| Dispatcher | 150.....150 |
| 150 | Go ahead |
| Dispatcher | 10-11 with 911 |
| 150 | 10-4 |

| | |
|---|---|
| 105 | 105 |
| Dispatcher | Go ahead 105. |
| 105 | See if you have anything verbally for a Robert Reed, Robert Reed. |
| XX | I'm already doing it. |

| | |
|---|---|
| X | ??42 I'll be out at (inaudible) |
| Dispatcher | 10-4. |

| | |
|---|---|
| X | Ah, 101 to (inaudible) |
| XX | Go ahead Chief. |
| X | Who's out here besides you and Mike? |
| XX | Ah, we have Mayer, Johnson and all three K-9s. |
| X | OK, let's leave the K-9s, you and Mike.  Anybody else can head on back home. Thank you. |
| XX | Ok, (inaudible)? |

| | |
|---|---|
| 105 | 105 101 |
| 101 | Go ahead |
| 105 | Ok, you want myself and 61 to take off and leave 96 97 98 out here? |
| 101 | Yeah, we got plenty of help now, from other agencies, ah, I'm going to need (inaudible) |
| 105 | 10-4.  Also, ah be advised Michael ?? is out here with the K-9. |
| 101 | Yeah, I've already talked to him. |

| | |
|---|---|
| Dispatcher | 140 |
| 140 | 40 go ahead. |
| Dispatcher | Ah be advised we got a call of a  red Ford pickup headed towards the hospital on Ed Carey from the Expressway.  Looks like it's J(inaudible) 1039. |
| 140 | (inaudible) clear. I'm over here on 6th and Tyler. |
| Dispatcher | 10-4 |
| 2614 | 2614. |
| Dispatcher | go ahead. |
| 2614 | Yeah, I'm right here at Hale and Ed Carey. I'll check around for it. |
| Dispatcher | 10-4. |

Dispatcher    Go ahead
X    Be 10-8 from out here, ah, be heading back into the city.
X    (inaudible)


X    42
Dispatcher    Go ahead.
X    I've been released by hospital, it's county 17—and they said they are going to have a 24hour guard on him. I'll be 10-8.
Dispatcher    10-4

END OF TRANSCRIPTION.

# TRANSCRIPTION OF EMS CALLS 07-07-98

| | |
|---|---|
| HPD | Harlingen Police Department. |
| EMS | This is 197. Where are we supposed to be assigned to? |
| HPD | (inaudible) |
| EMS | Were we supposed to be at R.D. Moore's house? |
| HPD | {Background communication (inaudible)}  Resaca and Gamble Road. |
| EMS | Resaca and Gamble? Is that R.D. Moore's house? |
| HPD | {Background  communication: Is that R.D. Moore's house?}  More than likely, yes. Ah— |
| EMS | Ok, is that where the (inaudible) is at? |
| HPD | Is that where, everything--? |
| EMS | Is that where the shots fired at? |
| HPD | Yes. |
| EMS | Alright, thank you. |
| HPD | Aha, bye bye. |

*Dial tone, dialing, ringing:*

| | |
|---|---|
| EMS | Harlingen EMS |
| Melody | This is Melody at the police department. |
| EMS | What? |
| Melody | We need two to three units out at Resaca and Gamble Road. I've got officers down. |
| EMS | Down at the officers? |
| Melody | Hmm? |
| EMS | Down at the officers? |
| Melody | yes. |
| EMS | Ok. |
| Melody | Ok. |
| EMS | Bye. |

*Dial tone, dialing, ringing?.*

| | |
|---|---|
| EMS | Harlingen EMS |
| Melody | Can you get AirCare out there also?  We got Border Patrol down also. |
| EMS | Ok. |
| Melody | Thanks |
| EMS | Bye. |

*Dial tone, dialing, ringing?.*

| | |
|---|---|
| Melody | {Background communication:  Sam Houston and Hudson Road south.} |
| EMS | Harlingen EMS |
| Melody | There's going to be some units at Sam Houston and Hudson Road south, heading your—leading your units over there, so that you'll know (inaudible) |
| EMS | Sam Houston and Hudson Road. |
| Melody | South. |
| EMS | Ok. |
| Melody | Alright. |

END OF TRANSCRIPTION.

Transcription of phone calls - Harlingen Police Department July 7, 1998

| | |
|---|---|
| HPD dispatcher - | "Harlingen Police Department" |
| HPD K-9 Officer Chris Read - | "This is 197, where were we supposed to be assigned to, were we supposed to be at R.D. Moore's house?" |
| HPD dispatcher - | "Resaca and Gamble Road" |
| HPD K-9 Officer Chris Read - | "Resaca and Gamble, is that R.D. Moore's house" |
| HPD dispatcher - | "Is that R.D. Moore's house...more than likely yes" |
| HPD K-9 Officer Chris Read - | "Is that where Foist is at?" |
| HPD dispatcher - | "Is that where everything" |
| HPD K-9 Officer Chris Read - | "Is that where shots fired is?" |
| HPD dispatcher - | "Yes" |
| HPD K-9 Officer Chris Read - | "Alright, thank you" |
| HPD dispatcher - | "Uh-huh, bye bye" |

---

*Dial tone, dialing, ringing*

| | |
|---|---|
| EMS - | "Harlingen EMS" |
| HPD dispatcher - | "This is Melody at the police department, I need two to three units out at Resaca and Gamble Road, I've got officers down" |
| EMS - | "downed officers" |
| HPD dispatcher - | "huh?" |
| EMS - | "downed officers?" |

Page -1-

CMsPDF - www.texisi.com

| | |
|---|---|
| HPD dispatcher - | "Yes" |
| | |
| EMS - | "Ok" |
| HPD dispatcher - | "Ok" |
| EMS - | "Bye" |

*Dial tone, dialing, ringing*

| | |
|---|---|
| EMS - | "Harlingen EMS" |
| HPD dispatcher - | "Can you get Air Care out there also, we got Border Patrol down also" |
| EMS - | "Ok" |
| HPD dispatcher - | "Thanks" |
| EMS - | "Bye" |

*Dial tone, dialing, ringing*

| | |
|---|---|
| EMS - | "Harlingen EMS" |
| HPD dispatcher - | "There's going to be some units at Sam Houston and Hudson Road south, heading your, leading your units over there - so they know exactly what's up" |
| EMS - | "Sam Houston and Hudson Road" |
| HPD dispatcher - | "South" |
| EMS - | "Ok" |
| HPD dispatcher - | "Alright" |

Harlingen Police Department radio transmissions July 7, 1998


HPD Sergeant Shawn Foist -          "We have shots fired...(inaudible)"

HPD dispatcher -                    "7:13"

HPD Sergeant Shawn Foist -              "We have shots fired"


HPD dispatcher -                    "Clear, shots fired 7:13"

HPD Sergeant Shawn Foist -          "A bunch of shots fired"

HPD Sergeant Shawn Foist -          "....Get EMS out here headquarters we're going to
                                    need at least two or three of them."

HPD Sergeant Shawn Foist -          "OK, we got probably three or five officers down,
                                    the subject is going to be in custody...roll us three
                                    EMS, probably the Air Care if they can send it"

HPD dispatcher -                    "Three EM, three EMS and Air Care, 10-4"

HPD Sergeant Shawn Foist -          "Go ahead and get us the Air Care, we got two
                                    Border Patrol down, bad"

Chief Scheopner -                   "He is custody Foist?"

HPD Sergeant Shawn Foist -          "Yeah, he's shot too"

Chief Scheopner -                   "OK"

Chief Scheopner -                   "Clear headquarters, need a couple of ambulances
                                    and Air Care south of San Benito, about two miles
                                    from the expressway south, and about a mile east."

HPD Sergeant Shawn Foist -          "We're going to need at least three ambulances"

HPD dispatcher -                    "EMS has been advised"

Chief Scheopner -                   "Take a look through the overheads, about two

Page -3-

|  | miles south of the expressway on Sam Houston about a mile east" |
|---|---|
| HPD dispatcher - | "Clear" |
| Chief Scheopner - | "Tell EMS there will be a unit down at Sam Houston south and Hudson Road, to uh, lead the ground units in" |
| HPD dispatcher - | "Clear" |
| Chief Scheopner - | "101, you got those units rolling" |
| HPD dispatcher - | "10-4 sir" |
| unidentified HPD officer - | "50, I'm going to be out what looks like a minor 10-31 at the south Y" |
| Chief Scheopner - | "101, we'll be out here a while, we got two more in the cornfield supposedly armed and on the loose" |
| HPD dispatcher - | "10-4 sir" |
| unidentified HPD officer - | "150" |
| HPD dispatcher - | "Go ahead" |
| unidentified HPD officer - | "Can I get a case number and time of call for this, uh, 31" |
| HPD dispatcher - | "10-4, 34976, 34976 at 7:18" |
| unidentified HPD officer - | "10-4, thank you" |
| unidentified HPD officer - | "50, I'm 10-8" |
| HPD dispatcher - | "10-4 150" |
| HPD dispatcher - | "150.........150" |
| unidentified HPD officer - | "Go ahead" |
| HPD dispatcher - | "10-11 with 911" |

Page -4-

| | |
|---|---|
| unidentified HPD officer - | "10-4" |
| HPD Sergeant Shawn Foist - | "105" |
| HPD dispatcher - | "Go ahead 105" |
| HPD Sergeant Shawn Foist - | "See if you have anything globally for a Robert Reed, Robert Reed" |
| Chief Scheopner - | "I'm already doing it" |
| HPD Officer Eric Nelson - | "42, I'll be out at the ER" |
| HPD dispatcher - | "10-4" |
| Chief Scheopner - | "101 to (inaudible)" |
| HPD Sergeant Shawn Foist - | "Go ahead Chief" |
| Chief Scheopner - | "Who's out here besides you and Mike" |
| HPD Sergeant Shawn Foist - | "Uh, we have Mayer, Johnson, and, uh, all three K-9s" |
| Chief Scheopner - | "Ok, lets leave the K-9s, you and Mike. Anybody else can head on back home. Thank you." |
| HPD Sergeant Shawn Foist - | "OK (inaudible)" |
| HPD Sergeant Shawn Foist - | "105 101" |
| Chief Scheopner - | "Go ahead" |
| HPD Sergeant Shawn Foist - | "Ok, you want myself and 61 to take off and leave, uh, 96, 97 and 98 out here?" |
| Chief Scheopner - | "Yeah, we've got plenty of help now from other agencies, uh I'm gonna need your portable, mine's dead" |
| HPD Sergeant Shawn Foist - | "10-4, also, uh, be advised Michael Laney is out here, uh, with the K-9" |
| Chief Scheopner - | "Yep, I've already talked to him" |

Page -5-

| | |
|---|---|
| HPD dispatcher - | "140" |
| unidentified HPD officer - | "40, go ahead" |
| HPD dispatcher - | "Uh, be advised we got a call of a red Ford pick-up headed towards the hospital on Ed Carey from the expressway...Looks like its chasing someone 10-39" |
| unidentified HPD officer - | "40 I'm clear but I'm over here on 6th and Tyler" |
| HPD dispatcher - | "10-4" |
| HPD Officer William Bilokury - | "2614" |
| HPD dispatcher - | "Go ahead" |
| HPD Officer William Bilokury - | "Yeah, I'm right here at Hale and Ed Carey, I'll check around for it" |
| HPD dispatcher - | "10-4" |
| HPD dispatcher - | "Go ahead" |
| HPD Sergeant Mike Garcia - | "Be 10-8 from out here, uh, be heading back into the City" |
| HPD dispatcher - | "10-4" |
| HPD Officer Eric Nelson - | "42" |
| HPD dispatcher - | "Go ahead" |
| HPD Officer Eric Nelson - | "I've been released by hospital, uh, it's county 17, and they said they are going to have a 24 hour guard on him, I'll be 10-8" |
| HPD dispatcher - | "10-4" |

**END**

Page -6-

ADMINISTRATIVE MESSAGE FROM: BVSA TIME/DATE OF MESSAGE INPUT: 06:32 07/07/98.

SO CAMERON COUNTY
RGV STATIONS
  EF: DOUBLE HOMOCIDE    OCCURED 0520 THIS MORNING
      TOOK PLACE IN RIO HONDO       POSS FIRST 2 TW    POSS LAST THREE 007
      ACTOR LEFT THE SCENE IN A WHT CHEVY TK  EXT CAB  POSSIBLY A 1997 MODEL
      WITH DARK TINTED WINDOWS    ACTOR IS A ERNEST MOORE FROM THE HARLINGEN
      AREA  ACTOR LSW WHT T SHIRT BLUE JEAN AND BOOTS    VEHICLE LAST SEEN IN
      THE SAN BENITO ARE AT JOINES AND GAMBLE RD  IF LOCATED USE CAUTION ACTOR
      MAY BE ARMED   FOR MORE INFO CONTACT THIS DEPT AT 956-544-0860
  CCSO COMM DIV: K SILGUERO/C02     070798    0632  CST

OUTPUT MSG 029,       FROM BVSA          07/07/98 06:32

Transcription of Radio Traffic 07/07/96

NOTE: X, XX, and XXX denote unidentified person(s) to transcri...

| | |
|---|---|
| 713 | We have shots fired! |
| Dispatcher | |
| 713 | We have shots fired! |
| Dispatcher | |
| 713 | Clear, shots fired, 713. |
| 713 | (inaudible) shots fired! |

X    Get, send EMS out here Headquarters!  We are c...
or three of them!

X    OK we got (inaudible) ...officers down...(inaudible...
closer, (inaudible) three EMS, probably the AirCare if they car...
Dispatcher    Three EM—three EMS and AirCare—10-4
X    Go ahead and get us the Air Care, we got two ...
Dispatcher    in custody (inaudible)?
X    Yeah, he's got two.
X    OK.
XX    Clear headquarters   need a couple of ambulance...
San Benito, south, two miles from the Expressway south, and ...
X    We're going to need at least three ambulances
Dispatcher    EMS has been advised.
XX    Take a look through the overheads, about two ...
Expressway on Sam Houston about a mile east.
XX    Tell EMS there will be a unit down at Sam Hous...
Road to ah, lead the ground units in.
Dispatcher    10-4.
XX    (inaudible:) you got those units rolling?
Dispatcher    10-4 Sir.

Dispatcher    (inaudible) looks like a minor 10-31 at ah, (ina...

XX    supposedly armed and on the loose.
(inaudible) we'll be out here a while, we go: tw...

Dispatcher    (inaudible)

Dispatcher    150.
XX    go ahead.
Dispatcher    (inaudible) this 31.
Dispatcher    10-4, 34976, 34976 at 718.
XX    10-4 thank you.

Maureen Stingley

Reorder P/N 159890

36 26 94 — 7/20/98
4/27/99 - 5/21/99

EXHIBIT NO. 6/8

EXHIBIT NO. 6/6

Maureen Stingley

Reorder P/N 159890

120m

7-26-98    7/26/98

4/21/99 - 5/21/99

6/1

EXHIBIT NO. 6/4

EXHIBIT NO.22A

Maureen Stingley

EXHIBIT NO.22B

| | |
|---|---|
| 5/11/98 - 5/11/98 | |
| 1.14.98  14:54 | 1.25.98  18:40 |
| 5/28/98  17:52 — 7/20/98 | |
| 8/22/98  19:36 | 9/28/98  14:40 |
| 10/5/99  10:23 | 10/5/99  22:43 |

Reorder PIN 159890

120m

#16

120m

#1

Reorder PIN 159890

Maureen Stingley

EXHIBIT NO. 22A

Maureen Stingley

EXHIBIT NO. 22B

Reorder PIN 159890

120m

#16

Digital Cassette    120m

7/20/58 - 2/18/55

1·14·98  14:54    1·25·98  18:40

5/28/98  17:52  —  7/20/98  8:22

8/22/98  19:36    9/26/98  14:40

10/5/99  10:23    10/5/99  22:43

Reorder PIN 159890

120m

#1

Digital Cassette    120m

Maureen Stingley

#



TEXAS DEPARTMENT OF PUBLIC SAFETY
TEXAS RANGER DIVISION

REPORT OF INVESTIGATION                                    Date:    07-14-98

| FILE TITLE  MASTER FILE | |
|---|---|
| 1 Capital Murder -FC-1900<br>2 Rio Hondo, Cameron County, 031<br>3 DELIA MORIN, WF, Age 31<br>4 00-07-98 | THIS REPORT IS THE PROPERTY OF TEXAS DPS-TEXAS RANGER DIVISION.  NEITHER IT NOR ITS CONTENTS MAY BE DISSEMINATED OUTSIDE THE AGENCY TO WHICH LOANED. |

| ACTIVE:___XX__INACTIVE:____  CLOSED:____ RESTRICTED:____<br>STATIONED: Brownsville, Texas<br>SUBMITTING INVESTIGATOR | | FILE NR<br>RD098312<br>DISSEMINATION | TYPE<br>O | PROGRAM<br>CRIMINAL<br>CX RELATED FILES |
|---|---|---|---|---|
| INV-ID-NR:   4543<br>SUP-ID-NR:   3079<br>CPT-ID-NR:<br>SEC-ID-NR: | BY: ROLANDO CASTANEDA, Sergeant<br>BY: RAY CANO, Lieutenant<br>BY:<br>DATE: | D1<br>D2<br>D3<br>D4<br>D5 | | F1  RD098338<br>F2<br>F3<br>F4<br>F5 |

RPT-RE: Offense Report (3 offenses)

---

<u>SYNOPSIS</u>

This is a Master File containing three (3) offenses.  On Tuesday, 07-07-98, at approximately 5:00 a.m., a male subject identified as ERNEST LANE MOORE (hereinafter refer to as MOORE), WM, DOB 12-23-72, entered a residence located at 311 Catherine in Rio Hondo, Cameron County, Texas and shot and killed two females and seriously wounded one male.  Shot and killed were DELIA MORIN, HF, DOB 05-31-67, and MARGARITA FLORES, HF, DOB 03-02-45. Wounded at the residence was DAN MORIN, HM, DOB 01-25-76.

On same date, at approximately 6:00 a.m., this writer was telephonically contacted by Harlingen DPS Communication Dispatcher LINDA ARCHER. Dispatcher ARCHER advised this writer that Cameron County Sheriff's Investigator JAVIER REYNA was requesting this writer's assistance in the double murder investigation.   This writer telephonically contacted Investigator REYNA and proceeded to said location.

On same date, at approximately 7:10 a.m., this writer arrived at the above location and met with Investigator REYNA. Investigator REYNA provided this writer with a brief synopsis of the above murders and advised that MOORE had been identified by eyewitnesses as the shooter in this investigation. Investigator REYNA further advised that Sheriff's Deputies were at the MOORE residence located on Gamble Road, in rural San Benito, Texas searching for MOORE.

At approximately 7:15 a.m., this writer heard Investigator REYNA's Cameron County radio transmission of officers being fired upon by MOORE and that officers were down (shot).

DPS SENSITIVE

CLE-1 (Rev. 6/91) Vag:07-28-98

Case 1:98-cv-00162   Document 106   Filed in TXSD on 07/10/2001   Page 289 of 550

CONTINUATION

| | DATE: 07-14-98 | | PAGE: 2 |
|---|---|---|---|
| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X_INACTIVE___CLOSED___RESTRICT___ | | |
| | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

This writer, accompanied by Investigator REYNA and other Cameron County Investigators, proceeded to the shooting location. Upon this writer's arrival at the Gamble Road location, the gunfight had ceased and this writer learned and observed that two (2) United States Border Patrol Agents had been shot to death and that a Cameron County Sheriff's Deputy had been wounded. The assailant, who was identified as MOORE, was wounded and later died at Valley Baptist Hospital in Harlingen, Texas. The two (2) murdered U.S. Border Patrol Agents are identified as SUSAN LYNN RODRIGUEZ, WF, DOB 07-11-69, and RICARDO GUILLERMO SALINAS, HM, DOB 04-29-74. Shot and wounded was Cameron County Sheriff's Deputy RAUL RODRIGUEZ, HM, DOB 01-28-66. A search for additional suspects was negative.

This writer will assist the Cameron County Sheriff's Department in the Rio Hondo double murder investigation and will also assist Texas Rangers RUDY JARAMILLO and ISRAEL PACHEO in conducting the investigation of the Border Patrol shooting in conjunction with the Cameron County Sheriff's Office, FBI and the U.S. Border Patrol.

This investigation will continue.

DETAILS

Master Offenses:

    Offense #1:   As noted above.

    Offense #2:   Capital Murder - FC - 1900
                      Rio Hondo, Cameron County, 031
                      MARGARITA FLORES, HF
                      07-07-98

    Offense #3:   Attempted Murder - F1 - 1500
                      Rio Hondo, Cameron County, 031
                      DAN MORIN, H/M,
                      07-07-98

1.   On 07-07-98, this writer was contacted at approximately 6:00 a.m., by Harlingen DPS Communications reference Investigator REYNA's request for

DPS SENSITIVE

CONTINUATION

| DATE: 07-14-98 | | PAGE: 3 |
|---|---|---|

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X_ INACTIVE___CLOSED___RESTRICT__ | | |
| | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

writer's assistance in a double murder investigation in Rio Hondo. Writer telephonically contacted REYNA and proceeded to said location.

2. While enroute to the scene, writer telephonically contacted DPS Crime Scene Criminalist Supervisor JOE MARCHAN reference assistance in processing above mentioned crime scene.

3. At approximately 7:10 a.m., writer arrived at the double murder crime scene location and observed the following reference the residence:

    A.  Was pink in color<br>
    B.  Was a single story dwelling<br>
    C.  Was made of wood construction<br>
    D.  Had black composition roof type material<br>
    E.  The front door faced north toward Catherine

4. Writer met with Investigator REYNA, who provided writer with a brief synopsis of the homicides and advised that several eyewitnesses had observed ERNEST MOORE commit the murders. Investigator REYNA further stated that MOORE had also shot and wounded a male occupant of the residence. The gunshot victim was identified as DAN MORIN, who was transported to Valley Baptist Medical Center, Harlingen, Texas.

5. Investigator REYNA further advised that:

    A.  Cameron County Sheriff's Deputy ROBERT RODRIGUEZ had observed and pursued a white Chevrolet pickup allegedly belonging to MOORE on FM 385 in the San Benito area.

    B.  Deputy RODRIGUEZ had pursued the pickup, but had lost it in the FM 385 area.

    C.  Deputy RODRIGUEZ had seen three (3) occupants in the cab of the pickup.

    D.  Cameron County Sheriff's Deputies had discovered the above pickup on Gamble Road in rural San Benito. Investigator REYNA further stated that the Cameron County Sheriff's Department was at the

CLE-2(Rev. 12/88)

CONTINUATION

DATE: 07-14-98          PAGE: 4

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF,  Age 31<br>07-07-98 | ACTIVE_X_ INACTIVE___CLOSED___RESTRICT___ | | |
| | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

location and was attempting to search for and arrest MOORE for the murders.

E.   The white pickup is described as a 1997 Chevrolet pickup having dark window coating material on all windows and bearing Texas registration WS-6007 registered to ERNEST MOORE,

6.   At approximately 7:15 p.m., while Investigator REYNA was briefing this writer reference the double murder, a transmission was broadcast over the Cameron County Sheriff's Department radio that shots were being fired and that officers were down at the MOORE residence.

7.   This writer, along with Investigator REYNA and Cameron County Investigator ROBERT RODRIGUEZ (*Note - no relation to the ROBERT RODRIGUEZ mentioned on Detail 5a.), proceeded to the shooting location on Gamble Road.

8.   Arriving at the Gamble Road, writer observed numerous Cameron County Sheriff's Units and U.S. Border Patrol units at the shooting scene. Writer also observed the following:

A.   A male uniformed U.S. Border Patrol agent with blood on his head area, lying next to the left front tire of a U.S. Border Patrol unit identified as Unit #M-7365, said unit was also bearing U.S. Government registration J17308.  The Patrol Border Agent was later identified as SALINAS.

B.   A shirtless white male who was lying on the ground with blood on his body. Writer later learned this male was shooting suspect ERNEST MOORE.

C.   An AirCare helicopter to transport victims.

D.   This writer did not observe Border Patrol Agent RODRIGUEZ nor Deputy RODRIGUEZ at the scene.

DPS SENSITIVE

CLE-2(Rev. 12/88)

CONTINUATION

| FILE TITLE  MASTER FILE | DATE: 07-14-98 | | PAGE: 5 |
|---|---|---|---|

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X_ INACTIVE___CLOSED___RESTRICT__ | | |
| | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

E.   Writer also observed MOORE's residence and described the residence as follows:

   (1)   A single story dwelling
   (2)   Constructed of white brick
   (3)   Attached garage facing northwest
   (4)   Black composition roof
   (5)   Front door faces northwest
   (6)   Gamble Road is an unapproved road, made of a caliche type material

9.   Writer then met with Cameron County Sheriff's Deputy Sergeant RONNIE SAENZ, who provided writer with a brief account of the shoot-out. Sgt. SAENZ advised this writer of the following (for details refer to Attachment A):

A.   Cameron County Deputies had located MOORE's white pickup at the residence of his father, Harlingen Police Detective R. D. MOORE.

B.   After deputies briefed Detective MOORE of his son's involvement in the Rio Hondo murders, Detective MOORE gave oral consent to the Sheriff's Department to search the residence for MOORE.

C.   Cameron County Deputies searched the residence and did not locate MOORE.

D.   U.S. Border Patrol Agents (SALINAS and RODRIGUEZ) had attempted to accompany the Sheriff's Department in searching for MOORE at the residence, but were refused access by Detective R. D. MOORE.

E.   While mentioned investigators, who were accompanied by the Border Patrol Agents, were walking back to their respected patrol units, MOORE appeared from the corn field located across the road from the MOORE residence and commenced firing at law enforcement officers with a large caliber assault rifle.

F.   MCORE shot and killed Border Patrol Agents SALINAS and RODRIGUEZ and seriously wounded Cameron County Deputy RODRIGUEZ.

DPS SENSITIVE

CLE-2(Rev. 12/88)

CONTINUATION

DATE: 07-14-98          PAGE: 6

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31 | ACTIVE _X_ INACTIVE___ CLOSED___ RESTRICT__ | | |
| 07-07-98 | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

G.   MOORE was eventually struck by gunfire.

H.   MOORE, after being wounded, was asked by Sgt. SAENZ if MOORE had acted alone and he (MOORE) made an up and down gesture with his head indicating "yes".

10.   Sgt. SAENZ further stated that two (2) other subjects were allegedly involved and suspected of being in the cornfield.   Sgt. SAENZ did advise that no one had seen the alledged suspects run into the cornfield, but during the pursuit by Deputy RODRIGUEZ at approximately 5:31 a.m., he (RODRIGUEZ) had seen three (3) occupants in the white pickup.

11.   Writer then requested assistance from the following:

A.   Texas Rangers ISRAEL PACHECO and RUDY JARAMILLO

B.   Texas Highway Patrol to secure the outer perimeter of the corn field and surrounding fields in search of the two (2) alleged suspects who were believed at large

C.   Air support from the DPS Helicopter to search and locate MOORE's other two (2) alleged accomplices.

12.   This writer, accompanied by Cameron County Sheriff OMAR LUCIO and Federal Bureau of Investigation Special Agent FREDDIE VELA established a command post near the crime scene and formulated an operational plan to secure the immediate area in search for the two (2) alleged suspects still at large in the cornfield.

13.   The U. S. Border Patrol canvassed the surrounding residences in search of the two alleged suspects resulting in negative finding.

14.   Air support from the DPS and the U. S. Border Patrol assisted in the search for the two (2) alleged suspects resulting in a negative finding.

DPS SENSITIVE

CLE-2(Rev. 12/88)

CONTINUATION

| | DATE: 07-14-98 | | PAGE: 7 |
|---|---|---|---|

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X_ INACTIVE___CLOSED___RESTRICT__<br><br>BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

15. Members of the U. S. Border Patrol Special Response Team entered the corn field and attempted to identify and follow visual tracks made by Subject MOORE and/or suspects. After initially identifying signs (footprints) in the edge of the cornfield, the U. S. Border Patrol was unable to establish any further movement into the interior of the cornfield.

16. At this time, K-9 units of the Texas Department of Corrections arrived and searched said cornfield with negative results.

17. At approximately 12:30 p.m., the FBI SWAT Team, accompanied by Special Response Units of the U. S. Border Patrol, Immigration and Naturalization Service, Brownsville Police Department SWAT, Edinburg Police SWAT and Texas Department of Public Safety, conducted a sweep of the entire length and width of the corn field. Search resulted in negative finding of MOORE's alleged associates.

18. Harlingen based Texas Ranger RUDY JARAMILLO arrived at the above crime scene and writer advised Ranger JARAMILLO that due to the magnitude of both crime scenes, writer would assume investigative responsibility in the Rio Hondo double murder investigation and Ranger JARAMILLO will take the lead in the investigation of the U. S. Border Patrol murders on Gamble Road in conjunction with the FBI (for details on the U. S. Border Patrol murders refer to Attachment B, CLE-1 written by Ranger JARAMILLO). This writer will also assist Ranger JARAMILLO in the investigation of the murders of the Border Patrol Agents and the wounding of the Cameron County Deputy Sheriff.

19. This writer returned to the Rio Hondo double murders' crime scene and assisted Cameron County Sheriff's Department with the investigation.

20. The DPS Crime Scene Team, consisting of Criminalist ALEX MADIGAL, ORLANDO OCHOA and JOE MARCHAN, were at the crime scene processing, photographing and gathering evidence (refer to Attachment C reference items recovered at the Crime Scene).

21. Writer entered the residence and observed the following:

DPS SENSITIVE

CLE-2(Rev. 12/88)

CONTINUATION

| | |
|---|---|
| | DATE: 07-14-98          PAGE: 8 |

FILE TITLE  MASTER FILE

| | | |
|---|---|---|
| FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |

Capital Murder - FC - 1900
Rio Hondo, Cameron County, 031
DELIA MORIN, WF, Age 31
07-07-98

ACTIVE_X_ INACTIVE___CLOSED___RESTRICT__

BY: ROLANDO CASTANEDA, Ssergent #4543

---

A. The residence was a seven (7) room house excluding the bathroom.

B. The residence consisted of three (3) bedrooms.

C. The residence had two (2) long hallways.

22. Writer observed two (2) fully clothed females with blood on their clothing.

23. Primary investigation has revealed the following:

A. That at approximately 5:00 a.m., a white male, who was later identified as ERNEST MOORE, had forced himself into the residence at gunpoint. MOORE pointed a rifle at occupant DONALD MORIN, HM, DOB 09-16-68, and ordered him (DONALD MORIN) to open the back side door.

B. That MOORE was yelling for his estranged girlfriend, JULIE COX, WF, DOB 10-25-78.

C. That COX told MOORE that she would leave with him, and returned to her bedroom to retrieve her belongings. MOORE then shot and killed Victims DELIA MORIN and MAGARITA FLORES as they approached him. MOORE also shot and wounded COX' new intimate male friend, DAN MORIN.

D. That DONALD MORIN, MICHAEL MARTINEZ, HM, DOB 02-13-79, and WILLIAM MORIN had fought with MOORE relinquishing him of the murder weapon, a MAC-90 Chinese made AK-47. DONALD MORIN pointed the weapon at MOORE in an attempt to shoot MOORE, but the weapon did not fire. DONALD MORIN then placed the weapon in the residence front yard, so that MOORE would not get it and use it against them.

E. That the occupants of the residence had physically struck MOORE numerous times with the murder weapon.

F. That MOORE ran out the same way he came in and departed in his white Chevrolet pickup.

DPS SENSITIVE

CLE-2(Rev. 12/88)

CONTINUATION

| | DATE: 07-14-98 | | PAGE: 9 |
|---|---|---|---|
| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31 | ACTIVE_X_ INACTIVE___CLOSED___RESTRICT__ | | |
| 07-07-98 | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

24.    This writer has established MOORE's motive for these murders as being jealousy toward estranged girlfriend, JULIE COX, and her relationship with her intimate male friend, DAN MORIN.  (*Note - autopsy performed on MOORE revealed that he was under the influence of alcohol, marihuana and cocaine, which may have contributed to the rage MOORE had and the act of violence that he committed.)

25.    Investigation reference the MAC-90 assault weapon revealed the following:

   A.    That Cameron County Deputy LEROY RICONES took custody of the weapon and secured it in his marked Cameron County Sheriff's patrol unit (refer to Attachment D).

   B.    When McAllen DPS Criminalist JOE MARCHAN arrived at the scene, RICONES relinquished custody of the weapon to Criminalist MARCHAN. Deputy RICONES first cleared the weapon and discovered it still contained a live round in it's chamber.  After removing the magazine, which contained live rounds, Deputy RICONES cleared the weapon.

   C.    DPS Criminalist JOE MARCHAN transported the weapon to the McAllen DPS Laboratory.

   D.    On 07-13-98, Investigator REYNA traveled to the McAllen DPS Laboratory and took custody of the weapon.  Investigator REYNA then transported same to the Austin DPS Crime Laboratory (Firearms) for examination (refer to Attachment E).

   E.    On 07-17-98, this writer contacted Austin DPS Crime Laboratory Examiner BILL SORROW.  Examiner SORROW advised this writer of the following:

       (1)    He had received the weapon and identified same as a MAC-90 assault weapon, Serial #9339798, Caliber 7.62 mm.

DPS SENSITIVE

CLE-2(Rev. 12/88)

CONTINUATION

| | DATE: 07-14-98 | | PAGE: 10 |
|---|---|---|---|

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X_ INACTIVE___ CLOSED___ RESTRICT___<br><br>BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

(2)  SORROW had received one (1) MAC-90 magazine with thirteen (13) live 7.62 mm rounds.  SORROW further advised that he had also received one loose 7.62 mm round;

(3)  One of the live rounds had pipped casing which is consistent when the firing pin strikes the primer, but fails to fire. (*Note- this is consistent to DONALD MORIN stating that he {MORIN} had pointed the rifle at MOORE and the rifle just clicked and did not fire {refer to detail 32} in this investigative report.)

(4)  The eight (8) spent casing located at the Rio Hondo Crime Scene are the same type and make as the live rounds.  The head stamp of the casing depicts numbers 324-94.

(5)  The submission form depicting the AMC-90, live rounds and spent casing were assigned Laboratory #L-264725 (also refer to Attachment E).

26.  The above weapon is described as the following:

A.  34 inches in length, including butt stock
B.  Brown butt stock
C.  brown pistol grip
D.  Brown fore stock
E.  Black barrel
F.  With green cotton sling
G.  Said weapon had a black banana type bullet magazine.

27.  On 07-08-98, Texas Ranger RUDY JARAMILLO contacted Tobacco FireArms and Alcohol Special Agent TONY VASQUEZ reference obtaining a firearms trace on the MAC-90 (refer to Attachment F).  On 07-13-98, this writer obtained a copy of the trace reference this weapon. The tracer indicated that the weapon owner was JOSEPH BENNETT VASQUEZE of Harlingen.  VASQUEZE is a Captain with the Harlingen Police Department.

28.  On 07-04-98, this writer obtained a written statement from Captain VASQUEZE which indicated the following (refer to Attachment G):

DPS SENSITIVE

CLE-2(Rev. 12/88)

CONTINUATION

| | DATE: 07-14-98 | | PAGE: 11 |
|---|---|---|---|
| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31 | ACTIVE_X_INACTIVE___CLOSED___RESTRICT__ | | |
| 07-07-98 | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

A.   That on September 1997 he (VASQUEZE) sold the weapon to R. D. MOORE for $225.00 U.S. Dollars.

29.   Investigation has revealed that the following occupants were in the residence on Catherine at the time of the shooting (refer to Attachment H for residence diagram):

A.   Bedroom #1 - Room of DONALD MORIN, HM

(1)   DAN MORIN, HM
(2)   JULIE COX, WF

B.   Bedroom #2 - Room of DELIA MORIN, HF

(1)   JENNIFER GWIN, HF, DOB 01-28-81
(2)
(3)

C.   Bedroom #3 - MARGARITA FLORES, HF

(1)   FEDENCIO JARAMILLO. HM. DOB 12-16-45
(2)

D.   Living room - WILLIAM ARTHUR MORIN, HM, DOB 02-13-79

(1)   MICHAEL MARTINEZ, H/M, 09-17-76

30.   Statements from the residence occupants were obtained and occupant DONALD MORIN provided investigators with a written statement on 07-07-98 and again on 07-12-98.  A brief synopsis of DONALD MORIN's statement is as follows (refer to Attachment I):

A.   On 07-07-98, at approximately 4:50 a.m., DONALD had awaken and was drinking Kool-Aid in the kitchen area of the residence.

B.   He noticed some headlights in the driveway of his residence in the backyard area.

DPS SENSITIVE

**CONTINUATION**

| | |
|---|---|
| | **DATE: 07-14-98**          **PAGE: 12** |

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|

Capital Murder - FC - 1900
Rio Hondo, Cameron County, 031
DELIA MORIN, WF, Age 31
07-07-98

ACTIVE _X_ INACTIVE___ CLOSED___ RESTRICT___

BY: ROLANDO CASTANEDA, Ssergent #4543

---

C.   He noticed a white male with a rifle pointing it at him (DONALD) through the door in the back of the residence. (*Note - this door has a glass window.)

D.   The male subject told him to unlock the door, while pointing the rifle at him. When DONALD opened the door, the white male grabbed him by the neck and placed the rifle to the back of his head.

E.   DONALD did not know the male, but JULIE COX called him by ERNEST MOORE. MOORE is COX'S ex-boyfriend.

F.   DONALD and MOORE went into JULIE's bedroom and woke her up.

G.   MOORE and JULIE started arguing and they started to leave. DONALD went to his Mother's (MARGARITA) bedroom (Bedroom #3) to get his rifle and then to his brother's bedroom (Bedroom #2) when he heard gunshots. DONALD later found his mother (MARGARITA) and his sister (DELIA) dead in the hallway of the residence

H.   DONALD then ran out the bedroom and observed his mother and sister (DELIA) in the hallway. MOORE was still in the hallway when he (MOORE) turned around and shot his brother, DAN MORIN.

I.   He (DONALD) grabbed the end of the rifle and got MOORE to the floor and began to strike MOORE with it. Also striking MOORE were MICHAEL MARTINEZ and WILLIAM MORIN, (DONALD MORIN's brother).

J.   He (DONALD) turned the weapon around on MOORE and attempted to shoot MOORE, but the rifle did not fire. DONALD then went outside and set the rifle by a tree in the front yard of the residence in fear of being shot by MOORE. DONALD then went back inside the residence. *Note - Cameron County Sheriff's Deputy LEROY RINCONES took custody of said weapon and turned it over to the DPS Crime Laboratory Criminalist JOE MARCHAN (refer to Attachment H).

K.   MOORE ran out the same way he came in through the side back door. He did not see MOORE leave (because he was tending to his mother and sister).

**DPS SENSITIVE**

CLE-2(Rev. 12/88)

Case 1:98-cv-00162   Document 106   Filed in TXSD on 07/10/2001   Page 300 of 550

CONTINUATION

| | DATE: 07-14-98 | | PAGE: 13 |
|---|---|---|---|

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT__ | | |
| | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

L.   MOORE was wearing a white T-shirt, blue jeans and boots.

31.  House guest JULIE COX, who is DAN MORIN's intimate girlfriend, provided investigators with the following statement on 07-07-98 and again on 07-13-98.  A brief synopsis of same is as follows (refer to Attachment J):

A.   MOORE was her ex-boyfriend.

B.   She was staying with the MORIN's and she had an intimate relationship with DAN MORIN.

C.   DELIA MORIN had offered her residence on Catherine Street when MOORE kicked her out of his father's residence.

D.   MOORE had called her at the Catherine Street residence on 07-06-98, just to see what was going on.

E.   DONALD MORIN had stepped into her bedroom (Bedroom #2) stating that someone was there to see her.  She then saw MOORE with a gun (rifle) and he (MOORE) had the gun pointed at DONALD.

