110

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| Vs. | § | |
| | § | **JUL 1 3 2001** |
| CITY OF HARLINGEN, TEXAS; | § | |
| And | § | Michael N. Milby |
| | § | Clerk of Court |
| GILBERTO M. RODRIGUEZ, ET AL | § | |
| Vs. | § | |
| | § | CIVIL ACTION NO. B-98-163 |
| CITY OF HARLINGEN, TEXAS; | § | (Consolidated with B-98-162 for all purposes) |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS. | § | |

## PLAINTIFF RAUL RODRIGUEZ' RESPONSE TO DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

LAW OFFICE OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, Texas 78539
(956) 383-7441
(956) 381-0825 (fax)

By: _____
RAMON GARCIA
State Bar No. 07641800
Federal Id. No. 3936

Of Counsel

SONIA I. LOPEZ
State Bar No. 24003862
Federal Id. No. 23501

### ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................... iii

INDEX OF AUTHORITIES.............................................................. iv

I.   NATURE AND STAGE OF THE PROCEEDINGS............................... 1

II.   SUMMARY JUDGMENT EVIDENCE............................................. 2

III.   SUMMARY OF THE ARGUMENT................................................. 3

IV.   BACKGROUND EVIDENCE........................................................ 9

V.   ARGUMENT AND AUTHORITIES............................................... 15

    A.   State-Created Danger................................................... 15
        1.   City of Harlingen's Liability is Predicated upon the Conduct of Chief
        Scheopner; a Custom at no Safe Weapons-Handling Procedures; and a
        Nexus between the Custom and the Tragic Shooting......................... 15

        2.   The Summary Judgment Evidence is Sufficient to Support Plaintiffs' State-
        Created Danger Cause of Action................................................. 20

            (A)   Defendant Harlingen Created the Dangerous Situation.............. 21

            (B)   Defendant Knew the Situation was Dangerous....................... 30

            (C)   The Dangerous Situation Created the Opportunity for Ernest Moore
            to Commit a Crime which Would not Otherwise Have Existed.... 30

            (D)   Chief Scheopner and Detective Moore Affirmatively Placed the U.S.
            Border Patrol Officers in a Position of Danger in Such a Way as to
            Strip the Officers of Their Ability to Self Defend.................... 30

        3.   Recent Cases Do Not Preclude the Application of the State-Created Danger
        Theory Here................................................................ 33

    B.   State Claim................................................................ 36

PRAYER ............................................................................... 44

# INDEX OF AUTHORITIES

**STATE CASES**                                                **PAGE**

*Blackwell v. Harris County,*
   909 S.W.2d 135, 139 (Tex.App. – Houston [14th Dist.] 1995, writ denied) .............   22

*City of Dallas v. Half Price Books, Records, Magazines, Inc.,*
   883 S.W.2d 374, 377 (Tex.App. – Dallas 1994, no writ) ..................................  22, 23

*Kennedy v. Baird,*
   682 S.W.2d 377, (Tex. App.-El Paso 1984, no writ) ......................................  10, 36

*Moore v. State,*
    562 S.W.2d 484, 486 (Tex.Crim.App.1978) ................................................... 22

*Praether v. Brandt,*
    1998 WL 754644, *4 (Tex.App.-Houston [1st Dist.] 1998, no pet) ..................... 10

*Villegas v. Griffin Indus.,*
    975 S.W.2d 745, 754 (Tex.App. – Corpus Christi 1998, writ denied) .................... 22

*Wallace v, Moberly,*
    947 S.W.2d 273, 277 (Tex.App. – Fort Worth 1997, no writ) ............................. 22

**FEDERAL CASES**                                                      **PAGE**

*Bowers v. Devito,*
    686 F.2d 616, 618 (7th Cir. 1982) ........................................................... 5

*Caoaritta v. Entergy Corporation,*
    168 F.3d 754, 755 (5th Cir 1999) ............................................................ 28

*Cornelius v. Town of Highland Lake, Al.,*
    880 F.2d 348, 353 (11th Cir. 1989) ......................................................... 5

*DeShaney v. Winnebago County, Wi.,*
    489 U.S. 189, 109 S.Ct. 998 (1989) ...................................................... 4, 5, 32

*Doe v. Hillsboro Independent School District,*
    81 F.3d 1395 (5th Cir. 1996) ............................................................. 4, 5, 6

*Gaudreault v. Municipality of Salem,*
    923 F.2d 203, 207 (1st Cir. 1990), cert. denied, 500 U.S. 956 ........................... 23

*Grandstaff v. City of Borger,*
    767 F.2d 161 (5th Cir 1985) ............................................................... 9, 16

*John Doe v. Hillsboro I.S.D.,*
    81 F.3d 1395, 1402 (5th Cir. 1996)....................................................... 4, 6

*Johnson v. Dallas I.S.D.,*                                           6, 8, 20,
    38 F.3d 198 (5th Cir. 1994) ................................................................. 34

*Jones v. Phyfer,*
    761 F.2d 642 (11th Cir. 1985) ............................................................. 5

*Laughlin v. Olszewski,*
    102 F.3d 190, 192 n.1 (5th Cir.1996)...................................................... 22

*Leffall v. Dallas Independent School District,*
    28 F.3d 512, 525 (5th Cir. 1994) .......................................................... 4, 6

*Palmer v. City of San Antonio,*
    810 F.2d 514, 516 (5th Cir. 1987)......................................................... 18

*Pembaur. v. City of Cincinnati,*
    475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) ........................................ 9, 16

*Piotrowski v. City of Houston,*
    51 F.3d 512 (5th Cir. 1995) ................................................................ 5

*Piotrowski v. City of Houston,*                             5, 6, 18,
    237 F.3rd at 567 fn. 33 (5th Cir. 2001) ........................................... 33, 34

*Randolph v. Cervantes,*
    130 F.3d 727, 731 (5th Cir. 1997) ................................................... 20

*Salas v. Carpenter,*
    980 F.2d at 299, 307 (5th Cir. 01992) .............................................. 20

*Saenz v. Heldenfels Bros., Inc.*
    183 F.3rd 389 (5th Cir. 1999) ....................................................... 34

*Schuster v. City of New York,*
    5 N.Y.2d at 81, 154 N.E.2d at 537 ................................................. 32

*Stengel v. Belcher,*
    522 F.2d 438, 441 (6th Cir. 1975) ............................................... 22, 23

*Tennant v. Peoria & P.U. Ry. Co.,*
    321 U.S. 29, 35 (1944) ............................................................... 29

*Thomas v. Sams,*
    734 F.2d 185, 192, (5th Cir. 1984), cert. denied, 472 U.S. 893 (1985).................. 16

*Turner v. Upton County, Texas,*
    915 F.2d 133, 136 (5th Cir. 1990) ................................................. 9, 16

*Vick v. Texas Employment Commission,*
    514 F.2d 734, 737 (5th Cir 1975)................................................... 28

*Webster v. City of Houston,*
    735 F.20 838, 841 (5th Cir. 1984)(en banc) ....................................... 19

*Wideman v. Shallowford Community Hospital, Inc.,*
    826 F.2d 1030, 1035 (11th Cir. 1987) .............................................. 6

## TEXAS STATUES, AND RULES                              PAGE

Texas Code of Criminal Procedure art. 18.19. .......................................... 11

Texas Commission on Law Enforcement Officer Standards and Education
    (TCLEOSE) Rules .......................................................... 11, 40, 41

Tex. Penal Code §1.07(a)(11)(A) (Vernon 1974) ......................................... 36

Texas Tort Claims Act §101.021 ....................................................... 9

## U.S. CODE                                          PAGE

42 U.S.C. § 1983 ………………………………………………………….. 6, 18, 20

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
#### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS. | § | |

## PLAINTIFF RAUL RODRIGUEZ' RESPONSE TO DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

### TO THE HONORABLE JUDGE TAGLE, U.S. DISTRICT COURT:

COMES NOW Plaintiff, Raul Rodriugez, and file this Response to Defendant's Second Motion for Summary Judgment.

### I. NATURE AND STAGE OF THE PROCEEDINGS

After the Court denied the Defendant City of Harlingen's Rule 12(b)(6) Motion to Dismiss Plaintiffs' state-created danger allegations and Texas Tort Claims Act cause of action (*See* pp. 20-24 of March 21, 2000 Orders and pp. 20-24 of April 11, 2000 Nunc Pro Tunc Order), the Defendant City of Harlingen moved for summary judgment to dismiss the two remaining causes of action on July 28, 2000. The motion was to have been submitted on August 17, 2000; however, on August 8, 2000, Plaintiffs, pursuant to Fed. R. Civ. P. 56(f), requested this Court continue the

CMPDF - www.Nelio.com

submission until the completion of discovery in this matter. On March 5, 2001, this Court granted Plaintiffs' motion and denied the City's summary judgment motion without prejudice as to re-filing. The Court further ordered that the City re-file its motion by June 20, 2001, and that Plaintiffs' file their response by July 10, 2001.

## II. SUMMARY JUDGMENT EVIDENCE

As summary judgment evidence, Plaintiff relies upon and incorporate herein by reference the following:

a.    Excerpts from Deposition of James Joseph Scheopner (Exhibit "A")

b.    Sylvia Pirtle's Sworn Statement [Scheopner's Deposition Exhibit 9-L] (Exhibit "B")

c.    Excerpts from Deposition of Joseph Bennett Vasquez (Exhibit "C")

d.    TCLEOSE § 211.104 Minimum Standards for Annual Firearms Proficiency (Exhibit "D)

e.    Sgt T. Hushen's Memo to Captain L. Rubio (Exhibit "E")

f.    Excerpts from Deposition of Ralph Dwayne. Moore (Exhibit "F")

g.    Arnold Rodriguez's Affidavit (Exhibit "G")

h.    Excerpts from Deposition of Sgt. Ronald K. Saenz (Exhibit "H")

i.    Shawn Foist's Sworn Statement [Scheopner's Deposition Exhibit 9-N] (Exhibit "I")

j.    Shawn Foist's Sworn Statement [Scheopner's Deposition Exhibit 9-U] (Exhibit "J")

k.    Calibre Press Street Survival Newsline No. 288 [Scheopner's Deposition Exhibit 22] (Exhibit "K")

l.    Computer Printout [Melody Matlock's Deposition Exhibit 47] (Exhibit "L")

m.    Excerpts from Deposition of Miguel P. Garcia (Exhibit "M")

n.    Albert Daniel Perry's Sworn Statement [Scheopner's Deposition Exhibit 9-E] (Exhibit "N")

o.    Harlingen Police Department Departmental Directives (Exhibit "O")

p.      Memorandum for Jose E. Garza, Chief Patrol Agent, McAllen, Texas from Hector Gonzalez, San Benito shooting Report [Scheopner's Deposition Exhibit 9-DD] (Exhibit "P")

q.      Robert Rodriguez's Sworn Statement [Scheopner's Deposition Exhibit 9-CC] (Exhibit "Q")

r.      Jose Rubio, Jr.'s Sworn Statement signed on June 4, 1999 (Exhibit "R").

