Case 1:98-cv-00162    Document 112    Filed in TXSD on 07/16/2001    Page 1 of 27

United States District Court
Southern District of Texas
FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

JUL 1 6 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL. | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS. | § | |

## PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO COMPEL DEFENDANT CITY OF HARLINGEN TO PRODUCE THE JAMES ROBENSON REPORT

COME NOW ARTURO GUILLERMO SALINAS, ET AL. AND GILBERTO M. RODRIGUEZ, ET AL., Plaintiffs in the above-styled and numbered cause, and, pursuant to Fed. R. Civ. P. 37, file this reply to Defendant's response to Plaintiffs' Motion to Compel Defendant, CITY OF HARLINGEN to produce the James Robenson Report.

1

CHIPDF - www.foxisi.com

# A.  INTRODUCTION

1.      On July 7, 1998, United States Border Patrol Agents Susan Rodriguez and Ricardo Salinas were killed and Deputy Sheriff Raul Rodriguez of Cameron County, Texas, was seriously injured by Ernest Moore with an AR-15 assault rifle in San Benito, Texas.

2.      The assault rifle had been delivered by a concerned citizen, Mrs. Sylvia Pirtle, to the Harlingen Police Department (HPD) for destruction.  R. D. Moore, an HPD police officer, took possession of that assault rifle for HPD, assuring the citizen that it would be destroyed. The rifle is the civilian version of a military assault rifle, which carries a high capacity of ammunition and fires ultra-high velocity, anti-personnel ammunition.  However, the assault rifle was not destroyed as requested.  Instead, HPD Police Chief Jim Scheopner illegally took possession of the rifle and issued it to R. D. Moore.

3.      Beneficiaries of deceased U.S. Border Patrol Agents Susan Rodriguez and Ricardo Salinas, on behalf of themselves and the estates of Susan Rodriguez and Ricardo Salinas, deceased, and Raul Rodriguez, a Deputy Sheriff of Cameron County, Texas, brought suits against the City of Harlingen, Texas, pursuant to 42 USC §1983 and the Texas Tort Claims Act (TEX. CIV. PRAC. & REM. CODE ANN., Chap. 101).

4.      After the tragic shooting incident, The City of Harlingen, through its City Manager Natalie F. Prim, employed Mr. James Robenson, an outside consultant, to review the city's investigation of matters relating to the shooting incident, and Mr. Robenson's investigation resulted in a written report.  (Ms. Prim's deposition, p. 13, l. 20 to p. 18 l. 5)[1].

5.      The deposition of Ms. Prim, the former city manager of Harlingen, was taken at the office of her current employment in Pensacola, Florida.  When Plaintiffs attempted to ask

---

[1]   All Ms. Prim's testimony cited in this motion is collected in the excerpt of her deposition and attached hereto as Exhibit "A."

about the matters stated in the Robenson Report, Mr. Tom Lockhart, attorney for the City of Harlingen, instructed Ms. Prim not to answer on the grounds that "that is privileged information in anticipation of litigation" and requested the witness " to honor that privilege and not respond." (Ms. Prim's deposition, p. 21, l. 4 to 25).

6.     Ms. Prim stated in her deposition that she assigned her former assistant manager in charge of supervising the police department, Joseph D. LaBeau, to investigate the shooting incident. (Ms. Prim's deposition, p. 9, l. 15 to p. 10, l. 14).  Subsequent to Ms. Prim's deposition, Plaintiffs took the deposition of Mr. LaBeau at the place of his current employment in Midlothian, Texas.  In his deposition, Mr. LaBeau testified that Mr. Robenson previously worked in Harlingen in an office fairly adjacent to Mr. LaBeau and would call him in and discuss the investigation with him.  (Mr. LaBeau's deposition, p. 63, l. 21 to 24; p. 66, l. 4 to 7)[2].  Because of Mr. Lockhart's assertion of privilege as to matters related to Mr. Robenson's work, in LaBeau's deposition, Plaintiffs did not ask Mr. LaBeau any question concerning Mr. Robenson's work.

## B. ARGUMENT & AUTHORITIES

7.     The Robenson Report is not covered by the privilege asserted by the Defendant because it was not trial preparation material of the kind protected under Fed. R. Civ. P. 26(b)(3-4).  As such, Plaintiffs are entitled to access to the Robenson Report.  Even if the Robenson Report is considered trial preparation material, the portions of the report that were not done in anticipation of litigation are discoverable.

8.     There are four classifications of experts (each with different discovery limitations) under Fed. R. Civ. P. 26(b)(4): "(1) Experts a party expects to use at trial... (2) Experts retained

---

[2]     All Mr. LaBeau's testimony cited in this motion is collected in the excerpt of his deposition and attached hereto as Exhibit "B."

3

or specially employed in anticipation of litigation or preparation for trial but not expected to be used at trial. (3) Experts informally consulted in preparation for trial but not retained. (4) Expert whose information was not acquired in preparation for trial." *Ager v. Jane C. Stormont Hosp, & Training Sch. for Nurses*, 622 F.2d 496, 500 (10th Cir.1980); *see also Hoover v. United States Department of the Interior*, (dissent) 611 F.2d 1132, 1145 (Fifth Cir.1980); *Healy v. Counts*, 100 F.R.D. 493, 495-96 (D.Colo.1984); C. Wright & A. Miller, *Federal Practice and Procedure* §2029, at 250 (1970). Defendant Harlingen concedes that it has the burden to show that the report it is seeking to protect was produced by an expert in one of the first three classifications, all of which are protected by Fed. R. Civ. P. 26(b)(4), but the Defendant fails to carry the burden. The Plaintiffs contend that Mr. Robenson falls into category four, which is "not included within the Rule 26(b)(4) at all and facts and opinions they [witnesses in this classification] have are freely discoverable as with any ordinary witness." *Ager v. Jane C. Stormont Hosp. & Training Sch. for Nurses* at 500.

9.      In determining whether a report was prepared "in anticipation of litigation," as defined by Fed. R. Civ. P. 26(b)(3), the test is usually whether the "*primary motivating purpose* behind the creation of the document was to aid in possible future litigation." *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir.1981), cert. denied, 454 U.S. 862 (1981) (emphasis added). In the case at bar, neither of the deposed Harlingen officials, Natalie Prim and Joe LeBeau, involved with the commissioning of the Robenson Report asserted that assisting with litigation was a stated purpose of the investigation. (Ms. Prim's deposition & Mr. LaBeau's deposition). In fact, City Manager Natalie Prim testified that the main impetus behind the Robenson Report was not the anticipation of litigation, but a desire to improve and standardize the practices of the police department. (Ms. Prim's deposition, pp. 84-89). Moreover, in the memorandum she

authored recommending a third-party review of police department practices, Ms. Prim never mentioned this or any other litigation, stating that to have done so would have been inappropriate. (Ms. Prim's deposition, p. 87).

