*117*

United States District Court
Southern District of Texas
FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

**JUL 1 8 2001**

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS. | § | |

---

## JOINT PRETRIAL ORDER

---

TO THE HONORABLE JUDGE TAGLE, U.S. DISTRICT COURT:

COME NOW, Giberto M. Rodriguez, individually and on Behalf of his minor Daughter, Megan Suzanne Rodriguez and the Estate of his Wife Susan Lynn Rodriguez, deceased; Stephen L. Williams and Robyn S. Williams, Surviving Parents of Susan Lynn Rodriguez, deceased; Arturo Guillermo Salinas and Elisa Herrera Salinas, individually and on Behalf of the Estate of their Son Ricardo Guillermo Salinas, deceased, Raul Rodriguez, Plaintiffs and City of Harlingen, Defendant, in the above reference action, filing their Joint Pretrial Order.

1.    **Appearance of Counsel**

    a.    For Plaintiffs Giberto M. Rodriguez, individually and on Behalf of his minor Daughter, Megan Suzanne Rodriguez and the Estate of his Wife Susan Lynn Rodriguez, deceased; Stephen L. Williams and Robyn S. Williams, Surviving Parents of Susan Lynn Rodriguez, deceased; Arturo Guillermo Salinas and Elisa Herrera Salinas, individually and on Behalf of the Estate of their Son Ricardo Guillermo Salinas, deceased:

        **Broadus Spivey**
        State Bar No. 00000076
        Federal I.D. No. 11146
        **Price Ainsworth**
        State Bar No. 00950300
        Federal I.D. No. 8065
        **Francis Pan**
        State Bar No. 15443300
        Federal I.D. No. 26385
        **SPIVEY & AINSWORTH, P.C.**
        48 East Avenue
        Austin, TX  78701
        512+474-6061
        512+474-1605 (fax)

        **Richard Pena**
        Law Offices of Richard Pena, P.C.
        Barton Oaks Plaza Two
        901 MoPac, Suite 325
        Austin, Texas 7746-5747
        512+327-6884
        512+327-8354 (fax)

    b.    For Plaintiff Raul Rodriguez

        **Ramon Garcia**
        State Bar No. 07641800
        Federal I.D. No. 3936
        **Sonia Lopez**
        State Bar No. 24003862
        Federal I.D. No. 23501
        **LAW OFFICES OF RAMON GARCIA, P.C.**
        222 West University Drive
        Edinburg, Texas  78539
        Telephone:  956/383-7441
        Telecopier: 956/381-0825

c.     For Defendant City of Harlingen, Texas

**Tom Lockhart**
State Bar No. 12473500
Federal I.D. No. 2257
**Roger W. Hughes**
Federal I.D. No. 5950
State Bar No. 1022950
**ADAMS & GRAHAM, L.L.P.**
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429
Telephone:  956/428-7495
Telecopier: 956/428-2954

## 2.     Statement of the Case

On July 7, 1998, U.S. Border Patrol Agents Susan Lynn Rodriguez and Ricardo (Rick) Salinas, and Cameron County Deputy Sheriff Raul Rodriguez were shot by Ernest Moore, Detective Moore's adult son, with a Harlingen Police Department AR-15 semi-automatic rifle, which has been identified as a 5.56 mmNATO caliber Frankfort Arsenal, model XM 177e2 semi-automatic rifle, .223 caliber, serial #FA0698 (C11).   The agents were killed and Deputy Rodriguez was seriously injured.

Beneficiaries of deceased U.S. Border Patrol Agents Susan Rodriguez and Ricardo Salinas on behalf of themselves and the estates of Susan Rodriguez and Ricardo Salinas, deceased, and Raul Rodriguez, a Deputy Sheriff of Cameron County, Texas, brought suits against the City of Harlingen, Texas pursuant to 42 USC §1983 and the Texas Tort Claims Act (TEX. CIV. PRAC. & REM. CODE ANN., Chap. 101).

## 3.     Jurisdiction

This Court has jurisdiction over the case at bar under 42 U.S.C. § 1983; 42 U.S.C. § 1988; 28 U.S.C. § 1343(a)(3); and 28 U.S.C. § 1331.

4. **Motions**

The motions are pending before the court:

a.      Defendant's Second Motion for Summary Judgment;

b.      Motion to Compel Defendant City of Harlingen to produce the James Roberson report filed by Plaintiffs Arturo Guillermo Salinas, et al and Gilberto M. Rodriguez, et al.;

c.      Motion in Limine filed by Plaintiffs Arturo Guillermo Salinas, et al and Gilberto M. Rodriguez, et al.;

d.      Motion in Limine filed by Defendant;

e.      Defendant's Motion For Permission To Conduct The Voir Dire Questioning By Counsel And To Conduct Individual Questioning Of Members Outside The Presence Of The Remainder Of The Panel On Media Coverage Of Shootings And Litigation; and

f.      Depending upon continued media coverage between now and trial, Defendant may be compelled to file a motion to transfer venue.

5. **Contention of Parties**

The Plaintiffs claim that the City of Harlingen is liable for certain alleged constitutional deprivations, including violations of the Plaintiffs' substantive due process rights via a "state created danger" that resulted from an official policy of the municipality. More specifically, they claim (1) the environment created by the City of Harlingen was dangerous; (2) the City knew it was dangerous; and (3) the City used its authority to create an opportunity that would not otherwise have existed for the third party's crime to have occurred. Such violations, Plaintiffs contend, proximately and actually caused the deaths of Susan Lynn Rodriguez and Ricardo Guillermo Salinas as well as the serious injuries inflicted upon Raul Rodriguez.

The Plaintiffs also assert that the City of Harlingen is liable under the Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2) for Chief Scheopner and Detective Moore's negligent and wrongful us of the AR-15 rifle in the scope of their employment.

Defendant says that the shootings were the acts of a private citizen for which it has no responsibility under federal or state law.

a. No Harlingen policy decision or policymaker action created an opportunity that would not have otherwise existed for the shootings to occur because Ernest had access to privately owned equally powerful rifles.

b. No Harlingen policy decision or policymaker action effectively stripped Agents S. Rodriguez and Salinas and Deputy Raul Rodriguez of their ability to defend themselves or cut off potential sources of private aid because the law enforcement team, Cameron County Sheriff Department ("CCSD") and U.S. Border Patrol ("BP"), were at the scene to capture a heavily armed homicidal suspect and the team was fully aware of the danger of being shot.

c. No Harlingen policy decision was made or policymaker action taken with knowledge of an immediate danger to known victims; Harlingen did not know Ernest Moore was going to shoot Agents S. Rodriguez and Salinas and Deputy Raul Rodriguez with an HPD rifle.

d. No Harlingen policy decision or policymaker action was done with deliberate indifference to a substantial risk of serious harm to Agents S. Rodriguez and Salinas and Deputy Raul Rodriguez.

e. No Harlingen policy decision or policymaker action was a proximate cause of the deprivation, deaths, and injuries at issue.

f. There is no proximate cause to support the state law claims.

g.    There is no negligent entrustment of the subject rifle to support the state law claims.

## 6.   Admissions of Fact

a.    On July 7, 1998, 25 year old Ernest Moore was the suspect in violent homicides committed with a privately owned AK-47 in Rio Hondo.

b.    When the Cameron County Sheriff Department pursued and found his vehicle near his father R.D. Moore's house, south of San Benito, it began a manhunt to capture Ernest and summoned the Border Patrol to assist.

c.    After the Cameron County Sheriff Department approached R.D. Moore at his residence, they contacted Harlingen Police Department to assist in getting Mr. Moore to cooperate.

d.    Ernest Moore shot and killed agents Border Patrol Agents Susan Lynn Rodriguez and Ricardo Salinas and seriously wounded Cameron County Sheriff Raul Rodriguez.

e.    The gun used by Ernest Moore was a Harlingen Police Department AR-15 semi-automatic rifle, which has been identified as a 5.56 mmNATO caliber Frankfort Arsenal, model XM 177e2 semi-automatic rifle .223 caliber, serial #FA0698 (C11).

7.   **Contested Issue of Fact**

**Plaintiffs' Contested Fact Issues:**

a.     Defendant City of Harlingen, Texas directs and supervises the City of Harlingen Police Department.

b.     James Joseph Scheopner was employed by the City of Harlingen Police Department for twenty-eight years, serving as its Chief of Police from 1993 to 1999.

c.     Police Chief Scheopner was the highest police authority in the City of Harlingen.

d.     Police Chief Scheopner had the total authority to discipline any of his officers.

e.     Ralph Dwayne Moore is employed by the City of Harlingen Police Department as a detective.

f.     Police Chief Scheopner and Detective Moore worked together for over twenty years.

g.     On July 7, 1998, U.S. Border Patrol Agents Susan Lynn Rodriguez and Ricardo (Rick) Salinas and Cameron County Deputy Sheriff Raul Rodriguez were ambushed in San Benito by Ernest Moore, Detective Moore's son, with an AR-15 semi-automatic assault rifle.

h.     The agents were killed and Deputy Rodriguez was seriously injured as a result of the ambush.

i.     The AR-15 rifle has been identified as a Frankfort Arsenal, model MX 177, .223 caliber, assault-type rifle, serial #FA0698.

j.     The AR-15 assault rifle had been delivered by a concerned citizen, Mrs. Sylvia Pirtle, to the Harlingen Police Department for destruction on June 23, 1995. (Exh. B).

k.  The Harlingen Police Department took possession of the AR-15 as temporary trustee on June 23, 1995.

l.  Detective Moore, acting for the Harlingen Police Department, received the weapon from Mrs. Pirtle and assured her he would take care of it.

m.  Instead of insuring the destruction of the AR-15, Detective Moore kept it—at first in his office and later in his son Ernest Moore's bedroom.

n.  The rifle in question was never officially the department's property for department use because HPD never explored any procedure (such as forfeiture) to obtain legal appropriation of the weapon in question.

o.  Initially after the incident, the City took the position publicly that the rifle was assigned to Detective Moore in his purported role as a "sharpshooter" for HPD.

p.  There is no documentation for the establishment by HPD of a 24-hour, on-call sharpshooter team.

r.  HPD officers are governed under the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE) rules.

s.  The TCLEOSE rules stipulate that any law enforcement officer who uses a rifle must comply with the yearly qualifications at a 100-yard range with the minimum of twenty duty rounds.

t.  The Harlingen Police Department borrows the indoor MMA gun range to comply with the yearly qualifications with the department-issued Beretta 9mm handgun and the department-issued shotguns assigned to the patrol units and to detectives.

u.  HPD has no 100-yard range to comply with the requirements, and no records exist indicating that Detective Moore complied with the rules regarding the AR-15. (Exh. E).

v.      Detective Moore has now admitted that he was not qualified to carry the AR-15 under TCLEOSE rules.

w.      Detective Moore made the rifle easily accessible to his son, Ernest Moore, by placing the rifle in the gun cabinet in his son's bedroom.

x.      Ernest Moore had a key to the gun cabinet.

y.      Detective Moore permitted his son, Ernest Moore, to use the rifle for target practice.

z.      Ernest Moore became proficient in the use of the AR-15 semi-automatic assault rifle he used to commit the crime.

aa.      On July 10, 1998, Chief Scheopner told news media that the AR-15 was registered to the HPD and that the rifle was assigned to Detective Moore because he was on-call 24 hours a day as the department's sharpshooter and was on the Special Weapons and Tactics (SWAT) team.

bb.      Discovery has revealed that Chief Scheopner's statement concerning Detective Moore's status as a sharpshooter was not true.

cc.      There was no SWAT [Special Weapons and Tactics] team in the Harlingen Police Department on July 7, 1998. In 1993, Chief Scheopner officially disbanded the ERT (Emergency Response Team) due to FLSA (Fair Labor Standards Act) problems, and Detective R. D. Moore was not a part of the ERT then.

dd.      Detective R. D. Moore was not on 24-hour call for emergency purposes. He carried no pager and no one was aware that he was on call. There is no documentation within the Harlingen Police Department indicating that Moore was appointed the department's sharpshooter by Chief Scheopner and/or Captain Joseph Vasquez.

ee.     The rifle and the caliber do not lend themselves to sharpshooter's responsibilities. The rifle had no scope, and the Harlingen Police Department did not supply the ammunition for the rifle. The common calibers accepted by law enforcement sharpshooters are the .308 caliber and the 30.06 caliber. The .223 caliber is not adequate for sharpshooter's responsibilities.

ff.     Detective R. D. Moore fails to comply with the original request by the person asking the Harlingen Police Department properly to dispose of the weapon.

gg.     Police Chief Scheopner allowed favored, high-ranking officers to circumvent, skirt, and outright violate laws.

hh.     Chief Scheopner allowed officers to keep weapons in their vehicles and homes

ii.     Chief Scheopner permitted Detective Moore take the AR-15 home on a daily basis as part of HPD's asigned job.

jj.     There were no instructions, written or oral, as to the safekeeping of department-issued weapons.

kk.     The only instruction Chief Scheopner gave to Detective Moore was "to stay readily available and proficient with rifles."

ll.     Officers of the City of Harlingen on numerous occasions were made aware of the Harlingen Police Departments' violations of policies and practices inconsistent with state and federal law and Police Department Directives; yet they refused to investigate thoroughly or to act in an appropriate manner to bring the department to compliance.

mm.     Ernest Moore had been treated for mental illness with Prozac and was a drug user until his death on July 7, 1998.

nn.     Ernest Moore's bedroom was decorated with Nazi posters, a Nazi military

uniform, and contained other Nazi and neo-Nazi items.

oo.     On July 7, 1998, at approximately 4:30 a.m., Ernest Moore, son of Defendant

Detective R. D. Moore, shot and killed Maria Morin and her daughter Delia, and

wounded her son Dan with another rifle, an AK-47, at 311 Catherine Street in Rio

Hondo, Texas.

pp.     After the AK-47 was wrested from him by others in the house, Ernest fled the Rio

Hondo house in his white pickup truck.

qq.     The witnesses in the Rio Hondo house, including Ernest's ex-girlfriend, called 911

to report the shooting and positively identified Ernest Moore as the assassin.

rr.     At approximately 5:20 a.m., the Cameron County Sheriff's Department responded

to the Rio Hondo shooting.

ss.     The suspect from the Rio Hondo shootings was identified as Ernest Moore; a

description of the vehicle was obtained; and a "look-out" to all law enforcement

agencies in the area was issued.

tt.     Ernest fled to his San Benito home and parked his truck in the driveway alongside

the City's truck assigned to Detective Moore.

uu.     The City vehicle assigned to Detective Moore was equipped with HPD's radio.

vv.     Ernest told his father at that time that he was "in deep shit."

ww.    Ernest took the AR-15 assault rifle and left the house.

xx.     At 6:06 a.m., HPD dispatch received the information "look-out" and sent it out.

yy.     At approximately 6:30 a.m., after reading the teletype, Sgt. Miguel P. Garcia

realized that Ernest Moore was Detective Moore's son.  Within a minute, Sgt.

Shawn Foist came to the office and told Sgt. Garcia that Ernest Moore was

Detective Moore's son.

zz.     Sgt. Foist thereafter had a phone conversation with Chief Scheopner, who told him to go to Detective Moore's house because Detective Moore was not cooperating.

aaa.    On the way to Detective Moore's house, Sgt. Foist had a couple of phone conversations with Chief Scheopner.

bbb.    As county deputies and United States Border Patrol Agents arrived at Detective Moore's house, Detective Moore met them outside and initially refused to permit the county deputies to search his house for Ernest.

ccc.    After talking to Chief Scheopner via telephone, Detective Moore allowed the county deputies into his home but refused entrance to the Border Patrol agents, saying that his son was not an illegal alien and they had no business with him.

ddd.    Detective Moore never gave the Border Patrol agents even a general warning regarding the whereabouts of his son or notified the agents that his son was armed with the AR-15 assault rifle.

eee.    While the officers were standing in the front of the Moore house discussing the situation, Ernest Moore walked out from a cornfield located near the Moore house and fired the AR-15 at Agents Salinas and Rodriguez and Deputy Rodriguez.

fff.    Chief Scheopner did not discipline Detective Moore following the San Benito shootings.

ggg.    Chief Scheopner did not recommend that Detective Moore be disciplined following the San Benito shootings.

hhh.    The City of Harlingen and Chief Scheopner insist to this day that they are free of fault and deserve no blame.

**Defendant's Contested Fact Issues:**

a.  None of Harlingen's alleged policies or decisions caused or could have prevented the unfortunate events.

b.  Harlingen did not cause Ernest Moore, R.D. Moore's adult son, to take the HPD rifle or give him the means and opportunity to commit these crimes which he did not already have.

c.  Harlingen did not force the BP or the CCSD to go to R.D. Moore's residence.

d.  Harlingen did not strip CCSD and BP of the means to defend themselves or to escape.

e.  Harlingen Police Chief, Jim Scheopner, did not know these victims were at the scene or were in immediate danger of being shot and Scheopner did not fail to tell them anything the CCSD or BP did not already know or believe.

f.  There is no proximate cause for either the federal or state claims.

g.  On July 7, 1998, Ernest was the suspect in violent homicides committed with an AK-47 rifle in Rio Hondo.

h.  When CCSD found his vehicle near his father's house, south of San Benito, it began a manhunt to capture Ernest and summoned the BP to assist.

i.  At approximately 6:06 a.m. HPD dispatch received an all points bulletin on the Rio Hondo homicides.

j.  At approximately 6:32 a.m. HPD dispatch received a CCSD teletype on the Rio Hondo shootings.

k.  At approximately 6:53 a.m. CCSD contacted HPD dispatch to request Police Chief or supervisor to assist in getting R.D. Moore to cooperate.

l.    The CCSD and BP came to R.D. Moore's residence to search for Ernest because they thought he was there.

m.    CCSD and BP came well armed including a high-powered assault rifle and protective gear.

n.    CCSD and BP were there to capture Ernest.

o.    The law enforcement team, CCSD and BP knew Ernest had killed others in Rio Hondo, he had a high-powered rifle, could kill again, and was believed to be in the area.

p.    The BP believed Ernest could even be in the cornfield across the road from the Moore residence.

q.    The law enforcement team, CCSD and BP took the necessary precautions, believing Ernest was close at hand.

r.    CCSD cautiously searched the truck and Moore residence to find him.

s.    CCSD and BP team began search of the surrounding fields and resaca.

t.    CCSD and BP could have left the area before the shootings.

u.    Ernest stepped out of the cornfield across the road and opened fire.

v.    Ernest was 20-50 feet from Border Patrol Agents Ricardo Salinas and Susan Rodriguez and approximately 80 feet from Deputy Raul Rodriguez.

w.    Whenever Ernest took the rifle from the gun safe at R.D. Moore's house, the HPD AR-15 was only one of many equally powerful guns in the safe. Among the other rifles in the same safe were a privately owned AR-15, and two other high powered semi-automatic rifles, SKS and M-1 Carbine.

x.    R.D. Moore did not give his son Ernest permission to take the HPD AR-15 rifle.

y.    Ernest Moore had previously fired the HPD AR-15 one time only.

z.  The private owned AR-15, SKS and M-1 Carbine were fully functional and operational and equally available to Ernest Moore.

aa.  Ernest Moore was proficient in the use, operation and shooting of these privately guns.

bb.  There was ammunition present and available for the privately owned SKS and M-1 Carbine semi-automatic rifles in addition to the privately owned AR-15.

cc.  The Moore privately owned AR-15 and the HPD clone AR-15 had exchangeable parts, with the same caliber and fire power, and utilized the same clips and magazines.

dd.  The SKS was a military rifle used by the Vietnamese during the Vietnam War.

ee.  The M-1 Carbine was a military rifle used by the armed forces in World War II and Korea.

ff.  Ernest could have used the privately owned semi automatic rifles just as easily to commit this tragedy.

gg.  If Ernest had taken the privately owned AR-15 or the SKS or M-1 in the same vault, Ernest could have as easily and effectively killed Border Patrol Agents Salinas and Susan Rodriguez and seriously wounded Deputy Sheriff Raul Rodriguez.

hh.  Capt. Vasquez instructed R.D. Moore to safeguard the rifle at night by taking it out of his vehicle and placing it in his home.

ii.  R.D. Moore kept the HPD AR-15 in a gun safe at his house because it was the safest place for it.

jj.  Ernest had not been in trouble with the law and had no criminal record.

kk.    Between 6:00 and 6:30 a.m., R.D. Moore was awakened by his wife, Patsy, who had heard a door slam and was concerned that something was wrong with Ernest.

ll.    The Moores searched for Ernest but could not find him.

mm.    Agent Hupp described that all Border Patrol agents went through several months of academy training with relatively extensive firearms training, including the M-4 rifle which is similar to the M-16 and AR-15 series.

nn.    The CCSD was in charge of the manhunt and Sgt. Saenz was the supervising officer in command.

oo.    Agent Susan Rodriguez was the senior Agent on the scene and assumed command of the Border Patrol agents at the scene.

pp.    The shots were fired 10 to 20 minutes after CCSD searched the house and the house search took 5-10 minutes.

qq.    The shooting occurred 7-8 minutes after the discussion amongst the Border Patrol that the armed murderers might be as close as the cornfield next to the road they were on, which was exactly where Ernest Moore was, in fact.

rr.    The shooting occurred 3-5 minutes after Border Patrol agents briefed Agents Sanchez and Salinas.

ss.    On July 7, 1998, Scheopner first learned of Ernest Moore's alleged illegal activities at approximately 6:50 a.m. through a telephone call from the dispatcher who advised that CCSD wanted assistance to get R.D. Moore to cooperate.

tt.    The only communication between Scheopner and R.D. Moore before the shootings, occurred after CCSD was at the residence and concerned only R.D. Moore cooperating with the CCSD, Scheopner being in transit to the scene and the HPD Sgts. Foist and Garcia in transit and arriving at R.D. Moore's home.

uu.   HPD Sgts. Foist and Garcia went to the scene because of the request of the CCSD.

vv.   When the shooting started, Scheopner was stopped at a CCSD roadblock on the other side of a canal or resaca bank approximately 200 yards from the Moore house; he could not see the house; could not and did not see any law enforcement personnel at the house; he did not know that BP Agent S. Rodriguez, BP Agent Salinas or Deputy Sheriff Raul Rodriguez were at the house.

ww.   Scheopner had not seen Ernest Moore, did not know where in the area around the house Ernest Moore was or even for sure if he was in the area and did not know what kind of gun, if any, Ernest had.

xx.   All pertinent information Scheopner received before the shootings was transmitted from CCSD personnel either directly or indirectly.

yy.   R.D. Moore's residence was outside the city limits and jurisdiction Harlingen and the HPD.

zz.   HPD had no jurisdiction over this manhunt; the CCSD was the law enforcement agency with jurisdiction.

aaa.   Harlingen did not have any authority to direct the activities of the BP, Agent S. Rodriguez, Agent Salinas, CCSD or Deputy Raul Rodriguez.

bbb.   The manhunt conducted by the law enforcement agencies and the follow up investigation eliminated the existence of other suspects.

ccc.   The cassette recordings off the master tapes were provided to Texas Ranger Jaramillo by the CCSD, BP and HPD.

ddd.   In a generally accepted routine practice, HPD master tapes were reused and recorded over.

eee.   Plaintiffs' first discovery request for the tapes was by subpoena duces tecum.

fff.    There is no history of unauthorized civilian use of HPD weapons.

ggg.    There is no HPD pattern or practice of accepting guns for destruction and assigning them to police officers.

hhh.    Scheopner did not learn until later after the shooting that Pirtle claimed the AR-15 had been turned in for destruction.

iii.    Scheopner did not know Ernest Moore and had no knowledge of Ernest being involved in any criminal activities.

jjj.    Scheopner did not condone officers letting family members take guns or giving access to civilians.

kkk.    R.D. Moore told Scheopner after the shootings that Mrs. Pirtle turned the rifle in without conditions.

lll.    R.D. Moore told Scheopner after the shootings that Ernest stole the key to gun safe.

mmm. Moore was verbally reprimanded.

nnn.    Scheopner was demoted.

ooo.    City Management found violations of the HPD weapon's handling practices and procedures.

ppp.    Changes were made in HPD weapons handling practices and procedures.

