```
                              U.S. DISTRICT COURT
                           SOUTHERN DISTRICT TEXAS
                                    FILED
```

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS  JUL 20 PM 2:43
BROWNSVILLE DIVISION

MICHAEL N. MILBY, CLERK

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| Vs. | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| And | § | |
| GILBERTO M. RODRIGUEZ, ET AL | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS; | § | |
| And | § | |
| RAUL RODRIGUEZ | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS. | § | |

**RESPONSE TO COURT'S ORDER DATED JULY 19, 2001 FILED BY PLAINTIFFS
ARTURO G. SALINAS, ET AL AND GILBERTO M. RODRIGUEZ, ET AL**

TO THE HONORABLE JUDGE TAGLE, U.S. DISTRICT COURT:

Plaintiffs Arturo G. Salinas, et al and Gilberto M. Rodriguez, et al respectfully file this Response, pursuant to the Court's Order dated July 19, 2001, to submit a complete copy of the affidavit of Joe Rubio with numbered pages. Plaintiffs hereby comply with the Court's Order by submitting a complete copy of Joe Rubio's affidavit with page numbered.

**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, TX 78701
512+474-6061
512+474-1605 (fax)

By *Francis Pan*
    Broadus Spivey
    State Bar No. 00000076
    Federal I.D. No. 11146
    Price Ainsworth
    State Bar No. 00950300
    Federal I.D. No. 8065
    Francis Pan
    State Bar No. 15443300
    Federal I.D. No. 26385

Richard Pena
Law Offices of Richard Pena, P.C.
Barton Oaks Plaza Two
901 MoPac, Suite 325
Austin, Texas 7746-5747
512+327-6884
512+327-8354 (fax)

**ATTORNEYS FOR PLAINTIFFS
ARTURO G. SALINAS, ET AL and
GILBERTO M. RODRIGUEZ, ET AL**

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the above and foregoing document was forwarded on July 20, 2001, to all counsel of record and interested parties via facsimile and U.S. mail:

Mr. Tom Lockhart
Mr. Roger W. Hughes
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429
ATTORNEYS FOR DEFENDANT

Mr. Ramon Garcia
Ms. Sonia Lopez
LAW OFFICES OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, TX 78539

_____
Francis Pan

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| Vs. | § | |
| CITY OF HARLINGEN, TEXAS, ET AL; | § | |
| And | § | |
| GILBERTO M. RODRIGUEZ, ET AL. | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| CITY OF HARLINGEN, TEXAS, ET AL; | § | (Consolidated with B-98-162 for all purposes) |
| And | § | |
| RAUL RODRIGUEZ | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| CITY OF HARLINGEN, TEXAS, ET AL. | § | (Consolidated with B-98-162 for all pre-trial matters) |

STATE OF TEXAS §
§
COUNTY OF CAMERON §

## VERIFICATION

On this day, Jose Rubio, Jr.. appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he said the facts and opinion stated in the affidavit he made on June 4, 1999, a copy of which is attached hereto as Exhibit "A," are within his personal knowledge and are true and correct.

_____
Jose Rubio, Jr.

SWORN TO and SUBSCRIBER before me by Jose Rubio, Jr. on July 12, 2001.

_____
Notary Public in and for
the State of Texas

CYNTHIA CORTEZ
Notary Public, State of Texas
My Commission Expires
January 22, 2004

# EXHIBIT A

ClibPDF - www.fastio.com

STATE OF TEXAS
COUNTY OF CAMERON

BEFORE ME, the undersigned authority, a notary public in and for Cameron County, Texas on this day personally appeared Jose Rubio Jr. who, after by being duly sworn did depose and say:

My name is Jose Rubio Jr. and I am a police officer for the City of Harlingen. I am 38 years old and I am a resident of Harlingen, Cameron County, Texas. I am writing this statement in a particular style where initially I introduce myself so as the reader can understand my background, education and experience. I will then describe in detail the events that happened concerning the death of the two Border patrol agents, Susan Rodriguez and Ricardo Salinas.

I started with the Harlingen Police Department on September 14, 1981. I currently hold the rank of lieutenant and I am assigned to the patrol division as a shift supervisor. I am a certified instructor for the Harlingen Police Department and I have taught the following courses to police officers:

- 3737 T.C.L.E.O.S.E. Supervisor's Course
- Personnel Evaluations for Police Officers
- Mental Health Education for Police Officers
- Arrest, Search, and Seizure
- Legal Update
- Police Photography
- Instructor's Course for New Instructors

A month after I graduated Harlingen High School in 1978, I joined the United States Army. I attended training to become a military police officer and I was assigned to Fort Myer, Virginia. I left the military in July of 1981 and shortly thereafter joined the Harlingen Police Department.

