*124*

United States District Court
Southern District of Texas
FILED

JUL 2 4 2001

Michael N. Milby
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS. | § | |

## SUPPLEMENTATION TO JOINT PRETRIAL ORDER

TO THE HONORABLE JUDGE TAGLE, U.S. DISTRICT COURT:

COME NOW, Gilberto M. Rodriguez, individually and on Behalf of his minor Daughter, Megan Suzanne Rodriguez and the Estate of his Wife Susan Lynn Rodriguez, deceased; Stephen L. Williams and Robyn S. Williams, Surviving Parents of Susan Lynn Rodriguez, deceased; Arturo Guillermo Salinas and Elisa Herrera Salinas, individually and on Behalf of the Estate of their Son Ricardo Guillermo Salinas, deceased; and Raul Rodriguez, Plaintiffs in the above referenced action, filing their First Supplementation to the Joint Pretrial Order filed with the Court on July 18, 2001.

In addition to the exhibits listed in Attachment "A" of the Joint Pre-Trial Order filed by all Parties to the case on July 18, 2001, Plaintiffs respectfully request supplementation of the exhibit list with the items listed in Plaintiffs' Supplemental Exhibits attached hereto as Exhibit "A."

Respectfully submitted,

**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, TX 78701
512+474-6061
512+474-1605 (fax)

By _Broadus Spivey_

Broadus Spivey
State Bar No. 00000076
Federal I.D. No. 11146
Price Ainsworth
State Bar No. 00950300
Federal I.D. No. 8065
Francis Pan
State Bar No. 15443300
Federal I.D. No. 26385

Richard Pena
Law Offices of Richard Pena, P.C.
Barton Oaks Plaza Two
901 MoPac, Suite 325
Austin, Texas 7746-5747
512+327-6884
512+327-8354 (fax)

**ATTORNEYS FOR PLAINTIFFS**
**Arturo G. Salinas, et al and**
**Gilberto M. Rodriguez, et al**

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the above and foregoing document was forwarded on July 24, 2001, to all counsel of record and interested parties via facsimile and U.S. mail:

Mr. Tom Lockhart
Mr. Jim Denison
Mr. Roger W. Hughes
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429
ATTORNEYS FOR DEFENDANT

RAMON GARCIA
SONJA LOPEZ
LAW OFFICES OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, TX 78539

_Broadus A. Spivey_
Broadus A. Spivey
Attorney for Plaintiffs
Arturo G. Salinas, et al and
Gilberto M. Rodriguez, et al

3163P.036-Supplementation to Joint Pre-trial Order

3

## EXHIBIT "A"

**Plaintiffs' Supplemental Exhibits**

| No. | Description | Admitted | Exd |
|-----|-------------|----------|-----|
| 293. | Report written by James Robenson, an outside consultant hired to review the City of Harlingen's investigation of matters relating to the shooting incident made the basis of this suit. | | |
| 294. | Video Recording from Patrol Car of Cameron County Sheriff's Deputy Heron Vidales on, July 7, 1998, the day of the incident made the basis of this suit. | | |
| 295. | Audio Recording from Patrol Car of Deputy Vidales on, July 7, 1998, the day of the incident made the basis of this suit. | | |

4



**James Robenson**
Consultant

1014 FM775 – Floresville, Texas 78114
Phone: 830-216-7783   Fax: 830-393-2230
Mobile: 830-391-0754
E-Mail: jrobenson@express-news.net
WedSite: http://www.jamesrobenson.qpq.com

# *Confidential Investigation*

## SCOPE OF INVESTIGATION

This report is the culmination of an investigation of the circumstances surrounding the ownership and chain of custody of a <u>Gun</u> – an Olympic Arms .223 caliber semi-automatic rifle, serial #FA-0698 (AR15 style). This Gun was used in a shooting incident on July 7, 1998 that resulted in three persons being shot and killed, two United States Border Patrol Agents and the suspect in their deaths, Mr. Ernest Moore. A private citizen had turned in the Gun to the Harlingen Police Department. At the time of the incident the Gun had been assigned to Harlingen Police Detective R.D. Moore, the father of the deceased suspect Mr. Ernest Moore.

