*134*

United States District Court
Southern District of Texas
ENTERED

AUG 0 2 2001

Michael N. Milby, Clerk of Court
By Deputy Clerk
11:24 Am

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

Arturo Guillermo Salinas, et al,           §
                                            §
            Plaintiffs,                     §
                                            §
v.                                          §    CIVIL ACTION NO. B-98-162
                                            §    (consolidated with B-98-163 and B-99-70)
City of Harlingen, et al,                   §
                                            §
            Defendants.                     §

### MEMORANDUM OPINION

BE IT REMEMBERED, that on August 2, 2001, after considering the Defendant's Second Motion for Summary Judgment [Dkt. No. 100], the Plaintiffs' Response to Defendant's Second Motion for Summary Judgment [Dkt. No. 106], Plaintiff Raul Rodriguez' Response to Defendant's Second Motion for Summary Judgment [Dkt. No. 110], Stipulation of Authentication of Documents [Dkt. No. 113], Plaintiffs' Response to Court's Order Dated July 11, 2001 [Dkt. No. 114], Defendant's Reply to Plaintiffs' Responses to Second Motion for Summary Judgment [Dkt. No. 115], Plaintiffs' Response to Court's Order Dated July 19, 2001 [Dkt. No. 122], Defendant's Notice of Recent Fifth Circuit Authority [Dkt. No. 127], and Defendant's Supplemental Brief in Support of Second Motion for Summary Judgment [Dkt. No. 128], the Court **GRANTED IN PART** the Defendant's Second Motion for Summary Judgment [Dkt. No. 100]. Summary judgment is granted on the Plaintiffs' 42 U.S.C. § 1983 Fourteenth Amendment substantive due process cause of action under the state created danger theory because the Defendant City of Harlingen did not legally cause the Plaintiffs' injuries.

I.     **SUMMARY AND PROCEDURAL HISTORY**

A series of tragic circumstances led to the murder of Border Patrol Agents Susan L. Rodriguez and Ricardo G. Salinas and the injury of Cameron County Sheriff Deputy

1

Raul Rodriguez on July 7, 1998. The Plaintiffs in this lawsuit are the immediate relatives of the murdered Border Patrol Agents and the wounded Cameron County Sheriff Deputy Raul Rodriguez. Plaintiffs Stephen L. Williams and Robyn S. Williams are the parents and Gilberto M. Rodriguez is the spouse of decedent Border Patrol Agent Susan L. Rodriguez. Gilberto M. Rodriguez has brought suit on his own behalf and on behalf of his and Susan L. Rodriguez' minor daughter Megan Suzanne Rodriguez. Plaintiffs Arturo Guillermo Salinas and Elisa Hernandez Herrera Salinas are the parents of decedent Border Patrol Agent Ricardo G. Salinas.

The Plaintiffs initially filed three separate lawsuits. Those lawsuits were consolidated in May 2000 [B-98-162, Dkt. No. 45] [B-98-163, Dkt. No. 45] [B-99-70, Dkt. No. 39] after the Court ruled on motions to dismiss filed in each case [B-98-162, Dkt. No. 43] [B-98-163, Dkt. No. 43] [B-99-70, Dkt. No. 37]. The Court subsequently granted the Parties' agreed motion to dismiss all claims against the individual Defendants R.D. Moore and Jim Scheopner [Dkt. No. 61]. The remaining Defendant, the City of Harlingen, filed a motion for summary judgment in July 2000 [Dkt. No. 59]. The Plaintiffs asked the Court to continue submission of the City's summary judgment motion so they could complete additional discovery before filing a response [Dkt. No. 66]. The Court granted the Plaintiffs' motion and set deadlines for the submission of a renewed summary judgment motion [Dkt. No. 94]. The City then filed its Second Motion for Summary Judgment [Dkt. No. 100]. The City's Second Motion for Summary Judgment [Dkt. No. 100] is the subject of this order.

The City argues in its pending motion for summary judgment that the Plaintiffs' 42 U.S.C. § 1983 claim for a violation of their Fourteenth Amendment substantive due process rights under the state created danger theory fails because the City's actions did not cause the Plaintiffs' injuries. Additionally, the City asserts the Plaintiffs cannot recover punitive damages against the City under federal law. The Court finds that although the City engaged in a series of reprehensible acts that demonstrate a complete disregard for the safety of the general public and the proper safeguarding and chain of custody of police department weapons, those acts were not the legal or proximate cause of the Plaintiffs'

2

injuries under 42 U.S.C. § 1983.  Punitive damages cannot be recovered from the City based on the Plaintiffs' 42 U.S.C. § 1983 cause of action.

II.   **STANDARD FOR RULING ON A SUMMARY JUDGMENT MOTION**

Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). See Hunt v. Cromartie, 526 U.S. 541, 552 (1999).  The party making a summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery documents which demonstrate the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Colson v. Grohman, 174 F.3d 498, 506 (5th Cir.1999). If the moving party meets this burden, the non-movant then must designate specific facts showing there is a genuine issue for trial to survive summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994). "In reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached." Perenco Nigeria Ltd. v. Ashland Inc., 242 F.3d 299, 304-05 (5th Cir. 2001).

III.    **SUMMARY OF FACTS IN THE SUMMARY JUDGMENT RECORD**[1]

Border Patrol Agent Susan L. Rodriguez, Border Patrol Agent Ricardo G. Salinas, and Cameron County Sheriff Deputy Raul Rodriguez were shot by Ernest Moore ("E. Moore") on July 7, 1998 while they stood in front of the house in which E. Moore lived together with his father, R.D. Moore, a Harlingen Police Department detective. The officers were at the Moore residence to assist in a search for E. Moore – the suspect in a shooting earlier that day. The weapon used by E. Moore to shoot the officers was an AR-15 semi-automatic rifle which a private citizen had turned into the Harlingen Police Department for destruction. However, the AR-15 rifle was not destroyed. Instead, the Harlingen Police Department allowed R.D. Moore to keep the AR-15 rifle at home, although he had no duties for which it could be appropriately used and although he had not received proper training on how to safeguard or use it. R.D. Moore gave his son access to the AR-15 rifle – it was stored in a gun safe in E. Moore's bedroom along with weapons owned by E. Moore and E. Moore had a key to the safe –, although E. Moore had a history of drug abuse, was taking Prozac intermittently, and his bedroom contained Nazi paraphernalia.

A.    **Events on July 7, 1998 that led up to the murder of Border Patrol Agents Susan L. Rodriguez and Ricardo G. Salinas and attempted murder of Cameron County Sheriff Deputy Raul Rodriguez**

E. Moore was the focus of a manhunt on the morning of July 7, 1998. At approximately 5:00 a.m. that morning after an evening of drinking and using cocaine and

---

[1] The Court did not rely on inadmissible portions of the summary judgment record. Of particular note, are double hearsay statements contained in portions of the investigatory reports relied on by both the Plaintiffs and Defendant [Dkt. No. 100, Exhs. K and L; Dkt. Nos. 106 and 110, Exh. X] and the affidavit of Jose Rubio, Jr. [Dkt. Nos. 106 and 110, Exh. R; Dkt. No. 122]. Many other affidavits and reports in the summary judgment record similarly include double hearsay statements that were not considered by the Court.

The Court ordered the Plaintiffs and Defendant to remedy defects in the summary judgment record [Dkt. Nos. 108 and 121]. All of the Plaintiffs, except Cameron County Sheriff Deputy Raul Rodriguez, joined with the Defendant in submitting documents to remedy those defects [Dkt. Nos. 113, 114, and 122]. In the interest of justice, the Court will treat the latter documents as if they were filed on behalf of all of the Plaintiffs.

marijuana, E. Moore went to look for his ex-girlfriend, Julie Lynn Cox, at the home of Dan Morin in Rio Hondo, Texas [Dkt. No. 100, Exh. P-1, 5:5-7; Dkt. Nos. 106 and 110, Exh. P, p.3, Exh. X, ¶24].[2]   When E. Moore arrived, he shot Dan Morin, Dan Morin's mother Margarita Flores, and Dan Morin's sister Delia Morin with an AK-47 semi-automatic rifle [Dkt. No. 100, Exh. L, p.1, Exh. P-1, 5:5-16, Exh. F, 208:11-24, Exh. K, ¶ 9].   Margarita Flores and Delia Morin died from their gunshot wounds and Dan Morin was seriously injured [Dkt. Nos. 100, Exh. L, p.1].

