148

United States District Court
Southern District of Texas
FILED

DEC 1 4 2001

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| CITY OF HARLINGEN, ET AL | { | JURY DEMANDED |
| and | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| CITY OF HARLINGEN, ET AL | { | |
| and | { | |
| RAUL RODRIGUEZ | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| CITY OF HARLINGEN, ET AL | { | |

---

**RENEWAL OF AND SUPPLEMENTATION TO DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT**

---

TOM LOCKHART
Admissions ID No. 2257
Texas State Bar No. 12473500
ROGER W. HUGHES
Admissions ID No. 5950
Texas State Bar No. 10229500
P. O. Drawer 1429
Harlingen, Texas 78551-1429

Attorney-in-Charge for Defendant,
CITY OF HARLINGEN

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS . . . . . . . . . . ii

INDEX OF AUTHORITIES . . . . . . . . . . ii

I. NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . . 1

II. SUMMARY JUDGMENT EVIDENCE AND GROUNDS . . . . . . . . . . 1

III. SUMMARY OF THE ARGUMENT . . . . . . . . . . 3

IV. BACKGROUND EVIDENCE . . . . . . . . . . 5

A. Ernest's Favorite Rifle Was *Not* HPD's Rifle . . . . . . . . . . 5

V. ARGUMENT AND AUTHORITIES . . . . . . . . . . 7

A. Summary Judgment Standard of Review . . . . . . . . . . 7

B. Law and Facts of this Case . . . . . . . . . . 8

1. State-Created Danger Claim . . . . . . . . . . 8

2. No Decision or Policy Adopted with Deliberate Indifference . . . . 14

3. State Law Claims Barred by Sovereign Immunity . . . . . . . . . . 17

4. No Evidence of Proximate Cause on State Law Negligence Claims . . . . . . . . . . 19

5. No Evidence to Support State Law Claims . . . . . . . . . . 19

C. Objections to Plaintiffs' Summary Judgment Evidence . . . . . . . . . . 20

CERTIFICATE OF SERVICE . . . . . . . . . . 22

# INDEX OF AUTHORITIES

Page

Cites:

*Balogh's of Coral Gables, Inc. v. Getz*, 798 F.2d 1356, n. 2 (11th Cir. 1986) . . . . . . . . . 7

*Barefield v. City of Houston*, 846 S.W.2d 399 (Tex. App.–Houston [14th Dist.] 1992, writ denied) . . . . . . . . . . . . . . . . . . . . . . 18

*Brown v. Bryan County,* 219 F.3d 450 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*City of Columbus v. Barnstone*, 921 S.W.2d 268 (Tex. App.–Houston [1st Dist.] 1995, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*City of El Paso v. Hernandez,* 16 S.W.3d 409 (Tex. App.–El Paso 2000, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Conner v. Travis County,* 209 F.3d 794 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Cozzo v. Tangipahoa Parish Council,* 262 F.3d 501 (5th Cir. 2001) . . . . . . . . . . . . 15-17

*DeShaney v. Winnebago County Dept. of Soc. Ser.*, 489 U.S. 189 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8

*Doe v. Hillboro ISD,* 113 F.3d 1412 (5th Cir. 1998)(en banc) . . . . . . . . . . . . . . . . . . . . . 9

*Farmer v. Brennan*, 511 U.S. 825 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392 (Tex. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Gabriel v. City of Plano,* 202 F.3d 741 (5th Cir. 2000), *en banc reh. denied,* 211 F.3d 127 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Gonzales v. City of El Paso*, 978 S.W.2d 619 (Tex. App.–El Paso 1998, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Johnson v. Dallas ISD,* 38 F.3d 198 (5th Cir. 1994), *cert. denied,* 514 U.S. 1017 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

*Kennedy v. Baird*, 682 S.W.2d 377
(Tex. App.–El Paso 1984, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Kerrville State Hosp. v. Clark*, 923 S.W.2d 582 (Tex. 1996) . . . . . . . . . . . . . . . . . . . . . 17

*Lefall v. Dallas ISD*, 28 F.3d 521 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Martin v. United States*, 528 F.2d 1157 (4th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*McClendon v. City of Columbia*, 258 F.3d 432
(5th Cir. 2001, m. reh. en banc pending) . . . . . . . . . . . . . . . . . . . . . . 3, 8, 9, 15, 16

*Missouri Pac. RR Co. v. American Statesman*,
552 S.W.2d 99 (Tex. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mosley v. Excel Corp.*, 109 F.3d 1006 (5th Cir. 1997),
*reh. denied*, 114 F.3d 1185 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Orrozco v. Dallas Morning News, Inc.*, 975 S.W.2d 392
(Tex. App.–Dallas 1998, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Piotrowski v. City of Houston*, 237 F.3d 567
(5th Cir. 2001), *reh. denied*, 251 F.3d 159
(5th Cir. 2001), *cert. denied*, 122 S. Ct. 53 (2001) . . . . . . . . . . . . . . . . . . 8, 9, 12, 14

*Ramos v. City of San Antonio*, 974 S.W.2d 112
(Tex. App.–San Antonio, 1998, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Randolph v. Cervantes*, 130 F.3d 727
(5th Cir. 1997), *cert. denied*, 525 U.S. 183 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . 8

*S.S. v. McMullen*, 225 F.3d 960 (8th Cir. 2001)(en banc),
*cert. denied*, 121 S.Ct. 1227 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Saenz v. Heldenfels Bros., Inc.*, 183 F.3d 389 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . 9, 14

*Salas v. Carpenter*, 980 F.2d 389 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Santos v. Merdock*, 243 F.3d 681 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11

*Schneider v. Esperanza Transmission Co.*,
744 S.W.2d 595 (Tex. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Snyder v. Trepagnier*, 142 F.3d 791 (5th Cir. 1998), *cert. dism'd by agreement*, 119 S.Ct. 1493 (1999) . . . . . . . . . . . . . . . . . . . . . 14, 15

*Story Serv., Inc. v. Ramirez*, 863 S. W. 2d 491 (Tex. App.--El Paso 1993, writ denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Texas Dept. of Crim. Justice v. Miller*, 51 S.W.3d 583 (Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Texas Dept. of Public Safety v. Petta*, 44 S.W.3d 575 (Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Ragghinti*, 560 F.2d 1376 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Dietrich*, 854 F.2d 1056 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Hogan*, 763 F.2d 697 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Livingston*, 661 F.2d 239 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . 7

*Univ. of Tex. Med. Branch v. York*, 871 S.W.2d 175 (Tex. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Whitehurst v. Wright*, 592 F.2d 834 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Texas Civil Practices & Remedies Code:

§ 101.021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 101.021(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

§ 101.055(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

§ 101.057 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

Federal Statutes:

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11

<u>Federal Rules of Evidence</u>:

Rule 607 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Rule 613 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

Rule 801(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

<u>U.S. Constitution</u>:

14th Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

# RENEWAL OF AND SUPPLEMENTATION TO DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendant, **CITY OF HARLINGEN** ("Harlingen"), and files this its Renewal and Supplementation to Defendant's Second Motion for Summary Judgment and would show the Court as follows:

## I. NATURE AND STAGE OF THE PROCEEDINGS

The nature of Plaintiffs claims and the procedural history of this case are set out in this Court's orders signed March 31, April 11, August 2, and October 18, 2001. (Dkt # 41, 43, 134 142). The case is set for final pre-trial conference and jury selection on February 7 and 11, 2002. (Dkt 147).

Based on deposition testimony from Ms. Cox, Defendant Harlingen renews its Second Motion for Summary Judgment (Dkt # 100) and supplements to assert additional grounds to dismiss the state law claims.

## II. SUMMARY JUDGMENT EVIDENCE AND GROUNDS

As summary judgment evidence, Defendant **Harlingen** relies upon and incorporates herein by reference the following:

a. Def. Exhs. A- P attached to Harlingen's Second Motion for Summary Judgement (Dkt # 100);

b. Supp. Def. Exhs. Q-W attached to Harlingen's Reply (Dkt. # 115);

c. Ralph D. Moore's affidavit filed July 16, 2001 (Dkt. # 113);

d. Exh. X, excerpts and exhibits from deposition of Julie Cox (taken Dec. 12, 2001);

e. Exh. Y, affidavit of Ralph Moore;

f. Exh. Z, pp. 49-50 and Exh. 7 to Deposition of Joseph Vasquez.

Defendant Harlingen is entitled to summary judgment that all Plaintiffs take nothing against it on the following grounds:

a. No Harlingen policy decision or policymaker action intentionally created any dangerous situation which would not have otherwise existed;

b. No Harlingen policy or policymaker decision thrust Border Patrol Agents S. Rodriguez and Salinas or Plaintiff Raul Rodriguez into that danger or stripped them of the ability to defend themselves;

c. No Harlingen policy or policymaker decision was made with knowledge of immediate danger to known victims;

d. No Harlingen policy or decision was made or adopted with deliberate indifference;

e. The law enforcement team Cameron County Sheriff Department (CCSD) and U.S. Border Patrol (BP) knew of the danger;

f. No Harlingen policy decision nor policymaker action was a proximate cause of the deprivation, deaths, and injuries at issue;

g. There is no proximate cause to support the state law claims;

h. Harlingen is entitled to sovereign immunity against the state law claim; the immunity is not waived under the Texas Tort Claims Act because Plaintiffs' claims do not arise from a "use or condition" of tangible personal property. TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(a) (Vernon 1997);

i. Alternatively, immunity is not waived because Plaintiffs' claims arise from an intentional tort or from a decision about the manner of providing police protection. TEX. CIV. PRAC. & REM. CODE ANN. § 101.055(3), -.057 (Vernon Supp. 2001);

j. There is no evidence of negligence or negligent entrustment.

Harlingen further incorporates as grounds for summary judgment the issues listed in ¶ III of its Second Motion for Summary Judgment, pp. 2-3. (Dkt # 1000).

## III. SUMMARY OF THE ARGUMENT

Shortly before the last trial date, a Fifth Circuit held that it will adopt the "state created" danger exception to *DeShaney*.[1] *See, McClendon v. City of Columbia,* 258 F.3d 432 (5th Cir. 2001, m. reh. en banc pending). However, the Fifth Circuit is considering the motion for rehearing en banc, and has even solicited a response to it from the respondent. Three and a half months later, the motion is still pending, which indicates a new opinion may be forthcoming.

Assuming *McClendon* is affirmed, the summary judgment evidence shows that none of the "state created" danger elements exist in this tragic case. First, the court concluded

1 *DeShaney v. Winnebago County Dept. of Soc. Ser.*, 489 U.S. 189, 196-97 (1989)

Ms. Cox's affidavits were "some evidence" to satisfy these elements because they showed Ernest Moore may have deliberately picked the HPD rifle. (Dkt # 146, p. 10-11). Ms. Cox now states that her earlier affidavits (Dkt. # 141, 145) were inaccurate and that her inspection of photos of both AR-15 rifles (the HPD rifle and Ernest's) show that Ernest's favorite rifle was *his own AR-15* (the privately owned one), *not* the HPD rifle.

Second, the City did not deprive the border patrol agents and the deputy of self-defense or sources of private aid because they knew they were engaged in a manhunt for someone who had killed, was armed and in the vicinity.

Third, municipal liability under 42 U.S.C. § 1983 requires that the city's policymaker adopt a policy or make a decision with conscious indifference. The Fifth Circuit has made it clear that the policymaker must have notice that the decision will result in a constitutional violation. This notice is usually the occurrence of other instances of violation putting the policymaker on notice that subordinates need training or instruction. The lack of prior incidents may suffice only if the subordinates have not been trained in any manner, as opposed to lacking training in a specific subject.

Finally the state law claims must be dismissed because (1) the Tort Claims Acts does not waive sovereign immunity for them, (2) there is no proximate cause, and (3) the facts fail to show actionable negligence.

## IV. BACKGROUND EVIDENCE

### A. Ernest's Favorite Rifle Was *Not* HPD's Rifle

After examining and comparing the photographs of the HPD AR-15 rifle and Ernest Moore's privately owned AR-15 rifle, Julie Cox has determined that his favorite rifle was his privately owned AR-15 rifle. Exh. X, Cox Depo. pp. 40 (ll. 2-12), 45 (l. 5)-46 (l.1), 48 (l. 20) - 49 (l. 20), pp. 103 (l. 24) - 106 (l. 19).[2/]

About a month before the shootings, HPD Capt. Vasquez made a private sale of an AR-15 rifle to Det. R. D. Moore for $974.25 with tax. See Exh. Z, Vasquez Depo. p. 49 (l. 5) - 50 (l. 21), Depos. Exh. 7; Def. Exh. I, Vasquez Depo., p. 137 (l. 21) - 138 (l. 2); Exh. X, Cox Depo. p. 101 (ll. 11-17).[3/]; Def. Exh. G (Dkt. # 100). The AR-15 was purchased by R.D. Moore for his son Ernest with Ernest's money. Exh. Y.

Ms. Cox recalled that, about a month before the shooting, Ernest Moore received an AR-15 rifle from his father, purchased with Ernest's money. Exh. X, Cox Depo. p. 47 (ll. 1-24). The rifle that Ernest's father bought was the rifle Ernest liked. Exh. X, Cox Depo. p. 88 (ll. 9-14), pp. 100 (l. 25) - 101 (l.10).

