*/4*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

DEC 1 4 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN | { | JURY DEMANDED |
| | { | |
| and | { | |
| | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN | { | |
| | { | |
| and | { | |
| | { | |
| RAUL RODRIGUEZ | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN | { | |

---

## DEFENDANT'S MOTION TO STRIKE NEWLY DESIGNATED EXPERT WITNESS ROBERT RODRIGUEZ

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendant CITY OF HARLINGEN and files this its MOTION TO STRIKE NEWLY DESIGNATED EXPERT WITNESS ROBERT RODRIGUEZ, and would respectfully show the Court as follows:

### I. **Certificate of Conference**

Defendant's counsel has conferred in good faith with counsel for Plaintiffs concerning the relief requested in this motion, and they cannot agree concerning the relief requested.

## II. **Status of Case and Issues Presented**

This case was originally set for Final Pretrial Conference on August 2, 2001, with jury selection for August 6, 2001. Plaintiffs' Witness List to the Joint Pretrial Order (Dkt. No. 117) filed in contemplation of such settings, named Robert Rodriguez of Helotes, Texas, as an expert witness (Witness No. 142). The case was continued and has been rescheduled for Final Pretrial on February 7, 2002, with jury selection on February 11, 2002. Plaintiffs did not designate Robert Rodriguez as an expert witness within the scheduling deadlines set in this case or FED. R. CIV. P. 26(a)(2). Plaintiffs have failed to provide any report from Mr. Rodriguez. Therefore, FED. R. CIV. P.37(c)(1) requires the Court to exclude the information that Plaintiffs failed to disclose under Rule 26(a).

## III. **Factual Background**

The Court's Scheduling Order (Dkt. No. 91) set February 28, 2001, as the deadline for Plaintiffs to designate their experts; Defendant was to designate its experts within 30 days after the deposition of Plaintiffs' expert. The Order further set jury selection for August 6, 2001.

The Court's Order (Dkt. No. 94) signed March 5, 2001, extended the close of discovery to May 31, 2001, and the deadline for dispositive motions to June 20, 2001.

By letter agreement dated March 30, 2001, the deadline for Plaintiffs' experts to be named with a report furnished was extended until May 5, 2001. Exh. A.

Robert Rodriguez, on behalf of the Plaintiffs, examined the HPD AR-15 in Austin at the DPS Crime Lab on July 6, 2000. Exhs. B and C.

Plaintiffs designation of experts dated May 4, 2001, did not list Robert Rodriguez as an expert or provide a report from him. Exh. D.

## II.  Status of Case and Issues Presented

This case was originally set for Final Pretrial Conference on August 2, 2001, with jury selection for August 6, 2001.  Plaintiffs' Witness List to the Joint Pretrial Order (Dkt. No. 117) filed in contemplation of such settings, named Robert Rodriguez of Helotes, Texas, as an expert witness (Witness No. 142).  The case was continued and has been rescheduled for Final Pretrial on February 7, 2002, with jury selection on February 11, 2002.  Plaintiffs did not designate Robert Rodriguez as an expert witness within the scheduling deadlines set in this case or FED. R. CIV. P. 26(a)(2).  Plaintiffs have failed to provide any report from Mr. Rodriguez.  Therefore, FED. R. CIV. P.37(c)(1) requires the Court to exclude the information that Plaintiffs failed to disclose under Rule 26(a).

## III.  Factual Background

The Court's Scheduling Order (Dkt. No. 91) set February 28, 2001, as the deadline for Plaintiffs to designate their experts; Defendant was to designate its experts within 30 days after the deposition of Plaintiffs' expert.  The Order further set jury selection for August 6, 2001.

The Court's Order (Dkt. No. 94) signed March 5, 2001, extended the close of discovery to May 31, 2001, and the deadline for dispositive motions to June 20, 2001.

By letter agreement dated March 30, 2001, the deadline for Plaintiffs' experts to be named with a report furnished was extended until May 5, 2001.  Exh. A.

Robert Rodriguez, on behalf of the Plaintiffs, examined the HPD AR- 15 in Austin at the DPS Crime Lab on July 6, 2000.  Exhs. B and C.

Plaintiffs designation of experts dated May 4, 2001, did not list Robert Rodriguez as an expert or provide a report from him.  Exh. D.

On May 31, 2001, Defendant formally designated Captain Joe Vasquez as an expert and referenced his deposition (with the signed notarized errata page) as containing "a complete statement of all of his opinions to be expressed and bases and reasons therefore; the data or other information considered by him in forming the opinions; and his qualifications." Dkt. No. 99. Captain Vasquez' deposition was taken on May 14, 2001, and he testified to his qualifications as a firearms expert and opinions on the HPD AR -15 and comparisons to the privately owned AR -15, SKS and M1 carbine semi-automatic rifles. Exh. E, p. 24, (l. 25) - p. 26, ( l. 10); p. 88, (l.l. 1-9); p. 133, (l. 24) - p. 137, (l. 23); p. 138, (l. 3) - p. 141, ( l. 16); p. 142, (l. 2) - p. 148, (l. 17).

Defendant heard nothing about Robert Rodriguez until June 25, 2001, when it received Supplementation of Plaintiffs' Rule 26(a) Initial Disclosures, which listed him only as a fact witness with knowledge about "the gun involved in the shooting incident." Dkt. No. 102 (p. 9).

On July 17, 2001, Plaintiffs e-mailed Defendant their witness list to be attached to the Joint Pre-Trial Order. For the first time, they designated Robert Rodriguez as "ATF-Gun Expert." (Joint Pre-Trial Order Exh. C, No. 142). Plaintiffs have tendered no expert report from Mr. Rodriguez.

On August 2, 2001, the Court granted Defendant's Motion for Summary Judgment on the 1983 Federal Claim (Dkt. No. 134). On August 6, 2001, the Court entered Final Judgment on the 1983 claim and ordered a stay of all proceedings on the pending state law claim until the Fifth Circuit rules on the Plaintiffs' appeal from the Final Judgment (Dkt. Nos. 139 and 140). On October 18, 2001, the Court withdrew the Partial Summary Judgment (Dkt. No. 146) and then on November 14, 2001, the Court issued a new Scheduling Order (Dkt. No. 147).

## IV. Argument & Authorities

A.     Rodriguez is Not a "Lay" Witness Exempt from Requirements for Experts

The Court should be vigilant to prevent parties from smuggling experts into the case without proper disclosure and reports by claiming their opinions are "lay" testimony. *Wright, Miller & Marcus,* FED. PRAC. & PROC., § 2031.1. (Supp., 2001). Mr. Rodriguez is an ATF agent retained as a consultant by Plaintiffs to examine the weapon. Defendant assumes Plaintiffs will claim he has some specialized training in firearms. He was not a witness to the underlying events. Therefore, the only means by which his testimony could be material and reliable would be based on any specialized skill, training and experience he may possess.

For that reason, he must be treated as an expert. *See, Prentis & Carlisle Co., Inc. v. Koehrig-Waterous Div. of Timberjack, Inc.*, 972 F.2d 6, 8 (1st Cir. 1992). Expert opinion testimony under FED. R. EVID. 702 covers not only scientific areas but also "technical" areas. It includes areas of "specialized" knowledge and persons who can testify only be virtue of skilled knowledge. *In re Illusions Holdings, Inc.*, 189 F.R.D. 316, 320 (S.D.N.Y. 1999). A lay witness can give a "lay" opinion only when it is not based on technical or specialized knowledge within the scope of Rule 702. *Illusions,* 189 F.R.D. at 320; FED. R. EVID. 701(c).

B.     Plaintiffs Failed to Timely Designate Rodriguez as Expert
       and Failed to Provide Report

Rodriguez was not designated by May 4, 2001, nor was a report ever provided. Therefore, he should be stricken. *Congressional Air, Ltd. v. Beech Aircraft Corp.*, 176 F.R.D. 513, 516 (D.Md. 1997); *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 604 (S.D. Tex. 2001)(Jack, J.).

First, Plaintiffs have provided no report from him. This is inexcusable because they had over a year to obtain one. This leaves Defendant with nothing to cross-examine him about; if he provided no report, he cannot be limited to the opinions in it, as required by FED. R. CIV. PROC. 37(c)(1). Defendant does not know what his findings or opinions are.

Second, Rodriguez is not a "rebuttal" expert so as to excuse a failure to designate him by May 4, 2001. Rule 26(a)(2)(C) pertains only to evidence intended solely to contradict or rebut evidence identified by the opposing parties' expert designation. The HPD rifle's characteristics were alleged by Plaintiffs as part of their case in their amended complaints. They made its qualities an element of their claims. Therefore issues about the rifle's characteristics were in the case before Defendant made its expert designation. Plaintiffs could have named Rodriguez on that subject at the outset, given that Rodriguez had examined the rifle almost 10 months before their deadline. Furthermore, Plaintiffs have known since July 28, 2000 that Defendant has taken the position that because of the privately owned guns, Plaintiffs cannot prove an opportunity was created for Ernest Moore to commit the crime that did not otherwise exist and cannot prove proximate cause (Defendant's First Motion for Summary Judgment, Dkt. No. 59, pp. 4, 5, 15, 16, and 18).

