United States District Court
Southern District of Texas
FILED

JAN 0 2 2002

Michael N. Milby
Clerk of Court

154

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS. | § | |

## PLAINTIFFS' RESPONSE TO RENEWAL OF AND SUPPLEMENTATION TO DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF

Plaintiffs Gilberto M. Rodriguez, individually and on Behalf of his minor Daughter, Megan Suzanne Rodriguez and the Estate of his Wife Susan Lynn Rodriguez, deceased; Stephen L. Williams and Robyn S. Williams, Surviving Parents of Susan Lynn Rodriguez, deceased; Arturo Guillermo Salinas and Elisa Herrera Salinas, individually and on Behalf of the Estate of their Son Ricardo Guillermo Salinas, deceased; and Raul Rodriguez file this response to Renewal of and Supplementation to Defendant's Second Motion for Summary Judgment and Memorandum in Support thereof.

## I. NATURE AND STAGE OF THE PROCEEDINGS

On December 14, 2001, Defendant filed Renewal of and Supplementation to Defendant's Second Motion for Summary Judgment. This is Defendant's fourth attempt to seek a summary adjudication of this litigation. Such attempt should fail.

After Plaintiffs filed their suit against City of Harlingen, R. D. Moore, and Police Chief Jim Shoepner respectively [Dkt. No.1 of B-98-162, Dkt. No.1 of B-98-163, and Dkt. No.1 of B-B-99-70,], the Defendants filed Motions to Dismiss under FRCP12(b)(6). [Dkt. Nos. 7 and 8 of B-98-162, Dkt. Nos. 7 and 8 of B-98-163, and Dkt. Nos. 7 and 8 of B-99-70]. Through long procedural process, on March 30, 2000, this Court entered Orders [Dkt. No. 43 of B-98-162, Dkt. No. 43 of B-98-163, and Dkt. No. 37 of B-99-70 ] for the following rulings:

(1) Defendant Moore and Scheopner's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) Based on Qualified Immunity [Dkt. No. 8] is **GRANTED**;

(2) Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) [Dkt. No. 7] is:

    (a) **MOOT** as to the Plaintiffs' 42 U.S.C. § 1983 claims alleged against Defendants Moore and Scheopner because the Court has granted them qualified immunity;

    (b) **GRANTED** as to the special relationship and special danger claims alleged against the City of Harlingen, and **DENIED** as to the Plaintiffs' state-created danger claim against the city; and

    (c) **DENIED** as to Plaintiffs' Texas Tort Claims Act cause of action against the City of Harlingen.

After the ruling, the three cases consolidated under B-98-162. [Dkt. No. 45 of B-98-163 and Dkt. No. 39 of B-99-70]. Plaintiffs and individual Defendants Moore and Scheopner entered an agreed Order of Dismissal with Prejudice [Dkt. No. 61], leaving the Plaintiffs remaining causes of action for state-created danger and Texas Tort Claims Act against the City of Harlingen.

On July 28, 2000, the only Defendant, the City of Harlingen, moved for summary

judgment to dismiss these two remaining causes of action [Dkt. No. 59]. The date of submission of the motion is August 17, 2000. Plaintiffs filed Motion to Continue the Submission of Defendant's Motion for Summary Judgment until the completion of the discovery [Dkt. No. 66]. On March 5, 2001, this Court entered an order granting Plaintiffs' continuance motion and denying Defendant's motion for summary judgment without prejudice [Dkt. No. 94]. In this order, this Court amended its scheduling order [Dkt. No. 91].

Following the amended scheduling order, Defendant the City of Harlingen refiled its summary judgment motion entitled Defendant's Second Motion for Summary Judgment [Dkt. No. 100] on June 19, 2001 and Plaintiffs filed their response on July 9, 2001 [Dkt. Nos. 106 and 110]. On August 2, 2001, this Court issued a memorandum opinion, in which this Court granted in part the Defendant's Second Motion for Summary Judgment as to Plaintiffs' state-created danger cause of action. [Dkt. No. 134]. After the issuance of the opinion, this Court conducted a hearing in the chamber, in which it granted Plaintiffs' request to abate Plaintiffs' remaining state claim cause of action until the conclusion of Plaintiffs' appeal on the state-created danger cause of action. [Dkt. No. 139].

While preparing their appeal, Plaintiffs discovered new evidence in Julie Cox's previously unavailable testimony. On August 16, 2001, Plaintiffs filed a Motion for Reconsideration of Partial Summary Judgment based on the newly discovered evidence [Dkt. No. 141]. Ms. Cox's affidavit was attached to the motion. On August 29, 2001, Defendant filed its response and objected to the affidavit on the ground that "[s]he does not affirmatively show that she has personal knowledge and is competent to testify about: (a) which AR-15 Ernest Moore used in the shootings; and (b) which AR-15 Ernest Moore had used on prior occasions." [Dkt. No. 144 at 3]. Plaintiffs then went back to Ms. Cox to cure what the Defendant alleged

was a defect of her affidavit. Ms. Cox gave a second affidavit, which was attached to Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion for Reconsideration [Dkt. No. 145], and was filed on September 12, 2001. On October 18, 2001, this Court entered an order granting Plaintiffs' motion for reconsideration, withdrawing the partial summary judgment previously entered, and denying Defendant's motion for summary judgment. [Dkt. No. 146]. On November 14, 2001, this Court signed a new Scheduling Order [Dkt. No. 147] setting the following deadlines:

1.  Motions previously withdrawn are allowed to be refiled by December 14, 2001;

2.  Plaintiffs are responsible for filing the joint pretrial order by January 22, 2002;

3.  Docket Call and final pretrial conference is set for 1:30 p.m. on February 7, 2002; and

4.  Jury Selection is set for 9:00 a.m. on February 11, 2002.

On December 14, Defendant filed Renewal of and Supplementation to Defendant's Second Motion for Summary Judgment. [Dkt. No. 148]. The motion repackages all of Defendant's previous motions with Ms. Cox's deposition testimony, in which Ms. Cox allegedly recants some of her affidavit testimony previously provided to Plaintiffs.

## II. EVIDENCE

In this Response, Plaintiffs reply upon and incorporate herein by reference the following evidence:

a.  Excerpts from Deposition of Julie Cox (Exhibit "A")

b.  Excerpts from Deposition of Captain Joseph Bennett Vasquez (Exhibit "B")

c.  Excerpts from Deposition of James Joseph Scheopner (Exhibit "C")

d.  Excerpts from Deposition of Detective Ralph Dwayne Moore (Exhibit "D")

## III. ARGUMENT AND AUTHORITIES

**A.      Renewal of and Supplementation to Second Motion for Summary Judgement is Improper**

Defendant's attempt to renew and supplement its Second Motion for Summary Judgement does not comply with this Court's Scheduling Order [Dkt. No. 147] of November 14, 2001, which sets a December 14, 2001 refiling deadline only to motions previously withdrawn. This Court has twice considered and ruled on Defendant's Second Motion for Summary Judgment, first on August 2, 2001 [Dkt. No. 134] and again on October 18, 2001 [Dkt. No. 146]. Defendant's Renewal of and Supplementation to Second Motion for Summary Judgment simply repackages Defendant's all of previous motions together with Julie Cox's deposition testimony, which allegedly shows that Julie Cox recanted some of her affidavit testimony previously provided to Plaintiffs.  If Defendant felt the Court committed an error or that any matter merited reconsideration, Defendant should follow the rules to move the Court to reconsider those points, and those points only.  It is improper and inefficient for the Defendant to reargue what had already been carefully considered by the Court.  Moreover, this Renewal of and Supplementation to Defendant's Second Motion for Summary Judgement would remain improper even if it were considered to be a motion for reconsideration.  In *Above the Belt v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983), the court held that a motion for reconsideration was improper when it was used "to ask the Court to rethink what it had already thought through--rightly or wrongly." In *Johnson v. Tp. Of Bensalem,* 609 F.Supp. 1340, 1342 n. 1 (E. D. Pa. 1985), the court held that each step of the litigation should build upon the last, and the parties should not be permitted to reargue previous rulings made in the case.

5

**B.      Renewal of and Supplementation to Second Motion for Summary Judgment is Improper to be Considered in the Summary Judgment Proceeding**

The Renewal of and Supplementation to Defendant's Second Motion for Summary Judgment filed on December 14, 2001 is too late to be considered.

Based on Defendant's Response to Plaintiffs' Reconsideration [Dkt. No. 141], it is clear that Defendant knew that it was critically important for it to verify the truthfulness of Ms. Cox's affidavit testimony no later than August 29, 2001 because on that day Defendant filed its response and objected to Ms. Cox's affidavit on the ground that "[s]he does not affirmatively show that she has personal knowledge and is competent to testify about: (a) which AR-15 Ernest Moore used in the shootings; and (b) which AR-15 Ernest Moore had used on prior occasions." This Court did not rule on Plaintiffs' motion for reconsideration until October 18, 2001. Defendant had sufficient time to obtain contradicting evidence before the Court's ruling. However, Defendant did not take action. Now, within two months of set trial date, Defendant filed the motion to further delay adjudfication of the case.

It is within this Court's discretion to not consider Cox's recanted testimony as set forth in Defendant's Renewal of and Supplementation to Second Motion for Summary Judgment at this time. In *Bernhardt v. Richardson-Merrell, Inc.*, 892 F.2d 440, 443 (5th Cir. 1990), the Fifth Circuit Court held that the district court did not abuse its discretion in excluding, on timeliness grounds, affidavit, which was first filed after the district court initially issued a ruling on summary judgment motion.

More importantly, Ms. Cox's deposition testimony supports this Court's denial of Defendant's Motion for Summary Judgment, not Defendant's argument that Ernest's favorite rifle was his own AR-15 (the privately owned one), not the HPD rifle. Cox's testimony reveals

that she knew only the HPD rifle, not the rifle purchased from Captain Vasquez as discussed in Section C below. Ms. Cox's deposition goes on to create a timeline that further clarifies any conflicting testimony. However, even apparent conflicts create an issue of fact, and on a motion for summary judgment, the district court is not to make credibility determinations or weigh evidence, but must consider facts in light most favorable to plaintiffs. *Adams v. Metiva*, 31 F.3d 375, 384 (6th Cir. 1994). To the extent that there is a conflict in a witness's testimony, such a conflict affects the weight of the testimony, not its admissibility. *See, e.g., United States v. Rodriguez*, 968 F.2d 130, 143 (2nd Cir. 1992, cert. Denied, 506 U.S. 847). The weighing of the evidence is a matter for the trier of fact. *Palazzo v. Corio*, 232 F.3d 38, 44 (2nd Cir. 2000).

