158

United States District Court
Southern District of Texas
FILED

JAN 1 4 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ARTURO GUILLERMO SALINAS, ET AL        §
                                       §
vs.                                    §
                                       §
CITY OF HARLINGEN, ET AL.,             §
                                       §
AND                                    §
                                       §
GILBERTO M. RODRIGUEZ, ET AL           §
                                       §
vs.                                    §        CIVIL ACTION NO. B-98-162
                                       §
CITY OF HARLINGEN, ET AL.,             §
                                       §
AND                                    §
                                       §
RAUL RODRIGUEZ,                        §
                                       §
vs.                                    §
                                       §
CITY OF HARLINGEN, ET AL.              §

## PLAINTIFF RAUL RODRIGUEZ' SUPPLEMENTAL RESPONSE TO RENEWAL OF AND SUPPLEMENTATION TO DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, Raul Rodriguez, and files this Supplemental Response to Renewal of and Supplementation to Defendant's Second Motion for Summary Judgment and Memorandum in Support Thereof.

### I. Introduction

On December 14, 2001, Defendant filed a Renewal of and Supplementation to Defendant's Second Motion for Summary Judgment. This case is set for final pre-trial conference and jury selection on February 7 and 11, 2002, respectively.

Defendant's attempt to dismiss this case should fail based on Ms. Julie Cox's

uncontroverted statements made in affidavits dated August 15 and September 6, 2001, and in deposition testimony.

## II.   Evidence

In this supplemental response, Plaintiff relies upon and incorporates herein by reference the following evidence:

a.   Excerpts from Deposition of Julie Lynn Cox (Exhibit "A").

b.   Affidavit of Julie Lynn Cox dated August 15, 2001 (Exhibit "B").

c.   Affidavit of Julie Lynn Cox dated September 6, 2001 (Exhibit "C").

d.   Affidavit of Julie Lynn Cox dated November 29, 2001 (Exhibit "D").

c.   Gun List Inventory (Exhibit "E").

## III.   Argument and Authorities

### A.   Julie Cox's Deposition Testimony Supports Her Affidavit Testimony Dated August 15 and September 6, 2001

Defendant's make deceptive and inaccurate representations in their Renewal of and Supplementation to Defendant's Second Motion for Summary Judgment in a last ditch effort to dismiss this case.   In her deposition testimony, Julie Cox admits the following:

(1)   She was told that there were two AR-15's that the Moores' possessed and/or owned when she gave her affidavit testimony dated August 15 and September 6, 2001;

(2)   Plaintiff's counsel was "nice" and did nothing to scare her when she   gave her affidavit testimony dated August 15 and September 6, 2001; and

(3)   She was shown a binder full of photographs, which included a picture of the privately owned AR-15.

In fact, it is imperative to point out what Julie Lynn Cox doesn't say in her affidavit dated November 29, 2001 to Defendant, and what she wasn't asked in deposition by counsel for Defendant, Tom Lockhart.   The only argument Defendant makes is that the privately owned AR-15 was Ernest Moore's favorite.   However, Julie

Lynn Cox does not controvert her affidavit testimony dated August 15 and September 6, 2001, that she saw Ernest Moore shoot the HPD AR-15 at her father's gun range, that Ernest Moore carried the HPD AR-15 in a brown bag, and that Ernest Moore shot the HPD AR-15 in the front of his father's home. Moreover, Julie Lynn Cox never stated in affidavit or deposition that the privately owned AR-15 was the only one Ernest Moore (1) shot in front of his father's home, (2) carried in a brown bag, and (3) shot in her father's gun range. This is never mentioned or addressed in her affidavit dated November 29, 2001, or deposition testimony and does not controvert her affidavit testimony offered on August 15 and September 6, 2001.

Material information contained in Julie Lynn Cox's affidavits dated August 15 and September 6 was not entirely controverted by her deposition testimony given on December 12, 2001, and as such, and are not prior inconsistent statements as Defense counsel strains to suggest. Accordingly, there is substantive and uncontroverted testimony in Julie Cox's deposition testimony and in her affidavits executed on August 15 and September 6 to warrant the Court's Denial of Defendant's Motion for Summary Judgment .

