IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAR 2 8 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN | { | |
| | { | |
| and | { | |
| | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-163 |
| | { | |
| CITY OF HARLINGEN | { | |
| | { | |
| and | { | |
| | { | |
| RAUL RODRIGUEZ | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-99-70 |
| | { | |
| CITY OF HARLINGEN | { | |

---

**DEFENDANT'S RENEWED MOTION UNDER RULE 50
FOR JUDGMENT AS A MATTER OF LAW**

---

TABLE OF CONTENTS

Page

I.  NATURE AND STAGE OF THE PROCEEDINGS ............................ 2

II. GROUNDS FOR JUDGMENT AS A MATTER OF LAW
    AND SUMMARY OF THE ARGUMENT ................................... 4

    A.  Due Process Violation Under 42 U.S.C. § 1983 ......................... 4

    B.  Negligence Under the Texas Tort Claims Act ........................... 8

III. ARGUMENT AND AUTHORITIES ...................................... 10

    A.  Standard of Review ............................................... 10

    B.  Federal Claim .................................................... 11

        1.  No "State Created Danger" Exception
            to _DeShaney_ Exists Or Applies In This Case ...................... 11

        2.  Elements of Any "State Created Danger" Exception ................ 15

        3.  City Did Not Create Ernest Moore's Only
            Opportunity to Commit Shootings .............................. 18

        4.  City Did Not Create the Risk, Did Not Affirmatively
            Place Agents/Deputy In the Dangerous Environment Nor
            Did it Strip Them of Means of Self-Defense or Escape ............ 20

        5.  City Had No Actual Knowledge of
            Immediate Danger to a Known Victim ......................... 25

        6.  No Proximate Cause ......................................... 26

            a.  Policies Too Remote in Time ........................... 27

            b.  Lack of Foreseeability ................................ 28

            c.  No "But-For" Causation ................................ 30

        7.  No Decision or Policy Adopted with Deliberate Indifference ........ 31

            a.  No Deliberate Indifference ............................. 32

              b.      No Ratification by Failure to Punish . . . . . . . . . . . . . . . . . . . . . . . 35

       8.     Officer's Actions Do Not Shock the Conscience . . . . . . . . . . . . . . . . . . 40

   C.    State Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

       1.     Barred by Sovereign Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

       2.     No Evidence of Proximate Cause on
             State Law Negligence Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

       3.     No Evidence to Support State Law Claims . . . . . . . . . . . . . . . . . . . . . . 45

CERTIFICATE OF CONFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# TABLE OF AUTHORITIES

<u>Cites</u>

Abdeljalil v. City of Fort Worth, 55 F. Supp. 614 (N.D. Tex. 1999),
    aff'd mem., 234 F.3d 28 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 44

Anderson v. Nosser, 456 F.2d 835 (5th Cir. 1972)
    (en banc), cert. denied, 409 U.S. 845 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Barfield v. City of Houston, 846 S.W.2d 399
    (Tex. App. - Houston [14th Dist.] 1992, writ denied) . . . . . . . . . . . . . . . . . . . . . 43

Berry v. McLemore, 670 F.2d 30 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 10

Brown v. Bryan County, Okla., 219 F.3d 450 (5th Cir. 2000),
    cert. denied 532 U.S. 1067 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 32, 33

Butler v. Union Pacific Ry. Co., 68 F.3d 378 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . 45

Campus Management, Inc. v. Kimball, 991 S.W.2d 948
    (Tex. App. - Fort Worth 1999, review denied) . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Causeway Medical Suite v. Leyoub, 109 F.3d 1096 (5th Cir.),
    cert. denied, 522 U.S. 943 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

City of Columbus v. Barnstone, 921 S.W.2d 268
    (Tex. App. - Houston [1st Dist.] 1995, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . 42

City of St. Louis v. Praprotnik, 485 U.S. 112 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992) . . . . . . . . . . . . . . . . . . 11, 12

Conner v. Travis County, 209 F.3d 794 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 31, 32

Coon v. Ledbetter, 780 F.2d 1158 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 37, 39

Correa v. Hospital of San Francisco, 69 F.3d 1184
    (1st Cir. 1995), cert. denied, 517 U.S. 1136 (1996) . . . . . . . . . . . . . . . . . . . . . . . 15

*County of Sac. v. Lewis*, 523 U.S. 833 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 39, 40

*Cozzo v. Tangipahoa Parish Council*,
    279 F.3d 273 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32, 33

*Daniels v. Williams*, 474 U.S. 327 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 39

*de Jesus Benavides v. Santos*, 883 F.2d 385 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . 12, 14

*DeShaney v. Winnebago County Dept. of Social Services*
    489 U.S. 189 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 10, 11, 12, 13, 14, 15

*Doe v. Hillboro ISD*, 113 F.3d 1412
    (5th Cir. 1998) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Doe v. Sullivan County, Texas*, 956 F.2d 545 (5th Cir. 1992),
    *cert. denied*, 506 U.S. 864 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Eastland County Co-op Dispatch v. Poyner*, 64 S.W.3d 182
    (Tex. App. - 2001, pet. filed) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Farmer v. Brennan*, 511 U.S. 825 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Fields v. City of Texas City*, 864 S.W. 2d 66
    (Tex. App.-- Houston [14[th] Dist.] 1993 writ. denied) . . . . . . . . . . . . . . . . . . . . . . 35

*Fort Bend County Drainage Dist. V. Sbrusch*,
    818 S.W.2d 392 (Tex. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir.)
    *cert. denied*, 506 U.S. 973 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Gabriel v. City of Plano*, 202 F. 3d 741(5th Cir. 2000),
    *en banc reh. denied*, 211 F. 3d 127 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 31

*Garza v. United States*, 809 F.2d 1170 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . 44

*Glass v. Smith*, 150 Tex. 632, 244 S.W. 2d 645 (1951) . . . . . . . . . . . . . . . . . . . . . . . 36

*Gonzales v. City of El Paso*, 978 S.W.2d 619
    (Tex. App.- El Paso 1998, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

*Gonzalez v. Ysletta I.S.D.*, 996 F. 2d 745 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 36

*Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . 39

*Greene v. Consolidated Freightways Corp.*, 74 F. Supp. 2d
    616 (E.D. Va. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Gros v. City of Grand Prairie*, 181 F.3d 613 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . 36

*Hart v. O'Brien*, 127 F.3d 424, (5th Cir. 1997),
    reh. denied, 154 F.3d 419 (5th Cir. 1998),
    cert. denied, 525 U.S. 1103 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 29, 30

*Hogan v. City of Houston*, 819 F.2d 604 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 13, 14

*Huffman v. County of Los Angeles*,
    147 F.3d 1054 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re: San Juan Dupont Plaza Hotel Fire Litigation*, 43 F.3d 1456
    (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Jackson v. City of Joliet*, 715 F.2d 1200 (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . 12

*Johnson v. Dallas I.S.D.*, 38 F.3d 198 (5th Cir. 1994),
    cert. denied, 514 U.S. 1017 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 23

*Juhl v. Airington*, 936 S.W.2d 640 (Tex. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 45

*Kerrville State Hosp. v. Clark*, 923 S.W.2d 582 (Tex. 1996) . . . . . . . . . . . . . . . . . . . . . 42

*Kennedy v. Baird*, 682 S.W.2d 377
    (Tex. App. - El Paso 1984, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Leavitt v. City of El Paso*, 2000 WL 33348224, *8 (W.D. Tex.
    2000 (Prado, J.), *aff'd* 264 F.3d 1140 (5th Cir. June 19, 2001),
    cert. denied, 122 S.Ct. 646 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521 (5th Cir. 1994) . . . . . . . . . . . . 10, 15, 16

*Martinez v. California*, 444 U.S. 277, 285 (1980) . . . . . . . . . . . . . . . . . . . . . . . 16, 26, 27

*Metromedia Co. v. Fugazy*, 983 F.2d 350 (2nd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . 15

*McClendon v. City of Columbia*, 258 F.3d 432

(5th Cir. 2001) m. reh. en banc granted, ___ F.3d __, 2002
WL 398361 (5th Cir. March 13, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15

*Missouri Pac. RRCo. V. American Statesman*,
552 S.W.2d 99 (Tex. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998),
*cert. denied*, 528 U.S. 810 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Mosley v. Exel Corp.*, 109 F.3d 1006, 1008-09 (5th Cir. 1997) . . . . . . . . . . . . . . . 10, 43

*Mt. Healthy School Dist. v. Doyle*, 429 U.S. 274 (1977) . . . . . . . . . . . . . . . . . . . . . . . 16

*Orrozco v. Dallas Morning News, Inc.*, 975 S.W.2d 392
(Tex. App. - Dallas 1998, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Overton v. City of Austin*, 748 F.2d 941 & n. 15
(5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Pahler v. City of Wilkes-Barre*, 2002 WL 389302 (3rd Cir. 2002) . . . . . . . . . . . . . . . . 41

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001),
reh. denied, 251 F.3d 159 (5th Cir. 2001), *cert. denied*,
122 S. Ct. 53 (2001) . . . . . . . . . . . 10, 14, 15, 16, 21, 22, 23, 24, 25, 27, 28, 30, 37

*Ramos v. City of San Antonio*, 974 S.W.2d 112
(Tex. App. - San Antonio, 1998, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Randolph v. Cervantes*, 130 F.3d 727 (5th Cir. 1997),
*cert. denied*, 119 S. Ct. 65 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

*Reimer v. Smith*, 663 F.2d 1316 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Rodriguez-Cirilo v. Garcia*, 115 F.3d 50 (1st Cir. 1997) . . . . . . . . . . . . . . . . . 16, 27, 30

*Rought v. Porter*, 965 F. Supp. 989 (W.D. Mich. 1996) . . . . . . . . . . . . . . . . . . . . . . 45

*S.S. v. McMellan* , 225 F.3d 960 (8th Cir. 2001)
(en banc) *cert. denied*, 121 S. Ct. 1227 (2001) . . . . . . . . . . . . 15, 16, 21, 22, 40, 41

*Saenz v. Heldenfels Bros., Inc.*, 183 F.3d 389 (5th Cir. 1999)        10, 15, 20, 24

*Schneider v. Esperanza Transmission Co.,*
744 S.W.2d 595 (Texas 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Siegert v. Gilley,* 500 U.S. 226 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Smith v. M. Sys. Food Stores,* 156 Tex. 484
297 S.W.2d 112, 114 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Snyder v. Trepagnier,* 142 F.3d 791(5th Cir. 1998)
*cert. dism'd by agreement,* 523 U..S. 1083 (1999) . . . . . . . . . . . . . . . . . 30, 31, 39

*Story Serv., Inc. v. Ramirez,* 863 S.W.2d 491
(Tex. App. - El Paso 1993, writ denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Sutton v. Utah State School for Deaf and Blind,*
173 F.3d 1226 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Texas Dept. of Crim. Justice v. Lone Star Gas Co.,*
978 S.W.2d 176 (Tex. App. - Texarkana 1998, no pet.) . . . . . . . . . . . . . . . . . . . . . 42

*Texas Dept. of Crim. Justice v. Miller,* 51 S.W.3d 583 (Tex. 2001) . . . . . . . . . . . . . . . 42

*Texas Dept. of Public Safety v. Petta,* 44 S.W.3d 575 (Tex. 2001) . . . . . . . . . . . . . . . . 43

*Turner v. Upton County, Tex.,*
915 F.2d 133 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Univ. of Tex. Med. Branch v. York,* 871 S.W.2d 175 (Tex. 1994) . . . . . . . . . . . . . . . . . 43

*Waldon v. City of Longview,* 855 S.W.2d 875
(Tex. App. - Tyler 1993, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Washington v. Dist. of Columbia,* 802 F.2d 1478
(D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Washington, v. Glucksberg,* 521 U.S. 702 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*White v. Edmond,* 971 F.2d 681 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Whiting v. Central Trux & Parts, Inc.,* 984 F. Supp. 1096
(E.D. Mich. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Williams v. Ellington,* 936 F.2d 881 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 37

*Young v. City of Dimmitt*, 787 S.W.2d 50 (Tex. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Texas Civil Practices & Remedies Code:

§ 101.021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

§ 101.021(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

§ 101.055(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 43

§ 101.056 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

§ 101.057 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

§ 101.057(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Texas Local Government Code Annotated:

§ 143.001 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

§ 143.052 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

§ 143.127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

§ 143.134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Federal Rules of Civil Procedure:

Rule 50(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Rule 50(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Rule 50(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22, 40

Federal Rules of Evidence:

Rule 201(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**Fifth Circuit Local Rules**:

Rule 41.3 .......................................................... 10


**U.S. Constitution**:

42 U.S.C § 1983 ............................................. 1, 25, 32, 44


**Harlingen Charter**:

§ 30 .............................................................. 35

§ 11 .............................................................. 35


**Harlingen Code**:

§ 32.035 ......................................................... 35

§ 32.044 ......................................................... 35

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant **CITY OF HARLINGEN** ("Harlingen" or the "City") renews its motion for judgment as a matter of law under Fed. R. Civ. P. 50, and respectfully requests the Court to enter a take-nothing judgment in its favor.

## I. NATURE AND STAGE OF THE PROCEEDINGS

This case arises from the tragic end of a manhunt to arrest a fleeing murderer, Ernest Moore. Hours earlier, Moore shot three members of the Morin family, two fatally, using an AK-47 semi-automatic; after that rifle was wrestled from him at the Morin house, Ernest fled. Sheriff's deputies pursued him to Det. Moore's home, where Ernest lived. During a shoot-out, Ernest killed two US Border Patrol agents Arturo Salinas and Susan Rodriguez (the "deceased Agents") and wounded Cameron County Deputy Sheriff Raul Rodriguez; Ernest used a Harlingen Police Department ("HPD") AR-15 semi-automatic rifle assigned to Det. R.D. Moore. The Sheriff's deputies killed Ernest in the ensuing shootout.

Although it is unclear when Ernest Moore took the HPD AR-15 from the Moore's gun safe, it is uncontroverted that the HPD rifle was but one of 20 other weapons stored there, including other semi-automatic assault rifles privately owned either by Ernest or his father. At the time in question, the City's practices and policies forbid letting family members use assigned weapons or surrendering them to anyone under any circumstances.

Plaintiffs Deputy Rodriguez and the families of the deceased Agents sued under 42 U.S.C. § 1983 to enforce the Due Process Clause; they have alleged that because the City "allowed" the city-owned gun to fall into Ernest Moore's hands, the City violated the constitutional rights of the officers who were killed or injured in the line of duty when they

1

attempted to arrest Ernest Moore. The plaintiffs have also sued under the Texas Tort Claims Act ("TTCA")[1] claiming that the City negligently entrusted the weapon to Det. Moore.

This case was tried to a jury on these theories between February 19 and 22, 2002. The trial record reflects the following:

- No evidence exists showing that before the date of the shooting then Harlingen Police Chief James Scheopner ("Scheopner") had any reason to know or believe that Det. Moore would not properly safeguard the HPD rifle at home during off-duty hours.

- No evidence exists showing that prior to July 7, 1998, Ernest Moore had committed any violent act or that he had openly expressed an intent to murder anyone.

- No evidence exists showing that Chief Scheopner was aware of Ernest Moore's bouts of depression, his substance abuse, or his apparent fascination with Hitler and "Nazi beliefs." There is no evidence that Scheopner had any reason to believe that, if the AR-15 was issued to Det. Moore, it created a risk that the weapon would be misappropriated by a family member who was abusing drugs and entertaining politically unpopular thoughts.

- Before the shooting began, the deceased Agents and Deputy Rodriguez had been informed that Ernest Moore had murdered other people, was likely to be armed, and was highly dangerous. No city actor placed the officers at the scene of the shooting — they were there because their jobs required them to be — and no city actor stripped them of the means to protect themselves.

- Soon after the shooting incident, the Harlingen Assistant City Manager Joseph LeBeau conducted a thorough investigation of how Ernest had obtained the AR-15 issued to his father. After that investigation, Mr. LeBeau recommended Chief Scheopner step down; Chief Schoepner did so voluntarily. As a further result, a new Chief was hired, and the new Chief implemented

---

1    TEX. CIV. PRAC. & REM. CODE ANN. § 101.001 *et seq.*

new policies to strengthen the City's supervision and control over weapons the City issued to its police personnel.

After the evidence closed, the Court overruled the City's oral and written motion for judgment as a matter of law. Dkt # 184, 192, 193, 196 ; R. 865-874, 884.   On February 26, 2002, the Court received a verdict for the plaintiffs on all counts.  Dkt # 204.  On March 7, 2002, plaintiffs moved for a judgment on the verdict.  Dkt # 210.

## II. GROUNDS FOR JUDGMENT AS A MATTER OF LAW AND SUMMARY OF THE ARGUMENT

Harlingen is entitled to judgment as a matter of law on the following grounds:

**A.   Due Process Violation Under 42 U.S.C. § 1983.**

1.   *No Evidence Exists of an Underlying Substantive Due Process Violation.*

a.   <u>Immateriality of the jury's liability finding</u>.  Under no view of the evidence does this case implicate the affirmative constitutional duty recognized by the Supreme Court in *DeShaney v. Winnebago County Dept. of Social Services.*[2] Substantive Due Process imposed no affirmative *constitutional* duty on the City to protect the injured police officers from assault by a suspect known to be violent during the course of his arrest, an inherent danger of their profession.

b.   <u>No evidence exists of the elements of the state-created danger theory submitted to the jury.</u>  Even if, *arguendo*, the state-created danger theory were a valid exception to *DeShaney* — which the City denies — the evidence is legally insufficient to prove the elements of an underlying violation of that rule, as it was submitted to the jury.  In particular:

  • <u>No evidence exists of knowledge of a particularized risk to specific persons</u>.  Legally insufficient evidence exists to prove that any city actor was deliberately indifferent in creating or increasing any danger to the Agents Salinas and Rodriguez or to

---

2     489 U.S. 189 (1989)

Deputy Rodriguez.  In this regard, there is no evidence Det. Moore knew or believed that if his son Ernest had any access to the AR-15 in question he would take it to murder anyone, let alone harm the deceased Agents or Dep. Rodriguez.

• <u>No evidence exists of use of City authority to create an opportunity for the crime</u>.  Legally insufficient evidence exists to prove that any City actor used his authority to create an opportunity for Ernest Moore to shoot his pursuers, which opportunity would not have existed but for the City actor's conduct.  Since Ernest owned and had access to numerous deadly weapons, the presence of the HPD's AR-15 in the family gun locker did not create an opportunity for a crime to occur different or greater than otherwise existed.

• <u>No affirmative act by a city actor of placing the injured officers in the alleged dangerous environment</u>.  Legally insufficient evidence exists to prove that a city actor *affirmatively* placed the deceased Agents and Deputy Rodriguez in a dangerous environment, let alone that some city actor stripped them of their ability to defend themselves or cut off potential sources of private aid. They voluntarily went to Det. Moore's premises fully armed for the purpose of finding and arresting Ernest Moore, whom they knew to be an armed and dangerous killer on the run.

• <u>No evidence exists of proximate cause</u>. The evidence is legally insufficient to prove either component of proximate causation, cause-in-fact or foreseeability. As to the cause-in-fact component, the evidence conclusively demonstrated Ernest Moore had access to numerous deadly weapons (including assault rifles which the City did not own), and there is no proof that but for the presence of R.D. Moore's AR-15 in the family gun vault that day, Earnest would have peacefully surrendered to police without incident, rather than engage police in a suicidal gun battle. As to foreseeability, there is no evidence to show that prior to July 7, 1998, any city actor knew or had reason to know that Ernest Moore had ever exhibited any violent behavior which signaled a significant likelihood that he would commit murder, if allowed access to a city-owned weapon.

• <u>There was no act by any City officer that "shocks the conscience."</u>  If there is any "state created danger" exception to

*DeShaney*, it is a species of Substantive Due Process and Plaintiffs had to prove the responsible officer's actions meet the "shock the conscience" standard, which is more than gross negligence or deliberate indifference. No legally sufficient evidence exists that any officer's conduct rises to this level of official abuse and brutality.

2. *No Evidence Exists of the Requisite Municipal Involvement By The Final Policymaker.*

a. <u>No direct final policymaker involvement</u>. No legally sufficient evidence exists to prove that any of the City policymakers, the City Council, the City Manager, or the Police Chief, knew that the City, by issuing the AR-15 to Moore, had thereby created a high risk that Moore's son would, as he did, steal the gun and use it to commit a murder. Indeed, there is no evidence that any final policymaker knew or had reason to know that Ernest Moore would be afforded access to the AR-15, in violation of express City policy.

b. <u>No evidence exists that any city policy or custom proximately caused the alleged underlying deprivations</u>. No legally sufficient evidence exists to prove that any official city policy, adopted by any City final policymaker, was the moving force of the alleged state-created danger or Ernest Moore's decision to shoot the deceased Agents or of Dep. Rodriguez. Whether or not the City enforced its regulations requiring Det. Moore to be proficient with the AR-15, Det. Moore's level of proficiency with that rifle did not cause Ernest to murder anyone. Whether or not the City documented its assignment of the gun to Det. Moore did not cause Ernest Moore to commit murder. No city policy required the City to preserve rather than destroy the weapon after Mrs. Pirtle turned it in; the refusal to destroy the weapon did not proximately cause Ernest Moore to use it to commit murder. The City did have policies forbidding personal use of property or surrendering their weapons to non-officers, and those policies were violated in this case. There is no legally sufficient evidence to prove that any final policymaker of the City condoned, or had constructive knowledge of, any widespread unconstitutional behavior so as to give rise to an unofficial custom with the force of law, or that any such custom was the proximate cause of the alleged state-created danger in this case.

c.   <u>No evidence of deliberate indifference exists</u>.  The evidence is legally insufficient to prove that the relevant final policymaker, in promulgating or condoning the policies and/or customs at issue here, was deliberately indifferent to whether the policies or customs would proximately cause constitutional violations of the sort at issue here.

c.   <u>No evidence exists to support municipal liability on a failure-to-train theory</u>.  No legally sufficient evidence exists to prove that need for more or different training concerning the storage, safeguarding, or assignment of weapons was so obvious, and the inadequacy so likely to result in the violation of the constitutional rights allegedly at issue here, that the policymakers of the City can reasonably be said to have been deliberately indifferent to the need.  Indeed, plaintiffs failed in this case to prove that (1) Harlingen officers were inadequately trained in relation to the assignment, storage, or safeguarding of their weapons, (2) a pattern of similar incidents in which the citizens were injured as a result of deficient training in this area, or (3) any alleged failure to train reflected a "deliberate" or "conscious" choice to endanger constitutional rights of the sort allegedly at issue here.  As to item (2), the "single incident exception" does not apply in this case because plaintiffs did not adduce legally sufficient evidence to prove the possibility of recurring situations that present an obvious potential for violation of the alleged constitutional rights at issue here and the need for additional or different training.  Moreover, no evidence exists that any purported inadequate training of city police officers was a proximate cause of Ernest Moore's decision to commit murder.

d.   <u>No evidence of ratification</u>.  Plaintiffs have failed to adduce legally sufficient evidence to prove that the relevant City final policymakers approved the alleged underlying constitutional violations or the basis for it. A custom or policy authorizing or encouraging police misconduct cannot be inferred from the City's isolated decision not to discipline any single officer for a single incident of alleged illegality.  In this particular case, the relevant final policymaker, the City Manager, authorized a thorough investigation of the City's policies for assigning weapons to police and the particular circumstances of the Department's assignment of the AR-15 in question to Det. Moore.  Following that investigation, the City Manager

6

recommended Chief Scheopner's demotion; Scheopner "voluntarily"stepped down. The new Chief then implemented a revised weapons policy which significantly tightened the City's supervision and control over its police firearms. As a matter of law, this action evidences concern, not deliberate indifference.

**B.     Negligence Under the Texas Tort Claims Act.**

1.     *No evidence exists of conduct for which the TTCA waives the City's sovereign immunity.*

    a.     <u>No "use" of property</u>. There is legally insufficient evidence to prove that Chief Scheopner's or R.D. Moore's "use" of the AR-15 proximately caused the deaths or injuries at issue.

    b.     <u>Intentional tort exemption</u>. Since this case arises out of Ernest Moore's intentional torts, there is no waiver of immunity. TEX. CIV. PRAC. & REM. CODE ANN. § 101.057(2).

    c.     <u>Discretionary/police power exemptions</u>. To the extent the negligence finding depends on either the City's inadequate policies or on a failure to have adopted policies — i.e., policies requiring documented assignments of weapons, policies concerning safe storage of police weapons during off-duty hours, or policies requiring periodic weapons competency certification — such a finding cannot support liability under the Tort Claims Act due to the police protection exemption (TEX. CIV. PRAC. & REM. CODE ANN. § 101.055(3)) and the discretionary powers exemption. TEX. CIV. PRAC. & REM. CODE ANN. § 101.056.

2.     *No evidence of any underling act of actionable negligence on the part of a City employee.*

    a.     <u>The deceased Agents and Deputy Rodriguez knew of the danger of confronting an armed, fleeing felon</u>. Thus, they (or their beneficiaries) are barred from recovery for injuries caused by

ordinary negligence as a result of risks inherent in responding to the emergency.

b. <u>No evidence exists of negligent entrustment by Chief Scheopner</u>. There is no evidence that Scheopner knew or should have known that issuing the AR-15 to Det. Moore would create a substantial risk that the weapon would be stolen by a family member and later used to commit a murder. No evidence exists that Det. Moore had any prior history of carelessness with his police-issued weapons, that the Chief knew of any such history even if Det. Moore had been careless on other occasions or the Chief knew Det. Moore would allow anyone unauthorized access to the city-owned weapon. Nor did Plaintiffs prove that Scheopner had any awareness of Ernest Moore's bouts of depression, his history of drug abuse, or his apparent Hitler fixation. Indeed, there is no evidence whatsoever of any prior violent acts by Ernest Moore.

c. <u>No evidence exists of any City actor's entrustment of the AR-15 to Ernest Moore.</u> No evidence exists to prove that Det. Moore entrusted the AR-15 to Ernest. Furthermore, if such evidence did exist (which the City denies) the City is not liable for such entrustment because it was contrary to City policy, and thus, Det. Moore did not act in the course and scope of his employment if he did entrust the rifle to Ernest.

d. <u>No evidence of any negligent act of Det. Moore</u>. No evidence exists to show that Det. Moore knew or should have known that his adult son would steal the AR-15 from the family's locked gun cabinet and use it to kill or injure someone.

e. <u>No evidence exists of proximate cause</u>.

• <u>Other guns available</u>. There is no evidence that had the AR-15 in question not been accessible, Ernest Moore would not have utilized one of the

8

other weapons to kill Agents Salinas and Susan Rodriguez and wound Deputy Raul Rodriguez.

• No "but for" connection between the lack of documentation and injuries. The claimed failure of the City to document the assignment of the AR-15 to Det. Moore did not cause Ernest Moore to murder the Agents or wound Deputy Rodriguez.

• No "but for" connection between Det. Moore's failure to demonstrate his proficiency with the weapon and the injuries. Det. Moore knew how to operate the weapon proficiently, but in any event even if Det. Moore could not hit the broad side of a barn with the rifle, the claim that he lacked a certificate of demonstrated proficiency in using the weapon did not cause his son to use the weapon to shoot people.

• Unforeseeable as a matter of law that the City's failure to have the AR-15 "disposed of" in 1995 by destroying it would result in Ernest Moore's shooting spree.

• Unforeseeable as a matter of law that the Chief's assignment of the gun to Det. Moore would lead to Moore's son using the weapon to commit murder.

• Unforeseeable as a matter of law that Det. Moore's method of storing the gun would proximately cause Ernest Moore's decision to use it in the shoot out with police.

