

United States District Court
Southern District of Texas
FILED

APR 1 6 2002

Michael N. Milby
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| V. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL | § | |
| | § | |
| V. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| V. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS. | § | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S RENEWED MOTION
## UNDER RULE 50 FOR JUDGMENT AS A MATTER OF LAW

Plaintiffs file this Response to Defendant's Renewed Motion under Rule 50

for Judgment as a Matter of Law. For the same reasons, and others, that this Court

denied Defendants' prior Rule 50 Motion, this post-verdict Rule 50 motion should

1

be denied, and the jury's verdict should be affirmed.

## STATEMENT OF THE CASE

### A.    Course Of Proceedings And Disposition Below.

The Court tried this case in February 2002, having previously denied the City's motion for summary judgment. Based on the evidence presented at trial, it denied the City's Rule 50(a) motion for judgment as a matter of law. The jury returned a unanimous verdict in favor of all Plaintiffs: Gilberto Rodriguez, individually and on behalf of his minor daughter, Megan Rodriguez and the Estate of his wife, Susan Rodriguez, deceased; Stephen and Robyn Williams, Surviving Parents of Susan Rodriguez, deceased; Arturo and Elisa Herrera Salinas, individually and on behalf of the estate of their son, Ricardo Salinas, deceased; and Raul Rodriguez, individually. The jury awarded damages as follows:

| | |
|---|---|
| Gilberto M. Rodriguez, Individually | $ 5,000,000.00 |
| Gilberto M. Rodriguez, on Behalf of his<br>  Minor Daughter, Megan Rodriguez | $10,000,000.00 |
| Stephen Williams | $ 2,500,000.00 |
| Robyn Williams | $ 2,500,000.00 |
| Arturo Salinas | $ 2,500,000.00 |
| Elisa Salinas | $ 2,500,000.00 |

Raul Rodriguez                                         $10,000,000.00

Defendant moved for judgment as a matter of law at the close of all the evidence and renewed its motion after Plaintiffs moved for entry of judgment on the verdict. Defendant reurges arguments already denied by this Court. Defendant's instant motion should likewise be denied, and the jury's verdict should be upheld.

**B.    Statement Of The Facts.**

Using an AR-15 assault rifle that was turned into the Harlingen Police Department for destruction, Ernest Moore, the neo-Nazi, drug abusing, and mentally unstable son of a negligent HPD Detective, murdered two United States Border Patrol Agents and almost killed a sheriff's deputy who arrived to assist with his arrest after Ernest murdered two other people in Rio Hondo (Tr. I: 132, 135, 157; II: 238-36, 241). The Harlingen police chief negligently entrusted the military AR-15 assault rifle to Detective R. D. Moore pursuant to the dangerous custom and policy of the HPD not to destroy weapons, monitor the use of weapons, or establish firm policies—trying to avoid liability by not creating a written policy restrictive of even the most deadly weapons (Tr. II: 236, 260-62, 308).

As early as July 1996, the Chief and City of Harlingen officials were

3

made aware many times of the HPD's missing weapons and violations of policies (Tr II: 237; III: 528-34, 624-35). Moreover, the HPD's customs and practices were patently inconsistent with state and federal law and even some Police Department directives, yet the City refused to investigate thoroughly or to require compliance, despite the report of its own expert and its Assistant City Manager that the Chief and Moore committed numerous violations (Tr. II: 267-70; 280; 282-84).  Neither was sanctioned and both still work for the HPD (Tr. II: 247, 282-84, 347, 363-64).

The jury found that:  (1)  the negligent use of the HPD rifle by an employee of the City of Harlingen in the scope of his employment for the City was a proximate cause of the deaths of Susan Rodriguez and Ricardo Salinas and bodily injury to Raul Rodriguez; (2)  a custom or policy made or adopted by the City of Harlingen with deliberate indifference caused a "state-created" danger that was a proximate cause of the deaths of Susan Rodriguez and Ricardo Salinas and bodily injury to Raul Rodriguez; it awarded damages accordingly.  Ample evidence supports the jury's findings which are not clearly erroneous, and they must be allowed to stand.

## ARGUMENT AND AUTHORITIES

**I.    THE STANDARD OF REVIEW GOVERNING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW REQUIRES THAT THE JURY'S VERDICT BE AFFIRMED IN THIS CASE.**

In considering Defendant's motion for judgment as a matter of law, this Court must draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the Plaintiffs.  The Fifth Circuit has opined that with respect to a jury verdict, this standard of review is especially deferential, and the Court should reverse only if no reasonable jury could have arrived at the verdict.  The Court may grant judgment as a matter of law only if there is *no* legally sufficient evidence on which to base the jury verdict.  FED.R.CIV.P. 50; *Mississippi Chemical Corp. v. Dresser-Rand Co.*, 2002 WL 480896, *2 (5th Cir. March 29, 2002).  Here, the record amply supports the jury's findings of liability, and the jury's verdict must be affirmed.

The standard of review is restricted to plain error for those issues that the Defendant did not raise in its pre-verdict motion for judgment.  Those issues are deemed waived, and may only be changed post-verdict if there is absolutely no evidence to support the jury's finding.  *Polanco v. City of Austin, Tex.*, 78 F.3d 968, 974 (5th Cir. 1996).  Here, Defendant only raised

the following issues in its pre-verdict motion for judgment as a matter of law: (1) no policy decision or policymaker action: (a) created a dangerous situation; (b) thrust the agents and deputy into danger; (c) was made with knowledge of danger to known victims; (d) was made or adopted with deliberate indifference; or (e) proximately caused harm. (2) The agents and deputy knew of the danger. (3) The City is entitled to sovereign immunity from state law claims because: (a) danger did not arise from a "use or condition of tangible personal property;" or (b) the tort was intentional or a decision about police protection matters. All other issues newly raised in Defendant's post-judgment motion for judgment as a matter of law are therefore waived.[1]

Similarly, Defendant may not now object to the law applied or the jury verdict form when it did not do so prior to submission of the case to the jury. FED.R.CIV.P. 51; *Dahlen v. Gulf Crews, Inc.*, 281 F.3d 487, 494 (5th Cir. 2002); *McDaniel v. Anheuser-Busch, Inc.,* 987 F.2d 298, 306-07 (5th Cir. 1993). Here, Defendant made no objections either to the jury instructions or the jury verdict before the jury spoke. Therefore, Defendant

---

[1] The following issues, and perhaps others, are new to the post-verdict motion: (1) no state-created danger exception exists or applies in this case; (2) the standard is "shock the conscience," not deliberate indifference, and this did not

may not complain that an incorrect legal standard was applied, as it does for instance in footnote 26 regarding deliberate indifference and on page 35 regarding Chief Scheopner's policy-making status, or, that the jury did not reach all of the requisite findings.[2] *See Piotrowski v. City of Houston,* 237 F.3d 567, 581 (5th Cir. 2001). Those arguments it has waived.

## II. THE CITY IS LIABLE FOR THE DEATH, PHYSICAL INJURY AND DAMAGES SUFFERED AS A RESULT OF THE DANGER IT CREATED FOR OTHER LAW ENFORCEMENT OFFICERS.

### A. This Circuit And Others Have Recognized That Section 1983 Liability Exists If State Actors Create Peril, Increase The Risk Of Peril, Or Act In A Way That Renders A Person More Susceptible To Peril.

Although as a general rule a State is under no affirmative duty to protect persons from acts of private citizens, in certain circumstances the Constitution imposes a duty on the State, the breach of which constitutes a Due Process violation: (1) when the state has a special relationship with a person in harm's way, and (2) when the state exposes a person to a danger of its own creation. *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 198 (1989). The former applies here because Detective

---

occur; (3) lack of foreseeability; (4) no ratification, etc.

[2] Plaintiffs' waiver lists here are not meant to be exhaustive, but to preserve for appeal the proper standard of review for all issues waived by

Moore, Chief Scheopner, and the HPD should be deemed to have a special relationship with Agents Salinas and Rodriguez and Deputy Rodriguez, as fellow law enforcement officers assisting in a criminal setting, and, because they were in extreme danger only because Detective Moore's son was wielding the HPD-issued assault weapon that rapid-fires powerful, Kevlar-piercing ammunition against which they were comparatively helpless. *See Schuster v. City of New York*, 5 N.Y.2d 75, 81, 154 N.E.2d 534, 537 (1958).

