234

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUL 1 2 2002

Michael N. Milby
Clerk of Court

| | |
|---|---|
| ARTURO G. SALINAS, ET AL | { |
| | { |
| V. | {       CIVIL ACTION NO. B-98-162 |
| | { |
| CITY OF HARLINGEN | { |
| | { |
| and | { |
| | { |
| GILBERTO M. RODRIGUEZ, ET AL | { |
| | { |
| V. | {       CIVIL ACTION NO. B-98-163 |
| | { |
| CITY OF HARLINGEN | { |
| | { |
| and | { |
| | { |
| RAUL RODRIGUEZ | { |
| | { |
| V. | {       CIVIL ACTION NO. B-99-70 |
| | { |
| CITY OF HARLINGEN | { |

---

**DEFENDANT CITY OF HARLINGEN'S MOTION FOR NEW TRIAL ON
DAMAGES OR IN THE ALTERNATIVE, FOR REMITTITUR**

---

TABLE OF CONTENTS

Page

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I. Certificate of Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Status of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. The Grounds for this Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IV. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The Damage Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Raul Rodriguez's Damage Evidence . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.    Gilberto and Megan Rodriguez's Damages . . . . . . . . . . . . . . . . . . 5

    D.    Stephen and Robyn Williams' Damages . . . . . . . . . . . . . . . . . . . . . 6

    E.    Arturo and Elisa Salinas' Damages . . . . . . . . . . . . . . . . . . . . . . . . 7

V. Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.    Standard for a New Trial on Damages Alone . . . . . . . . . . . . . . . . . . 8

    B.    Standard of Review for Remittitur: the "Maximum Recovery" Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.    New Trial on Damages Alone . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    D.    Remittitur for Personal injury damages to Raul Rodriguez . . . . . . . . . . . 12

    E.    Remittitur for Wrongful Death Damages . . . . . . . . . . . . . . . . . . . . 15

        1.    Megan Rodriguez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        2.    Gilberto Rodriguez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3.    Arturo & Elisa Salinas and Stephen & Robyn Williams  . . . . . . . . 19

IV.  Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

TABLE OF AUTHORITIES

<u>Cites</u>                                                                                    <u>Page</u>

*Auster Oil & Gas, Inc. v. Stream*, 835 F.2d 597
        (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-11

*Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778
        (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 18, 19

*Channel 20, Inc. v. World Wide Towers Servs.*,
        607 F.Supp. 551 (S.D. Tex. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336
        (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17-19

*Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176
        (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S.
        494 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Gough v. Nat. Pipeline Co. of Amer.*, 996 F.2d 763
        (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

*Gutierrez v. Exxon Corp.*, 765 F.2d 399
        (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Lebron v. United States*, 279 F.3d 321 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . 10, 11

*Lucas v. American Mfg. Co.*, 630 F.2d 291
        (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Moorhead v. Mitsubishi Aircraft Itnernat'l, Inc.*,
        828 F.2d 278 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Pressey v. Patterson*, 898 F.2d 1018 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . 12-14

*Randall v. Chevron, U.S.A., Inc.*, 13 F.3d 888
        (5th Cir. 1994), *reh. denied*, 22 F.3d 568
        (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-19

*Salinas v. O'Neill,* 286 F.3d 827 (5th Cir. 2002),
    *reh. denied,* ___ F.3d ___ (2002) ................................. 10, 11

*Simeon v. T. Smith & Sons,* 852 F.2d 1421
    (5th Cir. 1988) ................................................ 12, 14

*Tamez v. City of San Marcos,* 118 F.3d, 1085
    (5th Cir 1997) ................................................ 12-14

*Thomas v. Tex. Dept. of Crim. Justice,* 2002 WL 1404709
    (5th Cir. July 1, 2002) .......................................... 10

*Transco Leasing Corp. v. United States,* 896 F.2d 1435
    (5th Cir. 1990), *reh. denied,* 905 F.2d 61 (5th Cir. 1990) ............. 15, 20

*Wells v. Dallas Indep. Sch. Dist.,* 793 S.W.2d 679
    (5th Cir. 1986) ................................................. 9, 11

*Westbrook v. General Tire and Rubber Co.,*
    754 F.2d 1233 (5th Cir. 1985) ..................................... 8, 9

*Whitehead v. Food Max of Miss., Inc.,* 163 F.3d 265
    (5th Cir. 1999), reh. denied, 205 F.3d 1338
    (5th Cir. 1999) .................................................. 9

Texas Civil Practices & Remedies Code

§ 129.001 ......................................................... 15

Federal Rules of Civil Procedure

Rule 59 ........................................................... 1

Rule 59(a) ......................................................... 1

Federal Statutes

5 U.S.C. §8336(a) ................................................. 17

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendant, **CITY OF HARLINGEN** and files this its Motion for New Trial on Damages or, in the Alternative, for Remittitur, and would show the Court as follows:

## I. Certificate of Conference

Defense counsel has conferred with counsel for all plaintiffs and this motion is opposed.