F.   She heard DELIA MORIN leave the bedroom.  DONALD, DELIA, MARGARITA, DAN and JULIE were together in the back of the residence and MOORE was pointing the gun around.  JULIE told MOORE that she was leaving with him and turned around and entered her bedroom to get her purse. She then heard approximately ten (10) gunshots coming from within the residence.

G.   She then saw DELIA, MARGARITA and DAN lying in the hallway of the residence and they appeared to have been shot.

H.   DONALD, WILLIAM and MICHAEL were beating on MOORE and DONALD took MOORE's rifle away from him.

I.   MOORE ran past her and she observed him stagger to his white pickup and take off.  She did not see anyone else with him in the pickup.

DPS SENSITIVE

CLE-2(Rev. 12/88)

CONTINUATION

| FILE TITLE  MASTER FILE | DATE: 07-14-98 | | PAGE: 14 |
|---|---|---|---|
| | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031 | ACTIVE_X_ INACTIVE___CLOSED___RESTRICT__ | | |
| DELIA MORIN, WF, Age 31<br>07-07-98 | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

    J.    MOORE was wearing a white T-shirt and blue jeans.

32.  House guest MICHAEL DANIEL MARTINEZ provided investigators with a written statement on 07-07-98. A brief synopsis of same is as follows (refer to Attachment K):

    A.    He was sleeping on the living room couch of the residence.

    B.    At approximately 5:00 a.m., on 07-07-98, he heard arguing coming from the back of the residence. He saw DONALD and some white guy fighting.

    C.    He went to call 911 and then he heard some gunshots.

    D.    He saw DONALD struggling with the guy and heard someone yell, "Mickey come help". He saw DONALD with the gun and he joined DONALD in fighting this guy.

    E.    MOORE ran out the back of the house and he tripped over DELIA and MARGARITA and fell.

33.  Occupant WILLAM ARTHUR MORIN provided investigators with a written statement on 07-07-98 and again on 07-13-98. A brief synopsis of same is as follows (refer to Attachment L):

    A.    On 07-07-98, while asleep in the living room, he was awakened by people yelling.

    B.    He heard and recognized MOORE's voice. He heard gunshots and saw DONALD wrestling with MOORE in the living room. MOORE had a gun and it was black. *Note - WILLIAM MORIN and JULIE COX work at A La Texas Restaurant in San Benito. This is where WILLIAM MORIN met MOORE.

    C.    He and MICHAEL assisted DONALD in fighting MOORE and DONALD took the rifle away from MOORE.

DPS SENSITIVE

CLE-2(Rev. 12/88)

CONTINUATION

| FILE TITLE  MASTER FILE | DATE: 07-14-98 | | PAGE: 15 |
|---|---|---|---|
| | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X_ INACTIVE___CLOSED___RESTRICT__ | | |
| | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

D.  MOORE got up and ran out the back door and he observed MOORE get into his pickup.  He did not remember if MOORE got in the driver or passenger side of the vehicle.  He (MOORE) sped off towards Williams Road.

34.  Occupant JENNIFER GWIN MORIN provided investigators with a written statement on 07-07-98.  A brief synopsis of same is as follows (refer to Attachment M):

A.  She heard JULIE yelling MOORE's name.

B.  She and her sister, DELIA, got up and saw MOORE with a gun.

C.  She heard gunshots and saw her mother, MARGARITA, and sister, DELIA, on the floor in the hallway of the residence.

D.  She called 911.

35.  Occupant FEDENCIO JARAMILLO provided investigators with a written statement.  A brief synopsis of same is as follows (refer to Attachment N):

A.  MARGARITA was his common-law wife.

B.  On 07-07-98, at about 5:00 a.m., while asleep in his bedroom (Bedroom #3), he heard gunshots, put on his pants and opened his bedroom door where he observed MARGARITA and DELIA lying on the hallway floor unconscious.  He also saw that DAN had been shot.

C.  He did not see anyone kill MARGARITA or DELIA.

36.  On 07-11-98, writer traveled to Valley Baptist Hospital and obtained a preliminary autopsy report on MARGARITA FLORES and DELIA MORIN.  The autopsy on DELIA MORIN reveals the following (refer to Attachment O):

A.  The autopsy was performed on 07-08-98, by Dr. DAVENPORT.

**DPS SENSITIVE**

CLE-2(Rev. 12/88)

CONTINUATION

| | DATE: 07-14-98 | | PAGE: 16 |
|---|---|---|---|
| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF,  Age 31 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT___ | | |
| 07-07-98 | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

B.    DELIA MORIN died from two (2) gunshot wounds to the right side of the chest.

C.    One injured the right atrium of the heart, as well as both lungs. The other gunshot injured the left lobe on the liver.

D.    Gunshots appear to be distant range shots.

37.    Preliminary autopsy report on MARGARITA FLORES reveals the following (refer to Attachment P):

A.    The autopsy was performed on 07-08-98 by Dr. DAVENPORT.

B.    MARGARITA FLORES died from three (3) penetrating gunshot wounds to the chest and abdomen.

C.    The wound entrances are all near to each other in the left lateral breast and chest wall.

D.    Bullet fragments were retrieved within the liver and in subcutaneous tissues of the right lateral chest wall.

38.    On same date, when this writer concluded primary investigation of these homicides, this writer traveled back to the U. S. Border Patrol murders crime scene.  While at the crime scene, writer requested a written statement from R. D. MOORE reference same.  R. D. MOORE traveled to the Cameron County Sheriff's Office in Harlingen and attempted to provide writer with a written statement reference the Border Patrol shooting.

39.    At 4:00 p.m., on same date, R. D. MOORE was telephonically contacted by Investigator REYNA, who advised him that his son, ERNEST MOORE, was about to expire and that the hospital required his signature for organ donor request.  The interview was terminated and resumed on 07-08-98 (refer to Attachment Q).  ERNEST MOORE died at approximately 5:15 p.m., from mutiliple gunshot wounds.

CLE-2(Rev. 12/88)

CONTINUATION

| FILE TITLE  MASTER FILE | DATE: 07-14-98 | | PAGE: 17 |
|---|---|---|---|
| Capital Murder - FC - 1900 | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31 | ACTIVE_X_ INACTIVE___CLOSED___RESTRICT__ | | |
| 07-07-98 | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

40.   On Thursday, 07-09-98, at approximately 5:00 a.m., this writer, Ranger JARAMILLO, Investigator REYNA and Cameron County Deputy ARNULFO REYES, III, obtained verbal consent from Detective R. D. MOORE to utilize the white pickup used by MOORE to reconstruct the pursuit ERNEST MOORE had with Deputy RODRIGUEZ. The purpose of the reconstruction is to determine if Deputy RODRIGUEZ was able to view any occupants in the vehicle. Reconstruction resulted in the following:

A.   Ranger JARAMILLO and Investigator REYNA, while in a marked Cameron County patrol unit, pursued this writer, who was accompanied by Deputy REYES, on FM 345. Ranger JARAMILLO and Investigator REYNA were unable to observe this writer or the deputy who accompanied writer while approximately 50 feet away.

B.   While meeting the white pickup, Ranger JARAMILLO and Investigator REYNA were unable to observe this writer or any occupants in the vehicle.

C.   While stopped at the intersection of U. S. 77 and FM 345, Ranger JARAMILLO and Investigator REYNA were unable to observe this writer or any occupants in the vehicle.

41.   On same date, this writer, accompanied by Investigator REYNA, briefed Cameron County District Attorney YOLANDA DE LEON reference this investigation.

42.   On Tuesday, 07-14-98, this writer interviewed Pathologist MARGIE CORNWELL in reference to MOORE's autopsy. Doctor CORNWELL advised this writer that she had not noticed any bruising on MOORE's facial area. Doctor CORNWELL did advise that MOORE had bruising on his legs. Doctor CORNWELL further advised that she had not examined MOORE's arms, scalp or brain. This writer was attempting to determine if bruising was consistent to MOORE being beaten by the MORIN's.

43.   This investigation will continue in attempts to obtain a written statement from Victim DAN MORIN. This writer will also continue to assist Ranger JARAMILLO in the U.S. Border Patrol murders.

DPS SENSITIVE

CLE-2(Rev. 12/88)

CONTINUATION

| | DATE: 07-14-98 | | PAGE: 18 |
|---|---|---|---|
| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31 | ACTIVE_X_ INACTIVE___CLOSED___RESTRICT__ | | |
| 07-07-98 | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

## CUSTODY OF EVIDENCE

1. All evidence seized in this investigation will be submitted to the DPS
   Laboratory in McAllen and Austin, Texas.

## PHYSICAL DESCRIPTION

1. ERNEST LANE MOORE, WM, 12-23-72   (DECEASED)
   5'11", 175 lbs., brown eyes, brown hair
   Texas DL #15705863
   RR1, Box 297/Gamble Road
   San Benito, Texas

## WITNESSES AND INVESTIGATORS:

1. LINDA ACHER, Dispatcher
   Harlingen DPS Communication
   US 77 Sunshine Strip
   Harlingen, Texas

2. JAVIER REYNA, Investigator
   Cameron County Sheriff's Department
   974 E. Harrison
   Brownsville, Texas

3. JOE MARCHAN, Criminalist Supervisor
   Texas Department of Public Safety Crime Laboratory
   1414 Bicenntial
   McAllen, Texas

4. ROBERT RODRIGUEZ, Deputy
   Cameron County Sheriff's Department
   974 E. Harrison
   Brownsville, Texas

DPS SENSITIVE

CLE-2(Rev. 12/88)

CONTINUATION

| FILE TITLE  MASTER FILE | DATE: 07-14-98 | | PAGE: 19 |
|---|---|---|---|
| Capital Murder - FC - 1900 | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Rio Hondo, Cameron County, 031 | ACTIVE_X_ INACTIVE___CLOSED___RESTRICT__ | | |
| DELIA MORIN, WF, Age 31 | | | |
| 07-07-98 | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

5.  ROBERT RODRIGUEZ, Investigator
    Cameron County Sheriff's Department
    974 E. Harrison
    Brownsville, Texas

6.  RONNIE SAENZ, Sgt.
    Cameron County Sheriff's Department
    974 E. Harrison
    Brownsville, Texas

7.  ISRAEL PACHECO, Sgt.
    Texas Rangers, Company D
    1414 Bicenntial
    McAllen, Texas

8.  RUDY JARAMILLO, Sgt.
    Texas Rangers Company D
    US 77 Sunshine Strip
    Harlingen, Texas

9.  FREDDIE VELA, Special Agent
    Federal Bureau of Investigation
    1700 Parades Line Road
    Brownsville, Texas

10. ALEX MADRIGAL, Criminalist
    Texas DPS
    1414 Bicenntial
    McAllen, Texas

11. ORLANDO OCHOA, Criminalist
    Texas DPS
    1414 Bicenntial
    McAllen, Texas

12. DONALD MORIN, eyewitness
    311 Catherine
    Rio Hondo, Texas

DPS SENSITIVE

CLE-2(REV. 12/88)

CONTINUATION

| FILE TITLE  MASTER FILE | DATE: 07-14-98 | | PAGE: 20 |
|---|---|---|---|
| Capital Murder - FC - 1900 | FILE NO. RD098312 | TYPE O | PROGRAM CODE CRIMINAL |
| Rio Hondo, Cameron County, 031 DELIA MORIN, WF, Age 31 07-07-98 | ACTIVE_X_ INACTIVE___CLOSED___RESTRICT___ | | |
| | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

13.  JULIE COX, eyewitness
     311 Catherine
     Rio Hondo, Texas

14.  LEROY RICONES, Deputy
     Cameron County Sheriff's Department
     974 E. Harrison
     Brownsville, Texas

15.  BILL SORROW, Firearms Examiner
     Texas DPS
     P. O. Box 4087
     Austin, Texas

16.  TONY VASQUEZ, Special Agent
     ATF
     McAllen, Texas

17.  MICHAEL DANIEL MARTINEZ, eyewitness
     Rt. 5, Box 5186-A, FM 1561
     San Benito, Texas

18.  WILLIAM ARTHUR MORIN, eyewitness
     311 Catherine
     Rio Hondo, Texas

19.  JENNIFER GWEN, eyewitness
     311 Catherine
     Rio Hondo, Texas

20.  FEDENCIO JARAMILLO, eyewitness
     311 Catherine
     Rio Hondo, Texas

21.  YOLANDA DE LEON, District Attorney
     Cameron County Sheriff's Department
     974 E. Harrison
     Brownsville, Texas

DPS SENSITIVE

CLE-2(Rev. 12/88)

CRAPDF - www.fanfoo.com

CONTINUATION

| | DATE: 07-14-98 | | PAGE: 21 |
|---|---|---|---|

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF,  Age 31<br>07-07-98 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT__<br><br>BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

22.    MARGIE CORNWELL, Doctor
       Valley Baptist Hospital
       Ed Carey Drive
       Harlingen, Texas

DPS SENSITIVE

CLE-2(Rev. 12/88)

CVISPDF – www.fesiio.com

13:37  1    A.   Yes.

13:37  2    Q.   Anything else?

13:37  3    A.   No, I don't -- that's it.

13:37  4    Q.   Any scooter or little race car or anything like

13:37  5    that?

13:37  6    A.   A what?

13:37  7    Q.   A race car or a little scooter?

13:37  8    A.   Scooter?

13:37  9    Q.   Yeah.

13:37  10   A.   What kind of scooter?

13:37  11   Q.   Did you own any three-wheeled vehicle, a

13:37  12   three-wheeler?

13:37  13   A.   No.

13:37  14   Q.   Did you back out of the -- where did you back

13:37  15   out of?

13:37  16   A.   The garage.

13:37  17   Q.   What time did you wake up for the first time on

13:37  18   July 7th of 1998?

13:38  19   A.   I don't know exactly what time it was.  I --

13:38  20   like I -- he woke me up by the door hitting the wall,

13:38  21   and it woke me up and I got up.  I really don't know

13:38  22   what time.  It was still dark outside.

13:38  23   Q.   Which door woke you up?

13:38  24   A.   To his bedroom, to Ernest's bedroom.

13:38  25   Q.   So you heard the door slam; is that correct?

13:38 1      A.   Well, it hit -- hit the wall.

13:38 2      Q.   So you heard the door?

13:38 3      A.   Uh-huh.  And I thought he was just coming in to

13:38 4  get dressed, so I got up, put my clothes on because I

13:38 5  was going to get up, you know, to fix him his lunch.

13:38 6      Q.   What were you wearing when you went to bed?

13:38 7      A.   When I went to bed?

13:38 8      Q.   Yes.

13:38 9      A.   My pajamas.

13:58 10     Q.   Was it a dress or were they like pant pajamas?

13:38 11     A.   No, it was a gown.

13:38 12     Q.   And when you woke up and you heard the noise,

13:38 13  did you change immediately or did you go --

13:39 14     A.   I put my robe on, housecoat.

13:39 15     Q.   You put your robe on?

13:39 16     A.   Uh-huh.

13:39 17     Q.   Is that a yes?

13:39 18     A.   Yes.

13:39 19     Q.   And what did you do after that?

13:39 20     A.   Then I went into his room and I looked in

13:39 21  there, and he wasn't in there.  So then I went through

13:39 22  the house looking for him.  I thought maybe he had gone

13:39 23  toward the kitchen because all the lights were on.

13:39 24     Q.   And you don't know what time this was at?

13:39 25     A.   No, ma'am.  I just -- it was before -- it was

13:39   1   still dark outside.  I know that.

13:39   2       Q.  And you don't know whether it was 3:30?

13:39   3       A.  It wasn't that early.  It was -- I would say it

13:39   4   was sometime before 6:00, 5:00.  Maybe 5:30.

13:39   5       Q.  Could it have been 4:00?

13:39   6       A.  I -- I don't think so.  It may have been.

13:39   7       Q.  Okay.

13:39   8       A.  I'm not sure exactly what time it was.

13:39   9       Q.  Okay.  Tell me exactly what happened when you

13:40  10   heard -- when you heard the slam against the door.

13:40  11   What did you do?

13:40  12       A.  I got up and I put my housecoat on, and I went

13:40  13   to his room and walked -- you know, the door was open,

13:40  14   and I looked in there and I thought maybe he was in

13:40  15   there, but he wasn't.  So I walked down the hall into

13:40  16   the other part of the house.  I thought maybe he was up

13:40  17   front then, and he wasn't.  He wasn't in the house.

13:40  18       Q.  How loud was the door, this door slamming?

13:40  19       A.  Loud, you know, like somebody hitting it real

13:40  20   hard up against the wall.

13:40  21       Q.  What did your husband do at this time?

13:40  22       A.  He was asleep and he never -- he never knew any

13:40  23   of this was going on.

13:40  24       Q.  He didn't hear the door?

13:40  25       A.  No, he did not.  He didn't get up or anything.

# TEXAS DEPARTMENT OF PUBLIC SAFETY
## TEXAS RANGER DIVISION

### VOLUNTARY STATEMENT

THE STATE OF TEXAS

COUNTY OF CAMERON

My name is RAUL E. RODRIGUEZ. My address is _____. My home telephone number is _____ is born in Brownsville, Texas on

On July 6, 1998 I started my shift from 10:00 p.m. to 6:30 am. going into July 7, 1998. I am Corporal with The Cameron County Sheriff Department, assigned in the patrol division.

At around 5:00 am. I showed up at The Brownsville Sheriff's Office. I was turning in reports and checking the schedule and doing some other things at the office. At approximately 5:15 am. Chriss, the dispatcher received a 911 call. I over heard her say that three people were down, at a residence in Rio Hondo on Catherine street, and that family members of the victims were fighting with the suspect, who was still at the house.

I then immediately advised her to dispatch units out there and that I would be enroute also, to assist Rio Hondo PD since it was inside the city limits of Rio Hondo.

While enroute, Deputies were advised via radio, of a white Chevrolet truck, being the suspect vehicle involved in the shootings. I then over heard Deputy Robert Rodriguez find the suspect vehicle, and that he turned around on the vehicle and was in pursuit of the vehicle. At around this time, I was barely leaving Brownsville. I then immediately dispatched two other units to assist Rodriguez, Robert, with the pursuit.

About four or five minutes later, I heard Deputy Robert Rodriguez state that he lost the suspect vehicle on Gamble Road. I remember him saying that he saw three people in the vehicle. I then continued heading towards Catherine street, in Rio Hondo were the shooting actually took place.

Upon my arrival, Deputy Briones and Rincones had already sealed the perimeter and kept the family members out of the area. I then asked the Chief of Police of Rio Hondo if he needed our assistance, and he stated yes, so I advised dispatch to notify our proper brass.

I shortly went into the residence to make sure that the house was secure and made sure nobody touched anything and that everything was left as it was. We did remove a small child from the house who was hiding inside of a closet. We got him out through one of the bedroom windows.

By that time, Javier Reyna and Sgt. Saenz had been notified and we waited for their arrival. During this time, Deputies and Border Patrol was still in the area of Gamble Road looking for the suspect vehicle.

We had requested Border Patrol assistance just in case the suspect might head towards the Highway 281 area. They were advised to use caution and that the suspect was extremely armed and dangerous. He had left one weapon behind and we did not know if he had another one.

I remained at the scene to make sure nobody messed with the scene. I waited there until Javier Reyna arrived. I remained there and assisted Investigators in whatever they needed. Around that time, Javier Reyna had talked to one of the witnesses. The girl told Javier Reyna that the suspect was Ernest Moore. The girl started to tell Reyna where he lived and stuff about the suspect.

At around day break, it was about 7:00 am. I was advised via radio that they had found the suspect vehicle on the drive way of a house, at the intersection of Resaca and Gamble Rd. This was in the San Benito area. I



EXHIBIT NO. ___
5-18-00
Maureen Stingley

don't remember how it came out to be, but we were advised that it was the house of a Harlingen Police Detective RD Moore. Sgt.Saenz advised me for me and him to go to the scene over there with the other Deputies.

While we were enroute to the house. Deputy Robert Rodriguez advised via radio that RD Moore was being very uncooperative and belligerent towards my officers. Sgt.Saenz advised our dispatchers to notify Harlingen Police Supervisors and to meet us at RD Moore's residence.

Upon arrival at the house, myself and Sgt. Saenz, and some Border Patrol Units, along with Deputies Pete Vela, and trainee Jesse Villanueva, and Albert Garcia were also at the scene. Sgt.Saenz went up to RD Moore, and so did I. I do not know what he told him but RD Moore let us check his house for Ernest Moore.

At around that time, Susan Lynn, and Agent Ricardo Salinas were going to help us search the house. As we were going into the house, RD Moore stopped everybody and stated to The Border Patrol Agents that he did not want Border Patrol on the property, only Sheriff's because his son was not an illegal alien. The agents then waited outside the property. By that time, more agents were arriving waiting for us outside.

We went inside the house and started searching for the suspect. We knew the name of Ernest Moore but we did not know what he looked like, because the father was not cooperating. On RD Moore's bed I saw an automatic weapon, either a 380 or a 9mm. RD stated that the gun was his. I felt something was going on, because the father had a gun out and ready, loaded. I remember RD Moore state that his AR 15 was missing. He further said that all of his scopes were there, but that his son was a very good shot and he had practiced with the rifle before.

From there I went to Ernest Moore's room. There was lots of Nazi's paraphernalia and KKK paraphernalia in the room. I did not see a safe. By that time Sgt Saenz said for us to go outside, he is not here. We went outside and I remember one of the deputies spotted some ammunition on the ground besides the truck. They were live rounds. We were going to photograph them and get ready to impound the vehicle.

Myself, Agent Susan Lynn Rodriguez and myself were discussing this matter. Sgt.Saenz said to give us a minute and that we were going to search the area, after we had taken pictures of the scene. The live rounds were by the driver side on the ground. We were by the Oleander tree.

Not even a minute later, by the Oleander tree I heard rapid fire. Border Patrol was by their vehicles already. I was there by Sgt Saenz. When I heard the shots, instinct told me to drop. Sgt.Saenz ran towards the trucks on the drive way. I then was on my stomach and I unholstered my weapon. While I was on my belly I prepared myself for anybody who was shooting. I could not see who was shooting, but I could hear the shots. About fifteen seconds later, I noticed a subject, being Ernest Moore, with a rifle by the mail boxes. I saw a white male with a rifle. Everything was in black and white. I shot at him. I don't remember if it was three or four rounds that I had shot, he looked at me at the ground and just sprayed me with bullets. I would say after my tenth round, was when I got shot. I thought my arm was dismembered. I looked at Ronnie and I stared at him and told him, Ronnie I am hit I am hit. Ronnie just stared at me. He would not move. At that time I figured I was alone. I finished shooting my magazine. I then decided to re-load. I undid the magazine from my gun, and with my other arm got out a magazine from my pouch and locked and loaded my weapon and began to shoot at him again. I could still see Moore shooting at me and I was shooting at him. I was full of blood, and so was my gun. I guess after around 7 or 8 rounds, I saw Moore go forward and to the ground. I dropped my weapon and left it alone. I saw Robert Rodriguez run to where Moore was with his gun drawn, towards Ernest Moore. I heard someone say he was down. I saw that Willie Alvarez and Sam Montemayor pulled me from both my legs, to the rear of the Oleander's and began to apply pressure to my wounds so that it could stop bleeding. They tried to administer first aid.

After that they got the ambulance to me. I was then taken to the hospital. EMS cut my shirt. I left my gun at the scene. I remember being at the hospital. I remember being in the Emergency room. I just did not know the extent of my damage.

The above statement is true and correct to the best of my knowledge and ability.

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS THE 6TH DAY OF AUGUST, 1998.

Signature of Person Taking Statement                    Signature of Person Making Statement

witness

witness



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILE DIVISION


ARTURO G. SALINAS, ET AL          * CIVIL ACTION NO. B-98-162
                                  *
v.                                *
                                  *
CITY OF HARLINGEN, TEXAS, ET AL;  *
                                  *
and                               *
                                  *
GILBERTO M. RODRIGUEZ, ET AL      *
                                  *
v.                                * CIVIL ACTION NO. B-98-162
                                  *
CITY OF HARLINGEN, TEXAS, ET AL;  *
                                  *
and                               *
                                  *
RAUL RODRIGUEZ                    *
                                  *
v.                                *
                                  *
CITY OF HARLINGEN, TEXAS, ET AL.  * CIVIL ACTION NO. B-98-162


          Videotaped Deposition of NATALIE F. PRIM, taken

by attorney for the Plaintiffs at the offices of Wierzbicki

& Stephenson, 220 West Garden Street, Suite 801, Pensacola,

Florida, commencing at 11 a.m. on the 25th day of April,

2001, before Gina Hawkins, Registered Professional Reporter

and Notary Public.

1                     APPEARANCES

2

FOR THE PLAINTIFF:       PRICE AINSWORTH, ESQUIRE

3                        Spivey & Ainsworth, P.C.
                        48 East Avenue

4                        Austin, Texas 78701

5  FOR THE DEFENDANT:       TOM LOCKHART, ESQUIRE
                        Adams & Graham, L.L.P.

6                        222 E. Van Buren, West Tower
                        Harlingen, Texas 78551-1429

7

8  VIDEOGRAPHER:            TOMMY GRICE

9                INDEX OF WITNESS

10  NATALIE F. PRIM                     PAGE

11      DIRECT EXAMINATION BY MR. AINSWORTH       3

12

     CERTIFICATE OF OATH              100

13  CERTIFICATE OF REPORTER          101

14

15                INDEX OF EXHIBITS

16  PLAINTIFF'S NO.:

17     1 - City Manager's Report to the City
         Commission                13

18

     2 - Statement from the City Manager     51

19

20

21

22

23

24

25

WHEREUPON,

NATALIE F. PRIM

was called as a witness and, after having been first duly
sworn, was deposed and testified as follows:

DIRECT EXAMINATION

BY MR. AINSWORTH:

Q       Please state your name for the record.

A       Natalie Flores Prim.

Q       Ms. Prim, my name is Price Ainsworth.  I'm a
lawyer.  I'm here today from Austin, Texas representing the
Rodriguez and Salinas families in a lawsuit that arises from
some actions that took place back in July of 1998.

You understand we're taking your deposition in
that case today?

A       Yes.

Q       Have you had a chance to meet with Mr. Lockhart
before our deposition began?

A       Yes.

Q       And so you have a general understanding of how
the deposition process works?

A       Generally.

Q       Okay.  You're here under oath, just like if you
were at the courthouse, but it's a much more casual event.
If you need to stop and answer a phone call or a page or for
whatever reason, just let us know and we'll take a break,

1    all right?

2         A    Okay.

3         Q    Let me find out a little bit about you.  We're

4    in Pensacola, Florida taking your deposition today, and I've

5    never been to Pensacola before.  What is it that you do here

6    in Pensacola?

7         A    Well, I work with the Chamber of Commerce, and

8    I moved here over the summer with my husband.

9         Q    What is your job title?

10        A    Community development vice president.

11        Q    And has that been your job title since this

12   past summer, community development vice president?

13        A    Yes.

14        Q    And are you employed by the city or --

15        A    The Chamber of Commerce.

16        Q    Directly to the Chamber of Commerce?

17        A    Yes.

18        Q    Before the summer of 2000 were you in

19   Harlingen?

20        A    Yes, I was.

21        Q    And what was your job title there in Harlingen?

22        A    I was the city manager of Harlingen.

23        Q    How long did you serve as city manager of

24   Harlingen?

25        A    I joined Harlingen in 1993 and stayed for a

                    Wierzbicki & Stephenson Court Reporting Service

 1  period of seven years.

 2          Q    What was your employment, if any, before 1993?

 3          A    I was city manager of Mineral Wells, Texas.

 4          Q    So, you have some experience in West Texas as

 5  well.  How long were you the city manager in Mineral Wells?

 6          A    I recall about, I think close to three years,

 7  two-and-a-half, three years.

 8          Q    And had you worked somewhere prior to that?

 9          A    Yes, I was a city manager before that.

10          Q    Where before that?

11          A    Pilot Point, Texas.

12          Q    Where is Pilot Point?

13          A    It's in the Denton area --

14          Q    North Texas?

15          A    -- of the state.

16          Q    And how long were you there?

17          A    I believe, again, about two-and-a-half, three

18  years.

19          Q    Take me back before that.  Where were you

20  before you were at Pilot Point?

21          A    I was at my first city manager job in a city

22  called Shenandoah, Texas outside of Houston.

23          Q    And how long were you in Shenandoah?

24          A    Same about of time, about three years.

25          Q    Is this something you had trained for in

                Wierzbicki & Stephenson Court Reporting Service

1    college or had some educational training for?

2         A    I have a master's degree in public

3    administration, and then I joined the city of Dallas as an

4    intern in the early '80s.

5         Q    Where did you obtain your master's in public

6    administration?

7         A    George Washington University.

8         Q    Foggy Bottom?

9         A    That's right.

10        Q    And then having -- I guess you had obtained a

11   undergraduate degree prior to obtaining your master's

12   degree?

13        A    Correct.

14        Q    Where did you get your undergraduate degree?

15        A    University of Maryland.

16        Q    The time period I would like to focus on with

17   you is the time period when you were the city manager for

18   the City of Harlingen.  I guess different cities set up

19   their city administration in different fashions.

20             What was the role of the city manager there in

21   Harlingen in the time period you were there from like 1993

22   to 2000; is that right?

23        A    That's correct.  The role of city manager is to

24   oversee the daily operations of the city.

25        Q    And what does that mean?

1        A       It means that you basically supervise all the

2   operations of the citizens, supervise generally a number of

3   departments that provide public services.

4        Q       We think of a mayor, I guess, typically

5   as being a publicly-elected official.  Is the city

6   administrator an elected official in Harlingen?

7        A       No.  It's appointed.

8        Q       And are you appointed for a specific time

9   period or at will, I guess?

10       A       Yeah, at will.

11       Q       Just like the rest of us are employed in Texas,

12  huh?  Who would be your immediate supervisor, if you're the

13  city manager?

14       A       It would be the mayor and city council as a

15  collective group.

16       Q       And then who would be your -- who would report

17  to you?  Do you have an assistant city manager?

18       A       I had one assistant city manager, yes, and the

19  department heads.

20       Q       What about things like the police department

21  and those kinds of things, do they report to you, or do they

22  report to the mayor, or how does that work?

23       A       They report to the management, the city

24  manager.

25       Q       Okay.  And if I think of it as city management,

1  who all should I include in the group that makes up city

2  management?

3      A    It would have been myself, being the primary

4  manager, city manager, but I had one assistant city manager

5  as well in my office.

6      Q    And who was that assistant?

7      A    Joe Labeau.

8      Q    During the time period that you served as city

9  manager for Harlingen, who would have been the police chief?

10     A    It was Jim Scheopner.

11     Q    And was he there the entire time you were

12 there?

13     A    He was there as police chief during the time I

14 joined the city until, I think it was January of 1999,

15 somewhere in that range.

16     Q    And then a new police chief was appointed; is

17 that right?

18     A    Subsequently, yes.

19     Q    And who was the new police chief?

20     A    Victor Rodriguez.

21     Q    And so Chief Rodriguez would have been there

22 for a short time before you moved on to Pensacola?

23     A    Yes.  He was there and he resigned, but that's

24 correct.

25     Q    And who replaced Chief Rodriguez?

1      A      We didn't have a police chief at the time I
2  left.  We had an acting.

3      Q      Who was the acting police chief?

4      A      Robert Archer.

5      Q      During the time that you were city manager, can
6  you tell me, in chronological order, who the mayors of
7  Harlingen would have been?

8      A      It was Bill Card, Mayor Bill Card, from 1993
9  until 1998.  And then Mayor de la Garza, Connie de la Garza,
10  was voted in as mayor in 1998 until the time I left.

11      Q      All right.  You know this case involves a
12  shooting where a couple of border patrol agents, or I guess
13  actually three border patrol agents were injured and killed
14  in a shooting on July 7th of 1998.

15           It's my understanding that various entities,
16  including the City of Harlingen, investigated that
17  incident.

18           Were you involved at all in an investigation of
19  that incident?

20      A      Yes.

21      Q      And how would you describe that involvement?
22  Were you the investigator, or were folks reporting the
23  results of their investigation to you?

24      A      Well, once after the occurrence the assistant
25  city manager, who supervised the police department, went

Wierzbicki & Stephenson Court Reporting Service

1   down there to begin an investigation.

2          Subsequently it came up to my level, and then I

3   went ahead and did some review and went from there.

4          But for a period of months it was under Joe

5   Labeau, and then it got to my level.

6       Q    And was that because you had assigned

7   Mr. Labeau to it or just because a function of his job

8   duties was to oversee the police department or for them to

9   report to him?

10       A    Both.

11       Q    Okay.  Was there a team assisting Mr. Labeau in

12   his review of this incident, or did he put together a team;

13   do you recall?

14       A    No, he did not.

15       Q    Do you recall the results of his investigation?

16       A    Yes, somewhat.

17       Q    Did it result in a written report?

18       A    I can't recall.  I believe that may have --

19   there may have been one, but I don't recall.  Yes.  Yes,

20   there was something.  There was a memo or something he had

21   written up on it.

22       Q    Would the memo be directed to you or to the --

23   was it a city council or city commission?

24       A    It was -- well, they're called a city

25   commission, but they serve the same function as the city

1  council.

2       Q    Yes, ma'am.  Would Mr. Labeau's report have

3  been to the city commission or to you; do you recall?

4       A    I believe he would have sent it to me and the

5  mayor, city council.  I'm just not -- I just haven't seen

6  it.

7       Q    And I'm here today in 2001 taking your

8  deposition in Pensacola.  I take it that these aren't files

9  that you would have brought with you to work with the

10 Chamber of Commerce Department here in Pensacola?

11      A    Correct.

12      Q    Have you had a chance to review any of your

13 files from back at the time when you were the city manager

14 in preparation for your deposition today?

15      A    Today?

16      Q    Yes.

17      A    No.  I reviewed one document with Mr. Lockhart.

18      Q    Okay.  Back at the time in 1998, of course you

19 would have been familiar with such documents?

20      A    Well --

21      Q    As they were made?

22      A    Sure, as they were appearing or came to the

23 desk, yes.

24      Q    But in preparation for today's deposition,

25 you've not really gone back and said, "I need to look at

1  Mr. Labeau's report" or anything like that?

2      A    No.

3      Q    Okay.  You said you've reviewed one document

4  today?

5      A    That's correct.

6      Q    Can you tell me, just in general terms without

7  telling me what it is --

8          MR. LOCKHART:  I'll tell you what it is.  Y'all

9          had sent, and I think in response to interrogatories

10         y'all had, it's called City Manager's Report to the

11         City Commission, and y'all had, it was a bad copy and

12         it had "Draft" stamped on it.

13         MR. AINSWORTH:  Yes, sir.

14         MR. LOCKHART:  And I compared it to the actual

15         report that was given to the city commission, and

16         it's the same as your draft, so I thought it might

17         simplify things if you had a better copy that didn't

18         have "Draft" stamped on top of it.  So, that's the

19         document she's talking about.

20  BY MR. AINSWORTH:

21     Q    Let me then -- Mr. Lockhart's been kind enough

22  to hand me a document that's titled City Manager's Report to

23  the City Commission.

24         It looks like it's dated November 4th, 1998; is

25  that right?

Wierzbicki & Stephenson Court Reporting Service

1      A     That's correct.

2          MR. AINSWORTH:  Let me get the court reporter

3    to stop and put exhibit sticker No. 1 on that,

4    please.

5          (Plaintiff's Exhibit No. 1 was marked for

6    identification.)

7          MR. AINSWORTH:  Okay.  We're rolling now.

8    We've actually got an exhibit.

9      Q     This is -- Exhibit No. 1, is that the document

10  that you reviewed today with Mr. Lockhart in preparation for

11  your deposition?

12     A     Yes.

13     Q     Have you seen that document prior to today?

14     A     No, not since leaving the city.

15     Q     That's what I mean.  Did you see it back at the

16  time it was created, purportedly?

17     A     In 1998.

18     Q     In November of '98?

19     A     Definitely.

20     Q     Well, I want to ask you about how the report

21  was prepared.  Let me find out a little bit more about the

22  investigations that you know about that were made pursuant

23  to this July 7th, '98, shooting.

24         Other than Mr. Labeau's work, are you aware

25  of any other entities or governmental agencies that were

1    involved in investigating the shooting?

2         A    Subsequent to the report or prior to the

3    report?

4         Q    Or even at the same time, yes, ma'am.

5         A    Subsequent to the report we did ask a

6    third-party expert to come on and to review.

7         Q    Yes, ma'am.  And I'll get to that in just a

8    second.  But what about like, I guess the Texas Rangers may

9    have investigated?

10        A    I didn't see anything.  I don't recall.

11        Q    Or the Federal Bureau of Investigation, do you

12   recall anything about their work?

13        A    No,

14        Q    Were there other police entities, other than

15   the City of Harlingen Police, that were involved in the

16   investigation?

17        A    I don't know.  I know that the City of

18   Harlingen was, but some of these other agencies, you know,

19   may have been involved because of where it occurred or their

20   role.

21        Q    Yes, ma'am.  Or what about the county, were you

22   aware of any county investigation?

23        A    No.

24        Q    So, really, when we talk about your knowledge

25   regarding the investigation of the July 7th, '98, shooting

1    involving my clients, Rodriguez and Salinas, the

2    investigation you're familiar with is that that we could

3    call the Labeau investigation; is that fair enough?

4         A    Somewhat, yes.

5         Q    What did you call it at the time?

6         A    Just the review, the internal review.

7         Q    Okay.  And did that result in a written report?

8         A    Yes, it did.

9         Q    And is that what you have in front of you there

10   that we've marked as Exhibit No. 1?

11        A    Yes.

12        Q    Now, then after the written report, was a

13   second investigation or a supplemental investigation

14   performed involving this third party that you mentioned

15   a moment ago?

16        A    Yes.

17        Q    How was it that a decision was made to

18   incorporate this review by the third party?

19        A    Well, my report comes to a conclusion where

20   it's requesting a third-party review.  I talked to a couple

21   of my city manager friends, but one in particular that said

22   that when they had these kind of things happen sometimes

23   that was a good -- good thing to do.

24        Q    And who was the third party that was contacted?

25        A    Jim Robinson.

Wierzbicki & Stephenson Court Reporting Service

1      Q    Was that the kind of thing that you would

2  submit out for bids, or how was Mr. Robinson selected?

3      A    Through a recommendation of another city

4  manager.

5      Q    And did you interview Mr. Robinson about his

6  capacity to perform this review?

7      A    Yes, I did.

8      Q    And do you recall approximately when it was

9  that you would have talked to him?

10      A    I believe I talked to him in the fall of 1998,

11  maybe October, November, you know.  It was right around this

12  time frame.

13      Q    And what did you understand to be his expertise

14  in this area?

15      A    He had a career in law enforcement for 25

16  years.  He had held the position of, you know, everything

17  from patrolman all the way to chief in, I believe Pasadena,

18  California, but he was a consultant who had moved to the

19  Texas area.

20      Q    And do you recall where it was he was living,

21  roughly?

22      A    San Antonio area.

23      MR. LOCKHART:  Let me just state for the

24      record, if I can, Price, we have taken the position

25      that he is a privileged consultant, and we have made

1          that known to your firm.  I don't know if you're

2          aware of it.

3                But I didn't object to you asking about his

4          identity, which is obviously privileged, too, just

5          because you already knew who he was, but I just

6          wanted to make that for the record.