s.      Paul Ginsberg's Affidavit

t.      Jose Rubio, Jr.'s Affidavit (Exhibit "T")

u.      Affidavit and Report of Dr. George L. Kirkam (Exhibit "U")

v.      Tom Lockhart's Letter to the Undersigned Attorneys (Exhibit "V")

w.      Labels of Tape Housing [Gale Lynn Jones' Deposition Exhibits 61-A and B, and 62] (Exhibit "W")

x.      Texas Department of Public Safety's Report of Investigation Regarding Rio Hondo and San Benito Shootings (Exhibit "X")

y.      Excerpts from Deposition of Pasty Gail Moore (Exhibit "Y")

z.      Raul Rodriguez's Sworn Statement [Scheopner's Deposition Exhibit 9-P] (Exhibit "Z")

aa.     Natalie Flores Prim's Deposition (Exhibit "AA") with attachments

bb.     Joseph D. LaBeau's Deposition (Exhibit "BB") with attachments

### III.  SUMMARY OF THE ARGUMENT

Evidence adduced in discovery and offered here in support of this response is sufficient to raise genuine issues of material fact regarding Plaintiff's allegations that he has been denied constitutional protections by those acting under color of law as well as his personal injury claim made under the Texas Tort Claims Act. With regard to the civil rights claim, the Plaintiff's amended complaints allege a deprivation of the right to life guaranteed by the Due Process Clause of the Fourteenth Amendment in violation of 42 U.S.C. §1983. To establish a claim under §1983, "a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of law." *John Doe v. Hillsboro I.S.D.*, 81 F.3d 1395, 1402 (5th Cir. 1996) (*citing Leffall*

*v. Dallas Independent School District*, 28 F.3d 512, 525 (5th Cir. 1994)).

The Amended complaints allege the violation of United States Border Patrol Agent Susan Lynn Rodriguez's, Ricardo Salinas', and Raul Rodriguez' Fourteenth Amendment Protection against deprivation of life without due process of law.  *See* Rodriguez and Salinas Complaints at ¶¶ 1, 40.  The Complaints allege that the City of Harlingen's actions and policies, established by police Chief Jim Scheopner, proximately caused the violation of Raul Rodriguez' and Border Patrol Agents Rodriguez' and Salinas' right to life.  *Id.* at ¶¶ 35-41.

Plaintiff's summary judgment evidence establishes facts sufficient to raise genuine issues of material fact as to whether the Defendant Harlingen's conduct proximately caused the deaths of Agents Rodriguez and Salinas, and severe injuries to Deputy Raul Rodriguez.  These peculiar, aggravated facts trigger a "state-created danger" exception to the general principle that § 1983 does not recognize third-party liability under the color of law.  *See DeShaney v. Winnebago County, Wi.*, 489 U.S. 189, 109 S.Ct. 998 (1989).  Though not expressly adopted, the Fifth Circuit has explained and applied the state-created danger exception.  *Doe v. Hillsboro Independent School District*, 81 F.3d 1395 (5th Cir. 1996).  In its most recent pronouncement on the state-created danger theory of recovery, the Fifth Circuit was careful to reject an effort to dismiss the case for failure to state a claim (see *Piotrowski v. City of Houston*, 51F.3d 512 (5th Cir. 1995) ("Pietrowski I"), and the court dismissed on summary judgment only after distinguishing the facts of that case from other cases around the country that have recognized the theory.  (See *Piotrowski v. City of Houston*, 237 F.3[rd] at 567 fn. 33 (5th Cir. 2001) ("Piotrowski II") ("Piotrowski's case is, therefore, markedly different from cases in other jurisdictions in which the municipal employees created the dangerous situation and precluded the plaintiff from protecting herself ... [citations omitted]).

Under the state-created danger analysis, a duty exists on the state's part under § 1983 when the state was aware that the plaintiff faced a special danger that the general public did not face.

*Bowers v. Devito*, 686 F.2d 616, 618 (7th Cir. 1982); *Jones v. Phyfer*, 761 F.2d 642 (11th Cir. 1985); *Cornelius v. Town of Highland Lake, Al.*, 880 F.2d 348, 353 (11th Cir. 1989). Judge Posner, two years after writing the initial Seventh Circuit opinion for *DeShaney*, revisited the idea of third-party actors clothed in the color of law, holding, **"[i]f the state puts a man in a position of danger and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."** *Bowers* at 618.

The Fifth Circuit has repeatedly discussed the third-party exception based on a state-created danger though it has never sustained liability based on the state-created danger exception, because of each prior case's own factual deficiencies. *Doe v. Hillsboro I.S.D.,* , 113 F. 3d 1412, 1414 (5th Cir. 1997)(en banc).

As Fifth Circuit Judge Edith Jones observed, "The key to the state-created danger cases lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." (*quoting Wideman v. Shallowford Community Hospital, Inc.*, 826 F.2d 1030, 1035 (11th Cir. 1987). Judge Jones continued, "Thus, the environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable they must have used their authority to create an opportunity that would not otherwise have existed for the third-party's crime to occur." The Fifth Circuit has applied the state-created danger doctrine and has "assumed arguendo that it recognizes the claim," in *Leffall*. In subsequent cases quoting *Leffall*, it simply found that the facts of those cases did not to fall within the state-created danger exception. *Doe v. Hillsboro I.S.D.,* 153 F.3d 1412, 1414 (5th Cir. 1997); *Johnson v. Dallas I.S.D.,* 38 F.3d 198 (5th Cir. 1994); *Piotrowski*, 237 F.3d 585 at fn. 33.

Here, however, the summary judgment evidence establishes facts that should warrant the application of the state-created danger doctrine and give rise to liability under 42 U.S.C. § 1983.

5

Such facts include the following:

- Defendant *knew* the AR-15 semi-automatic assault rifle was turned in to the Harlingen Police Department for only one purpose: **to be destroyed**.

- Defendant *knew* that it was a dangerous weapon.

- Defendant *knew* that the weapon was not destroyed (as was required by state and local guidelines), but was transferred to Detective Moore, at his request, even though:

  - Detective Moore was not trained in its use.

  - Detective Moore did not demonstrate his proficiency in its use and operation.

  - Detective Moore was supposed to, but did not, keep the assault rifle in his police unit.  Instead, he kept it in his residence, where his son, Ernest Moore, lived and had access to the weapon.

- The City of Harlingen issued the AR-15 semi-automatic assault rifle, to Detective Moore, in accordance the city's Police Department custom, without training, contrary to state administrative laws for issuing firearms.

- On the morning of July 7, 1998, Defendant *knew* that Ernest Moore was the suspect in a double homicide in Rio Hondo that lead law enforcement directly to the residence of Detective Moore, where Ernest Moore lived, in search of Ernest Moore.

- Defendant *knew* that Moore's son was nearby; that his son was in serious trouble; that the AR-15 semi-automatic assault rifle entrusted to Detective Moore was missing and, in all reasonable probability, was in the possession of his son; and that Ernest Moore was proficient with that rifle – all before Border Patrol Agents Salinas and Rodriguez arrived at the scene.

- Detective Moore, after dssing the situation with Chief Schoepner, refused to permit the Border Patrol Agents from entering his home to search for his son.  Of course, this action put the agents directly in harm's way.

- Nevertheless, the Defendant did absolutely nothing to warn law enforcement officers,

6

including Border Patrol Agents Salinas and Rodriguez, and Deputy Raul Rodriguez of the missing weapon that had disappeared along with Ernest Moore.

• Defendant *knew* of the dangerous position into which their actions placed officers, but the Defendant did nothing to warn or protect them from this specific danger that the Defendant created for these two officers.

• These Decedents held a special relationship with Ernest Moore because they intended to confront, apprehend, and arrest Ernest Moore for an earlier shooting in Rio Hondo. This relationship was one of direct confrontation and was unique and distinct from the public at large.

• These officers, who were duty bound to confront, apprehend, and arrest Ernest Moore, faced special danger because Detective R.D. Moore permitted Ernest Moore, access to the Harlingen owned AR-15.

As Judge Jones observed, "When state actors knowingly place a person in danger, the due process clause of the constitution has been held to render them accountable for the foreseeable injuries that result from their conduct, whether or not the victim was in formal state custody." *Johnson v. Dallas I.S.D.*, 38 F.3d 198 (5th Cir. 1994).

Detective Moore had to know that his method of storing the AR-15 semi-automatic assault rifle allowed Ernest Moore to arm himself with the unusually dangerous weapon; that Ernest was in the vicinity of the Moore house; that Ernest had the "city's" AR-15; that Ernest posed a violent threat as he was proficient with the weapon; that law enforcement officers including identification of Border Patrol Agents and Cameron County Sheriff's Deputies were arriving at the scene and would attempt to apprehend the Ernest Moore; and that the Defendant had not warned any of the Plaintiffs, or other officers of those dangers.

Knowing all of this, Detective Moore spoke telephonically with Harlingen Police Chief Jim Scheopner, before the Plaintiffs and the other law enforcement Border Patrol Agents arrived at the

Moore house, but the Defendant warned none of the officers before or after they arrived at the scene that Ernest Moore had the City of Harlingen Ar-15 semi-automatic rifle. The Plaintiffs and other law enforcement officers faced special danger because of their special relationship to Ernest Moore. The Plaintiffs and the other law enforcement officers were intending to confront, apprehend, and arrest Ernest Moore for the Rio Hondo shooting.

Plaintiffs must prove injury from a city policy or custom in order to hold to the City of Harlingen liable. A municipality's final policymakers are held effectively to have made policy or condoned creation of a custom by ratifying the unconstitutional or illegal actions of subordinate officers or employees. *See Pembaur. v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). *Turner v. Upton County, Texas*, 915 F.2d 133, 136 (5th Cir. 1990). When an officer commits unconstitutional acts and is never disciplined, the municipality implicitly ratifies and adopts that unconstitutional conduct as official policy, and municipal liability then results. *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir 1985). The disposition of the policymaker must be inferred circumstantially from conduct of the officer and the policymaker. Id. at 171. Following any catastrophic and incompetent performance, where there are no reprimands, no discharges, no admissions of error, and no changes made in policy, the court and jury can accept that this is "the way things are done" in that municipality. Id. Here, the City of Harlingen ratified Detective R.D. Moore's conduct, as is evidenced by the city's failure to censure, discipline, or reprimand Detective Moore after he improperly received, possessed, and stored the AR-15 and after he failed to warn fellow law officers of a known, avoidable danger.