10. Even if this Court concludes that the Robenson Report was compiled in "anticipation of litigation," the Plaintiff is still entitled to those portions of the report not directly related to the case at bar because Mr. Robenson, while in the employ of Harlingen, wore "two hats" for the city; that is, he investigated both the incident made the basis of this lawsuit and, more generally, the standards and practices of the Harlingen Police Department. *Marine Petroleum Co. v. Champlin Petroleum Co.*, 641 F.2d 984 (D.C. Cir.1978). *Atari Corp. v. Sega of America*, 161 F.R.D. 417 (N.D.Cal.1994). In *Marine Petroleum*, the Court explained the "two hats" rule, stating that "that one may simultaneously be a litigation expert with Rule 26(b)(4) protection as to some matters and simply an unprotected actor or witness to others..." *Marine Petroleum Co. v. Champlin Petroleum Co.* at 992. The *Atari Corp.* Court elucidated the boundaries of the "two hat" rule when it held that an expert in that case "must give his opinions and facts known, except to the extent that they were obtained *exclusively* in anticipation or in preparation for trial as an expert." *Atari Corp. v. Sega of America* at 421 (emphasis in original). The Robenson Report's analysis of Harlingen Police Department policy and standards, in light of the uncertainty surrounding these very issues, is quite germane to these proceedings and should be disclosed to the extent that it does not concern his investigation of the incident made the basis of this lawsuit. *In camera* review is the proper method for making such determinations. *General Electric Captial Corp. v. Directv, Inc. & Hughes Electronics*, 1998 WL 849389, *4 (D.Conn.1998).

## C.  CONCLUSION

11.    Because the City of Harlingen has refused to comply with all rules requiring production of the Robenson Report, the Court should compel the City to produce the report. Further, the Court should permit follow-up telephone depositions (as opposed to having Plaintiffs' counsel travel to such remote deposition locations) of Ms. Prim and Mr. LaBeau regarding the Robenson Report because the City's prior refusal to permit such deposition questions was without substantial justification.  In the alternative, the Robenson Report should be submitted to the Judge for *in camera* review, so that determinations as to what parts of the report were produced in anticipation of litigation can be made.

## D.  PRAYER

13.    For these reasons, Plaintiffs request the Court to compel the City of Harlingen to produce the Robenson Report and to order brief follow-up telephone depositions of Ms. Prim and Mr. LaBeau regarding the Robenson Report.  In the alternative, Plaintiffs request that the Judge review the Robenson Report, *in camera*, and compel the Defendant those portions of the report not made in anticipation of litigation.

Respectfully Submitted,

**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, TX 78701
512+474-6061
512+474-1605 (fax)

By _____

Broadus Spivey
State Bar No. 1895500
Federal I.D. No. 11146
Price Ainsworth
State Bar No. 00950300
Federal I.D. No. 8065
Francis Pan
State Bar No. 15443300
Federal I.D. No. 26385

## CERTIFICATE OF SERVICE

I hereby certify that the original of the above and foregoing document was forwarded on this 13th day of July, 2001, to the following counsel of record and interested parties via facsimile and certified mail, return receipt requested:

Mr. Tom Lockhart                    **Via Fax: 956+428-2954**
Mr. Roger W. Hughes                 **Via Cert. Mail #7000 1670 0008 1124 7433**
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429
ATTORNEYS FOR DEFENDANT

Mr. Roman Garcia                    **Via Fax: 956+381-0825**
Ms. Sonia Lopez                     **Via Cert. Mail #7000 1670 0008 1124 7426**
LAW OFFICES OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, Texas 78539
ATTORNEY FOR PLAINTIFF RAUL RODRIGUEZ

_____
Price Ainsworth

**3163D.079**

7

# EXHIBIT "A"

Selected pages from the transcript of the videotaped deposition of Natalie F. Prim, taken on April 25, 2001 in Pensacola, Florida.

CVisPDF – www.fastio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILE DIVISION

| | |
|---|---|
| ARTURO G. SALINAS, ET AL | * CIVIL ACTION NO. B-98-162 |
| | * |
| v. | * |
| | * |
| CITY OF HARLINGEN, TEXAS, ET AL; | * |
| | * |
| and | * |
| | * |
| GILBERTO M. RODRIGUEZ, ET AL | * |
| | * |
| v. | * CIVIL ACTION NO. B-98-162 |
| | * |
| CITY OF HARLINGEN, TEXAS, ET AL; | * |
| | * |
| and | * |
| | * |
| RAUL RODRIGUEZ | * |
| | * |
| v. | * |
| | * |
| CITY OF HARLINGEN, TEXAS, ET AL. | * CIVIL ACTION NO. B-98-162 |

          Videotaped Deposition of NATALIE F. PRIM, taken
by attorney for the Plaintiffs at the offices of Wierzbicki
& Stephenson, 220 West Garden Street, Suite 801, Pensacola,
Florida, commencing at 11 a.m. on the 25th day of April,
2001, before Gina Hawkins, Registered Professional Reporter
and Notary Public.

# COPY

# DO NOT WRITE ON TRANSCRIPT – ENTER CHANGES HERE

**In Re: Salinas vs City of Harlington**

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 89 | 10 | "my" – should be "me" |
| 96 | 18 | "in" – ? delete |

Under Penalties of perjury, I declare I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.

5/21/01
Date

Natalie Prim
Deponent: Natalie Prim

1    Q       What do you mean by "best practices" in that

2  instance?

3    A       Well, I had concerns, are we handling our

4  weapons issues or handling like other departments do it,

5  you know.  I think I had questions there of how are they

6  checked out in other areas or other cities, if you will, in

7  their departments, what kind of mechanism did they have in

8  place, what kind of criteria do they have in place.  So, I

9  questioned the whole thing.

10   Q       And when you're talking about what other cities

11 do, I guess you'd be referring to what -- you're trying to

12 figure out in your own mind what does a reasonable and

13 prudent police department do with regard to the assignment

14 of its weapons and the training and the use of its weapons?

15   A       Yes.

16   Q       And you had concern, at least as of November

17 4th, 1998, that perhaps Harlingen wasn't doing what other

18 cities were doing in that regard; is that right?