**8.    Agreed Propositions of Law**

Plaintiffs' state law claims are governed by the Texas Tort Claims Act (TEX. CIV. PRAC. & REM. CODE ANN., Chap. 101).

**9.    Contested Propositions of Law**

**Plaintiffs' Contested Propositions of Law**

a.    Police Chief James Shoepner of Harlingen Police Department at all times acted in

bona fide pursuance of his general authority to act for the City of Harlingen in the area of law enforcement, which acts were and are imputed to the City of Harlingen. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, (1986); *Thomas v. Sams*, 734 F.2d 185, 192, (5th Cir. 1984), cert. denied, 472 U.S. 893 (1985).

b.  Police Chief James Shoepner of Harlingen Police Department as the final policymaker for the law enforcement of the City of Harlingen is held effectively to have made policy or condoned creation of a custom by ratifying the unconstitutional or illegal actions of subordinate officers or employees of Harlingen Police Department. *See Pembaur. v. City of Cincinnati*, 475 U.S. 469, (1986); *Turner v. Upton County, Texas*, 915 F.2d 133, 136 (5th Cir. 1990).

c.  When Detective R. D. Moore commited unconstitutional acts and is never disciplined, the City implicitly ratifies and adopts that unconstitutional conduct as official policy, and municipal liability then results. *Grandstaff v. City of Borger*, 767 F.2d 161, 171-72 (5th Cir 1985).

d.  If Detective R. D. Moore knew that his  action as to the safeguard of the AR-15 in question would be approved by Chief Scheopner at the time of his action, then the causation requirement had been met. *Palmer v. City of San Antonio*, 810 F.2d 514, 516 (5th Cir. 1987).

e.  The fact that the Fifth Circuit Court did not reject outright the state-created danger doctrine implies that the Court would adopt the theory if presented with a case meeting the elements described by the Court in *Randolph v. Cervantes*, 130 F.3d 727, 731 (5th Cir. 1997); *Johnson v. Dallas Independent School District*, 38 F.3d 198, 201 (5th Cir. 1994)as follows:

(1)  The government officials must create the dangerous situation;

(2)    They must know the situation is dangerous;

(3)    The danger must create an opportunity for a third party to commit a crime which would not otherwise exist; and

(4)    They must affirmatively place the plaintiff in a position of danger in such a way as to strip the plaintiff of his ability for self-defense.

f.    Harlingen Police Department's deliberate reuse of the tapes and the spoliation of the tapes' content create a jury issue regarding that content. *Caoaritta v. Entergy Corporation*, 168 F.3d 754, 755 (5th Cir 1999); *Vick v. Texas Employment Commission*, 514 F.2d 734, 737 (5th Cir 1975).

g.    A firearm is a deadly weapon per se, Tex. Penal Code sec. 1.07(a)(11)(A) (Vernon 1974).

h.    The City is liable for the deaths of Susan Lynn Rodriguez and personal injury of Raul Rodriguez so cause by the use of the AR-15 in question. Tex. Civ. Prac. & Rem. Code § 101.021(2).

i.    The City is charged with responsibility for the use of the AR-15 in question where the control of the weapon has passed to another." *Kennedy v. Baird*, 682 S.W.2d 377, 378 (Tex. App. – El Paso 1984, no writ).

j.    In order to use a seized weapon, a law enforcement agency must seek an order from the court to forfeit the weapon to the state for use by the law enforcement agency holding the weapon. Texas Code of Criminal Procedure art. 18.19.

**Defendant's Contested Propositions of Law**

a.    The 14th Amendment's Due Process Clause is triggered only by affirmative government conduct and puts no duty on government officials to act to prevent a third-party from harming other plaintiffs. *DeShaney v. Winnebago County Dept.*

*of Soc. Serv.*, 489 U.S. 189, 196-197 (1989). The Supreme Court neither approved nor disapproved of a rule imposing liability if the state created the risk of harm to which it forced the claimant to suffer. *Id.* Though often asked to do so, the 5th Circuit has declined to adopt a "state created" danger exception to *DeShaney.* See, *Piotrowski v. City of Houston*, 237 F.3d 567, 584 (5th Cir. 2001), *petition. for cert. pending*, ____ U.S.L.W. ___ ( June 5, 2001)(No. 00-1811); *Johnson v. Dallas I.S.D.*, 38 F.3d 198, 201 (5th Cir. 1994), *cert. denied*, 514 U.S. 1017 (1995). In *Johnson*, the 5th Circuit questioned whether such an exception could ever meet the "demanding standard for constitutional liability." 38 F.3d at 201.

Due Process does not require government officials take action to prevent the commission of an offense. *DeShaney*, 489 U.S. at 202. There, it imposes no duty to arrest a lawbreaker to prevent further harm to the public. *Saenz v. Heldenfels Bros.*, 183 F.3d 389, 392 (5th Cir. 1999).

Section 1983 affords a remedy only for injury to federal rights; it creates no remedy for violations of state law. *Wyatt v. Cole*, 994 F.2d 1113, 1117-18 (5th Cir. 1993), *cert. denied*, 510 U.S. 971 (1993). Therefore, it is irrelevant that the alleged conduct violated any state laws requiring the City provide protection.

b.   Although the 5th Circuit has not adopted the "state created" danger exception to the *DeShaney* rule, it has outlined the elements of the theory:

1.   The state actors must create an environment that is dangerous;

2.   The state actors must know that it is dangerous;

3.   The state actors must have used their authority to create an opportunity that otherwise would not have existed for a third-party's crime to occur;

4.  The state must have effectively stripped a person of his or her ability to defend herself or cut off potential sources of private aid; and

5.  The action must be done with deliberate indifference.

*Randolph v. Cervantes*, 130 F.3d 727, 731 (5th Cir. 1997), *cert. denied*, 525 U.S. 182 (1998); *Johnson*, 38 F3d 201; *Piotrowski*, 237 F.3d at 585. The "state created" danger exception will not apply where a government actor is not aware of an immediate danger facing a specific known victim. *Saenz*, 183 F.3d at 392.

c.  Harlingen is not vicariously liable for the acts of its employees. *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S.658, 694 (1978). To hold Harlingen liable, Plaintiffs must show that a final policy maker adopted a "policy" that caused the deprivation. *Bd. of County Comm. Bryan v. Brown*, 520 U.S.397, 403 (1997). What body or person speaks with final policy making authority is a law question for the court based on state law. *Jett v. Dallas I.S.D.*, 491 U.S. 701, 737 (1989). Whether the City's governing body has delegated final policymaking authority to a lower official is also a law question based on state law. *Id.* at 738. The City does not concede the chief of police has final policymaking authority for all of the areas identified by Plaintiffs. Therefore the court must determine this from state and local positive law as well as evidence of the City's customs and usages. *Gros v. City of Grand Prairie*, 181 F.3d 613, 616 (5th Cir. 1999), *reh. en banc denied*, 193 F.3d 521 (5th Cir. 1999).

d.  The policy maker must either expressly adopt a policy or there must be a widespread practice of city police officer so common and well settled that it fairly represents a policy known to and adopted by the policy maker. *Piotrowski*, 237 F.3d at 579, 581. The failure to have a policy cannot be a "policy" unless the

failure amounts to an intentional choice, not an unintentional oversight. *City of Canton v. Harris*, 489 U.S.378, 389 (1989); *Doe v. Dallas I.S.D.*, 153 F.3d 211, 217 (5th Cir. 1998). Likewise, an unconstitutional deprivation is not ratified or approved simply because the responsible official is not sanctioned or reprimanded afterwards. *Snyder v. Trepagnier*, 142 F.3d 791, 797-98 (5th Cir. 1998), *cert. dism'd*, 119 S.Ct. 1493 (1999).

e.    The alleged "policy" is not unconstitutional on its face. Therefore, Plaintiffs must show that an otherwise neutral policy was adopted with deliberate indifference to the certainty that a constitutional deprivation will result. *Piotrowsky*, 237 F.3d at 578, 581; *Snyder*, 142 F.3d at 795-96. Ordinary or heightened negligence will not meet the test of deliberate indifference. *Snyder*, 142 F.3d at 579-80. The official must be aware of the facts in which an inference could be drawn that a substantial risk of harm exists and must actually draw the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

f.    Because this is a Substantive Due Process claim, Plaintiffs must show that the responsible officers' actions meet the "shock the conscious" test. *County of Sacramento v. Lewis*, 523 U.S. 833, 854-55 (1998).

g.    The City's policy must be the proximate cause of the violation of Plaintiffs' federal rights. *Martinez v. California*, 44 U.S. 277, 285 (1980); *Doe v. Sullivan County, Texas*, 959 F.2d 545, 550 (5th Cir. 1982); *Reimer v. Smith*, 663 F.2d 1316, 1322 (5th Cir. 1981). In order to constitute proximate cause, the constitutional violation must not be too remote from the injury. *Martinez*, 444 U.S. at 285. Second, the deprivation or injury must be the foreseeable result of the constitutional violation. *Anderson v. Nosser*, 456 F.2d 835, 841 (5th Cir. 1972) (en

banc) *cert. denied*, 409 U.S. 845 (1972). Third, it must be the "cause in-fact" of the deprivation. *Rodriguez-Cirilo v. Garcia*, 115 F3d 552 (5th Cir. 1997). This means that the deprivation would not have occurred "but for" the constitutional violation. *Mt. Healthy School District v. Doyle*, 429 U.S. 274, 287 (1997); *Hart v. O'Brien*, 127 F.3d 424, 446 (5th Cir. 1997) *reh'g denied*, 154 F.3d 419 (5th Cir. 1998), *cert. denied*, 525 U.S. 1103 (1999).

h.   The Plaintiffs' state law claims rely part on negligent entrustment. Although Texas cases have recognized a common law cause of action for negligently entrusting a firearm to an incompetent user (see, *Kennedy v. Baird*, 682 S.W.2d 377, 388 (Tex. App.–El Paso 1984, no writ) there is no case providing for liability for failing to prevent a weapon from being taken without permission. By analogy, Texas does not impose a duty to safeguard car keys to prevent a thief from stealing the car and hitting a third party. *See, Story Serv., Inc. v. Ramirez*, 863 S. W. 2d 491, 497-98 (Tex. App.--El Paso 1993, writ denied). There is no liability simply for failing to take adequate precautions against unauthorized use. Moreover, a city employee did not use the rifle. Therefore, Plaintiffs have the burden to show that, when the City entrusted the rifle to its employee, it knew or should have known that the employee would use poor judgment in allowing third parties to use or possess the firearm. *See, Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596 (Tex. 1987).

i.   Sovereign Immunity is waived against the City only if the death or injury arises out of the use or condition of tangible personal property. TEX. CIV. P.& REM. CODE, § 101.021. Property is "used" only if it is employed or applied for a given purpose; "non-use" can not support a claim. *Kerrville State Hosp. v. Clark*, 923

S.W.2d 582, 584 (Tex. 1996). If the tangible property is not defective, then "use"
requires an allegation the defendant supplied the property lacking an integral safety
component. *Kerrville*, 923 S.W.2d at 585; *Ramos v. City of San Antonio*, 974
S.W.2d 112, 116 (Tex. App.–San Antonio, 1998, no pet.). It is not enough that
some property was involved; there is no waiver of immunity unless the use of
property must actually caused the injury. *Texas Dept. of Crim. Justice v. Miller*,
44 Tex. S. Ct. J. 963, 965 (Tex. 2001).

It is a government employee that must misuse the property. *Gonzales v. City of
El Paso*, 978 S.W.2d 619, 623 (Tex. App.–El Paso 1998, no pet.). The "use" by
a third party is insufficient. *City of Columbus v. Barnstone*, 921 S.W.2d 268, 272
(Tex. App.–Houston [1st Dist.] 1995, no writ); *Ramos v. City of San Antonio*, 974
S.W.2d at 116.

The use or failure to convey information is not a use of tangible property that
waives immunity. *Univ. of Tex. Med. Branchv. York*, 871 S.W.2d 175, 179 (Tex.
1994). There, an alleged failure to train or instruct does not fall within the
waiver. *Texas Dept. of Public Safety v. Petta*, 44 Tex. S. Ct. J. 597, 600 (Tex.
2001). Likewise there is no waiver for failing to use communication devices to
convey information. *City of El Paso v. Hernandez*, 16 S.W.3d 409, 416-17 (Tex.
App.–El Paso 2000, no pet.).

j.   Many of Plaintiffs' allegations arise out of alleged improper policies or the failure
to have policies. There is no waiver of sovereign immunity for injuries arising
from the policy decisions over the matter of providing police protection. TEX.
CIV. PRAC. & REM. CODE ANN., § 101.055(3)(Vernons Supp. 2001); *Orrozco v.
Dallas Morning News, Inc.*, 975 S.W.2d 392, 297-98 (Tex. App.–Dallas 1998, no

pet.); *Gonzales,* 978 S.W.2d at 622-23. The acts arise out of an intentional tort, sovereign immunity is not waived. TEX. CIV. PRAC. & REM. CODE ANN., § 101.057 (Vernons Supp. 2001); *Petta,* 44 Tex. S. Ct. J. at 600. Because Ernest Moore's actions are intentional torts, there is no waiver of immunity under section 101.055. *Gonzales,* 978 S.W.2d at 623; *Barefield v. City of Houston,* 846 S.W.2d 399, 406 (Tex. App.–Houston [14th Dist.] 1992, writ denied).

k.   Plaintiffs assert various violations of state administrative regulations concerning the maintenance of proficiency of weapons, as well as violations of local directives concerning issuing weapons. The adoption of statutes or regulations to define the common law duties for negligence are discretionary with the Court. *Perry v. S. N.,* 973 S.W.2d 301, 304-5 (Tex. 1998). Before a statute can even qualify as a standard of care, Plaintiff must belong to the class of person the statute or law seeks to protect and his injury must be of the type the statute was written to prevent. *Id.* at 305. Even so, the Court must then determine whether the statute creates an appropriate standard for tort liability. *Id.* at 305-6. The Courts need not accept every administrative regulation as a standard for civil liability. *Continental Oil Co. v. Simpson,* 604 S.W.2d 530 (Tex. Civ. App.–Amarillo 1980, writ ref'd n.r.e.).

Before adopting a regulation as a standard for common law duty, the Court should consider whether or not that the statute or regulation creates a new duty or reformulates a common law standard, whether the defendant would have adequate notice of the prohibited conduct, the consequences of imposing civil liability, the possibility of disproportionate fault, etc. *Perry,* 973 S.W.2d at 307-8; *Praesel v. Johnson,* 967 S.W.2d 391, 395-96 (Tex. 1998).

As a general rule, there is no common law duty to protect Plaintiffs from the criminal acts of third parties or to otherwise come to their aid. *Perry*, 973 S.W.2d at 306; *San Benito Bank & Trust Co. v. Landair Travels*, 31 S.W.3d 312, 317 (Tex. App.–Corpus Christi 2000, no pet.). Here, the administrative regulations and directives are not a suitable basis. They are obviously written for the purpose of ensuring that officers be able to correctly fire their weapons and to determine to what officers what weapons are assigned. There is nothing in the language of the regulations showing they were intended to cover safeguarding weapons or otherwise prevent weapons from falling into the hands of criminals. They were not intended to protect the public from the acts of non-police personnel who take the weapons.

1.  The alleged promise to Pirtle to destroy the rifle creates no duty in favor of the deceased Border Patrol Agents or Plaintiff Raul Rodriguez. The failure to perform a gratuitous promise makes the Defendant liable only if he knows that the services are necessary for the protection of a third party and (1) negligence in the performance of the promise increases the risk of harm to that party, or (2) the third party detrimentally relies on the alleged promise to perform. *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 396 (Tex. 1991). At the time the rifle was delivered to the City, it would have had no basis to realize destruction was necessary to protect either the Border Agents or Deputy Rodriguez. Next, because the City did nothing towards destroying the rifle, it undertook no affirmative course of action which increased the risk. *Id.* at 396-7. Because none of this was either communicated to either Deputy Rodriguez or the Border Patrol Agents, they could not have relied on it. *Id.* at 397.

m.      State law limits the City's liability for state tort claims to $250,000.00 each person and $500,000.00 for each single occurrence for bodily injury or death. TEX. CIV. P. & REM. CODE ANN., § 101.023(c) (Vernons 1990). The deaths of the two Border Patrol Agents and the injury to Deputy Rodriguez constitute a "single occurrence" for the purpose of section 101.023(c).

**10.   Exhibits**

See Attachment "A" for Plaintiffs.

See Attachment "B" for Defendant.

**11.   Witnesses**

See Attachment "C" for Plaintiffs.

See Attachment "D" for Defendant.

**12.   Settlement**

A mediation was conducted on December 18, 1998 in Austin which was unsuccessful. The parties do not believe additional mediation efforts will be productive.

**13.   Trial**

Seven to ten 8-hour days of evidence. Plaintiffs' counsel, Broadus Spivey, requests that the taking of evidence not start until August 13th so that he may attend a State Bar meeting. This is not opposed by defense counsel.

**14.   Attachments**

(1)    Proposed questions for the voir dire examination

See Attachment "E" for Plaintiffs.

See Attachment "F" for Defendant.

(2)    Proposed charge, including instructions, definitions, and special interrogatories, with authority

See Attachment "G" for Plaintiffs.

See Attachment "H" for Defendant.

_____     Date: _____
United States District Judge

# JOINT PRETRIAL ORDER

**Approved:**

_____

Attorney-in-Charge, Plaintiffs Gilberto
M. Rodriguez, et al. and Arturo G.
Salinas, et al.

Date: _7-18-01_____

# JOINT PRETRIAL ORDER

Approved:

Attorney-in-Charge, Plaintiffs
Raul Rodriguez

Date: 7/18/01

# JOINT PRETRIAL ORDER

**Approved:**

_____     Date: 7 - 18 - 01
Attorney-in-Charge, Defendant City of
Harlingen

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL. | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS. | § | |

## Plaintiffs' Exhibit List

| No. | Description | Admitted | Exd |
|---|---|---|---|
| | | | |
| 1. | 10-22-98 Ltr to Custodian of Records, Harlingen Police Dept., from Margarita Gonzalez, Reporter, Valley Morning Star requesting under the Texas Open Records Act copies of or access to certain information | | |
| 2. | 021001-021013 Harlingen Police Department Total Service Quality Assessment Executive Summary | | |
| 3. | 023005-023008 Vol. 5, Issue 2 of *The Blue Shield*, A Publication of The Harlingen Police Officers Association (10-95) | | |
| 4. | 023034 *The Blue Shield*, A Publication of the Harlingen Police Association (7-98) | | |
| 5. | 023030 Harlingen Police Department Case Miscellaneous Report, nature of incident – Policy Clarification Request, | | |

| | | | |
|---|---|---|---|
| | name of complainant – Sgt. T. Kimbriel. (1-28-98) | | |
| 6. | Statement of 2 things that you like as a Harlingen Police Officer and 2 things that you dislike as a Harlingen Police Officer. (1-13-94) | | |
| 7. | 023042 Issues Involved in Timekeeping/FLSA Review, Verbal Discoveries and Recommendations | | |
| 8. | 023002 Police Depart. Memorandum to Natalie Flores Prim, City Manager from Jim Scheopner, Chief of Police with subject of Meeting with Police Association Panel (3-7-95) | | |
| 9. | 023003 Police Department Memorandum to Natalie Flores Prim, City Manager from Jim Scheopner, Chief of Police with subject of Meetings with Police Association Panel (4-5-95) | | |
| 10. | 023018 Police Department To Whom It May Concern letter from Jim Scheopner regarding collective bargaining for the police officers of the City of Harlingen. (2-16-96) | | |
| 11. | Capital of The Lower Rio Grande Valley Statement from The City Manager regarding the actions and progress that the city has undertaken relating to the shooting incident that took place in San Benito earlier this summer. | | |
| 12. | Document to Joe LaBeau, Assistant City Manager from Arnold Rodriguez, Human Resources Director with the subject of Police Problem-Solving Training (8-28-98) | | |
| 13. | 012272 Document to Natalie Prim, City Manager from Arnold Rodriguez, Human Resources Director with the subject of Presence of Attorney (12-4-98) | | |
| 14. | 005045 Document to Joe LaBeau, Assistant City Manager from Arnold Rodriguez, Human Resources Director with the subject of Concern with Rumors and Source-Advice Requested (8-19-98) | | |
| 15. | 009006-009007 Document to Natalie Flores Prim, City Manager from Arnold Rodriguez, Dir., Human Resources with the subject of Police Communications (4-12-96) | | |
| 16. | 023024 For Your Information to Natalie F. Prim, City Manager from Arnold Rodriguez, Human Resources Director with the subject of Public Safety Focus Team Agenda (6-24-96) | | |
| 17. | 023025-023027 Document to Cesar Maldonado, Civil Service Commission Chairman Herman Wise, Civil Service Commission Vice-Chairman Greg Powers, Civil Service Commission Member from Arnold Rodriguez, Human Resources Director Public Safety Focus Team with subject of Review of Local Civil Service Rules (6-24- | | |

| | | | |
|---|---|---|---|
| | 96) | | |
| 18. | 014033 Interoffice Memorandum to File from Joseph D. LaBeau, Assistant City Manager re Meeting Notes (1-30-98) | | |
| 19. | 014006 Memorandum to Jim Scheopner, Chief of Police, from Joe LaBeau, Assistant City Manager, re Command Staff Team (7-12-96) | | |
| 20. | 023004 Memorandum to Natalie Flores Prim, City Manager from Joe LaBeau, Assistant City Manager re Police Association (4-27-95) | | |
| 21. | 012271 Document to Arnold Rodriguez, Human Resources Director from Natalie Flores Prim, City Manager re City Files and Documents (12-3-98) | | |
| 22. | 009035 Interoffice Memorandum to Jim Scheopner, Chief of Police from Natalie Prim, City Manager re Administrative Leave (11-5-98) | | |
| 23. | 009002 Capital of The Lower Rio Grande Valley letter to Jim Scheopner, Police Chief, and Robert Archer, Assistant Police Chief, in response to the meeting with the police officers on Friday, 3-8-96. (3-13-96) | | |
| 24. | 023016 Memorandum to Mayor and City Commission from Natalie Flores Prim, City Manager re Response to Hgn. Police Officers Association (2-12-96) | | |
| 25. | 023017 Capital of The Lower Rio Grande Valley letter to Shawn R. Foist, President, Harlingen Police Officers Association re 2-8-96 regarding the Association's intent to initiate collective bargaining procedures. (2-13-96) | | |
| 26. | 032114-032118 Interoffice Memorandum to Jim Scheopner, Chief of Police from Joseph D. LaBeau, Assistant City manager re Performance Discrepancies/Improvement Plan (9-15-98) | | |
| 27. | 10-6-98 Harlingen Police Association Press Release signed by J. Rubio | | |
| 28. | 10-6-98 Harlingen Police Association letter to Mayor Connie De La Garza; City of Harlingen Commissioners Nat Lopez, Jesse Robles, Jack Hatfield, Rick Rodriguez, Chris Boswell, signed by Jose Rubio, Jr., Antonio Sanchez, Dennis Zamarron, Roberto Silva | | |
| 29. | 10-6-98 Harlingen Police Association letter to Mayor Connie De La Garza; City of Harlingen Commissioners Nat Lopez, Jesse Robles, Jack Hatfield, Rick Rodriguez, Chris Boswell, signed by Jose Rubio, Jr., Antonio Sanchez, Dennis Zamarron, Roberto Silva | | |
| 30. | 10-14-98 Harlingen Police Association letter (2 pgs.) to Sheryl Reed, Civil Service Director; Cesar Maldonado, | | |