Over the last 17 years of service, I have managed to attend several schools of quality instruction and have also attended college. I received my Associates Degree in 1986 from Texas Southmost College in Criminal Justice. I have approximately 118 college hours in an effort to obtain my degree in police administration. Unfortunately due to the shift work, I have been unable to obtain my degree. I hold a Masters Peace Officers Certificate issued by the Texas Commission of Law Enforcement Standards and Education. I am a certified intoxilyzer operator and I am a certified

*[signature]*

SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.

*[signature]*

Notary Public in and for Cameron County Texas
Roberto Silva   04-29-2000
Name (printed of typed)   Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

1

instructor. I have attended a wide variety of numerous continuing education police schools instructed by a variety of instructors. They were sponsored by several different agencies such as the FBI, TEXAS A&M, the International Chiefs of Police, the Lower Rio Grande Valley Police Academy, and so on. The schools that I have attended have enhanced my knowledge in my chosen profession of law enforcement.

I was assigned to the detective division in October of 1988 to crimes against property. I worked a variety of cases gaining invaluable experiences during the time that I was assigned to detectives. In January of 1990, I was promoted to sergeant after placing first in a civil service examination. I was assigned to the patrol division and worked under Lieutenant Scheopner until November 1990. I was then assigned to the Traffic Division of the Harlingen Police Department. I was placed in charge of not only the officers assigned to that division but the dispatchers and jailers were also added to my list of responsibilities. I held that position until May of 1993 when the new police chief, Jim Scheopner, reassigned me to the patrol division. In June of 1993, I placed first in the lieutenant's civil service examination and after I was promoted, I was assigned to be in charge of a patrol shift. The responsibilities are varied in this position but are closest associated with that of a "watch-commander." I supervise two sergeants and depending on shift strengths, up to nineteen patrol officers. Part of my responsibilities are to approve reports and ensure that investigations are carried out in proper fashion at crime scenes. I also carry out the administrative responsibilities of my position.

In July of 1992, I assumed the role of President of the Harlingen Police Officer's Association. I would serve on the board of directors for the next six years until my departure in January of 1999. I was the President of the Association on the day of the tragic shootings of the Border Patrol Officers and the Morin family in Rio Hondo.

On Tuesday, July 7, 1998, I was on day shift and I was scheduled to instruct a class on Mental Health Education for Police Officers. My two shift supervisors were also scheduled to attend this class and Sergeant Miguel Garcia was to cover my shift for the day. As I was preparing to leave for the Harlingen Police Department, I received a phone call from Officer Matthew Manning around 7:15 a.m. informing me that RD Moore's son, Ernest, had just shot two Border Patrol officers and a sheriff's deputy. He further informed me that Sgt. Foist and Sgt. Garcia had been called out to RD Moore's house in San Benito. He told me there was chaos out there because of the shootings and there was a massive manhunt for two other suspects. I left immediately to the Harlingen Police Department. When I arrived, I met up with Matthew and other officers at the rear of the station.

*[signature]*

SWORN AND SUBSCRIBED TO BEFORE ME, on this **4th** day of **June, 1999.**

*[signature]*
Notary Public in and for Cameron County Texas

Roberto Silva    04-29-_____
Name (printed of typed)    Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

2

At this point, I learned that an AR-15 belonging to RD Moore had been used in the shootings. I also learned that Sergeant Foist had been involved in the shooting and that several officers had shot Ernest Moore. I was informed the reasons behind both Sergeant Foist and Sergeant Garcia being there at the scene were a request by the Cameron County Sheriff's Department. Apparently, RD Moore had denied permission to the Sheriff deputies to search the house for Ernest Moore and had been rude to them. From what I also gathered, Chief Scheopner was called and he contacted RD Moore over the phone. The facts were trickling in slowly about how the shooting started and the events prior to the shooting. I was informed that two other people had died in Rio Hondo and another person had been taken to VBMC as a result of being shot.

Around 10 a.m., Officer Foist came in to the Harlingen Police Department. He described what happened and he stated that "It was suicide by cop." He tells me that he was forced to take cover behind a boat when the shooting started. He described the scene saying it was like "Rambo" when Ernest Moore came out of his hiding place and started to unload the AR-15. He believes he struck Ernest due to his proximity and stated, "I had to shoot RD's kid." A few minutes later, Sgt. Mike Garcia returned from San Benito and the stress of the incident was evident on his face. We learn that he had to hold RD Moore's wife down to protect her from the flying bullets. He went home due to the stress. Officers Chris Read and Steve Mayer (Harlingen K-9 officers) returned from the scene about an hour later. Chris describes the scene as chaotic as it appears no one is in charge. We continue attending the class but it was hard to instruct and keep up with what was going on. The search for the two suspects had made nationwide news and the search was called off around 2 p.m.