## FINDINGS

The findings of this investigation are the result of the following:

A.   A review of all available relevant correspondence; such as, memoranda, policies, reports and notes
B.   Interviews of involved persons
C.   Inspection of the Gun
D.   My personal experience of 30 years as a practitioner and consultant in police systems

The investigation revealed that in the aftermath of the crime that occurred on July 7, 1998 Police Chief James Scheopner made mistakes in handling the City of Harlingen's involvement. Captain Joseph Vasquez violated Department policy. Detective Moore violated Department policy and used poor judgment.



PLAINTIFF'S
EXHIBIT
*B*

1

## Finding #1

**Chief Jim Scheopner conducted a brief inquiry into an incident that should have been thoroughly investigated.**

1. The Chief said that there were a number of other agencies conducting investigations in the incident. Some people thought that meant that there was no need for any other investigation. In his memorandum dated July 14, 1998 titled Officer Involved Shooting to Assistant City Manager Joe LeBeau the Chief states:

   "The fatal shooting of the two Border Patrol Agents on July 7, 1998 has been fully investigated by the F.B.I. and the Texas Rangers. It was also studied, in depth, by the Cameron County Sheriff's Department, the U.S. Border Patrol, and out agency to determine what exactly happened. The investigations were looking for cause, effect, and responsibility. Our agency had three officers at the scene during the shooting; Detective R.D. Moore, Sgt. Shawn Foist, and Sgt. Mike Garcia. Sgt. Foist returned fire at the suspect. Beyond the criminal investigation, the agencies wanted to determine if they could prevent such incidents from occurring in the future with better training, equipment, or policies. It has been determined by everyone that no one did anything wrong at all, and that the only person that was responsible for this extraordinary tragedy was the assailant."

   - The other police agencies were conducting <u>criminal</u> investigations into the incident, as well as, administrative investigations into their own employees. The person responsible for investigating whether the involvement of the Harlingen Police Department personnel and equipment was proper and correct according to the policies, directives and practices of the City of Harlingen and its Police Department was the Chief of Police. He did not conduct such an investigation.

2

2. At the scene the Chief told Sergeant Shawn Foist, who had fired his weapon and Sergeant Mike Garcia, who was a witness to write reports. He then forwarded the reports to the other investigating police agencies and kept a copy for the Department.

- Police administrators do not rely on other police agencies to conduct their administrative investigation of their employees or equipment

- Frequently criminal occurrences are multijurisdictional police incidents. After the scene is stabilized the decision is made as to which police agency is going to handle the criminal aspects. The various agencies then began their own <u>administrative</u> investigations into the involvement of their personnel and equipment. These investigations are initiated immediately so that witnesses memories are fresh and undiluted and information is readily available for the inquires that are sure to follow.

3. The Chief states that he was told by the lawyers and Assistant City Manager Joe LeBeau in a meeting on July 21, 1998 that they would be conducting the investigation into the Gun. Consequently, he did not conduct one.

- The Chief had plenty of time before the date of this meeting to initiate an investigation. The administrative investigation should have begun immediately on 7/7/98. It did not.

- Assistant City Manager Joe LeBeau, the only person at the meeting with the authority to do so, said that he did in any way prohibit Chief Scheopner from conducting an investigation into the circumstances around the Gun. In fact he encouraged him to do so.

The investigation and review of the discretionary power and behavior of police personnel is the very core of police administration. There is always the need to confer with legal <u>advisors</u> who have the responsibility to protect the citizens' monies from avoidable expenditures or appropriations. Public administrators take the legal advice of their attorneys into consideration in making their decisions. Neither the City Attorney Brendan Hall nor the Texas Municipal League and City of Harlingen Attorney Tom Lockhart can order the Chief to do anything. If they were extremely uncomfortable with something that the Chief was or was not doing, they would have to approach the City Manager Natalie Prim or the Assistant City Manager Joe LeBeau and persuade them to instruct him accordingly. This action was not taken.

3

- No investigation was done to determine if the discharge of Sergeant Foist's weapon was appropriate in accordance with the administration of City of Harlingen Police Department. The other Sergeant Mike Garcia reportedly did not shoot his weapon. What was the reason?