At approximately 5:15 a.m., the Cameron County Sheriff Department's dispatcher received a 911 call from the scene of the shooting in Rio Hondo.   The 911 call identified E. Moore as the shooter [Dkt. No. 100, Exh. P-1, 3:1-5, 8:14-9:11; Dkt. Nos. 106 and 110, Exh. P, p.2].   The dispatcher then sent out a radio transmission to Rio Hondo police officers and sheriff deputies to respond to the crime scene and gave them a "Code 3" warning [Dkt. No. 100, Exh. O, 11:12-21, Exh. P-1, 2:25, 3:13, 3:17, 22:9-13; Dkt. Nos. 106 and 110, Exh. Q, p.1].   A "Code 3" warning is the highest danger warning that can be sent out [Exh. O, 98:6-18].

On his way to the crime scene, Sheriff Deputy Robert Rodriguez obtained a description of E. Moore's pick up truck and spotted a vehicle that fit the description [Dkt. Nos. 106 and 110, Exh. Q, p.1-2].   After a high speed pursuit, Deputy Robert Rodriguez lost sight of the suspect vehicle in the vicinity of San Benito, Texas.   At approximately 6:45 a.m., Deputy Robert Rodriguèz re-located the vehicle parked in the driveway of a residence and called for back up [Dkt. Nos. 106 and 110, Exh. Q, p.2-3].   The Sheriff Department dispatcher then gave several additional "Code 3" warnings to officers [Dkt. No. 100, Exh. P-2, 14:6, 14:24].

Shortly after Deputy Robert Rodriguez re-located the suspect's vehicle, a man exited the residence where it was parked and identified himself as R.D. Moore, a Harlingen

---

[2] "Interview of witnesses reveals that Ernest Moore was at a friends [sic] house, drinking excessively and abusing cocaine and marijuana from about 6:00 p.m. July 6, 1998 to when they last saw him at about 2:00 a.m. July 7, 1998 (toxicology reports indicated he tested positive for cocaine and marijuana and had an alcohol level of .092)" [Dkt. Nos. 106 and 110, Exh. P, p.3].

CutePDF - www.tacsu.com

Police Department detective [Dkt. Nos. 106 and 110, Exh. Q, p.3-4]. After a tense exchange, R.D. Moore told Deputy Robert Rodriguez that E. Moore was his son and was probably armed and in the vicinity [Dkt. Nos. 106 and 110, Exh. Q, p.3-4]. R.D. Moore demanded information on what his son had done [Dkt. Nos. 106 and 110, Exh. Q, p.3-4]. Deputy Rodriguez told R.D. Moore that his supervisor, Sargeant Ronald K. Saenz, was on the way and would provide him with information [Dkt. Nos. 106 and 110, Exh. Q, p.4].

R.D. Moore suspected that his son E. Moore was in trouble because his wife woke him up around 6:00 a.m. and told him that she was worried. Mrs. Moore had heard a door slam and saw her son's pick up truck in the driveway, but could not find him [Dkt. No. 100, Exh F, 5:14-15, 33:22-34:6]. R.D. Moore went into his son's bedroom and saw that the gun safe in the bedroom was open and at least one semi-automatic rifle was missing [Dkt. No. 100, Exh F, 5:25-6:4, 16:22]. He then walked outside and saw that his son's pick up truck was damaged. When he looked inside, he saw ammunition on the floorboard [Dkt. No. 100, Exh F, 17:5-18:22, 20:4-25]. R.D. Moore and his wife searched for E. Moore both inside the house and in surrounding areas but could not find him [Dkt. No. 100, Exh. F, 21:21-22:4].[3]

Soon after Deputy Robert Rodriguez called for back up, officers from the Cameron County Sheriff Department, Border Patrol, and Harlingen Police Department began to arrive at the Moore residence [Dkt. Nos. 106 and 110, Exh. J, p.1-2; Exh. P, p.2]. The Cameron County Sheriff Department had contacted the local Border Patrol office to request assistance in the search and sent a 'look out' call to the Harlingen Police Department [Dkt. Nos. 106 and 110, Exh. P, p.2; Exh. L]. Deputy Raul Rodriguez states that he, among others, warned the Border Patrol office "to use caution and that the suspect was extremely armed and dangerous" [Dkt. Nos. 106 and 110, Exh. Z, p.1]. Cameron County Sheriff Department Sergeant Ronald K. Saenz and Deputy Raul Rodriguez were among the first

---

[3] R.D. Moore states that he did not see or speak to his son that morning [Dkt. No. 100, Exh. F, 5:8-12]. A Harlingen Police Department sergeant, however, states that he remembers R.D. Moore indicating that E. Moore had told him that he was "in a lot of shit" [Dkt. Nos. 106 and 110, Exh. I and Exh. J, p.2]

to arrive [Dkt. No. 100, Exh. A, 9:14-10:3; Dkt. Nos. 106 and 110, Exh. Z, p.1-2]. Sergeant Saenz informed R.D. Moore that his son was the suspect in a murder and obtained consent to search the Moore residence [Dkt. No. 100, Exh. A, 10:4-18].[4]

Sergeant Saenz, Deputy Raul Rodriguez, Deputy Robert Rodriguez, and a few other sheriff deputies began the search of the Moore residence at approximately 7:06 a.m. [Dkt. No. 100, Exh. A, 11:6-11; Dkt. Nos. 106 and 110, Exh. Q, p.5, Exh. Z, p.2]. As part of the search of the Moore residence, the officers examined E. Moore's bedroom and reported seeing Nazi paraphernalia [Dkt. No. 100, Exh. K, ¶39; Dkt. Nos. 106 and 110, Exh. H, 87:21-23, Exh. Q, p.5, Exh. Z, p.2]. The officers determined that E. Moore was not in the house [Dkt. No. 100, Exh. A, 12:16-25].

After the search was complete, Sergeant Saenz, Deputy Raul Rodriguez, and Agent Susan L. Rodriguez stood in the front yard and discussed how to proceed with the search for E. Moore in surrounding areas [Dkt. No. 100, Exh. A, 16:20-18:14; Dkt. Nos. 106 and 110, Exh. Z, p.2]. Agent Rodriguez was the senior Border Patrol agent on the scene and was in charge of coordinating the Border Patrol presence [Dkt. No. 100, Exh. C, 12:6-19, Exh. D, 11:5-14:20, 15:12-16:6; Dkt. Nos. 106 and 110, Exh. P, p.2-3]. Agent Rodriguez was aware that the suspect was armed, dangerous, and could be in the vicinity [Dkt. No. 100, Exh. C, 13:12-23, 66:14-22; Dkt. Nos. 106 and 110, Exh. P, p.2].

Shortly after Sergeant Saenz, Deputy Rodriguez, and Agent Rodriguez began their discussion, Border Patrol Agents Ricardo G. Salinas and Orlando Sanchez walked up to Agent Rodriguez to be briefed. Agents Salinas and Sanchez's supervisor had informed them that E. Moore was a murder suspect and sent them to the Moore residence to assist with the search by providing communication between a Border Patrol helicopter and law enforcement officers on the ground [Dkt. No. 100, Exh. D, 8:12-10:1]. When Agents Salinas and Sanchez arrived there were numerous law enforcement officers at the scene,

---

[4] Border Patrol Agent Susan L. Rodriguez attempted to assist the Sheriff Department with the search; however, R.D. Moore refused her entry [Dkt. No. 100, Exh. A, 10:21-11:5]. R.D. Moore stated that his son was not an illegal alien and that he would not allow Border Patrol agents into his home [Dkt. Nos. 106 and 110, Exh. F, 39:8-40:13].