In November, 2001, Ms. Cox was interviewed at her home, with her mother present, by an investigator retained by the City, Mr. Reyna. Mr. Reyna showed her photographs of the HPD AR-15 and the privately owned AR-15, and for the first time she

---

2 The photographs of the two different rifles she has examined have been authenticated by Det. R. D. Moore. See attached Exh. Z.

3 Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion for Reconsideration (Dkt.# 145) admitted the rifle was privately purchased from Capt. Vasquez on June 9, 1998.

could compare photos of the two rifles. Exh. X, Cox Depo. p. 87 (ll. 1-12). Once she saw the two different photographs, she realized that the rifle in Cox depos. Exh. 2 was the one Ernest liked. Exh. X, Cox Depo. p. 87 (ll. 1-12).

She attributes her previous error in referencing Cox depo. Exh. 1 to several things. First, when she met with attorney Sonia Lopez, at the attorney's office, she was scared. Exh. X, Cox Depo. p. 54 (ll. 3-24). Second, she looked at autopsy photos which upset her very much. Exh. X, Cox Depo. pp. 83 (l.2) - 84 (l.2). (Ms. Cox was more comfortable when interviewed by Mr. Reyna in November. Exh. X, Cox Depo. pp. 85 (l. 18) - 86 (l. 16). Third, although Julie Cox told attorney Sonia Lopez during the interview that Ernest's favorite rifle was the one that his father purchased for him recently before the shootings, Ms. Lopez only showed her the photograph of the AR-15 rifle that belonged to the HPD; Ms. Cox was not shown the photograph of the privately owned AR-15. Exh. X, Cox Depo. pp. 84 (l. 5) - 85 (l. 5), 91 (ll. 4-13). Ms. Cox was not shown or told there were two AR-15 type rifles present at the Moore home. Exh. X, Cox Depo. pp. 53 (l. 22) - 54 (l. 2). Ms. Cox did no know there were two AR-15 type rifles present at the Moore home. Exh. X, Cox Depo. p. 91 (ll. 14-16), pp. 102 (l. 24) - 103 (l.11).

When Ms. Cox was shown the photographs of both AR-15 type rifles at her deposition on December 12, 2001, she positively stated that the photograph of the privately owned AR-15 was Ernest's favorite rifle and not the HPD rifle. Exh. X, Cox Depo. pp. 86 (l. 13) - 87 (l. 12); Exh. Y, R.D. Moore affidavit. If called to testify live at trial, Ms. Cox will testify that the rifle identified as the privately owned, just purchased with Ernest's

money, AR-15 is the one that Ernest liked best.  Exh. X, Cox Depo. pp. 87 (l. 18) - 88 (l. 14).

## V.  ARGUMENT AND AUTHORITIES

### A.    Summary Judgment Standard of Review

The standard of review is adequately described in the August 2, 2001, order.  (Dkt. 134, p. 3).

However, Ms. Cox's first two affidavits (Dkt. # 141, 145) are not admissible to prove the substance of her statements.  FED. R. OF EVID. 607 and 613 would permit Plaintiffs to try to use them to impeach Ms. Cox at trial.  However, this rule cannot be used as loophole to admit a prior inconsistent statement that would be otherwise inadmissible as hearsay. See, e.g. *United States v. Hogan*, 763 F.2d 697, 701 (5th Cir. 1985); *Whitehurst v. Wright*, 592 F.2d 834, 839-40 (5th Cir. 1979).  At trial, Ms. Cox's first two affidavits would be classified as hearsay under FED. R. OF EVID. 801(d). *United States v. Dietrich*, 854 F.2d 1056, 1061-62 (7th Cir. 1988); *United States v. Livingston*, 661 F.2d 239, 241 (D.C. Cir. 1981); *United States v. Ragghinti*, 560 F.2d 1376, 1380-81 (9th Cir. 1977); *Martin v. United States*, 528 F.2d 1157, 1159-60 (4th Cir. 1975).  If a prior inconsistent affidavit will be classified as hearsay at trial, then it is not admissible to prove the substance of the affidavit and can be used solely for the purposes of impeachment. *Hogan*, 763 F.2d at 701; *Whitehurst*, 592 F.2d at 839-40.  The courts have prevented parties from calling the witness at trial where it is apparent that the sole purpose

is to offer a prior inconsistent statement which would be inadmissible for its substance. See, e.g. *Hogan*, 763 F.2d at 703; *Balogh's of Coral Gables, Inc. v. Getz*, 798 F.2d 1356, 1358, n. 2 (11th Cir. 1986).

Where it is apparent that a prior inconsistent affidavit would be admissible at trial solely for the purposes of impeachment and could not be admissible for its substance, the affidavit is "no evidence" for summary judgment purposes. *Santos v. Merdock*, 243 F.3d 681 (2nd Cir. 2001).

## B. Law and Facts of this Case

### 1. State-Created Danger Claim

The Court's rulings have dismissed all § 1983 claims against the City, save for a potential "state created" danger claim under Substantive Due Process. One Fifth Circuit panel has indicated that it will adopt the "state created" danger exception to *DeShaney*. *McClendon v. City of Columbia,* 258 F.3d 432 (5th Cir. 2001, m. reh. en banc pending). However, the Fifth Circuit is considering the motion for rehearing en banc, and has even solicited a response to it from the respondent. Three and a half months later, the motion is still pending, which indicates a new opinion may be forthcoming. Assuming *arguendo* it is affirmed, the Fifth Circuit has outlined the elements of that theory:

a. The state actors must create an environment that is dangerous;

b. The state actors must know that it is dangerous;

c. The state actors must have used their authority to create an opportunity that otherwise would not have existed for a third party to commit the crime;

d. The state must have effectively stripped a person of his or her ability to defend herself or cut off potential sources of private aid; and

e. The action must be done with deliberate indifference.

*Piotrowski v. City of Houston,* 237 F.3d 567, 585 (5th Cir. 2001), *reh. denied,* 251 F.3d 159 (5th Cir. 2001), *cert. denied,* 122 S. Ct. 53 (2001); *Randolph v. Cervantes,* 130 F.3d 727, 731 (5th Cir. 1997), *cert. denied,* 525 U.S. 183 (1998). At the time the official acted, he must have subjective knowledge of an immediate risk to a specific victim. *McClendon,* 258 F.3d at 438; *Saenz v. Heldenfels Bros., Inc.,* 183 F.3d 389, 291, 292 (5th Cir. 2000). The official must have "actual knowledge" that a serious risk of physical harm exists. *Doe v. Hillboro ISD,* 113 F.3d 1412, 1415 (5th Cir. 1998)(en banc). The official must create a risk of harm that did not exist before the state's intervention. *Piotrowski,* 237 F.3d at 584. Merely increasing the risk of harm is insufficient. *Lefall v. Dallas ISD,* 28 F.3d 521, 531 (5th Cir. 1994); *Johnson v. Dallas ISD,* 38 F.3d 198, 201 (5th Cir. 1994), *cert. denied*, 514 U.S. 1017 (1995). If the danger is the same as if the state had done nothing, there is no "state created" danger. *S.S. v. McMullen,* 225 F.3d 960, 962-63 (8th Cir. 2001)(en banc), *cert. denied,* 121 S.Ct. 1227 (2001).

For the reasons stated and briefed in the Second Motion for Summary Judgement (Dkt .#100) there is no evidence:

a. The City caused the shooting or created an opportunity to commit an offense that would not have otherwise existed;

b. The City stripped the Border Patrol agents and Dep. Rodriguez of the means of self-defense or cut off all avenues of escape;

c. Defendant's officers knew, at the time they acted, of an immediate risk of harm to a specific person;

d. The officers had actual knowledge of a specific risk of physical harm.

**a. No Causation/No Creation of Otherwise Nonexistence Chance to Commit Crime**

The Court concluded that Ms. Cox's prior affidavit was the only evidence available for the jury to determine whether Ernest chose the weapon deliberately or randomly. Dkt. # 146, p. 10. The Court concluded that her prior affidavit was "central to the Plaintiffs' case." Dkt. # 146, p. 11. It is the only evidence cited as changing the prior result that the City is entitled to a summary judgment.

Ms. Cox now states her prior affidavit was incorrect. Her error was attributed to being caught "cold," not being shown the photograph of the privately owned AR-15 rifle and her emotional state after observing upsetting autopsy photographs. It is undisputed that the *privately owned* AR-15 was purchased a month before the accident. Ms. Cox is positive that it was the recently purchased AR-15 that Ernest liked best and she told this to attorney Lopez. After being shown photographs of the two different AR-15 rifles, she has identified the privately owned one, not HPD's rifle, as the one Ernest liked best.

Therefore, there is no longer any substantive evidence admissible at trial to support Plaintiffs' theory. *Compare, Santos*, 243 F.3d at 684.

In *Santos*, plaintiff was suspected in the murder of a young girl. His uncle, Mr. Gonzalez, gave police an affidavit that Santos had admitted killing her. 243 F.3d at 682. The police used the affidavit to arrest Santos. At the probable cause hearing, Gonzalez again implicated Santos. *Id.* at 683. However, Santos' attorney then obtained an affidavit from Gonzalez stating that (1) his prior testimony was false and (2) he gave a false affidavit because the police coerced him. *Id.* The charges were perjury.

Thereafter, Santos sued the officers under 42 U.S.C. § 1983 for causing his arrest based on the use of affidavits the officers knew to be false. However, at his deposition, Gonzalez testified he had not been coerced by the police officers to lie and had falsely implicated Santos for purely personal reasons. *Id.* The officers moved for summary judgment. Santos' only evidence that the police officers coerced Gonzalez to get his initial testimony was the affidavit obtained by his lawyer. *Id.* The trial court granted summary judgment for the police officers.

The 2nd Circuit affirmed, holding the affidavit was not admissible or competent evidence to show the officers had coerced the initial testimony. *Id.*at 683. The affidavit would be admissible at trial only as impeachment under FEDERAL RULE OF EVIDENCE 613; prior inconsistent statements are inadmissible hearsay for the purpose of proving their substantive content. *Id.* at 684. The affidavit could be used only for impeachment, but could not be substantive evidence for summary judgment purposes. *Id.* Because Santos could offer nothing to show that Gonzalez would testify at trial in a manner consistent with

the affidavit (and inconsistent with the deposition), the affidavit was inadmissible and incompetent to oppose summary judgment. *Id.*

*Santos* is closely in point. In both cases the non-movant's counsel obtained affidavits from a witness favorable to the that party. In both cases, the non-party witness then stated in deposition testimony that the prior affidavit was in error. In both cases the prior affidavit was the only proof offered on a vital point. The result should be the same here as in *Santos*. Moreover, Ernest's preference is immaterial to whether the HPD rifle gave him his only chance to shoot the agents and Dep. Rodriguez. The question is whether the presence of the HPD rifle created an opportunity to shoot them, one that would not otherwise exist. Plaintiffs must offer some evidence that, "but for" the presence of the HPD rifle in the gun safe, Ernest would have taken no weapon from the safe when he opened it. Whatever his preferences, other rifles of equal power were there when he went to the gun vault. Whatever impulse that caused him to seek a rifle would have motivated him to take the privately owned AR-15 or the other rifles. His preference for one rifle does not establish that, in its absence, he would have taken no rifle.

**b. City Did Not Strip Agents/Deputy of Means of Self-Defense or Escape**

The Court initially concluded that the City did not strip Dep. Rodriguez or the agents of the means of defense or escape because they knew they were in a manhunt for a person who had murdered two others, was armed and was in the vicinity. (Dkt. # 134, p. 29). In light of Ms. Cox's early affidavit, the Court reconsidered, reasoning that evidence of his preferences showed why he went on a shooting spree. (Dkt. #146, p. 10).

The Court distinguished *Piotrowski*, because there the ex-boyfriend had already made attempts on plaintiff's life.  (Dkt. #146, pp. 10-11).

*Piotrowski* is apposite because the victim knew of her danger.   The Fifth Circuit held that her claim failed on this element because she knew of the threat and the City did nothing to prevent her from defending herself.  237 F.3d at 585, 585 n. 33.  While Ernest Moore did not fire warning shots at the agents, it is uncontroverted they knew his intent, believed him armed and nearby, and debated what steps to take to protect themselves.  They came to the Moore residence to apprehend an armed and dangerous person they believed was there.

*Compare, Salas v. Carpenter,* 980 F.2d 389, 308 (5th Cir. 1992); *Johnson v. Dallas ISD,* 38 F.3d 198, 202 (5th Cir. 1994), *cert. denied,* 514 U.S. 1017 (1995).   In *Salas,* a distraught husband took his wife hostage in a judge's office.  980 F.2d at 302.  Sheriff Carpenter took control of the situation, surrounding the office with his deputies.  He declined to allow the local police to assist in any way, although they had a SWAT team and trained hostage negotiators; his office had neither.  *Id.*   After six hours, the husband shot his wife and committed suicide.  *Id.* at 303.  The plaintiffs urged that the sheriff cut off all means of escape or self-defense because his people were incompetent to either negotiate the wife's release or storm the office to rescue her, and because he refused to let competent officers intervene.   *Id.* at 309.  The Fifth Circuit held this was insufficient evidence to show the sheriff deprived her of all means of escape or self-defense.  The fact

his deputies failed to rescue her did not mean she had no meaningful sources of protection. *Id.* at 308.