Even if Plaintiffs claim Rodriguez is a "rebuttal expert," they were required to designate him as an expert and provide reports within 30 days after Defendant's designation. FED. R. CIV. P. 26(a)(3)(C). The purpose is to allow an opposing party time to prepare cross-examination, confer with its own experts, and file any supplemental reports or designations. *Congressional Air*, 176 F.R.D. at 515. The idea is to prevent "trial by ambush" and avoid "under-the-gun" depositions on the eve of trial. *Id.* at 516, 517.

*Congressional Air* is close in point. There, plaintiff designated and provided reports from its expert in January, 1997; defendant tendered its expert and his report at its

deadline in March, 1997. *Id.* at 514.  Discovery closed in April, 1997. *Id.*  In October, 1997, a few weeks before trial, plaintiff served a new report from its expert; it covered a new area the expert had not covered before, but which responded to the report from defendant's expert. *Id.* at 515.

The Maryland district court struck the report. 176 F.R.D. at 517.  Because the report covered new areas, it was clearly rebuttal to the prior expert, not a supplemental report. *Id.* at 516.  Second, it was late under Rule 26(a)(2)(C)'s deadline for rebuttal reports.  The lengthy delay after the close of discovery showed the belated designation was an "ambush." *Id.*  The court condemned putting the defendant to the election of either demanding a continuance on the eve of trial or doing "under-the-gun" depositions. *Id.*

First, Rule 26(a)(2)(C) requires the same disclosure from purely rebuttal experts as principal experts, i.e., designation and a report.  Plaintiffs have provided no report.  Defendant cannot "hold" him to his opinions nor can it confer with its own experts and file any supplemental reports or designations.

Second, Plaintiffs' belated designation of Rodriguez attempts to do what *Congressional Air* condemns, ambush at trial by surprise expert.  Plaintiffs retained Mr. Rodriguez to conduct his examination ten (10) months before deadline for designation of experts.  They chose not to designate him as a testifying expert until after the deadlines set in this case and by FED. R. CIV. P. 26(a)(2).   Plaintiffs offer no justification for this delay.

**WHEREFORE, PREMISES CONSIDERED**, Defendant prays this Court grant this Motion and enter an order that the Plaintiffs not be permitted to call Robert Rodriguez as an expert witness, not be permitted to present any testimony or opinions from Rodriguez, and any other such further relief at law and equity to which they show themselves entitled

to receive.

Respectfully submitted,

By: _____

**TOM LOCKHART**
Admissions ID No. 2257
Texas State Bar No. 12473500
**ROGER W. HUGHES**
Admissions ID No. 5950
Texas State Bar No. 10229500
**ADAMS & GRAHAM, L.L.P.**
P. O. Drawer 1429
Harlingen, Texas  78551-1429
956/428-7495; FAX: 956/428-2954

Attorney-in-Charge for Defendant,
CITY OF HARLINGEN

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of December, 2001, a true and correct

copy of the above and foregoing instrument was delivered to counsel of record for all

parties, as indicated below.

Attorneys-in-Charge for Plaintiffs, GILBERTO M. RODRIGUEZ, et al and
ARTURO GUILLERMO SALINAS, et al:

    Mr. Broadus A. Spivey          **Via CMRRR# 7000 1670 0005 2563 2990**
    **SPIVEY & AINSWORTH, P.C.**
    48 East Avenue
    Austin, Texas  78701-4320

Attorney-in-Charge for Plaintiff, RAUL RODRIGUEZ:

    Ms. Sonia Lopez            **Via CMRRR# 7000 1670 0005 2563 2983**
    **LAW OFFICES OF RAMON GARCIA, P.C.**
    222 West University Drive
    Edinburg, Texas  78539

                                        TOM LOCKHART

# APPENDIX
## TABLE OF CONTENTS

**EXHIBIT REF.**                              **EXHIBITS**

A ............  Letter agreement dated March 30, 2001, extending deadline for Plaintiffs' experts to be named with a report furnished until May 5, 2001.

B ............  Letter regarding examination of HPD AR-15 in Austin at the DPS Crime Lab on July 6, 2000.

C ............  Affidavit of Tom Lockhart with attachment.

D ............  Plaintiffs' May 4, 2001 Designation of Experts.

E ............  Excerpts from deposition of Joseph Bennett Vasquez.

BROADUS A. SPIVEY
BOARD CERTIFIED
PERSONAL INJURY TRIAL LAW

PRICE AINSWORTH
BOARD CERTIFIED
PERSONAL INJURY TRIAL LAW

FRANCIS PAN
ATTORNEY AT LAW

# SPIVEY & AINSWORTH, P.C.

ATTORNEYS AT LAW
48 EAST AVE.
AUSTIN, TEXAS 78701-4320

Ph 512+474-6061
Fx 512+474-1605
Email: price@spain-attys.com

HOUSTON OFFICE:
CHARLES AINSWORTH
ATTORNEY AT LAW
3700 MONTROSE BLVD.
HOUSTON, TX 77006-4624
Ph 713+874-0800
Fx 713+874-0815

J165C.216

March 30, 2001

Mr. Tom Lockhart
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429

FAX#: 956+428-2954

Ms. Sonia Lopez
LAW OFFICES OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, TX 78539

FAX#: 956+381-0825

Re:   Civil Action No. B-98-162; *Salinas, et al. v. City of Harlingen, et al.;*
      U.S.D.C., Southern District of Texas, Brownsville Division
                              and
      Civil Action No. B-98-163; *Rodriguez, et al. v. City of Harlingen et al.;*
      U.S.D.C, Brownsville Division

Dear Counsel:

This letter will confirm our agreement of today to extend the discovery deadlines in the Scheduling Order as follows:

The Plaintiffs' experts will be named with a report furnished by 05/05/01 and their depositions will be taken by 05/21/01.

If this is your understanding of our agreement, please so indicate by affixing your signature below and returning by facsimile transmittal and hard copy.

Thank you for your attention to this matter.

Sincerely,

Price Ainsworth

PA/ds

**EXHIBIT A**

March 30, 2001
Page 2

AGREED TO & APPROVED THIS 30TH DAY OF MARCH, 2001 BY:

By: _____        By: _____
     Tom Lockhart                          Price Ainsworth
     Fed ID# 2257                          Fed ID# 8065
     Attorney for Defendant                Attorney for Rodriguez & Salinas

By: _____
     Sonia Lopez
     Fed ID# 3936
     Attorney for Raul Rodriguez

# SPIVEY & AINSWORTH, P.C.

ATTORNEYS AT LAW
48 EAST AVE.
AUSTIN, TEXAS 78701-4320

Ph  512-474-6061
Fx  512-474-1605
Email: bas@spain-attys.com

BROADUS A. SPIVEY
BOARD CERTIFIED
PERSONAL INJURY TRIAL LAW

PRICE AINSWORTH
BOARD CERTIFIED
PERSONAL INJURY TRIAL LAW

FRANCIS PAN
ATTORNEY AT LAW

HOUSTON OFFICE:
CHARLES AINSWORTH
ATTORNEY AT LAW
3700 MONTROSE BLVD.
HOUSTON, TX 77006-4624
Ph  713-874-0800
Fx  713-874-0813

3143C.390

July 17, 2001

Mr. Tom Lockhart                                    *FAX: 956-428-2954*
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429

Re:    Civil Action No. B-98-162; Salinas, et al. v. City of Harlingen, et al.;
       U.S.D.C., Southern District of Texas, Brownsville Division
                                    and
       Civil Action No. B-98-163; Rodriguez, et al. v. City of Harlingen et al.;
       U.S.D.C, Brownsville Division

Dear Mr. Lockhart:

One of the exhibits, which I feel is necessary and appropriate as an exhibit in the trial of this case, is the AR-15 rifle in question. We are allowed the opportunity to examine that rifle on Thursday, July 6, 200, and it was in the possession of Texas Department of Public Safety. I assume it is still there and I want to request that it be brought to the courtroom. I think Judge Tagle will probably order its production but I am sure the DPS would produce it without the formality of a court order if you would agree. Please let me know if you will agree. If so, I will draft a letter of agreement for your signature.

Thank you.

Sincerely,

Broadus A. Spivey
BAS/am

cc.    Ms. Sonja Lopez                             **FAX#: 956-381-0825**
       LAW OFFICES OF RAMON GARCIA, P.C.
       222 West University Drive
       Edinburg, TX 78539

**EXHIBIT B**

THE STATE         )

                        :

OF TEXAS          )

     **BEFORE ME**, the undersigned Notary Public in and for the State of Texas, on this day personally appeared **TOM LOCKHART**, known to me to be the person whose name is subscribed hereto, who being first duly sworn in the manner provided by law, on oath stated as follows:

     "My name is **TOM LOCKHART**. I am over the age of twenty-one (21) years; am in all respects competent to testify about and have personal knowledge of the following facts:

     I am a practicing attorney licensed by the State Bar of Texas in May 1975.