In the renewed motion, Defendant cited *Santos v. Murdock*, 243 F.3d 681 (2nd Cir. 2001) to argue that a prior inconsistent affidavit could not be admissible for its substance and that "there is no longer any substantive evidence admissible at trial to support Plaintiffs' theory." (at pages 8 and 10). Such argument is without merit. In the present case, Plaintiffs do find substantive evidence in Ms. Cox's deposition to support the Court's Denial of Defendant's Motion for Summary Judgment and Plaintiffs' theory as set forth in Section C below.

Therefore, this Court should deny Defendant's Renewal of and Supplementation to Second Motion for Summary Judgment.

## C.   JULIE COX'S DEPOSITION TESTIMONY SUPPORTS THE COURT'S DENIAL OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In Defendant's Renewal of and Supplementation to Defendant's Second Motion for Summary Judgment, Defendant argued

> Assuming *McClendon* is affirmed, the summary judgment evidence shows that none of the "state created" danger elements exist in the tragic case. First, the court concluded Ms. Cox's affidavits were "some evidence" to satisfy these elements because they showed Ernest Moore may have deliberately picked the HPD rifle. (DKt # 146, p.10-11). Ms. Cox now states that her earlier affidavits (Dkt. #141, 145) were inacurate and that her

inspection of photos of both AR-15 rifles (the HPD rifle and Ernest's) show that Ernest's favorite rifle was *his own AR-15* (the privately owned one), *not* the HPD rifle.

Defendant's argument is not supported by Ms. Cox's own deposition testimony. On the contrary, there is evidence in Ms. Cox's deposition testimony which can be substituted for the affidavits to support this Court's conclusion that "the affidavit, as newly discovered evidence, is grounds for vacating the summary judgment in that it creates a material issue of fact on whether the City created an opportunity that otherwise would not have existed for Ernest Moore to go on a shooting spree." (DKt. No. 146, p.12).

Defendant states that Ms. Cox testified that the AR-15 rifle which was Ernest's favorite and was shot in her presence was the one his father purchased for Ernest[1] (Exh. A, 86-13 to 87-12; 39-13 to 16). However, Ms. Cox's deposition testimony has revealed that the AR-15 to which she referred in the deposition is the one owned by HPD[2], not the one purchased from Captain Vasquez.

The Colt AR-15 (identified in Cox's deposition as No. 2) was purchased by R. D. Moore from Captain Vasquez on June 9, 1998. (Exh. B, 49-12 to 20, last two pages of Exhibit 7). Ms. Cox moved out of Det. Moore's house about one week prior to the shooting on July 7, 1998. (Exh. A, 99-14 to 22). Ms. Cox testified that she did not see Ernest shooting rifles while she was out at the Morin house. (Exh. A, 100-20 to 24). This limits the time period in which Ms. Cox could have seen Ernest practicing the Colt AR-15 to the three week period beginning with Ernest's father's purchase of the rifle from Captain Vasquez on June 9, 1998 and her departure from the Moore's house around June 30, 1998. However, Ms. Cox's deposition testimony revealed that during this period of time Ernest did not practice shooting. More importantly, Ms. Cox testified that on a few occassions Ernest brought an AR-15 out of his father's house and shot

---

[1]    This AR-15 is Colt and identified in Ms. Cox's deposition as No. 2.
[2]    This AR-15 is Olympic Arms and identified in Ms. Cox's deposition as No. 1.

it around the time they began dating in 1997, and that the shooting of AR-15 was before Ernest

began visiting Ms. Cox's father's target range.  (Exh. A, 125-4 to 12; 128-8 to 19; and 129-3 to

9).  Significantly, Ms. Cox testified that Ernest had not been in her father's range more than one

month before the July 7, 1998 shooting (and thus prior to the purchase of the Colt AR-15 from

Captain Vasquez):

> **Q:**  Okay. Did you ever talk with your dad about trying to pinpoint in time when it was that Ernest had been out to your parents' house shooting?
>
> **A:**  With my mom, not my dad.  I don't – we never – I don't even remember if we even met then, I don't remember.
>
> **Q:**  Okay, and did your mom tell you that she thought that Ernest had been out there just a week before the shooting?
>
> **A:**  <u>No, god no, it wasn't a week; I know that for sure.  I know he hadn't been out there in a long time.</u>
>
> **Q:**  I mean it had been more than a month.
>
> **A:**  <u>Yeah, before, yeah.</u>
>
> **Q:**  And when you're saying "Yeah," what do you mean by that?
>
> **A:**  <u>It had been more than a month or so.</u>

(Exh. A, 131-29 to 132-10).  (Emphasis added).  Ms. Cox also testified that Ernest shot an AR-

15 in the beginning of their dating in 1997:

> **Q:**  And were there other occassions that you saw Ernest shoot rifles other than out back at your parent's house?
>
> **A:**  And to in front of his house.
>
> **Q:**  Okay, and would he set up a target and shoot or just like shoot at a tree?
>
> **A:**  Yeah, he'd shoot at a tree, a beer can or something, yeah.
>
> **Q:**  And you'd seen him do that also?

**A:** Yes.

**Q:** And had you seen him do it with an assault rifle?

**A:** Yes.

**Q:** Had you seen him do it with the AK-47?

**A:** Not with the AK-47 in front of his house, that was at my parents' house. <u>The AR-15, he used that in front of the house, I'd seen him do that.</u>

**Q:** Okay, when he got the rifle to shoot in front of his house, was it in his house when he went to get it or did he get it out of his truck, or what do you remember on that?

**A:** He got it out of his house, he'd just got it, yeah.

**Q:** Oka, and was it after this point in time that he would go out to your parents' house to practice?

**A:** <u>No, he had not been there, this was like in the beginning sort of when we started going out, dating.</u>

**Q:** When he would practice at your parents' house?

**A:** Yes.

**Q:** Okay, so when you practiced at your parents' house was before he shot out in front of his house.

**A:** Excuse me, sir.

**Q:** Okay, I'm trying to pinpoint in time. He practiced out at your dad's range, right?

**A:** Yes.

**Q:** Was that before you saw him practice in front of his parents' house?

**A:** No, he did his parents' house before too.

**Q:** So it kind of went back and forth on that.

**A:** Yeah, but it wasn't – yeah, but he only went like a couple of times at my days, anyways, so he did it more at his place.

10

(Exh. A, 127-18 to 129-5).  (Emphasis added).  Ms. Cox testified that she and Ernest started their dating in October of 1997 ( Exh. A, 16-16 to 19) and moved in Ernest's house in November of 1997 (Exh. A, 15-18 to 20).  Their dating is far away from the time Det. Moore purchased the Colt AR-15 from Captain Vasquez.

Ms. Cox's  testimony reveals that Ernest showed an AR-15 to Ms. Cox and shot on an AR-15 in her presence.  Both the shooting and showing took place not only before the Colt AR-15 was purchased from Captain Vasquez  but before it was ever in Det. Moore's house.  Ms. Cox testified that she knew only one AR-15 which was from HPD at the time she was with Ernest (Exh. A, 91-23 to 24).  Ms. Cox also testified that the AR-15 she knew was purchased from HPD (Exh. A, 51-7 to 11) and she and her mother thought the AR-15 from HPD was illegal (Exh. A, 51-19 to 20).  Such testimony further supports the fact that the AR-15 she witnessed Ernest shooting was the one that came from HPD, not the one purchased from Captain Vasquez.  Even if the timeline allowed Ernest to show Ms. Cox the AR-15 puchased from Captain Vasquez, Ms. Cox would not have obtained the thought of illegality and purchasing from the HPD because Ernest would have had no reason to mention the legality of the rifle and HPD.

Ms. Cox's answers quoted above truly reflect Ms. Cox's recollection at the time she gave affidavits on August 15 and September 6, 2001.  These recollections provided true and accurate testimony that the AR-15 she saw Ernest practicing and carrying was HPD's, not the one R.D. Moore purchased from Captain Vasquez. (Exh. A, 117-18 to 119-18).  Such timely recollections are preferable because they provide answers that are direct and positive without being led.  Ms. Cox's confusion of which rifle she knew was caused by her mother.  (Exh. A, 41-10 to 11; 42-6 to 10; 43-7 to 19; 67-25 to 68-8; 129-14 to 130-20; 131-20 to 25).

In Ms. Cox's deposition, Defendant's attorney did not question Ms. Cox's testimony that

Ernest had a gun bag in his pickup with an AR-15 inside. (Exh. A, 81-3 to 88-25). The events of the day of the tragic shooting corroborate the undisputed testimony. The HPD's AR-15 had been carried in the gun bag and was not randomly selected from the gun cabinet that day. There is no evidence as Defendant's would allege that Ernest Moore took the AR-15 from the gun safe on the morning of July 7, 1998.

It is within a judge's discretion to believe or disbelieve testimony or overall credibility of a witness; and a conflicting statement does not require the judge to disbelieve everything the witness says. *Piraino v. International Orientation Resources, Inc.*, 137 F.3d 987, 991 (7th Cir. 1998). In the totality of Cox's testimony, it shows that the AR-15 which Ms. Cox was familiar was the one from HPD, not the one purchased from Captain Vasquez. This comes from answers that are direct, that are positive, and that have not been led. Accordingly, this Court should deny Defendant's Renewal of and Supplementation to Second Motion for Summary Judgment.

**D.   DEFENDANT'S ARGUMENT OF NO EVIDENCE TO SUPPORT STATE LAW CLAIMS IS WITHOUT MERIT**

Defendant argues that "[t]he Plaintiffs' state law claims rely, in large part, on negligent entrustment. In this case, there was no deliberate entrustment of the rifle by Det. Moore to his son." This argument is without merit because the issues raised by Defendant have been addressed by this Court at pages 22 to 24 of the Order of March 31, 2000 [Dkt. No. 43]. Moreover, the assault rifle, under any circumstances, should not have been available for anything less than official use by appropriate personnel. (Exhibit C, 69-16 to 70-6). Instead, Det. Moore made the rifle easily accessible to his son, Ernest Moore, by placing the rifle in the gun cabinet co-owned by him and his son and kept in his son's bedroom. (Exh. D, 87-25 to 88-2). Ernest had a key to the gun cabinet. (Exh. D, 50-20 to 51-8). Det. Moore permitted his son, Ernest, to use the rifle for target practice. (Exh. D, 142-18 to 19). Ms. Cox testified that Ernest practiced with the rifle a couple of times. ( Exh. A, 125-4 to 12; 128-8 to 19; 129-3 to 9). Ernest not only acquired, but became proficient   in   the   use   of   the   AR-15   semi-automatic   assault   rifle   he   used   to

12

commit the crime, through the illegal and negligent acts and practices of Chief Jim Scheopner and Detective R. D. Moore.