Specifically, in her deposition Julie Lynn Cox acknowledges making inaccurate statements in her affidavit to Defendant dated November 29, 2001. Ms. Cox testified that she was aware that there were two AR-15's in the Moore residence at the time she signed both affidavits dated August 15 and September 6, 2001:

> Q:    Okay. Now back in August when we met, you and I went over the gun inventory list; is that correct?
>
> A:    Yes.
>
> Q:    Okay, and--
>
> A:    It was a written -- yes, I remember that.
>
> Q:    Let me hand you what I've marked as Cox number 3. Julie, back when you and I met for the first time you and I went over the gun list inventory, correct?
>
> A:    Uh-huh.
>
> Q:    Is that a yes?

A:    Yes.

Q:    Okay, and the entry number 3, there is a reference to a gun that's owned by the City, marked as "City", is that correct?

A:    Yes, ma'am.

Q:    And on my number 1 there's a referenced a gun, a Colt AR-15 that's owned by Ernest; is that correct?

A:    Yes.

Q:    And this gun list inventory attempts to identify all the guns that were in the gun safe on the date of the incident in question?

A:    Yes.

(Exh. A, 52-11 to 53-7 and Exh. E).  Ms. Cox deposition testimony is uncontroverted that she knew that there were two AR-15's when she gave her affidavit's dated August 15 and September 6  to Plaintiff's counsel.

Q:    And was it your understanding that the gun that was used in the shootings was owned or belonged to the City of Harlingen?

A:    That I knew that it did?

Q:    Yes.

A:    Yeah, I guess so, yeah.

Q:    And your knowledge was gathered after the incident in question, that knowledge that you have, you know that the gun was owned or belonged to the City of Harlingen, that knowledge--

A:    After this, after this.

Q:    Okay, and you knew that when you and I met; is that correct?

A:    Excuse me.

Q:    You knew that the gun that had been used in the incident in question belonged or was owned by the City of Harlingen when you and I met?

A:    Yeah.

Q:    Okay. And when you and I met it was also your knowledge that there was a gun that the Moores, either R.D. or Ernest Moore, that

there was an AR-15 that R.D. Moore or Ernest Moore owned.

A:    The one he purchased, yes, number 2, yes.

(Exh. A, 55-20 to 56-17).  It is undisputed that Julie Lynn Cox was aware and was told at the time she gave here affidavit testimony dated August 15 and September 6, 2001, that there were two AR-15's that the Moore's possessed and that there were two AR-15's referenced in the gun list inventory.  (Exh. E).  As a matter of fact what Ms. Cox's affidavit testimony dated November 29, 2001, only says was that she was not "shown or told that there were two (2) AR-15's owned by the Moores".  (Exh. D).  Obviously, Ms. Cox would not be told that there were two AR-15's owned by the Moores because the Olympic Arms AR-15 belonged to the City of Harlingen and was not owned by R.D. or Ernest Moore.    However, what she did know and what she was told when she signed the affidavits dated August 15 and September 6 was that there were two AR-15's that the Moores' possessed. As such, it is clear that Ms. Cox, with full knowledge that there were two AR-15's in existence identified the HPD AR-15 as the gun that Ernest Moore shot in front of his father's home, carried in a brown bag, took to her father's gun range, the one that was his favorite, and the one that he used to kill the two Border Patrol agents and severely injure Cameron County's Sheriff's Deputy Raul Rodriguez.

Additionally, Julie Lynn Cox testified that Plaintiff's counsel was "nice" and fair to her when they met for the first and only time, aside from the deposition.  It was only after the line of questioning referenced above and after Ms. Cox acknowledges that she was aware and was told that there were two AR-15's that she stated that she was scared, but that Plaintiff's counsel did nothing to scare her.

Q:    And was I mean to you?

A:    No, no, I don't' mean--

Q:    Was I forceful with you?

A:    No, I was -- just the situation at hand, not you personally, no.

Q:    Okay, but there was nothing that I did to scare you?

A:    Not you personally, just the situation at hand, you know, everything, you know, just thinking about everything again.  It was

more than I wanted to handle and I didn't think about it, I never thought that I had to even think about what happened, you know, about the guns. I never even knew that was going to be an issue, you know.

Q:    Okay, fair enough. But I just want the record to be clear that when you and I met we did go over that gun list inventory.

A:    Yeah, I remember the --definitely I remember the gun list.

Q:    And I didn't do anything to scare you or anything-

A:    No, no, it was just the situation. I mean think about it, you know.

(Exh. A, 54-11 to 55-8).

Q:    How was I with you?

A:     You were nice.

(Exh. A, 90-23 to 24).