## III. ARGUMENT AND AUTHORITIES

A.     **Standard of Review**

Judgement as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for a party on an issue on which that party has

been fully heard.[3] The court should consider all of the evidence in the light most favorable to the party opposed to the motion.[4] Where, as here, the facts and inferences point so strongly in favor of the movant that reasonable jurors could not arrive at a contrary verdict, granting the motion is proper.[5]

## B.    Federal Claim.

### 1.    No "State Created Danger" Exception to *DeShaney* Exists Or Applies In This Case.

Charge Question No. 2 limited any federal claim to "state created" danger. On March 13, 2002, the Fifth Circuit granted petition for rehearing en banc in *McClendon*,[6] the only Fifth Circuit case to recognize the validity of any "state created" danger exception to *Deshaney*.    As a result, the panel opinion is automatically vacated[7] and is thus no longer the law in this Circuit.

This restores the pre-*McClendon* status.  The Fifth Circuit previously questioned "state-created danger" doctrine[8] and consistently refused to adopt it.[9] A fair reading of the

---

3    FED. R. CIV. P. 50(a)(1).

4    *Mosley v. Excel Corp.*, 109 F.3d 1006, 1008-09 (5th Cir. 1997), *quoting Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969).

5    *Id.*

6    *McClendon v. City of Columbia*, 258 F.3d 432 (5th Cir. 2001) *m. reh. en banc granted*, ___ F.3d ___, 2002 WL 398361 (5th Cir. March 13, 2002)

7    *See* 5th CIR. LOC. R. 41.3.

8    *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 530 (5th Cir. 1994).

9    *Randolph v. Cervantes*, 130 F.3d 727, 731 (5th Cir. 1997) ("The state-created danger theory has not been adopted in this Circuit."), *cert. denied*, 119 S. Ct. 65 (1998); *see also Saenz v. Heldenfels Bros., Inc.*, 183 F.3d 398, 392 n.6 (5th Cir. 1999); *Piotrowski v. City of Houston*, 237 F.3d 567, 585 (5th Cir. 2001), *reh. denied*, 251 F.3d 159 (5th Cir. 2001), *cert. denied*, 122 S. Ct. 53 (2001).

U.S. Supreme Court's opinion in *DeShaney v. Winnebago County Dept. of Soc. Serv.*,[10/] would reveal there is no such doctrine. *DeShaney* holds that an affirmative constitutional duty to provide protection arises only from the state's affirmative act of taking an individual into custody, which, in due process nomenclature, "deprived" the individual of the personal "liberty" necessary for self-protection.[11/]

Because there was no such custody imposed on Deputy Rodriguez or the deceased Agents, *DeShaney* therefore holds that no constitutional violation occurred.

The state-created danger doctrine as developed by some lower courts is a gloss on the body of constitutional common law known as Substantive Due Process. For good reason, the Supreme Court has exhorted all federal courts to resist the temptation to implement their policy preferences under this concept. "'[G]uideposts for responsible decisionmaking in this unchartered area are scarce and open-ended,'"[12/] and when federal courts extend constitutional protection to an asserted right, to a great extent they "place the matter outside the arena of public debate and legislative action."[13/] Substantive due process is not a font of constitutional tort law simply to be thrust upon the states.[14/]

---

10    489 U.S. 189 (1989).

11    *Id.*, at 200-01 (citations omitted) (emphasis added).

12    *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

13    *Washington*, 521 U.S. at 720; *see also, generally, Causeway Medical Suite v. Ieyoub*, 109 F.3d 1096, 1113-24 (5th Cir.) (E. Garza, concurring) (criticizing the free-roaming judicial activism under the guise of interpreting the word "liberty" in the Due Process Clause, and arguing that courts abusing judicial power in this manner have effectively abrogated the power reserved by the people to amend the Constitution), *cert. denied*, 522 U.S. 943.

14    *See, .e.g., Siegert v. Gilley*, 500 U.S. 226 (1991) (reputation is not a constitutionally protected interest); *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (negligently inflicted harm is not constitutionally cognizable).

Nothing in the text [15] or history[16] of the Due Process Clause supports the claim that any constitutional liberty interest exists to be free from a state-created risk of being victimized by private crime. Before deciding whether such a purported interest warrants constitutional recognition, this Court should not begin by plucking an isolated sentence out of context from the *DeShaney* opinion. The proper starting point should be the Constitution itself, with due regard for our Nation's history, legal traditions, and practices in the relevant area.[17] Those sources provide no support for any constitutionally-based right to be free of some amorphous governmentally-enhanced risk of being victimized by private crime. Indeed, the longstanding common law tradition generally holds that police officers injured in the line of duty have no recovery against persons whose negligence caused the officer to confront the dangerous situation.[18]

Courts deciding the reach of the *DeShaney* rule are in accord on this point. In *de Jesus Benavides v. Santos*,[19] plaintiffs were prison officials who alleged that other prison personnel had been deliberately indifferent in allowing prison inmates to smuggle weapons into the prison. During an attempted prison break, prisoners shot the plaintiffs. On the

---

15    *See Collins v. City of Harker Heights*, 503 U.S. 115, 130 (1992) (rejecting claim of the family of a deceased city worker who died of asphyxia in a city sewer system — certainly a danger both created by the state and known to be dangerous — and concluding that "the Due Process Clause does not impose an independent federal obligation on municipalities to provide certain minimal levels of safety and security in the workplace.").

16    *See Jackson v. City of Joliet*, 715 F.2d 1200, 1203-04 (7th Cir. 1983) (Posner, J.) (noting that the Fourteenth Amendment, adopted in 1868 at the height of laissez-faire thinking, was concerned with official oppression, such as misuse of the state's power to kill, not with the state's failure to prevent death).

17    *See Washington*, 521 U.S. at 710 (and cases cited).

18    See Juhl v. Airington, 936 S.W.2d 640, 645-46 (Tex.1996) (R. Gonzales, J., concurring in a scholarly opinion about the history and status of the Fireman's Rule).

19    883 F.2d 385 (5th Cir. 1989).

strength of *DeShaney*, the Fifth Circuit affirmed the dismissal of the complaint for failure to state a claim, holding that in contrast to the custodial relationship which triggers an affirmative constitutional duty to protect persons from private violence, "prison guards are employees who enlisted, on terms they found satisfactory, and who were free to quit whenever they pleased."[20/] The Fifth Circuit cited its earlier ruling in *Hogan v. City of Houston*,[21/] a pre-*DeShaney* opinion. In *Hogan*, the Fifth Circuit similarly affirmed the dismissal of a complaint alleging that certain policies of the City of Houston's prisoner intake facility allowed a prisoner to grab an officer's gun and shoot Hogan, another officer, and that such policies manifested deliberate indifference for the safety of its officers.

In *Washington v. Dist. of Columbia,* a prison guard was attacked by an inmate with a concealed steel leg post.[22/] He claimed that the other prison officials recklessly and knowingly had inadequate procedures to search for weapons, to reduce overcrowding, and to identify violent prisoners.[23/] The D.C. Circuit upheld a Rule 12(b)(6) dismissal. There was no constitutional duty to protect the guards in this situation because the state did not force guards into a situation where they were helpless; the guards voluntarily chose their job and were free to leave if the risks were unsatisfactory. As the D.C. Circuit noted:

> "The state must protect those it throws into snake pits, but the state need not guarantee that volunteer snake charmers will not be bitten."[24/]

---

20    *Id.* at 388 (internal quotation marks and brackets deleted).

21    819 F.2d 604 (5th Cir. 1987).

22    802 F.2d 1478, 1479 (D.C. Cir. 1986).

23    *Id.*

24    *Id.* at 1482.

The point of comparison is that the nature of the law enforcement job puts the officer in harm's way; the state does not create the risk that law enforcement officers will face violent offenders. In *de Jesus Benavides, Hogan,* and *Washington* officers all claimed that inadequate policies allowed criminals to obtain and use weapons against them. In each case the courts found that the state did not create the risk, affirmatively put the officers in the dangerous situation they had been hired to confront, or deprive them of the means of self-defense.

Similarly in this case, there is no view of the evidence which brings it within the rule of *DeShaney*. The City did not affirmatively place the deceased Agents or Deputy Rodriguez in the line of fire. Those officers assumed that risk as part of their duties; they put themselves there. Thus, under the under the rubric of the Due Process Clause, the City did not deprive them of any interest in "life" or "liberty" so as to trigger an affirmative duty of protection. It was Ernest Moore, the private gunman, who committed *those* deprivations. Thus, the jury's answer to Question No. 2 is legally immaterial.

## 2.    Elements of Any "State Created Danger" Exception

Assuming *arguendo* a "state created" danger exception to *DeShaney* is recognized, the Fifth Circuit has outlined the elements of that theory:[25]

a.    The state actors must intentionally create an environment that is dangerous;

b.    The state actors must know that it is dangerous;

c.    The state actors must have used their authority to create an opportunity that otherwise would not have existed for a third party to commit the crime;

---

25    *Piotrowski,* 237 F.3d at 585; *Randolph,* 130 F.3d at 731.

d.    The state actors must affirmatively place that person in the dangerous environment, effectively stripping such person of his or her ability to defend themselves or cut off potential sources of private aid; and

e.    The action must be done with deliberate indifference.[26]

The key to the "state created danger" theory lies in the state actor affirmatively placing the individual in a position of danger, effectively stripping a person of self defense or cutting off private sources of aid.[27]

The official must have "actual knowledge" that a serious risk of physical harm exists.[28] At the time the official acted, he must have subjective knowledge of an immediate risk to a specific victim.[29] The official must create a risk of harm that did not exist before

---

26    Defendant urges that the standard is "shock the conscience" rather than deliberate indifference. *Piotrowski* indicates the actor's mental attitude must be deliberate indifference. However, any exception to *DeShaney* could state only a Substantive Due Process claim. The standard for such claims is "shock the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *S.S. v. McMullen*, 225 F.3d 960, 964 (5th Cir. 2001)(en banc) *cert. denied*, 121 S.Ct. 1227 (2001); *Sutton v. Utah State School for Deaf and Blind*, 173 F.3d 1226, 1238 (10th Cir. 1999); *cf, Lefall*, 28 F.3d at 531 (predicting that "shock the conscience" standard would apply to any "state created danger" exception to *DeShaney*). While a Rule 50(b) renewed motion is restricted to those grounds urged in the Rule50(a) motion preverdict, the Court may consider new grounds when necessary to prevent "manifest injustice." *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1196 (1st Cir. 1995); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 362 (2nd Cir. 1992). Here, at the time of trial, *McClendon* set the standard as deliberate indifference. This court had said *McClendon* was the law and it would not speculate on what the Fifth Circuit would or would not do. Dkt # 162, p. 4 n.1. Now *McClendon* has been withdrawn, which leaves the question undecided. It is manifestly unjust to prevent the City from taking advantage of new arguments opened by a postverdict change in the law.

27    *Piotrowski*, 237 F.3d at 585 *citing Johnson v. Dallas I.S.D.*, 38 F.3d 198, 201 (5th Cir. 1994).

28    *Doe v. Hillsboro ISD*, 113 F.3d 1412, 1415 (5th Cir. 1998)(en banc).

29    *Saenz v. Heldenfels Bros., Inc.*, 183 F.3d 389, 291, 292 (5th Cir. 2000).

15

the state's intervention.[30] Merely increasing the risk of harm is insufficient.[31] If the danger is the same as if the state had done nothing, there is no "state created" danger.[32]

This Court stated that causation is especially important in the context of state-created danger exception cases, where frequently it is difficult to identify to what extent the danger faced by the plaintiff was caused by the state versus a private actor. Dkt # 43, p. 20. The official's act must have proximately caused the violation of the plaintiffs' federal rights.[33] Implicit in the 'deprivation' of liberty or property is a causal link between the constitutional violation and the deprivation.[34] First, the constitutional violation must not be too remote from the injury.[35] Second, the deprivation must be a foreseeable result.[36] Third, it must be the 'cause-in-fact' of the deprivation.[37] This means that the deprivation would not have occurred 'but-for' the constitutional violation.[38]

---

30    *Piotrowski*, 237 F.3d at 584.

31    *Lefall*, 28 F.3d at 531; *Johnson v. Dallas ISD*, 38 F.3d 198, 201 (5th Cir. 1994), *cert. denied*, 514 U.S. 1017 (1995).

32    *S.S. v. McMullen*, 225 F.3d 960, 962-63 (8th Cir. 2001)(en banc), *cert. denied*, 121 S.Ct. 1227 (2001).

33    *Martinez v. California*, 444 U.S. 277, 285 (1980); *Doe v. Sullivan County, Texas*, 956 F.2d 545, 550 (5th Cir. 1992); *Reimer v. Smith*, 663 F2d 1316, 1322 (5th Cir. 1981).

34    *Mt. Healthy School Dist. v. Doyle*, 429 U.S. 274, 286 (1977); *Martinez*, 444 U.S. at 285; *Reimer*, 663 F.2d at 1322.

35    *Martinez*, 444 U.S. at 285.

36    *Anderson v. Nosser*, 456 F.2d 835, 841 (5th Cir. 1972)(en banc), *cert. denied*, 409 U.S. 845 (1972).

37    *Rodriguez-Cirilo v. Garcia*, 115 F.3d 50, 52 (1st Cir. 1997).

38    *Mt. Healthy School Dist.*, 429 U.S. at 287; *Hart v. O'Brien*, 127 F.3d 424, (5th Cir. 1997), *reh. denied*, 154 F.3d 419 (5th Cir. 1998), *cert. denied*, 525 U.S. 1103 (1999).

### 3.    City Did Not Create Ernest Moore's Only Opportunity to Commit Shootings

When this Court denied the City's motion for summary judgment, it concluded that Ms. Cox's prior affidavit was the only evidence available for the jury to determine whether Ernest chose HPD AR-15 deliberately or randomly. Dkt. # 146, p. 10. The Court concluded that her prior affidavit was "central to the Plaintiffs' case." Dkt. # 146, p. 11. It was the expectation she would testify the HPD rifle was his favorite and he carried it often in his truck that defeated summary judgment. Dkt # 164, pp. 4-5.

However, at trial, Ms. Cox did not testify Ernest preferred the HPD rifle, used it, or carried in his truck. Though she saw Ernest shoot rifles at her father's house before Ernest got his own AR-15 rifle, she could not say what rifles he used; she could not say the rifles she saw him use were PX-1, DX-1, or any other rifle. R. 452 (l. 19-21), 453 (l. 81-21), 454 (l. 14-23), 455 (l. 17-19). Plaintiffs conceded that her trial testimony shed no light on this issue. R. 872(l. 18-19).

In short, no evidence existed to refute Det. R.D. Moore's testimony that Ernest's favorite rifle was the AK-47 and that this was the rifle he usually carried in his truck. R. 400 (l. 19-20), 444 (l. 1-7). He said Ernest had used the HPD rifle only on one prior instance, and he shot only two to three bullets. R. 363 (l. 6-23).

Moreover, whether or not Ernest's favorite was the HPD rifle is immaterial because the evidence fails to support the causal linchpin- that 'but for' the presence of the HPD rifle in the Moore gun safe, the shootings would not have occurred. Mr. Kirkham's opinions are "no evidence" to show the presence of the HPD rifle created the only opportunity to shoot

the officers. First, Kirkham freely acknowledged that the presence of the other rifles in the gun safe gave Ernest an opportunity to commit the crimes. R. 600 (l. 10-14), 640 (l. 3-6).[39] Although he claimed the presence of the HPD weapon "substantially and proximately in my view *contributed*" to the shooting (R. 632 (l. 17-24)), he conceded that he did not specifically know why Ernest chose the HPD rifle and, most importantly,  that there is no way of knowing if he would have chosen the other rifles if the HPD weapon were not there. R. 588 (l. 19-25).

Kirkham's "favorite gun" theory suffered because (1) it committed the logical fallacy of assuming its conclusion as a premise and (2) he could not testify as a psychologist as to Ernest's motives.  He admitted his opinions on "contribution" were based on a *hypothetical assumption* that Ernest had more familiarity with and preference for the HPD rifle than the others; which made him deliberately choose it over the others present.  R.590 (l. 18-21), 591(l. 10-15), 640 (l. 11-20).  This *assumption* is the most important and "primary factor" for his opinion on contribution. R. 589 (l. 7-17), 597(l. 1-14).  Plaintiffs offered no evidence to prove that assumption.  None of Kirkham's data supports a conclusion Ernest deliberately chose the HPD rifle over the others.  Kirkham considered significant a police photo of the gun safe showing the Colt AR-15 in front of the others. R. 591 (l. 16-22).  However he admitted that photo was taken *after* Det. Moore had removed and replaced the Colt AR-15 during the shooting; he therefore did not know the location of the rifles within the safe when Ernest took the HPD AR-15 and thus could not say Ernest "reached past" the Colt AR-15 to

---

39    Twenty firearms were present in the Moore gun safe. DX-1. Fourteen were rifles or shotguns, included a M-1 carbine, a SKS, a Colt AR-15 and the HPD Olympic arms AR-15,  its 'clone'. R. 354 (l. 19) - 355 (l. 10), 444 (l. 25) - 446 (l. 6).

grab it.  R. 591(l. 23) - 592 (l. 4), 592 (l. 17-22).   The Court held that his speculation on

Ernest's possible psychological motives to pick a police rifle over privately-owned ones was

inadmissible.  R. 608 (l. 9-13).  Kirkham conceded his conclusion that Ernest "deliberated"

before choosing was undercut by Ernest being "high" on drugs and alcohol.  R. 593 (l. 3-19);

PX-9.

Finally, his "favorite gun" theory was based on his unsupported belief that  mentally

disturbed people will always seek out weapons with which they are familiar.  R. 589 (l. 15-

17).  He derived this opinion from his 'experience.'  R. 598 (l. 1-14).  He admitted that he

had not tested this opinion, nor had he submitted it to "peer review" by other criminologists.

R. 597 (l. 20-25).  In fact, this case was unique for him; he had never seen a case where the

shooter had to choose one rifle of many.  R. 598 (l. 25) - 599 (l. 3), 640 (l. 7-10).  In short,

he is like the sociologist who opines all Indians walk in single file because the only one he

ever saw did so.

Ernest's preference, if any, for one rifle over another is immaterial to whether the

HPD rifle gave him his only chance to shoot anyone.  For the Plaintiffs to forge a causal

link, the evidence must show the HPD rifle created his only opportunity to shoot them, one

that would not otherwise exist.  Whenever Ernest took the HPD rifle, its presence among the

other equally powerful rifles did not alter what would occur.   Therefore, the link is missing.

### 4.   City Did Not Create the Risk, Did Not Affirmatively Place Agents/Deputy In the Dangerous Environment Nor Did it Strip Them of Means of Self-Defense or Escape

The City did not create the risk of harm that Ernest Moore would shoot the deceased

Agents or Dep. Rodriguez.  Their profession imposes on them the risk that they will face

danger when trying to arrest violent offenders. The City did not put them there, it did not put Ernest Moore there, nor did it give him the motive to shoot them.

The Sheriff requested Border Patrol assistance; Agent Susan Rodriguez responded from the field; and Agent Salinas responded from the station. DX-2, R. 721 (l. 3-18), R. 859 (l. 14-22). Plaintiff Raul Rodriguez was sent by his Sergeant Saenz. R. 837 (l. 7) - 838 (l 20). It was Plaintiff Raul Rodriguez who told agent Susan Rodriguez and her team to wait near their vehicle, their location when Ernest opened fire. R. 839(l. 24)-840(l. 7).

Once they arrived they were briefed on the danger Ernest posed and able to take whatever actions they deemed necessary for their defense. CCSD and BP knew that Ernest had already killed two persons with a rifle. Det. Moore advised CCSD Dep. Roberto Rodriguez that Ernest was in the area, possibly in the fields around the house, that Ernest had assault rifles capable of piercing Keflar vests, and that he was likely to return to either kill them or himself. R. 663 (l.1-19), 668 (l. 2) - 669 (l.14). This was in turn communicated to the Sheriff's Department and Agents Susan Rodriguez and Salinas were briefed about the situation. R. 670 (l. 8) - 672 (l. 3), 698 (l. 12) - 699 (l. 13), 862 (l. 12) - 864 (l. 6). Agent Hupp on her team brought with him an M-4, a fully automatic assault rifle similar to the Army's M-16. R. 858 (l. 5-18). After Agent Rodriguez's team realized Ernest could be in the cornfield next to their unit (which was exactly where he was), they chambered rounds in their rifles. R. 860 (l. 14) - 861 (l. 7).

*Abdeljalil v. City of Fort Worth*,[40] is a remarkably instructive case on this point. In that case, the wife and children of a murder victim alleged a state-created danger claim

---

40    55 F. Supp. 614 (N.D. Tex. 1999), *aff'd mem.*, 234 F.3d 28 (5th Cir. 2000).

against a city and a city employee, Shirley Walker, after the victim was stabbed to death by the city employee's son, Duncan Walker. Ms. Walker worked in the evidence room of the Fort Worth Police Department. There, by means of a city-owned computer, she obtained confidential information concerning the whereabouts of the victim, which she provided to her son. Duncan used this information to locate the victim's home and murdered the victim using a 8-10 inch folding pocket knife that Shirley Walker had stolen from the police department evidence room and given to Duncan. In granting summary judgment for Ms. Walker on the underlying state-created danger claim, the Court recited the tentative three-element formulation of that theory, and stated: "To prove the third element, a plaintiff must demonstrate that he was stripped of means to defend himself and cut off from sources of aid" by the state actor. Plaintiffs have failed to raise an issue of fact as to whether Shirley actively prevented plaintiffs from protecting themselves from Duncan's attack."[41] This same logic dictates the outcome in the present case: the Salinas and Rodriguez plaintiffs have failed to raise any issue of fact as to whether Det. Moore prevented the deceased Agents or Deputy Rodriguez from protecting themselves from Ernest Moore's attack.

The Fifth and Eighth Circuits also recently highlighted the importance of determining whether any risk created was greater than if the state had done nothing.[42]

In *Piotrowski*, the victim of a botched contract murder instigated by her former lover claimed Houston detectives assisted a private detective who hired the would-be killer for her ex-lover. Piotrowski left her boyfriend who had become increasingly violent, physically

---

41    *Id.*, at 627 (internal quotes and citations omitted).

42    *Piotrowski*, 237 F.3d at 584; *S.S.*, 225 F.3d at 963.

abusing her.[43] The private detective then hired a killer, giving him Piotrowski's mug shots he obtained from his police contacts.[44] The first attempt on her life failed, but this convinced Piotrowski her life was in danger.[45] The second attempt to kill her left her paralyzed. The district court found for Piotrowski.

The 5th Circuit reversed and rendered. First, the City of Houston's acts did not create the risk that the ex-lover would try to harm her. The ex-lover had a propensity for violence before police did anything; thus, the police actions at best left Piotroski in an already dangerous position. [46] Second, by leaving her to fend for herself, the City did not create a risk of harm different from what would have happened had the police done nothing.[47] Nothing the police did made the existing danger any different.[48]

In *S.S.*, the state family services agency removed a child from the home because the father had permitted a pedophile to sexually abuse her; two years later the agency returned the girl to her father's care. The father permitted the pedophile to live in the house and the pedophile then raped the girl, causing her substantial injury.[49] The 8th Circuit (en banc)

---

43    237 F.3d at 572.

44    *Id.* at 574.

45    *Id.* at 574-75.

46    *Id.* at 584.

47    *Id.*

48    *Id.* at 584-85.

49    225 F.3d at 962.

upheld a Rule 12(b)(6) dismissal.[50]  The state's action did not create a risk any greater than if it had never removed the child from her father's care.[51]

This Court distinguished *Piotrowski*, because there the ex-boyfriend had already made attempts on plaintiff's life. Dkt. #146, pp. 10-11. *Piotrowski* is controlling because the victim knew of her *danger*. The Fifth Circuit held that her claim failed on this element because she knew of the *threat* and the City did nothing to prevent her from defending herself.[52] The law enforcement team knew Ernest's intent, and believed him armed and nearby. Had the City destroyed its rifle in 1997, the team would still have been there facing the same risk of harm.

In *Johnson v. Dallas ISD*[53] a non-student entered a high school campus with a handgun, started a disturbance, and shot a student.[54] The Fifth Circuit held that the students presence on campus due to compulsory attendance was insufficient to prove school officials stripped him of the means of self-defense or aid.[55]  The claim failed because there was nothing to show the officials placed him in a confrontational encounter with a violent criminal or put the criminal in front of him.[56]

---

50    *Id.* at 963.

51    *Id.*

52    237 F.3d at 585, 585 n. 33.

53    38 F.3d 198, 202 (5th Cir. 1994), *cert. denied,* 514 U.S. 1017 (1995).

54    38 F.3d at 199.

55    *Id.* at 202.

56    *Id.*

### 5.    City Had No Actual Knowledge of Immediate Danger to a Known Victim

The "state created danger" doctrine will not apply where the government actor is not subjectively aware of any immediate danger facing the victim.[57] In *Saenz*, the Fifth Circuit clearly stated that the "state created danger" theory is inapposite without a known victim. [58] The state actors must intentionally create that risk of harm.[59]

In *Saenz*, the Fifth Circuit upheld summary judgment in favor of two sheriff's deputies who declined to arrest an obviously drunk driver.[60] About 15 minutes after the deputies declined to arrest him, the drunk driver had an accident causing two fatalities. The Fifth Circuit affirmed, holding that allegations the officers were aware of the danger posed by the drunk and made plaintiffs more vulnerable were insufficient to state a claim.[61] The officers did not deny life or liberty if they were not subjectively aware the plaintiffs were there.[62] They did not violate Due Process by increasing the risk of harm to unidentified members of the public.[63] The identity of the person endangered must be known to the officer at the time he creates the risk.[64]

---

57    *Saenz*, 183 F.3d at 391.

58    *Id.* at 392.

59    *Piotrowski*, 237 F.3d at 585.

60    183 F.3d at 390.

61    *Id.* at 391.

62    *Id.*

63    *Id.* at 392.

64    *Id.*

Here, at the time the rifle was assigned to Det. Moore, no one at the City had actual awareness of any risk to the deceased Agents or Dep. Rodriguez. There is no evidence Det. Moore deliberately gave the HPD rifle to his son or that Chief Schoepner ever suspected Ernest would acquire it. There is no evidence either intended him to take the rifle on July 7, 1998. They did not know against whom Ernest might use it.

### 6.    No Proximate Cause

It is not enough for Det. Moore actions to be a proximate cause; a City policy must also be a direct cause, a moving force. A direct causal link must exist between the City's policy and the constitutional violation; the policy was the "moving force" behind the injury.[65] If this element were diluted section 1983 municipal liability would collapse into respondeat superior.[66] The Charge identified five (5) possible policies:

    a.    the failure to destroy the AR-15 rifle in question;

    b.    the failure to enforce regulations requiring the demonstration of proficiency with assigned weapons;

    c.    the failure to have a policy requiring written assignment of weapons to officers;

    d.    the failure to instruct or train police officers concerning storage, safeguarding, or assignment of weapons; or

    e.    the assignment of the AR-15 rifle in question to Detective R. D. Moore.

---

65    *Piotrowski*, 237 F.3d at 580; *Brown v.Bryan County, Okla.*, 219 F.3d 450, 457 (5th Cir. 2000).

66    *Piotrowski*, 237 F.3d at 580.

The key to Plaintiffs' causation theory is that Ernest's prior use of the HPD AR-15 caused him to deliberately choose it over all the available rifles on July 8, 1998.