The state-created danger exception applies here because Detective Moore, Chief Scheopner, and the HPD created the agents' and deputy's peril by their dangerous and deliberately indifferent customs and policies which allowed the unrestricted release of this high-powered military weapon, putting it into Ernest Moore's hands, and, by turning the agents away at Moore's front door--and without instructing them to take cover--when they knew Ernest was not inside but was likely nearby, in a homicidal and suicidal state, and wielding the deadly AR-15 from which the murdered and injured agents had no defense. *See McClendon v. City of Columbia*, 258 F.3d 432 (5th Cir. 2001) (state-created danger theory is widely recognized by the circuits and has been recognized by the Fifth Circuit, as evidenced by

---

Defendant in this Court.

8

the many cases cited by the Court in this case), *rehrg. en banc granted*, 2001 WL 398361 (March 13, 2002).[3]

Contrary to Defendant's claim, the State need not have been wholly responsible for the creation of the danger:

> [C]ourts uniformly have held that "state actors may be liable if they *created* the Plaintiffs' peril, *increased* their risk of harm, *or acted to render them more vulnerable* to danger.

*Id.* at 435, 439 (emphasis added). Nor does *DeShaney* require state custody at the time of the harm, as Defendant asserts. *Id.* at 436. Instead, the "key element" is whether the state created the danger or at least made the person more vulnerable to it. All three aspects of state-created danger existed here for Agents Salinas and Rodriguez and Deputy Rodriguez. The City is accountable for the foreseeable injuries that resulted. *Id.* at 435, 437.

**B.    The Jury's Finding Of Liability For State-Created Danger Is Supported By The Law Upon Which It Was Instructed Without Objection From The Defendant.**

The jury was instructed, pursuant to Fifth Circuit law and without any

---

[3]Plaintiffs recognize that the grant of rehearing vacates the panel opinion in *McClendon* and cite it only because it provides some indication of the opinion of three judges on the Court on these issues; much of the law on which it is based is not new; and, it is not yet clear on what issues rehearing has been granted. Plaintiffs will request the opportunity to supplement its briefing on these issues as more is learned about the status of the case on rehearing.

objection, that a City is liable for deprivation of a constitutional right under

the state-created danger theory if:

> (1)  the deprivation was pursuant to a governmental custom, policy, ordinance or regulation; or
>
> (2)  for an action performed pursuant to a "custom" that, although it has not been formally adopted by a final policymaker of the City, is a persistent, widespread practice that is so common and well-settled as to constitute a custom that fairly represents City policy; or
>
> (3)  a final policy maker ratified a subordinate's decision by approving of the decision and the basis for it.

The Chief of Police is deemed a final policymaker, and his actions and

omissions which deprived the Plaintiffs of constitutional rights are

actionable against the City.

The Plaintiffs claimed violations of the following policies, customs,

regulations or decisions:

> (1)  failure to enforce legal regulations and laws requiring demonstration of proficiency with assigned weapons;
>
> (2)  assignment of the AR-15 to Detective Moore;
>
> (3)  failure to instruct or train police officers concerning storage, safeguarding, or assignment of weapons;
>
> (4)  failure to have a policy of written assignment of weapons;
>
> (5)  failure to destroy the AR-15 in the first place.

The Plaintiffs also specifically claimed state-created danger through

arbitrary abuse of power, and this Court properly instructed that state-created

danger occurred if any City official increased the danger to the agents and

10

deputy, acted with deliberate indifference to their safety, and affirmatively placed them in danger, effectively stripping them of the ability to defend themselves or seek aid. Deliberate indifference exists if the environment created by the state actors is dangerous; they knew it was dangerous; and they used their authority to create an opportunity that would not otherwise have existed for a third party to commit a crime. *See Randolph v. Cervantes,* 130 F.3d 727, 731 (5th Cir. 1997), *rehrg. en banc denied,* 140 F.3d 1040 (5th Cir.) *cert. denied,* 525 U.S. 822 (1998); *Johnson v. Dallas Independent School Dist.,* 38 F.3d 198, 201 (1994), *cert. denied,* 514 U.S. 1017 (1995).

### C.    The Record Evidence Supports The Jury's Finding Of Liability Under Controlling Law.

In the present case, repetitive abuses of police power by Chief Scheopner and Detective Moore led to this tragedy. A widespread custom of not destroying weapons and lack of weapons accountability led to the Moores' joint possession of the AR-15 rifle. This alone shows deliberate indifference to the extreme risk of this particular weapon which caused the deaths and injuries. *See Piotrowski*, 237 F.3d at 581.[4] As this Court held in

---

[4] *Piotrowski* also rebuts Defendants argument that the City is not liable because Moore acted against official policy by bringing the gun home and using it

rejecting Defendant's challenge to causation:

> [In the cases cited by Defendant], the injuries were caused entirely by private citizens. Here, the City not only failed to destroy the AR-15, as was its duty, it misused the rifle by wrongly conferring it upon one of its officers, who in turn wrongly gave his son access to it. Defendant confuses the issue by portraying E. Moore's actions as the sole cause of the officers' and agents' injuries and deaths. ....[A] fact question remains as to whether the City was a cause.... (Op. 1/4/02 at 5).

This jury found that it was.

Moreover, here, this loose custom of gun handling/usage combined with Moore's placing these agents and deputy directly in the line of fire shows that the City did indeed create the risk. Contrary to Defendant's argument, this is not a situation where police were harmed while simply doing their job in any kind of typical encounter–even with a known murderer. Here, the City's deliberately indifferent gun custom, its unfettered release of this extremely dangerous, vicious weapon, and Detective Moore's refusal to offer a safe harbor to these officers--when he knew his son was nearby, homicidal, and wielding a Kevlar-piercing assault rifle--imposed a duty beyond the scope of ordinary police work. *Compare Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989) (where officer arrested drunk driver

---

personally. As explained in *Piotrowski*, 237 F.3d at 581, the widespread customary policy of allowing such loose handling of guns overrides any official,

and left female passenger in high crime area, where she was raped, deliberate indifference to safety was found), *cert. denied*, 498 U.S. 938 (1990); *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) (by contrast to a mere failure to avert danger, liability exists for placing person in danger and failing to protect them).

**(1) The Chief's Policy And Release Of This Gun To Moore Created a Danger That Would Not Otherwise Have Existed.**

The destructive magnitude of this AR-15 was so great that Chief Scheopner's policy allowing unrestricted release of it from a locked evidence room alone posed a foreseeable and extreme risk of harm to all, including these agents, with deliberate indifference to the dangers he was creating. On the spectrum of firearms, this was equivalent to a "nuclear" weapon:

- the AR-15 had a deadly range of 3 miles;

- its velocity and power are extreme;

- it is designed to do extreme damage rapidly;

- it easily pierces protective Kevlar of standard issue "bullet-proof" vests;

- it is a military-issued weapon designed solely for rapid, mass

---

but unenforced, policy.

killing;

- there was no immediate need or any other legitimate reason to allow this weapon out of the station under anything but the most strict standards and accountability. (Tr. III: 624-27).

The Chief knew when he "assigned" this vicious weapon to Moore that:

- Moore had never trained on this weapon;

- the AR-15 was not a sharpshooting or SWAT team weapon;

- Moore's only "training" on any weapon of this kind was 20 years earlier;

- Moore had not demonstrated any proficiency with it;

- Moore *could not train on it* on any local, approved or appropriate firing range because the AR-15 was too powerful and was not allowed to be used on any local range;

- Moore was taking it home;

- Moore would be shooting it "in his front yard" without regard to proximity or the danger to family, neighbors, citizens or other officers;

- this created an extreme risk of harm to anyone who came within 3 miles of this weapon and that risk of harm would not otherwise have existed from any ordinary police-issued gun (Tr. II: 307-09; III: 624-31).