## II. Status of the Case

On June 28, 2002, the court entered a Final Judgment [dkt # 228]. On July 11, 2002, the Court entered a clarification that issued a writ of mandamus.

## III. The Grounds for this Motion

The Final Judgment as clarified apparently awarded the $35 million found by the jury. Defendant is entitled to a remittitur under Rule 59 or for a new trial on damages alone under Rule 59(a).

## IV. Factual Background

### A.     The Damage Award

The jury awarded in global findings the following damages:

| Gilberto Rodriguez: | $5,000,000 for funeral expenses, loss of support and services, loss of companionship, and mental anguish |
| Megan Rodriguez: | $10,000,000 for loss of support and services, loss of companionship, loss of instruction and guidance, mental anguish, and loss of inheritance |

1

| Stephen Williams: | $2,500,000 for funeral expenses, loss of support and services, loss of companionship, and mental anguish |
| Robyn Williams: | $2,500,000 for loss of support and services, loss of companionship, and mental anguish |
| Arturo Salinas: | $2,500,000 for funeral expenses, loss of support and services, loss of companionship, and mental anguish |
| Elisa Salinas: | $2,500,000 for loss of support and services, loss of companionship, and mental anguish |
| Raul Rodriguez: | $10,000,000 for physical pain, mental anguish, loss of earning capacity, physical impairment and disfigurement, medical care, and loss of enjoyment of life |

## B.    Raul Rodriguez's Damage Evidence

The sum of his evidence shows that, after being released from the hospital and undergoing about a few months of physical rehabilitation for his shoulder, Dep. Raul Rodriguez returned to work without any disability. He presented no evidence concerning loss of earning capacity after returning to work, pain after returning to work, or physical disability after returning to work.

He is 36 years of age, married in 1986 and divorced in 2000. 4 RR 833 (l. 2-15). He has been with the Sheriff's office since 1987. 4 RR 832 (l. 8-24).[1] His salary is about $27,000.00 a year. 4 RR 850 (l. 1-4).

---

1    "4 RR ___" = Trial Record for Feb. 22, 2002.

2

He was about 20 yards from Ernest Moore when he began firing. 4 RR 840 (l. 11-15). He felt something hit his shoulder and saw blood but continued to return fire until Ernest went down. 4 RR 840 (l. 20) - 841 (l. 10). Dep. Rodriguez thought he was dying. 4 RR 841 (l. 11) - 842 (l. 4).

The medical records show that EMS ambulance took him from the scene only minutes after the shooting and he arrived at Valley Baptist Medical Center within 20 minutes. PX-40 (EMS records, p. 3); 4 RR 842 (l. 11-25). There he felt numbness and difficulty breathing. 4 RR 842 (l. 20-25). The records show that, in the ER, it was discovered that (1) he received a wound to the hand, and (2) a shot had entered the shoulder, fractured a rib, pierced the lung, and caused bleeding in the area around the heart. DX-4, pp. 5-7; PX- 40 (VBMC 7/7/98 Admission Records, p. 0031). The hand injury was described as a "flesh wound." PX 40 (VBMC 7/7/98 Admission Records, p. 0031). Emergency surgery was done to open the chest, repair the blood vessel and stop the bleeding. PX-40. When he awoke, his whole body hurt. 4 RR 845 (l. 6-17). He was on life support until his lung function returned. 4 RR 845 (l. 21) - 846 (l. 11).

Dr. Lawler, the heart surgeon, determined that the bullet entered the left shoulder, "grooved" along the deltoid muscle, entered the chest through the 3rd rib, went through the left lung lobe, and pierced the sac around the heart ("peridcardium"), and cut the left ventricle to the heart. DX 4, pp. 8-9. Dr. Clark, an orthopedic surgeon, determined the bullet lacerated some upper muscle tissue, but there was no injury to the deeper structures or tendons or nerves in the shoulder. DX-4, p. 7; DX-5, p. 5. Dr. Clark believed the hand had been injured when Dep. Rodriguez fell. DX-5, p. 5.