7                MR. AINSWORTH:  And we'll get to it.  I don't

8          mean to protract the depo or whatever, but there may

9          be, from time to time, I understand you may need to

10        make objections or whatever.  I'll be sure and pause

11        for those.

12 BY MR. AINSWORTH:

13          Q      The time that you talked to Mr. Robinson,

14 did you interview him, or do you recall who interviewed

15 him?

16          A      I believe I interviewed him, along with Joe,

17 yes.

18          Q      And did he have a copy of the Exhibit No. 1

19 that -- when you say Joe, you mean Joe Labeau?

20          A      Yes.

21          Q      And did you provide Mr. Robinson with a copy of

22 Exhibit No. 1?

23          A      Yes, I believe so.

24          Q      And then he performed an investigation separate

25 from the investigation that's reported in Exhibit No. 1; is

1    that right?

2         A    Yes.

3         Q    Did that investigation result in a written

4    report?

5         A    Yes.

6         Q    And do you know to whom -- when was the written

7    report provided; do you know?

8         A    I believe it was provided sometime -- well, it

9    was after this date in November of '98, and it was probably

10   provided in, you know, the weeks following.

11            It seemed to me that he worked within a month

12   of time.

13        Q    So, roughly before January of '99?

14        A    Yes.

15        Q    Or about then?

16        A    Yes.

17        Q    And do you know to whom that report would have

18   been given?

19        A    It was given to Mr. Lockhart.

20        Q    Okay.  I mean, did Mr. Robinson give it

21   directly to Mr. Lockhart, or did he give it to you, or do

22   you recall?

23        A    He gave it directly to Mr. Lockhart.

24        Q    And why was that?

25        A    Well, it was just, so many things were

1  happening by this time period.  We had notice of

2  litigation.  We had just, you know, growing public

3  sentiment about what's happened and why.  We had questions

4  from the media on an ongoing basis.

5          And then my assistant had gone in and reviewed

6  some of the department, and it just seemed to be the right

7  thing to do.

8          Q    Well, I didn't ask that very well.  How was it

9  that Mr. Lockhart was provided the report as opposed to,

10  say, you or Mr. Labeau or somebody like that?  Why was

11  Mr. Lockhart involved?

12          A    Because we had litigation notice.  I believe

13  the litigation notices came over the summer, if I recall.

14  And so, you know, clearly it was the method chosen.

15          Q    And was Mr. Lockhart retained as outside

16  counsel for the city?

17          A    Absolutely.

18          Q    And so he was provided a copy of that pursuant

19  to his role as outside counsel for the city relative to this

20  July 7th, '98, shooting incident?

21          A    Yes.

22          Q    How was Mr. Robinson compensated for his work

23  in preparing the report?

24          A    He was paid, I believe, on a lump-sum basis and

25  gave me an estimate of his time.  I think it was time and

Wierzbicki & Stephenson Court Reporting Service

1  hours, and I believe that's what it was, not to exceed.

2  And we came to an agreement, and he submitted his hours for

3  the amount of time into the report preparation.

4      Q      And then he was paid by the City of Harlingen

5  directly?

6      A      Yes.

7      Q      Is that something that you have to submit the

8  bills to the city commission, or how does that work?

9      A      I had the authority, the discretion to spend

10  funds, and I -- I don't remember even how much it was, but

11  it was, you know, $5,000, somewhere on that basis maybe,

12  and it was not unusual for me to hire people to do things

13  as needed.

14      Q      Okay.  But these are public funds as opposed to

15  some sort of private funds?

16      A      Right.  Right.

17      Q      And then as it falls within your administrative

18  duties and budget, you were able to hire Mr. Robinson to

19  perform the investigation?

20      A      Correct.

21      Q      He prepared a written report that was submitted

22  to outside counsel sometime before the turn of the year, you

23  think, in '99?

24      A      It seemed to me to happen within a matter of

25  weeks after this report came out.

1    Q    Okay.  Now, you've not reviewed that report in

2  preparation for your deposition today?

3    A    No.

4    Q    And anything you remember from it would be just

5  based on your review of it back at the time it was prepared;

6  is that right?

7    A    Correct.

8    Q    So, understanding we're going to need to pause

9  for objections, can you tell me what the report said?

10       MR. LOCKHART:  And I will instruct the witness

11       that that is privileged information in anticipation

12       of litigation and request the witness to honor that

13       privilege and not respond.

14  BY MR. AINSWORTH:

15    Q    Along those same lines, can you tell me how

16  the report, if it did, differed from that that's marked

17  Exhibit 1 here today?

18       MR. LOCKHART:  And I would make the same

19       objection and instruction.

20       MR. AINSWORTH:  And I think it's pretty clear

21       that whatever I ask her about, what I'll call the

22       Robinson report, the argument here today is that's

23       privileged and that I'm not going to be permitted to

24       discuss it with her today.

25       MR. LOCKHART:  Exactly.

Wierzbicki & Stephenson Court Reporting Service

BY MR. AINSWORTH:

    Q    So, with that understanding, let me ask you about the report I can ask you about then.

    Other than the report that we've marked as Exhibit No. 1 and the Robinson report, do you know of any other reports you've read that constitute a summary of the investigation performed of the July 7th, '98, shooting in which the border patrol agents, Rodriguez and Salinas, were killed?

    A    The only one I knew about was Joe Labeau's memo or whatever his document was when he went in to discuss it at the department.

    Q    And how is that different from Exhibit No. 1 that you have there?

    A    Well, I don't have that.  So, I would just say here that, you know, I did a review of some of the department's documents, inventory and some of their memos, et cetera, and policies, et cetera.  That's what I recall. And then I wrote my report based on that.

    Q    Okay.  So, you had Mr. Labeau's report when you prepared Exhibit No. 1?

    A    Yes.  Yes.

    Q    Okay.  When I said how is it different from, what I was trying to get to, what does it look like?  Is it a process where he's interviewed folks at the police

1  department, or what is it?

2      A    Well, I don't have it.  It's been some time

3  since I've looked at it, but it seemed to me that he went

4  into the department, and you know, wrote a memo on what he

5  thought the situation in the department was in terms of

6  policies, maybe procedures, et cetera, and then, you know,

7  tried to review the circumstances to the best his knowledge.

8      Q    And do you recall approximately when

9  Mr. Labeau's report would have been prepared?

10     A    Well, it would have been prior to November 4th.

11     Q    Do you recall approximately when he would have

12 begun his investigation?

13     A    I believe -- well, it would have been after the

14 incident.

15     Q    Like immediately or --

16     A    Well, I believe that Tom Lockhart was already

17 on the case.  So, it would have been, you know, after the

18 incident within a certain amount of time I don't recall.

19     Q    Was that report in any way supplemented

20 after it was provided to you?  Was there a subsequent

21 supplementation or anything that you know of?

22     A    No, I don't remember.

23     Q    What would have been Mr. Labeau's training as

24 of the time that he began this investigation that resulted

25 in his report?

Wierzbicki & Stephenson Court Reporting Service

1      A    Well, he was an assistant city manager, and he

2  basically supervised the department, so on the basis of

3  responsibility.

4      Q    So, he had some experience with supervision of

5  the department?

6      A    He had supervised it, I think, for several

7  years, yes.

8      Q    Did he have any law enforcement training that

9  you know of?

10     A    No.

11     Q    Had he ever served as a police officer or

12 police chief or captain?

13     A    No.

14     Q    He fell more in the administrative role, and

15 oversight of the department came under his agents; is that

16 right?

17     A    Oversight of the department, along with about

18 seven or eight others.  So, it was one department out of a

19 group.

20     Q    Seven or eight other departments, like fire

21 department or something like that?

22     A    Planning, that type of thing, yes.

23     Q    Okay.  And then you utilized his report in the

24 preparation of your report; is that right?

25     A    Somewhat.  I believe I had some documents come

Wierzbicki & Stephenson Court Reporting Service

1  up from the police department, and I just started reviewing

2  things on my own.

3          I would say that it was there, but I wanted to

4  know myself, what does the inventory say, what do memos say,

5  what do policies say, so I asked for some of those documents

6  to come up.  I looked at it myself and wrote this.

7      Q      And I didn't mean to restrict.  That wasn't the

8  only thing you reviewed in preparing your report; correct?

9      A      Correct.

10     Q      But it was one of the items that you reviewed?

11     A      True.

12     Q      Did he submit his report to anybody else other

13 than you, Mr. Labeau?

14     A      To Mr. Lockhart.

15     Q      Would it be the kind of thing that was

16 presented to the city commission?

17     A      No.

18     Q      It was prepared for you; is that right?

19     A      Prepared for me and I believe Mr. Lockhart to

20 some degree.  Again, I just haven't seen it, so I don't

21 remember.

22     Q      Okay.  And do you know if a copy of it was kept

23 there in the City of Harlingen files?

24     A      No.  I believe it was given to Mr. Lockhart.

25     Q      And as far as you know, no other copies were

1    retained by the city in some fashion?

2            A       That's correct, my knowledge of it.

3            Q       Now, if I look at your report there that we've

4    marked as Exhibit No. 1, it looks like it appears on a total

5    of four pages; is that right?

6            A       That's correct.

7            Q       On the first page we see kind of a few

8    introductory paragraphs; is that right?

9            A       Yes.

10           Q       There's not really a great deal there in terms

11   of a statement about the facts of the shooting incident; is

12   that right?

13           A       Correct.

14           Q       I mean, there's some mention of the date, that

15   kind of thing?

16           A       Right.

17           Q       Now, would Mr. -- see if I can say his name

18   again.  I'm sorry.  -- Labeau's report have contained a more

19   detailed description of the facts of the shooting incident?

20           A       Well, again, I don't have it, but I don't think

21   so.  I think that this was just, you know, information that

22   was in the media every day and in the matter of a situation

23   occurring.

24                   And we had, you know, been made aware that the

25   rifle had been through the City of Harlingen, and so it was

1  just information common to the situation.

2       Q     Well, have you tried to come to an

3  understanding as to what happened with regard to the

4  shooting event?

5       A     How do you mean that?

6       Q     Well, I mean more of the particulars about, you

7  know, who was involved in the shooting, what had happened

8  earlier in the day, that kind of thing?

9       A     Through meetings with our attorney I believe

10  that were taking place at this point in time, I think in the

11  fall of that point, yes, I had had several meetings with

12  Mr. Lockhart about it.

13       Q     Well, and I don't mean to ask you about

14  anything that Mr. Lockhart has told you or that other

15  counsel in his firm may have discussed with you.

16            What I'm trying to get to more is what kind of

17  facts you were gleaning from any investigation that the city

18  was performing or that the police officers involved in the

19  investigation were supplying to you, either Mr. Labeau or

20  yourself.

21            For instance, did you come to any kind of

22  understanding about the origins of how the City of Harlingen

23  came into possession of the rifle?

24       A     Only, and again, I don't mean to be repetitive,

25  but through discussions with Mr. Lockhart.  He is the one

1    that, I believe, briefed me on what had occurred.

2        Q       Well, do you have an understanding that a

3    citizen had delivered the AR-15 rifle to the Harlingen

4    Police Department back in 1995?

5        A       It came to my attention, yes.

6        Q       And what's your understanding of why this AR-15

7    rifle was brought into the Harlingen Police Department?

8        A       Well, my understanding was that it was brought

9    in because the citizen didn't care to keep it any longer and

10   brought it to the police department to hand it over because

11   they didn't want it anymore.

12       Q       Was there some type of program in place whereby

13   citizens could bring in unwanted weapons so that the weapons

14   could be destroyed?

15       A       I don't know.  I just don't have any

16   information on that.

17       Q       As to whether or not this particular rifle was

18   brought in to be destroyed, you don't have any information

19   on that facts of the reasons why it was brought in?

20       A       No.

21       Q       Did you understand that, obviously, the rifle

22   was not destroyed?

23       A       That's correct.

24       Q       And that in some fashion the weapon was

25   provided to a fellow named R.D. Moore there that had worked

1  with the police department?

2         A     Yes.

3         Q     What is your understanding of how the weapon,

4  the AR-15, was supplied to R.D. Moore?

5         A     What I understand is that it was donated, and

6  Jim Scheopner had assigned him, at the time, some duties

7  that required him or allowed him, rather, to take it home.

8  And so he was able to go ahead and take it with permission.

9  So, there was -- it was by permission of the chief that he

10  was allowed.

11        Q     So, your understanding of the facts of the case

12  is that Chief Scheopner had an awareness that R.D. Moore was

13  permitted to keep this AR-15 rifle?

14        A     Yes.

15        Q     And Chief Scheopner would have understood that

16  R.D. Moore had the rifle prior to the shooting incident of

17  July 7th, 1998?

18        A     That was my understanding from Chief Scheopner,

19  yes.

20        Q     Now, in your review of the facts of the

21  incident, you didn't come across any incidents in which R.D.

22  Moore had been trained with the rifle, did you?

23        A     I believe he had -- when Labeau looked at it,

24  he had had some training, but it had been a number of years

25  off and that -- and so I was aware of some training many,

many years previous to the incident.  So, that had come up.

Q      But as far as training with this particular
AR-15 as opposed to, say, some military weapon previously,
did you come across any training specifically where R.D.
Moore was trained with this weapon?

A      No.

Q      Now, you have an understanding that this weapon
can fire a number of rounds in rapid succession?

A      I don't know anything about guns, sir.
I assume it can because of how it's described, but I don't
know.

Q      All right.  And you have no familiarity with
the weapon itself?

A      No.

Q      Based on your review of the investigation, did
you have an understanding that R.D. Moore kept the rifle at
his house?

A      Yes, from Chief Scheopner.

Q      Now, did you eventually come to an
understanding that the rifle was kept in R.D. Moore's son's
room, Ernest Moore's room?

A      I learned that after the fact, yes.

Q      Now, do you have an understanding one way or
the other as to when Mr. Scheopner knew that the gun was
being kept at R.D. Moore's house?

1       A       No, I wouldn't know that.  At some point.

2       Q       Or as to in particular what room of the house

3   it was kept?

4       A       No.

5       Q       You just wouldn't know that one way or the

6   other?

7       A       No.

8       Q       The -- do you have a memory of the

9   investigation that Mr. Labeau performed as to whether or not

10  he uncovered facts that indicated that Mr. R.D. Moore had

11  taught Ernest Moore how to shoot the rifle?

12      A       You'd have to -- you'd have to ask Joe.  He had

13  told me that -- you know, I just don't remember, but it

14  seemed to me that maybe R.D. had had a hobby or so, but

15  that's what I recall.  And so, you know, their hobby was

16  guns.

17      Q       And we'll get to the particulars, I guess, of

18  Mr. Labeau's memory eventually.

19              What was it that indicated to you that the

20  Moore's family's hobby was guns?  Where did you derive that

21  understanding?

22      A       It came after when, I think I asked questions

23  or how did this -- you know, how did things happen or why

24  or what have you, but that he had been somewhat of an

25  expert,  R.D. himself had been somewhat of an expert

Wierzbicki & Stephenson Court Reporting Service

1  sharp-shooter-type thing.  And he had the reputation of

2  being the department's person when, you know, for any kind

3  of a situation that would call for those type of expert

4  skills; that he was the person that people -- that the chief

5  would call on or the department would call on when that type

6  of thing would arise.

7        Q     As to the son, Ernest Moore, R.D. Moore's

8  son, did you come to any understanding about his own

9  psychological stability as of the date of this incident

10 back in July of 1998?

11       A     No.

12       Q     Did you receive information that Ernest Moore

13 had neo-Nazi propaganda in his bedroom or anything like

14 that?

15       A     It came -- I learned of that as, you know,

16 media, and you know, maybe some conversations or a meeting

17 or so with Mr. Lockhart, yes.

18       Q     And did you learn that he was in fact on

19 various psychiatric medications like Prozac and that type of

20 thing?

21       A     I didn't know that, no.

22       Q     Are you aware of any investigation as to

23 whether or not he had taken any mood-altering drugs on the

24 evening or morning hours of July 7th, 1998?  That's Ernest

25 Moore I'm talking about.

1      A      No, I didn't.

2      Q      Have you ever learned as to whether or not he

3   was intoxicated or taking cocaine or had marijuana or

4   anything in his system as of that morning?

5      A      What I learned came later in the discussions

6   with Mr. Lockhart, the series of events that led up to that

7   day or night.

8      Q      And in Mr. Labeau's investigation does he make

9   any reference or report of what Ernest Moore had been doing

10  over the course of the evening and early morning prior to

11  the shooting?

12     A      No.

13     Q      You understand there was an earlier shooting at

14  about 4:30 a.m. that morning where a couple of folks were

15  killed and another seriously wounded over in Rio Hondo?

16     A      I recall that.

17     Q      And that apparently Mr. Ernest Moore had been

18  involved in that shooting as well?

19     A      That's correct.  That's what I was told.

20     Q      Was that part of the subject matter of

21  Mr. Labeau's investigation?

22     A      No.

23     Q      Mr. Labeau's investigation dealt more with the

24  gun, I take it?

25     A      That's correct.

1      Q      As opposed to what happened in the prior

2  shooting?

3      A      I think it was just what was going on, let me

4  go down to the police department and meet and find out about

5  that, the gun itself and what happened and et cetera, what

6  was the situation.

7      Q      Well, as of July 7th, 1998, when the border

8  patrol agents were killed, was there any type of policy that

9  you were able to locate by which the police department would

10  assign out an assault rifle like this AR-15 to Mr. R.D.

11  Moore?

12      A      I believe that there was a policy or some

13  type of written document that said that they had to have

14  everything done in writing.

15      Q      Yes, ma'am.

16      A      And I do recall seeing something on that order.

17      Q      Kind of a voucher system where you say, Price

18  has this weapon or whomever has that weapon?

19      A      I think, you know, it was something that

20  required a note or a memo, you know, only under the chief's

21  direction by written memo is what I remember.

22      Q      And this was an internal standard that was

23  maintained there at the Harlingen Police Department?

24      A      Correct.

25      Q      Do you know what the purpose of that standard

1    was?

2         A    Only, I guess, to keep track of whatever. And

3    also to keep track of those weapons, but also to be sure

4    that the chief approves, as the head of the department, any

5    kind of sign-outs.

6         Q    And as to this particular weapon, the AR-15

7    that was used to kill the border patrol agents, do you know

8    whether or not that particular rifle had ever been signed

9    out in this written format to R.D. Moore?

10        A    It was my understanding there had been a

11   verbal, but not a written sign-out, if you will; that there

12   had been a verbal okay on it or a verbal approval from the

13   chief, but not written.

14        Q    So, if I'm understanding what you're telling

15   me, the chief, Mr. Scheopner, knew, at least by way of

16   verbal communication, that R.D. Moore had the weapon?

17        A    It's my understanding, yes.

18        Q    But as far as the internal procedures whereby

19   these weapons are tracked or meant to be tracked at the

20   department, the written procedure just wasn't followed in

21   this instance; is that right?

22        A    They did not have a written memo on it, and it

23   did require that.

24        Q    Have you made any review of Mr. Labeau's report

25   or any other review of the facts of this case which would

1  lead you to an understanding as to about what time the

2  various phone calls reporting the events were made to the

3  Harlingen Police Department?

4       A     No, I didn't see anything.  I don't recall

5  anything else.

6       Q     So, if I was to ask you about what time the

7  Sheriff's Department knew about the incident or first had

8  the incident reported, and I'm talking about the Rio Hondo

9  shooting, or what time the Harlingen Police Department had

10 the first report of the Rio Hondo shooting, do you know one

11 way or the other?

12      A     No, I don't.

13      Q     That's certainly not something you've reviewed

14 in preparation for your deposition today?

15      A     No.

16      Q     As to when Police Chief Scheopner first knew

17 of the Rio Hondo shooting, do you have any particular

18 recollection based on your discussion with him or the review

19 of the Labeau report?

20      A     No.  I believe he would have been called, like,

21 you know, for any kind of emergency, called right from the

22 department.  But when that occurred, the time, I know that

23 the chief called me maybe around six or so in the morning,

24 you know, six, seven o'clock, the time I was getting ready,

25 and he called and told me what had happened.

Wierzbicki & Stephenson Court Reporting Service

1        And I said, "You can check back with me later
2   and let me know how things are going."
3        We knew it was outside the city, and so that
4   was my indication.
5        Q    All right.  Now, when you say six, you're
6   talking about 6 a.m. that morning?
7        A    Six or seven.  I know I was getting ready
8   for work.  You know, that's just what I recall, six or
9   seven o'clock.
10       Q    Pretty early to be getting a call from anybody,
11  much less the police chief, I guess?
12       A    Well, you know, it would happen, though.
13  They would call.  Department heads would call if something
14  was up, and I was usually up early.  So, it was all right.
15       Q    Do you recall talking to Chief Scheopner?
16  Do you call him Chief Scheopner, or do you call him
17  Mr. Scheopner?  What did you call him?
18       A    I just called him Jim.
19       Q    Okay, Jim.  I'll call him Chief Scheopner.
20  We'll know who we're talking about.
21       Do you recall talking to him that morning about
22  whatever it was, six or seven?
23       A    He called and just, you know, let me know that
24  the incident had occurred and that it was -- I asked him
25  where it was, and he told me it was outside the city.

Wierzbicki & Stephenson Court Reporting Service

1  It was out in the county somewhere.  And you know, he was

2  advising me.

3          I said, "Okay.  Well, keep me advised, and I'll

4  talk with you a little bit later on today."  And I finished

5  getting ready and went to work.

6          Q    When you say, "The incident had occurred," are

7  you talking about the Rio Hondo shooting, or are you talking

8  about the San Benito shooting where the border patrol agents

9  were killed?

10         A    I think we were talking about San Benito.

11  I think we were talking about San Benito at that point.

12         Q    As best you can recall, he had not called you

13  about the Rio Hondo shooting earlier in the morning?

14         A    I don't remember.  I definitely remember the

15  San Benito situation, but not so much the Rio Hondo.

16  I don't remember at what point I learned there was more to

17  it.

18         But he told me of the incident, and you know,

19  my concern was, was it in the city limits.  And then he said

20  it was outside the city limits, out in the county and that

21  there were a number of people out there.  I said, "Keep me

22  posted."

23         Q    Did he tell you about what had happened?

24         A    He had told me that Ernest Moore was involved

25  in the shootings and basically -- and it was Detective

Wierzbicki & Stephenson Court Reporting Service

1  Moore's son, and he mentioned that.

2          I said, you know, "It's very unfortunate and

3  keep me posted." And that's all we knew at that point.

4      Q    Did you know anything at that point about the

5  involvement of the AR-15 that had been assigned to Detective

6  Moore?

7      A    No.

8      Q    And did you learn how many people had in fact

9  been wounded or killed at the San Benito shooting?

10     A    I can't remember what he said, but you know, I

11 believe he said that there had been a shooting where there

12 was one or two agents, I don't recall the detail, but he was

13 apprising me of a situation that, you know, would have been

14 not unusual for anything that he thought was important for

15 me to know if I felt it was information at that point in

16 time.

17     Q    Do you know where he was when he called you?

18     A    No.  I'm assuming it was in his car, or you

19 know -- I assumed he was in the car out at the scene or so.

20     Q    At least on his way to the scene or something

21 like that?

22     A    Yeah, out there.  I just don't remember, and I

23 don't think he said.  I just assumed he was out there with

24 other law enforcement.

25     Q    Do you recall what he told you about Detective

        Wierzbicki & Stephenson Court Reporting Service

1  Moore's involvement in the incident?

2       A     No.  He just told me it was Moore's son more

3  than anything else.

4       Q     I mean, did you learn that Mr. and Ms. Moore

5  were at home?

6       A     No, they didn't go into that.  He didn't go

7  into that.  He just told me it was Detective Moore's son,

8  and I thought that was very unfortunate and went from there.

9       Q     What was your understanding, if you had one, as

10 of that morning when Chief Scheopner called you as to why

11 border patrol agents were at the scene?

12      A     I didn't ask.  I just didn't.  No, I didn't

13 ask, and he didn't say.  He just told me that it was a

14 situation of young Mr. Moore, you know, committing these

15 acts and being out there.

16            And I just said, you know, "Call me later."

17 It was very quick, you know, and I don't recall any detail

18 at that point.

19      Q     Do you recall learning that morning what the

20 weapon was or the chain of custody, if you will, of the

21 weapon that the assailant, Ernie Moore, Ernest Moore, was

22 using, that AR-15?

23      A     No, there wasn't any discussion.

24      Q     Chief Scheopner didn't tell you anything about,

25 "I'm afraid this may have been a Harlingen Police Department

1   weapon that was used in the shooting" or anything like that?

2         A     No.

3         Q     Did he tell you that morning that he knew that

4   R.D. Moore had some, at least one weapon at the house that

5   he had obtained from the Harlingen Police Department?

6         A     No, he didn't discuss that.

7         Q     Now, you mentioned a moment ago that it was

8   your understanding that Mr. R.D. Moore had some sort of

9   expertise or skill as a sharp-shooter.  Is that a fair

10  understanding of what you said a moment ago?

11        A     That's what Joe told me, and I believe that --

12  I can't remember if Jim had said that to us; that he had had

13  those kind of responsibilities or what have you.

14              And then Joe, you know, looked at that and

15  said, you know, that he had -- apparently had those kind of

16  responsibilities at some point and if anything happened he

17  was able to be called upon in an expert-type of situation,

18  hostage or a very bad situation.  He would be available.

19        Q     While you were the city commissioner -- city

20  manager, I'm sorry.

21        A     City manager.

22        Q     City manager there in Harlingen, are you

23  aware of an event where something like a swat team or a

24  sharp-shooter team was ever needed to quell a hostage

25  situation?

1        A       I can't think of one today.

2        Q       Did you know, as of July 7th, 1998, whether

3   or not the Harlingen Police Department had a swat team?

4        A       Well, I think there had been some -- there was

5   a little confusion about they had had one that I think the

6   chief disbanded.

7                You know, at that point, you know, it's just

8   not something I ever asked about.

9        Q       What is your understanding as to when the chief

10  had disbanded, Chief Scheopner I guess, had disbanded the

11  sharp-shooter or swat team?

12       A       Well, sometime, I guess, when we were looking

13  at this, you know, it came to our attention that he had

14  disbanded it when he came on as chief because he said, you

15  know, we don't really need that, et cetera, but I don't --

16  don't, you know, I don't know if he had a team set up that

17  could be assembled on a very short notice that would be able

18  to respond to those kind of situations.

19               But my understanding is that he had decided he

20  didn't want that kind of a team organization and he was

21  going to do something else, but it wasn't something that he

22  thought was prudent for the department.

23       Q       What was your understanding then as to why this

24  assault rifle was being assigned out to R.D. Moore?

25       A       Well, you know, at the same time -- my

1    knowledge of that assignment came after the incident,

2    after all this had happened.

3              So, I wouldn't have known about it during the

4    course of the operation.   It's just not something I would

5    ask the chief about.   I wouldn't have thought to ask.

6              The things we concentrated on were budgets and

7    that kind of thing, personnel.

8         Q    Okay.   After the incident, though, and that's

9    the kind of thing that I guess Mr. Labeau would have been

10   looking into, as to why was this weapon that had been taken

11   into the Harlingen Police Department by a local citizen

12   eventually in place there at R.D. Moore's home?

13        A    Again, you'd have to ask Joe what he construed

14   from his review.

15             You know, he told me that there was no swat

16   team any longer and that Jim had decided to disband it and

17   it was just not prudent.   And you know, I don't recall a lot

18   more about swat.

19        Q    Do you have an understanding as to why this

20   particular weapon was not the subject of a written sign-out

21   according to the procedure that was in place at Harlingen

22   prior to this shooting?

23        A    No.   They just hadn't gotten to the written

24   part of it.   My understanding is the chief had authorized it

25   verbally.

1    Q    And it's your understanding that the chief knew

2  that the gun was out at R.D. Moore's house?

3    A    It's my understanding, yes, that he knew it was

4  there.

5    Q    And that the gun had originally been brought

6  into the police department as early as 1995?

7    A    Yes, we learned that.

8    Q    But that the written procedure, just they

9  hadn't gotten around to following that by the time of this

10  July of '98 shooting; is that right?

11    A    Not in written form.

12    Q    Now, after the shooting I guess the gun was

13  taken back into possession and kept there at the -- what's

14  your understanding of what happened to the gun after the

15  shooting?

16    A    I don't know.  My understanding is that, you

17  know, the federal authorities, you know, there were several

18  people, I believe, that looked at the circumstances and that

19  it was taken into custody by one of the agents.  Which one,

20  I don't know.  I can't tell you.  Maybe one of the federal

21  authorities, I don't know, or state.

22    Q    Mr. Ernest Moore died in the incident in which

23  the border patrol agents were shot?

24    A    That's correct.

25    Q    So, obviously no prosecution was made of Ernest

1  Moore?

2          A       That's correct.

3          Q       So, the gun wasn't really necessary for

4  prosecuting Ernest Moore; right?

5          A       Correct.

6          Q       But as far as you know, the gun was no longer

7  kept at the R.D. Moore household; is that right?

8          A       That's right.

9          Q       And it wasn't reassigned out by written

10  procedure or verbal procedure or any procedure to any other

11  sharp-shooter or person with expertise on the police force;

12  is that right?

13          A       Do you mean after the incident?

14          Q       Yes, ma'am.

15          A       After the incident, you know, I understood

16  that there were several organizations looking at the

17  circumstances, and at what point one of them took it into

18  custody I don't know.  I understand that's what happened

19  after the fact.

20          Q       Was R.D. Moore in any way disciplined by the

21  police department or the city after the events in which the

22  border patrol agents were killed?

23          A       It's my understanding, yes.

24          Q       And what is your understanding of which entity

25  would have been involved in that disciplinary procedure?

Wierzbicki & Stephenson Court Reporting Service

1       A       Well, the department.

2       Q       The police department?

3       A       Police department, but the assistant city

4  manager undertook some disciplinary action after the

5  situation.

6       Q       Do you have a recollection of what that was?

7       A       I believe it was, you know -- it would have

8  been oral, I believe.  I don't know.  I just don't remember.

9  But I do know that Joe Labeau handled some type of

10 discipline after the fact.

11      Q       All right.

12      A       On his own.

13      Q       And are you talking about he called him in on

14 the carpet and talked to him about it, talked to R.D. Moore

15 about it, or are you talking about leave without pay or some

16 sort of discipline like that, or do you recall?

17      A       You'd have to talk to Joe, but he carried it

18 out, and I remember that it was something that he initiated

19 as being appropriate.

20      Q       Was any discipline, as far as you know, meted

21 out with regard to Police Chief Scheopner?

22      A       Disciplinary action?

23      Q       Yes, ma'am.

24      A       No.

25      Q       Now, is the police chief role, the chief of

Wierzbicki & Stephenson Court Reporting Service

1   police role in Harlingen a political appointment, or is it

2   an appointment that is made by the mayor, or how is that

3   accomplished in Harlingen?

4            A       In Harlingen it's a city manager's

5   recommendation to the city commission, and then they take

6   a vote on it.

7            Q       And does the police chief serve at the will of

8   the city manager?

9            A       Yes.

10           Q       And so the -- I mean by that the city manager

11  has the capacity to fire, to demote or whatever?

12           A       Yes.

13           Q       And I guess from time to time you've got to

14  make a decision, do we need a new city police chief?

15           A       Yes.

16           Q       And that falls on the shoulders of the city

17  manager to determine when that time is up or when it's ripe,

18  I guess?

19           A       Yes.

20           Q       In this particular instance Police Chief

21  Scheopner was eventually demoted from police chief; is that

22  right?

23           A       Yes.

24           Q       Was that relative to this incident where the

25  border patrol agents were killed?

Wierzbicki & Stephenson Court Reporting Service

1     A     Well, it all happened at about the same time,

2  but it was just a series of issues that I think just told me

3  that it was time to make a change.

4             And the department was growing, and I felt it

5  was in the best interest of the department to consider

6  change.

7     Q     It's my understanding that eventually Chief

8  Scheopner resigned as a lieutenant or at lieutenant's pay;

9  is that right?

10    A     He resigned his position of chief and asked to

11 be reinstated as lieutenant.

12    Q     And then eventually resigned from that

13 position as well?

14    A     Well, I don't know about that.  He was a

15 lieutenant when I left Harlingen last year.

16    Q     Okay.  And that would have been your decision,

17 as city manager, to ask Chief Scheopner for his resignation

18 and then to reinstate him at lieutenant; is that right?

19    A     It was my -- yes, it would have been within my

20 authority.

21    Q     The second half of that question, the

22 multi-phase question, I'm sorry.  Do you then make the

23 decision to put him on at lieutenant, or does the new police

24 chief make the decision, or how does that work?

25    A     No.  I just gave him a memo and said, you know

1    effective immediately you're a lieutenant, and you can

2    return to the department and take up your job.

3             And then he would be under the supervision of a

4    chief or an acting chief in this case.

5        Q    And did you do a written memo to Chief

6    Scheopner?

7        A    I believe he wrote me a memo that said, "I

8    would like to be reinstated back to my former position."

9    He was in, you know, a state of turmoil, and he felt that

10   this -- it was best.

11            And there had been a lot of turmoil and

12   disturbance to him, and it was something he had wanted.

13   So, I wrote him a memo back and said you're reinstated as a

14   lieutenant.

15       Q    Was his memo to you in response to a memo where

16   you had asked for his resignation, or is that what prompted

17   you to ask for his resignation?

18       A    He had been out on administrative leave during

19   the time of the review, and he had been out a period of

20   about seven weeks, eight weeks, whatever it was during the

21   time that we did this.

22            So, I think it gave him some -- a chance to

23   think things over, and just I think the relationship had

24   been deteriorating, in all fairness, for a while.

25       Q    What is administrative review?

              Wierzbicki & Stephenson Court Reporting Service

1    A    It means you're home basically or you don't

2  report to work, but you're still being paid, and we felt it

3  was time -- it was appropriate.

4    Q    Would that be the city manager's role to put

5  the police chief, if necessary, on an administrative review?

6    A    Yes.

7    Q    And in this particular instance did you put

8  Chief Scheopner on administrative review?

9    A    Basically it was just an administrative leave,

10  if you will.  It was called administrative leave.  And it

11  was, you know, during the time of the review by Jim

12  Robinson.  So, we said, "Go ahead.  We'll go ahead and pay

13  you."  So, he understood that that was necessary.

14    Q    Why did you put Police Chief Scheopner on

15  administrative review or leave while this border patrol

16  agent shooting was being investigated?

17    A    I just think it was best for him to remove

18  himself from the department so that way the consultant could

19  review whatever he needed to in the department, speak with

20  folks and have the opportunities that he needed to be able

21  to undertake that appropriately.

22    Q    I take it from time to time that you're called

23  upon to -- would you have been called upon, as city manager

24  for the City of Harlingen, to make a report to the city

25  commissioners?

Wierzbicki & Stephenson Court Reporting Service

1     A    Yes.

2     Q    And some of us in other cities may know that as

3 city council or whatever, but that's part of your assignment

4 is to go over and tell them how things are going; is that

5 right?

6     A    Yes.

7     Q    And I guess also you frequently would have

8 found yourself as the spokesperson for the city as far as

9 press releases and that type of thing?

10     A    That's correct.

11     Q    And without going into any great detail, after

12 the events of July 7th, 1998, and the morning before, there

13 was a great deal of press and public interest in both the

14 Rio Hondo and San Benito shootings; is that right?

15     A    Correct.

16     Q    And it was the kind of thing that I'm sure the

17 city commissioners were interested in hearing from the city

18 manager as to what was being done to investigate the events;

19 is that fair to say?

20     A    Yes.

21     MR. AINSWORTH:  Let me hand you what I'll get

22     the court reporter to mark as Exhibit No. 2.  It's

23     not a very good copy, but maybe we can get through it

24     right fast.

25     (Plaintiffs' Exhibit No. 2 was marked for

1   identification.)

2       Q       What I'm handing you is a two-page document

3   that's been faxed half a dozen times, looks like.  Have you

4   seen this document before?

5       A       Yes.

6       Q       It may not have been something that you've read

7   recently.

8       A       Yes, I recall this.  I've not read it recently.

9       Q       But you can see there that it's got the court

10  reporter's sticker on there.  We've put it as Exhibit No. 2,

11  correct?

12      A       Uh-huh.

13      Q       And then on the top it's got the letterhead of

14  the Capital of the Lower Rio Grande Valley and the City of

15  Harlingen logo; is that right?

16      A       Correct.

17      Q       And it looks like on the top of the page there

18  the title is Statement from the City Manager; is that right?

19      A       Correct.

20      Q       Now, can you recall -- I know we're looking

21  back now three-some-odd years, just right at three years, I

22  guess.

23              Can you recall putting together the memo that

24  we've marked as Exhibit No. 2?

25      A       Yes.


Wierzbicki & Stephenson Court Reporting Service

1     Q     And what was the purpose of your putting

2     together this memo?

3     A     Well, again, I think we were responding to the

4     public.  We had had notice of the lawsuits.  I remember

5     doing it from Mr. Lockhart's office sometime before this,

6     maybe a month, you know.  I don't see a date on here.

7     I can't believe we wrote it without a date.

8     Q     Well, and I may have --

9     A     I think in that time frame, maybe before

10    November because it seemed to me we did this and then we did

11    this.

12    Q     And from the context of the wording of the

13    document that we've marked as Exhibit No. 2, it looks like

14    it precedes the report that we've marked as Exhibit No. 1 in

15    time?

16    A     That's correct.

17    Q     And it seems to indicate there that you're

18    speaking to the press and to the city commissioners?

19    A     I believe it was the press because they had,

20    you know, been calling and wanted to know more about what

21    was going on, so we responded.

22    Q     And this is -- again, this is something you put

23    together?

24    A     Yes.

25    Q     You're indicating there that you want to assure

1   the police officers, families and community that we began to

2   review the facts in this matter, and you're referring to the

3   San Benito shooting?

4       A    I believe so.

5       Q    And you indicate "almost immediately," is that

6   right?

7       A    Yes.

8       Q    I think it says, "Literally within days of the

9   events"?

10      A    Right.

11      Q    And you discuss that there's been a detailed,

12  methodical, professional review and that "We've made

13  substantial progress on the report," is that right?

14      A    Yes.

15      Q    Now, in that paragraph, to which report would

16  you have been referring; to Mr. Labeau's report?

17      A    I believe so.  I think it was Labeau's report

18  at that point because we were asking -- asking him to take a

19  look at what happened, and he was down there meeting with

20  folks, with the officers.

21      Q    The report continues and says, "Our review and

22  study are ongoing.  I can assure you that we will be able to

23  give you a better idea in the days and weeks ahead of when

24  an administrative report will be presented to the city

25  commission and to you and to the police," and it continues

Wierzbicki & Stephenson Court Reporting Service

1    on.

2              That was your statement to the press and the

3    city commissioners back at that time?

4         A    Correct.

5         Q    Now, when you're talking about an

6    "administrative report," what are you talking about?

7         A    Well, I believe we meant -- we meant this

8    report here; that we would have something to return back

9    to the public, and saying that we were looking at the

10   circumstances and as much of the information as possible.

11        Q    The video camera will pick it up, but you're

12   pointing to Exhibit No. 1 there?

13        A    Yes.

14        Q    As opposed to the report that was made by

15   Mr. Robinson to you?

16        A    Right.  It was prior to that.  This was prior

17   to that.

18        Q    Now, the Robinson report is prepared with

19   public funds?

20        A    Correct.

21        Q    But as far as you know, it's never been made

22   available to the public?

23        A    That's correct.

24        Q    It discusses the role of folks that are like

25   the chief of police and Detective R.D. Moore that were under

1   the employee of the City of Harlingen; is that right?