Plaintiffs clearly alleged acts of negligence in the use of tangible personal property by the City of Harlingen that proximately caused this incident, and the discovery in this matter has established beyond a preponderance of the evidence that the City was negligent in its handling of the AR-15 and that such negligence was a proximate cause of the deaths of the Border Patrol agents. Proximate cause includes and embraces both foreseeability and cause in fact and does not have to be asserted more specifically. Defendants cannot challenge the application of §101.021 of

the Texas Tort Claims Act to Harlingen's liability, in a situation in which a municipality negligently failed to prevent a weapon from being taken from the municipality. *Kennedy v. Baird*, 682 S.W.2d 377, 388 (Tex. App.-El Paso 1984, no writ); *Praether v. Brandt*, 1998 WL 754644, *4 (Tex.App.-Houston [1st Dist.] 1998, no pet). The City's negligent handling of the assault weapon was a proximate cause of the tragic death of the Border Patrol agents and the severe injuries sustained by Deputy Raul Rodriguez.

## IV.  BACKGROUND EVIDENCE

Defendant City of Harlingen, Texas, directs and supervises the City of Harlingen Police Department. James Joseph Scheopner was employed by the City of Harlingen Police Department for twenty-eight years, and served as its Chief of Police from 1993 to 1999. (Exh. A, 12-1 to 8; 13-3 to 8). City Chief Scheopner was the highest police authority in the City of Harlingen and the buck stopped with him. (Exh. A, 19-8 to 20). He had the total authority to discipline any of his officers. (Exh. A, 152-19 to 153-5; 208-22 to 209-2). Ralph Dwayne Moore is employed by the City of Harlingen Police Department as a Detective. (Exh. F, 108-18 to 23). City Chief Scheopner and Detective Moore worked together for over twenty years. (Exh. A, 31-24 to 32-2).

On July 7, 1998, U.S. Border Patrol Agents Susan Lynn Rodriguez and Ricardo (Rick) Salinas, and Cameron County Deputy Sheriff Raul Rodriguez were ambushed by Ernest Moore, Detective Moore's son, with an AR-15 semi-automatic assault rifle, which has been identified as a Frankfort Arsenal, model MX 177, .223 caliber, assault-type rifle, serial #FA0698. Agents were killed and Deputy Rodriguez was seriously injured.

The AR-15 assault rifle had been delivered by a concerned citizen, Mrs. Sylvia Pirtle, to the HPD for destruction on June 23, 1995. (Exh. B). The City of Harlingen Police Department took possession of the AR-15 as temporary trustee on June 23, 1995. Detective Moore, acting for the Harlingen Police Department, received of the weapon from Mrs. Pirtle and assured her he would take care of it. (Exh. B). He didn't. Instead of assuring the destruction of the AR-15, Detective Moore kept it – at first in his office, and later in his son Ernest Moore's bedroom. (Exh. F, 121-9

9

to 12; 50-11 to 12).  The weapon was given to the department for destruction and should have been put in the evidence locker until it was destroyed.  It was never officially the department's property for department use because HPD never explored any procedure (such as forfeiture) to obtain legal appropriation of the weapon in question.  (Exh. U).  In order to use a seized weapon, a law enforcement agency has to seek an order from the court to forfeit the weapon to the state for use by the law enforcement agency holding the weapon.  Texas Code of Criminal Procedure art. 18.19.

Initially after the incident, the City took the position publicly that the rifle was supposedly assigned to Detective Moore in his purported role as a "sharpshooter" for HPD.  (Exh. A, 27-18 to 19).  There is no documentation for the establishment by HPD of a 24 hour, on-call sharpshooter team.  (Exh. A, 71-10 to 25).  Harlingen Police Officers are governed under the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE) rules.  (Exh. A, 244-20 to 245-12).  The rules stipulate that any law enforcement officer who uses a rifle must comply with the yearly qualifications at a 100-yard range with the minimum of twenty duty rounds.  (Exh. D).  The Harlingen Police Department borrows the indoor MMA gun range to comply with the yearly qualifications with the department-issued Beretta 9mm handgun and the department issued shotguns assigned to the patrol units and to detectives.  HPD has no 100-yard range to comply with the requirements and no records exist that Detective Moore complied with the rules regarding the AR-15.  (Exh. E).  Detective Moore has now admitted that he was not qualified to carry the AR-15.  (Exh. F, 131-10 to 12).

The assault rifle, under any circumstances, should have been available for official use only.  (Exh. A, 69-16 to 70-6).  However, Detective Moore made the rifle easily accessible to his son, Ernest Moore, by placing the rifle in the gun cabinet in his son's bedroom.  (Exh. F, 87-25 to 88-2).  Ernest had a key to the gun cabinet.  (Exh. F, 50-20 to 51-8).  Detective Moore permitted his son, Ernest Moore, to use the rifle for target practice.  (Exh. F, 142-18 to 19).  Ernest Moore acquired and became proficient in the use of the AR-15 semi-automatic assault rifle he used to

commit the crime, through the illegal and negligent acts and practices of Chief Scheopner and

Detective Moore.

On July 10, 1998, Chief Scheopner told news media that the AR-15 was registered to the

HPD. (Exh. T). Purportedly, the rifle was assigned to Detective Moore because he was on-call 24

hours a day as the department's sharpshooter and was on the Special Weapons and Tactics

(SWAT) team. Discovery has revealed that Chief Scheopner's statement was not true. A

Harlingen Police Association's Letter to the citizens of this community (Exh. T) establishes the

following facts:

- There was no SWAT [Special Weapons and Tactics] team in the Harlingen Police Department on the 7th of July 1998. In 1993, Chief Scheopner officially disbanded the ERT (Emergency Response Team) due to FLSA (Fair Labor Standards Act) problems, and Detective RD Moore was not a part of the ERT then.
- Detective RD Moore was not on 24-hour call for emergency purposes. He carried no pager and no one was aware that he was on call. There is no documentation within the Harlingen Police Department directing supervisors and or subordinates indicating that Moore was the department's sharpshooter by Chief Scheopner and or Captain Joseph Vasquez.
- The rifle and the caliber do not lend itself for sharpshooter's responsibilities. The rifle had no scope and the Harlingen Police Department did not supply the ammunition for the rifle. The common calibers accepted by law enforcement sharpshooters are the 308 caliber or the 30.06 caliber. The 223 caliber is not adequate for sharpshooter's responsibilities. The AR-15 rifle may be used as assault rifle but only after meeting the qualifications set forth by TCLEOSE and proper approval by the department head. It would require the development of departmental policy (rules) so as to avoid vicarious liability. We have no such policy in place.

The fact that the weapon was turned in for disposal and then issued by Captain Vasquez to

Detective RD Moore goes against the original request by the person asking us to properly dispose

of the weapon. (Exh. B; Exh. F, 53-4 to 11).

During Chief Scheopner's tenure as Harlingen Police Department's Chief of Police, he

abused his authority and position by fashioning a broad range of policies and practices inconsistent

with, in violation of, and with disregard for state and federal laws and Harlingen Police

Department Directives. He allowed favored, high-ranking officers to circumvent, skirt, and

outright violate laws. Through this display of favoritism and disregard, he created a system that

ultimately lead to a federally regulated, semi-automatic assault rifle to come into the hands of a person who could not legally possess such a firearm.

Chief Scheopner allowed officers to keep weapons in their vehicles and homes. (Exh. A, 29-22 to 30-3). Presumably, he would not allow the weapons to be kept for personal use. (Exh. A, 69-16 to 70-6). Detective Moore took the AR-15 home on daily basis. (Exh. F, 142-15 to 17). Yet there were no instructions, written or oral, as to the safekeeping of such weapons. (Exh. A, 30-17 to 31-21; 70-7 to 12). The only instruction Chief Scheopner gave to Detective Moore was "to stay readily available and proficient with rifles." (Exh. A, 30-13 to 16).

On numerous occasions, City of Harlingen's officers were made aware of Harlingen Police Departments' violations of policies and practices inconsistent with state and federal law and Police Department Directives, yet they refused to investigate thoroughly or to act in an appropriate manner to bring the department into compliance. (Exh. G).

Ernest Moore had been treated for mental illness with Prozac and was a drug user until his death on July 7, 1998. (Exh. A, 91-6 to 14; Exh. F, 144-14 to 20). His bedroom was decorated with Nazi posters, a Nazi military uniform, and contained other Nazi and Neo-Nazi items. (Exh. H, 87-21 to 23).

On July 7, 1998, at approximately 4:30 a.m., Ernest Moore, son of Defendant Detective R. D. Moore, shot and killed Maria Morin and her daughter Delia, and wounded her son Dan with another rifle, an AK-47, at 311 Catherine Street in Rio Hondo, Texas. (Exh. X). After that rifle was wrestled away from him by others in the house, Ernest fled the house in his white pick-up truck. The witnesses in the house, including Ernest's ex-girlfriend, called 911 to report the shooting and positively identified Ernest Moore as the assassin. (Exh. X).

At approximately 5:20 a.m., the Cameron County Sheriff's Department responded to the shooting. The suspect was identified as Ernest Moore and a description of the vehicle and license plate numbers were obtained and issued a "look-out" to all law enforcement agencies in the area. (Exh. X).

Ernest fled home and parked his truck in the driveway alongside the City's truck assigned to Detective Moore. The City vehicle was equipped with HPD's mobile radio. Reportedly, Ernest told his father at that time that he was "in deep shit." (Exhs. I, J and K). Ernest then took the AR-15 assault rifle and left the house.

At 6:06 a.m., HPD dispatcher received the information "look-out" and sent it out. (Exh. L). At approximately 6:30 a.m., after reading the teletype, Sgt. Miguel P. Garcia realized that Ernest Moore was Detective Moore's son. (Exh. M, 55-11 to 56-9). Within a minute, Sgt Shawn Foist came to the office and told Sgt. Garcia the same thing. (Exh. M, 59-21 to 60-3). Immediately thereafter, Sgt. Foist had a phone conversation with Chief Scheopner who told him to go to Detective Moore's house because Detective Moore was not cooperative. (Exh. M, 62-13 to 68-5). On the way to Detective Moore's house, Sgt. Foist had a couple of phone conversations with Chief Scheopner. (Exh. M, 68-8 to 69-9).

As County Deputies and United States Border Patrol Agents arrived at Detective Moore's house, Detective Moore met them outside and initially refused to permit the County Deputies to search his house for Ernest. After talking to Chief Scheopner via telephone, he let in the County deputies into his home, but refused entrance to the Border Patrol agents, saying that his son was not an illegal alien and they had no business with him. (Exh. F, 39-15 to 40-13). Detective Moore never gave the Border Patrol Agents even a general warning regarding the whereabouts of his son, or notified the Agents that his son was armed with the AR-15 assault rifle. (Exh. F, 40-14 to 41-23). His refusal to permit the Agents to enter his home effectively placed the Agents directly in harm's way.