19   A       Well, at that point I really didn't know were

20 they doing as much as others do, or were they doing less or

21 were they doing more.  I don't know.

22   Q       But that's what you were setting out to find

23 out is, make a comparison as to whether or not Harlingen was

24 doing what other cities ordinarily do in their usual course

25 of handling their weapons?

1   A    That's true.

2   Q    In an effort to determine that, you felt like

3   it was necessary to retain somebody specialized in the area

4   to assist you in making this inquiry about what's the

5   ordinary city doing with regard to the usual course of its

6   handling of weapons; is that right?

7   A    Yes.

8   Q    And you indicate there that "Finally, because

9   of the highly specialized nature of law enforcement,

10  management concludes that -- concludes the need for

11  expert assistance in evaluating and reviewing the above,"

12  is that right?

13  A    Yes.

14  Q    And you recommend that the department -- that

15  the department practices should be brought to the level of

16  best practices in law enforcement; is that right?

17  A    Correct.

18  Q    And that you recommended using an independent

19  expert professional with a background in law enforcement and

20  police operations in order to achieve best practices; is

21  that right?

22  A    Correct.

23  Q    And you would charge that individual with

24  review of the incident, review of the inquiry made thus far,

25  recommending any steps that might be necessary to

Wierzbicki & Stephenson Court Reporting Service

1   standardize department policies and procedures and then

2   complete the task in a timely fashion; is that right?

3          A    Yes.

4          Q    Now, in fact, what you're suggesting there in

5   that recommendation is that somebody like Mr. Robinson be

6   retained to comply with these recommendations; is that

7   right?

8          A    I think to come in and do the review, yes,

9   and to provide advice, yes.

10         Q    And the advice was pertinent to this review of

11  what happened in the San Benito shooting where the border

12  patrol agents were killed; right?

13         A    Yes, he reviewed that.

14         Q    And that's what you mean by "Review of the

15  initial incident"?

16         A    Yes.

17         Q    You also would have wanted somebody in

18  Mr. Robinson's role to review what steps had been done up

19  to November 4th, '98, in the investigation of the events?

20         A    Say that again.

21         Q    You suggest here that this individual will be

22  charged with a "Review" -- I'm inserting the word "of the

23  inquiry thus far and to make any further necessary inquiry."

24              I guess what you're asking is that whoever is

25  retained, that he be asked to make sure that you and

Wierzbicki & Stephenson Court Reporting Service

1    Mr. Labeau have done the appropriate investigation so

2    far?

3              A     For full information, yes.

4              Q     Yeah.  And then to recommend any steps which

5    would be necessary to standardize department policies and

6    procedures; is that right?

7              A     Yes.

8              Q     And then do it timely; is that right?

9              A     Yes.

10             Q     Was anybody, other than Mr. Robinson, ever

11   employed to accomplish these recommendations?

12             A     No.  No.  Mr. Robinson, and that was it.

13             Q     And I don't see any discussion under

14   "Recommendation" that Mr. Robinson be retained or any other

15   person be retained in an effort to provide information

16   pursuant to the anticipated litigation that you had been

17   given notice of over the course of that summer back in

18   1998.

19             Do you see any mention of that here in

20   Exhibit No. 1?

21             A     No.  We didn't discuss the litigation in this.

22   It wouldn't have been appropriate with the report.

23             Q     Isn't it fair to say, Ms. Prim, that you wanted

24   the policies and procedures there at the Harlingen Police

25   Department brought up to best practices whether or not any

1  police operations.

2       Q       You're more trained in it than the average

3  person on the street, obviously, because you're involved in

4  the day-to-day oversight of the police department, but what

5  you felt like was that it was necessary for you to have some

6  input from a professional trained in that area to review

7  what are the standards for police procedures in this context

8  and how do they relate to what was actually being done in

9  Harlingen?

10      A       Run that by my again.

11      Q       You felt like you needed professional expertise

12 in the area of deciding what are the standards for police

13 procedures in this area and whether or not Harlingen was

14 complying with those standards or needed improvement?

15      A       Yes.

16      Q       And really that didn't relate to whether or

17 not the city was going to be sued or wasn't going to be

18 sued.  You wanted the practices themselves to be brought

19 up to best practices if they were deficient or at least to

20 satisfy yourself that the practices were as good as they

21 could be?

22      A       I wanted to know, yes, from an expert.

23      Q       And after some review, you fell upon

24 Mr. Robinson as that person; is that right?

25      A       Yes.


        Wierzbicki & Stephenson Court Reporting Service

1  lawsuits were ever filed?

2      A    Well, the incident is what brought it all

3  about.  The department was managed by the assistant city

4  manager and there had been, you know, certainly some, you

5  know, issues from time to time that I felt that we had

6  already -- we had a crisis on our hands.  We had the public

7  wanting to know.  We had the press calling us every day.

8      We had -- the lawsuits, I think, happened

9  within the first couple of months right after the incident

10  occurred.  So, you know, we just had a real crisis on our

11  hands and we had to respond, and I felt like -- I really

12  felt like I'm not qualified to get to the bottom of this and

13  know all these agencies and understand how to walk through

14  an investigation, and I felt that that's why we needed to

15  have expert advice, and I wanted to know the truth.

16      Q    Well, you're doing better than I would have

17  done because I can't remember what TCLSE stands for, but

18  the point is that based on the fact that you're the city

19  administrator as opposed to the city police department

20  chief, I guess you may have concerns as to whether or not

21  the police department was adhering to best practices, but as

22  to what is the appropriate practice, what do other cities do

23  under the same or similar circumstances, you really didn't

24  know one way or the other?

25      A    I didn't really know much in terms of detailed

1    Q    He was in Texas at the time?

2    A    Yes.

3    Q    He had the right background, it looked like,

4    for the job?

5    A    Yes.

6    Q    And he eventually agreed to make the review;

7    is that right?

8    A    Yes.

9    Q    Did he in fact review, without telling me

10   exactly what he said or anything like that, did he review

11   the initial incident?

12   A    Yes.

13   Q    Did he review the inquiry that you and

14   Mr. Labeau had made up to November 4th of 1998?

15   A    I believe he had whatever we had in our files

16   at his disposal, yes, but he basically took it on for a

17   month or whatever time period it was to apprise us.

18   Q    And was part of his assignment to recommend

19   any steps which might be necessary to standardize department

20   policies and procedures when compared to other city police

21   departments?

22   A    I believe we asked him to look at the incident

23   and then, you know, give us some feedback and some advice,

24   yes.