3

|  |  |  |  |
|---|---|---|---|
|  | Chairman-Civil Service Commission; Greg Powers, Civil Service Commissioner; Herman Wise, Civil Service Commissioner, City of Harlingen, signed by Jose Rubio Jr; Antonio Sanchez; Dennis M. Zamarron; Roberto Silva; with Attachment (3 pgs.); Law Enforcement Code of Ethics (1 pg.); Harlingen Police Department Employee Standard (1 pg.); Goals (1 pg.); Rules (1 pg.) Management of Personnel (4 pgs.) Professional Conduct and Community Relations (2 pgs.) |  |  |
| 31. | Police Officers Association document stating "These are a few notes I took during a meeting I had with the Vice-President of the Harlingen Police Officers Association in reference to the shootings (October 22, 1998).  Author unknown. |  |  |
| 32. | 11-29-98 Harlingen Police Association Letter to the citizens of this community, signed by Jose Rubio, Jr.; Robert Silva; Dennis M. Zamarron; Antonio Sanchez |  |  |
| 33. | 023040-023041 Harlingen Police Association Letter to the Editor, explaining to the citizens of this community why the Harlingen Police Association went public  on the issue of the tragic Border Patrol shootings that occurred on July 7, 98; signed by Jose Ribio Jr., President of Harlingen Police Association. |  |  |
| 34. | 1-6-99 Presentation to City Commission 01-06-99 by Dennis M. Zamarron who was there to represent the Harlingen Police Association in the capacity of Vice President.  Presentation was on the issue of the resignation of Chief Jim Scheopner. |  |  |
| 35. | Harlingen Police Association letter to Honorable Mayor Card from Shawn R. Foist |  |  |
| 36. | 2-15-95 Harlingen Police Association letter to The Honorable Mayor William Card, City of Harlingen, from Dennis Zamarron, President of Harlingen Police Officer's Association, regarding the Association's appreciation for Mayor Card's quick response in regards to their letter of initiating collective bargaining procedures. |  |  |
| 37. | 7-14-98 Copy of Valley Morning Star article by Laura B. Martinez:  Police Weapons Policy Comes Under Fire |  |  |
| 38. | Copy of newspaper article by Margarita Gonzalez, Valley Morning Star:  Inquiry in Place, City, police clash about shooting investigation. |  |  |
| 39. | 10-8-98 Copy of newspaper article by Margarita Gonzalez of the Valley Morning Star:  Harlingen |  |  |

| | | | |
|---|---|---|---|
| | probes shooting deaths of two BP agents | | |
| 40. | 10-8-98 Copy of newspaper article, Associated Press: Investigation sought of police rifle used in killings | | |
| 41. | 10-31-98 Copy of newspaper article by Margarita Gonzalez, Valley Morning Star:  City attorney contradicts chief; Hall:  Harlingen does not have SWAT team | | |
| 42. | 11-5-98 Copy of newspaper article by Gina Perales, Valley Morning Star:  City report says rifle was intended 'for disposal'; Gun was given to officer instead of destroyed | | |
| 43. | 11-6-98 Copy of newspaper article that appeared in Austin American Statesman:  Rifle that killed agents was in police custody | | |
| 44. | 11-07-98 Copy of newspaper article by Gina Perales, Valley Morning Star:  Chief placed on leave; Consultant suggests Scheopner take break during investigation | | |
| 45. | 12-1-98 Copy of newspaper article by Margarita Gonzalez and Gina Perales, Valley Morning Star:  Inquiry delayed again; Panel holds action after possible conflict issue arises | | |
| 46. | 12-9-98 Copy of newspaper article by Margarita Gonzalez, Valley Morning Star:  No entry for agents; FBI status report offers insight into deaths of border Patrol officers | | |
| 47. | 12-31-98 Copy of newspaper article by Margarita Gonzales, Valley Morning Star:  Memo rebukes Scheopner; Chief allegedly gave back rubs, made belittling remarks | | |
| 48. | 1-5-99 Copy of newspaper article by Gina Perales, Valley Morning Star:  Chief seeks reassignment; Scheopner stepping down from post, wants to stay in uniform | | |
| 49. | 1-21-99 Copy of newspaper article by Gina Perales, Valley Morning Star:  city employee discusses problems; Man says he was placed on leve for knowing too much | | |
| 50. | Copy of newspaper article from elrocinante.com/editorals/harlingen.htm Web Site:  Scandals Rock Harlingen | | |
| 51. | 7-4-99 Copy of newspaper article by Mary Moreno, Valley Morning Star:  Images of deadly shootout remain vivid for many | | |
| 52. | 7-6-99 Copy of newspaper article by Madeline Baro | | |

| | | | |
|---|---|---|---|
| | Diaz, Associated Press Writer:  One year later, Border Patrol mourns two slain agents | | |
| 53. | 7-7-99 Copy of newspaper article by Mary Moreno, Valley Morning Star:  Officer files offense reports | | |
| 54. | 7-9-99Copy of newspaper article by Mary Moreno, Valley Morning Star:  Officer makes allegation; Harlingen policeman says R.D. Moore tried to store gun after shooting | | |
| 55. | 7-9-99 Copy of newspaper article, Associated Press:  Officers accused on rifle used to kill border agents | | |
| 56. | 7-11-99 Copy of newspaper article by Mary Moreno, Valley Morning Star:  New era for Harlingen; Rodriguez starts work as chief today | | |
| 57. | 9-14-99 Copy of newspaper article by Mary Moreno, Valley Morning Star:  Inquiry into accusations against four Harlingen officers complete | | |
| 58. | 10-25-99 Copy of newspaper article by Mary Moreno, Valley Morning Star:  Chief resigns, effective Nov. 14 | | |
| 59. | 11-9-99 Copy of newspaper article by Mary Moreno, Valley Morning Star:  Decision coming for Zamarron | | |
| 60. | 11-11-99Copy of newspaper article by Mary Moreno, Valley Morning Star:  Castillo named interim chief in Harlingen | | |
| 61. | 11-12-99 Copy of newspaper article by Mary Moreno, Valley Morning Star:  Police chief suspends Zamarron | | |
| 62. | 6-13-00 Ltr from Mr. Lockhart to Plaintiffs' counsel with enclosures | | |
| 63. | 7-7-98 Billing records for HPD issued mobile phones | | |
| 64. | 7-13-98 Valley Morning Star newspaper article | | |
| 65. | Documents and photographs from the CCSD investigative file | | |
| 66. | The guns and the gun vault located at the Moore residence on 7-7-98, which are currently located at the residence of R. D. Moore at 1064 Preston Trail, Harlingen, Tx.  Specifically the guns are listed in the attached Inventory List with the exception of Nos. 2 and 3 | | |
| 67. | R. D. Moore's mobile phone number billing records for the month of July 1998 | | |
| 68. | Payroll check stub of Susan Lynn Rodriguez | | |
| 69. | 6-18-98 Statement of Earnings and Leave for Susan Lynn Rodriguez for the official pay date | | |
| 70. | 1-4-98 Susan Lynn Rodriguez's Federal Employee Retirement System benefit statement dated | | |

| 71. | 1995, 1996, & 1997 U.S. Income Tax Returns for Susan & Gilberto Rodriguez | | |
|---|---|---|---|
| 72. | Birth Certificate of Susan Lynn Williams (Rodriguez) | | |
| 73. | Marriage Certificate of Susan Lynn Rodriguez and Gilberto Rodriguez | | |
| 74. | Susan Lynn Rodriguez's Death Certificate | | |
| 75. | Birth Certificate of Megan Suzanne Rodriguez, daughter of Susan Lynn Rodriguez & Gilberto Rodriguez | | |
| 76. | Ricardo Salinas' Statement of Earning for several pay periods | | |
| 77. | Birth Certificate of Ricardo Salinas | | |
| 78. | Death Certificate of Ricardo Salinas (This records are missing from the file) | | |
| 79. | Marriage Certificate of Ricardo Salinas' parents, Arturo Salinas & Elisa Herrera | | |
| 80. | 5-3-01 George L. Kirkham's Report to Plaintiffs' Counsel | | |
| 81. | George L. Kirkham's Professional Vita | | |
| 82. | 5-1-01 Phyllis R. Silverman's Report to Plaintiffs' Counsel | | |
| 83. | Phyllis R. Silverman's Curriculum Vitae | | |
| 84. | Ginsberg's Report to Plaintiffs' Counsel | | |
| 85. | Ginsberg's Curriculum Vitae | | |
| 86. | Investigative Affidavit & the Report of Javier Reyna of CCSD | | |
| 87. | Civil Service Commission documents relating to their inspection of the HPD dated April 7,  April 14 and May 11, 1993 | | |
| 88. | Users' manuals of the computer used by HPD on July 7, 1998, which was described  by Mr. Gale Jones in his deposition of April 26, 2001 | | |
| 89. | Program manuals of each and every software program used in the computer used by HPD on July 7, 1998, including the manual for the "New World System" program. | | |
| 90. | Users' manuals of the Dictaphone machine described by Mr. Gale Jones in Page 25, line 22 to Page 27, line 20 of his deposition of April 26, 2001. | | |
| 91. | Computer used by HPD on July 7, 1998, which was described by Mr. Gale Jones in his deposition of April 26, 2001. | | |
| 92. | Dictaphone machine described by Mr. Gale Jones in page | | |

| | | | |
|---|---|---|---|
| | 25, line 22 to page 26 of his deposition of April 26, 2001. | | |
| 93. | All 3x5 recipe cards used to track movement into and out of the evidence room from 1995 to the present | | |
| 94. | Policy manual of HPD promulgated by former Police Chief Victor Rodriguez | | |
| 95. | 11-9-98 Retention Agreement whereby The City of Harlingen retained James M. Robenson | | |
| 96. | Federal Bureau of Investigation Training School Certificate of Attendance of Ralph D. Moore having attended a Special Tactical Firearms School from June 6 to June 11, 1976 | | |
| 97. | Dectective R. D. Moore's work schedule from July 5, 1998 through July 8, 1998. | | |
| 98. | Jim Scheopner's Personnel File | | |
| 99. | 12-1-98 FBI document | | |
| 100. | Document entitled "Questions: On the Border Patrol Shootings" with 55 questions from Harlingen Police Association. | | |
| 101. | 7-7-99 Cameron County Sheriff's Dept. Case Report re Dennis Zamarron | | |
| 102. | 11-5-98 Proposed press release from Jim Scheopner | | |
| 103. | Statement of Funeral Goods & Services for Susan L. Rodriguez | | |
| 104. | Worklife Expectancy Manual | | |
| 105. | Autopsy Report of Susan L. Rodriguez | | |
| 106. | Statement of Funeral Expenses for Ricardo Salinas | | |
| 107. | 5-18-98 Statement of Earnings and Leave for Ricardo Salinas for official pay date | | |
| 108. | Autopsy Report of Ricardo Salinas | | |
| 109. | Texas Ranger Report on the Rio Hondo murders | | |
| 110. | Texas DPS Laboratory Physical Evidence Submission Form | | |
| 111. | 12-1-98 FBI Preliminary Report | | |
| 112. | Texas Commission on Law Enforcement Officer Standards and Education | | |
| 113. | Harlingen Police Department Total Service Quality Assessment by Ms. Fitzgerald | | |
| 114. | Personnel file of R.D. Moore | | |

| | | | |
|---|---|---|---|
| | Ex. 1-A of Scheopner depo | | |
| 1 1 5 . | Personnel file of R.D. Moore<br>Ex. 1-B of Scheopner depo | | |
| 1 1 6 . | 7-8-98 HPD Police Radio Call PL102002<br>Ex. 2 of Scheopner depo | | |
| 1 1 7 . | 5-6-98 Record of Handguns destroyed<br>Ex. 3 of Scheopner depo | | |
| 1 1 8 . | HPD memorandum from Scheopner to La Beau<br>Ex. 4 of Scheopner depo | | |
| 1 1 9 . | Gun List Inventory<br>Ex. 5 of Scheopner depo | | |
| 1 2 0 . | Sylvia Pirtle Receipt<br>Ex. 6 of Scheopner depo | | |
| 1 2 1 . | HPD Manual Provisions on Weapons 4.03.004-4.05.002<br>Ex. 7-A of Scheopner depo | | |
| 1 2 2 . | HPD letter from Victor Rodriguez re regulations and policies<br>Ex. 7-B of Scheopner depo | | |
| 1 2 3 . | Texas DPS, Texas Ranger Division report completed by Jaramillo<br>Ex. 8-A of Scheopner depo | | |
| 1 2 4 . | Texas DPS, Texas Ranger Division report completed by Casteneda<br>Ex. 8-B of Scheopner depo | | |
| 1 2 5 . | Texas DPS, Texas Ranger Division report completed by Jaramillo<br>Ex. 8-C of Scheopner depo | | |
| 1 2 6 . | Texas DPS, Texas Ranger Division report completed by Jaramillo<br>Ex. 8-D of Scheopner depo | | |
| 1 2 7 . | Texas DPS, Texas Ranger Division report completed by Pacheco<br>Ex. 8-E of Scheopner depo | | |
| 1 2 8 . | Texas DPS, Texas Ranger Division report completed by Casteneda<br>Ex. 8-F of Scheopner depo | | |
| 1 2 9 . | Statement of George Hupp<br>Ex. 9-A of Scheopner depo | | |
| 1 3 0 . | Statement of Michael James Riley<br>Ex. 9-B of Scheopner depo | | |
| 1 3 1 . | Statement of Doel Nicholas Anders<br>Ex. 9-C of Scheopner depo | | |
| 1 3 2 . | Statements of David Rey Sosa<br>Ex. 9-D of Scheopner depo | | |

| 1 3 3 . | Statement of Albert Daniel Perry<br>Ex. 9-E of Scheopner depo | | |
|---|---|---|---|
| 1 3 4 . | Statement of Ralph Dewayne Moore<br>Ex. 9-F of Scheopner depo | | |
| 1 3 5 . | Statement of Robert Wayne Reed, Jr.<br>Ex. 9-G of Scheopner depo | | |
| 1 3 6 . | Statement of Jason Walence<br>Ex. 9-H of Scheopner depo | | |
| 1 3 7 . | Statement of Larry Dewayne Moore<br>Ex. 9-I of Scheopner depo | | |
| 1 3 8 . | Statement of Patsy Gail Moore<br>Ex. 9-J of Scheopner depo | | |
| 1 3 9 . | Statement of Orlando Sanchez<br>Ex. 9-K of Scheopner depo | | |
| 1 4 0 . | Statement of Sylvia Pirtle<br>Ex. 9-L of Scheopner depo | | |
| 1 4 1 . | Statement of Miguel P. Garcia<br>Ex. 9-M of Scheopner depo | | |
| 1 4 2 . | Statement of Shawn Ray Foist<br>Ex. 9-N of Scheopner depo | | |
| 1 4 3 . | Statement of Tomas Mares, Jr.<br>Ex. 9-O of Scheopner depo | | |
| 1 4 4 . | Statement of Raul E. Rodriguez<br>Ex. 9-P of Scheopner depo | | |
| 1 4 5 . | Statement of Willie Alvarez<br>Ex. 9-Q of Scheopner depo | | |
| 1 4 6 . | Statement of Pedro Vela<br>Ex. 9-R of Scheopner depo | | |
| 1 4 7 . | Statement of Jesus Raphael Villanueva<br>Ex. 9-S of Scheopner depo | | |
| 1 4 8 . | Statement of Miguel P. Garcia<br>Ex. 9-T of Scheopner depo | | |
| 1 4 9 . | Statement of Shawn Ray Foist<br>Ex. 9-U of Scheopner depo | | |
| 1 5 0 . | Statement of Gilbert Briones<br>Ex. 9-V of Scheopner depo | | |
| 1 5 1 . | Statement of Jorge Delgado<br>Ex. 9-W of Scheopner depo | | |
| 1 5 2 . | Statement of Heron Lewis Vidales<br>Ex. 9-X of Scheopner depo | | |
| 1 5 3 . | Statement of Cody Mitchell<br>Ex. 9-Y of Scheopner depo | | |
| 1 5 4 . | Statement of Ronald K. Saenz<br>Ex. 9-Z of Scheopner depo | | |

| | | | |
|---|---|---|---|
| 155. | Statement of Samuel Montemayor<br>Ex. 9-AA of Scheopner depo | | |
| 156. | Statement of Alberto Ricardo Garcia<br>Ex. 9-BB of Scheopner depo | | |
| 157. | Statement of Robert Rodriguez<br>Ex. 9-CC of Scheopner depo | | |
| 158. | Statement of Hector Gonzalez<br>Ex. 9-DD of Scheopner depo | | |
| 159. | Statement of Ralph Dewayne Moore<br>Ex. 9-EE of Scheopner depo | | |
| 160. | DPS Crime Lab report<br>DPS Crime Lab report<br>autopsy report<br>Ex. 9-FF of Scheopner depo | | |
| 161. | Statement of Daniel Diaz<br>Ex. 9-GG of Scheopner depo | | |
| 162. | Statement of Douglas L. Spielman<br>Ex. 9-HH of Scheopner depo | | |
| 163. | HPD list of weapons issued (typed)<br>Ex. 10-A of Scheopner depo | | |
| 164. | HPD list of semi-automatic handguns<br>Ex. 10-B of Scheopner depo | | |
| 165. | HPD list of weapons (handwritten)<br>Ex. 10-C of Scheopner depo | | |
| 166. | Firearms by serial number<br>Ex. 10-D of Scheopner depo | | |
| 167. | Video tape **(retained by Sonia Lopez)**<br>Ex. 11 of Scheopner depo | | |
| 168. | Audio tape **(retained by Sonia Lopez)**<br>Ex. 12 of Scheopner depo | | |
| 169. | Autopsy report for Ernest Moore<br>Ex. 13 of Scheopner depo | | |
| 170. | Map of City of Harlingen<br>Ex. 14 of Scheopner depo | | |
| 171. | Photographs<br>Exs. 15-A thru 15-RRR of Scheopner depo | | |
| 172. | Photographs<br>Exs. 16-A thru 16-FFF of Scheopner depo | | |
| 173. | Photographs<br>Exs. 17-A thru 17-N of Scheopner depo | | |
| 174. | Photographs<br>Exs. 18-A thru 18-T of Scheopner depo | | |
| 175. | Photographs<br>Exs. 19-A thru 19-R of Scheopner depo | | |

11

| 176. | Photographs<br>Exs. 20-A thru 20-O of Scheopner depo | | |
|------|-------------------------------------------------------|---|---|
| 177. | Photographs<br>Exs. 21-A thru 21-F of Scheopner depo | | |
| 178. | Calibre Press Street Survival Newsline No. 288<br>Ex. 22 of Scheopner depo | | |
| 179. | Agenda for Command Staff Meeting<br>Ex. 23 of Scheopner depo | | |
| 180. | HPD Manual Provisions on the Release of Information<br>4.06.002-4.07.005<br>Ex. 24 of Scheopner depo | | |
| 181. | HPD Jim Scheopner memo re one-day suspension of<br>Foist without pay<br>Ex. 25 of Scheopner depo | | |
| 182. | HPD Jim Scheopner memo re one-day suspension of<br>Foist without pay<br>Ex. 26 of Scheopner depo | | |
| 183. | Calibre Press Street Survival Newsline No. 288 (with<br>yellow highlighting)<br>Ex. 27 of Scheopner depo | | |
| 184. | Map of R.D. Moore's property and scene of shootings<br>in San Benito<br>Ex. 28 of R.D. Moore depo | | |
| 185. | Map of R.D. Moore's property and scene of shootings<br>in San Benito<br>Ex. 29 of Hupp depo | | |
| 186. | Map of R.D. Moore's property and scene of shootings<br>in San Benito<br>Ex. 30 of Riley depo | | |
| 187. | Statement of Ronald K. Saenz<br>Ex. 31 of Saenz depo | | |
| 188. | List of guns<br>Ex. 1 of Vasquez depo | | |
| 189. | Receipt for MAK-90<br>Ex. 2 of Vasquez depo | | |
| 190. | Firearms Trace Report<br>Ex. 3 of Vasquez depo | | |
| 191. | HPD Receipt for Return of Property<br>Ex. 4 of Vasquez depo | | |
| 192. | Newspaper article<br>Ex. 5 of Vasquez depo | | |
| 193. | Agreed Judgment<br>Ex. 6 of Vasquez depo | | |
| 194. | ATF Form 4473<br>Ex. 7 of Vasquez depo | | |

| 195. | ATF Form 4473<br>Ex. 8 of Vasquez depo | | |
|---|---|---|---|
| 196. | License issued to Joseph B. Vasquez<br>Ex. 9 of Vasquez depo | | |
| 197. | License issued to Joseph B. Vasquez<br>Ex. 10 of Vasquez depo | | |
| 198. | Receipt for gun sale<br>Ex. 11 of Vasquez depo | | |
| 199. | Personnel file for Joseph Vasquez<br>Ex. 12 of Vasquez depo | | |
| 200. | INS memo re stolen M-4 rifle<br>Ex. 13 of Vasquez depo | | |
| 201. | ATF license for Maufrias Sales Co.<br>Ex. 14 of Vasquez depo | | |
| 202. | Statement by Joseph B. Vasquez<br>Ex. 15 of Vasquez depo | | |
| 203. | Statement of Miguel P. Garcia to Texas Rangers<br>Ex. 50 of Garcia's depo | | |
| 204. | Statement of Shawn Ray Foist to Texas Rangers<br>Ex. 51 of Garcia's depo | | |
| 205. | Statement of Shawn Ray Foist<br>Ex. 52 of Garcia's depo | | |
| 206. | Drawing of Moore's property and crime scene<br>Ex. 53 of Garcia's depo | | |
| 207. | Draft form of report given to La Beau from Scheopner re officer involved in shooting<br>Ex. 1 of La Beau's depo | | |
| 208. | Memo to Scheopner from La Beau re officer possession and loss of assault rifle<br>Ex. 2 of La Beau's depo | | |
| 209. | Memo to Prim from La Beau re shooting incident/recommendations for action<br>Ex. 3 of La Beau's depo | | |
| 210. | Receipt for weapons from Pirtle<br>Ex. 4 of La Beau's depo | | |
| 211. | Memo to La Beau from Scheopner re departmental weapons<br>Ex. 5 of La Beau's depo | | |
| 212. | Statement from the City Manager<br>Ex. 6 of La Beau's depo | | |
| 213. | Preliminary draft of city manager's report concerning the 7th of July, 1998 shooting incident<br>Ex. 7 of La Beau's depo | | |
| 214. | Original of ANI/ALI 911 calls<br>Ex. 36-A of Jones' depo | | |