I got the feeling that the shootings were going to come back and haunt the department. RD Moore has had access to the evidence room for over twenty years. A few years ago, I saw him playing around with a Colt Ar-15 rifle in the evidence room and I knew that he liked to shoot guns. At that time, he stated the AR-15 was his personal weapon. I had also heard stories that he had problems with his son, Ernest. I knew the department had very lax policies and procedures and had very little accountability. One of the areas of concern that I had was the evidence room which had no regular audits or set of rules for proper disposal of evidence or other items turned into the evidence room. During the course of the last two years, we had tried through the Association to develop a new set of departmental directives to cover areas of weaknesses and /or strengthen the policies we did have. There were to many word of mouth policies with no documented procedures. There was so much resistance by the administrative staff of the Harlingen Police Department

*[signature]*

SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.

*[signature]*

Notary Public in and for Cameron County Texas

Roberto Silva     09-29-20__

Name ( printed of typed)     Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

3

(Scheopner, Archer, Vasquez) that we eventually gave up on the notion that we would develop a new set of departmental directives or a set of policies and procedures.

On Wednesday, July 8, 1998, the news media was still carrying the Border Patrol shootings as priorities. CNN, Fox News, and the San Antonio Express are the non-valley news media that have joined the local news media in making the story a priority. There were rumors surfacing that RD Moore had the right to carry the gun because of his on-call status. That afternoon, I paid a visit to Commissioner Rick Rodriguez about my concerns. Rick Rodriguez is a lawyer, prior prosecutor and I have known him for a long time. Since I didn't know all the facts and there were plenty of rumors circulating around such as the AR-15 being fully automatic and RD Moore being on call, I informed Rick Rodriguez that I suspected there would be some sort cover up. Rick Rodriguez at the time was a brand new City Commissioner and he was just getting his feet wet. When I left his office, I informed him that I would be in touch with him if anything substantial developed.

On Thursday, July 9, 1998, the Valley Morning Star reported that drugs were linked to the shooting spree. It also reported that Ernest had traces of cocaine, marijuana, and alcohol and that a Mac-90 assault rifle was used. I kept thinking that all this would come back to haunt the police department. The United States Attorney General, Janet Reno, and the INS Chief, announced they would attend the funeral for the slain agents, Ricardo Salinas and Susan Rodriguez. On page A4 of the Valley Morning Star, there was a picture of Sergeant Andy Muniz carrying an assault rifle with a scope. I know that he was out there trying to help but I also know that he is not qualified to carry an assault rifle. The father of slain agent Ricardo Salinas, Art Salinas, made a public statement about the corrupted sheriffs in the Rio Grande Valley. KGBT Dave Johnson repeated his statement on the news.

On Friday, July 10, 1998, I assisted in the funeral of Susan Rodriguez at the Queen of Peace Church. I assigned four of my officers to join the rest of the officers who are providing traffic control. After I cleared from 13th and 77, I stopped by the Queen of Peace Church. I could not bring myself to enter the church and I left after a while. At 6 p.m., I was at home and turned on the news to Channel 5 ABC news. Peter Torgerson, news anchor, came on and announced the AR-15 used to kill the agents was registered to the Harlingen Police Department. The weapon was assigned to Detective RD Moore because of his on-call status. At that point, I went into a shock because I could not believe what was just announced. This was the beginning of a cover up in the use of our weapon to kill the agents and to justify why RD Moore had access to the weapon. My phone rang immediately after the announcement and it was Dennis Zamarron. He also could not believe what

*[signature]*

SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.

*[signature]*
Notary Public in and for Cameron County Texas
Roberto Silva   04-29-2000
Name (printed of typed)   Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

4

we just heard and he asked me, "What are we going to about it." I told him that I was going to make some phone calls and I will be in touch with him. The phone rang a second time. This time it was Sergeant Shawn Foist. He is pissed-off and states the Chief is lying about what he is saying about the gun. He states that he knows what really happened and that he has information to use against the Chief. I ask him what is the information that he has and he refuses to divulge it stating that he will release it when needed. I know Foist's character well and I know that he won't do anything. I get pissed off at him because he was almost killed in a shooting by a jail escapee. He laid partial blame on the department and he raised the issue of lax procedures which led to his shooting but he never followed up on his threats. I call him a "pussy" and told him that he was part of the problem because of his failure to speak out and tell the truth. I hung up on him. I get another phone call and it is from Lieutenant Ramon Vela. He is on duty and Officer Jose Angel Villarreal is next to him. They express their concerns over the lie that the Chief Scheopner just made to the media to cover up the gun. They are both having difficulty trying to understand why the Chief would say that RD Moore was on call and part of a SWAT team that does not exist. I know and they know that RD Moore was not on call and we know that he is not the department sniper. He also asked me what was I going to do about the lie that Chief Scheopner had created to justify the our department weapon being used during the shooting of the two agents. I told him that I was working on it. I then called Harlingen City Commissioner Rick Rodriguez on his mobile phone. He told me that he was at Tropi-Casa having a beer. He states, "You were right, we are in trouble. Deep shit trouble." He told me that he had plans so he can't talk any further. I decided to call the Valley Morning Star police newspaper reporter, Laura Martinez, who I have known for a number of years. Laura is really familiar with the Harlingen Police Department as she has been covering issues and the operations of the Harlingen Police department for a number of years. As soon as she heard my voice, she stated, "Lieutenant, I knew it was you. I know why you are calling. I was expecting your call. I guess you heard." She then asked me what I thought about what the Chief said. I told her that I thought it was important to reverse the question back to her and asked her what she thought. She stated that she wanted me to first answer the question. I told her it was important to hear her opinion first because she covered the police department and was familiar with it. She replied, "The Chief is lying. It's obvious. RD Moore is not on call. I know you all don't have a SWAT team." She was upset about the lie and did not understand why Scheopner would lie. I explained that probably to cover up the use of the weapon and the weapon not being issued properly. I further explained that he and RD Moore were friends and went way back over twenty five years. I told her that we can't let the Chief get away with this lie. She asked me what can she do. I tell her to reinterview the Chief and commit him to some answers and he will hang himself. She promised to do that but she already has him committed to his story. * Note: Laura Martinez