- No documented investigation was done when the Chief learned on 11/8 or 9/98 that Captain Vasquez had authorized the assignment of the Gun to Detective Moore.

- No documented investigation was conducted when the Chief saw that the receipt stated that the Gun had been turned in to the Department for disposal.

- No investigation was initiated when the Chief learned that the police officer that Captain Vasquez authorized to carry the Gun had not qualified with it.

There are always explanations for the numerous questions that surround a police incident. Those explanations need to be <u>documented</u> as the result of a formal <u>investigation</u>. This process provides the police professional with the substantiated information needed to proactively provide the City Administration, the elected representative of the citizens and the general public with the assurance that the Police Department is using the authority invested in them appropriately.

- The Chief and members of the Department at his direction gathered information about this incident in response to inquires from the City Administration and the media, not as part of a comprehensive investigation. These scattered bits of information are confusing and sometimes contradictory and are not substitutes for a professional administrative investigation.

- Chief Scheopner did not initiate an investigation into his Department's involvement into the incident that occurred at Detective Moore's home on July 7, 1998. His investigation should have begun immediately. It should have been documented and comprehensive.

4

## Finding #2

**Chief Jim Scheopner provided inaccurate information which misled the City Manager Natalie Prim, Assistant City Manager Joe LeBeau about the extent to which the City of Harlingen might be involved in the incident.**

1. Chief Scheopner's use of the word "donated" both in a quote in the July 11, 1998 edition of the Valley Morning Star and stated in his memorandum dated July 14, 1998 misrepresented the language on the actual receipt for the Gun.

   The Chief contends in an interview on 11/9/98 and reasserted in a subsequent telephone interview on 11/23/98 that he was verbally told by Captain Vasquez that the Gun was "donated" prior to his statements to the press and in the memorandum. He insists that he did not see the receipt or a copy of the receipt for the Gun until he was preparing papers for the Freedom of Information Act letter of the Valley Morning Star which was dated 7/21/98. He said that he did not attempt to "mislead the press". The following does <u>not</u> support this assertion:

   a. <u>The only document that describes the Gun in the Police Department is the receipt or a copy of that receipt. In his owns words in his same memorandum dated July 14 where he uses the word "donated" he proceeds to describe the Gun "The rifle is a .223 caliber Olympic Arms semi-automatic rifle, serial # FA-0698 that was donated to the Harlingen Police Department in 1995 by a citizen." The only way he would know the detailed description of the Gun, including the serial number was to have seen the receipt or have someone read it to him.</u>

   b. On 11/24/98 at approximately 8:45 am Captain Vasquez said that he was sure that he had received the receipt for the Gun on 7/8/98 from Detective Moore. He then made a copy of it and took both the original and the copy to Chief Scheopner on the same day - Wednesday, 7/8/98. He said that he remembered because Detective Moore, who was on leave, came into the Department to get some money for the funeral. He further remembered that Assistant Chief Archer was in office with Chief Scheopner. <u>Captain Vasquez showed the original and gave the copy of the Gun receipt to Chief Scheopner on 7/8/98.</u> At that time there was some discussion about the meaning of the wording on the receipt. The words "disposal" and "destroy" were discussed.

   c. Assistant Chief Archer also remembers being present when <u>Chief Scheopner received a copy of the Gun receipt from Captain Vasquez on 7/8/98.</u> Assistant Chief Archer recalls the incident because it occurred just before he left for a business trip to Corpus Christi evening of 7/8/98

5

- It is clear from the information written on the receipt by Detective Moore that the rifle had been turned in to the Department "for disposal".



Detective Moore wrote " for disposal" on the receipt after speaking with the woman who had turned the Gun into the PD on June 23, 1995. Whatever conversation she had with Detective Moore, it caused him to write in his own handwriting " ... turned over to H.P.D. for disposal..."

- The statements in his memorandum and of his top management personnel indicate that the Chief saw the receipt for the Gun where the term "for disposal" was used before he prepared his referenced memorandum of July 14, 1998 . He subsequently continued to use the word "donated" in describing how the gun was received into the Police Department.