CVsPDF - www.fineio.com

and fellow agents, including fellow Agent George A. Hupp, directed them to speak with Agent Rodriguez [Dkt. No. 100, Exh. C, 68:22-70:17]. Agent Hupp recalls that he or another agent told Agents Salinas and Sanchez that the suspect was probably in the vicinity and armed [Dkt. No. 100, Exh. C, 69:11-70:17]. Shortly after Agents Rodriguez, Salinas, and Sanchez began speaking gun fire suddenly erupted [Dkt. No. 100, Exh. D, 16:8-12; Dkt. Nos. 106 and 110, Exh. P, p.3].

E. Moore had exited a corn field across from the Moore residence at approximately 7:15 a.m. and began relentlessly shooting at law enforcement officers with a semi-automatic weapon [Dkt. Nos. 106 and 110, Exh. Q, p.5, Exh. X, ¶9, Exh. Z, p.2]. Agents Rodriguez and Salinas were fatally shot and Deputy Raul Rodriguez was seriously wounded [Dkt. No. 100, Exh. K]. Agent Rodriguez "was shot on the upper right thigh and left neck" and died on the way to the hospital [Dkt. No. 100, Exh. K; Dkt. Nos. 106 and 110, Exh. P, p.3]. "Agent Salinas received a fatal shot to the back of the skull and another shot entering the back of his left thigh" [Dkt. Nos. 106 and 110, Exh. P, p.3]. Although Deputy Raul Rodriguez was shot in the left arm and the bullet traveled into his chest, he returned fire along with other law enforcement officers until E. Moore stopped shooting [Dkt. Nos. 106 and 110, Exh. Z, p.2]. E. Moore died from gunshot wounds later that day [Dkt. No. 100, Exh. K].

B.     **Ernest Moore's access to firearms, including the AR-15 semi-automatic rifle he used to murder Border Patrol Agents Susan L. Rodriguez and Ricardo G. Salinas and to attempt to murder Cameron County Sheriff Deputy Raul Rodriguez**

Ernest Moore took the semi-automatic weapons used in both the Rio Hondo and San Benito shootings from a gun safe in his bedroom. The safe had been jointly purchased by E. Moore and R.D. Moore and both men had keys [Dkt. Nos. 106 and 110, Exh. F, 50:20-24, 51:7-8]. The safe contained 20 firearms according to an inventory completed by R.D. Moore after the shootings [Dkt. No. 100, Exh. G; Dkt. No. 113]. Of those 20 weapons, three were the property of the Harlingen Police Department, 12

8

belonged to E. Moore, and five belonged to R.D. Moore. The inventory completed by R.D. Moore includes both the AK-47 rifle used in the Rio Hondo and the AR-15 rifle used in the San Benito shooting [Dkt. No. 100, Exh. G]. In addition to the AK-47 and AR-15 rifles, the gun safe contained at least four other semi-automatic rifles [Dkt. No. 100, Exh. G]. The latter rifles were the private property of E. Moore; they were operable and had many rounds of ammunition [Dkt. No. 100, Exh. F, 209:19-23 and Exh. G]. According to R.D. Moore, E. Moore was proficient in the use of most of the 20 weapons in the safe [Dkt. No. 100, Exh. F, 210:12-17].

C.   **Investigation into Ernest Moore's use of an AR-15 semi-automatic rifle entrusted to the Harlingen Police Department to murder Border Patrol Agents Susan L. Rodriguez and Ricardo G. Salinas and to attempt to murder Cameron County Sheriff Deputy Raul Rodriguez**

The City of Harlingen, investigators, and the public soon discovered that the AR-15 semi-automatic rifle used by E. Moore in the July 7, 1998 murder and attempted murder of the three law enforcement officers belonged to the Harlingen Police Department.[5] Obviously, a private citizen's use of a police department weapon to shoot law enforcement officers was the subject of scrutiny. The shooting generated both a criminal investigation and an internal administrative review. The criminal investigation of the murders and attempted murder was performed by Texas Ranger Rodolfo C. Jaramillo on behalf of the Texas Department of Public Safety [Dkt. No. 100, Exh. K]. The administrative review of the Harlingen Police Department's role in the use of the AR-15 rifle was initiated by Assistant City Manager Joe LaBeau, as the individual directly responsible for supervising the Harlingen Police Department, upon the request of City Manager Natalie Prim [Dkt. Nos. 106 and 110, Exh. AA, 9:18-10:10, Exh. BB, 11:17-12:15].

The Chief of Police of the Harlingen Police Department Jim Scheopner initially told the press on July 10, 1998 that the AR-15 semi-automatic rifle used by E. Moore was

---

[5] See e.g. Dkt. No. 100, Exh. K, ¶107; Dkt. Nos. 106 and 110, Exh. A, 87:19-25, Exh. T, Exh. BB-3, p.1; Dkt. No. 122, p.4.

9

registered to the police department. He further explained that R.D. Moore was assigned the weapon and was allowed to keep it at home because he was on-call 24 hours a day as the police department's sharpshooter on its current or past Special Weapons and Tactics (SWAT) team [Dkt. Nos. 106 and 110, Exh. A, 87:7-10,19-25, Exh. T; Dkt. No. 122, p.4-5]. The criminal and administrative investigations into the shootings subsequently demonstrated that Chief Scheopner's statements to the public were in part seriously misleading and in part outright false.

Texas Ranger Jaramillo soon discovered that the AR-15 rifle had been given to the police department by a public citizen for destruction. When Ranger Jaramillo was told that the AR-15 rifle was police department property, he requested a weapon trace [Dkt. No. 100, Exh. K, ¶113]. The trace revealed that the AR-15 rifle was registered to a private citizen, Dr. Thomas E. Pirtle [Dkt. No. 100, Exh. K, ¶114]. Ranger Jaramillo contacted Dr. Pirtle and his wife Sylvia Pirtle and set up an interview for July 16, 1998 [Dkt. No. 100, Exh. K, ¶142]. At the interview, Mrs. Pirtle identified the AR-15 rifle used by E. Moore in a photographic array and stated that she had delivered it to the Harlingen Police Department for destruction along with another weapon in 1995 [Dkt. No. 100, Exh. K, ¶ 143; Dkt. Nos. 106 and 110, Exh. B]. Mrs. Pirtle stated that "there had been some break ins in the neighborhood and it made me uneasy having assault[-]type weapons in the house. I did not want to take a chance in anyone breaking into our home and the weapons getting into the wrong hands" [Dkt. Nos. 106 and 110, Exh. B]. She states that she met with Detective R.D. Moore and "told him that I wanted the weapons destroyed, I don't recall what he said but, he implied that he would take care of it. . . . I asked him for a receipt, I don't know the exact words he used but he stated something to the effect that I did not need one. I told him that I was not leaving until I received one. Moore then filled out a receipt and gave it to me with the information on the weapons" [Dkt. Nos. 106 and 110, Exh. B]. Mrs. Pirtle provided Ranger Jaramillo with a copy of the receipt which shows that she delivered the weapons for "disposal" on June 23, 1995 [Dkt. No. 100, Exh. K, ¶ 143(D); Dkt. No. 124-B, p.6]. When Ranger Jaramillo contacted Chief of Police Scheopner to inquire about what

10

he had discovered, he was told that the the AR-15 rifle had been donated to the police department [Dkt. Nos. 106 and 110, Exh. K, ¶ 146-147].

Assistant City Manager LaBeau asked Chief Scheopner for a written explanation of how a police department weapon ended up in the hands of E. Moore [Dkt. Nos. 106 and 110, Exh. BB, 11:17-13:12]. Chief Scheopner wrote a memorandum to Assistant City Manager LaBeau on July 14, 1998, that differs markedly from the statement he gave to the press on July 10, 1998. In the memorandum, Scheopner states:

> Several years ago, the Harlingen Police Department assembled a Special Weapons and Tactics Team. It was disbanded about 5 years ago. The only officers still employed that have had extensive training in SWAT tactics are Captain J.B. Vasquez and Detective R.D. Moore. If an incident ever occurs where a police sharpshooter was needed, one of these officers would be called. The weapon used by the assailant . . . was donated to the Harlingen Police Department in 1995 by a citizen. It was assigned to Detective Moore, by Captain Vasquez, to be carried by him in the event that a tactical situation arose where a police sharshooter [sic] was needed.
>
> [Detective Moore] lives in the country south of San Benito, and for safety reasons, secures the rifle in the gun vault at his house at night. The rifle was safely secured in the locked gun vault at Detective Moores [sic] home on July 6, 1998. In doing this, Detective Moore went above and beyond normal procedures to secure the weapon. Sometime during the early morning hours of July 7, 1998, Det. Moores [sic] 25 year old son, Ernest Moore, clandestinely, and without authority or permission, got the key to the gun vault of Moores [sic] key ring, opened the vault and took two semi-automatic rifles out, leaving the vault open" [Dkt. No. 100, Exh. BB-1, p.1-2].