In *Johnson,* a non-student entered a high school campus with a handgun, started a disturbance, and shot a student. 38 F.3d at 199. The Fifth Circuit held that simply because the victim was a student at school was insufficient to prove school officials stripped him of the means of self-defense or aid. *Id.* at 202. The claim failed because there was nothing to show the officials placed him in a confrontational encounter with a violent criminal or put the criminal in front of him. *Id.*

### c. City Had No Actual Knowledge of Immediate Danger to a Known Victim

The "state created danger" doctrine will not apply where the government actor is not subjectively aware of any immediate danger facing the victim. *Saenz*, 183 F.3d at 391. There, the Fifth Circuit clearly stated that the "state created danger" theory is inapposite without a known victim. *Id.* at 392.

In *Saenz*, the Fifth Circuit upheld summary judgment in favor of two sheriff's deputies who declined to arrest an obviously drunk driver. 183 F.3d at 390. About 15 minutes after the deputies declined to arrest him, the drunk driver had an accident causing two fatalities. *Id.* The Fifth Circuit affirmed, holding that allegations the officers were aware of the danger posed by the drunk and made plaintiffs more vulnerable were insufficient to state a claim. *Id.* at 391. The officers did not deny life or liberty if they were not subjectively aware the plaintiffs were there. *Id.* They did not violate Due Process by increasing the risk of harm to unidentified members of the public. *Id.* at 392.

The identity of the person endangered must be known to the officer at the time he acts. *Id.* Here, at the time the rifle was assigned to Moore, no one at the City had actual awareness of any risk to the agents or Dep. Rodriguez.

**2. No Decision or Policy Adopted with Deliberate Indifference**

The alleged "policy" is not unconstitutional on its face. Therefore, Plaintiffs must show that an otherwise neutral policy was adopted with deliberate indifference to the certainty that a constitutional deprivation will result. *Piotrowski*, 237 F.3d at 578, 581; *Snyder*, 142 F.3d at 795-96. The policy's existence and deliberate indifference are two different issues; there is no liability if the policy was adopted or ratified without deliberate indifference. *Cozzo v. Tangipahoa Parish Council,* 262 F.3d 501, 515 (5th Cir. 2001)

The August 2, 2001, order concludes that it was "eminently foreseeable" that poor weapons accountability would eventually result in a HPD weapon falling into the wrong hands. Dkt. # 134, p. 26. However, foreseeability is not the entire test. Ordinary or heightened negligence will not meet the test of deliberate indifference. *Snyder v. Trepagnier*, 142 F.3d 791, 797-98 (5th Cir. 1998), *cert. dism'd by agreement*, 119 S.Ct. 1493 (1999). The official must be aware of the facts in which an inference could be drawn that a substantial risk of harm exists and must actually draw the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

A claimant proves deliberate indifference by showing either (1) the City consciously chose to not train officers after being on notice that its current regimen had failed to prevent misconduct and injuries; or (2) a single incident with proof of the possibility of recurring

situations that presents an obvious potential for violations of constitutional rights and the need for training. *McClendon,* 258 F.3d at 442; *Conner v. Travis County,* 209 F.3d 794, 797 (5th Cir. 2000); *Gabriel v. City of Plano,* 202 F.3d 741, 745 (5th Cir. 2000), *en banc reh. denied,* 211 F.3d 127 (5th Cir. 2000). The Fifth Circuit has generally rejected proof of a single incident as a sufficient basis to hold a city liable. *Cozzo,* 262 F.3d at 515; *McClendon,* 258 F.3d at 442; *Snyder,* 142 F.3d at 798-99.

The fact that there are no other instances of harm undercuts the deliberate indifference claim. *Cozzo,*262 F.3d at 515; *Conner,* 209 F.3d at 797. The Fifth Circuit has found the "single instance" theory viable only where there is a complete failure to provide any training on any subject to an inexperienced officer with a record of recklessness. *McClendon,* 258 F.3d at 442 citing *Brown v. Bryan County,* 219 F.3d 450, 461 (5th Cir. 2000). It must be obvious that the failure to train would lead to injury; this stringent standard requires unmistakable culpability and clearly connected causation. *Id.* at 442.

In *McClendon* the failure to train officer Carney on a specific subject did not meet this rigorous standard. 258 F.3d at 443. Likewise, McClendon failed to show that the police chief's failure to act when informed Loftin was implicated in an earlier shooting caused Officer Carney to loan a gun to Loftin. *Id.*

In *Cozzo,* a sheriff's deputy misinterpreted a TRO to require the eviction of plaintiff from her residence. 262 F.3d at 506. Although the deputy had completed various training programs, he had not taken an eight week course required by state law that would have taught him the proper interpretation. *Id.* at 514. The Fifth Circuit concluded this was some

evidence that the sheriff had failed to train him. *Id.* However, there had been no prior incidents of deputies wrongfully evicting people or dispossessing citizens of their property. *Id.* at 515. The Fifth Circuit reversed, holding that there was no evidence of deliberate indifference under the "single incident" exception. *Id.* at 515-16.

At its best, Plaintiffs' evidence could be no more than ordinary or heightened negligence which is insufficient. Because Det. Moore had some training in weapons and had not previously shown himself incompetent to handle weapons, this case fails to meet the rigorous standard for the "single incident" exception.

The affidavit of Mr. Kirkham, plaintiffs' expert (Dkt. # 106, 100, Exh. U), does not solve their problem. Generally the opinion testimony of a single expert is insufficient to prove that a single incident shows deliberate indifference. *Cozzo,* 262 F.3d at 515; *Conner,* 209 F.3d at 798.

### 3. State Law Claims Barred by Sovereign Immunity

The Plaintiffs have alleged state claims under Texas Tort Claims Act based upon negligence.

Sovereign Immunity against state tort claims is waived against the City only if the death or injury arises out of the use or condition of tangible personal property. TEX. CIV. P.& REM. CODE, § 101.021. Property is "used" only if it is employed or applied for a given purpose; "non-use" cannot support a claim. *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 584 (Tex. 1996). If the tangible property is not defective, then "use" requires an allegation the defendant supplied the property lacking an integral safety component. *Kerrville*, 923

S.W.2d at 585; *Ramos v. City of San Antonio*, 974 S.W.2d 112, 116 (Tex. App.–San Antonio, 1998, no pet.). It is not enough that some property was involved; sovereign immunity is not waived unless the use of property actually caused the injury. *Texas Dept. of Crim. Justice v. Miller,* 51 S.W.3d 583, 588 (Tex. 2001).

It is a government employee that must misuse the property. *Gonzales v. City of El Paso*, 978 S.W.2d 619, 623-24 (Tex. App.–El Paso 1998, no pet.)(no waiver when private citizen shot the plaintiff). The "use" of property by a third party is insufficient. *City of Columbus v. Barnstone*, 921 S.W.2d 268, 272 (Tex. App.–Houston [1st Dist.] 1995, no writ); *Ramos v. City of San Antonio*, 974 S.W.2d at 116.

The use or failure to convey information is not a use of tangible property that waives immunity. *Univ. of Tex. Med. Branch v. York,* 871 S.W.2d 175, 179 (Tex. 1994). There, an alleged failure to train or instruct does not fall within the waiver. *Texas Dept. of Public Safety v. Petta,* 44 S.W.3d 575, 580 (Tex. 2001). Likewise there is no waiver for failing to use communication devices to convey information. *City of El Paso v. Hernandez,* 16 S.W.3d 409, 416-17 (Tex. App.–El Paso 2000, no pet.).

If the injury arises from an intentional tort, sovereign immunity is not waived. TEX. CIV. PRAC. & REM. CODE ANN., § 101.057 (Vernons Supp. 2001); *Petta*, 44 S.W.3d at 580. Because Ernest Moore's actions are intentional torts, there is no waiver of immunity under section 101.055. *Gonzales*, 978 S.W.2d at 623 (intentional tort committed by third party barred under section 101.057); *Barefield v. City of Houston*, 846 S.W.2d 399, 406 (Tex. App.–Houston [14th Dist.] 1992, writ denied).

Many of Plaintiffs' allegations arise out of alleged improper policies or the failure to have policies. There is no waiver of sovereign immunity for injuries arising from the policy decisions over the matter of providing police protection. TEX. CIV. PRAC. & REM. CODE ANN., § 101.055(3)(Vernons Supp. 2001); *Orrozco v. Dallas Morning News, Inc.*, 975 S.W.2d 392, 297-98 (Tex. App.–Dallas 1998, no pet.); *Gonzales,* 978 S.W.2d at 622-23.

**4. No Evidence of Proximate Cause on State Law Negligence Claims**

To prevail on a negligence cause of action Defendant must prove proximate cause. The state law definition of proximate cause parallels the federal definition. Plaintiffs must prove cause in fact which requires proof that "but for" and "without which" defendant's conduct, the event would not have occurred and plaintiffs must prove that defendant's conduct is not too remote from the event. *Missouri Pac. RR Co. v. American Statesman,* 552 S.W.2d 99, 103-4 (Tex. 1977); *Mosley v. Excel Corp.*, 109 F.3d 1006, 1009 (5th Cir. 1997), *reh. denied,* 114 F.3d 1185 (5th Cir. 1997). As discussed in the previous section entitled Federal Claims, plaintiffs in this case, as a matter of law, cannot establish proximate cause between any action of the city or its employees, and the tragic events that occurred on July 7, 1998.

**5. No Evidence to Support State Law Claims**

The Plaintiffs' state law claims rely, in large part, on negligent entrustment. In this case, there was no deliberate entrustment of the rifle by Det. Moore to his son. Although Texas cases have recognized a common law cause of action for negligently entrusting a firearm to an incompetent user (see, *Kennedy v. Baird*, 682 S.W.2d 377, 388 (Tex. App.–El

Paso 1984, no writ) there is no case providing for liability for failing to prevent a weapon from being taken without permission. By analogy, Texas does not impose a duty to safeguard car keys to prevent a thief from stealing the car and hitting a third party. *See, Story Serv., Inc. v. Ramirez*, 863 S. W. 2d 491, 497-98 (Tex. App.--El Paso 1993, writ denied). There is no liability simply for failing to take adequate precautions against unauthorized use.

Moreover, a city employee did not use the rifle. Therefore, Plaintiffs have the burden to show that, when the City entrusted the rifle to its employee, it knew or should have known that the employee would use poor judgment in allowing third parties to use or possess the firearm. *See, Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596 (Tex. 1987). There is no evidence that Det. Moore's superiors knew or should have known he would exercise bad judgment.

The alleged promise to Pirtle to destroy the rifle creates no duty in favor of the deceased Border Patrol agents or Deputy Raul Rodriguez. The failure to perform a gratuitous promise makes the defendant liable only if he knows that the services are necessary for the protection of a third party and (1) negligence in the performance of the promise increases the risk of harm to that party, or (2) the third party detrimentally relies on the alleged promise to perform. *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 396 (Tex. 1991). At the time the rifle was delivered to the City, it would have had no basis to realize destruction was necessary to protect either the Border Agents or Deputy Rodriguez. Next, because the City did nothing towards destroying the rifle, it undertook no affirmative course

of action which increased the risk. *Id.* at 396-7. Because none of this was communicated to Deputy Rodriguez or the Border Patrol Agents, they could not have relied on it. *Id.* at 397.

**C. Objections to Plaintiffs' Summary Judgment Evidence**

Plaintiffs may choose to rely upon their evidence filed previously. Dkt. # 106, 110. Although Defendant has objected before, it renews the objections made in its Reply. (Dkt. # 115). Moreover Defendant objects to Ms. Cox's affidavits (Dkt # 141,145) on the basis they are hearsay and inadmissible to prove the substance of her statements.

**WHEREFORE, PREMISES CONSIDERED**, Defendant moves for summary judgment that the remaining claims of all Plaintiffs in these causes be dismissed and they take nothing against Defendant.

Respectfully submitted,

By: ______________________
TOM LOCKHART
Admissions ID No. 2257
Texas State Bar No. 12473500
ROGER W. HUGHES
Admissions ID No. 5950
Texas State Bar No. 10229500
ADAMS & GRAHAM, L.L.P.
P.O. Drawer 1429
Harlingen, Texas 78551-1429
956/428-7495; FAX: 956/428-2954
Attorney-in-Charge for Defendant, CITY OF HARLINGEN, TEXAS

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document was forwarded on this 14th day of December 2001, to the following counsel of record and interested parties:

---

Attorneys of record for Plaintiffs, GILBERTO M. RODRIGUEZ, et al and ARTURO GUILLERMO SALINAS, et al:

Mr. Broadus A. Spivey CMRRR # 7000 1670 0005 2563 2990
**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, Texas 78701-4320

Attorney of record for Plaintiff, RAUL RODRIGUEZ:

Mr. Ramon Garcia CMRRR # 7000 1670 0005 2563 2983
Ms. Sonia Lopez
**LAW OFFICES OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, Texas 78539

TOM LOCKHART

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | CIVIL ACTION NO. B-98-162 |
| V. | { | |
| CITY OF HARLINGEN | { | JURY DEMANDED |
| and | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| CITY OF HARLINGEN | { | |
| and | { | |
| RAUL RODRIGUEZ | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| CITY OF HARLINGEN | { | |

---

**AFFIDAVIT OF TOM LOCKHART**

---

**THE STATE** )
:
**OF TEXAS** )

**BEFORE ME**, the undersigned Notary Public, on this the 13th day of December 2001, personally appeared **TOM LOCKHART**, who, upon his oath, duly stated as follows:

"My name is **TOM LOCKHART**. I am over the age of 18 years and am fully competent to testify and have personal knowledge of the facts contained herein and they are true and correct.