     On July 16, 1998, I was retained to represent the City of Harlingen on the July 7, 1998 Ernest Moore shooting incident.

     I personally attended the inspection of the HPD AR-15 rifle at DPS headquarters in Austin on July 6, 2000, the attached letter dated June 30, 2000 is a true, accurate and complete copy of the letter I prepared and sent, confirming such inspection. Robert Rodriguez was at such inspection on behalf of the Plaintiffs."

     Further affiant sayeth not.

                                     **TOM LOCKHART**

     **SWORN TO AND SUBSCRIBED** before me, the undersigned authority, by the said **TOM LOCHKART** on the 30th day of July, 2001, to certify which witness my hand and seal of office.

MARIA S. MARTINEZ
Notary Public
State of Texas
Comm. Exp. 11-14-2004
Notary Seal

Notary Public in and for THE STATE OF TEXAS
Print Name:   MARIA S. MARTINEZ
My Commission Expires: 11-14-2004

**EXHIBIT C**

LAW OFFICES OF

# ADAMS & GRAHAM, L.L.P.

AFFILIATED WITH HILL GILSTRAP ADAMS & GRAHAM, L.L.P.

222 E. VAN BUREN, WEST TOWER
P.O. DRAWER 1429
HARLINGEN, TEXAS 78551
TEL (956) 423-7495    FAX (956) 423-2954
www.adamsgraham.com

**TOM LOCKHART**
Partner

AFFILIATE OFFICES
AUSTIN
CHICAGO
DALLAS/FORT WORTH
LITTLE ROCK

June 30, 2000

Mr. William M. Sorrow, Examiner                    Via Fax No. 512/424-2906
Firearms Section
Texas Department of Public Safety
Crime Laboratory Service MSC 0462
P. O. Box 4143
Austin, Texas  78765-4143

Re:    **Civil Action No. B-98-162**
       **Gilberto Rodriguez, et al. v. City of Harlingen, et al**
       **Arturo Guillermo Salinas, et al. v. City of Harlingen, et al.**
       **Raul Rodriguez, et al. v. City of Harlingen, et al.**
       **Our File No.        :     H-1023**

Dear Mr. Sorrow:

This confirms the scheduling of the inspection of MAK-90 Sporter semiautomatic rifle and Frankford Arsenal Model XM177 E2 semiautomatic rifle referenced in your March 10, 2000 report (L-264725).  This inspection will take place at 1:00 p.m. on July 6, 2000. We will meet you at 1:00 p.m. at the Headquarters Annex (Building B) of the Texas Department of Public Safety Headquarters Complex in Austin.

It is my understanding that the following persons will be in attendance:

   1)    a lawyer and a firearms consultant representing the families of the deceased Border Patrol Agents;

   2)    a lawyer representing Deputy Sheriff Raul Rodriguez;

   3)    a lawyer representing Harlingen Police Detective R.D. Moore; and

   4)    myself, as the attorney for the City of Harlingen.

It is my further understanding that there is no request to fire these rifles with live ammunition.  Should you need any further information, please advise.

Mr. William Sorrow
June 30, 2000
Page 2

We look forward to seeing you next week.

Sincerely yours,

ADAMS & GRAHAM, L.L.P.

Tom Lockhart

TL/mm

cc:  Mr. Broadus Spivey                          <u>Via Fax No. 512/474-1605</u>
     **SPIVEY & AINSWORTH, P.C.**
     48 East Avenue
     Austin, Texas  78701-4320

     Ms. Sonia Lopez                             <u>Via Fax No. 956/381-0825</u>
     **LAW OFFICES OF RAMON GARCIA, P.C.**
     222 West University Drive
     Edinburg, Texas  78539

     Mr. Richard Pena                            <u>Via Fax No. 512/327-8354</u>
     **LAW OFFICES OF RICHARD PENA, P.C.**
     Barton Oaks Plaza Two
     901 MoPac, Suite 325
     Austin, Texas  78746-5747

     Mr. Walter J. Passmore                      <u>Via Fax No. 956/686-1276</u>
     **PASSMORE, WALKER & TWENHAFEL, L.L.P.**
     P. O. Drawer 3766
     McAllen, Texas  78502-3766

     Mrs. Yolanda De Leon                        <u>Via Fax No. 956/544-0869</u>
     Cameron County District Attorney
     Cameron County Hall of Justice
     974 E. Harrison, 2nd Floor
     Brownsville, Texas  78520

# SPIVEY & AINSWORTH, P.C.

BROADUS A. SPIVEY
BOARD CERTIFIED
PERSONAL INJURY TRIAL LAW

PRICE AINSWORTH
BOARD CERTIFIED
PERSONAL INJURY TRIAL LAW

FRANCIS PAN
ATTORNEY AT LAW

ATTORNEYS AT LAW
48 EAST AVE.
AUSTIN, TEXAS 78701-4320

Ph 512-474-6061
Fx 512-474-1605
Email: fyp@span-attys.com

HOUSTON OFFICE:
CHARLES AINSWORTH
ATTORNEY AT LAW
3700 MONTROSE BLVD
HOUSTON, TX 77006-4624
Ph 713-874-0800
Fx 713-874-0815

May 4, 2001

3163C 239

*Via Certified Mail No.* Z 116 384 685
Mr. Tom Lockhart
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429

Re: Civil Action No. B-98-162; Salinas, et al. v. City of Harlingen, et al.;
U.S.D.C., Southern District of Texas, Brownsville Division
and
Civil Action No. B-98-163; Rodriguez, et al. v. City of Harlingen et al.;
U.S.D.C, Brownsville Division.

Dear Mr. Lockhart:

Pursuant to the Texas Rules of Civil Procedure and the Joint Discovery/Case Management Plan, please find enclosed a copy of the following documents:

1. Expert Report, Curriculum Vitae and fee schedule of Plaintiffs' Expert Witness, Phyllis Silverman, Ph.D.; and

2. Expert Report, List of Cases Retained as an Expert and fee schedule of Plaintiffs' Expert Witness, George L. Kirkham.

Thank you for your attention to this matter.

Sincerely,

Price Ainsworth

PA/kam

Enclosures

cc: Ms. Sonja Lopez                                    **Regular U.S. Mail**
    LAW OFFICES OF RAMON GARCIA, P.C.
    222 West University Drive
    Edinburg, TX 78539                                 **EXHIBIT D**