## IV. PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiffs pray that this Honorable Court deny Renewal of and Supplementation to Defendant's Second Motion for Summary Judgment. And grant any and all further relief that justice required.

Respectfully submitted,

**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, TX  78701
512+474-6061
512+474-7005 (fax)

By

Broadus A. Spivey
State Bar No. 00000076
Federal I.D. No. 11146
Price Ainsworth
State Bar No. 00950300
Federal I.D. No. 8065
Francis Pan
State Bar No. 15443300
Federal I.D. No. 26385

Richard Pena
Law Offices of Richard Pena, P.C.
Barton Oaks Plaza Two
901 MoPac, Suite 325
Austin, Texas 7746-5747
512+327-6884
512+327-8354 (fax)

**ATTORNEYS–IN-CHARGE FOR PLAINTIFFS**
**ARTURO G. SALINAS, ET AL and GILBERTO M.**
**RODRIGUEZ, ET AL**

13

**LAW OFFICES OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, TX 78539
956+383-7441
956+381-0825 (Fax)

By _____
Ramon Garcia
State Bar No. 07641800
Federal I.D. No. 3936
Sonia I. Lopez
State Bar No. 24003862
Federal I.D. No. 23501

**ATTORNEYS-IN-CHARGE FOR PLAINTIFF
RUAL RODRIGUEZ**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the above and foregoing document was forwarded on _January 2_ , 2001, to counsel of record for Defendant via facsimile and U.S. mail:

      Mr. Tom Lockhart
      Mr. Jim Denison
      Mr. Roger W. Hughes
      ADAMS & GRAHAM, L.L.P.
      222 E. Van Buren, West Tower
      Harlingen, Texas 78551-1429
      ATTORNEYS-IN-CHARGE FOR
      DEFENDANT CITY OF HARLINGEN

_____
Broadus A. Spivey

3163P.050

14

# CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | * | |
| VS. | * | CIVIL ACTION B-98-162 |
| CITY OF HARLINGEN | * | |
| | * | |
| and | * | |
| | * | |
| GILBERTO M. RODRIGUEZ, ET AL | * | |
| VS. | * | CIVIL ACTION B-98-162 |
| CITY OF HARLINGEN | * | |
| | * | |
| and | * | |
| | * | |
| RAUL RODRIGUEZ | * | |
| VS. | * | CIVIL ACTION B-98-162 |
| CITY OF HARLINGEN | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
JULIE LYNN COX
DECEMBER 12, 2001

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of JULIE LYNN COX
produced as a witness at the instance of the Plaintiffs
and duly sworn, was taken in the above-styled and
numbered cause on the 12th day of December, 2001, from
10:29 p.m. to 1:35 p.m., before JUDITH HENNIGH, CSR in
and for the State of Texas, reported by oral stenography
at the offices of Ramon Garcia, Edinburg, Texas,
pursuant to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.

=========================================================
HENNIGH-QUIN COURT REPORTERS
Box 3036, Edinburg, Texas 78540
(956) 383-8887 / Fax 380-2050
Toll Free (800) 892-6305
=========================================================

CERTIFIED COPY

## HENNIGH-QUIN COURT REPORTERS
### CERTIFIED SHORTHAND REPORTERS

1    A    Repeat your question.

2    Q    The incident in question occurred on July 7th of

3  1998.  Do you recall living with Ernest Moore on

4  December of 1997?  That would have been around

5  Christmastime.

6    A    Yeah, because I only spent one Christmas with

7  him, and I do remember going to his aunt's house and i

8  was living there.

9    Q    Okay, so in December of 1997 you were living

10  with Ernest?

11    A    Uh-huh.

12    Q    Okay.  How long before then do you recall living

13  with him, do you --

14    A    I don't recall, I'm sorry, I don't recall.

15    Q    Okay, do you remember living with Ernest Moore

16  during Thanksgiving?

17    A    Yeah, I remember Thanksgiving too.

18    Q    Okay, so we can at least say that on November of

19  1997 you were living with Ernest Moore.

20    A    Yes.

21    Q    And I guess I'm going through holidays because

22  that's usually the only way that people can remember.

23    A    It's the only time I remember, exactly, you're

24  right.

25    Q    Do you remember living with Ernest Moore on

**HENNIGH-QUIN COURT REPORTERS**
CERTIFIED SHORTHAND REPORTERS

1  Halloween?

2      A    No.  I don't remember Halloween.

3      Q    So we can at least say that in November of 1997.

4      A    Yeah.

5      Q    And how many months prior to that, if any, had

6  you been dating Ernest before you moved in to live with

7  him?

8      A    Before I moved in?  It wasn't that long, it was

9  maybe a month or so.

10     Q    If we say that you were living with Ernest in

11 November of 1997, that's your best recollection.

12     A    Uh-huh.

13     Q    In the one month before then you had been seeing

14 him, but not living with him.

15     A    Yeah.

16     Q    We can at least go back to October of 1997 and

17 say that you do at least recall beginning your

18 relationship --

19     A    Yes, because I remember spending nights, because

20 I remember my birthday is in October, and I remember for

21 my -- it was my 20th birthday, I believe, I wasn't

22 living with him then, but I was seeing him and I did

23 spend a couple of nights there.

24     Q    Okay, do you have any recollection prior to

25 October of dating Ernest Moore?

**HENNIGH-QUIN COURT REPORTERS**
**CERTIFIED SHORTHAND REPORTERS**

1    Q    (Ms. Lopez) Other than the AR-15 that you're

2  mentioning, was there any other gun that he shot after

3  you moved in with him?

4    A    See, that's -- there's two different guns I

5  didn't know.  Can I say this, I don't know.

6    Q    Yes, go ahead.

7    A    Okay, I can say what I --

8    Q    Yes.

9    A    Can I look at it too, this is all right to do

10  this, right?

11    Q    That's all right.

12    A    Now this one was number 1, I don't remember this

13  one, but this one is the one that he had purchased.

14  This is the one that he had shot.  He shot this in front

15  of his house, and this is the one that I remember him

16  shooting.  He did have this one, but I don't remember

17  him shooting it, you know.

18          MR. LOCKHART:  Would you just identify for

19  the record because they have numbers and your signature

20  is on them, which is which.  Just for the record,

21  because you're saying this one and this one --

22          WITNESS:  But they're both AR-15s.

23          MS. LOPEZ:  Let me go ahead and do this,

24  Tom.

25          MR. LOCKHART:  No, I understand, but

**HENNIGH-QUIN COURT REPORTERS**
CERTIFIED SHORTHAND REPORTERS

1  gun range; is that correct?

2      A    See, that's what was wrong, because when I was

3  thinking about it I talked to my mother, and my parents

4  didn't want him bringing that over, so then I was

5  thinking, I don't think he ever took it, because I was

6  talking to my mom and my mom was telling me, she was

7  like "Remember, we didn't want him taking it."  And I

8  was like okay, so maybe he didn't take it with him.

9      Q    But do you know whether he did or he did not?

10     A    I don't remember.  See, my mom confused me when

11 she told me that.  She remembers more than I do.

12     Q    Do you remember when that was, when you took it

13 to your parents?

14     A    No, I don't.

15     Q    Would it have been --

16     A    I don't.

17     Q    Would it have been -- let's use holidays for

18 reference points.  Would it have been in December of

19 '97, Christmastime?

20     A    I don't remember, it's all a blur, it really,

21 really is.  I can't remember.

22     Q    Could it have been around Valentine's?

23     A    I don't remember that either.

24     Q    Do you know how many months prior to the

25 incident in question that took place?

## HENNIGH-QUIN COURT REPORTERS
### CERTIFIED SHORTHAND REPORTERS

1          MR. LOCKHART:  I'm sorry, what took place?

2     Q    (Ms. Lopez) That Ernest came to your father's

3  gun range to shoot, as what you said your recollection

4  initially was that he shot an AR-15 at your father's gun

5  range.

6     A    Yeah, but see when my mom was telling me that he

7  didn't take it with him, because I remember that they

8  didn't want him having it because he wasn't supposed to

9  take it with him, you know.  He didn't -- I don't

10 remember, I really don't remember.

11    Q    Okay.

12    A    So I really can't say anything.

13    Q    Could it have been several months before the

14 incident in question.

15         MR. LOCKHART:  I'm going to object, you're

16 badgering the witness now.

17    A    I can't, I don't remember, I'm not going to say

18 something I don't remember, I can't, this is really --

19 sorry.

20    Q    (Ms. Lopez) It's okay.  Do you recall him

21 shooting at your father's gun range?

22    A    Yes, but it's not the AR-15.  It's an AK-47 he

23 did shoot there.

24    Q    Okay, do you know whether he shot an AR-15?

25    A    At my dad's gun range?

**HENNIGH-QUIN COURT REPORTERS**
**CERTIFIED SHORTHAND REPORTERS**

1    Q    Yes.

2    A    No, because my parents didn't want him to take

3  it.

4    Q    But why did they -- was is your prior testimony

5  in your affidavit that he took an AR-15 to your father's

6  gun range?

7    A    That's what I thought, though I couldn't

8  remember, and then my mom, she told me about that, and I

9  started thinking about it, because remember, it's been

10  three years or more, and you don't want to remember

11  something like that, so I don't know.

12    Q    Am I correct in stating that you don't -- that

13  your testimony that you gave initially about the AR-15

14  being shot at your father's gun range, that is what you

15  recalled at that time; is that correct?

16    A    Yeah, that's what I recalled, but then when I

17  talked to my mother I was thinking about it and my mom

18  was like no, because they didn't want him having it out

19  there.

20    Q    Okay, now after talking to your mom you're not

21  sure, am I correct in stating that, that you're not

22  sure --

23    A    No, I'm sure, I am more sure of him not taking

24  it than I am of him taking there and shooting it, you

25  know.

**HENNIGH-QUIN COURT REPORTERS**
**CERTIFIED SHORTHAND REPORTERS**

1    A    No, there was no gun that belonged to the City

2  of Harlingen.

3    Q    Okay.  No one, you had never heard anyone

4  mention that a particular gun belonged to the City of

5  Harlingen?

6    A    Bought from, but not belonged to.

7    Q    Okay, was it your understanding that Cox number

8  2 was bought from the City of Harlingen or from the

9  police department?

10    A    Yes, it was bought from the City of Harlingen

11  Police Department.

12    Q    How do you know that?

13    A    Because Ernie and R.D. -- well, R.D. had been

14  talking about it with Ernie and Ernie told me.  I don't

15  know why, you know he told me, he showed it to me when

16  he first got it.

17    Q    Is that why you recall something about purchase,

18  that the gun was illegal?