Furthermore, Julie Lynn Cox by her own admission in her deposition recanted another statement made in her affidavit to the Defendant dated November 29, 2001. In paragraph three (3) of the aforementioned affidavit, Julie Cox states that on August 15 and September 6, 2001 she signed affidavits that were produced to her by investigators claiming to represent Gilberto Rodriguez. She goes on to say that [t]he firm they were working for was Ramon Garcia's office. (Exh. D). Apparently, again Defendant attempts to insinuate that investigators for Plaintiff Raul Rodriguez lied to Ms Cox about who they were appearing on behalf of and were representing. However, in her deposition, Ms. Cox testifies that she was unaware that there were two Rodriguez families involved in the instant action and that she didn't remember whether it was Raul or Gilberto Rodriguez whom the investigators stated they represented. Specifically, Ms. Cox testified as follows:

Q:    Okay. Now on entry number 3, you state in your affidavit that there were some affidavits that were produced by some investigators claiming to represent Gilberto Rodriguez, and the firm they were working for was Ramon Garcia's office; is that correct?

A:    Yes.

Q:     Okay, I represent Raul Rodriguez and not Gilberto Rodriguez.  Are you sure that our investigator said that they represented Gilberto and not Raul Rodriguez?

A:     Hold on.  (Witness examines document).  I don't know.

Q:     Because I just want to make sure, because I don't want, you know, for something to make an insinuation, you know, like somebody's falsely stating that you represent someone when they don't.

       Am I correct in stating that you don't remember whether they said Raul Rodriguez or Gilberto Rodriguez?

A:     No, I don't remember.

Q:     Okay, were you aware that there are -- that the Cameron County sheriff's deputy that was injured in the incident in question, his name is Raul Rodriguez, and similarly that there was another Border Patrol agent who was also killed by the name of Gilberto Rodriguez?

A:     Did I know that?

Q:     Yes.

A:     No.

Q:     Okay, so you weren't aware that there were two Rodriguez families involved in this lawsuit?

A:     No.

Q:     Okay.  And so --

A:     Well, I knew Susan Lynn Rodriguez, right?

Q:     Yes.

A:     Yeah, I remember that Border Patrol agent.

Q:     Okay, but were you aware that Gilberto Rodriguez, I'm sorry, was also one of the plaintiffs in this lawsuit?

A:     I didn't know his name.

Q:     Okay, and that there is also a Raul Rodriguez also a plaintiff in this case.

A:    That's the sheriff, right?

Q:    That's the Cameron County sheriff's deputy.

A:    Okay.

Q:    Were you aware that there was a Gilberto Rodriguez and a Raul Rodriguez?

A:    No.

Q:    Okay. Am I correct in stating that you don't remember whether my investigators claimed to represent Gilberto Rodriguez or Raul Rodriguez?

A:    No.

(Exh. A, 56-18 to 58-17).

Finally, Ms. Cox was saw a binder full of photographs that included a picture of the privately owned AR-15.  However, after viewing these photographs Ms. Cox identified the HPD AR-15 as the rifle that she had seen Ernest Moore use many times before, the gun that he had in her presence shot in front of his father's home, the gun he shot at her father's gun range, and the gun he would carry in a brown bag in his truck.  Specifically, Ms. Cox testified as follows:

Q:    And then do you remember how many pictures you were shown altogether?

A:    A stack of them about that big (indicating).   Different pictures, different things.

Q:    All right, now you've shown us a stack about---

A:    It was a paper, a stack, it was quite a few.

(Exh. A, 84-5 to 84-15).   This binder of photographs included a photograph, not only of the HPD AR-15, but also of the privately owned AR-15 now referenced in Ms. Cox's affidavit dated November 29, 2001.

For the reasons set forth in Plaintiffs' Response to Renewal Of and Supplementation to Defendant's Second Motion for Summary Judgment and Memorandum in Support Thereof and in Plaintiff Raul Rodriguez' Supplemental Response to Renewal of and Supplementation to Defendant's Second Motion for

Summary Judgment and Memorandum in Support Thereof Of, Defendant's motion should be denied.

## IV. Prayer

WHEREFORE PREMISES CONSIDERED, Plaintiff prays that this Honorable Court deny Renewal of and Supplementation to Defendant's Second Motion for Summary Judgment and grant Plaintiff any and all further relief that justice requires.