These policies are all too remote; they are not the moving force of Ernest Moore's decision to select the HPD AR-15 and commit murder with it. None of these policies satisfy the 'but-for' causation prong, because the evidence is legally insufficient to prove that Ernest would not have shot anyone had the HPD AR-15 been absent.

###    a.    Policies Too Remote in Time

The first three and the fifth policies are too remote because they simply make the rifle present. The assignment of the weapon to R.D. Moore occurred in 1997, several months before the shooting. In *Martinez*[67] plaintiffs sued the state board of pardons over the murder of a girl by a parolee. The criminal had been convicted as an insane, violent sex offender, with a recommendation against parole; after 5 years the board paroled him, with full knowledge of his history and the likelihood he would commit violent crimes.[68] Five months after his release, he tortured and murdered plaintiff's daughter.[69] The Supreme Court concluded that the release five months earlier was too remote in time to be a proximate cause of her death.[70]

---

67    *Martinez,* 444 U.S. at 285.

68    *Id.* at 279.

69    *Id.* at 280.

70    *Id.* at 285.

In *Rodriguez-Cirilo*,[71/] family members had obtained an order to detain Cirilo for two days of mental exams; two weeks after police refused to enforce the order or arrest Cirilo, he stabbed his brother.[72/] The First Circuit concluded the two week delay between the failure to arrest and the stabbing made the causal link too remote.[73/]

### b.      Lack of Foreseeability

Any failure to instruct Det. Moore on how to safeguard the weapon would not foreseeably result in a family member taking it without permission.   Plaintiffs do not claim the rifle was lost through carelessness; the linchpin of their theory is that Det. Moore let his son use it to the point where Ernest felt compelled to seize it when he had need of a rifle. Likewise, the failure to require Det. Moore yearly prove he can hit targets with and clean an AR-15 would not foreseeably result in a family member taking the rifle.   The same applies to a failure to destroy the rifle or have a written assignment list.

In *Piotrowski,* Plaintiff argued that the City's policy permitting moonlighting allowed her husband's cohort to hire off-duty police officers to harass her.[74/]   The 5th Circuit held this was not a cause of her shooting.[75/]   A policy to allow officers to moonlight for private investigators would foreseeably result in intrusive surveillance but not contract killings.[76/]

It was not foreseeable that the City's existing policies were inadequate and would lead

---

71      115 F.3d at 52.

72      *Id.* at 51.

73      *Id.* at 52, citing *Martinez* 444 U.S. at 285.

74      237 F.3d at 580.

75      *Id.* at 581.

76      *Id.*

to this shooting.  It was a universal practice that city property not be used by family members or for personal use.  R. 241(l. 13-16).  HPD had a policy not to relinquish a weapon to someone not an officer or allow unauthorized use.  R. 254 (l. 9-20), 503 (l. 12-20).  Chief Schoepner did not approve of letting family members use police weapons.  R. 281 (l. 21) - 282 (l. 5).  There is no evidence Scheopner knew anything about Ernest Moore's bouts of depression, his substance abuse, or his apparent Hitler fixation.  There was no evidence showing that Chief Schoepner had ever learned of incidents when an officer allowed family members to use the officer's service weapon, let alone suggestion that he knew of a practice among the rank and file to store their weapons during off-duty hours in places where mentally unstable persons had easy access  R. 342 (l. 2-12), 343(l. 4-8).  There was no evidence to controvert Scheopner's testimony that he did not learn until May 2000- long after the shooting incident- that Det. Moore had once allowed his son to shoot the HPD rifle.  R. 343 (l. 9-12)

In *Huffman v. County of Los Angeles*,[77] plaintiff was shot by an off-duty sheriff's deputy at a bar.  The sheriff required all deputies carry their guns off duty.  The deputy became drunk at a bar, argued with plaintiff, and shot him during a fight in the parking lot.[78] The sheriff had a policy against being drunk and disorderly in public; however, there were several prior off-duty shootings while drunk.[79]  Plaintiff urged the sheriff failed to train on the specific dangers of carrying a firearm while drunk.  The Ninth Circuit reversed a verdict

---

77      147 F.3d 1054, 1060 (9th Cir. 1998).

78      147 F.3d at 1056, 1060.

79      *Id.* at 1057, 1060.

for plaintiff and dismissed. The sheriff could not have foreseen these private acts of violence would result from not training more extensively.[80] Because he had a policy against being "drunk and disorderly" that was sufficient.[81] It was not foreseeable that failing to also instruct officers not to be "drunk and disorderly" when carrying a gun would have caused this shooting.[82]

### c.    No "But-For" Causation

None of the alleged policies or customs can be the "but for" cause. If the HPD AR-15 had been absent from Moore's safe, Ernest could have taken the privately owned AR-15, SKS or M-1 Carbine. Those weapons would have inflicted the same deaths and injuries. Plaintiffs must offer some evidence that, "but for" access to the HPD rifle in the gun safe, Ernest would have taken no weapon from the safe when he opened it.

There is no evidence Ernest preferred the City rifle. See above at p.17.

Even if there were evidence Ernest favored the HPD rifle, his preference was immaterial. Any preference for one rifle does not establish that, in its absence, he would have decided to shoot no one or would have been unable to do so.

In *Hart,*[83] a DPS trooper O'Brien arrested Hart and took him before the magistrate for arraignment. O'Brien told the magistrate that Hart had a federal warrant out (which was untrue) which caused the magistrate to deny Hart bail; the next day the magistrate set bail for

---

80    *Id.* at 1060.

81    *Id.*

82    *Id.*

83    127 F.3d at 446

29

Hart, but Hart was unable to raise the bond for two weeks. [84] The Fifth Circuit found that there was no cause-in-fact for any unlawful detention caused by the false statement; had a reasonable bond been set, Hart could not have met it and would have remained in jail.[85]

In *Rodriguez-Cirilo*,[86] after Cirilo had threatened to kill himself or his brother, family members obtained a order requiring Cirilo to be detained at a local hospital for 2 days for psychiatric testing. Police officers declined to enforce the arrest order and Cirilo refused to go.[87] Two weeks later he argued with his brother and stabbed him. The First Circuit found no causation. Because the order was for only two days and there was nothing to show he would have been held longer, there was no proof Cirilo would not have been released before the stabbing.[88]

### 7.    No Decision or Policy Adopted with Deliberate Indifference

The policies described in the Court's Charge are not unconstitutional on their face. Therefore, Plaintiffs must show that an otherwise neutral policy was adopted with deliberate indifference to the certainty that a constitutional deprivation will result.[89] The policy's

---

84      *Id.* at 434.

85      *Id.* at 446.

86      *Rodriguez-Cirilo*, 115 F.3d at 51.

87      *Id.* at 51.

88      *Id.* at 53.

89      *Piotrowski*, 237 F.3d at 578, 581; *Snyder v. Trepagnier*, 142 F.3d 791, 797-98 (5th Cir. 1998), *cert. dism'd by agreement*, 523 U.S. 1083 (1999).

existence and deliberate indifference are two different issues; there is no liability if the policy was adopted or ratified without deliberate indifference.[90]

### a.    No Deliberate Indifference

This Court's August 2, 2001, order concludes that it was "eminently foreseeable" that poor weapons accountability would eventually result in a HPD weapon falling into the wrong hands. Dkt. # 134, p. 26. However, foreseeability is not the entire test. Ordinary or heightened negligence will not meet the test of deliberate indifference.[91] The official must be aware of the facts in which an inference could be drawn that a substantial risk of harm exists and must actually draw the inference.[92]

A claimant proves deliberate indifference by showing either (1) the City consciously chose to not train officers after being on notice that its current regimen had failed to prevent misconduct and injuries; or (2) a single incident with proof of the possibility of recurring situations that presents an obvious potential for violations of constitutional rights and the need for training.[93] The Fifth Circuit has generally rejected proof of a single incident as a sufficient basis to hold a governmental unit liable.[94]

---

90    *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 288 (5th Cir. 2002).

91    *Snyder*, 142 F.3d at 795-96.

92    *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

93    *Conner v. Travis County*, 209 F.3d 794, 797 (5th Cir. 2000); *Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000), *en banc reh. denied*, 211 F.3d 127 (5th Cir. 2000).

94    *Cozzo*, 279 F.3d at 288; *Snyder*, 142 F.3d at 798-99.

The fact that there are no other instances of harm of the sort at issue in this case undercuts the deliberate indifference claim.[95] The Fifth Circuit has found the "single instance" theory viable only where there is a complete failure to provide any training on any subject to an inexperienced officer with a record of recklessness. It must be obvious that the failure to train would lead to injury; this stringent standard requires unmistakable culpability and clearly connected causation.[96]

Even if, *arguendo,* Plaintiffs' evidence could amount to ordinary or heightened negligence (which the City denies), negligence alone does not support municipal liability under section 1983. Plaintiffs' criticisms applied to only a small part of the HPD practices concerning weapons. The HPD had only four rifles, which were assigned only to Det. Moore and Capt. Vasquez. R. 334 (l. 16-24), 365 (l. 8-13).    A written inventory and assignment of handguns existed, just not one for the rifles. R. 237 (l. 7-13). Det. Moore had been trained on an AR-15 and had shown himself a "top shot" in the HPD. R. 249 l. 10-24), 308 l. 17) - 309 (l. 20), 330 (l.1) - 331 (l.12). HPD complied with TECLOSE regulations for qualifying on handguns; it did not for rifles because it had no adequate firing range for rifles. R. 306 (l. 24) - 307 (l. 16).

There is no proof that, in 1997, Chief Schoepner was indifferent to a known or obvious risk that, during off-duty hours, an officer's family member would misappropriate an HPD weapon and use it to harm others. Because the shooting arose in this case from a mentally unstable family member's misappropriation of a service weapon from a locked

---

95    *Cozzo,* 279 F.3d at 288; *Conner,* 209 F.3d at 797.

96    *Brown v. Bryan County, Ok.,* 219 F.3d 450, 461 (5th Cir. 2000).

family gun safe, the relevant risk is the officer's method for *safeguarding the weapon at home* against unauthorized use by that type of person. There is no evidence that, prior to this tragedy, the City policymakers had any reasons to believe that family members of HPD officers were stealing HPD weapons, or that R.D. Moore had been irresponsible about safeguarding other assigned weapons. In light of the above evidence, this case fails to meet the rigorous standard for the "single incident" exception.

In *Cozzo,* a sheriff's deputy misinterpreted a TRO to require the eviction of plaintiff from her residence.[97] Although the deputy had completed various training programs, he had not taken an eight week course required by state law that would have taught him the proper interpretation.[98] The Fifth Circuit concluded this was some evidence that the sheriff had failed to train him.[99] However, there had been no prior incidents of deputies wrongfully evicting people or dispossessing citizens of their property.[100] The Fifth Circuit reversed, holding that there was no evidence of deliberate indifference under the "single incident" exception.[101]

The testimony of Mr. Kirkham does not fill the void. The opinion testimony of a single expert is insufficient to prove that a single incident shows deliberate indifference. [102]

---

97      279 F.3d at 279.

98      *Id.* at 287.

99      *Id.* at 288.

100     *Id.*

101     *Id.*

102     *Conner,* 209 F.3d at 798.

33

### b.    No Ratification by Failure to Punish

Plaintiffs claimed that because the City did not punish Schoepner and Moore, the City "ratified" their allegedly unconstitutional behavior. The charge defined "ratification" as the final policymaker's approval of a subordinate's decision and the basis for it.[103]  This standard, set out in *City of St. Louis v. Praprotnik*, adds several significant qualifications to that bald statement. The Court also said: "Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy."[104] The Supreme Court gave two examples of situations in which a supervisor could realistically be deemed to have adopted a policy which was formulated by a lower-ranking official.  One is if the decision by a subordinate was "cast in the form of a policy statement and expressly approved by the supervising policymaker."[105] The other is if a "series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware."[106]

What is clear, however, is "that the mere fact that a supervisor failed to discipline a subordinate . . . . does not a municipal policy make."[107]   "[A] city's custom or policy

---

103    *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Turner v. Upton County, Tex.*, 915 F.2d 133, 136 (5th Cir. 1990).

104    Id., at 130.

105    *Id.*

106    *Id.*

107    *Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir. 1998) (police chief's failure to discipline officers who created "state-created danger" did not thereby ratify the subordinates' conduct).

authorizing or encouraging police misconduct 'cannot be inferred from a municipality's isolated decision not to discipline a single officer for a single incident of illegality.'"[108]

Under this standard, the City did not ratify any alleged state-created danger (assuming, of course, one was created in the first place, which the City denies). Not only is the Police Chief's failure to punish Det. Moore insufficient evidence of ratification; there is no evidence that the Police Chief was the final policymaker for disciplining officers. According to the Harlingen City Charter, the City Commission is the governing body, "which shall retain, possess and exercise all powers and privileges heretofore possessed by said city," and the city manager is generally empowered to direct and supervise all departments, offices, and employees of the City.[109] In 1962, the City's governing body adopted a civil service program and a Civil Service Commission.[110] The City also adopted the State's statutory framework for implementing the program, the Police and Fire Fighters Civil Service Act.[111] Subject to the governing body's continuing review and approval, the governing body authorized the Civil Service Commission to set rules governing police

---

108    *Fraire v. City of Arlington*, 957 F.2d 1268, 1278-79 (5th Cir.) (quoting *Berry v. McLemore*, 670 F.2d 30, 33 (5th Cir. 1982) and holding that city's failure to discipline police officer for isolated incident involving alleged use of excessive force did not give rise to inference of ratification of police misconduct), *cert. denied*, 506 U.S. 973 (1992).

109    *See* HARLINGEN CHARTER, at §§ 30, 11 (attached hereto as Ex. 3). The City requests the Court to take judicial notice of the Charter. See FED. R. EVID. 201(f) ("Judicial notice may be taken at any stage of the proceeding."). It is well established that the Court may take judicial notice of city charters and ordinances. *See Overton v. City of Austin*, 748 F.2d 941, 954-55 & n.15 (5th Cir. 1984); *Fields v. City of Texas City*, 864 S.W.2d 66, 69 (Tex. App.— Houston [14th Dist.]1993, writ denied).

110    *See* HARLINGEN CODE, §§ 32.035-.044 (attached hereto as Ex. 4). The City requests the Court to take judicial notice of these civil service ordinances.

111    TEX. LOC. GOV'T CODE ANN. § 143.001 *et seq.*

hiring, training, and discipline.[112/]  Under state law, the Chief of Police has the initial power to suspend or terminate the employment of a police officer, but the Commission may review and reverse such decisions.[113/]  Accordingly, for disciplinary decisions involving the rank and file officers such as R.D. Moore, the final policymaker is the City Commission and/or the City Commission.[114/]

Immediately after the shooting, Assistant City Manager LaBeau began his own investigation. PX-13. He made his own report to City Manager Natalie Prim, which became part of Plaintiffs' case. R. 496 (l. 8) - 508 (l. 9); PX-15. LaBeau reprimmanded Det. Moore. R. 392 (l. 16-22). LaBeau recommended removing Schoepner as chief; Schoepner stepped down voluntarily, but LaBeau believed his report was the cause. R. 510 (l. 11-19), 514(l. 8-12). A new chief was hired, and the new Chief, Victor Rodriguez, promulgated new policies for disposal and security of weapons. PX-20. LaBeau recommended outside review of the HPD and its policies. R. 513 (l. 18) - 514 (l. 21).

Plaintiffs' real complaint is the level and speed of punishment was insufficient. Policymakers are not deliberately indifferent simply because they fail to remove the subordinate or impose lesser sanctions.[115/]

---

112    As the Texas Supreme Court has defined the relationship of the municipality's governing body and its civil service commission: "The City Council in the aldermanic form of municipal government and the City Commission in the Commission form of government has always been the primary repository of municipal legislative powers in this state" *Glass v. Smith*, 150 Tex. 632, 244 S.W.2d 645, 651 (1951). That the civil service commission "is authorized by statute to make rules does not authorize it to divest the City Council of its legal rights as governing body of the City." *Id.*

113    TEX. LOC. GOV'T CODE ANN. §§ 143.052, 143.127-.134.

114    *Gros v. City of Grand Prairie*, 181 F.3d 613 (5th Cir. 1999).

115    *Gonzalez v. Ysletta I.S.D.*, 996 F.2d 745, 762 (5th Cir. 1993).

Nor is there any evidence that any policy maker approved "the basis for" Det. Moore's alleged unconstitutional act. Chief Schoepner did not approve of Det. Moore allowing his son to fire the HPD rifle or otherwise have access to it. R. 242 (l. 16-24). Det. Moore told Chief Schoepner that Ernest had stolen the key to the rifle safe from off his key ring. R. 244 (l. 21) - 245 (l. 6). Schoepner resigned as chief in January 1999. R. 291(l. 16-17). Not until May 2000 did Schoepner learn Det. Moore had allowed his son to fire the HPD rifle. R. 343 (l. 9-12). If the evidence surrounding the shootings was unclear, he was entitled to accept his subordinates version of the facts.[116] For this reason there was no deliberate indifference.[117]

Plaintiffs cannot succeed on a theory imputing ratification to the City based on information learned by the City only after the injury. The City's actions based upon such information cannot be the moving force behind the injury if the decision was made after the injury.[118]

In *Piotrowski,* plaintiff claims the failure to discipline two officers after she complained they were helping her ex-boyfriend harass her was a policy adopted with deliberate indifference.[119] The police department interviewed the officers and reached a

---

116    *Coon v. Ledbetter,* 780 F.2d 1158, 1162 (5th Cir. 1986)(unreasonable to infer sheriff defended reckless conduct if deputies' version of facts was plausible).

117    *See Piotrowski,* 237 F.3d at 581-82; *Leavitt v. City of El Paso,* 2000 WL 33348224, * 8 (W.D. Tex. 20000(Prado, J.), *aff'd* 264 F.3d 1140 (5th Cir. June 19, 2001), *cert. denied,* 122 S. Ct. 646 (2001) (copies attached as Exhs. 1 & 2).

118    *Williams v. Ellington,* 936 F.2d 881 (6th Cir. 1991).

119    237 F.3d at 581.

perfunctory conclusion that no wrongdoing had occurred.[120/] Moreover, there were no prior complaints against the officers.[121/] Absent a prior pattern of misconduct, the failure to punish the officers after a "formalistic investigation" was no evidence either of a policy or deliberate indifference.[122/]

In *Leavitt*, Border Patrol Agent Alvarez shot his wife after a series of escalating domestic disputes.[123/] While handling one dispute, city police officers learned Mr. Alvarez was a law enforcement officer and released him without arrest.[124/] The IAD investigated disciplinary charges against the officers, but dropped the charges after investigating them.[125/] The City had a policy to escort domestic abuse victims to a City-sponsored shelter for battered wives; after Mrs. Alvarez waited at the station for an hour or more, she was advised to come back later for an escort.[126/] Her husband killed her the next day at her mother's house. After her death, the police department conducted a cursory investigation and gave a press release making the arguably false statement she had waited at the station only a few minutes before leaving.[127/]

---

120    *Id.* at 573-74, 582.

121    *Id.* at 582.

122    *Id.*

123    2000 WL 33348224 at *1; Exh. 1.

124    *Id.* at *2.

125    *Id.* at *8.

126    *Id. at *2.

127    *Id.* at *9.

The El Paso federal district court concluded that neither the failure to punish the officers nor the false public statements were any evidence of a policy, much less one that caused Mrs. Alvarez's death.[128] El Paso's motion for summary judgment was granted. The Fifth Circuit affirmed, finding no error.[129]

If Plaintiffs' argument is that the level of sanctions is circumstantial evidence of City's policy before the shooting, it fails because only "extraordinary factual circumstances" surrounding the shooting could justify such an inference.[130] In *Grandstaff*[131], the policymaker's post-shooting actions were evidence the officers acted pursuant to an existing policy only because (1) virtually the entire department participated in the shooting, and (2) under any conceivable version of the events, the officers' actions were indefensible.[132] The Fifth Circuit has limited the case to its "highly peculiar facts," applicable only to extreme factual situations.[133] However tragic, the facts of this case fall far short of that standard. There was no municipal ratification.

### 8.    Officer's Actions Do Not Shock the Conscience

Under Substantive Due Process, the state's conduct must be conscience shocking.[134] This requires deliberate indifference, which is more than ordinary or even gross

---

128    *Id.* at 8-9.

129    Exh. 2.

130    *Snyder,* 142 F.3d at 797-98, *citing Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir. 1985).

131    767 F.2d 161 (5th Cir. 1985).

132    *See Coon v. Ledbetter,* 780 F.2d 1158, 1160 (5th Cir. 1986).

133    *Snyder,* 142 F.3d at 797-98; *Coon,* 780 F.2d at 1161.

134    *Daniel v. Williams,* 474 U.S. 327, 332 (1986); *Lewis,* 523 U.S. at 850.

negligence.[135/] Legal conclusions like "fraud," "malice", or "reckless" are insufficient to state a Substantive Due Process Claim.[136/] Instead the facts alleged must show a level of abuse of power that is so brutal or offensive that it does not comport with notions of fair play and decency.[137/] The focus is on the state's acts, not the criminal's acts or his crime.[138/]

In *S.S.,* state protective services removed a three year old girl from her father's custody based on suspected sexual abuse by an unknown person, as well as gross neglect by the father and returned her two years later.[139/] In the interim, the case workers learned that the father was close friends with a convicted child molester who visited the girl with her father in foster care; a psychologist warned the case workers that the father was "dangerously sympathetic" to the molester and that reunification could put the child at risk.[140/] Shortly after her return to her father, the molester sexually abused her.

The 8th Circuit upheld a Rule 12(b)(6) dismissal on the grounds that restoring the father custody was not conscience shocking.[141/]

> 'We are mindful that the acts that S.S. claims were perpetrated against her once she was returned to her father were utterly indecent and egregious; and we do not doubt that those acts themselves would shock the conscience. They certainly shock ours. But we focus here, not on those acts, but on the state's acts that S.S. says led to her injuries. We do not see how we could well hold

---

135    *Lewis,* 523 U.S. at 848.

136    *Id.* at 854.

137    *Id.* at 846, 847; *S.S.,* 225 F.3d at 964

138    *S.S.,* 225 F.3d at 964.

139    *Id.* at 962, 965.

409    *Id.* at 965.

141    *Id.* at 964.

those acts actionable without violating the Supreme Court's caveat against making 'of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States.' [citations omitted]"[142]

The heart of Plaintiffs' case is that Officer Moore stored the HPD rifle where his son could take it without permission to commit a crime. At best the evidence shows that better training or better weapons security would have resulted in Ernest Moore having no access to the HPD rifle. There is no evidence that, when Ernest took the HPD rifle, Det. Moore (or any City officer) knew he intended to assault anyone or that Det. Moore intended Ernest to have it to shoot anyone. An in-depth investigation by combined federal and state authorities showed Det. Moore did nothing to aid or abet his son's crimes. R. 201(l. 2-25). Ranger Jaramillo, the chief investigator, concluded this was no "hate crime" rather events in San Benito were "suicide-by-cop," i.e., suicide by provoking a violent shooting with police. R. 185 (l. 3) - 186 (l. 1). Even if the alleged acts of poor weapons control prove negligence, they do not rise to the level of brutality or an abuse of official power that "shocks the conscience."

## C.     State Law Claims

### 1.     Barred by Sovereign Immunity

Sovereign immunity against state tort claims is waived against the City only if the death or injury arises out of the use or condition of tangible personal property.[143] Property

---

142   *Id.* at 965. See also, *Pahler v. City of Wilkes-Barre,* 2002 WL 389302, *2 (3rd Cir. 2002)[Unpublished, CTA3 App. 1, IOP 5.2)(police officer shot during drug raid by fellow officer with a shot gun had no "state created" danger claim; not "conscience shocking" to send poorly trained officer who did not put his shotgun on 'safety' during raid).

143   TEX. CIV. PRAC. & REM. CODE, § 101.021.

is "used" only if it is employed or applied for a given purpose; "non-use" cannot support a claim.[144] If the tangible property is not defective, then "use" requires an allegation the defendant supplied the property lacking an integral safety component.[145] It is not enough that some property was involved; sovereign immunity is not waived unless the use of property actually caused the injury.[146] Accordingly, the Tort Claims Act does not waive the City's immunity from negligent entrustment claims, because the act of entrusting city property is not a use of property which causes the injury.[147]

It is a requirement that a government employee must misuse the property.[148] The Tort Claims Act specifically provides that no waiver exists unless the relevant actor is "an employee acting within the scope of his employment."[149] The "use" of property by a third party is insufficient.[150] Thus Ernest Moore's use cannot constitute the City's use.

---

144    *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 584 (Tex. 1996).

145    *Kerrville*, 923 S.W.2d at 585; *Ramos v. City of San Antonio*, 974 S.W.2d 112, 116 (Tex. App.–San Antonio, 1998, no pet.).

146    *Texas Dept. of Crim. Justice v. Miller*, 51 S.W.3d 583, 588 (Tex. 2001).

147    *Texas Dept. of Criminal Justice v. Lone Star Gas Co.*, 978 S.W.2d 176, 178 (Tex. App.–Texarkana 1998, no pet.); *Waldon v. City of Longview*, 855 S.W.2d 875, 880 (Tex. App.–Tyler 1993, no writ)(citing *Young v. City of Dimmitt*, 787 S.W.2d 50, 51 (Tex. 1990); *Eastland County Co-op Dispatch v. Poyner*, 64 S.W.3d 182 (Tex. App.–2001, pet. filed).

148    *Gonzales v. City of El Paso*, 978 S.W.2d 619, 623-24 (Tex. App.–El Paso 1998, no pet.)(no waiver when private citizen shot the plaintiff).

149    TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1).

150    *City of Columbus v. Barnstone*, 921 S.W.2d 268, 272 (Tex. App.–Houston [1st Dist.] 1995, no writ); *Ramos v. City of San Antonio*, 974 S.W.2d 112, 116 (Tex. App. -- San Antonio 1998, no pet.).

The use or failure to convey information is not a use of tangible property that waives immunity.[151] Therefore, an alleged failure to train or instruct does not fall within the waiver.[152]

If the injury arises from an intentional tort, sovereign immunity is not waived.[153] Because Ernest Moore's actions are intentional torts, there is no waiver of immunity under section 101.055.[154]

Plaintiffs' allegations arise out of either the failure to have policies or of inadequate policies. There is no waiver of sovereign immunity for injuries arising from the policy decisions over the matter of providing police protection.[155]

## 2.    No Evidence of Proximate Cause on State Law Negligence Claims

To prevail on a negligence cause of action Plaintiffs must prove proximate cause. The state law definition of proximate cause parallels the federal definition. Plaintiffs must prove cause in fact which requires proof that "but for" and "without which" defendant's conduct, the event would not have occurred and plaintiffs must prove that defendant's conduct is not too remote from the event.[156] As discussed in the previous section entitled

---

151    *Univ. of Tex. Med. Branch v. York,* 871 S.W.2d 175, 179 (Tex. 1994).

152    *Texas Dept. of Public Safety v. Petta,* 44 S.W.3d 575, 580 (Tex. 2001).

153    TEX. CIV. PRAC. & REM. CODE ANN., § 101.057 (Vernons Supp. 2001); *Petta,* 44 S.W.3d at 580.

154    *Gonzales,* 978 S.W.2d at 623 (intentional tort committed by third party barred under section 101.057); *Barefield v. City of Houston,* 846 S.W.2d 399, 406 (Tex. App.–Houston [14th Dist.] 1992, writ denied).

155    TEX. CIV. PRAC. & REM. CODE ANN., § 101.055(3)(Vernons Supp. 2001); *Orrozco v. Dallas Morning News, Inc.,* 975 S.W.2d 392, 397-98 (Tex. App.–Dallas 1998, no pet.); *Gonzales,* 978 S.W.2d at 622-23.