Chief Scheopner's acceptance of this reckless gun policy and imprimatur of Moore's actions on the morning in question seal the City's

14

liability. Moore was a long-time friend of the Chief who has been criticized by many for showing favoritism to certain officers (Tr. II: 255-56, 303-04). Significantly, Chief Scheopner participated in an attempted "cover-up" after the shooting, making or accepting such deceptions as: (1) the AR-15 was turned over for donation, not destruction; (2) Ernest stole the key to a gun case that he actually co-owned and was in his bedroom; (3) Moore was assigned the gun as sharpshooter and member of the SWAT team, even though (a) there was no written assignment of the gun, in violation of the law; (b) Moore was not qualified to have the gun or be a sharpshooter, nor did he ever attempt to qualify; (c) Moore was not a member of a SWAT team; there was no SWAT team (Tr. II: 235-37;238-41; 246-48, 250, 304-05, 344). Indeed, the Chief arrogantly insisted that neither he nor R.D. Moore did anything wrong (Tr. II: 250, 252). Numerous officers expressed concern about the Chief's handling of these matters and attempted cover-up (Tr. II:255, 282; III: 525).

The Fifth Circuit has held that conduct of a state actor which is more culpable than negligence may constitute denial of due process sufficient to support an action under 42 U.S.C. § 1983. *Salas v. Carpenter*, 980 F.2d 299, 307 (5th Cir. 1992). The abuses of police power here created or, at the

least, significantly increased, a dangerous environment for Agents Salinas and Rodriguez and Deputy Rodriguez in deliberate indifference to their safety.

### (2) The Chief's Deliberately Indifferent And Unrestricted Release Of This Killing Machine Increased The Risk Of Peril To These Agents And Deputy And Rendered Them More Vulnerable Than They Would Have Been to Any Typical Weapon.

The very power of this weapon alone increased the risk of peril to Agents Rodriguez, Salinas and Deputy Rodriguez and rendered them effectively defenseless in comparison:

- against the HPD AR-15, their Kevlar vests were useless;

- their guns were "feeble" by comparison;

- their guns did not have the range, power, velocity, or firing capacity of the AR-15 (Tr. III:  624-27).

In addition, when Moore forced the Border Patrol Agents to stay outside, he did not inform them of Ernest's hatred of minorities, his proximity to them, his crazed mental state, or his willingness to commit suicide by attacking and murdering police authorities (Tr. II: 427-28).

Finally, as this Court appropriately held in its January 4, 2002 order, the Plaintiffs possessed evidence sufficient to show that Ernest chose this particular gun for his murderous rampage against the authorities, and that the

City's failure to destroy the gun, and customary policy of non-restrictiveness and lack of accountability with regard to it created fact questions for the jury as to cause.   There is no evidence that any other operable weapon in the Moore arsenal would have posed the same extreme risk to these agents:

- the other AR-15 had no clips in it, had been in the house only a month, and Moore could not shoot it that morning when he tried to do so (Tr. I: 134);

- Ernest Moore chose the HPD gun on the initial murderous rampage:
  - he had ammunition for it in his truck;
  - he had shot it before with his father;
  - he was proficient with it;
  - it was smaller, more portable, and easier to use;
  - it would do rapid and extreme damage at even enormous range;

- the other unusual weapons in Ernest's room were for "display" (Tr. I: 171);

- Ernest had shot the HPD weapon many times before (Tr. III: 503)

- Ernest deliberately left the newer AR-15 in the cabinet;

- No inventory of the guns alleged to be at the Moore house that morning was produced until 2 years after the murders (Tr. II: 428-29);

- Ernest shot the HPD AR-15 that morning (Tr. III: 664);

- Defendants put on no independent evidence of the condition of the other weapons (Tr. I: 132-36);

- there is no independent evidence of the availability of ammunition for the other weapons;

- there is no evidence that Ernest had any proficiency with the other weapons that the City claims were available;

- there is no evidence any other working weapon in the Moore arsenal would pierce Kevlar, had the range, or had the overall rapid destructive power of the HPD AR-15 that Ernest chose (Tr. I: 136).

The issue of cause is a fact-finding which the jury found in favor of Plaintiffs, determining that the City's failings were a proximate cause of these officers' and agents' injuries and deaths. That finding is not clearly erroneous; rather, it is supported by substantial evidence, and it must be affirmed.

All the elements of "state-created danger" are met. The cases cited by Defendant are factually distinguishable because they did not present the affirmative conduct by the City necessary to find a state-created danger. *See e.g., Johnson* (affirmative conduct missing); *Doe* (knowledge element missing); *Piotrowski* (creation of danger missing); *Saenz* (discretionary police decision where danger was not evident). The especially egregious and unusual facts and evidence of this case satisfy the elements.

      **(a)    Defendant Harlingen Created The Dangerous Situation.**

Dr. Kirkham testified that a municipal custom or policy had developed in the Harlingen Police Department that exposed citizens to serious injury or death (Tr. III: 634). The AR-15 rifle was misappropriated by Moore and the HPD pursuant to their customary policy of not destroying weapons, not requiring proficiency with rifles, and allowing Moore simply to walk out with it with no training, restrictions, or accountability (Tr. I: 99-101; II: 367-70, 372). Even assuming proper appropriation, it should have been used for official purposes only, and because of the extreme danger posed by this particular weapon, could have been properly assigned only under the most restrictive conditions and qualifications. Instead, Detective Moore, who had NO legitimate reason to handle the weapon at all, took it home and shared it with Ernest with no more care or regard than if it were a toy (Tr. II: 351-54, 362-63).

The HPD and Chief Scheopner's disregard for any reasonable standard of safety in the issuance and handling of weapons--even the most deadly--established a customary policy of "gross incompetence" and deliberate indifference to safety (Tr. III: 635). As this Court found, it was "eminently foreseeable" that poor weapons accountability would eventually result in an HPD weapon falling into the wrong hands. Dr. Kirkham, the

renowned expert at trial, also testified that the failure of the HPD and Chief Scheopner to implement and enforce proper weapons policies and procedures created this danger, which would not otherwise have existed (Tr. III: 624-35).    Indeed, the total absence of proper and strictly enforced policies and procedures designed to prevent such harm is shocking and unconscionable (Tr. III: 627, 630-31). *See McClendon*, 237 F.3d at 441-43 (although not supported by the facts there, the Fifth Circuit noted that evidence of widespread custom of loose handling, storing, etc. of guns would subject City to liability for resulting harm; similarly, failure to provide any gun training would likewise trigger liability).

The tragic events of this lawsuit started with the double homicide at Rio Hondo, after someone in the Moore household gave Ernest Moore the new telephone number of his girlfriend, who had just a few days earlier left him (Tr. I: 124). At approximately 4:30 a.m. on July 7, 1998, Ernest Moore arrived at the home where his girlfriend had answered the phone. Ernest shot and killed Maria Morin and her daughter, Delia, and wounded her son, Dan, with an AK-47. After someone wrested this rifle from him, Ernest and another man fled in his white pick-up truck. Witnesses, including Ernest's ex-girlfriend, called 911 to report the shooting and positively identified

Ernest as the shooter, informing them in the first call that he was the son of HPD Detective R.D. Moore  (P.Ex. 50C; Tr. I: 138-39, 141-42).

Ernest fled directly to his parents' home.  Before 6:00 a.m., Detective Moore heard "a commotion" in the house  (Tr. I: 114; III: 662-64, 668). There was ample evidence for the jury to believe that Detective Moore spoke with his son when he burst in, and Ernest told Moore that he was "in deep shit."  (Tr. I: 154; III: 661-64, 668).  Moore knew his son was "out of control," "crazy," on Prozac and cocaine, homicidal, suicidal, willing to kill police officers, and armed with a Kevlar piercing HPD AR-15, and said "he had loaded 3 magazines" of 30 shots each (Tr. III: 661-64, 668-69).  Moore did not stop Ernest, but said he grabbed his rifle and a searchlight and went looking for him (Tr. I: 145, 151; III: 662).   He and his wife found ammunition for the AR-15 in Ernest's truck (Tr. I: 118, 120, 130, 137). Moore heard shots fired outside, but did not pursue Ernest further (Tr. III: 664).

Moore knew even before Ernest went to Rio Hondo that he was a danger and a threat.  He knew and told Deputy Rodriguez that his son "was upset with two drug dealers in Rio Hondo for turning his girlfriend on to cocaine, and he was going to take care of it." (Tr. III: 662).  The jury could

have inferred that Detective Moore learned of the homicides from his son and/or from his mobile police radio on which lookouts were being broadcast. Otherwise, Daniel Perry, Ernest's foreman, would not have been told by the Moores (when Perry called around 6:15 a.m. regarding whether Ernest would be coming to work that day) that, "[he] probably was not [and] that he, Ernie, was in a lot of trouble [and] that he had shot somebody" (Tr. I: 142-43).