3

He was released from VBMC after 8 days.    PX-40 (VBMC Admission Records 7/7/98, p. 0027).  His lungs cleared within 6 weeks.  DX-4, p. 4.  Dr. Lawler prescribed physical therapy for his left shoulder. DX-4, p. 4. Dep. Rodriguez is right handed. PX-40. By Nov. 2, 1998, the shoulder range of motion was normal and the only limitation was some stiffness in a left forefinger (which Dr. Lawler expected to disappear in 6 months); DX-4, p. 3; PX 40 (VBMC Physical Therapy Records, pp. 011, 026). Dr. Lawler returned him to work without restriction.  DX-4, p. 3.

Dep. Rodriguez returned to work on December 1, 1998.  4 RR 849 (l. 20-25).  That means he lost, at best, about 5 months wages or $11,250.00 (5/12 of $27,000.00).  His total medical expenses were $60,111.00. PX-41. Dep. Rodriguez did not describe any physical disability after this time.  He did not claim there were any physical tasks (at work or home) he could no longer perform.

Dep. Rodriguez described himself as bitter and upset at the world for being shot.  4 RR 848 (l. 9-17).  He still dreams about the shooting. 4 RR 849 (l. 15-19).  He attributes his divorce to his wife not being able to tolerate his attitude.  4 RR 847 (l. 15-22).

In final argument, Rodriguez's counsel urged the jury that $5 million was the appropriate amount for his injuries. 5 RR 910.[2]

---

2      "5 RR ___" = Trial Record of Feb. 25, 2002.

### C.    Gilberto and Megan Rodriguez's Damages

Agent Susan Rodriguez was 29 years old at the time of her death, with a life expectancy of 51 more years. PX 27, 32. She was a college graduate and began with the Border Patrol in 1993. 4 RR 800 (l. 18). She was a GS-9 and her gross earnings at that time were about $45,000.00 a year. 4 RR 731 (l. 23) - 732 (l. 5); PX-33. Her supervisor felt she was outstanding, close to being a senior agent. 4 RR 724 (l. 5), 732 (l. 9-12). She was in line for promotions that might increase her salary by $10-20,000.00. 4 RR 732 (l. 9-20). There was no evidence presented concerning her savings habits or how much she had accumulated in savings.

Her daughter, Megan, was born June 10, 1996, and barely two at the time. 4 RR 814 (l. 16-20). Susan Rodriguez was described as a devoted mother. 4 RR 798 (l. 12-15). However, she performed the "balancing act" between a full-time career and motherhood. 4 RR 725 (l. 3-10). The death was terrible for Megan and she misses her mother. 4 RR 802 (l. 13-15), 825 (l. 16-22). Megan does not know what happened to her mother; the family has been careful not to tell and has told only how happy her mother was. 4 RR 826 (l. 2) - 827 (l. 19). There is no claim that Megan has been treated by or in need of treatment by a counselor or psychiatrist for anxiety, grief or any other emotional condition caused by her mother's death.

Gilberto Rodriguez met his wife in 1993 and they married in 1995. 4 RR 813-14. Both had full time jobs with the Border Patrol; he is now with the INS. 4 RR 811-13, 815, 823.

On the day of the shooting, he heard of the incident over the radio. 4 RR 817 (1. 1-25). He rushed to the hospital only to find her motionless in the hospital bed. 4 RR 817 (1. 19-25).

He describes his feelings about her death as bitterness and frustration. 4 RR 819 (1. 13-25). He lost his life's companion. 4 RR 825 (1. 9-12). He feels unable to function as a mother to Megan. 4 RR 825 (1. 6-15). He now lives in Austin, Texas, near his sister who can help fill that role in Megan's life. 4 RR 816 (1. 5-16).

### D.    Stephen and Robyn Williams' Damages

Mr. Williams was a retired Border Patrol agent since 1995. 4 RR 804. There was no evidence that Susan provided her parents with monetary support, or that she ever counseled her parents on any subject. There was no evidence concerning the number of times they visited with Susan other than a visit on Megan's second birthday. 4 RR 810, 814.

After Susan's death, Mr. and Mrs. Williams were "devastated." 4 RR 823 (1. 1-6). Mrs. Williams visited doctors and her priest. 4 RR 809 (1. 12) - 810 (1. 8).

Mr. Williams initially felt grief over Susan's death. 4 RR 804 (1. 21-25). Now he feels frustration over how the government investigated the shooting. 4 RR 806 (1. 13) - 807 (1. 6). He sometimes feels that he doesn't want to get over it. 4 RR 809 (1. 15-21).