2          A      I haven't seen it in two-and-half years.

3          Q      I don't mean to say it specifically said that,

4   but they're a topic of the report?

5          A      Of course.

6          Q      And again, that's not been made available to

7   either the press or the public at large?

8          A      That's correct.

9          Q      Was it presented -- was Mr. Robinson's report

10  presented to the city commissioners?

11         A      No.

12         Q      Is there any type of executive session where

13  either some part of the commission or maybe just the mayor

14  or something like that would have reviewed the report?

15         A      No.

16         Q      Other than Mr. Lockhart and yourself, do you

17  know of anybody -- and obviously Mr. Robinson, that have

18  seen Mr. Robinson's report?

19         A      The only other person may have been Joe

20  Labeau, but I don't even remember.  I believe that, but I

21  don't think anyone else.

22         Q      Turn with me, if you would then, for a moment,

23  to the report that we marked as Exhibit No. 1.  This is the

24  administrative report that you mentioned and apparently that

25  you mentioned in the press release that we marked as Exhibit

Wierzbicki & Stephenson Court Reporting Service

1  No. 2?

2       A       Right, which came after.

3       Q       Okay.  And what you indicate there on the first

4  paragraph -- well, let me go ahead and look at the top of

5  the page.

6              It indicates this is the City Managers Report

7  to the City Commission Concerning the 7th of July, 1998,

8  Shooting Incident; is that right?

9       A       Yes.

10       Q       And in particular you're discussing the

11  shooting incident in which the border patrol agents were

12  killed by Ernest Moore using the AR-15 rifle we've been

13  discussing?

14       A       Yes.

15       Q       It's your understanding, as of the time that

16  you're drafting this report that we've marked as Exhibit

17  No. 1, that that rifle was brought into the Harlingen Police

18  Department and eventually found its way over to Detective

19  Moore's house; is that right?

20       A       That was my understanding, yes.

21       Q       And you indicate there in the first paragraph

22  that "On July 7th, 1998, a very tragic incident took place

23  in which two border patrol agents, Susan Lynn Rodriguez and

24  Ricardo Salinas, were killed," and I can't read the rest of

25  it because of my copy.  What does that sentence say?

Wierzbicki & Stephenson Court Reporting Service

1    A    "And Deputy Sheriff, Raul Rodriguez, wounded."

2    Q    Can then you read the next sentence to me as

3    well?

4    A    "Following the incident, it was learned the

5    rifle used by the assailant, 25-year-old Ernest Moore, was a

6    Harlingen Police Department (HPD) semi-automatic AR-15.

7    This rifle was assigned to Harlingen Police Detective R.D.

8    Moore by Moore's supervisor."

9    Q    Now, when you refer there to "Moore's

10   supervisor," are you meaning Chief Scheopner?

11   A    Well, you know, I can't recall if it was

12   directly Scheopner or whether it was Captain Vasquez.

13        I believe I may have been referring there to

14   Captain Vasquez being his immediate supervisor, but again, I

15   think it was the immediate supervisor, you know, when I was

16   talking about approvals, you know, that the chief was to be

17   the final approval or however it worked.

18   Q    Okay.  And you don't mention in the paragraph

19   there anything about the means by which the rifle came into

20   the possession of the police department?

21   A    That's correct.

22   Q    As of the time that you wrote the report in

23   November of '98, did you know that in fact the AR-15 rifle

24   had been brought in by a local citizen?

25   A    Yes.

Wierzbicki & Stephenson Court Reporting Service

Q    Did you know that the rifle had been assigned
to Ernest Moore -- I'm sorry, to R.D. Moore, even though the
written procedure for assigning such weapons had not been
followed?

A    Yes.

Q    And would you have known also by the time of
this report that there in fact was not any existing swat
team to which Mr. -- Detective Moore had been assigned?

A    Could you repeat the question?

Q    Yeah.  As of the time that you wrote this
report in November of 1998, did you know that there wasn't a
swat team?

A    Yes.

Q    To which Detective Moore had been assigned?

A    That's correct.

Q    I apologize.  I'll mix up the Moore names
several times, and I'll try to go back and clean it up each
time.

Now, you indicate in the report in the second
paragraph that this Harlingen Police Department rifle had
been placed in a locked gun vault with five privately-owned
semiautomatic rifles; is that right?

A    Correct.

Q    And you're referring to the gun safe, the
Remington gun safe over at Detective Moore's house?

1       A       I understand that from the meetings we had,

2  yes.

3       Q       Did you learn, as of November 4th, 1998, that

4  the gun safe was kept in Ernest's room as opposed to

5  somewhere else in R.D. Moore's house?

6       A       I can't recall at what point I learned it,

7  but I believe I knew it at the time of writing this.

8       Q       Would you have known how that lock worked?

9  Was it a combination lock or a key lock, or how was this

10 particular gun vault locked?

11      A       I don't know that.

12      Q       Would you have known, as of November 4th of

13 1998, whether or not Ernest would have had access to this

14 gun safe that was kept in his room?

15      A       I wouldn't have known the details of that.

16      Q       Do you know whether or not any of the other

17 weapons in the gun safe found their way to Detective Moore's

18 home via this same channel that we've been discussing with

19 the AR-15; that they were somehow brought in by local

20 citizens and then assigned out, either on a verbal or a

21 written order, to Detective Moore?

22      A       I don't know that.

23      Q       Do you know -- when you say you don't know

24 that, are you saying that, no, that's not true or you just

25 don't know about the origin of any of the other guns?

1       A       I just don't know about the origin of it.

2   I was just told this.

3       Q       For instance, the shooting events that occurred

4   earlier that morning over in Rio Hondo, do you know where

5   that gun came from that Ernest Moore allegedly used?

6       A       It seemed to me that I was told that one of

7   those guns had come from a Detective Vasquez, but it was a

8   private gun that he had sold to R.D.  It was his personal.

9   You know, it wasn't anything brought into the department.

10  That's how I understood it when I asked about it.

11      Q       If you were going to go find about that

12  yourself, would you go talk to Detective Vasquez or Joe

13  Labeau, or who would you -- would be the best person for me

14  to go talk to about it?

15      A       I don't know.  I would think that one of those

16  two would maybe have more information on that.

17      Q       And is it your understanding that the Detective

18  Vasquez, was he one of -- what was his rank?  How did he fit

19  in in comparison to Detective Moore?

20      A       He was a captain, I believe.  And then

21  detective is, you know, basically -- I'm not quite sure what

22  rank they hold at that point, but a detective is not really,

23  you know, out on the patrol, but it's, I believe, a

24  promotion into a detective unit.

25              But then they're under either a captain or

1    under one of the lieutenants, depending on the structure of

2    the organization.

3         Q    And I think it's fair to say, when you were

4    describing this a moment ago, that you may not have an exact

5    recollection, but there's something, sounds like in the back

6    of your mind, that maybe the gun used in the earlier

7    shooting had been sold to Detective Moore by Detective

8    Vasquez?

9         A    I can't recall if we had talked about it in the

10   meetings with Tom, but it seemed to me it had come up, only

11   that it had been a privately-held gun by Detective Vasquez

12   that he had sold to Moore, you know, because they had had

13   the hobby or so, but it wasn't anything involved in the

14   police department.

15        Q    Just that these two police detectives had

16   traded it among themselves?

17        A    Apparently.  That's what I was told.

18        Q    And as to how Detective Vasquez came into

19   possession of the gun, do you know one way or the other?

20        A    No.  That I don't know.

21        Q    And when I asked you if it was -- if that gun

22   involved in the Rio Hondo shooting had been brought in by a

23   public citizen originally, you just don't know one way or

24   the other?

25        A    No, that one I don't know.

Wierzbicki & Stephenson Court Reporting Service

1      Q     You indicate in paragraph 3 in the report that

2  the city representatives undertook, is that "an immediate

3  and thorough reinvestigation of this HPD weapons

4  handling" -- I can't read my copy.

5      A     Okay.

6      Q     I'm still on the front page of Exhibit 1.

7      MR. LOCKHART:  Here.  I've got another copy.

8      Q     This is much better.  "City representatives

9  undertook an immediate and thorough investigation of this

10  HPD weapons handling issue," is that what you indicate?

11      A     Yes.

12      Q     Which city representatives are you referring to

13  there?

14      A     I'm talking about Joe Labeau.

15      Q     Okay.  And "immediate," I think you told us a

16  moment ago it began literally days after the event?

17      A     Right.

18      Q     And I think that's what it says in the --

19      A     Right.  And then Jim had also, you know, taken

20  it upon himself to look at circumstances, I think, right

21  after, and then Joe -- and in the meantime we were having

22  discussions with Atty. Lockhart.

23      Q     And "thorough investigation of this HPD

24  weapons handling issue," what issue is it that you're

25  referring to there?

1      A    Well, just the weapon itself, that's what I

2  mean.

3      Q    Well, are you referring to how the weapon came

4  into the possession of R.D. Moore and then eventually into

5  the hands of Ernest Moore?

6      A    No.  I think it's just, how did we get this,

7  how did it come to the city, where did it go from there,

8  how -- reviewing policies, that type of thing.

9      Q    And then you indicate that "In regards to this

10  incident, this report provides management findings and

11  recommendations in two major areas:"

12         And those are, number one, the review of the

13  July 7th shooting, and number two, the City Management's

14  Police Department review, is that right?

15      A    Yes.

16      Q    And then the rest of the report is broken out

17  into a discussion of those two areas, with a recommendation

18  on the last page?

19      A    Right.

20      Q    And the first part of the report is the review

21  of the July 7th shooting; is that right?

22      A    Yes.

23      Q    And that appears on page 2 of your report?

24      A    Yes.

25      Q    Now, in this review of the July 7th shooting,

1   there's really not a great deal of discussion as to what

2   happened in Rio Hondo earlier in the morning or what

3   happened at San Benito that morning either, is there?

4        A    That's correct.

5        Q    Now, are you aware, as city manager, as to what

6   was done as far as the investigation of the Rio Hondo

7   shooting?

8        A    No, I don't recall anything.

9        Q    I take it you would have had opportunity to

10  review things like reports from deputy sheriffs and that

11  kind of thing about that shooting?

12       A    I did not pursue that.  What I asked our chief

13  to do was to take a look at this, and then I asked Joe

14  Labeau to go in and to take a closer look at things.

15       Q    Let me ask you about one thing just because, if

16  for no other reason than it's just curious to me, there's a

17  report by a deputy sheriff, who at one point thinks he is

18  following Ernest Moore's vehicle out near R.D. Moore's home.

19            And in the report he indicates that he sees the

20  silhouette of three persons in the pickup.

21            Have you ever come to any understanding as to

22  who, if there were, the other two people in Ernest Moore's

23  pickup would have been after the Rio Hondo shooting and

24  before the San Benito shooting?

25       A    No, I didn't look at anything like that, no

1    information.

2         Q    Are you aware of any discussion that you would

3    have had with Mr. Labeau or Detective Scheopner or even R.D.

4    Moore about who the other two people in the pickup might

5    have been?

6         A    No, I don't recall anything being discussed

7    there.

8         Q    Did you ever talk with the deputy sheriffs or

9    any people from the county about how many people were

10   involved in the earlier shooting in Rio Hondo?

11        A    No.

12        Q    Have you ever talked to R.D. Moore about what

13   happened that morning there at his home and the events in

14   which the border patrol agents were killed?

15        A    No, not one-on-one.  I believe there were some

16   meetings that took place with counsel, but no.

17        Q    Well, I don't mean to ask you about what you've

18   been told by counsel or anything like that.  But what I'm

19   getting to is, have you ever had a discussion with R.D.

20   Moore where he indicated to you that he talked to his son

21   before the shooting that morning or he seen his son before

22   the shooting that morning?

23        A    No.  Outside of our meetings, no, I did not

24   have a one-on-one discussion with him.

25        Q    Do you know whether or not Mr. Labeau had the

opportunity to interview R.D. Moore?

A I'm not sure. He may have. You'd have to ask him, but I don't -- I don't recall that.

Q Do you know whether or not Mr. Labeau made any investigation as to who, if anybody, was in the pickup that morning with Ernest Moore after the Rio Hondo shooting and before the San Benito shooting?

A Again, I don't think he looked at that, no.

Q Okay. You indicate, in the review of the July 7th shooting here in Exhibit No. 1, that in the days following the shooting the chief of police communicated to the assistant city manager and the city manager that Detective Moore was in possession of the weapon in order to respond to tactical situations to fulfill assigned sharp-shooter responsibilities. Do you see that sentence?

A Yes.

Q Now, eventually did you come to the understanding that in fact no team had been created to respond to such tactical situations requiring sharp-shooter responsibilities?

A I did. I came to that awareness during the review at some point in time. I don't recall when.

Q Do you feel like, in your report that we've marked as Exhibit No. 1, that you've accurately reported what the chief of police told you or communicated to you?

ClibPDF - www.fastio.com

1      A     Yes.  Yes, he did communicate what I've written

2    here, but it was Moore's practice to transport the weapon

3    daily to and from work and secure it.  I thought it was

4    being secured in the vehicle.  But you know, carried in,

5    carried out, I don't know.

6          He told us he was taking it home.  That was

7    definite during -- you know, during the days following.

8      Q     But as to whether or not the gun had been

9    assigned to Detective Moore pursuant to sharp-shooter

10   duties, you eventually came to the understanding that he

11   didn't have any sharp-shooter duties, didn't you?

12     A     Well, I believe the way Chief Scheopner

13   explained it to me was that it was given to him in the event

14   it was needed, but you know, and that if a situation arose

15   in the middle of night or a situation arose at some point in

16   time, he would be able to access it and use it if a

17   situation called for it.

18         And that's how he explained it to us; that he

19   had given him permission to take it and use it if need be in

20   a crisis situation.

21     Q     And what Chief Scheopner led you to believe was

22   that Detective Moore brought the gun back and forth to work

23   each day?

24     A     Yes.  That's how he explained it initially to

25   me, yes.

1    Q    And then when he got home Detective Moore was

2  expected to secure the weapon?

3    A    He didn't go into that.  He just basically said

4  it was allowed to be taken daily to and from work, and you

5  know, I assume he carried it in his vehicle or truck or what

6  have you and took -- just took responsibility for it outside

7  the department.

8    Q    Now, then you indicate that police -- the

9  police chief's review of the incident stated -- let me,

10  first of all, ask you before we talk about the statements,

11  what your understanding is as to the investigation performed

12  by the police chief.

13    A    That he had basically said that the only person

14  responsible for the situation was the assailant.

15    Q    No.  I mean -- I'm interrupting you.  I

16  apologize, but did he talk to anybody other than R.D. Moore,

17  or what do you know on that?

18    A    Well, all I know is that he would have talked

19  to people in the department, you know.  The details of who

20  he talked to beyond that, I don't -- I don't know that.

21    Q    Did he indicate to you, in his review of the

22  incident, who all he thought was involved in the Rio Hondo

23  shooting?

24    A    No, he didn't go into that, I think.

25    Q    Do you know if any other charges were ever

1  brought against anyone other than Ernest Moore relative to

2  the Rio Hondo shooting earlier that morning?

3          A    I don't have any knowledge of that.

4          Q    As to the events of San Benito in which the

5  border patrol agents were killed, did the police chief

6  indicate to you, in his review of the incident, when he

7  first had information that R.D. Moore's son, Ernest Moore,

8  was involved in the Rio Hondo shooting?

9          A    Could you rephrase that?

10         Q    I've got lots of Moores, and I've got lots of

11  shootings.  What I'm trying to get to is, did the police

12  chief, in his review of the incident that he made to you so

13  that you could prepare Exhibit No. 1, did he tell you when

14  he first learned that Ernest Moore was involved in the Rio

15  Hondo shooting?

16         A    No, I don't think there was a mention of that.

17  I think he looked at his department.

18         Q    What I'm really getting to is time specific.

19  I mean, did he tell you, I knew as of 6:06 or 6:01 or

20  whatever time?

21         A    No.  No.

22         Q    And so you don't really know one way or the

23  other what time the police chief knew about the fact that

24  Detective Moore's son was involved in this earlier shooting

25  in Rio Hondo?

1    A    No, I really don't know the details.

2    Q    And as to when the police chief knew that

3 Ernest Moore had returned to his father's house where this

4 AR-15 was supposedly secured, did you and the police chief

5 have any discussion as to when he became aware that Ernest

6 had returned to his father's house?

7    A    No.

8    Q    They don't call you until after both events had

9 taken place?

10   A    I believe that he called after, I believe the

11 San Benito because I asked him, "Are you in the City of

12 Harlingen?"

13        He said, no, we're outside in the San Benito

14 area or outside in an unincorporated area or county area or

15 something.

16   Q    And that would have been important to you

17 because of the zone of the jurisdiction and what other law

18 enforcement agencies would have been involved?

19   A    That's correct.

20   Q    So, that would have stuck in your mind as to,

21 okay, where are you, who all is going to be out there, that

22 kind of thing; is that right?

23   A    That's correct.

24   Q    You indicated in this Exhibit No. 1 that the

25 police chief's review of the incident stated that several

Wierzbicki & Stephenson Court Reporting Service

1  agencies had reviewed the shooting; right?

2       A    Yes.

3       Q    Do you understand now that may have involved

4  the Texas Rangers, the FBI even, various law enforcement

5  entities?

6       A    I seem to recall the Texas Rangers being

7  involved.  And I don't know if the county was involved,

8  but I seem to recall that he had discussed that, several

9  agencies.

10      Q    But you personally had not reviewed any of the

11 reports or findings of these other agencies?

12      A    No.

13      Q    You know, they took statements from different

14 folks and that kind of thing.

15           Did you ever have to sit down and read all the

16 statements of the various people that were interviewed by

17 the different law enforcement agencies?

18      A    I don't recall being knowledgeable about their

19 investigations, no.

20      Q    The Police Chief Scheopner's review of the

21 incident stated that the only person responsible for this

22 tragedy was the assailant, Ernest Moore, is that right?

23      A    That was his statement, yes.

24      Q    And he indicated that no departmental

25 violations had occurred; is that right?

1    A    He did state that.

2    Q    But as city manager your job is to take in this

3    information, incorporate it into your own thought process

4    and then analyze whether or not further investigation is

5    needed; is that right?

6    A    That's correct.

7    Q    And in fact, the way you've set out your report

8    here, as we look at the second of this four-page document,

9    is that you have a "Background" section under "Review of the

10   July 7th shooting," and then you have "Management Inquiry"

11   as the second section; is that right?

12   A    That's right.

13   Q    And it's fair to interpret that what you're

14   doing here is, you're talking to the police chief and then

15   you're following up to see if what he's told you is

16   accurate; is that right?

17   A    That's right.

18   Q    And rather than just taking it at face value

19   that the only person responsible for this tragedy was the

20   assailant and that no departmental violations had occurred,

21   you set about to make your own inquiry to determine if that

22   was true; is that right?

23   A    Correct.

24   Q    And what you did is, you set up an

25   administrative review that had the following areas of

1    concern, reports and information surrounding the incident,

2    policies, procedures and practices and application of

3    management practices; is that right?

4         A    Correct.

5         Q    And let me get you to translate for me

6    somewhat.  What does "Reports and information surrounding

7    the incident" refer to when you say that you've set up an

8    administrative review to identify those areas of concern?

9         A    I think it was just what was -- what was the

10   situation going on with R.D. Moore?  Was the gun actually

11   assigned to him?  How was it assigned?  Who was

12   responsible?  That is probably what I looked at.

13        Q    What do you mean by "Policies, procedures and

14   practices"?

15        A    What are the internal procedures the department

16   would call for in a situation such as take home weapons,

17   just like take home vehicles?  What do the policies of the

18   department say are required?

19        Q    And what do you mean by "Application of

20   management practices"?

21        A    I think just keeping up to date on what is

22   required for individuals who do take that home.  As a

23   manager, what was -- what was the responsibility of the

24   management head, the police chief, of safeguard, of review,

25   of training, just the whole management responsibility of

1    that kind of -- those kind of matters.

2         Q    Well, as of November 4th, 1998, the date of

3    your report that we've marked as Exhibit No. 1, what

4    policies, procedures and practices did your administrative

5    review identify as the areas of concern?

6         A    I think we looked at the internal department

7    policies that were promulgated in the department.  This is

8    how we operate, in other words.

9              I remember that we may have gotten the -- there

10   was another set that I think was TCLSE, you know, those type

11   of documents.  I think maybe we got some documents that said

12   what they require for departments because they were licensed

13   through TCLSE.  It seemed to me I recall those two in

14   particular.

15        Q    Now, TCLSE is an acronym?

16        A    Texas Law Enforcement -- Texas Commission on

17   Law Enforcement, I believe is what it stands for.

18        Q    And it set standards also for assigning weapons

19   and that type of thing?

20        A    I believe so, yes.

21        Q    So, you were looking at what were the existing

22   internal standards there at the department for the

23   assignment of weapons; right?

24        A    Right.

25        Q    And you were looking at what other law

Wierzbicki & Stephenson Court Reporting Service

1   enforcement entities suggest as the proper guidelines for

2   the assignment of weapons; is that right?

3        A    Well, I looked at TCLSE, but it was to review

4   their guidelines and their criteria for weapons, if you

5   will, and weapons training.

6        Q    And the reason you looked at TCLSE was because

7   you knew that to be an accepted standard for such things,

8   the assignment of weapons, that type of thing?

9        A    Yes.

10       Q    And you used the internal policies that were

11  in place, as well as these TCLSE standards, in coming to a

12  review of the policies and procedures that were in place and

13  that should be in place at the City of Harlingen; is that

14  right?

15       A    That's right.

16       Q    Okay.  And then in the second part of your

17  report, it comes under the heading City Management's Police

18  Department Review; is that right?

19       A    Yes.

20       Q    And so what you're doing then is, you've looked

21  at the standards and then you're comparing whether or not

22  the police department, in this instance, has complied with

23  what you would assume to be the accepted procedures and

24  policies for the assignment of weapons and that type of

25  thing?

1        A        Correct.

2        Q        You, again, have a background statement and

3   then a management inquiry; is that right?

4        A        Yes.

5        Q        And the background statement is kind of like

6   what you've been told.  And the management inquiry is the

7   investigation that you're focusing on as a result of what

8   you've been told; is that right?

9        A        Correct.

10       Q        In this instance under "Background," what you

11  indicate here is, "The assistant city manager," that's Joe

12  Labeau, "inspected the department evidence rooms, weapons

13  and lockers in late July.  Copies of policies and procedures

14  were requested and reviewed by the city manager.  Some

15  activities were without written policies or procedures,

16  thus not providing the benefit of written administrative

17  guidelines for the department," is that right?

18       A        That's right.

19       Q        Now, what I'm understanding here is that the

20  assistant city manager went over and had to go through the

21  evidence room, look at the weapons and that type of thing;

22  is that right?

23       A        That's correct.

24       Q        And then you personally reviewed existing

25  policies and procedures, like you just told me about, is

Wierzbicki & Stephenson Court Reporting Service

1    that right?

2         A     Yes.

3         Q     There were some activities that did not have

4    written policies or procedures.  What are you referring to

5    there?

6         A     I believe that in anything regarding the

7    disposal, as I say there, theirs wasn't -- my understanding

8    and recollection is there was no guidelines written for how

9    often it's done or how they're -- how frequently they are,

10   you know, stock piled and then, you know, disposed of.

11   I just don't recall seeing anything on that.

12        Q     Okay.  And you make three bulletin points there

13   about your -- about observations.  The second and third deal

14   with storage of guns that are taken in.

15              The first refers to "An inspection of

16   departmental records produced a handwritten inventory of

17   records, but did not reveal Moore's sign-out of the weapon."

18   What do you mean by that statement?

19        A     If I recall, I remember seeing the inventory,

20   but not seeing, you know, a place where Moore would have

21   signed out; this is -- I've taken this home as of this date

22   per -- with the supervisor's initials or what have you.

23   That's what I referred to there.

24              So, when I looked at the information, I didn't

25   see anything involving R.D. Moore.

1    Q    All right.  Did that appear to you to be not

2  with keeping the -- let me rephrase that.

3         Did the failure to have a sign-out for the

4  AR-15 to R.D. Moore appear to you to be a departure from the

5  city police department's own standards for the assignment of

6  weapons?

7    A    Yes.

8    Q    Did it appear to you to be a departure from the

9  suggested guidelines put out by TCLSE?

10   A    I did not really refer to TCLSE then.  I was

11 referring to the internal department review that said

12 there had to be a written memorandum with the chief's

13 authorization, is how I remember it, for any kind of

14 sign-outs.

15   Q    And in this instance you couldn't locate such a

16 written memorandum?

17   A    That's correct.

18   Q    And so that looked like, to you, it was a

19 departure from the internal standards there at the police

20 department?

21   A    That's correct.

22   Q    And as to whether or not those standards were

23 based on TCLSE, is that what it looked like to you?

24   A    You know, it looked to me like these were

25 department policies that, you know, covered everything from,

1   you know -- they were, you know, just discussing how they

2   operate, just various chapters, if you will.

3           And when you looked at, you know, the part

4   relating to any kind of weapons, et cetera, it seemed to

5   me that they were comprehensive, almost like personnel

6   policies, if you will, for the department.

7       Q    And after the assistant city manager, Joe

8   Labeau's inspection of the evidence rooms and weapons and

9   your own review of the written policies and procedures,

10  management, that's you I guess, came to certain preliminary

11  findings that revealed, quoting, "Serious concerns and

12  questions regarding the adequacy of records, weapon handling

13  policies, inventory and disposition controls and management

14  practices," is that right?

15      A    Yes.

16      Q    Okay.  Now, when you say, "Serious concerns

17  and questions," you're referring to the failure of the

18  department to have made written memorization --

19  memorialization of the assignment of the AR-15 to

20  Detective Moore; is that right?

21      A    Correct.

22      Q    And you refer there to "Records, weapon

23  handling policies, inventory and disposition control and

24  management practices," but specifically you're discussing

25  how this AR-15 got into the hands of Detective Moore without

1    being the subject of a written chain of custody kept there

2    at police department; is that right?

3        A    What I was referring to is that I had not seen

4    Moore's sign-out of the weapon, and so that caused me to

5    just say, okay, if Moore hasn't signed out for the weapon,

6    why, why not, you know, where are the checks here or reviews

7    from time to time.  So, it caused me to question it, yes.

8        Q    You go on to say, "Because of management's

9    concern, documentation for HPD Weapons need to be reviewed,

10   particularly in the areas of receipt, handling,

11   inventorying, storage, disposition, assignment and

12   training," is that right?

13       A    Correct.

14       Q    Okay.  Now, what was it about the disposition

15   of weapons that had caused you concern?

16       A    Well, I think it's because we, number one, I

17   didn't see Moore's sign-out on the weapon.

18            I also, you know, just didn't feel that we had

19   kept a sophisticated, you know, type of logging mechanism in

20   place.  I think there was the written, but yet I found --

21   didn't find any relationship there to Moore, and so it just

22   caused me to question the whole thing, well, how are things

23   working here and what can be done better.

24       Q    You also referred to "assignment and

25   training."  Is that assignment of weapons to individuals?

Case 1:98-cv-00162   Document 106   Filed in TXSD on 07/10/2001   Page 398 of 550

1      A      I think, yes, assignment of the weapons.

2      Q      And are you talking about training of

3  individuals in the use of the weapons assigned to them?

4      A      I think, yes.  The qualifying criteria, yes.

5      Q      So, after you had reviewed the rules and

6  Mr. Labeau had reviewed the department, you had serious

7  concerns and questions regarding how this weapon had been

8  permitted to be taken home by Mr. Moore; is that fair to

9  say?

10     A      To be taken home, no.  I think it was just

11 internally in the department.  My concerns were, how are you

12 handling the documentation of this because it's -- it's not

13 unusual for individuals to take things home, but how do we

14 get there?  What is our -- where are the guidelines?

15 Where's our chain of custody, et cetera?  What documentation

16 do we have that shows we've taken responsibility?

17     Q      Well, you didn't come across any written

18 document that showed that he should have the weapon, that

19 R.D. Moore should have the weapon; correct?

20     A      Should have the weapon?

21     Q      Right.  I mean, a written document saying,

22 "This weapon will be in the possession of R.D. Moore"?

23     A      No, I did not.

24     Q      You didn't come across a written document that

25 said he would be storing it in a particular place in his

Wierzbicki & Stephenson Court Reporting Service

1    home or auto?

2         A    No.

3         Q    You didn't come across a particular document

4    that discussed whether or not the weapon should have been

5    disposed of rather than assigned to a police officer?

6         A    No, I did not.  I came across the receipt, it

7    seemed like.  And then I saw that, you know, it had been

8    turned into the department.

9         Q    And then, of course, there was no written

10   document discussing or evidencing the fact that R.D. Moore

11   had been trained in the use of the weapon; is that right?

12        A    That's correct.

13        Q    And after making this management inquiry, your

14   report leads to, I guess, three conclusions there on page 4

15   of the report?

16        A    That's right.

17        Q    And when you refer there, on page 4 in

18   conclusion, to the word "management," I take it that's you;

19   is that right?

20        A    That's correct.

21        Q    You indicate in the first point that

22   "Management has concerns whether departmental policies,

23   procedures and practices are in conformance with

24   professional 'best practices,'" is that right?

25        A    Yes.


                   Wierzbicki & Stephenson Court Reporting Service

1    Q    What do you mean by "best practices" in that
2  instance?
3    A    Well, I had concerns, are we handling our
4  weapons issues or handling like other departments do it,
5  you know.  I think I had questions there of how are they
6  checked out in other areas or other cities, if you will, in
7  their departments, what kind of mechanism did they have in
8  place, what kind of criteria do they have in place.  So, I
9  questioned the whole thing.
10   Q    And when you're talking about what other cities
11 do, I guess you'd be referring to what -- you're trying to
12 figure out in your own mind what does a reasonable and
13 prudent police department do with regard to the assignment
14 of its weapons and the training and the use of its weapons?
15   A    Yes.
16   Q    And you had concern, at least as of November
17 4th, 1998, that perhaps Harlingen wasn't doing what other
18 cities were doing in that regard; is that right?
19   A    Well, at that point I really didn't know were
20 they doing as much as others do, or were they doing less or
21 were they doing more.  I don't know.
22   Q    But that's what you were setting out to find
23 out is, make a comparison as to whether or not Harlingen was
24 doing what other cities ordinarily do in their usual course
25 of handling their weapons?

Wierzbicki & Stephenson Court Reporting Service

1    A    That's true.

2    Q    In an effort to determine that, you felt like

3 it was necessary to retain somebody specialized in the area

4 to assist you in making this inquiry about what's the

5 ordinary city doing with regard to the usual course of its

6 handling of weapons; is that right?

7    A    Yes.

8    Q    And you indicate there that "Finally, because

9 of the highly specialized nature of law enforcement,

10 management concludes that -- concludes the need for

11 expert assistance in evaluating and reviewing the above,"

12 is that right?

13    A    Yes.

14    Q    And you recommend that the department -- that

15 the department practices should be brought to the level of

16 best practices in law enforcement; is that right?

17    A    Correct.

18    Q    And that you recommended using an independent

19 expert professional with a background in law enforcement and

20 police operations in order to achieve best practices; is

21 that right?

22    A    Correct.

23    Q    And you would charge that individual with

24 review of the incident, review of the inquiry made thus far,

25 recommending any steps that might be necessary to

1    standardize department policies and procedures and then

2    complete the task in a timely fashion; is that right?

3        A    Yes.

4        Q    Now, in fact, what you're suggesting there in

5    that recommendation is that somebody like Mr. Robinson be

6    retained to comply with these recommendations; is that

7    right?

8        A    I think to come in and do the review, yes,

9    and to provide advice, yes.

10       Q    And the advice was pertinent to this review of

11   what happened in the San Benito shooting where the border

12   patrol agents were killed; right?

13       A    Yes, he reviewed that.

14       Q    And that's what you mean by "Review of the

15   initial incident"?

16       A    Yes.

17       Q    You also would have wanted somebody in

18   Mr. Robinson's role to review what steps had been done up

19   to November 4th, '98, in the investigation of the events?

20       A    Say that again.

21       Q    You suggest here that this individual will be

22   charged with a "Review" -- I'm inserting the word "of the

23   inquiry thus far and to make any further necessary inquiry."

24           I guess what you're asking is that whoever is

25   retained, that he be asked to make sure that you and

1   Mr. Labeau have done the appropriate investigation so

2   far?

3       A     For full information, yes.

4       Q     Yeah.  And then to recommend any steps which

5   would be necessary to standardize department policies and

6   procedures; is that right?

7       A     Yes.

8       Q     And then do it timely; is that right?

9       A     Yes.

10      Q     Was anybody, other than Mr. Robinson, ever

11  employed to accomplish these recommendations?

12      A     No.  No.  Mr. Robinson, and that was it.

13      Q     And I don't see any discussion under

14  "Recommendation" that Mr. Robinson be retained or any other

15  person be retained in an effort to provide information

16  pursuant to the anticipated litigation that you had been

17  given notice of over the course of that summer back in

18  1998.

19             Do you see any mention of that here in

20  Exhibit No. 1?

21      A     No.  We didn't discuss the litigation in this.

22  It wouldn't have been appropriate with the report.

23      Q     Isn't it fair to say, Ms. Prim, that you wanted

24  the policies and procedures there at the Harlingen Police

25  Department brought up to best practices whether or not any

1  lawsuits were ever filed?

2      A     Well, the incident is what brought it all

3  about.  The department was managed by the assistant city

4  manager and there had been, you know, certainly some, you

5  know, issues from time to time that I felt that we had

6  already -- we had a crisis on our hands.  We had the public

7  wanting to know.  We had the press calling us every day.

8           We had -- the lawsuits, I think, happened

9  within the first couple of months right after the incident

10 occurred.  So, you know, we just had a real crisis on our

11 hands and we had to respond, and I felt like -- I really

12 felt like I'm not qualified to get to the bottom of this and

13 know all these agencies and understand how to walk through

14 an investigation, and I felt that that's why we needed to

15 have expert advice, and I wanted to know the truth.

16     Q     Well, you're doing better than I would have

17 done because I can't remember what TCLSE stands for, but

18 the point is that based on the fact that you're the city

19 administrator as opposed to the city police department

20 chief, I guess you may have concerns as to whether or not

21 the police department was adhering to best practices, but as

22 to what is the appropriate practice, what do other cities do

23 under the same or similar circumstances, you really didn't

24 know one way or the other?

25     A     I didn't really know much in terms of detailed

1    police operations.

2         Q    You're more trained in it than the average

3    person on the street, obviously, because you're involved in

4    the day-to-day oversight of the police department, but what

5    you felt like was that it was necessary for you to have some

6    input from a professional trained in that area to review

7    what are the standards for police procedures in this context

8    and how do they relate to what was actually being done in

9    Harlingen?

10        A    Run that by my again.

11        Q    You felt like you needed professional expertise

12   in the area of deciding what are the standards for police

13   procedures in this area and whether or not Harlingen was

14   complying with those standards or needed improvement?

15        A    Yes.

16        Q    And really that didn't relate to whether or

17   not the city was going to be sued or wasn't going to be

18   sued.  You wanted the practices themselves to be brought

19   up to best practices if they were deficient or at least to

20   satisfy yourself that the practices were as good as they

21   could be?

22        A    I wanted to know, yes, from an expert.

23        Q    And after some review, you fell upon

24   Mr. Robinson as that person; is that right?

25        A    Yes.

Wierzbicki & Stephenson Court Reporting Service

1      Q      He was in Texas at the time?

2      A      Yes.

3      Q      He had the right background, it looked like,

4  for the job?

5      A      Yes.

6      Q      And he eventually agreed to make the review;

7  is that right?

8      A      Yes.

9      Q      Did he in fact review, without telling me

10  exactly what he said or anything like that, did he review

11  the initial incident?

12      A      Yes.

13      Q      Did he review the inquiry that you and

14  Mr. Labeau had made up to November 4th of 1998?

15      A      I believe he had whatever we had in our files

16  at his disposal, yes, but he basically took it on for a

17  month or whatever time period it was to apprise us.

18      Q      And was part of his assignment to recommend

19  any steps which might be necessary to standardize department

20  policies and procedures when compared to other city police

21  departments?

22      A      I believe we asked him to look at the incident

23  and then, you know, give us some feedback and some advice,

24  yes.

25            MR. LOCKHART:  How we doing on time, Price?

1        MR. AINSWORTH:  Not bad.  Give me about

2    20 more minutes.

3        MR. LOCKHART:  I'm not doing any talking.

4    Would you like to take a break or get something to

5    drink?

6        THE WITNESS:  No.  If you think you just need

7    20 minutes, that's fine.

8        MR. LOCKHART:  Like I say, I'm fine, but I'm

9    not doing the talking.  I can listen without a lot of

10   effort, you know.  It doesn't make me thirsty.

11       THE WITNESS:  I'm fine.

12  BY MR. AINSWORTH:

13       Q    Eventually were rules put in place that would

14  require written assignment of weapons to -- of each weapon

15  to police department personnel?

16       A    Yes.  I don't have factual knowledge of that,

17  but the chief that came after Jim did do a complete review

18  of the department and put out directives and a policy

19  procedure manual that was very voluminous, very detailed,

20  and that came -- probably came about a year later.

21       Q    What would have been the chain of command

22  regarding a manual like that?  Does he just draft it and

23  say this is the manual, or does he have to have the city

24  manager's approval, or how does that work?

25       A    Well, I'm trying to think.  He would have had

1    to, you know, bring it to me and seek approval from that --

2    from that -- from my office.

3              Yes, he did -- Chief Rodriguez, when he

4    reviewed it --

5         Q    Yes, ma'am.

6         A    -- brought it to my office.

7         Q    And he hands you a manual.  How do you look at

8    it and decide, well, this is the best manual I've ever seen

9    or it's not good enough, or what do you compare it with?

10        A    Well, I looked at -- when I got it I looked

11   at the level of detail.  I looked at, you know, the

12   comprehensive notes.  I looked at matters that said,

13   you know, it really was part of personnel policies, you

14   know.  You cannot get away from your personnel policy.

15   That is really the city's -- the highest level of authority,

16   if you will, in terms of personnel management, but it was

17   referenced.

18             So, you know, I looked at those kind of issues

19   to be sure that the personnel policies were referenced and

20   made a part of that, but that's generally how it worked.

21        Q    And regarding the assignment and storage of

22   weapons, did the manual that Chief Rodriguez supplied you

23   differ from what the previous standards had been at the

24   police department?

25        A    I can't tell you the details now.  It's just

1  been too long.  But I do recall a lot of detail and a lot

2  of volume, and you know, very specific type of advice and

3  that he went to that effort.

4       Q     Was the manual adopted as an appropriate

5  statement of policy and procedures for the Harlingen Police

6  Department?

7       A     Subsequently, yes.

8       Q     And did it address the assignment and storage

9  of weapons?

10      A     I believe so.  But again, I would tell you

11  you'd have to --

12      Q     If I wanted to compare what the manual under

13  Chief Rodriguez said as compared to the manual under Chief

14  Scheopner said, was there a manual under Chief Scheopner

15  that discussed the assignment and storage of weapons?

16      A     I believe, yes.  Yes.

17      Q     And did the two manuals differ as to the

18  assignment and storage of weapons as to procedure or policy?

19      A     Well, you know, I can't recall the details, but

20  each one covered the general area.

21            But Chief Scheopner, I looked at those in great

22  detail.  When they came under Chief Rodriguez, it was about

23  a year -- more than a year or so later that we got them, and

24  then, you know, I looked at various points in it.

25      Q     Were there big changes that you recall in that

Wierzbicki & Stephenson Court Reporting Service

1    area?  I don't mean everything else.