While the officers were standing in the front of the Moore house discussing the situation, Ernest Moore walked out from the cornfield across the road that passed in front of the Moore house and fired the AR-15 at Agents and Deputy Rodriguez. (Exh. H, 71-8 to 15; Exh. X). His first shots struck Agent Salinas in the rear of the skull. A second volley struck Agent Rodriguez. A third group of shots struck Deputy Rodriguez. (Exh. X). The law enforcement officers started

13

to shoot back at Ernest.  Ernest was shot and ceased firing.  (Exhs. X and Z).

Chief Scheopner did not discipline Detective Moore (Exh. A, 87-15 to 18).  Chief Scheopner did not recommend that Detective Moore be disciplined.  (Exh. A, 89-14 to 17)  The City and Chief Scheopner insist, to this day, that they are free of fault and deserve no blame.

## V.  ARGUMENT AND AUTHORITIES

### A.    State-Created Danger

#### 1.    City of Harlingen's Liability is Predicated upon the Conduct of Chief Shoepner; a Custom of no Safe Weapons-Handling Procedures; and a Nexus between the Custom and the Tragic Shooting

Chief Scheopner was the highest police authority in the City of Harlingen and the buck stopped with him.  (Exh. A, 19-8 to 20).  He had the total authority to discipline any of his officers.  (Exh. A, 152-19 to 153-5; 208-22 to 209-2).  Chief Scheopner had final authority to make and establish a policy governing the operation of the City of Harlingen Police Department and the conduct of its officers and personnel.  Chief Shoepner at all times acted in bona fide pursuance of his general authority to act for the City of Harlingen in the area of law enforcement, which acts were and are imputed to the City of Harlingen.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, (1986); *Thomas v. Sams*, 734 F.2d 185, 192, (5th Cir. 1984), cert. denied, 472 U.S. 893 (1985).

A municipality's final policymakers are held effectively to have made policy or condoned creation of a custom by ratifying the unconstitutional or illegal actions of subordinate officers or employees. *See Pembaur. v. City of Cincinnati*, 475 U.S. 469, (1986).  *Turner v. Upton County, Texas*, 915 F.2d 133, 136 (5th Cir. 1990).  When an officer commits unconstitutional acts and is never disciplined, the municipality implicitly ratifies and adopts that unconstitutional conduct as official policy, and municipal liability then results.  *Grandstaff v. City of Borger*, 767 F.2d 161, 171-72 (5th Cir 1985).  An injured plaintiff is not likely to document proof of policy or disposition, either of the policymaker or throughout the police force.  *Id* at 171.  The court must

14

.

accept that the plaintiff may encounter difficulties in making that proof, because of the lack of credible witnesses and the avenues for dispute and distraction over the actual facts of each specific incident. Id. The disposition of the policymaker must be inferred circumstantially from conduct of the officer and the policymaker. Id. Following any catastrophic and incompetent performance, when there are no reprimands, no discharges, no admissions of error, and no changes made in policy, the court and jury can accept that this is "the way things are done" in that municipality. Id. If prior policy had been violated, a court and jury could expect to see a different reaction; if officers' conduct is not acceptable to a police chief, a court and jury expects to see changes made. Id.

Interestingly, even the City's own investigation of the incident and Chief Scheopner's actions was critical of the Chief for his having "made no formal investigation of the matter and [the fact that he] had allowed Moore to work without interruption or questioning." (Exh. BB, attached as Exhibit 3 (report) to LaBeau deposition at p. 3). The internal investigation concluded that, "The Chief failed to initiate an objective departmental review of the circumstances, policies and procedures by which Moore came to possess the AR-15." Id. at p. 4. It is this admitted failure by the Chief to reprimand Moore and to investigate the tragic events that the law recognizes as evidence of a custom or policy sufficient to warrant the imposition of § 1983 liability.

The rifle was supposedly assigned to Detective Moore as a sharpshooter for HPD. (Exh. A, 27-18 to 19). The rifle, under any circumstances, should have been used for official purposes only. (Exh. A, 69-16 to 70-6). When Chief Scheopner was asked why the rifle fell into Ernest Moore's hands, Chief Scheopner said that Detective Moore told him his son stole his gun cabinet key. (Exh. A, 103-4 to 6). However, the evidence proves otherwise. The City did not maintain an Emergency Response Team comprised of sharpshooter. (Exh. T). Detective Moore made the rifle easily accessible to his son, Ernest Moore, by placing the rifle in the gun cabinet in his son's bedroom. (Exh. F, 87-25 to 88-2). Ernest had a key to the gun cabinet, which was purchased by

15

Detective Moore and his son together. (Exh. F, 50-20 to 51-15). Detective Moore even permitted his son, Ernest Moore, to use the assault rifle for target practice. (Exh. F, 142-18 to 19).

The danger created by allowing the assault rifle to be placed in the home of Detective Moore is directly attributable to the failure of the Harlingen Police Department and Chief Scheopner, to implement and enforce proper policies and procedures to prevent such an occurrence. (Exh. U).

After the tragic shooting, all of the initial deceptions and cover-ups made by Chief Scheopner, Captain Vasquez, and Detective Moore (such as the destruction of the AR-15, Ernest stealing Detective Moore's key to the gun safe, allowing Ernest Moore to use the AR-15 for target practice, and failure to comply the requirement of proficiency) came to light. Even after acknowledging the truth, Chief Scheopner never disciplined Detective Moore. (Exh. A, 89-14 to 17; 209-16 to 18; 210-17 to 211-15). In *Palmer v. City of San Antonio*, 810 F.2d 514, 516 (5th Cir. 1987), the Court stated that if officers know at the time of their action the use of excessive force in arresting person will be approved by the policymakers, then the causation requirement has been met.

In a recent case in which the Fifth Circuit refused to permit recovery for an individual in suit against a municipality based on alleged 42 U.S.C. § 1983 allegations involving facts whereby police officers supplied information about a target to a privately hired assassin, the court was sharply critical of the claimant's efforts to identify "an official policy" that was the moving force in the violation of a constitutional right. *Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001). The court noted that, for purposes of § 1983 liability, such a policy may be evidenced by custom, that is:

> ... a persistent widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy ....

*Piotrowski*, 237 F.3d 567, 579 (*quoting Webster v. City of Houston*, 735 F.20 838, 841 (5th Cir.

16

1984)(en banc)).  It would appear that the Harlingen City official designated to investigate the means by which the City's assault rifle fell into Ernest Moore's hands had the court's language in mind when he drafted his conclusions upon inspecting the Harlingen Police Department's evidence rooms, weapons. lockers and Detective Moore's office.  Mr.LaBeau, the Assistant City Manager, in his report dated October 14, 1998, regarding the July 7, 1998, incident "in which "two Border Patrol agents were killed with a weapon belonging to the Harlingen Police Department" observed that

- A handwritten inventory of weapons issued existed, but did not show Moore'sign-out of the AR-15.

- Hundreds of weapons, mostly handguns, were stored in stacked bins with tags which relate to case documentation.  Many of these weapons have been in storage for years, some decades.

- A wide assortment of rifles were stored in various secured rooms.  Some of these were owned by the Department.  Others were marked as "evidence."

- Over the years, some of the weapons have been put in service, usually with permission of the Chief.

- No current effort has been made to dispose of the stockpiled weapons.

- It was Moore's practice to store the AR-15 behind his office door, even after he no longer had weapons safekeeping duties.

(Exh. BB, attached as Exhibit 3 (report) to deposition of Joseph D. LaBeau pp. 4-5) (discussed at pp. 19 et seq. of deposition).  Mr. LaBeau concluded that "a review of the departmental policies and procedures identifies a number of apparent violations" which he lists.  These violations included violations of use of unauthorized weapons and inadequate training in weapons use.  *Id.* at p. 9-10.  Most importantly, he observed that "[it] is clear there <u>are no detailed policies and procedures </u>for the handling of weapons, and there has been inadequate weapons practice and training...weapons control and inventory practices are inadequate and unprofessional.  In addition there has been <u>no formal assignment</u> by any officer to duties of sharpshooter... ."  *Id.* at 10 (emphasis in original).

17

It is this widespread custom of failing to maintain safe weapons-handling procedures that is the moving force behind the constitutional deprivations alleged in this case. If the assault rifle had been disposed of as originally intended or assigned and stored in a proper manner, the weapon would not have been used to kill Agents.

**2. The Summary Judgment Evidence is Sufficient to Support Plaintiffs' State Created Danger Cause of Action**

The fact that the Fifth Circuit Court did not reject outright the state-created danger doctrine implies that the Court would adopt the theory if presented with a case meeting the elements described by the Court. The elements of such a cause of action are as follows:

1. The government officials must create the dangerous situation;

2. They must know the situation is dangerous;

3. The danger must create an opportunity for a third party to commit a crime which would not otherwise exist; and

4. They must affirmatively place the plaintiff in a position of danger in such a way as to strip the plaintiff of his ability for self-defense.

*Randolph v. Cervantes*, 130 F.3d 727, 731 (5th Cir. 1997); *Johnson v. Dallas Independent School District*, 38 F.3d 198, 201 (5th Cir. 1994).

In the present case, the tragic event made the basis of this lawsuit was a result of repetitive abuse of police power by Chief Scheopner and Detective Moore. Had there not been abuses of police power by Chief Scheopner, the tragic event would not have occurred. Conduct of a state actor, more culpable than negligence, may constitute denial of due process sufficient to support an action under 42 U.S.C. § 1983. *Salas v. Carpenter*, 980 F.2d 299, 307 (5th Cir. 01992). Chief Scheopner's abuse of police power not only knowingly created a dangerous environment for Agents, but it was also a deliberate neglect of their safety. All the elements of "state-created danger" are present here.

## (A)   Defendant Harlingen Created the Dangerous Situation

The rifle, under any circumstances, should have been used for official purposes only. (Exh. A, 69-16 to 70-6).  Detective Moore placed the assigned rifle in the gun cabinet to which Ernest had a key because the cabinet was purchased by Detective Moore and his son together. (Exh. F, 50-20 to 51-8).  Detective Moore placed the cabinet in his son's bedroom.  (Exh. F, 87-25 to 88-2).  The arrangement of the cabinet made the assault rifle easily accessible to his son, Ernest Moore.