25             MR. LOCKHART:   How we doing on time, Price?

             Wierzbicki & Stephenson Court Reporting Service

## EXHIBIT "B"

Selected pages from the transcript of the oral deposition of Joseph D. LaBeau, taken on May 15, 2001 in Midlothian, Texas.

CVisPDF – www.fesino.com

ARTURO G. SALINAS, ET AL
VS. CITY OF HARLINGEN, ET AL

Multi-Page™

JOSEPH D. LaBEAU
MAY 15, 2001

---

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHWESTERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION

 3  ARTURO G. SALINAS, ET AL )  CIVIL ACTION NO. B-98-162
    VS.                      )
 4  CITY OF HARLINGEN, TEXAS,)
    ET AL;                   )
 5  AND                      )
    GILBERTO M. RODRIGUEZ,   )
 6  ET AL.                   )
    VS.                      )  CIVIL ACTION NO. B-98-163
 7  CITY OF HARLINGEN, TEXAS,)
    ET AL;                   )
 8  AND                      )
    RAUL RODRIGUEZ           )
 9  VS.                      )  CIVIL ACTION NO. B-99-70
    CITY OF HARLINGEN, TEXAS,)
10  ET AL                    )

11  -----------------------------------------------------

12               ORAL DEPOSITION OF

13              JOSEPH D. LaBEAU

14                 MAY 15, 2001

15  -----------------------------------------------------

16     ORAL DEPOSITION of JOSEPH D. LaBeau, produced as a

17  witness at the instance of the PLAINTIFFS ARTURO G.

18  SALINAS and GILBERTO M. RODRIGUEZ, and duly sworn, was

19  in the above-styled and numbered cause on May 15, 2001,

20  at 1:23 p.m., before CHERIE HOLLAND, CSR, in and for the

21  State of Texas, reported by machine shorthand at the

22  offices of the City Hall of Midlothian, 104 West

23  Avenue E, Midlothian, Texas, pursuant to the Federal

24  Rules of Civil Procedure and the provisions stated on

25  the record or attached hereto.
```

---

**Page 2**

```
 1            A P P E A R A N C E S

 2  FOR THE PLAINTIFFS ARTURO G. SALINAS and
       GILBERTO M. RODRIGUEZ
 3        Price Ainsworth
          SPIVEY & AINSWORTH, P.C.
 4        48 East Avenue
          Austin, Texas  78701-4320
 5
    FOR THE PLAINTIFF RAUL RODRIGUEZ
 6        Ramon Garcia (No appearance)
          LAW OFFICES OF RAMON GARCIA, P.C.
 7        222 West University Drive
          Edinburg, Texas 78539
 8
    FOR THE DEFENDANT
 9        Tom A. Lockhart
          ADAMS & GRAHAM, L.L.P.
10        222 E. Van Buren Street, West Tower
          Harlingen, Texas 78551-1429
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1            I N D E X
                                            PAGE
 2  Appearances.................................     2

 3  Stipulations................................     1

 4
    JOSEPH D. LaBeau
 5      Examination by MR. AINSWORTH...........     4
        Examination by MR. LOCKHART............    90
 6
    Changes and Signature.......................    92
 7
    Reporter's Certificate......................    94
 8
    Certificate Affidavit.......................    95
 9

10
11  NO.    DESCRIPTION                          PAGE

12   1     Report given in draft form           13

13   2     Memorandum to Jim Scheopner          13

14   3     Memorandum to Natalie Prim           19

15   4     Receipt                              32

16   5     Memorandum to Joe LaBeau             38

17   6     Statement from the City Manager      69

18   7     City Manager's Report to the City    69

19          REQUESTED DOCUMENTS/INFORMATION
20                    NONE
21
22
23
24
25
```

---

**Page 4**

```
 1              JOSEPH D. LaBEAU,
 2  having been first duly sworn, testified as follows:
 3                   EXAMINATION
 4  BY MR. AINSWORTH:
 5     Q. Please state your name for the record, sir.
 6     A. Joseph David LaBeau.
 7     Q. And how are you currently employed, Mr. LaBeau?
 8     A. I'm the City Manager of the City of Midlothian,
 9  Texas.
10     Q. And we're here today at the City Hall, Town
11  Hall in Midlothian taking your deposition. Do you
12  understand that we're taking your deposition in a case
13  that arises from a shooting incident that occurred back
14  near Harlingen, Texas, on July 7th of 1998?
15     A. Yes, sir.
16     Q. It's my understanding that back during that
17  summer you were the Assistant City Manager at Harlingen,
18  Texas; is that right?
19     A. That's correct.
20     Q. I appreciate your — giving us some of your
21  time today, and I promise I won't be too long. If I
22  can, let me find out a little bit about you before I
23  find out about the events of that summer back in 1998.
24        Where did you grow up, sir?
25     A. In the midwest. I was born in Chicago, and I
```

---

SHARP HOLLAND
(817) 731-1377

92

1    I, JOSEPH D. LaBEAU, have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted herein.

4            CORRECTIONS AND/OR CHANGES AND SIGNATURE

5    PAGE        LINE        CORRECTION        REASON FOR CHANGE

6    36     2     "what is" to "that"     correction of error

7    36     5     comma after "is"     read correctly

8    36     7     question mark after "department"     read correctly

9    36     8     dashes to "me"     correction

10   52     1     dashes to "mean"     word missing

11   60     15    "is" after understanding     word missing

12   63     1     never to "ever"     correction

13   63     22    "I" to "He"     correction

14   73     7     dashes to full statement     words missing

15   73     8     "made" deleted + correct word put in

16   73     24    dashes replaced with correct words

17   75     15    "me" to "Jim"     what I said

18   75     16    "of" before which     what I said

19   75     21    dashes to full statement     words missing

20   84     20    "it" after support     word missing

21   84     24    "we've" to "we'd have"     what I said

22   _____

23   _____

24   _____

25   _____

SHARP HOLLAND
METRO (817) 731-1377

93

1  _____

2  _____

3  _____

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13

14

15                    _____

16                    JOSEPH D. LaBEAU

17

18 STATE    OF    TEXAS       )
                              )
19 COUNTY OF Ellis            )

20     SUBSCRIBED AND SWORN to before me by the said JOSEPH
   D. LaBEAU, on this the **30** day of **May**_____,
21 A.D., 2001.

22
                                _____
23   LINDA SIBLEY              Notary Public in and for
     NOTARY PUBLIC            Ellis_____ County, Texas
24   STATE OF TEXAS           My Commission Expires: **2-6-04**
     My Comm. Exp. 02-06-2004
25

SHARP HOLLAND
METRO (817) 731-1377

ARTURO G. SALINAS, ET AL      Multi-Page™      JOSEPH D. LaBEAU
VS. CITY OF HARLINGEN, ET AL                      MAY 15, 2001

Page 57