13

| 215. | Printout of ANI/ALI calls, C. Garza<br>Ex. 37-A of Jones' depo | | |
|------|-----------------------------------------------|--|--|
| 216. | Additional pages to ANI/ALI<br>Ex. 37-B of Jones' depo | | |
| 217. | Additional ALI printouts<br>Ex. 38-A of Jones' depo | | |
| 218. | Dispatcher's Checkout Log<br>Ex. 40-A of Jones' depo | | |
| 219. | Dispatcher's Checkout Log<br>Ex. 41-A of Jones' depo | | |
| 220. | HPD-Incident Processing<br>Ex. 54 of Jones' depo | | |
| 221. | Audio tape-radio traffic<br>Ex. 55 of Jones' depo | | |
| 222. | Audio tape-EMS calls<br>Ex. 56 of Jones' depo | | |
| 223. | Audio tape-E. Moore homicide, side A & B<br>Ex. 57 of Jones' depo | | |
| 224. | Transcript of radio traffic<br>Ex. 58 of Jones' depo | | |
| 225. | Transcript of EMS calls<br>Ex. 59 of Jones' depo | | |
| 226. | Transcript of phone calls-HPD<br>Ex. 60 of Jones' depo | | |
| 227. | Jacket of audio tape<br>Ex. 61-A of Jones' depo | | |
| 228. | Cassette tape<br>Ex. 61-B of Jones' depo | | |
| 229. | Jacket of audio tape<br>Ex. 62-A of Jones' depo | | |
| 230. | Cassette tape<br>Ex. 62-B of Jones' depo | | |
| 231. | Sack of cassette tapes<br>Ex. 63 of Jones' depo | | |
| 232. | Empty cassette tape box<br>Ex. 64-A of Jones' depo | | |
| 233. | Teletype message-sheriff's office<br>Ex. 65 of Jones' depo | | |
| 234. | Report by Speedy Leal<br>Ex. 66 of Jones' depo | | |
| 235. | Receipt for Return of Property<br>Ex. 67 of Jones' depo | | |
| 236. | Property tag and index card<br>Ex. 68 of Jones' depo | | |

14

| | | | |
|---|---|---|---|
| 2 3 7 . | Sheriff's Department Case Report<br>Ex. 1 of Ledezma's depo | | |
| 2 3 8 . | Rio Hondo Police Offense Report<br>Ex. 2 of Ledezma's depo | | |
| 2 3 9 . | RGV Lookout Teletype<br>Ex. 3 of Ledezma's depo | | |
| 2 4 0 . | Transcript-Tape No. 1<br>Ex. 4 of Ledezma's depo | | |
| 2 4 1 . | Transcript-Tape No. 3<br>Ex. 5 of Ledezma's depo | | |
| 2 4 2 . | Transcript-Tape No. 2<br>Ex. 6 of Ledezma's depo | | |
| 2 4 3 . | City Manager's Report to the City Commission<br>Ex. 1 of Prim's depo | | |
| 2 4 4 . | Statement from the City Manager<br>Ex. 2 of Prim's depo | | |
| 2 4 5 . | Patsy Moore statement to Cameron County Sheriff's Department<br>Exh. 32 of Patsty Moore depo | | |
| 2 4 6 . | Drawing San Benito crime scene<br>Exh. 33 of Patsy Moore depo | | |
| 2 4 7 . | Map of survey and improvements of the Moore residence<br>Exh. 34 of Patsy Moore depo | | |
| 2 4 8 . | Telephone bill for Moore residence<br>Exh. 35 of Patsy Moore depo | | |
| 2 4 9 . | Incoming calls and teletype<br>Exh. 36 of Melody Matlock depo | | |
| 2 5 0 . | Teletype<br>Exh. 37 of Melody Matlock depo | | |
| 2 5 1 . | Teletype<br>Exh. 38 of Melody Matlock depo | | |
| 2 5 2 . | Retention schedule for records of public safety agencies<br>Exh. 39 of Melody Matlock depo | | |
| 2 5 3 . | Dispatchers check out log<br>Exh. 40 of Melody Matlock depo | | |
| 2 5 4 . | Dispatchers check out log<br>Exh. 41 of Melody Matlock depo | | |
| 2 5 5 . | Memorandum from Robert Archer concerning use of the Dictaphone system<br>Exh. 42 of Melody Matlock depo | | |
| 2 5 6 . | Memorandum from Robert Archer concerning use of the Dictaphone system<br>Exh. 43 of Melody Matlock depo | | |

| 271. | Photo of Ricardo Salinas and fiancé | | |
|---|---|---|---|
| 272. | Salinas family photo | | |
| 273. | Gilberto Rodriguez family photo | | |
| 274. | Photos of the crime scenes, autopsies & injuries | | |
| 275. | Photos of Moore's property taken by Plaintiffs' counsel. | | |
| 276. | The AR-15 rifle in question; or a facsimile thereof; or photographs thereof | | |
| 277. | Letter to notify City Manager of Raul Rodriguez's claim for damages | | |
| 278. | Texas Rangers' San Benito Murder Report | | |
| 279. | 9-15-98 Memo fr Mr. LaBeau (Assistant City Manager) to Chief Scheopner re: Performance Discrepancies/Improvement Plan | | |
| 280. | 10-6-98 Harlingen Police Officers Association press release | | |
| 281. | 2-15-95 Ltr from Dennis Zamarron to Mayor William Card, re: collective bargaining | | |
| 282. | Harlingen E.M.S.<br>Billing and Medical Records | | |
| 283. | Valley Baptist Medical Center<br>Billing and Medical Records | | |
| 284. | Emcare-Har Emer. Physicians<br>Billing and Medical Records | | |
| 285. | Valley Radiologist & Associates<br>Billing and Medical Records | | |
| 286. | Pathology Laboratory<br>Billing and Medical Records | | |
| 287. | Harlingen Anesthesia<br>Billing and Medical Records | | |
| 288. | Cardiovascular Association<br>Billing and Medical Records | | |
| 289. | Heart Clinic, P.A.<br>Billing and Medical Records | | |
| 290. | Pulmonary Associates<br>Billing and Medical Records | | |

| | 291. | Louis Hamer, M.D.<br>Billing and Medical Records | | |
|---|---|---|---|---|
| 292. | | TCLEOSE Cultural Diversity - Hate Crimes | | |

18

CutePDF - www.textio.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | JURY DEMANDED |
| | { | |
| and | { | |
| | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |
| | { | |
| and | { | |
| | { | |
| RAUL RODRIGUEZ | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |

---

## DEFENDANT'S EXHIBIT LIST

---

| No. | Description | Admitted | Exd |
|---|---|---|---|
| | | | |
| 1. | Gun List Inventory at R.D. Moore's home | | |
| 2. | Statement of George Hupp | | |
| 3. | Statement of Michael James Riley | | |
| 4. | Statement of Orlando Sanchez | | |
| 5. | Statement of Raul E. Rodriguez | | |
| 6. | Statement of Ronald K. Saenz | | |

| No. | Description | Admitted | Exd |
|-----|-------------|----------|-----|
| | | | |
| 7. | Videotape of recreation of chase scene | | |
| 8. | Cassette tape of HPD dispatch | | |
| 9. | Photographs from Texas Ranger and CCSD | | |
| 10. | Autopsy report on Susan Rodriguez | | |
| 11. | Autopsy report on Ricardo Salinas | | |
| 12. | 7-page HPD dispatcher log | | |
| 13. | Two transcripts of cassette on HPD dispatch recordings | | |
| 14. | Cameron County Sheriff Department teletype message | | |
| 15. | Three cassette tapes of Cameron County Sheriff Department dispatch on July 7, 1998 | | |
| 16. | Three transcripts of cassette tapes of Cameron County Sheriff Department Dispatch on July 7, 1998 | | |
| 17. | Raul Rodriguez personnel and payroll records from Cameron County Sheriff Department | | |
| 18. | Javier Reyna investigative records affidavit with Case Report | | |
| 19. | Rodolfo C. Jaramillo affidavit with Reports of Investigation and scale drawings | | |
| 20. | Cardiovascular Associates of Harlingen medical records on Raul Rodriguez | | |
| 21. | Dr. Bliss W. Clark's medical records on Raul Rodriguez | | |
| 22. | DPS Firearms examiner William Sorrow's 6-page report | | |
| 23. | Statement of CCSD Deputy Robert Rodriguez | | |
| 24. | Copy of handwriting on HPD cassette tape in the possession of Texas Rangers | | |
| 25. | HPD miscellaneous report, receipt, property tag and index card referencing the cassette tape and dispatcher log | | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL. | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial |
| matters) | § | |
| CITY OF HARLINGEN, TEXAS. | § | |

## WITNESS LIST

The following is a list of persons who will, in reasonable probability, be called by Plaintiffs to testify on direct examination in this case

| | Name | Nature of Testimony |
|---|---|---|
| | | |
| | **Plaintiffs** | |
| | | |
| 1. | Gilberto M. Rodriguez<br>P.O Box 151802<br>Austin, Texas 78715<br>Hm: 512+892-1002<br>Wk: 512+708-9537 | Husband of Susan Lynn Rodriguez |

1

| 2. | Arturo Guillermo Salinas<br>8179 Sunshine Trail<br>San Antonio, Texas 78244<br>Hm: 210+661-0579 Wk: 210+242-3877 | Father of Ricardo Guillermo Salinas |
|----|---|---|
| 3. | Elisa Salinas<br>8179 Sunshine Trail<br>San Antonio, Texas 78244<br>Hm: 210+661-0579 Wk: 210+242-3877 | Mother of Ricardo Salinas |
| 4. | Robyn S. Williams<br>926 Paint Rock Valley Road<br>Philadelphia, Tenn. 37846<br>Hm: 865+376-9167<br>Fx:   865+376-1581 | Mother of Susan Rodriguez |
| 5. | Stephen L. Williams<br>926 Paint Rock Valley Road<br>Philadelphia, Tenn. 37846<br>Hm: 865+376-9167<br>Fx:   865+376-1581 | Father of Susan Rodriguez |
| 6. | Raul E. Rodriguez<br>Cameron County Sheriff's Dept.<br>954 E. Harrison<br>Brownsville, Texas 78520 | Cameron County Sheriff's Corporal, wounded by Ernest Moore in San Benito; returned fire against Ernest Moore |
| | **Cameron County Sheriff's Office** | |
| 7. | Gilbert Briones<br>954 E. Harrison<br>Brownsville, Texas 78520<br>Ph:  956+550-7290 | Deputy; he and Ricones were the first from CCSO to arrive at scene of shooting in Rio Hondo; at scene of shootings in San Benito; made statement to Texas Rangers |
| 8. | Samuel Montemayor<br>954 E. Harrison<br>Brownsville, Texas 78520<br>Ph:  956+550-7290 | Deputy; at scene of shootings in San Benito; spoke to R.D. Moore before the shootings and searched his house; returned fire against Ernest Moore; gave statement to Texas Rangers |

| 9. | Javier Reyna<br>954 E. Harrison<br>Brownsville, Texas 78520<br>Ph:  956+550-7290 | Criminal Investigator; investigated and wrote report on murders and attempted murder in Rio Hondo; also at scene of shootings in San Benito; Ranger Jaramillo asked him to collect and deliver radio logbooks and tape recordings for CCSO; participated in re-enactment of chase of Ernest Moore |
|---|---|---|
| 10. | Leroy Rincones<br>954 E. Harrison St.<br>Brownsville, Texas 78520<br>Ph:  956+550-7290 | Deputy; first, with Briones, to arrive at scene of shooting in Rio Hondo |
| 11. | Robert Rodriguez<br>954 E. Harrison<br>Brownsville, Texas 78520<br>Ph:  956+550-7290 | Patrol Deputy; noticed Ernest Moore's truck after he left scene in Rio Hondo and chased him to San Benito; spoke to R.D. Moore before the shootings and searched his house; returned fire against Ernest Moore; gave statement to Texas Rangers & CCSO |
| 12. | Ronald K. Saenz<br>Personnel & Safety Risk Office<br>954 E. Harrison<br>Brownsville, Texas 78520<br>Ph:  956+550-7290 | Senior Patrol Sargent; at scene of shootings in Rio Hondo and San Benito; spoke to R.D. Moore and BP Agent Rodriguez before the shootings; made statement to Texas Rangers |
| | **Department of Public Safety- Texas Rangers** | |
| 13. | Rodolfo C. Jaramillo<br>Texas Rangers Company "D"<br>US 77 Sunshine Strip<br>Harlingen, Texas | Investigated and wrote report of shooting of BP agents and deputy by Ernest Moore; participated in re-enactment of chase of Ernest Moore |
| 14. | Israel Pacheco<br>Texas Rangers Company "D"<br>1414 Bicentennial<br>McAllen, Texas | At scene of shootings in San Benito; interviewed witnesses and friends of Ernest Moore |
| | **Harlingen Police Department** | |
| | | |

| 15. | Miguel (Mike) Garcia<br>Harlingen Police Dept.<br>1102 S. Commerce<br>Harlingen, TX 78550<br>956+427-8787 | Sergeant; along with Foist, was first on scene in San Benito from HPD & spoke to R. D. Moore before shooting; took Patsy Moore to cover when the shooting started; gave statement to Texas Rangers |
|-----|-----------------------------------------------------------------------------------------------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 16. | R.D. Moore<br>Harlingen Police Department<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Harlingen police officer, father of Ernest Moore (murderer), states that Captain Vasquez verbally issued the AR-15 as a service weapon; states that Sylvia Pirtle relinquished the AR-15 to the HPD for destruction or safe-keeping; states that the AR-15 sat in his gun safe for about two weeks before the shootings in San Benito; made statement to Texas Rangers |
| 17. | Luciano Rubio<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Captain in charge of training division; Joe Rubio's younger brother; asked Gilbert Gonzalez to investigate the AR-15 and was warned by Archer to stop the investigation; attended weekly staff meetings at HPD |
| 18. | Jim Schoepner<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Chief of Harlingen Police Department at the time of the shootings (retired from Chief in Jan. 1999, currently holds rank as lieutenant); knowledge of the operation of HPD, assignment of subject rifle and shooting incident |
| 19. | Roberto Silva<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Secretary of the Harlingen Police Officers Association; signed letters to the Harlingen City Commission and the Harlingen City Civil Service Commission explaining the HPD cover-up |

3

| 20. | Joseph (Joe) Vasquez<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Captain; commanding officer of R.D. Moore and assigned to him the AR-15 used by Ernest Moore in the shootings in San Benito; sold to R.D. Moore the AK-47 used by Ernest Moore in the shootings in Rio Hondo; head of the internal investigations department at the time of the shootings, but did not do an investigation; gave statement to Texas Rangers |
|---|---|---|
|   | **U.S. Border Patrol** |   |
|   |   |   |
| 21. | John C. Brinning<br>U.S. Border Patrol Agent | Agent In-Charge; met with Ranger Jaramillo after shootings in San Benito about possible criminal violations |
| 22. | Jose (Joe) E. Garza<br>Chief U.S. Border Patrol Agent<br>McAllen Sector<br>McAllen, Texas | Knowledge of shooting incident; met with Texas Ranger Lt. Cano regarding shootings in San Benito |
| 23. | George A. Hupp<br>Tuscon INS Investigations<br>P.O. Box 17221<br>Tucson, AZ 85731 | BP agent stationed in McAllen at the time of shootings in San Benito; at scene of shootings in San Benito; gave statement to Texas Rangers |
| 24. | Orlando Sanchez<br>U.S. Border Patrol Agent<br>McAllen Sector<br>McAllen, Texas<br><br>1713 W. 4th St., #4<br>Weslaco, Texas 78596 | Agent Salinas' partner; at scene of shootings in San Benito; returned fire against Ernest Moore; gave statement to Texas Rangers |
|   |   |   |
|   | **OTHERS** |   |
|   |   |   |
| 25. | Doel Nicholas Anders<br>422 E. Caffery St.<br>Pharr, Texas | Ernest Moore's friend and co-worker; was with him the night before the shootings; passed polygraph test; gave statement to Texas Rangers |

4

| 26. | Billy Ballenger | One of the owners of Ballenger's Construction, where Ernest Moore worked |
|-----|-----------------|-------------------------------------------------------------------------|
| 27. | Joe Charles Ballenger | One of the owners of Ballenger's Construction, where Ernest Moore worked |
| 28. | Tommy Ballenger | One of the owners of Ballenger's Construction, where Ernest Moore worked |
| 29. | Rudy Cavazos | Friend of Ernest Moore; was with him the night before the shootings |
| 30. | Shawn Foist<br>509 County Rd. 163, 2A<br>Centre, Alabama 35960<br>Ph: 256+927-9389<br>W: 256+543-7001 | Sergeant; along with Garcia, was first on scene in San Benito from HPD and spoke to R.D. Moore before shooting; R.D. Moore told him that he had spoken to Ernest that morning (Foist told Texas Rangers later that he is not positive that R.D. Moore told him that he had talked to his son that morning); during the shooting, he was in the garage with R.D. Moore and returned fire; gave statement to Texas Rangers; later suspended for posting a letter on the internet concerning the shootings |
| 31. | Gale Lynn Jones<br>Valley High Charter School | Dispatch supervisor at the time of the shootings; in charge of dispatchers for Harlingen police, fire and EMS; left HPD in the fall of 1999, currently assistant principal at a high school |
| 32. | Joseph (Joe) LaBeau<br>City Hall of Midlotian<br>104 West Avenue E.<br>Midlothian, Texas 76065 | Assistant City Manager (resigned In July 1999 to take job as city manager of Midlothian); knowledge of activities after the incident |
| 33. | Patsy Moore<br>1604 Preston Trail<br>Harlingen, Texas 78552 | Mother of Ernest Moore & husband of R.D. Moore; gave statement to Texas Rangers |

| 34. | Albert Daniel Perry<br>Rt 1, Box 227<br>Stuart Place Rd.<br>Harlingen, TX | Foreman at Ballinger's Construction Co. where Ernest Moore worked; called Patsy Moore when Ernest did not show up for work the day of the shootings; gave statement to Texas Rangers. |
|---|---|---|
| 35. | Sylvia Pirtle<br>2609 Lotus<br>Harlingen, Texas | Mrs. Pirtle gave the AR-15 that Ernest Moore used in the shootings in San Benito to R.D. Moore at the Harlingen PD; she gave R.D. Moore the instructions to destroy the weapon to prevent it from falling into the hands of a criminal; gave statement to Texas Rangers |
| 36. | Natalie Prim<br>410 Tanglewood Dr.<br>Pensacola, FL 32503<br>850+438-4088 | Harlingen City Manager at the time of the shootings; knowledge of activities after the incident. |
| 37. | James Robenson<br>1014 FM 775<br>Floresville, Texas 78114 | Floresville management auditor and consultant hired by City of Harlingen to conduct an independent review of the city following the San Benito shootings |
| 38. | Arnold Rodriguez<br>1910 N. 8th St.<br>Harlingen, TX 78550 | Former Human Resources Director; filed lawsuit against the city, Natalie Prim and Joseph LeBeau for a retaliatory firing |
| 39. | Victor Rodriguez<br>8610 Shoal Creek<br>Austin, Texas 78757<br>512+406-5401 | Former Chief of Brownsville Police Department; replaced Schoepner as Chief of HPD |
| 40. | Jose (Joe) Rubio<br>214 West Cano St.<br>Edinburg, TX 78539<br>W: 956+318-0900<br>M: 956+491-5562 | Former detective at HPD and former President of the Harlingen Police Officers Association; told FBI agents about the lax procedures at HPD and the cover-up; attended weekly staff meetings at HPD; signed letters to the Harlingen City Commission and the Harlingen City Civil Service Commission explaining the HPD cover-up |

| 41. | Daniel Winn (female) | Friend of Ernest Moore; was with him the night before the shootings |
|-----|----------------------|--------------------------------------------------------------------|
| 42. | Dennis Zamarron | Vice-President of Harlingen Police Officers Association; told FBI agents about the lax procedures at HPD and the cover-up; signed letters to the Harlingen City Commission and the Harlingen City Civil Service Commission explaining the HPD cover-up; filed offense reports with the CCSO against Moore, Schoepner, Archer and Vasquez for abuse of official capacity and obstruction |
| | **Witnesses to Shooting in Rio Hondo** | |
| 43. | Julie Lynn Cox<br>Rt. 2, Box 227-A<br>Alamo, Texas<br>(last known address) | Ex-girlfriend of Ernest Moore, was dating Dan Morin at the time of the shooting in Rio Hondo; witnessed shooting there and called the police; gave statement to Texas Rangers |
| 44. | Dan Morin (at time of injury)<br>311 Catherine Street<br>Rio Hondo, Texas | Critically injured by Ernest Moore; was dating Julie Cox, Moore's ex-girlfriend, at the time of the shooting; gave statement to Texas Rangers |
| 45. | Jennifer Gwin Morin (at time of shootings)<br>311 Catherine Street<br>Rio Hondo, Texas | Was present in house at time of shootings in Rio Hondo; gave statement to Texas Rangers |
| 46. | William Arthur Morin<br>311 Catherine Street<br>Rio Hondo, Texas | Witnesses shootings om Rop Jpmdp' wrest;ed AL-47 away from Ernest Moore; gave statements to Texas Rangers |
| 47. | Mrs. Lucia Tamayo Prather<br>306 Catherine<br>Rio Hondo, Texas | Saw at least 2 men get into the Ernest Moore pick-up |
| | **Plaintiffs' Experts** | |

| | | |
|---|---|---|
| 48. | George Kirkham<br>5596 Westernway<br>Lake Worth, FL 33463<br>800+488-9231 | Police Procedure |
| 49. | Dr. Phyllis Silverman<br>18 Ingleside Road<br>Lexington, MA 02420<br>W:  MGH Institute of Health<br>       Professions<br>       101 Merrimac St.<br>       Boston, MA 02114<br>781+861-0368 | Expert on Death |