*[signature]*

**SWORN AND SUBSCRIBED TO BEFORE ME,** on this <u>4th</u> day of <u>June, 1999.</u>

*[signature]*

Notary Public in and for Cameron County Texas

<u>Roberto Silva          04-29-2000</u>
Name ( printed of typed)     Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

5

would leave the Valley Morning Star in another week and this left a void in the investigative department of the newspaper to continue following up properly.

I then called up Dennis Zamarron and told him that I would see what we can do and I will drop by his house. I can't figure out who to call next at that this point because the Chief is involved and the City manager, Natalie Prim, and Joe LaBeau, the Assistant City Manager, are not the type of persons you can trust to do the right thing.

Around 7:30 p.m., that same night, I decide to see my FBI friend by the name of Armando Fernandez. I have known Armando for a number of years and I also know his wife, Rosie. I stopped by their house and Rosie tells me that Armando should be on his way home from Brownsville. She calls Armando on the phone and I briefly explain to Armando that I have some concerns over the Border Patrol shootings. He tells me that he will be home in about twenty minutes and I tell him that I will return. I go to Dennis Zamarron's house and I give him the latest news of my upcoming meeting with Armando Fernandez. We decide to go over to his house together. Upon arriving at Armando's house, he tells me that he called David Church, a fellow FBI agent who is a case agent working on the Border Patrol shooting. David arrives a few minutes later. In the next hour or so, we are going to express our concerns and explain our procedures on our weapons. I explain to David that since I am a patrol lieutenant, I would know if one of my resources available to me for emergency purposes would be a SWAT officer. I explain the fact that I am familiar with on-call procedures and Detective RD Moore is not on the on-call roster that some detectives are assigned to. Further the fact that he is being called the department SWAT officer is a total surprise to me and the rest of the other officers. We explain checkout procedures if you want to borrow a weapon from the police department arsenal. Of course, we explain this is limited to detectives and only handguns. The procedure used to be a 3x5 card which is signed out by the evidence custodian but we seriously doubt at this point, that any sort of procedures are in existence. The procedures that I mentioned were under Chief Anderson's regime and there was no set of procedures implemented by Chief Scheopner when he took over in March of 1993. Bottom line, we tell David Church that RD Moore should not have possessed the weapon used to kill the Border Patrol agents. I also conveyed my concerns that we should have a detailed inventory of the Harlingen Police Department arsenal as I suspect other weapons will probably be missing. In addition, we should also try to see if we can identify the weapons at RD Moore's house to see if any of them belonged to the Harlingen Police Department. David was very receptive to our concerns and we exchanged ideas on the manner to proceed with a detailed investigation. David assured us that a follow up would be made. We tell him that he needs to move on it by Monday because there has not been enough time to cover their

SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.

Notary Public in and for Cameron County Texas

Roberto Silva   04-29-____
Name (printed of typed)   Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

6

tracks on the issue of the weapon and other weapons. When I left Armando's house, I felt a heavy burden was lifted and I felt relieved. Dennis Zamarron expressed the same feelings and I dropped him off at home.

On Monday, July 13, 1999, RD Moore returned to work. During the next two days, Chief Scheopner, Assistant Chief Archer, Captain Vasquez, and Detective RD Moore went behind closed doors. We suspected they were discussing their stories so as they would corroborate. At one point, through the rumor mill we heard that Captain Vasquez was afraid the statement was not factual and he did not want to go to jail. Never the less, this was the opportune time for them to discuss their stories and set them straight. I was wondering why we had not heard or seen anything of a follow up by the FBI or the Texas Rangers at the police department. On this day, for the first time I hear about the Neo-Nazi paraphernalia found inside the bedroom of Ernest Moore. This shocks me initially because I can't believe that a police officer would allow his son to have the Neo-Nazi paraphernalia. Part of our law enforcement training under mandatory T.C.L.E.O.S.E. regulations covers culture diversity which addresses hate crimes and racist groups. The State of Texas governing body has made a tremendous effort to attempt to address the issues of hate crimes and racial prejudice to law enforcement officers by having a mandatory culture diversity class every two years. It would be against departmental policy for Officer Moore to condone the behavior of his son by allowing Ernest Moore to be involved in Neo-Nazi activities.