Whether the statement of the Chief that the weapon had been "donated" to the Department was intended to mislead the City Administration and the public is debatable, what is clear is that the use of the word did not accurately denote the language on the receipt.

6

2.  Chief Scheopner made statements that indicated that he knew that everything surrounding the incident had been done correctly.

In his memorandum dated July 14, 1998 to Assistant City Manager Joe LeBeau Chief Scheopner states:

> "It has been determined by everyone that no one did anything wrong at all, and that the only person that was responsible for this extraordinary tragedy was the assailant".

- It was premature and misleading to say that nothing wrong was done without substantiating that statement with a thorough investigation.

In another memorandum dated July 24, 1998 he states:

> "The shooting incident of July 7, 1998, where 25 year old Ernest Moore of San Benito fatally shot two Border Patrol Agents, has been thoroughly investigated. Whenever there is a critical incident involving Harlingen Police Department personnel and equipment, policies and procedures are carefully reviewed and evaluated. It is my conclusion that no laws or policies were violated by any Harlingen Police employees, and no changes in procedure are anticipated at this time. Employees acted in an appropriate and responsible manner before, during and after the incident."

In reference to the above memorandum Robenson asked Chief Scheopner in an interview on 11/9/98:

> " Chief what information other than your conversation did you have to say that? Help me?"

Chief Scheopner responds:

> " Not a hell of a lot.  Okay here's where I probably screwed up royally."

7

3. Chief Scheopner used words that did not clearly state the facts in the last paragraph of his memorandum to the City Administration of July 14, 1998:

> "The rifle was safely secured in the locked gun vault at Detective Moore home on July 6, 1998. In doing this, Detective Moore went above and beyond normal procedures to secure the weapon. Sometime during the early morning hours of July 7,1998, Det. Moore 25 year old son, Ernest Moore, clandestinely, and without authority or permission, got the key to to gun vault off Moore's key ring, opened the vault and took *two semi-automatic rifles out, leaving the vault open."

- The following is an <u>example</u> of a more objective statement of the same assertions by Detective Moore:

Detective Moore stated that he secured the rifle in the locked gun vault at his home on July 6, 1998. He further stated that when he was awakened in the early morning hours of July 7,1998, his key to the gun vault was missing, the vault was open and *two semi-automatic rifles were missing.

- The Chief took uncorroborated statements made by a person who is the subject of an internal investigation and repeated them to the City Manager as if they were facts. It does not impugn the integrity of the person making the statements to repeat the statements and the source. <u>This approach asserts the objectivity of the investigation.</u>

8

4. Chief Scheopner used words that were misleading In a memorandum from Chief Scheopner dated October 15,1998 to the City Manager entitled PROPERTY DOCUMENTATION AND DISPOSAL he states:

> "There are procedures which are in place with the evidence custodian and those are followed with the utmost of attention because of the importance of the rules of evidence and its impact in court cases."

The City Manager responds to this memorandum and asked the Chief

> "Referring to your 10/15/98 memorandum regarding property documentation and disposal —
> > 'There are procedures which are in place with
> > the evidence custodian and those are followed...'
> Please provide me a copy of the written procedures that are quoted above."

Chief Scheopner's response was:

> "The procedures referred to in my memo, of 10-15-95, are in the form of 'standard' or 'common practice' and are not in written form."

- When the Police Chief tells the City Manager that highly sensitive procedures such as the chain of custody of evidence is followed with the "utmost of attention" and when asked replies that the procedures are by word of mouth, he is definitely inaccurate.  If the City Manager had not asked the follow-up question, her understanding of the security of evidence in her Police Department would not be correct for future budget considerations, etc.

9

## Finding #3

**Chief Jim Scheopner failed to take the appropriate action when he learned that Captain Vasquez had violated Department policy by assigning a weapon to a Harlingen Police Officer without requiring that the officer demonstrate his proficiency with that weapon or providing a valid reason to make the exception.**

1. More important than what is stated in Department policy is how the Police Chief interprets that policy. In his memorandum dated October 1, 1998 to Assistant City Manager Joe LeBeau on the subject of "Departmental Weapons" Chief Scheopner stated the following:

   "The current Harlingen Police Departments Policy Manual was written using model policies from the Texas Municipal League (TML) and the Texas Commission on Law Enforcement Officers Standards and Education (TCLEOSE). They have been reviewed by the city attorney. The weapons policies are in section 4.04 (see attached) . Along with these policies, the department adheres to the TCLEOSE standards."