Scheopner further asserts that "[i]t has been determined by everyone that no one did anything wrong at all, and that the only person that was responsible for this extraordinary tragedy was the assailant" [Dkt. Nos. 106 and 110, Exh. BB-1, p.1].

After further investigation, Assistant City Manager Labeau wrote a memorandum dated October 14, 1998 to City Manager Prim summarizing his findings on whether the police department had followed proper procedures in allowing R.D. Moore to keep the AR-15 rifle at his home [Dkt. Nos. 106 and 110, Exh. BB-3]. LaBeau's report to City Manager Prim concluded that:

11

- The Chief had made no formal investigation into the matter and had allowed Moore to work without interruption or questioning.
- Captain Vasquez had allowed Moore to take the weapon home for the general purpose of a 'duty weapon.'
- There was no substantiation in practice or in documentation that Moore served the department in a 'sharp-shooter role.'
- Moore had the weapon in his possession for over a year, and his possession of the weapon was undisciplined sometimes leaving it in his pick-up truck, other times behind the door of his office.
- The inventory procedures in the department were informally and not uniformly applied.
- Moore had not had formal training on the weapon since 1976.
- Moore did not qualify annually with the weapon, but instead practiced shooting it in his yard at home. . . .
- The weapon in question had been delivered to the department for 'disposal.'
- On at least one occasion Moore had allowed his son to use the weapon.
- No records exist of training or actual call-out for Moore in his supposed duty as a sharp shooter.
- Departmental policies . . . appeared to this reviewer to have been violated.
- The Chief asserted that no departmental violation had been violated [sic] [Dkt. Nos. 106 and 110, Exh. BB-3, p.3-4].
- A handwritten inventory of weapons issued existed, but did not show Moore's sign-out of the AR-15.
- Hundreds of weapons, mostly handguns, were stored in stacked bins with tags which relate to case documentation. Many of these weapons have been in storage for years, some decades.
- A wide assortment of various rifles were stored in various secured rooms. Some of these were owned by the Department. Others were marked as 'evidence.'
- Over the years, some of these weapons have been put into service, usually with permission from the Chief.
- No current effort has been made to dispose of stock-piled weapons [Dkt. Nos. 106 and 110, Exh. BB-3, p.4-5].

LaBeau further noted that an in-house audit indicated that seven officers, including R.D. Moore, were not in compliance with annual firearm qualification requirements [Dkt. Nos. 106 and 110, Exh. BB-3, p.7-8]. Based on these findings, LaBeau concluded that Chief Scheopner lied and recommended that a disciplinary review be conducted on Chief Scheopner, Captain Vasquez, and R.D. Moore's actions [Dkt. Nos. 106 and 110, Exh. BB-3, p.8, 11-13]. He generally concluded that "it is clear that there <u>are no detailed policies</u>

12

and procedures for the handling of weapons, and there has been inadequate weapons practice and training. The department lacks proper documentation of weapons training and qualification" [Dkt. Nos. 106 and 110, Exh. BB-3, p.10]. LaBeau also recommended that a third party be appointed to conduct further investigation [Dkt. Nos. 106 and 110, Exh. BB-3, p.13].

Thereafter, on November 4, 1998, City Manager Prim made a report to the Harlingen City Commission that states that "management's preliminary findings reveal serious concerns and questions regarding the adequacy of records, weapons handling policies, inventory disposition and controls, and management practices" [Dkt. Nos. 106 and 110, Exh. BB-7, p.3]. Prim adopted LaBeau's recommendation that a third party be appointed to conduct further review. She stated that "because of the highly specialized nature of law enforcement, management concludes the need for expert assistance in evaluating and reviewing" the police department's actions and practices [Dkt. Nos. 106 and 110, Exh. BB-7, p.4]. Ms. Prim subsequently hired a an expert in police practices, James Robenson, to conduct a specialized investigation [Dkt. Nos. 106 and 110, Exh. AA, 89:11-90:24].

James Robenson conducted a review of the circumstances that led up the use of the AR-15 rifle in the shootings and issued a report with findings that confirm Assistant City Manager LaBeau's conclusions in his October 14, 1998 report and City Manager Prim's concerns [Dkt. No. 124-B][6]  Robenson made several additional findings based on new information he uncovered and his own expertise. As to R.D. Moore, Robenson found that he violated good police practice and could be sanctioned for: (1) failing to notify the property custodian that he had received the AR-15 rifle and that Mrs. Pirtle had requested the weapon's destruction [Dkt. No. 124-B, p.15, 18]; and, (2) permitting his son to fire the AR-15 rifle in practice at their home [Dkt. No. 124-B, p.17, 18]. As to Chief Scheopner,

---

[6] The Court granted a motion to compel the Robenson Report [Dkt. No. 116]. Thereafter, the Plaintiffs submitted the report as part of the Parties' Joint Pretrial Order [Dkt. No. 124]. The Court then issued an order notifying the Parties that it would consider the Robenson Report in ruling on the Defendant's pending summary judgment motion [Dkt. No. 125].

13

Robenson found that Scheopner: (1) failed to conduct a proper inquiry after the shooting; (2) provided inaccurate information to City management; (3) failed to take appropriate action once he knew that the AR-15 rifle had been received 'for disposal'; and, (4) acted inappropriately once he knew R.D. Moore had been assigned a weapon on which he was not proficient [Dkt. No. 124-B, p.10, 14]. Robenson clearly questions the veracity of Chief Scheopner's statement that R.D. Moore was on 24-hour-call-out-status as a sharpshooter given that the police command personnel who would use R.D. Moore in that capacity were unaware that he was a designated sharpshooter, the AR-15 "is not a rifle used by any 'sharpshooter'", and there was no procedure in place so the department could contact R.D. Moore 24 hours a day [Dkt. No. 124-B, p.12-13]. Robenson also found that Captain Vasquez engaged in misconduct [Dkt. No. 124-B, p. 18]. In conclusion, Robenson states "in areas of high risk and liability for employee and the City[,] written policies and procedures should be in place. These areas include firearms and evidence. They should be published so that everyone is aware of them. They should be reviewed and amended accordingly. They must be enforced" [Dkt. No. 124-B, p.18]. The clear implication of the entire report is that the word of mouth policies in place at the police department for the chain of custody of evidence and safeguarding of firearms were inadequate [Dkt. No. 124-B, p.9, 18].

IV.     **LIABILITY OF THE CITY OF HARLINGEN UNDER 42 U.S.C. § 1983 FOR THE ALLEGED VIOLATION OF BORDER PATROL AGENTS SUSAN L. RODRIGUEZ AND RICARDO G. SALINAS AND CAMERON COUNTY SHERIFF DEPUTY RAUL RODRIGUEZ' CONSTITUTIONAL RIGHTS**

The City argues in its pending motion for summary judgment that the facts of this case do not satisfy the elements of the state created danger theory of 42 U.S.C. § 1983 liability for violation of the murdered and injured officers' Fourteenth Amendment right to life and bodily integrity. The City maintains no City policy or policymaker created a danger that Agent Rodriguez, Agent Salinas, and Deputy Rodriguez did not already face independent of any actions or policies of the City. Although E. Moore used a City-owned AR-15 rifle to shoot the officers, he had ready access to privately-owned and similarly

14

powerful semi-automatic weapons.   Additionally, the City asserts that it did not possess any information on the danger faced by the officers that they did not already have.   It therefore did not withhold any information that would have enabled the officers to avoid the danger or better defend themselves.