I am lead counsel for the Defendant City of Harlingen in the above styled and numbered case.

I attended and participated in the deposition of Julie Lynn Cox taken on December 12, 2001. The attached excerpts from such deposition truly and accurately reflect the deposition testimony given by Julie Lynn Cox and the attached Exhibits are true and correct copies of the Exhibits identified by Julie Lynn Cox at her deposition."

Further affiant sayeth not.

TOM LOCKHART

**SWORN TO AND SUBSCRIBED** before me, the undersigned authority, by the said **TOM LOCKHART** on the 13th day of December, 2001, to certify which witness my hand and seal of office.

MARIA S. MARTINEZ
Notary Public
State of Texas
Comm. Exp. 11-14-2004

[Notary Seal]

Notary Public in and for
THE STATE OF TEXAS

Print Name: Maria S. Martinez

My Commission Expires: 11-14-2004

CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ARTURO G. SALINAS, ET AL *
VS. * CIVIL ACTION B-98-162
CITY OF HARLINGEN *
*
and *
*
GILBERTO M. RODRIGUEZ, ET AL *
VS. * CIVIL ACTION B-98-162
CITY OF HARLINGEN *
*
and *
*
RAUL RODRIGUEZ *
VS. * CIVIL ACTION B-98-162
CITY OF HARLINGEN *

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF
JULIE LYNN COX
DECEMBER 12, 2001

*******************************************

ORAL AND VIDEOTAPED DEPOSITION of JULIE LYNN COX produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 12th day of December, 2001, from 10:29 p.m. to 1:35 p.m., before JUDITH HENNIGH, CSR in and for the State of Texas, reported by oral stenography at the offices of Ramon Garcia, Edinburg, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

=======================================================

HENNIGH-QUIN COURT REPORTERS
Box 3036, Edinburg, Texas 78540
(956) 383-8887 / Fax 380-2050
Toll Free (800) 892-6305

=======================================================

CERTIFIED COPY

A P P E A R A N C E S

FOR THE PLAINTIFF RAUL RODRIGUEZ

MS. SONIA I. LOPEZ
LAW OFFICES OF RAMON GARCIA
222 WEST UNIVERSITY
EDINBURG, TEXAS 78639

FOR THE PLAINTIFF GILBERTO M. RODRIGUEZ, ET AL

MR. PRICE AINSWORTH
SPIVEY & AINSWORTH, P.C.
48 EAST AVENUE
AUSTIN, TEXAS 78701

FOR THE DEFENDANTS

MR. TOM LOCKHART
ADAMS & GRAHAM, L.L.P.
222 WEST VAN BUREN
HARLINGEN, TEXAS 78550

VIDEOGRAPHER: Bobby Vega Productions, Edinburg, Texas
COURT REPORTER: Judith Hennigh, CSR #1752

I N D E X

| | PAGE |
|---|---|
| JULIE LYNN COX | |
| Examination by Ms. Lopez (Total time used: 1:50) | 5, 89 |
| Examination by Mr. Lockhart (Total time used: 0:11) | 81 |
| Examination by Mr. Ainsworth (Total time used: 0:49) | 92 |
| Signature and Changes | 136 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Gun Photo | 40 |
| 2 | Gun Photo | 40 |
| 3 | Gun List Inventory | 52 |
| 4 | 11//29/01 Affidavit | 53 |
| 5 | Firearms Transaction Record | 60 |
| 6 | 8/15/01 Affidavit | 67 |
| 7 | 9/06/01 Affidavit | 67 |
| 8 | 7/07/98 Affidavit | 78 |
| 9 | 7/13/98 | 78 |

IT WAS AGREED that no objections SHALL be made by any Party at the time of taking of said deposition; except objections as to the form of the question, including leading, or the responsiveness of the answer, which if not made during the deposition are waived; but if and when said deposition, or any portion thereof, is offered in evidence at the trial of this cause by any party thereto, it shall be subject to any and all other legal objections, such objections to be made at the time of the tender, the same as though the witness were on the stand personally testifying.

IT WAS FURTHER AGREED that the witness must appear

before any Notary Public or official authorized to administer oaths, and at such time the witness has the privilege of reading over said deposition and making any corrections to her answers she finds to be necessary, such corrections to be made in accordance with the Federal Rules of Civil Procedure.

IT WAS FURTHER AGREED by and between Counsel that following delivery of the original deposition herein by the officer to the deponent for the purpose of signature by deponent, said original deposition shall be returned directly to the court reporter, JUDITH HENNIGH, Hennigh-Quin Court Reporters, within thirty (30) days following receipt of same, together with any corrections, additions or changes thereto, at which time the reporter will file a Return Certificate and deliver the signed deposition to the custodial attorney herein, MS. SONIA I. LOPEZ.

IT WAS AGREED that should the original deposition herein fail to be returned, signed and notarized, ten (10) days prior to the date of trial in this cause, or prior to any appropriate hearing herein, a certified copy of same may be used herein for all purposes, as though it were the signed original, upon proper notice to opposing Counsel.

IT WAS FURTHER AGREED that after said deposition has

been returned, in accordance with these stipulations and agreements, it will be treated by the parties hereto and may be used herein with the same force and effect as though all statutes and rules relating to the taking and returning of depositions had been fully complied with.

JULIE LYNN COX,

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. LOPEZ:

Q Would you please state your complete name for the record?

A Julie Lynn Cox.

Q Ms. Cox, my name is Sonia Lopez and I represent Raul Rodriguez, which is one of the Cameron County sheriff's deputies that was injured in this case.

What we're going to do this morning is we're basically going to ask you some questions regarding your knowledge of some of the events that occurred on July 7th of 1998, and your knowledge regarding Ernest Moore's use of some of the guns that have been referred to and referenced in this case.

If at any time you do not understand any of my questions, or some of my questions, then just tell me "I don't understand, and would you repeat that question for me."

And the lady that is seated right here to my right-hand side, she's basically going to be taking down your testimony and she's going to be putting it book form and then she will be delivering it to you, or someone will be delivering it to you so that you can read over and just make sure that there's no inaccuracies that's been stated on it, so that you can make some changes on an errata sheet, what we call an errata sheet on the back, if there are some changes that need to be made on there.

Also, if you would just respond orally, if it's a yes, say yes, instead of uh-huh, because there is no way to document that in the transcription of the record.

A Yes, I understand.

Q Okay. Ms. Cox, would you please tell us where you currently reside?

A I live in Alamo, Texas.

Q And what is the address there in Alamo, Texas?

A 7 Miles East Tower Road.

Q If someone were to send you a letter, what would be the exact address?

A Route 2, Box 227A, Alamo, Texas 78516.

Q How long have you resided at this address?

A I've lived there almost all my life.

Q I know that you were previously living somewhere

they've got number 1 and number 2 and your signatures.

MS. LOPEZ: Let me go ahead and mark this first exhibit as Julie Cox exhibit number 1.

(Exhibit 1 marked).

MR. LOCKHART: That's what I was talking about, the number that was at the top.

WITNESS: Yes.

MR. LOCKHART: She's going to remark them, that's good.

MS. LOPEZ: And let me go ahead and mark the other one that you've referenced as Cox number 2.

(Exhibit 2 marked).

Q (Ms. Lopez) Now, after you moved in with Ernest Moore, is the AR-15 gun the only gun you recall him ever shooting?

A Recall, yes, but there could have been more. I wasn't there all the time.

Q Okay, do you know whether he shot any other guns?

A Yeah, I was aware of him shooting other guns, I'm sure, but he had to, I'm not -- you know, I don't know, it's been a while.

Q Okay. You mentioned in one of your affidavits that you've provided, and let me go ahead and mark that as well. That Ernest had shot an AR-15 at your father's

A Ernie had said something like that. I don't know why, I have no idea why.

Q That the gun was illegal?

A Yeah, that's something I remember.

Q What else did he say about this AR-15, other than it being illegal?

A Which one are we talking about, number 1 or number 2? I don't know anything about number 1, so we're talking about number 2, right, the one he had purchased is the one I'm talking about.

Q Well let me ask you this.

A His father had purchased it.

Q Okay, let me ask you this.

MR. LOCKHART: Which one?

WITNESS: Number 2, excuse me, number 2.

Q (Ms. Lopez) The one that you said that your family said --

A That's is the only difference I know between is because the stock is different completely and the one that he purchased was number 2, that is the main reason why I know that it was number 2, because his father, he had paid money for it. This one he didn't pay for. And Ernie liked this one because it was the one that he had bought and he spent money on it, he spent like 1500 bucks. Don't quote me on that one, but he spent money

on it and he liked it, that was his gun.

Q When you talk about the one that your parents didn't want him to bring over because it was illegal.

A Uh-huh.

Q Which gun?

A Oh, I don't know. It's not illegal, so for some reason they got that in their head or Ernie had said something, maybe I said something, I don't remember. That's the only thing I -- you know.

Q You said that now you've learned that it's not illegal.

A Yeah, because -- yeah.

Q Okay, and what have you learned, what did you know about it before?

A I don't know anything about it still, I just know the difference. I just know the stock is different and I don't know if it's legal or not, so -- I guess it's not legal -- illegal, excuse me.

Q What were you told about it being illegal?

A I don't remember. I just -- I don't even know why, I don't know why that was in my head.

Q That Ernest told you that the gun was illegal?

A Yeah, I just don't remember where that came from, there was some reason, but then I don't remember, I just don't. Maybe -- I don't know.

Q Okay. When was the first time that you can recall Ernest shooting the AR-15?

A Number 2. I remember when he first got it, he came out of the garage and he said "Look what my dad brought from the police station." I go "Yeah, it's nice." I never paid attention, I wasn't -- you know, and then he wanted to go shoot it then when he first got it, yeah. But I didn't watch him or anything, but he was shooting it.

Q Do you know how long before the incident in question that occurred?

A Okay, it wasn't that long. Maybe a month to three weeks, four to three weeks, maybe. It was a brand new gun, he hadn't had it very long.

Q Could it have been longer than three to four weeks?

A No, it couldn't have been longer because he didn't have it that long, huh-uh, it couldn't have been longer.

Q Okay. And it's your understanding that that was whose gun?

A I assume it was Ernie's, because he had paid for it, it was his money. And obviously it was legal and everything was legit, so.

Q Am I correct, then, in stating that between

November of '97 when you lived with Ernest and the time of the incident in question you only recall him shooting a weapon three to four weeks before the incident in question?

A A weapon?

Q Yes.

A Or that gun?

Q A weapon.

A A weapon. Before -- I don't remember that. I do remember him shooting that, of course. I don't remember anything else, he could have shot other guns, I don't remember. He could have done it right in front of me, I don't remember, I really don't remember.

Q Was it your understanding that all the guns that were in the gun safe were all of -- were whose guns?

A They were -- some were R.D.'s, and Larry kept his police gun in there too just to keep it away, and -- most of them were Ernie's though, he collected, he had some antiques in there too.

Q Okay. What was your understanding about AR-15. I know we've just marked one as Cox number 1 and Cox number 2. How many AR-15s, was it your understanding, that the Moores, either R.D., Larry or Ernest owned?

A I didn't really know. I mean I knew he had one, I didn't really know about that one really. It looks

familiar, you know, it's like it's different. I don't remember that one.

MR. LOCKHART: "That one," which one are you talking about.

WITNESS: Number 1, excuse me. It's different when I have them right in front of me. I can tell the difference completely. I remember this one.

MR. LOCKHART: That being number 1 -- or number 2?

WITNESS: Number 2, yes, I remember number 2.

Q (Ms. Lopez) Do you know how many AR-15s they owned?

A See, I knew they had an AR-15, I didn't know how many they had -- he had, excuse me, so no, it could have been an AK-47 or an AR-15, I don't know the difference, you know. The only reason I do know about that one is because of the reason he bought it, number 2, because he bought it and he told me it was -- he showed it to me, do you know what I mean?

Q You don't know the difference between an AK-47 and --

A Well, I know, you know, but I was just trying to say, you know, I couldn't really tell you. Because he had a lot of guns in there I have never even seen,

A Yes, ma'am.
Q And on my number 1 there's a reference to a gun, a Colt AR-15 that's owned by Ernest; is that correct?
A Yes.
Q Okay. And this gun list inventory attempts to identify all the guns that were in the gun safe on the date of the incident in question.
A Yes.
Q Okay. I know that you've stated in an affidavit that I'll go ahead and mark as Cox exhibit -- and I guess that's the one that you have there.
A Number 3?
(Exhibit 4 marked).
Q Let me go ahead and give it to you. Cox exhibit number 4. Is this an affidavit that you recently gave --
A Uh-huh.
Q -- to a gentleman --
A Yes.
Q -- by the name of Cipriano Reyna?
A Yes.
Q On entry number 6 of your statement it says "When I went to Sonia Lopez's office I was not shown or told that there were two AR-15s owned by the Moores.
A Uh-huh.

Q Is that correct?

A Yes.

Q Okay, when you and I met we did go over the gun list inventory.