1

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      BROWNSVILLE DIVISION

 3   ARTURO GUILLERMO SALINAS   )(
     AND ELISA HERNANDEZ        )(
 4   HERRERA SALINAS            )(
                                )(
 5   VS.                        )(  CIVIL ACTION NO. B-98-162
                                )(
 6   CITY OF HARLINGEN, TEXAS,  )(
     R.D. MOORE, AND            )(
 7   JIM SCHEOPNER              )(
                                )(
 8          AND                 )(
                                )(
 9   GILBERTO M. RODRIGUEZ,     )(
     INDIVIDUALLY AND ON        )(
10   BEHALF OF HIS MINOR        )(
     DAUGHTER, MEGAN SUZANNE    )(
11   RODRIGUEZ, AND STEPHEN L.  )(
     WILLIAMS AND WIFE, ROBYN   )(
12   S. WILLIAMS, SURVIVING     )(
     BENEFICIARIES OF THE       )(
13   DECEASED                   )(
                                )(
14   VS.                        )(  CIVIL ACTION NO. B-98-163
                                )(
15   CITY OF HARLINGEN, TEXAS,  )(
     R.D. MOORE, AND            )(
16   JIM SCHEOPNER              )(
                                )(
17   AND                        )(
                                )(
18   RAUL RODRIGUEZ             )(
                                )(
19   VS.                        )(  CIVIL ACTION NO. B-99-070
                                )(
20   CITY OF HARLINGEN, R. D.   )(
     MOORE, AND JIM SCHEOPNER   )(
21
22   - - - - - - - - - - - - - - - - - - - - - - - - - -
             ORAL DEPOSITION OF JOSEPH BENNETT VASQUEZ
23                       MAY 14, 2001
     - - - - - - - - - - - - - - - - - - - - - - - - - -
24     REPORTED BY MAUREEN STINGLEY, CERTIFIED COURT REPORTER
25
```

COPY

EXHIBIT E

BRYANT & STINGLEY, INC.

1           Oral deposition of JOSEPH BENNETT VASQUEZ, who

2    resides in Cameron County, Texas, taken by

3    PRICE AINSWORTH, Attorney for the Plaintiffs, reported

4    by MAUREEN STINGLEY, Certified Court Reporter in and

5    for the State of Texas, on MAY 14, 2001, in the offices

6    of ADAMS & GRAHAM, L.L.P., 222 East Van Buren, West

7    Tower, Harlingen, Texas, pursuant to the Federal Rules

8    of Civil Procedure.

9

                      APPEARANCES

10

    COUNSEL FOR PLAINTIFFS ARTURO GUILLERMO SALINAS

11   AND ELISA HERNANDEZ HERRERA SALINAS; and GILBERTO
    M. RODRIGUEZ, INDIVIDUALLY AND ON BEHALF OF HIS

12   MINOR DAUGHTER, MEGAN SUZANNE RODRIGUEZ, AND
    STEPHEN L. WILLIAMS AND WIFE, ROBYN S. WILLIAMS,

13   SURVIVING BENEFICIARIES OF THE DECEASED:

14        PRICE AINSWORTH
          SPIVEY & AINSWORTH, P.C.

15       48 East Avenue
          Austin, Texas 78701

16
          SONIA LOPEZ

17       LAW OFFICES OF RAMON GARCIA
          222 West University Drive

18       Edinburg, Texas  78539

19   COUNSEL FOR DEFENDANTS CITY OF HARLINGEN, TEXAS,
    JIM SCHEOPNER, AND R.D. MOORE:

20
          TOM LOCKHART

21       ADAMS & GRAHAM, L.L.P.
          222 East Van Buren, West Tower

22       Harlingen, Texas 78550

23   ALSO PRESENT:  ARTURO G. SALINAS
                 ROY RODRIGUEZ

24

25

14 05  1   would he have to fill out one of those cards?

14 05  2       A.  What we used to do is make an inventory list of

14.05  3   what was in his disposition.  You know, if it was going

14 05  4   to be taken out and destroyed, taken out to city

14:05  5   auction, he would take it out and date it and stuff and

14:06  6   take it over to the warehouse.

14:06  7       Q.  Okay.  All right.  Now that I have got kind of

14:06  8   a basic understanding of how the department worked, let

14 06  9   me stop for a moment and ask you about some of these

14:06  10  things you brought with you today.

14:06  11            When you were invited to the deposition,

14 06  12  there was a lawyer form attached called a subpoena

14:06  13  duces tecum.  And you have brought with you a stack of

14:06  14  an inch and a half or so of paper in response to that

14:06  15  subpoena; is that right?

14:06  16      A.  Uh-huh.

14:06  17      Q.  Let me go through some of these things and ask

14:06  18  you what they are.  I have not had a chance to look

14:06  19  through them, but my colleague has, and I'm sure she'

14:06  20  have more questions for you.  But at least I can have

14:06  21  general understanding of what this is I'm looking at.

14.06  22            I'll start at the top and work my way to

14 06  23  the bottom.  Is that all right?

14.06  24      A.  Sure.

      Q.  Okay.  This first document we have marked as

14:06  1   Exhibit No. 1 looks like it's a legal-size document

14:06  2   with categories across the top beginning with

14:06  3   Manufacturer and/or Importer and ending with Address

14:06  4   and License Number.  What is that?

14:07  5        A.   It's an entry form, entry logbook.

14:07  6        Q    And where is that logbook maintained?

14:07  7        A.   On the premises, where the license is.

14:07  8        Q.   And what are the firearms that are being

14:07  9   referred to on that entry log?

14:07 10        A.   They are firearms that I received and sold.

14:07 11        Q.   That you personally or that the police

14:07 12   department did?

14:07 13        A.   No, no, this is nothing to do with the police

14:07 14   department.  This is private business.

14:07 15        Q.   All right.  Now, when you say, "It's kept there

14:07 16   on the premises," I thought you meant there at the

14:07 17   police department.

14:07 18        A.   No, no, no.  I mean the gun store, where I have

14:07 19   my gun license.

14:07 20        Q.   All right, and for how long a period of time

14:07 21   have you had a gun store?

14:07 22        A.   It belongs to another gentleman who I do

14:07 23   part-time work for and assist.  He lets me keep my

14:07 24   license there and sell used guns there.  I just stick

14:08 25   them out on a rack.  I have done that since October or

14 05  1   would he have to fill out one of those cards?

14 05  2       A    What we used to do is make an inventory list of

14.05  3   what was in his disposition.  You know, if it was going

14.05  4   to be taken out and destroyed, taken out to city

14.05  5   auction, he would take it out and date it and stuff and

14.06  6   take it over to the warehouse.

14.06  7       Q.  Okay.  All right.  Now that I have got kind of

14.06  8   a basic understanding of how the department worked, let

14.06  9   me stop for a moment and ask you about some of these

14 06  10  things you brought with you today.

14.06  11           When you were invited to the deposition,

14.06  12  there was a lawyer form attached called a subpoena

14:06  13  duces tecum.  And you have brought with you a stack of

14:06  14  an inch and a half or so of paper in response to that

14.06  15  subpoena; is that right?

14:06  16      A.  Uh-huh.

14:06  17      Q.  Let me go through some of these things and ask

14:06  18  you what they are.  I have not had a chance to look

14:06  19  through them, but my colleague has, and I'm sure she'll

14.06  20  have more questions for you.  But at least I can have a

14:06  21  general understanding of what this is I'm looking at.

14.06  22           I'll start at the top and work my way to

14 06  23  the bottom.  Is that all right?

14.06  24      A.  Sure.

14.06  25      Q.  Okay.  This first document we have marked as

14:06  1    Exhibit No. 1 looks like it's a legal-size document

14:06  2    with categories across the top beginning with

14:06  3    Manufacturer and/or Importer and ending with Address

14:06  4    and License Number.  What is that?

14:07  5         A.  It's an entry form, entry logbook.

14:07  6         Q.  And where is that logbook maintained?

14:07  7         A.  On the premises, where the license is.

14:07  8         Q.  And what are the firearms that are being

14:07  9    referred to on that entry log?

14:07  10        A.  They are firearms that I received and sold.

14:07  11        Q.  That you personally or that the police

14:07  12   department did?

14:07  13        A.  No, no, this is nothing to do with the police

14:07  14   department.  This is private business.

14:07  15        Q.  All right.  Now, when you say, "It's kept there

14:07  16   on the premises," I thought you meant there at the

14:07  17   police department.

14:07  18        A.  No, no, no.  I mean the gun store, where I have

14:07  19   my gun license.

14:07  20        Q.  All right, and for how long a period of time

14:07  21   have you had a gun store?

14:07  22        A.  It belongs to another gentleman who I do

14:07  23   part-time work for and assist.  He lets me keep my

14:07  24   license there and sell used guns there.  I just stick

14:08  25   them out on a rack.  I have done that since October or

14 08  1    November of '97.

14 08  2         Q.  Okay, is that when you got your license to --

14 08  3         A.  I have the license in there that you can look

14 08  4    at.

14 08  5         Q.  In this stack?

14 08  6         A.  Yes.

14 08  7         Q.  We'll work our way down there and I won't get

14 08  8    our papers mixed up here.  But since about October of

14 08  9    '97, or so?

14 08  10        A.  Yes, sir.

14:08  11        Q.  Okay.  And who is the fellow that you show the

14 08  12   guns with?

14 08  13        A.  Paul Rosamond, R-O-S-A-M-O-N-D.

14 08  14        Q.  And is that here in Harlingen?

14.08  15        A.  Yes, sir.

14 08  16        Q.  And does he have a gun shop that's open to the

14:08  17   public?

14.08  18        A.  Yes, sir.

14 08  19        Q.  It's not something you make an appointment and

14.08  20   go to?

14.08  21        A.  Oh, no, no.

14.08  22        Q.  From time to time since about '97, you have

14 08  23   bought and sold guns through Mr. Rosamond's shop?

14.08  24        A.  Yes, sir.

14 08  25        Q.  And what is the name of his shop?

14:47  1         Q.  Okay, where would you have have expected it to

14:47  2    be in the daytime?

14:47  3         A.  I would have expected him to -- he was

14:47  4    instructed when I issued it to him that he could put it

14:47  5    in his police car, but I said, "At night," when he

14:47  6    parked that car, "I want that rifle coming out of that

14:47  7    car and going in your house   I do not want that gun

14:47  8    stolen in the burglary of your vehicle."

14:47  9         Q.  Okay, but the chief assigned -- and I'm talking

14:47  10    about Chief Scheopner -- is it "Scheopner" or

14:47  11    "Schoepner"?

14:47  12         A.  Scheopner.

14:47  13         Q.  Chief Scheopner assigned the weapon to

14:47  14    Detective Moore's office so that it wouldn't get rusted

14:47  15    in the vault, right?

14:47  16         A.  At that time, when we was having all that

14:47  17    water -- and I don't remember when that was -- that's

14:47  18    the reason it was moved and placed in his office.

14:47  19         Q.  Okay.

14:47  20         A.  It was when Chief Scheopner told me that he was

14:47  21    dissolving the ERT team, that Moore and I would have to

14:48  22    be ready, because if he was going to call on somebody,

14:48  23    he was going to call on us because we had been to the

14:48  24    SWAT school.

14:48  25         Q.  And so it was stored for a while in his office?

14:48  1  A.  Yes, sir.