19    A    Yes.  Illegal, no, that was my mom's

20  interpretation and mine, it had nothing to do with that.

21    Q    Interpretation from what?

22    A    Give me a minute here to gather my thoughts.

23  Repeat your question, I'm sorry.

24    Q    Okay.  Earlier in your testimony you stated that

25  there was some mention that the gun was illegal.

67

1    A    Once or twice, I'm going to say twice, two

2  times.

3    Q    Okay.  I just want to make sure it was your

4  testimony in the affidavit that you previously provided

5  that he shot an AR-15 at your father's gun range; that

6  was your testimony?

7    A    Yeah, I thought that.

8    Q    That was your testimony.

9    A    Yeah.

10          MR. LOCKHART:  You're talking about her

11  affidavit she gave to you?

12          MS. LOPEZ:  Yes.

13    Q    (Ms. Lopez) And again, when I mentioned that was

14  your testimony, I'm talking about that's what you wrote.

15    A    Yes.

16    Q    And let me just for purposes of the record let

17  me go ahead and mark that as well.

18          (Exhibits 6 and 7 marked).

19    Q    It's Cox exhibit number 6, and then let me show

20  you Cox exhibit number 7.

21    A    (Witness examines documents).

22    Q    And then let me show this one marked as Cox

23  exhibit number 7.

24    A    (Witness examines document).

25    Q    And it was your testimony on what's been marked

**HENNIGH-QUIN COURT REPORTERS**
**CERTIFIED SHORTHAND REPORTERS**

1  as -- your testimony, I mean this is what you testified

2  to in your affidavit on Cox exhibit number 6, where I

3  begin to read "He liked that gun and had in my presence

4  shot the gun in front of his house and at my father's

5  gun range."  Is that correct?

6      A    Yeah, I did say that then, but when I started

7  talking to my mom, I don't think he ever took that gun

8  there.

9      Q    Okay, on Cox exhibit number 7, again on the last

10 paragraph it says "Ernest Moore liked that gun and had

11 in my presence shot the gun in front of his house and at

12 my father's gun range."

13     A    Yeah.

14     Q    Okay.

15     A    He did shoot in front of his house, though.

16     Q    Okay.  And again, the only photograph of the gun

17 that I showed you was Cox exhibit number 1?

18     A    Yes, ma'am, yeah.

19     Q    Now on the morning of July 7th of 1998, as I was

20 stating earlier, it was Patsy Moore's testimony that

21 someone had called --

22     A    Yes.

23     Q    -- that morning.

24     A    Yes.

25     Q    How did you know that?

## HENNIGH-QUIN COURT REPORTERS
### CERTIFIED SHORTHAND REPORTERS

1          MS. LOPEZ:  I have no further questions,

2   I'm going to go ahead and pass to Tom at this time.

3   BY MR. LOCKHART:

4      Q    Julie, may I call you Julie?

5      A    Yes.

6      Q    I'm Tom Lockhart, I represent the City of

7   Harlingen.  We just met today.

8      A    Uh-huh.

9      Q    I'm going to ask you to do the same thing.

10  Uh-huhs are kind of hard, okay.

11     A    Yes, I know, I'm sorry.

12     Q    I'm going to be real short.  First of all, you

13  have been asked about people contacting you,

14  investigators contacting you.  Your first contact after

15  this incident, and I think it's occurred in the last few

16  months.

17     A    Yes.

18     Q    Did you talk with Sonia Lopez of Ramon Garcia's

19  office the first contact, or was it somebody else?

20     A    I had just given her statements, but I had

21  talked to somebody, the other gentleman that works

22  there.

23     Q    Okay, who initiated the contact?  Did you call

24  Ramon Garcia's office or Sonia Lopez, or did somebody

25  from Sonia Lopez call you?

1    A    Well, they had been trying to get in contact

2  with me, and I thought I could help do something for

3  them, so I called them back.

4    Q    Okay, when did they call you, when did they call

5  to you that you knew they were looking for you?

6    A    When did they call me?

7    Q    Yeah.

8    A    I'm not sure, like what date?

9    Q    Yeah, what I'm trying to understand is, you came

10  in here and were interviewed by Sonia Lopez.

11    A    Yes.

12    Q    And before that how long had it been when you

13  knew that they were trying to contact you?

14    A    Maybe like a month or so.  It wasn't too long.

15    Q    And then did they actually call and talk to you,

16  or did you call here and talk to somebody?

17    A    No, I talked to someone.

18    Q    You called here?

19    A    Yes.

20    Q    And do you remember who you talked to?

21    A    No.

22    Q    And did they ask you to come in here to their

23  offices?

24    A    Yes, yes.

25    Q    And you did come in?

1    A    Yes.

2    Q    And you described some of your visit with Ms.

3 Lopez, right?

4    A    Yes.

5    Q    Before you visited with Ms. Lopez, first of all,

6 where were you here in the office?  Was it here in this

7 room or another room?

8    A    Another room.

9    Q    Okay.  When you first went in there was anybody

10 with you?

11   A    No.

12   Q    Was there anything in there for you to look at?

13   A    Yes.

14   Q    What was in there?

15   A    There was some pictures and, you know, some gun

16 pictures and some other stuff.

17   Q    What other stuff?

18   A    Autopsy photos that I has seen.

19   Q    Autopsy photos of Ernest?

20   A    Yes, and Delia.

21   Q    Did that upset you?

22   A    Oh, very much so.

23   Q    How long were you there with the pictures before

24 somebody came in to talk to you?

25   A    I wasn't alone with them.

## HENNIGH-QUIN COURT REPORTERS
### CERTIFIED SHORTHAND REPORTERS

1     Q     Who was with you?

2     A     Sonia Lopez.

3     Q     Okay.  Okay, fair enough.  Anybody else?

4     A     No.

5     Q     And then do you remember how many pictures you

6     were shown altogether?

7     A     A stack of them about that big (indicating).

8     Different pictures, different things.

9     Q     All right, now you've shown us a stack about --

10    A     It was a paper, a stack, it was quite a few.

11    Q     All right, but as I understand it, the only

12    photograph of an AR-15 that was shown to you while you

13    were here with Ms. Lopez was the one that's been

14    identified as Cox exhibit number 1.

15    A     Yes.

16    Q     Okay, you were not shown Cox exhibit number 2?

17    A     No.

18    Q     Now while you were here did you tell Ms. Lopez

19    that the gun that Ernest liked and the gun that you had

20    seen him shooting, the AR-15 --

21    A     Yes.

22    Q     -- was the gun that his dad had just purchased

23    for him?

24    A     Yes.

25    Q     And you told her that day when she was

1  interviewing you?

2      A    Yes.

3      Q    Okay.  And has that always been your

4  recollection?

5      A    Yes.

6      Q    Now when the two affidavits were brought to you

7  by the investigators, where was that, where did you sign

8  the affidavits from Sonia Lopez's office?

9      A    In front of my sister's place.

10     Q    Where is that?

11     A    It's in Alamo, it's right by where I live.

12     Q    Was it outside?

13     A    Yes, it was outside.

14     Q    Did they call and tell you they were bringing

15  the affidavit by?

16     A    No, I could tell they had been waiting for me -

17  there, and I had signed one at my apartment as well.

18     Q    All right.  And the affidavit that you gave

19  that's been marked at exhibit number 4, when you talked

20  with Mr. Reyna --

21     A    Yes.

22     Q    Where did that interview take place?

23     A    In my house.

24     Q    And who was present in addition to you?

25     A    It was my mother.

1    Q    Let me just ask you to compare between the

2  circumstances of that interview by Mr. Reyna in your

3  house with your mother as compared to the interview here

4  with Ms. Lopez.

5    A    Yes.

6    Q    And I'm not casting any aspersions at Ms. Lopez,

7  she's a good lawyer, but of the two interviews, which

8  one were you most comfortable with?

9    A    The one with my mother.

10    Q    And did you feel like Mr. Reyna was fair with

11  you and took his time with you?

12    A    Yes, yes, of course he was.

13    Q    Okay, and as a result of that interview, you

14  signed the affidavit that's been marked exhibit number

15  4, correct?

16    A    Yes.

17    Q    All right, and if you were called upon to

18  testify at the trial of this case --

19    A    Yes.

20    Q    -- would you testify to the contents of your

21  exhibit number 4, the affidavit that you gave to Mr.

22  Reyna on November 29th this year?

23    A    Yes.

24    Q    Because that's true and accurate, correct?

25    A    Yes, sir.

1    Q   And if you were called upon to testify at the

2  trial of this case about which was Ernest's favorite gun

3  and the one that you saw him practicing with and the one

4  that he liked, would you identify for the jury your

5  exhibit number 2?

6    A   Yes.

7    Q   Which was first shown to you when Mr. Reyna met

8  with you at your house.

9    A   Yes.

10    Q   And that was the first time that you were able

11  to compare exhibits one and two?

12    A   Yes.

13    Q   And after comparing them, you're clear and

14  you're sure that the gun that Ernest liked and that he

15  used was the one his dad had purchased for him and that

16  has been marked exhibit number 2?

17            MS. LOPEZ:  Objection, form.

18    Q   (Mr. Lockhart) Now if you were called to testify

19  at the trial of this case in front of a jury, Ms. Cox --

20  I'll call you Julie.  Tell us which gun that Ernest

21  liked and that he shot in your presence, which one in

22  the photographs?

23    A   Number 2.

24    Q   All right, and if you were called to testify

25  about which gun he liked, is that the gun that he showed

1  you, came out of the garage and showed you and said his

2  dad had just bought him?

3      A    Yes.

4      Q    And if you were called to testify at trial in

5  front of a jury, is that gun that he liked and he used

6  the gun that he told you that he had paid for with his

7  own money?

8      A    Yes.

9      Q    And is that the gun, if you were called to

10 testify about the AR-15 that Ernest Moore liked and shot

11 in your presence, is that the gun that had just been

12 purchased for him by his father within a month of these

13 shootings?

14     A    Yes.

15     Q    I apologize if I asked this.  Julie, how did you

16 know that Sonia Lopez's office was looking for you, how

17 did you learn that?

18     A    They kept on leaving me notes inside my mail

19 slot and they talked to my neighbor and gave me like

20 little cards and they'd write things.  But I had never

21 did anything till I started thinking -- my mom suggested

22 that I should call them, maybe I could help or

23 something, you know.

24          MR. LOCKHART:  I'll pass the witness, thank

25 you again.

**HENNIGH-QUIN COURT REPORTERS**
CERTIFIED SHORTHAND REPORTERS

1      A      It was about an hour, yes.

2      Q      Was I fair with you?

3      A      Yes.

4      Q      Okay.  With respect to the issue of the gun that

5  R.D. had purchased for Ernest Moore, am I correct in

6  stating that it's your testimony that you indicated to

7  me that the gun that Ernest liked was the one that his

8  dad had purchased for him.