Respectfully submitted,

LAW OFFICE OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, TX 78539
956-383-7441
956-381-0825 (Fax)

By: _____
RAMON GARCIA
State Bar No. 07641800
Federal I.D. No. 3936
SONIA I. LOPEZ
State Bar No. 24003862
Federal I.D. No. 23501

**ATTORNEYS FOR PLAINTIFF RAUL RODRIGUEZ**

## CERTIFICATE OF SERVICE

I, SONIA I. LOPEZ, do hereby certify that on this 14th day of January, 2002,
Plaintiff Raul Rodriguez' Supplemental Response to Renewal of and Supplementation
to Defendant's Second Motion for Summary Judgment and Memorandum In Support
Thereof was sent to the following:

Mr. Tom Lockhart                              CMRRR: 7001 1140 0002 5107 5781
Adams & Graham, L.L.P.
P.O. Drawer 1429
Harlingen, Texas 78551-1429

Mr. Broadus Spivey                            CMRRR: 7001 1140 0002 5107 5774
Mr. Price Ainsworth
Spivey & Ainsworth, P.C.
48 East Avenue
Austin, Texas 78701


SONIA I. LOPEZ

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ARTURO G. SALINAS, ET AL    *
VS.          *   CIVIL ACTION B-98-162
CITY OF HARLINGEN     *
           *
and          *
           *
GILBERTO M. RODRIGUEZ, ET AL   *
VS.          *   CIVIL ACTION B-98-162
CITY OF HARLINGEN     *
           *
and          *
           *
RAUL RODRIGUEZ      *
VS.          *   CIVIL ACTION B-98-162
CITY OF HARLINGEN     *

**********************************************
ORAL AND VIDEOTAPED DEPOSITION OF
JULIE LYNN COX
DECEMBER 12, 2001
**********************************************

ORAL AND VIDEOTAPED DEPOSITION of JULIE LYNN COX

produced as a witness at the instance of the Plaintiffs

and duly sworn, was taken in the above-styled and

numbered cause on the 12th day of December, 2001, from

10:29 p.m. to 1:35 p.m., before JUDITH HENNIGH, CSR in

and for the State of Texas, reported by oral stenography

at the offices of Ramon Garcia, Edinburg, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

=============================================================
HENNIGH-QUIN COURT REPORTERS
Box 3036, Edinburg, Texas 78540
(956) 383-8887 / Fax 380-2050
Toll Free (800) 892-6305
=============================================================

CERTIFIED COPY

PLAINTIFF'S
EXHIBIT

A

**HENNIGH-QUIN COURT REPORTERS**
**CERTIFIED SHORTHAND REPORTERS**

1    A    See -- okay, I had thought that's why my parents

2    didn't want him to bring that gun over there.  For some

3    reason I got that in my head, maybe that's the reason

4    why Ernie told me that, but I don't know.

5    Q    Back in August of this year you and I met for

6    the first time; is that correct?

7    A    Yes, ma'am.

8    Q    We didn't talk this morning anything about the

9    incident in question, did we?

10   A    Huh-uh, no.

11   Q    Okay.  Now back in August when we met, you and I

12   went over a gun inventory list; is that correct?

13   A    Yes.

14   Q    Okay, and --

15   A    It was a written -- yes, I remember that.

16             (Exhibit 3 marked).

17   Q    Let me hand you what I've marked as Cox number

18   3.  Julie, back when you and I met for the first time

19   you and I went over this gun list inventory, correct?

20   A    Uh-huh.

21   Q    Is that a yes?

22   A    Yes.

23   Q    Okay, and the entry number 3, there is a

24   reference to a gun that's owned by the City, marked as

25   "City;" is that correct?

53

1    A    Yes, ma'am.

2    Q    And on my number 1 there's a reference to a gun,

3    a Colt AR-15 that's owned by Ernest; is that correct?

4    A    Yes.

5    Q    Okay.  And this gun list inventory attempts to

6    identify all the guns that were in the gun safe on the

7    date of the incident in question.

8    A    Yes.

9    Q    Okay.  I know that you've stated in an affidavit

10   that I'll go ahead and mark as Cox exhibit -- and I

11   guess that's the one that you have there.

12   A    Number 3?

13            (Exhibit 4 marked).

14   Q    Let me go ahead and give it to you.  Cox exhibit

15   number 4.  Is this an affidavit that you recently

16   gave --

17   A    Uh-huh.

18   Q    -- to a gentleman --

19   A    Yes.

20   Q    -- by the name of Cipriano Reyna?

21   A    Yes.

22   Q    On entry number 6 of your statement it says

23   "When I went to Sonia Lopez's office I was not shown or

24   told that there were two AR-15s owned by the Moores.