156    *Missouri Pac. RR Co. v. American Statesman,* 552 S.W.2d 99, 103-4 (Tex. 1977); *Mosley v. Excel Corp.,* 109 F.3d 1006, 1009 (5th Cir. 1997), *reh. denied,* 114 F.3d 1185 (5th Cir. 1997).

Federal Claims, plaintiffs in this case, as a matter of law, cannot establish proximate cause between any action of the city or its employees, and the tragic events that occurred on July 7, 1998.[157/]

### 3.    No Evidence to Support State Law Claims

The Charge submitted only one negligence theory, i.e., that Schoepner improperly entrusted the rifle to Det. Moore who he should have anticipated would carelessly entrust to someone else. The Charge properly required Plaintiffs to prove that, when the City entrusted the rifle to Det. Moore, it knew or should have known that he would use poor judgment in allowing third parties to use or possess the firearm.[158/]  There is no evidence that Det. Moore's superiors knew or should have known he would exercise bad judgment, or even that he would entrust it to his son.  There was no deliberate entrustment of the rifle by Det. Moore to his son.

Even if the charge could be contorted to cover a claim that Det. Moore negligently stored the rifle where his son could take it, a favorable finding is immaterial because there is no such duty.  While Texas cases have recognized a common law cause of action for negligently entrusting a firearm to an incompetent user,[159/] there is no case providing for liability for failing to prevent a weapon from being taken without permission.  By analogy,

---

157    *See also Abdeljalil*, 55 F.Supp.2d at 627 (wife and child of murder victim brought section 1983 and TTCA suit after City employee's son stabbed victim with a knife that employee had taken from the police department evidence room; employee's act of entrusting knife to son not a proximate cause of slaying); *Garza v. United States*, 809 F.2d 1170 (5th Cir. 1987)(child injured by explosive device stolen from military base; government's negligence not proximate cause of injury because intervening criminal's acts were not foreseeable).

158    *See, Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596 (Tex. 1987).

159    *See, Kennedy v. Baird*, 682 S.W.2d 377, 388 (Tex. App.–El Paso 1984, no writ).

Texas does not impose a duty to safeguard car keys to prevent a thief from stealing the car and hitting a third party.[160]  There is no liability simply for failing to take adequate precautions against unauthorized use.

Furthermore, if such evidence did exist, which the City denies, such act of entrustment cannot be attributed to the City because the City expressly prohibited Det. Moore from allowing others to use his police weapons, and thus, Det. Moore did not act in the course and scope of his employment if in fact he did entrust the gun to Ernest.[161]

In this particular case, as a matter of public policy, there is no recovery because the officers injured in the line of duty accepted the risk of that injury as part of their jobs.[162]

---

160    *See, Story Serv., Inc. v. Ramirez*, 863 S. W. 2d 491, 497-98 (Tex. App.--El Paso 1993, writ denied).

161    An employer is not liable for actions that an employee takes in his own interests and not to further the purpose of carrying out the master's business. *Smith v. M Sys. Food Stores*, 156 Tex. 484, 486-87, 297 S.W.2d 112, 114 (1957).

162    *See Juhl v. Airington*, 936 S.W.2d 640 (Tex. 1996)(Gonzales, concurring)(discussion of common law Fireman's Rule which bars police officers from recovering for injuries caused by ordinary negligence as a result of risks inherent in responding to an emergency). Justice Gonzales, while recognizing that Texas had to date only applied the rule in premises liability cases, argues that such a narrow interpretation is inconsistent with the trend in other jurisdictions to extend the rule based upon public policy grounds.  See also *Campus Management, Inc. v. Kimball*, 991 S.W.2d 948 (Tex. App. - Fort Worth 1999, review denied)(applying Texas version of fireman's rule in premises case to bar recovery by firefighter injured by negligence of property owner and noting that Juhl did not reject the Fireman's rule); *Butler v. Union Pacific Ry. Co.*, 68 F.3d 378 (10th Cir.1995)(common law "Fireman's Rule" provides that a fireman cannot maintain a negligence action against the party who caused the risk that necessitated the fire fighter's presence in the first place. Rule is premised on public policy against recovery for injuries caused by the very wrong that initially requires officer's presence in an official capacity and subjects him to harm.); *In re: San Juan Dupont Plaza Hotel Fire Litigation*, 43 F.3d 1456 (1st Cir. 1994)(Fireman's Rule recast in modern times into "Professional Rescuer's Rule" applicable when risk created by defendants' conduct is one that the plaintiff predictably encounters when he enters private property in the course of carrying out his professional duties, as say a a firefighter or police officer); *White v. Edmond*, 971 F.2d 681 (11th Cir. 1992)(as a matter of public policy a public safety employee cannot recover for the injuries caused by the very negligence that initially required his presence in an official capacity and subjected the public safety employee to harm); *Rought v. Porter*, 965 F. Supp. 989 (W.D. Mich. 1996)(defense of so-called Fireman's Rule is a traditional state rule of immunity which, if applicable would bar both state and federal claims against the defendant. The rule precludes actions by public safety officers against private or public parties for injuries the officers sustain in the normal course of their duties.  Notes that being shot by a felon is a "normal" risk of a safety officer's duties); *Greene v. Consolidated Freightways Corp.*, 74 F. Supp.2d 616 (E.D. Va. 1999)("In any instance where a police officer arrests someone, that someone would have necessarily violated some law. The violation of the law brings about the arrest. Under the fireman's rule, the police officer cannot complain of negligence based upon the violation of some law that brings about

---

The alleged promise to Pirtle to destroy the rifle creates no duty in favor of the deceased Border Patrol agents or Deputy Raul Rodriguez. The failure to perform a gratuitous promise makes the defendant liable only if he knows that the services are necessary for the protection of a third party and (1) negligence in the performance of the promise increases the risk of harm to that party, or (2) the third party detrimentally relies on the alleged promise to perform.[163] At the time the rifle was delivered to the City, it would have had no basis to realize destruction was necessary to protect either the Border Agents or Deputy Rodriguez. Next, because the City did nothing towards destroying the rifle, it undertook no affirmative course of action which increased the risk.[164] Because none of this was communicated to Deputy Rodriguez or the Border Patrol Agents, they could not have relied on it.[165]

**WHEREFORE, PREMISES CONSIDERED**, Defendant moves for judgment as a matter of law, that the remaining claims of all Plaintiffs in these causes be dismissed and that they take nothing against Defendant.

---

the arrest"); *Whiting v. Central Trux & Parts, Inc.*, 984 F. Sup. 1096 (E.D. Mich. 1997) ("The 'fireman's rule' is an age-old common law rule that prevents police officers or public safety officers, and fireman from recovering damages for injuries: (1) deriving from negligence causing the officers presence, and (2) stemming from the normal risks of the officers profession." . . ."The public hires, trains, and compensates the fire fighters and police officers to deal with dangerous but inevitable situations. . . . The rule developed from the notion that taxpayers employ fireman and policeman, at least in part, to deal with future damages that may result from the taxpayer's own negligence. To allow actions by policemen and firemen against negligent taxpayers would subject them to multiple penalties for protection.").

163    *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 396 (Tex. 1991).

164    *Id.* at 396-7.

165    *Id.* at 397.

Respectfully submitted,

By: 

TOM LOCKHART
Admissions ID No. 2257
Texas State Bar No. 12473500
ROGER W. HUGHES
Admissions ID No. 5950
Texas State Bar No. 10229500
ADAMS & GRAHAM, L.L.P.
P.O. Drawer 1429
Harlingen, Texas 78551-1429
956/428-7495; FAX: 956/428-2954

Attorney-in-Charge for Defendant, CITY
OF HARLINGEN, TEXAS

## CERTIFICATE OF CONFERENCE

Defendants counsel have conferred with Plaintiffs' counsel concerning the relief this

motion requests; Plaintiffs are opposed to it.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing

document was forwarded on this 27th day of March, 2002, to the following counsel of

record and interested parties:

Attorneys of record for Plaintiffs, GILBERTO M. RODRIGUEZ, et al and
ARTURO GUILLERMO SALINAS, et al:

Mr. Broadus A. Spivey               CMRRR # 7001 2510 0004 2061 2481
**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, Texas 78701-4320

47

Attorney of record for Plaintiff, RAUL RODRIGUEZ:

Mr. Ramon Garcia                           CMRRR # 7001 2510 0004 2061 2498
Ms. Sonia Lopez
**LAW OFFICES OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, Texas  78539

_____
TOM LOCKHART

The City argues that the state law tort claims against it are barred by the Texas Tort Claims Act ("TTCA"). The TTCA limits municipal liability solely to claims for property damage, personal injury or death caused by 1) the operation or use of motor vehicles and equipment; or 2) the condition or use of tangible personal property or real property. Tex. Civ. Prac. & Rem.Code § 101.021.

First the Plaintiffs argues that the TTCA should be interpreted extremely broadly in this domestic violence case. In support of this, the Plaintiff cites to the Texas Family Violence Prevention Act, which requires that officers responding to family violence calls create written crime reports. They also point of a Texas policy that policy should maximum protection to victims of domestic violence. Despite this, in the absence of any indication that Texas courts have interpreted or would interpret the Texas Tort Claims Acts in this manner, the Court cannot create such a broad exception to sovereign immunity.

Additionally, the Plaintiffs argue that their state law claims fall under the categories provided in the TTCA in three ways. They argue that using a patrol car to drive Mr. Alvarez home in March 1996 constituted a misuse of a motor vehicle. They further argue that Officer Durand's use of the police department's computer system and printer to print copies of all documents was a misuse of tangible personal property. [FN10] Finally, they argue that by not arresting Alvarez, the police failed to use their handcuffs, guns, car and police station.

> FN10. There is evidence that Officer Durand printed Alejandro Aivarez's case file from the computer system in April 1996 even though he was not assigned to the case.

The Plaintiffs' arguments that their state law claims fall under the TTCA waiver of sovereign immunity must fail. The use of the patrol car to drive Mr. Alvarez home in March 1996 is not the proximate cause of Mrs. Alvarez's murder on March 17, 1997. Similarly, the Plaintiffs have pointed to no causal connection between Officer Durand's use of police department computers and the murder of Suzy Alvarez. Finally, non-use of police equipment does not constitute use under the TTCA. Kassen v. Hatley, 887 S.W.2d 4, 16 (Tex.1994). To find that the Plaintiffs' negligence claims are caused by the use of property or motor-driven vehicles would be to stretch the language

of the TTCA beyond the limits that Texas courts have provided or are likely to provide. Regardless of how strong their negligence claims might be, the Plaintiffs cannot overcome the City's immunity from tort claims.

Conclusion

Accordingly, it is ORDERED that Defendant, United States of America's Motion for Summary Judgment (Docket No. 64) is granted in part and denied in part such that the Plaintiffs' claims for negligent supervision and retention remain for trial, that Defendant City of El Paso's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Docket No. 67) is GRANTED, that Defendant City of El Paso's Motion to Strike and Objections to Plaintiffs' Summary Judgment Proof (Docket No. 76) is DENIED, that Defendant City of El Paso's Motion to Strike and Objections to Plaintiffs' Designated Expert Witnesses (Docket No. 84) is DENIED AS MOOT and that Plaintiffs' Motion to Exclude Testimony of Defendant City of El Paso's Expert Robert Taylor, Ph.D. (Docket No. 86) is DENIED AS MOOT.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2000 WL 33348224
(Cite as: 2000 WL 33348224 (W.D.Tex.))

**H**
Only the Westlaw citation is currently available.

United States District Court, W.D. Texas, El Paso
Division.

Delbert LEAVITT, Jr, et al., Plaintiffs,
v.
THE CITY OF EL PASO and United States of
America Defendants.

No. Civ.A.EP-99-CA-76-EP.

July 10, 2000.

ORDER

PRADO, J.

*1 On this date the Court considered Defendant, United States of America's Motion for Summary Judgment, filed April 17, 2000, the Plaintiffs' response to that motion and the Defendant's reply. After careful consideration, the Court will grant the motion in part and deny it in part. Also on this date the Court considered the Defendant City of El Paso's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, filed April 17, 2000, the Plaintiffs' response to that motion and the Defendant's reply. After careful consideration, the Court will grant the motion. Also on this date the Court considered Defendant City of El Paso's Motion to Strike and Objections to Plaintiffs' Summary Judgment Proof. The Court will deny this motion.

Background and Procedural History

On March 17, 1997, Maria Susana ("Suzy") Alvarez was shot and killed by her husband, Alejandro Alvarez, a United States Border Patrol agent. In killing his wife, Agent Alvarez used the duty weapon the Border Patrol had issued to him. Agent Alvarez was convicted of his wife's murder.

Suzy Alvarez's death was the culmination of a lengthy abusive relationship with her husband. She had gone to the El Paso police department several times with claims of abuse, even visiting a police station the night before she was killed. Mrs. Alvarez had also complained to the Border Patrol, her husband's employer.

Agent Alvarez did not have a particularly impressive employment record at the Border Patrol. He was originally hired in November 1988 and was stationed in Laredo, Texas. In 1992, he transferred to El Paso. In October 1994 he received a reprimand for conduct unbecoming a Service officer. According to the U.S.'s summary judgment evidence, this conduct appears to be aggravated assault against Suzy Alvarez. In March 1995, he received a three-day suspension for sleeping on duty. This was followed shortly by three more incidents of sleeping on duty and two unauthorized absences from work. In June 1995, he told the Border Patrol that he had a drinking problem for which he required help. Subsequently, he was counseled for poor performance, and was observed looking "gaunt and haggard" and reaching for the butt of his gun when asked if he was all right. (Def. U.S.A. Exhibit 5). In August 1995, he was admitted to a rehabilitation center, and on August 31, 1995, he was issued a firm choice letter indicating that he had to either receive effective alcohol treatment or he would be fired. The letter also indicated that he would be fired if he engaged in "any misconduct such as sleeping on duty, alcohol or drug related misconduct, or [had] alcohol or drug related performance deficiencies." On March 31, 1996, he was arrested for driving while intoxicated. This arrest resulted in a letter from the Border Patrol proposing Alvarez's removal as an agent. Despite this letter, he was not fired. He did, however, sign a last chance agreement in August 1996, indicating he would comply with Border Patrol regulations or else he would lose his job.

*2 Szuy Alvarez had several dealings with the El Paso Police Department concerning her husband during the course of her marriage. In March 1993, she went to the East Valley Station with complaints of abuse. While there, the desk officer suggested that she deal with this problem through the civil justice system, so as not to injure the Border Patrol's reputation. In March 1994, she again went to the police. This time a complaint was filed. Arrest warrants were issued for Alejandro Alvarez but were eventually canceled. There is a fact issue about whether Suzy Alvarez actually requested that the charges be dropped. On June 15, 1994, police went to the Alvarez home because of a fight. Later, Suzy called the detective on the case and requested that charges be dropped. She again went to the police station on June 18, 1994 reporting that her husband had assaulted her and had pointed a gun at her and

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

threatened to kill her. A complaint was filed, and a police report later indicates that Suzy Alvarez did not want to press charges on this complaint. Police were again called to the Alvarez home in April 1995, resulting in a written complaint being filed.

Additionally, Alejandro Alvarez had another series of incidents involving the El Paso police. On March 31, 1996, Juana Bellah, a woman who had dated Alejandro Alvarez shortly before the incident, called the police because Alejandro was drunk, beating on her door and yelling. He also threatened to kick in the door. Ms. Bellah called the police. Officers Lom [FN1] and Wilburn arrived approximately two minutes later. Ms. Bellah told them that Mr. Alvarez was her ex-boyfriend, that he was a border patrol agent and that she wanted them to take him home. She testified at her deposition that the police officer's demeanor changed immediately once they heard he was a border patrol agent. The officers drove him home but left his car parked in her driveway. The officers dropped him off at his apartment, without turning him over to anyone.

FN1. Alejandro Alvarez's brother had been Officer Lom's partner in the police department.

Ms. Bellah then left her house. Once she returned, she discovered that her house had been burglarized. She again called the police, telling them that she suspected that Alejandro Alvarez had committed the crime. Two different officers arrived at her house. While the officers were investigating the burglaries, Mr. Alvarez drove up to her house. Once he pulled into the driveway, the officers smelled alcohol and asked Mr. Alvarez to get out of his car. He refused to cooperate, became aggressive, and was arrested for driving while intoxicated and resisting arrest.

The evening before she was murdered, Ms. Alvarez went to the El Paso Shelter for Battered Women but was turned away because of a policy of not accepting women into the shelter unless they had a police escort. She then went with her sister, brother-in-law, and children to the East Valley police station in El Paso. Although there are fact disputes about details of this visit, when viewed in the light most favorable to the Plaintiffs, they arrived at the station around 6 p.m. Ms. Alvarez requested a police escort to the shelter. It is undisputed that she originally told the officer at the front desk that her husband had not abused her in the immediate past. Her sister, Dolores Olivas, however, told the officer that Mr. Alvarez had previously taken

his wife to the desert, pointed a gun at her head and threatened to kill her. Once her sister showed the officer a burn on Ms. Alvarez's arm, Ms. Alvarez told the officer that her husband had caused the burn. At some point, the officer called for a police escort, but refused to take Ms. Olivas to pick up diapers and milk for Ms. Alvarez's baby. Ms. Alvarez decided to go back home and return to the station for an escort the next day when her husband would be at work. The desk officer did not try to change her mind and held the door open for her on her way out. She and her family left the station around 6:53 or 6:58. The next day, after having left Alejandro Alvarez, she was killed at her mother's house.

*3 Mrs. Alvarez's estate, her children and her mother bring suit against the City of El Paso (the "City") and the United States of America. They sue the United States under the Federal Tort Claims Act, 28 U.S.C. § 2674 ("FTCA") for negligently entrusting Agent Alvarez with a firearm. They sue the City under 42 U.S.C. § 1983 for violation of due process and equal protection rights. They also sue the city for negligence.

In its motion for summary judgment, the United States argues that it is entitled to sovereign immunity under the discretionary function exception of the FTCA, 28 U.S.C. § 2680(a). In its motion the City argues that it is immune from the state law claims and that the Plaintiffs cannot establish either their Due Process or Equal Protection claims. The City also filed a motion to strike various pieces of the Plaintiffs' summary judgment evidence. This motion is denied because the Court finds the evidence actually used in ruling on the motion for summary judgment to be admissible.

### Summary Judgment Standard

In the usual case, the party who seeks summary judgment must show by affidavit or other evidentiary materials that there is no genuine dispute as to any fact material to resolution of the motion. *See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n. 4 (1986); Lavespere v. Niagra Machine & Tool Works, Inc., 910 F.2d 167, 178 (5th Cir.1990); Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir.1986).* To satisfy this burden, the movant must either submit evidentiary documents that negate the existence of some material element of the nonmoving party's claim or defense or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmoving party's claim or defense. *See Celotex*

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

*Corp.*, 477 U.S. at 325; *Lavespere*, 910 F.2d at 178.

Once the moving party has carried that burden, the burden shifts to the nonmoving party to show that summary judgment is not appropriate. *See Fields v. City of South Houston*, 922 F.2d 1183, 1187 (5 th Cir.1991). The nonmoving party cannot discharge this burden by referring to the mere allegations or denials of the nonmoving party's pleadings; rather, that party must, either by submitting opposing evidentiary documents or by referring to evidentiary documents already in the record, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324; *Fields*, 922 F.2d at 1187. In order for a court to find there are no genuine material factual issues, the court must be satisfied that no reasonable trier of fact could have found for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Liberty Lobby*, 477 U.S. at 249-50; Fed. R. Civ. P. 56(e).

*4 Where the party opposing the motion for summary judgment will have the burden of proof on an essential element of his case at trial and does not, after adequate time for discovery, make a showing sufficient to establish the existence of that element, summary judgment may be entered against him. *Celotex*, 477 U.S. at 322-24; *Fontenot*, 780 F.2d at 1194-95.

Discretionary Function--FTCA

The FTCA generally waives the United States' sovereign immunity for tort claims, such that the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. [FN2] Within this broad waiver of sovereign immunity, the FTCA provides an exception for claims involving the exercise of discretionary functions. This exception provides that sovereign immunity is not waived for:

FN2. The Fifth Circuit has held, therefore, that for a claim of negligence to be actionable under the FTCA, the duty involved in the claim must be created by state law. *Johnson v. Sawyer*, 47 F.3d 716, 729 (5 th Cir.1995). An FTCA claim cannot be based on a violation of federal statute, even when the plaintiffs are claiming that the violation of a federal statute constitutes negligence per se under state tort doctrine. *Id.* Therefore, Plaintiffs' claim that the United States was negligent per se based on its violation of 18 U.S.C. § 44 and Title

VII of Public Law 90-351 is not actionable under the FTCA.

Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
28 U.S.C. § 2680(a).

Exceptions to the FTCA's waiver of sovereign immunity are to be construed in favor of the government. *McNeily v. United States*, 6 F.3d 343, 347 (5 th Cir.1993).

Whether the discretionary function exception applies is determined by a two- part test. To be a discretionary function, first there must be an element of judgment or choice involved. *Gaubert*, 499 U.S. at 322-23. If a statute, regulation or policy requires a particular course of action, then this first prong is not met because the government employee has no choice but to comply. *Id.* at 322. Secondly, the judgment or choice must be based on public policy considerations. *Id.* at 323.

Negligent Supervision and Retention

The claims that the United States negligently supervised and retained Agent Alvarez relate to two kinds of decisions made about him. Particularly, the Plaintiffs argue that the United States was negligent in the discipline it took against Alvarez. Additionally, they argue that the United States should have acted differently concerning Alvarez's drug use. In terms of the issues addressed by the United States' motion, the Plaintiffs point to two policies: the Standard Schedule of Disciplinary Offenses and Penalties for Employees of the U.S. Department of Justice and the Immigration and Naturalization Service's Drug Free Workplace Program.

Courts of Appeal have frequently held that employment decisions, such as whom to hire or how to supervise an employee are discretionary functions. *See, e.g. Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1217 (D.C.Cir.1997) ("hiring, training, and supervision choices .. are choices 'susceptible to policy judgment' "); *Tonelli v. United States*, 60 F.3d 492 (8 th Cir.1995) (dismissing negligent hiring claims and stating that "issues of employee supervision and retention generally involve the permissible exercise of policy judgment and fall within the discretionary function exception).

*5 Nevertheless, the general understanding that there is no discretion to violate policy must apply in the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

employment context, as well. The Plaintiffs point to several policies which they argue were violated by the United States. Although most of these policies give the Border Patrol discretion in their decisions involving the supervision and retention of employees, a fact question exists as to whether the drug program provided any discretion not to discipline Alejandro Alvarez.

Upon a finding of drug use, the employee must be receive some kind of disciplinary action, although the extent of the disciplinary action appears to be subject to the supervisor's discretion. See also Supervisor's Guide at 7. Additionally, the INS' Drug Free Workplace--Applicant and Employee Drug Testing Program provides that "[u]pon a finding of illegal drug use, action shall be taken as specified in Chapter 4, paragraph K. of the DOJ plan." [FN3]

> FN3. The Court notes that this statement is from the section of the policy concerning random testing.

The DOJ Plan describes that an DOJ employee may be "found" to use drugs "on the basis of any appropriate evidence." (Id. at K.1) This evidence includes direct observation or evidence from an arrest or conviction. In this case, there is a fact question as to whether the INS had "any appropriate evidence." The Plaintiffs have presented evidence that the records from Agent Alvarez's stay at a rehabilitation center were sent to INS office of security in DC. These records indicated a daily use of cocaine and heroin. This could possibly be a finding of drug use.

Therefore, although the extent of the discipline is left to the supervisor's discretion, there was no discretion not to impose some discipline upon a finding of drug use. Therefore, there is a fact question as to whether the United States is entitled to immunity, and therefore the Plaintiffs' claims based on negligent supervision and retention can survive based on the question whether the Border Patrol had a finding of drug use which would require some disciplinary action to be taken against Agent Alvarez.

Alternatively, the Plaintiffs also appear to argue that the supervisors should have tested under the reasonable suspicion testing program. The Department of Justice Drug-Free Workplace Plan provides that "first-line supervisors shall ... [i]nitiate a reasonable suspicion test after first making appropriate factual observations and document those observations and obtaining approval from the second line supervisor." (DOJ Plan at Ch. 3

G. 2.) Additionally, the plan provides that:

> Reasonable suspicion testing may be based upon, among other things:
> (1) Observable phenomena, such as direct observation of drug use or possession and/or the physical symptoms of being under the influence of a drug;
> (2) A pattern of abnormal conduct or erratic behavior ...
> (4) Information provided either by reliable and credible sources or independently corroborated (DOJ Plan at Ch. 4, A. 3).

Nothing in this provision makes ordering reasonable suspicion testing mandatory. Although a fact question exists whether there were observable phenomena, a pattern of abnormal conduct or erratic behavior, or whether the INS in DC had received information under paragraph (4), a resolution of these questions in the Plaintiffs' favor would not take the decision out of the discretionary realm.

### Negligent Entrustment of Firearm

*6 Although neither side points to any cases on point, the decision whether to entrust a border patrol agent with a firearm would generally appear to be a discretionary function. Whether to issue an agent a firearm involves a choice or judgment, and the enforcement of laws at the border would implicate policy.

The Court has found no statute, regulation, or policy that would remove the United States' discretion in this regard. The Plaintiffs point to several violations of the INS Firearm Policy by Agent Alvarez, but these violations do not address the issue of whether the INS had discretion to entrust him with a firearm. Whether Agent Alvarez violated the policy by carrying his gun does not address the issue of the United States' discretion. Therefore, the United States is entitled to claim immunity based on the discretionary function.

Therefore, the United States is entitled to immunity based on the discretionary function exception to the FTCA for the negligent entrustment claim.

### City of El Paso

The Plaintiffs bring several claims against the City for violation of due process, violation of equal protection and negligence. To establish a claim under 42 U.S.C. § 1983, the Plaintiffs must establish both a violation of the Constitution or the laws of the United States and

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

that the violation was committed by a person acting under color of state law.

### Substantive Due Process

As a general rule, in the absence of a "special relationship" [FN4] the state has no obligation under the Due Process Clause of the Fourteenth Amendment to provide protection from a private person. *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 200 (1989). *DeShaney* is applicable to this case, and therefore, it would appear that there is no cause of action based on the City's failure to protect Ms. Alvarez. The Plaintiffs argue, however, that they have a claim under the Due Process Clause based on the theory of state-created danger.

> FN4. The Fifth Circuit has held that a special relationship only arises when a party is involuntarily confined through the affirmative use of state power. *Walton v. Alexander,* 44 F.3d 1297, 1306 (5 th Cir.1995).

Although the Fifth Circuit has never recognized a due process claim based on state-created danger, it also has not eliminated the possibility of such a claim. *Piotrowski v. City of Houston,* 51 F .3d 512, 515 (5 th Cir.1995); *Johnson v. Dallas Indep. Sch. Dist.,* 38 F.3d 198, 201 (5 th Cir.1994). For liability under this theory, a state actor must have created a dangerous environment, he must know of its dangerousness and he must have created an opportunity that would not have existed otherwise for the third party's crime to occur. *Johnson,* 38 F.3d at 201.