An off-duty peace officer who observes a crime in progress immediately becomes an on-duty officer. *Laughlin v. Olszewski*, 102 F.3d 190, 192 n.1 (5th Cir.1996); *Villegas v. Griffin Industries*, 975 S.W.2d 745, 754 (Tex.App. – Corpus Christi 1998, writ denied); *Wallace v. Moberly*, 947 S.W.2d 273, 277 (Tex.App. – Fort Worth 1997, no writ); *City of Dallas v. Half Price Books, Records, Magazines, Inc.*, 883 S.W.2d 374, 377 (Tex.App. – Dallas 1994, no writ). A police officer is not relieved of his duty to prevent crime when he witnesses an illegal act simply because he is off-duty. *See Blackwell v. Harris County*, 909 S.W.2d 135, 139 (Tex.App. – Houston [14th Dist.] 1995, writ denied) (*citing Moore v. State*, 562 S.W.2d 484, 486 (Tex.Crim.App.1978)). He certainly may not cover-up a crime or delay apprehension of a criminal.

It is the nature of the act performed, not the clothing of the actor or the status of being on-duty or off-duty, that determines whether an officer has acted under color of law for purposes of the civil rights statutes. *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975). In *Stengel*, Belcher, an off-duty officer, involved himself in an altercation in a bar. As a result he killed two people and paralyzed a third with a handgun assigned to him. Belcher contended that his actions were taken as a private citizen because he was engaged in private social activity, was out of uniform, off-duty, and never identified himself as a police officer. However, the Court held that while shooting the three men, Belcher was acting under the color of law because the police regulations required him to carry a gun at all times, and further, the police chief testified that the office regulations required an officer to take action in any type of police or criminal activity 24 hours a day. *Belcher*, 522 F.2d at 441.

An off-duty police officer who performs an actual or apparent duty of his office is acting under the color of law. In *City of Dallas v. Half Price Books, Records, Magazines, Inc.*, 883 S.W.2d 374, 377 (Tex.App.--Dallas 1994), the Court held that an off-duty police officer who observes a crime immediately becomes an on-duty police officer. An officer who is present at

the scene of an arrest and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under civil rights statutes. *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 207 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991).

In the present case, officers were required to swear to enforce federal and state laws, and local ordinances under Subsection 6.08.002 of the Departmental Directives of the HPD [hereinafter "Directives"]. As a police officer, Moore had the duty to take action and report all violations coming to his attention, as well as all information he received about any actual or suspected violation of the law (Subsection 6.07.001); to arrest when necessary to enforce laws and to protect the public (Subsection 6.08); and to make appropriate arrests when witnessing or receiving information of violations of the law (Subsection 6.08.001). This was true off-duty as well. (Subsections 4.01.005 and 4.05). Under these Directives, Detective Moore was required to take police action to stop or investigate criminal activity 24 hours a day, regardless of whether he was on-duty or the crime involved his son.

In the present case, Detective Moore knew that Ernest Moore intended to commit, and had committed, some crime (long before anyone else).

24

Moore told Deputy Rodriguez: "*I know my son did something, I want to know what.*" R. D. Moore also knew that his son "was going to take care of" two drug dealers in Rio Hondo. He also said his son " *was probably contemplating suicide and that he hoped he would commit suicide, because if he didn't his son would come back and kill us,*" and stated that his son was a *"damn good shot"* (Tr. III: 661-64, 668-69).

Moore illegally purchased for and gave his son access to a variety of extremely dangerous firearms. Detective Moore knew his son's criminally dangerous propensities, and yet enabled him by affording this access and the ability to commit these crimes with a weapon against which there is no readily available defense. Detective Moore did nothing to stop Ernest, though he admittedly knew that his son was a danger to the public at-large and, specifically, to these agents and deputy (Tr. III: 661-64, 668-69).

Detective Moore not only allowed his son to flee from his house, but the jury could have inferred that he effectively assisted his son in escaping arrest before the murders by refusing to allow the agents into his home, delaying the search, and generally refusing to cooperate with the authorities. In addition to putting his crazed son in possession of this unusually lethal weapon, Detective Moore himself placed the Border Patrol agents directly in

harm's way by refusing their entry into his home when he knew that Ernest was nearby, homicidal, and wielding the police-issued assault weapon against which they were comparatively defenseless.

Moreover, when Detective Moore discovered that the AR-15 rifle was missing, he had the duty to arrest his son, and to inform all of the law enforcement officers immediately, including Border Patrol Agents Rodriguez and Salinas, of Ernest's mental state, and his proximity and his possession of the AR-15 and 3 magazines. Instead, Detective Moore left the agents in a dire situation, outside, where they could be picked off. Detective Moore's failure to take proper police action against his son, his own resistance to the officers, and his concealment of information from other officers at the scene were in direct violation of his prescribed his duties (Tr. I: 209, 218-19). Meanwhile, the Chief–by radio and upon arriving at the scene--did nothing to countermand the extreme danger to the agents that his callous and casual release of the deadly AR-15 caused.

Chief Scheopner attempts to limit the City's liability by asserting that he first learned about Ernest Moore's involvement in the Rio Hondo shooting at approximately 6:50 a.m.   However, the evidence shows differently.   The entirety of the HPD received a "Look Out" for Ernest

Moore at 6:06 a.m., and the few tapes of police transmission produced by the City show that someone instructed the dispatcher in the first call from the Rio Hondo shootings around 5:30 a.m. that Ernest Moore was HPD Detective R. D. Moore's son and said: "Somebody warn the Chief." (P.Ex. 50C). Moreover, the City Manager said the Chief called her between 6:00 and 7:00 a.m. (Tr. II: 312). At approximately 5:30 a.m., Sgt. Mike Garcia and Sgt. Foist already knew that the killer, Ernest Moore, was Detective Moore's son, and they knew his license plate number. Chief Scheopner had several telephone conversations with Sgt. Foist, and Scheopner ordered Sgt. Garcia and Sgt. Foist to go to Detective Moore's house because Detective Moore was not being cooperative. Chief Scheopner was also himself en route to Moore's home. The situation was being broadcast on all police channels and on the local news by 6:00 a.m. (Tr. II: 316, 318-24; P.Ex. 50C; Tr. III: 648-49, 565).

### (3) The Availability Of Other Weapons Does Not Undermine The Jury's Fact-Finding Of Causation.

The City's causation argument that other weapons were available to Detective Moore's son misses the point. The jury believed that Ernest deliberately chose the AR-15 police-issue rifle. That finding is entitled to

deference and it is not clearly erroneous. The AR-15 was the weapon that Ernest Moore chose to use when he was on the run after his first murders of the day. It was a weapon that Detective Moore previously had allowed Ernest Moore to practice shooting. It was smaller, more portable, and maneuvered better than the other weapons in the family arsenal, and there is no independent evidence the others were functional that morning (Tr. III: 624-25, 627). In addition, it had the added appeal of being a police weapon and for someone as disturbed as Ernest, the perfect means to mow down the Border Patrol agents. Ernest's proficiency with the weapon, his practices on it with his father, the massive damage it would inflict, and its other characteristics made it a logical – and a predictable – choice from among the other firearms that were available to Ernest Moore – a choice which Chief Scheopner and Detective Moore should never have made available to someone as clearly disturbed as Ernest (Tr. III: 631-34, 638-39). No other gun in the household had these characteristics (Tr. III: 639). Moreover, the other AR-15 that Detective Moore had illegally purchased for Ernest did not have any clips in it that morning and was useless when Detective Moore himself reached for it (Tr.I: 134; II: 433-34, 443 ).