### E.    Arturo and Elisa Salinas' Damages

Agent Salinas was 23 years old and unmarried.[3] 4 RR 780; PX-27, 28.  His pay was about $30,000.00 plus overtime.  4 RR 734; PX 29.  His superiors described him as particularly talented in arresting illegal aliens.  4 RR 726.

His father, Arturo Salinas, was retired from the Air Force; the family were long time San Antonio residents.  4 RR 777.  His family was described as close; he called his mother weekly.  4 RR 780 (l. 16-25), 788 (l. 4-10).  However, there was no evidence that he provided his parents with financial support or counseled them on any subject.

He was close to his mother, Elisa, and often told her everything he was doing.  4 RR 796 (l. 22) - 797 (l. 9).  After his death, she cried at nights, though she was described normally as reserved.  4 RR 785 (l. 21) - 786 (l. 2).  At holidays it was particularly hard for her.  4 RR 796 (l. 12-21).

His father, Arturo Salinas, described himself now as angry and frustrated.  4 RR 786 (l. 8-16).

---

3    He was apparently engaged to be married shortly.  4 RR 780.

## V. Argument and Authorities

The court has already overruled the City's motions concerning the liability findings, but has not yet had the opportunity to address the damage award. By seeking a new trial only on damages, the City does not concede the liability findings and will continue to dispute them on appeal.

The damage awards are excessive under the current federal case law. The awards for Dep. Rodriguez and Megan Rodriguez vastly exceed the maximum recovery sanctioned in similar cases. The other awards substantially exceed the maximum recovery awarded for the death of a spouse or an adult child. Because so much of each award is beyond the maximum recovery, the verdict was the result of passion or prejudice; a new trial on damages is warranted. Alternatively, the court should remit the damages.

### A.   Standard for a New Trial on Damages Alone

A new trial on only one particular issue is appropriate if "it clearly appears that the issue to be retried is so distinct and separate from the others that a trial of it alone may be without injustice." *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 499 (1931); *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233, 1242 (5th Cir. 1985). Courts have found issues of liability and damages to be intertwined where the issue is one of contract and the resolution of factual disputes regarding contractual terms is intertwined with the assessment of damages, or where it appears that the jury reached a compromise verdict. *See Westbrook*, 754 F.2d at 1242 (stating this analysis, *citing Gasoline Prods.*, 283 U.S. at 499) (contract) and *Lucas v. American Mfg. Co.*, 630 F.2d 291, 294 (5th Cir. 1980) (compromise verdict)). This is not a contract case, and the high damages award indicates

8

the jury's strong belief regarding the liability issues and that the verdict was not a compromise. *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 278-79 (5th Cir. 1999), *reh. denied*, 205 F.3d 1338 (5th Cir. 1999); *Westbrook*, 754 F.2d at 1242.

A jury's assessment of damages may be excessive even though it reaches an acceptable verdict on liability. *Westbrook*, 754 F.2d at 1242. As a general rule, error with respect to damages should require a new trial on damages only. *Channel 20, Inc. v. World Wide Towers Servs.*, 607 F.Supp. 551, 559 (S.D. Tex. 1985). Once liability is established, a new trial on damages only is proper. *Westbrook*, 754 F.2d at 1242. In this case there is no reason why a new trial on damages should also mean a new trial on liability.

Where the jury's excessive award results from passion and prejudice the proper remedy is not remittitur but a new trial. *Whitehead*, 163 F.3d at 275 (5th Cir. 1998); *Auster Oil & Gas, Inc. v. Stream*, 835 F.2d 597, 603-04 (5th Cir. 1988). In some cases, the sheer excessiveness of the award indicates the award was motivated by passion and prejudice which is not cured by even substantial remittitur. In *Wells v. Dallas Indep. Sch. Dist.*, 793 S.W.2d 679, 684 (5th Cir. 1986) a school administrator deprived of his pre-termination due process rights was awarded $1.9 million, which the district court judge reduced to $250,000. The appellate court determined that the $1.9 million was so excessive that it had to be motivated by passion and prejudice, and that the size of the remittitur indicated the final judgment was "not in any way a product of the jury. It was the judge's verdict." The court therefore ordered a new trial.

In *Auster*, the jury awarded punitive damages of $5,000,000, but the district court reduced it to $650,000.00. The Fifth Circuit ordered a new trial on damages because it was

9

"left with the inescapable conclusion that the jury was motivated by passion and prejudice in their award" and a $4.35 remittitur did not cure it. *Auster*, 835 F.2d at 603-04.