2         A    I can't tell you that.  You'd have to have the

3    police tell you that.

4         Q    There are these different folks that are

5    identified by witnesses and by different parties in this

6    case.  Let me just ask you about a couple of them now.

7              Have you talked to Mr. Labeau any time recently

8    about this case?

9         A    No.

10        Q    Do you recall when the last time, generally

11   speaking, would have been that you talked to Mr. Labeau

12   about the events of July 7th, 1998?

13        A    Probably -- probably close to two years ago.

14   You know, he left the city, and then we kept in touch, but

15   it wasn't about this.  It was occasionally, "How are you

16   doing" type of thing.

17        Q    Yes, ma'am.  Do you know where he went after he

18   left the city?

19        A    He became city manager of Midlothian.

20        Q    And since that time you've not talked to him

21   about the lawsuits or anything like that?

22        A    No, not about this lawsuit.  No.

23        Q    There's a fellow named Arnold Rodriguez that

24   was a human resources director back in 1996?

25        A    Yes.

Wierzbicki & Stephenson Court Reporting Service

1    Q    Do you recall Mr. Rodriguez?

2    A    Yes.

3    Q    It's my understanding that eventually

4 Mr. Rodriguez was let go also; is that right?

5         MR. LOCKHART:  Now, you said "also."

6         MR. AINSWORTH:  I'm sorry.

7         MR. LOCKHART:  Who else were you referring to?

8         MR. AINSWORTH:  That's a bad question.

9 BY MR. AINSWORTH:

10   Q    Mr. Rodriguez was let go, period, end of

11 sentence.

12   A    He was terminated from the city in 1999, I

13 believe.

14   Q    Do you recall what were the reasons for his

15 termination, Arnold Rodriguez?

16   A    Well, you know, there is pending litigation.

17 I'm not sure how to respond to that.

18   Q    Can you give me the subject area or something

19 like that?  I don't need the particulars.

20   A    I just didn't trust him.  It had been a

21 deteriorating relationship for a long time.

22   Q    Had he been critical of the police department's

23 procedures and practices up to that point in time, the time

24 of his termination?

25   A    He had been critical of everything.

Wierzbicki & Stephenson Court Reporting Service

1     Q    Okay.

2     A    I don't mean to say that flippantly.  We just

3 didn't get along.

4     Q    Okay.  I saw some memo about, "Bring all the

5 materials back" or "Don't have any materials at your home"

6 or something like that.

7          Was there -- was there some problem with Arnold

8 Rodriguez, as far as you can recollect, retaining city

9 documents or something like that?

10    A    Yes, there was.  He had a number of documents

11 at home, and I had to -- it was maybe two months before he

12 left, and I had to order them back and order them back in by

13 five o'clock.

14          And he brought in four huge boxes of, you know,

15 just paper that I, you know, can tell you was, just seemed

16 to me, thousands of pages, but it was quite substantial.

17 He had been taking documents home for a while.  We couldn't

18 fill in open records requests.

19          And when he brought it back I realized all he

20 had been taking home over a period of time.

21    Q    Were these documents about -- about police

22 department procedures, or what area of city management would

23 they have been concerning?

24    A    It was human resources material, for the most

25 part.  He was our human resources director and so he just

1    was taking things home that I thought -- there was some

2    confidential records there, but it was mostly work papers,

3    and you know, files and things that really should have been

4    in the office.

5         Q    Do you recollect, prior to the July 7th, 1998,

6    shooting, Mr. Rodriguez being critical of policies and

7    procedures, in the police department in particular, and

8    relative to the assignment of weapons?

9         A    No.  No.

10        Q    That really wouldn't have been the area of --

11        A    No.

12        Q    -- that he was assigned?

13        A    He was personnel director, human resources

14   director.  So, that was his area of expertise, but not on

15   weapons and those kind of matters.

16        Q    Well, and as to whether or not he had made any

17   types of complaints about the -- about personnel procedures

18   over in the police department, did that have anything to do

19   with why he was let go or anything like that?

20        A    No.  No.

21        Q    As I understand what you've told me, it was

22   just, you're the city manager, you've got to be able to

23   get along with folks you've got in the human resource

24   department, and you and Mr. Rodriguez just had a falling

25   out, didn't really get along?

                Wierzbicki & Stephenson Court Reporting Service

1       A       Well, it was just a relationship that I don't

2   believe, the way I felt about it, it wasn't based on trust

3   and respect and confidence.  I just didn't trust him, didn't

4   trust him.

5       Q       I've asked about anything you've reviewed

6   in preparation for your deposition today.  You've not

7   reviewed today the Robinson report; is that right?

8       A       Today, no.

9       Q       When would the last time you think you would

10  have seen the Robinson report been?

11      A       Shortly after it was delivered to Mr. Lockhart

12  in late 1998 or early 1999.  It was late 1998.

13      Q       You have seen it, however?

14      A       I've seen it once.

15      Q       And had the chance to read it, I take it?

16      A       Yes.

17      Q       I know memory fades, but it would be a part of

18  the materials that you reviewed relative to the incidents of

19  July 7th, 1998, over the course of time?

20      A       Yes, I reviewed it that time.

21              MR. AINSWORTH:  You know, Tom, I sure would

22          like to read that Robinson report, so I'm going to

23          make a request of you to provide it to me,

24          understanding that you're asserting your allegation

25          of privilege at this time.

1          MR. LOCKHART:   Your request is so-noted.

2          MR. AINSWORTH:   Okay.   If I had it, I'd ask her

3     questions about it, about why, as the city manager,

4     she had Mr. Robinson do it and what the conclusions

5     were and whether or not that played any role in the

6     development of the policies and procedures at the

7     city and the changes, if any.   But you know, if I

8     don't have it I can't ask her about it.

9          So, despite our lengthy travels to this nice

10    city to take her deposition, that's all I have at

11    this time.

12         MR. LOCKHART:   We have no questions at this

13    time.

14         (Whereupon, the deposition was concluded.)

15

16

17

18

19

20

21

22

23

24

25

Wierzbicki & Stephenson Court Reporting Service

CERTIFICATE OF OATH

STATE OF FLORIDA   )

COUNTY OF ESCAMBIA)


     I, the undersigned authority, certify that

NATALIE F. PRIM, appeared personally before me and was duly

sworn.

     WITNESS my hand and official seal this 26th day of

April, 2001.

_____

Gina Hawkins, RPR



Gina Hawkins
Commission # CC 948887
Expires Aug. 8, 2004
Bonded Thru
Atlantic Bonding Co., Inc.

<u>CERTIFICATE OF REPORTER</u>

STATE OF FLORIDA   )

COUNTY OF ESCAMBIA)

     I, Gina Hawkins, Registered Professional Reporter, certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true record of the testimony given by the witness; that the witness did not waive reading and signing.

     I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in this action.


Gina Hawkins
Registered Professional Reporter

# DO NOT WRITE ON TRANSCRIPT – ENTER CHANGES HERE

**In Re: Salinas vs City of Harlington**

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 89 | 10 | "m y" — should be "m e" |
| 96 | 18 | "in" – ? delete |

Under Penalties of perjury, I declare I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.

5/21/01
Date

Natalie Prim
Deponent: Natalie Prim

1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHWESTERN DISTRICT OF TEXAS
 2                      BROWNSVILLE DIVISION

 3   ARTURO G. SALINAS, ET AL  )  CIVIL ACTION NO. B-98-162
     VS.                       )
 4   CITY OF HARLINGEN, TEXAS, )
     ET AL;                    )
 5   AND                       )
     GILBERTO M. RODRIGUEZ,    )
 6   ET AL.                    )
     VS.                       )  CIVIL ACTION NO. B-98-163
 7   CITY OF HARLINGEN, TEXAS, )
     ET AL;                    )
 8   AND                       )
     RAUL RODRIGUEZ            )
 9   VS.                       )  CIVIL ACTION NO. B-99-70
     CITY OF HARLINGEN, TEXAS, )
10   ET AL                     )

11   ------------------------------------------------------

12                      ORAL DEPOSITION OF

13                      JOSEPH D. LaBEAU

14                        MAY 15, 2001

15   ------------------------------------------------------

16       ORAL DEPOSITION of JOSEPH D. LaBEAU, produced as a

17   witness at the instance of the PLAINTIFFS ARTURO G.