The failure of the Harlingen Police Department and Chief Scheopner to implement and enforce proper weapons policies and procedures did create a danger to the community that would not otherwise have existed.  Great and foreseeable harm would result if weapons such as the assault rifle in question fell into the wrong hands.  The total  absence of proper policies and procedures designed to prevent such harm is shocking and unconscionable.  (Exh. U).

The tragic events that led to this lawsuit started with the double homicide at Rio Hondo.  At approximately 4:30 a.m. on July 7, 1998, Ernest Moore shot and killed Maria Morin and her daughter, Delia, and wounded her son, Dan, with an AK-47.  (Exh. X).  After others in the house wrestled the rifle away from him, Ernest fled in his white pick-up truck.  (Exh. X).  The witnesses in the house, including Ernest's ex-girlfriend, called 911 to report the shooting and gave a positive identification of Ernest as the shooter.  (Exh. X).

Ernest fled to his parents' home.  Shortly before 6:00 a.m., Pasty Moore, his mother, noticed that he was home because she heard Ernest's bedroom door slam shut.  (Exh. Y, 131-17 to 133-4).  Detective Moore and his wife walked to Ernest's truck.  (Exh, F, 20-2 to 20).  Mrs. Moore showed Detective Moore the inside of the truck and he saw that there was ammunition on the floorboard.  Detective Moore's assigned City vehicle, which was equipped with the HPD's mobile radio, was parked alongside Ernest's truck in the driveway.  (Exh. F, 18- 22).  Detective Moore must have turned on the mobile radio to learn that his son committed the homicides.

Otherwise, Daniel Perry, Ernest's foreman, would not have been told by Mrs. Moore (when Perry called between 6:15 to 6:30 a.m. regarding whether or not Ernest would be coming to work that day) that, "[he] probably was not that he, Ernie, was in a lot of trouble that he had shot somebody". (Exh. N). Sgt. Foist's statement that Ernest Moore told his father, Detective Moore, that he was "in deep shit" before leaving the house with the assault rifle must be true despite R. D. Moore's assertion later that he did not speak to his son that morning.  (Exh. I, J, and K).

An off-duty peace officer who observes a crime in progress immediately becomes an on-duty officer. *Laughlin v. Olszewski*, 102 F.3d 190, 192 n.1 (5th Cir.1996); *Villegas v. Griffin Indus.*, 975 S.W.2d 745, 754 (Tex.App. – Corpus Christi 1998, writ denied); *Wallace v, Moberly*, 947 S.W.2d 273, 277 (Tex.App. – Fort Worth 1997, no writ); *City of Dallas v. Half Price Books, Records, Magazines, Inc.*, 883 S.W.2d 374, 377 (Tex.App. – Dallas 1994, no writ). A police officer is not relieved of his duty to prevent crime when he witnesses an illegal act simply because he is off-duty. *See Blackwell v. Harris County*, 909 S.W.2d 135, 139 (Tex.App. – Houston [14th Dist.] 1995, writ denied) (*citing Moore v. State*, 562 S.W.2d 484, 486 (Tex.Crim.App.1978)).

It is the nature of the act performed, not the clothing of the actor or even the status of being on-duty or off-duty, which determines whether an officer has acted under color of law for purposes of the civil rights statutes. *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975).  In *Stengel*, Belcher, an off-duty officer, involved himself in an altercation in a bar.  As a result he killed two people and paralyzed a third with a handgun assigned to him.  Belcher contended that his actions were taken as a private citizen because he was engaged in private social activity, was out of uniform, off-duty, and never identified himself as a police officer at any time.  However, the court held that while shooting the three men, Belcher was acting under the color of law because the police regulations required him to carry a gun at all times, and further, the police chief testified that the office regulations required an officer to take action in any type of police or criminal activity 24

20

hours a day. *Belcher*, 522 F.2d at 441. An off-duty police officer who performs an actual or apparent duty of his office is acting under the color of law. In *Half Price Books*, 883 S.W.2d at 377, the court held that an off-duty police officer who observes a crime immediately becomes an on-duty police officer. An officer who is present at the scene of an arrest and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under civil rights statutes. *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 (1st Cir. 1990), *cert. denied*, 500 U.S. 956.

In the present case, officers are required to swear to enforce federal and state laws, and local ordinances under Subsection 6.08.002 of the Departmental Directives of the Harlingen Police Department, (hereinafter referred to as "Directives") (Exh. O). The police officers have the following duties:

(1) to "protect and serve" the community by complying with their lawful duty to preserve the peace, protect life and property, and to deter and prevent crime while detecting and apprehending criminals (Subsection 6.07);

(2) to take action and report upon all violations coming to their attention, as well as all information they receive about any actual or suspected violation of the law (Subsection 6.07.001);

(3) to make arrests when necessary to enforce laws and to protect the public (Subsection 6.08); and

(4) to make appropriate arrests when witnessing or receiving information of violations of the law (Subsection 6.08.001).

The Directives instruct off-duty officers:

(1) to carry their badges and police identification with them (Subsection 4.05.001);

(2) to take proper police actions in matters coming to their attention (Subsection4.01.005); and

(3) to report to the Police Department information of a law violation they received when practical. If the situation requires immediate action, the officers take the proper action and make written reports (Subsection 4.05).

Under these Directives, Detective Moore is required to take police action to stop or investigate criminal activity 24 hours a day regardless of whether he is on-duty or off-duty.

21

In the present case, Detective Moore knew that Ernest Moore had committed some crime (long before Cameron County Deputy Robert Rodriguez knew). Detective Moore was quoted in Hector Gonzalez's Memo (Exh. P) provided to Jose E Garza, Chief Patrol Agent, McAllen, Texas, as follows:

> After returning to the area where he last saw the suspect vehicle, Deput Rodriguez found the suspect vehicle parked at a residence on the corner of Gamble and Resaca Road. As he approached the residence, he observed a person, later identified as R. D. Moore, a Harlingen, Texas Police Officer, step out of the garage and state to Deputy Rodriguez *"I know my son did something, I want to know what."* R. D. Moore also stated that his son was upset at two drug dealers that had turned his girlfriend on to cocaine and that his son was going to take care of that. He also stated that he was missing two weapons, an AK-47 and a rifle. He further stated that *"his son was probably contemplating suicide and that he hoped he would commit suicide, because if he didn't his son would come back and kill us"* and stated that his son was a *"damn good shot."*

The summary is supported by Detective Moore's testimony. (Exh. F, 34-22 to 37-9) and Cameron Couty Deputy Sheriff Robert Rodriguez's Sworn Statement (Exh. Q)

According to Sgt. Foist's sworn statements and the e-mail he sent out (Exh. I, J, and K), Detective Moore's statement confirmed that he had knowledge of his son's involvement in the shooting at Rio Hondo and access to the AR-15 well before the shooting at the Moore's home. Under the Directives mentioned, Detective Moore should have taken action to investigate what his son had done. Detective Moore should have, at the very least, detained his son for questioning. He knew his son's extremely dangerous propensities. Instead, Detective Moore chose not only to allow his son to flee from his house, but he actually assisted his son in escaping arrest by the Cameron County authorities. In his affidavit, Lt. Jose Rubio of Harlingen Police Department stated:

> On Tuesday, July 7, 1998, I was on day shift and I was scheduled to instruct a class on Mental Health Education for Police Officers. My two shift supervisors were also scheduled to attend this class and Sergeant Miguel Garcia was to cover my shift for the day. As I was preparing to leave for the Harlingen Police Department, I received a phone call from Officer Matthew Manning around 7:15 a.m. informing me that RD Moore's son, Ernest, had just shot two Border Patrol officers and a sheriff's deputy. **He further informed me that Sgt. Foist and Sgt. Garcia had been called out to RD Moore's house in San Benito.**

22

**. . . I was informed the reasons behind both Sergeant Foist and Sergeant Garcia being there at the scene were a request by the Cameron County Sheriff's Department. Apparently, RD Moore had denied permission to the Sheriff deputies to search the house for Ernest Moore and had been rude to them. . .**

(Exh. R) (emphasis added).

Moreover, when Detective Moore discovered that the AR-15 rifle was missing from the gun safe, he had the duty to pursue his son, to arrest him, and to have informed all of the law enforcement officers, including Border Patrol Agents Rodriguez and Salinas and Deputy Rodriguez, that Detective Moore's son was in possession of a deadly assault rifle. Detective Moore did not pursue any of these actions. Detective Moore's failure to take proper police action against his son and his concealment of information from other officers at the scene were in direct violation of the Directives that were to have prescribed his duties.

Chief Scheopner attempts to limit the City's liability by asserting that he first learned about Ernest Moore's involvement in the Rio Hondo shooting at approximately 6:50 a.m. However, the evidence suggests differently. HPD received a "Look Out" for Ernest Moore at 6:06 a.m. At approximately 5:30 a.m., Sgt. Mike Garcia and Sgt. Foist already knew that Ernest Moore was Detective Moore's son, and they knew his license plate number. (Exh. M, 55-11 to 60-3). Around that time, Chief Scheopner had several telephone conversations with Sgt. Foist, and Scheopner ordered Sgt. Garcia and Sgt. Foist to go to Detective Moore's house because Detective Moore was not being cooperative. (Exh. M, 62-13 to 69-9). Since Chief Scheopner and Detective Moore denied having knowledge of Ernest Moore's involvement in the Rio Hondo shooting before Detective Moore was told by Sgt. Saenz of the Cameron County Sheriff's Office at around 6:45 a.m., the radio recording of such conversation would be important in verifying the truthfulness of their testimony.

In the March 21, 2000 Orders and the April 11, 2000 Nunc Pro Tunc Order, this Court observed the following with regard to the state-created danger cause of action and the proof

necessary to establish that theory:

> . . . In addition, one can reasonably infer that the police department's final policymaker, Defendant Scheopner, knew that E. Moore posed a real threat to the decedent. Given that Defendant Moore told the first person who walked up to his house that his son was on the verge of killing himself or a third person, had taken his father's missing weapon and had committed a prior crime, it would be reasonable to infer that he conveyed the same information to Defendant Scheopner, a long-time friend, in the telephone conversation they had before the decedent was killed. **If Defendant Scheopner knew of the real threat posed by E. Moore before the decedent was killed, he could have avoided the danger he created by warning the law enforcement team surrounding the house to take necessary precautions to secure their safety.** It is common sense that the decedent would have proceeded very differently if he had known that E. Moore was close by, carrying an assault rifle, and homicidal. Without information on the suspect's location, weapon and state of mind, the decedent had no reason to take special steps such as donning protective gear or staying out of open areas. The decedent was effectively stripped of the ability to defend himself, and became an easy target. **If Defendant Scheopner had the ability to warn the decedent of the very real danger created by his own policies and procedures, and did not, his actions were outrageous and shock the conscience.**

(*See* pp. 21-22 of the Orders and p. 22 of the Nunc Pro Tunc Order) (emphasis added).