```
1    A. Yes, sir.
2    Q. You indicate on the next bullet point what you
3  recommend with regard to administrative action and Chief
4  Scheopner; is that right?
5    A. I'm sorry?
6    Q. I'm skipping over to page 11 and under the
7  administrative action section that began on page 10 —
8    A. Yes.
9    Q. — you suggest what should be done with regard
10  to Chief Scheopner —
11   A. Yes.
12   Q. — you're making this recommendation to
13  Ms. Flores — to Ms. Prim?
14   A. Yes.
15   Q. Okay. What was your recommendation with regard
16  to Chief Scheopner?
17   A. It was my recommendation that he be returned to
18  his former rank of lieutenant under Civil Service Law.
19  This was the procedure for removal of a chief who had
20  been promoted from within.
21   Q. And why did you feel like that action should be
22  taken?
23   A. I felt he could no longer be effective in his
24  position as Chief of Police.
25   Q. Well, did you feel like that Chief Scheopner
```

Page 58

```
1  had failed to properly investigate and objectively
2  report to the Assistant City Manager the facts
3  surrounding this border patrol shooting?
4    A. Yes.
5    Q. Did you feel like there were contradictions in
6  Chief Scheopner's written and oral statements regarding
7  this sharpshooter duty story as a — that constituted,
8  in your words, a major situation embellishment?
9    A. Yes, sir.
10   Q. And did you ultimately conclude the Chief
11  should be relieved of duty at once and appointed to his
12  former rank of lieutenant?
13   A. Yes, I did.
14   Q. You have a discussion there about who might be
15  appointed in the interim to act as Chief of Police, but
16  in any event, you suggested that — or you urged that
17  swift action be taken?
18   A. Yes, I did.
19   Q. You discussed there what should be done with
20  regard to administrative action pertaining to Captain
21  Vasquez and Detective Moore; is that right?
22   A. Yes, sir.
23   Q. And what were your recommendations after
24  conducting your investigation with regard to
25  Captain Vasquez and Detective Moore?
```

Page 59

```
1    A. I recommended that they be put on paid
2  administrative leave and subject to a disciplinary
3  review.
4    Q. Now, what is paid administrative leave? Did I
5  say that right?
6    A. Yes, sir. It's — it's time off with pay.
7  It's nonpunitive release from duty while a matter is
8  reviewed.
9    Q. And what is a disciplinary review?
10   A. As I used it in that term — let's see. I
11  think I — the next paragraph kind of picks up on that.
12  Because it is a Civil Service regulated department, only
13  the department head, that is Chief of Police, may
14  discipline members of a Civil Service Department.
15       Therefore, since I just recommended he be
16  removed, I suggested these alternatives, that the acting
17  Chief, whoever it is, be appointed to — be instructed
18  to appoint a third party to review the investigative
19  material and, I guess, in short make a recommendation
20  for any discipline that would be appropriate for
21  Captain Vasquez or Detective Moore or other officers who
22  were responsible.
23   Q. Now, who was appointed as Acting Chief?
24   A. Robert Archer.
25   Q. And did Robert Archer as Acting Chief conduct
```

Page 60