The following is a list of persons who have knowledge of, or it is claimed that they have knowledge of, relevant facts and one or more of which may be called as a witness if it appears necessary during the trial of this case.

| | Name | Nature of Testimony |
|---|---|---|
| | **Cameron County Sheriff's Office** | |
| 1. | Willie Alvarez<br>954 E. Harrison St.<br>Brownsville, Texas 78520 | Deputy; at scene of shootings in San Benito; covered rear of R.D. Moore's house during search; gave statement to Texas Rangers |
| 2. | Rene Borrego<br>954 E. Harrison St.<br>Brownsville, Texas 78520 | Chief dispatcher |
| 3. | Merced Burnias<br>954 E. Harrison<br>Brownsville, Texas 78520 | Investigator; transported AK-47 and shell casings used in shootings in Rio Hondo to Austin DPS for analysis |
| 4. | Jorge Delgado<br>954 E. Harrison<br>Brownsville, Texas 78520 | Deputy; spoke with R.D. Moore before the shooting; left the scene to search another residence; stayed with Ernest Moore at hospital until his death; gave statement to Texas Rangers |
| 5. | Domingo Diaz<br>954 E. Harrison<br>Brownsville, Texas 78520 | Investigator; at scene of shooting in Rio Hondo and took statements from witnesses there; also investigated the charges filed by Zamarron against Moore, Schoepner, Vasquez and Archer |
| 6. | John Frizzell<br>954 E. Harrison<br>Brownsville, Texas 78520 | Investigator; at scene of shooting in Rio Hondo and took statements from witnesses there |
| 7. | Alberto Ricardo Garcia<br>954 E. Harrison<br>Brownsville, Texas 78520 | Deputy; at scene of shooting in San Benito; searched R.D. Moore's house; returned fire against Larry Moore; gave statement to Texas Rangers |

| 8. | Ernesto Gonzalez<br>954 E. Harrison<br>Brownsville, Texas 78520 | Investigator; at scene of shooting in Rio Hondo |
|---|---|---|
| 9. | Rey Gonzalez<br>954 E. Harrison St.<br>Brownsville, Texas 78520 | Deputy |
| 10. | Roman Gracia<br>954 E. Harrison<br>Brownsville, Texas 78520 | Investigator; at scene of shooting in San Benito |
| 11. | Chris Ledezma<br>954 E. Harrison<br>Brownsville, Texas 78520 | Dispatcher; knowledge of shooting incident |
| 12. | Omar Lucio<br>954 E. Harrison<br>Brownsville, Texas 78520 | Sheriff; former HPD captain; met with investigators after the shootings; talked with Joe Rubio after the shootings about the HPD cover-up |
| 13. | Tomas Mares, Jr.<br>954 E. Harrison St.<br>Brownsville, Texas 78520 | Deputy; at scene of shootings in San Benito; gave statement to Texas Rangers |
| 14. | Cody Mitchell<br>954 E. Harrison<br>Brownsville, Texas 78520 | Deputy; at scene of shootings in San Benito and present during conversation with R.D. Moore before the shootings; gave statement to Texas Rangers |
| 15. | Pete Ramirez<br>954 E. Harrison St.<br>Brownsville, Texas 78520 | Deputy |
| 16. | Reyes<br>954 E. Harrison St.<br>Brownsville, Texas 78520 | Deputy; participated in re-enactment of chase of Ernest Moore |
| 17. | Robert Rodriguez<br>954 E. Harrison St.<br>Brownsville, Texas 78520 | Investigator; at scene of shootings in Rio Hondo and San Benito; took statements from witnesses |
| 18. | Pedro Vela<br>954 E. Harrison<br>Brownsville, Texas 78520 | Deputy; at scene of shootings in San Benito; gave statement to Texas Rangers |

| 19. | Aaron (Heron?) Lewis Vidales<br>954 E. Harrison<br>Brownsville, Texas 78520 | Deputy; at scene of shootings in San Benito; searched brush on east side of Gamble Road and covered rear of R.D. Moore's house until search finished; gave  statement to Texas Rangers |
| 20. | Jesus Raphael Villanueva<br>954 E. Harrison<br>Brownsville, Texas 78520 | Deputy; at scene of shooting in San Benito; returned fire against Ernest Moore; gave statement to Texas Rangers |
| | **Department of Public Safety-<br>Crime Lab & Misc.** | |
| | | |
| 21. | Linda Archer<br>DPS Communications<br>1630 N. 77 Sunshine Strip<br>Harlingen, Texas | Dispatcher |
| 22. | Gilbert Capuchina<br>McAllen DPS | Polygraph examiner; at scene of shootings in San Benito and examined friends of Ernest Moore |
| 23. | Joe Cisneros | DPS Motor Vehicle Theft Investigator Sgt.; Ranger Pancheco asked him to collect radio logbooks and tape recordings from the HPD pertaining to radio traffic of the murders |
| 24. | Keith Gibson<br>McAllen DPS Crime Lab<br>1414 Bicentennial<br>McAllen, Texas | Processed crime scene at San Benito for DPS |
| 25. | Jill Kinkade<br>Austin DPS Crime Lab | Latent print technician |
| 26. | Kent Kinkade | Forensic photographer; processed crime scene in San Benito for DPS |
| 27. | Alex Madrigal<br>McAllen DPS Crime Lab<br>1414 Bicentennial<br>McAllen, Texas | Criminalist; processed crime scene in San Benito for DPS |

11

| 28. | Joe Marchan<br>McAllen DPS Crime Lab<br>1414 Bicentennial<br>McAllen, Texas | Criminalist; McAllen DPS Crime Lab Supervisor; processed crime scene in San Benito for DPS |
|---|---|---|
| 29. | Orlando Ochoa<br>McAllen DPS Crime Lab<br>1414 Bicentennial<br>McAllen, Texas | Serologist; processed crime scene in San Benito for DPS |
| 30. | William M. Sorrow<br>Austin DPS Crime Lab | Firearms Examiner; met with Ranger Jaramillo concerning physical evidence |
| 31. | Glenn Unnasch<br>Austin DPS Crime Lab | Latent print examiner; processed crime scene in San Benito for DPS |
| 32. | Ramiro Valdez<br>McAllen DPS Crime Lab<br>1414 Bicentennial<br>McAllen, Texas | Processed crime scene at San Benito for DPS |
|  | **Department of Public Safety–<br>Highway Patrol** |  |
| 33. | Henry Bentacourt<br>Highway Patrol<br>Harlingen, Texas | Sergeant; member of Mobile Incident Response Team that reconstructed crime scene in San Benito |
| 34. | Oscar Cruz<br>Highway Patrol<br>Brownsville, Texas | Corporal; member of Mobile Incident Response Team that reconstructed crime scene in San Benito |
| 35. | George Elizondo<br>Highway Patrol<br>McAllen, Texas | Corporal; member of Mobile Incident Response Team that reconstructed crime scene in San Benito |
| 36. | Andy Maldonado<br>Highway Patrol<br>Raymondville, Texas | Trooper; member of Mobile Incident Response Team that reconstructed crime scene in San Benito |
| 37. | Hector Ramos<br>Highway Patrol | Captain; met with investigators from Texas Rangers after the shootings |

| 38. | Michael Taquard<br>Highway Patrol<br>Kingsville, Texas | Sergeant; member of Mobile Incident Response Team that reconstructed crime scene in San Benito |
| --- | --- | --- |
| 39. | Troy Wilson<br>Highway Patrol<br>Victoria, Texas | Trooper; member of Mobile Incident Response Team that reconstructed crime scene in San Benito |
| | **Department of Public Safety-<br>Texas Rangers** | |
| 40. | Ray Cano<br>Texas Rangers Company "D" | Lieutenant; at scene of shootings in San Benito |
| 41. | Rolando Castenda<br>Texas Rangers Company "D"<br>5 Boca Chica, Ste. #16<br>Brownsville, Texas | Assisted in investigation of murders and attempted murder in Rio Hondo; at scene of shootings in San Benito; participated in re-enactment of chase of Ernest Moore |
| | **Federal Bureau of Investigation** | |
| 42. | Raul Cabarillo<br>Federal Bureau of Investigation | Supervisor; met with Ranger Jaramillo after the shootings |
| 43. | Robert Carbido<br>Federal Bureau of Investigation | Special Agent in Charge of the Brownsville unit; informed Schoepner of Sergeant Foist's internet posting regarding the shootings |
| 44. | David Church<br>Federal Bureau of Investigation | At scene of shooting in San Benito; inventoried Ernest Moore's pickup with Agent Vela and Ranger Jaramillo; present at Ernest Moore's autopsy; met with Rubio, Zamarron, and Agent Fernandez after the shootings when Rubio and Zamarron told them about the lax procedures at HPD and the cover-up |
| 45. | Jorge Cisneros<br>Federal Bureau of Investigation | Special Agent |

| 46. | Roy De La Garza<br>Federal Bureau of Investigation<br>McAllen, Texas | Assisted in investigation of shootings in San Benito |
|---|---|---|
| 47. | Armando Fernandez<br>Federal Bureau of Investigation | Friend of Jose Rubio; met with Rubio, Zamarron, and Agent Church after the shootings when Rubio and Zamarron told them about the lax procedures at HPD and the cover-up |
| 48. | Chris Gregorsky<br>Federal Bureau of Investigation<br>McAllen, Texas | Assisted in investigation of shootings in San Benito |
| 49. | Staci H. Gutierrez<br>Federal Bureau of Investigation<br>McAllen, Texas | File supervisor |
| 50. | Stephen C. Hauck<br>Federal Bureau of Investigation | Assisted in investigation of shootings in San Benito; interviewed Larry Moore after the shootings |
| 51. | Robert (Bob) Marshall<br>Federal Bureau of Investigation<br>McAllen, Texas | Assisted in investigation of shootings in San Benito; interviewed Larry Moore after the shootings |
| 52. | Mario Martinez<br>Federal Bureau of Investigation<br>1700 Paredes Line Rd.<br>Brownsville, Texas | Knowledge of shooting incident |
| 53. | Kevin Stafford<br>Federal Bureau of Investigation<br>1701 W. Bus. 83, Ste. 1100<br>McAllen, Texas | Special Agent In-Charge; was present at scene of shootings in San Benito |
| 54. | Freddy Vela<br>Federal Bureau of Investigation<br>1700 Paredes Line Rd.<br>Brownsville, Texas | Special agent; at scene of shootings in San Benito; inventoried Ernest Moore's pickup with Agent Church and Ranger Jaramillo |
| 55. | Mark Williams (Williamson?)<br>Federal Bureau of Investigation<br>1701 W. Bus. 83, Ste. 1100<br>McAllen, Texas | Special agent; at scene of shootings in San Benito |

| 56. | John Wood<br>Federal Bureau of Investigation<br>1700 Paredes Line Rd.<br>Brownsville, Texas | Special agent in charge of the crime scene in San Benito for FBI; present at Ernest Moore's autopsy |
|---|---|---|
| | **Harlingen Police Department** | |
| 57. | Guy Anderson | Former Chief of HPD; preceded Schoepner; would know about SWAT team at HPD |
| 58. | Robert Archer<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Assistant chief; warned Luciano Rubio to stop his investigation of the AR-15; attended the weekly staff meetings at HPD |
| 59. | William Bilokury<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Officer; voice recorded on police radio after the shootings in San Benito |
| 60. | Danny Castillo<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Lieutenant; attended the weekly staff meetings at HPD; R.D. Moore spoke to him and gave an affidavit regarding the shooting incident |
| 61. | Gilbert Gonzalez<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Detective; custodian of HPD evidence vault; on vacation during receipt of the AR-15 from Mrs. Pirtle |
| 62. | Johnson<br>1102 S. Commerce<br>Harlingen, Texas 78550 | At scene of shootings in San Benito |
| 63. | Michael Laney<br>1102 S. Commerce<br>Harlingen, Texas 78550 | K-9 officer at scene of shootings in San Benito |
| 64. | Espiridion Leal<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Lieutenant; attended weekly staff meetings at HPD; signed out tapes of radio traffic on the day of the shootings |
| 65. | Steven Mayer<br>1102 S. Commerce<br>Harlingen, Texas 78550 | K-9 officer at scene of shootings in San Benito |

| 66. | David Means<br>1102 S. Commerce<br>Harlingen, Texas 78550 | R.D. Moore spoke to him and gave him an affidavit regarding the shooting incident |
|---|---|---|
| 67. | Rhonda Mitchell<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Officer, complained to LaBeau about Scheopner's credibility and honesty |
| 68. | Andy Muniz<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Sergeant; Joe Rubio saw a picture of him carrying an assault rifle with a scope; Rubio says he is not qualified to use an assault rifle |
| 69. | Eric Nelson<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Officer;  escorted Ernest Moore to ER |
| 70. | Johnny Ramirez<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Range master at the time of the shootings; responsible to ensure that every officer meets standards and qualifies on weapons |
| 71. | Chris Read<br>1102 S. Commerce<br>Harlingen, Texas 78550 | K-9 officer at scene of shootings in San Benito |
| 72. | Antonio Sanchez<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Treasurer of the Harlingen Police Officers Association; signed letters to the Harlingen City Commission and the Harlingen City Civil Service Commission explaining the HPD cover-up |
| 73. | Roberto Silva<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Secretary of the Harlingen Police Officers Association; signed letters to the Harlingen City Commission and the Harlingen City Civil Service Commission explaining the HPD cover-up |
| 74. | Ramon Vela<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Lieutenant; expressed concern to Ruibio about the cover-up by HPD; attended weekly staff meetings at HPD |

| 75. | Jose Angel Villarreal<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Officer; expressed concern to Rubio about the cover-up by HPD |
|---|---|---|
| 76. | Ray Wisdom<br>1102 S. Commerce<br>Harlingen, Texas 78550 | Sergeant; firearms instructor and range master at the time of the shootings; was in charge of maintaining the files of the firearms proficiency of the HPD officers |
| | **U.S. Border Patrol** | |
| 77. | J.P. Cronin<br>U.S. Border Patrol Agent | Deputy Chief; met with Ranger Jaramillo after shootings in San Benito about possible criminal violations |
| 78. | Daniel Diaz<br>U.S. Border Patrol Agent<br>McAllen Sector<br>McAllen, Texas | K-9 handler, at scene of shootings in San Benito; gave statement to Texas Rangers |
| 79. | Ray M. Garza<br>U.S. Border Patrol Agent | Assistant Chief; met with Ranger Jaramillo after shootings in San Benito about possible criminal violations |
| 80. | Hector Gonzalez<br>U.S. Border Patrol Agent<br>McAllen Sector<br>McAllen, Texas | First Line Supervisor; at scene of shootings in San Benito; met with investigators from Texas Rangers after the shootings |
| 81. | Luciano Gonzalez<br>McAllen Sector<br>McAllen, Texas | Mechanic; arrived at scene in San Benito to tow Agents Sanchez's and Salinas' vehicle |
| 82. | Edward Kelly<br>U.S. Border Patrol Agent<br>McAllen Sector<br>McAllen, Texas | Knowledge of shooting incident |
| 83. | Roberto Longoria | Supervisor |

| 84. | Eduardo Payan<br>U.S. Border Patrol Agent | First Line Supervisor; Ranger Jaramillo asked him to collect and deliver radio logbooks and tape recording from the Border Patrol's main communications office in McAllen |
|---|---|---|
| 85. | J. Perry<br>U.S. Border Patrol Agent | Deputy Chief; met with Ranger Jaramillo after shootings in San Benito about possible criminal violations |
| 86. | Santos Ramirez<br>U.S. Border Patrol Agent | Intelligence officer |
| 87. | Michael James Riley<br>U.S. Border Patrol Agent<br>McAllen Sector<br>McAllen, Texas<br><br>108 E. Campeche<br>South Padre Island, Texas 78597 | Agent Rodriguez's partner; at scene of shootings in San Benito; gave statement to Texas Rangers |
| 88. | Douglas L. Spielman<br>U.S. Border Patrol Agent<br>McAllen Sector<br>McAllen, Texas | Supervisor; knowledge of shooting incident |
| 89. | Jerry Spruiell<br>U.S. Border Patrol Agent | Supervisor |
| | **Bureau of Alcohol, Tobacco and Firearms** | |
| 90. | Tony Vargas<br>Agent | Executed gun trace on AR-15 used by Moore in San Benito; told Ranger Jaramillo that the AR-15 was registered to Dr. Thomas Pirtle and the AK-47 was registered to HPD Captain Vasquez |
| 91. | Danny Carpenter<br>Agent | In charge of gun trace on AR-15 and AK-47 used by Moore in shootings |
| | **Harlingen City Officials** | |
| | | |

18

| 92. | Brendan Hall | City Attorney at the time of the shootings |
|---|---|---|
| 93. | Marvin Hendrix | Current Harlingen Risk Manager |
| 94. | Nat Lopez | City Commissioner at the time of the shootings; Joe Rubio talked to him after the shootings about a possible cover-up by HPD; at a public budget workshop, he asked Prim for a formal inquiry into the shootings |
| 95. | Cesar Maldanado | Chairman of the Harlingen Civil Service Commission at the time of the shootings; Jose Rubio talked to him after the shootings about a possible cover-up by HPD |
| 96. | Rick Rodriguez | City Commissioner at the time of the shootings; Joe Rubio talked to him after the shootings about a possible cover-up by HPD |
| 97. | Roy Rodriguez | Current City Manager for Harlingen |
| | **OTHERS** | |
| 98. | Harry Butters, M.D. Valley Baptist Medical Center Harlingen, Texas | Radiologist who treated Raul Rodriguez |
| 99. | Mr. & Mrs. Carlson 360 East Hwy. 77, Ste. 1 San Benito, Texas 78586-5214 | Neighbors of R.D. Moore |
| 100. | Dr. Bliss W. Clark 1601 Treasure Hills Blvd. Harlingen, Texas 78550 | Surgeon who operated on Raul Rodriguez on 7-7-98 |
| 101. | Armando Corea | Knowledge of Ernest Moore |
| 102. | Margie W. Cornwell, M.D. Valley Baptist Medical Center Harlingen, Texas | Performed autopsy on Ernest Moore |

| 103. | Lawrence J. Dahm, M.D.<br>Valley Baptist Medical Center<br>Harlingen, Texas | |
|------|------------------------------------------------------------------------------|---|
| 104. | Dr. DeWitt S. Davenport<br>Pathology<br>P.O. Drawer 2588<br>Harlingen, TX 78551 | Performed autopsies on Ricardo Salinas and Susan L. Rodriguez |
| 105. | Yolanda de Leon | Cameron County District Attorney |
| 106. | Juan Delgado<br>Valley Baptist Medical Center<br>Harlingen, Texas | Security guard present during Dan Morin's statement to Texas Rangers |
| 107. | Wm. Eddy, HT, CT<br>Valley Baptist Medical Center<br>Harlingen, Texas | |
| 108. | Charles Fisher, M.D.<br>Valley Baptist Medical Center<br>Harlingen, Texas | Radiologist who treated Raul Rodriguez |
| 109. | Dr. Laurie Fitzgerald<br>Colorado | Prepared report on HPD in 1996 |
| 110. | Waite W. Goad<br>775 E. Hudson Rd<br>San Benito, Texas | Owner of the cornfield across the road from R.D. Moore's house where Ernest Moore was hiding; he combined the cornfield the day after the shootings in San Benito; stated that R.D. Moore did not ask him to combine the field; gave statement to Texas Rangers |
| 111. | Sallie Gonzalez<br>Justice of the Peace Pct. 5-1<br>608 E. Harrison<br>Harlingen, Texas | Pronounced Agent Salinas dead at the scene |
| 112. | Bill Hagen | Cameron County District Attorney |
| 113. | Dr. Christopher Hansen<br>2121 Pease<br>Harlingen, Texas 78550 | Surgeon who operated on Raul Rodriguez on 7-7-98 |

20

| 114. | Dr. Marion Lawler, Jr.<br>2310 N. Ed Carey Drive<br>Harlingen, Texas 78550 | Treating physician of Raul Rodriguez; operated on him on 7-7-98 |
|---|---|---|
| 115. | Melody Matlock<br>Harlingen EMS<br>1705 Vermont<br>Harlingen, Texas 78550 | Harlingen EMS dispatcher; knowledge of shooting incident |
| 116. | Marcos Antonio Medina<br>Rt. 1, Box 50<br>San Benito, Texas 78586 | Knowledge of Ernest Moore; passed polygraph test |
| 117. | Larry Dewayne Moore | Ernest Moore's brother; spoke to Ernest the night before the shootings and gave him a phone number; gave statement to Texas Rangers |
| 118. | James Moran | Friend of Gilbert Rodriguez |
| 119. | Ted Picacio<br>Valley Baptist Medical Center<br>Harlingen, Texas | Assisted on autopsy of Ernest Moore, Susan Rodriguez and Ricardo Salinas |
| 120. | Dr. Thomas Emmett Pirtle III<br>2609 Lotus<br>Harlingen, Texas | The registered owner of the AR-15 that Ernest Moore used in the shootings in San Benito |
| 121. | Robert Wayne Reed<br>Rt. 8 Box 777<br>Harlingen, Texas | Employee with Ernest Moore at Ballenger Construction Co.; Ernest Moore was at his house the night before the shootings; passed polygraph test; gave made statement to Texas Rangers |
| 122. | Rufino Rodriguez<br>Rio Hondo Police Department | Lieutenant on Rio Hondo PD; at scene of shooting in Rio Hondo |
| 123. | Paula Sharkely, M.D.<br>Valley Baptist Medical Center<br>Harlingen, Texas | Radiologist who treated Raul Rodriguez |
| 124. | George E. Skye, II, M.D.<br>Valley Baptist Medical Center<br>Harlingen, Texas | Radiologist who treated Raul Rodriguez |