That same morning, July 13, 1998, I paid a visit to Nat Lopez, a Harlingen City Commissioner. I expressed my concerns over the lies told by Scheopner in regards to the weapon and the creation of a convenient SWAT team to justify the weapon. He has a budget workshop scheduled for noon concerning police benefits. He assures me that he will bring it up during the workshop in one way or another. I attend the budget workshop and Mr. Lopez brings up the issue of our weapon being used to kill the two Border Patrol agents. He asks for a formal inquiry to be made. The City Manager, Natalie Prim, is squirming in her seat as she is very uncomfortable and upset that Nat Lopez brought up the subject during the public workshop. She assures him that they will look into the matter. *Note: Two days later, on July 15, 1998, the Valley Morning Star would have a story about Mr. Lopez's comments. The Valley Morning also mentioned in the story that the rifle used to kill the two agents was donated to the Harlingen Police Department by a private citizen. Scheopner is asked three times if the weapon was turned in for destruction. He refuses to answer the question after he is asked three times.

On July 14, 1998, Sergeant Foist submits an e-mail to Caliber Press in reference to the

*[signature]*

SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.

*[signature]*
Notary Public in and for Cameron County Texas

Roberto Silva    04-29-__
Name ( printed of typed)    Commission Exp.

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

7

Border Patrol Shootings. The e-mail points is important because Foist makes it appear that Ernest Moore had a conversation with RD Moore and Ernest said, " I'm in deep shit now, Dad" as he headed out the door. RD Moore then notices the AR-15 is missing from the safe. Chief Scheopner was upset at Foist for his e-mail going out on the world wide web. Scheopner considered suspending Foist for two weeks and after he talked to him, the suspension was reduced to a day. Foist told me during this episode that he was willing to fight the two week suspension based on the severity of the suspension and it would give him an opportunity to have a full hearing where everything would come out. Since he was only suspended for one day, he took his medicine and did not appeal the suspension. Foist also asked me if he was in good standing with the Association as far as legal coverage and I told him that he was. Foist was worried about a polygraph test that the Texas Rangers had asked him to take to clarify the issue of whether RD Moore had warned his son. Two days later, Foist would tell me that word had been handed down from Washington that the polygraph was canceled and he would have to take the polygraph test.

The organization chart of the Harlingen Police Department provides Captain Luciano Rubio, my younger brother, is in charge of the training division. Luciano and I had discussed the weapon and his role as a Captain and obligation to look into the matter. The fact that we both knew that RD Moore had not ever qualified with an AR-15 and his training records reflected his lack of qualifications to carry the rifle, would eventually surface in any sort of inquiry. This would be a major concern in his role as a supervisor of that division. Detective Gilbert Gonzalez, was the department custodian of evidence, and therefore, he would have knowledge of whether the weapon used to kill the two agents was properly checked out. It would be Detective Gonzalez's responsibility to have the documentation for the weapon to be checked out. When Luciano asked Gilbert about the weapon, he became nervous and did not cooperate in his inquiry. Later, on July 15, 1998, Chief Archer asked Luciano to join him in a cup of coffee across the street at Rosita's Restaurant. Archer paid for Luciano's taco and coffee. When they were walking back, Assistant Chief Archer told Luciano not to meddle in the Border Patrol shooting. When me and Luciano talked, we could not figure out why Gilbert Gonzalez would run to Scheopner and tell him about the inquiry that he had made. Archer's warning was a strong message to Captain Rubio because he did not want a probe even though Luciano had all rights by his position.

On the evening of the 15th of July, I was contacted by Dennis Zamarron at home. He relayed an encounter that happened with RD Moore. Dennis was at the copier located between the detective division and Moore's office. Mario Arreola (narcotics investigator) was at the computer that is generally used to check for mug shots. RD Moore walked in with a camouflaged gun sheath

_____

SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.

_____
Notary Public in and for Cameron County Texas

Roberto Silva        04-29-2000
Name ( printed of typed)    Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

8

and a small caliber rifle was inside the bag. RD Moore had a surprise look on his face and dropped off his package inside his office. Dennis called me immediately afterwards and I told him at this point it was just another thing that we would have to tackle as a problem. Note: During the Lockhart attorney's meeting on October 9, 1998, this issue was addressed and explained as RD Moore holding a weapon for a friend.