   "These state that the departments range master keep firearms qualifications records, and make them available if requested to do so during an audit check by the commission. Also, that every peace officer must qualify once a year, according to department standards, with the firearms carried by that officer in an official capacity on or off duty."

   Harlingen Police Department Directives state:

   **4.04.01**      **APPROVED WEAPONS AND AMMUNITION**

   The Department authorizes officers to carry and use only Department issued or approved handguns, shotguns, ammunition, chemical agents and side handle batons. The chief approves all weapons and ammunition.

   **4.04.02**      **TRAINING**

   An officer must undergo, Department approved, training, and display proficiency in the use of any authorized weapon the officer carries. Additionally, officers must comply with all continuing proficiency training required by the Department.

   - Clearly Detective Moore's possession of the Gun was a violation of established and interpreted Department Policy in that he was carrying a Gun that he had not qualified with.

10

2. It has been suggested that the reason for not qualifying with the Gun was because the existing shooting range was inadequate.

The existing restraint of an inadequate range in Harlingen for qualification would necessitate several logical and policy compliant decisions:

   a. First not to assign the Gun to Detective Moore until he had demonstrated his present ability to operate the weapon efficiently to qualify as a "sharpshooter".

   b. The second alternative would have been to send Detective Moore and/or the Department Range Master with the Gun to another policing agency or private range in order to demonstrate the necessary level of proficiency. Recordation of Detective Moore's witnessed performance under these circumstances should be made and maintained in order to substantiate his proficiency for future inquiries and challenges.

   c. Chief Scheopner suggested the third alternative in his memorandum dated October 1, 1998 when he said "Since we have no SWAT team, if we have a situation where a sharpshooter is needed, we will call the Brownsville Police Department, or D.P.S., until we come up with a better idea."

3. It has also been suggested that Detective Moore was trained with a similar type weapon inferring that qualifying may not be necessary. This suggestion is a stretch when you understand that the training referred to was received over 20 years ago.

11

4.  Chief Scheopner stated in his July 14,1998 memorandum that "It was assigned to Detective Moore, by Captain Vasquez, to be carried by him in the event that a tactical situation arose where a police sharpshooter was needed."

On Monday, November 16, 1998 at approximately 2:30pm I examined an Olympic Arms .223 semi-automatic rifle, serial # FA-0698 at the Texas Department of Public Safety in Austin, Texas in the presence of Criminalist 5 Firearms Examiner Bill Sorrow.  This gun was the weapon taken in as evident at the scene of the July 7, 1998 shooting incident in San Benito.  This weapon is also the same weapon and serial # described by Detective Moore in a Department receipt signed by him on June 23, 1995 when he received a rifle from a citizen. I examined the rifle and found it to be an opened sighted .223 caliber rifle.  I checked the mechanism and found it to be semi-automatic.  Mr. Sorrow stated that he had also conducted this preliminary test with the same results.

• An open sighted semi automatic .223 rifle is not a rifle used by any " sharpshooter".  First and foremost, a sharpshooter needs some sort of accurate target acquisition system like a scope or a laser.  A range finding device is also important.  A bolt action rifle is frequently preferred because of the theory that it is more accurate that a semi-automatic rifle.  Being "a good shot" is not enough when lives hang in the balance of one or two well placed shots over various distances.  If Detective Moore had been called upon to use this weapon in a life threatening "sharpshooter" situation, the City of Harlingen, Detective Moore and the lives of the persons involved would be in a hazarded and disadvantaged position.

12

5. In the same aforementioned memorandum Chief Scheopner stated:

> "Detective Moore is also the departments evidence technician expert, and is on call 24 hours a day for major investigation scenes."

The Detective Call Out Log is posted in the dispatcher room so that the detective who may be called out after hours is readily available. This log is posted on a weekly and a monthly basis. The on-call detective is used as an evidence technician and an investigator.

- A review of the Detective Call Out Logs from 1995 to present reveals that Detective Moore's name was never placed on it.