In response, the Plaintiffs argue that the City of Harlingen's policies and the acts of its policymakers do trigger the state created danger theory and that the City can be held liable for the violation of the Fourteenth Amendment right of Agent Rodriguez, Agent Salinas, and Deputy Rodriguez to bodily integrity.   They contend that Chief Scheopner is a City policymaker in the area of Harlingen Police Department weapons policies and his acts are consequently attributable to the City.   They further argue that Chief Scheopner knew that the AR-15 semi-automatic rifle was issued to Detective R.D. Moore, although he was not trained in its use or safekeeping, and that E. Moore had taken the AR-15 rifle and was proficient with that rifle before the officers were shot.   As such, the Plaintiffs claim that Chief Scheopner created the danger faced by the officers at the Moore residence in San Benito, but did nothing to warn them of that danger.

The Court finds that Chief Scheopner was a final policymaker for the City of Harlingen.   His conduct in allowing R.D. Moore to take possession of the AR-15 rifle and complete failure to maintain and enforce adequate policies on the assignment, chain of custody, and safeguarding of weapons, was deliberately indifferent to the constitutional rights of Agents Rodriguez and Salinas and Deputy Rodriguez.   However, those acts and omissions were not the proximate cause of the officers' deaths or injuries under the state created danger theory because they did not create an opportunity that otherwise would not have existed for the E. Moore's crimes to occur, nor did they effectively strip the officers' ability to defend themselves.

A.   **Law on the state created danger theory of liability for a violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983**

Title 42, United States Code, Section 1983 provides a mechanism for persons to seek redress for deprivations of federal constitutional rights by a person or local

governmental entity acting under color of state law.  See Monell v. Dept. of Soc. Services of City of New York, 436 U.S. 658, 689 (1978).  The state-created danger theory is a basis of recovery for a violation of an individual's Fourteenth Amendment substantive due process right to bodily integrity under 42 U.S.C. § 1983.  It is based on the premise that a government official or entity violates an individual's right to bodily integrity when it causes a foreseeable injury at the hands of a private person.  See McClendon v. City of Columbia, 2001 WL 776813, at *2 (5th Cir. July 26, 2001).  An early and oft-cited opinion aptly describes the state created danger theory: "[I]f a state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role is merely passive; it is as much an active tort-feasor as if it had thrown him into a snake pit." Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982).

Recent state created danger cases primarily focus on Supreme Court dicta in DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189 (1989), that suggests that the Supreme Court would approve of the state created danger theory.  In Deshaney, the Supreme Court held that the state had no affirmative duty under the Fourteenth Amendment to protect the plaintiff against private violence or provide government aid, but then stated "[w]hile the state may have been aware of the dangers [the plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them." Id. at 201.  Deshaney accordingly suggested that had the state created the danger faced by the plaintiff, it might be held liable.

The Fifth Circuit recently recognized the state created danger theory as a viable cause of action.  See McClendon, 2001 WL 776813, at *2.  In McClendon v. City of Columbia, Miss., the Fifth Circuit stated, "[w]e have not heretofore explicitly adopted and enforced [the state created danger theory]. We do so now." Id.  Until the Fifth Circuit issued its opinion in McClendon on July 26, 2001, it had repeatedly indicated that it would adopt the state created danger theory if it were presented with an adequate factual scenario, but that every case it had considered so far has fallen short of the mark.  See Piotrowski v. City of Houston, Tex., 237 F.3d 567, 584 (5th Cir. 2001); Saenz v. Heldenfels Bros., Inc., 183 F.3d 389, 391-92 (5th Cir. 1999); Randolph v. Cervantes, 130 F.3d 727,

16

731 (5th Cir. 1997); Doe v. Hillsboro Indep. Sch. Dist., 113 F.3d 1412, 1415 (5th Cir. 1997); Salas v. Carpenter, 980 F.2d 299, 306-09 (5th Cir. 1995); Johnson v. Dallas Indep. Sch. Dist., 38 F.3d at 198, 200-02 (5th Cir. 1994); Lefall v. Dallas Indep. Sch. Dist., 28 F.3d 521, 530-31 (5th Cir. 1994). In McClendon, the Fifth Circuit outlined the basic elements a plaintiff must prove to prevail on a state created danger claim: (1) state actors must have created a dangerous environment or increased the danger of harm to the plaintiff; (2) state actors must have known that the environment was dangerous; and, (3) state actors "must have used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur." McClendon, 2001 WL 776813, at *2 (citing Johnson, 38 F.3d at 201).

B.  **Law on the liability of local governmental entities for constitutional violations pursuant to 42 U.S.C. § 1983**

For a city to be held liable under 42 U.S.C. § 1983, a plaintiff must prove that a federal right was violated as a result of an official policy, practice, or custom of that governmental body's policymakers. See Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 403 (1997); Palmer v. City of San Antonio, Tex., 810 F.2d 514, 516 (5th Cir. 1987), abrogated on other grounds by Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993). "Although occasionally referred to as if they were three distinct creatures, a local governmental entity's official 'policies,' 'practices,' and 'customs' are really three different terms for those actions which sufficiently bear the imprimatur of a governmental entity's final policymakers to justify holding the governmental entity responsible therefor." Hicks v. Bexar County, Tex., 973 F.Supp. 653, 677 (W.D. Tex. 1997). In other words, requiring proof of a municipal policy ensures that a city is held liable for its own wrongs, instead of imposing respondeat superior liability for the actions of a governmental employee. See City of Canton v. Harris, 489 U.S. 378, 385 (1989); Piotrowski, 237 F.3d at 578.

17

A city policy, custom, or practice can be created through several means.  Under §
1983, a city can be held liable for its officially promulgated rules, or the single act of a final
policymaker designated as such under state law.  See City of St. Louis v. Praprotnik, 485
U.S. 112, 122-23 (1988) (plurality opinion); Pembaur v. Cincinnati, 475 U.S. 469, 478-79
(1986); Baltazor v. Holmes, 162 F.3d 368, 377 (5th Cir.1998).  In addition, liability can be
premised on a persistent, widespread practice of officials or employees which is not
officially adopted, but is so common that actual or constructive knowledge can be attributed
to final policymakers.  See Esteves v. Brock, 106 F.3d 674, 677 (5th Cir. 1997).

In order to impose § 1983 liability on a city, a plaintiff must prove that the city's
policy, custom, or practice was adopted with deliberate indifference to the plaintiff's
constitutional rights and that it caused the plaintiff's constitutional injury.  The policy,
custom, or practice must have been created with deliberate indifference to the known or
obvious consequence that a constitutional violation would result. See Piotrowski, 237 F.3d
at 579.  "Deliberate indifference of this sort is a stringent test, and 'a showing of simple or
even heightened negligence will not suffice' to prove municipal culpability."  Id. (citing
Bryan County, 520 U.S. at 407.  Moreover, "there must be a direct causal link between the
municipal policy and the constitutional deprivation." Piotrowski, 237 F.3d at 580.

The Fifth Circuit has emphasized the importance of following a proper order of
analysis in determining whether a city can be held liable for an alleged constitutional injury
under § 1983.  See id. at 578.  "Mistakes in analyzing section 1983 municipal liability cases
frequently begin with a failure to separate the three attribution principles and to consider
each in light of relevant case law."  Id.  The three attribution principles are "a policymaker,
an official policy and the 'moving force' of the policy."  Id.  In light of the Fifth Circuit's
admonition, this Court will first identify the policymaker for the City of Harlingen on police
department weapons practices and then examine whether an official policy exists that can
be attributed to the City.   If a relevant City policy exists, the Court will subsequently
determine whether that policy caused the Plaintiffs' alleged constitutional injury.

18

C.    **Chief Scheopner was delegated final policymaking power in the area of police**
      **department weapons policies, and, therefore, the City can be held responsible**
      **for his actions**

The Parties in this case disagree on whether Chief Scheopner is a final policymaker

on police department weapons policies for the City of Harlingen. The Plaintiffs argue that

Chief Scheopner is a final policymaker for the City and the Defendant City asserts that he

is not. The Court finds that the City's policymaking power on police department weapons

policies was delegated to Chief Scheopner from the City Commission and City Manager.