A Yes, but I can't tell by this, I have to see pictures. I'm sorry, I didn't know, I was -- you know, I was scared. I'm 23 years -- I know I'm not very stupid, but I'm not very smart about laws and stuff, and I -- you know, you scared the -- you know, you scared me.

Q And was I mean to you?

A No, no, I don't mean --

Q Was I forceful with you?

A No, I was -- just the situation at hand, not you personally, no.

Q Okay, but there was nothing that I did to scare you?

A Not you personally, just the situation at hand, you know, everything, you know, just thinking about everything again. It was more than I wanted to handle, and I didn't think about it, I never thought I had to even think about what happened, you know, about the guns. I never even knew that was going to be an issue, you know.

Q Okay, fair enough. But I just want the record

A Yes.

Q And you described some of your visit with Ms. Lopez, right?

A Yes.

Q Before you visited with Ms. Lopez, first of all, where were you here in the office? Was it here in this room or another room?

A Another room.

Q Okay. When you first went in there was anybody with you?

A No.

Q Was there anything in there for you to look at?

A Yes.

Q What was in there?

A There was some pictures and, you know, some gun pictures and some other stuff.

Q What other stuff?

A Autopsy photos that I has seen.

Q Autopsy photos of Ernest?

A Yes, and Delia.

Q Did that upset you?

A Oh, very much so.

Q How long were you there with the pictures before somebody came in to talk to you?

A I wasn't alone with them.

Q Who was with you?

A Sonia Lopez.

Q Okay. Okay, fair enough. Anybody else?

A No.

Q And then do you remember how many pictures you were shown altogether?

A A stack of them about that big (indicating). Different pictures, different things.

Q All right, now you've shown us a stack about --

A It was a paper, a stack, it was quite a few.

Q All right, but as I understand it, the only photograph of an AR-15 that was shown to you while you were here with Ms. Lopez was the one that's been identified as Cox exhibit number 1.

A Yes.

Q Okay, you were not shown Cox exhibit number 2?

A No.

Q Now while you were here did you tell Ms. Lopez that the gun that Ernest liked and the gun that you had seen him shooting, the AR-15 --

A Yes.

Q -- was the gun that his dad had just purchased for him?

A Yes.

Q And you told her that day when she was

interviewing you?

A Yes.

Q Okay. And has that always been your recollection?

A Yes.

Q Now when the two affidavits were brought to you by the investigators, where was that, where did you sign the affidavits from Sonia Lopez's office?

A In front of my sister's place.

Q Where is that?

A It's in Alamo, it's right by where I live.

Q Was it outside?

A Yes, it was outside.

Q Did they call and tell you they were bringing the affidavit by?

A No, I could tell they had been waiting for me there, and I had signed one at my apartment as well.

Q All right. And the affidavit that you gave that's been marked at exhibit number 4, when you talked with Mr. Reyna --

A Yes.

Q Where did that interview take place?

A In my house.

Q And who was present in addition to you?

A It was my mother.

Q Let me just ask you to compare between the circumstances of that interview by Mr. Reyna in your house with your mother as compared to the interview here with Ms. Lopez.

A Yes.

Q And I'm not casting any aspersions at Ms. Lopez, she's a good lawyer, but of the two interviews, which one were you most comfortable with?

A The one with my mother.

Q And did you feel like Mr. Reyna was fair with you and took his time with you?

A Yes, yes, of course he was.

Q Okay, and as a result of that interview, you signed the affidavit that's been marked exhibit number 4, correct?

A Yes.

Q All right, and if you were called upon to testify at the trial of this case --

A Yes.

Q -- would you testify to the contents of your exhibit number 4, the affidavit that you gave to Mr. Reyna on November 29th this year?

A Yes.

Q Because that's true and accurate, correct?

A Yes, sir.

Q And if you were called upon to testify at the trial of this case about which was Ernest's favorite gun and the one that you saw him practicing with and the one that he liked, would you identify for the jury your exhibit number 2?

A Yes.

Q Which was first shown to you when Mr. Reyna met with you at your house.

A Yes.

Q And that was the first time that you were able to compare exhibits one and two?

A Yes.

Q And after comparing them, you're clear and you're sure that the gun that Ernest liked and that he used was the one his dad had purchased for him and that has been marked exhibit number 2?

MS. LOPEZ: Objection, form.

Q (Mr. Lockhart) Now if you were called to testify at the trial of this case in front of a jury, Ms. Cox -- I'll call you Julie. Tell us which gun that Ernest liked and that he shot in your presence, which one in the photographs?

A Number 2.

Q All right, and if you were called to testify about which gun he liked, is that the gun that he showed

you, came out of the garage and showed you and said his dad had just bought him?

A Yes.

Q And if you were called to testify at trial in front of a jury, is that gun that he liked and he used the gun that he told you that he had paid for with his own money?

A Yes.

Q And is that the gun, if you were called to testify about the AR-15 that Ernest Moore liked and shot in your presence, is that the gun that had just been purchased for him by his father within a month of these shootings?

A Yes.

Q I apologize if I asked this. Julie, how did you know that Sonia Lopez's office was looking for you, how did you learn that?

A They kept on leaving me notes inside my mail slot and they talked to my neighbor and gave me like little cards and they'd write things. But I had never did anything till I started thinking -- my mom suggested that I should call them, maybe I could help or something, you know.

MR. LOCKHART: I'll pass the witness, thank you again.

A It was about an hour, yes.

Q Was I fair with you?

A Yes.

Q Okay. With respect to the issue of the gun that R.D. had purchased for Ernest Moore, am I correct in stating that it's your testimony that you indicated to me that the gun that Ernest liked was the one that his dad had purchased for him.

A Yes.

Q Do you recall ever stating that it was the gun that his dad had "just" purchased?

A Yes, the one he -- well, there was only one that he did purchase, so yeah.

Q But did you know that at that time, how many guns or --

A I didn't know there was two AR-15s.

Q Okay, and did you know at that time which guns R.D. had purchased and which ones he had not purchased?

A No.

Q Did you know at that time which guns that were in the gun safe R.D. Moore purchased and which ones he hadn't purchased?

A Just the one from the police station is the only one I knew about, which is number 2.

Q But you didn't know that -- back on July 7th of

something.

A Yes.

Q And I'm piecing together from different depos. If your memory is more accurate than that, tell me, but -- so you moved out a week or so before the incident?

A Yes, yes.

Q Okay, and if the accident happens on July 7th.

A Yes.

Q Then you go out with him on July the 4th or something.

A Yes.

Q So were you just living at Mr. Morin's house for three days before you went back out with Ernest?

A It was a short period, it was a short period.

Q Okay. But I mean if it was three days or four days or five days, do you have a specific recollection as you sit here?

A Specific, no.

Q Okay, so I take it, anyway, during that time period while you were out at the Morin house you wouldn't have seen Ernest practicing with a weapon or anything during that time period, right?

A No, not then.

Q Okay. And I guess if we go backwards in time

for some time there, you can't really tell me when the last time would have been that you saw before this July 7th, 1998 shooting when you saw Mr. Moore practice with the AR-15?

A Yes, I seen him, like because he had only had the gun for such a short period. He just recently got that gun before the incident, and I'm not sure how long before that, but it had been recent when he started shooting that gun, because he had just got it, so yeah, he did, I do remember that.

Q Okay. Well, the transfer documents from Capt. Vasquez who sold the Colt Sporter that I think is marked there on Exhibit number 2 to Mr. Ernest Moore's father is dated something like -- you've probably already been over this, but June 9th of 1998, so that's less than four weeks before the shooting that took place, right?

A Yes.

Q And for at least a week of that time or so, you weren't living in that house, right.

A No.

Q And for some time period before that, you can't remember when it was that you last saw Mr. Moore shoot a rifle, right?

A No.

Q Now your father has a gun range, right?

A Yes, sir.

Q When you shoot a rifle at your father's gun range do you have to register anything. To say I'm going to be on line number 2, or stall number 3, or whatever it is?

A Oh, no.

Q Would there be any kind of record, then, when it was that Ernest had gone out their to practice?

A No.

Q Okay, and as to whether or not it was in June or July or whatever date, you just can't tell me as you sit here today, right?

MR. LOCKHART: Objection misleading.

Q (Mr. Ainsworth) Do you know what date it was?

A No, I don't.

Q And whether or not it was a week before the shooting or two weeks before this shooting or any day in specific, you can't tell me; is that right?

A Yes.

Q Now the -- as to when the weapon that's marked as exhibit number 1 came home to the Moore household. Do you know one way or the other?

A Excuse me, repeat that please.

Q I'm sorry, it wasn't a good question. Exhibit number 1, that's the AR-15, that was found on Mr.

Moore's body on the day of the shooting in July of '98, okay. Okay, as to when that gun came into the Moore household, came into their having of the weapon --

MR. LOCKHART: You're talking about exhibit one, I'm sorry.

MR. AINSWORTH: Yes.

A I didn't really know about that one, I don't remember that one.

Q (Mr. Ainsworth) Okay.

A So I didn't even know he had it, I didn't know there was two AR-15s.

Q Okay, so you're not saying that that gun had been there for a year and he never used it or anything like that.

A Could have been there.

Q You just don't know.

A I just don't know.

Q Okay, the day it arrived, you don't have a specific recollection of that?

A I never -- I don't even remember seeing it, to tell you the truth.

Q Okay, you just remember there being one gun?

A Yes. But I do remember this one, though.

Q And as I understand your testimony, the difference is the stock.

A Yes.

Q Okay, and the fact that the one on exhibit number 2 appears to be a wooden stock.

A Yes. Because Ernie had showed me this one, I remember him specifically, I see it exactly.

MR. LOCKHART: What number?

WITNESS: Number 2, excuse me, number 2.

Q (Mr. Ainsworth) Okay, now there are other guns stacked behind that one, right.

A Yes.

Q And what are the stocks on those guns?

A I can't see them.

Q Well I mean do you have a recollection of them?

A No, I think they're AK-47 and SKS.

Q And do you remember what the stocks were on them?

A On was a sporter, I believe, a sporter stock, and I don't know the other one.

Q And when you say "a sporter stock," what do you mean by that?

A Sporter stock is instead of the grip it's got like -- I don't know how to describe it.

Q Is it a pistol stock or a straight cylinder --

A No, they call it a sporter stock, that's how I know. I don't know how to describe it, though, but it's

got like a grip thing, but it's like --

Q Sporter is a reference to the shape of the stock.

A Yeah.

Q And if I had to get you to draw it, you could draw --

A Yeah.

Q You wouldn't call the stock on that exhibit 2 a sporter, would you, that's the one that you've identified as being Mr. Moore's favorite?

A Yeah, that's a -- I don't know what that is. Because this one looks like it folds.

Q When you say "this one" we've got to go back and figure out what you --

A Number 1, I'm sorry, number 1, I forget. Number 1.

Q That looks like if folds on number 1?

A Yeah, see, that's the difference between them that I --

Q Okay, and the one on exhibit number 2, how would you describe that stock?

A It doesn't fold. On number 2 its got a different stock.

Q Okay. What do you mean by that, just so I'll have a clear record, what do you mean by "different"?

A Because I guess this one goes into -- I don't know how to describe it. I don't know.

Q Well, let me ask it like this then. If you're describing a sporter would you describe exhibit number one or exhibit number 2, a sporter stock?

A I might be wrong about the sporter stock, but I was thinking that -- because I'm just thinking of AK-47 and the sporter stock, do you know what I mean. So I think that's what it's called, a sporter stock, yeah.

Q And I'm not trying to tell you which one is right and which one is wrong.

A I know.

Q What I'm trying to figure out is why you are distinguishing these two guns in your mind?

A Well, the only reason I can't really -- well I can distinguish them, of course, but they look totally different. This one has like a fat barrel, I mean excuse me, end of it, and this one looks more metal, I don't know.