14:48  2  Q.  In Detective Moore's office.  I have got a

14:48  3 bunch of "his's" in there.  And then eventually the gun

14:48  4 was assigned to Detecive Moore; is that right?

14:48  5  A.  Yes, sir.

14:48  6  Q.  Not just to his office but to him?

14:48  7  A.  Yes, to him.

14:48  8  Q.  Okay, when it was assigned to Detective Moore,

14:48  9 that was something you did; is that right?

14:48  10  A.  Yes, sir.

14:48  11  Q.  As opposed to Chief Scheopner?

14:48  12  A.  Yes, sir.

14:48  13  Q.  And you assigned it to Detective Moore because

14:48  14 it's your understanding that the chief was dissolving

14:48  15 the ERT team?

14:48  16  A.  Well, he told me that he was going to dissolve

14:48  17 that because none of them had been to school.  They

14:48  18 weren't -- none of them were qualified to shoot a

14:48  19 rifle, I don't think.

14:48  20    He says, "I have got to dissolve it and

14:48  21 come up with a functional new team."  But he said, "In

14:48  22 the meantime, you and Moore need to be ready because if

14:48  23 I need somebody, you two guys are the guys I'm going to

14:49  24 call."

14:49  25  Q.  What was the ERT team?

14 49   1      A.  They were, for the most part, a bunch of guys

14 49   2  that wanted to be SWAT team members.  They more or less

14 49   3  volunteered themselves.  And I think Chief Guy Anderson

14:49   4  said, "Sure."

14 49   5        But they were eating us up alive on

14:49   6  overtime.  They were doing a lot of jogging/repelling

14 49   7  over on the old bridge over the Arroyo.

14.49   8      Q.  Does ERT stand for emergency response team?

14 49   9      A.  Yes, sir.

14:49 10      Q.  When Chief Scheopner came on, he decided that

14.49 11  he didn't really need that particular ERT team; is that

14:49 12  right?

14.49 13      A.  At a later time.  I think at some point the

14.49 14  overtime got staggering.  We had limited funds at that

14:49 15  time, and the overtime was getting pretty high, between

14:49 16  that and a few other details we had.  And he says, "I

14.49 17  really need a team that I can call on and not a bunch

14:49 18  of guys out here jogging."

14.50 19        I told him -- I said, "Well, Moore and I

14.50 20  are getting kind of old.  So we'll do it but you had

14 50 21  better start actually hunting up a new young team."

14 50 22      Q.  Well, about when was it that -- do you remember

14 50 23  the year, or the month and the year, when he told you

14 50 24  that he -- that Chief Scheopner told you that he wasn't

14.50 25  going to have an ERT team?

14:53　1　　　　Q.　But, in any event, rather than storing it over

14:53　2　in the evidence locker, during the day the gun was to

14:53　3　be stored in Detective Moore's vehicle; is that right?

14:53　4　　　　A.　Yeah.　He wanted to carry it in his vehicle,

　　　　5　and I had no objection to that.　We had shotguns in all

14:53　6　the cars.　And most of your federal agents carry

　　　　7　rifles, and I didn't see a problem with it.

14:53　8　　　　　　　　　But I did tell him it needed to be

14:54　9　safeguarded at night; it needed to go in and be put up.

14:54　10　　　　Q.　Well, when you said "safeguarded at night,"

14:54　11　what did you mean by that?

14:54　12　　　　A.　Not to leave it out there in his vehicle where

14:54　13　it could be stolen.

14:54　14　　　　Q.　Well, did you mean for him to bring it back in

14:54　15　to the police department?

14:54　16　　　　A.　No.　Sorry.

14:54　17　　　　Q.　That's okay.

14:54　18　　　　A.　He lives out south of town here, and that

14:54　19　wouldn't -- I mean, if he got a call, his chances were

14:54　20　probably just as good to be called at the house and

14:54　21　called out.

14:54　22　　　　　　　　　The two times I was called out as a SWAT

14:54　23　team member were from my house.　I was never on the job

14:54　24　when I was utilized.

14:54　25　　　　Q.　But you didn't think that it would be a good

14 54  1  idea for him to leave it in the vehicle at night?

14 54  2      A.  No, no, not left in the vehicle, no.

14:54  3      Q.  And when they are kept in the vehicle, are they

14 54  4  locked in somehow?

14.54  5      A.  The shotguns are, but we have, you know, had

14.54  6  people attempt to pull shotguns out of cars where they

14.54  7  damaged the shotguns.  They are locked into the cars.

14 55  8          But on that particular type rifle, I'm not

14:55  9  even sure what type of a lock device they would have

14.55  10  for something that comes apart like that.  They do snap

14:55  11  apart, you know.  You can take them apart.

14.55  12     Q.  And so you felt like safety required that the

14:55  13  gun be moved to out of the vehicle at night?

14:55  14     A.  Taken in.

14:55  15     Q.  Because you didn't want passersby to be

1..55  16  intrigued with the weapon and think, you know, "I'm

14.55  17  just" --

14:55  18     A.  Well, I didn't think they would be intrigued

14:55  19  because I told him to keep it out of sight because I

14.55  20  didn't want the vehicle broken into.

14:55  21          We have a lot of car burglaries in this

14 55  22  area.  We have a lot of cars stolen in this area.  And

14.55  23  of the guns we get lost off the police department, they

14·55  24  were lost in auto thefts.

14:55  25     Q.  And your reason for telling Detective Moore to

14.54   1   idea for him to leave it in the vehicle at night?

14.54   2       A.   No, no, not left in the vehicle, no.

14.54   3       Q.   And when they are kept in the vehicle, are they

14.54   4   locked in somehow?

14.54   5       A.   The shotguns are, but we have, you know, had

14.54   6   people attempt to pull shotguns out of cars where they

14.54   7   damaged the shotguns.   They are locked into the cars.

14.55   8            But on that particular type rifle, I'm not

14.55   9   even sure what type of a lock device they would have

14.55  10   for something that comes apart like that.   They do snap

14:55  11   apart, you know.   You can take them apart.

14.55  12       Q.   And so you felt like safety required that the

14:55  13   gun be moved to out of the vehicle at night?

14:55  14       A.   Taken in.

14:55  15       Q.   Because you didn't want passersby to be

1..55  16   intrigued with the weapon and think, you know, "I'm

14.55  17   just" --

14.55  18       A.   Well, I didn't think they would be intrigued

14.55  19   because I told him to keep it out of sight because I

14.55  20   didn't want the vehicle broken into.

14.55  21            We have a lot of car burglaries in this

14.55  22   area.   We have a lot of cars stolen in this area.   And

14.55  23   of the guns we get lost off the police department, they

14.55  24   were lost in auto thefts.

14.55  25       Q.   And your reason for telling Detective Moore to

14:55  1     get the gun out of the vehicle was to protect the gun

14:55  2     from falling into the wrong hands?

14:55  3         A.  Yes, because most police weapons that are

14:55  4     stolen are not stolen out of houses.  They're not out

14:55  5     of police departments.  They are stolen out of

14:56  6     vehicles.

14:56  7              Just like INS, there was a write-up like

14:56  8     two weeks ago where they are missing, gosh, thousands

14:56  9     from here to San Diego.  But they're stolen out of

14:56 10     vehicles.  They're not out of these houses.  My police

14:56 11     experience tells me when you park a car at night, you

14:56 12     take the weapon out and you take it and put it up.

14:56 13         Q.  And what was your understanding as to where

14:56 14     Detective Moore was going to keep the gun in his house?

14:56 15         A.  I didn't know where.  I just told him to take

14:56 16     it in.

14:56 17         Q.  Okay.  Now, you know, I have never held an

14:56 18     Olympic Arms rifle like this.  I say an AR-15.  That's

14:56 19     a type of assault rifle; is that right?

14:56 20         A.  They are not truly assault rifles because they

14:56 21     lack all the things that an assault rifle has.  But

14:56 22     they are made to look like the military assault rifle

14:56 23     or the police tactical weapon.  Those have selector

14:57 24     switches where you can switch over to full automatic

14:57 25     and have a burst by one pull of the trigger, and what

BRYANT & STINGLEY, INC.

15:16  1   Chief Scheopner knew that Detective Moore had the

15:16  2   rifle?

15:16  3      A.  Yeah, he knew that he had it.

15:16  4      Q.  Okay, and then after you told Detective Moore

15:16  5   to -- or you had assigned him the weapon and told him

15:16  6   to get it out of his vehicle at night and, you know,

15:16  7   take it in his house and that kind of thing, that would

15:16  8   have also been the kind of thing that Chief Scheopner

15:16  9   would have known about, wouldn't it?

15:16 10      A.  He should have.  I asked him about it later,

15:16 11   and he says, "I don't specifically remember you telling

15:16 12   me about it."

15:17 13      Q.  Do you feel like, looking back on it, that's

15:17 14   the kind of thing you would have told Chief Scheopner

15:17 15   about?

15:17 16      A.  Usually.  I made reports to him constantly on

15:17 17   what I did, you know.

15:17 18      Q.  And what was the reason that you assigned the

15:17 19   AR-15 to Mr. Moore?

15:17 20      A.  Because I was told that they were dissolving

15:17 21   that ERT team that just flat wasn't qualified anyway,

15:17 22   and he was going to have to depend on the two sole

15:17 23   remaining members of the SWAT team until he could get a

15:17 24   new team trained in case of an emergency.

15:17 25      Q.  He being Chief Scheopner?

15 17  1      A.  Yes.

15 17  2      Q.  And so Chief Scheopner passed along that

15 17  3  information to you and then you told Detective Moore

15 17  4  that you were assigning him that rifle?

15.17  5      A.  I don't remember just when I told him that I

15.17  6  was -- I didn't tell him -- he asked me if he could

15.17  7  carry the weapon in his vehicle where, you know, if he

15.17  8  was out, he would have it and wouldn't have to run back

15:18  9  to the station to get it, which, you know, makes

15:18 10  perfect sense.  We carry a pistol, you know.

15.18 11      Q.  And if I was trying to figure out who initiated

15:18 12  the assignment of the weapon to Detective Moore, I

15.18 13  guess in some ways that goes back to Chief Scheopner,

15:18 14  doesn't it, because he was telling you that you weren't

15.18 15  going to have the ERT team anymore?

15.18 16      A.  Right.  He said that he was dissolving that

15:18 17  team.  He said, "I have got a problem with this team."

15.18 18  He said, "I'm going to dissolve it."  He says, "But in

15.18 19  the meantime, you and Moore are going to be the two

15.18 20  guys I call on if there's any kind of an emergency."

15.18 21  He said, "You're the last two guys we've got from the

15 18 22  old SWAT team."  He says, "You guys are going to have

15.18 23  to pick up the slack if I need you."

      24      Q.  And whether or not there was any form or

15.19 25  whatever filled out, you feel like you would have told

                    BRYANT & STINGLEY, INC.

15 35  1   Q.  So you had a business?

15 35  2   A.  Yes.  It's my business.  I've got my own tax

15.35  3   number, my own firearms license.  I had my own