9      A      Yes.

10      Q      Do you recall ever stating that it was the gun

11  that his dad had "just" purchased?

12      A      Yes, the one he -- well, there was only one that

13  he did purchase, so yeah.

14      Q      But did you know that at that time, how many

15  guns or --

16      A      I didn't know there was two AR-15s.

17      Q      Okay, and did you know at that time which guns

18  R.D. had purchased and which ones he had not purchased?

19      A      No.

20      Q      Did you know at that time which guns that were

21  in the gun safe R.D. Moore purchased and which ones he

22  hadn't purchased?

23      A      Just the one from the police station is the only

24  one I knew about, which is number 2.

25      Q      But you didn't know that -- back on July 7th of

1    A    Almost, yes.

2    Q    Okay, and as I understand it, and I don't need

3 to know the intimate details, but there was some period

4 where you and Ernest had a parting of the ways and you

5 actually moved out of the house; is that right?

6    A    Yes.

7    Q    And that was for a month or so before this

8 shooting, wasn't it?

9    A    No, it was a week, week at the most, yes, that I

10 remember.

11    Q    There was some time period where you started

12 dating Mr. Morin; is that right?

13    A    Yes.

14    Q    And basically moved into his house.

15    A    Yes.

16    Q    Or his parents' home.

17    A    Yes.

18    Q    And that would have been how long before the

19 shooting that you moved into his home?

20    A    A week.

21    Q    A week?

22    A    Yes.

23    Q    And then shortly before this event, like on the

24 July the 4th or holiday or something like that you and

25 Ernest went out again, like for the 4th of July or

1  something.

2      A    Yes.

3      Q    And I'm piecing together from different depos.

4  If your memory is more accurate than that, tell me,

5  but -- so you moved out a week or so before the

6  incident?

7      A    Yes, yes.

8      Q    Okay, and if the accident happens on July 7th.

9      A    Yes.

10     Q    Then you go out with him on July the 4th or

11 something.

12     A    Yes.

13     Q    So were you just living at Mr. Morin's house for

14 three days before you went back out with Ernest?

15     A    It was a short period, it was a short period.

16     Q    Okay.  But I mean if it was three days or four

17 days or five days, do you have a specific recollection

18 as you sit here?

19     A    Specific, no.

20     Q    Okay, so I take it, anyway, during that time

21 period while you were out at the Morin house you

22 wouldn't have seen Ernest practicing with a weapon or

23 anything during that time period, right?

24     A    No, not then.

25     Q    Okay.  And I guess if we go backwards in time

1   Q    And do you have a copy of that affidavit in

2 front of you, I think it's the short one.

3   A    Yes, here it is.

4   Q    And what's the exhibit number on that one.

5   A    There's two of them, though.

6   Q    Okay, is there one with your signature on it?

7   A    Yes, both of them, yes.

8   Q    Okay, and what are the exhibit numbers on those

9 affidavits?

10   A    Number 6 and number 7, one on September 6th and

11 one on August 15th.

12   Q    Okay, now the one on September the 6th, is that

13 marked as exhibit number 6?

14   A    Number 7.

15   Q    Okay.  Now when you completed that affidavit on

16 August the 15th of 2001, exhibit number 7.

17   A    Yes.

18   Q    Did you feel like it was true and accurate?

19   A    Then at the time, yes.

20   Q    Okay, and then a subsequent affidavit was signed

21 by you on September the 6th; is that right?

22   A    Yes, sir.

23   Q    And we've marked that as exhibit number 7 today;

24 is that right?

25   A    Yes.

**HENNIGH-QUIN COURT REPORTERS**
**CERTIFIED SHORTHAND REPORTERS**

1      Q    And at the time -- did you sign that affidavit

2   on that separate day?

3      A    Separate, yes, it was -- yeah, it was a week or

4   two after.

5      Q    And on that day did you feel like the testimony

6   that you were giving in that affidavit was true and

7   accurate?

8      A    Yes, at the time, yes.

9      Q    Okay.  Now when you signed exhibits 6 and 7, the

10  affidavits of August 15th and September 6th, I reversed

11  those -- no, that's right.  August 15th and September

12  6th, respectively, did you have the opportunity to see

13  an inventory of the various rifles that had been taken

14  from the Moore household?

15     A    Yes.

16     Q    Okay, and if those show multiple rifles and

17  various AR-15s and that kind of thing, they would have

18  been on that list, whatever was on the list?

19     A    Yes.

20     Q    Is it a fair reading of your affidavits that

21  we've marked as exhibit number 6 and exhibit number 7

22  that you felt like the photograph that was shown to you,

23  that I think is exhibit number 1 today.

24     A    Yes.

25     Q    Okay, that that photo -- the rifle depicted in

**HENNIGH-QUIN COURT REPORTERS**
CERTIFIED SHORTHAND REPORTERS

1 that photograph, exhibit number 1, that back on August

2 15th and September 6th you felt like that was the AR-15

3 that you had seen Mr. Moore use on prior occasions?

4     A   Yes, I did, you know.  I didn't really look at

5 it anyways.

6     Q   Well and did you feel like back at the time that

7 you executed the affidavits marked exhibits 6 and 7

8 today, that that was the AR-15 rifle that you had seen

9 from time to time Mr. Moore carry in his pickup truck?

10     A   Repeat that again.

11     Q   I'm sorry.  If you think back with me when

12 you're signing these affidavits on August 15th and

13 September 6th.

14     A   Yes, sir.

15     Q   All right.  Did you feel like the rifle that was

16 depicted in exhibit number 1 was the one that Mr. Moore

17 had carried in his pickup on prior occasions?

18     A   Yeah.

19     Q   And then, I guess after that at some point you

20 had contact with Mr. Lockhart; is that right?

21     A   No.

22     Q   Did someone from his office come talk to you,

23 Mr. Reyna?

24     A   Yes.

25     Q   Okay, and did they call you or how was it that

1   the rifles actually being present?

2      A     No, god no, huh-uh, I never seen them after

3   that, nope.

4      Q     Okay, on those occasions when Ernest would do

5   rifle practice with the AR-15, are we talking about once

6   or twice or what are we talking about?

7      A     A couple of times, yeah.

8      Q     Okay, and how far apart would those occasions

9   have been, was it --

10     A     On weekends or something, you know.  A weekend

11  or now and then.  His dad didn't really care for him

12  doing it too much.

13     Q     Okay, and where is your dad's rifle range in

14  comparison to where Ernest Moore lived?

15     A     He lives in Alamo, my father does, and they live

16  in San Benito.

17     Q     And is the rifle range in Alamo?

18     A     Yes, it's in the back of my parents' house.

19     Q     And is it a rifle range where anybody who wants

20  to go do target practice, they can rent the range?

21     A     It's just something my dad did.  He's got

22  some -- you know they have a lot of property out there,

23  so he just put -- he has a lot of guns, he's a deer

24  hunter, and so he has to sight in your guns or something

25  like that, so it's just like a homemade thing, its not

1  just different rifles different times.

2      A    He'd take an AK-47, if I remember.

3      Q    Okay, and would he take a bunch of guns each

4  time, or did he --

5      A    No, they didn't like him carrying his guns.

6      Q    "They" being his parents?

7      A    My parents.

8      Q    Your parents, okay.  Would Ernest's dad ever go

9  use your dad's range?

10     A    No, he's never met my father.

11     Q    And your dad would go out with you-all when

12  Ernest would go shoot the targets?

13     A    It was my father and Ernie that went, I'd stay

14  in the house with my mom, I didn't shoot.

15     Q    You didn't shoot the rifles, whichever one they

16  were?

17     A    No.

18     Q    And were there other occasions that you saw

19  Ernest shoot rifles other than out back at your parents'

20  house?

21     A    And to in front of his house.

22     Q    Okay, and would he set up a target and shoot or

23  just like shoot at a tree?

24     A    Yeah, he'd shoot at a tree, a beer can or

25  something, yeah.

**HENNIGH-QUIN COURT REPORTERS**
**CERTIFIED SHORTHAND REPORTERS**

1    Q    And you'd seen him do that also?

2    A    Yes.

3    Q    And had you seen him do it with an assault

4  rifle?

5    A    Yes.

6    Q    Had you seen him do it with the AK-47?

7    A    Not with the AK-47 in front of his house, that

8  was at my parents' house.  The AR-15, he used that in

9  front of the house, I'd seen him do that.

10    Q    Okay, when he got the rifle to shoot in front of

11  his house, was it in his house when he went to get it or

12  did he get it out of his truck, or what do you remember

13  on that?

14    A    He got it out of his house, he'd just got it,

15  yeah.

16    Q    Okay, and was it after this point in time that

17  he would go out to your parents' house to practice?

18    A    No, he had not been there, this was like in the

19  beginning sort of when we started going out, dating.

20    Q    When he would practice at your parents' house?

21    A    Yes.

22    Q    Okay, so when you practiced at your parents'

23  house was before he shot out in front of his house.

24    A    Excuse me, sir.

25    Q    Okay, I'm trying to pinpoint in time.  He

**HENNIGH-QUIN COURT REPORTERS**
**CERTIFIED SHORTHAND REPORTERS**

1  practiced out at your dad's range, right?

2     A    Yes.

3     Q    Was that before you saw him practice in front of

4  his parents' house?

5     A    No, he did his parents' house before too.

6     Q    So it kind of went back and forth on that.

7     A    Yeah, but it wasn't -- yeah, but he only went

8  like a couple of times at my days, anyways, so he did it

9  more at his place.

10          MR. AINSWORTH:  Let's take a break for just

11  a second, somebody is calling me, I've got to grab that

12  right fast.

13          (Recess from 1:28 p.m. to 1:30 p.m.).

14     Q    (Mr. Ainsworth) Okay, between the time that you

15  signed the affidavits in August and September and the

16  time that you signed the affidavit in November, did you

17  have any kind of epiphany or sudden realization that the

18  testimony that you had given to Sonia back in August and

19  September was inaccurate or --

20     A    When I started thinking about it, my mom, when I

21  started talking to my mom.  Because I, you know, I tried

22  to put everything behind me, you know, I didn't think

23  about the gun, I never even thought twice about it, so

24  it's hard to remember something I didn't think of.  You

25  know, I don't know how to say it, but yeah, I did,

**HENNIGH-QUIN COURT REPORTERS**
**CERTIFIED SHORTHAND REPORTERS**

1  because I started talking to my mom and my mom is like

2  "Hey, that's not right."  She remembered more than I

3  did.