25   A    Uh-huh.

**HENNIGH-QUIN COURT REPORTERS**
**CERTIFIED SHORTHAND REPORTERS**

1    Q    Is that correct?

2    A    Yes.

3    Q    Okay, when you and I met we did go over the gun

4  list inventory.

5    A    Yes, but I can't tell by this, I have to see

6  pictures.  I'm sorry, I didn't know, I was -- you know,

7  I was scared.  I'm 23 years -- I know I'm not very

8  stupid, but I'm not very smart about laws and stuff, and

9  I -- you know, you scared the -- you know, you scared

10 me.

11   Q    And was I mean to you?

12   A    No, no, I don't mean --

13   Q    Was I forceful with you?

14   A    No, I was -- just the situation at hand, not you

15 personally, no.

16   Q    Okay, but there was nothing that I did to scare

17 you?

18   A    Not you personally, just the situation at hand,

19 you know, everything, you know, just thinking about

20 everything again.  It was more than I wanted to handle,

21 and I didn't think about it, I never thought I had to

22 even think about what happened, you know, about the

23 guns.  I never even knew that was going to be an issue,

24 you know.

25   Q    Okay, fair enough.  But I just want the record

1   to be clear that when you and I met we did go over that

2   gun list inventory.

3       A    Yeah, I remember the -- definitely I remember

4   the gun list.

5       Q    And I didn't do anything to scare you or

6   anything --

7       A    No, no, it was just the situation.  I mean think

8   about it, you know.

9       Q    Okay.  Were you aware that -- that the weapon

10  that was used in the incident in question was a gun that

11  was not owned by the Moores, but that belonged to the

12  City of Harlingen?

13      A    Excuse me, I'm sorry.

14      Q    Were you aware that the gun that was used in the

15  incident in question, in San Benito --

16      A    Yeah.

17      Q    -- was a gun that was not owned by the Moores?

18      A    I read something in the paper about it.  In the

19          paper I read that.

20      Q    And was it your understanding that the gun that

21  was used in the shootings was owned or belonged to the

22  City of Harlingen?

23      A    That I knew that it did?

24      Q    Yes.

25      A    Yeah, I guess so, yeah.

1    Q    And your knowledge was gathered after the

2  incident in question, that knowledge that you have, you

3  know that that gun was owned or belonged to the City of

4  Harlingen, that knowledge --

5    A    After this, after this.

6    Q    Okay, and you knew that when you and I met; is

7  that correct?

8    A    Excuse me.

9    Q    You knew that the gun that had been used in the

10 incident in question belonged or was owned by the City

11 of Harlingen when you and I met?

12   A    Yeah.

13   Q    Okay.  And when you and I met it was also your

14 knowledge that there was a gun that the Moores, either

15 R.D. or Ernest Moore, that there was an AR-15 that R.D.

16 Moore or Ernest Moore owned.

17   A    The one he purchased, yes, number 2, yes.

18   Q    Okay.  Now on entry number 3, you state in your

19 affidavit that there were some affidavits that were

20 produced by some investigators claiming to represent

21 Gilberto Rodriguez, and the firm they were working for

22 was Ramon Garcia's office; is that correct?

23   A    Yes.

24   Q    Okay, I represent Raul Rodriguez and not

25 Gilberto Rodriguez.  Are you sure that our investigator

1  said that they represented Gilberto and not Raul

2  Rodriguez?

3      A    Hold on.   (Witness examines document)    I don't

4  know.

5      Q    Because I just want to make sure, because I

6  don't want, you know, for something to make an

7  insinuation, you know, like somebody's falsely stating

8  that they represent someone when they don't.

9           Am I correct in stating that you don't remember

10  whether they said Raul Rodriguez or Gilberto Rodriguez?

11      A    No, I don't remember.

12      Q    Okay, were you aware that there are -- that the

13  Cameron County sheriff's deputy that was injured in the

14  incident in question, his name is Raul Rodriguez, and

15  similarly that there was another Border Patrol agent who

16  was also killed by the name of Gilberto Rodriguez?