The Plaintiffs argue that when the City entered into a contract with the El Paso Shelter for Battered Women to provide transportation to the shelter they increased Ms. Alvarez's vulnerability to private violence. They also argue that this contract removed her ability to engage in self-help because it resulted in the Shelter's refusal to accept women who arrive at the shelter without a police escort. However, the contract between the City and the shelter cannot form the basis of a state-created danger claim because the " 'state-created danger' theory is inapposite without a known victim." *Saenz v. Heldenfels Bros.,* 183 F.3d 389, 391 (5 th Cir.1999) (holding that a sheriff's decision to permit a drunk driver to stay on the road does not implicate due process because the due process clause concerns deliberate deprivations and the sheriff was not aware that the eventual victims of the driver were on the road). Furthermore, the City's contract with the shelter

was for the police to provide an escort to the shelter and an escort to allow the victim to pick up personal items. (Plaintiff's App. at kk). There is no evidence that it was anything but purely the shelter's policy not to accept women without an escort. (*Id.* at N, KK) There is no evidence that the City had anything to do with the creation of this policy. Therefore, the City did not create the danger caused by the shelter's policy.

*7 Additionally, the Plaintiffs argue that the police department's refusal to escort her immediately to the shelter, when combined with the agreement between the City and the shelter, created a danger in violation of the Constitution. Again, there is no evidence that the City played any role in creating the shelter's policy. Furthermore, the Plaintiffs have produced no evidence that time Ms. Alvarez was waiting, and would have to wait, for an escort was a dangerous environment created by the police. The Plaintiffs make much of the officer's escorting of Ms. Alvarez from the station (described elsewhere as holding the door open), but this act, which came after Ms. Alvarez had decided to leave did not create a dangerous situation. Therefore, the Plaintiffs' claims for due process violations must fail. [FN5]

> FN5. Additionally, the Plaintiffs' response includes a section entitled "El Paso Police Department Deliberately Ignored Texas Criminal Law Mandates." In this section, the argue they the City violated various aspects of Texas law by not protecting Suzy Alvarez, by not arresting Alejandro Alvarez without a warrant and by not filing a written report. The Plaintiffs do not argue how these violations apply to their claims. These violations do not implicate a fundamental right, nor do they form the basis of a procedural due process claim.

### Equal Protection

Although in the absence of a special relationship or perhaps in the situation of state-created danger, there is no constitutional right to police protection, the police may not "selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause. *DeShaney,* 489 U.S. at 197 n. 3. Generally, equal protection claims are concerned with discrimination on the basis of a class. *Wheeler v. Miller,* 168 F .3d 241, 251 (5 th Cir.1999). To establish an equal protection claim, the Plaintiffs must first establish that others similarly situated were treated

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

differently. *Id. at 252.* Further, this discrimination must have been intentional. *Edwards v. Johnson,* 209 F.3d 772, 779 (5 th Cir.2000). The two groups the Plaintiffs allege were deprived of their rights to equal protection of the laws are: 1) victims of domestic violence and 2) victims of acts of domestic violence committed by law enforcement personnel. [FN6]

> FN6. In their response to the City's motion, the Plaintiffs never separately delineate the two classes. Nevertheless, in some parts of their response, they argue equal protection generally for victims of domestic violence. See Plaintiffs' response at p. 5-6, 15. In other parts of their response, the Plaintiffs focus more on the Border Patrol / law enforcement aspect. Id. at 16, 18.

Several courts have recognized that victims of domestic violence can be a class protected by the equal protection clause. *See e.g. Shipp v. McMahon,* 199 F.3d 256 (5 th Cir.2000); *Navarro v. Block,* 72 F.3d 712, 717 (9 th Cir.1996). When recognized, this claim is often tied to the idea that discrimination against victims of domestic violence is discrimination against women, a well-established protected class. *Shipp,* 199 F.3d at 262 (describing claims that a sheriff's office "afforded less protection to women victims of domestic violence than other victims"). The Court will assume without deciding, that the second category, that of victims of domestic abuse committed by law enforcement officers can form the basis of an equal protection complaint, as well.

### Policy

Respondeat superior cannot form the basis of a municipality's liability under Section 1983. *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 691 (1978). Vicarious municipal liability, then, only arises when the injury is based on the municipality's policy or custom. *Id.* Policy can either be officially adopted by a lawmaking official or it can include "a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Bennet v. City of Slidell,* 735 F.2d 861, 862 (5 th Cir.1984).

**\*8** The Plaintiffs have not presented evidence of policy to support municipal liability for Ms. Alvarez's dealings with police officers. [FN7] They have not

provided evidence of a widespread practice common enough to be policy. They have pointed to no evidence that any policymaker was involved in any of the times Ms. Alvarez sought police protection or aid. [FN8]

> FN7. The Plaintiffs did not sue any of the officers in their individual capacities.

> FN8. The Plaintiffs have not clearly established what the policy at issue is. *See* Plaintiff's Response at 7 ("custom and practice of shielding Alejandro Alvarez, a fellow law enforcement officer, from arrest and further intervention from the criminal justice system"); Id. at 8 ("policy of shielding agents or police relatives"); Id. at 10 ("policy or custom of discriminatory or disparate treatment of domestic violence victims"); Id. at 11 ("widespread practice of favoritism and shielding of law enforcement domestic abuse"); Id. at 17 ("custom of treating law enforcement domestic abuse less seriously than other crimes").

Regarding their argument that the City had a policy of treating victims of domestic violence worse than victims of other crimes, the Plaintiffs present an affidavit of a former domestic violence instructor who taught a seminar which "a large group" of El Paso police officers attended. She stated that she "witnessed negativity and obvious resistance from the officers to treating victim complaints as reports of crime. Several officers openly and loudly stated in the presence of supervisors that they would not do anything at a domestic violence call because the female victim would later drop charges and it would be a waste of police time." (Gina Orona-Ruiz Aff. at ¶ 9). However, she gave no indication of the reaction of the supervisors. Comments made by individual officers are not policy.

The Plaintiffs point to three different incidents when Ms. Alvarez went to the police as indicative of policy. (pp 9 -10). However, the three items, even when combined, do not show the existence of a fact issue on the question of policy. Three isIsolated incidents do not establish a persistent, widespread practice sufficient to establish a custom or policy. The three incidents the Plaintiffs particularly point to are as follows 1.) the statement made by a desk officer when Ms. Alvarez went in to make a complaint in March 1993 that she should handle the matter civilly instead of through the police was not policy so as not to "give the Border

Page 8

Patrol a bloody nose" 2.) a detective, in June 1994, when obtaining a warrant, did not tell the magistrate about Mr. Alvarez's use of a weapon resulting in the issuance of a warrant for a misdemeanor rather than for a felony because a felony would cost Mr. Alvarez his job; and 3.) the incidents at the police station the evening before her murder.

Although the Plaintiffs argue that the shielding of Mr. Alvarez from legal consequences of his action extended to the policymaker level within the police department, they provide no evidence directly in support of this contention. Instead, they rely upon post-incident investigations of the behavior of Officers Lom and Wilburn and investigations following Mrs. Alvarez's murder. Subsequent investigations, and specifically the results of those investigations, can be used to establish policy. *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5 th Cir.1985). However, in this case, the subsequent investigations fall short of establishing a fact question about the existence of a policy.

An internal investigation was conducted following Mr. Alvarez's arrest at Juana Bellahs' house. This investigation was based on Officer Lom's and Wilburn's decision to drop Agent Alvarez off at his apartment instead of turning him over to a responsible adult and their failure to document the incident. The later decision that the disciplinary charges be dropped on this one incident does not establish a fact issue about the existence of a policy.

*9 The Plaintiffs argue that the shortcomings of the polices' internal post-murder investigation established a municipal policy. This investigation, conducted by Captain Nava, a station commander, was arguably not as thorough as it could have been. However, the Plaintiffs do not establish any connection between this investigation and any City policy of discrimination against the victims of law enforcement domestic abuse or of domestic abuse in general. In connection to the investigation, the Plaintiffs also point to a statement made by a police spokesman to the effect that Mrs. Alvarez had only waited at the station for five minutes. However, the Plaintiffs never establish any connection between this statement and any policy of violating the equal protection rights of victims.

Additionally, the Plaintiffs argue that the City's failure to train its police officers can be used to establish its liability. A municipality's failure to train police can subject it to Section 1983 liability only when the failure to train shows deliberate indifference to residents' constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). The Plaintiffs point to no

evidence to create a fact question whether any lack of training was the result of deliberate indifference. Therefore, failure to train its police cannot make the City liable in this case for the acts of its employees.

Finally, the Plaintiffs have established the existence of a fact question whether the act of not filling out complaint reports for domestic violence calls, as required by state law, was widespread enough to be a custom or policy, even though the writing of such a report was required by the City's written policy. Police officers did not write a report each time Mrs. Alvarez went to the police. Similarly, another domestic violence victim indicated that officers did not prepare a complaint report every time that the police came to her house to answer calls about abuse or threats of violence. (Tracey Yanez aff. at ¶ 4). The Plaintiffs also include statistics indicating that in 1996 and 1997 reports were not filed every domestic violence call dispatched. (Plaintiffs' Ex. HH). This evidence raises a fact issue concerning whether the City had a policy of not filing complaint reports on every call of domestic violence. If true, this probably was in violation of Texas law. Nevertheless, the policy of not filing complaint reports is not relevant to the Plaintiffs' claim that the City discriminated against victims of domestic abuse *committed by law enforcement.* [FN9] More importantly, if the policy in question is only that of not filing complaint reports in domestic violence cases, the Plaintiffs have a causation problem. The Plaintiffs make no allegation that making a written report, in and of itself, would have prevented Agent Alvarez from committing murder. Although the Plaintiff produces a statement by the police department that "[e]ffective, aggressive misdemeanor arrest and prosecution can prevent violence from escalating to felony level or homicide," they have produced no information that a report would necessarily lead to an arrest and prosecution. Nor do they produce any evidence suggesting that the writing of a report on March 6, 1997 or on earlier dates would have prevented Agent Alvarez from murdering his wife.

FN9. Nothing in the summary judgment evidence indicates that Ms. Yanez's husband was involved with law enforcement.

*10 Therefore, because there is no evidence of any policy other than not creating written reports, summary judgment will be granted in favor of the City on the Plaintiffs' equal protection claims.

Texas Tort Claims Act

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Attorney of record for Plaintiff, RAUL RODRIGUEZ:

Mr. Ramon Garcia                    CMRRR # 7001 2510 0004 2061 2498
Ms. Sonia Lopez
**LAW OFFICES OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, Texas  78539

_____
TOM LOCKHART

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

U.S. COURT OF APPEALS

**FILED**

JUN 1 9 2001

CHARLES R. FULBRUGE III
CLERK

---

No. 00-50636

---

DELBERT LEAVITT, JR, Etc.; ET AL.,

Plaintiffs,

DELBERT LEAVITT, JR, Legal Representative of the Alvarez Children on behalf of the ESTATE OF MARIA SUSANA ALVAREZ, DEC'D, AND APRIL ALVAREZ, STEPHANIE ALVAREZ, ALEXIS ALVAREZ, ALEJANDRO ALVAREZ, JR AND ELIZABETH ALVAREZ, Minors All Individually Acting By and Through their Legal Representative DELBERT LEAVITT, JR; DOLORES BALEDEMAR; ESTATE OF MARIA SUSANA ALVAREZ,

Plaintiffs-Appellants,

versus

CITY OF EL PASO; ET AL.,

Defendants,

CITY OF EL PASO,

Defendant-Appellee.

---

Appeal from the United States District Court
for the Western District of Texas

---

Before DAVIS, WIENER, and STEWART, Circuit Judges.

PER CURIAM:*

On March 17, 1997, Maria Susana Alvarez ("Suzy") was shot and killed by her husband, Alejandro Alvarez ("Alejandro"), a United States Border Patrol agent, with his duty weapon. Alejandro was subsequently convicted of murder. Suzy's estate, her five minor children, and her mother brought suit under 42 U.S.C. § 1983 through her brother, Delbert Leavitt ("Leavitt") against the City of El Paso ("City") claiming violations of equal protection and substantive due process.[1] The district court granted summary judgment in favor of the City on all of Leavitt's claims which he now appeals.

This Court reviews summary judgments de novo, reviewing all disputed facts and reasonable inferences "in the light most favorable to the nonmoving party." Duffy v. Leading Edge Prods., 44 F.3d 308, 312 (5th Cir. 1995). Federal Rule of Civil Procedure 56(c) notes that summary judgment is appropriate where "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law."

Leavitt argues that the trial court erred when it granted summary judgment in favor of the City on his substantive due process claim. He claims that the City created a danger when it did not provide Suzy transportation to a battered woman's shelter the evening before her murder and according to a contract the City had with the shelter.[2] Leavitt also contends that the trial court erred

---

*Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Leavitt also brought claims for negligent supervision and negligent entrustment of a weapon against the United States under the Federal Tort Claims Act. The district court granted summary judgment in favor of the United States on the negligent entrustment claim. Leavitt and the United States subsequently agreed to dismiss the remaining claim.

[2] Although this Court has not recognized this theory, it has not eliminated the possibility of a due process claim based on state-created danger. See Piotrowski v. City of Houston, 51 F.3d 512, 515

2

Mar-11-02 04:17P OFFI   OF THE CITY ATTY   91:   41-41 150        MAR 11 '02   05:21PM   P.4

when it granted summary judgment in favor of the City on his equal protection claim that the City had a policy or custom of providing less police protection to victims of domestic violence than to victims of other crimes. See Monell v. New York City Dept. of Soc. Serv., 436 U.S. 658, 694 (1978). Leavitt moreover argues that the district court erred when it held that the City was immune from Leavitt's claim under the Texas Tort Claims Act ("TTCA").

The City responds that neither Leavitt's complaint nor the summary judgment evidence presents any substantive evidence of a City policy or custom that deprives citizens of their constitutional rights. It moreover argues that the El Paso Police Department did not have a duty to control the acts of Alejandro because there was no "special relationship" between Suzy and municipal employees. Vaquera v. Salas, 810 S.W.2d 456, 461 (Tex. App.-San Antonio 1991, writ denied). The City also asserts that it is entitled to sovereign immunity under the TTCA because none of the three exceptions to municipal liability, claims arising out of the operation or use of motor-driven vehicles, claims arising from premises defects, and claims arising from the condition or use of personal property, is satisfied here. See TEX. CIV. PRAC. & REM. CODE § 101.021.[3]

---

(5th Cir. 1995) (stating that "[w]hile this Court has not affirmatively held that this theory is a valid exception to the *DeShaney* rule, . . . it has addressed what a plaintiff would have to demonstrate to qualify for relief under this theory").

[3] The City also contends that this Court does not have jurisdiction to hear this appeal because it claims that Leavitt filed a premature notice of appeal. We find, however, that Federal Rule of Appellate Procedure 4(a)(2) permits this Court to exercise jurisdiction. See Barrett v. Atlantic Richfield Co., 95 F.3d 375, 379 (5th Cir. 1996) (stating that the Fifth Circuit had jurisdiction over a case in which the plaintiff filed a notice of appeal before all claims were resolved against all parties and when the district court had not certified the nonfinal judgment under Federal Rule of Civil Procedure 54(b)).

3

Suzy's death at the hands of her husband and in front of at least two of her children is unfortunate indeed.   Having fully reviewed the record, we cannot conclude, however, that the district court erred when it granted summary judgment.  We, therefore, affirm.

AFFIRMED.



**CITY OF**
**HARLINGEN**

## CAPITAL OF THE LOWER RIO GRANDE VALLEY
**"WORKING AS A TEAM TO PROVIDE QUALITY SERVICE WITH RESPECT AND FAIRNESS TO ALL CITIZENS"**

I, Sylvia R. Trevino, City of Secretary of the City of Harlingen, do hereby certify that the following attachment is a true and correct copy of the Charter of the City of Harlingen.

I further certify that the Charter was in effect on July 8, 1998 and remained in effect to the present time.

_____
Sylvia R. Trevino, City Secretary

Sworn and subscribed before me this 27th day of March by Sylvia R. Trevino, City Secretary for the City of Harlingen.

VERONICA MEDRANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 04-27-2005

_____
Veronica Medrano
Notary Public

*"Recipient Of Keep Texas Beautiful Governor's Achievement Award"*

**118 E. TYLER    ●    P.O. BOX 2207    ●    HARLINGEN, TEXAS 78551    ●    (956) 427-8700**

# CHARTER OF THE CITY OF HARLINGEN

2

Harlingen - Charter Table of Contents

## CHARTER TABLE OF CONTENTS
## HARLINGEN, TEXAS

Article

I.   **ACT OF INCORPORATION, CORPORATE NAME AND GENERAL POWERS**

    § 1.   Incorporation and name
    § 2.   General powers

II.  **BOUNDARY LIMITS AND EXPANSION**

    § 1.   Boundaries
    § 2.   Expansion of boundaries

III. **ELECTIONS**

    § 1.   Regular and special elections
    § 2.   Election controlling laws
    § 3.   Election returns

IV.  **MUNICIPAL GOVERNMENT**

    § 1.   Mayor and Commissioners
    § 2.   Qualifications
    § 3.   Election and term of office
    § 4.   Vacancies of Mayor and Commissioners
    § 5.   Duties and powers of Mayor
    § 6.   Duties and powers of Mayor Pro-Tempore
    § 7.   Duties and powers of Commission; governing body constituted
    § 8.   Investigations by Commission
    § 9.   Compensation of Mayor and Commission
    § 10.  Recall of Mayor and Commissioners
    § 11.  City Manager
    § 12.  Municipal Court
    § 13.  Departments
    § 14.  Appointive officers and employers; qualifications, salaries, and services in general
    § 15.  Oaths of office
    § 16.  Vacancies; appointive officers

4

**Harlingen - Charter Table of Contents**

### V.   LEGISLATION (ORDINANCES AND RESOLUTIONS)

§ 1.    Meetings of Commission
§ 2.    Legislative and business procedure
§ 3.    Powers of ordinance
§ 4.    Style of ordinances
§ 5.    Enactment of ordinances, resolutions and motions
§ 6.    Emergency ordinances
§ 7.    Publication of ordinances
§ 8.    Recording of ordinances
§ 9.    Initiative and referendum
§ 10.   Codification of ordinances

### VI.   FINANCE

§ 1.    General
§ 2.    Taxation
§ 3.    Municipal bonds
§ 4.    Accounting procedure
§ 5.    Payment of accounts and claims
§ 6.    Depositories
§ 7.    Audit and examination

### VII.   ACQUISITION AND OWNERSHIP OF PROPERTY

§ 1.    Acquisition of property
§ 2.    Property previously acquired
§ 3.    Property exempt from execution
§ 4.    Eminent domain
§ 5.    Contracts to purchase property

### VIII.   PERMANENT PUBLIC IMPROVEMENTS AND PARKS

§ 1.    Street, sidewalk, and alley improving and assessing
§ 2.    Defective sidewalks as nuisances
§ 3.    Opening, extending, straightening, and widening streets and alleys
§ 4.    Street and alley obstructions, alterations, and closing
§ 5.    Franchise for use of streets
§ 6.    Parks and playgrounds
§ 7.    Sanitary sewers

### IX.   MUNICIPAL AIRPORT

§ 1.    Ownership and operation

**Table of Contents** 5

**X.   PUBLIC UTILITIES**

§ 1.   Municipal ownership and operation
§ 2.   Funds for acquisition
§ 3.   Manufacture or purchase of public utility products
§ 4.   Municipal ownership and operation made exclusive
§ 5.   Franchising and regulating private utility companies
§ 6.   Public utilities; [funds to be kept separate]
§ 7.   Utility trustees

**XI.   PEACE, GOOD ORDER AND GENERAL WELFARE CONTROL**

§ 1.   Animals (domestic)
§ 2.   Auxiliary functions financing
§ 3.   Building (private) construction
§ 4.   Building (use) safety
§ 6.   Fire Department
§ 7.   Fire limits and construction
§ 8.   Food; production, handling and distribution
§ 9.   Garnishment of city funds
§ 10.  Health (public)
§ 11.  Library (public)
§ 12.  Licenses; business, occupations, signs
§ 13.  Liability for damages
§ 14.  Litigation
§ 16.  Miscellaneous activities
§ 17.  Nuisances
§ 18.  Peddlers and pawnbrokers
§ 19.  Penal ordinances
§ 20.  Platting of property
§ 22.  Police Department
§ 23.  Prisons, workhouses, hospitals, orphanages, charities
§ 25.  Sanitary inspection
§ 26.  Transportation (public)
§ 28.  Weights and measures
§ 29.  Zoning
§ 30.  General powers

**XII.   GENERAL PROVISIONS**

§ 1.   Ratification of ordinances
§ 2.   Amendments to Charter
§ 3.   Vote on proposed Charter
§ 4.   Election of first Mayor and Commission
§ 5.   Litigation pending at enactment of Charter
§ 6.   Re-arranging of articles and sections

Harlingen - Charter Table of Contents

6

# CHARTER

*Editor's note: The original Home Rule Charter was adopted February 24, 1927. It was thereafter amended June 7, 1947, May 13, 1950, and August 12, 1954. One of the amendments adopted August 12, 1954, authorized the reorganization and rearrangement of the entire Charter by ordinance for that purpose adopted by the Elective Commission of the City of Harlingen. This was done and confirmed by an ordinance adopted March 2, 1955. The Charter set out in this volume is that as rearranged by such ordinance of March 2, 1955, and as subsequently amended.*

## ARTICLE I. ACT OF INCORPORATION, CORPORATE NAME AND GENERAL POWERS

## SECTION 1. INCORPORATION AND NAME.

All the inhabitants of the City of Harlingen, in Cameron County, Texas, as the boundaries and limits of said City are herein established, or may be hereafter established, shall be a body politic, incorporated under and be known by the name and style of the "City of Harlingen" with such powers, rights and duties as are hereinafter provided, and all other powers not herein specifically designated that are granted by the Constitution and laws of Texas to such cities.

## SECTION 2. GENERAL POWERS.

The City of Harlingen made a body politic and corporate by the adoption of this Charter, shall have perpetual succession, may use a common seal, may sue and be sued, may contract and be contracted with, implead and be impleaded in all courts and places and in all matters whatever; may take, hold, and purchase personal and real property within or without the city limits, as may be needed for the corporate purposes of said City, and may sell any real or personal property owned by it; perform and render all public services and, when deemed expedient, may condemn property within or without the city limits for corporate use, and may hold, manage and control same; and shall enjoy all the rights, immunities, powers, privileges and franchises possessed by said City in its original and previous capacity as a general law municipal corporation, where not in conflict with the provisions of this Charter; and shall be subject to all the duties and obligations and shall have the rights, immunities, powers, privileges and franchises herein conferred and granted, and as specified in the statutes and Constitution of the State of Texas and the United States Government, including the application of the City's zoning and subdivision powers and other powers to its extraterritorial jurisdictional area as specified by TEX. REV. CIV. STAT., Art. 970a, and subsequent amendments thereto.
(Res. 79-R-7, passed 2-24-79)
*Editor's Note: TEX. REV. CIV. STAT., Art. 970a is now located at TEX. LOC. GOV'T CODE §§ 43.001 et seq.*

**Harlingen - Charter**

## ARTICLE II. BOUNDARY LIMITS AND EXPANSION

### SECTION 1. BOUNDARIES.

The boundaries and limits of the City of Harlingen shall be as established in original Charter of the City of Harlingen, dated May 16, 1927, and duly recorded in Book 6 at pages 599-629 inclusive, Record of City Charters and Amendments, Office of the Secretary of State, Austin, Texas, and as extended by ordinances of the City of Harlingen enacted subsequent thereto.

### SECTION 2. EXPANSION OF BOUNDARIES.

The City Commission shall have power by ordinance to fix the boundary limits of the said City of Harlingen and to provide for the extension of said boundary limits and the annexation of additional territory lying adjacent to said City, all pursuant to and in compliance with the procedure provided for in TEX. REV. CIV. STAT., Art. 970a, including all subsequent amendments thereto, and any other applicable state statutes. The City Commission shall also have the power to disannex by ordinance territory previously annexed upon the initiative of the City of Harlingen or upon the petition of the residents of said area as provided in TEX. REV. CIV. STAT., Art. 970a, Section 10, as amended. Upon additional territory being so annexed, the inhabitants thereof shall be entitled to all rights and privileges of other citizens, and shall be bound by the acts, ordinances, resolutions and regulations of the City. (Ord. 73-30, passed 11-7-73; Am. Ord. 84-83, Amend. No. 1, passed 12-5-84)

*Editor's Note: TEX. REV. CIV. STAT., Art. 970a is now located at TEX. LOC. GOV'T CODE §§ 43.001 et seq.*

## ARTICLE III. ELECTIONS

### SECTION 1. REGULAR AND SPECIAL ELECTIONS.

Regular municipal elections of the City of Harlingen to elect a Mayor and/or Commissioner shall be held on the third Saturday in May. All other municipal elections provided for in this Chapter or by state or federal law shall be special elections. All such special elections shall be called for dates in accordance with state election laws. (Ord. 73-30, passed 11-7-73; Am. Ord. 75-44, passed 11-11-75; Res. 87R-10, passed 4-9-87)

### SECTION 2. ELECTION CONTROLLING LAWS.

All elections shall be conducted, and results canvassed, and announced by the election authorities, as prescribed by the general election laws of the State of Texas, and said general election laws shall control in all municipal elections, except as otherwise herein provided. (Ord. 75-44, passed 11-11-75)

## SECTION 3.  ELECTION RETURNS.

The Commission shall at the next regular meeting day of said commission, after each regular and special election, canvass the returns and declare the result of such election. At such meetings canvassing and declaring those elections held for the purpose of electing a Mayor and/or Commissioners, the Mayor and/or Commissioners declared elected shall qualify and assume the duties of their offices.

## ARTICLE IV.  MUNICIPAL GOVERNMENT

## SECTION 1.  MAYOR AND COMMISSIONERS.

The governing body of the City of Harlingen shall consist of the commission, which shall be composed of five (5) commissioners, and the mayor, the same being the elective officers of the City. (Ord. 73-30, passed 11-7-73)

## SECTION 2.  QUALIFICATIONS.

The Mayor and each Commissioner shall be citizens of the United States, and have resided in the State of Texas for a continuous period of twelve (12) months and in the City of Harlingen for a continuous period of twelve (12) months, and have attained the age of twenty-one (21) years at the time of filing as a candidate for such position; and have the other qualifications of an elector of the City and as provided for candidates in the State election code. The Mayor, Commissioners and other officers and employees shall not be indebted to the City, save and except for ad valorem taxes and other indebtedness incurred in the ordinary course of City government, but with such ad valorem taxes and other indebtedness to be timely paid (otherwise constituting a disqualifying indebtedness hereunder); shall not hold any other public office of emolument, except the office of Notary Public, and shall not be interested in the profits or emoluments or any contract, job, work or service for the municipality, or interested in the sale to or by the City of any property, real or personal. All such qualifications and requirements shall be fully complied with by any prospective candidate for the position of Mayor or Commissioner at the time of the filing for election. Any officer or employee of the City who shall cease to possess any of the qualifications herein required shall forthwith forfeit his office and any such contracts in which any officer or employee is or may become interested may be declared void by the Commission. No officer or employee shall directly or indirectly accept any compensation, public or private, in consideration for or as a consequence of his status as an officer or employee other than such compensation as may be provided in this Charter or by ordinance as authorized herein and no officer or employee shall directly or indirectly solicit or accept any gift, service, or discount in the purchase of any service or real or personal property offered as a consequence of his status as an officer or employee of the City. Any violation of this section shall be a misdemeanor, and on conviction for such violation, such office or employment shall be forfeited.