Whether Ernest Moore would have picked another rifle if the HPD

assault rifle was not available to him is a matter of pure speculation. The jury found that he chose this one, and it is Defendant who hypothetically argues that he would have chosen another, or even that any of the others were loaded and worked. The evidence shows that Ernest selected this rifle, which he liked very much and was comfortable shooting based on past experience. He had ammunition in his truck for the AR-15 and the AK-47.[5] He was prepared with both on his murder mission to Rio Hondo. Other than R. D. Moore's assertion, there is no independent evidence that any of the other weapons in the Moore arsenal were working and/or capable of doing the rapid, deadly damage of the HPD AR-15, which renders even the agents "bullet-proof" vests worthless in the face of its assault power and their own weapons "feeble" by comparison (Tr. I: 135-36; III: 445-46, 624-26). This weapon, alone, by its very fire-power and maneuverability, created a means for death and destruction that did not otherwise exist.

"It is not the function of a Court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences." *Tennant v. Peoria & P.U. Ry. Co.*, 321 U.S. 29, 35 (1944). The

---

[5]   The Ak-47 with which Ernest murdered his victims in Rio Hondo was

Defendant had the burden of convincing the jury on this point. The defense failed, and rightly so. The Defendant has not offered any evidence that

would establish as a matter of law that its hypothetical scenario would or even could have taken place. The fact remains that Ernest Moore chose only the powerful, City-owned AR-15, which Detective Moore had provided him to murder these agents and injure Deputy Rodriguez. It was the City's custom not to destroy the weapon, not to require proficiency before custody, of refusing to monitor or restrict any weapons-handling–even this most deadly one– that put this "nuclear weapon" in Ernest Moore's hand to murder federal agents Rodriguez and Salinas and injure deputy Rodriguez. Dr. Kirkham testified that the City's policies caused these deaths and injuries (Tr. III: 633-34). The expert testimony and the raw facts support the jury's finding of causation.

### (c)    Defendant Knew The Situation Was Dangerous.

There is no doubt that Chief Scheopner and Detective Moore knew of the volatile and hazardous nature of the situation:   first, that the weapon itself was extremely dangerous, capable of firing 3 miles and powerful

---

actually registered to Captain Vasquez of the HPD (Tr. II: 431).

enough to rip through any bullet-proof vest; second that Ernest Moore had possession of the AR-15 semi-automatic rifle and he had loaded 3 clips with 30 rounds each; third, that Ernest Moore's mental status was homicidal and suicidal; and fourth, that Ernest Moore was an experienced marksman. *See McClendon*, 237 F.3d at 441 ("it [is] beyond peradventure that a police officer's actions of giving a person a weapon in a situation the officer knows or should know has a strong potential for violence constitutes deliberate indifference").    Detective Moore knew his son was on the verge of committing suicide or killing someone. He said so (Tr. III.634-35, 661-64, 668).

Before the shooting, Police Chief Scheopner had at least one telephone conversation with Detective Moore.    Detective Moore and the Chief had worked together 28 years and were close friends; indeed, Moore was known to be one of Police Chief Scheopner's "cronies."    The jury had ample evidence to infer that the Chief knew much more and much sooner than he admitted.

> **(d)    The Dangerous Situation Created The Opportunity For Ernest Moore To Commit A Crime That Would Not Otherwise Have Existed.**

First, the Chief knew of the extremely dangerous nature of this

weapon which alone was of such enormity to create an unusual peril that would not have existed (Tr. II: 288-89). Dr. Kirkham, Plaintiff's testifying expert with 30 years experience in teaching and as a police officer, testified that there is nothing more important than police possession of firearms. They are deadly and must be closely monitored (Tr. III: 614). This weapon, in particular, was designed to kill–rapidly and en mass. There was no legitimate reason for RD Moore to have this very dangerous weapon (Tr. III: 627-30), and certainly not in his home. "It was a clear and very serious violation of nationally accepted law enforcement standards for this weapon to be given by the Department to Detective Moore for him to be allowed to take charge of it." (Tr. III: 624-25).

Second, both the destructive nature of the weapon itself and the actions of R.D. Moore made the Border Patrol agents "sitting ducks." Even though the officers knew they were trying to apprehend a murderer, neither the Chief nor the City took any action to provide the Border Patrol agents the details of the gravity of the situation or instruct them to take cover. In the face of the massive firepower and velocity of the AR-15, "the weapons the Border Patrol agents had were feeble by comparison" (Tr. III: 624).

The jury could also have reasonably inferred that the agents believed

32

there was less danger because they were at the home of an HPD officer, and that he would take steps to protect them. Detective Moore admitted telling the Border Patrol agents that he would not allow them in his house, and he felt bad about that later (Tr. I: 115-16, 155). He did not tell the excluded Border Patrol agents of Ernest's condition and state of mind. The agents, arriving at the home of a fellow police officer, were not prepared, and no one with knowledge even attempted to prepare them, for the brutal ambush that awaited them. By bringing many of the other officers inside, Detective Moore then deprived the Border Patrol agents of the presence of other officers to secure the area, or assist them, and effectively rendered them "sitting ducks" for his crazed and murderous son (Tr. III: 669). He forced these agents to stay outside his home, in danger that he knew existed, while bringing most of the other officers near the house inside to conduct a search. *Compare McClendon*, 237 F.3d at 441. This too contributed to the commission of the crimes by Ernest.

Third, this gun, the HPD's AR-15, had multi-faceted appeal for the sick young man. As the evidence showed, Ernest had unique experience with it, was extremely comfortable with it, had practiced with it extensively, deliberately chose rounds for it, and could conceal it and wield it more

33

effectively due to its size and maneuverability in the field. Given his neo-Nazi tendencies, the jury could reasonably conclude that he would be fascinated with–and attracted to–using a high-powered, *police* assault weapon to kill minority agents and officers. By its policy of failing to destroy, or at least safeguard, this assault rifle, the City gave Ernest Moore possession of it, the opportunity to practice with it, and to murder. The jury rightly determined that this was a proximate cause of the officers' and agents' injuries and deaths.

> **(e)   Chief Scheopner And Detective Moore Affirmatively Placed The U. S. Border Patrol Officers In A Position Of Danger In Such A Way As To Strip The Officers Of Their Ability To Self-Defend**.

The powerful destructive capability of this assault rifle that HPD's policy placed in the hands of Ernest Moore rendered the agents defenseless. Their bullet-proof vests were worthless, and their weapons were "feeble" in comparison (Tr. III: 624-25 630, 668-69). Neither Agent Salinas or Rodriguez, nor Deputy Rodriguez, had any weapon with them that could begin to match the range, velocity, or overall firepower of the HPD AR-15 Ernest Moore was wielding. Had this been an ordinary firearm, they would have at least had a chance at self-defense; but, it was not. Spraying tumbling

rounds, rapid-fire, the HPD AR-15 would shoot a range of 3 miles with extraordinary velocity, cutting through a bullet-proof vest "as if it were butter" (Tr. III: 624-27, 630).

In addition to the above and contrary to Defendant's argument, the victims in this case *were* identifiable before the event occurred. They were certainly identifiable to R.D. Moore, who chose to leave them outside-- knowing his son was out there with the rifle--while inviting the other officers inside. Moore, the Chief, and the HPD also had reason to know before the shooting that Border Patrol Agents would assist in the coordinated effort to apprehend the suspect, and they knew when they arrived on the scene.    In addition, Ernest Moore was already known by his father, Detective Moore, and the HPD to be "crazy," "out of control," homicidal, suicidal, and on cocaine and Prozac.  Ernest Moore's bedroom was filled with Neo-Nazi paraphernalia. Detective Moore had to know that his son had a "Neo-Nazi mentality" and hatred of minorities. Detective Moore should have been concerned that minority law enforcement officers would be his son's first targets.  In light of Chief Scheopner's close working relationship with Detective Moore and the telephone conversation he had with Detective Moore in the critical moments before the tragic incident in question, the jury

was entitled to infer Chief Scheopner had possession of the same information that Detective Moore had.

Moreover, had Chief Scheopner or Detective Moore fulfilled their duties by destroying this powerful assault weapon as directed, keeping it locked at the station and away from Ernest Moore, arresting him when he arrived home that morning, and at least requiring all officers on the scene to take cover while warning Susan Rodriguez and Ricardo Salinas about the imminently dangerous situation, the agents would not have been killed by Ernest. Therefore, Detective Moore, Chief Scheopner, and the City were responsible for the deaths of Agents Rodriguez and Salinas, and the injuries to Deputy Rodriquez, under the civil rights statutes.