**B.    Standard of Review for Remittitur: the "Maximum Recovery" Analysis**

The jury's verdict is entitled to great deference; it will not be overturned unless there is a clear showing that it is excessive or the jury was influenced by passion or prejudice. *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995). The sky is not the limit for non-economic damages, even in death cases. *Eiland*, 58 F.3d at 183; *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983). The court may then condition the denial of a motion for new trial upon plaintiffs filing a remittitur of a respecified amount; if the plaintiff declines to remit the amount specified, a new trial results. Charles Wright, Arthur Miller & Mary Kane, FED. PRAC. & PROC., § 2815, p. 160 (1995).

Courts evaluate the excessiveness of damages under a doctrine that has come to be known as the "maximum recovery rule." *Salinas v. O'Neill*, 286 F.3d 827, 830 (5th Cir. 2002), *reh. denied*, ___ F.3d ___ (2002); *Thomas v. Tex. Dept. of Crim. Justice*, 2002 WL 1404709, *6 (5th Cir. July 1, 2002). Central to this analysis is a comparison to awards in other cases for similar injuries, limiting the comparison to cases in the "relevant jurisdiction." *Salinas*, 286 F.3d at 831; *Thomas*, 2002 WL 1404709, *5. For federal cases, the "relevant jurisdiction" are federal cases decided within the Fifth Circuit. *Salinas*, 286 F.3d at 831. In conducting this review, the court should limit itself to published decisions. *Lebron v. United States*, 279 F.3d 321, 326 -27 (5th Cir. 2002). Where there is no published opinion from the trial court and the published appellate opinion fails to distinguish between the different components of the damages award, those cases should not be considered in the

"maximum recovery" analysis. *Id.* at 326 n.5. To avoid substituting its opinion for that of the jury, the court may permit an award to exceed previous awards in factually similar cases by a maximum of 50%. *Salinas*, 286 F.3d at 831, n.6.

In this case, the plaintiffs submitted liability theories arising under both federal and Texas state law. However, as the court stated, if the award were under state law, the Texas Tort Claims Act would limit all plaintiffs to a proportionate share of $500,000.00; that would render remittitur on damages for state law claims moot. The remittitur is needed only for the damages under federal law. Therefore, it is appropriate for the "maximum recovery" analysis to consider only federal law cases in the Fifth Circuit. *See, e.g. Salinas*, 286 F.3d at 831 (comparing to 5th Circuit cases where federal law controlled).

## C.    New Trial on Damages Alone

A new trial is warranted for two reasons. First, when the size of the necessary remittitur is so large, that is proof jury bias; the judgment after remittitur is no longer based on the verdict. *Wells*, 793 F.2d at 684; *Auster*, 835 F.2d at 603-4. Here, the necessary remittitur for Dep. Rodriguez and Megan Rodriguez would be at least 90% of the verdict. For the other Plaintiffs, the remittitur would be 60-80% of the verdict. When the verdict is excessive by a factor of seven, it is inherently suspect and a new trial (rather than remittitur) is the remedy. *Auster*, 835 F.2d at 602.

Second, the record supports the excessive award resulted from bias and prejudice. Plaintiffs openly complained of their bitterness over a "cover up" going all the way from Harlingen to Attorney General Janet Reno. They asked the jury to use its limited power to award damages to signal public support as the only means that could alleviate their

bitterness. 4 RR 773(l. 6-20), 784(l. 6)-785(l. 14), 806 (l. 13-25), 805(l. 22)-806(l. 5), 821(l. 13)-822(l. 1). The message was clear, that only great damages would communicate the public sympathy necessary to alleviate their suffering.

Moreover, Plaintiffs' arguments were carefully structured to play on animosity towards Ernest Moore's alleged "neo-Nazi" beliefs and to insinuate that the shooting at the Moore residence was racially motivated. The evidence was overwhelming, if not conclusive, that Ernest Moore opened fired in order to commit "suicide-by-cop" and that he could not have known the identity or race of those he shot. Nonetheless, Ernest Moore's alleged "neo-Nazi" beliefs were brought up repeatedly in questioning and in argument. See, e.g., 5 RR 896 (l. 17-24). The inflammatory nature of such allegations is such that evidence does not disprove or dispel the prejudice they incite.

In conclusion, a new trial on damages alone is warranted.