18   SALINAS and GILBERTO M. RODRIGUEZ, and duly sworn, was

19   in the above-styled and numbered cause on May 15, 2001,

20   at 1:23 p.m., before CHERIE HOLLAND, CSR, in and for the

21   State of Texas, reported by machine shorthand at the

22   offices of the City Hall of Midlothian, 104 West

23   Avenue E, Midlothian, Texas, pursuant to the Federal

24   Rules of Civil Procedure and the provisions stated on

25   the record or attached hereto.
```

1                          **A P P E A R A N C E S**

2    FOR THE PLAINTIFFS ARTURO G. SALINAS and
     GILBERTO M. RODRIGUEZ
3          Price Ainsworth
           SPIVEY & AINSWORTH, P.C.
4          48 East Avenue
           Austin, Texas  78701-4320
5
     FOR THE PLAINTIFF RAUL RODRIGUEZ
6          Ramon Garcia (No appearance)
           LAW OFFICES OF RAMON GARCIA, P.C.
7          222 West University Drive
           Edinburg, Texas 78539
8
     FOR THE DEFENDANT
9          Tom A. Lockhart
           ADAMS & GRAHAM, L.L.P.
10         222 E. Van Buren Street, West Tower
           Harlingen, Texas 78551-1429
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               I N D E X

2                                                   PAGE

Appearances.................................   2

3   Stipulations................................   1

4   JOSEPH D. LaBEAU
5       Examination by MR. AINSWORTH...............   4
        Examination by MR. LOCKHART................  90

6   Changes and Signature.......................  92

7   Reporter's Certificate......................  94

8   Certificate Affidavit.......................  95

9

10              E X H I B I T S

11  NO.     DESCRIPTION                          PAGE

12  1       Report given in draft form            13

13  2       Memorandum to Jim Scheopner           13

14  3       Memorandum to Natalie Prim            19

15  4       Receipt                               32

16  5       Memorandum to Joe LaBeau              38

17  6       Statement from the City Manager       69

18  7       City Manager's Report to the City     69

19

20          REQUESTED DOCUMENTS/INFORMATION

                        NONE
21

22

23

24

25

**JOSEPH D. LaBEAU,**

having been first duly sworn, testified as follows:

**EXAMINATION**

BY MR. AINSWORTH:

13:23:00  5    Q.    Please state your name for the record, sir.

6    A.    Joseph David LaBeau.

7    Q.    And how are you currently employed, Mr. LaBeau?

8    A.    I'm the City Manager of the City of Midlothian,

9 Texas.

13:23:10  10    Q.    And we're here today at the City Hall, Town

11 Hall in Midlothian taking your deposition.  Do you

12 understand that we're taking your deposition in a case

13 that arises from a shooting incident that occurred back

14 near Harlingen, Texas, on July 7th of 1998?

13:23:26  15    A.    Yes, sir.

16    Q.    It's my understanding that back during that

17 summer you were the Assistant City Manager at Harlingen,

18 Texas; is that right?

19    A.    That's correct.

13:23:34  20    Q.    I appreciate your -- giving us some of your

21 time today, and I promise I won't be too long.  If I

22 can, let me find out a little bit about you before I

23 find out about the events of that summer back in 1998.

24    Where did you grow up, sir?

13:23:47  25    A.    In the midwest.  I was born in Chicago, and I

13:23:49  1   was reared mostly in Indiana and Ohio.  About 18, I came

2   to Texas.  The military brought me here.

3        Q.   And how did you end up in Harlingen?  Bring me

4   from age 18 up to the time you were the Assistant City

13:24:02  5   Manager.

6        A.   When I -- when I got out of the service, I went

7   to school in Stephenville, Texas.  I got a government

8   degree at the university there and then went to North

9   Texas.  I got a master's in public administration, took

13:24:15 10   a position at the City of Denton, Texas, as an

11   administrative assistant there.  I worked there about

12   three or four years.

13            From there, I went to Longview, Texas, and then

14   from Longview to College Station, and then College

13:24:27 15   Station, I got a call from Ms. Prim, and she asked me if

16   I would consider being her assistant and -- and I did,

17   so I went to Harlingen.

18        Q.   Had you met Ms. Prim previously?

19        A.   Yes, sir.  I had met her at a seminar, and I --

13:24:41 20   well, actually she'd invited me to come over to Mineral

21   Wells to where she was then City Manager -- previously

22   City Manager --

23        Q.   Yes, sir.

24        A.   -- and talk to her employees about performance

13:24:50 25   evaluations.  So I'd done kind of collegial work for

13:24:54   1   her.

2      Q.    And how long were you in Harlingen total?

3      A.    About six years.

4      Q.    And when you left -- and you were hired as

13:24:59   5   Assistant City Manager?

6      A.    Yes.

7      Q.    And what was your job title when you left?

8      A.    The same, Assistant City Manager.

9      Q.    When you left there, did you come to

13:25:09  10   Midlothian?

11      A.    Yes, sir.

12      Q.    And when you came to Midlothian, tell me what

13   your job title was.

14      A.    City Manager.

13:25:13  15      Q.    And you've held that job consistently since

16   that time?

17      A.    Yes.

18      Q.    Continuously since that time, I guess is what

19   I'm trying to say.

13:25:19  20      A.    Yes.

21      Q.    What does the City Manager in Midlothian do?

22   What's your -- is there an average day?

23      A.    Well, it's pretty chaotic.  I think there's one

24   theme here in town.  I was talking to Tom about it at --

13:25:31  25   during lunch.  And it's just growth.  We've got a lot of

| 13:25:34 | 1 | growth happening. And so we're trying hard as we can to |
| | 2 | get the infrastructure in the ground to get ahead of the |
| | 3 | growth. |
| | 4 | The development community wants to build |
| 13:25:41 | 5 | subdivisions, and we need to have water lines and sewer |
| | 6 | lines and roads and things like that in place. |
| | 7 | Q. For those that may be hearing your deposition |
| | 8 | some day, the -- as best I can tell, Midlothian is a |
| | 9 | town south of the Fort Worth/Dallas area and kind of |
| 13:25:54 | 10 | between -- the split between I-35 West and I-35 East? |
| | 11 | A. That's correct. |
| | 12 | Q. So I guess you're getting growth from south of |
| | 13 | the metroplex? |
| | 14 | A. Right. A lot -- a lot of growth is coming from |
| 13:26:05 | 15 | out -- from above us, South Dallas area. 360, Highway |
| | 16 | 360, which is a main artery going up in Dallas/Fort |
| | 17 | Worth is going to be opened up to 287, which empties out |
| | 18 | into Midlothian. And we expect that that will bring a |
| | 19 | lot -- a huge amount of growth when it happens. |
| 13:26:25 | 20 | Q. I see. I'm sure that keeps you busy? |
| | 21 | A. Well, yeah. |
| | 22 | Q. And then if we think back to what your job |
| | 23 | title would have been in Harlingen as Assistant City |
| | 24 | Manager, how were your duties different then? What did |
| 13:26:36 | 25 | you do back then? |

13:26:36   1    A.    Well, I -- just -- I would do whatever the City

2    Manager would assign me to do.  So typically, the way

3    she arranged the organization was she gave me some

4    departments to supervise and she supervised some others.

13:26:50   5    Principally, you know, there were too many individual

6    departments in that town for her to have all those

7    people reporting to her at once.

8    Q.    So you were a buffer between her and individual

9    departments?

13:27:02   10   A.    Yes, uh-huh.

11   Q.    Which particular departments can you recall

12   back in, say, July of 1998, that you had been in charge

13   of?

14   A.    Human Resources, Community Development,

13:27:13   15   Planning, Police Department, Public Works and Public

16   Services, which I think is the -- it's the Parks and

17   Recreation, I believe.

18   Q.    And how did it work in particular with regard

19   to the police department?  Did the police chief report

13:27:28   20   to you?

21   A.    Yes.

22   Q.    And then you would report to Ms. Prim, the City

23   Manager?

24   A.    Yes, that's correct.

13:27:33   25   Q.    And who was the police chief back in July

SHARP HOLLAND
METRO (817) 731-1377

13:27:35 1   of '98?

2      A.   I believe it was Jim Scheopner.

3      Q.   Now, this incident where the two border patrol

4   agents were shot and killed at a police detective's home

13:27:47 5   near Harlingen, how did you first learn of that

6   shooting?

7      A.   I'm -- I'm not exactly sure.  I'm pretty sure

8   it was through the news on television.

9      Q.   You just saw it on the 6 o'clock news or

13:28:00 10   whatever that morning?

11      A.   I think so, sir, yeah.

12      Q.   Do you remember getting a phone call from Chief

13   Scheopner at that time about the shooting?

14      A.   No, not specifically.

13:28:14 15      Q.   As the shooting was near a detective's home,

16   was that the kind of thing that you would have expected,

17   you would have eventually received a phone call from the

18   Police Chief about what he -- his investigation thus far

19   revealed, that kind of thing?

13:28:29 20      A.   Yes, I certainly would expect to be briefed by

21   it -- I mean, about it.

22      Q.   And do you recall generally when it was that

23   you were first briefed about it?

24      A.   I feel certain it was the next day.  It

13:28:37 25   happened at night, in the early morning hours, and I

13:28:41   1  feel certain it was the next day.  I can't say exactly

2  as to when.

3       Q.    All right.  And I may -- I've messed up the

4  dates in every deposition.  I apologize.  But if we use

13:28:52   5  July the 7th, that morning, as the day of the shooting,

6  the time of the shooting, do you feel like it was later

7  that afternoon --

8       A.    Yes.

9       Q.    -- or do you think it's -- on over into the

13:28:59  10  8th?

11       A.    No, I think it would have been the same day.

12  It was a regular workday as I recall.  So we'd been at

13  work, and we would have been briefed.  I would have been

14  briefed.

13:29:10  15       Q.    And did you have a meeting at your office with

16  Chief Scheopner, or did you just talk to him over the

17  phone?

18       A.    On that day, I don't recall whether we had a

19  private meeting or not.  I seem to remember something of

13:29:22  20  a briefing that occurred -- I mean, while we were in

21  another meeting, a directors type meeting is what I

22  think I remember.  It was a very short update on what

23  had happened.  Facts were still, I think, unfolding at

24  that point.

13:29:37  25       Q.    And do you recall what you were told about the

13:29:39   1   events that day?

2       A.    Just that -- that -- I remember the basic

3   story, that there had been a homicide in San Benito and

4   that the perpetrator of it was a son of one of the

13:30:00   5   police officers here -- here in Harlingen, and that also

6   that same individual had murdered two border patrol

7   agents who had tried -- somehow gotten involved in his

8   arrest.

9       Q.    Do you recall when it was that you learned that

13:30:25   10   anything about the weapons that this perpetrator, I'll

11   call him Ernest Moore, had used in either of the

12   shootings?

13       A.    Not -- as it -- at this moment, I can't

14   remember the specific date or time.  I do know that in

13:30:38   15   my reports, you know, that's one of the things that --

16   that we focused on.

17       Q.    Were you assigned to any type of task of

18   follow-up into the investigation as to what happened in

19   this shooting, by the City Manager?

13:30:53   20       A.    Not the shooting per se.  That was a criminal

21   investigation, and it wasn't within our realm of

22   responsibility.  But I was asked by the City Manager to

23   review the administrative procedures in the department

24   and make sure that everything was done appropriately and

13:31:13   25   that policies had been complied with.

13:31:16   1        Q.   Now, when you say "administrative procedures in

2   the department," you mean in the police department?

3        A.   Yes.

4        Q.   And when you say "policies had been complied

13:31:24   5   with," you're talking about the internal policies there

6   at the Harlingen Police Department?

7        A.   That's right.

8        Q.   Do you recall about when it would have been

9   that the City Manager, Ms. Prim, would have -- would

13:31:33  10   have asked you to make that type of investigation

11   relative to when the shooting occurred?

12        A.   I'd say -- it strikes me it would have been

13   within a few days or so.  Since I have a report, I could

14   probably refer to the date of that and that would be

13:31:49  15   close.

16        Q.   Okay.  And you -- you've got a stack of paper

17   there in front of you --

18        A.   Right.

19        Q.   -- that are materials that you brought with you

13:31:57  20   to the deposition today?

21        A.   Right.

22        Q.   Okay.  And you're leafing through them to find

23   this report that you would have drafted back in the

24   summer of '98?

13:32:04  25        A.   Yes, sir.

13:32:05   1         Q.    Okay.   Let's pull that one out, and we'll mark

2    it.   How about it?

3         A.    Okay.   When did you say the shooting occurred?

4         Q.    I think it was July the 7th.

13:32:17   5         A.    I've got a memorandum here to the Chief of

6    Police, dated July 15th, and this is following a

7    memorandum that he had sent me, I think, a day before.

8    So I'd say it's somewhere within -- it looks like within

9    a week --

10         Q.    Okay.

11         A.    -- we had begun an investigation.   The chief

12    had done a preliminary response in the July 14th memo.

13         Q.    Yes, sir.

14         A.    And then I -- I followed up with this

13:32:46   15    memorandum dated July 15th.

16         Q.    All right, sir.   Just so that we -- we can

17    piece together at a later time what it is we're talking

18    about.   Let's go ahead and we'll have the court reporter

19    mark the July 14th memo from Chief Scheopner to you as

13:33:02   20    Exhibit No. 1.

21               (Exhibit Nos. 1 and 2 marked.)

22         Q.    (BY MR. AINSWORTH)   Mr. LaBeau, what I've done

23    is marked as Exhibit No. 2 the July 15th memo from you

24    to Chief Scheopner.   All right, sir?

13:33:42   25         A.    Okay.

Case 1:98-cv-00162   Document 106   Filed in TXSD on 07/10/2001   Page 432 of 550

13:33:42  1     Q.   And do have you a copy of those in front of

2  you?

3     A.   Yes, I do.

4     Q.   Okay.  Now, as you look at Exhibit No. 1, it

13:33:47  5  looks like that Chief Scheopner's writing to you on

6  July 14th; is that right?

7     A.   Right.

8     Q.   Okay.  And part of what he's discussing is

9  where the weapons came from that were used in these

13:34:03  10  Moore shootings; is that right?

11     A.   Yes.  It appears to be -- well, let me look at

12  it.

13     Q.   All right.

14     A.   Yes, he does.  He does refer to that weapon

13:34:32  15  here, it appears.  Okay.

16     Q.   And what -- what it looks like Chief Scheopner

17  is telling you in the paragraph beginning at the bottom

18  of the page on Exhibit -- on the first page of Exhibit 1

19  is that the weapon used by the assailant was a Harlingen

13:35:07  20  Police Department rifle described as an Olympic Arm

21  semi-automatic rifle; is that right?

22     A.   Yes.

23     Q.   He indicates there that it was donated to the

24  Harlingen Police Department in 1995 by a citizen, and

13:35:20  25  then it was assigned to Detective Moore by Captain

13:35:27    1   Vasquez in the event that a tactical situation arose

2   where a police sharpshooter was needed; is that right?

3       A.   That's what it says, yes.

4       Q.   And then in the last paragraph it indicates

13:35:33    5   that the rifle had been safely secured in a locked gun

6   vault in Detective Moore's home on July 6th, 1998; is

7   that right?

8       A.   Yes, yes.

9       Q.   And Cap- -- Chief Scheopner is indicating that

13:35:46   10   in doing this, Detective Moore went above and beyond

11   normal procedures to secure the weapon; is that right?

12       A.   Yes.

13       Q.   Okay.  And then as we look at Exhibit No. 2,

14   that's your memo back to him -- Chief Scheopner; is that

13:36:01   15   right?

16       A.   Yes.

17       Q.   Okay.  And in the middle of the page there on

18   Exhibit No. 2, you ask him about this retention of the

19   weapon by Detective Moore for sharpshooting purposes.

13:36:30   20       A.   Yes.

21       Q.   And in particular you ask him for the record of

22   when the gun was assigned to Detective Moore and that

23   type of thing; is that right?

24       A.   That's right.

13:36:42   25       Q.   You were looking for like a sign-in/sign-out

13:36:46    1    sheet is what the Exhibit 2 indicates?

2        A.    That's right.

3        Q.    Some type of job description and basic

4    memorandum regarding the existence of the sharpshooter's

13:36:55    5    duties?

6        A.    Yes, sir.

7        Q.    And any records showing any actual call-out or

8    dispatch of a police sharpshooter?

9        A.    Right.    Those were examples of -- of records

13:37:02    10    that I was asking him to compile.

11        Q.    And then a second area that you asked Chief

12    Scheopner to report to you on would be regarding the

13    documentation of training for this Detective Moore with

14    regard to this weapon?

13:37:21    15        A.    Right.

16        Q.    And then what was the third area as we go on

17    the second page of the -- of the Exhibit No. 2?

18        A.    A third area -- the sentence reads:    "A third

19    area covered by your report should include

13:37:32    20    substantiation of responsible handling of the weapon by

21    Detective Moore."    And it goes on to list some things

22    here that I was going to ask for.

23        Q.    Okay.    And then fourth, you asked for the

24    history of how the weapon came to be in the possession

13:37:46    25    of the Harlingen Police Department; is that right?

13:37:50    1    A.    Yes, that's correct, sir.

            2    Q.    And then finally you asked for his

            3  recommendations, if any, at the bottom of the second

            4  page?

13:38:00    5    A.    Yes.

            6    Q.    Okay.  Now, if we go through each one of those

            7  areas of inquiry -- let me just -- I guess, before we

            8  specify each area talk about the questions generally.

            9         Why were you writing this memo on July 15th,

13:38:16   10  1998, to Chief Scheopner?

           11    A.    I felt that we needed more than the memo he had

           12  written on July 14th to explain the circumstances of the

           13  event.

           14    Q.    And why did you feel like you needed -- you

13:38:31   15  needed more than just Exhibit No. 1, July 14th report?

           16    A.    It was absent a number of the details that I

           17  stipulated in the July 15th memo.

           18    Q.    Well, why did you feel like those details were

           19  necessary to inquire as to?

13:38:50   20    A.    Well, I think the memo probably says that.  May

           21  I refer to it?

           22    Q.    Sure.

           23    A.    I guess, it -- it says that -- my thought was

           24  that we needed documentation to substantiate the kind of

13:39:15   25  general assertions that had been made in the July 14th

13:39:19  1    memo.

2        Q.    Okay.   And it looks like what's happened is

3    you've had a discussion previously with Chief Scheopner

4    before he writes you the July 14th memo; right?   I mean,

13:39:30  5    just a verbal.

6        A.    Probably had, yes.

7        Q.    And the reason I'm saying that is you look at

8    Exhibit No. 2, it says:   "This memo is to follow up on

9    my request earlier this week for a written report

13:39:41 10    explaining Detective Moore's possession and loss of a

11    police department-owned assault rifle.   Do you see that

12    sentence?

13        A.    Yes, I do.

14        Q.    So it looks like you had said, okay, now, how

13:39:50 15    did Detective Moore have an assault rifle and then lose

16    one, right?

17        A.    Uh-huh.

18        Q.    And then you got Exhibit No. 1, the report back

19    from Chief Scheopner; correct?

13:40:00 20        A.    Yes, uh-huh.

21        Q.    And rather than stopping the investigation

22    there, you felt like there was some additional questions

23    that you had that you set out in Exhibit No. 2, correct?

24        A.    That makes sense, yes, sir.

13:40:10 25        Q.    And there were about, oh, four or five areas in

SHARP HOLLAND
METRO (817) 731-1377

13:40:12   1   particular that you wanted to ask him about, right?

2        A.   Right.

3        Q.   And the first one was you wanted some type of

4   written documentation as to how this particular --

13:40:21   5   particular weapon, this assault weapon, came into

6   Detective Moore's possession; is that right?

7        A.   Yes.

8        Q.   You asked him for a sign-in/sign-out sheet or

9   whatever record there would be showing that this weapon

13:40:36  10   had been assigned to Detective Moore; is that right?

11        A.   Yes.

12        Q.   Did you ever receive any written documentation

13   indicating when this weapon had been assigned to

14   Detective Moore?

13:40:51  15        A.   I'd have to refer to my summary report.  I did

16   get -- did go through a lot of paper during the

17   episode -- during the, I guess, the investigation, but I

18   think I summarized my findings in my report, which is

19   somewhere in this stack here.

13:41:07  20        Q.   Is that this one?

21        A.   Yes, sir.

22        Q.   Okay.

23             MR. AINSWORTH:  Let's mark that as

24   Exhibit No. 3, how about it?

13:41:12  25             (Exhibit No. 3 marked.)

13:41:28   1      Q.    (BY MR. AINSWORTH)    And Exhibit No. 3 looks

2   like an interoffice memorandum to Ms. Prim, the City

3   Manager from you, dated October 14th, 1998; is that

4   right?

13:41:37   5      A.    Right.

6      Q.    And on the reference line it says, Shooting

7   Incidents/Recommendations for Action; is that right?

8      A.    Yes.

9      Q.    And the first two pages look like a typed

13:41:49   10   report.   And then there are summaries of interviews and

11   inspections attached to that?

12      A.    Right.

13      Q.    And there's, what, 13 pages total or something?

14      A.    Right.

13:42:05   15      Q.    Okay.   Well, this deposition doesn't need to be

16   a pop quiz.   If for any reason you need to stop and

17   review this report or any of them, feel free to do so.

18   So that we get a chance to refresh your recollection as

19   to what was happening.

13:42:19   20      A.    Okay.

21      Q.    We were asking -- I was asking you questions

22   looking back at Exhibit No. 2 about what you were able

23   to obtain regarding the written assignment for the

24   Olympic Arms rifle assault weapon to Detective Moore.

13:42:35   25           Looking back, now, at your full report here at

13:44:49   1   one that I was -- that I recall being told about and

2   that was rather antidotal.  There was no documentation.

3        Q.    Okay.  So you asked how was the weapon assigned

4   to Detective Moore and couldn't get any written

13:45:02   5   documentation on that.  And you asked how was Detective

6   Moore assigned or trained as a sharpshooter or what were

7   his duties.  And you couldn't get any written

8   documentation of that; is that right?

9        A.    That's correct.

13:45:14  10        Q.    The second area that you asked about was

11  whether or not Detective Moore had been properly trained

12  as a sharpshooter?  I'm looking at your Exhibit No. 2,

13  the report of July 15th?

14        A.    Yes, sir.

13:45:30  15        Q.    Okay.  And what you were asking for there,

16  there were about four bullet points.  You wanted

17  documentation of training and regular weapons practice

18  and qualifications, policies and procedures,

19  documentation about weapon inventories, and a statement

13:45:45  20  from Captain Vasquez describing supervisory and training

21  discussions and directions, that type of thing; is that

22  right?

23        A.    Yes, that's right.

24        Q.    Okay.  And did you find any documentation of

13:45:56  25  training of this particular individual, Detective Moore,

13:46:00  1  with this particular weapon, the AR-15?

2      A.    I can't say whether there was documentation or

3  not, but there was somewhere in my report, I think, a

4  reference to -- to Detective Moore's having been

13:46:15  5  trained -- I believe it was in Quantico, but it had been

6  years.

7      Q.    Well, when you say "years," you mean long

8  before this rifle ever came into the possession of the

9  police department?

13:46:28  10     A.    That's my understanding, yes.

11     Q.    Okay.  He hadn't been trained with this

12  particular weapon --

13     A.    I -- I --

14     Q.    -- with the serial number on it?

13:46:37  15     A.    I have no record of that, no, sir.

16     Q.    Okay.  And as whether or not he had been

17  trained as a sharpshooter, whatever that is, did you

18  find any training documentation there at the Harlingen

19  Police Department regarding this individual, Detective

13:46:50  20  Moore, being a sharpshooter?

21     A.    No, sir.

22     Q.    What is a sharpshooter?

23     A.    I really don't know.  I -- I think it's a

24  commonly used term, but I would hesitate under oath to

13:47:02  25  try to specify it.

13:47:04   1      Q.   Well, would you expect that a sharpshooter

2   could shoot accurately?

3      A.   Yes, sir.

4      Q.   And you'd want to be able to shoot accurately

13:47:12   5   at a great distance?

6      A.   Yes, sir.

7      Q.   Do you have any indication that you can show

8   me, based upon your investigation of this incident, that

9   this type of weapon, an AR-15, can be shot at any great

13:47:25   10   distance accurately?

11      A.   No, sir.  There's no evidence of -- to that

12   fact.

13      Q.   It didn't have a scope on it, did it?

14      A.   No, sir, it didn't.

13:47:32   15      Q.   And it just had little finger-held adjustable

16   sights on it -- I mean, finger-adjusted sights?

17      A.   I don't know, sir.

18      Q.   Okay.  As far as you know, is this the kind of

19   weapon that sharpshooters all across the country carry

13:47:47   20   when they're working for SWAT teams at various police

21   departments?

22      A.   I couldn't -- I'm not qualified to speculate on

23   that.

24      Q.   And you haven't turned up any indication in

13:47:56   25   your investigation that this is a commonly used

13:48:00   1    sharpshooting weapon, have you?

           2        A.    No, sir.

           3        Q.    Okay.  And that's kind of why you were asking

           4    these questions about, well, tell me how he had this

13:48:06   5    gun, and tell me how he was trained and that kind of

           6    thing.  You were inquiring as to what was this

           7    individual's training with this weapon; is that right?

           8        A.    Yes, sir.

           9        Q.    The third area covered -- that you were asking

13:48:19  10    Chief Scheopner to cover with you was regarding the

          11    handling procedures for the weapon; is that right?

          12        A.    That's correct.

          13        Q.    Okay.  And again, you've got about four bullet

          14    points set out in your -- in the exhibit we've marked as

13:48:34  15    Exhibit No. 2.  Do you see those --

          16        A.    Yes, I saw those.

          17        Q.    -- on the second page of Exhibit No. 2?

          18        A.    I'm right there.

          19        Q.    Okay.  And part of what you're asking about

13:48:46  20    there is the day-to-day procedures for the handling and

          21    securing of the weapon; is that right?

          22        A.    Yes, sir.

          23        Q.    Okay.  And were you able to come up with any

          24    type of written documentation with -- that was showing

13:49:06  25    when the -- that would show when the weapon had been

13:49:08  1    checked in or checked out of the police department?

2         A.   No, I was not.

3         Q.   Were you able to come up with any type of

4    written documentation that would show where the weapon

13:49:18  5    was kept on a daily basis?

6         A.   No.

7         Q.   And was there any other type of documentation

8    that would show who all had used the weapon in the past?

9         A.   Such as a log or something of that effect?

13:49:35  10    Q.   Yes.

11        A.   No, sir.

12        Q.   Okay.  What did you find out about where the

13   gun -- what had happened to the gun while it was in the

14   possession of the police department?

13:49:47  15    A.   I think in my report -- can I refer to it

16   again?

17        Q.   I'm interrupting again.  You're flipping over

18   to No. 3 now?

19        A.   Yes, sir.

13:49:59  20    Q.   Okay.

21        A.   I believe on page 3 --

22        Q.   Yes, sir.

23        A.   -- I made some comments to that -- or some

24   findings to that effect during an interview with

13:50:19  25   Chief Scheopner, Assistant Chief Robert Archer and

SHARP HOLLAND
METRO (817) 731-1377

13:50:26  1  Captain Joe Vasquez and Detective Moore, a number of

2  points emerged.  And I'll try to skip through them.

3  One relevant question you had -- you may have

4  asked -- I think it's the second one.  It says:

13:50:41  5  "Captain Vasquez had allowed Moore to take the weapon

6  home for the general purpose of a 'duty weapon.'"

7  The next point, there was no substantiation --

8  is that your question, sir?

9  Q.  Well, I was trying to figure out where all the

13:50:54  10  weapon had been while it was at the police department.

11  If we look at the -- at a couple of different bullet

12  points you make there, it looks like that --

13  A.  I see in this bullet point, I think, is, "Moore

14  had had the weapon in his possession for over a year,

13:51:11  15  and his possession of the weapon was undisciplined

16  sometimes leaving it in his pickup truck, other times

17  leaving it behind the door of his office."

18  Q.  Now, what I've heard is that the weapon was

19  taken out of the evidence locker -- I think, that's what

13:51:28  20  was described as at one point, because of the humidity

21  in the room.  Have you -- did you learn that as well, or

22  does that comport with your memory?

23  A.  It -- it's possible.  I think that the -- it

24  was conveyed to me, and it seems reasonable that weapons

13:51:43  25  kept a long time in that -- in that locker room would

13:51:46  1  deteriorate because it wasn't really built for that

2  purpose.

3      Q.   And then it was taken out of that room and

4  stuck behind a file cabinet out of plain view in

13:51:56  5  Detective Moore's locked office.  Is that what you

6  recall?

7      A.   If it says that in my off- -- my report, so I

8  would -- I would agree that's what I was told.

9      Q.   Okay.  Now, that wasn't really any written

13:52:06  10  formal procedure for the handling of weapons subject to

11  rust.  That's just what they've done, just took it out

12  of one room and stuck it behind a file cabinet in

13  Detective Moore's office?

14      A.   That's what it sounds like to me, sir.  I saw

15  no procedure to do that.

16      Q.   And then eventually rather than just sticking

17  it behind the file cabinet, he started taking it home in

18  his pickup truck or whatever his vehicle was, Detective

19  Moore did?

13:52:28  20      A.   I don't think he did of his own volition.  I

21  think that he -- I was told when I inquired that Captain

22  Vasquez had made an assignment of the weapon to

23  Detective Moore.

24      Q.   All right.  And so he carried it like -- you

13:52:41  25  know, we see these shotguns and things from time to time

13:52:44    1   in police vehicles.  He just had that gun in his

            2   vehicle; is that right?

            3       A.   That's my understanding.

            4       Q.   Okay.  But unlike a shotgun, this weapon breaks

13:52:52    5   apart, and you can't really lock it in the police

            6   vehicle, can you?

            7       A.   I would think you -- I guess, you're asking

            8   could -- could the vehicle be locked --

            9       Q.   Sure.

13:53:03   10       A.   -- of course, that's probably not what you're

           11   asking me.

           12       Q.   You can lock the doors of the vehicle --

           13       A.   Right.

           14       Q.   -- but can you safely lock the weapon into a

13:53:10   15   mount in the vehicle?  Do you know?

           16       A.   No, I simply don't know.

           17       Q.   Okay.  And then from time to time, did you have

           18   the understanding that Detective Moore would actually

           19   take the gun into his house?

13:53:22   20       A.   Yes, I was told that.

           21       Q.   And he would store it in a gun safe there in

           22   his house?

           23       A.   That's correct.

           24       Q.   And the gun safe was kept in his son's house --

13:53:33   25   in his son's room; is that right?

SHARP HOLLAND
METRO (817) 731-1377

13:53:33    1      A.    I -- I don't know about that.

            2      Q.    Okay.  So the -- in essence, what's happened is

            3  the gun has made its way out of the evidence locker at

            4  the Harlingen Police Department into the son's bedroom.

13:53:44    5  Is that what your general understanding is?

            6      A.    I really don't believe it was ever conveyed to

            7  me that it was kept in his son's bedroom.  I think it

            8  was only conveyed to me that the weapon was locked in a

            9  gun safe in his home.

13:53:56   10      Q.    Uh-huh.  And the original reason for taking it

           11  out of the gun -- the evidence locker, was to keep the

           12  gun from rusting, was for the benefit of the gun?

           13      A.    I -- I couldn't say that.  I couldn't agree

           14  with that either, sir, because Captain Vasquez did say

13:54:13   15  to me on my investigation that he had assigned the

           16  weapon to Detective Moore.

           17      Q.    Okay.  This is after it was put behind the file

           18  cabinet and then it was assigned to Detective Moore?

           19      A.    That is what I was given to believe, yes, sir.

13:54:31   20      Q.    Okay.  The fourth area you asked

           21  Chief Scheopner about back on July 15th, 1998, a week or

           22  so after the shooting, was about where the rifle had --

           23  you know, had come from originally; is that right?

           24      A.    Right.

13:54:47   25      Q.    Okay.  Let's look at -- do you talk about that

13:54:47  1  at all in Exhibit No. 3, your report?

2      A.   Let me take a quick look here.  As I -- as I

3  scan this document, I don't see it mentioned.

4                  (Exhibit No. 4 marked.)

13:55:44  5      Q.   (BY MR. AINSWORTH)   Well, do you have a

6  general recollection as to where the gun come from?

7      A.   Yes, sir.  I was told by Detective Moore, I

8  believe, that he had received from it a citizen who had

9  donated the gun.

13:56:00  10     Q.   Okay.  And, in fact, that's what he said to you

11  back on that report or letter that we marked as

12  Exhibit No. 1 down at the bottom of the first page, you

13  said something like, the rifle is a .223 caliber,

14  Olympic Arms semi-automatic rifle -- he gives the serial

13:56:23  15  number -- that was donated to the Harlingen Police

16  Department in 1995 by a citizen?

17     A.   Right.

18     Q.   Now, when you received that information, rather

19  than just taking that at face value, you wrote the memo

13:56:34  20  back that we marked as Exhibit No. 2, and you asked for

21  a follow-up regarding the circumstances by which the gun

22  was donated.  You asked particularly, who donated the

23  rifle?  When it was donated --

24     A.   Okay.

13:56:45  25     Q.   -- and for what purpose; is that right?

SHARP HOLLAND
METRO (817) 731-1377

13:56:47  1        A.    Okay.

          2        Q.    And that does seem like legitimate questions to

          3   ask the police chief.

          4        A.    Okay.

13:56:51  5        Q.    And he -- you were able to, I guess, receive

          6   some information on that, whether or not it makes its

          7   way into your report --

          8        A.    That's right.

          9        Q.    -- like that that we've marked as

13:56:59 10   Exhibit No. 4?

         11        A.    Right.

         12        Q.    Okay.  All right.  And if you look at

         13   Exhibit No. 4 with me, that appears to be an item that

         14   looks like in the lower left-hand corner, it says, REC

13:57:17 15   or received by R.D. Moore.  Do you see that?

         16        A.    Yes, I do.

         17        Q.    Okay.  And it describes there a couple of

         18   different weapons that have been brought into the

         19   Harlingen Police Department.  Do you see that?

13:57:28 20        A.    Yes, I do.

         21        Q.    And the second one listed there is a -- the

         22   Olympic Arms -- I won't read all the numbers --

         23   semi-automatic, looks like?

         24        A.    Yes.

13:57:38 25        Q.    Okay.  And then below the weapons it indicates

| | | |
|---|---|---|
| 13:57:40 | 1 | both weapons turned over to HPD for -- what's that word |
| | 2 | look like? |
| | 3 | A.   I believe it says disposal. |
| | 4 | Q.   Okay.   Disposal by -- looks like it says -- |
| 13:57:53 | 5 | R.D. Moore; is that right? |
| | 6 | A.   Yes, sir. |
| | 7 | Q.   And then it has the name of the person that's |
| | 8 | donated the weapons? |
| | 9 | A.   I think it does.   I'm just having trouble |
| 13:58:01 | 10 | finding it right now. |
| | 11 | Q.   It's just right under, it says, Sylvia Pirtle |
| | 12 | in different print? |
| | 13 | A.   Oh, right, yes, sir. |
| | 14 | Q.   Okay.   Now, when you read this, "both weapons |
| 13:58:09 | 15 | turned over to HPD for disposal," that -- I mean, |
| | 16 | that -- it does say disposal there, not donation, |
| | 17 | doesn't it? |
| | 18 | A.   Yes, it does. |
| | 19 | Q.   What does that mean to you in just plain old |
| 13:58:21 | 20 | cornbread language?   Does that mean for reassignment to |
| | 21 | the sharpshooter team to you? |
| | 22 | A.   I know there's a dispute over what the intent |
| | 23 | was and what was communicated during this transaction. |
| | 24 | I believe it was Detective Moore in my interview with -- |
| 13:58:41 | 25 | that I spoke of earlier with the Chief and Assistant |

Case 1:98-cv-00162    Document 106    Filed in TXSD on 07/10/2001    Page 451 of 550

13:58:45  1  Chief, told me that he had accepted the weapon from

2  them, but it was kind of -- as I recall now, there's

3  just a difference of agreement about what was intended

4  to happen to those weapons.

13:58:57  5       The only other relevant fact that I have is

6  that it turns out -- it was represented to me by these

7  same officers that, in fact, a weapon that's donated

8  can't be simply destroyed.  That there's a certain

9  process that they have to go through.  And if memory

13:59:18  10  serves me correctly, that a judge has to make a ruling

11  before it can be destroyed.  So those were the things

12  conveyed to me --

13       Q.   Okay.

14       A.   -- with regard to this.

13:59:27  15       Q.   So you can't just tear one up, but you can pass

16  it out or put it behind the file cabinet or whatever?

17       A.   Well, in reference to what?

18       Q.   The weapon.

19       A.   In reference to what procedure or rule, sir, I

13:59:43  20  mean -- in my opinion, personal opinion or -- I mean, I

21  don't know what reference --

22       Q.   Well, I guess, either way.  I mean, you're

23  saying that there was some sort of rule that required

24  that the destruction of a rifle or weapon had to go

13:59:49  25  through some sort of court inquiry?

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 13:59:52 | 1  | A.   Right.  And that's, I guess what I'm trying --       |
|          | 2  | the point I'm trying to get to there is what is the      |
|          | 3  | point they had made to me when I asked them about it was |
|          | 4  | that they simply couldn't destroy the weapon.            |
| 14:00:02 | 5  | And so I guess what the issue here is was the            |
|          | 6  | truth told to these people or not when they dropped      |
|          | 7  | these guns off at the police department.  And they were  |
|          | 8  | telling -- I got the impression they were telling me,    |
|          | 9  | that, yes, they'd been honest with them, that they were  |
| 14:00:19 | 10 | just misunderstood.                                      |
|          | 11 | Q.   Okay.  So if --                                     |
|          | 12 | A.   That the Pirtle's thought that it was going to      |
|          | 13 | be destroyed, it goes without question.  I think         |
|          | 14 | everybody stipulates that is so.  But that R.D. Moore    |
| 14:00:31 | 15 | ever intended to communicate that is under dispute.      |
|          | 16 | Q.   All right.  In any event, you send out the         |
|          | 17 | letter or memo we've marked as Exhibit No. 2 on          |
|          | 18 | July 15th, 1998.                                         |
|          | 19 | Do you get a report back from Chief Scheopner           |
| 14:00:47 | 20 | that addresses the inquiries that you make in            |
|          | 21 | Exhibit No. 2?                                           |
|          | 22 | A.   No.                                                 |
|          | 23 | Q.   And why don't you get a written response to        |
|          | 24 | your memo from the Assistant City Manager?               |
| 14:01:12 | 25 | A.   It was in consultation with -- with legal          |

SHARP HOLLAND
METRO (817) 731-1377

14:01:16    1    counsel that the chief was advised to --

            2            MR. LOCKHART:  Let's -- okay.  Let's wait

            3    a minute.  I don't want to get into attorney-client

            4    communications on it.

14:01:26    5            MR. AINSWORTH:  Yeah, I didn't realize

            6    that that's what we were doing.

            7        Q.   (BY MR. AINSWORTH)  What I'm getting to is:

            8    You never got a written report back from the Chief of

            9    Police?

14:01:34   10        A.   No, sir, I didn't.

           11        Q.   Okay.  When you wrote Exhibit No. 2, did you

           12    expect a written report back from him?

           13        A.   Yes, I did.

           14        Q.   Eventually, in October of that year, you were

14:01:42   15    able to put together the report that we've marked as

           16    Exhibit No. 3; is that right?

           17        A.   Right.

           18        Q.   Prior to that time, October 14th, 1998, you did

           19    receive some memorandum from Chief Scheopner, right?

14:02:04   20        A.   Right.  I've got the July 14th one, if that's

           21    what you're referring to.

           22        Q.   Well, I meant after your request of

           23    July 15th --

           24        A.   Oh, okay.

14:02:14   25        Q.   -- and before the October 14th, 1998, you

1    got at least --

2    A.    Yes, I did.

3    Q.    -- one memorandum from him, right?

4    A.    Yes, sir, I did.

14:02:23    5    Q.    And do you have a copy of that in front of you?

6    A.    I do.

7    MR. AINSWORTH:  Okay.  Let's get our court

8    reporter to mark that as Exhibit No. 5.

9    (Exhibit No. 5 marked.)

14:02:55    10    Q.    (BY MR. AINSWORTH)  What is Exhibit No. 5?

11    A.    It's a memo from Jim Scheopner, Chief of

12    Police, to me, dated October 1, 1998.  And the subject

13    is Departmental Weapons.

14    Q.    Okay.  Now, was this memo sent to you in

14:03:14    15    response to your July 15th memo that we marked as

16    Exhibit No. 2, or was this some separate inquiry that

17    you had made?

18    A.    Either in part or -- or whole, I couldn't say.

19    A lot of time had transpired.  Obviously, it's October.

14:03:41    20    We'd had a number of -- I'd made a number of inquiries.

21    I'd had the -- since the time I wrote this original

22    memo, I'd had this investigation that I'd done in the

23    police department and interviewed all the officers.  I

24    think I interviewed them singly as well.

14:03:58    25    I think I talked to Chief Scheopner several

14:04:01  1  times.  I -- I just can't say that this is a direct

2  response to my July 15th memo or whether it -- that it's

3  in part in response to some of those other things that

4  emerged.

14:04:13  5       Q.    All right, sir.  And you did, in fact, receive

6  it from Chief Scheopner; is that right?

7       A.    Yes.

8       Q.    This is his memo to you pursuant to his duties

9  as Police Chief back in -- on October 1st of 1998?

14:04:27  10      A.    Right.

11      Q.    And we've marked it as Exhibit No. 5 here.

12  There are a couple of pages that are attached that have

13  decimal paragraphs --

14      A.    Right.

14:04:38  15      Q.    -- decimal coded paragraphs.  It begins with

16  Court Appearance and so on.

17            What are those pages?

18      A.    These are copies of the departmental policies.

19      Q.    Okay.  And the last paragraph on paragraph --

14:04:50  20  page 1 of Exhibit No. 5 says, "The current Harlingen

21  Police Department Policy Manual was written using model

22  policies from the Texas Municipal League and the Texas

23  Commission on Law Enforcement Officers Standards and

24  Education"; is that right?

14:05:04  25      A.    Yes.

14:05:05 1    Q.    And they've been reviewed and these weapon

2    policies are in Section 4.04 (see attached); is that

3    right?

4    A.    Right.

14:05:12 5    Q.    And did you understand that these policies that

6    are attached to the memo marked Exhibit No. 5 would have

7    been in effect, or should have been in effect, as of

8    July of 1998?

9    A.    Yes, sir.

14:05:27 10   Q.    Okay.  And so when you were looking to see in

11   your own inquiry whether or not the police department

12   had met internal guidelines and procedures for handling

13   the Olympic Arms rifle in question, these were the

14   policies that you would have looked to, the standards

14:05:40 15   you would have looked to?

16   A.    Yes, sir.

17   Q.    And you received this memo prior to putting out

18   your report that we've marked as Exhibit No. 3, the

19   October 14th, 1998, memo?

14:05:51 20   A.    Right.

21   Q.    Can we look at that for just a second now?

22   A.    Uh-huh.

23   Q.    What -- I apologize if some of these questions

24   sound inane, but that's -- we have legal hoops to jump

14:06:09 25   through.

SHARP HOLLAND
METRO (817) 731-1377

| | | |
|---|---|---|
| 14:06:09 | 1 | This appears to be a memo from you dated |
| | 2 | October 14th, 1998, to Natalie Flores Prim; is that |
| | 3 | right? |
| | 4 | A.   Yes, sir. |
| 14:06:15 | 5 | Q.   It looks like beside the "from" line where it |
| | 6 | says, Joseph D. LaBeau, Assistant City Manager.  You've |
| | 7 | put your initials; is that right? |
| | 8 | A.   That's right. |
| | 9 | Q.   And this is all below the heading Interoffice |
| 14:06:26 | 10 | Memorandum? |
| | 11 | A.   Yes, sir. |
| | 12 | Q.   And this would have been the kind of duties |
| | 13 | would have had as the Assistant City Manager when |
| | 14 | contacting or corresponding with the City Manager from |
| 14:06:36 | 15 | time to time, you would use a form like this? |
| | 16 | A.   Yes, sir. |
| | 17 | Q.   And this is, in fact, your work; is that right? |
| | 18 | A.   Yes, it is. |
| | 19 | Q.   And that's why -- why your initials appear |
| 14:06:45 | 20 | there? |
| | 21 | A.   Yes. |
| | 22 | Q.   You indicate in the first paragraph there that |
| | 23 | the subject -- regarding the subject of this July 7th, |
| | 24 | 1998, incident in which two border patrol agents were |
| 14:06:59 | 25 | killed that -- with a weapon belonging to the Harlingen |

14:07:02   1   Police Department; is that right?

2        A.   That's right.

3        Q.   And the basic facts surrounding this case are

4   that Detective Moore had a Harlingen Police Department

14:07:10   5   semi-automatic AR-15 rifle locked in a gun safe in his

6   home.  And that sometime during the early morning hours

7   of July 7th, 1998, that Detective Moore's 25-year-old

8   son, Ernest Moore, retrieved the department weapon from

9   the gun safe and subsequently, shot and killed the

14:07:28   10   agents, possibly also wounding a Cameron County Deputy

11   Sheriff; is that right?

12        A.   That's right.

13        Q.   Okay.  And we'll be sure -- I apologize for

14   reading this.  The court reporter has a copy, so that

14:07:39   15   she can follow along --

16             MR. LOCKHART:  Make sure you're reading it

17   right.

18        Q.   (BY MR. AINSWORTH)  -- so that I -- because I

19   get to reading too fast.

14:07:46   20             Now, as a part of your checking into this

21   incident, you made interviews with a number of different

22   folks there at the police department; is that right?

23        A.   Yes.

24        Q.   First, you indicate on the first page that you

4:08:02   25   had discussions with the Chief of Police; is that right?

14:08:05  1       A.    Yes.

        2       Q.    On the second page, you've discussed there a

        3  report dated July 15th, 1998.

        4       A.    Do we have it here?

14:09:01  5       Q.    Yes, sir.  I think what you're talking about

        6  there is Exhibit No. 2, the July 15th, 1998 memo?

        7       A.    That's right.

        8       Q.    Okay.  That's the memo where we went through

        9  the four or five points where you made a request to the

14:09:15 10  police chief in specific areas?

       11       A.    That's right.

       12       Q.    And then as we look at page No. 3, you also

       13  interviewed Detective Moore and as well as Captain

       14  Vasquez and the police chief; is that right?

14:09:33 15       A.    Yes.

       16       Q.    Then as we look through on page 4, you made

       17  your own inspection of the police department, including

       18  the evidence rooms, weapons, lockers and Detective

       19  Moore's office.

14:09:58 20       A.    That's true.

       21       Q.    As we look at page 5 you talk to -- it appears

       22  that you talked to other police officers with the

       23  Harlingen Police Department about -- well, complaints

       24  they had along the lines of whether or not there was, in

14:10:25 25  fact, a sharpshooter position and whether or not that

14:10:28  1    was why Moore had the weapon?

2       A.    That's correct.

3       Q.    I want to ask you about some other points here.

4    But if -- then as we go forward towards page No. 8 of

14:11:00  5    the exhibit, it looks like there's a paragraph entitled

6    Findings and Actions; is that right?

7       A.    Yes, sir.

8       Q.    Okay.  And what are these findings that are set

9    out here?  What are you doing here?

14:11:20  10      A.    After -- I guess, it's the findings in my

11   report and summary and recommended actions to the City

12   Manager.

13      Q.    Yes, sir.

14            Now, this is -- you're writing this in -- on

14:11:32  15   October 14th, 1998; is that right?

16      A.    Yes.

17      Q.    Or approximately then?

18      A.    Yes.

19      Q.    And this is after the investigation that you've

14:11:39  20   conducted internally there on behalf of the City of

21   Harlingen?

22      A.    Yes, sir.

23      Q.    And this is pursuant to your duties as the

24   Assistant City Manager back at that time; is that right?

14:11:57  25      A.    Yes.

SHARP HOLLAND
METRO (817) 731-1377

14:11:57  1        Q.   And you draw the conclusion, based upon your

2    investigation, that those that are set out there on

3    page 8 and following that indicates, No. 1, that the

4    Chief failed to initiate an objective departmental

14:12:06  5    review of the circumstances, policies and procedures by

6    which Moore came to possess the AR-15.

7             Is that right?

8        A.   That's right.

9        Q.   Okay.  What did you mean by this statement?

14:12:18  10        A.   Just what it said.  He didn't in -- in --

11    initiate an investigation, appropriate investigation

12    into the circumstances by which Moore came to possess

13    the AR-15.

14        Q.   Well, are you -- is this after the border

14:12:36  15    patrol shooting incident looking backwards, or are you

16    talking about before Detective Moore ever got

17    the AR-15 -- I mean, before the shooting ever took

18    place?

19        A.   I mean afterwards, after the shooting.

14:12:54  20        Q.   Okay.  Now, when you said the Chief failed to

21    initiate an objective departmental review of the

22    circumstances, policies and procedures by which Moore

23    came to possess the AR-15, what would an objective

24    departmental review have demonstrated with regard to why

14:13:10  25    Moore came to possess or how Moore came on possess the

14:13:13  1   AR-15?

2        A.    Well, I think that it would have resembled a

3   lot more of the material I got in the interview with the

4   Chief and Assistant Chief and Captain Vasquez and Ed

14:13:25  5   Moore.

6            They simply described that Moore had been

7   assigned the rifle by Captain Vasquez for general

8   purposes and that Moore had had it for over a year, all

9   those other points that came out in the interview when

14:13:40  10  we went down there and talked to them.  That's what I --

11  I would have preferred the Chief to have done.

12       Q.    Okay.  The second finding you indicate there is

13  that the Chief of Police made false statements and

14  reports regarding the assignment of the AR-15 to R.D.

14:13:54  15  Moore; is that right?

16       A.    Yes, sir.

17       Q.    What were false statements -- or what false

18  statements and reports regarding the assignment of the

19  AR-15 to Detective Moore are you referencing there?

14:14:04  20       A.    I guess the one that comes to mind in

21  particular is -- I think I characterize it later in the

22  report as -- the overall sharpshooter duty story is a

23  major situational embellishment, on page 11 of the same

24  report.

14:14:32  25       Q.    "A situational embellishment," what do you mean

SHARP HOLLAND
METRO (817) 731-1377

14:14:39  1  by the term "situational embellishment"?

2     A.   I mean, while there may have been -- well, I

3  mean, there was no -- there was no sharpshooter squad.

4  There was no sharpshooter team.  While the Chief may

14:15:00  5  well have had in his mind that -- that he would use

6  Detective Moore in circumstances like that, that it was

7  inaccurate to characterize him as having been assigned

8  sharpshooter duty, and that to do so caused a

9  credibility problem.

14:15:21  10     Q.   All right, sir.  And then Point No. 3, you

11  indicate that a review of the departmental policies and

12  procedures identifies a number of apparent violations.

13  Is that the word you used?

14     A.   Yes, sir.

14:15:32  15     Q.   Okay.  And then do you attempt to set out there

16  what procedures -- or some of the procedures that were

17  violated in this instance?

18     A.   Yes.

19     Q.   Okay.  The first one regards a reference to

14:15:46  20  authorized weapons, and that's one of the paragraphs

21  from the manual that had been attached to Chief

22  Scheopner's memo to you that we've marked as

23  Exhibit No. 5?

24     A.   Yes.

14:16:01  25     Q.   Okay.  And you -- you're looking at

14:16:03  1   Paragraph 4.04 regarding Authorized Weapons?

2      A.   Yes.

3      Q.   Okay.  Now, under that paragraph under this

4   particular violation, you referenced the fact that your

14:16:26  5   investigation revealed that Detective Moore had fired

6   the weapon in his front yard at his residence on more

7   than one occasion and that -- that on at least one time

8   and let his son use the weapon.

9           MR. LOCKHART:  Well, read -- read from it.

14:16:42  10  Read what it says.

11     Q.   (BY MR. AINSWORTH)  It says, "R.D. Moore stated

12  he would practice with the weapon by shooting it in the

13  yard of his residence, and on one occasion, R.D. Moore

14  knew his son had discharged the weapon because he had

14:16:55  15  allowed his son to do so."

16          Is that what you meant -- is that what your

17  review indicated?

18     A.   Yes, sir.

19     Q.   So I guess what you're saying there is that on

14:17:08  20  at least one occasion Detective Moore had fired the

21  weapon at his residence?

22     A.   I believe so.

23     Q.   And that you really don't know how many times

24  the son had fired the weapon prior to killing the border

14:17:21  25  patrol agents?

SHARP HOLLAND
METRO (817) 731-1377

14:17:22   1       A.    I was told by Detective Moore that he had only

2    allowed his son to do it once.

3       Q.    Well, what you indicate here is that he knew he

4    had done it once, right?

14:17:31   5       A.    Let me take a look at that sentence, if I may.

6    "Also, R.D. Moore stated he practiced with the weapon by

7    shooting it in his yard."

8            So that's true and I do recall that he

9    indicated and seemed to be a recurrent practice.  That

14:17:45  10    it didn't happen just once.  The Detective practiced in

11    his yard on occasion.  Then it says --

12       Q.    And this -- this -- I'm sorry to interrupt.

13       A.    Well, I was just going to say and then it

14    says -- well, I know what it says and I remember

14:17:56  15    specifically what the Detective told me, and the

16    Detective told -- I asked him, had his son ever fired

17    it?  And he told me he'd allowed him to fire it once.

18    So that's what happened.  I don't know how it squares

19    with that sentence.

14:18:10  20       Q.    Okay.  The -- and -- and did that appear to you

21    to be a violation of the authorized weapons paragraph in

22    the police manual?

23       A.    Yes, sir, it did.

24       Q.    And then the next paragraph reference is

14:18:20  25    4.04.001, Approved Weapons and Ammunition; is that

1    right?

2        A.    Yes.

3        Q.    Okay.  And your reference there is to the

4    fact that -- and I'm reading, "Captain Vasquez reported

14:18:37    5    that he did not follow any procedure (in issuing the

6    weapon) and did not obtain the Chief's approval.

7    Captain Vasquez reported that he did not discuss with

8    Detective Moore any specific duties when issuing the

9    weapon"; is that right?

14:18:50    10        A.    That's right.

11        Q.    Okay.  And does that appear to you to be a

12    violation of the Harlingen Police Department manual for

13    the use of approved weapons and ammunition?

14        A.    Yes, it does.

14:19:00    15        Q.    The next reference in this report is to

16    4.04.002 regarding Training; is that right?

17        A.    Yes, sir.

18        Q.    And these are all subparagraphs under the

19    Authorized Weapons provision in the manual?

14:19:14    20        A.    That's correct.

21        Q.    And this has to do with an officer undergoing

22    department approved training?

23        A.    Yes, sir.

24        Q.    And what you indicate there is that -- that in

14:19:23    25    your findings is that:  "Detective Moore reported that

14:19:27   1   he was last trained in 1976 for this type weapon.   And

           2   Detective Moore reported that he did not comply with all

           3   continuing proficiency training required by department

           4   and TCLEOSE standards?

           5        A.    That's right.

           6        Q.    And TCLEOSE is T-C-L-E-O-S-E.

           7              And that appeared to you also to be a

           8   violation?

           9        A.    Yes, sir.

14:19:52  10        Q.    In Paragraph 4, you point out the fact that it

          11   didn't appear that Moore had this -- had complied with

          12   the mandated annual training with the AR-15; is that

          13   right?

          14        A.    Right.

14:20:03  15        Q.    And then in Paragraph 5 you indicate that there

          16   are no detailed policies and procedures for the handling

          17   of weapons, and there's been inadequate weapons practice

          18   and training.   The department lacks proper documentation

          19   of weapons training and qualification.   Weapons control

14:20:20  20   and inventory practices are inadequate and

          21   unprofessional.   In addition, there's been no formal

          22   assignment by any officer to duties of sharpshooter,

          23   although there may be a few officers who are proficient

          24   marksmen.

14:20:36  25              What do you mean by that paragraph?

14:20:41  1        A.    I guess, not trying to be coy, but I -- just

2    what it says that the -- the department lacks clear

3    policies and procedures.   There wasn't appropriate

4    documentation of training and qualification on specific

14:20:52  5    weapons.

6             And, again, I guess, the point that we have

7    made is that there was no formal assignment of any

8    officer to duties as sharpshooter.

9        Q.    Well, if we go through the paragraph where it

14:21:07  10    says it is clear there are no detail policies and

11    procedures for the handling weapons.

12        A.    Okay.

13        Q.    And there has been adequate -- inadequate

14    weapons practice and training.

14:21:16  15             When you're talking about the handling of

16    weapons, are you talking about the method by which this

17    particular assault rifle was assigned or put into the

18    possession of Detective Moore?

19        A.    Yes, that would cover that --

20        Q.    Okay.

21        A.    -- as well as other weapons.   I think I was

22    reporting to what seemed to me to be a general

23    inadequacy in the department's procedures.

24        Q.    We're still under the heading of the report

14:21:44  25    called Findings and Action?

14:21:47 1    A.    Yes, sir.

2    Q.    And so there's the -- there's the -- there's no

3  detail policies and procedures for the handling of the

4  weapon.  And then the second point made in the paragraph

14:21:59 5  is that the department lacks proper documentation of

6  weapons training and qualification.  And I take it there

7  you're referring to Detective Moore's -- the lack of

8  proper documentation regarding Detective Moore's

9  training and qualification with the weapon?

14:22:14 10    A.    The comment's broader than that, but it

11  certainly comprehends that, yes, sir.

12    Q.    Okay.  And then you indicate that weapons

13  control and inventory practices are inadequate and

14  unprofessional.

14:22:28 15        Inadequate in what way?

16    A.    Well, I -- I would refer to the first two

17  points that there aren't policies and procedures for the

18  handling of weapons.  By that, I guess, a

19  check-in/check-out -- a strict check-in/check-out

14:22:44 20  procedures and periodic inventories, things of that

21  nature.

22        And then the documentation of weapons and

23  qualifications, which is kind of obvious.  Because those

24  are not in place, I feel that's -- I conclude in my

14:22:58 25  report that that's inadequate and not up to professional

14:23:00  1  standards.

2      Q.   And then after having made these findings, you

3  indicate to the City Manager, Ms. Prim, certain

4  administrative actions that you suggest should be taken?

5      A.   Yes, sir.

6      Q.   Is that right?

7      A.   Yes.

8      Q.   You indicate remedial action needs to be taken

9  at once to improve department practices; is that right?

10      A.   Yes.

11      Q.   And you indicate that first, the Chief has

12  been -- or in the first bullet point that the Chief has

13  been directed to implement the National Law Enforcement

14  Standards; is that right?

14:23:29  15      A.   Yes.

16      Q.   And it was your belief at that time back in

17  October of 1998, that this action would lead to

18  national, professional accreditation of the Department's

19  policies and practices.  This is a minimal first step

20  toward preventing further exposure from any incidents

21  arising due to inadequate standards and/or

22  unprofessional practices within the Department; is that

23  right?

24      A.   Yes, sir.

14:23:52  25      Q.   Okay.  Now, your review of the policies and

14:23:56   1   procedures for the handling of weapons and the

2   documentation of training and qualification with weapons

3   was that the Department and the City did not comport

4   with the National Standards as of July 7th, 1998; is

14:24:11   5   that right?

6        A.   Yes, sir.  Well, let me qualify that, may I?

7        Q.   Sure.

8        A.   I was looking for a way to improve what I'd

9   seen.  And so I was -- I had consulted with colleagues

14:24:29   10   and one suggestion was that I consider recommending

11   having the department get national accreditation.

12        In the City of College Station where I had

13   previously worked, the police department went through

14   that process, and I remember since that the -- there was

14:24:47   15   a very singular sense of professionalism in achieving

16   that.

17        And so I -- that -- while I can't say as to

18   exactly what the standards for weapons handling are in

19   the national level and how they compare to what was done

14:24:59   20   here, it was more of a general professionalization.

21        Q.   Yes, sir.  And it seemed to you that would --

22   obtaining that accreditation under the National Law

23   Enforcement Standards would be an effective step towards

24   bringing the City of Harlingen Police Department's

14:25:19   25   standards up to a level where they would have detailed

14:25:23  1  policies and procedures for the handling of weapons and

2  for the documentation of weapons training and

3  qualification?

4      A.    Yes, sir.

14:25:29  5      Q.    You indicate there that it's a minimal first

6  step; is that right?

7      A.    Yes.

8      Q.    And that it would be a step towards preventing

9  further exposure from any incidents; is that right?

14:25:43  10      A.    That was my conclusion, yes, sir.

11      Q.    And what do you mean by "further exposure" in

12  that context?

13      A.    Well, I -- I meant incidents such as had

14  occurred of where the department would be embarrassed by

14:25:58  15  its lack of extensive policies and procedures.

16      Q.    And do you feel like that's what had happened

17  in this instance, that the Department and the City were

18  embarrassed by the lack of policies and procedures?

19      A.    I couldn't speak for the City or the

14:26:21  20  Department.  I can say that I felt embarrassed at the

21  findings.

22      Q.    And you were doing what you could to make sure

23  it didn't happen again; is that --

24      A.    Yes, sir.

14:26:31  25      Q.    -- an accurate assessment?

SHARP HOLLAND
METRO (817) 731-1377

14:26:32  1      A.    Yes, sir.

2      Q.    You indicate on the next bullet point what you

3  recommend with regard to administrative action and Chief

4  Scheopner; is that right?

14:26:45  5      A.    I'm sorry?

6      Q.    I'm skipping over to page 11 and under the

7  administrative action section that began on page 10 --

8      A.    Yes.

9      Q.    -- you suggest what should be done with regard

14:26:56  10  to Chief Scheopner --

11      A.    Yes.

12      Q.    -- you're making this recommendation to

13  Ms. Flores -- to Ms. Prim?

14      A.    Yes.

14:27:02  15      Q.    Okay.  What was your recommendation with regard

16  to Chief Scheopner?

17      A.    It was my recommendation that he be returned to

18  his former rank of lieutenant under Civil Service Law.

19  This was the procedure for removal of a chief who had

14:27:24  20  been promoted from within.

21      Q.    And why did you feel like that action should be

22  taken?

23      A.    I felt he could no longer be effective in his

24  position as Chief of Police.

14:27:42  25      Q.    Well, did you feel like that Chief Scheopner

14:27:56   1   had failed to properly investigate and objectively

2   report to the Assistant City Manager the facts

3   surrounding this border patrol shooting?

4       A.   Yes.

14:28:06   5       Q.   Did you feel like there were contradictions in

6   Chief Scheopner's written and oral statements regarding

7   this sharpshooter duty story as a -- that constituted,

8   in your words, a major situation embellishment?

9       A.   Yes, sir.

14:28:51   10      Q.   And did you ultimately conclude the Chief

11  should be relieved of duty at once and appointed to his

12  former rank of lieutenant?

13      A.   Yes, I did.

14      Q.   You have a discussion there about who might be

14:29:04   15  appointed in the interim to act as Chief of Police, but

16  in any event, you suggested that -- or you urged that

17  swift action be taken?

18      A.   Yes, I did.

19      Q.   You discussed there what should be done with

14:29:16   20  regard to administrative action pertaining to Captain

21  Vasquez and Detective Moore; is that right?

22      A.   Yes, sir.

23      Q.   And what were your recommendations after

24  conducting your investigation with regard to

14:29:36   25  Captain Vasquez and Detective Moore?

SHARP HOLLAND
METRO (817) 731-1377

14:29:36   1      A.    I recommended that they be put on paid

2    administrative leave and subject to a disciplinary

3    review.

4      Q.    Now, what is paid administrative leave?  Did I

14:29:47   5    say that right?

6      A.    Yes, sir.  It's -- it's time off with pay.

7    It's nonpunitive release from duty while a matter is

8    reviewed.

9      Q.    And what is a disciplinary review?

14:30:12  10      A.    As I used it in that term -- let's see.  I

11    think I -- the next paragraph kind of picks up on that.

12    Because it is a Civil Service regulated department, only

13    the department head, that is Chief of Police, may

14    discipline members of a Civil Service Department.

14:30:34  15          Therefore, since I just recommended he be

16    removed, I suggested these alternatives, that the acting

17    Chief, whoever it is, be appointed to -- be instructed

18    to appoint a third party to review the investigative

19    material and, I guess, in short make a recommendation

14:30:52  20    for any discipline that would be appropriate for

21    Captain Vasquez or Detective Moore or other officers who

22    were responsible.

23      Q.    Now, who was appointed as Acting Chief?

24      A.    Robert Archer.

14:31:07  25      Q.    And did Robert Archer as Acting Chief conduct

14:31:11  1  a -- an administrative review of -- or disciplinary

2  review of Captain Vasquez and Detective Moore?

3      A.   No.

4      Q.   And why was that not done?

14:31:27  5      A.   I believe he was instructed not to.

6      Q.   And do you know who instructed him not to?

7      A.   I think it was -- again --

8           MR. LOCKHART:  If it's attorney-client, I

9  would instruct him not to answer.

14:31:40  10     Q.   (BY MR. AINSWORTH)  Well, let me ask you like

11  this:  Do you know if anybody like the City Manager or

12  City Commissioners instructed the Acting Chief not to

13  take any disciplinary action with regard to Vasquez or

14  Moore?

14:31:56  15     A.   My understanding, it was under advice of

16  counsel.

17          Is something wrong?

18     Q.   That's fine.  You're doing good.  I'm not doing

19  very well asking the question.

14:32:07  20          In any event, you indicate there on the last

21  page --

22          MR. LOCKHART:  Just for the record, we're

23  not waiving any attorney-client privilege by not

24  interrupting by clearly a question that didn't call for

14:32:18  25  it and a response that was not responsive to the poor

| | |
|---|---|
| 14:32:25 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 14:32:33 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 14:32:40 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 14:32:55 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 14:33:13 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 14:33:25 | 25 |

1    question.

2              MR. AINSWORTH:  Now, he's calling my

3    questions names.

4              MR. LOCKHART:  I don't mean it in a

5    derogatory sense.

6              MR. AINSWORTH:  I understand.

7    Q.   (BY MR. AINSWORTH)   On page 13, it indicates

8    that the third party reviewer should then make

9    recommendations as to disciplinary action.

10             Are you aware of whether or not any

11   disciplinary action was ever taken with regard to

12   Captain Vasquez or Detective Moore relative to this

13   shooting of the border patrol agents and the Cameron

14   County Deputy Sheriff?

15             MR. LOCKHART:  And I'm going to object for

16   the record.  I think you've mischaracterized his

17   findings on the page before.  You misstate that the

18   document itself and the evidence as to what the findings

19   were with regard to these two individuals.

20   Q.   (BY MR. AINSWORTH)   Well, I'm trying to ask,

21   if you look at page 13 there, okay, about the middle of

22   the page, you indicate that this third party reviewer

23   should then make recommendations as to disciplinary

24   action.

25             Now, as I understand it, you're talking about

14:33:27   1   disciplinary action, if any, as to Captain Vasquez and

           2   Detective Moore; is that right?

           3        A.   Yes, sir.

           4        Q.   And -- and any others that might be responsible

14:33:35   5   is what you're indicating?

           6        A.   Yes, sir.

           7        Q.   Okay.  Do you know whether or not any

           8   disciplinary action was ever taken as to Captain Vasquez

           9   or Detective Moore?

14:33:50  10        A.   In -- in regards to this report, I -- I can

          11   say -- I'm going to have to answer this two ways -- make

          12   two points in my response.

          13             In regards to this report, the intention was --

          14   I guess, my recommendation is that either a captain

14:34:08  15   within the Department be promoted as Interim Chief or

          16   that -- and I believe -- I say -- a credible

          17   professional outside of the Department be appointed as

          18   Interim Chief.  Those are my recommendations.

          19             And so those kind of precede this

14:34:26  20   recommendation because the point that I'm trying to get

          21   to is that I didn't feel competent to make a

          22   disciplinary review of police procedure.  They needed a

          23   competent objective professional to do that, and that's

          24   what I asked to happen in this report.

14:34:46  25             Did that ever happen?  No police professional

14:34:48  1   never made, to my knowledge, a disciplinary study of --

2   of this incident.

3        Q.   After your report dated October 14th, 1998, was

4   given to Ms. Prim, was Chief Scheopner disciplined in

14:35:13  5   the manner that you suggested in the report, where he

6   would be relieved of duty at once and appointed to his

7   former rank of lieutenant?

8        A.   Eventually, he was, sir, yes.

9        Q.   Was -- as far as you know, was any other

14:35:32  10   investigation conducted prior to the time that

11   Chief Scheopner was reduced to the rank of lieutenant

12   between when your report came out and when he was

13   reduced?

14        A.   There was an independent investigation done by

14:35:46  15   a consultant, yes, sir.

16        Q.   Okay.  Was that the report that was done by

17   this fellow Roberson?

18        A.   Yes, Jim Roberson.

19        Q.   Did you review that report?

14:35:56  20        A.   Not -- not in entirety or even a reasonable

21   draft of it.  Jim worked in an office fairly adjacent to

22   mine.  I worked rather independently, but from time to

23   time, he would call me in and discuss the case with me.

24   I guess he was questioning me as well.

14:36:20  25        Q.   Did -- do you know when Mr. Roberson completed

14:36:22   1    his report?

2        A.    No, I'm sorry.  I don't.

3        Q.    Do you know when Chief Scheopner was reduced to

4    the rank of lieutenant?

14:36:32   5        A.    I would think we probably have something

6    here --

7                    THE WITNESS:  Don't we, to indicate that?

8                    MR. LOCKHART:  I don't think I'm aware of

9    that if there is something in the documents.

14:36:53  10                    MR. AINSWORTH:  Tell you what.  If you

11    want to take a look just a second.  Let me get another

12    shot of coffee.

13                    THE WITNESS:  Okay.

14                    MR. LOCKHART:  Let's go off the record.

15                    (Break taken.)

16        Q.    (BY MR. AINSWORTH)  Okay.  I was trying to

17    piece together in my mind what takes place between the

18    time that you write your October 14th, 1998, report that

19    we've marked as Exhibit 3 --

20        A.    Okay.

21        Q.    -- and when the Chief Scheopner steps down to

22    the rank of lieutenant.  First of all, do we know when

23    he stepped down to the rank of lieutenant?  You may not

24    know this.

14:41:10  25        A.    I'm sorry.  I don't have that.

14:41:11  1      Q.   I don't think I know that either off the top of

2  my head.

3           In the interim, did you conduct any other

4  investigation into police procedures or weapons handling

14:41:21  5  policies at Harlingen relative to this July 7th

6  incident?

7      A.   No.

8      Q.   Do you know of any other --

9      A.   Well, you know, this --

10      Q.   Yes, sir.

11      A.   I'm getting confused with the dates on this.

12      Q.   Okay.  But after you did this report that we

13  marked as Exhibit No. 3, did you do any other reports

14  about your investigation?

14:41:44  15      A.   I don't know.

16      Q.   Okay.

17      A.   I don't know.

18      Q.   We don't have one in front of us today, so I'm

19  assuming there was not a formal written report?

14:41:52  20      A.   In response to your subpoena, I -- I kept a

21  stack of the Harlingen stuff, the Harlingen documents,

22  and I submitted them all to the attorney.  And he

23  reviewed them and -- and passed them over, so I'm

24  relying on my attorney's responsiveness.

14:42:13  25      Q.   As far as you know, though, in preparing for

SHARP HOLLAND
METRO (817) 731-1377

14:42:14  1  your deposition today, you don't remember seeing a

2  report that you drafted dated after October 14th, 1998?

3       A.   No.

4       Q.   I glean from your previous response that from

14:42:23  5  time to time Mr. Roberson might talk to you in pursuant

6  to his own investigation?

7       A.   Right.

8       Q.   As to whether or not the Roberson report came

9  out before the police chief was demoted, do you have

14:42:37  10  recollection one way or the other?

11       A.   I really don't know.

12       Q.   Now, in your report, you talk about a -- on the

13  last page of the report that the Acting Chief be

14  instructed to appoint an objective expert third party to

14:43:01  15  review the existing investigatory material, make

16  appropriate further inquiry and hold separate

17  disciplinary hearings.  Do you see that discussion?

18       A.   Yes, sir.

19       Q.   Okay.  And what you're suggesting there, is it

14:43:15  20  fair for me to understand, that the Police

21  Chief Scheopner should step down --

22       A.   Right.

23       Q.   -- a new Acting Chief should be appointed,

24  correct?

14:43:24  25       A.   Right.

SHARP HOLLAND
METRO (817) 731-1377

14:43:25  1      Q.   And that the Acting Chief should then retain

2    this objective expert third party to conduct a review?

3      A.   Yes, uh-huh.

4      Q.   Okay.  Now, the purpose that's discussed here

14:43:37  5    in this paragraph is not to conduct that review so as to

6    defend any actions, any legal actions brought by the

7    families of the border patrol agents, was it?

8      A.   No.

9      Q.   The purpose was to bring the Harlingen Police

14:43:55  10   Department up to standard, up to snuff if, in fact, it

11   needed to be improved?

12      A.   In this specific case, the purpose would be to

13   administer appropriate civil service discipline to these

14   officers if it was -- if it was appropriate.

14:44:15  15      Q.   Okay.

16      A.   Yes.

17      Q.   To make inquiry to see whether or not any

18   violations had occurred?

19      A.   Yes, sir.

14:44:20  20      Q.   Okay.  And, in fact, was an objective expert

21   third party appointed to review existing investigatory

22   material and make appropriate further inquiry?

23           MR. LOCKHART:  As is recommended here?

24      Q.   (BY MR. AINSWORTH)   As you've recommended

14:44:36  25   here?

14:44:36 1    A.    Not for this purpose, no.

2    Q.    Okay.

3    A.    I -- I surmise you're talking about Jim

4 Roberson.

14:44:44 5    Q.    What was your understanding of why Mr. Roberson

6 was hired?

7    A.    I -- I -- I'm not sure.  I wasn't consulted.  I

8 do know that he reviewed a lot of the similar facts as I

9 did, but I -- it never was my opinion that he was going

14:45:02 10 to make recommendations for discipline.

11    Q.    Okay.  And I don't mean to use any artifice or

12 guile -- what -- to this point I've not -- I've not seen

13 Mr. Roberson's report.  It's my understanding that the

14 objection to my obtaining that report is based upon the

14:45:26 15 fact that he has been retained to consult with counsel

16 in preparation of a defense in anticipation of

17 litigation.

18    A.    Right.

19    Q.    If that report -- my argument is if that report

14:45:40 20 is to be used for something like purposes of conducting

21 a --

22    A.    Discipline --

23    Q.    -- a separate disciplinary hearing --

24    A.    Right.

14:45:48 25    Q.    -- then I would have an argument to get the

14:45:49  1  report.  I mean, you're telling me it was not used in

2  that particular context?

3      A.    I did not -- I never had the impression that

4  Mr. Roberson was going to conduct a disciplinary

14:46:02  5  hearing, no, sir.

6      Q.    Okay.  Now, if -- my argument also is that if

7  the report is to be used to bring the procedures at the

8  police department up to national standards that I'm

9  entitled to, do you know if the report was used in any

14:46:14  10  way to review policies and procedures at the Department

11  in order to see if they comported with the National

12  Standards for weapons handling and weapons training?

13      A.    I don't know.  The City Manager hired Jim and

14  she's the one who determined the purpose of his report.

14:46:37  15      Q.    The City Manager issued a couple of statements

16  regarding this July 7th shooting; is that right?

17      A.    Yes.

18      Q.    Okay.  And have a -- you may have a couple of

19  those in front of you there.

14:46:48  20      A.    Okay.

21          MR. AINSWORTH:  Let's mark the next one as

22  No. 6, is that what it is?

23          (Exhibit Nos. 6 and 7 marked.)

24      Q.    (BY MR. AINSWORTH)  Okay.  Now, the first thing

14:47:19  25  we are looking at as -- is marked Exhibit No. 6, do you

14:47:23   1   see that?

2   A.   Yes, uh-huh.

3   Q.   And then in the upper right-hand corner it

4   says, Faxed October 28, 1998.  Do you see that?

14:47:31   5   A.   Yes.

6   Q.   I don't really see a date on it elsewhere, do

7   you?

8   A.   No, I don't.

9   Q.   Does that sound about like when it would have

14:47:41   10   been --

11   A.   I presume --

12   Q.   -- presented, late October, 1998?

13   A.   It sounds about right, yes, sir.

14   Q.   And it indicates there that it is a statement

14:47:48   15   from the City Manager and then towards the bottom of the

16   page, it indicates that she's introducing you, Joe

17   LaBeau, as Assistant City Manager as well as others?

18   A.   Yes, sir.

19   Q.   Okay.  Was this presented at a press conference

14:48:01   20   or how was this presented?

21   A.   At a press conference.

22   Q.   And do you remember the press conference?

23   A.   Yes, sir.

24   Q.   Do you remember where it would have been held?

14:48:09   25   A.   Yes.  It was at Town Hall, City Hall.

14:48:13 1     Q.   And was Ms. Prim in addition to her remarks to

2  the press that day providing a written copy of this

3  statement from the City Manager to the press on about

4  that day?

14:48:24 5     A.   I don't know.  I really don't know whether she

6  gave them a copy of this or not.

7     Q.   Okay.  Did you assist Ms. Prim in preparing

8  this statement, the written statement?

9     A.   I don't know.  I think she wrote it herself.

14:48:44 10     Q.   Okay.  Now, on the back page, the second page

11  of the two-page document we've marked as Exhibit No. 6,

12  it indicates that our review and study are ongoing.

13     At that point in time had you -- were you

14  continuing to review and study the police department

14:49:01 15  procedures and practices relative to the July 7th, 1998,

16  shooting?

17     A.   Okay.  Let's see.  The date is 10-28, and

18  where's my report?

19     Q.   It's the 14th.

14:49:30 20     A.   I was finished when I made this report.  I

21  suspect there may be something wrong with this fax date.

22  I would check the date of this press -- press

23  conference.  It's a matter of record and surely, you

24  could find that.

14:49:46 25     Q.   Okay.  And then she indicates here that, "I can

14:49:46  1   assure you that we will be able to give you a better

2   idea in the days and weeks ahead of when an

3   administrative report will be presented to the City

4   Commission and to you and to the police."

14:50:01  5        Now, are you aware of a concluding

6   administrative report in this instance?

7        A.   Concluding administrative report.  I guess it's

8   this one.

9        Q.   Okay.  And you're looking at what we've marked

14:50:14  10  as Exhibit No. 7?

11       A.   Yes.

12       Q.   Okay.

13            MR. LOCKHART:  Just for your information,

14   that's the one he had in his file that, you know, has

14:50:22  15  the draft on it, but we compared it to the final that

16   Natalie testified about, and they're identical except it

17   just has draft on it.

18       Q.   (BY MR. AINSWORTH)   So let's look at

19   Exhibit No. 7 for just a second.  And that is entitled

14:50:38  20  City Manager's Report to the City Commission concerning

21   the 7th of July 1998 shooting incident; is that right?

22       A.   (Nodding head.)

23       Q.   And you're nodding head and you're telling me

24   that it is, right?

14:50:47  25       A.   Yes.

14:50:48  1      Q.    And it's dated -- the date of the report is

2   Wednesday November 4th, 1998?

3      A.    Yes, sir.

4      Q.    Okay.  Did you assist at all in the preparation

14:51:19  5   of the City Manager's Report that we've marked as

6   Exhibit No. 7?

7      A.    Assisted at all -- I -- well, that's -- I

8   didn't write it, and I made it -- you know -- I may

9   have -- she may have consulted with me about some aspect

14:51:39  10  of it, sir.  But it's her report.

11     Q.    Okay.  Well, look over with me on page 4, the

12  last page of the report.  Under the heading conclusion

13  there --

14     A.    Yes.

14:51:53  15     Q.    -- Ms. Prim indicates that management has

16  concerns whether Department policies, procedures and

17  practices are in conformances with professional best

18  practices.  Do you see that paragraph?

19     A.    Yes, I do.

14:52:05  20     Q.    Now, did you talk with Ms. Prim about whether

21  or not the Police Department's policies and procedures

22  and practices were in conformance with professional best

23  practices?

24     A.    Again, my -- I guess -- I think of the report

14:52:19  25  that I made and I think it certainly covers that area.

14:52:23  1          Q.    All right.  And, in fact, if we flip back to

2      your report, you had indicated that -- I'm sorry -- that

3      one of the things that should be done is that the police

4      department should follow --

14:53:12  5                      MR. LOCKHART:  What page are you looking

6      at?

7                      MR. AINSWORTH:  I'm looking at page 10.

8          Q.    (MR. AINSWORTH)  National Law Enforcement

9      Standards or should implement the National Law

10     Enforcement Standards --

11         A.    Yes, sir.

12         Q.    -- is that right?

13         A.    Yes, sir.

14         Q.    And would you characterize those National Law

14:53:22  15     Enforcement Standards as professional best practices?

16         A.    I would.

17         Q.    Okay.  She indicates in the second point there,

18     that in addition there may be a range of actions

19     required to ascertain the appropriate policy, procedure

14:53:36  20     and practice standards required to maintain and support

21     the City of Harlingen Police Department.

22              And then finally, Because of the highly

23     specialized nature of law enforcement, management

24     concludes the need for expert assistance in evaluating

14:53:53  25     and reviewing the above.  Do you see that paragraph?

14:53:56   1      A.    Yes, sir.

2      Q.    Now, is it your understanding that in order to

3   see that the city comported with these best practices,

4   that outside expert consultant would be retained to

14:54:10   5   evaluate and review the City of Harlingen Police

6   Department's policies, procedures and practices to

7   see -- in which instances they comported with the best

8   practices and in which instances they deviated from the

9   best practices?

14:54:26  10      A.    Well, I think you're getting back to the

11   purpose of retention of Mr. Roberson.  I really can't

12   say what was in her mind when she retained him.

13      Q.    Okay.  Was anybody -- I'm sorry.

14      A.    I just wanted to say that she had many private

14:54:42  15   meetings with me and many private meetings with counsel

16   and he, which I was not a part.

17      Q.    Well, was anybody else hired in order to

18   observe whether or not the policies and procedures of

19   the Harlingen Police Department comported with best

14:54:55  20   practices, other than Mr. Roberson?

21      A.    Well, time -- time line, probably sometime

22   later, but I know that we had a personnel lawyer come in

23   and do harassment training.  I mean, is that --

24      Q.    He came in and taught y'all how to harass?

14:55:14  25      A.    No.  She came in, hopefully for prevent us from

1  it.

2      Q.   No, I'm giving you a hard time.

3      A.   Yeah.

4      Q.   As of November 1998 --

5      A.   Yes, sir.

6      Q.   -- anybody other than Roberson hired to check

7  the policies and see if they comported with best

8  practices?

9      A.   No, no.

14:55:30 10   Q.   Okay.  Now, if we go back to your report that's

11  marked as Exhibit No. 3, as best you can recollect, your

12  original report just had 13 pages; is that right?

13      A.   I -- I can't say.

14      Q.   Okay.  Were there any attachments to the -- any

14:55:57 15  interoffice memorandum that we've marked as

16  Exhibit No. 3?

17      A.   I can't say.  I do not recall.

18      Q.   Now, as we go through the report there will be

19  gaps --

14:56:08 20   A.   Yes, sir.

21      Q.   -- like at the bottom of page 2 and before

22  page 3.

23      A.   Uh-huh.

24      Q.   Now, is there a report somewhere that has those

14:56:21 25  gaps filled in?

14:56:21    1          MR. LOCKHART:  Yes, there is.  There

2   certainly is, and I am the one that created those gaps.

3          MR. AINSWORTH:  Okay.

4          MR. LOCKHART:  This is a hybrid report,

14:56:29    5   Price.  It has a lot of attorney-client communication

6   and work product in it, and I thought I could do it a

7   couple of ways.  I could just refuse to produce the

8   whole report.  I'm not so sure that this report is

9   discoverable, but I wanted to give you the benefit of

14:56:44   10   his investigation, but I didn't want to waive any

11   attorney-client privilege.  So I took his original

12   report, and I redacted the parts that were

13   attorney-client or work-product --

14          MR. AINSWORTH:  Okay.

14:56:56   15          MR. LOCKHART:  -- and that's where you see

16   the gaps.  You'll also see a couple of gaps where it

17   talks about people at meetings.  What's missing is my

18   name.

19       Q.    (BY MR. AINSWORTH)   Well, have you compared

14:57:20   20   Exhibit No. 3 as we've marked it today --

21       A.    Yes, sir.

22       Q.    -- to the unredacted version?

23       A.    No, I haven't.

24       Q.    Okay.  And you don't have --

25       A.    Well --

SHARP HOLLAND
METRO (817) 731-1377

14:57:29   1      Q.     -- I mean, not recently?

           2      A.     Well, I did briefly, yes, I did.  To be

           3    honest -- when he brought -- when I met with Tom this

           4    morning, he brought me the stack of papers that I had

14:57:42   5    given him, and he had given back to me.  And he gave me

           6    a smaller stack that said these -- these what were

           7    responsive to your subpoena.

           8      Q.     Yes, sir.

           9      A.     Okay.  And then he said there's -- he drew my

14:57:57  10    attention to the report, and he said that there were

          11    some sections that he had taken out for attorney-client

          12    privilege, and he was going to explain that and ask

          13    you -- was going to explain that.

          14            He got called from the room and while he was

14:58:11  15    from the room, I went to the original stack and started

          16    to make a comparison.  And I noticed some of these

          17    paragraphs, as to their substance, they seemed to all

          18    include -- there seemed to be a paragraph about my

          19    report to Tom.

14:58:30  20      Q.     Okay.

          21      A.     And that's -- that's about all I remember.

          22      Q.     Okay.  What -- that's what -- I don't mean to

          23    ask you about what did the sentences say --

          24      A.     Okay.

14:58:35  25      Q.     -- what I mean to ask you is, is there a topic

14:58:38   1   area like if we go to the bottom of page 2, there's --

2   under the heading, Investigation by Assistant City

3   Manager, there's a paragraph.  See that?

4       A.   Right.

14:58:46   5       Q.   And then it appears that there's a missing

6   section from that page?

7       A.   Right.

8       Q.   Would you expect that that missing section is a

9   discussion about your conversations with Mr. Lockhart?

14:58:58   10       A.   Yes.

11       Q.   Okay.  It's not further investigation that you

12   had with other City personnel or Police Department

13   personnel?

14       A.   I don't think so.  I honestly don't -- I don't

14:59:07   15   know because I just scanned.

16       Q.   Okay.  And is in any of the missing parts from

17   the report that we've marked as Exhibit No. 3, are they

18   discussions that you had with Mr. Roberson?

19       A.   No.  I'm fairly certain there's nothing in my

14:59:26   20   report concerning Mr. Roberson.

21       Q.   Okay.  I've kept you for an hour and a half,

22   and I appreciate your time.  Let me do a couple of

23   housecleaning measures, if I can.

24       A.   Yes, sir.

14:59:46   25       Q.   For the most part, you've investigated the City

|  |  |  |
|--|--|--|
| 14:59:48 | 1 | of Harlingen Police Department's handling of the AR-15 |
|  | 2 | assault rifle and the Police Department's procedures for |
|  | 3 | training folks with the use of weapons; is that right? |
|  | 4 | A.    That's right, uh-huh. |
| 15:00:03 | 5 | Q.    As far as what happened on the morning of |
|  | 6 | July 7th about either the earlier shooting that morning |
|  | 7 | or the shooting out at the Detective Moore's house, did |
|  | 8 | you conduct any type of investigation as to what |
|  | 9 | happened? |
| 15:00:17 | 10 | A.    No, not at all. |
|  | 11 | Q.    Or as to who knew what when, like, when |
|  | 12 | Chief Scheopner knew that Detective Moore's son might |
|  | 13 | have been involved in that shooting? |
|  | 14 | A.    No, sir, that was a criminal matter.  And so I |
| 15:00:30 | 15 | think it was outside the scope of my administrative |
|  | 16 | investigation. |
|  | 17 | Q.    Did you make any kind of inquiry as to who all |
|  | 18 | had been involved in the earlier shooting where |
|  | 19 | Mr. Moore was injured? |
|  | 20 |         MR. LOCKHART:  You're talking about Rio |
|  | 21 | Honda? |
|  | 22 | Q.    (BY MR. AINSWORTH)  Over at Rio Honda. |
|  | 23 | A.    Did I make some kind of investigation -- |
|  | 24 | Q.    Yes, sir. |
|  | 25 | A.    -- into that matter? |

15:00:53   1          No, sir.

2          Q.    All right.  Did you determine how many -- of if

3     anybody was with Ernest Moore when he went over to that

4     house or anything like that?  Did you investigate that

15:00:58   5     type of question?

6          A.    No.  The most I might have pursued it was to

7     ask if there was another police weapon involved.

8          Q.    Okay.  Did you make any inquiry as to where

9     Mr. Ernest Moore had obtained the weapon that he used at

15:01:15  10     the Rio Honda shooting?  You may not recollect either.

11          A.    Your question again?

12          Q.    You know, do you know where he got the gun that

13     he used at the Rio Honda shooting?

14          A.    Captain Vasquez told me.

15:01:28  15          Q.    And what's your understanding as to where

16     Ernest Moore got that gun?

17          A.    I -- well, I can't trace it, but I know that

18     originally, it was Captain Vasquez's gun.  I believe it

19     was.  I don't know -- speculation.

15:01:45  20          Q.    That's what you recollect anyway?

21          A.    Something like that, yeah.

22          Q.    And it might have been sold to the family or

23     whatever --

24          A.    Something like that, yeah.

15:01:45  25          Q.    Okay.  What about --

15:01:49  1      A.    My -- my interest stopped in it as soon as it

2   was clear to me it wasn't a police department weapon.

3   It wasn't a City weapon.

4               MR. LOCKHART:  You say it wasn't?

15:01:56  5               THE WITNESS:  Was not, yeah.  It wasn't

6   City property.

7      Q.    (BY MR. AINSWORTH)  Did you ever talk with

8   Chief Scheopner about the events that happened that

9   morning over at Detective Moore's house?

15:02:11 10      A.    Oh, I'm sure -- I'm sure I did.

11      Q.    Did you ever come to any kind of understanding

12   as to what time of day he understood that Ernest Moore,

13   Detective Moore's son was a suspect in the Rio Honda

14   shooting?

15:02:30 15      A.    About what time of day?

16      Q.    You know, was it 6:00 a.m. or 7:00 a.m. or

17   whatever time?

18      A.    Boy --

19      Q.    Would it be --

15:02:35 20      A.    -- I don't recollect, sir.  The conversations

21   that we had about that matter would have been more

22   side-bar, the more artificial part of my duties.  I

23   wouldn't rely on that information.  It wasn't an

24   official report of police actions or findings.

25      Q.    All right.  I don't know if we need to mark

SHARP HOLLAND
METRO (817) 731-1377

15:02:57  1  this or not.  You brought with you today a couple other

2  documents that were from the Harlingen Police

3  Association; is that right?

4      A.   Right.

15:03:03  5      Q.   It looked like a couple dated October 6th, '98,

6  and one dated October 14th, 1998.

7           What are these documents?

8      A.   Let me look at them.  Here they are.  I think

9  these are requests from the Harlingen Police Association

15:03:20  10  for, if memory serves, an independent investigation.  I

11  think they wanted the Civil Service Commission to do an

12  investigation.

13      Q.   And why were these documents in your possession

14  from the Harlingen Police Association?

15:03:40  15      A.   Oh, I had been probably copied.  They usually

16  copied me when -- they might not have put it on the

17  letter, but often they would copy me.

18      Q.   Okay.  And so when you got the carbon copy, you

19  just put it in your file regarding this matter?

15:03:53  20      A.   Yes, sir.

21      Q.   Okay.  Did you initiate any type of Civil

22  Service investigation or ask that one be done?

23      A.   No, no.

24      Q.   Other than the mention that we had in your

15:04:04  25  report that we marked as Exhibit No. 3, I think, about

15:04:09    1    if one's going to be done, it has to be done regarding

           2    the Police of Chief and that sort of thing?

           3        A.    It has to be done according to the procedure,

           4    yes, sir.

15:04:16    5        Q.    Okay.  But you didn't call for any initial --

           6    any investigation other than in that report?

           7        A.    No.

           8        Q.    Okay.  Well, let me ask you then some general

           9    follow-up questions about -- based upon your

15:04:41   10    investigation of this matter, if proper police

          11    procedures had been employed, do you feel like the

          12    Olympic Arms rifle would have been available to Ernest

          13    Moore on the morning of July 7th, 1998?

          14                MR. LOCKHART:  Objection, form.

15:05:01   15            You can answer.  I'm just making an objection

          16    for the record.

          17                THE WITNESS:  Oh.

          18        A.    I think probably it would have been available.

          19    I think we would have had proper documentation to

15:05:15   20    support.  There was probably nothing wrong with

          21    Detective Moore having that weapon for a -- for a

          22    duty -- duty weapon.

          23            It's just that we didn't have the supporting

          24    documentation and training.  So I think we've  been

15:05:31   25    better -- much better represented had we done those

15:05:33 1    things.

2        Q.   (BY MR. AINSWORTH)   What today you mean by much

3    better represented?

4        A.   Well, we could have pointed to all of our

15:05:38 5    procedures to show that, you know, he had checked it

6    out, and that it had been properly assigned.  And we

7    wouldn't have had this -- this story of sharpshooter,

8    which was an embarrassment.

9            And I think he would have -- we would have seen

15:05:54 10   to it that he had periodically trained with it and

11   gotten certified.

12       Q.   Well, if we go back step by step and look,

13   first of all, at when Ms. Pirtle brought the gun in.  I

14   guess, if the gun had been destroyed at that point

15:06:11 15   rather than distributed, then it wouldn't have been

16   available to Mr. Moore, would it, to Ernest Moore?

17       A.   No, certainly not.

18       Q.   Okay.  If the weapon had been kept in the

19   assignment -- in the evidence locker until assigned --

15:06:22 20   and we know it never was assigned.  There's no written

21   assignment, correct?

22       A.   It's --

23       Q.   You never found a written assignment?

24           MR. LOCKHART:  Price, you've asked about

15:06:31 25   four questions.

15:06:32  1     Q.   (BY MR. AINSWORTH)  Let me interrupt you.  You

2  never got a -- you never found a written assignment

3  whereby this weapon was assigned to R.D. Moore, correct?

4     A.   That's right.

15:06:41  5     Q.   Okay.  So if it had still been in the evidence

6  locker like it was supposed to have been before it was

7  assigned, then it wouldn't have been available to Ernest

8  Moore on the morning of the shooting, would it?

9     A.   If it was still in the evidence locker,

15:06:53  10  certainly not.

11     Q.   If it had been kept in the rust-free

12  environment behind the filing cabinet in Ernest

13  Moore's -- I mean, R.D. Moore's office and locked up, it

14  wouldn't have been at his house, right?

15:07:10  15     A.   That's right, sir.

16     Q.   If it had been locked in his police vehicle,

17  and locked in a mount in his vehicle, then it wouldn't

18  have been in his house, right?

19     A.   That's right, sir.

15:07:14  20     Q.   If it had been in a safe in his room, it

21  wouldn't have been available to his son that morning,

22  right?

23     A.   I can't say.

24     Q.   Okay.

15:07:23  25     A.   You're making a distinction of where it was

15:07:27   1   located, and I don't have any knowledge about that.

2       Q.   Okay.  Okay.  In any event, if it had been

3   assigned only after the police officer R.D. Moore had

4   received training with the weapon -- but we know in this

15:07:41   5   instance he didn't get any training, right?

6       A.   No, not within a reasonable period, yes, sir.

7       Q.   Okay.  So if we -- if it had been assigned

8   after he had received the training in this instance, it

9   wouldn't have gone to his home, correct?

15:07:54  10       A.   Yes, that's correct.

11       Q.   So it looks like if each of the procedures had

12   been followed, the weapon wouldn't have been in the

13   son's bedroom on the morning of July 7th, '98; isn't

14   that right?

15:08:07  15       A.   Well, I don't know that I can really -- I don't

16   think that that's the truth.  I -- I really don't.

17       Q.   Well, if it had been assigned out properly --

18       A.   Okay.

19       Q.   -- and we know it wasn't assigned in this case,

15:08:20  20   right?

21       A.   Right.

22       Q.   So it would have still been at the police

23   station, wouldn't it?

24       A.   Well, is this -- isn't this -- if it would been

15:08:28  25   assigned out properly, he would have it.  But it would

15:08:32  1   be -- it would be -- it would be documented.  So he

2   would have it if it had been assigned out properly.

3       Q.   If he had been trained with it --

4       A.   I feel like I'm --

15:08:39  5       Q.   Well -- and I don't mean to be in double speak

6   with you.  But what I'm trying to get to is:  If any of

7   the procedures along the way had been followed -- all

8   right -- then the purpose of those procedures is not to

9   permit an assault weapon to be laying around at the

15:08:59 10  police detective's son's bedroom, aren't they?

11               MR. LOCKHART:  I'm going to object to that

12  as form and misstates his earlier testimony.

13               You can answer, if you can.

14      A.   I think what's wrong -- why I can't agree with

15:09:16 15  your logic, is that I think each one of these procedures

16  could have easily been accomplished and that the

17  assignment of the weapon was going to take place

18  nonetheless.

19               And that it wasn't the procedures that would

15:09:30 20  have kept the assignment from happening, it was that the

21  procedures were neglected, the assignment would have

22  been made, I think, irrespective of -- of the -- and

23  were made irrespective of the fact that the procedures

24  were not followed.  But if the Captain wanted to let the

15:09:50 25  Detective have the rifle for a duty weapon, it was going

SHARP HOLLAND
METRO (817) 731-1377

15:09:54   1   to happen.  I mean, there's no reason not to.

2       Q.   (BY MR. AINSWORTH)  Well, but -- I mean, the

3   rules aren't just rules for -- so that people have to

4   jump through hoops.  The rules have a purpose.

15:10:07   5       A.   Right.

6       Q.   And I guess part of those is to see that the

7   right people have weapons that they're trained for,

8   isn't it?  Doesn't that sound like a logical reason for

9   some of these rules?

15:10:16  10       A.   That's a logical reason, yes, sir.

11       Q.   And the purpose is to keep the weapon out of

12   the hands of folks that aren't trained and supposed to

13   have these weapons?

14       A.   That's a jump in logic that I can't quite make

15:10:32  15   with you.  I feel that it would have been more prudent

16   had those procedures been followed, but I don't think

17   that the purpose of the procedures was where as you say,

18   to keep the weapon out of Detective Moore's hands.

19            I think the purpose of the procedures were to,

15:10:59  20   let me just say, to ensure that he could perform his

21   duties professionally if called upon to do it and use

22   the weapon, to ensure that we, the City, could justify

23   its control of the weapons.  I think those were the

24   purposes of the procedures.

25            So where I'm trying to make a distinction is

15:11:15   1   that I -- I don't think it's fair to say that but for

2   following, you know, the procedures he would have had

3   this -- this gun.  I think he had -- his assignment of

4   the gun was lawful, even appropriate.

15:11:27   5        What was inappropriate here was there were a

6   number of procedures that were not followed, and they

7   should have been followed.  And it's -- it's regretful

8   that they weren't.

9        MR. AINSWORTH:  I think that's all I have.

15:11:42   10  I appreciate your time.

11                  **EXAMINATION**

12  BY MR. LOCKHART:

13       Q.   I have just a couple of follow-up.  And Joe, I

14  may be just getting old and my ears get clogged and I

15:11:53   15  don't hear.

16       And I may have misheard this, but I think while

17  ago at one time Price asked you a question such as that

18  you had made a finding that the Chief of Police had made

19  false statements or reports regarding the border patrol

15:12:23   20  shootings, and I think your answer was yes.  I may be

21  mistaken and the record will indicate.

22       But, in any event, let me ask that question to

23  you now.  Did you make any finding that the Chief of

24  Police made false statements and reports regarding the

15:12:30   25  San Benito or border patrol shooting?

15:12:32   1      A.   No.   My findings are only about the Department

2  procedures in as to whether or not they were followed.

3      Q.   And specifically the finding that you made

4  about the Chief of Police making false statements and

15:12:47   5  reports were specifically related to, as you indicate,

6  on page 11 the sharpshooter's duty story is a major

7  situation embellishment?

8      A.   That's correct.

9      Q.   That's the only thing in your investigation

15:13:05  10  that you found and believe that the Chief had made false

11  statements and reports about?

12      A.   That's correct.

13           MR. LOCKHART:   Okay.   Thank you.

14           MR. AINSWORTH:   That's all I have.

15           (Deposition concluded at 3:13 p.m.)

16

17

18

19

20

21

22

23

24

25

1    I, JOSEPH D. LaBEAU, have read the foregoing

2  deposition and hereby affix my signature that same is

3  true and correct, except as noted herein.

4       CORRECTIONS AND/OR CHANGES AND SIGNATURE

5  PAGE      LINE      CORRECTION      REASON FOR CHANGE

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