The Court's opinion recognizes that Police Chief Scheopner's knowledge of the danger at Moore's house and his actions in dealing with that danger are critical evidentiary points which Plaintiffs need to establish their state-created danger claims. In other words, any communication between Chief Scheopner and his Harlingen Police Department (HPD) officers are critically important to Plaintiffs' state-created danger claims.

Discovery reveals that the HPD dispatcher received the information concerning the Rio Hondo shooting at 6: 06 a.m. However, the tapes and transcripts of the 911 calls, the officers' radio traffic, and EMS calls that the Defendant produced show only the events that transpired immediately after the San Benito shooting, which occurred at approximately 7:13 a.m. The Defendant did not produce tapes and transcripts of the 911 calls, the officers' radio traffic, and EMS calls during the critical time between 6:06 a.m. and 7:13 a.m. When Plaintiffs asked for the original master tape or tapes, Defendant informed Plaintiffs that the original master tape or tapes had been re-used. (Exh. W). It is impossible to retrieve "recorded-over" material from such tapes

24

since the same particles on the tapes now are in a configuration that represents the most recent recording. (Exh. S).

The destruction of the original master tape or tapes has hindered Plaintiffs' ability to prove their claims. After taking depositions of the dispatchers and officers involved in both the Rio Hondo and San Benito shootings, Plaintiffs are unable to reconstruct conclusively (though the circumstantial evidence is compelling) the chronology of events that transpired on the morning of July 7, 1998, and to discover Chief Scheopner's knowledge of the danger at Moore's house and his action in dealing with the danger. Chief Scheopner testified that he did not know about the situation until 6:50 a.m. (Defendant's Second Motion for Summary Judgment at 12). Unbelievably, Scheopner would have us accept that he did not turn on his portable radio, which would have enabled him to get the Rio Hondo Shooting information. (Ex. A, 169-22 to 178-16). However, evidence reveals that Chief Scheopner communicated with Sgt. Foist at approximately 6:35 a.m. (Exh. A, 62-13 to 68-5). Chief Scheopner does not recall exactly what he told Sgt. Foist. (Exh. A, 180-6 to 17). Chief Scheopner opted not to communicate with Detective Moore through radio transmission purportedly because he thought Detective Moore's radio would not be on, but Chief Scheopner testified that, contrary to what logic would dictate, he did not even try the radio. (Exh. A, 183-12 to 22). Sgt. Garcia testified that after Scheopner obtained the information from the radio, he never used the radio to communicate with other officers. (Exh. M, 80-5 to 12). Detective Moore had a HPD radio in the assigned city vehicle. He also testified that he did not use it. (Exh. F, 162-24 to 163-15). Whether he told the truth could have been verified by the radio recording, but now those recordings have been destroyed.

There were two tapes purportedly recording the radio traffic on July 7, 1998. One was re-used on April 27, 1999, and the other one was re-used on August 22, 1998, February 5, 1999. and October 5, 1999 (according to the label on the tape housing). (Exh. W). On the day after the San Benito shooting, Chief Scheopner knew the City was going to be sued because of the involvement of the City's rifle. (Exh. A, 49-7). On August 12, 1998, the City was first formally

25

notified by Plaintiffs of potential litigation. (Exh. A, 204-18). Plaintiffs' original complaint was filed on November 9, 1998. After five and one-half months of litigation, the City re-used the tape on April 27. 1999. The City's re-use of the tape recording of the HPD's radio traffic must be presumed to have been done in bad faith because it was re-used after the City had been sued. Therefore, the law entitles the Plaintiffs to an adverse evidentiary inference against the City. *Caoaritta v. Entergy Corporation*, 168 F.3d 754, 755 (5th Cir 1999); *Vick v. Texas Employment Commission*, 514 F.2d 734, 737 (5th Cir 1975). At the very least, the fact of the re-use of the tapes should be admitted for the jury to weigh with the other evidenced in the case. *Caoaritta*, 168 F.3d at 756. The deliberate reuse of the tapes and the spoliation of the tapes' content create a jury issue regarding that content.

The City's causation argument that the summary judgment evidence suggests that other weapons were available to Detective Moore's son misses the point. The AR-15 was the weapon that Ernest Moore chose to use when he was on the run after his first shootings of the day. It was a weapon which Detective Moore previously had allowed Ernest Moore to practice shooting. Ernest's proficiency with the weapon made it a logical – and a predictable – choice from among the other firearms that were available to Ernest Moore – a choice which Detective Moore should have anticipated prior to the time that Ernest Moore left the house with the assault rifle.

Furthermore, whether Ernest Moore would have picked another rifle if the assault rifle in question was not available to him is a matter of pure speculation. He ran, and he may or may not have taken another gun with him. "It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences." *Tennant v. Peoria & P.U. Ry. Co.*, 321 U.S. 29, 35 (1944).

The Defendant suggests that Ernest Moore would have selected an alternative weapon if the AR-15 had not been made available to him. While the Defendant has the burden of proof on this point, it has not offered any evidence that would establish as a matter of law that the Defendant's

suggested scenario would have taken place. The fact remains that Ernest Moore only took the City-owned AR-15 when preparing to confront the law officers that were on their way to apprehend him. It is the City's failure to have destroyed the weapon that created the opportunity for Ernest Moore to have access to the weapon that he, in fact, chose when taking the lives of Rodriguez and Salinas.

### (B)   Defendant Knew the Situation was Dangerous

There is no doubt that Chief Scheopner and Detective Moore knew of the volatile and hazardous nature of the situation:  first, that Ernest Moore had possession of the AR-15 semi-automatic rifle with ample ammunition; second, that Ernest Moore's mental status was not stable; and third, that Ernest Moore was an experienced marksman.  Detective Moore knew his son was on the verge of committing suicide or killing someone. (Exh. Q).  Before the shooting, Police Chief Scheopner had a telephone conversation with Detective Moore.  Detective Moore was known to be one of Police Chief Scheopner's "cronies."  It is logical that Detective Moore would have related to Police Chief Scheopner the same thing he told Deputy Sheriff Rodriguez -- that, "*his son was probably contemplating suicide and that he hoped he would commit suicide, because if he didn't his son would come back and kill us.*"  (Exh. Q).

### (C)   The Dangerous Situation Created the Opportunity for Ernest Moore to Commit a Crime which Would not Otherwise Have Existed

By failing to safeguard the rifle, to prevent Ernest Moore from taking the rifle, to arrest Ernest Moore, or to inform the Border Patrol agents and Deputy Rodriguez that Ernest Moore had the AR-15 semi-automatic rifle and that he was near the house, Chief Scheopner and Detective Moore gave Ernest Moore the opportunity to ambush the law enforcement officers.

### (D)   Chief Scheopner and Detective Moore Affirmatively Placed the U. S. Border Patrol Officers in a Position of Danger in Such a Way as to Strip the Officers of Their Ability to Self Defend

The victims in the case at bar were identifiable before the event occurred.  The state actors had reason to know before the shooting that Border Patrol Agents and Cameron County Sheriff's

CtMPDF - www.fastio.com

Deputies would be assisting in the coordinated effort to apprehend the suspect. (Defendant's Second Motion for Summary Judgment at 3). In addition, Ernest Moore was already known by his father, Detective Moore, and the Harlingen Police Department to be psychologically unstable, the recipient of prescription psychiatric drugs, and a cocaine user. (Exh. A, 91-6 to 14; Exh. F, 144-14 to 20). It was also known that Ernest Moore's bedroom was filled with Neo-Nazi paraphernalia.

In his affidavit (Exhibit R), Lt. Rubio testified:

> . . . On this day [Monday, July 13, 1999], for the first time, I hear about the Neo-Nazi paraphernalia found inside the bedroom of Ernest Moore. This shocks me initially because I can't believe that a police officer would allow his son to have the Neo-Nazi paraphernalia. Part of our law enforcement training under mandatory T.C.L.E.O.S.E. regulations covers culture diversity which addresses hate crimes and racist groups. The State of Texas governing body has made a tremendous effort to attempt to address the issues of hate crimes and racial prejudice to law enforcement officers by having a mandatory culture diversity class every two years. It would be against departmental policy for Officer Moore to condone the behavior of his son by allowing Ernest Moore to be involved in Neo-Nazi activities.

Detective Moore had to know that his son had a "Neo-Nazi mentality" and hatred of minorities since Ernest Moore lived with his father. Detective Moore knew that the Neo-Nazi paraphernalia was in his son's room. Detective Moore should have been concerned that minority law enforcement officers would be his son's first targets.

In light of Chief Jim Scheopner's close working relationship with Detective Moore and the telephone conversation he had with Detective Moore at the critical moment before the tragic incident in question, Chief Scheopner also, in all reasonable probability, had reason to know that minority law enforcement officers would be Ernest Moore's first targets.

After responding to the call and going to the scene, Agents were entrapped, and it was too late for them to back out of harm's way because they were already under Ernest Moore's murderous eye. This situation was created by the failure of Detective Moore and Chief Scheopner to fulfill their police duties under Subsection 6.07 of the Directives, which provides that: "Officers 'protect and serve' the community by complying with their lawful duty to preserve the peace,

protect life and property, and to deter and prevent crime while detecting and apprehending criminals." Had Chief Scheopner or Detective Moore fulfilled their this Directive by warning Susan Rodriguez, Ricardo Salinas, and Raul Rodriguez about the imminently dangerous situation and having them seek cover, Officers would not have been killed by Ernest Moore. Therefore, Detective Moore and Chief Scheopner were responsible for the deaths of Officers Rodriguez and Salinas under the civil rights statutes, and the injuries sustained by Deputy Raul Rodriguez. This Court can, and should, take judicial notice of the Nazi and Neo-Nazi mentality, the corresponding attitude of intensely despising minorities, and the predisposition of such "hate groups" to use violence to injure and kill minorities. *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 202, 109 S.Ct. 998, 1005 (1989); *Schuster v. City of New York*, 5 N.Y.2d at 81, 154 N.E.2d at 537.

In *Schuster* the Plaintiff was killed while attempting to assist the city police department in the apprehension of a suspected murderer. The Court recognized that a police officer owes a special duty to use reasonable care for the protection of persons who have collaborated with the police department in the arrest or prosecution of criminals. As the Plaintiffs have alleged in their amended complaint, the facts in the case at bar are closely analogous to *Schuster*.