```
1  a — an administrative review of — or disciplinary
2  review of Captain Vasquez and Detective Moore?
3    A. No.
4    Q. And why was that not done?
5    A. I believe he was instructed not to.
6    Q. And do you know who instructed him not to?
7    A. I think it was — again —
8        MR. LOCKHART: If it's attorney-client, I
9  would instruct him not to answer.
10   Q. (BY MR. AINSWORTH) Well, let me ask you like
11  this: Do you know if anybody like the City Manager or
12  City Commissioners instructed the Acting Chief not to
13  take any disciplinary action with regard to Vasquez or
14  Moore?
15   A. My understanding, it was under advice of
16  counsel.
17       Is something wrong?
18   Q. That's fine. You're doing good. I'm not doing
19  very well asking the question.
20       In any event, you indicate there on the last
21  page —
22       MR. LOCKHART: Just for the record, we're
23  not waiving any attorney-client privilege by not
24  interrupting by clearly a question that didn't call for
25  it and a response that was not responsive to the poor
```

SHARP HOLLAND                                  Page 57 - Page 60

ARTURO G. SALINAS, ET AL     Multi-Page™     JOSEPH D. LaBEAU
VS. CITY OF HARLINGEN, ET AL                          MAY 15, 2001

**Page 61**

1 question.
2     MR. AINSWORTH: Now, he's calling my
3 questions names.
4     MR. LOCKHART: I don't mean it in a
5 derogatory sense.
6     MR. AINSWORTH: I understand.
7     Q. (BY MR. AINSWORTH)  On page 13, it indicates
8 that the third party reviewer should then make
9 recommendations as to disciplinary action.
10     Are you aware of whether or not any
11 disciplinary action was ever taken with regard to
12 Captain Vasquez or Detective Moore relative to this
13 shooting of the border patrol agents and the Cameron
14 County Deputy Sheriff?
15     MR. LOCKHART: And I'm going to object for
16 the record. I think you've mischaracterized his
17 findings on the page before. You misstate that the
18 document itself and the evidence as to what the findings
19 were with regard to these two individuals.
20     Q. (BY MR. AINSWORTH)  Well, I'm trying to ask,
21 if you look at page 13 there, okay, about the middle of
22 the page, you indicate that this third party reviewer
23 should then make recommendations as to disciplinary
24 action.
25     Now, as I understand it, you're talking about

**Page 62**

1 disciplinary action, if any, as to Captain Vasquez and
2 Detective Moore; is that right?
3     A. Yes, sir.
4     Q. And -- and any others that might be responsible
5 is what you're indicating?
6     A. Yes, sir.
7     Q. Okay. Do you know whether or not any
8 disciplinary action was ever taken as to Captain Vasquez
9 or Detective Moore?
10     A. In -- in regards to this report, I -- I can
11 say -- I'm going to have to answer this two ways -- make
12 two points in my response.
13     In regards to this report, the intention was --
14 I guess, my recommendation is that either a captain
15 within the Department be promoted as Interim Chief or
16 that -- and I believe -- I say -- a credible
17 professional outside of the Department be appointed as
18 Interim Chief. Those are my recommendations.
19     And so those kind of precede this
20 recommendation because the point that I'm trying to get
21 to is that I didn't feel competent to make a
22 disciplinary review of police procedure. They needed a
23 competent objective professional to do that, and that's
24 what I asked to happen in this report.
25     Did that ever happen? No police professional

**Page 63**

1 never made, to my knowledge, a disciplinary study of --
2 of this incident.
3     Q. After your report dated October 14th, 1998, was
4 given to Ms. Prim, was Chief Scheopner disciplined in
5 the manner that you suggested in the report, where he
6 would be relieved of duty at once and appointed to his
7 former rank of lieutenant?
8     A. Eventually, he was, sir, yes.
9     Q. Was -- as far as you know, was any other
10 investigation conducted prior to the time that
11 Chief Scheopner was reduced to the rank of lieutenant
12 between when your report came out and when he was
13 reduced?
14     A. There was an independent investigation done by
15 a consultant, yes, sir.
16     Q. Okay. Was that the report that was done by
17 this fellow Roberson?
18     A. Yes, Jim Roberson.
19     Q. Did you review that report?
20     A. Not -- not in entirety or even a reasonable
21 draft of it. Jim worked in an office fairly adjacent to
22 mine. I worked rather independently, but from time to
23 time, he would call me in and discuss the case with me.
24 I guess he was questioning me as well.
25     Q. Did -- do you know when Mr. Roberson completed

**Page 64**

1 his report?
2     A. No, I'm sorry. I don't.
3     Q. Do you know when Chief Scheopner was reduced to
4 the rank of lieutenant?
5     A. I would think we probably have something
6 here --
7     THE WITNESS: Don't we, to indicate that?
8     MR. LOCKHART: I don't think I'm aware of
9 that if there is something in the documents.
10     MR. AINSWORTH: Tell you what. If you
11 want to take a look just a second. Let me get another
12 shot of coffee.
13     THE WITNESS: Okay.
14     MR. LOCKHART: Let's go off the record.
15     (Break taken.)
16     Q. (BY MR. AINSWORTH)  Okay. I was trying to
17 piece together in my mind what takes place between the
18 time that you write your October 14th, 1998, report that
19 we've marked as Exhibit 3 --
20     A. Okay.
21     Q. -- and when the Chief Scheopner steps down to
22 the rank of lieutenant. First of all, do we know when
23 he stepped down to the rank of lieutenant? You may not
24 know this.
25     A. I'm sorry. I don't have that.

ARTURO G. SALINAS, ET AL     Multi-Page™     JOSEPH D. LaBEAU
VS. CITY OF HARLINGEN, ET AL                MAY 15, 2001

Page 65

1   Q. I don't think I know that either off the top of
2 my head.
3      In the interim, did you conduct any other
4 investigation into police procedures or weapons handling
5 policies at Harlingen relative to this July 7th
6 incident?
7   A. No.
8   Q. Do you know of any other --
9   A. Well, you know, this --
10   Q. Yes, sir.
11   A. I'm getting confused with the dates on this.
12   Q. Okay. But after you did this report that we
13 marked as Exhibit No. 3, did you do any other reports
14 about your investigation?
15   A. I don't know.
16   Q. Okay.
17   A. I don't know.
18   Q. We don't have one in front of us today, so I'm
19 assuming there was not a formal written report?
20   A. In response to your subpoena, I -- I kept a
21 stack of the Harlingen stuff, the Harlingen documents,
22 and I submitted them all to the attorney. And he
23 reviewed them and -- and passed them over, so I'm
24 relying on my attorney's responsiveness.
25   Q. As far as you know, though, in preparing for

Page 66

1 your deposition today, you don't remember seeing a
2 report that you drafted dated after October 14th, 1998?
3   A. No.
4   Q. I glean from your previous response that from
5 time to time Mr. Roberson might talk to you in pursuant
6 to his own investigation?
7   A. Right.
8   Q. As to whether or not the Roberson report came
9 out before the police chief was demoted, do you have
10 recollection one way or the other?
11   A. I really don't know.
12   Q. Now, in your report, you talk about a -- on the
13 last page of the report that the Acting Chief be
14 instructed to appoint an objective expert third party to
15 review the existing investigatory material, make
16 appropriate further inquiry and hold separate
17 disciplinary hearings. Do you see that discussion?
18   A. Yes, sir.
19   Q. Okay. And what you're suggesting there, is it
20 fair for me to understand, that the Police
21 Chief Scheopner should step down --
22   A. Right.