21

| 125. | David Reynerio (Rey) Sosa<br>7201 N. 33rd St.<br>McAllen, Texas | Ernest Moore's friend and Julie Cox's ex-boyfriend (before Moore); had not seen Moore for over a year; passed polygraph test; gave statement to Texas Rangers |
|------|------|------|
| 126. | Jason Louis Wallence<br>902 S. Loop Apt. #E7<br>Harlingen, Texas | Employee at Valley Baptist Medical Center, where autopsy was perfomed; met Ernest Moore the night before the shootings; passed polygraph test; gave statement to Texas Rangers |
| | **Witnesses to Shooting in Rio Hondo** | |
| 127. | Johnny Avila | Jennifer Gwin's young nephew; was present in house at time of shootings in Rio Hondo |
| 128. | Fidencio Jaramillo (at time of shootings)<br>311 Catherine Street<br>Rio Hondo, Texas | Margarita Flores' husband; was present in house at time of shootings in Rio Hondo, but did not witness them; gave statement to Texas Rangers |
| 129. | Michael Daniel Martinez | Friend of Donald and William Morin; witnessed shootings in Rio Hondo; wrestled AK-47 away from Ernest Moore; gave statement to Texas Rangers |
| 130. | Dan Morin (at time of injury)<br>311 Catherine Street<br>Rio Hondo, Texas | Critically injured by Ernest Moore; was dating Julie Cox, Moore's ex-girlfriend, at the time of the shooting; gave statement to Texas Rangers |
| 131. | Donald Morin (at time of shootings)<br>311 Catherine Street<br>Rio Hondo, Texas | Witnessed shootings in Rio Hondo; wrestled AK-47 away from Ernest Moore; gave statement to Texas Rangers |
| 132. | Stephen | Jennifer Gwin's young nephew; was present in house at time of shootings in Rio Hondo |
| | **Reporters** | |

CVAPDF - www.texio.com

| 133. | Jerry Deal | Editor, Valley Morning Star |
| --- | --- | --- |
| 134. | Laura B. Martinez | Valley Morning Star, reporter (no longer at VMS) |
| 135. | Mary Moreno | Valley Morning Star, reporter |
| 136. | Gina Perales | Valley Morning Star, reporter |
| 137. | Margarita Gonzales | Valley Morning Star, reporter |
| 138. | Fernando Del Valle | Valley Morning Star, reporter |
| 139. | Maria Hughes | Valley Morning Star, reporter |
| 140. | Rickey Dailey | Valley Morning Star, Arnold Rodriguez story |
| | **Plaintiffs' Experts** | |
| 141. | Paul Ginsberg<br>Professional Audio Laboratories, Inc.<br>7 Skylark Dr.<br>Spring Valley, N.Y. 10977 | Audio tape expert |
| 142. | Robert Rodriguez<br>13850 Magnolia Way<br>Helotes, TX 78023 | ATF - Gun Expert |

| 143. | Maricela Rodriguez | Ex-wife of Raul Rodriguez |
| --- | --- | --- |
| 144. | Sue Scheopner | Wife of Jim Scheopner |
| 145. | Lea Cruz Chavez<br>118-B Huisache Street<br>Los Fresnos, Texas | Caretaker of R.D. Moore's Mother |
| 146. | Allan Gail Todd<br>905 East Tyler<br>Harlingen, Texas | Sister of R.D. Moore |

23

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | JURY DEMANDED |
| | { | |
| and | { | |
| | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |
| | { | |
| and | { | |
| | { | |
| RAUL RODRIGUEZ | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |

---

## DEFENDANT'S WITNESS LIST

---

| | Name | Brief Statement of Nature of Testimony |
|---|---|---|
| | | |
| 1. | Captain Joseph Vasquez<br>1306 High St.<br>Harlingen, Texas  78550 | Assignment and handling of the subject AR-15 and opinions concerning Ernest's use of privately owned rifles |
| 2. | Ronald K. Saenz<br>Personnel & Safety Risk Office<br>964 E. Harrison<br>Brownsville, Texas  78520 | Shooting incident |

|  | Name | Brief Statement of Nature of Testimony |
|---|---|---|
| 3. | George A. Hupp<br>Tucson INS Investigations<br>P. O. Box 17221<br>Tucson, AZ  85731 | Shooting incident |
| 4. | Javier Reyna<br>Cameron County Sheriff's<br>Department<br>954 E. Harrison<br>Brownsville, Texas  78520 | Shooting incident and follow up investigation |
| 5. | Rodolfo C. Jaramillo<br>Texas Department of Public<br>Safety<br>1630 N. 77 Sunshine Strip<br>Harlingen, Texas  78550 | Shooting incident and follow up investigation |
| 6. | Dr. DeWitt Davenport<br>Pathology<br>P. O. Drawer 2588<br>Harlingen, Texas  78551 | Autopsies of Susan Rodriguez and Ricardo Salinas |
| 7. | Dr. Marion Lawler, Jr.<br>2310 N. Ed Carey Drive<br>Harlingen, Texas  78550 | Medical opinions on Raul Rodriguez |
| 8. | Michael James Riley<br>U.S. Border Patrol Agent<br>McAllen Sector<br>McAllen, Texas  78501 | Shooting incident |
| 9. | Orlando Sanchez<br>U.S. Border Patrol Agent<br>McAllen Sector<br>McAllen, Texas  78501 | Shooting incident |
| 10. | Kris Ledezma<br>Dispatcher<br>Cameron County Sheriff<br>Department<br>954 E. Harrison<br>Brownsville, Texas  78520 | Shooting incident |
| 11. | Melody Matlock<br>Harlingen EMS<br>1705 Vermont<br>Harlingen, Texas  78550 | Shooting incident |

| | Name | Brief Statement of Nature of Testimony |
|---|---|---|
| | | |
| 12. | R.D. Moore<br>City Harlingen Police Department<br>1102 S. Commerce St.<br>Harlingen, Texas  78550 | Relationship with Ernest Moore, assignment and possession of HPD AR-15, shooting incident and follow up activities |
| 13. | Patsy Moore<br>1604 Preston Trail<br>Harlingen, Texas  78552 | Personal relationship with Ernest Moore and shooting incident |
| 14. | James Joseph Scheopner<br>City Harlingen Police Department<br>1102 S. Commerce St.<br>Harlingen, Texas  78550 | Assignment and handling of the subject AR-15, activities on July 7, 1998, follow up investigation and activities |
| 15. | Miguel Garcia<br>City Harlingen Police Department<br>1102 S. Commerce St.<br>Harlingen, Texas  78550 | Shooting incident |
| 16. | Natalie Flores Prim<br>410 Tanglewood Drive<br>Pensacola, FL  32503 | Follow up investigation and action |
| 17. | Joe LaBeau<br>City Hall of Midlothian<br>104 West Avenue E.<br>Midlohian, Texas  76065 | Follow up investigation and action |
| 18. | Robert Rodriguez<br>Cameron County Sheriff's Department<br>954 E. Harrison<br>Brownsville, Texas  78520 | Deputy Cameron County Sheriff's Department shooting incident |
| 18. | Gale Lynn Jones<br>City Harlingen Police Department<br>1102 S. Commerce St.<br>Harlingen, Texas  78550 | Dispatch procedures for reuse of master tapes |
| 19. | Antonio Medina<br>Rt. 1, Box 50<br>San Benito, Texas  78586 | Personal friend of Ernest Moore |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL. | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS. | § | |

## PLAINTIFFS' PROPOSED VOIR DIRE QUESTIONS

1.    Have you or a close family member been employed by the city of Harligen or any other city government?  If so, in what capacity and for whom?

2.    Does your employment involve close dealings with Harligen City Officials (such as business sales to the city or contracts to provide services)?  If so, please describe those dealings and whether or not such ties would make it difficult for you to serve as a fair juror in this case.

3.    Do you or a close family member have any work experience in law enforcement?  If so, what is that experience?

4.    Have you or a close family member been employed in a job where you handled or adjusted claims?  If so what was that employment?

5.    Do you keep any guns in your home?  If so, what type and how are they stored?

**Attachment**
**— E**

6.     Are you or a close family member licensed to sell guns, or have you or a close family member worked at a job where guns were sold?  If so, describe that operation (trade shows, sporting goods store, etc.).

7.     Have you or a close family member received training in handling weapons or marksmanship?  If so, what type of training have you received?

8.     Do you or a close family member own or possess any assault-type rifles, such as an AK-47 or an AR-15?  If so, how long have you owned the gun or guns; how are they stored; and what type of training have you had in their use?

9.     Have you or a close family member been wounded or injured in a shooting incident?  If so, please describe the incident briefly.  Will you be able to set aside your personal experience, which may or may not have resulted in a lawsuit upon which you made a recovery, and judge the facts of this case as they are presented at trial?  Will you hold it against the Plaintiffs in this case because they seek compensation from an event similar to one in which you were involved in a suit and may not have been compensated?

10.     Are you now or have you ever been a member of the National Rifle Association?  If you were a member but are no longer a member, why not?

11.     Have you ever read *The Turner Diaries* by Andrew MacDonald?

12.     Are you a collector of World War II memorabilia?  If so, what types of things do you collect?  Specifically, do you collect Nazi memorabilia?

13.     Have you or a close family member ever been a party to a lawsuit?  If so, please describe whether you were the Plaintiff (the person bringing the suit) or the Defendant (the person being sued) and the nature of the case.

14.     Have you ever served on a jury?  If so, was it a criminal or civil jury; did you serve as foreperson of the jury; and did you reach a verdict?

15.     The law provides that, if the Plaintiffs prove their case, they are entitled to have the jury assess damages for such intangible items as mental anguish and loss of companionship.  Do you have a strongly held belief that would prevent you from awarding substantial money damages, if proved, for such intangible elements?  If so, please describe that belief or conviction.

16.     There has been a great deal of press coverage about the events that give rise to this lawsuit.  There has been some discussion in the community about those events as well.  Will you be able to set aside what you have read or heard and base your verdict on the evidence that is presented in this trial?

17.     If you live in the City of Harligen, can you assess money damages in this case if proven without regard to concern as to how those damages would be paid?  There has been media coverage about the applicable insurance coverage available to the City of Harligen for this

CUUPDF - www.fenrir.com

incident. If you have seen such reports, will you be able to set aside such information and base your verdict on the evidence presented in this trial?

18.    Are you, or any member of your immediate family a member of Citizens Against Lawsuit Abuse?

19.    Plaintiffs are seeking substantial money damages in this wrongful death action. Do you have strongly held personal beliefs that would prevent you from awarding an amount of money, however great the amount as determined by the evidence, in cases based on the wrongful death of a family member?

20.    There are many witnesses that may potentially be called to testify in this case. Please listen to the following list of potential witnesses, stand if you recognize a name with whom you are well acquainted, and after I finish the list I'll ask each one of you if there is something about that relationship that would cause you to have a leaning, one way or the other, in considering the testimony in this case:

| | |
|---|---|
| Gilberto M. Rodriguez | (Husband of Susan Rodriguez) |
| Arturo Guillermo Salinas | (Father of Ricardo Salinas) |
| Robyn S. Williams | (Mother of Susan Rodriguez) |
| Stephen L. Williams | (Father of Susan Rodriguez) |
| Arnold Rodriguez | (Former Human Resources Director for the City of Harlingen) |
| Raul Rodriguez | (Cameron County Sheriff's Deputy) |
| Jim Schoepner | (Harlingen Chief of Police at the time of the shooting) |
| R.D. Moore | (Harlingen police officer & father of Ernest Moore) |
| Gilbert Briones | (Cameron County Sheriff's Deputy) |
| Samuel Motemayor | (Cameron County Sheriff's Deputy) |
| Leroy Rincones | (Cameron County Sheriff's Deputy) |
| Robert Rodriguez | (Cameron County Sheriff's Deputy) |
| Robert Rodriguez | (Cameron County Sheriff's Investigator) |
| Ronald K. Saenz | (Sergeant Cameron County Sheriff's Department) |
| Rodolfo C. Jaramillo | (Texas Ranger) |
| Israel Pacheco | (Texas Ranger) |
| Shawn Foist | (Sergeant Harlingen Police Department) |
| Victor Rodriguez | (Chief of Police Harlingen Police Department) |
| Jose Rubio | (Former detective Harlingen Police Department) |
| Luciano Rubio | (Captain Harlingen Police Department) |
| Roberto Silva | (Secretary of the Harlingen Police Officers Association) |
| Joseph Vasquez | (Captain Harlingen Police Department) |
| John C. Brinning | (U.S. Border Patrol Agent) |
| George A. Hupp | (U.S. Border Patrol Agent) |
| Michael James Riley | (U.S. Border Patrol Agent) |
| Orlando Sanchez | (U.S. Border Patrol Agent) |
| Joseph LaBeau | (Former Harlingen Assistant City Manager) |
| Doel Nicholas Anders | (Friend and co-worker of Ernest Moore) |
| Rudy Cavazos | (Friend of Ernest Moore) |
| Sylvia Pirtle | (Original owner of the AR-15) |

| | |
|---|---|
| James Robenson | (Floresville management auditor) |
| Victor Rodriguez | (Former Harlingen Police Chief) |
| Daniel Winn | (Friend of Ernest Moore) |
| Julie Lynn Cox | (Ex-girlfriend of Ernest Moore) |
| Mrs. Prather | (Witnessed two men get into Ernest Moore's pick-up) |
| William Arthur Morin | (Witnessed shootings in Rio Hondo) |
| George Kirkham | (Plaintiffs' Expert witness on Police procedure) |
| Dr. Phyllis Silverman | (Plaintiffs' Expert witness on Death and Bereavement) |

21.     The parties are represented by counsel.  The families of the slain Border Patrol Agents are represented by Broadus Spivey, Price Ainsworth and Francis Pan of the firm Spivey & Ainsworth, P.C. in Austin and Richard Pena who has offices here and in Austin.  The Defendant City of Harligen is represented by Tom Lockhart of the firm Adams & Graham, L.L.P. in Harligen.  Do you know any of these lawyers, and is there anything about that relationship that would make it difficult for you to serve as a juror in this case?

22.     Is there anything in past dealing with Border Patrol Agents that would cause you to have a leaning, one way or the other, as we begin this case that involves the families of slain Border Patrol Agents?  If so, please describe that dealing with Border Patrol Agents.

23.      Have you received any training in law or medicine?  If so, please describe such training.

24.  You are not to base your verdict on sympathy.  This means that your verdict must not be based on sympathy for the victims or for the entities that may have to respond in money damages.  Can you follow the law without concern for sympathy for the victims or in considering who will have to pay damages, however substantial the amount of the verdict?

25.     Is there anything that you are aware of that might affect your serving as a fair juror in this case?

26.     The parties are represented by counsel.  The injured Cameron County Sheriff's Deputy is represented by Ramon Garcia and Sonia Lopez of the Laws Office of Ramon Garcia, P.C. in Edinburg.  Do you know any of these lawyers, and is there anything about that relationship that would make it difficult for you to serve as a juror in this case?

27.     Do you have any problems or concerns finding liability against a city for acts of its agent and/or employees?

28.      Would you have any problems finding that a police officer could have aided and abetted in the commission of a homicide?

**3163 Trial NTBK Voir Dire Questions**

CAMPDF - www.fevisa.com

Case 1:98-cv-00162   Document 117   Filed in TXSD on 07/18/2001   Page 83 of 149

Respectfully submitted,

SPIVEY & AINSWORTH, P.C.
48 EAST AVENUE
AUSTIN, TEXAS 78701
512/474-6061
512/474-1605  fax


By_____

Broadus Spivey
State Bar No.18955000
Price Ainsworth
State Bar No. 00950300

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the above and foregoing document was forwarded on July __18th__, 2001, to all counsel of record and interested parties via Certified mail return receipt requested:

Mr. Tom Lockhart
Mr. Jim Denison
Mr. Roger W. Hughes
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429
ATTORNEYS FOR DEFENDANT


_____

Price Ainsworth


3163 Trial NTBK Voir Dire Questions

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | JURY DEMANDED |
| | { | |
| and | { | |
| | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |
| | { | |
| and | { | |
| | { | |
| RAUL RODRIGUEZ | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |

---

## DEFENDANT'S PROPOSED VOIR DIRE QUESTIONS TO THE JURY PANEL

---

1.  Is there any member of the jury panel who knows the Plaintiffs:

    a.  Arturo Guillermo Salinas;
    b.  Elisa Hernandez Herrera Salinas;
    c.  Gilberto M. Rodriguez, Individually and on behalf his Minor Daughter, Megan Suzanne Rodriguez;
    d.  Robyn S. Williams;
    e.  Stephen L. Williams; and
    f.  Raul Rodriguez.

2.  Plaintiffs will call a number of witnesses in this case. I will read to you the names of those witnesses. If you know any of the them, please raise your hands. (Read the names.)

**Attachment**
**— F**

3.      Please describe the nature of your knowledge of these witnesses.  Do you feel that because you know these people that you would tend to believe them, rather than someone else?

4.      The parties are represented by counsel.  The families of the slain Border Patrol Agents are represented by Broadus Spivey, Price Ainsworth and Francis Pan of the firm of Spivey & Ainsworth, P.C. in Austin and Richard Pena who has offices here and in Austin.  The Defendant City of Harlingen is represented by Tom Lockhart and Roger W. Hughes of the firm Adams & Graham, L.L.P. in Harlingen.  Do you know any of these lawyers, and is there anything about that relationship that would make it difficult for you to serve as a juror in this case?

5.      Is there anything in past dealing with Border Patrol Agents that would cause you to have a leaning, one way or the other, as we begin this case that involves the families of slain Border Patrol Agents?  If so, please describe that dealing with Border Patrol Agents.

6.      Is there any member of the jury panel who knows or is related to anyone who works for the Border Patrol or Cameron County Sheriff's Department?

7.      Has anyone ever served as a juror or witness in a case?  If so:

        a.      What was the nature of the case?

        b.      What Court?

        c.      Was the verdict for the Plaintiff or Defendant?

        d.      Is there anything about that case that would influence you in this case?

8.      Has anyone on the jury panel or a family member or close friend filed a personal injury or wrongful death case?

9.      Have any of you, a member of your family or close friend ever filed a lawsuit against a federal, state or local government agency?

10. Have any of you, or a member of your family or close friend ever been shot with a gun?

11. Is there any member of the jury panel who has a reservation or concern about holding the Plaintiffs to their burden of proof in this lawsuit?

12. Does anyone here have any negative feelings towards the City of Harlingen for whatever reason that may affect your attitude towards the Defendant in this case?

13. Is there any member of the jury panel who would be likely to decide this case on the basis of sympathy for the families of the deceased Border Patrol Agents or injured Raul Rodriguez, rather than on the basis of a fair and objective evaluation of all the evidence?

14. The Court will instruct you concerning the nature of Plaintiffs' claims and the law which governs these claims. It might be that the Court's instructions on the law regarding these claims and any rights which Plaintiffs may have will differ from your views. In such a circumstance, is there anyone on the jury panel who cannot follow the Court's instructions?

15. Has anyone formed or expressed an opinion that the Plaintiffs in this case should recover from Defendant City of Harlingen.

16. Does any member of the jury panel feel that just because a lawsuit is filed and goes to trial, that Plaintiffs are entitled to win or that Plaintiffs' claims have some merit?

17. Is there any member of the jury panel that feels the City of Harlingen should not have the right to have a jury decide this case?

18. Does any member of the jury panel have any knowledge of this case other than what you have heard in the Courtroom? If so, please describe the source of your knowledge.

19. How many of you have subscribed to the Valley Morning Star since July 7, 1998 - please raise your hands.

20.     How many of you have read any articles in the Valley Morning Star about this shooting or litigation - please raise your hands.

21.     How many of you have read or heard anything about this shooting or this litigation on the t.v., radio or newspaper - please raise your hands.

22.     Is there anyone here, that because of media coverage feels they cannot be fair and impartial to the parties and decide this case only on the facts admitted during the trial and instructions by this Court?

23.     Is there anyone here, that because of media coverage of the shooting or litigation, is leaning towards one side or the other or is predisposed to the position of one side or the other of this lawsuit?

24.     Based upon what you know about this case so far, is there anything in your background or experience that would affect your ability to be impartial in this case?

## INDIVIDUAL VOIR DIRE QUESTIONS OUTSIDE THE PRESENCE
## OF THE REMAINDER OF THE PANEL

25.     What have you read or heard?

26.     How does this affect your attitude towards the trial?

Respectfully submitted,

By: _____

Tom Lockhart
Admissions ID No. 2257
Texas State Bar No. 12473500
Roger W. Hughes
Admissions ID No. 5950
Texas State Bar No. 10229500
**ADAMS & GRAHAM, L.L.P.**
P. O. Drawer 1429
Harlingen, Texas  78551-1429
956/428-7495; FAX: 956/428-2954

Attorney-in-Charge for Defendant,
CITY OF HARLINGEN

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document

was forwarded on this 18th day of July, 2001, to the following counsel of record and interested

parties:

Attorneys-in-Charge for Plaintiffs, GILBERTO M. RODRIGUEZ, et al and
ARTURO GUILLERMO SALINAS, et al:

Mr. Broadus A. Spivey
**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, Texas  78701-4320

Attorney-in-Charge for Plaintiff, RAUL RODRIGUEZ:

Ms. Sonia Lopez
**LAW OFFICES OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, Texas  78539

_____
TOM LOCKHART

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL. | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS. | § | |

**PROPOSED COURT'S CHARGE TO THE JURY**

MEMBERS OF THE JURY:

You have heard the evidence in this case.  I will now instruct you in the law that you must apply.  It is your duty to follow the law as I give it to you.  On the other hand, that you the jury are the judges of the fact.  Do not consider any statement that I have made in the course of the trial or make in these instructions as an indication that I have any opinion about the facts of this case.  Statements and arguments of the attorneys are not evidence and are not instructions on the law.  They are intended only to assist the jury in understanding the evidence and the parties' contentions.

**Attachment**
**G**

Answer each question from the facts as you find them.  Do not decide who you think should win and then answer the questions accordingly.  Your answers and your verdict must be unanimous.  You must answer all questions from a preponderance of the evidence.  By this is meant the greater weight and degree of credible evidence before you.  In other words, a preponderance of the evidence just means the amount of evidence that persuades you that a claim is more likely so than not so.  In determining whether any fact has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them.

In determining the weight to give the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remember it, because, as you all know, people forget some things or remember other things inaccurately.  So, if a witness has made a misstatement, you need to consider whether the misstatement was intentional falsehood or simply an innocent lapse of memory; and the significance of that misstatement may depend on whether it has to do with an important fact or with only an unimportant detail.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified

2

in the light of common experience.  In other words, you may make deductions and reach

conlusions that reason and common sense lead you draw from the facts that have been

established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any fact, even if a

greater number of witnesses may have testified to the contrary, if after considering all the

other eviednce you believe that single witness.

There are two types of evidence that you may consider in properly finding the

truth as to the facts in the case.  One is diret evidence -- for instance, the testimony of an

eyewitness.  The other is indirect or circumstantial evidence, meaning the proof of a

chain of circumstances that indicates the existence or nonexistence of certain other facts.

As a general rule, the law makes no distinction between direct and circumstantial

evidence, but simply requires you find the facts from preponderance of all the evidence,

both direct and circumstantial.

When knowledge of technical subject matter may be helpful to the jury, a person

who has a special training or experience in the techinical field -- he or she is generally

referred to as an expert witness -- is permitted to state his opinions on those technical

matters.  However, you are under no obligation to accept that opinion.  As with any other

witness, it is up to you to decide whether to rely upon it.