By that same afternoon on July 15, 1998, I had heard rumors that the FBI agents had "ratted" us out to Scheopner. The rumor was there would be no probe because "Union Politics" were being blamed. I was on midnight shift and I left home early because of the fear of retaliation. I had become a target on different occasions because of my Association activities and I knew they were capable of making my life uncomfortable by singling you out any minor thing. The police department had staff meetings every Thursday afternoon to discuss issues. On occasion, these meetings were used as opportunities to take some "cheap shots" at certain individuals. The staff meetings were held on a weekly basis because we had some "communication" problems and turmoil between some of the younger administrative members. I decided to skip the staff meeting of July 16, 1998. Around 4:30 p.m., Lieutenant Ramon Vela contacted me at home and told me the results of the staff meeting. He told me that Scheopner, Archer, and Captain Vasquez were pissed off about some officers going to the FBI. He told me that Archer had said they wanted to fire people. He said Captain Vasquez called us "bastards" and that we should be fired. Vasquez would repeat this statement several times. Vela also told me that Scheopner had also said that we did not understand the details on the Border Patrol shooting and we should mind our own business. The meeting was generally attended by the two captains (Rubio and Vasquez), the four lieutenants (Rubio, Vela, Castillo, and Leal), and both Chief Scheopner and Assistant Chief Archer. At this meeting, every one should have been there for the exception of my brother who was on vacation.

That same night, July 16, 1998, I came into work on the midnight shift at 11 p.m. and I saw that Captain Vasquez was waiting for me. As soon as I finished my briefing to the shift, I was summoned by Captain Vasquez to his office. The first thing that he asked me was why I did not show up to the staff meeting. I told him I was not feeling well, that my stomach was in knots. He proceeded to go over some issues discussed during the staff meeting. He blasted the "Blue Shield" which was an Association newsletter. The Blue Shield had an article on pay issues and Captain Vasquez told me that as supervisors we should be able to take care of pay issues. Then he asked me if I knew the two persons who went to the FBI in regards to the Border Patrol Shooting. I told him that I did not know who went to the FBI. He asked me again and I again responded that I did not know. He then stated that the FBI had contacted the Chief (Scheopner) and they had informed him

*[signature]*

SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.

*[signature]*

Notary Public in and for Cameron County Texas

_Roberto Silva_      04-25-_____

Name (printed of typed)     Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

9

that two supervisors had gone to the FBI. He stated that these two supervisors were circulating rumors and that we had no fault in the shooting. He then stated that his position was to fire these two individuals and he asked me if I understood. I told him that I understood. "No, he says, I don't think you understand." I told him that I understood and I got the point, "You want to fire the two individuals who went to the FBI.." Captain Vasquez proceeded to explain they had friends in the FBI and they would eventually find out who went to the FBI. He further explained there is a loyalty to Chief Scheopner from the FBI because he attended the FBI academy and there is a loyalty built up when you attend the FBI academy. He then asked me again if I understood that we are going to fire the individuals who went to the FBI. I told him, "Whatever it takes, Captain." He continued talking about pay issues, evaluations, and people leaking stories to the newspaper concerning the police department. He then told me that he is going to shift the days off to the lieutenants in the near future. This is an obvious "power play" message to tell me he is command and can arbitrarily change my days off whenever he wants. This has never happened before as the lieutenant controls the days off for the shift. *Note: **This will be last staff meeting due to the perception that we were back stabbers.**

In the early part of August and continuing through the month, a newsletter emerged anonymously called "The Blue Cow." The Association would publish an informative newsletter called the "Blue Shield" that would address issues. The Blue Cow was making fun of officers past and present in their outcry of issues. The writing was malicious and could easily be traced to one or two individuals due to the story contents and writing style. The Blue Cow was delivered to a Lion Club's meeting by Chief Archer and passed around City Hall by Chief Scheopner. After the third Blue Cow came out, some officer came out with an anonymous newsletter called "The Tainted Brass." The officer in the newsletter blasted the fact that we had covered up the use of a missing gun that was used in the Border Patrol shooting. It also blasted the administration of the department with all type of allegations of wrong doing. The "Tainted Brass" also made its way to City Hall. Joe LaBeau, the Assistant City Manager, came around the police department and he contacted several officers trying to find out who wrote the "The Tainted Brass." He stated that he was concerned about some of the contents and there would be no retaliation from his part if the officer stepped forward. No one came forward. Joe LaBeau would later on confirm to me that Chief Archer had authored "The Blue Cow."