Further during a recent review of the Police Department by Assistant City Manager Joe LeBeau command staff personnel of the Department were asked if they were aware of Detective Moore's 24-hour-call-out status. They responded that they were not. The command staff of the Police Department is the persons who would authorized the calling out of Department personnel in case of an emergency in the absence of the Chief of Police.

If Chief Scheopner wants Detective Moore to be available for 24 hour call out in case of an emergency, he should notify his staff and be sure that Detective Moore has a pager and/or a telephone posted so that contact people can get a hold of him when told to do so.

- The Chief discusses Detective Moore's 24-hour status in the context of his availability with the Gun. The idea is that Detective Moore with his Gun and call-out status has been available for emergency call-out since approximately April Of 1997. This situation is difficult to understand when the Chief has stated that he did not know that Captain Vasquez had assigned the Gun to Detective Moore until after the incident on 7/7/98.
  **How would he or anyone know to call Moore out?**

Further there should be some type of emergency call out plan, so that everyone knows what to do in an emergency. It does not have to be elaborate. A memorandum from the Chief or a fundamental published procedure might suffice.

13

6. In interviews with Chief Scheopner, Captain Vasquez and Detective Moore each them suggested that another consideration for assigning the Gun to Moore was to have additional firepower in case an incident like the "bank robbery in California" should occur in Harlingen. I assumed that they were referring to the failed bank robbery in North Hollywood California that received nationwide media coverage after two suspects armed with fully automatic rifles killed and wounded a number of citizens and police officers in February 1997. A couple of months, according to Captain Vasquez before Detective Moore begin carrying the Gun.

- The suspects were armed with <u>fully automatic</u> weapons. The possession of a <u>semi-automatic</u> weapon does not give the police equal firepower.

## Finding #4

**Chief Scheopner failed to take action against Captain Vasquez and/or Detective Moore when he learned that the Gun had been taken into the Department "for disposal" by Detective Moore who later requested that Captain Vasquez assign it to him.**

- The Gun had been retained instead of destroyed. Captain Vasquez had violated Department Directives and good police practices by assigning it to Moore. Moore was carrying the Gun without any qualifying

## Finding #5

**Captain Vasquez failed to notify Chief Scheopner, in writing, of his action in assigning the Gun to Detective Moore. Captain Vasquez may have told the Chief verbally. Captain Vasquez said that he told the Chief about his assigning the Gun to Detective Moore. The Chief did not recall the conversation.**

According to a portion of Policy 4.04.01 APPROVED WEAPONS AND AMMUNITION "The chief approves all weapons and ammunition."

- It therefore follows that Captain Vasquez should have notified Chief Scheopner of his decision to make an exception to existing Policy in assigning the Gun to Moore.

This situation is a reiteration of a need for through documentation and investigation when there are allegations of personnel misconduct.

14

## Finding #6

**Captain Vasquez violated Department Policy by assigning a weapon to a Harlingen Police Officer without requiring that the officer demonstrate his proficiency with that weapon.**

-The relevant information has been covered in Finding #3.

## Finding #7

**Detective Moore failed to notify the regular property custodian of the circumstances by which the Gun was received by the Department. Detective Moore violated Harlingen Police Department Directive # 4.04.002 in that he failed to demonstrate proficiency with the Gun that he was authorized to carry. He also used poor judgment in allowing his son to shoot his assigned Harlingen Police Department Gun in practice.**

1. It is clear from the information written on the receipt by Detective Moore that the rifle had been turned in to the Department "for disposal".



- Detective Moore wrote " for disposal" on the receipt after speaking with the woman who had turned the Gun into the PD on June 23, 1995. Whatever conversation she had with Detective Moore, it caused him to write in his own handwriting " ... turned over to H.P.D. for disposal..."

15

The definition of the words "for disposal" may be somewhat varied. A common understanding might be "to do away with" or "destroy".