1.    Law on identifying a city's policymakers

Who is a final policymaker for a governmental entity is a question of state law to be

determined by the court. See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989);

Gros v. City of Grand Prairie, Tex., 181 F.3d 613, 615 (5th Cir. 1999). The United States

Supreme Court has stated that "state law ... will always direct a court to some official or

body that has the responsibility for making law or setting policy in any given area of a local

government's business." Praprotnik, 485 U.S. at 125. However, "[t]his is not to say that

state law can answer the question for us [through labels]. But our understanding of the

actual function of a governmental official, in a particular area, will necessarily be dependent

on the definition of the official's functions under relevant state law." McMillan v. Monroe

County, Ala., 520 U.S. 781, 786 (1997). If state law does not grant final policymaking

authority to any one person, a court cannot look for a *de facto* policymaker. See

Praprotnick, 485 U.S. at 124-25.

The Supreme Court has distinguished final policymaking authority and final

decision-making authority. Municipal liability can only be premised on the acts of a final

policymaker, not a final decision-maker. See Praprotnick, 485 U.S. at 126; Pembaur, 475

U.S. at 481-83. There is no simple bright-line rule that can be followed to distinguish

between a final policymaker and a final decision-maker in many cases. See Praprotnick,

485 U.S. at 126-27. However, in Praprotnick the Supreme Court provided some basic

guiding principles. "When an official's discretionary decisions are constrained by policies

not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." Id. at 127.  See Brady v. Fort Bend County, 145 F.3d 691, 698-99 (5th Cir. 1998); Worsham v. City of Pasadena, 881 F.2d 1336, 1340-41 (5th Cir. 1989); Neubauer v. City of McAllen, 766 F.2d 1567, 1573-74 (5th Cir.1985), overruled on other grounds by Walther v. Lone Star Gas Co., 952 F.2d 119, 126 (5th Cir.1992).

While municipal liability cannot be premised on *respondeat superior* principles, final policymaking authority can be delegated such that a final decision-maker becomes a final policymaker on the delegated issue.  The Supreme Court recognized in Praprotnick that if delegation of policymaking authority were not possible, "a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others [such that] § 1983 could not serve its intended purpose." Praprotnick, 485 U.S. at 127. "[A]bsent a contrary regulation or ordinance, a city council's or city manager's continuous refusal to exercise some theoretical authority to review a municipal official's policy decisions will, at some point, establish the municipal official as the final policymaking authority by custom or usage having the force of state law."[7] Gros, 181 F.3d at 616 n.2. "[W]hether an official has been delegated final policymaking authority is a question of law for the judge, not of fact for the jury." Id. at 617.  In determining whether an official has been delegated final policymaking authority, a court must be mindful of the distinction

---

[7] See also Praprotnick, 485 U.S. at 127; Doe on Behalf of Doe v. Dallas Indep. Sch. Dist., 153 F.3d 211, 216 (5th Cir. 1998); Eugene v. Alief Indep. Sch. Dist., 65 F.3d 1299, 1304-05 (5th Cir. 1995); Yeager v. City of McGregor, 980 F.2d 337, 343-44 (5th Cir. 1993); Bennett v. City of Slidell, 728 F.2d 762, 769 (5th Cir.1984)(en banc); Mireles v. Bay City Indep. Sch. Dist., 992 F.Supp. 916, 919 (S.D. Tex. 1998).

between final decision-making and policymaking authority. See Jett v. Dallas Indep. Sch. Dist., 7 F.3d 1241, 1245-51 (5th Cir. 1993) ("Jett II").

> 2.    Chief Scheopner was delegated final policymaking authority over the Harlingen Police Department's weapons policies          '

Under the City of Harlingen's government structure, City Manager Natalie Prim and the City Commission had final authority on the practices of City departments, such as the Harlingen Police Department [Dkt. Nos. 106 and 110, Exh. AA, 6:20-7:15]. City Manager Prim was responsible for overseeing the daily operations of the City departments and she shared that task with her Assistant City Manager Joe LaBeau [Dkt. Nos. 106 and 110, Exh. AA, 7:1-15, Exh. BB, 8:1-10]. Assistant City Manager LaBeau supervised the Harlingen Police Department on a day-to-day basis and he then reported back to City Manager Prim [Dkt. Nos. 106 and 110, Exh. BB, 8:11-24]. However, despite the formal organizational structure of the City government, over time City Manager Prim and Assistant City Manager LaBeau delegated their power to make policy on weapons procedures and practices for the Harlingen Police Department to Chief of Police Jim Scheopner.[8]

City Manager Prim, Assistant City Manager LaBeau, and Chief Scheopner were all appointed in 1993 or shortly thereafter [Dkt. Nos. 106 and 110, Exh. A, 19:4-7, Exh. AA, 4:23-5:1, Exh. BB, 6:2-3]. From the beginning, Prim and LaBeau were not involved with the police department's law enforcement practices and procedures. According to several individuals who lodged complaints, Prim and LaBeau refused to intercede to effect changes within the police department, although by 1996 and 1997, they were both aware of deep-rooted problems with Chief Scheopner's administration of the Harlingen Police

---

[8] The delegation of final policymaking authority on weapons practices does not mean that other areas of power, such as personnel decisions within the police department, were delegated to Chief Scheopner. Final policymaking authority for all areas of a particular City department does not have to rest in one body or individual. "[T]he question is not whether [a government official acts for a city department] in some categorical, 'all or nothing' manner. Our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." McMillan, 520 U.S. at 785.

21

Department. They either purposely turned a blind eye to the reports of problems or were unwilling to challenge Chief Scheopner's opposition to change until after the shooting on July 7, 1998.[9]

City Manager Prim and Assistant City Manager LaBeau were never involved in decision-making on Harlingen Police Department weapons procedures. The only document that contained written procedures for the police department, the Harlingen Police Department Departmental Directives, was issued by Chief Scheopner in 1994 and remained in effect until after the July 7, 1998 shootings.[10] The directives contain only very general rules on authorization to carry weapons and training on those weapons [Dkt. Nos. 106 and 110, Exh O, Sections 4.04, 4.04.001, 4.04.002]. They contain no specific rules on the safekeeping, storage, and chain of custody of weapons.[11] Chief Scheopner confirmed in his deposition and in memoranda that the police department had no policies on what to do with weapons turned into the department by private citizens and the directives contained no procedures for confiscated weapons [Dkt. Nos. 106 and 110, Exh. A, 66:9-67:14, Exh. O, Exh. BB-5].[12] Furthermore, Chief Scheopner stated in his

---

[9] See Dkt. Nos. 106 and 110, Exh. G, Exh. T, Exh. AA:42:23-43:7, 88:25-89:1; Dkt. No. 122, p.3-4, 11-12.

[10] The language in Section 1.01 of the directives, entitled "Development and Revision of Written Directives," indicates that they were generated by Chief Scheopner. It states that "the Chief of Police finds it beneficial to incorporate written directives, policy statements, procedures and rules into one general manual" [Dkt. Nos. 106 and 110, Exh O].

[11] The directives reference the peace officer licensing requirements of the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE) [Dkt. Nos. 106 and 110, Exh. BB-5 and Exh. O]. TCLEOSE is a state regulatory agency charged with the responsibility of establishing, implementing, and maintaining standards for peace officers. TCLEOSE requires police officers to demonstrate proficiency on the firearms they carry on an annual basis. These annual proficiency requirements, however, focus on the officer's ability to shoot the weapon and clean and care for it, not their ability to maintain a proper chain of custody and safeguard firearms. See 37 TEX. ADMIN. CODE § 211.104 (1998), included in the summary judgment record as Dkt. Nos. 106 and 110, Exh. D.

[12] Chief Scheopner states in his deposition that he believed the directives contained provisions on confiscated weapons [Dkt. Nos. 106 and 110, Exh. A, 66:19-67:7]. A review of the directives indicates that they contained no such provision [Dkt. Nos. 106 and 110, Exh. BB-5 and Exh. O].

deposition that there were no formal chain of custody procedures, policies on the safekeeping weapons in police officers' homes, or written training procedures for weapons [Dkt. Nos. 106 and 110, Exh. A, 31:8-21; 64:14-19, 69:4-7]. He could not specify any measures taken to ensure that officers were not assigned weapons they were not trained to use and safeguard [Dkt. Nos. 106 and 110, Exh. A, 65:3-13].