Q Now Captain Vasquez's deposition had some attachments to it also, just like we're putting stickers on these pieces of paper and attaching them to your deposition. And at the time of his deposition we actually attached those transfer documents by which the weapon he sold to Ernie's father --

# E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Gun Photo | 40 |
| 2 | Gun Photo | 40 |
| 3 | Gun List Inventory | 52 |
| 4 | 11//29/01 Affidavit | 53 |
| 5 | Firearms Transaction Record | 60 |
| 6 | 8/15/01 Affidavit | 67 |
| 7 | 9/06/01 Affidavit | 67 |
| 8 | 7/07/98 Affidavit | 78 |
| 9 | 7/13/98 | 78 |

#1

Julie Col

EXHIBIT NO. 1

#2 Julie Cox

## GUN LIST INVENTORY

| | | |
|---|---|---|
| Ernest | 1. | Colt AR-15 Semi Auto 223 Cal. 2/20 round clips and 4/30 round. 350 rounds ammo. |
| Ernest | 2. | AK-47 Semi Auto 7.65 x 39 Cal. 2/5 round clips and 4/30 round. 500 rounds ammo. |
| City | 3. | Olympic Arms Semi Auto .223 same amount of clips as No. 1. Same ammo - (City weapon). |
| Ernest | 4. | SKS Semi Auto 7.65 x 39 Cal. 1/10 round clips - same amount as No. 2. |
| Ernest | 5. | M-1 Carbine Semi Auto 30 Cal. - 2/5 round clips and 2/30 round clips. 50 rounds ammo. |
| Ernest | 6. | Mossburg pump 12 ga. Shotgun riot type - 7 round magazine pistol grip. 50 rounds. |
| Ernest | 7. | Mauser Bolt Action Military 10 round magazine 8 mm Cal. 20 rounds ammo. |
| Ernest | 8. | Infield Bolt Action Military 10 rounds magazine 308 Cal. 20 rounds ammo. |
| R.D. | 9. | Remington 870 pump Shotgun - 12 gauge - 50 rounds ammo. |
| R.D. | 10. | Winchester lever Action w/scope - 30-30 Cal. 40 rounds ammo. |
| R.D. | 11. | Custom built Remington w/Mauser Bolt Action 6 mm Cal. w/scope - 50-60 rounds ammo. |
| R.D. | 12. | Remington Mod. 700 Bolt Action 22-250 Cal. w/scope. 100+ rounds ammo. |
| R.D. | 13. | Remington Single Shot Bolt Action. .22 Cal. 200 rounds ammo. |
| Ernest | 14. | Ruger Mod - 10-22 Semi Auto Rifle. 10 round clip. Ammo same as No. 13. |

EXHIBIT NO. 3
J. HENNIGH

| | | |
|---|---|---|
| Ernest | 15. and | |
| Ernest | 16. | Two Mauser Mod. P-38 Pistols, Semi Auto 9 mm Cal. 2/8 round clips. 400 rounds ammo. |
| City | 17. | Mauser Semi Auto Pistol 7.65 Cal. 1/7 round clips. 20 rounds ammo. |
| Ernest | 18. | Luger Semi Auto Pistol 9 mm Cal. 2/8 round clips. Ammo same as Nos. 15 and 16. |
| Ernest | 19. | Smith and Wesson Semi Auto Pistol 9 mm Cal. with 3/15 round clips. Ammo as as Nos. 15, 16 and 18. |
| City | 20. | Berretta Mod 92 Semi Auto Pistol 9 mm Cal. with 3/15 round clips. Ammo same as Nos. 15, 16, 18 and 19. |

**AFFIDAVIT**

---

THE STATE OF TEXAS *
*
COUNTY OF HIDALGO *

BEFORE ME, the undersigned Notary Public, on this day personally appeared JULIE LYNN COX who being by me duly sworn on his oath, deposed and said the following:

1. "My name is JULIE LYNN COX. I am over the age of eighteen (18) years, and of sound mind and suffer from no legal disabilities. I have never been convicted of a crime and I am fully competent, duly qualified and authorized to make this Affidavit, and I have personal knowledge of the matters stated herein and they are true and correct.

2. I currently reside in Alamo, Texas. My date of birth is October 25, 1978 and I am 23 years of age.

3. On August 15, 2001 and September 6, 2001 I signed affidavits that were produced to me by investigators claiming to represent Gilberto Rodriguez. The firm they were working for was Ramon Garcia's office.

4. On those affidavits I indicated that I had seen Ernest Moore shoot an AR-15. A picture was shown to me by Sonia Lopez who is an attorney at Ramon Garcia's office. I was only shown one photograph of an AR-15 which I presumed was the one Ernest Moore used in the shooting. I also indicated that Ernest had shot the AR-15 on several occasions in front of the Moore residence in San Benito, Texas.

5. On this day I was shown two photographs by investigator Cipriano Reyna. By studying the two photographs I have identified the AR-15 that I had previously seen Ernest Moore shoot in front of his residence. I have signed the laser copy photograph which is numbered no. 2. I do not recall ever seeing Ernest Moore shoot the AR-15 which is numbered no. 1. I have also signed the laser photo copy.

Julie Cox

Cox

6. When I went to Sonia Lopez office I was not shown or told that there were two (2) AR-15's owned by the Moores. I do recall Ernest telling me that his favorite gun was the AR-15 that his father had just purchased. This is the gun that I saw Ernest practice with.

7. I would also like to say that I did not initiate calling or making contact with Ramon Garcia's office. I was approached by there investigators and is how I came involved in this case.

8. I also would like to say that I told Sonia Lopez that the AR-15 I had seen Ernest practice with was the one that his father had purchased for him.

9. I have never seen the AR-15 which is numbered no. 1 because the stock is different from photograph no. 2. The photograph no. 2 is the one I saw Ernest Moore practice with because the stock was wood.

"Further Affiant sayeth naught."

[signature]
JULIE LYNN COX

SUBSCRIBED AND SWORN TO BEFORE ME by the said Julie Lynn Cox on this the 29 the day of NOVEMBER, 2001, to certify which, witness my hand and official seal.

[signature]
Notary Public, State of Texas
My Commission Expires: 4/10/05

CIPRIANO REYNA
MY COMMISSION EXPIRES
April 10, 2005

#1
Julie Col



Nov 30 01 02:07p ?MS&GRAHAM LLP ( 3)428-2954 p.6

#2 Julie Cox



OMB NO. 1512-012

# DEPARTMENT OF THE TREASURY
## BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
## FIREARMS TRANSACTION RECORD PART I - OVER-THE-COUNTER

TRANSFEROR'S TRANSACTION SERIAL NUMBER

NOTE: Prepare in original only. All entries on this form must be in ink. **See Important Notices, Definitions and Instructions**

**SECTION A - MUST BE COMPLETED PERSONALLY BY TRANSFEREE (BUYER)**

1. TRANSFEREE'S *(Buyer's)* NAME *(Last, First, Middle)*: Moore, Ralph Dwayne
- [✓] MALE [ ] FEMALE
2. HEIGHT: 5'11"
3. WEIGHT: 190
4. RACE: Whi[te]
5. RESIDENCE ADDRESS *(No., Street, City, County, State, ZIP Code)*: Cameron Co. Rt 1 Box 297 San Benito, TX. 78586
6. DATE OF BIRTH: MONTH 12 DAY 2 YEAR 46
7. PLACE OF BIRTH *(City)*: Harlingen; STATE OR FOREIGN COUNTRY: TX

8. CERTIFICATION OF TRANSFEREE *(Buyer)* - Questions a. through l. must be answered with a "yes" or a "no" inserted in the box at the right of the question.

a. Are you the actual buyer of the firearm indicated below? If you answer no to this question the dealer cannot transfer the firearm to you. *(See Important Notice 1.)* — Yes

b. Are you under indictment or information in any court for a crime for which the judge could imprison you for more than one year? An information is a formal accusation of a crime made by a prosecuting attorney. — No

c. Have you been convicted in any court of a crime for which the judge could have imprisoned you for more than one year, even if the judge actually gave you a shorter sentence? *(See Important Notice 3 and EXCEPTION.)* — No

d. Are you a fugitive from justice? — No

e. Are you an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance? — No

f. Have you ever been adjudicated mentally defective or have you been committed to a mental institution? — No

g. Have you been discharged from the Armed Forces under dishonorable conditions? — No

h. Are you an alien illegally in the United States? — No

i. Have you ever renounced your United States citizenship? — No

j. Are you subject to a court order restraining you from harassing, stalking, or threatening an intimate partner or child of such partner? *(See Important Notice 4 and Definition 4.)* — No

k. Have you been convicted in any court of a misdemeanor crime of domestic violence? This includes any misdemeanor conviction involving the use or attempted use of physical force committed by a current or former spouse, parent, or guardian of the victim or by a person with a similar relationship with the victim. *(See Important Notice 5 and Definition 5.)* — No

l. Are you a citizen of the United States? — Yes

m. What is your State of residence? Texas *(State)*

If you are not a citizen of the United States, you have a State of residence only if you have resided in the State for at least 90 days prior to the date of this sale. *(See Definition 6).*

I CERTIFY THAT THE ABOVE ANSWERS ARE TRUE AND CORRECT. I UNDERSTAND THAT A PERSON WHO ANSWERS "YES" TO ANY OF THE QUESTIONS 8b THROUGH 8k IS PROHIBITED FROM PURCHASING OR POSSESSING A FIREARM. I ALSO UNDERSTAND THAT THE MAKING OF A FALSE ORAL OR WRITTEN STATEMENT OR THE EXHIBITING OF ANY FALSE OR MISREPRESENTED IDENTIFICATION WITH RESPECT TO THIS TRANSACTION IS A CRIME PUNISHABLE AS A FELONY. I FURTHER UNDERSTAND THAT MY REPETITIVE PURCHASE OF FIREARMS FOR THE PURPOSE OF RESALE FOR LIVELIHOOD AND PROFIT WITHOUT A FEDERAL FIREARMS LICENSE IS A VIOLATION OF LAW. *(SEE IMPORTANT NOTICE 6)*

TRANSFEREE'S *(Buyer's)* SIGNATURE: RD Moore — DATE: 6-9-98

**SECTION B - TO BE COMPLETED BY TRANSFEROR (SELLER)**

**THE PERSON DESCRIBED IN THIS SECTION HAS IDENTIFIED HIMSELF/HERSELF TO ME IN THE FOLLOWING MANNER:**

9. TYPE OF AND NUMBER ON IDENTIFICATION *(Driver's license or identification which shows name, date of birth, place of residence, and signature. Purchasers who are aliens must provide a valid government-issued photo identification. See Instructions to Transferor 1 and 2).*

Tex DL 04073289

10. TYPES AND DATES OF ADDITIONAL IDENTIFICATION REQUIRED FOR ALIENS *(e.g., utility bills or lease agreements. See Instruction to Transferor 2).*

On the basis of (1) the statements in Section A; (2) the verification of identity noted in Section B; and (3) the information in the current list of Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s), described below and on the back, to the person identified in Section A.

| | 11. TYPE *(Pistol, Revolver, Rifle, Shotgun, etc.)* | 12. MODEL | 13. CALIBER OR GAUGE | 14. SERIAL NO. | 15. MANUFACTURER *(and importer, if any)* |
|---|---|---|---|---|---|
| 1. | Rifle | Sporter | .223 | MH014417141 | Colt |
| 2. | | | | | |
| 3. | | | | | |
| 4 | | | | | |

EXHIBIT NO. Vasquez 2 5/24/01 Maureen Stingley

**Complete ATF F 3310.4 for multiple purchases of handguns** *(See Instruction to Transferor 7.)*

16. TRADE NAME AND ADDRESS OF TRANSFEROR *(Seller) (Hand stamp may be used.)*

JOSEPH B. VASQUEZ
412-7571
212 E. JACKSON, HARLINGEN, TEXAS 78550
FFL 5-74-031-01-0J-38500

17. FEDERAL FIREARMS LICENSE NO. *(Hand stamp may be used.)*

JOSEPH B. VASQUEZ
412-7571
212 E. JACKSON, HARLINGEN, TEXAS 7855[0]
FFL 5-74-031-01-●J-38500

Cox EXHIBIT NO. 5 J. HENNIGH

THE PERSON ACTUALLY MAKING THE FIREARMS SALE MUST COMPLETE ITEMS 18 THROUGH 20.

18. TRANSFEROR'S *(Seller's)* SIGNATURE: Joseph B Vasquez
19. TRANSFEROR'S TITLE: Owner
20. TRANSACTION DATE: 6-9-98

EPH B. VASQUEZ

CUSTOMER'S ORDER NO. 412-7571 DATE 6-7-9

~~212 E. JACKSON, HARLINGEN, TEXAS 78550~~

NAME FFL 5-74-031-01-0J-38500

ADDRESS R.D. Moore

CITY, STATE, ZIP Harlingen Police Dept.

| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT. | MDSE RETD | PAID OUT |
|---|---|---|---|---|---|---|
| | | | | | | |

| | QUAN. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|
| 1 | | | | |
| 2 | 1 | Colt Sporter | | 900.00 |
| 3 | | #MH044174 | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | TAX | | 74.2 |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | 974.2 |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |

RECEIVED BY

RDC470

KEEP THIS SLIP FOR REFERENCE

ORIGINAL

STATE OF TEXAS §
§
COUNTY OF HIDALGO §

# AFFIDAVIT

Before me, the undersigned notary, on this day personally came and appeared SONIA I. LOPEZ, to me well known, and who, after being by me duly sworn did say:

"My name is Julie Lynn Cox. I am over the age of 21 years, and am competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

On July 7, 1998, I was at 311 Catherine Street in Rio Hondo, Texas, with the Morin family. On that date, Ernest Moore appeared at the residence and shot and killed Delia Morin and Margarita Flores.

I was Ernest Moore's girlfriend for at least a year prior to the shooting and had lived with him at his parents home in San Benito, Texas. The AR-15 semi-automatic gun that was used to kill the two Border Patrol Agents and seriously injure a Cameron County Sheriff's Deputy on the morning of July 7, 1998, had been utilized by Ernest Moore many times before. He liked that gun and had in my presence shot the gun in front of his house and at my father' s gun range. R.D. Moore allowed his son to use this gun on many occasions. Ernest would also carry this gun in a brown bag in his truck.

Further, Affiant sayeth not.

Julie Cox
JULIE LYNN COX

Sworn to and subscribed before me by Julie Lynn Cox on this the 5th day of August, 2001.

ADELITA GOMEZ
Notary Public
STATE OF TEXAS
My Comm. Exp. Apr. 28, 2002

Adelita Gomez
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

Cox
EXHIBIT NO. 6
J. HENNIGH

STATE OF TEXAS §
§
COUNTY OF HIDALGO §

# AFFIDAVIT

Before me, the undersigned notary, on this day personally came and appeared JULIE LYNN COX, to me well known, and who, after being by me duly sworn did say:

"My name is Julie Lynn Cox. I am over the age of 21 years, and am competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

On July 7, 1998, I was at 311 Catherine Street in Rio Hondo, Texas, with the Morin family. On that date, Ernest Moore appeared at the residence and shot and killed Delia Morin and Margarita Flores.