15 35  4   inventory.  It's not big.  It's very small.  It was

15.35  5   part time, refinish a gun, stick it out there for sale,

15.35  6   you know.

15.35  7   Q.  And do you file your own tax return for the

15.35  8   business?  Is that a yes?

15.35  9   A.  Yes.

15 35 10   Q.  Who are your employees?

15:35 11   A.  I don't have any employees.  I just told you

15:35 12   it's a very small business.

15.35 13        What I do is I leave them at the store,

15.35 14   and as per ATF rules, he has -- Mr. Rosamond, since

15:35 15   it's his store and I leave my stuff there, he has full

15.36 16   control over it because I can't afford to have

15.36 17   employees there.  So I have given him full authority to

15:36 18   sell stuff.

15 36 19        But at the end of the day, I go in there

15 36 20   and I put my stamp on there and fill out the necessary

15 36 21   paperwork.  I mean, he has the 4473 filled out, and he

15 36 22   runs the background check on my license, which is

15·36 23   hanging right there on the wall.  So it's all mine.

15 36 24   Q.  Does Mr. Rosamond have a license to run --

15 36 25   A.  Yes, he is a licensed dealer, a very big

16:35  1          MR. LOCKHART:   That belonged to the

16:35  2    Harlingen PD?

16:35  3        Q.   Yes.

16:35  4        A.   A PD AR-15?

16:35  5        Q.   Yes.

16:35  6        A.   Gosh, I think we only had just one.  That's the

16:35  7    four rifles that you have listed there, that's the four

16:35  8    PD rifles, that's all we had.  We had three -- we

16:35  9    bought one and three come from other sources.  That's

16:35 10    all we had.

16:35 11        Q.   Did Andy Muniz, to your knowledge, ever take

16:35 12    possession of the AR-15 that was utilized in the

16:35 13    incident in question?

16:35 14        A.   This rifle that was used?

16:35 15        Q.   Yes, sir.

16:35 16        A.   I don't have any idea who took possession of

16:35 17    that rifle.

16:35 18          MS. LOPEZ:   I have no further questions.

16:35 19    Thank you.

16:35 20          MR. LOCKHART:   I've got a few.

16:35 21          MS. LOPEZ:   Okay.

      22                      EXAMINATION

16:35 23    BY MR. LOCKHART:

16:35 24        Q.   Mr. Vasquez, how old a man are you?

16:36 25        A.   59

16.36   1    Q.  You have been asked some questions here today

16.36   2    about guns and shooting guns, and I want to go over

16.36   3    your experience and training with firearms, okay?

        4    A.  Uh-huh.

16.36   5    Q.  And we'll try to do it as promptly as we can in

16.36   6    respect to good Lawyer Sonia Lopez' time.

16.36   7             But tell me, when you went to the police

16.36   8    academy, did you get any firearms training there?

16.36   9    A.  Yes, sir.

16.36  10    Q.  And then have you taken firearms training since

16.36  11    the police academy?

16.36  12    A.  Yes, sir.

16.36  13    Q.  And have you attended courses?

16.36  14    A.  Yes, sir.

16.36  15    Q.  Tell me about those.

16.36  16    A.  I started out teaching firearms for the Texas

16.36  17    A&M Extension Service at the police academy sometime in

16.37  18    probably the mid '70s, and I got my instructor's

16.37  19    certificate in, I believe -- the first one in 1976.

16.37  20             I have been to the FBI's special weapons

16.37  21    and tactics school in Quantico, Virginia.  I have been

16.37  22    to the FBI's firearms instructor course.  I have been

16.37  23    to the FBI transition instructor's course, where they

16.37  24    teach you to instruct transition from revolvers to

16.37  25    automatics

16 37  1            There may be one or two others that I

16 37  2   can't remember offhand.

16.37  3       Q.  All right.  Now, as far as your work with the

16 37  4   Harlingen Police Department, have you ever had

16.37  5   assignments in training other officers in the use of

16 37  6   firearms?

16 37  7       A.  Yes, sir.

16:37  8       Q.  Tell me about those.

16.38  9       A.  In like 1975 or '76, I was teaching firearms at

16:38 10   the police academy, where we taught rookies how to

16.38 11   shoot that had never handled guns.

16.38 12            I was also the range officer for a number

16:38 13   of years, where I took officers out for their annual

16.38 14   qualifications, and I can't remember the years.  I was

16.38 15   the training officer for like '86, '87 and '88,

16:38 16   somewhere in there, where I did that every month.  I

16.38 17   took a different crew out and had them shoot.

16.38 18            When the police department wanted to

16.38 19   transition from revolvers to automatics, I made up all

16 38 20   the material that they would need and taught the course

16 38 21   in shooting the new automatic 9 millimeters in using

16:39 22   the -- the first holster uses a level two holster,

16 39 23   where they had to be trained to use that.

16:39 24            And I also worked with the officers when

16 39 25   they transitioned from the Smith & Wesson 9

16:39  1   millimeters -- I can't remember the year on that -- and

16:39  2   switched over to Berettas.

16:39  3        Q.  Now, you also mentioned something about that

16:39  4   you had worked as a detective for several years.  How

16:39  5   many years was that?

16:39  6        A.  The first go-round was nine years as a

16:39  7   detective.

16:39  8        Q.  And then you came back to the detectives as a

16:39  9   sergeant?

16:39 10        A.  No.  I promoted to sergeant and left detectives

16:39 11   and went back to patrol.

16:39 12        Q.  And then you came back a detective in what

16:39 13   capacity?

16:39 14        A.  As a captain.

16:39 15        Q.  And you were the supervisor of the detectives?

16:39 16        A.  Yes, sir.

16:39 17        Q.  How many years did you do that?

16:39 18        A.  About five years.

16:39 19        Q.  Now, in your job as a detective, would you on

16:40 20   occasion be called out to observe autopsies of murder

16:40 21   victims, specifically victims murdered by firearms?

16:40 22        A.  Yes, sir. .

16:40 23        Q.  And tell us how often that would happen.

16:40 24        A.  Gosh, I'm not really sure.  Maybe three or four

16:40 25   times a year.  You know, some years are busier than

16 40  1   others. I never kept count. You know, I never really

16 40  2   liked going.

16.40  3      Q. And you would actually, as part of the law

16:40  4   enforcement team, be assigned to observe the murder

16:40  5   victim autopsy and the removal of the bullet that

16.40  6   killed the person?

16 40  7      A. Yes, sir, I would have to remain in the morgue

16.40  8   with the pathologist and photograph and take custody of

16:40  9   all of the evidence that was turned over to the police

16 40 10   department.

16.41 11      Q. And did you continue to do that when you

16:41 12   returned as a captain?

16:41 13      A. I have been back over there as a captain also,

16 41 14   yeah.

16:41 15      Q. And have you trained your detectives under you

16.41 16   to do that job?

16:41 17      A. Yes, sir. I would send them over there with

16 41 18   the intentions of getting some exposure to that because

16.41 19   -- nobody likes to do that. It's just an ugly part of

16.41 20   the job.

16:41 21      Q. I understand. Now, you have been asked about

16:41 22   an AR-15 or .223 that you sold -- you privately sold to

16:41 23   R. D. Moore as a private citizen, correct?

16 41 24      A. Yes, sir.

16 41 25      Q. I believe you have also referred to it as a

16:41  1    Colt Sporter.

16:41  2        A.   Yes, sir.

16:41  3        Q.   Now, the AR-15, give us the history of that

16:41  4    gun.  Where did it evolve from?

16:42  5        A.   I think the year was like '63, at the very

16:42  6    earliest, when the M-16 come out and was being tested

16:42  7    for the military, and the AR-15 came out a short time

16:42  8    later, which is a civilian spinoff of the M-16.  It

16:42  9    looks very similar at a glance.  It lacks a selector

16:42 10    switch, a three-position selector with an M-16.

16:42 11        Q.   And that selector switch would allow that M-16

16:42 12    to go to fully automatic?

16:42 13        A.   Yes, sir.

16:42 14        Q.   And the AR-15 does not have that capability?

16:42 15        A.   No, sir.

16:42 16        Q.   All right.  Now, you mentioned Quantico, FBI

16:42 17    SWAT training, back in the '70s?

16:42 18        A.   Yes, sir.

16:42 19        Q.   Did you train on a rifle at Quantico?

16:42 20        A.   Yes, sir, we trained with a couple of different

16:42 21    rifles.

16:42 22        Q.   And which ones were those?

16:42 23        A.   The M-16 with silencer, and the Remington model

16:43 24    700 -- 7.62 x 51, or what people call a .308

16:43 25    Winchester.

BRYANT & STINGLEY

16 43   1        Q.  All right, and the M-16 that you trained on at

16 43   2    Quantico, first of all, how long was that school?

16.43   3        A.  50 hours long.

16 43   4        Q.  Tell us about the training that you received on

15.43   5    the M-16.

16 43   6        A.  We had a lot of classroom on that, and then we

16 43   7    went out to the range, where they had live ammunition,

16:43   8    we just spent the day shooting the darn things, and

16:43   9    then when we got through shooting them -- we shot them

16:43  10    at about 150 meters, and they were very accurate.  And

16:43  11    then we had to go to the cleaning room where we broke

16:43  12    them down into parts and cleaned them.

16:43  13        Q.  All right.  And while you were there at

16.43  14    Quantico at the training school, how many rounds would

16:44  15    you estimate that you shot out of an M-16?

16.44  16        A.  I probably -- gosh, I don't know.  I shot a lot

16:44  17    because it doesn't kick punch, and I kind of liked it

16:44  18    over the .308.  The .308 with bolt action kicks pretty

16:44  19    hard when you're laying down and it's just sitting up

16 44  20    on top of your shoulder.  So I shot the M-16 quite a

       21    bit -- gosh, I don't know -- quite a bit.  We spent the

16 44  22    day out there.  It was the one I tried to stick to

16:44  23    until they told me to move on.

16 44  24        Q   All right, and did you shoot it in different

16:44  25    positions?

BRYANT & STINGLEY, INC.

16:44  1      A.  Yeah, we shot it in the prone, in the kneeling

16:44  2  and in the standing.

16:44  3      Q.  And all those at a target?

16:44  4      A.  Yes, sir.

16:44  5      Q.  And then you were graded on your target

16:44  6  accuracy?

16:44  7      A.  Yes, sir.

16:44  8      Q.  Okay, and you passed that course, that 50-hour

16:44  9  course?

16:44 10      A.  Yes, sir.

16:44 11      Q.  Now, since then, have you privately owned

16:44 12  AR-15s?

16:44 13      A.  Yes, sir.

16:45 14      Q.  How many?

16:45 15      A.  Gosh, I'm not really sure.  Two or three, I

16:45 16  guess.  I presently have one.

16:45 17      Q.  You presently have one?

16:45 18      A.  Yes.

16:45 19      Q.  And have you shot those over the years?

16:45 20      A.  Yes, sir.

16:45 21      Q.  Your privately-owned ones?

16:45 22      A.  Yes, sir.

16:45 23      Q.  How many different times?