4      Q    And so she started talking with you about

5  what --

6      A    Yeah, we started, because I never talked to my

7  mom about it before, just until that day we started

8  talking about it and she started, like you know, telling

9  me and helping me out, because I couldn't remember.

10      Q    Helping you out how?

11      A    Because I was trying to figure it out, you know.

12      Q    Well what were you trying to figure out, Ms.

13  Cox?

14      A    About the guns and what -- I just, you know.

15      Q    So the testimony that you gave on November 29th

16  was after you had talked to your mom about it.

17      A    The 29th.

18      Q    That's the most recent one, the one you have in

19  front of you there that's exhibit number 4, I think.

20      A    Yes, sir.

21      Q    And then of course you talked to the

22  investigator from Mr. Lockhart's office. Mr. Reyna,

23  right?

24      A    Yes.

25      Q    Okay, and he had shown you those pictures before

1  you signed that affidavit, right?  The pictures that are

2  attached to the affidavit?

3      A    Yes, yes, yes.

4      Q    Okay, and so you talked to these different

5  people and then you came up with the affidavit

6  eventually that's marked November 29th, 20001, exhibit

7  number 4?

8      A    Yes.

9      Q    Did you talk to anybody else between August and

10  September and the time that the November affidavit was

11  put together?

12     A    No.

13     Q    Okay.  Did you talk to your dad at all?

14     A    No, I never discussed it with my dad.  He just

15  told me that, you know, someone came to his office, and

16  that was it, we never discussed it.

17     Q    Well, did he tell you that they were wanting to

18  talk to you about another affidavit?

19     A    No, I don't remember them saying that, no.

20     Q    Okay.  Did you ever talk with your dad about

21  trying to pinpoint in time when it was that Ernest had

22  been out to your parents' house shooting?

23     A    With my mom, not my dad.  I don't -- we never --

24  I don't even remember if we even met then, I don't

25  remember.

**HENNIGH-QUIN COURT REPORTERS**
**CERTIFIED SHORTHAND REPORTERS**

1    Q    Okay, and did you mom tell you that she thought

2  that Ernest had been out there just a week before the

3  shooting?

4    A    No, god no, it wasn't a week, I know that for

5  sure.  I know he hadn't been out there in a long time.

6    Q    I mean it had been more than a month.

7    A    Yeah, before, yeah.

8    Q    And when you're saying "Yeah," what do you mean

9  by that?

10    A    It had been more than a month or so.

11    Q    Okay, but your mom would remember if Ernest had

12  been out there shooting because you and your mom were in

13  the house.

14    A    Yes.

15    Q    And your dad would remember if it had been more

16  than a month.

17    A    Yes, he signed an affidavit and everything too.

18    Q    Your dad did?

19    A    My father did, yes.

20    Q    There are too many affidavits.  I can't remember

21  what day it is today.

22    A    I don't even remember my last name.

23    Q    But is the gist of your dad's testimony, as you

24  know it, that Ernest had been out there shooting more

25  than a month before this incident on July 7th?

THE STATE OF TEXAS      *      CAUSE NO. B-98-162
                            *      US DISTRICT COURT
COUNTY OF HIDALGO        *      BROWNSVILLE DIVISION

I, JUDITH HENNIGH, Texas Certified Shorthand Reporter #1752, do hereby certify that the foregoing copy of the deposition of JULIE LYNN COX, reported in the foregoing numbered and styled cause by me, is a true and correct copy of the original deposition herein as duly certified and delivered by me.

CERTIFIED TO this the 13th day of December, 2001.


_____
          JUDITH HENNIGH
Certified Shorthand Reporter
Texas CSR #1752
Expires 12/31/02
Hennigh-Quin Court Reporters
Box 3036, Edinburg, Texas  78540
956/383-8887 / Fax 380-2050
Toll Free 1 800/892-6305