17      A    Did I know that?

18      Q    Yes.

19      A    No.

20      Q    Okay, so you weren't aware that there were two

21  Rodriguez families involved in this lawsuit?

22      A    No.

23      Q    Okay.  And so --

24      A    Well, I knew Susan Lynn Rodriguez, right?

25      Q    Yes.

1    A    Yeah, I remember that Border Patrol agent.

2    Q    Okay, but were you aware that Gilberto

3  Rodriguez, I'm sorry, was also one of the plaintiffs in

4  this lawsuit?

5    A    I didn't know his name.

6    Q    Okay, and that there is also a Raul Rodriguez

7  also a plaintiff in this case.

8    A    That's the sheriff, right?

9    Q    That's the Cameron County sheriff's deputy.

10    A    Okay.

11    Q    Were you aware that there was a Gilberto

12  Rodriguez and a Raul Rodriguez?

13    A    No.

14    Q    Okay.  Am I correct in stating that you don't

15  remember whether my investigators claimed to represent

16  Gilberto Rodriguez or Raul Rodriguez?

17    A    No.

18    Q    Okay.  Now on paragraph 4, you said "On those

19  affidavits I indicated that I had seen Ernest Moore

20  shoot an AR-15.  A picture was shown to me by Sonia

21  Lopez, who is an attorney at Ramon Garcia's office.  I

22  was only shown one photograph of and AR-15 which I

23  presume was the one that Ernest used in the shooting."

24         Let me ask you this.  I never showed you --

25    A    You showed me a whole thing --

1    Q    Who was with you?

2    A    Sonia Lopez.

3    Q    Okay.  Okay, fair enough.  Anybody else?

4    A    No.

5    Q    And then do you remember how many pictures you

6 were shown altogether?

7    A    A stack of them about that big (indicating).

8 Different pictures, different things.

9    Q    All right, now you've shown us a stack about --

10    A    It was a paper, a stack, it was quite a few.

11    Q    All right, but as I understand it, the only

12 photograph of an AR-15 that was shown to you while you

13 were here with Ms. Lopez was the one that's been

14 identified as Cox exhibit number 1.

15    A    Yes.

16    Q    Okay, you were not shown Cox exhibit number 2?

17    A    No.

18    Q    Now while you were here did you tell Ms. Lopez

19 that the gun that Ernest liked and the gun that you had

20 seen him shooting, the AR-15 --

21    A    Yes.

22    Q    -- was the gun that his dad had just purchased

23 for him?

24    A    Yes.

25    Q    And you told her that day when she was

1    that I am, I think I take pride in being pretty good at

2    talking to people, and I need to ask you this because I

3    want the record to reflect this, to accurately reflect

4    whatever your testimony may be.  I didn't badger you

5    when I met you, did I?

6        A    No.

7        Q    Was I nice with you?

8        A    Yes.

9        Q    Was that the first time that you had ever had

10   spoken to anybody about what happened since July 7th of

11   1998?

12       A    Besides the Texas Rangers?

13       Q    Yes.

14       A    Yes.

15       Q    So you were obviously -- like you said, you were

16   scared about what was going to happen.

17       A    Yes, very.

18       Q    You didn't really want to have to discuss these

19   issues or have to deal with this again.  But was there

20   anything that I did in my part to cause you to be

21   scared?

22       A    No, it was the situation.

23       Q    How was I with you?

24       A    You were nice.

25       Q    Did I take a lot of time talking to you?

**HENNIGH-QUIN COURT REPORTERS**
**CERTIFIED SHORTHAND REPORTERS**

THE STATE OF TEXAS          *     CAUSE NO. B-98-162
                            *     US DISTRICT COURT
COUNTY OF HIDALGO           *     BROWNSVILLE DIVISION

    I, JUDITH HENNIGH, Texas Certified Shorthand Reporter #1752, do hereby certify that the foregoing copy of the deposition of JULIE LYNN COX, reported in the foregoing numbered and styled cause by me, is a true and correct copy of the original deposition herein as duly certified and delivered by me.

    CERTIFIED TO this the 13th day of December, 2001.