The Mayor and each Commissioner shall fully comply with TEX. REV. CIV. STAT., Art. 988b, and any subsequent amendments thereto pertaining to disclosure of local officials conflicts of interest, and upon conviction of an offense thereunder, said office of mayor or Commissioner shall forthwith be forfeited.
(Ord. 75-44, passed 11-1-75; Res. 79-R-7, passed 2-24-79; Am. Ord. 84-83, Amend. Nos. 2, 7, passed 12-5-84)
*Editor's Note: TEX. REV. CIV. STAT., Art. 988b is now located at TEX. LOC. GOV'T CODE §§ 171.001 through 171.008.*

## SECTION 3.  ELECTION AND TERM OF OFFICE.

At the regular municipal election of the City of Harlingen to be held in 1988 and every three (3) years thereafter an election shall be held for the election of candidates to hold the office of Commissioner-Place One, Commissioner-Place Two and Commissioner-Place Three. At the regular municipal election to be held in 1989 and every three (3) years thereafter, an election shall be held for the election of the mayor and for the offices of Commissioner-Place Four and Commissioner-Place Five. At all elections held pursuant to this section each candidate shall designate in writing on or before [the] applicable filing deadline prescribed by the Texas Election Code which one of the aforementioned offices the candidate seeks. The candidate for each of the five (5) places, respectively, receiving a majority of the votes cast for commissioner of such place at such elections shall be elected commissioner of such place and each shall hold office for a term of three (3) years and until his or her successor is elected and qualifies. The candidate for mayor receiving a majority of the votes cast for mayor at such elections shall be elected mayor and shall hold office for a term of three (3) years and until his or her successor is elected and qualifies. As used in this section, the word "majority" shall be defined as any percentage of all votes cast for a particular office which exceeds fifty (50) per cent of all votes cast for that office. In the event no candidate for mayor receives a majority of votes cast and/or in the event no candidate for commissioner of a particular place receives a majority of votes cast or in the event of a tie vote for mayor and/or a tie vote for commissioner of any place, there shall be a run-off election, to be conducted in accordance with the Texas Election Code, between the two candidates receiving the highest number of votes or tied for mayor and/or commissioner of a particular place. The candidate receiving the majority of votes for the respective office at such runoff election shall be elected. Nothing herein shall be construed as prohibiting any such office holder from being a candidate for re-election. The commission shall be the judge of the election and the qualification of its members.

Each candidate elected to the office of mayor or commissioner at the regular municipal election of the City of Harlingen to be held in 1988 and at every regular municipal election thereafter shall serve for a term of three (3) years and until his or her successor is elected and qualifies; unless sooner removed from office as herein provided. Nothing herein shall alter the term of office of any such office holder elected pr(or to the regular municipal election of 1988.
(Res. 87R-10, passed 4-9-87)

## SECTION 4.  VACANCIES OF MAYOR OR COMMISSIONERS.

Vacancies in the office of Mayor or Commissioner shall be filled for the remainder of the unexpired term by a majority vote of the qualified electors of said City at a special election duly called by ordinance. Provided, however, if such a vacancy occurs within ninety (90) days of the end of the term of the vacated office, the remaining Commissioners, by a majority vote, shall appoint a qualified person to fill such unexpired term.
(Ord. 73-30, passed 11-7-73)

## SECTION 5.  DUTIES AND POWERS OF MAYOR.

The Mayor of the City shall be the presiding officer of the Commission. He shall not be entitled to vote as a member of the commission except in the case of a tie. He shall sign all bonds, ordinances, resolutions, proclamations, deeds and conveyances, and he shall exercise all powers and perform all duties as chief executive officer of the City Commission imposed upon him by this Charter and by the ordinances of the City.
(Ord. 73-30, passed 11-7-73; Am. Ord. 84-83, Amend. No. 3, passed 12-5-84)

## SECTION 6.  DUTIES AND POWERS OF MAYOR PRO-TEMPORE.

In the absence of the Mayor, a Mayor Pro-tempore shall act in his place and stead. At the second regular meeting of the City Commission after each election of a Mayor and/or Commissioners, one of such Commissioners shall be elected Mayor Pro-tempore by a majority vote of the Commissioners. In the absence of both the Mayor and Mayor Pro-tempore, a presiding Mayor Pro-tempore shall be elected by a majority vote of the Commissioners. In the absence of the Mayor, the Mayor Pro-tempore shall be charged with the same duties of the Mayor, shall be entitled to the same rights and privileges of the Mayor and shall be subject to the same restrictions and limitations of the Mayor as provided for in this Charter.

## SECTION 7.  DUTIES AND POWERS OF COMMISSION; [GOVERNING BODY CONSTITUTED].

The commission shall enact all ordinances and resolutions and adopt all regulations and constitute the legislative body of the City. The Commission and the Mayor shall constitute the governing body of the City with all the powers and authority herein granted; provided, however, that the Mayor and Commissioners shall have no administrative responsibilities.
(Res. 79-R-7, passed 2-24-79; Ord. 84-83, Amend. No. 4, passed 12-5-84)

**Harlingen - Charter**

## SECTION 8.  INVESTIGATIONS BY COMMISSION.

The Commission may investigate the financial transaction of any office or department of the city government, and the acts and conduct of any official or employee. In conducting such investigation, the Commission may compel the attendance of witnesses, the production of books and papers, and other evidence, and for that purpose may issue subpoenas or attachments which shall be signed by the Mayor; which may be served and executed by any officer authorized by law to serve subpoenas or other process, or any peace officer of the City. If any witness shall refuse to appear or to testify to any facts within his knowledge, or to produce any papers, or books in his possession, or under his control, relating to the matter under investigation before the Commission, the Commission shall have the power to cause the witness to be punished as for contempt, not exceeding a fine of one hundred dollars ($100.00) and three (3) days in the City prison. No witness shall be excluded from testifying, touching his knowledge of the matter, under investigation in any such inquiry, but such testimony shall not be used against him in any criminal prosecution except for perjury committed upon such inquiry.

## SECTION 9.  COMPENSATION OF MAYORS AND COMMISSIONERS.

The Mayor and Commissioners shall receive such salaries as may be fixed by the Commission, provided that in the absence of an ordinance fixing such salaries, the Mayor and Commissioners shall serve without compensation, and provided further that the salary of the Mayor shall not exceed five thousand dollars ($5,000.00) per year, and the salary of each Commissioner shall not exceed three thousand dollars ($3,000.00) per year.

## SECTION 10.  RECALL OF MAYOR OR COMMISSIONERS.

The people of the City reserve the power to recall any member of the Commission or Mayor and may exercise such power by filing with the City Secretary a petition, signed by qualified voters of the City equal in number to at least fifteen (15) per cent of the qualified voters of the City, demanding the removal of a Commissioner or Mayor. The petition shall be signed and verified in the manner required for an initiative petition, shall contain a general statement of the grounds for which the removal is sought, and one of the signers of each petition paper shall make an affidavit that the statements therein made are true.

Within twenty (20) days after a recall petition is filed, the City Secretary shall examine the same. The provisions regulating examination, certification and amendment of initiative petitions shall apply to recall petitions. If the petition is certified by the City Secretary to be sufficient and the Commissioner of Mayor, whose removal is sought, does not resign within five (5) days after the certification to the Commission, the Commission shall order and hold a recall election within not less than thirty (30) nor more than sixty (60) days from such certification.

**Charter**                                                                                      13

Ballots used at recall elections shall conform to the following requirements:

(1) With respect to each person whose removal is sought, the question shall be submitted: "Shall (name of Commissioner or Mayor) be removed from the office of City Commissioner (or Mayor)?"

(2) Immediately below each such question there shall be printed the two following propositions, one above the other, in the order indicated:

"For the recall of (name of Commissioner or Mayor)."

"Against the recall of (name of Commissioner or Mayor)."

If a majority of the votes cast at a recall election shall be against removal of the Commissioner or Mayor named on the ballot, he shall continue in office. If the majority of the votes cast at such election be for the removal of the Commissioner or Mayor named on the ballot, the Commission shall immediately declare his office vacant and such vacancy shall be filled in accordance with the provisions of this Charter for the filling of vacancies. A Commissioner or Mayor thus removed shall not be a candidate to succeed himself in an election called to fill the vacancy thereby created.

No recall petition shall be filed against a Commissioner or Mayor within six (6) months after he takes office and no Commissioner or Mayor shall be subjected to more than one recall election during a term of office.


## SECTION 11. CITY MANAGER.

The City Commission of the City of Harlingen, Texas, shall appoint a City Manager on the basis of his executive and administrative qualifications and experience in municipal administration who shall be the chief administrative officer of the municipal government. He shall direct and supervise the administration of all departments, offices, and employees of the City except as otherwise provided by this Charter or by law. He may or may not, at the time of his appointment, be a resident but shall immediately establish his residence within the City upon accepting the office. He shall receive a salary as shall be determined by the City Commission and shall serve at the will of the City Commission. Whenever the office of City Manager is vacant, the City Commission shall forthwith appoint an acting City Manager who shall during such vacancy have and exercise all powers and duties of the City Manager. No member of the governing body shall be eligible to serve as City Manager or acting City Manager. He shall appoint and, when he deems it necessary for the good of the City, suspend or remove at will all City employees and appointive officers provided for, by or under this Charter, except as otherwise provided by law or this Charter. He may authorize any administrative officer who is subject to his direction and supervision to exercise these powers with respect to subordinates in that officer's department. He shall attend all City Commission meetings and shall have the right to take part in discussion but may not vote. He shall see that all laws, provisions of this Charter and legislative enactments of the City Commission, subject to enforcement by him or by officers subject to his direction and supervision, are faithfully executed. He shall prepare and submit the annual budget to the City Commission. He shall submit to the City Commission and make available to the public a

complete report on the finances of the City as of the end of each fiscal year. He shall make such other reports as the City Commission may require concerning the operations of City departments and offices subject to his direction and supervision. He shall keep the City Commission fully advised as to the financial condition and future needs of the City and make such recommendations to the City Commission concerning the affairs of the City as he deems desirable. He shall perform such other duties as are specified in this Charter or may be required by the City Commission.
(Ord. 73-30, passed 11-7-73; Am. Ord. 84-83, Amend. No. 11, passed 12-5-84)

## SECTION 12.  MUNICIPAL COURT.

Said City shall have the power to provide for one or more courts for the trial of misdemeanor offenses, each known as a "municipal court," and with each such court to have one or more Municipal Judges, and with such powers and duties as are refined and prescribed in TEX. REV. CIV. STAT., Arts. 1194 - 1200 inclusive (including amendments and lettered additions and amendments thereto) in Ch. 16, Title 28; and to appoint, as soon as practicable after the adoption of this Charter, suitable persons for the position and/or positions of Judge or Judges of the municipal court or courts, who shall discharge the duties of said office under the terms and provisions of the State law creating said court, and subject to the provisions of this Charter; and to appoint a Clerk and other officer or officers of such court.
(Ord. 75-44, passed 11-11-75; Res. 79-R-7, passed 2-24-79)
*Editor's Note: TEX. REV. CIV. STAT., Arts. 1194-1200 is now located at TEX. GOV'T CODE §§ 29.002 et seq.*

## SECTION 13.  DEPARTMENTS.

The Commission shall create and consolidate such offices and may divide the administration of the City's affairs into such departments as they may deem advisable and may discontinue any such office or department at their discretion.

## SECTION 14. APPOINTIVE OFFICERS AND EMPLOYERS; QUALIFICATIONS, SALARIES, AND SERVICES IN GENERAL.

The elected Mayor and Commissioners and full-time salaried employees of the City of Harlingen shall have no other office of public emolument (except that of notary public) nor be interested in any contract work, service or other business with the City of Harlingen, including the buying and selling of property, save and except for the services for which such elected official and/or full-time salaried employee is elected and/or hired; and further providing that appointive, part-time, unpaid officials of the City, may do business with other departments of the City other than the department in which such unpaid, part-time appointive official is actually appointed and a member; with additional safeguards to be determined by the City Manager and Elective Commission that any such business negotiated and consummated by any such part-time, unpaid and appointive official of the City with any other than that in which he is appointed and a member; shall in no way be influenced by the department and his position therein of which he is an appointed member. All officers and employees of the City whether

appointed or elected, paid or unpaid, who exercise responsibilities beyond those that are merely advisory in nature shall fully comply with TEX. REV. CIV. STAT., Art. 988B, and any amendments thereto pertaining to disclosure of local officials conflicts of interest and upon conviction of an offense there under such officer or employment shall forthwith be forfeited.

No contract shall ever be made which binds the City to pay for personal services to be rendered, for any stated period of time, but all appointive officers and employees shall be subject to preemptory discharges as herein provided.

The commission shall fix and determine the wages and salaries of all appointive officers and employees of the City, and provide for the payment thereof.

No person related within the second degree by affinity or within the third degree by consanguinity to the Mayor, to either of the Commissioners or to the City Manager shall be appointed to any office, position, clerkship or service of the City.
(Ord. 75-44, passed 11-11-75; Am. Ord. 79-39, passed 8-1-79; Am. Ord. 82-79, Amend. No. 5, passed 1-15-83; Am. Ord. 84-83, Amend. No. 5, passed 12-5-84)
*Editor's Note: TEX. REV. CIV. STAT., Art. 988B is now located at TEX. LOC. GOV'T CODE §§ 171.001 through 171.008.*

## SECTION 15.  OATHS OF OFFICE.

Each elective commissioner and Mayor, the City Manager, each police officer, and other city officials as may be prescribed by City ordinance from time to time, before entering upon the duties of his or her office, shall take and subscribe to the oath prescribed by the Constitution of the State of Texas for County officials.
(Res. 79-R-7, passed 2-24-79; Ord. 84-83, Amend. No. 6, passed 12-5-84)

## SECTION 16.  VACANCIES; APPOINTIVE OFFICERS.

In the event of the occurrence of a vacancy, prior to the normal expiration thereof, of any position provided to be filled by appointment by the Mayor and/or City Commission in this Charter, the Mayor and/or Commission, as the case may be, shall fill the vacancy by interim appointment; said interim appointments to be under the same terms and conditions as provided for such original appointments.

**Harlingen - Charter**

## ARTICLE V.  LEGISLATION (ORDINANCES AND RESOLUTIONS)


### SECTION 1.  MEETINGS OF COMMISSION.

The Commissioners shall meet at such time as may be prescribed by the ordinance or resolution, but they shall meet at least once a month. The Mayor, any two Commissioners or the City Manager (hereinafter provided for) may call special meetings of the Commission at any time deemed advisable. All meetings of the Commission shall be public except such executive sessions as may be provided for by law, and any such citizen shall have access to the minutes and records thereof at all reasonable times. The Commission shall determine its own rules and order of business and shall keep a journal of its proceedings.
(Res. 79-R-7, passed 2-24-79)


### SECTION 2.  LEGISLATIVE AND BUSINESS PROCEDURE.

Three (3) Commissioners and a presiding Mayor or Mayor Pro tempore shall constitute a quorum to do business. The Commission shall conduct its business by adoption or rejection of ordinances or resolutions or motions.
(Ord. 73-30, passed 11-7-73)


### SECTION 3.  POWERS OF ORDINANCE.

The City of Harlingen shall have the power to enact and enforce all ordinances necessary to protect health, life and property, and to prevent and summarily abate and remove all nuisances, and to preserve and enforce the good government, order and security of the City and it inhabitants, and to enact and enforce ordinances on any and all subjects, provided that no ordinance shall be enacted inconsistent with the provisions of this Charter or the general laws or Constitution of the State of Texas.


### SECTION 4.  STYLE OF ORDINANCES.

The style of all ordinances of the City of Harlingen, shall be: "Be It Ordained by the City of Harlingen," but the same may be omitted when published in book or pamphlet form by the City of Harlingen.


### SECTION 5.  ENACTMENT OF ORDINANCES, RESOLUTIONS AND MOTIONS.

Each proposed ordinance or resolution shall be in written or printed form when presented to the Commission. Each ordinance shall have a captain summarily and generally stating the provisions thereof. Ordinances shall be adopted on their first presentation by reading of the caption only and resolutions shall be adopted by abbreviated oral description except where reading of an ordinance or

**Charter**                                                                    17

resolution in full is supported by a four-fifths vote of the Commission. To be adopted, an ordinance must be presented and approved at two (2) separate Commission meetings. To approve any ordinance or adopt any resolution shall require three (3) affirmative votes. Motions may be adopted by simple majority. Provided, however, an ordinance declared an emergency measure may be finally adopted at the meeting at which it is introduced and presented, upon favorable and supporting four-fifths vote of the Commission. Enactment of ordinances, resolutions and motions, by providing that Commissioners and the Mayor when required to vote, shall not abstain from voting aye or nay on any ordinance, resolution or motion presented to the Elective Commission for determination except in the event of the existence of a conflict of interest as that term is defined herein. For purposes of this section, a conflict of interest shall be deemed to exist when the outcome of a vote on an ordinance, resolution or motion shall result in a direct pecuniary benefit or loss to a Commissioner or the Mayor or to any entity, firm or corporation of which a Commissioner or the Mayor is an owner, partner or stockholder. In the event of such conflict of interest, the affected Commissioner or Mayor shall abstain from voting aye or nay on the ordinance, resolution or motion.

(Ord. 73-30, passed 11-7-73; Res. 79-R-7, passed 2-24-79; Am. Ord. 82-97, Amend. Nos. 1, 2, passed 1-15-83; Am. Ord. 84-83, Amend. No. 8, passed 12-5-84)

## SECTION 6.  EMERGENCY ORDINANCES.

An emergency measure is an ordinance for the immediate preservation of the public peace, property, health or safety and providing for the usual daily operation of a municipal department, in which the emergency is set forth and defined therein. Ordinances making a grant, renewal, extension of a franchise, or other special privileges or regulating the rate to be charged for its service by any public utility, shall never be passed as an emergency measure.

(Ord. 73-30, passed 11-7-73; Am. Ord. 84-83, Amend. No. 9, passed 12-5-84)

## SECTION 7.  PUBLICATION OF ORDINANCES.

The City Clerk shall give notice of the passage of every ordinance imposing a penalty, fine, imprisonment, or forfeiture for the violation of the provisions thereof, by causing the captain or title of any such ordinance to be published in some daily newspaper in the City of Harlingen, at least once within ten (10) days after the passage if said ordinance, and shall note on every such ordinance, the caption of which is hereby required to be published, and on the record thereof, the fact that same has been published as required by the Charter, and the date of such publication, which shall be prima facie evidence of such publication; provided, that the provisions of this section shall not apply to revision and codification of the ordinances of the city, as the commission may from time to time adopt.

## SECTION 8.  RECORDING OF ORDINANCES.

Every ordinance or resolution, upon its becoming effective, shall be recorded in a book kept for that purpose and shall be authenticated by the signature of the mayor and the party exercising the duties of city clerk or city secretary.

## SECTION 9. INITIATIVE AND REFERENDUM.

The people of the city reserve the power of direct legislation by initiative, and in the exercise of such power may propose any ordinance, not in conflict with this Charter, the state constitution, or the state laws except an ordinance appropriating money or authorizing the levy of taxes. Any initiated ordinance may be submitted to the commission by a petition signed by qualified voters of the city equal in number to at least fifteen (15) per cent of the qualified voters of the city.

The people reserve the power to approve or reject at the polls any legislation enacted by the commission which is subject to the initiative process under this Charter, except an ordinance which is enacted for the immediate preservation of the public peace, health or safety, which contains a statement of its urgency, and which is adopted by the favorable votes of four or more of the commissioners. Prior to the effective date of any ordinance which is subject to referendum, a petition signed by qualified voters of the city equal in number to at least fifteen (15) per cent of the qualified voters of the city may be filed with the city secretary requesting that any such ordinance be either repealed or submitted to a vote of the people. When such a petition has been certified as sufficient by the city secretary, the ordinance specified in the petition shall not go into effect, or further action thereunder shall be suspended if it shall have gone into effect, until and unless it is approved by the voters as herein provided.

Initiative petition papers shall contain the full text of the proposed legislation in the form of an ordinance including a descriptive caption. The signature to the initiative or referendum petition need not all be appended to one paper, but each signer shall sign his name in ink or indelible pencil and shall add to his signature his place of residence by street and number. One of the signers of each separate petition shall make an affidavit that he, and he only, personally circulated such petition and that each signature appended thereto was made in his presence and is the genuine signature of the person whose name it purports to be.

Within thirty (30) days after an initiative or referendum petition is filed, the city secretary shall determine whether the same is signed by the requisite number of qualified voters. The city secretary shall declare void any petition paper which does not have an affidavit attached thereto as heretofore required. In examining the petition, the city secretary shall write the letters "D.V." in red ink opposite the names of signers found not qualified to vote.

After completing examination of the petition, the secretary shall certify the result thereof to the commission at its next regular meeting, stating the number of persons found on the petition who are qualified to vote and the number of persons found on the petition who are not qualified to vote. If the certificate of the city secretary shall show an initiative or referendum petition to be insufficient, the secretary shall notify the person filing the petition, and it may be amended within ten days from the date of such notice by filing a supplementary petition upon additional papers signed and filed as provided for an original petition. Within fifteen (15) days after such amendment is filed, the secretary shall examine the amended petition and certify as to its sufficiency. If the amended petition is found to be insufficient, the secretary shall return the petition to the person filing the same, without prejudice to the filing of a new petition for the same purpose.

When the commission receives an authorized initiative petition certified by the city secretary to be sufficient, the commission shall either: (a) pass the initiated ordinance without amendment within sixty (60) days after the date of the certification to the commission; or (b) submit said initiated ordinance without amendment to a vote of the qualified voters of the city at a regular or special election to be held within ninety (90) days after the date of the certification to the commission; or (c) at such election, submit to a vote of the qualified voters of the city said initiated ordinance without amendment, and an alternative ordinance on the same subject proposed by the commission.

When the commission receives an authorized referendum petition certified by the city secretary to be sufficient, the commission shall reconsider the referred ordinance, and if upon such reconsideration such ordinance is not repealed, it shall be submitted to the voters at a regular or special election to be held not more than ninety (90) days after the date of certification to the commission. Special elections on initiated or referred ordinances shall not be held more frequently than once each six (6) months, and no ordinance on the same subject as an initiated ordinance which has been defeated at any election may be initiated by the voters within two years from the date of such election.

The ballot used in voting upon an initiated or referred ordinance shall state the caption of the ordinance and below the caption shall set forth on separate lines the words, "For the Ordinance," and "Against the Ordinance."

Where an initiated ordinance or an alternative ordinance proposed by the commission is submitted, the ballot shall state the caption of each ordinance, clearly designating them "Ordinance No. 1" and "Ordinance No. 2," respectively, and shall set forth below the captions on separate lines the words "For Ordinance No. 1," "For Ordinance No. 2" and "Against Both Ordinances." Where an initiated ordinance and an alternative ordinance are submitted, each voter shall vote "For" only one ordinance or "Against Both Ordinances," and a vote for one ordinance shall be counted as a vote against the other ordinance.

Any number of ordinances may be voted on at the same election in accordance with the provisions of this article. If a majority of the votes cast is in favor of a submitted ordinance, it shall thereupon be effective as an ordinance of the city. An ordinance so adopted may be repealed or amended at any time after the expiration of two years by a four-fifths (4/5) vote of the commission. A referred ordinance which is not approved by a majority of the votes cast shall be deemed thereupon repealed. (Ord. 75-44, passed 11-11-75)

## SECTION 10.  CODIFICATION OF ORDINANCES.

The commission shall have all general ordinances of the city compiled and printed in code form; the commission is empowered to thereafter recodify said general ordinances as may be deemed necessary, from time to time. For the purpose of this section, general ordinances shall be deemed to be those ordinances of a permanent or continuing nature which affect the residents of the city at large. Every general ordinance enacted subsequent to the original codification provided for above shall be enacted as an amendment to the code. When adopted by the commission, the printed codes of general ordinances contemplated by this section shall be in full force and effect without the necessity of such codes or any part thereof being published in any newspapers.

Harlingen - Charter

20

An ordinance of the City of Harlingen may be proved prima facie by a printed code of ordinances purporting to be printed by authority of the city, or by a copy of the ordinance certified by the city secretary to be a true copy of the same, or by the city secretary's official record thereof.

# ARTICLE VI.  FINANCE

## SECTION 1. GENERAL.

The city shall have the power to control and manage the finances of the city; to provide its fiscal year and fiscal arrangements.

## SECTION 2. TAXATION.

The City shall have the power and is hereby authorized annually to levy and collect taxes, not exceeding two dollars and fifty cents ($2.50) on each one hundred dollars ($100.00) of assessed valuation of all real and personal property within the City limits, not exempt from taxation by the Constitution and laws of the State, for any purpose not inconsistent with the Constitution of the State of Texas.

Shall authorize the granting and issuance of licenses and shall direct the manner of issuing and registering the same and fix the fees therefor; but no license shall issue for a longer period than one (1) year and shall not be assignable except by permission of the governing authority of the City.

Shall have the power, annually, to levy and collect a franchise tax against any public corporation using and occupying the public streets or grounds of the City, separately from the tangible property of such corporation, and to levy and collect, annually, upon the property and shares of corporations, companies and corporate institutions, as the same are now or may be assessed by the State laws, and shall have full power to enforce the collection of such taxes.

Shall have the power to regulate the manner and mode of making out tax lists, inventories and appraisements of property therein, and to prescribe the oath that shall be administered to each person rendering property for taxation, and to prescribe how, when and where property shall be rendered and to prescribe the number and form of assessment rolls, and to adopt such measures as may be deemed advisable to secure the assessment of all property within the city limits and to collect taxes thereon, and may provide a fine upon all persons failing, neglecting or refusing to render their property for taxation, and to do any and all other things necessary or proper to render effectual the collection of monies by taxation.

Shall have the power to provide for the rendition of unrented property for taxation and levy and assess taxes thereon, annually, and provide for the rendition, levy and assessment of taxes for previous years on property omitted from taxation, and to provide interest at the rate of six (6) per cent per annum upon such unrendered or omitted property, and to change and provide for correction and reassessment of property erroneously assessed.

All real, personal or mixed property held, owned or situated in the City of Harlingen shall be liable for all municipal taxes, due by the owner thereof, including taxes on real estate, franchises, personal and mixed property, and all other municipal taxes, of whatsoever character. Such municipal taxes are hereby declared to be a lien, charge and encumbrance upon the property so taxed and shall be a prior lien to all other claims, sales, assignments, transfers, gifts and judicial writs. Said lien shall exist from the first day of January of each year until all such taxes have been paid, and against any real estate which, for any cause, has failed to be assessed for one or more years, and such lien shall be good and effective for every year for which assessment has so failed.

Personal property of all persons, firms or corporations owing any such taxes to the City of Harlingen, is hereby made liable for all such taxes whether same be upon personal or real property or upon both.

The governing authority of the City, at its first meeting in June of each year, or as soon thereafter as practicable, shall levy the annual tax for each year, but special taxes or assessments allowed by this Charter may be levied, assessed and collected at such time as the governing authority may determine; provided, that should the governing authority fail or neglect to levy the annual tax herein provided for, for any one (1) year the annual tax levy for the preceding year last made by such governing authority shall and will be considered in force and effective as the tax levy for the year for which no annual tax levy was made.

The annual levy of ad valorem tax and other taxes subject to the State of Texas Tax Code shall be levied each year at the earliest date possible commensurate with the beginning of the city fiscal year. Any special taxes or assessments not specifically regulated and controlled by the Texas Tax Code may be levied, assessed, and collected at such time as the governing body may determine.

Said City shall have full power to provide for the prompt collection, by suit or otherwise, of taxes assessed, levied and imposed and is hereby authorized, and to that end shall have full power and authority to sell, or cause to be sold, all kinds of property, real and personal, and shall make such rules and regulations and enact all such taxes whether same be upon personal or real property or any taxes provided in this Charter.

All monies arising from the collection of taxes by the City shall be divided into two funds, and designated as a "General Fund" and an "Interest and Sinking Fund."

No irregularities in the time or manner of making or returning the City assessment rolls or the approval of such rolls, shall invalidate any assessment.