This Court can, and should, take judicial notice of the Nazi mentality, the corresponding attitude of intensely despising minorities, and the predisposition of such "hate groups" to use violence to injure and kill minorities. *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 202, 109 S.Ct. 998, 1005 (1989); *Schuster v. City of New York*, 5 N.Y.2d at 81, 154 N.E.2d at 537 (special duty of care owed to those who collaborate in the arrest of criminal); *see also Taylor v. Phelan*, 9 F.3d 882, 886 (10th Cir. 1993) (*Schuster* means that in a situation where the

government has actively called on someone for help, "[i]n return for seeking out assistance, the government is obliged to provide special protection to those who give help).

In *Schuster*, the Plaintiff was killed while attempting to assist the city police department in the apprehension of a suspected murderer. The Court recognized that a police officer owes a special duty to use reasonable care for the protection of persons who have collaborated with the police department in the arrest or prosecution of criminals. The same duty applied to Moore and Scheopner to use reasonable care to afford protection to the assisting agents and deputy[6] who had no prior relationship with the Moores, or knowledge of the Moore family's HPD arsenal, ammunition stockpiles, and obsession with guns and Nazis. Instead, Moore's refusal to cooperate and turning them away directly caused them to be in plain view, and

---

[6] In the instant case, the Border Patrol Agents were a part of a coordinated, integrated law enforcement effort that involved city, county, and federal agencies. As the memo indicates: "at approximately 6:41 a.m. the Cameron County Sheriff's Department contacted McAllen Sector's Communication Center and requested Air Operation's assistance in locating the suspect. LECA John Cantu contacted Harlingen Supervisory Border PATROL agent Doug Spielman who dispatched some Harlingen Agents to assist in the search and in coordinating the Air Ops assistance." Based on this request, Border Patrol Agents went to Detective Moore's house to assist in the search. The Agents were confronted by Detective Moore who hampered the effort by stating, "Hold up the Border Patrol. I don't want Border Patrol in my house, my son is not an illegal alien" (Tr. I: 115-16; II: 427-28)

Scheopner, who knew Moore was not cooperating, did not order Moore to provide cover or instruct the agents to take cover.

The coordinated, integrated nature of the multi-force effort to apprehend the suspect made it unquestionably foreseeable that Border Patrol agents would be present at the Moore home. The involvement of the Border Patrol Agents in this law enforcement effort establishes a special relationship between the agents and state actors such that the agents were entitled to have been shielded from--or at least warned of--potential harm. Instead, Detective Moore knowingly sent the agents into harm's way (Tr. II: 427-28). Clearly such actions, when made under color of law, exceed the standards established in the *Schuster* decision.

### D.     In addition, Chief Scheopner And The City Ratified The Decisions Which Violated Plaintiffs' Constitutional Rights, And Which Led To Their Deaths And Injuries.

Chief Scheopner was the highest police authority in the City of Harlingen. As the Court instructed--without objection--he had full authority to make decisions and/or set policy for which the City would be liable. The Chief also had total authority over the discipline and oversight of his department and its officers. At all times, and in his every action and inaction, Chief Scheopner acted pursuant to this official authority. His

actions and inactions are imputed to the City.   *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, (1986); *Thomas v. Sams*, 734 F.2d 185, 192, (5th Cir. 1984), cert. denied, 472 U.S. 893 (1985).

As the jury found, the policies, customs and actions attributable to Chief Scheopner caused the deaths and injuries here. *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 171-72 (5th Cir 1985), *cert. denied*, 480 U.S. 916 (1987).   The Chief deliberately, indifferently and without justification or restriction, put a lethal weapon in the hands of a murderer–a weapon of such murderous magnitude that it rendered law enforcement officers defenseless and normal law enforcement protections and weapons useless in comparison.   Moreover, the Chief ratified the unconstitutional and illegal actions of subordinate officers Moore, Vasquez, and others. *See also Pembaur. v. City of Cincinnati*, 475 U.S. 469, (1986).   *Turner v. Upton County, Tex.*, 915 F.2d 133, 136 (5th Cir. 1990), *cert. denied*, 498 U.S. 1069 (1991).   In *Grandstaff*, 676 F.2d at 170-72, the Fifth Circuit held that when an officer commits unconstitutional acts and is not disciplined, the municipality implicitly ratifies that unconstitutional conduct as accepted policy, and municipal liability then results:

> Where police officers know at the time they act that their...
> conscious disregard of the rights and safety of innocent third

parties will meet with the approval of city policymakers, the affirmative link/moving force requirement is satisfied. *Id.* at 170.

Contrary to the Defendant's assertion, Plaintiffs do not argue ratification based purely on the Chief's refusal to reprimand. Rather, as in *Grandstaff*, ratification occurred by "[c]onscious indifference to widespread incompetence or misbehavior [which is] more than a matter of extreme negligence and more than a failure to instruct or train." *Id.; accord Palmer v. City of San Antonio*, 810 F.2d 514, 516 (5th Cir. 1987). There was no legitimate reason whatsoever for the Chief to let this deadly assault rifle leave the station with no restriction, accountability, showing of immediate need, or demonstration of the strictest proficiency and regard for safety.

The jury's verdict must be construed in light of the evidence. Here, Chief Scheopner, and the City, ratified his officers' misconduct in several areas, including failing to destroy the gun, allowing R.D. Moore to treat it as casual personal property and share it with his son, and allowing possession of rifles with no demonstration of proficiency or safe handling. This loose--indeed nonexistent--standard regarding guns was widespread, longstanding, and part of the Chief's policy. Both the Assistant City Manager and the City's retained expert found fault with the Chief and Moore for this policy

and the deliberately indifferent acts pursuant to it (Tr. II: 267-70, 273-76, 278-84, 367-70, 372, 390-91, 392-94; III: 473, 478-487, 499-516). Chief Scheopner created or at least had actual knowledge of the gun custom and policy. *See Piotrowski*, 237 F.3d at 578 n. 18, 579, 581 (citing *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1084) (en banc). He chose his unwritten and lax policy deliberately–trying to avoid liability for his reckless acts (Tr. II: 237, 260-62).

An injured plaintiff is not likely to possess documentary proof of policy or disposition, either of the policymaker or throughout the police force. *Grandstaff*, 767 F.2d at 171. The disposition of the policymaker may be inferred circumstantially from conduct of the officer and the policymaker. *Id.* In this case, however, we have actual admissions of at least three customs or policies which caused this tragedy: (1) not destroying weapons (a change from prior policy) (Tr. II: 386, 390-91); (2) allowing an officer simply to take a deadly weapon for his own use with no restrictions (Tr. II: 236-37); and, (3) not requiring any demonstration of proficiency before allowing possession of any rifle – even the most dangerous (Tr. II: 249, 253-54, 260, 310, 367-69).

Following any catastrophic and incompetent performance—as

41

occurred here, if there are no reprimands, no discharges, no admissions of error, and no changes made in policy, the jury may infer this simply is "the way things are done" in that municipality. *Id.* Indeed, here, the City's own investigation concluded that the Chief "made no formal investigation of the matter and ... allowed Moore to work without interruption or questioning."[5] "The Chief failed to initiate an objective departmental review of the circumstances, policies and procedures by which Moore came to possess the AR-15." (Tr. II: 267-68, 269-70, 364).

Here, that is exactly what occurred. The Chief's close-knit system of preferential treatment, his opinion that only Ernest Moore did anything wrong, and his willingness to "look the other way" regarding certain officers, including Moore, ratified the officers' actions and renders the City accountable, as does the City's failure to require changes (Tr. II: 252, 255-

---

[6] Even after Moore's testimony at trial revealed that he committed a federal felony by lying on a firearms form to purchase another weapon for Ernest, Moore continues to work as a detective with the HPD (Tr. II: 433-436, 441). In a pure "straw purchase," Detective Moore represented on the federally required form that he was the purchaser of the weapon and was not purchasing it for anyone else when he was in fact purchasing it for Ernest (Tr. II: 434-35); he answered no to drug use questions that Ernest would have had to answer yes (Tr. II: 436-37). Under questioning by the Court, he admitted that he was not the actual purchaser of the Colt AR-15, and it was clear to the jury that Ernest could not have lawfully purchased it (Tr. II: 435-37). Moore violated 18 U.S.C.A. § 922 by making a false statement on the federal form. This is a federal felony which carries a five year

56, 282-84). Moreover, based on their 28 year friendship and close working relation, the jury was entitled to infer that Chief Scheopner had constructive knowledge not only of Moore and his son's personal use of the rifle, but also of Ernest's psychological problems, drug abuse and Nazi tendencies. He nonetheless allowed Moore to take home a high-powered assault rifle and share it with his disturbed son. Chief Scheopner's knowledge is also evidenced by his ratification of Detective Moore's wrongful actions on the morning in question, when the Chief took no action to inform or protect the assisting agents.