### D.    Remittitur for Personal injury damages to Raul Rodriguez

The award of $10 million to Raul Rodriguez for his injuries was also excessive in light of the previous awards in factually similar or even more severe cases. *Pressey v. Patterson*, 898 F.2d 1018, 1024-25 (5th Cir. 1990)(§1983 case concerning gunshot to head; $2 million dollar award for non-economic loss upheld); *Tamez v. City of San Marcos*, 118 F.3d, 1085, 1089 (5th Cir 1997)(§ 1983 case, noting jury verdict of $75,000.00 for gunshots to leg and arm); *Gough v. Nat. Pipeline Co. of Amer.*, 996 F.2d 763, 767-68 (5th Cir. 1993)(maritime case for severe burns; $2 million verdict reduced to $600,000.00 for non-economic loss and $560,000.00 for economic loss); *Simeon v. T. Smith & Sons*, 852 F.2d

1421, 1425, 1427 (5th Cir. 1988)(maritime case by deckhand whose foot was nearly severed; verdict of $1.25 million for pain and suffering reduced to $600,000.00).

Raul Rodriguez incurred medical bills of just over $60,000; his injuries prevented him from working for five months, which, at an annual salary of $27,000, would mean $11,250 in lost wages. There was no evidence of any lingering physical impairment, disability or loss of earning capacity. Therefore, all but approximately $73,000 of Raul Rodriguez's damages must be attributed to physical pain, mental anguish, disfigurement, and loss of enjoyment of life. The remaining award of $9,927,000 (attributable only to physical pain, mental anguish, and loss of enjoyment of life) is excessive.

In *Pressey*, the victim was shot in the head without warning. 898 F.2d at 1020. A $2 million award was upheld, but Pressey's injuries were more severe and permanent. At the time of trial he continued to suffer headaches, neck pain, and painful seizures, unlike Raul Rodriguez who had no lingering physical complaints. 898 F.2d at 1024-25. Because Pressey continued to experience physical pain, Pressey's award for past physical pain ($750,000) is much higher than what Raul Rodriguez is entitled to. Pressey also suffered memory loss, impaired judgment, a drastic reduction in his IQ, difficulty controlling the left side of his body. Part of his skull and brain were destroyed. These factors should mean that Pressey's award for physical impairment, mental anguish, and disfigurement ($1.5 million) should be greater than that awarded to Raul Rodriguez. Yet for all these types of damages for which Pressey received a total of $2,250,000, Raul Rodriguez received $9,925,000.

In *Tamez*, Tamez was shot in the arm and the leg by a police firearm and hospitalized for treatment. 118 F.3d at 1088. Raul Rodriguez was shot in the hand and the arm, also by

a police firearm and he was also hospitalized. Tamez, however, was awarded only $75,000 in damages, while Raul Rodriguez received $10,000,000. *Id.* at 1089. *Tamez* is not very explicit regarding the extent of Tamez's injuries. Nevertheless, the difference in awards for the two cases involving gunshot wounds is remarkable.

In *Gough,* plaintiff was severely burned in a boat-gas pipeline collision; he spent 2 days in the hospital for burns and three years in counseling for post-traumatic stress disorder. 996 F.2d at 764. His treatment was ongoing at the time of trial. The Fifth Circuit determined that $600,000.00 was the maximum reasonable amount for non-economic loss and reduced the $1.4 million attributable to non-economic loss to that amount. *Id.* at 767-68.

In *Simeon,* a deckhand's foot was nearly severed by a mooring line. 852 F.2d at 1424. He was hospitalized for two months, suffered permanent pain and disability in that leg, and became depressed. *Id.* The 5th Circuit granted a remittitur on $1.25 million for pain and suffering to $600,000.00.

Here, Dep. Rodriguez's injuries are less severe that those in *Pressey, Gough,* and *Simeon.* Although his injury initially was severe and life-threatening, he has made an excellent physical recovery, with no continuing pain or disability. Defendant suggests that the maximum reasonable recovery (aside from his medical bills and lost wages) is $400,000.00; the Court should remit his recovery to that amount, plus medical bills and lost wages.

14

### E.    Remittitur for Wrongful Death Damages

#### 1.    Megan Rodriguez

The jury awarded $10 million for loss of support and services, loss of companionship, loss of instruction and guidance, mental anguish, and loss of inheritance. There was no evidence of loss of inheritance and the evidence would not support more than some portion of Susan Rodriguez projected salary through Megan's eighteenth birthday. Thus, at least $9.5 million of the award is for mental anguish and loss of consortium.

Susan Rodriguez had a yearly salary of about $45,000.00. Although her supervisor stated she was "in line" for promotions, no specific dates were projected and only a possible range of increases was given. This is insufficient to award loss of support based on increases in salary. *Compare, Transco Leasing Corp. v. United States,* 896 F.2d 1435, 1454 (5th Cir. 1990), *reh. denied,* 905 F.2d 61 (5th Cir. 1990). Megan would become an adult at age 18. TEX. CIV. PRAC. & REM. CODE, § 129.001. At $45,000.00 a year, Susan Rodriguez would have earned $720,000.00 by Megan's 18th birthday; this does not take into account taxes or discounting to present value. Assuming she devoted half her gross income to supporting Megan, the award for lost support would be $360,000.00. Discounted to present value, the sum could be no more than $300,000.00.