```
1   _____

2   _____

3   _____

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13

14

15                     _____

16                     JOSEPH D. LaBEAU

17

18  STATE    OF    TEXAS       )
                               )
19  COUNTY OF _____       )

20      SUBSCRIBED AND SWORN to before me by the said JOSEPH
    D. LaBEAU, on this the _____ day of _____,
21  A.D., 2001.

22

23                     _____
                       Notary Public in and for
24                     _____ County, Texas
                       My Commission Expires: _____

25
```

```
 1   STATE  OF   TEXAS )
     COUNTY OF TARRANT )
 2

 3       I, Cherie Holland, Certified Shorthand Reporter of

 4   the State of Texas, certify that the foregoing

 5   deposition of JOSEPH D. LaBEAU, was reported

 6   stenographically by me at the time and place indicated,

 7   said witness having been placed under oath by me, and

 8   that the deposition is a true record of the testimony

 9   given by the witness.

10       I further certify that I am neither counsel for nor

11   related to its outcome.

12       Given under my hand and seal of office on this the

13   24th day of May, 2001.

14

15

16                    Cherie Holland

17   _____
     CHERIE HOLLAND, Texas CSR 574, RPR-CM
18   Expiration 12-31-02

19

20

21

22

23

24

25
```

SHARP HOLLAND
METRO (817) 731-1377

```
 1              IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHWESTERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3  ARTURO G. SALINAS, ET AL  )  CIVIL ACTION NO. B-98-162
    VS.                       )
 4  CITY OF HARLINGEN, TEXAS, )
    ET AL;                    )
 5  AND                       )
    GILBERTO M. RODRIGUEZ,    )
 6  ET AL.                    )
    VS.                       )  CIVIL ACTION NO. B-98-163
 7  CITY OF HARLINGEN, TEXAS, )
    ET AL;                    )
 8  AND                       )
    RAUL RODRIGUEZ            )
 9  VS.                       )  CIVIL ACTION NO. B-99-70
    CITY OF HARLINGEN, TEXAS, )
10  ET AL                     )

11                   CERTIFICATE AFFIDAVIT
             ORAL DEPOSITION OF JOSEPH D. LaBEAU
12                      MAY 15, 2001

13       I, CHERIE HOLLAND, Certified Shorthand Reporter in

14  and for the State of Texas, certify pursuant to the

15  Rules and/or agreement of the parties present on the

16  following:

17       That this deposition transcript is a true record

18  of the testimony given by the witness after said witness

19  was duly sworn by me.

20       That $_____ is the charge for the preparation

21  of the completed deposition transcript and any copies of

22  exhibits, charged to _____.