In the instant case, the Border Patrol Agents and Cameron County Sheriff's Deputies were a part of a coordinated, integrated law enforcement effort that involved city, county, and federal agencies. (Exh. P). As the memo indicates: "at approximately 6:41 a.m. the Cameron County Sheriff's Department contacted McAllen Sector's Communication Center and requested Air Operation's assistance in locating the suspect. LECA John Cantu contacted Harlingen Supervisory Border Patrol Agent Doug Spielman who dispatched some Harlingen Agents to assist in the search and in coordinating the Air Ops assistance." Based on this request, Border Patrol Agents went to Detective Moore's house to assist in the search. The Agents were confronted by Dectective Moore who stated, "Hold up the Border Patrol. I don't want Border Patrol in my house, my son is not

29

an illegal alien." (Exh. P).

The coordinated, integrated nature of the multi-force effort to apprehend the suspect made it unquestionably foreseeable that Border Patrol agents and Cameron County Sheriff's Deputies would be present at the Moore home. The involvement of the Border Patrol Agents in this law enforcement effort establishes a special relationship between the agents and state actors such that the agents were entitled to have been shielded from harm. Instead, the state actor Detective Moore took deliberate steps to withhold information from the agents that would have assisted them in their own protection, and he knowingly and deliberately sent the agents into harm's way. Clearly such actions, when made under color of law, abrogate the standards established in the *Schuster* decision.

### 3. Recent Cases Do Not Preclude the Application of the State-Created Danger Theory Here

In the Fifth Circuit's most recent discussion of the state-created danger theory, the court indicated that, "even if we were to adopt the theory in that case, the Plaintiff could not recover." *Piotrowski v. City of Houston*, 237 F.3d 567, 584 (5th Cir. 2001). The court noted that "Piotrowski alleged that the City created a danger by allowing its employees to affirmatively assist Bell [a privately paid assassin] in carrying out the attack on her... The initial problem is that no matter what official protection Bell received, the City actors did not create the danger she faced." *Id.*

Conversely, in the case at bar the Plaintiffs have alleged that the City created a danger through its policy of not destroying weapons intended for destruction and permitting officers to take such weapons home and store them as their own. Such a policy was the moving force in the chain of events that placed the assault rifle in the disturbed assailant's hands.

The *Piotrowski* court also observed that "depending on the facts, some cases interpret the state-created danger theory to result in § 1983 liability if government actors <u>increase</u> the danger of harm to a private citizen by third parties," but the court reviews the facts in that case and determines

that no increase in danger was manifested by the City's actions. *Id.* at 584-85. Here the City's actions have the effect of placing a high-powered, semi-automatic assault rifle in the perpetrator's hands. Such a fact (as compared to the state-actors providing the assailant a mug-shot of the victim prior to the assault) is directly linked to the assault itself as the state's dangerous instrumentality was provided to the assailant by virtue of the City's widespread policy of ignoring safe-weapons-handling practices.

Finally, the Fifth Circuit in *Piotrowski* notes that, "the City did not act with deliberate indifference. To establish deliberate indifference, '[t]he environment created by the state-actors must be dangerous; they must know it is dangerous; and....they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur'." *Id.* at 585 (quoting *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994)). Here the City's blatant disregard for safe-weapons-handling practices results in an extremely dangerous weapon (one that all admit was known by the City to be dangerous) in the hands of an unstable individual. More importantly, it is the fact that Chief Scheopner, Captain Vasquez and Detective Moore are employed by the City as police officers that cloaks them in the authority to take the weapon out of the line for disposal; re-issue the weapon to R. D. Moore; let him keep it behind his file cabinet, or in his pick-up truck, or in a cabinet in his deranged son's bedroom. But for this authority conferred upon them by the City of Harlingen, these state-actors would not have been in a position "to create an opportunity that would not otherwise have existed for the third-party's crime to occur."

As it later held in *Piotrowski II*, the Fifth Circuit in *Saenz v. Heldenfels Bros., Inc.* 183 F.3[rd] 389 (5th Cir. 1999) held that the state-created danger line of cases were "factually inapplicable" to the evidence in *Saenz*. The Court held that a state actor does not "offend due process by permitting an intoxicated driver to remain on the highway, thereby increasing the risk of harm to unidentified and unidentifiable members of the public." *Id.* In the instant case, however,

CVISPDF - www.texto.com

it was foreseeable to the state actors that the perpetrator would act to injure identifiable persons.

First, it was foreseeable that a dangerous situation would present itself. Officer Moore had specific knowledge about his son that made it probable and highly likely that there was imminent and unreasonable danger to Decedents Rodriguez and Salinas, and Deputy Rodriguez. Second, the dangerous situation was the direct result of the state actors placing a dangerous instrumentality into the perpetrator's hands. This case involves a military assault weapon which was turned over to the state actors for destruction because of the nature of the weapon. The weapon had the capacity to fire numerous rounds in rapid succession. Unlike the standard issue police revolver, the AR-15 assault rifle presented a significant risk of danger for many individuals within a wide range of the user of the weapon. Also, unlike the typical officer revolver, this weapon was brought to the police department to be destroyed. The unique circumstances by which this specific weapon found its way into the hands of this particular perpetrator distinguishes this case from other instances involving shootings with police weapons. And more importantly the unique circumstances of this case involving an extremely dangerous instrumentality that was within the control of the state actors distinguishes this case from *Saenz*. One must assume that the Fifth Circuit would have been less reticent to apply the state-created-danger line of cases to the *Sanez'* facts if the perpetrator in *Saenz* had been driving a state-owned vehicle. Third, the victims in the case at bar were identifiable before the event occurred. The state actors had reason to know before the shooting that Border Patrol Agents would be assisting in the coordinated effort to apprehend the suspect. Ernest Moore was already known by his father, R. D. Moore, and the Harlingen Police Department to be psychologically unstable.

**B.**   **State Claim**

The City argues that there was no negligent entrustment of the rifle to Ernest Moore because the rifle was taken by Ernest Moore without permission. However, the evidence shows otherwise.

"A firearm is a deadly weapon per se, Tex. Penal Code sec. 1.07(a)(11)(A) (Vernon

1974), and under certain circumstances, the owner may be charged with responsibility for the use made of it where the control of the weapon has passed to another." *Kennedy v. Baird*, 682 S.W.2d 377, 378 (Tex. App. – El Paso 1984, no writ)

Discovery in this matter has established that the defendant's handling of the weapon in question violated all standards for prudent conduct including its own. After the tragic debacle in which the two Border Patrol agents were killed, the City launched an investigation to determine why a weapon capable of such destruction and belonging to the City would find its way into the hands of such a disturbed young man. The results of that inquiry depict what would be described as a comedy of errors if it were not so horrible.

At the time of the shootings, Natalie Flores Prim was the City Manager of Harlingen. Her deposition is attached as Exhibit "AA" and incorporated herein. She assigned the Assistant City Manager Joseph D. LaBeau to perform an internal review of the incident. (Exch. AA at pp. 14-15). Mr. LaBeau's duties precluded administrative oversight of the City police department. *Id.* at 24. Ms. Prim testified that, based upon her understanding of Mr. LaBeau's investigation, the City of Harlingen's internal procedures for the assignment of weapons (which was to have followed a written voucher system) was not adhered to with regard to the assignment of the AR-15 to R. D. Moore. *Id.* at p. 34-35. However, Chief Scheopner was aware that R. D. Moore was keeping the weapon even before the shooting. *Id.* Apparently the Chief initially took the position after the shooting that R. D. Moore had been assigned the assault rifle as a member of the City's SWAT team, but the "unit" had been disbanded long before the incident. *Id.* p. 34-35. While the Chief knew that the City no longer maintained such a unit, he also knew that R. D. Moore was keeping the weapon at his home. *Id.* at 44.

Ms. Prim's report to the City in November, 1998, was based in large part on Mr. LaBeau's investigation. Ms. Prim admits that the weapon was assigned to R. D. Moore without regard to the City's written weapon assignment system and kept in a gun safe at Mr. Moore's home. *Id.* at p. 57-60. She knew at the time of her report that the gun had been brought in to the department by

a private citizen, assigned to Moore under the guise of his serving on a City SWAT team even though the City no longer maintained such a unit, and kept at Moore's home. *Id.* Ms. Prim acknowledged that the assignment of the weapon in this fashion abrogated the City's internal policies and procedures. *Id.* at p. 79-80. <u>After</u> the deaths of the Border Patrol agents and the City's investigation of the weapons handling practices, a voluminous, detailed policy procedures manual was issued by the City that addressed the assignment and storage of police department weapons. *Id.* at 91-93.

While Ms. Prim's deposition establishes that the City abrogated its own policies and procedures regarding the handling of the AR-15, the deposition of the Assistant City Manager LaBeau proves that the City also violated standards and rules in this area that are generally applicable throughout this state. His deposition is attached as Exhibit "BB" and incorporated herein. He was assigned by Ms. Prim to review the administrative procedures in the City's police department after the tragic shooting of the Border Patrol agents. (Exh. BB at p. 11-12). Exhibit 3 to his deposition is Mr. LaBeau's October 14, 1998, memo to Ms. Prim that sets forth his findings and recommendations for action. <u>Id</u>. at 13-14.

In his report at p. 3, Mr. LaBeau recorded the following points based upon his interviews of Detective R. D. Moore and his supervisors:

- The Chief had made no formal investigation of the matter and had allowed Moore to work without interruption or questioning.

- Captain Vasquez had allowed Moore to take the weapon home for the general purpose of a "duty weapon."

- There was no substantiation in practice or in documentation that Moore served the department in a "sharp-shooter role."

- Moore had had the weapon in his possession for over a year, and his possession of the weapon was undisciplined sometimes leaving it in his pick-up truck, other times behind the door of his office.

- The inventory procedures in the department were informal and not uniformly applied to all officers.

- Moore had not had formal training on the weapon since 1976.

34

- Moore did not qualify annually with the weapon, but instead practiced shooting it in his yard at home.

- On at least one occasion Moore had allowed his son to use the weapon.

- The weapon in question had been delivered to the department for "disposal."

- No records exist of training or actual call-out for Moore in his supposed duty as a sharp shooter.

- Department policies (see secions 4.04 – 4.04.006) appeared to this reviewer to have been violated.

- The Chief asserted that no departmental violation had been violated, nor had any TCLEOSE requirements been violated.

- The Chief presented an inventory which he represented a showing all weapons present and accounted for, except the AR-15 which had never been signed-out and was now in custody with other agencies as evidence.

Id. at Exhibit 3 to LaBeau deposition (report) pp. 3-4.  After his interviews, Mr. LaBeau proceeded to inspect the police department's evidence rooms, weapons, lockers, and Detective Moore's office.  His report lists the following observations made during that inspection:

- A handwritten inventory of weapons issued existed, but did not show Moore's signout of the AR-15.

- Hundreds of weapons, mostly handguns, were stored in stacked bins with tags which relate to case documentation.  Many of these weapons have been in storage for years, some decades.