23   Q. -- a new Acting Chief should be appointed,
24 correct?
25   A. Right.

Page 67

1   Q. And that the Acting Chief should then retain
2 this objective expert third party to conduct a review?
3   A. Yes, uh-huh.
4   Q. Okay. Now, the purpose that's discussed here
5 in this paragraph is not to conduct that review so as to
6 defend any actions, any legal actions brought by the
7 families of the border patrol agents, was it?
8   A. No.
9   Q. The purpose was to bring the Harlingen Police
10 Department up to standard, up to snuff if, in fact, it
11 needed to be improved?
12   A. In this specific case, the purpose would be to
13 administer appropriate civil service discipline to these
14 officers if it was -- if it was appropriate.
15   Q. Okay.
16   A. Yes.
17   Q. To make inquiry to see whether or not any
18 violations had occurred?
19   A. Yes, sir.
20   Q. Okay. And, in fact, was an objective expert
21 third party appointed to review existing investigatory
22 material and make appropriate further inquiry?
23      MR. LOCKHART: As is recommended here?
24   Q. (BY MR. AINSWORTH) As you've recommended
25 here?

Page 68

1   A. Not for this purpose, no.
2   Q. Okay.
3   A. I -- I surmise you're talking about Jim
4 Roberson.
5   Q. What was your understanding of why Mr. Roberson
6 was hired?
7   A. I -- I -- I'm not sure. I wasn't consulted. I
8 do know that he reviewed a lot of the similar facts as I
9 did, but I -- it never was my opinion that he was going
10 to make recommendations for discipline.
11   Q. Okay. And I don't mean to use any artifice or
12 guile -- what -- to this point I've not -- I've not seen
13 Mr. Roberson's report. It's my understanding that the
14 objection to my obtaining that report is based upon the
15 fact that he has been retained to consult with counsel
16 in preparation of a defense in anticipation of
17 litigation.
18   A. Right.
19   Q. If that report -- my argument is if that report
20 is to be used for something like purposes of conducting
21 a --
22   A. Discipline --
23   Q. -- a separate disciplinary hearing --
24   A. Right.
25   Q. -- then I would have an argument to get the

### Page 69

1  report.  I mean, you're telling me it was not used in
2  that particular context?
3      A.  I did not -- I never had the impression that
4  Mr. Roberson was going to conduct a disciplinary
5  hearing, no, sir.
6      Q.  Okay.  Now, if -- my argument also is that if
7  the report is to be used to bring the procedures at the
8  police department up to national standards that I'm
9  entitled to, do you know if the report was used in any
10  way to review policies and procedures at the Department
11  in order to see if they comported with the National
12  Standards for weapons handling and weapons training?
13      A.  I don't know.  The City Manager hired Jim and
14  she's the one who determined the purpose of his report.
15      Q.  The City Manager issued a couple of statements
16  regarding this July 7th shooting; is that right?
17      A.  Yes.
18      Q.  Okay.  And have a -- you may have a couple of
19  those in front of you there.
20      A.  Okay.
21          MR. AINSWORTH:  Let's mark the next one as
22  No. 6, is that what it is?
23          (Exhibit Nos. 6 and 7 marked.)
24      Q.  (BY MR. AINSWORTH)  Okay.  Now, the first thing
25  we are looking at as -- is marked Exhibit No. 6, do you

### Page 70

1  see that?
2      A.  Yes, uh-huh.
3      Q.  And then in the upper right-hand corner it
4  says, Faxed October 28, 1998.  Do you see that?
5      A.  Yes.
6      Q.  I don't really see a date on it elsewhere, do
7  you?
8      A.  No, I don't.
9      Q.  Does that sound about like when it would have
10  been --
11      A.  I presume --
12      Q.  -- presented, late October, 1998?
13      A.  It sounds about right, yes, sir.
14      Q.  And it indicates there that it is a statement
15  from the City Manager and then towards the bottom of the
16  page, it indicates that she's introducing you, Joe
17  LaBeau, as Assistant City Manager as well as others?
18      A.  Yes, sir.
19      Q.  Okay.  Was this presented at a press conference
20  or how was this presented?
21      A.  At a press conference.
22      Q.  And do you remember the press conference?
23      A.  Yes, sir.
24      Q.  Do you remember where it would have been held?
25      A.  Yes.  It was at Town Hall, City Hall.

### Page 71

1      Q.  And was Ms. Prim in addition to her remarks to
2  the press that day providing a written copy of this
3  statement from the City Manager to the press on about
4  that day?
5      A.  I don't know.  I really don't know whether she
6  gave them a copy of this or not.
7      Q.  Okay.  Did you assist Ms. Prim in preparing
8  this statement, the written statement?
9      A.  I don't know.  I think she wrote it herself.
10      Q.  Okay.  Now, on the back page, the second page
11  of the two-page document we've marked as Exhibit No. 6,
12  it indicates that our review and study are ongoing.
13          At that point in time had you -- were you
14  continuing to review and study the police department
15  procedures and practices relative to the July 7th, 1998,
16  shooting?
17      A.  Okay.  Let's see.  The date is 10-28, and
18  where's my report?
19      Q.  It's the 14th.
20      A.  I was finished when I made this report.  I
21  suspect there may be something wrong with this fax date.
22  I would check the date of this press -- press
23  conference.  It's a matter of record and surely, you
24  could find that.
25      Q.  Okay.  And then she indicates here that, "I can

### Page 72

1  assure you that we will be able to give you a better
2  idea in the days and weeks ahead of when an
3  administrative report will be presented to the City
4  Commission and to you and to the police."
5          Now, are you aware of a concluding
6  administrative report in this instance?
7      A.  Concluding administrative report.  I guess it's
8  this one.
9      Q.  Okay.  And you're looking at what we've marked
10  as Exhibit No. 7?
11      A.  Yes.
12      Q.  Okay.
13          MR. LOCKHART:  Just for your information,
14  that's the one he had in his file that, you know, has
15  the draft on it, but we compared it to the final that
16  Natalie testified about, and they're identical except it
17  just has draft on it.
18      Q.  (BY MR. AINSWORTH)  So let's look at
19  Exhibit No. 7 for just a second.  And that is entitled
20  City Manager's Report to the City Commission concerning
21  the 7th of July 1998 shooting incident; is that right?
22      A.  (Nodding head.)
23      Q.  And you're nodding head and you're telling me
24  that it is, right?
25      A.  Yes.

ARTURO G. SALINAS, ET AL
VS. CITY OF HARLINGEN, ET AL

Multi-Page™

JOSEPH D. LaBEAU
MAY 15, 2001

Page 73

1  Q. And it's dated -- the date of the report is
2  Wednesday November 4th, 1998?
3  A. Yes, sir.
4  Q. Okay. Did you assist at all in the preparation
5  of the City Manager's Report that we've marked as
6  Exhibit No. 7?
7  A. Assisted at all -- I -- well, that's -- I
8  didn't write it, and I made it -- you know -- I may
9  have -- she may have consulted with me about some aspect
10  of it, sir. But it's her report.
11  Q. Okay. Well, look over with me on page 4, the
12  last page of the report. Under the heading conclusion
13  there --
14  A. Yes.
15  Q. -- Ms. Prim indicates that management has
16  concerns whether Department policies, procedures and
17  practices are in conformances with professional best
18  practices. Do you see that paragraph?
19  A. Yes, I do.
20  Q. Now, did you talk with Ms. Prim about whether
21  or not the Police Department's policies and procedures
22  and practices were in conformance with professional best
23  practices?
24  A. Again, my -- I guess -- I think of the report