In deciding whether to accept or rely upon the opinion of an expert witness, you

may consider any bias of the witness, including any bias you may infer from evidence

that the expert witness has been or will be paid for reviewing the case and testifying, or

from the evidence that he testifies regularly as an expert witness and his income from

such testimony represents a significant portion of his income.

3

Additionally, do not assume from anything I may have done or said during the trials that I have any opinion concerning any of the issues in this case. Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts. [1]

The Plaintiffs claim that the City of Harlingen, a municipality, is liable for certain alleged constitutional deprivations, including violations of the Plaintiffs' substantive due process rights via a "state created danger." A city is liable for the deprivation of a constitutional right if the deprivation was pursuant to governmental custom, policy, ordinance, regulation, or for a decision performed pursuant to a "custom" that has not been formally adopted by an appropriate decision make may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have force of law, or for a final policymaker who made policy or condoned creation of a custom by ratifying the unconstitutional or illegal actions of subordinate officers or employees. Therefore, if you find that the Plaintiffs were injured as a the proximate or legal result of the City of Harlingen's policy, custom, ordinance, regulation or decision, as defined above, whether made by its lawmakers or by those officials whose edicts or acts may fairly be said to represent official policy, the City of Harlingen itself will be responsible.

The Plaintiffs claim the City of Harlingen violated their civil rights guaranteed by the Constitution. They claim the City of Harlingen violated their rights to procedural or substantive due process by causing the death of Susan Lynn Rodriguez and Ricardo Guillermo Salinas and serious injuries to Raul Rodriguez by arbitrarily abuseing its governmental power and that the City of Harlingen violated their rights to substantive due process through a "state created danger." Where the City knowingly place the law

---

[1]   Fifth Circuit Pattern Jury Instructions, Civil, (1999)

CamPDF - www.fasiko.com

enforcement officers in danger, or make them more vulnerable to it, the due process clause of the Constitution renders the City of Harlingen accountable for forseeable deaths and injuries from the City's conduct.  To establish the existence of a "state created danger," the Plaintiff must show (1) the environment created by the City was dangerous; (2) the City knew it was dangerous; and (3) the City used its authority to create an opportunity that would not otherwise have existed for the third party's crime to have occurred.[2]

The Plaintiffs also assert that the City of Harlingen is liable under the Texas Tort Claims Act for Chief Scheopner's and Detective Moore's negligent and wrongful use of the AR-15 rifle in the scope of their employment.  According to Texas law, the City is liable for personal injury and death so caused by the use of tangible personal property if the City would, were it a private person, be liable to Plaintiffs.[3]

A firearm is a deadly weapon per se under Tex. Penal Code §. 1.07(a)(11)(A) (Vernon 1974).  The City has a duty to properly store and safeguard such a highly dangerous instrumentality.  The City is charged with the responsibility for the safe use and storage of the AR-15 rifle in question where the control of the weapon has passed to another negligently.[4]

Negligence means that Chief Scheopner entrusted the AR-15 rifle to a person with no qualification in its use or storage and Detective Moore failed to properly store and safeguard the AR-15 rifle from being easily accessible to others.  The City is liable for

---

[2]    Patterned the Court's Charge to the Jury used in *Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001) because *Piotrowski* is a state-created danger case. *Randolph v. Cervantes*, 130 F.3d 727, 731 (5th Cir. 1997); *Johnson v. Dallas Independent School District*, 38 F.3d 198, 201 (5th Cir. 1994).

[3]    Tex. Civ. Prac. & Rem Code § 101.021(2)

[4]    *Kennedy v. Baird*, 682 S.W.2d 377, 378 (Tex. App. – El Paso 1984, no writ).

CUMPDF – www.tesla.com

the deaths of Agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas and the personal injury of Deputy Raul Rodriguez if such deaths and personal injury were proximately caused by the negligence of Chief Scheopner and Detective Moore acting within their scope of employment.

If the Plaintiffs have proven their claim against the Defendant by a preponderance of the evidence, you must determine the damages to which the Plaintiffs are entitled. You should not interpret the fact that I have given instructions about the Plaintiffs' damages as an indication in any way that I believe that the Plaintiff should, or should not, win this case. It is your task first to decide whether the Defendant is liable. I am instructing you on damages only so that you will have guidance in the event you decide that the Defendant is liable and that the Plaintiffs are entitled to recover money from the Defendant.

If you find that the Defendant is liable to the Plaintiffs, then you must determine an amount that is fair compensation for all of the Plaintiffs' damages. These damages are called compensatory damages. The purpose of compensatory damages is to make each of the Plaintiffs whole; that is, to compensate each of the Plaintiffs for the damage that the Plaintiff has suffered. Compensatory damages are not limited to expenses that the Plaintiffs may have incurred because of their injuries. If the Plaintiffs win, they are entitled to compensatory damages for physical injury, pain and suffering, mental anguish, shock and discomfort, lost earning capacity, medical expenses and loss of enjoyment of life that they have suffered because of the Defendant's conduct.

You may award compensatory damages only for injuries that the Plaintiffs prove were proximately caused by the Defendant's allegedly wrongful custom, policy, or

practice -- if they were indeed wrongful. The damages that you award must be fair compensation for all of the Plaintiffs' damages, no more and no less. Damages are not allowed as a punishment and cannot be imposed or increased to penalize the Defendant. You should not award compensatory damages for speculative injuries, but only for those injuries which the Plaintiffs have actually suffered or that the Plaintiffs are reasonably likely to suffer in the future.

If you decide to award compensatory damages, you should be guided by dispassionate common sense. Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork. On the other hand, the law does not require that the Plaintiffs prove the amount of their losses with mathematical precision, but only with as much certainty and accuracy as the circumstances permit.

You must use sound discretion in fixing an award of damages if you award damages drawing reasonable inferences where you find them appropriate from the facts and circumstances in evidence.

You should consider the following elements of damage, to the extent you find them proved by a preponderance of the evidence:

A.    Survivors' Damages:

   a.    Lost Support and Services

        The loss of Susan Lynn Rodriguez's support and services that the Plaintiff Gilberto M. Rodriguez has sustained and will sustain in the future because of Susan Lynn Rodriguez's death. You must determine the duration of any future loss by considering the joint life expectancy of Susan Lynn Rodriguez and Plaintiff Gilberto M. Rodriguez. Joint life expectancy means the number of years that both Susan Lynn Rodriguez and Plaintiff

7

Gilberto M. Rodriguez could have expected to be alive together, considering the ages and life expectancy of each at the time of Susan Lynn Rodriguez's death.

The loss of Susan Lynn Rodriguez's support and services that the Minor Plaintiff Megan Suzanne Rodriguez has sustained and will sustain in the future because of Susan Lynn Rodriguez's death. You must determine the duration of any future loss by considering the joint life expectancy of Susan Lynn Rodriguez and Minor Plaintiff Megan Suzanne Rodriguez. Joint life expectancy means the number of years that both Susan Lynn Rodriguez and Minor Plaintiff Megan Suzanne Rodriguez could have expected to be alive together, considering the ages and life expectancy of each at the time of Susan Lynn Rodriguez's death.

The loss of Susan Lynn Rodriguez's support and services that the Plaintiff Stephen L. Williams has sustained and will sustain in the future because of Susan Lynn Rodriguez's death. You must determine the duration of any future loss by considering the joint life expectancy of Susan Lynn Rodriguez and Plaintiff Stephen L. Williams. Joint life expectancy means the number of years that both Susan Lynn Rodriguez and Plaintiff Stephen L. Williams ould have expected to be alive together, considering the ages and life expectancy of each at the time of Susan Lynn Rodriguez's death.

The loss of Susan Lynn Rodriguez's support and services that the Plaintiff Robyn S. Williams has sustained and will sustain in the future because of Susan Lynn Rodriguez's death. You must determine the duration of any future loss by considering the joint life expectancy of Susan Lynn Rodriguez and Plaintiff Robyn S. Williams. Joint life expectancy means the number of years that both Susan Lynn Rodriguez and Plaintiff

Robyn S. Williams could have expected to be alive together, considering the ages and life expectancy of each at the time of Susan Lynn Rodriguez's death.

The loss of Ricardo Guillermo Salinas' support and services that the Plaintiff Arturo Guillermo Salinas, if any, sustained as a result of the death of has sustained and will sustain in the future because of Ricardo Guillermo Salinas' death. You must determine the duration of any future loss by considering the joint life expectancy of Ricardo Guillermo Salinas and Plaintiff Arturo Guillermo Salinas. Joint life expectancy means the number of years that both Ricardo Guillermo Salinas' and Plaintiff Arturo Guillermo Salinas could have expected to be alive together, considering the ages and life expectancy of each at the time of Ricardo Guillermo Salinas' death.

The loss of Ricardo Guillermo Salinas' support and services that the Plaintiff Elisa Hernandez Herrera, if any, sustained as a result of the death of has sustained and will sustain in the future because of Ricardo Guillermo Salinas' death. You must determine the duration of any future loss by considering the joint life expectancy of Ricardo Guillermo Salinas and Plaintiff Elisa Hernandez Herrera. Joint life expectancy means the number of years that both Ricardo Guillermo Salinas' and Plaintiff Elisa Hernandez Herrera could have expected to be alive together, considering the ages and life expectancy of each at the time of Ricardo Guillermo Salinas' death.

b.    Surviving Spouse

The Plaintiff Gilberto M. Rodriguez's loss of companionship and protection, and his mental pain and suffering that resulted from Susan Lynn Rodriguez's death. In determining the duration of these losses, you must consider the joint life expectancy of the decedent and the Plaintiff Gilberto M. Rodriguez.

9

c.    Surviving Minor Child

The loss of parental companionship, instruction, and guidance, and the mental pain and suffering Minor Plaintiff Megan Suzanne Rodriguez sustained because of Susan Lynn Rodriguez's death.  In determining the duration of these losses, you must consider the joint life expec tancy of the decedent and the surviving child.[5]

Under Texas state law, the survivors are entitled to loss of comapnionship and society, which means the loss of the positive benefits flowing from the love, confort, companionship, and society the survivors, in reasonable probability, would have received from deceased had they lived, and mental anguish, which means the emotional pain, torment, and suffering experience by the survivors because of the death of deceased.[6]

B.    Estate Damages:

a.    Lost accumulations

The estate's loss of net accumulations, that is, that part of the decedent's net income from salary after taxes, including pension benefits that the decedent, after paying personal expenses and monies for the support of the decedent's survivors, would have remaining as part of the estate if the decedent had lived his normal life expectancy.

If you find for the Plaintiffs, she is entitled to recover an amount that will fairly compensate them for any damage they have suffered to date.[7]

If you find that the Plaintiffs are reasonably certain to suffer damages in the future from her injuries, then you should award them the amount that you believe would fairly compensate them for such future damages.

---

[5]    Fifth Circuit Pattern Jury Instructions, Civil, (1999) at 196-197.
[6]    PJC 9.2, 9.3, and 9.5 of Texas Pattern Jury Charges, General Negligence (2000).
[7]    Fifth Circuit Pattern Jury Instructions, Civil, (1999) at 195.

An award for future damages necessarily requires that payment be made now for a loss that the Plaintiffs will not actually suffer until some future date.  If you should find that the Plaintiffs are entitled to future damages, including future earnings, then you must determine the present worth in dollars of such future damages.

If you award damages for loss of future earnings, you must consider two particular factors:

1.      You should reduce any award by the amount of expenses that the Plaintiffs would have incurred in making those earnings.

2.      If you make an award for future loss of earnings, you must reduce it to present value by considering the interest that the Plaintiffs could earn on the amount of the award if they made a relatively risk-free investment.  The reason why you must make this reduction is because an award of an amount representing future loss of earnings is more valauble to the Plaintiffs if they receive it today than if they received it in the futurem when they would have otherwise earn it.  It is more valuable because the Plaintiffs can earn interest on it for the period of time in between the date of the award and the date they would have earned the money.  Thus you should adjust the amount of any award for future loss of earnings by the amount of interest that the Plaintiffs can earn on the amount in the future.

You must not make any adjustment to present value for any damages you may award for future pain and suffering or future mental anguish.

It is your sworn duty as jurors to discuss the case with one another in an effort to reach  agreement if you can do so.  Each of you must decide the case for yourself, but

11

only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced you are wrong. However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

Remember that in a very real way you are the judges -- the judges of facts. Your only interest is to seek the truth from the evidence in the case.

When you retire to the jury room to deliberate, you may take with you this charge and the exhibits that the Court has admitted into evidence. Select your Foreperson and conduct your deliberations. If you recess during your deliberations, follow all of the instructions that I have given you concerning your conduct during the trial. After you have reached your unanimous verdict, your Foreperson must fill in your answers to the written questions and sign and date the verdict form. Use one of the jury note forms to advise the Marshal that you have reached a verdict. You must never disclose to anyone, not even to me, your numerical division on any question.

If you want to communicate with me at any time, please give a written message to the Marshal, who will bring it to me. I will then respond as promptly as possible either in writing or by meeting with you in the courtroom. I will always first show the attorneys your question and my response before I answer your question.

You may now retire to the jury room to conduct your deliberations.[8]

---

[8]    Fifth Circuit Pattern Jury Instructions, Civil, (1999);

12

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL. | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all |
| purposes) | | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial |
| matters) | | |
| CITY OF HARLINGEN, TEXAS. | § | |

## **INTERROGATORIES**

13

**INTERROGATORY NO. 1**[9]

Do you find from a preponderance of the evidence that, as a result of a custom, policy or practice, the Defendant, violated the civil rights of Susan Lynn Rodriguez, Ricardo Guillermo Salinas, and Raul Rodriguez by creating a "state created danger," which resulted in the deaths of Susan Lynn Rodriguez, Ricardo Guillermo Salinas and serious injuries to Raul Rodriguez?

ANSWER "YES" OR "NO"

ANSWER: _____

---

[9]    Patterned the Court's Interrogatories used in *Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001) because *Piotrowski* is a state-created danger case

**INTERROGATORY NO. 2[10]**

Do you find from a preponderance of the evidence that Defendant's negligence proximately caused the death of Susan Lynn Rodriguez and Ricardo Guillermo Salinas, and injury to Rual Rodriguez?

ANSWER "YES" OR "NO"

ANSWER: _____

---

[10]   PJC 7.12 of Texas Pattern Jury Charges (2000).

IF YOU HAVE ANSWERED "YES" TO INTERROGATORY 1 OR INTERROGATORY 2, THEN ANSWER THE FOLLOWING INTERROGATORIES; OTHERWISE, SIGN AND DATE THE VERDICT FORM BELOW.

**INTERROGATORY NO. 3[11]**

What sum of money, if any, if paid now in cash by this Defendant, do you find would fairly and reasonably compensate Gilberto M. Rodriguez for the damages, if any, sustained as a result of the death of Susan Lynn Rodriguez?

Answer in dollars and cents or "none" for each of the following:

1.    Lost Support and Services

     Past       ANSWER:_____

     Future    ANSWER:_____

2.    Loss of companionship and Protection

     Past       ANSWER:_____

     Future    ANSWER:_____

3.    Mental Pain and Sufferinganguish

     Past       ANSWER:_____

     Future    ANSWER:_____

4.    Funeral Expenses

     ANSWER:_____

---

[11]    All the damages questions are patterned the Court's Interrogatories used in *Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001) because *Piotrowski* is a state-created danger case in accordance with damage instructions set forth in pages 195-197 of Fifth Circuit Pattern Jury Instructions, Civil, (1999) and PJC 9.2, 9.3, and 9.5 of Texas Pattern Jury Charges, General Negligence (2000).

16

CltePDF - www.havinc.com

**INTERROGATORY NO. 4**

What sum of money, if any, if paid now in cash by this Defendant, do you find would fairly and reasonably compensate Megan Suzanne Rodriguez for the damages, if any, sustained as a result of the death of Susan Lynn Rodriguez?

Answer in dollars and cents or "none" for each of the following:

1.  Lost Support and Services

    Past        ANSWER:_____

    Future      ANSWER:_____

2.  Loss of Parental companionship, instruction, and and guidance

    Past        ANSWER:_____

    Future      ANSWER:_____

3.  Mental Pain and Suffering

    Past        ANSWER:_____

    Future      ANSWER:_____

**INTERROGATORY NO. 5**

What sum of money, if any, if paid now in cash by this Defendant, do you find would fairly and reasonably compensate Stephen L. Williams and Robyn S. Williams for the damages, if any, sustained as a result of the death of Susan Lynn Rodriguez?

Answer in dollars and cents or "none" for each of the following:

1.  Lost Support and Services

    Past        ANSWER:_____

    Future      ANSWER:_____

2.  Loss of Companionship and Society

    Past        ANSWER:_____

    Future      ANSWER:_____

3.  Mental Anguish

    Past        ANSWER:_____

    Future      ANSWER:_____

**INTERROGATORY NO. 6**

What sum of money, if any, if paid now in cash by this Defendant, do you find would fairly and reasonably compensate Arturo Guillermo Salinas and Elisa Hernandez Herrera for the damages, if any, sustained as a result of the death of Ricardo Guillermo Salinas?

Answer in dollars and cents or "none" for each of the following:

1.    Lost Support and Services

        Past        ANSWER:_____

        Future     ANSWER:_____

2.    Loss of Companionship and Society

        Past        ANSWER:_____

        Future     ANSWER:_____

3.    Mental Anguish

        Past        ANSWER:_____

        Future     ANSWER:_____

19

**INTERROGATORY NO. 7**

What sum of money, if any, if paid now in cash by this Defendant, do you find would fairly and reasonably compensate Raul Rodriguez for the damages, if any, sustained as a result of Defendant's conduct?

Answer in dollars and cents or "none" for each of the following:

1.   Physical pain

      Past         ANSWER:_____

      Future     ANSWER:_____

2.   Medical expenses

      Past         ANSWER:_____

      Future     ANSWER:_____

3.   Lost earnings and benefits

      Past         ANSWER:_____

      Future     ANSWER:_____

4.   Mental anguish

      Past         ANSWER:_____

      Future     ANSWER:_____

5.   Loss of enjoyment of life

      Past         ANSWER:_____

      Future     ANSWER:_____

**INTERROGATORY NO. 8**

What sum of money, if any, if paid now in cash by this Defendant, do you find would fairly and reasonably compensate Susan Lynn Rodriguez for the damages, if any, sustained as a result of Defendant's conduct?

Answer in dollars and cents or "none" for each of the following:

1.  Lost Accumulations

    ANSWER:_____

21

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | JURY DEMANDED |
| | { | |
| and | { | |
| | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |
| | { | |
| and | { | |
| | { | |
| RAUL RODRIGUEZ | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |

---

## DEFENDANT'S PROPOSED COURT'S CHARGE TO THE JURY

---

MEMBER OF THE JURY:

You have heard the evidence in this case. I will now instruct you on the law that you must apply. It is your duty to follow the law as I give it to you. On the other hand, you the jury are the judges of the facts. Do not consider any statement that I have made in the course of trial or make in these instructions as an indication that I have any opinion about the facts of this case.

You have heard the closing arguments in this case. Opening statements and closing arguments are not evidence and are not instructions on the law. They are intended only to assist the jury in understanding the evidence and the parties' contentions.

---

Your verdict must be unanimous and you must answer all questions from a preponderance of the evidence which means the greater weight and degree of credible evidence before you. In other words, a preponderance of the evidence just means the amount of evidence that persuades you that a claim is more likely so than not so. In determining whether any fact has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget somethings or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was an international falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witness may have testified to the contrary, if after considering all the other evidence you believe that single witness.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case. One is direct evidence-such as testimony of an eyewitness. The other is indirect or

circumstantial evidence–the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field (he is called an expert witness) is permitted to state his opinions on those technical matters. However, you are not required to accept that opinion. As within any other witness, it is up to you to decide whether to rely upon it.

In deciding whether to accept or rely upon the opinion of an expert witness, you may consider any bias of the witness, including any bias you may infer from evidence that the expert witness has been or will be paid for reviewing the case and testifying, or from the evidence that he testifies regularly as an expert witness and his income form such testimony represents a significant portion of his income.

**[Fifth Circuit Pattern Jury Instructions, 3.1, 1999.]**

# FEDERAL CLAIMS

The plaintiffs claim that the City of Harlingen, a municipality, is liable for the alleged constitutional deprivations. A City is liable for the deprivation of a constitutional right if the deprivation was pursuant to governmental custom, policy, ordinance, regulation or decision. Therefore, if you find that plaintiffs were injured as the proximate or legal result of Harlingen's policy, custom, ordinance, regulation or decision, whether made by its lawmakers or by those officials whose edicts or acts may fairly be said to represent official policy, the City of Harlingen itself will be liable.

The _____ is an official whose acts constitute final official policy of the City of Harlingen. Therefore, if you find that the acts of _____ deprived the plaintiff of constitutional rights, the City of Harlingen is liable for such deprivations.

**[Fifth Circuit Pattern Jury Charges, § 10.3, 1999]**

For an injury to be a proximate or legal result of a City policy there must be a direct causal link between the City's policy, custom, ordinance, regulation, or decision, and the deprivation of the constitutional right. The policy, custom, ordinance, regulation, or decision must be the moving force behind the violation.

[*Monell v. Dep't of Social Service,* 436 U.S. 658, 695 (1978); *Piotrowski v. City of Houston,* 237 F.3d 567, 579-580 (5th Cir. 2001), *pet. for cert. filed.*]

Plaintiffs claim they were injured as a result of the City of Harlingen's entrustment of a rifle to Det. R.D. Moore and the failure to have a policy concerning the safeguarding or handling of weapons assigned to police officers.

To find that the policy caused a "state created" danger you must find:

A.      These actions were a policy, custom or decision of the City of Harlingen, and

B.      The entrustment or the failure to have a policy were so likely to result in the violation of constitutional rights, that the policy makers of the City can reasonably be said to have been deliberately indifferent to the certainty that a constitutional violation would result; and

C.      The actions were a proximate cause of injury to the plaintiff. [Plaintiff's injury was the proximate result of the actions.]

[ *Snyder v. Trepagnier,* 142 F.3d 791, 795-96 (5th Cir. 1998), *cert. dism'd,* 119 S. Ct. 1493 (1999).]

Plaintiffs alleged that their injuries resulted from a failure to have a policy [an express procedure] concerning _____. The failure to adopt a policy cannot qualify as a policy unless the failure amounts to an intentional choice and is not merely an unintentional oversight.

*[City of Canton v. Harris,* **489 U.S. 378, 389 (1989);** *Doe v. Dallas I.S.D.,* **153 F.3d 211, 217 (5th Cir. 1998)]**

Plaintiffs claim that they were injured as a result of the City of Harlingen's failure to properly train its officers and that the alleged failure can be considered to be the official policy of the city.