I have been appointed to the Cameron County Emergency Services Board. In August, there were several meetings to discuss the upcoming taxes and distribution of funds to the fire departments and EMS. There was an issue as to who should pick up the "floaters" in the Rio

SWORN AND SUBSCRIBED TO BEFORE ME, on this **4th** day of **June, 1999.**

Notary Public in and for Cameron County Texas

_Roberto Silva_   04-29-0_

Name ( printed of typed)    Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 200_

10

Grande River or in other bodies of waters in Cameron County. Sheriff Lucio had been asked to attend the meetings to discuss the issue. In one of the meetings in mid August, he showed up and we asked for his ideas on the issue. After the meeting was over, Sheriff Lucio and I started to talk. He invited me over to his office and I joined him. Being that Sheriff Lucio was a Harlingen Police Officer for over 34 years, he was familiar with our policies and practices. We started to discuss the Border Patrol shooting and how the weapon used to kill the agents and wound his deputy came to be in RD Moore's hands. He agreed at that point it was a lie created by Scheopner to cover the use of the weapon. I asked him if he was going to do anything about it since he knew the truth and he said the FBI and Texas Rangers were in charge of the investigation. **Note: On at least another occasion, around October, I asked him again about the weapon and he walked away not wanting to address the issue.**

On September 4, 1999, I stopped by City Hall to make an open records request. I ran into Joe LaBeau and he asked to talk to me. He wanted to know if I knew the author of the Tainted Brass and I told him no. He pointed there were several issues in the newsletter that concerned him. He wanted to know about the issue of the weapon. I told him that I was uncomfortable talking about the issue of the weapon. He became angry demanding that I tell him what I knew about the weapon. Since Captain Vasquez had made it clear that anyone talking about the Border Patrol shooting would be fired, I felt that I could not tell Mr. LaBeau anything without the fear of retaliation. Mr. LaBeau did not have the best reputation among City employees and employees were fearful of him and mistrusted him. Joe LaBeau was trying to fix the problems at the police department but there was to much opposition and political power plays by Chief Scheopner to do an effective job. I told Joe LaBeau there would be a time and place that we would talk but not today. I did give him a hint and I told him that he needed to check T.C.L.E.O.S.E. regulations concerning the qualifications of officers carrying assault rifles. He was not familiar with T.C.L.E.O.S.E. and I had to give him another hint that the rules would be posted on the Internet by searching the web site. That same afternoon, I went to work and I submitted a memorandum to Captain Vasquez and Chief Scheopner in regards to my encounter with Joe LaBeau. I outlined in the memorandum the details and that Joe LaBeau had requested to talk to me about the Border Patrol Shooting and that I felt uncomfortable because I was under the threat of being fired if we talked about the Border Patrol Shooting. About two days later, I ran into Chief Scheopner and he made a casual remark about the memorandum and Joe LaBeau. He did not give me permission to discuss the case with Joe LaBeau. I did not ask for permission because I knew better and the continuing conflict in the department over the issue of the Border Patrol shooting and the conflict with management (Joe LaBeau) was the not the right atmosphere where permission would be granted. It did become obvious to me at this point of the

SWORN AND SUBSCRIBED TO BEFORE ME, on this <u>4th</u> day of <u>June, 1999.</u>

Notary Public in and for Cameron County, Texas

<u>Roberto Silva</u>     <u>04-29</u>
Name (printed of typed)    Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

11

lack of expertise of any City administrator to conduct a formal inquiry into the weapon. Two months later and no one had gone into the evidence room and made a formal audit or inventory of all weapons.

In the latter part of September, I went to the Texas State Conference of the *"The Fraternal Order of Police"* in Corpus Christi. I met up with several police officers at this conference in which there is an estimated 200 officers in attendance. Dennis Zamarron had been asking me all along when were we going to go public with the issue of the deception and cover-up. I told him that I would discuss the issue with some of the officers at the conference so as we get a direction to take. I discussed the issue at full length with two officers. One was Randy Malone from the Austin Police Department. Randy gave me some advice and informed that if went public with the issue of the lies/cover-up, we would be protected under the "Texas Whistle Blowers's Act." Randy is 25 year veteran of the police department. I then discussed the issue with Gil Gallegos who is the National President of the Fraternal Order of Police (270,000 nation wide members). Gil is a retired Deputy Chief of the Albuquerque, New Mexico Police Department. He participates in a narcotics task force and sits on a Congressional committee that addresses Border States issues. Part of the committee is Janet Reno, the United States Attorney General, along with other Senators. When I discussed the issue of the Border Patrol shooting and the deception/cover-up by Chief Scheopner and other officers, he described it as "corruption at its worse." He informed me that I had an obligation to tell the truth. He informed me that if I needed any assistance, to contact him and he would try to help out through Janet Reno.