- **Most important is the understanding of the person who turned the Gun into the Police Department who stated that the Gun should be destroyed.**

Detective Moore said that he doesn't recall notifying Mr. Gilberto, the property custodian, that the Gun had been taken into the Department or the request that it be destroyed. Mr. Gonzales was on vacation on the day the Gun was received. Detective Moore further explained that a couple of days later he removed the Gun and another weapon into his office because it had a much dryer humidity than the property room where there had been problems with weapon developing rust. He have the Department's AFIS (Automated Fingerprint Identification System) in his office which necessitates the dryer humidity

- Detective Moore failed to convey to the appropriate person that the owner wanted the Gun destroyed.

2. Detective Moore stated in his Voluntary Statement given to the Texas Ranger Division of the Texas Department of Public Safety on 7/17/98 that:

> "There is no policy in our department that states that I have to qualify with any rifle that I carry. I had not qualified with this particular weapon, however I am familiar with the AR-15 and its functions."

Harlingen Police Department Directive 4.04.002 states:

> "An officer must undergo, Department approved, training, and display proficiency in the use of any authorized weapon the officer carries. Additionally, officers must comply with all continuing proficiency training required by the Department."

- Chief Scheopner also mentions in his interview with Robenson on 11/9/98 that the Directives don't specify rifles.

- The response is simple, direct and reasonable. A rifle is a "weapon" which was authorized for Moore by Captain Vasquez. It, therefore, follows that Moore should "display" his "proficiency" with the Gun in compliance with established policy. Additionally, it is good sound thinking that if you are issuing a deadly weapon you need to be sure the person handling it is proficient in its use, regardless of what the Directive does or does not say.

16

3. In a group meeting on July 21, 1998 Detective Moore stated that he had permitted his son to fire the Gun in practice at their home.

- This act is a violation of good police practice, if for no other reason that the shooter might accidentally injure themselves or someone else while practicing. No matter how slight the chance, it is more prudent not to permit the person to use the Department issued weapon

17

## SUMMARY

In the aftermath of the incident with the Gun on July 7, 1998 a number of occurrences came to the attention of Chief Scheopner which mandated that he conduct or cause to be conducted a detailed, documented administrative investigation.  He failed to do so. Instead of clearing the air with a professional review of the circumstances surrounding the Gun, he further complicated and confused the situation with summary statements that were inaccurate, unsubstantiated and refuted by the facts. The number one charge invested in a policing agency by its citizens and symbolized by the badge is that of public trust.  If that trust is in any way compromised then there is a serious breech in the delivery of service to the community that should be repaired.

Captain Vasquez should have told Moore that he would check with Chief Scheopner and get back with him.  Regardless, if he decided to assign the Gun to Moore he should have put it in writing with his training requirement and directed it to the Chief and a copy to Detective Moore.  He failed to comply with policy in recognizing that it was the authority of the Chief to make the decision on assignment of the Gun.  He further failed to notify or make arrangements for Detective Moore to demonstrate his proficiency with the weapon. He violated Harlingen Police Department Policies 4.04.001 & 4.04.002 and good police management practices and can be negatively sanctioned.

Detective Moore should have procedurally and a matter of good professional practice notified the property custodian of the presence of the Gun and the owner's request for destruction.  He was derelict in his responsibility as a property custodian and can be negatively sanctioned.

Detective Moore is buffeted from sustaining the Policy violations of being assigned and carrying an unauthorized weapon because the Gun was authorized by Captain Vasquez.  Even after it was authorized the Policy requires the officer to qualify with the weapon.  The qualification is complicated because of a lack of proper provisions being made by police management for the officer to demonstrate proficiency with assigned weapon.

Detective Moore violated good police practice and used poor judgment by permitting his son to fire his Department authorized weapon.  He can be negatively sanctioned.

Policies are guidelines that from time to time are violated for cause.  The executive officer of a police department, Chief Scheopner, can create, do away with, and amend policies. These policies should be practical; conform to law, applicable standards, and most importantly, the needs of the community. Too many and too few policies are problematical; however, in areas of high risk and liability for the employee and the City written policies and procedures should be in place.  These areas include firearms and evidence.  They should be published so that everyone is aware of them.  They should be reviewed and amended accordingly.  They must be enforced.

18

# Changes

Page 1, last paragraph – delete the word "significant"

**Page 2, First paragraph – delete the sentence "The issue is not whether the investigation was handled properly.  It is that there was no investigation."**