City Manager Prim indicates in her deposition that she did not inquire about weapons procedures or assignment of weapons during her tenure. "It's just not something I would ask the chief about. . . . The things we concentrated on were budgets and that kind of thing, personnel" [Dkt. Nos. 106 and 110, Exh. AA, 42:23-43:7]. In commenting on the investigation that occurred after the shooting, City Manager Prim indicated that "we looked at the internal department policies that were promulgated in the department" [Dkt. Nos. 106 and 110, Exh. AA, 75:6-7, emphasis added]. City Manager Prim refers only to the internal policies of the police department, and does not indicate that her office or the City Commission had any policies or exerted any control over weapons procedures.

During 1996 and 1997, City Manager Prim and Assistant City Manager LaBeau received several complaints regarding Chief Scheopner's administration of the police department from the Human Resources Director for the City, Arturo Rodriguez, and the police union, the Harlingen Police Officers Association (HPOA). However, according to the individuals who made the complaints, their recommendations were not put into effect because of Chief Scheopner's resistance and the City Manager and City Commission's unwillingness to challenge Chief Scheopner to ensure that changes were made. The City's investigative reports issued after the shooting indicate such a pervasive absence of appropriate weapons-handling procedures and accountability that they lend credence to Arturo Rodriguez and the HPOA officers' assertion that complaints were made to City management regarding police department weapon practices.

Arturo Rodriguez was the Human Resources Director for the City from 1996 to 2000 [Dkt. Nos. 106 and 110, Exh. G, ¶1]. He states in an affidavit that he met twice a week with Chief Scheopner, the police department's command staff, and representatives of the police union, the Harlingen Police Officers Association (HPOA) [Dkt. Nos. 106 and 110, Exh. G,

¶1-2]. During those meetings, Mr. Rodriguez discovered problems within the administration of the police department and he repeatedly recommended that City Manager Prim send Assistant City Manager LaBeau to the police department to investigate [Dkt. Nos. 106 and 110, Exh. G, ¶2]. However, City Manager Prim did not act on Mr. Rodriguez' recommendations and "throughout 1996 and 1997 she kept Mr. LaBeau out of the police department. Mr. LaBeau's absence from the HPD was very obvious in 1996 and 1997" [Dkt. Nos. 106 and 110, Exh. G, ¶3-4]. Mr. Rodriguez further states that after the July 7, 1998 shooting, "Ms. Prim believed it is important enough to send Mr. LaBeau to the HPD, and Mr. LaBeau 'discovers' what has been there and repeatedly reported to him for 2 years! Ms. Prim and Mr. LaBeau knew about the problems but they avoided them because they were afraid to confront Chief Scheopner. Mr. LaBeau on several occasions broke into tears when confronted by others; he did this at meetings outside the HPD and with the HPD command staff. He could not take confrontational pressure. Ms. Prim just did not want to know the truth because it would force her hand and for whatever reason she could not take the right and necessary action" [Dkt. Nos. 106 and 110, Exh. G, ¶3].[13] City Manager Prim indicates in her deposition in April 2001 that she fired Mr. Rodriguez; however, she did not comment on her reasons for the termination because of pending litigation [Dkt. Nos. 106 and 110, Exh. AA, 94:23-95:21]. Ms. Prim further stated that she does not remember that Mr. Rodriguez made any complaints about police department procedures [Dkt. Nos. 106 and 110, Exh. AA, 97:5-20].

The HPOA stated in a press release following the shooting that it had asked the City Commission to order a revision of the Harlingen Police Department's directives in March of 1996; however, no revisions were made due to the opposition of Chief Scheopner [Dkt. Nos. 106 and 110, Exh. T]. Jose Rubio, Jr., a lieutenant with the police department, the

---

[13] The City objects to certain portions of the affidavit of Arnold Rodriguez because they are conclusionary [Dkt. No. 115]. The Court will not consider the last sentence of paragraphs five and six of Mr. Rodriguez' affidavit because they contain conclusionary statements that are inadmissible under Federal Rule of Evidence 701. Paragraphs five and six of Mr. Rodriguez' affidavit are cited as six and seven respectively in the body of this order because they are misnumbered in the affidavit [Dkt. Nos. 106 and 110, Exh. G].

president of the HPOA, and one of the four HPOA officers who signed the press release, elaborates on the HPOA's efforts to effect changes in police department procedures in an affidavit. He states, "I knew that the department had very lax policies and procedures and had very little accountability. One of the areas of concern that I had was the evidence room which had no regular audits or set of rules for proper disposal of evidence of other items turned into the evidence room. During the course of the last two years, we had tried through the Association to develop a new set of departmental directives to cover areas of weakness and/or strengthen the policies we did have. There were too many word of mouth policies with no documented procedures. There was so much resistance by the administrative staff of the Harlingen Police Department (Scheopner, Archer, Vasquez) that we eventually gave up on the notion that we would develop a new set of departmental directives or a set of policies and procedures" [Dkt. No. 122, p.3-4]. "[Assistant City Manager] Joe LaBeau was trying to fix the problems at the police department but there was to [sic] much opposition and political power plays by Chief Scheopner to do an effective job" [Dkt. No. 122, p.11].

In summary, the Court finds that the failure of City Manager Prim and Assistant City Manager LaBeau to exert authority over Harlingen Police Department weapons policies over the course of years and their failure to act on repeated complaints regarding those policies, effectively delegated final policymaking power in that area to Chief of Police Scheopner. Chief Scheopner's decisions on police department weapons practices therefore constitute the policy of the City of Harlingen for purposes of § 1983 liability.

D.    **Chief of Police Jim Scheopner, as a final policymaker for the City of Harlingen, adopted weapons policies that were deliberately indifferent to constitutional rights**

Chief Scheopner as the final policymaker for the City of Harlingen's police department weapons policies acted improperly in issuing the AR-15 semi-automatic rifle used in the July 7, 1998 shootings to R.D. Moore and in failing to create and enforce appropriate policies for the assignment, chain-of-custody, training, and safeguarding of

25

weapons.   His acts and omissions were the policy of the City of Harlingen and demonstrated shocking deliberate indifference to the constitutional rights of the public and the three officers who were shot by E. Moore.  Firearms are deadly weapons and it is eminently foreseeable that a pervasive lack of accountability in the assignment and safekeeping of weapons will eventually lead to a police department weapon falling into the wrong hands.[14]

The Plaintiffs' allegations regarding the City's policies are based both on the Chief Scheopner's affirmative acts as a final policymaker and his omissions in failing to adopt and enforce appropriate policies.  The failure to adopt or enforce policies can only form the basis for § 1983 liability when it is part of a pattern of serious incompetence that is deliberately indifferent to the likely consequence that it will lead to the deprivation of constitutional rights.  See Brown, 520 U.S. at 405; Dallas Indep. Sch. Dist., 153 F.3d at 216; Evans v. City of Marlin, Tex., 986 F.2d 104, 108 (5th Cir. 1993); Holland v. City of Houston, 41 F.Supp.2d 678, 705 (S.D. Tex. 1999).  Proof of a single incident, is usually insufficient.  See Gabriel v. City of Plano, 202 F.3d 741, 745 (5th Cir. 2000).

Chief Scheopner's affirmative acts and lack of policies and accountability, as described in detail in Sections III(C) and IV(C)(2) of this order, allowed R.D. Moore to store the AR-15 rifle at home in a location accessible to his son.  Chief Scheopner acted affirmatively in approving of R.D. Moore's possession of the AR-15 rifle although R.D. Moore had no responsibilities that required its use, the weapon was not appropriate for any police department duties that could be assigned to R.D. Moore, and R.D. Moore had no formal training on how to use or safeguard the weapon.[15]  Moreover, Chief Scheopner had

---

[14] Section 1.07(17) of the Texas Penal Code defines a firearm as a deadly weapon.  See Tex. Penal Code § 1.07(17).