I was Ernest Moore's girlfriend for at least a year prior to the shooting and had lived with him at his parents home in San Benito, Texas. The AR-15 semi-automatic gun that was used to kill the two Border Patrol Agents and seriously injure a Cameron County Sheriff's Deputy on the morning of July 7, 1998, had been utilized by Ernest Moore many times before.

I am able to ascertain that the gun that Ernest used in the San Benito shooting was the same gun he had used before because I was provided with a photograph of the gun that had been used in the shootings by Ms. Sonia I. Lopez. The gun seen in the photograph is the same gun Ernest had used many times before.

Ernest Moore liked that gun and had in my presence shot the gun in front of his house and at my father's gun range. R.D. Moore allowed his son to use this gun on many occasions. Ernest would also carry this gun in a brown bag in his truck.

Further, Affiant sayeth not.

Julie Cox
JULIE LYNN COX

Sworn to and subscribed before me by Julie Lynn Cox on this the 6th day of September, 2001.

ADELITA GOMEZ
Notary Public
STATE OF TEXAS
My Comm. Exp. Apr. 28, 2002

Adelita Gomez
NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

Cox
EXHIBIT NO. 7
J. HENNIGH

THE STATE OF TEXAS §

COUNTY OF CAMERON §

BEFORE ME, the undersigned authority in and for Cameron County, Texas, on this the 7TH DAY OF JULY, 1998, A.D., did personally appear: JULIE LYNN COX, who after being by me duly sworn, did depose and say: MY NAME IS JULIE COX, MY DATE OF BIRTH IS OCTOBER 25,1978, I RESIDE AT RT 2 BOX 227-A ALAMO, TEXAS, AND I CAN BE REACHED AT 956-787-3121. I AM NINETEEN YEARS OLD.

ON JULY 7,1998, I WAS STAYING AT 311 KATHRYN STREET IN RIO HONDO, TEXAS WITH THE MORIN FAMILY. THE REASON I WAS STAYING THERE IS BECAUSE MY EX-BOYFRIEND "ERNIE" ERNEST MOORE OF SAN BENITO, TEXAS HAD KICKED ME OUT OF HIS HOUSE. I HAD BEEN STAYING WITH HIS FAMILY ON GAMBLE ROAD UNTIL A COUPLE OF WEEKS AGO. MY FRIEND, DELIA MORIN, TOLD ME THAT I COULD STAY WITH HER UNTIL I COULD MOVE BACK TO MY MOM'S HOUSE.

THIS MORNING, JULY 7,1998 I WAS ASLEEP IN THE SIDE BEDROOM AND I HEARD SOME NOISES LIKE A DOOR SLAMMING COMING FROM THE BACK OF THE HOUSE. I WOKE UP AND I SAW "BLUE" MORIN STEP INTO THE BEDROOM WHERE I WAS AT. HE, "BLUE", SAID TO ME "JULIE, SOMEONE IS HERE FOR YOU". AND I SAW "ERNIE", ERNEST MOORE, WITH A GUN, IT WAS A RIFLE, BLACK IN COLOR, AND HE HAD "BLUE" BY THE HAIR AND HAD THE GUN POINTED AT "BLUE". I GOT UP AND "ERNIE" SAID "WHAT THE FUCK". I SCREAMED BECAUSE I SAW THE GUN. I TOLD "ERNIE" TO PUT THE GUN AWAY. I TOLD "ERNIE" THAT I WOULD GET MY STUFF AND GO WITH HIM BECAUSE I THOUGHT THAT WOULD CHILL HIM OUT.

"ERNIE" WAS WEARING A WHITE T-SHIRT, BLUE JEANS, AND BOOTS. HE IS ABOUT 5'10" ABOUT 185 LBS.. HE HAS SOME TATTOOS ON HIS ARMS. A HARLEY DAVIDSON TATTOO ON HIS RIGHT SHOULDER AND A GRIM REAPER TATTOO ON HIS LEFT FOREARM.

DAN, DAN MORIN THE GUY I AM GOING WITH NOW AND HE WAS IN THE BED WITH ME, HE GOT UP AND WENT TO WHERE "ERNIE" AND "BLUE" WERE. THEY WENT TOWARDS THE BACK. I CAME OUT TO THE HALLWAY AND I SAW DELIA COME FROM THE BACK BEDROOM AND I HEARD HER TELL "ERNIE" THAT HE HAD BETTER LEAVE THAT SHE WAS GOING TO CALL THE COPS. HER MOTHER, MARGARITA FLORES, [illegible] HERE TOO. SHE HAD COME OUT TO SEE WHAT THE RUCKUS WAS ALL ABOUT. [illegible] LUE", "ERNIE", DELIA MORIN, MARGARITA FLORES, DAN, AND ME WERE ALL

Cox

EXHIBIT NO. 8

J. HENNIGH

THERE-IN THE BACK OF THE HOUSE TOGETHER. I WAS LOOKING FOR THE TELEPHONE TO CALL THE COPS AND "ERNIE" WAS POINTING THE GUN AROUND AT EVERYBODY AND DELIA WAS TELLING ME TO CALL THE COPS. I LEFT AND WENT INTO THE BEDROOM TO GET SOME STUFF TOGETHER. I TOLD "ERNIE"," I'M GOING TO LEAVE WITH YOU, LET ME GET MY PURSE".

THE NEXT THING I KNOW IS I HEARD GUN SHOTS AND I SMELLED GUN POWDER. THERE WERE A LOT OF SHOTS, MORE THAN TEN I DON'T KNOW. I WENT OUT OF THE BEDROOM AND I SAW DELIA, SHE WAS SCRUNCHED DOWN ON THE FLOOR LAYING AGAINST THE SHELVES, SHE WASN'T MOVING. I SAW DAN THERE TOO AND HE WAS BLEEDING. HE HAD TWO HOLES IN HIS STOMACH AND SOMEBODY SAID HE HAD GOT SHOT IN THE FOOT. I DON'T KNOW WHO SAID THAT. I SAW MRS. FLORES ON THERE FLOOR TOO. FEDENCIO, MRS. FLORES HUSBAND CAME OUT OF A BEDROOM AND SAID "CALL THE COPS" SO I WENT IN AND CALLED THE COPS. I WAS ON THE PHONE IN THE BEDROOM AND I WALKED OUT AND I SAW BILL MORIN, MIKE, A FRIEND OF THE MORIN'S, AND "BLUE" WERE "KICKING "ERNIE"S ASS". I GUESS "BLUE" HAD TAKEN THE GUN AWAY FROM "ERNIE" BECAUSE "BLUE" HAD THE GUN. THEY HAD HIM ON THE FLOOR IN THE LIVING ROOM. I SAW "ERNIE" GET UP AND HE RAN PAST ME TOWARD THE BACK OF THE HOUSE. AS HE DID HE GRABBED MY HAIR LIKE HE WAS TRING TO GET ME TO GO WITH HIM. HE KEPT GOING AND HE TRIPPED AS HE WENT OUTSIDE. HE GOT UP, RAN TO HIS TRUCK, HE HAS A WHITE CHEVY EXTENDED CAB 1997, AND HE GOT IN . I WENT BACK INSIDE.

WHEN I GOT BACK INSIDE I SAW A GUY WEARING A UNIFORM AND HE HAD BANDAGES AND WAS PUTTING THEM ON DAN AND TELLING HIM NOT TO MOVE. HE TOLD ME TO PUT PRESSURE ON THE BANDAGE AND TO HOLD IT THERE. A HELICOPTER CAME AND TOOK DAN AND LATER SOME MORE COPS SHOWED UP AND STARTED PUT UP YELLOW TAPE AND ASKING US QUESTIONS.

THAT'S ABOUT ALL I CAN REMEMBER RIGHT NOW.

The above is A true and correct statement TO the best of my knowledge and ability.

X Julie Cox

Sworn and subscribed TO before me on this the 7 day of [illegible] 1998, A.D.

JOHN C. FRIZZELL
Notary Public, State of Texas

Notary Public for Cameron County, Texas

THE STATE OF TEXAS §

COUNTY OF CAMERON §

BEFORE ME, the undersigned authority in and for Cameron County, Texas, on this the 13th DAY OF, July, 1998, A.D., did personally appear:, who after being by me duly sworn, did depose and say: My name is Julie Lynn Cox, my date of birth is 10-25-78. I reside at Rt 2 Box 227-A, Alamo, Texas. I am nineteen years old. I do not have a phone at this time.

J.C. I would like to add to the written statement I provided to Cameron County Sheriff's Investigator John Frizzell on 07-07-98.

That Delia Morin had offered her residence on Catherine Street in Rio Hondo, when Ernest kicked me out of his fathers residence approximately two weeks ago. Delia, Bill and Dan Morin are co-workers at A La Texas restaurant in San Benito, Texas. I am presently having an intimate relationship with Dan Morin, but we are not boy friend and girlfriend.

On 07-06-98, I received a telephone call from Ernest Moore at the Catherine house at approximately 8:00 p.m. I do not know how Ernest got my phone number because I never called him from that residence. I was staying there with my Dan Morin who I have had a intimate relationship and we were not boyfriend and girlfriend. When Ernest called me he asked me what was going on and we made small talk. I could tell by the way Ernest was talking that he was high on drugs or alcohol. Ernest told me a couple of weeks ago that if he ever found out that I was seeing someone behind his back I'm going to do something. I asked him "what" he stated don't worry about it.

On the night of the shooting I first recognized Ernest voice and then I recognized him when I told him I would go with him. I did not see the shooting because I was getting my purse from the bedroom I was staying in. After the shooting, I followed Ernest outside by the side door and I saw him staggering and getting into the drivers side of his pickup and start it up. I did not see him leave or did I see anyone with Ernest. Ernest never spoke to anyone when he was staggering to his truck. I also did not see anyone from inside the house outside. Ernest was wearing a white T-shirt with blue jeans and boots.

I gave this statement voluntarily to Texas Ranger Rolando Castaneda and FBI Freddie Vela and the above is a true and correct statement to the best of my knowledge and ability. J.C.

Julie Cox

Cox

EXHIBIT NO. 9

Notary Public for Cameron County, Texas



Texas Department of Public Safety
Texas Rangers Company "D"
DOUBLE HOMICIDE:
311 Catherine St., Rio Hondo, Tx.
07-07-98 @ 4:50 AM.
Investigated by:
Sgt. Rolando Castaneda
Drawn by:
Sgt. Rodolfo C. Jaramillo
NOT TO SCALE- Rough Draft
N
Ernest Moore's PU
Dan's PU
Julie's PU
Addition
Garage Door
Covered Porch Room
Rear Door
Clos.
Bed Room #2
Bed Room #3
A/C
Hall
Bath
Bed Room #1
Hall
Kitchen
Laundry Room
Living Room
Dining Room
Front Door
7-13-98
10:23 PM
JC.



7-29-98 Sketch drawn for D.W. Morris
Bed #1
Bed #2
Bed #3
Kitchen
BATH
Julie
Gun w/gun

TEXAS DEPT. OF PUBLIC SAFETY
OFFICE OF GENERAL COUNSEL
AUG 14 2000

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| CITY OF HARLINGEN | { | JURY DEMANDED |
| and | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| CITY OF HARLINGEN | { | |
| and | { | |
| RAUL RODRIGUEZ | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| CITY OF HARLINGEN | { | |

## AFFIDAVIT OF RALPH DWAYNE MOORE

THE STATE )
:
OF TEXAS )

**AFFIDAVIT**

**BEFORE ME**, the undersigned Notary Public in and for the State of Texas, on this day personally appeared **RALPH DWAYNE MOORE**, known to me to be the person whose name is subscribed hereto, who being first duly sworn in the manner provided by law, on oath, stated as follows:

"My name is **RALPH DWAYNE MOORE** and I am over the age of twenty-one (21) years, am in all respects competent to testify, have personal knowledge of the facts stated herein and the same are true and correct.

#1

Julie Cox



(#2)
Julie Cox



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ARTURO GUILLERMO SALINAS AND ELISA HERNANDEZ HERRERA SALINAS )(

VS. )( CIVIL ACTION NO. B-98-162

CITY OF HARLINGEN, TEXAS, R.D. MOORE, AND JIM SCHEOPNER )(

AND )(

GILBERTO M. RODRIGUEZ, INDIVIDUALLY AND ON BEHALF OF HIS MINOR DAUGHTER, MEGAN SUZANNE RODRIGUEZ, AND STEPHEN L. WILLIAMS AND WIFE, ROBYN S. WILLIAMS, SURVIVING BENEFICIARIES OF THE DECEASED )(

VS. )( CIVIL ACTION NO. B-98-163

CITY OF HARLINGEN, TEXAS, R.D. MOORE, AND JIM SCHEOPNER )(

AND )(

RAUL RODRIGUEZ )(

VS. )( CIVIL ACTION NO. B-99-070

CITY OF HARLINGEN, R. D. MOORE, AND JIM SCHEOPNER )(

COPY

---

ORAL DEPOSITION OF JOSEPH BENNETT VASQUEZ
MAY 14, 2001

---

REPORTED BY MAUREEN STINGLEY, CERTIFIED COURT REPORTER

Oral deposition of JOSEPH BENNETT VASQUEZ, who resides in Cameron County, Texas, taken by PRICE AINSWORTH, Attorney for the Plaintiffs, reported by MAUREEN STINGLEY, Certified Court Reporter in and for the State of Texas, on MAY 14, 2001, in the offices of ADAMS & GRAHAM, L.L.P., 222 East Van Buren, West Tower, Harlingen, Texas, pursuant to the Federal Rules of Civil Procedure.