16:45 24      A.  Gosh, I don't know.  I used to belong to the

16:45 25  Valley Gun Club, and I could go out and shoot all I

16 45  1   wanted.  You know, it was very close, very convenient.

16 45  2            Then we had the old police range before

16 45  3   they bulldozed it down.  We could go out there and

16 45  4   shoot rifles.  So I got to shoot rifles a lot.

16.45  5            I can't remember what year they tore the

16:45  6   police range down, but it must have been -- it was

16.45  7   probably somewhere in the late '80s.

16.45  8      Q.  What I'm getting to, Captain Vasquez, are you

16 45  9   very familiar with the operation of an AR-15?

16:45 10            MS. LOPEZ:  Objection; form.

16:45 11      Q.  You can answer.

16.45 12      A.  Yeah, I'm fairly familiar with it.

16:46 13      Q.  And you have got this familiarity from owning

16:46 14   two or three of them and shooting them or at least

16:46 15   shooting in the family of the AR-15 since the mid '70s?

16:46 16      A.  Yes, sir.

16:46 17            MS. LOPEZ:  Objection; form.

16:46 18      Q.  Now, let's talk about this Harlingen Police

16.46 19   Department rifle, the Olympic Arms .223.

16.46 20            MS. LOPEZ:  Tom, I need to place a call to

16:46 21   the office.  Are you going to be a lot longer?

16.46 22            MR. LOCKHART:  Maybe 10 minutes max.

16.46 23            MS. LOPEZ:  Can we take a break so I can

16.46 24   make a call?

16 47 25            MR. LOCKHART:  You bet.

BRYANT & STINGLEY, INC.

16.52  1          (Brief recess).

16.52  2          Q.  Captain Vasquez, we took a little break, and I

16.52  3    was asking you about the city-owned Olympic Arms

16.52  4    semi-automatic .223.  Now, I think you referred to it

16.52  5    earlier as an AR-15 clone?

16.52  6          A.  Yes, sir.

16.52  7          Q.  And does it shoot the same caliber bullet as

16.52  8    the AR-15?

16:52  9          A.  Yes, sir.

16.52  10         Q.  .223?

16.52  11         A.  Yes, sir.

16.52  12         Q.  The same fire power?

16:52  13         A.  Yes, sir.

16.52  14         Q.  The same -- you use the same magazines or

16:52  15    clips?

16:52  16         A.  Yes, sir.

16.52  17         Q.  How about the parts on the two guns?

16:52  18         A.  They interchange.

16:52  19         Q.  All right.  Is that why you call it an AR-15

16:53  20    clone?

16:53  21         A.  Yes, sir, because the Olympic Arms uses their

16:53  22    own model designations, and just to clarify that it's

16:53  23    not truly an AR-15 because an AR-15 is a Colt, and the

16:53  24    Olympic Arms has its own, but it is a copy of a Colt.

16:53  25         Q.  All right.  Now, we have seen from Exhibit 5 to

16:53  1    Scheopner's deposition -- it's entitled Gun List

16:53  2    Inventory, and there's also a reference to an SKS

16:53  3    semi-automatic 7.65 x 39 caliber.  Are you familiar

16:53  4    with an SKS semi automatic?

16:53  5         A.  Yes.  It's a 7.62 x 39.

16:53  6         Q.  Okay, so this is a typo.  It should be a 7 --

16:53  7         A.  -- .62.

16:53  8         Q.  All right, and what is the caliber -- just

16:53  9    explain to us what the caliber of this gun is.

16:54  10        A.  7.62 is a .30 caliber, so to speak.  Normally,

16:54  11   we think of it as being a .308, but I think an SKS is

16:54  12   actually a .311, slightly larger in diameter.

16:54  13        Q.  Have you ever privately owned any SKS

16:54  14   semi-automatic 7.62s?

16:54  15        A.  Yes, sir.

16:54  16        Q.  How many?

16:54  17        A.  Quite a few.  They are cheap guns.  I have

16:54  18   probably had somewhere between eight to 10 of them.

16:54  19        Q.  All right, sir.  And have you fired all of

16:54  20   those guns?

16:54  21        A.  Yes, sir.

16:54  22        Q.  Shot them all at target practice?

16:54  23        A.  Yes, sir.

16:54  24        Q.  And how many rounds would you say over the

16:54  25   years you have shot out of an SKS semi-automatic 7.62?

16 54   1          A.   Probably a couple of thousand rounds.

16 54   2          Q.   And what is the history on that gun?

16 54   3          A.   It's a Russian design, a Seminoff.  I believe

16 55   4    it come out right towards the end of World War II.  It

16 55   5    was immediately replaced by a more sophisticated

16 55   6    weapon, the AK-47.  They come out of the '40s.  The

16 55   7    Seminoff was kept in production -- in the service for a

16 55   8    number of years because it's a carbine, a small rifle,

16 55   9    and it works pretty good.  They shipped a lot of them

16 55  10    to the Warsaw Pact countries.

16 55  11          Q.   All right.  Well, just for us knowing histories

16 55  12    of different wars, has this SKS been used in wars in

16 55  13    the past?

16 55  14          A.   Yes, sir.  The last time I believe it was used

16 55  15    was in Vietnam.  Vietnamese forces used it.  It was not

16 55  16    necessarily the favorite.  The AK was the favorite of

16 55  17    the two, but they did use a lot of SKS's, and the

16 56  18    Chinese used a lot of them for rural police and stuff

16 56  19    like that.

16 56  20          Q.   And you're talking about the Vietnamese during

16 56  21    the war?

16 56  22          A.   During the war that we was involved in.

16 56  23          Q.   And then let me turn your attention to another

16 56  24    gun that's listed on this inventory, Exhibit 5, M-1

16 56  25    carbine semi automatic .30 caliber.  Are you familiar

BRYANT & STINGLEY   INC

16 56   1    with that gun?

16 56   2        A.   Yes, sir.

16.56   3        Q.   Have you owned any M-1 carbines in your

16 56   4    lifetime?

16:56   5        A.   Yes, sir.

16:56   6        Q.   How many?

16 56   7        A.   I'm not sure.  They used to be pretty

16.56   8    reasonable.  I think I probably had about five of

15.56   9    those.

16:56  10        Q.   All right.  And did you also shoot those?

16:56  11        A.   As long as the surplus of ammunition held up.

16:56  12        Q.   All right.  How many rounds would you estimate

16:56  13    that you, over your lifetime, have shot out of an M-1

16:56  14    carbine semi automatic .30?

16:57  15        A.   Over a thousand.

16:57  16        Q.   Now, let me ask you to assume with me a couple

16.57  17    of things, Captain Vasquez.  Number one, that on the

16.57  18    morning of the incident in San Benito, Ernest Moore

16:57  19    either stepped out of a corn field or stood up in a

16:57  20    corn field and took aim, that we have had some

16:57  21    testimony he was as close as 20 to 25 feet from the

16 57  22    Border Patrol agents that he killed.

16:57  23                MS. LOPEZ:  Objection; form.

16.57  24        Q.   We also have evidence from the Texas Rangers

16 57  25    official plat and measurements that the distance from

16:57  1    Ernest Moore to one of the Border Patrol agents was

16:58  2    approximately 44 feet.

16:58  3                  MS. LOPEZ:  Objection; form.

16:58  4        Q.  That Ernest Moore's distance to the other

16:58  5    Border Patrol's agent was approximately 50 feet and

16:58  6    that Ernest Moore's distance from Deputy Sheriff Raul

16:58  7    Rodriguez was approximately 76 to 83 feet.

16:58  8                  MS. LOPEZ:  Objection; form.

16:58  9        Q.  Now, making those assumptions and making the

16:58  10   assumptions that Ernest Moore, who we know committed

16:58  11   this horrible tragedy, shot one of the Border Patrol

16:58  12   agents in the head, which was a fatal injury, one of

16:58  13   the Border Patrol agents in the neck, which was a fatal

16:58  14   injury, and shot Deputy Sheriff Raul Rodriguez in the

16:58  15   left chest, my question to you is, making those

16:59  16   assumptions --

16:59  17                  MS. LOPEZ:  Objection; form.

16:59  18       Q.  Based upon your knowledge and experience and

16:59  19   training with, first of all, the Colt AR-15, could

16:59  20   Ernest Moore that morning have just as easily and

16:59  21   efficiently and effectively, with the same effort, have

16:59  22   killed these two Border Patrol agents and seriously

16:59  23   wounded Deputy Sheriff Raul Rodriguez?

16:59  24                  MS. LOPEZ:  Objection; form.

16:59  25       A.  The AR-15 versus the Olympic?

BRYANT & STINGLEY, INC.

16 59   1        Q.   Yes, sir.

16.59   2        A.   Absolutely.   The results would have been the

16 59   3   same.

16.59   4        Q.   Now, my next question is, making the same

16:59   5   assumptions and the hypothetical, if Ernest Moore had,

16 59   6   instead, grabbed the privately-owned SKS semi-automatic

16 59   7   7.62, based upon your experience and your use of these

17:00   8   guns, could Ernest Moore have as easily, efficiently

17·00   9   and effectively killed these two Border Patrol agents

17.00  10   and seriously wounded Deputy Sheriff Raul Rodriguez?

17.00  11              MS. LOPEZ:   Objection; form.

17:00  12        A.   Yes, sir.

17.00  13        Q.   And making the same hypothetical assumptions,

17.00  14   if Ernest Moore had grabbed the privately-owned M-1

17:00  15   carbine semi-automatic .30 caliber that morning, could

17:00  16   he have just as easily, efficiently and effectively

17.00  17   killed the two Border Patrol agents and seriously

17:00  18   wounded Deputy Sheriff Raul Rodriguez?

17 00  19        A.   Yes, sir.

17·00  20              MS. LOPEZ:   Objection; form.

17.01  21        Q.   Have you ever given expert testimony as a

17.01  22   firearms expert before?

17:01  23        A.   Yes, sir.

17 01  24        Q.   Tell us about that.

17 01  25        A.   I was called upon to explain the function of a

17:01  1    bolt action rifle and the function of a lever action

17:01  2    rifle in a murder that occurred here in town, where the

17:01  3    father killed his son.

17:01  4        Q.  And in summary, just to make sure I understand,

17:01  5    Captain Vasquez, it's your testimony and opinions,

17:02  6    based upon your background and experience, that if

17:02  7    Ernest Moore, instead of grabbing the HPD .223 AR-15

17:02  8    clone, instead of grabbing that gun he had grabbed out

17:02  9    of the gun vault either the privately-owned Colt AR-15

17:02  10   or the privately-owned SKS semi-automatic 7.62 or the

17:02  11   privately-owned M-1 carbine semi-automatic .30 caliber,

17:02  12   he could have just as easily and efficiently and

17:02  13   effectively killed the Border Patrol agents and

17:02  14   seriously wounded Raul Rodriguez?

17:02  15            MS. LOPEZ:  Objection; form.

17:02  16       A.  Given where they were struck, I think the

17:03  17   results would have been exactly the same.

17:03  18            MR. LOCKHART:  That's all the questions I

17:03  19   have.

       20                         EXAMINATION

17:03  21   BY MS. LOPEZ:

17:03  22       Q.  Just some follow-up questions, Captain Vasquez.

17:03  23   You don't know whether Ernest Moore grabbed any guns

17:03  24   from a gun vault, do you?

17:03  25       A.  I don't know.

BRYANT & STINGLEY, INC.

Case 1:98-cv-00162   Document 149   Filed in TXSD on 12/14/2001   Page 56 of 57

ARTURO GUILLERMO SALINAS
VS.
CITY OF HARLINGEN, TX

TN_ 575