# HENNIGH-QUIN COURT REPORTERS
## CERTIFIED SHORTHAND REPORTERS

1

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION

 3    ARTURO GUILLERMO SALINAS   )(
      AND ELISA HERNANDEZ        )(
 4    HERRERA SALINAS            )(
                                 )(
 5    VS.                        )(  CIVIL ACTION NO. B-98-162
                                 )(
 6    CITY OF HARLINGEN, TEXAS,  )(
      R.D. MOORE, AND            )(
 7    JIM SCHEOPNER              )(
                                 )(
 8            AND                )(
                                 )(
 9    GILBERTO M. RODRIGUEZ,     )(
      INDIVIDUALLY AND ON        )(
10    BEHALF OF HIS MINOR        )(
      DAUGHTER, MEGAN SUZANNE    )(
11    RODRIGUEZ, AND STEPHEN L.  )(
      WILLIAMS AND WIFE, ROBYN   )(
12    S. WILLIAMS, SURVIVING     )(
      BENEFICIARIES OF THE       )(
13    DECEASED                   )(
                                 )(
14    VS.                        )(  CIVIL ACTION NO. B-98-163
                                 )(
15    CITY OF HARLINGEN, TEXAS,  )(
      R.D. MOORE, AND            )(
16    JIM SCHEOPNER              )(
                                 )(
17    AND                        )(
                                 )(
18    RAUL RODRIGUEZ             )(
                                 )(
19    VS.                        )(  CIVIL ACTION NO. B-99-070
                                 )(
20    CITY OF HARLINGEN, R. D.   )(
      MOORE, AND JIM SCHEOPNER   )(
21    - - - - - - - - - - - - - - - - - - - - - - - - - - -
22        ORAL DEPOSITION OF JOSEPH BENNETT VASQUEZ
                        MAY 14, 2001
23    - - - - - - - - - - - - - - - - - - - - - - - - - - -
24    REPORTED BY MAUREEN STINGLEY, CERTIFIED COURT REPORTER
25
```

COPY

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

14:34  1    awarded to us by the courts.

14:34  2        Q.  That's how the .243 got to the police

14:34  3    department?

14:34  4        A.  Yes, sir.

14:34  5        Q.  Okay.  I don't know a good place to put a

14:34  6    sticker on this one.  I'm going to put it right down

14:34  7    here -- I don't know if I will or not.  In the center

14:35  8    of the page, it says No. 14, serial number.  I'm not

14:35  9    going to put it over any of the blanks that are not

14:35  10   filled in there -- or any of the blanks that are filled

14:35  11   in.  I'm going to stick it right in the middle of the

14:35  12   page.  Tell me what Exhibit No. 7 is.

14:35  13       A.  This is a 4473 form filled out by R. D. Moore.

14:35  14       Q.  And that's where he is purchasing a weapon?

14:35  15       A.  Yes, sir.

14:35  16       Q.  Okay, can you tell from looking at Exhibit No.

14:35  17   7 what weapon it is that he is purchasing?

14:35  18       A.  Yes, sir.

14:35  19       Q.  Which weapon is it?

14:35  20       A.  It's the Colt Sporter.

14:35  21       Q.  Now, what is a Colt Sporter?  Is that a pistol,

14:35  22   or what is that?

14:35  23       A.  It's basically a civilian version of the M-16.

14:35  24       Q.  Okay.  What is Exhibit No. 8?

14:36  25       A.  It's a 4473.

REPORTER'S CERTIFICATE

         I, MAUREEN STINGLEY, Certified Court

Reporter, certify that the witness, JOSEPH BENNETT

VASQUEZ, was duly sworn by me, and that the deposition

is a true and correct record of the testimony given by

the witness on MAY 14, 2001; that the deposition was

reported by me in stenograph and was subsequently

transcribed under my supervision.

         I FURTHER CERTIFY that I am not a

relative, employee, attorney or counsel of any of the

parties, nor a relative or employee of such attorney or

counsel, nor am I financially interested in the action.


         WITNESS MY HAND on this the 17th day of

_____May_____, 2001.


                    Maureen Stingley by Y.
                    MAUREEN STINGLEY, CSR NO. 691
                    Expiration Date: 12/31/02
                    Bryant & Stingley, Inc.
                    2010 East Harrison
                    Harlingen, Texas 78550

OMB NO. 1512-0129

## DEPARTMENT OF THE TREASURY
### BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
### FIREARMS TRANSACTION RECORD PART I - OVER-THE-COUNTER

TRANSFEROR'S TRANSACTION SERIAL NUMBER

NOTE: Prepare in original only. All entries on this form must be in ink. **See Important Notices, Definitions and Instructions**

### SECTION A - MUST BE COMPLETED PERSONALLY BY TRANSFEREE (BUYER)

1. TRANSFEREE'S (Buyer's) NAME (Last, First, Middle)
*Moore, Ralph Dwayne*

- [✓] MALE  [ ] FEMALE

2. HEIGHT *5'11"*
3. WEIGHT *190*
4. RACE *White*

5. RESIDENCE ADDRESS (No., Street, City, County, State, ZIP Code) *Cameron, Co.*
*Rt 1 Box 297 San Benito TX. 78586*

6. DATE OF BIRTH
MONTH *12* DAY *2* YEAR *46*

7. PLACE OF BIRTH (City) *Harlingen*
STATE OR FOREIGN COUNTRY *TX*

8. CERTIFICATION OF TRANSFEREE (Buyer) - Questions a. through l. must be answered with a 'yes' or a 'no' inserted in the box at the right of the question

a. Are you the actual buyer of the firearm indicated below? If you answer no to this question the dealer cannot transfer the firearm to you. (See Important Notice 1.) — *Yes*

b. Are you under indictment or information in any court for a crime for which the judge could imprison you for more than one year? An information is a formal accusation of a crime made by a prosecuting attorney. — *No*

c. Have you been convicted in any court of a crime for which the judge could have imprisoned you for more than one year, even if the judge actually gave you a shorter sentence? (See Important Notice 3 and EXCEPTION.) — *No*

d. Are you a fugitive from justice? — *No*

e. Are you an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance? — *No*

f. Have you ever been adjudicated mentally defective or have you been committed to a mental institution? — *No*

g. Have you been discharged from the Armed Forces under dishonorable conditions? — *No*

h. Are you an alien illegally in the United States? — *No*

i. Have you ever renounced your United States citizenship? — *No*

j. Are you subject to a court order restraining you from harassing, stalking, or threatening an intimate partner or child of such partner? (See Important Notice 4 and Definition 4.) — *No*

k. Have you been convicted in any court of a misdemeanor crime of domestic violence? This includes any misdemeanor conviction involving the use or attempted use of physical force committed by a current or former spouse, parent, or guardian of the victim or by a person with a similar relationship to the victim. (See Important Notice 5 and Definition 5.) — *No*

l. Are you a citizen of the United States? — *Yes*

m. What is your State of residence? *Texas*
(State)

If you are not a citizen of the United States, you have a State of residence only if you have resided in the State for at least 90 days prior to the date of this sale. (See Definition 6.)

I CERTIFY THAT THE ABOVE ANSWERS ARE TRUE AND CORRECT. I UNDERSTAND THAT A PERSON WHO ANSWERS "YES" TO ANY OF THE QUESTIONS 8b THROUGH 8k IS PROHIBITED FROM PURCHASING OR POSSESSING A FIREARM. I ALSO UNDERSTAND THAT THE MAKING OF A FALSE ORAL OR WRITTEN STATEMENT OR THE EXHIBITING OF ANY FALSE OR MISREPRESENTED IDENTIFICATION WITH RESPECT TO THIS TRANSACTION IS A CRIME PUNISHABLE AS A FELONY. I FURTHER UNDERSTAND THAT MY REPETITIVE PURCHASE OF FIREARMS FOR THE PURPOSE OF RESALE FOR LIVELIHOOD AND PROFIT WITHOUT A FEDERAL FIREARMS LICENSE IS A VIOLATION OF LAW. (SEE IMPORTANT NOTICE 6)

TRANSFEREE'S (Buyer's) SIGNATURE *RD Moore*
DATE *6-9-98*

### SECTION B - TO BE COMPLETED BY TRANSFEROR (SELLER)

THE PERSON DESCRIBED IN THIS SECTION HAS IDENTIFIED HIMSELF/HERSELF TO ME IN THE FOLLOWING MANNER:

9. TYPE OF AND NUMBER ON IDENTIFICATION (Driver's license or identification which shows name, date of birth, place of residence, and signature. Purchasers who are aliens must provide a valid government-issued photo identification. See Instructions to Transferor 1 and 2).
*Tex DL 04073289*

10. TYPES AND DATES OF ADDITIONAL IDENTIFICATION REQUIRED FOR ALIENS (e.g., utility bills or lease agreements. See Instruction to Transferor 2).

On the basis of (1) the statements in Section A; (2) the verification of identity noted in Section B; and (3) the information in the current list of Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s), described below and on the back, to the person identified in Section A.

| | 11. TYPE (Pistol, Revolver, Rifle, Shotgun, etc.) | 12. MODEL | 13. CALIBER OR GAUGE | 14. SERIAL NO. | 15. MANUFACTURER (and importer, if any) |
|---|---|---|---|---|---|
| 1. | *Rifle* | *Sporter* | *.223* | *MH014417141* | *Colt* |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |

EXHIBIT NO. *S-14-01* Maureen Slingley

Complete ATF F 3310.4 for multiple purchases of handguns (See Instruction to Transferor 7.)

16. TRADE/CORPORATE NAME AND ADDRESS OF TRANSFEROR (Seller) (Hand stamp may be used.)

JOSEPH B. VASQUEZ
412-7571
212 E. JACKSON, HARLINGEN, TEXAS 78550

17. FEDERAL FIREARMS LICENSE NO. (Hand stamp may be used.)

JOSEPH B. VASQUEZ
412-7571
212 E. JACKSON, HARLINGEN, TEXAS 7855
FFL 5-74-031-01-0J-38500

THE PERSON ACTUALLY MAKING THE FIREARMS SALE MUST COMPLETE ITEMS 18 THROUGH 20.

18. TRANSFEROR'S (Seller's) SIGNATURE *Joseph B Vasquez*

19. TRANSFEROR'S TITLE *Owner*

20. TRANSACTION DATE *6-9-98*

(5300.9) PART I (4-97) PREVIOUS EDITIONS ARE OBSOLETE

JOSEPH B. VASQUEZ

| CUSTOMER'S ORDER | 5412-7571 | DATE | 6-7-98 |
|---|---|---|---|

212 E. JACKSON, HARLINGEN, TEXAS 78550
FFL 5-74-031-01-0J-38500

**NAME**

**ADDRESS** R.D. Moore

**CITY, STATE, ZIP** Harlingen Police Dept.

| SOLD BY | CASH | C.O.D | CHARGE | ON ACCT | MDSE RETD | PAID OUT |
|---|---|---|---|---|---|---|

| | QUAN. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|
| 1 | | | | |
| 2 | 1 | Colt Sporter | 900 | 00 |
| 3 | | #MHO 44174 | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | TAX | 74 | 25 |
| 7 | | | | |
| 8 | | | | |
| 9 | | | 974 | 25 |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |

RECEIVED BY

RDC4705

**KEEP THIS SLIP FOR REFERENCE**
ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | |
|---|---|
| ARTURO GUILLERMO SALINAS ) ( | |
| AND ELISA HERNANDEZ ) ( | |
| HERRERA SALINAS ) ( | |
| ) ( | |
| VS. ) ( | CIVIL ACTION NO. B-98-162 |
| ) ( | |
| CITY OF HARLINGEN, TEXAS, ) ( | |
| R.D. MOORE, AND ) ( | |
| JIM SCHEOPNER ) ( | |
| ) ( | |
| AND ) ( | |
| ) ( | |
| GILBERTO M. RODRIGUEZ, ) ( | |
| INDIVIDUALLY AND ON ) ( | |
| BEHALF OF HIS MINOR ) ( | |
| DAUGHTER, MEGAN SUZANNE ) ( | |
| RODRIGUEZ, AND STEPHEN L. ) ( | |
| WILLIAMS AND WIFE, ROBYN ) ( | |
| S. WILLIAMS, SURVIVING ) ( | |
| BENEFICIARIES OF THE ) ( | |
| DECEASED ) ( | |
| ) ( | |
| VS. ) ( | CIVIL ACTION NO. B-98-163 |
| ) ( | |
| CITY OF HARLINGEN, TEXAS, ) ( | |
| R.D. MOORE, AND ) ( | |
| JIM SCHEOPNER ) ( | |
| ) ( | |
| AND ) ( | |
| ) ( | |
| RAUL RODRIGUEZ ) ( | |
| ) ( | |
| VS. ) ( | CIVIL ACTION NO. B-99-070 |
| ) ( | |
| CITY OF HARLINGEN, ) ( | |
| R.D. MOORE, AND ) ( | |
| JIM SCHEOPNER ) ( | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF JAMES JOSEPH SCHEOPNER
MAY 18, 2000
VOLUME 1

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

REPORTED BY MAUREEN STINGLEY, CERTIFIED COURT REPORTER

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

3:55  1    Police Department?

13:55  2        A.   Yes.

13:55  3        Q.   When would that have been?

13:55  4        A.   Somewhere in '95 or early '96.

13:56  5        Q.   What chain of custody procedures were in place

13:56  6    to document R. D. Moore's receipt of the weapon?

13:56  7        A.   None.

13:56  8        Q.   You have told us about four weapons that were

13:56  9    given to two officers, Vasquez and Moore, to take

13:56 10    home -- or to have in their possession; is that

13:56 11    correct?

13:56 12        A.   They were assigned weapons, yes, sir.

13:56 13        Q.   And was that assigned to them for their

13:56 14    official use?

13:56 15        A.   Yes, sir.

13:56 16        Q.   And were they allowed to use them for their·

13:56 17    personal use?

13:56 18        A.   No, sir.

13:56 19        Q.   How would you distinguish in a case of a rifle

13:56 20    such as an AR-15 between official use and personal use?

13:56 21        A.   It's city property.  No city property is

13:56 22    allowed to be used for personal use.

13:56 23        Q.   If I were a friend of R. D. Moore and went to

13:57 24    his house and said, "Gosh, I like that AR-15, I would

13:57 25    like to go shoot it out on the range," would that be an

13:57  1    appropriate use of that rifle?

13:57  2        A.  No, sir.

13:57  3        Q.  If R. D. Moore's son said, "Pop, I would like

13:57  4    to take that rifle out and shoot it," would that be an