                           JUDITH HENNIGH
Certified Shorthand Reporter
Texas CSR #1752
Expires 12/31/02
Hennigh-Quin Court Reporters
Box 3036, Edinburg, Texas  78540
956/383-8887 / Fax 380-2050
Toll Free 1 800/892-6305


# HENNIGH-QUIN COURT REPORTERS
## CERTIFIED SHORTHAND REPORTERS

STATE OF TEXAS                     §
                                   §
                                   §
COUNTY OF HIDALGO                  §

## AFFIDAVIT

Before me, the undersigned notary, on this day personally came and appeared

SONIA I. LOPEZ, to me well known, and who, after being by me duly sworn did say:

"My name is Julie Lynn Cox. I am over the age of 21 years, and am competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

On July 7, 1998, I was at 311 Catherine Street in Rio Hondo, Texas, with the Morin family. On that date, Ernest Moore appeared at the residence and shot and killed Delia Morin and Margarita Flores.

I was Ernest Moore's girlfriend for at least a year prior to the shooting and had lived with him at his parents home in San Benito, Texas. The AR-15 semi-automatic gun that was used to kill the two Border Patrol Agents and seriously injure a Cameron County Sheriff's Deputy on the morning of July 7, 1998, had been utilized by Ernest Moore many times before. He liked that gun and had in my presence shot the gun in front of his house and at my father's gun range. R.D. Moore allowed his son to use this gun on many occasions. Ernest would also carry this gun in a brown bag in his truck.

Further, Affiant sayeth not.

_____
JULIE LYNN COX

Sworn to and subscribed before me by Julie Lynn Cox on this the 5th day

of _August_____, 2001.

ADELITA GOMEZ
Notary Public
STATE OF TEXAS
My Comm. Exp. Apr. 28, 2002

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS



PLAINTIFF'S
EXHIBIT
B

STATE OF TEXAS                          §
                                        §
                                        §
COUNTY OF HIDALGO                       §

## AFFIDAVIT

Before me, the undersigned notary, on this day personally came and appeared

JULIE LYNN COX, to me well known, and who, after being by me duly sworn did say:

"My name is Julie Lynn Cox. I am over the age of 21 years, and am competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

On July 7, 1998, I was at 311 Catherine Street in Rio Hondo, Texas, with the Morin family. On that date, Ernest Moore appeared at the residence and shot and killed Delia Morin and Margarita Flores.

I was Ernest Moore's girlfriend for at least a year prior to the shooting and had lived with him at his parents home in San Benito, Texas. The AR-15 semi-automatic gun that was used to kill the two Border Patrol Agents and seriously injure a Cameron County Sheriff's Deputy on the morning of July 7, 1998, had been utilized by Ernest Moore many times before.

I am able to ascertain that the gun that Ernest used in the San Benito shooting was the same gun he had used before because I was provided with a photograph of the gun that had been used in the shootings by Ms. Sonia I. Lopez. The gun seen in the photograph is the same gun Ernest had used many times before.

Ernest Moore liked that gun and had in my presence shot the gun in front of his house and at my father' s gun range. R.D. Moore allowed his son to use this gun on many occasions. Ernest would also carry this gun in a brown bag in his truck.

Further, Affiant sayeth not.

_Julie Cox_
JULIE LYNN COX

Sworn to and subscribed before me by Julie Lynn Cox on this the ___6th___ day
of ___September___, 2001.

ADELITA GOMEZ
Notary Public
STATE OF TEXAS
My Comm. Exp. Apr. 28, 2002

_Adelita Gomez_
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

PLAINTIFF'S
EXHIBIT
C

## AFFIDAVIT

THE STATE OF TEXAS          *

COUNTY OF HIDALGO          *

BEFORE ME, the undersigned Notary Public, on this day personally appeared JULIE LYNN COX who being by me duly sworn on his oath, deposed and said the following:

1.  "My name is JULIE LYNN COX. I am over the age of eighteen (18) years, and of sound mind and suffer from no legal disabilities. I have never been convicted of a crime and I am fully competent, duly qualified and authorized to make this Affidavit, and I have personal knowledge of the matters stated herein and they are true and correct.

2.  I currently reside in Alamo, Texas. My date of birth is October 25, 1978 and I am 23 years of age.

3.  On August 15, 2001 and September 6, 2001 I signed affidavits that were produced to me by investigators claiming to represent Gilberto Rodriguez. The firm they were working for was Ramon Garcia's office.

4.  On those affidavits I indicated that I had seen Ernest Moore shoot an AR-15. A picture was shown to me by Sonia Lopez who is an attorney at Ramon Garcia's office. I was only shown one photograph of an AR-15 which I presumed was the one Ernest Moore used in the shooting. I also indicated that Ernest had shot the AR-15 on several occasions in front of the Moore residence in San Benito, Texas.