The governing body of the City of Harlingen shall have the power to create a Board of Equalization if required under State law.

The City shall have the power, by ordinance, to levy and collect a tax on occupancy of hotel rooms (comprehensively defined in such ordinance) in the City of Harlingen such tax not to exceed the maximum percentage allowed by state law of the consideration paid by the occupant or occupants or each such room.

(Res. 79-R-7, passed 2-24-79; Am. Ord. 82-97, Amend. No. 3, passed 1-15-83; Am. Ord. 80-101, Amend. No. 2, passed 1-21-81; Am. Ord. 84-83, Amend. No. 10, passed 12-5-84)

## SECTION 3.  MUNICIPAL BONDS.

The governing authority of the City shall have the power to appropriate so much of the general revenue of the City as may be necessary for the purpose of retiring and discharging the accrued indebtedness of the City, and for the purpose of improving the streets, purchasing and constructing sewers, erecting and maintaining public works of every kind and for purchasing or constructing waterworks plants and systems, and for the purpose of erecting, maintaining, and operating an electric light and power plant and such other public utilities as the governing authority may, from time to time, deem expedient; and in furtherance of any and all of these subjects, the City shall have the right and power to borrow money upon the credit of the City, within the limits provided by law, and to issue coupon bonds of the City therefor, in such sum or sums as may be deemed expedient; to bear interest not to exceed the amount specified and provided for by the applicable statutes of the State of Texas, from time to time; payable annually or semiannually, at such place or places as may be designated by the City ordinance.

All bonds shall specify for what purpose they are issued, and shall be invalid if sold for less than their par value, and when any bonds are issued by the City, a fund shall be provided to pay the interest and create a sinking fund to redeem said bonds which fund shall not be diverted or drawn upon for any purposes, and the person acting as City Treasurer shall honor no drafts, upon said fund except to pay interest upon or redeem the bonds for which it was provided.

Said bonds may be issued serially and shall be issued for a period of time not to exceed forty (40) years; shall be signed by the Mayor, countersigned by the person acting in the capacity of City Clerk or Secretary, and shall be payable at such places and times as may be fixed by the ordinance of the governing authority. All such bonds shall be submitted to the attorney general of the State of Texas for his approval and the comptroller for registration, as provided by the State law; provided, that any such bonds, after approval, may be issued by the city either optional or serial, or otherwise, as may be deemed advisable by the governing body.

Before the issuance of general obligation bonds, the same shall be submitted to a vote of the qualified voters of the City of Harlingen, Texas, and should a majority of the votes cast at such election be in favor of issuing such general obligations bonds, the same shall be issued as provided herein; but should said election fail to carry, such general obligation bonds shall not be issued. The election provided for herein shall be conducted as other elections under the state law, after due notice by publication, on the same day in each of two (2) successive weeks in a newspaper of general circulation published in said city, the date of first publication to be not less than fourteen (14) days

prior to the date set for said election; which said notice shall state the nature and purpose of said election. Nothing herein shall prohibit the elective commission from issuing certificates of obligation or warrants, but only upon the affirmative vote of four-fifths (4/5) of the elective commission. (Ord. 75-44, passed 11-11-75; Res. 87R-10, passed 4-9-87)

## SECTION 4. ACCOUNTING PROCEDURE.

An accounting procedure shall be devised and maintained for the city adequate to record in detail all transactions affecting the acquisition, custodianship and disposition of values, including cash receipts, credit transactions and disbursements; and the recorded facts shall be presented periodically to officials and to the public in such summaries and analytical schedules in detailed support thereof as shall be necessary to show the full effect of such transactions for each fiscal year, upon the finances of the city and in relation to each department of the city government, including district summaries and schedules for each public utility owned and operated.

## SECTION 5. PAYMENT OF ACCOUNTS AND CLAIMS.

The city treasurer shall audit and approve, before payment, all bills, invoices, payrolls, and other evidences of claims and demands or charges against the city government; any such claims against the City of Harlingen for damages for the death or personal injury of any person or for damages to or destruction of property of any kind, which does not constitute a taking or damage of property under Article 1, Section 17, Constitution of Texas, shall be submitted in writing to the city manager, the same to be duly verified by affidavit, and to be submitted within ninety (90) days after said death, personal injury or property damage has been sustained; stating specifically in such written notice when, where and how the death, injury, damage or destruction occurred, and the apparent extent of any such injury, the amount of damages sustained, the actual residence of the claimant by street and number, at the date the claim is presented, the actual residence of such claimant for six (6) months immediately preceding the occurrence of such death, injury, damage, or destruction, and the names and addresses of all witnesses upon whom it is relied to establish the claim for damages; and the failure to so notify the city manager within the time and manner specified herein shall exonerate, excuse and exempt the city from any liability whatsoever. No act of any officer or employee of the city shall waive compliance, or stop the city from requiring compliance, with the provisions of this section as to notice, but such provisions may be waived by resolution of the commission, made and passed before the expiration of the ninety (90) day period herein provided, and evidenced by minutes of the commission.

## SECTION 6. DEPOSITORIES.

All monies received by any person, department, or agency of the city for or in connection with affairs of the city shall be deposited promptly in city depositories, which shall be designated by the commission in accordance with such regulations and subject to such requirements as to security for deposits and interest thereon as may be established by ordinance. All checks, vouchers or warrants for the withdrawal of money from the city depositories shall be signed by the city treasurer or his deputy and countersigned by the city manager.

## SECTION 7.  AUDIT AND EXAMINATION.

All accounts and fiscal records of the City of Harlingen shall be audited on a perpetual basis by a continuous, independent audit, the independent auditor for such purposes, who shall be a certified public accountant, to be designated and employed by the commission from time to time. The commission may require a full audit report of the fiscal affairs of the City of Harlingen as often as it sees fit, provided that it shall have one such full audit report at least once each year; and such audit shall be available in full to the public.


## ARTICLE VII.  ACQUISITION AND OWNERSHIP OF PROPERTY


## SECTION I.  ACQUISITION OF PROPERTY.

The City of Harlingen shall have the power and authority to acquire by purchase, gift, devise, condemnation or otherwise any character of property including any charitable or trust fund.


## SECTION 2. PROPERTY PREVIOUSLY ACQUIRED.

All real estate owned in fee simple title or held by lease, sufferance, easement or otherwise; all public buildings, fire stations, parks, public squares, streets, alleys and all property of whatever kind, character or description, whether real or personal, which has been granted, donated, purchased or otherwise acquired by the City of Harlingen, through any means or agency, and all causes of action, choses in action, rights and privileges of every kind and character, and all property of whatsoever character and description which may have been held or is now held, controlled or used by the said City of Harlingen for public ways or in trust for the public shall vest in and remain in and inure to the said corporation of the City of Harlingen by the legal adoption of this Charter.


## SECTION 3.  PROPERTY EXEMPT FROM EXECUTION.

Said City shall have the power to provide that no public property or any other character of property owned or held by said City shall be subject to any execution of any kind or nature.


## SECTION 4.  EMINENT DOMAIN.

Said City shall have the right of eminent domain and the power to appropriate private property for public purposes whenever the governing authority shall deem it necessary; and to take any private property, within or without the City limits, for any of the following purposes to-wit: city halls, police stations, jails, calabooses, fire stations and fire alarm systems, libraries, hospitals, sanitariums, auditoriums, market houses, slaughter houses, reformatories, abattoirs, streets, alleys, parks, highways, playgrounds, sewer systems, storm sewers, sewage disposal plants, filtering beds and

emptying grounds for sewer systems, drainages, drainage water, water supply sources, wells, water and electric light and power systems, street car systems, telephone and telegraph systems, gas plants or gas systems, cemeteries, crematories, prison farms, pest houses, and to acquire lands, within or without the City, for any other municipal purpose that may be deemed advisable. That the power herein granted for the purpose of acquiring private property shall include the power of improvements and enlargements of waterworks, including water supply, riparian rights, standpipes, filtration plants, watersheds, and the construction of supply reservoirs. That in all cases wherein the City exercises the power of eminent domain, it shall be controlled, as nearly as practicable, by the laws governing the condemnation of property by railroad corporations in this State; the City taking the position of the railroad corporation in any such case.

## SECTION 5.  CONTRACTS TO PURCHASE PROPERTY.

All contracts for public printing, public improvements, public work and the purchase of supplies or other personal property, for use in any department of the city, exceeding the maximum expenditure allowed by state law shall be let on sealed competitive bids after advertisement by publication thereof at least once in some newspaper published in the city, the first publication of such advertisement to be at least ten (10) days before such contract be let, but the commission may permit or require proposals to be filed for doing such work, or furnishing such materials upon alternative or different plans and methods or for different materials or upon proposals and specifications of different characters adopted by the city or submitted by bidders with their bids; and the commission may reject all such bids or select and adopt such bid and let the work to or purchase the supplies in question from the lowest bidder whose bid, in the opinion of the commission, is most advantageous to the city. All purchases or contracts for public printing, public improvements, public work or supplies or other personal property for the use in any department of the city of less than the amount allowed by state law shall be competitive and shall be purchased or let at the discretion of the city manager.

No member of the City Commission, or any other officer or employee of the Corporation, shall be directly or indirectly interested in any work, business or contract, the expense, price or consideration of which is paid, in whole or in part, from the City Treasury, or by an assessment levied by an ordinance or resolution of the City Commission, nor be the surety of any person having a contract, work or business with the City, for the performing of which security may be required. Any contract which violates the foregoing provision shall be void, and no legal right or advantage shall ever be acquired by any person by reason of any act or thing done in violation thereof; and any member of the City Commission or other office of the corporation, who knowingly shall be or become interested in any work, business or contract in violation of this section shall immediately forfeit his office.

(Ord. 73-30, passed 11-7-73; Res. 79-R-7, passed 2-24-79; Am. Ord. 82-97, Amend. No. 4, passed 1-15-83)

**Harlingen - Charter**

## ARTICLE VIII.  PERMANENT PUBLIC IMPROVEMENTS AND PARKS

### SECTION 1.  STREET, SIDEWALK AND ALLEY IMPROVING AND ASSESSING.

The City shall have dominion, control and jurisdiction in, upon and over and under its public streets, squares, avenues, alleys and highways and to provide for the improvement thereof, upon the initiative of the Commission, or upon petition of property owners, as hereinafter provided by paving, repaving, raising, grading, and draining openings, widening, narrowing or straightening, and by construction of sidewalks, and curbs or culverts, or otherwise. The word "highway" as used herein shall include all streets, alleys, sidewalks, public places, avenues and squares in the City. The City shall have the power to assess the whole cost of sidewalks and curbs and not more than three-fourths of the cost of other street improvement work, except the cost to be paid owners of railroads and street railroads, against the owners of property abutting the highway or section thereof improved, and against said property, and to fix a lien against said property which shall be superior to all other liens and claims, except City, State and County and other taxes, and a charge of personal liability against owners of said property. The portion of the cost assessed against said owners of abutting property may be made payable in deferred installments, the last maturing of which shall become due not more than five (5) years from the completion of the improvements and which shall bear interest at the rate of not exceeding eight (8) percent per annum. Said assessments may include reasonable attorney's fees and cost of collection, if incurred, and the Commission shall have power to fix the terms of payment, maturity and conditions of said assessments and of the assignable certificates hereinafter provided for.

The entire cost of making such improvements between or under the rails, tracks and switches or railroads or street railroads, occupying any highway or intersection improved, and for two (2) feet on the outside of said tracks, shall be paid by the owners thereof, and secured by a lien assessed on the road beds, ties, tracks, franchise and other property of said owners, which lien shall be superior to all other liens, claims or interests in or upon said property, except City, State, and County or other taxes. The ordinance making such assessment shall provide the time and terms of payment thereof and for the payment of interest, costs and attorney's fees as above set out.

No assessments shall be made against owners of abutting property or against railroads, or street railroads, or their property, until after a hearing to said owners, and to lien holders or other interested parties before the Commission, preceding by reasonable notice thereof which shall consist of a general notice published at least three (3) times prior to the hearing in some newspaper of general circulation published in the City of Harlingen, the first publication to be at least ten (10) days before the date of hearing. The commission shall have authority to give other additional notice in its discretion, but the published notice shall be sufficient and binding upon lien holders and other interested parties and owners.

At said hearing owners and other interested parties shall have the right to contest said assessments, the legality or regularity of any proceeding with reference thereto, or the special benefits arising from said improvement.

No assessment shall be made against any owner of abutting property or his property in excess of special benefits thereto in enhanced value thereof arising from said improvements.

All protests, contests and objections at said hearing shall be in writing, and the Commission shall have power to hear evidence, summon witnesses and take testimony with reference thereto.

Said assessments may be enforced, either by suit in any court having jurisdiction, brought by the City for the benefit of the holder and owner of said assessments or the certificates evidencing same, or brought by said owner and holder, or by sale of the property assessed in the same manner, or as near as possible, as is prescribed for sale of real estate for municipal taxes.

The lien of the assessments herein mentioned shall relate back and take effect as to all subsequent purchasers and creditors from the date of the ordinance of resolution ordering the improvement.

*Subsection 1.*  The Commission shall have power to cause to be issued in the name and on behalf of the City assignable certificates in writing, declaring the liability of owners and their property for the payment of assessments and to fix the terms and conditions of such certificates. If any such certificates shall recite that the proceedings with reference to making such improvements have been regularly had in compliance with law, and that prerequisites to the fixing of the assessment lien against the property, and the personal liability of the owner, have been performed, such recitals shall be prima facie evidence of the facts so recited, and no further proof therefor shall be required in any court.

*Subsection 2.*  Nothing herein contained shall empower the City to fix a lien by assessment against any property exempt by law from sale under execution, but the owner of such exempt property shall nevertheless be personally liable for the pro rata portion of laid cost which would hereunder be assessed against such property were it not exempt, and such cost shall be assessed against said owner.

The fact that any improvement is omitted in front of exempt property shall not invalidate the lien of assessment made against other property.

*Subsection 3.*  In apportioning costs of improvements among owners of the abutting property, the Commission shall act in accordance with the front foot rule, in proportion as the front feet of property of each owner abutting the highway to be improved is to the whole frontage thereof. But if in particular cases the application of this rule would be unequal or unjust, the Commission shall adopt such rule as shall effect substantial justice and equality, in view of special benefits received and burdens imposed.

*Subsection 4.*  No error, mistake or informality in the ordinance of assessment or in any other step or proceeding prerequisite to said assessment shall invalidate the same, but the Commission shall at any time correct the same.

No error or mistake in describing any parcel of abutting property or the name of its owner shall invalidate an assessment, but it shall notwithstanding have full force and be in effect against said premises and the real and true owner thereof.

Whenever in the opinion of the Commission any error, mistake or invalidity exists in any proceeding with reference to said improvements or assessments, it shall correct said error, mistake or invalidity and reassess said property and the owners thereof, with reference to which same exists. Such reassessments shall be made after a notice and hearing as herein provided, and not in excess of benefits

in enhanced value of the property assessed, and otherwise as near as possible in accordance with the provisions hereof with reference to original assessments. After such reassessments the City shall have power to issue assignable certificates evidencing the same, as hereinbefore provided, which may be payable in deferred installments, the last maturing not over five (5) years from date of said reassessment, and the terms and conditions of said certificates shall as near as possible comply with the preceding provisions hereof having reference to assignable certificates.

No reassessments shall be made unless proceedings therefor are begun within three (3) years from the date of the original assessments, provided that if the validity of any assessment shall be involved in litigation, the period of time consumed therein shall not be considered in computing said three (3) years.

The Commission shall have power to adopt rules, regulations, and ordinances not inconsistent herewith for the purpose of carrying into effect every part of this section and its subsections, and to effect said assessments and reassessments.

Subsection 5.   Whenever the owners of more than fifty (50) per cent of the front feet of property abutting any highway or section thereof which they desire improved, shall petition the Commission in writing (which may be one or more separate petitions) and shall state the limits within which the work is to be done, the general description thereof and the materials and methods or alternate materials and method with which it is desired said improvements shall be made, and the signers of said petition shall agree therein to pay the several amounts which may be assessed against them respectively under the terms thereof, the said petition shall be filed with the Commission, and shall be by it examined and in its discretion approved or disapproved by resolution.

The approval of such petition by the Commission shall be conclusive of its regularity and validity, and if so approved, the Commission shall order the work done as nearly as possible with the materials and in accordance with the methods, or if alternative materials or methods shall be set out in said petition, in accordance with some method and with some material or materials therein specified.

When the procedure is under this subsection, the Commission shall make said improvements and assess and apportion the cost hereof, after notice and hearing as hereinbefore provided, and shall take all steps and do all things with reference thereto in strict accordance with the provisions of this section. Provided that when said work is done pursuant to petition the City shall pay the whole cost of improvement of intersections of other streets and alleys with the highways named to be improved, except the portion thereof assessable against railroads and street railroads so occupying said highway and intersection; said railroads and street railroads shall pay the whole cost of such improvements of said highway or portion thereof between and under their rails and tracks and two (2) feet on the outside thereof, which cost shall be assessed against owners thereof and their property, and collected in the manner provided in this article; and the owners of property abutting the highway or section thereof to be improved shall pay the whole remaining cost of such improvements, and the same shall be apportioned among them and assessed against them, and their property in the manner provided in this article.

*Subsection 6.* In any suit brought for the enforcement of an assessment, reassessment or personal liability, the allegation in the petition or other pleading that all proceedings with reference to making such improvements have been regularly had in compliance with the law and that all prerequisites to the fixing of the assessment lien upon the property assessed and the personal liability of the owner, or the insurance of the assignable certificates have been performed, shall be deemed a sufficient allegation of every proceeding required by law, the City Charter or its ordinances with reference to such improvements or prerequisites to the fixing of such lien or liability and insurance of said certificates, and shall dispense with the necessity of pleading each of said preceding steps or prerequisites specifically, and shall in all courts be taken as if each of said steps, proceedings, or prerequisites had been alleged and set out in full.

Any property owner against whom or whose property an assessment or reassessment has been made shall have the right within twenty (20) days thereafter to bring suit in any court having jurisdiction to set aside or correct the same or any proceeding with reference thereto, on account of any error or invalidity therein. But thereafter such owner, his heirs, assigns or successors shall be barred from any such action or any defense of invalidity in such proceedings or assessments in any action in which the same may be brought in question.

*Subsection 7.* All contracts for street improvements heretofore entered into by the City and not fully performed and all proceedings had by it with reference thereto, are hereby ratified, confirmed and validated, and all powers heretofore enjoyed by the City whereby it was empowered to provide for the execution of said contracts, and for the assessment of any portion of the cost of said improvements against owners of property abutting same, and their said property, or against the owners of railroads and street railroads and their property, and also all powers of the said City for the enforcement of said assessments and collections thereof, are hereby extended and preserved in full force for the purpose of making said assessments and enforcing said existing contracts, and it shall be the duty of said Commission to pass all ordinances and resolutions and take all steps necessary or proper to fully execute said contracts or validate or ratify the same and to make and enforce said assessments.

*Subsection 8.* The City Commission, in carrying out and exercising the powers granted by this section and its subsections may proceed by resolution, except that no assessment or reassessment shall be finally levied otherwise than by ordinance.

All the powers granted by this section and its subsections, when adopted shall be applicable to the enforcement of said existing contracts and to the making and enforcement of the assessments therein provided to be made against owners of abutting property, and their property, and against the owners of railroads and street railroads and their property, and to the issuance of assignable certificates as herein provided; and the Commission shall fully exercise said powers to make and enforce said assessments, and to issue said certificates, under and in accordance with terms of this section and its subsections, when adopted.

## SECTION 2.  DEFECTIVE SIDEWALKS AS NUISANCES.

Said City shall have the power to provide for the construction, improvement or repair of any such sidewalk or the construction of any such curb, by penal ordinance, and to declare defective sidewalks to be a public nuisance.

## SECTION 3.  OPENING, EXTENDING, STRAIGHTENING AND WIDENING STREETS AND ALLEYS.

Said City shall have the power to open, extend, straighten and widen any public street, avenue, boulevard or alley and for such purpose to acquire the necessary land, by purchase or condemnation, and to provide that the cost of improving such street, avenue, boulevard or alley by opening, extending, straightening, or widening the same shall be paid by the owners of property lying in the territory of such improvement to the extent they are especially benefited thereby, and to provide that the cost shall be charged by special assessment against such owners and their property for the amount due by them, and three (3) Special Commissioners shall be appointed by the County Judge of Cameron County, Texas, for the purpose of condemning said land and apportioning said cost, and such apportionment shall be specially assessed by the governing authority of said City against the owners and their property lying in the territory so found by said Special Commissioners to be specially benefited in enhanced value, and said City may issue assignable certificates for the payment of any such cost against such property owners and their property and may provide for the payment thereof in deferred payments, which deferred payments shall bear interest at the rate of not exceeding eight (8) per cent per annum. Said City shall pay such portion of such cost as may be determined by said special commissioners to be due by it; provided the cost paid by the city shall never exceed one-third (1/3) of the cost of such improvement.

## SECTION 4.  STREET AND ALLEY OBSTRUCTIONS, ALTERATIONS AND CLOSING.

Said city shall have the power:

(1) To control, regulate and remove all obstructions, encroachments and incumbrances on any public street, avenue, boulevard or alley and to narrow, alter, widen, straighten, vacate, abandon and close same; provided that the closing of all or any portions of any street or alley shall be by ordinance adopted by the elective Commission; said city may close for the exclusive use temporarily or perpetually by any railroad company or other corporation having power of eminent domain, any part or parts, of any street or streets, alley or alleys, and to ratify and confirm any prior ordinances closing any street or streets, alley or alleys, or any part or parts thereof, for the use of any railroad company or any such other corporation; to provide for sprinkling and cleaning same and to regulate and control the moving of buildings and structures of every kind and character upon and along the same. Provided further, that when an ordinance to abandon or close any public street as set forth hereinabove is considered

by the elective commission, the entire elective commission or a quorum thereof may consider and pass said ordinance on first reading, but said ordinance shall not be passed or approved on final reading unless the entire elective commission is present for the vote on said ordinance.

(2) To require property owners, their agents and lessees to remove, within a reasonable time, ice, slush, snow and other debris from sidewalks fronting on property owned, occupied or controlled by such owner, agent or lessee, and to require such owner, agent or lessee to remove all low hanging limbs from trees adjacent to sidewalks in said city.

(Ord. 73-30, passed 11-7-73; Am. Ord. 75-44, passed 11-11-75)

## SECTION 5. FRANCHISE FOR USE OF STREETS.

Said city shall have the power and authority to grant franchises for the use, or occupancy of streets, avenues, alleys and any and all public grounds belonging to or under the control of the city. No telegraph, telephone, electric light or power, street railway, gas company, waterworks, water systems or any other character of public utility shall be granted any franchise or permitted the use of any street, avenue, alley, highway or grounds of the city without first making application to and obtaining the consent of the governing authorities thereto, expressed by ordinance, and upon paying such compensation as may be prescribed, and upon such conditions as may be provided for any such ordinance, and before such ordinance proposing to make any grant for franchise or privilege to any applicant to use or occupy any street, avenue, alley or any other public ground belonging to or under control of the city, shall become effective, publication of said ordinance, as finally proposed to be passed, shall be made in some newspaper published in the City of Harlingen, once a week for three (3) consecutive weeks, which publication shall be made at the expense of the applicant desiring said grant, and said proposed ordinance shall not be thereafter changed unless again republished as in the first instance, nor shall any such ordinance take effect or become a law or vest any rights in the applicant therefor, until after the expiration of thirty (30) days from the last publication of said ordinance, as aforesaid.

Pending the time such ordinance may become effective, it is hereby made the duty of the governing authority of the city to order an election if requested so to do by written petition signed by at least ten (10) per cent of the legally qualified voters, as determined by the number of votes cast in the last regular municipal election; at which election the qualified voters of said city shall vote for or against the proposed grant, as set forth in detail by the ordinance conferring the rights and privileges upon the applicant therefor. Such election shall be ordered not less than thirty (30) days nor more than ninety (90) days from the date of filing said petition and if at said election the majority of the votes cast shall be for the granting of such franchise or privilege, said ordinance and the making of said proposed grant shall thereupon become effective, but if a majority of the votes cast at said election shall be against the granting of such franchise or privilege, such ordinance shall be ineffective and the making of such proposed grant shall be null and void.

## SECTION 6. PARKS AND PLAYGROUNDS.

Said city shall have exclusive control over all city parks and playgrounds and to control, regulate and remove all obstructions and prevent encroachments thereupon; and to provide for raising, grading, filling, terracing, landscape gardening, erecting buildings, providing amusements therein, for establishing walks and paving driveways around, in and through said parks, playgrounds and other public grounds.

## SECTION 7. SANITARY SEWERS.

Said city shall have exclusive control to provide for a sanitary sewer system and for the maintenance thereof; to require property owners to make connection to such sewers with their premises and to provide for fixing a lien against any property owner's premises who fails or refuses to make sanitary sewer connections and to charge the cost against the said owner and make a personal liability, and to fix penalties for failure to make sanitary sewer connections.

## SECTION 8. RESERVED.

*Editor's note. Ord. 75-44, adopted Nov. 11, 1975, provided, in proposed charter amendment number 10, for the repeal of Art. VIII, § 8, which pertained to hours of municipal laborers. Said amendment was approved at a referendum of the electorate held Dec. 9, 1975. Formerly, § 8 was derived unamended from the charter reorganization ordinance of March 2, 1955.*

## ARTICLE IX. MUNICIPAL AIRPORT

## SECTION 1. OWNERSHIP AND OPERATION.

Said city shall have the power to provide for the ownership, establishment, operation and maintenance of a public municipal airport, provided that the operation and maintenance of said airport and all supporting properties appurtenant thereto shall be under the exclusive supervision, control and authority of a special board to be known as the "Harlingen Airport Board" which shall be composed of five (5) resident citizens of the City of Harlingen, Texas, to be appointed by the mayor of the City of Harlingen, Texas, and approved by the city commission of the City of Harlingen, Texas, the present seven (7) members of such board at the time of adoption of this amendment to serve the balance of their present appointive terms, with the expiration of the first two (2) such appointive terms to terminate such positions on the board, and with the termination of each of the succeeding five (5) term expirations to be succeeded by the appointment of a respective succeeding member to serve a term of five (5) years, such expiration and succeeding appointive procedure to continue, provided that the city commission of the City of Harlingen, Texas, shall by ordinance establish such rules and regulations as shall be deemed necessary to enable such board to administer the business and operation of such airport for the best interests of the City of Harlingen, Texas, and its inhabitants and further provided

Charter

that the Harlingen Airport Board shall annually submit a budget to the city commission of the City of Harlingen, Texas, for approval and no expenditure of airport funds shall be made except in accordance with such approved budget or approved amendment thereto, and shall make detailed monthly reports covering all phases of the operation and maintenance of said airport and supporting properties to the city commission of the City of Harlingen; that the city manager shall be an ex officio member of the Harlingen Airport Board; and that no provision hereof shall be construed to delegate to the Harlingen Airport Board any power not capable of being so delegated by law, and all powers delegated hereunder shall be subject to any restrictions otherwise imposed by the laws of the State of Texas and the Charter of the City of Harlingen.
(Ord. 73-30, passed 11-7-73)

## ARTICLE X.  PUBLIC UTILITIES

## SECTION 1.  MUNICIPAL OWNERSHIP AND OPERATION.

Said city shall have the power to buy, own or construct, and to maintain and operate, within or without the city limits, complete water system or systems, gas or electric lighting or power plant or plants, fertilizing plants, abattoirs, municipal railway terminals, ice plants or any other public service utility, and to demand and receive compensation for services furnished by the city for private purposes or otherwise, and to have file original jurisdiction to regulate by ordinance the collection or compensation for services rendered by all of such municipally owned and operated public utility services save and except telephone systems (the collection and compensation for same to be regulated by the state). That said city shall have power to acquire by lease, purchase or condemnation, the property of any person, firm or corporation now or hereafter conducting any such business, for the purpose of operating such public utility or utilities for the purpose of distributing such service throughout the city, or any portion thereof.
(Ord. 75-44, passed 11-11-75)

## SECTION 2.  FUNDS FOR ACQUISITION.

Should the city determine to acquire any public utility by purchase, condemnation or otherwise as herein provided, said city shall have the power to obtain funds for the purpose of acquiring said public utility and paying the compensation therefor, by issuing bonds or notes, or other evidences of indebtedness, and shall secure the same by fixing a lien upon the property constituting the public utility so acquired and said security shall apply alone to said property so pledged.