Finally, after the tragic shooting, outright deceptions and cover-ups made by Chief Scheopner, Captain Vasquez, and Detective Moore came to light. Clearly, the Chief's affirmative acts to hide wrongdoing by his officers constitutes ratification and shows that Chief Scheopner accepted their illegal actions fully and without consequence. Most telling is the fact that neither Moore, nor the Chief, was sanctioned by the City in any way, and they both still work as police officers in Harlingen. The City never even called Moore in to discuss its own expert's findings of his violations and misconduct (Tr. II: 364).

---

term of imprisonment pursuant to 18 U.S.C.A. § 924.

## II.    THE CITY'S NEGLIGENCE USE AND NEGLIGENT ENTRUSTMENT ALSO CAUSED THESE MURDERS.

The Court instructed the jury on two negligence[7] grounds--negligent use and negligent entrustment.[8]  Defendant did not object to this instruction. The jury found that the City's negligence proximately caused these murders and injuries.

### A.    The City Is Liable For Negligent Use Of The AR-15 Assault Weapon Which Was Turned In By A Concerned Citizen For Destruction, But Which Was Instead Used To Kill Two People And Injure Another.

Negligent use of personal property that causes death or injury subjects the City to liability if the City would be liable were it a private entity. TEX.CIV.PRAC.&REM.CODE § 101.021(2); *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 584 (Tex. 1996).  Here, the City's negligent handling of the lethal AR-15 rifle, its failure to destroy it to protect others as requested by its rightful owner, and its customary gun policy allowing the assault weapon to be personally used by the Moores, proximately caused the tragic deaths of

---

[7] Defendant's argument that intentional tort does not waive sovereign immunity is wholly misplaced in this negligence case. *See Def. Br.* at 43.

[8] The Defendant improperly merges these two distinct legal theories of negligence.  "Use" relates to use of the gun, and "entrustment" relates to entrustment of it.  Plaintiffs do not argue only that the act of entrusting the gun was a negligent use of it. *Def. Br.* at 42.

the Border Patrol agents and injury of the Deputy.

Defendant cannot challenge the application of §101.021 of the Texas Tort Claims Act to Harlingen's liability, in a situation in which a municipality negligently failed to prevent a weapon from being taken from the municipality. *Kennedy v. Baird*, 682 S.W.2d 377, 388 (Tex.App.-El Paso 1984, no writ); *Prather v. Brandt*, 981 S.W.2d 801, 806 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). The City is vicariously liable for its employees' negligence under § 101.021(2) as if it were a private entity. Here, the City not only negligently failed to prevent the weapon's removal from the City, the police Chief negligently entrusted this extremely dangerous assault weapon to R.D. Moore and his household.

The record evidence establishes that the Defendant's casual handling of the deadly weapon in question violated all standards for prudent conduct, including its own. As discussed *supra*, both the City's retained expert and the Assistant City Manager found numerous violations of reasonable standards of care and existing guidelines.

The City of Harlingen's internal procedures for handling weapons was not adhered to with regard to the assignment of the AR-15 to R. D. Moore. (P.Ex 18; Tr. III: 500-511). Instead, the Chief purposely adopted a

customary, unwritten policy of no written assignment; no accountability, monitoring or restriction on use, and no qualification requirements for rifles (Tr. I: 155-57 II: 236, 260-62, 276-79).    Chief Scheopner was aware that R.D. Moore was keeping the weapon at home even before the shooting. (Tr. II: 241, 280-81).  The Chief lied about the reason for Moore's possession of the assault rifle (Tr. III: 479-86, 501-02).    Based on their long-standing relationship, the Chief knew or should have known Moore's son was disturbed, drug abusive, had been committed, and was dangerous (Tr. II: 234, 241-43, 255-56, 281, 287-90, 303-04).

Indeed, under Texas negligence law, Detective Moore's own knowledge in relation to the rifle and the circumstances is imputed to the City.  A municipality can only know of things relating to its business, such as police work and use of police property, through its officers and agents. Here, Detective Moore clearly knew all the relevant facts relating to this gun, its usage, and his criminally disturbed son's access to it.  *See City of Forth Worth v. Davidson*, 296 S.W. 288 (Tex. 1927); *City of Texarkana v. Nard*, 575 S.W.2d 648, 652 (Tex.App.--Tyler 1978); 39 TEX.JUR.2D (REV.) MUNICIPAL CORPORATIONS § 221; 60 TEX.JUR.3D PUBLIC OFFICERS AND EMPLOYEES § 227.  Detective Moore, as an officer of the law, should be held

accountable for allowing his disturbed son access to <u>any</u> weapon given his son's psychological problems, drug usage, previous commitment to an MHMR drug clinic, alcohol abuse, and propensities for violence.    It was unlawful for Ernest to have any weapon, yet R.D. Moore illegally purchased them for him and shared this police weapon with him—acts of crime themselves by R.D. Moore.

The weapon was assigned to R.D. Moore pursuant to Chief Scheopner's custom and policy of not requiring any accounting or accountability for weapons.  The City acknowledged that assignment of the weapon in this fashion abrogated the City's internal policies and procedures, yet it did nothing to sanction the Chief or Moore. *Id.* at p. 79-80.

Assistant City Manager LaBeau found that the City also violated standards and rules in this area that are generally applicable throughout this state. (Tr. III: 479-92, 500-09) sets forth his findings and recommendations for action.

- The Chief had made no formal investigation of the matter and had allowed Moore to work without interruption or questioning.

- Captain Vasquez had allowed Moore to take the weapon home for the general purpose of a "duty weapon."

- There was no substantiation in practice or in documentation that Moore served the department in a

"sharp-shooter role."

- Moore had had the weapon in his possession for over a year, and his possession of the weapon was undisciplined sometimes leaving it in his pick-up truck, other times behind the door of his office.

- The inventory procedures in the department were informal and not uniformly applied to all officers.

- Moore had not had formal training on the weapon since 1976.

- Moore did not qualify annually with the weapon, but instead practiced shooting it in his yard at home.

- On at least one occasion Moore had allowed his son to use the weapon.

- The weapon in question had been delivered to the department for "disposal."

- No records exist of training or actual call-out for Moore in his supposed duty as a sharp shooter.

- Department policies (see sections 4.04 – 4.04.006) appeared to this reviewer [the Assistant City Manager] to have been violated.

- The Chief asserted that no departmental violation had been violated, nor had any TCLEOSE requirements been violated.

- The Chief presented an inventory which he represented a showing all weapons present and accounted for, except the AR-15 which had never been signed-out and was now in custody with other agencies as evidence.

48

(*Id.* at P.Ex. 15) pp. 3-4; Tr. III:  500-09).

After his interviews, Mr. LaBeau inspected the police department's evidence rooms, weapons, lockers, and Detective Moore's office.  His report lists the following observations made during that inspection:

- A handwritten inventory of weapons issued existed, but did not show Moore's sign out of the AR-15.

- Hundreds of weapons, mostly handguns, were stored in stacked bins with tags which relate to case documentation.  Many of these weapons have been in storage for years, some decades.

- A wide assortment of various rifles were stored in various secured rooms.  Some of these were owned by the Department.  Others were marked as "evidence."

- Over the years, some of the weapons have been put in service, usually with permission from the Chief.

- No current effort has been made to dispose of stockpiled weapons.

- It was Moore's practice to store the AR-15 behind his office door, even after he no longer had weapons safekeeping duties.

(P.Ex 15 p. 4-5; Tr. III: 479-87).

Ultimately, Mr. LaBeau reached the following conclusions pursuant to his assignment to investigate the matter on behalf of the City:

- The Chief failed to initiate an objective departmental review of the circumstances, policies and procedures by which Moore

came to possess the AR-15

- The Chief of Police made false statements and reports regarding the assignment of the AR-15 to R. D. Moore.