"Loss of inheritance" depends on proof that Susan Rodriguez would have enhanced her estate by saving some of her earnings or by prudent investments and that, in reasonable probability, she would have left that amount to Megan upon her natural death. *Douglass v. Delta Air Lines, Inc.,* 897 F.2d 1336, 1340 (5th Cir. 1990). Assuming the jury awarded Megan and her father the full value of Susan Rodriguez's lifetime earnings, they received

the full value of what she could have saved from her salary. *Compare, Moorhead v. Mitsubishi Aircraft Itnernat'l, Inc.,* 828 F.2d 278, 291 (5th Cir. 1987). There being no evidence of Susan Rodriguez's savings or savings habits, there was no evidence of what amount, if any, she would have added to her estate, apart from her earnings, through investment (much less how much would be left to Megan rather than her husband).

Assuming the jury ignored the instruction to discount pecuniary loss to present value, the most the jury could have awarded Megan for loss of support was between $360-720,000.00. This means the jury awarded her $9.28-9.64 million for loss of society and mental anguish.

Against the tragic loss to Megan one must weigh that she was barely two years old at the time of the shooting. Apparently she had no memory of the events as her father admits that she does not know the details and he is not sure how to tell her. Consequently, she has been spared the emotional trauma that an older child would have suffered due to knowing her mother and understanding the events and her loss. In light of the evidence and her circumstances, the award of over $9.2 million for loss of society and companionship, etc., is excessive.

Dr. Silverman's testimony does not support this award. She is a behavioral research scientist, who studies the reaction of people in general to stimuli. 4 RR 739 (l. 23-25), 746 (l. 11-15). She is not a counselor. 4 RR 746 (l. 9-10). She described only in general terms the ability of children at various ages to understand and cope with a death. 4 RR 767(l. 11)-769(l. 3), 770(l. 16)-771(l. 16). She did not and could not describe Megan's emotion reactions. A child of two does not understand death and understands only that the parent is

not there at that time. 4 RR 767(l. 11-19). The participation of a child of two in the grieving process is "academic." 4 RR 770(l. 21-23). Dr. Silverman described only the feelings that Megan "may have" during her childhood. 4 RR 796(l. 1-3). No family member provided any specific corroboration.

Compare, Randall v. Chevron, U.S.A., Inc., 13 F.3d 888, 902 (5th Cir. 1994), reh. denied, 22 F.3d 568 (5th Cir. 1994)(upholding award of $150,000.00 to minor daughter for loss of society damages in maritime death case); Douglass, 897 F.2d at 1344 (in diversity air crash death case, $470,000.00 mental anguish/loss of society damages for 5 year old child upheld).[4] An amount over $9.2 million is plainly excessive. If Douglass is used as the yardstick, the maximum possible for loss of society, mental anguish, etc., would be almost $700,000.00. Defendant urges that, on the evidence in this case, any amount over $500,000.00 would be excessive.

Therefore, Defendant requests a remittitur to $800,000.00 ($500,000.00 mental anguish/loss of society, etc., and $300,000.00 loss of support discounted).

### 2.    Gilberto Rodriguez

Loss of support damages must be calculated based on his wife's $45,000.00 a year salary. See supra, pp. 13-14. She would be eligible to retire at age 55 because by that age she would have 30 years in service. 5 U.S.C. §8336(a). The most possible would be 26 years of her salary (26 x $45,000 = $1.17 million), less the support from her earnings the jury awarded Megan (at best $360,000.00). Failure to deduct the support awarded Megan

---

4    Douglass was a diversity case; the court surveyed damage awards from both federal and state courts. Because the "maximum recovery" was influenced by state court decisions, Douglass may not be controlling in cases arising from federal claims.

would give them a double recovery because the lost support came from the same salary. If the jury ignored the instruction to discount future lost support to present value, the most the jury could have awarded Gilberto Rodriguez for lost support was $ 810,000.00. If it were discounted, it could be no more than $600,000.00.

This means the jury awarded about $ 4.2-4.4 million for lost society, mental anguish, etc. This is excessive in light of all the evidence.