23       That the deposition transcript was submitted by

24  Certified Mail/Hand Delivery on MAY 24, 2001, to the

25  witness or to the attorney for the witness for
```

1  examination, signature and return to SHARP HOLLAND by

2  JUNE 25, 2001.

3       That the deposition transcript was/was not

4  returned to the deposition officer on_____.

5       If returned, the attached Changes and Signature

6  page contains any changes and the reasons therefor.

7       That the original deposition transcript, or a copy

8  thereof together with copies of all exhibits, for

9  safekeeping and use at trial, was delivered to the

10  attorney or party who asked the first question appearing

11  in the transcript, pursuant to Rule 30(f) of the Texas

12  Rules of Federal Court.

13       That pursuant to information made a part of the

14  record at the time said testimony was taken, the

15  following includes all parties of record:

16

17  FOR THE PLAINTIFFS ARTURO G. SALINAS
    and GILBERTO M. RODRIGUEZ
         Price Ainsworth
18       SPIVEY & AINSWORTH, P.C.
         48 East Avenue
19       Austin, Texas  78701-4320

20  FOR THE PLAINTIFF RAUL RODRIGUEZ
         Ramon Garcia (No appearance)
21       LAW OFFICES OF RAMON GARCIA, P.C.
         222 West University Drive
22       Edinburg, Texas 78539

23  FOR THE DEFENDANT
         Tom A. Lockhart
24       ADAMS & GRAHAM, L.L.P.
         222 E. Van Buren Street, West Tower
25       Harlingen, Texas 78551-1429

1    Given under my hand and seal of office on this the

2  24th day of May, 2001.

3

4

5                  **CHERIE HOLLAND, Texas CSR 574, RPR-CM**
                  Expiration:  12/31/02

6

7                  **SHARP HOLLAND**
                  **International Court Reporting**

8                  300 Railhead Bldg.
                  4425 W. Vickery Blvd.

9                  Fort Worth, Texas  76107
                  (Metro) 817/731-1377

10                 (FAX) 817/731-1816

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:98-cv-00162    Document 106    Filed in TXSD on 07/10/2001    Page 514 of 550

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS, ET AL; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL. | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS, ET AL; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS, ET AL. | § | |

## NOTICE OF INTENT TO TAKE ORAL DEPOSITION OF JOE LA BEAU
## WITH SUBPOENA DUCES TECUM

TO:  Defendants CITY OF HARLINGEN, TEXAS; by serving the Attorney-In-Charge, Tom Lockhart and Roger W. Hughes, Adams & Graham, L.L.P., P. O. Drawer 1429, Harlingen, Texas 78551-1429

PLEASE TAKE NOTICE that Plaintiffs intend to take the oral deposition of JOE LA BEAU on May 15, 2001, beginning at 1:30 p.m., at the City Hall of Midlothian, 104 West Avenue E, Midlothian, TX 76065, to be used as evidence in the above entitled and numbered cause. Said deposition shall continue from day to day until completed and shall be taken before a certified shorthand reporter from the offices of Sharp Holland International Court Reporting, 4425 West Vickery Blvd., Suite 300, Ft. Worth, TX 76107.

A Subpoena Duces Tecum shall issue requiring the witness to appear and produce at the time of said deposition the materials set forth on Exhibit "A," attached hereto and made a part thereof.

Respectfully submitted:

SPIVEY & AINSWORTH, P.C.
48 East Avenue
Austin, TX 78701
512+474-6061
512+474-1605 (fax)

By *Francis Pan*
Broadus Spivey
State Bar No. 1895500
Federal I.D. No. 11146
Francis Pan
State Bar No. 15443300
Federal I.D. No. 26385

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this instrument has been served upon the following counsel of record for the Defendants by facsimile transmittal, on the 8th day of May 2001:

Mr. Tom Lockhart
Mr. Roger W. Hughes
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429
ATTORNEYS FOR DEFENDANT

Mr. Ramon Garcia
Ms. Sonia Lopez
LAW OFFICES OF RAMON GARCIA
222 West University Drive
Edinburg, Texas 78539
ATTORNEYS FOR PLAINTIFF RAUL RODRIGUEZ

*Francis Pan*
Francis Pan

## EXHIBIT "A"

1. Each and every investigative report made by or on behalf of the City of Harlingen relating to the shooting incident in San Banito on July 7, 1998.

2. Joseph Bennett Vasquez's complete personnel file with the Harlingen Police Department.

3. Each and every document which references Captain Joseph Bennett Vasquez as a custodian of the evidence and/or firearms for the City of Harlingen Police Department.

4. Each and every document which references Detective R. D. Moore as the custodian of the evidence and/or firearms for the City of Harlingen Police Department.

5. Each and every document which references Captain Joseph Bennett Vasquez as a member of the Emergency Response Team of Harlingen Police Department.

6. Each and every document which references Detective R. D. Moore as a member of the Emergency Response Team of the Harlingen Police Department.

7. Each and every document which references Captain Joseph Bennett Vasquez as a member of the Special Weapons and Tactics Team of the Harlingen Police Department.

8. Each and every document which references Detective R. D. Moore as a member of the Special Weapons and Tactics Team of the Harlingen Police Department.

9. Each and every document which shows that Captain Joseph Bennett Vasquez was an officer on 24-hour call for emergency purposes on July 7, 1998.

10. Each and every document which shows that Detective R. D. Moore was an officer on 24-hour call for emergency purposes on July 7, 1998.

11. Each and every document which shows that Detective R. D. Moore complied with Texas Commission of Law Enforcement Standards and Education rules to carry the AR-15, which was used in the shooting incident in San Banito on July 7, 1998.

12. Each and every document which shows that former Police Chief James Joseph Scheopner approved Detective R. D. Moore to carry the AR-15, which was used in the shooting incident in San Banito on July 7, 1998.

Case 1:98-cv-00162   Document 106   Filed in TXSD on 07/10/2001   Page 517 of 550

13. Each and every rule, regulation, and/or policy promulgated by Harlingen Police Department to govern the use of a rifle by its officers effective on July 7, 1998 and any subsequent amendment or supplement.

14. Each and every document that shows the AR-15, which was used in the shooting incident in San Banito on July 7, 1998, was legally obtained by Harlingen Police Department.

15. Each and every document the City of Harlingen and/or Harlingen Police Department received from the Harlingen Police Association's concern about any matter relating to the AR-15, which was used in the shooting incident in San Banito on July 7, 1998.

16. Each and every response the City of Harlingen and/or Harlingen Police Department made to Harlingen Police Association's concern about any matter relating to the AR-15, which was used in the shooting incident in San Banito on July 7, 1998.

17. The ANI Printout and the ALI Printout, which is described in Gale Jones' deposition (pg 24, line 19 to pg 25, line 10).



**SHARP HOLLAND**
International
COURT REPORTING, INC.

# STIPULATIONS

UNITED STATES DISTRICT COURT
*for the Southern* DISTRICT OF *Texas*
*Brownsville* DIVISION

*Arturo G. Salinas, et al   Civil Action No. B-98-162*
*vs*
*City of Harlingen, et al*
*and*
*Gilberto M. Rodriguez, et al   Civil Action No. B-98-163*
*vs*
*City of Harlingen, Texas, et al*
*and*
*Paul Rodriguez   Civil Action No. B-99-70*
*vs*
*City of Harlingen, Texas et al*

VS.

_____

_____

_____

_____

CIVIL ACTION NO. _____

Video Tech: _____

Location: *City Hall of*
*Midlothian*
*104 West Ave F*
*Midlothian Tx 76065*

Trial Date_____

Date: *5-15-01*

STIPULATIONS
1 of 5

1. _Joseph V. LaBeau_

Start _1:23_ AM/**PM**

End _3:13_ AM/**PM**

Also present: _____

_____

_____

3. _____

Start _____ AM/PM

End _____ AM/PM

Also present: _____

_____

_____

2. _____

Start _____ AM/PM

End _____ AM/PM

Also present: _____

_____

_____

4. _____

Start _____ AM/PM

End _____ AM/PM

Also present: _____

_____

_____

## $\mathcal{P}$URSUANT TO:

Notice ☑    Court Order ☐

Agreement ☐    Subpoena ☐

## $\mathcal{O}$BJECTIONS

☑ Under Rules: All objections will be reserved until trial except objections as to the form of the question and the responsiveness of the answers, which objections are waived if not made at the time of the deposition.

☐ All objections shall be reserved until the time of trial waiving rule requiring objections as to the form of the questions and responsiveness of the answer.

☐ All objections must be made at the time of the taking of the deposition or else be waived.

☐ Objections made by one defendant good for all.

# SIGNATURE

☑ Before any Notary

☐ Sent to witness's attorney; return to Reporter within 30 days.

☑ Sent to witness; return to Reporter within 30 days.

☐ Signature waived.

☑ If original deposition is not signed and filed by the time of trial or any hearing, a certified copy may be used in lieu thereof.

☐ Sent to witness's attorney who will be custodial attorney and inform all other counsel of any and all changes/corrections _____ ; therefore, the Reporter is relieved of any further responsibility.

☐ Said original is to remain in Reporter's office for signature.

# TRANSCRIPT DELIVERY

☐ To Counsel if witness is a party to the suit.

☐ To witness by certified mail, return receipt requested: _____
_____

# FILING OF DEPOSITION AND EXHIBITS

☑ Pursuant to Rule 30 (f) (delivery to custodial attorney; for safekeeping and use at trial)

# EXHIBITS

☐ To Counsel if witness is a party to the suit.
Return Original exhibits to: _____
_____

# OTHER STIPULATIONS

_____

_____

**DISCLOSURE**

Disclosure pursuant to Supreme Court Rule Adopted and Promulgated in conformity with Chapter 52 of the Government Code, V.T.C.A. Please be advised that neither I, nor Sharp Holland International Courting Reporting, Inc., to the best of my knowledge, have any existing or past financial business, professional, family or social relationship with any of the parties or their attorneys which might reasonably create an appearance of partiality, unless otherwise indicated with an asterisk.

1.  **ORIGINAL and 1 Copy** ☑                    **ORIGINAL and 1 SH** Script (Condensed) ☐

    Copy of Exhibits:         Yes ☑        No ☐
    *ASCII Format:            Yes ☑        No ☐
    *SH Script (Condensed):   Yes ☑        No ☐
    e-mail:    Yes ☑        No ☐    e-mail Address _price@ spain-atke_

    Signature: _____

    Attorney for : _T/S_____

2.  Copy of Transcript:   Yes ☑        No ☐
    Copy of Exhibits:     Yes ☑        No ☐
    *ASCII Format:        Yes ☑        No ☐
    *SH Script (Condensed): Yes ☑      No ☐
    e-mail:    Yes ☑        No ☑    e-mail Address _____

    Signature: _____

    Attorney for : _Harlingen_____

3.  Copy of Transcript:   Yes ☐        No ☐
    Copy of Exhibits:     Yes ☐        No ☐
    *ASCII Format:        Yes ☐        No ☐
    *SH Script (Condensed): Yes ☐      No ☐
    e-mail:    Yes ☐        No ☐    e-mail Address _____

    Signature: _____

    Attorney for : _____

4.  Copy of Transcript:   Yes ☐        No ☐
    Copy of Exhibits:     Yes ☐        No ☐
    *ASCII Format:        Yes ☐        No ☐
    *SH Script (Condensed): Yes ☐      No ☐
    e-mail:    Yes ☐        No ☐    e-mail Address _____

    Signature: _____

    Attorney for : _____

*Any ASCII or **SH** Script ordered in lieu of a duplicate will be invoiced as a duplicate.

# COPY

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHWESTERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

## ARTURO G. SALINAS, GILBERTO M. RODRIGUEZ, and RAUL RODRIGUEZ, ET AL

### VS.

## CITY OF HARLINGEN, TEXAS, ET AL

# EXHIBIT NOS. 1 thru 7

**TO THE**
**ORAL DEPOSITION OF**
## JOSEPH D. LaBEAU

**TAKEN**
**MAY 15, 2001**

Prepared by:
## SHARP HOLLAND
**International Court Reporting, Inc.**
**4425 West Vickery Blvd.**
**Fort Worth, Texas 76107**
**Metro: (817) 731-1377     FAX: (817) 731-1816**



CITY OF

HARLINGEN

# POLICE DEPARTMENT

~~MEMORANDUM~~  *Report given in Draft form & Verbally*

TO: Joe LaBeau, Assistant City Manager
FROM: Jim Scheopner, Chief of Police
SUBJ: Officer Involved Shooting
DATE: July 14, 1998

Death has always bothered me; especially senseless, violent,
tragic death. The main objective a peace officer has is to
protect life. The fatal shooting of the two Border Patrol Agents
on July 7, 1998 has been fully investigated by the F.B.I. and the
Texas Rangers. It was also studied, in depth, by the Cameron
County Sheriff's Department, the U.S. Border Patrol, and our
agency to determine what exactly happened. The investigations
were looking for cause, effect, and responsibility. Our agency
had three officers at the scene during the shooting; Detective
R.D. Moore, Sgt. Shawn Foist, and Sgt. Mike Garcia. Sgt. Foist
returned fire at the suspect. Beyond the criminal investigation,
the agencies wanted to determine if they could prevent such
incidents from occurring in the future with better training,
equipment, or policies. It has been determined by everyone that
no one did anything wrong at all, and that the only person that
was responsible for this extraordinary tragedy was the assailant.

Law Enforcement occassionally deals with violent individuals and
violent situations. We try to be prepared to safely respond to
these encounters. Every Harlingen officer has a 9mm semi-
automatic hangun issued, along with 3 magazines and carries 43
rounds of ammunition. Every patrol unit has a shotgun in it.
Several plain clothed officers have a shotgun or rifle in their
assigned vehicles. Training is given on the assigned weapons.

Several years ago, the Harlingen Police Department assembled a
Special Weapons and Tactics team. It was disbanded about 5 years
ago. The only officers still employed that have had extensive
training in SWAT tactics are Captain J.B. Vasquez and Detective
R.D. Moore. If an incident ever occurs where a police
sharpshooter was needed, one of these officers would be called.

The weapon used by the assailant was the property of the
Harlingen Police Department. The rifle is a .223 caliber Olympic
Arms semi-automatic rifle, serial #FA-0698 that was donated to
the Harlingen Police Department in 1995 by a citizen. It was
assigned to Detective Moore, by Captain Vasquez, to be carried by

---

1102 S. COMMERCE • P.O. BOX 1631 • HARLINGEN, TEXAS 78551 • (956) 427-8750 • FAX (956) 427-8794

*LaBeau*
Exhibit No: __1__
Date: 5-15-01  Rptr:CH



CITY OF

HARLINGEN

# POLICE DEPARTMENT

him in the event that a tactical situation arose where a police sharshooter was needed. Detective Moore is also the departments evidence technician expert, and is on call 24 hours a day for response to major investigation scenes. He is assigned a take-home police vehicle (a Chevrolet pickup) during the week. He has carried the semi-automatic rifle behind the seat of his unit since it was assigned to him. He lives in the country south of San Benito, and for safety reasons, secures the rifle in the gun vault at his house at night.

The rifle was safely secured in the locked gun vault at Detective Moores home on July 6, 1998. In doing this, Detective Moore went above and beyond normal procedures to secure the weapon. Sometime during the early morning hours of July 7, 1998, Det. Moores 25 year old son, Ernest Moore, clandestantly, and without authority or permission, got the key to the gun vault off Moores key ring, opened the vault and took two semi-automatic rifles out, leaving the vault open. These weapons were used to kill 4 people. No one knows why these weapons were selected. Many others could have been stolen and used, as Moore is a gun collector. In fact, his departmental issued semi-automatic handgun was readily accessible and not secured in the vault.

# Confidential

## M E M O R A N D U M

**to:**   Jim Scheopner, Chief of Police

**from:**   Joseph D. LaBeau, Assistant City Manager

**re:**   Officer Possession and Loss of Assault Rifle

**date:**   July 15, 1998

This memo is to follow up on my request earlier this week for a written report explaining Detective Moore's possession and loss of a Police Department owned assault rifle.

You have previously advised me verbally that no-one other than the assailant did anything wrong and that numerous law enforcement agencies have determined that the only person responsible for this extraordinary tragedy was the assailant. You also advised me that Detective Moore was assigned the weapon to respond to tactical situations as a part of his official responsibilities as a department sharp-shooter. Also, you have advised me that he went above and beyond the normal security precaution by securing the rifle in his personal gun vault at home during the evening. This needs to be documented now in your written report.

Your written report should also provide substantiation for your assertion that Detective Moore's possession of the weapon was appropriate because of his official duties as a "sharp- shooter" for the department. Substantiation would include items such as the following:

- Sign-In / Sign-Out sheet for weapons issued for these purposes.

- Job description and/or memorandums in the department substantiating the existence of this duty.

- Any record showing any actual call-out or dispatch of a police sharp-shooter.

- A statement from Detective Moore's supervisor, Captain Vasquez, stating his understanding of Moore's duties and responsibilities as a sharp-shooter.

A second area that the report should cover is substantiation that the department's supervision of Moore in his duties as a sharp-shooter was appropriate. Substantiation should include items such as:

- Documentation of training and regular weapons practice and qualification.

Exhibit No: 2
Date: 5-15-01   Rptr: CH

- All policies and procedures regarding sharp-shooter duties and weapons sign-out, handling, training, qualification, etc.

- Documentation showing when the weapon was last inventoried and/or inspected/known to be in the possession of Detective Moore.

- A statement from Captain Vasquez describing supervisory and training discussions directions, or activities that he had with Detective Moore related to his duties as a sharp-shooter.

A third area covered by your report should include substantiation of responsible handling of the weapon by Detective Moore.  This substantiation should include:

- Detective Moore's statement concerning his understanding of his duties and responsibilities as an on-call, sharp-shooter for the department.

- Detective Moore's statement regarding his training and regular practice and qualification with the weapon in question.

- A statement from Detective Moore as to whether or not the weapon was carried daily to and from work and secured each and every evening or whether or not and for how long the weapon was continually stored at his residence.

- A statement from Detective Moore as to whether or not, except for the date of the known tragedy, he had maintained sole personal control of the weapon, or whether any other person ever handled the weapon during the period it was assigned to Detective Moore.

Fourthly, your report should directly describe any relevant facts and circumstances related to the donation of the rifle to the Department.  Particularly, who donated the rifle, when it was donated and for what purpose.

Finally, your report should reference any other relevant facts or circumstances regarding this matter and identify your recommendations for any actions you would take regarding this matter.

Please provide this report by the close of business of July 23rd.  Also, please contact me if you have any questions concerning the report or its due date.

cc    :    Natalie Flores Prim, City Manager
           Brendan Hall, City Attorney

from the desk of....

Joseph D. LaBeau
Assistant City Manager
City of Harlingen
118 East Tyler
Harlingen, Texas 78551

(956) 427-8800
Fax: (956) 430-8526

# interoffice
## MEMORANDUM

to:     Natalie Flores Prim, City Manager

from:   Joseph D. LaBeau, Assistant City Manager

re:     Shooting Incident / Recommendations for Action

date:   October 14, 1998

On July 7, 1998, two Border Patrol agents were killed with a weapon belonging to the Harlingen Police Department. The basic facts surrounding this case are that Detective R. D. Moore had a Harlingen Police Department semi-automatic AR-15 rifle locked in a gun safe at his home. Sometime during the early morning hours of July 7, 1998 Detective Moore's 25 year old son, Ernest Moore, retrieved the department weapon from the gun safe and subsequently shot and killed the agents, possibly also wounding a Cameron County Deputy Sheriff.

### Representations by the Chief of Police

On the day of the shooting the Chief of Police told the City Manager and the Assistant City Manager that Detective Moore was in possession of the weapon in order to respond to tactical situations as a part of his official responsibilities as a department sharp-shooter. Chief Scheopner also assured management that Detective Moore's practice was to carry weapon to and from work every day and secure it in the evening in his personal gun vault. Chief Scheopner prepared a memorandum on July 14, 1998 entitled, "Officer Involved Shooting," which stated that several agencies had reviewed the shooting and it had "been determined by everyone that no one did anything wrong at all, and that the only person that was responsible for this extraordinary tragedy was the assailant". The memorandum

1


Exhibit No: 3
Date: 5-15-01   Rptr:CH

goes on to say that the rifle was assigned to Detective Moore by Captain Vasquez to be carried by him for tactical purposes. The memo further states that he is on call 24 hours a day, that he carries the rifle to and from work in his pick-up truck and that he secures it every evening in his gun vault at home. The memo represents that Detective Moore went above and beyond normal procedures to secure the weapon and that Moore's son clandestinely stole a key to the gun vault and broke into the vault to obtain the weapons.

### Investigation by Assistant City Manager

Due to a mutual concern about this very tragic event, the City Manager directed the Assistant City Manager to pursue the matter diligently and ensure that their was full accountability for departmental policies and procedures. On July 15, 1998, the Assistant City Manager issued a memorandum entitled, "Officer Possession and Loss of Assault Rifle." This memorandum made specific inquiry into the normal administrative documentation regarding equipment sign-out, assignment and duty, training and supervisory practices that would be expected to be found in a professionally administered local government department.

CibiPDF - www.fsnitc.com

**Interview of Detective R. D. Moore and Supervisors**

This interview took place on July 21, 1998.  Present were the Assistant City Manager, the Chief of Police, the Assistant Chief of Police, Captain Joseph Vasquez, Detective R. D. Moore,                        During the interview the following points emerged:

- The Chief had made no formal investigation of the matter and had allowed Moore to work without interruption or questioning.

- Captain Vasquez had allowed Moore to take the weapon home for the general purpose of a "duty weapon".

- There was no substantiation in practice or in documentation that Moore served the department in a "sharp-shooter role."

- Moore had had the weapon in his possession for over a year, and his possession of the weapon was undisciplined sometimes leaving it in his pick-up truck, other times behind the door of his office.

- The inventory procedures in the department were informal and not uniformly applied to all officers.

- Moore had not had formal training on the weapon since 1976.

3

- Moore did not qualify annually with the weapon, but instead practiced shooting it in his yard at home.

- On at least one occasion Moore had allowed his son to use the weapon.

- The weapon in question had been delivered to the department for "disposal".

- No records exist of training or actual call-out for Moore in his supposed duty as a sharp shooter.

- Departmental policies (see sections 4.04 - 4.04.006) appeared to this reviewer to have been violated.

- The Chief asserted that no departmental violation had been violated, nor had any TCLEOSE requirements been violated.

- The Chief presented an inventory which he represented as showing all weapons present and accounted for, except the AR-15 which had never been signed-out and was now in custody with other agencies as evidence.

## Inspection of the Department

Immediately following the interview on July 21, 1999, the Assistant City Manager inspected the Department evidence rooms, weapons, lockers, and Moore's office.  The following findings were made:

- A handwritten inventory of weapons issued existed, but did not show Moore's sign-out of the AR-15.

4

- Hundreds of weapons, mostly handguns, were stored in stacked bins with tags which relate to case documentation. Many of these weapons have been in storage for years, some decades.

- A wide assortment of various rifles were stored in various secured rooms. Some of these were owned by the Department. Others were marked as "evidence".

- Over the years, some of the weapons have been put in service, usually with permission from the Chief.

- No current effort has been made to dispose of stock-piled weapons.

- It was Moore's practice to store the AR-15 behind his office door, even after he no longer had weapons safe-keeping duties.

**Officer Concerns**

On August 27, 1998 the Assistant City Manager met with Officer Rhonda Mitchell concerning a grievance she had about an assignment. During the meeting, Officer Mitchell raised the issue of the Chief's credibility and honesty. Among the examples raised by Officer Mitchell was her assertion that the Chief had lied about Moore's possession of the AR-15 and that there was no "sharp shooter" position, and that instead Moore's possession of the weapon was evidence of special treatment among a ring of good-ol-boys who were allowed to take department property for personal purposes. Officer Mitchell stated that there was an impression among members of the department that this group existed. She illustrated her point by presenting a copy of a newsletter entitled, "The Tainted Brass" in which the department is characterized as having an unprofessional approach to checking-out AR-15's from the evidence room. Officer Mitchell suggested that the Assistant City Manager verify her complaint by contacting Command Staff officers.

5

CivilPDF - www.favisa.com

Within the next few days the Assistant City Manager separately interviewed Captain Luciano Rubio, Lieutenant Joe Rubio, Lieutenant Leal, and Lieutenant Vela and asked them if they had any knowledge of a swat/sharp shooter function in the department. Captain Rubio, Lieutenant Rubio and Lieutenant Vela each said that they did not have any knowledge of such a function and that should such a function exist, they as Senior Command Staff would certainly have been aware of it. Lieutenant Leal did recognize that Captain Vasquez might be called for such a duty, but had no knowledge that Detective Moore served in this capacity.

At a separate meeting on September 22, 1998 Lt. Jose Rubio advised the Assistant City Manager that TCLEOSE regulations had been violated.

6

CVisPDF - www.fsvisi.com

## Follow-up Action

On October 1, 1998 the Chief wrote a memo in which he specified follow-up action that he had taken with regards to departmental weapons.   In the memo the Chief once again asserts that the department adheres to its policies as well as TCLEOSE standards.  In the same memorandum the Chief reports an in-house audit indicates that seven officers

7

CMPDF - www.fesito.com

including R. D. Moore were not in compliance with annual firearm qualification requirements.

## Intimidation Complaints

On October 6, 1998 the City received notice that the Harlingen Police Association had made complaints that certain of their members had been threatened with termination if they reported departmental wrongdoing or impropriety.  On October 9, 1998 the Assistant City Manager met with representatives of the Harlingen Police Officers Association and reviewed their concerns in detail.  The only specific report of intimidation to arise from that meeting was a statement allegedly made by Captain Joseph Vasquez that anyone speaking out about this case would be fired.  On the same date I interviewed Captain Vasquez and informed him of the complaint.  Captain Vasquez denied making this statement and said that he had said anyone who gave misinformation or undermined the ongoing criminal investigation should be fired.  Captain Vasquez flatly denies that he in any way intimidated anyone from making good faith reports of factual information to any appropriate agency.  Nevertheless, this group of HPOA officers vigorously assert that they were indeed threatened.

## Findings and Action

After a review of the foregoing the following findings are presented;

1.      The Chief failed to initiate an objective departmental review of the circumstances, policies and procedures by which Moore came to possess the AR-15.

2.      The Chief of Police made false statements and reports regarding the assignment of the AR-15 to R. D. Moore.

8

3.    A review of the departmental policies and procedures identifies a number of apparent violations:

> **4.04. Authorized Weapons:** *The Department authorizes officers to carry certain weapons, and authorizes the use of those weapons only when necessary to lawfully accomplish departmental goals. Officers carry and use only those weapons approved and authorized by the Department.*

> Captain Vasquez reported that he approved this weapon for R. D. Moore without written notification to the Chief. However, the weapon was taken home and placed in a gun vault. Also, R. D. Moore stated he would practice with the weapon by shooting it in the yard of his residence and on one occasion, R. D. Moore knew his son had discharged the weapon because he had allowed his son to do so.

> **4.04.001 Approved Weapons and Ammunition:** *The Department authorizes officers to carry and use only Department issued or approved handguns, shotguns, ammunition, chemical agents and batons. The chief approves all weapons and ammunition. Under special conditions of limited duration, the Commanding Officer on duty may authorize the use of other weapons. A commanding officer taking this action justifies the decision in writing to the Chief.*

> Captain Vasquez reported that he did not follow any procedure *(in issuing the weapon)* and did not obtain the Chief's approval. Captain Vasquez reported that he did not discuss with Detective Moore any specific duties when issuing the weapon.

> **4.04.002 Training:** *An officer must undergo Department approved training*

*and display proficiency in the use of any authorized weapon the officer carries. Additionally, officers must comply with all <u>continuing proficiency training</u> required by the Department.*

Detective Moore reported that he was last trained in 1976 for this type weapon. Detective Moore reported that he did not comply *with all continuing proficiency training required* by the Department and TCLEOSE standards (TAC, Title 37, Part VII, Chapter 211, Section 211.104).

4. A review of departmental training requirements records shows no record of mandated annual training by Moore with the AR-15. In fact, Moore and several other officers have not event met annual proficiency requirements (TCLEOSE) for use of their side arms.

5. It is clear there <u>are no detailed policies and procedures</u> for the handling of weapons, and there has been inadequate weapons practice and training. The <u>department lacks proper documentation</u> of weapons training and qualification. Weapons control and inventory practices are inadequate and unprofessional. In addition, there has been <u>no formal assignment</u> by any officer to duties of sharpshooter, although there may be a few officers who are proficient marksmen.

**Administration Actions**

Remedial action needs to be taken at once to improve Department practices:

• The Chief has been directed to implement the <u>National Law Enforcement Standards</u>. This action will lead to national professional accreditation of the Department's policies and practices. This is a minimal first step toward preventing further exposure from any incidents arising due to inadequate standards and/or

10

CVisPDF - www.fasiss.com

unprofessional practices within the Department.

- **Chief Jim Scheopner:** Civil Service Law (Local Government Code Chapter 143, Subchapter A, paragraph 143.013 allows that an appointing official may remove the Department Head afterwhich, that person shall be placed in a position with a rank not lower than that held by the department head immediately before appointment.

Administrative action should be taken immediately regarding Chief Jim Scheopner. Clearly, Chief Scheopner failed to properly investigate and objectively report to the Assistant City Manager the facts surrounding this matter. Contradictions in Chief Scheopner's written and oral statements arose in meetings and in interviews, indicating the *"sharp shooter duty"* story is a major situation embellishment. The Chief is directly responsible for the undisciplined and unprofessional environment described in this report. Furthermore, <u>the Chief has already been placed on a probationary performance status</u> for a number of other performance discrepancies. These are detailed in a 9/15/98 memorandum entitled, "Performance Discrepancies / Improvement Plan." Key performance discrepancy areas noted are:

- Professionalism

- Responsiveness and Reliability, and

- Management Practices

In sum, it is clear that the Chief has an overwhelming loss of credibility with management and with the leadership of his own Department. Therefore:

11

- The Chief should be relieved of duty at once and appointed to his former rank of Lieutenant.

- An acting Chief of Police should be appointed immediately. Due to the Departmental unrest, I would suggest that the acting Chief be removed from involvement in the incident and free from reputation for antagonistic, partisan practices in the Department. Unfortunately, Assistant Chief Archer has himself reported that he wrote an inflammatory newsletter, entitled "The Blue Cow," which attacked labor interests in the Department. Such past partisan activity makes it unlikely that he could be successful in restoring confidence among those most expressive of dissatisfaction. Therefore, I recommend Captain Luciano Rubio be appointed, as he is the ranking officer not involved and has demonstrated good police administrative skills, and has avoided partisan activities in his personal conduct. Another prudent option would be for a credible professional outside of the Department to be appointed as interim Chief. In any case, I would urge swift action be taken.

### Captain Vasquez and Detective Moore:

These two individuals are alleged to have permitted or to have caused serous violations of policy and professional practice with regard to weapons. Departmental unrest will persist and their work effectiveness will be curtailed until their conduct is subjected to proper disciplinary review. For the sake of the morale and good-order of the Department, I recommend these individuals be placed on paid administrative leave pending the outcome of the disciplinary review (recommended below).

### Disciplinary Actions

By Civil Service law, (Local Government Code Chapter 143, Subchapter D) only the "Department Head" (Chief of Police) may discipline members of a Civil Service

Department.   Therefore, the following actions are recommended:

1)   The Acting Chief be instructed to appoint an objective, expert, third party to review the existing investigatory material, make appropriate further inquiry, and hold separate disciplinary hearings for:

   • Captain Vasquez
   • Detective Moore
   • Other officers identified as responsible for rule violations or unprofessional weapons practices.

This third party reviewer should then make recommendations as to disciplinary action.

2)   The Acting Chief should then take appropriate disciplinary action for all violations that he believes occurred relative to Civil Service Code 143, Subchapter D.

cc   :   Jim Scheopner, Chief of Police

13

HARLINGEN PD RECEIPT FOR RETURN OF PROPERTY                    CASE _____

Location _Police Dept._                Time _4:20_ A.M. _P.M._        DATE _6 23 95_

ITEMS: _9mm Luger Interdynamic Mod. KG-99 Ser.# L5555 Semi Auto Pistol_

_Cal 556 nato - Olympic Arms Mod. KM-177 E2 Ser.# FA-0698 Semi Auto _

_Both weapons turned over to H.P.D for disposal by RD Moore_

Sylvia Piatle
2609 Lotus
Harl. Tex. 78550

_Rec. by RL Moore_ _____ Officer _____  210-425-7032  Receiver


LaBeau
Exhibit No: 4
Date 5-15-0  Rptr: CH

CITY OF



**HARLINGEN**

# POLICE DEPARTMENT

MEMORANDUM



Exhibit No: 5
Date: 5-15-01  Rptr.CH

```
     TO: Joe LaBeau, Assistant City Manager
   FROM: Jim Scheopner, Chief of Police
   SUBJ: Departmental Weapons
   DATE: October 1, 1998
```

Every police officer is issued a Beretta 92F 9 mm handgun. The narcotic officers are also issued more concealable handguns; Sig-Sauer .380 semiautomatic pistols. Most of the marked patrol vehicles, and some of the unmarked vehicles are equipped with Remington 870 or Winchester 1100 12 gauge shotguns. These have all been purchased by the department for the officers.

Over the past years, the department has come into ownership of other firearms, either given to the department by citizens, or awarded by the courts. These firearms are stored in one of the evidence vaults. Four handguns are currently issued to officers. Detective Lieutenant E. Leal checked out a .380 Beretta August 26,1997. Detective Sergeant E. Cortez checked out a Walther .380 November 15, 1994. Detective Al Garcia checked out a Colt .38 snub nose September 29, 1989. Detective Gilbert Gonzalez checked out a S&W .38 snub nose on July 28, 1998. These plainclothes investigators wanted a more concealable weapon, and all have desk jobs at the station. A S&W 12 gauge shotgun is assigned to patrol, and a Mossberg 12 gauge shotgun in assigned to the training office. No other firearms are checked out. The most recent weapons turned in were a 12 gauge shotgun on April 19, 1998, and an AR 15 type tactical weapon on July 7, 1998. Since we have no SWAT team, if we have a situation where a sharpshooter is needed, we will call the Brownsville Police Department, or D.P.S., until we come up with a better idea.

Our department is using the MMA indoor range, as we have been for several years since our old range at the airport was torn down. We cannot fire rifles there. Several attempts at securing land for an outdoor range have fallen through at the last minute. A current proposal for one at the Port of Harlingen looks very promising by the summer of 1999.

The current Harlingen Police Departments Policy Manual was written using model policies from the Texas Municipal League (TML)and the Texas Commission on Law Enforcement Officers Standards and Education (TCLEOSE). They have been reviewed by the city attorney. The weapons policies are in section 4.04 (see attached). Along with these policies, the department adheres to

---

**1102 S. COMMERCE • P.O. BOX 1631 • HARLINGEN, TEXAS 78551 • (956) 427-8750 • FAX (956) 427-8794**

the TCLEOSE standards. These state that the departments range master keep firearms qualifications records, and make them available if requested to do so during an audit check by the commission. Also, that every peace officer must qualify once a year, according to department standards, with the firearms carried by that officer in an official capacity on or off duty.

I have requested copies of policies from other law enforcement agencies, especially CALEA agencies, and TML. Some have arrived. I want to review these for consideration of modifying or amending our policies, so we can have the best policy available. Policies are written based on the organizations vision, mission, goals, and values. They can be ministerial or discretionary. Ministerial policies give the employee no discretion, so if there is a problem, the agency promulgating the policy is held liable, not the employee. Discretionary policies allow the employee some discression and judgement. If there is a problem, the city is generally protected under sovereign immunity. Long story short; if a policy is needed have it, but if you do not need one, then don't write one. You cannot possibly have a policy for every circumstance that arises. Even if you do there will still be someone wanting to file a civil suit. Creating a policy will transform the act from discretionary (sovereign immunity) to ministerial (no immunity).

Training Officer Johnny Ramirez is the range master, having taken over the position when Sgt. Ray Wisdom retired in April, 1998. We have several other firearms instructors, and are going to have more trained when schools become available. The range master is responsible to ensure that every officer meets standards and qualifies. An in-house audit has revealed that 7 officers were not current within regulations. They did not qualify last year (1997). These officers are, Assistant Chief Robert Archer, and detectives R. Camacho, Al Garcia, G. Garcia, R. Moore, J. Nava, and J. Parrish. I have been informed that this was an oversight by both the range master, officers, and in records keeping. Due to the fact that we have no adequate long gun range, or approved lesson plan, we have not maintained records on rifles and shotguns. This situation is being corrected, and I have been informed that a new records keeping process will ensure this does not happen again. There is no action taken by TCLEOSE against an agency or officer if the firearms standards are not adhered to. Continuing education training is strictly monitored by TCLEOSE, and we are up to date, and even ahead in some areas.

Once we get multiple versions of policies, I will get with the city attorney and make any changes necessary. The range master and firearms instructors will ensure that all officers show proficiency on their weapons to comply with TCLEOSE standards and departmental policies. If not, discipline will be administered.

4.03.004    COURT APPEARANCE
Personnel attending court as witnesses in criminal cases wear uniforms or conservative clothing.  District and Federal courts may require other standards.

4.03.005    MAINTENANCE OF EQUIPMENT
Personnel maintain equipment in good condition and use care in handling city property. They report immediately the loss or damage of any city owned property.  If an employee intentionally or through negligence loses or damages city property, the employee may be held accountable to replace or repair the property.

4.04    AUTHORIZED WEAPONS
The Department authorizes officers to carry certain weapons, and authorizes the use of those weapons only when necessary to lawfully accomplish Departmental goals.  Officers carry and use only those weapons approved and authorized by the Department.

4.04.001    APPROVED WEAPONS AND AMMUNITION
The Department authorizes officers to carry and use only Department issued or approved handguns, shotguns, ammunition, chemical agents and side-handle batons.  The chief approves all weapons and ammunition.

Officers do not alter or modify approved weapons or ammunition and have the responsibility of cleaning and general up keep of all weapons issued them.  They immediately report any weapon lost, damaged or malfunctioning.  Any supervisor, or the range-master, may inspect any weapon for safety, upkeep and compliance with these directives.

Under special conditions of limited duration, the Commanding Officer on duty may authorize the use of other weapons.  A Commanding Officer taking this action justifies the decision, in writing, to the Chief.

4.04.002    TRAINING
An officer must undergo, Department approved, training, and display proficiency in the use of any authorized weapon the officer carries.  Additionally, officers must comply with all continuing proficiency training required by the Department.

4.04.003    HANDGUNS
Officers on duty, or while off duty and carrying a handgun as a peace officer, carry the pistol issued to them by the Department, or approved by the Chief.

4.04.004    CARRYING WEAPONS
Always, while on duty, officers carry their Department issued pistols, or approved weapon.  An officer never relinquishes a weapon to an assailant voluntarily.

An officer carrying a handgun conspicuously on duty, wears his badge prominently displayed.  When off duty, officers carrying a weapon, carry it inconspicuously and concealed.

4.04.005    USE OF WEAPONS
Officers do not display or brandish a weapon as a threat unless the actual use of the weapon is a legal option.  However it is permissible, when anticipated, to ready a weapon for use.

Normally, a firearm is not drawn in public except during inspections or for lawful use.   Officers discharge firearms only under the following conditions:

▶ During range practice or authorized competitive events.

▶ To destroy an animal that represents a threat to public safety, or as a humanitarian measure where the animal is seriously injured.

▶ When justified by the Texas Penal Code, and Chapter 6 of these Directives.

4.04.006    REPORTS ON WEAPON USE
An officer using a weapon or firing a gun, accidentally or intentionally, except on the firing range or while at a legitimate sporting event, reports the incident in writing.

4.05    ENFORCEMENT OFF DUTY
Any off duty officer receiving information of a law violation, reports the violation to the Department when practical.  If the situation requires immediate action, the officer takes the proper action and makes a written report.  An off duty officer under the influence of an alcoholic beverage or medication, avoids taking any official police action if possible.

4.05.001    IDENTIFICATION
Off duty officers carry their badges and police identification with them.

4.05.002    ENFORCEMENT ACTION
Officers making arrests off duty, operate under the same laws that govern private citizens when making arrests.



## CAPITAL OF THE LOWER RIO GRANDE VAl
HARLINGEN

"WORKING AS A TEAM TO PROVIDE QUALITY SERVICE WITH RESPECT AND FAIRNESS"



FAXED 12-28-98 ml
mailed

## STATEMENT FROM THE CITY MANAGER

Good afternoon ladies and gentlemen.

We're pleased to be here today.    The events and news of the last few days have presented us with an opportunity to brief you. We want to share with you the actions and progress that the city has undertaken relating to the shooting incident that took place in San Benito earlier this summer.

First of all, on behalf of Mayor de la Garza and members of the City Commission want to say that this was a terrible tragedy that affected all of us and our hearts go out to the families and everyone involved.

We want to assure the police officers, families and community that we began to review the facts in this matter almost immediately. Literally within days of the events. It has been a detailed, methodical, professional review. And we've made substantial progress on the report.

We're very proud of our police department. They have been cooperative and forthcoming in our review. We're confident that we've been getting the facts and the truth.

Many of you even within the police department have not been aware of our review. That's because it's our duty to preserve the rights and confidentiality of our employees and matters of this sensitive nature. However, I can give you a better idea of what we've been doing over these last few months.

- Let me introduce Joe Labeau, Assistant City Manager and outside counsel, Tom Lockhart. They were assigned to review these matters and to obtain the facts
- they physically inspected the department
- policies and procedures were reviewed
- a significant number of people have been interviewed - inside & outside the department
- worked with and cooperated with other agencies such as the Texas Rangers who are also involved in the case.

*"Recipient Of Keep Texas Beautiful Governor's Achievement Award"*

118 E. TYLER   •   P.O. BOX 2207   •   HARLINGEN, TEXAS 78551   •   (956) 427-8700

LaBeau

Exhibit No: 6
Date: 5-15-01            Rptr: CH

Our review and study are ongoing.  I can assure you that we will be able to give you a better idea in the days and weeks ahead of when an administrative report will be presented to the City Commission and to you and to the police.  Until the report is complete, it would be inappropriate to divulge any of the details of that study. From day one, we've been actively involved in learning all the facts so that justice is served and we do the right thing.  It's our obligation, duty and responsibility.  But to the extent possible,  we'll be happy to try to answer any questions you may have within the perimeters.

CUtePDF - www.texisc.com

# PRELIMINARY DRAFT

# CITY MANAGER'S REPORT
## To The CITY COMMISSION

### CONCERNING THE 7TH OF JULY, 1998 SHOOTING INCIDENT

### Wednesday
### 4 November, 1998

On July 7, 1998, a very tragic incident took place in which two Border Patrol Agents *(Susan Lynn Rodriguez and Ricardo Salinas)* were killed and Deputy Sheriff, Raul Rodriguez, wounded. Following the incident it was learned the rifle used by the assailant, 25 year old Ernest Moore, was a Harlingen Police Department (HPD) semi-automatic AR-15. This rifle was assigned to Harlingen Police Detective R. D. Moore by Moore's supervisor.

The HPD rifle had been placed in a locked gun vault along with five privately owned semi-automatic rifles. Ernest, without permission from R. D. Moore, removed the HPD rifle from the locked safe, instead of one of the remaining privately owned semi-automatic rifles. It appears this tragic event would still have occurred had Ernest Moore selected one of the other remaining semi-automatic rifles instead of the HPD rifle.

City representatives undertook an immediate and thorough investigation of this HPD weapons handling issue. In regards to this incident, this report provides management findings and recommendations in two major areas:

I — Review of the July 7th Shooting, and

II — City's Management's Police Department Review.



Exhibit No: 7
Date: 6-15-01    Rptr:CH

Page 1 of 4

Case 1:98-cv-00162   Document 106   Filed in TXSD on 07/10/2001   Page 548 of 550

## I.   REVIEW OF THE JULY 7TH SHOOTING

## BACKGROUND

In the days following the shooting, the Chief of Police communicated to the Assistant City Manager and City Manager that Detective Moore was in possession of the weapon in order to respond to tactical situations to fulfill assigned sharpshooter responsibilities. Management was advised Detective Moore's practice was to transport the weapon daily to and from work and in the evening secure the weapon in his personal gun vault.

Police Chief's review of the incident stated:

- several agencies had reviewed the shooting,
- the only person responsible for this tragedy was the assailant, and
- no departmental violations had occurred.

## MANAGEMENT INQUIRY

Our administrative review has identified the following areas of concern:

- Reports and information surrounding this incident.
- Policies, procedures, and practices.
- Application of management practices.

## PRELIMINARY DRAFT

# II. CITY MANAGEMENT'S POLICE DEPARTMENT REVIEW

## BACKGROUND

The Assistant City Manager inspected the Department evidence rooms, weapons, and lockers in late July. Copies of policies and procedures were requested and reviewed by the City Manager. Some activities were without written policies or procedures, thus not providing the benefit of written administrative guidelines for the department.

The following observations were made:

- An inspection of department records produced a handwritten inventory of weapons, but did not reveal Moore's sign out of the weapon.

- Hundreds of weapons, mostly handguns, are stored in stacked bins with tags relating to cases.

- No current written procedure addresses disposal of stockpiled weapons. Many weapons have been in storage for years.

## MANAGEMENT INQUIRY

Management's preliminary findings reveal serious concerns and questions regarding the adequacy of:

- records,
- weapon handling policies,
- inventory and disposition controls, and
- management practices.

Because of management's concern, documentation for HPD weapons need to be reviewed, particularly in the areas of receipt, handling, inventorying, storage, disposition, assignment and training

# CONCLUSION

1. Management has concerns whether department policies, procedures and practices are in conformance with professional "best practices".

2. In addition, there may be a range of actions required to ascertain the appropriate "policy, procedure and practices" standards required to maintain and support the City of Harlingen Police Department.

3. Finally, because of the highly specialized nature of law enforcement, management concludes the need for expert assistance in evaluating and reviewing the above.

# RECOMMENDATION

1. Bring department practices to the level of "best practices" in law enforcement.

2. Management recommends using an independent, expert professional with a background in law enforcement and police operations in order to achieve "best practices". This action will also assure department personnel, city residents, taxpayers and others of the highest professional standards in determining improvements. This individual will be charged with:

   a) review of the initial incident;

   b) review the inquiry thus far and make any further necessary inquiry;

   c) recommend any steps which may be necessary to standardize department policies and procedures, and

   d) finally, complete this task in a timely fashion.