- A wide assortment of various rifles were stored in various secured rooms. Some of these were owned by the Department.  Others were marked as "evidence."

- Over the years, some of the weapons have been put in service, usually with permission from the Chief.

- No current effort has been made to dispose of stockpiled weapons.

- It was Moore's practice to store the AR-15 behind his office door, even after he no longer had weapons safekeeping duties.

Id. at Exhibit 3 to LaBeau depo. (report) p. 4-5.

Ultimately, Mr. LaBeau reached the following conclusions pursuant to his assignment to

35

investigate the matter on behalf of the City:

1. The Chief failed to initiate an objective departmental review of the circumstances, policies and procedures by which Moore came to possess the AR-15.

2. The Chief of Police made false statements and reports regarding the assignment of the AR-15 to R. D. Moore

3. A review of the departmental policies and procedures identifies a number of apparent violations:

> 4.04. Authorized Weapons: The Department authorizes officers to carry certain weapons, and authorizes the use of those weapons only when necessary to lawfully accomplish departmental goals. Officers carry and use only those weapons approved and authorized by the Department.
>
> Captain Vasquez reported that he approved this weapon for R. D. Moore without written notification to the Chief. However, the weapon was taken home and placed in a gun vault. Also, R. D. Moore stated he would practice with the weapon by shooting it in the yard of his residence and on one occasion, R. D. Moore knew his son had discharged the weapon because he had allowed his son to do so.
>
> 4.04.001 Approved Weapons and Ammunition: The Department authorizes officers to carry and use only Department issued or approved handguns, shotguns, ammunition, chemical agents and batons. The chief approves all weapons and ammunition. Under special conditions of limited duration, the Commanding Officer on duty may authorize the use of other weapons. A commanding officer taking this action justifies the decision in writing to the Chief.
>
> Captain Vasquez reported that he did not follow any procedure (in issueing the weapon) and did not obtain the Chief's approval. Captain Vasquez reported that he did not discuss with Detective Moore any specific duties when issuing the weapon.
>
> 4.04.002 Training: An officer must undergo Department approved training and display proficiency in the use of any authorized weapon the officer carries. Additionally, officers must comply with all continuing proficiency training required by the Department.
>
> Detective Moore reported that he was last trained in 1976 for this type weapon. Detective Moore reported that he did not comply *with all continuing proficiency training required* by the Department and TCLEO standards (TAC, Title 37, Part VII, Chapter 211, Section 211.104).

4. A review of departmental training requirements records shows no record of mandated annual training by Moore with the AR-15. In fact, Moore and several other officers have not event [sic] met annual proficiency requirements (TCLEOSE) for use of their side arms.

5. It is clear there are no detailed policies and procedures for the handling of weapons, and there has been inadequate weapons practice and training. The department lacks proper documentation of weapons training and qualification. Weapons control and inventory

practices are inadequate and unprofessional.  In addition, there has been <u>no formal</u> <u>assignment</u> by any officer to duties of sharpshooter, although there may be a few officers who are proficient marksmen.

*Id.* at Exhibit 3 to LaBeau depo. (report) at pp. 8-10.

Mr. LaBeau's report makes numerous references to Harlingen Police Department standards as well as "TCLEOSE" guidelines.  As he explained in his deposition, it was Mr. LaBeau's determination that the City's policies were intended to adhere to the Texas Commission on Law Enforcement Officers Standards and Education ("TCLEOSE") guidelines before the July, 1998 shootings.  LaBeau depo. at pp. 39-40.  The paragraph references to which Mr. LaBeau refers in delineating in his report the Harlingen Police Department violations are thus city and state standards for reasonable, prudent conduct that (by the city's own admission) have been abrogated in the handling, assignment, and storage of the AR-15 in question.

Plaintiffs' retained expert George L. Kirkham, Professor Emeritus at the Florida State University's School of Criminology, puts Mr. LaBeau's findings regarding the Harlingen Police Department's violations of internal and state standards for police department conduct into context in his affidavit and report attached here as Exhibit "U"  Mr. Kirkham makes it clear that

> In my opinion, it was a gross deviation from widely accepted law enforcement standards and practices to issue this weapon to R. D. Moore and to allow him to keep it in his home. The rifle originally was turned in to the Harlingen Police Department in 1995. It's owner, Mrs. Sylvia Pirtle, clearly intended for it to be destroyed.  Det. R. D. Moore was the officer who received the rifle from Mrs. Pirtle.  He later arranged with his chain of command to have this weapon issued to him in his role as a "sharpshooter" for the Harlingen Police Department.  The Police Department made no record of the assignment of this rifle to Det. Moore.  Moore apparently kept the weapon in his office for a while, and then moved it to a gun safe located inside his home.  Moore and his son Ernest, who lived with him at the time of the incident in question, owned a number of weapons, which were stored in this gun safe; both men had access to the contents of the safe.
>
> The rifle in question never should have been placed into the hands of R. D. Moore. From the statement of Mrs. Pirtle, it is clear that her intent was for this weapon to be destroyed; any other use or disposition of this weapon was improper.  Det. Moore knew that his son Ernest suffered from depression, had a problem with drug and alcohol abuse, and apparently had a fascination with Nazi memorabilia.  Assuming, arguendo, that the rifle in question had properly been issued to Det. Moore, no prudent, well-trained peace officer would hae stored such a weapon in a manner which allowed ready access by any other person, particularly an obviously troubled young man such as Det. Moore's son.

37

Further, I find that the danger created by allowing this rifle to be placed in the home of Det. Moore is directly attributable to the failure of the Harlingen Police Department and its chief, James Scheopner, to implement and enforce proper policies and procedures to prevent such an occurrence.  Both Chief Scheopner and Det. Moore testified in deposition that, at the time of the incident in question, the Harlingen Police Department had no policies, either written or verbal, regarding the receipt, issuance or storage of weapons such as the Olympic Arms rifle.  As noted above, there was no documentation that this particular weapon had been issued to Det. Moore.  Indeed, Mrs. Pirtle asserts that, until she insisted on getting a receipt, Det. Moore had not planned to even document the receipt of this weapon from her.

In addition, Chief Scheopner made no effort to ascertain that the rifle issued to Det. Moore was safely and properly stored, nor did he take steps to assure that Det. Moore was properly trained in the use of this weapon.  Chief Scheopner testified that he merely instructed Det. Moore to "stay proficient, stay ready" (Scheopner depo. p. 73).  It appears that the only actual training Det. Moore received in the use of such weapons was at an FBI school Moore attended in 1978.

The failure of the Harlingen Police Department and Chief Scheopner to implement and enforce proper weapons policies and procedure did, in my opinion, create a danger to the community that would not otherwise have existed.  Considering the great and foreseeable harm that could result if weapons such as the rifle in question fell into the wrong hands, I find the conduct of Chief Scheopner and Det. Moore in this matter, as well as the total absence of proper policies and procedures designed to prevent such harm, to be shocking and unconscionable.

Faced with the overwhelming evidence regarding its negligence (which includes the testimony of its own City Manager, the conclusions of its own investigation by its Assistant City Manager, and the opinions of the only independent expert identified to assess the issue), the City of Harlingen in its most recent summary judgment attempt abandons any effort to defend its actions concerning weapons-handling-policy violations and adheres merely to a flimsy proximate cause argument.  The Plaintiffs' response is clear—if the gun had been destroyed when brought into the police department by a Harlingen citizen then it wouldn't have been in Detective Moore's disturbed son's hands at the time of the shooting.  Mr. LaBeau admitted as much on deposition when he responded to the following question:

> 1.Well, if we go back step-by-step and look, first of all, at when Ms. Pirtle brought the gun in.  I guess, if the gun had been destroyed at that point rather than distributed, then it wouldn't have been available to Mr. Moore, would it, to Ernest Moore?

1.No, certainly not.

(Exh. "BB" at p. 85).

While this fact may seem obvious, there are those in the City's service who continue to try and "explain-away" the City's failure to destroy the weapon. Interestingly these are the same individuals who initially tried to have the public believe that Detective Moore, though untrained with the weapon, was assigned a rapid-fire assault rifle without a scope pursuant to his duties as a sharpshooter in (what we now know to be a non-existent) SWAT Team. Captain Vasquez, in a deposition taken as recently as this past May, continued to assert that the reference on the receipt pursuant to which Mrs. Pirtle delivered the AR-15 to the Harlingen Police Department on 6-23-95, says "for disposal" but "it means reissue." (Exh. C at pp. 34-5; 79-81). When asked whether the language on that receipt referred to "disposal" or "donation," Mr. LaBeau was careful to point out that the person who originally brought the weapon into the police department believed the weapon was going to be destroyed rather than be reissued. Mr. LaBeau remarked "that the Pirtle's thought that it was going to be destroyed, it goes without question. I think everybody stipulates that is so...." (Exh. BB at p. 36). Apparently it would have been more accurate for Mr. LaBeau to have said, "everybody except the person in charge of assigning the weapon would stipulate that Ms. Pirtle wanted the gun destroyed."

If the gun had been destroyed as Ms. Pirtle intended, it would not have been used to kill the Border Patrol agents. To suggest that some other gun might have been used is only speculation on the City's part - speculation on a point that is essential to the City's argument that is in the nature of an affirmative defense that a third-party was responsible for causing the event. Plaintiffs do not have to establish that the City's failure to destroy, assign, or store the weapon in accordance with state and local standards was the proximate cause of the killing; they need only show that it was a proximate cause. Given the fact that his police-officer father had shown him how to use the weapon, there is at least a genuine issue of material fact presented as to why Ernest Moore selected

39

the illegally stored AR-15 to assault and kill the law enforcement officers and severly injurere Cameron County Sheriff's Deputy Raul Rodriguez who had come to his home to assist in his arrest.

## PRAYER

WHEREFORE, Plaintiff respectfully requests this Court to deny Defendant's Motions to Dismiss and allow Plaintiff to proceed immediately with preparation for a speedy and just trial.

Respectfully submitted,

LAW OFFICE OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, Texas 78539
(956) 383-7441
(956) 381-0825 (fax)

By: _____
RAMON GARCIA
State Bar No. 07641800
Federal Id. No. 3936

Of Counsel

SONIA I. LOPEZ
State Bar No. 24003862
Federal Id. No. 23501

**ATTORNEYS FOR PLAINTIFFS**

40

## CERTIFICATE OF SERVICE

I, SONIA I. LOPEZ, do hereby certify that on this the 13th day of July, 2001, a true and correct copy of the above and foregoing Plaintiff Raul Rodriguez' Response to Defendant's Second Motion for Summary Judgment was sent by certified, United States Mail, return receipt requested to:

Mr. Tom Lockhart
Mr. Rogers W. Hughes
Adams & Graham, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429

Sonia I. Lopez

41