25  that I made and I think it certainly covers that area.

Page 74

1  Q. All right. And, in fact, if we flip back to
2  your report, you had indicated that -- I'm sorry -- that
3  one of the things that should be done is that the police
4  department should follow --
5       MR. LOCKHART: What page are you looking
6  at?
7       MR. AINSWORTH: I'm looking at page 10.
8  Q. (MR. AINSWORTH) National Law Enforcement
9  Standards or should implement the National Law
10  Enforcement Standards --
11  A. Yes, sir.
12  Q. -- is that right?
13  A. Yes, sir.
14  Q. And would you characterize those National Law
15  Enforcement Standards as professional best practices?
16  A. I would.
17  Q. Okay. She indicates in the second point there,
18  that in addition there may be a range of actions
19  required to ascertain the appropriate policy, procedure
20  and practice standards required to maintain and support
21  the City of Harlingen Police Department.
22       And then finally, Because of the highly
23  specialized nature of law enforcement, management
24  concludes the need for expert assistance in evaluating
25  and reviewing the above. Do you see that paragraph?

Page 75

1  A. Yes, sir.
2  Q. Now, is it your understanding that in order to
3  see that the city comported with these best practices,
4  that outside expert consultant would be retained to
5  evaluate and review the City of Harlingen Police
6  Department's policies, procedures and practices to
7  see -- in which instances they comported with the best
8  practices and in which instances they deviated from the
9  best practices?
10  A. Well, I think you're getting back to the
11  purpose of retention of Mr. Roberson. I really can't
12  say what was in her mind when she retained him.
13  Q. Okay. Was anybody -- I'm sorry.
14  A. I just wanted to say that she had many private
15  meetings with me and many private meetings with counsel
16  and he, which I was not a part.
17  Q. Well, was anybody else hired in order to
18  observe whether or not the policies and procedures of
19  the Harlingen Police Department comported with best
20  practices, other than Mr. Roberson?
21  A. Well, time -- time line, probably sometime
22  later, but I know that we had a personnel lawyer come in
23  and do harassment training. I mean, is that --
24  Q. He came in and taught y'all how to harass?
25  A. No. She came in, hopefully for prevent us from

Page 76

1  it.
2  Q. No, I'm giving you a hard time.
3  A. Yeah.
4  Q. As of November 1998 --
5  A. Yes, sir.
6  Q. -- anybody other than Roberson hired to check
7  the policies and see if they comported with best
8  practices?
9  A. No, no.
10  Q. Okay. Now, if we go back to your report that's
11  marked as Exhibit No. 3, as best you can recollect, your
12  original report just had 13 pages; is that right?
13  A. I -- I can't say.
14  Q. Okay. Were there any attachments to the -- any
15  interoffice memorandum that we've marked as
16  Exhibit No. 3?
17  A. I can't say. I do not recall.
18  Q. Now, as we go through the report there will be
19  gaps --
20  A. Yes, sir.
21  Q. -- like at the bottom of page 2 and before
22  page 3.
23  A. Uh-huh.
24  Q. Now, is there a report somewhere that has those
25  gaps filled in?

SHARP HOLLAND

Page 73 - Page 76

ARTURO G. SALINAS, ET AL
VS. CITY OF HARLINGEN, ET AL

Multi-Page™

JOSEPH D. LaBEAU
MAY 15, 2001

**Page 77**

1   MR. LOCKHART: Yes, there is. There
2   certainly is, and I am the one that created those gaps.
3       MR. AINSWORTH: Okay.
4       MR. LOCKHART: This is a hybrid report,
5   Price. It has a lot of attorney-client communication
6   and work product in it, and I thought I could do it a
7   couple of ways. I could just refuse to produce the
8   whole report. I'm not so sure that this report is
9   discoverable, but I wanted to give you the benefit of
10  his investigation, but I didn't want to waive any
11  attorney-client privilege. So I took his original
12  report, and I redacted the parts that were
13  attorney-client or work-product --
14      MR. AINSWORTH: Okay.
15      MR. LOCKHART: -- and that's where you see
16  the gaps. You'll also see a couple of gaps where it
17  talks about people at meetings. What's missing is my
18  name.
19  Q. (BY MR. AINSWORTH) Well, have you compared
20  Exhibit No. 3 as we've marked it today --
21  A. Yes, sir.
22  Q. -- to the unredacted version?
23  A. No, I haven't.
24  Q. Okay. And you don't have --
25  A. Well --

**Page 78**

1   Q. -- I mean, not recently?
2   A. Well, I did briefly, yes, I did. To be
3   honest -- when he brought -- when I met with Tom this
4   morning, he brought me the stack of papers that I had
5   given him, and he had given back to me. And he gave me
6   a smaller stack that said these -- these what were
7   responsive to your subpoena.
8   Q. Yes, sir.
9   A. Okay. And then he said there's -- he drew my
10  attention to the report, and he said that there were
11  some sections that he had taken out for attorney-client
12  privilege, and he was going to explain that and ask
13  you -- was going to explain that.
14      He got called from the room and while he was
15  from the room, I went to the original stack and started
16  to make a comparison. And I noticed some of these
17  paragraphs, as to their substance, they seemed to all
18  include -- there seemed to be a paragraph about my
19  report to Tom.
20  Q. Okay.
21  A. And that's -- that's about all I remember.
22  Q. Okay. What -- that's what -- I don't mean to
23  ask you about what did the sentences say --
24  A. Okay.
25  Q. -- what I mean to ask you is, is there a topic

**Page 79**

1   area like if we go to the bottom of page 2, there's --
2   under the heading, Investigation by Assistant City
3   Manager, there's a paragraph. See that?
4   A. Right.
5   Q. And then it appears that there's a missing
6   section from that page?
7   A. Right.
8   Q. Would you expect that that missing section is a
9   discussion about your conversations with Mr. Lockhart?
10  A. Yes.
11  Q. Okay. It's not further investigation that you
12  had with other City personnel or Police Department
13  personnel?
14  A. I don't think so. I honestly don't -- I don't
15  know because I just scanned.
16  Q. Okay. And is in any of the missing parts from
17  the report that we've marked as Exhibit No. 3, are they
18  discussions that you had with Mr. Roberson?
19  A. No. I'm fairly certain there's nothing in my
20  report concerning Mr. Roberson.
21  Q. Okay. I've kept you for an hour and a half,
22  and I appreciate your time. Let me do a couple of
23  housecleaning measures, if I can.
24  A. Yes, sir.
25  Q. For the most part, you've investigated the City

**Page 80**

1   of Harlingen Police Department's handling of the AR-15
2   assault rifle and the Police Department's procedures for
3   training folks with the use of weapons; is that right?
4   A. That's right, uh-huh.
5   Q. As far as what happened on the morning of
6   July 7th about either the earlier shooting that morning
7   or the shooting out at the Detective Moore's house, did
8   you conduct any type of investigation as to what
9   happened?
10  A. No, not at all.
11  Q. Or as to who knew what when, like, when
12  Chief Scheopner knew that Detective Moore's son might
13  have been involved in that shooting?
14  A. No, sir, that was a criminal matter. And so I
15  think it was outside the scope of my administrative
16  investigation.
17  Q. Did you make any kind of inquiry as to who all
18  had been involved in the earlier shooting where
19  Mr. Moore was injured?
20      MR. LOCKHART: You're talking about Rio
21  Honda?
22  Q. (BY MR. AINSWORTH) Over at Rio Honda.
23  A. Did I make some kind of investigation --
24  Q. Yes, sir.
25  A. -- into that matter?