To find the alleged failure to train caused a "state created" danger you must find:

A.    That the City's training program was inadequate to trains its officers and employees to carry out their duties;

B.    The need for more training or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the City can reasonably be said to have been deliberately indifferent to the need for such training;

C.    The failure to provide proper training was a proximate cause of injury to the plaintiff. [Plaintiff's injury was the proximate result of the failure to train]

**[Modified from Devitt, Blackmar, and Wolff, 3 FED. JURY PRAC. AND INSTRUCTIONS, § 103.11A (SUPP. 2000)]**

Deliberate indifference is a stringent test. Proof of simple or heightened negligence will not suffice. The official must be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and he must also draw that inference.

[*Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Piotrowski v. City of Houston,* 237 F.3d 567, 579-580 (5th Cir. 2001), *pet. for cert. filed.*]

The Due Process Clause, 14th Amend. U.S. Constitution, confers no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual. The City's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause. The Due Process Clause permits liability only if the City's officials created the danger to Plaintiffs and they acted with deliberate indifference. There is "state created" danger only if:

A.      The City officials intentionally created a dangerous environment;

B.      The City officials used their authority to create an opportunity for a third party to commit a crime which would not otherwise exist;

C.      The City officials knew that the environment is dangerous;

D.      The identity of the persons facing the danger was known to the City official when they created the danger;E..      The City officials affirmatively placed that individual in that dangerous environment, effectively stripping that person of the ability to defend himself or herself or cutting off potential sources of private aid;

F.       The City officials' action must shock the conscience; and

G.      The actions must be a proximate cause of the plaintiff's injury or death.

[*County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Johnson v. Dallas I.S.D.*, 38 F.3d 198, 201 (5th Cir. 1994); *Randolph v. Cervantes*, 130 F.3d 727, 731 (5th 1997), *cert. denied*,   119 S.C. 1493 (1999); *Saenz v. Heldenfels Brothers*, 183 F.3d 389, 392 (5th Cir. 1999); *Piotrowski v. City of Houston*, 237 F.3d 567, 583-85 (5th Cir. 2001), *pet. for cert. filed.*]

The actions must be the proximate cause of the deprivation of the life or liberty.

For the actions to be a "proximate cause," Plaintiffs must prove that:

A.     the deprivation of life or liberty must not be too remote a consequence of the City's actions;

B.     the deprivation of life liberty must be the foreseeable result of those actions; and,

C.     the deprivation of life or liberty would not have occurred but for the constitutional violation.

*Mt. Heathly City School Dist. V. Doyle*, 429 U.S. 274, 285-87 (1977); *Martinez v. California*, 444 U.S. 277, 285 (1980); *Hart v. O'Brien*, 127 F.3d 424, 446 (5th Cir. 1997), reh. denied, 154 F.3d 419 (5th Cir. 1998), cert. denied, 525 U.S. 1103 (1999); *Rodriguez-Cirilo v. Garcia*, 115 F.3d 50, 42-3 (1st Cir. 1997); *Gonzalez v. Ysletta I.S.D.*, 996 F.2d 745, 761 n. 12 (5th Cir. 1993), reh. denied, 20 F.3d 471 (5th Cir. 1994).

## STATE LAW CLAIMS

Plaintiffs claim that the City of Harlingen was negligent.

Plaintiffs claim that negligent use of City property, the Police Department rifle, by a City employee in the scope and course of his employment was the proximate cause of injury to Plaintiff Raul Rodriguez and the deaths of Susan Rodriguez and Richard Salinas.

"Negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

**[Texas Pattern Jury Charges, PJC 2.1 (1998)]**

"Proximate cause" means that cause which, in a natural and continuous sequence, unbroken by any new and independent cause, produces an event, and without which cause such event would not have occurred.  In order to be a proximate cause, the act or omission complained of must be such that a person using *ordinary care* would have foreseen that the event, or some similar event, might reasonably result therefrom.  There may be more than one proximate cause of an event.

"New and independent cause" means the act or omission of a separate and independent agency, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question and thereby becomes the immediate cause of such occurrence.

**[Texas Pattern Jury Charges, PJC 3.1 (1998)]**

There may be more than one proximate cause of an event, but if an act or omission of any person not a party to the suit was the "sole proximate cause" of an occurrence, then no act or omission of any other person could have been a proximate cause.

**[Texas Pattern Jury Charges, PJC 3.2 (1998)]**

An "employee" is a person in the service of another with the understanding, express or implied, that such other person has the right to direct the details of the work and not merely the result to be accomplished.

**[Texas Pattern Jury Charges, PJC 7.1 (1998)]**

An employee is acting in the scope of his employment if he is acting in the furtherance of the business of his employer.

**[Texas Pattern Jury Charges, PJC 7.6 (1998)]**

As to Plaintiffs' claim that the rifle was negligently entrusted to R. D. Moore, "negligence" means entrusting the rifle to a reckless person if the City knew or should have known that R.. D. Moore was reckless. Such negligence is a proximate cause of death or injury if (1) the City knew or should have known R. D. Moore would use poor judgment in allowing another person to use the rifle, and (2) that person's negligent use of the rifle was the proximate cause of injury or death.

[*Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596 (Tex. 1987); Tex. Pattern Jury Charges PJC 7.12 (1998)]

# DAMAGES

If any plaintiff has proven his or her claim against the defendant by a preponderance of the evidence, you must determine the damages to which the plaintiff is entitled. You should not interpret the fact that I have given instructions about the plaintiff's damages as an indication in any way that I believe that the plaintiff should, or should not, win this case. It is your task first to decide whether the defendant is liable. I am instructing you on damages only so that you will have guidance in the event you decide that the defendant is liable and that the plaintiff is entitled to recover money from the defendant.

**[Fifth Circuit Pattern Jury Instruction 15.1, 1999.]**

If you find that the defendant is liable to any plaintiff, then you must determine an amount that is fair compensation for all of that plaintiff's damages. These damages are call compensatory damages. The purpose of compensatory damages is to make the plaintiff whole–that is, to compensate the plaintiff for the damage that the plaintiff has suffered. Compensatory damages are not limited to expenses that the plaintiff may have incurred because of his injury. If the Plaintiff Raul Rodriguez wins, he is entitled to compensatory damages for the physical injury, pain and suffering, mental anguish, lost earning capacity, and medical expenses that he has suffered because of the defendant's conduct.

If Plaintiffs [list the border patrol survivor plaintiffs] win, they are entitled to compensatory damages for loss of services and support, loss of companionship, mental anguish, medical expenses, and funeral expenses they have suffered because of the Defendant's conduct.

You may award compensatory damages only for injuries that the plaintiff proves were proximately caused by the defendant's allegedly wrongful custom, policy, or practice, if any. The damages that you award must be fair compensation for all of the plaintiff's damages, no more and no less. Damages are not allowed as a punishment and cannot be imposed or increased to penalize the defendant. You should not award compensatory damages for speculative injuries, but only for those injuries which the plaintiff has actually suffered or that the plaintiff is reasonably likely to suffer in the future.

If you decide to award compensatory damages, you should be guided by dispassionate common sense. Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork. On the other hand, the law does not require that the plaintiff prove the amount of his losses with mathematical precision, but only with as much definiteness and accuracy as the circumstance permits.

You must use sound discretion in fixing an award of damages if you award damages drawing reasonable inferences where you find them appropriate from the facts and circumstances in evidence.

You should consider the following elements of damage, to the extent you find them proved by a preponderance of the evidence:

**[Fifth Circuit Pattern Jury Instruction, 15.2, 1999.]**

A.    Damages Accrued

If you find for a plaintiff, he or she is entitled to recover an amount that will fairly compensate him or her for any damages he or she has suffered to date.

B.    Calculation of Future Damages

If you find that a plaintiff is reasonably certain to suffer damages in the future from his or her injuries, then you should award him or her the amount you believe would fairly compensate him or her for such future damages.

C.    Reduction of Future Damages to Present Value

An award of future damages necessarily requires that payment be made now for a loss that plaintiff will not actually suffer until some future date. If you should find that the plaintiff will not actually suffer until some future date. If you should find that the plaintiff is entitled to future damages, including future earnings, then you must determine the present worth in dollars of such future damages.

If you award damages for loss of future earnings, you must consider two particular factors:

1.    You should reduce any award by the amount of the expenses that the plaintiff would have incurred in making those earnings.

2.    If you make an award for future loss of earnings, you must reduce it to present value by considering the interest that the plaintiff could earn on the amount of the award if he made a relatively risk-free investment. The reason why must make this reduction is because an award of an amount representing future loss of earnings is more valuable to the plaintiff if he receives it today than if he received it in the future, when he would otherwise have earned it. It is more valuable because the plaintiff can earn interest on it for the period of time between the date of the award and the date he would have earned the money. Thus you should adjust the amount of any award for future loss of earnings by the amount of interest that the plaintiff can earn on that amount in the future.

If you make any award for future medical expenses, you should adjust or discount the award to present value in the same manner as with the loss of future earnings.

However, you must not make any adjustment to present value for any damages you may award for future pain and suffering or future mental anguish.

**[Fifth Circuit Pattern Jury Instruction, § 15.3, 1999.]**

## BODILY INJURY DAMAGES FOR RAUL RODRIGUEZ

You may award damages for any bodily injury that the Plaintiff Raul Rodriguez has sustained any pain and suffering, disability, disfigurement, mental anguish and/or loss of capacity for enjoyment of life that the Plaintiff, Raul Rodriguez experienced in the past or will experience in the future as a result of the bodily injury. No value of intangible things, such as mental or physical pain and suffering has been or need by introduced. You are not trying to determine a value, but an amount that will fairly compensate the plaintiff for the damages he has suffered. There is no exact standard for fixing the compensation to be awarded for these elements of damage. Any award that you make should be fair in the light of the evidence.

**[Fifth Circuit Pattern Jury Instruction, § 15.4, 1999.]**

You may award the reasonable expense of hospitalization and medical and nursing care and treatment that the Plaintiff Raul Rodriguez will require because of his injuries which were caused by the defendant's wrongful conduct.

**[Fifth Circuit Pattern Jury Instruction, § 15.7, 1999.]**

## WRONGFUL DEATH AND SURVIVOR DAMAGES FOR
## PLAINTIFFS ARTURO SALINAS AND ELISA SALINAS

You may award Arturo Salinas and Elisa Salinas damages they may have sustained for lost support and services, medical and funeral costs, loss of companionship, and mental anguish as follows:

1.   Lost Support and Services

The loss of Richard Salinas' support and services that the Plaintiffs, Arturo Salinas and Elisa Salinas have sustained because of Richard Salinas' death. You must determine the duration of any future loss by considering the joint life expectancy of Richard Salinas and the Plaintiffs, Arturo Salinas and Elisa Salinas. Joint life expectancy means the number of years that both Richard Salinas and Plaintiffs, Arturo Salinas and Elisa Salinas could have been expected to be alive together, considering the ages and life expectancy of each at the time of Richard Salinas' death.

In evaluating past and future loss of support and services, you must consider the Plaintiffs, Arturo Salinas and Elisa Salinas' relationship to Richard Salinas, the amount of Richard Salinas' probable net income available for distribution to the Plaintiffs Arturo Salinas and Elisa Salinas and the replacement value of Richard Salinas' services to the Plaintiffs, Arturo Salinas and Elisa Salinas. "Support" includes contributions in kind as well as sums of money. "Services" means tasks that Richard Salinas regularly performed that now will be a necessary expense to the Plaintiffs, Arturo Salinas and Elisa Salinas because of Richard Salinas' death.

2.   Medical and Funeral Expenses

Medical and/or funeral expenses due to Richard Salinas' injury or death paid by the Plaintiffs, Arturo Salinas and Elisa Salinas.

3.   Surviving Parent of Child

The Plaintiffs Arturo Salinas and Elisa Salinas' mental anguish resulting from the death of their child. In determining the duration of this mental pain and suffering, you must consider the life expectancies of the Plaintiffs Arturo Salinas and Elisa Salinas.

**[Fifth Circuit Pattern Jury Instruction, § 15.12, 1999.]**

WRONGFUL DEATH AND SURVIVOR DAMAGES FOR PLAINTIFFS

GILBERT RODRIGUEZ, MEGAN RODRIGUEZ,

STEPHEN WILLIAMS AND ROBIN WILLIAMS

You may award Plaintiff Gilbert Rodriguez, Megan Rodriguez, Stephen Williams and Robin Williams damages they may have sustained for lost support and services, medical and funeral services, loss of companionship, and mental anguish as follows.

1.    Lost Support and Services

The loss of Susan Rodriguez' support and services that the Plaintiff, Gilbert Rodriguez have sustained because of Susan Rodriguez' death. You must determine the duration of any future loss by considering the joint life expectancy of Susan Rodriguez' and the Plaintiff, Gilbert Rodriguez. Joint life expectancy means the number of years that both Susan Rodriguez' and Plaintiff, Gilbert Rodriguez could have been expected to be alive together, considering the ages and life expectancy of each at the time of Susan Rodriguez' death.

In evaluating past and future loss of support and services, you must consider the Plaintiff, Gilbert Rodriguez' relationship to Susan Rodriguez, the amount of Susan Rodriguez' probable net income available for distribution to the Plaintiff, Gilbert Rodriguez and the replacement value of Susan Rodriguez' services to the Plaintiff, Gilbert Rodriguez. "Support" includes contributions in kind as well as sums of money. "Services" means tasks that Richard Salinas regularly performed that now will be a necessary expense to the Plaintiff, Gilbert Rodriguez because of Susan Rodriguez' death.

2.    Medical and Funeral Expenses

Medical and/or funeral expenses due to Susan Rodriguez' injury or death paid by the Plaintiff, Gilbert Rodriguez.

3.  <u>Surviving Spouse</u>

The Plaintiff Gilbert Rodriguez' loss of companionship and protection, and his mental anguish that resulted from Susan Rodriguez' death.  In determining the duration of these losses, you must consider the join life expectancy of the decedent and the Plaintiff, Gilbert Rodriguez.

4.  <u>Surviving Minor Child</u>

The loss of parental companionship, instruction, and guidance, and the mental anguish Megan Rodriguez sustained because of Susan Rodriguez' death.  In determining the duration of these losses, you must consider the joint life expectance of the decedent and Megan Rodriguez.

5.  <u>Surviving Parent of Child</u>

The Plaintiffs Stephen Williams and Robin Williams' mental anguish resulting form the death of their child.  In determining the duration of this mental pain and suffering, you must consider the life expectancies of the Plaintiffs Stephen Williams and Robin Williams and Susan Rodriguez.

**[Fifth Circuit Pattern Jury Instruction, § 15.12, 1999.]**

It is your sworn duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong. However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

Remember that in a very real way you are the judges-judges of facts. Your only interest is to seek the truth from the evidence in the case.

When you retire to the jury room to deliberate, you may take with you this charge and the exhibits that the Court has admitted into evidence. Select your Foreperson and conduct your deliberations. If you recess during your deliberations, follow all of the instructions that I have given you concerning your conduct during the trial. After you have reached your unanimous verdict, your Foreperson must fill in your answers to the written questions and sign and date the verdict form. Use one of the jury note forms to advise the CSO that you have reached a verdict. You must never disclose to anyone, not even to me, your numerical division on any question.

If you want to communicate with me at any time, please give a written message to the CSO, who will bring it to me. I will then respond as promptly as possible either in writing or by meeting with you in the courtroom. I will always first show the attorneys your question and my response before I answer your question.

You may no retire to the jury room to conduct your deliberations.

Respectfully submitted,

By: _____

TOM LOCKHART
Admissions ID No. 2257
Texas State Bar No. 12473500
ROGER W. HUGHES
Admissions ID No. 5950
Texas State Bar No. 10229500
P. O. Drawer 1429
Harlingen, Texas 78551-1429
956/428-7495; FAX: 956/428-2954

Attorney-in-Charge for Defendant,
CITY OF HARLINGEN

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document was

forwarded on this 18th day of July, 2001, to the following counsel of record and interested parties:

Attorneys-in-Charge for Plaintiffs, GILBERTO M. RODRIGUEZ, et al and
ARTURO GUILLERMO SALINAS, et al:

Mr. Broadus A. Spivey                **Via CMRRR# 7000 1670 0013 4635 2289**
**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, Texas 78701-4320

Attorney-in-Charge for Plaintiff, RAUL RODRIGUEZ:

Ms. Sonia Lopez                      **Via CMRRR# 7000 1670 0013 4635 2272**
**LAW OFFICES OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, Texas 78539

_____
TOM LOCKHART

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | JURY DEMANDED |
| | { | |
| and | { | |
| | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |
| | { | |
| and | { | |
| | { | |
| RAUL RODRIGUEZ | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN, ET AL | { | |

---

**DEFENDANT'S REQUESTED SPECIAL INTERROGATORIES**

---

MEMBER OF THE JURY:

## QUESTION NO. 1

Do you find from the preponderance of the evidence that a custom, policy or decision made or adopted by the City of Harlingen with deliberate indifference caused a "state created" danger that was the proximate cause of Susan Rodriguez's death?

Answer "Yes" or "No": _____

---

# QUESTION NO. 2

Do you find from the preponderance of the evidence that a custom, policy or decision made or adopted by the City of Harlingen with deliberate indifference caused a "state created" danger that was the proximate cause of Ricardo Salinas' death?

Answer "Yes" or "No": _____

# QUESTION NO. 3

Do you find from the preponderance of the evidence that a custom, policy or decision made or adopted by the City of Harlingen with deliberate indifference caused a "state created" danger that was the proximate cause of injury to Raul Rodriguez?

Answer "Yes" or "No": _____

# QUESTION NO. 4

Do you find from a preponderance of the evidence that any negligent use of the Harlingen Police Department rifle by an employee of the City of Harlingen in the scope of his employment for the City was the proximate cause of:

      A      Susan Rodriguez's death?

Answer "Yes" or "No": _____

      B.     Ricardo Salinas' death?

Answer "Yes" or "No": _____

      C.     Injury to Raul Rodriguez?
      D.

Answer "Yes" or "No": _____

If you have answered Question No. 1 or 4A "yes," the answer Question No. 5; otherwise, do not answer Question No. 5.

## QUESTION NO. 5

What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiffs Gilbert Rodriguez, Megan Rodriguez, Stephen Williams and Robin Williams for their injuries, if any, resulting from the death of Susan Rodriguez?

Consider the following elements of damages listed below and none other.  Consider each element separately.  Do not include damages for one element in any other element.

Answer separately, in dollars and cents, for damages, if any.

    A.    Medical and funeral expenses paid or incurred by Gilbert Rodriguez.

    Answer: _____

    B.    Gilbert Rodriguez' loss of support and services.

    Answer: _____

    C.    Gilbert Rodriguez' loss of companionship.

    Answer: _____

    D.    Gilbert Rodriguez' mental anguish in the past.

    Answer: _____

    E.    Mental anguish that, in reasonable probability, Gilbert Rodriguez will suffer in the future.

    Answer: _____

    F.    Megan Rodriguez' loss of support and services.

    Answer: _____

    G.    Megan Rodriguez' loss of companionship.

Answer: _____

H.    Megan Rodriguez' mental anguish in the past.

Answer: _____

I.    Mental anguish that, in reasonable probability, Megan Rodriguez will suffer in the future.

Answer: _____

J.    Stephen Williams loss of support and services.

Answer: _____

K.    Stephen Williams' loss of companionship.

Answer: _____

L.    Stephen Williams' mental anguish in the past.

Answer: _____

M.    Mental anguish that, in reasonable probability, Stephen Williams will suffer in the future.

Answer: _____

N.    Robin Williams loss of support and services.

Answer: _____

O.    Robin Williams' loss of companionship.

Answer: _____

P.    Robin Williams' mental anguish in the past.

Answer: _____

Q.    Robin anguish that, in reasonable probability, Stephen Williams will suffer in the future.

Answer: _____

If you have answered Question No. 2 or 4B "yes," the answer Question No. 6; otherwise, do not answer Question No. 6.

## QUESTION NO. 6

What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiffs Arturo Salinas and Elisa Salinas for their injuries, if any, resulting from the death of Ricardo Salinas?

Consider the following elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element.

Answer separately, in dollars and cents, for damages, if any.

    A.    Medical and funeral expenses paid or incurred by Arturo Salinas.

    Answer: _____

    B.    Arturo Salinas' loss of support and services.

    Answer: _____

    C.    Arturo Salinas' loss of companionship.

    Answer: _____

    D.    Arturo Salinas' mental anguish in the past.

    Answer: _____

    E.    Mental anguish that, in reasonable probability, Arturo Salinas will suffer in the future.

    Answer: _____

    F.    Elisa Salinas' loss of support and services.

    Answer: _____

G.    Elisa Salinas' loss of companionship.

Answer: _____

H.    Elisa Salinas' mental anguish in the past.

Answer: _____

I.    Mental anguish that, in reasonable probability, Elisa Salinas will suffer in the future.

Answer: _____

If you have answered Question No. 3 or 4C "yes," the answer Question No. 5; otherwise, do not answer Question No. 7.

## QUESTION NO. 7

What sum of money, if paid now in cash, would fairly and reasonably compensate Raul Rodriguez for *his* injuries, if any, resulting from the occurrence in question?

Consider the elements of damages listed below and none other. Consider each element separately. Do not include interest on any amount of damages you may find.

Answer separately, in dollars and cents, for damages, if any.

A.    Physical pain and mental anguish sustained in the past.


Answer: _____

B.    Physical pain and mental anguish that, in reasonable probability, Raul Rodriguez will
sustain in the future.

Answer: _____

C.    Loss of earning capacity sustained in the past.

Answer: _____

D.    Loss of earning capacity that, in reasonable probability, Raul Rodriguez will
sustain in the future.

Answer: _____

E.    Physical impairment sustained in the past.

Answer: _____

F.    Physical impairment that, in reasonable probability, Raul Rodriguez will
sustain in the future.

Answer: _____

G.    Medical care in the past.

Answer: _____

H.    Medical care that, in reasonable probability, Raul Rodriguez will incur in the future.

Answer: _____

Respectfully submitted,

By: _____

TOM LOCKHART
Admissions ID No. 2257
Texas State Bar No. 12473500
ROGER W. HUGHES
Admissions ID No. 5950
Texas State Bar No. 10229500
P. O. Drawer 1429
Harlingen, Texas  78551-1429
956/428-7495; FAX: 956/428-2954

Attorney-in-Charge for Defendant,
CITY OF HARLINGEN

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document was

forwarded on this 18th day of July, 2001, to the following counsel of record and interested parties:

Attorneys-in-Charge for Plaintiffs, GILBERTO M. RODRIGUEZ, et al and
ARTURO GUILLERMO SALINAS, et al:

> Mr. Broadus A. Spivey          **Via CMRRR# 7000 1670 0013 4635 2289**
> **SPIVEY & AINSWORTH, P.C.**
> 48 East Avenue
> Austin, Texas  78701-4320

Attorney-in-Charge for Plaintiff, RAUL RODRIGUEZ:

> Ms. Sonia Lopez                **Via CMRRR# 7000 1670 0013 4635 2272**
> **LAW OFFICES OF RAMON GARCIA, P.C.**
> 222 West University Drive
> Edinburg, Texas  78539

TOM LOCKHART