I came back after the conference and I made an appointment with Roberto Garcia (Edinburg-Garcia, Lopez, and Wood) who is the Harlingen Police Association Attorney. We discussed the issue and we settled on two approaches. I told him that I would draft two letters asking for a formal inquiry from the City Commission pursuant to City Charter and one from the Civil Service Commission. I had already discussed the issue with Cesar Maldonado who is the Chairman of the Harlingen Civil Service Commission. We did not go into specifics because I knew they may make a ruling on any inquiry but I did express my concerns about having the door open for the inquiry. Cesar informed that if the inquiry had anything to do with Civil Service or a Civil Service violation, he would at least allow us the opportunity to be addressed as an agenda item. On October 5, 1998, the Association Executive Board decided to sign off on the two inquiries and formally present them to the news media so as to lay a claim on the Whistle Blower's Act if anything resulted. The signing members of both letters, one addressed to the Harlingen City Commission and the other to the Harlingen City Civil Service Commission, are

*[signature]*

SWORN AND SUBSCRIBED TO BEFORE ME, on this <u>4th</u> day of <u>June, 1999.</u>

*[signature]*
Notary Public in and for Cameron County Texas
<u>Roberto Silva</u>   <u>04-29-20[00]</u>
Name ( printed of typed)    Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

12

as follows:

1. Jose Rubio Jr., President, 17 year veteran
2. Dennis Zamarron, Vice-President, 18 year veteran
3. Antonio Sanchez, Treasurer, 18 year veteran
4. Roberto Silva, Secretary, 17 year veteran.

The draft letters were approved by Mr. Garcia and we contacted the news media. On the 6th of October, we called for a press conference at 6 p.m. at Antonio's Restaurant. Dennis had been contacted by Chief Scheopner several times during the day and warned that he was subject to disciplinary action if he broke departmental directives. Dennis eventually had to tell Chief Scheopner to lay off him because he was harassing him and he understood that he was subject to disciplinary action. Zamarron invited Scheopner to the press conference. Antonio Sanchez was contacted on that day by Scheopner but he did not reveal any details. I came back from the attorney's office and there was a message from Captain Vasquez on my recorder to contact him and there was another message left by Chief Scheopner. Chief Scheopner called my home around 4:30 p.m. again and my wife informed him that I was busy with the attorneys and he quit calling afterwards. At 4:50 p.m., we delivered our letters to City Hall and we started our press conference at 6:00 p.m. We were all nervous and scared. Each one of us had talked to our wives and explained that we subject to disciplinary action and could be fired as a result of our actions. At the point that we delivered the press conference and letters, we had given up hope on any law enforcement agency coming out and investigating fully the Border Patrol shootings. The administration was about to target those individuals who had gone to the FBI because no action was being taken against them.

On October 8th, 1998, Tom Lockhart and Natalie Prim had their structured press conference. After their press conference, Tom Lockhart, Dennis Zamarron and I went behind closed doors. I informed Mr. Lockhart that I was upset at the callous disregard of the City not to conduct a thorough investigation and then have someone like Scheopner threaten to fire us if we went to the FBI. At this time, he claimed that he had no knowledge of Scheopner's actions.

On October 9th, 1999, we had a round table discussion with our Association attorney present, Bobby Garcia, and Tom Lockhart. Tom had tried to interview us separately and we had agreed that we would not be interviewed separately. A non retaliation agreement was signed before we started our discussion. I had prepared for this meeting by having fifty two questions

SWORN AND SUBSCRIBED TO BEFORE ME, on this 4th day of June, 1999.

_____
Notary Public in and for Cameron County Texas

Roberto Silva    09-29-2000
Name ( printed of typed)    Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

13

that I wanted to discuss and possibly answered. Mr. Lockhart did not answer many of the questions due to the pending litigation but we were able to decipher some of the answers through the conversation that we had for numerous hours. The greatest bit of knowledge that we did learn at this meeting was the role of Captain Vasquez. He had released the weapon to RD Moore to take home and have it in his vehicle for emergency purposes. We discussed this theory of how the weapon was being used by RD Moore and their story is full of holes.

All though the City Commission and the Civil Service Commission failed to initiate a probe into the Border Patrol shootings, it has become obvious through the follow up stories by the media and the facts that have been trickling in, that we were right in our suspicions. The weapon was turned in for destruction purposes and all though law enforcement can utilize a weapon of such caliber and design for legitimate purposes, no documented or formal steps were taken to put the weapon into use. The weapon is an assault rifle and not the type of weapon that should be used for sniper duties. There are departmental directives and T.C.L.E.O.S.E. regulations that were not followed by the Harlingen Police Department. The fact that not one law enforcement agency at the point of this statement has stepped forward and pursued a detailed, thorough investigation into how the weapon, used to kill two Federal Agents, **Susan Rodriguez and Ricardo Salinas**, and wound a Cameron County Deputy, came to be in RD Moore's hands is truly demoralizing. There is a loss of understanding of why the many law enforcement agencies that have jurisdiction in this tragedy can look the other way is appalling. I have paid the price in both my personal life and professional life by bringing this matter forward when no else would. Emotionally and physically, I have paid the price. This matter will only come to a closure when the lawsuits are settled and to some of us, there will never be a closure.

SWORN AND SUBSCRIBED TO BEFORE ME, on this **4th** day of **June, 1999.**

Notary Public in and for Cameron County Texas

Roberto Silva   04-29-2000
Name (printed of typed)   Commission Expires

ROBERTO SILVA
Notary Public
STATE OF TEXAS
My Comm. Exp. April 29, 2000

14