[15] Chief Scheopner stated that Captain Vasquez had issued the AR-15 rifle to R.D. Moore during the administrative investigation into the use of the AR-15 rifle in the murders and attempted murder.  During his deposition in May 2000, Chief Scheopner explained that he explicitly approved of the assignment and "told [R.D. Moore] he was going to be one of the two designated sharpshooters" [Dkt. Nos. 106 and 110, Exh. A, 27:18-19].

obviously inadequate policies in place for the chain of custody and safeguarding of police department weapons and did not enforce existing policies.[16]

One would expect and hope that Chief Scheopner and R.D. Moore's blatant misconduct would lead to their discipline and that the systemic problems within the police department would lead the City to ensure that proper weapons policies were in place and enforced. The failure to take corrective and disciplinary action after clear instances of misconduct can constitute ratification of that misconduct. Ratification alone is rarely sufficient proof that an individual's misconduct constitutes the policy of a governmental entity. However, it clearly does constitute some evidence of policy. See Piotrowski, 237 F.3d at 578 n.18; Snyder, 142 F.3d at 797-98; Coon v. Ledbetter, 780 F.2d 1158, 1161-62 (5th Cir.1986); Grandstaff v. City of Borger, 767 F.2d 161, 171 (5th Cir.1985); Gonzales v. Westbrook, 118 F.Supp.2d 728, 737 (W.D. Tex. 2000); Drain v. Galveston County, 999 F.Supp. 929, 937 (S.D. Tex. 1998).

The summary judgment record indicates that little, if anything, was done to hold Chief Scheopner and R.D. Moore accountable for their actions and does not include any information on meaningful steps taken by the City to ensure that proper weapons policies exist and are enforced. Chief Scheopner was not subject to disciplinary action and he voluntarily resigned his position as Chief of Police and reverted to his former position of lieutenant [Dkt. Nos. 106 and 110, Exh. A, 87:11-14, 89:6-7, Exh. AA, 46:20-50:21]. Similarly, R.D. Moore was at most given an oral reprimand by Assistant City Manager LaBeau [Dkt. Nos. 106 and 110, Exh. A, 87:11-18, Exh. AA, 45:20-46:19]. City Manager Prim states that about a year after the shootings the chief of police who replaced Scheopner created new police department directives that were subject to her approval [Dkt. Nos. 106 and 110, Exh. AA, 91:13-92:2]. However, when City Manager Prim was

---

[16] Ranger Jaramillo discovered that the AR-15 rifle was registered to Dr. Thomas E. Pirtle in his investigation after the shooting. It appears that the police department did not comply with a federal regulation requiring it to register with the federal government a firearm it "acquires for official use" that is "not registered to it, such as by abandonment or forfeiture." 27 C.F.R. § 179.104.

asked how she determined that the directives contained appropriate weapons procedures she stated that she noted that the procedures were detailed and that she had focused on personnel issues in her review of the directives [Dkt. Nos. 106 and 110, Exh. AA, 92:2-94:3]. In other words, unless a review of the new directives was conducted by some other person, City management completely failed to take steps to guarantee that appropriate policies and procedures exist to help prevent the future mishandling of weapons despite comprehensive reports of gross misconduct.

E.    **The City of Harlingen's policies were not the proximate cause of the violation of Border Patrol Agents Susan L. Rodriguez and Ricardo G. Salinas and Cameron County Sheriff Deputy Raul Rodriguez' constitutional rights, and the City consequently cannot be held liable under 42 U.S.C. § 1983**

A city can only be held liable under 42 U.S.C. § 1983 for deliberately indifferent policies if those policies proximately caused the plaintiff's constitutional injury. See Spiller v. City of Texas City, 130 F.3d 162, 167 (5th Cir.1997). The city's policy "must be more than a mere 'but for' coupling between cause and effect." Fraire v. City of Arlington, Tex., 957 F.2d 1268, 1281 (5th Cir.1992) (citing Harris, 489 U.S. at 386). A plaintiff must "prove a direct causal link between the [city] policy and the constitutional deprivation." Snyder v. Trepagnier, 142 F.3d 791, 795 (5th Cir.1998) (citing Harris, 489 U.S. at 389). See Morris v. Dearborne, 181 F.3d 657, 672-73 (5th Cir. 1999); Kerr v. Lyford, 171 F.3d 330 (5th Cir. 1999). In other words, "the policy must be the 'moving force' behind the violation." Piotrowski, 237 F.3d at 580 (citing Monell, 436 U.S. at 694. See also Martinez v. California, 444 U.S. 277, 285 (1980). The Fifth Circuit has "cautioned . . . that causation under § 1983 is not to be gauged by the standards of ordinary tort law. Indeed, this requirement of a causal connection in a § 1983 action often may have the practical effect of imposing a heightened standard of proximate cause." Doe v. Rains County Indep. Sch. Dist., 66 F.3d 1402, 1415 (5th Cir. 1995) (citations and quotation marks omitted).

The elements of a state created danger cause of action incorporate the general § 1983 causation requirements. To survive summary judgment on a state-create danger claim, a plaintiff must create a material issue of fact on whether the danger created by the

28

government actor, in this case the City of Harlingen, created an opportunity that otherwise would not have existed for the third party's crime to occur. See Piotrowski, 237 F.3d at 584-85; Randolph,130 F.3d at 731. Although City policies allowed E. Moore access to the City-owned AR-15 semi-automatic rifle he ultimately used to murder Agents Rodriguez and Salinas and to attempt to murder Deputy Rodriguez, they did not thereby create an opportunity that otherwise would not have existed for E. Moore to commit those crimes. E. Moore had equal access to his own semi-automatic rifles and ammunition in the gun safe in his bedroom and there is no evidence to indicate that it was anything but happenstance that he selected a City-owned weapon instead of one of his own weapons. Additionally, the City did not strip Agents Rodriguez and Salinas and Deputy Rodriguez of their ability to defend themselves or cut off potential sources of private aid. The officers were aware that they were engaged in a manhunt for an individual who had already murdered two people and possibly a third, and was probably armed and in the vicinity.[17] Consequently, although the City's actions and omissions that allowed E. Moore access to the City-owned AR-15 rifle are appalling and demonstrate a complete lack of regard for the safety of the officers and the public, they did not cause the murders Agents Rodriguez and Salinas and the attempted murder of Deputy Rodriguez. See e.g. Piotrowski, 237 F.3d at 584-85; Callis v. Sellars, 931 F.Supp. 504, 520 (S.D. Tex. 1996).

---

[17] The Plaintiffs argue that Chief Scheopner knew of the danger faced by the officers and did not nothing to warn them. The summary judgment record contains conflicting evidence on when Chief Scheopner learned of E. Moore's involvement in the Rio Hondo shootings on the morning of July 7, 1998 and what he knew [Dkt. No. 100, Exh. N, 161:4-163:25; Dkt. Nos. 106 and 110, Exh. A, 169:22-183:22, Exh. J, p.1-2, Exh. M, 55:11-69:9]. The summary judgment record is unclear on this point in part because the Harlingen Police Department re-used the master tapes that recorded radio traffic during the relevant time period [Dkt. Nos. 106 and 110, Exhs. S, V, and W]. The Plaintiffs argue that the Court should employ an adverse inference because the City engaged in intentional or bad faith spoliation of evidence by recording over the tapes after they received notice of this litigation. The Court need not rule on whether spoliation of evidence occurred because what Chief Scheopner knew and when on the morning of July 7, 1998 is irrelevant. Any warning Chief Scheopner could have conceivably given the three officers would not have significantly added to their ability to defend themselves. See e.g. Justiss Oil Co., Inc. v. Kerr-McGee Refining Corp.,, 75 F.3d 1057, 1063 n.13 (5th Cir. 1996). However, the fact that the police department re-used highly relevant tapes after they received formal notice of litigation indicates, at the very least, yet one more instance of serious incompetence.

## VI.   <u>LIABILITY OF THE CITY OF HARLINGEN FOR PUNITIVE DAMAGES UNDER FEDERAL LAW</u>

The City correctly asserts in its summary judgment motion that the Plaintiffs cannot recover punitive damages under federal law.  The Plaintiffs appear to concede this point as it is not addressed in their response.  Punitive damages cannot be recovered against a municipality under § 1983 as a matter of law.  <u>See</u> <u>City of Newport v. Fact Concerns, Inc.</u>, 453 U.S. 247 (1981).

DONE at Brownsville, Texas, this 2nd day of August 2001.

Hilda G. Tagle
United States District Judge

30