APPEARANCES

COUNSEL FOR PLAINTIFFS ARTURO GUILLERMO SALINAS AND ELISA HERNANDEZ HERRERA SALINAS; and GILBERTO M. RODRIGUEZ, INDIVIDUALLY AND ON BEHALF OF HIS MINOR DAUGHTER, MEGAN SUZANNE RODRIGUEZ, AND STEPHEN L. WILLIAMS AND WIFE, ROBYN S. WILLIAMS, SURVIVING BENEFICIARIES OF THE DECEASED:

PRICE AINSWORTH
SPIVEY & AINSWORTH, P.C.
48 East Avenue
Austin, Texas 78701

SONIA LOPEZ
LAW OFFICES OF RAMON GARCIA
222 West University Drive
Edinburg, Texas 78539

COUNSEL FOR DEFENDANTS CITY OF HARLINGEN, TEXAS, JIM SCHEOPNER, AND R.D. MOORE:

TOM LOCKHART
ADAMS & GRAHAM, L.L.P.
222 East Van Buren, West Tower
Harlingen, Texas 78550

ALSO PRESENT: ARTURO G. SALINAS
ROY RODRIGUEZ

INDEX

Appearances .................................... 2

Examination by Mr. Ainsworth...................... 4
Examination by Ms. Lopez.......................... 83
Examination by Mr. Lockhart....................... 133
Examination by Ms. Lopez.......................... 148

Errata Sheet/Signature Page ...................... 151

Reporter's Certificate ........................... 152

DOCUMENTARY EVIDENCE

| Ex. No. | Description | Iden. |
|---|---|---|
| 1 | List of guns ........................ | 25 |
| 2 | Receipt for MAK-90 ................ | 28 |
| 3 | Firearms Trace Report ............. | 31 |
| 4 | HPD Receipt for Return of Property . | 33 |
| 5 | Newspaper article ................. | 39 |
| 6 | Agreed Judgment ................... | 48 |
| 7 | ATF Form 4473 ..................... | 49 |
| 8 | ATF Form 4473 ..................... | 49 |
| 9 | License issued to Joseph B. Vasquez | 51 |
| 10 | License issued to Joseph B. Vasquez | 51 |
| 11 | Receipt for gun sale .............. | -- |
| 12 | Personnel file for Joseph Vasquez .. | 52 |
| 13 | INS memo re stolen M-4 rifle........ | 53 |
| 14 | ATF license for Maufrias Sales Co... | 54 |
| 15 | Statement by Joseph B. Vasquez ..... | 82 |

JOSEPH BENNETT VASQUEZ,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. AINSWORTH:

13:42 Q. Please state your name for the record, sir.

13:42 A. Joseph Vasquez.

13:42 Q. And, Mr. Vasquez, you're a captain in the Harlingen Police Department; is that right?

13:42 A. Yes.

13:42 Q. Captain Vasquez, my name is Price Ainsworth. I'm a lawyer. I practice in Austin. I'm here today representing the Rodriguez and Salinas families in a lawsuit that arises from a shooting that occurred back in July of 1998, a suit against the city. Do you understand I'm taking your deposition in that case today?

13:42 I need to remind you, while we may drift off into conversation, that the court reporter is jotting down what we say, and it's hard for her to get down nods of the head and shakes of the head and that kind of thing. All right, sir?

13:42 A. Okay.

13:42 Q. Also, I'll remind you "uh-huhs" and "huh-uhs" look a lot alike when they are typed. So try and remember, and I'll try to remind you if I can, to

awarded to us by the courts.

Q. That's how the .243 got to the police department?

A. Yes, sir.

Q. Okay. I don't know a good place to put a sticker on this one. I'm going to put it right down here -- I don't know if I will or not. In the center of the page, it says No. 14, serial number. I'm not going to put it over any of the blanks that are not filled in there -- or any of the blanks that are filled in. I'm going to stick it right in the middle of the page. Tell me what Exhibit No. 7 is.

A. This is a 4473 form filled out by R. D. Moore.

Q. And that's where he is purchasing a weapon?

A. Yes, sir.

Q. Okay, can you tell from looking at Exhibit No. 7 what weapon it is that he is purchasing?

A. Yes, sir.

Q. Which weapon is it?

A. It's the Colt Sporter.

Q. Now, what is a Colt Sporter? Is that a pistol, or what is that?

A. It's basically a civilian version of the M-16.

Q. Okay. What is Exhibit No. 8?

A. It's a 4473.

Q.   And, again, somebody is purchasing a weapon?

A.   Yes, sir.

Q.   What weapon -- who is purchasing a weapon under that 4473?

A.   At the time he was a detective, John Lee Parrish.  He purchased a bird gun, a 12-gauge pump Remington shotgun.

Q.   Now, the 4473 that we looked at a moment ago, Exhibit No. 7, the Colt Sporter?

A.   Yes, sir.

Q.   That was Detective Moore buying that weapon from you; is that right?

A.   Yes, sir.

Q.   From your company?

A.   From the store, from the store.

Q.   And do you have a separate name for the gun company, or is it just under --

A.   It's under my name.

Q.   Vasquez?

A.   Yes, sir.  I stamp them right down here at the bottom.

Q.   All right.  And then the pump shotgun, the 870 that we looked at under the 4473 that's marked Exhibit No. 8, is also being purchased from you?

A.   Yes, sir.

REPORTER'S CERTIFICATE

I, MAUREEN STINGLEY, Certified Court Reporter, certify that the witness, JOSEPH BENNETT VASQUEZ, was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on MAY 14, 2001; that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this the 17th day of May, 2001.

Maureen Stingley by

MAUREEN STINGLEY, CSR NO. 651
Expiration Date: 12/31/02
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen, Texas 78550

OMB NO. 1512-0129

# DEPARTMENT OF THE TREASURY
## BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
## FIREARMS TRANSACTION RECORD PART I - OVER-THE-COUNTER

TRANSFEROR'S TRANSACTION SERIAL NUMBER

NOTE: Prepare in original only. All entries on this form must be in ink. **See Important Notices, Definitions and Instructions**

**SECTION A - MUST BE COMPLETED PERSONALLY BY TRANSFEREE (BUYER)**

| 1. TRANSFEREE'S *(Buyer's)* NAME *(Last, First, Middle)* | | 2. HEIGHT | 3. WEIGHT | 4. RACE |
|---|---|---|---|---|
| Moore, Ralph Dwayne | [X] MALE [ ] FEMALE | 5'11" | 190 | White |

| 5. RESIDENCE ADDRESS *(No., Street, City, County, State, ZIP Code)* | 6. DATE OF BIRTH MONTH | DAY | YEAR | 7. PLACE OF BIRTH *(City)* / STATE OR FOREIGN COUNTRY |
|---|---|---|---|---|
| Rt 1 Box 297 San Benito, Tx. 78586 Cameron, Co. | 12 | 2 | 46 | Harlingen / TX |

8. CERTIFICATION OF TRANSFEREE *(Buyer)* - Questions a. through l. must be answered with a "yes" or a "no" inserted in the box at the right of the question.

| Question | Answer |
|---|---|
| a. Are you the actual buyer of the firearm indicated below? If you answer no to this question the dealer cannot transfer the firearm to you. *(See Important Notice 1.)* | Yes |
| b. Are you under indictment or information in any court for a crime for which the judge could imprison you for more than one year? An information is a formal accusation of a crime made by a prosecuting attorney. | No |
| c. Have you been convicted in any court of a crime for which the judge could have imprisoned you for more than one year, even if the judge actually gave you a shorter sentence? *(See Important Notice 3 and EXCEPTION.)* | No |
| d. Are you a **fugitive** from justice? | No |
| e. Are you an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance? | No |
| f. Have you ever been adjudicated mentally defective or have you been committed to a mental institution? | No |
| g. Have you been discharged from the Armed Forces under dishonorable conditions? | No |
| h. Are you an alien illegally in the United States? | No |
| i. Have you ever renounced your United States citizenship? | No |
| j. Are you subject to a court order restraining you from harassing, stalking, or threatening an intimate partner or child of such partner? *(See Important Notice 4 and Definition 4.)* | No |
| k. Have you been convicted in any court of a misdemeanor crime of domestic violence? This includes any misdemeanor conviction involving the use or attempted use of physical force committed by a current or former spouse, parent, or guardian of the victim or by a person with a similar relationship with the victim. *(See Important Notice 5 and Definition 5.)* | No |
| l. Are you a citizen of the United States? | Yes |

m. What is your State of residence? Texas *(State)*

If you are not a citizen of the United States, you have a State of residence only if you have resided in the State for at least 90 days prior to the date of this sale. *(See Definition 6).*

**I CERTIFY THAT THE ABOVE ANSWERS ARE TRUE AND CORRECT. I UNDERSTAND THAT A PERSON WHO ANSWERS "YES" TO ANY OF THE QUESTIONS 8b THROUGH 8k IS PROHIBITED FROM PURCHASING OR POSSESSING A FIREARM. I ALSO UNDERSTAND THAT THE MAKING OF A FALSE ORAL OR WRITTEN STATEMENT OR THE EXHIBITING OF ANY FALSE OR MISREPRESENTED IDENTIFICATION WITH RESPECT TO THIS TRANSACTION IS A CRIME PUNISHABLE AS A FELONY. I FURTHER UNDERSTAND THAT MY REPETITIVE PURCHASE OF FIREARMS FOR THE PURPOSE OF RESALE FOR LIVELIHOOD AND PROFIT WITHOUT A FEDERAL FIREARMS LICENSE IS A VIOLATION OF LAW. *(SEE IMPORTANT NOTICE 6)***

TRANSFEREE'S *(Buyer's)* SIGNATURE: RD Moore    DATE: 6-9-98

**SECTION B - TO BE COMPLETED BY TRANSFEROR (SELLER)**

**THE PERSON DESCRIBED IN THIS SECTION HAS IDENTIFIED HIMSELF/HERSELF TO ME IN THE FOLLOWING MANNER:**

9. TYPE OF AND NUMBER ON IDENTIFICATION *(Driver's license or identification which shows name, date of birth, place of residence, and signature. Purchasers who are aliens must provide a valid government-issued photo identification. See Instructions to Transferor 1 and 2).*

Tex DL 04073289

10. TYPES AND DATES OF ADDITIONAL IDENTIFICATION REQUIRED FOR ALIENS *(e.g., utility bills or lease agreements. See Instruction to Transferor 2).*

On the basis of (1) the statements in Section A; (2) the verification of identity noted in Section B; and (3) the information in the current list of Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s), described below and on the back, to the person identified in Section A.

| | 11. TYPE *(Pistol, Revolver, Rifle, Shotgun, etc.)* | 12. MODEL | 13. CALIBER OR GAUGE | 14. SERIAL NO. | 15. MANUFACTURER *(and importer, if any)* |
|---|---|---|---|---|---|
| 1. | RiFLe | SPoRTeR | .223 | MH014417141 | CoLT |
| 2. | | | | | |
| 3. | | | | | |
| 4 | | | | | |

EXHIBIT NO. Vasquez 7 5-14-01 Maureen Stingley

**Complete ATF F 3310.4 for multiple purchases of handguns** ***(See Instruction to Transferor 7.)***

16. TRADE/CORPORATE NAME AND ADDRESS OF TRANSFEROR *(Seller) (Hand stamp may be used.)*

JOSEPH B. VASQUEZ
412-7571
212 E. JACKSON, HARLINGEN, TEXAS 78550
FFL 5-74-031-01-9J-38500

17. FEDERAL FIREARMS LICENSE NO. *(Hand stamp may be used.)*

JOSEPH B. VASQUEZ
412-7571
212 E. JACKSON, HARLINGEN, TEXAS 78550
FFL 5-74-031-01-9J-38500

THE PERSON ACTUALLY MAKING THE FIREARMS SALE MUST COMPLETE ITEMS 18 THROUGH 20.

| 18. TRANSFEROR'S *(Seller's)* SIGNATURE | 19. TRANSFEROR'S TITLE | 20. TRANSACTION DATE |
|---|---|---|
| Joseph B Vasquez | Owner | 6-9-98 |

JOSEPH B. VASQUEZ

CUSTOMER'S ORD ...412-7571 DATE 6-7-9?

NAME 212 E. JACKSON, HARLINGEN, TEXAS 78550
FFL 5-74-031-01-0J-38500

ADDRESS R. D. Moore

CITY, STATE, ZIP Harlingen Police Dept.

| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT. | MDSE RETD | PAID OUT |
|---|---|---|---|---|---|---|
| | | | | | | |

| | QUAN. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|
| 1 | | | | |
| 2 | 1 | Colt Sporter | | 900.00 |
| 3 | | #MH044174 | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | Tax | | 74.25 |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | 974.25 |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |

RECEIVED BY

RDC4705

KEEP THIS SLIP FOR REFERENCE
ORIGINAL