```
1        ERRATA SHEET/SIGNATURE PAGE

2    PAGE  LINE   CHANGE                              REASON

3     29   13    dELeTe (ANTONIO)

4     41    4    deNoTed TO doNATed           MisspeLLed

5     46   19    STERN TO STURM               MisspeLLed

6     63   19    BUZZ To Buzzed               misspeLLed

7     64   13    LiAbiLiTy TO RELiAbiLiTy     CoRRecTioN

8     69  13.14  GRAMS TO GRAiNS              CoRRecTioN

9     84   17    FiRST TO SecoNd              CoRRecTioN

10    96    7    PURchASES To PURPoSES        CoRRecTioN

11    99   15    ER to ERT                    coRRecTioN

12   120    5    Add AFTER QuANTico 1976      CoRRecTioN

13   144    7    SeminoFF TO SimoNoV          coRRecTioN
     147   25    Add iN The 1980's            AdditioN
14        I, JOSEPH BENNETT VASQUEZ, have read the foregoing
     transcript and hereby affix my signature that same is
15   true and correct, except as noted above.

16                          JOSEPH BENNETT VASQUEZ

17               JOSEPH BENNETT VASQUEZ

18   THE STATE OF TEXAS

19   COUNTY OF CAMERON

20            SUBSCRIBED AND SWORN TO BEFORE ME, the

21   undersigned authority on this the ___29th___ day of

22   May,_____, 2001.

23           MARIA S. MARTINEZ
                Notary Public
24            State of Texas
           Comm. Exp. 11-14-2004      Maria S. Martinez
25                                Notary Public in and for
                                  The State of Texas
```

15?

```
1                    REPORTER'S CERTIFICATE

2               I, MAUREEN STINGLEY, Certified Court

3   Reporter, certify that the witness, JOSEPH BENNETT

4   VASQUEZ, was duly sworn by me, and that the  deposition

5   is a true and correct record of the  testimony given by

6   the witness on MAY 14, 2001; that the deposition was

7   reported by me in stenograph and was subsequently

8   transcribed under my supervision.

9               I FURTHER CERTIFY that I am not a

10  relative, employee, attorney or counsel of any of the

11  parties, nor a relative or employee of such attorney or

12  counsel, nor am I financially interested in the action.

13

14              WITNESS MY HAND on this the 17th day of

15  ____May____, 2001.

16

17

18

19

20

21              Maureen Stingley by
                MAUREEN STINGLEY, CSR NO. 691
22              Expiration Date: 12/31/02
                Bryant & Stingley, Inc.
23              2010 East Harrison
                Harlingen, Texas 78550
24

25
```

BRYANT & STINGLEY, INC.