13:57  5    acceptable use of that weapon?

13:57  6        A.  No, sir.

13:57  7        Q.  Were any instructions, written or oral, given

13:57  8    to R. D. Moore, to not allow his son to use that weapon

13:57  9    or anybody else?

13:57 10        A.  No, sir, not by me.

13:57 11        Q.  By anybody?

13:57 12        A.  Not to my knowledge, no, sir.

13:57 13        Q.  At all times while you were chief, did R. D.

13:57 14    Moore's job title remain the same as detective police

13:57 15    officer?

13:58 16        A.  His job title?

13:58 17        Q.  Uh-huh.

13:58 18        A.  Yes, sir, I believe so.

13:58 19        Q.  And his assignments remained the same?

13:58 20        A.  No, sir.  I believe right when I took over, I

13:58 21    believe he was still evidence custodian and working on

13:58 22    the finger print computer, which was very

13:58 23    time-consuming.  So I moved Detective Gilbert Gonzalez

13:58 24    in as evidence custodian and put Moore in charge of the

13:58 25    AFIS, the Automated Fingerprint Identification System,

1                    REPORTER'S CERTIFICATE

2              I, MAUREEN STINGLEY, Certified Court

3  Reporter, certify that the witness, JAMES JOSEPH

4  SCHEOPNER, was duly sworn by me, and that the

5  deposition is a true and correct record of the

6  testimony given by the witness on MAY 18, 2000; that

7  the deposition was reported by me in stenograph and was

8  subsequently transcribed under my supervision.

9              I FURTHER CERTIFY that I am not a

10 relative, employee, attorney or counsel of any of the

11 parties, nor a relative or employee of such attorney or

12 counsel, nor am I financially interested in the action.

13             WITNESS MY HAND on this the 31st day of

14 _____, 2000.

15

16

17 _____

   MAUREEN STINGLEY, CSR NO. 691

18 Expiration Date: 12/31/00
   Bryant & Stingley, Inc.

19 2010 East Harrison
   Harlingen, Texas 78550

20

21

22

23

24

25

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| ARTURO GUILLERMO SALINAS )( <br> AND ELISA HERNANDEZ )( <br> HERRERA SALINAS )( <br> )( <br> VS. )( | CIVIL ACTION NO. B-98-162 |

ARTURO GUILLERMO SALINAS )(
AND ELISA HERNANDEZ )(
HERRERA SALINAS )(
                    )(
VS.                 )(  CIVIL ACTION NO. B-98-162
                    )(
CITY OF HARLINGEN, TEXAS, )(
R.D. MOORE, AND     )(
JIM SCHEOPNER       )(
                    )(
     AND            )(
                    )(
GILBERTO M. RODRIGUEZ, )(
INDIVIDUALLY AND ON )(
BEHALF OF HIS MINOR )(
DAUGHTER, MEGAN SUZANNE )(
RODRIGUEZ, AND STEPHEN L. )(
WILLIAMS AND WIFE, ROBYN )(
S. WILLIAMS, SURVIVING )(
BENEFICIARIES OF THE )(
DECEASED            )(
                    )(
VS.                 )(  CIVIL ACTION NO. B-98-163
                    )(
CITY OF HARLINGEN, TEXAS, )(
R.D. MOORE, AND     )(
JIM SCHEOPNER       )(
                    )(
AND                 )(
                    )(
RAUL RODRIGUEZ      )(
                    )(
VS.                 )(  CIVIL ACTION NO. B-99-070
                    )(
CITY OF HARLINGEN,  )(
R.D. MOORE, AND     )(
JIM SCHEOPNER       )(

- - - - - - - - - - - - - - - - - - - - - - - - - -
VIDEOTAPED DEPOSITION OF RALPH DWAYNE MOORE
MAY 19, 2000
VOLUME 1
- - - - - - - - - - - - - - - - - - - - - - - - - -

REPORTED BY MAUREEN STINGLEY, CERTIFIED COURT REPORTER

14:42  1    A.  I just -- I saw the Colt.  I grabbed it, but

14:42  2  there was no clips.

14:42  3    Q.  Okay.

14:42  4    A.  I immediately set it down and went for my

14:42  5  service pistol.

14:42  6    Q.  Okay, did you notice that the other AR-15 was

14:42  7  missing?

14:42  8    A.  No.

14:42  9    Q.  Had you placed all those guns in the cabinet,

14:42 10  or had your son placed some of them in there?

14:42 11    A.  Well, I placed the AR-15 and the Olympic in

14:42 12  there, yes.

14:42 13    Q.  All right, had your son placed some of the

14:42 14  other weapons in there?

14:42 15    A.  Yes.

14:42 16    Q.  Did he own some of the weapons, or were they

14:42 17  all yours?

14:42 18    A.  No, he owned most -- some of them, I owned some

14:42 19  of them.

14:42 20    Q.  All right.  Did both of you keep the weapons in

14:42 21  that cabinet for safekeeping?

14:43 22    A.  Yes.

14:43 23    Q.  Did both of you have access to that cabinet?

14:43 24    A.  Yes.

14:43 25    Q.  Did anybody besides you and he have a key to

14:43 1    the gun cabinet?

14:43 2        A.  No.

14:43 3        Q.  How about your wife?

14:43 4        A.  No.

14:43 5        Q.  But you did have a key?

14:43 6        A.  Yes.

14:43 7        Q.  And your son had a key?

14:43 8        A.  Yes.

14:43 9        Q.  How long had you had a key to that gun cabinet?

14:43 10       A.  From the time we purchased it.

14:43 11       Q.  All right.  When you say "We purchased it," who

14:43 12   is the "we"?

14:43 13       A.  We -- my son and I purchased it together.

14:43 14       Q.  Okay.

14:43 15       A.  It was split, a split venture.

14:43 16       Q.  Where did you get that?

14:43 17       A.  The safe?

14:43 18       Q.  Yes.

14:43 19       A.  I believe it was purchased at Johnny's True

14:43 20   Value.

14:43 21       Q.  I'm sorry?

14:43 22       A.  Johnny's True Value.

14:43 23       Q.  Okay.  In where?  What time?

14:43 24       A.  In Harlingen.

14:43 25       Q.  Harlingen.  And is that business still in

67

1          REPORTER'S CERTIFICATE

2               I, MAUREEN STINGLEY, Certified Court

3     Reporter, certify that the witness, RALPH DWAYNE MOORE,

4     was duly sworn by me, and that the deposition is a true

5     and correct record of the testimony given by the

6     witness on MAY 19, 2000; that the deposition was

7     reported by me in stenograph and was subsequently

8     transcribed under my supervision.

9               I FURTHER CERTIFY that I am not a

10    relative, employee, attorney or counsel of any of the

11    parties, nor a relative or employee of such attorney or

12    counsel, nor am I financially interested in the action.

13               WITNESS MY HAND on this the 31st day of

14    May                    , 2000.

15

16

17    _____
      MAUREEN STINGLEY, CSR NO. 691
18    Expiration Date: 12/31/00
      Bryant & Stingley, Inc.
19    2010 East Harrison
      Harlingen, Texas 78550

20

21

22

23

24

25

Case 1:98-cv-00162   Document 154   Filed in TXSD on 01/02/2002   Page 64 of 68

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ARTURO GUILLERMO SALINAS  ) (
AND ELISA HERNANDEZ       ) (
HERRERA SALINAS           ) (
                          ) (
VS.                       ) ( CIVIL ACTION NO. B-98-162
                          ) (
CITY OF HARLINGEN, TEXAS, ) (
R.D. MOORE, AND           ) (
JIM SCHEOPNER             ) (
                          ) (
       AND                ) (
                          ) (
GILBERTO M. RODRIGUEZ,    ) (
INDIVIDUALLY AND ON       ) (
BEHALF OF HIS MINOR       ) (
DAUGHTER, MEGAN SUZANNE   ) (
RODRIGUEZ, AND STEPHEN L. ) (
WILLIAMS AND WIFE, ROBYN  ) (
S. WILLIAMS, SURVIVING    ) (
BENEFICIARIES OF THE      ) (
DECEASED                  ) (
                          ) (
VS.                       ) ( CIVIL ACTION NO. B-98-163
                          ) (
CITY OF HARLINGEN, TEXAS, ) (
R.D. MOORE, AND           ) (
JIM SCHEOPNER             ) (
                          ) (
AND                       ) (
                          ) (
RAUL RODRIGUEZ            ) (
                          ) (
VS.                       ) ( CIVIL ACTION NO. B-99-070
                          ) (
CITY OF HARLINGEN,        ) (
R.D. MOORE, AND           ) (
JIM SCHEOPNER             ) (

- - - - - - - - - - - - - - - - - - - - - - - - -

ORAL DEPOSITION OF RALPH DWAYNE MOORE
MAY 23, 2000
VOLUME 2

- - - - - - - - - - - - - - - - - - - - - - - - -

REPORTED BY MAUREEN STINGLEY, CERTIFIED COURT REPORTER

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

13:32  1          A.  My house had been burglarized several times

13:32  2     back in the early or mid '70s, after I bought the

13:32  3     house.

13:32  4          Q.  Okay, any guns taken in any of those?

13:33  5          A.  No.  The first time I caught the individual

13:33  6     that did it and got the property back.  The second time

13:33  7     was a motorcycle.  The third time they took TVs and

13:33  8     VCRs.  I didn't get that property back.  And they -- at

13:33  9     that time they did take a .22 single action, which I

13:33 10     did get back later, and a pump BB gun, if I recall.

13:33 11          Q.  In that first burglarization, did they take any

13:33 12     weapons?

13:33 13          A.  No, the juveniles, I don't -- if they did, I

13:33 14     wasn't aware of it because my service pistol was

13:33 15     hanging on the door.  They took the handcuffs out of

13:33 16     the gun belt but they didn't take the revolver.

13:33 17          Q.  What about -- you told me the other day when

13:33 18     you bought that Remington gun safe.  But when was that?

13:34 19          A.  I don't recall the date that I bought it, but

13:34 20     we did buy it from Johnny's True Value.

13:34 21          Q.  And I don't have my notes handy, but how --

13:34 22     about how long had you had that?

13:34 23          A.  Several years.

13:34 24          Q.  When your wife woke you up, you put on your

13:34 25     shorts, went in Ernest's room and saw the gun cabinet

13:34 1    open.

13:34 2        A.   Yes.

13:34 3        Q.   You realized, I think you told us the other

13:34 4    day, that the AK-47 was gone?

13:34 5        A.   Yes.

13:34 6        Q.   Now, how did you come in possession of that

13:34 7    gun?

13:35 8        A.   How did I come in possession of it?

13:35 9        Q.   Yes.

13:35 10       A.   I purchased it through Captain Vasquez.

13:35 11       Q.   Through who?

13:35 12       A.   Captain Vasquez.

13:35 13       Q.   Okay.  Did you use it in your line of duty, or

13:35 14   was it just kept for personal use?

13:35 15       A.   No, I did not use it in the line of duty.  I

13:35 16   purchased it for Ernest, with his money.

13:35 17       Q.   Okay.  Do you still have that weapon?

13:35 18       A.   No.

13:35 19       Q.   Do you know where it is?

13:35 20       A.   I think the Texas Department of Public Safety

13:35 21   has it in their laboratories in Austin.

13:35 22       Q.   When you saw -- I believe you told us that you

13:35 23   noticed the AK-47 was missing.  Did you notice anything

13:35 24   else was missing at that time?

13:35 25       A.   No, I didn't do an inventory.  I just knew that

14:53  1    this, and it might be beneficial to the department and

14:54  2    to the citizens of Harlingen if I were to be ready and

14:54  3    available with it.

14:54  4        Q.  But did you specifically ask him whether you

14:54  5    could carry the AR-15 into your home or take it to your

14:54  6    home?

14:54  7        A.  Yes.

14:54  8        Q.  And what was his response?

14:54  9        A.  He didn't see any problem why not.

14:54  10       Q.  The Mini 14, did you also keep it in your home

14:54  11   at times?

14:54  12       A.  No.

14:54  13       Q.  You never took it home?

14:54  14       A.  It was kept there at the police department.

14:54  15       Q.  How many times had you taken the AR-15 to your

14:54  16   home?

14:54  17       A.  It was on a daily basis.

14:54  18       Q.  How many times did your son fire the AR-15?

14:54  19       A.  Once that I am aware of.

14:54  20       Q.  Had he ever mentioned to you that he had

14:54  21   borrowed your AR-15?

14:54  22       A.  No.

14:54  23       Q.  Did you ever have any reason to suspect that he

14:55  24   had used your AR-15 on a prior occasion?

14:55  25       A.  No.

```
 1              REPORTER'S CERTIFICATE

 2         I, MAUREEN STINGLEY, Certified Court

 3   Reporter, certify that the witness, RALPH DWAYNE MOORE,

 4   was duly sworn by me, and that the deposition is a true

 5   and correct record of the testimony given by the

 6   witness on MAY 23, 2000; that the deposition was

 7   reported by me in stenograph and was subsequently

 8   transcribed under my supervision.

 9         I FURTHER CERTIFY that I am not a

10   relative, employee, attorney or counsel of any of the

11   parties, nor a relative or employee of such attorney or

12   counsel, nor am I financially interested in the action.

13         WITNESS MY HAND on this the 31st day of

14   _____May_____, 2000.

15

16

17         Maureen Stingley by /a

18         MAUREEN STINGLEY, CSR NO. 691
           Expiration Date: 12/31/00

19         Bryant & Stingley, Inc.
           2010 East Harrison

20         Harlingen, Texas 78550

21

22

23

24

25
```