5.  On this day I was shown two photographs by investigator Cipriano Reyna. By studying the two photographs I have identified the AR-15 that I had previously seen Ernest Moore shoot in front of his residence. I have signed the laser copy photograph which is numbered no. 2. I do not recall ever seeing Ernest Moore shoot the AR-15 which is numbered no. 1. I have also signed the laser photo copy.

*Julie Cox*

PLAINTIFF'S EXHIBIT
D

6.   When I went to Sonia Lopez office I was not shown or
     told that there were two (2) AR-15's owned by the
     Moores.   I do recall Ernest telling me that his
     favorite gun was the AR-15 that his father had just
     purchased.   This is the gun that I saw Ernest
     practice with.

7.   I would also like to say that I did not initiate
     calling or making contact with Ramon Garcia's office.
     I was approached by there investigators and is how I
     came involved in this case.

8.   I also would like to say that I told Sonia Lopez that
     the AR-15 I had seen Ernest practice with was the one
     that his father had purchased for him.

9.   I have never seen the AR-15 which is numbered no. 1
     because the stock is different from photograph no. 2.
     The photograph no. 2 is the one I saw Ernest Moore
     practice with because the stock was wood.


"Further Affiant sayeth naught."

_Julie Cox_

JULIE LYNN COX

     SUBSCRIBED AND SWORN TO BEFORE ME by the said Julie Lynn
Cox on this the __29__ the day of _November_, 2001, to certify
which, witness my hand and official seal.


Notary Public, State of Texas
My   Commission   Expires: 4/10/05

CIPRIANO REYNA
MY COMMISSION EXPIRES
April 10, 2005

Case 1:98-cv-00162   Document 158   Filed in TXSD on 01/14/2002   Page 26 of 29





#2
Julie Cox



# GUN LIST INVENTORY

Ernest    1.    Colt AR-15 Semi Auto 223 Cal. 2/20 round clips and 4/30 round. 350 rounds ammo.

Ernest    2.    AK-47 Semi Auto 7.65 x 39 Cal. 2/5 round clips and 4/30 round. 500 rounds ammo.

City    3.    Olympic Arms Semi Auto .223 same amount of clips as No. 1. Same ammo - (City weapon).

Ernest    4.    SKS Semi Auto 7.65 x 39 Cal. 1/10 round clips - same amount as No. 2.

Ernest    5.    M-1 Carbine Semi Auto 30 Cal. - 2/5 round clips and 2/30 round clips. 50 rounds ammo.

Ernest    6.    Mossburg pump 12 ga. Shotgun riot type - 7 round magazine pistol grip. 50 rounds.

Ernest    7.    Mauser Bolt Action Military 10 round magazine 8 mm Cal. 20 rounds ammo.

Ernest    8.    Infield Bolt Action Military 10 rounds magazine 308 Cal. 20 rounds ammo.

R.D.    9.    Remington 870 pump Shotgun - 12 gauge - 50 rounds ammo.

R.D.    10.    Winchester lever Action w/scope - 30-30 Cal. 40 rounds ammo.

R.D.    11.    Custom built Remington w/Mauser Bolt Action 6 mm Cal. w/scope - 50-60 rounds ammo.

R.D.    12.    Remington Mod. 700 Bolt Action 22-250 Cal. w/scope. 100+ rounds ammo.

R.D.    13.    Remington Single Shot Bolt Action. .22 Cal. 200 rounds ammo.

Ernest    14.    Ruger Mod - 10-22 Semi Auto Rifle. 10 round clip. Ammo same as No. 13.



PLAINTIFF'S
EXHIBIT
2

| | | |
|---|---|---|
| Ernest | 15. | and |
| Ernest | 16. | Two Mauser Mod. P-38 Pistols, Semi Auto 9 mm Cal. 2/8 round clips. 400 rounds ammo. |
| City | 17. | Mauser Semi Auto Pistol 7.65 Cal. 1/7 round clips. 20 rounds ammo. |
| Ernest | 18. | Luger Semi Auto Pistol 9 mm Cal. 2/8 round clips. Ammo same as Nos. 15 and 16. |
| Ernest | 19. | Smith and Wesson Semi Auto Pistol 9 mm Cal. with 3/15 round clips. Ammo as as Nos. 15, 16 and 18. |
| City | 20. | Berretta Mod 92 Semi Auto Pistol 9 mm Cal. with 3/15 round clips. Ammo same as Nos. 15, 16, 18 and 19. |