## SECTION 3.  MANUFACTURE OR PURCHASE OF PUBLIC UTILITY PRODUCTS.

Said city shall have the authority to manufacture its own electricity, gas or anything else that may be needed or used by it or the public; to make contracts with any person, firm or corporation for the purchase of gas, water, and electricity or any other commodity or articles used by it or the public, and to sell same to the public as may be determined by the governing authority.

## SECTION 4.  MUNICIPAL OWNERSHIP AND OPERATION MADE EXCLUSIVE.

In the event said city shall acquire by purchase, gift, devise, deed, condemnation or otherwise, any waterworks system, electric light or power system, gas system, street railway system, telephone system, or any other public service utility to operate and maintain for the purpose of serving the inhabitants of said city, the right to operate and maintain such public service utility, so acquired, shall be exclusive.

## SECTION 5.  FRANCHISING AND REGULATING PRIVATE UTILITY COMPANIES.

Said city shall have the original jurisdiction to determine, fix and regulate the charges, fares and rates of any person, firm or corporation exercising, or that may hereafter exercise any right or franchise and/or public privilege (save and except for any such entity furnishing telephone or other telecommunications services) in said city and to prescribe the kind of service to be furnished, the equipment to be used and manner in which services shall be rendered and to change such regulations from time to time; that in order to ascertain all of the facts necessary for a proper understanding of what is or should be reasonable rate of regulation, the governing authority shall have full power to inspect the books and other records of such person, firm or corporation and compel the attendance of witnesses for such purpose; provided that in adopting such regulations and in fixing or changing such compensation, no stock or bond authorized or issued by any person, firm or corporation exercising such franchise or privilege shall be considered unless proof be made that the same have been actually issued by such person, firm or corporation for money, or its equivalent, paid and used for the development of the property under investigation. The city may delegate its rate-making authority in all franchised public utilities within the city to the Public Utilities Commission of Texas as prescribed by state statutes.

To require waterworks corporations, gas companies, street car companies, telephone companies, electric light and power companies or other companies, or individuals, exercising franchises, now or hereafter, from the city, to make and furnish extensions of their service to such territory as may be required by ordinance.
(Ord. 75-44, passed 11-11-75)

## SECTION 6.  PUBLIC UTILITIES; [FUNDS TO BE KEPT SEPARATE.]

(A) No funds collected from the furnishing of water and sanitary sewer services by the city, or federal, state or other grants proceeds applied for and funded for sanitary sewer and water projects or needs, shall ever be commingled with other city funds. None of said collected funds or grant proceeds shall be used for any purposes other than for the expansion, extension, operation, or maintenance of sewer and waterworks systems of the city, or to retire indebtedness for same, except in the event of a bona fide natural disaster, and then only upon the affirmative vote of four-fifths (4/5) of the city commission.

(B) Except as hereinafter provided in paragraph (C), neither of said systems shall receive funds from other departments of the city except in the event of a natural disaster, or as hereinabove referenced, resulting from unforeseen conditions, in which event said water and sanitary sewer systems may seek and receive emergency advancements and loans from any one or more of other city revenue sources, or from the city regular administrative government general fund, or other city sources. Such justifiable extreme emergency conditions shall be those under which it is necessary to obtain such emergency funds in order to avoid curtailing water and sewer service by such city owned department, to the injury of the citizens of the City of Harlingen. Any such emergency loans or advancements shall be duly reimbursed by the funds [system] borrowing such funds to the department lending such funds, from future revenues of such system, with such reimbursement to be budgeted therefor as a part of the standard budgetary procedure.

(C) Nothing contained hereinabove shall prohibit:

(1) The elective commission from issuing general obligation bonds pursuant to the Charter of the city, required for water and sewer capital improvements, provided that such bonds shall be retired from surplus revenues of the water and sewer departments to the extent available; or

(2) The use of funds received by the city from grants including but not limited to revenue sharing grants and community development grants, for water and sanitary sewer system capital improvements.

(3) The elective commission from issuing certificates of obligation, but only upon the affirmative vote of four-fifths (4/5) of the elective commission.

(D) There shall be not less than one annual independent audit of the water and sewer department, independent of any other audit of other departments of the city, furnished to the elective commission. Said audit may or may not be a fraud audit at the direction of the elective commission.
(Res. 79-R-7, passed 2-24-79)

wastewater or wastewater facilities. Nothing contained herein shall be construed to mean the storm sewer or drainage system of the city. The utility trustees shall constitute a separate and independent section of the city administrative government subject only to its appointment by and accountability to the elective commission of the city as herein provided for.

In the management, operation and control of the city-owned water and sewer utilities systems, the trustees are empowered to employ a water and sewer utilities manager with the prior approval and consent of the elective commission as the full-time manager and operator of the city-owned water and sewer utilities systems. The trustees shall determine the qualifications and compensation of such water and sewer utilities manager upon the prior approval and consent of the elective commission. Such water and sewer manager shall serve at the discretion of the utility trustees.

The trustees shall adopt rules and regulations for its meetings and operation.

It shall be the duty of such trustees to plan for and provide for the installation of water and sewer lines; provide for the expansion and maintenance of the water and sewer system; to provide for the acquisition and supply of water; and to provide for expansion of sewer and water treatment facilities.

The utility trustees shall otherwise determine the administrative personnel and organization of the department. The personnel policy of the City of Harlingen shall apply to all water and sewer department employees. The utility trustees shall, in all things, comply with the Charter of the City of Harlingen, statutes and constitution of the State of Texas, and all federal laws, rules and regulations, including but not limited to provisions covering competitive bidding, open meetings, affirmative action plans, and rules and regulations of appropriate governmental agencies.

(E) *Financing*. The trustees may obtain capital improvements and operating capital from bonds and other borrowed money, provided that such requests be approved by and issued by the elective commission, and such bond funds and other borrowed money shall be funded by revenues from the said city-owned water and sewer utilities systems.

(F) *Fiscal year and budget*. The trustees shall operate the city-owned water and sewer utilities systems by the city fiscal year and shall preplan its operations by annual budgets fully adopted prior to the inception of such fiscal year of operation. Such budgets shall be presented to the elective commission for the latter's approval.

(G) *Coordination*. The water and sewer utilities manager shall attend elective commission meetings at the direction of said commissioners for the purpose of furnishing information and reports as requested by the elective commission with reference to the operations of the utility trustees from time to time. In matters of coordination between the water and sewer utilities and other city departments where conflict arises, the city manager shall be the final authority. In all other matters said utility manager shall be answerable directly to the trustees.

**Harlingen - Charter**

(H) *Appeal.* Any citizens of the City of Harlingen including city commissioners individually, or acting as the elective commission, shall be entitled to appeal, in writing, any decision of the utility trustees directly to the elective commission within ten (10) days of such decision by said utility trustees. Within ten (10) days after such written appeal is filed with the city secretary, a date for a hearing shall be set by the elective commission. The elective commission of the City of Harlingen shall have full, complete and total authority to overrule or reverse such appealed decision, by an affirmative vote of not less than four (4) commissioners. The decision of the elective commission shall be final. If an affirmative decision of the utility trustees is overruled by the elective commission, there need be no further action taken by the utility trustees. If a negative decision of the utility trustees is overruled by the elective commission, said elective commission shall then prescribe what action shall be taken by the utility trustees and/or the water and sewer department. Such action, as prescribed by the elective commission, shall be carried out by the personnel of the water and sewer department.

(I) *Conflicts.* The water and sewer systems and departments administering same, shall be exempt from the provisions of Article IV, Section 11 of this Charter, and this section shall not be considered to be in conflict therewith.

(J) *Policy.* Any extension policies of the sewer department or the water department of the City of Harlingen shall be set forth, in writing, as an ordinance of the City of Harlingen, to be approved by the elective commission, as in the manner of other ordinances codified in the Code of the City of Harlingen.
(Res. 79-R-7, passed 2-24-79)


## ARTICLE XI.  PEACE, GOOD ORDER AND GENERAL WELFARE CONTROL


## SECTION 1.  ANIMALS (DOMESTIC).

Said city shall have the power:

(1)  To prohibit the driving of herds of horses, mules, cattle, hogs, sheep, goats and all herds of domestic animals along or upon the streets, avenues or alleys of said city.

(2)  To establish and regulate public pounds, to regulate, restrain and prohibit the running at large of horses, burros, mules, cattle, sheep, swine, goats, geese, chickens, pigeons, ducks and all other domesticated animals and fowls, and to authorize the restraining, impounding and sale of the same for the cost of the proceedings and the penalty incurred, and to order their destruction when they cannot be sold, and to impose penalties upon the owner thereof for the violation of any ordinances regulating or prohibiting the same and to tax, regulate, restrain and prohibit the running at large of dogs and to authorize their destruction and impose penalties on the owner or keeper thereof.

(3)  To prohibit the inhumane treatment of animals and provide punishment thereof.

Charter

## SECTION 2. AUXILIARY FUNCTIONS FINANCING.

The city commission may annually appropriate monies from the general fund of the city to the aggregate amount of not more than two (2) mills on each one dollar valuation of the taxable property within the city in any one year, for the purpose of establishing and maintaining the following enumerated services or any one or more of them, to wit:

(1) Chamber of commerce

(2) City library

(3) Public hospital

(4) General welfare

## SECTION 3. BUILDING (PRIVATE) CONSTRUCTION.

Said city shall have the power to provide for the issuance of permits for erecting all buildings; for the inspection of the construction of all buildings in respect to proper wiring for electric lights and other electric appliances; piping for gas, flues, chimneys, plumbing and sewer connections and to enforce proper regulations in regard thereto.

## SECTION 4. BUILDING (USE) SAFETY.

Said city shall have the power:

(1) To enact and enforce all ordinances and resolutions necessary to regulate the safety of all office buildings, hotels, apartment houses, rooming houses, hospitals, theaters, store buildings and all public buildings.

(2) To require the construction of fire escapes in connection with public buildings, and to determine the sufficiency and regulate the safety of all exits and fire escapes provided on public buildings of every kind and character.

## SECTION 5. RESERVED.

*Editor's note. Ord. No. 75-44, adopted Nov. 11, 1975, proposed amendment number 12 which provided for the repeal of § 5 of Art. XI. Said amendment was approved by a referendum of the electorate Dec. 9, 1975. Former § 5, which pertained to fines and collection, had been contained in the charter reorganization ordinance of March 2, 1955.*

**Harlingen - Charter**

## SECTION 6. FIRE DEPARTMENT.

Said city shall have the power to provide for establishing and maintaining the fire department of the city.

## SECTION 7. FIRE LIMITS AND CONSTRUCTION.

Said city shall have the power to provide for the establishment and designation of fire limits; to prescribe the kind and character of structures to be erected therein; to provide for the erection of fireproof buildings within said limits and for the condemnation of dangerous or dilapidated structures which are calculated to increase fire hazards.

## SECTION 8. FOOD: PRODUCTION, HANDLING AND DISTRIBUTION.

Said city shall have the power to provide for the inspection of dairies, cows and dairy herds, slaughter pens and slaughter houses and abattoirs, within or without the city limits from which meat, milk, butter or eggs from same are furnished to the inhabitants, of said city, and to provide for the inspection of meat markets, grocery stores, drug stores, confectioneries, fruit stands, ice cream factories, laundries, bottling plants, hotels, restaurants and bakeries; the source, storage and distribution of water, and all other places where food and drink for human consumption are manufactured, handled, sold or exposed for sale, and to regulate and inspect the character and standards of such articles of food and drink so sold or offered for sale.

## SECTION 9. GARNISHMENT OF CITY FUNDS.

Said city shall have the power to provide that no funds of the city shall be subject to garnishment, and that the city shall never be required to answer in any garnishment proceedings.

## SECTION 10. HEALTH (PUBLIC).

Said city shall have the power to provide for a health department and the establishment of rules and regulations protecting the health of the city; the establishment of quarantine stations, pest houses and hospitals and to provide for the adoption of necessary quarantine laws to protect the inhabitants against contagious and infectious diseases.

## SECTION 11. LIBRARY (PUBLIC).

Said city shall have the power to provide for establishing and maintaining a public library.

## SECTION 12.  LICENSES: BUSINESS, OCCUPATIONS, SIGNS.

Said city shall have the power to license any lawful business, occupation or calling that is susceptible to the control of the police power, and to license, regulate, control or prohibit the erection of signs or billboards.

## SECTION 13.  LIABILITY FOR DAMAGES.

The liability of the city on any claim for damages to any person or property shall be that as determined and established by the common law and applicable state and federal statutes, from time to time; and the city may establish procedural rules and regulations governing the city's liability in such cases, as may be deemed advisable, and as authorized by state or federal law.
(Ord. 75-44, passed 11-11-75)

## SECTION 14.  LITIGATION.

It shall not be necessary in any action, suit or proceedings in which the city shall be a party, for any bond, undertaking or security to be executed in behalf of the city.

## SECTION 15.  RESERVED.

*Editor's note.  Ord. No. 75-44, adopted Nov. 11, 1975, proposed amendment number 13 which provided for the repeal of § 15 of Art. XI. Said amendment was approved by a referendum of the electorate Dec. 9, 1975. Formerly § 15, which had pertained to market places, abattoirs and slaughter pens, had been contained in the charter reorganization ordinance of March 2, 1955.*

## SECTION 16.  MISCELLANEOUS ACTIVITIES.

Said city shall have the power to prohibit and restrain the flying of kites, firing of firearms, fire-crackers, rolling of hoops and the use of velocipedes, bicycles and skates or the use and practice of any amusement on the streets or sidewalks to the annoyance of pedestrians or persons using such streets or sidewalks, and to restrain, regulate and prohibit the ringing of bells, or blowing of horns, bugles and whistling, crying of goods and other noises, practices and performances tending to the collection of persons in the streets or tending, unnecessarily, to interfere with the peace and quietude of the inhabitants of said city; and to suppress and regulate all unnecessary noises.

**Harlingen - Charter**

## SECTION 17.  NUISANCES.

Said city shall have the power to define all nuisances, prohibit the same within the city and outside the city limits for a distance of five thousand (5,000) feet; to police all parks, grounds, speedways, streets, avenues, and alleys owned by said city, within or without the city limits; to prohibit the pollution of all sources or water supply of said city, and to provide for the protection of watersheds.

## SECTION 18.  PEDDLERS AND PAWNBROKERS.

Said city shall have the power to license, tax and regulate or suppress and prevent hawkers, peddlers and pawnbrokers.

## SECTION 19.  PENAL ORDINANCES.

Said city shall have the power to provide for the enforcement of all ordinances enacted by it, by a fine not to exceed two hundred dollars ($200.00), provided that no ordinance shall provide a greater or less penalty than is prescribed for a like offense by the laws of the state.

## SECTION 20.  PLATTING OF PROPERTY.

The provisions of the Chapter 231, Page 342, Acts of 1927, Fortieth Legislature providing for platting and recording subdivisions or additions; acknowledgement of plats; approval of plats or plans by planning commission or governing body and recording same; indorsement of approval of plats by planning commission or governing body; vacation of plats or plans and procedure of same; improvement to effect dedication; approval prior to connection of public utilities and disapproval of plats or plans, said statutes being also designated as TEX. REV. CIV. STAT., Art. 974A, together with all amendments thereof and hereby adopted.

*Editor's Note: TEX. REV. CIV. STAT., Art. 974A is now located at TEX. LOC. GOV'T CODE §§ 212.001 et seq.*

## SECTION 21.  RESERVED.

*Editor's note.  Ord. 75-44, adopted Nov. 11, 1975 proposed amendment number 14 which provided for the repeal of § 21 of Art. XI. Said amendment was approved by a referendum of the electorate Dec. 9, 1975. Formerly § 21, which pertained to plumbers, had been contained in the charter reorganization ordinance of March 2, 1955.*

## SECTION 22.  POLICE DEPARTMENT.

Said city shall have the power to establish and maintain the city police department, prescribe the qualifications and duties of policemen and regulate their conduct.

## SECTION 23.  PRISONS, WORKHOUSES, HOSPITALS, ORPHANAGES, CHARITIES.

The city shall have the power to establish, and/or maintain, and/or regulate the city jail, and such hospitals and other charitable institutions as may be deemed expedient by the governing authority. (Ord. 75-44, passed 11-11-75)

## SECTION 24.  RESERVED.

*Editor's note.  Ord. 75-44, adopted Nov. 11, 1975 proposed amendment number 15 which provided for the repeal of § 24 of Art. XI. Said amendment was approved by a referendum of the electorate Dec. 9, 1975. Formerly § 24, which pertained to prostitutes and bawdy houses, had been contained in the charter reorganization ordinance of March 2, 1955.*

## SECTION 25.  SANITARY INSPECTION.

Said city shall have the power to provide for the inspection and regulation of the sanitary conditions of all premises and vacant lots within the city limits; for the removal of garbage, night soil, refuse and unsanitary vegetation; to provide for establishing a lien against the property for any expense incurred by the city enforcing this provision and further to provide for the making and enforcing of all proper and reasonable regulations, for the health and sanitation of said city and its inhabitants.

## SECTION 26.  TRANSPORTATION (PUBLIC).

Said city shall have the power:

(1)  To license, tax and regulate all charges or fares made by any person, firm or corporation owning, operating or controlling any vehicle operated for the carriage of passengers or freight for hire, on the public streets of the city.

(2)  To regulate the operation of railway trains and street cars operated on, along or across the streets, avenues or alleys of said city; to license and control the operation of automobiles, motorcycles, taxicabs, buses, cabs and carriages and all character of vehicles using the public streets and regulate the use and occupancy of the streets by any of such vehicles.

## SECTION 27.  RESERVED.

*Editor's note.  Ord. 75-44, adopted Nov. 11, 1975, proposed an amendment number 16 which provided for the repeal of § 27 of Art. XI. Said amendment was approved by a referendum of the electorate Dec. 9, 1975. Formerly § 27, which pertained to vagrants and beggars, had been contained in the charter reorganization ordinance of March 2, 1955.*

## SECTION 28.  WEIGHTS AND MEASURES.

Said city shall have the power to provide for the inspection of weights, measures, and meters and fix a standard of such weights, measures, and meters and require conformity of such standards and provide penalties for failure to use or conform to the same, and to provide for inspection fees.

## SECTION 29.  ZONING.

Said city shall have the power to divide the city into zones for the regulation of buildings therein and in each zone to establish building lines and to regulate the location, height, dimensions and material of all buildings to be erected therein, with full power to make different regulations and building lines in different zones and thereafter to alter the same.

## SECTION 30.  GENERAL POWERS.

The enumeration of powers made in this Charter shall never be construed to preclude, by implication or otherwise, the city from exercising the powers incident to the enjoyment of local self government, nor to do any and all things not inhibited by the constitution and laws of the State of Texas except as herein expressly changed or limited, the City of Harlingen and its governing body, shall retain, possess and exercise all powers and privileges heretofore possessed by said city, and its governing body. If any part of this Charter shall, for any reason, be declared invalid by a court of competent jurisdiction, such judgment shall not affect nor impair the validity of the remaining provisions hereof, and the same shall continue in full force and effect.

## ARTICLE XII.  GENERAL PROVISIONS

## SECTION 1.  RATIFICATION OF ORDINANCES.

All ordinances and resolutions in force at the time of the taking effect of this Charter, not inconsistent with its provisions, shall continue in force until amended or repealed.

## SECTION 2.  AMENDMENTS TO CHARTER.

This Charter, after its adoption, may be amended in accordance with the provisions of Chapter 13, Title 28, Revised Statutes of 1925, the State of Texas, and acts amendatory thereof.



**CITY OF HARLINGEN**

## CAPITAL OF THE LOWER RIO GRANDE VALLEY
### "WORKING AS A TEAM TO PROVIDE QUALITY SERVICE WITH RESPECT AND FAIRNESS TO ALL CITIZENS"

I, Sylvia R. Trevino, City Secretary for the City of Harlingen, do hereby certify that the following attachment is a true and correct copy of the City of Harlingen Code of Ordinances, Sections 32.035 through 32.044 regarding the Civil Service Commission for Police Officers and Fire Fighters.

I further certify that Sections 32.035 through 32.044 of the Code of Ordinances were in effect on July 8, 1998 and remain in effect to the present time.

Sylvia R. Trevino
City Secretary

Sworn and subscribed before me this 27th day of March, 2002 by Sylvia R. Trevino City Secretary for the City of Harlingen.

VERONICA MEDRANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 04-27-2005

Veronica Medrano
Notary Public

*"Recipient Of Keep Texas Beautiful Governor's Achievement Award"*

**118 E. TYLER     ●     P.O. BOX 2207     ●     HARLINGEN, TEXAS 78551     ●     (956) 427-8700**

## CIVIL SERVICE COMMISSION FOR POLICE OFFICERS AND FIRE FIGHTERS

### § 32.035  DEFINITIONS.

For the purpose of this subchapter, the following definitions shall apply unless the context clearly indicates or requires a different meaning.

*DIRECTOR.*  Director of the fire fighter's and police officer's Civil Service Commission.

*FIRE FIGHTER* and *POLICE OFFICER.*  Any member of the Fire Department or Police Department respectively, appointed to such positions in substantial compliance with the provisions of §§ 9, 10, and 11 of the State Civil Service law, or who are entitled to civil service status under § 24 of the State Civil Service law.

*STATE CIVIL SERVICE LAW.*  TEX. LOC. GOV'T CODE §§ 143.001 et seq.
('73 Code, § 2-163) (Ord. 62-25, passed 12-5-62)

### § 32.036  SYSTEM ESTABLISHED; COMPLIANCE WITH STATE REGULATIONS.

(A) There is hereby established, pursuant to the authority provided for in TEX. LOC. GOV'T CODE §§ 143.001 et seq., a civil service system for fire fighters and police officers of the city. ('73 Code, § 2-164)

(B) The civil service system for fire fighters and police officers shall be determined, controlled, and operated pursuant to the provisions of the State Civil Service law and subsequent amendments thereto, together with the provisions of this chapter. ('73 Code, § 2-165)
(Ord. No. 62-25, 12-5-62)

### § 32.037  COMMISSION ESTABLISHED; COMPOSITION.

There is hereby established a fire fighter's and police officer's Civil Service Commission which shall consist of three members as herein provided for.
('73 Code, § 2-166) (Ord. 62-25, passed 12-5-62)

### § 32.038  APPOINTMENT; TERM; VACANCIES.

(A) Members of the Civil Service Commission for fire fighters and police officers shall be appointed by the Mayor and such appointments shall be confirmed by the City Commission before any such appointments shall be effective. The term of office for each member shall be for three years, or until a successor is appointed, confirmed, and qualified. Each year one member shall be appointed.

Any such vacancies in the Commission, caused by death, resignation, or otherwise, or by failure of any appointee to qualify within ten days after appointment, shall be filled in the manner hereinbefore specified, and such appointment shall be for the unexpired term of the retiring Commissioner or of the appointee failing to qualify.

(B)  The beginning date of each successive term of members shall be on March 1. In the event that upon the expiration of the term of any such member his or her replacement is not succeeded by appointment by the Mayor and Commission as herein provided for, such member shall nevertheless continue as a member of such Commission until a replacement appointment is in fact made by the Mayor and Commission as herein provided for, with such replacement appointment to terminate on the regularly scheduled date as herein provided for.
('73 Code, § 2-167) (Ord. 62-25, passed 12-5-62; Am. Ord. 80-30, passed 3-19-80)

## § 32.039  QUALIFICATIONS.

Each member of the Civil Service Commission for fire fighters and police officers shall be of good moral character, be a resident of the city and shall have resided in the city for a period of more than three years at the time of appointment; shall be over the age of 25 years; and shall not have held any public office within the preceding three years; and shall not be a member of any other city board or committee concurrently with his term as member of such Commission.
('73 Code, § 2-168) (Ord. 62-25, passed 12-5-62)

## § 32.040  COMPENSATION.

Members of the Civil Service Commission for fire fighters and police officers shall serve without compensation.
('73 Code, § 2-169) (Ord. 62-25, passed 12-5-62)

## § 32.041  ORGANIZATION AND RULES OF PROCEDURE.

The Civil Service Commission for fire fighters and police officers shall annually during the month of January, elect a chairman and a vice-chairman. Two members of such Commission shall constitute a quorum to transact business. Such Commission shall make such rules and regulations for the proper conduct of its business as it shall find necessary and expedient.
('73 Code, § 2-170) (Ord. 62-25, passed 12-5-62)

## § 32.042  POWERS AND DUTIES.

The Civil Service Commission for fire fighters and police officers shall have such powers and duties as are provided for in the State Civil Service law, including and restating the following:

(A) Inspect the Fire and Police Departments at least once a year.

(B) Make an annual report to the City Commission.

(C) Make such investigations of matters of the civil service system as they shall deem advisable and as may be requested by the Mayor, City Commission, or City Manager, reporting the results of such investigations as shall be requested by the last three mentioned parties or agencies.

(D) Provide for the classification of all fire fighters and police officers, the same to be confirmed by ordinance of the City Commission.

(E) Hold such public hearings as are provided for as required by the State Civil Service law.

(F) Determine and adopt such rules as it finds necessary for the proper conduct of its business and for the proper administration of the civil service system, all in accordance with the provisions of the State Civil Service law. Such rules shall provide for the prevention of appointment or employment of any person without good moral character; or any person unfit mentally or physically; or any person incompetent to discharge the duties of such employment or appointment. Such rules shall further provide for open, free, and competitive examinations for entrance and promotional positions in the fire and police classified service; minimum qualifications for applicants; duties of the Director of fire-fighter's and police officer's civil service; and such other procedures as are deemed necessary for administration of the civil service system for fire fighters and police officers.

(G) Provide for the employment, regulation, and discharge of fire fighters and police officers in accordance with the State Civil Service law and the rules established by the Civil Service Commission for fire fighters and police officers.
('73 Code, § 2-171) (Ord. 62-25, passed 12-5-62)


## § 32.043 DIRECTOR CREATED; APPOINTMENT.

There is hereby created the office of Director of fire fighter's and police officer's civil service, which shall be filled by the appointment of the Civil Service Commission for fire fighters and police officers of some person meeting the same requirements as provided for members of such Commission. The Director shall be an employee of the city, or some other person. The Elective Commission shall determine what salary, if any, shall be paid the Director. The Director shall at all times, be subject to removal by the Civil Service Commission for fire fighters and police officers. He shall serve as secretary to the Civil Service Commission for fire fighters and police officers and shall perform all such work incidental to the fire fighter's and police officer's civil service as may be required of him by the Civil Service Commission for fire fighters and police officers.
('73 Code, § 2-172) (Ord. 62-25, passed 12-5-62)


## § 32.044 OFFICE SPACE.

The City Commission shall provide adequate and suitable office space for the conduct of the business of the Civil Service Commission for fire fighters and police officers.
('73 Code, § 2-173) (Ord. 62-25, passed 12 5-62)