- A review of the departmental policies and procedures identifies a number of apparent violations:

    4.04. Authorized Weapons:    The Department authorizes officers to carry certain weapons, and authorizes the use of those weapons only when necessary to lawfully accomplish departmental goals.  Officers carry and use only those weapons approved and authorized by the Department.

    Captain Vasquez reported that he approved this weapon for R. D. Moore without written notification to the Chief.  However, the weapon was taken home and placed in a gun vault.  Also, R. D. Moore stated he would practice with the weapon by shooting it in the yard of his residence and on one occasion, R. D. Moore knew his son had discharged the weapon because he had allowed his son to do so.

    4.04.001 Approved Weapons and Ammunition:    The Department authorizes officers to carry and use only Department issued or approved handguns, shotguns, ammunition, chemical agents and batons.  The chief approves all weapons and ammunition.  Under special conditions of limited duration, the Commanding Officer on duty may authorize the use of other weapons.  A commanding officer taking this action justifies the decision in writing to the Chief.

    Captain Vasquez reported that he did not follow any procedure (in issuing the weapon) and did not obtain the Chief's approval.  Captain Vasquez reported that he did not discuss with Detective Moore any specific duties when issuing the weapon.

    4.04.002 Training:    An officer must undergo Department approved training and display proficiency in the use of any

authorized weapon the officer carries.  Additionally, officers must comply with all continuing proficiency training required by the Department.

Detective Moore reported that he was last trained in 1976 for this type weapon.  Detective Moore reported that he did not comply *with all continuing proficiency training required* by the Department and  TCLEOSE standards (TAC, Title 37, Part VII, Chapter 211, Section 211.104).

- A review of departmental training requirements records shows no record of mandated annual training by Moore with the AR-15.  In fact, Moore and several other officers have not event [sic] met annual proficiency requirements (TCLEOSE) for use of their side arms.

- It is clear there are no detailed policies and procedures for the handling of weapons, and there has been inadequate weapons practice and training.  The department lacks proper documentation of weapons training and qualification. Weapons control and inventory practices are inadequate and unprofessional.  In addition, there has been no formal assignment by any officer to duties of sharpshooter, although there may be a few officers who are proficient marksmen.

(Tr. III: 500-511; P.Ex. 15: 8-10).  The City's retained expert, Robenson agreed

(P.Ex.18; Tr. II: 267-70).

The Chief also had a policy of not destroying weapons turned in to the

Department. The evidence is clear—if the gun had been destroyed when

brought into the police department by a Harlingen citizen, then it would not

have been in Detective Moore's disturbed son's hands at the time of the

shooting. Mr. LaBeau admitted this (Tr. III: 500-11).

If the gun had been destroyed as Ms. Pirtle intended, it would not have been used to kill the Border Patrol agents and seriously injure Deputy Rodriguez. To suggest that some other gun might have been used is pure speculation on the City's part - speculation on a point that is essential to the City's argument that is in the nature of an affirmative defense that a third-party was responsible for causing the event. Moreover, there is no evidence, as discussed *supra*, that there was any other gun available that would have caused this extreme level of death and destruction. Plaintiffs do not have to establish that the City's failure to destroy, assign, or store the weapon in accordance with state and local standards was the proximate cause of the killing, although it was; they need only show that it was a proximate cause. *Missouri Pac.R. Co. v. American Statesman*, 552 S.W.2d 99 (Tex. 1977).

This Court reached the same conclusion in rejecting Defendant's pre-verdict argument of "no cause," finding that this case is distinguishable from those cited by Defendant because here, the government was not only responsible for but also misused the property: "the City not only failed to destroy the AR-15, as was its duty, it misused the rifle by wrongly conferring it upon one of its officers, who in turn wrongly gave his son

access to it." The Court found that Defendant was confusing "the issue by portraying Ernest Moore's actions as the sole cause of the officers' and agents' injuries and deaths," when the Plaintiffs had sufficient evidence to show that the City's wrongful actions were also a cause. (Op. 1/4/02 at 5).

**B.**   **For Similar Reasons, The City Is Liable For Negligent And Wrongful Entrustment Of This Dangerous Assault Weapon.**

The City also argues that there was no negligent entrustment of the assault rifle. Negligent entrustment requires only that the City entrusted the rifle to a person it knew or should have known was reckless. *Schneider v. Esperanza Transmission Co.,* 744 S.W.2d 595, 595 (Tex. 1987). Here, the unrestricted entrustment of the gun to the unqualified R.D. Moore and to Ernest was certainly negligent, and Ernest's use of the gun caused the deaths and injuries to these officers. "A firearm is a deadly weapon per se, Tex. Penal Code sec. 1.07(a)(11)(A) (Vernon 1974), and under certain circumstances, the owner may be charged with responsibility for the use made of it where the control of the weapon has passed to another." *Kennedy v. Baird*, 682 S.W.2d 377, 378 (Tex. App. – El Paso 1984, no writ). This gun was unusually dangerous.

Moreover, the Chief's entrustment of the assault rifle to Detective Moore was itself negligent because the City allowed Moore to take the gun

home, and share it with his son--with no legitimate reason, need, qualification, or any accountability. This gun, which was turned in on condition of destruction, was both wrongly and negligently entrusted to R.D. Moore and to Ernest Moore, whom R.D. knew was unfit to be in possession of any firearm and could not do so lawfully.

The City's attempt to argue that the rifle was taken by Ernest Moore without permission fails. The evidence shows otherwise. Moore was allowed to take it home and carry it around under the department's outrageous and dangerous customs and practices. He showed Ernest how to fire the gun, allowed Ernest to shoot it at targets, and gave him full access to it. Detective Moore knew Ernest had Nazi paraphernalia throughout his room, and that Ernest had been committed for drug rehabilitation and had serious psychological problems. Even Chief Scheopner admitted that any police officer should be concerned about Nazi paraphernalia (Tr. II; 241). Detective Moore wrongly and negligently entrusted to his criminally disturbed son a rifle that was turned in for destruction precisely because its owner, Mrs. Pirtle, feared that it would fall into the wrong hands. It did not *fall* into the wrong hands; the City literally placed it there. As the jury and this Court found, that the gun would fall into the wrong hands, causing a

terrible result, was eminently foreseeable, and it is exactly what occurred in this case. The jury had ample support on this record to make the findings and draw the inferences that it did.

## CONCLUSION

Plaintiffs request that Defendant's Renewed Motion under Rule 50 for Judgment as Matter of Law be denied, that Plaintiffs' Motion for Judgment be entered, and that Plaintiffs receive any other relief to which they are entitled.

Respectfully submitted,

**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, TX  78701
512+474-6061
512+474-1605 (fax)

By _Broadus A. Spivey_
Broadus A. Spivey
State Bar No. 00000076
Federal I.D. No. 11146
Price Ainsworth
State Bar No. 00950300
Federal I.D. No. 8065

Richard Pena
Law Offices of Richard Pena, P.C.
Barton Oaks Plaza Two
901 MoPac, Suite 325
Austin, Texas 7746-5747
512+327-6884
512+327-8354 (fax)

**ATTORNEYS–IN-CHARGE FOR
PLAINTIFFS ARTURO G. SALINAS,
ET AL and GILBERTO M.
RODRIGUEZ, ET AL**

**LAW OFFICES OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, TX 78539
956+383-7441
956+381-0825 (Fax)

By _____

Ramon Garcia
State Bar No. 07641800
Federal I.D. No. 3936
Sonia I. Lopez
State Bar No. 24003862
Federal I.D. No. 23501

**ATTORNEYS-IN-CHARGE FOR
PLAINTIFF RAUL RODRIGUEZ**

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that a true copy of the above and foregoing document was forwarded to counsel of record for Defendant via United States mail on this 16th day of April, 2002:

    Mr. Tom Lockhart
    Mr. Jim Denison
    Mr. Roger W. Hughes
    ADAMS & GRAHAM, L.L.P.
    222 E. Van Buren, West Tower
    Harlingen, Texas 78551-1429
    ATTORNEYS-IN-CHARGE FOR
    DEFENDANT CITY OF HARLINGEN

Broadus A. Spivey