Dr. Silverman's testimony does not justify the award. The acute sadness (i.e., mental anguish) suffered by the deceased's spouse lasts 6 months to two years. 4 RR 764(l. 1-18). This is accentuated at holidays and anniversaries, but will be less intense with time. 4 RR 765(l. 9-19). The loss of companionship would go on for a long period of time, but the spouse will eventually get control over it. 4 RR 772(l. 13-20). The loss is permanent but adapting to that loss becomes part of one's character in order to face the future. 4 RR 754(l.21)-755(l. 23), 772(l. 9)-773(l. 5). Dr. Silverman's testimony concerned general observations about the general grieving process; she did not specifically describe Gilbert Rodriguez's reaction or progress.

*Compare, Douglass,* 895 F.2d at 1343 (in diversity air crash death case, $500,000.00 for mental anguish and $500,000.00 for loss of society damages for death of wife held not excessive); *Randall,* 13 F.3d at 904 (in maritime death case, $300,000.00 loss of society for death of spouse upheld); *Caldarera,* 705 F.2d 778, 785 (5th Cir. 1983)(in diversity air crash case, $250,000.00 was the maximum amount that could be affirmed for loss of society and

mental anguish for death of wife).[5] Assuming arguendo *Douglass* is a suitable benchmark, the maximum possible would be $1 million; otherwise, *Randall* and *Caldarera* would support at best $600,000.00.

Defendant urges the $5 million verdict should be remitted to $1,210,222.00 ($600,000.00 for mental anguish/loss of society, $600,000.00 for loss of support, and $10,222.00 for funeral expenses [PX 34].

### 3.    Arturo & Elisa Salinas and Stephen & Robyn Williams

The jury awarded each of the parents $2.5 million for loss of support, loss of society, and mental anguish; the award to Arturo Salinas included funeral expenses, which are undisputed.[6]

There was no evidence to support loss of support damages. There was no evidence that Agents Susan Rodriguez or Ricardo Salinas provided financial support or guidance to either parent. Consequently the entire $2.5 million for each must be for mental anguish or loss of society. Under the evidence, this amount is excessive.

Defendant has been unable to locate a 5th Circuit case concerning excessive damages for the death of an adult child based on a federal claim. Comparison to diversity decisions in the Fifth Circuit suggests the maximum that would be approved is in the range of $250-500,000.00. *See, e.g., Gutierrez v. Exxon Corp.,* 765 F.2d 399, 403 (5th Cir. 1985)(in diversity case from Texas, $1 million joint award to both parents for loss of society and

---

5    *Caldarera* was diversity case and therefore is not exactly comparable. However, the court there surveyed federal cases from several states. 705 F.2d at 785, n.23.

6    PX- 30, $4,455.00.

mental anguish due to death of adult child was not excessive); *compare, Transco Leasing Corp.,* 896 F.2d 1453 (in diversity case for death of minor child, noting that $500,000.00 award was double the highest amount it had approved and reducing award to $250,000.00). Defendant urges that the highest amount based on the evidence would be $500,000.00 to each parent (plus $4,455.00 funeral expenses to Mr. Salinas).

### IV. Conclusion

The court should grant a new trial on damages as to some or all of Plaintiffs' damages. Alternatively, the court should order Plaintiffs to remit a portion of the damages awarded in the amounts suggested above in order to avoid a new trial.

Respectfully submitted,

By: _____
ROGER W. HUGHES
Admissions ID No. 5950
Texas State Bar No. 10229500
TOM LOCKHART
Admissions ID No. 2257
Texas State Bar No. 12473500
**ADAMS & GRAHAM, L.L.P.**
P.O. Drawer 1429
Harlingen, Texas 78551-1429
956/428-7495; FAX: 956/428-2954

Attorney-in-Charge for Defendant, CITY OF HARLINGEN, TEXAS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document was forwarded on this 12 day of July, 2002, to the following counsel of record and interested parties:

Attorneys of record for Plaintiffs, GILBERTO M. RODRIGUEZ, et al and

ARTURO GUILLERMO SALINAS, et al:

    Mr. Broadus A. Spivey          CMRRR #7001 2510 0004 2061 2702
    Mr. Price Ainsworth
    **SPIVEY & AINSWORTH, P.C.**
    48 East Avenue
    Austin, Texas  78701-4320

Attorney of record for Plaintiff, RAUL RODRIGUEZ:

    Mr. Ramon Garcia           CMRRR #7001 2510 0004 2061 2696
    Ms. Sonia Lopez
    **LAW OFFICES OF RAMON GARCIA, P.C.**
    222 West University Drive
    Edinburg, Texas  78539

ROGER W. HUGHES