United States District Court
Southern District of Texas
FILED

AUG 0 1 2002

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **ARTURO G. SALINAS, ET AL** | § | **CIVIL ACTION NO. B-98-162** |
| | § | |
| **Vs.** | § | |
| | § | |
| **CITY OF HARLINGEN, TEXAS;** | § | |
| | § | |
| **And** | § | |
| | § | |
| **GILBERTO M. RODRIGUEZ, ET AL** | § | |
| | § | |
| **Vs.** | § | **CIVIL ACTION NO. B-98-163** |
| | § | **(Consolidated with B-98-162)** |
| **CITY OF HARLINGEN, TEXAS;** | § | |
| | § | |
| **And** | § | |
| | § | |
| **RAUL RODRIGUEZ** | § | |
| | § | |
| **Vs.** | § | **CIVIL ACTION NO. B-99-70** |
| | § | **(Consolidated with B-98-162)** |
| **CITY OF HARLINGEN, TEXAS.** | § | |

## PLAINTIFFS GILBERTO M. RODRIGUEZ, ET AL AND ARTURO G. SALINAS, ET AL'S RESPONSE TO DEFENDANT CITY OF HARLINGEN'S MOTION FOR NEW TRIAL ON DAMAGES OR IN THE ALTERNATIVE, FOR REMITTITUR AND MEMORANDUM IN SUPPORT THEREOF

Plaintiffs Gilberto M. Rodriguez, individually and on Behalf of his minor Daughter, Megan Suzanne Rodriguez and the Estate of his Wife Susan Lynn Rodriguez, deceased; Stephen L. Williams and Robyn S. Williams, Surviving Parents of Susan Lynn Rodriguez, deceased; and Arturo Guillermo Salinas and Elisa Herrera Salinas, individually and on Behalf of the Estate of their Son Ricardo Guillermo Salinas, deceased, file this response to the Defendant City of Harlingen's Motion for New Trial on Damages, or in the Alternative, for Remittitur and Memorandum in Support thereof.

## I. NATURE AND STAGE OF THE PROCEEDINGS

On July 12, 2002, Defendant City of Harlingen filed its Motion for New Trial on Damages, or in the Alternative, for Remittitur ("Motion"). Defendant seeks a new trial on damages by arguing that the damage awards are excessive under the current federal case law and the verdict was the result of passion or prejudice. (Motion at p. 8). Defendant's argument is without merit and the motion should be denied.

## II.    ARUGMENT AND AUTHORITIES

The City's request for new trial or remittitur on damages seeks to nullify the jury's verdict and further evidences the City's callous disregard for the lives and livelihood of the border patrol agents and deputy sheriff brutally assaulted and murdered or seriously injured through the City's conduct. Susan Rodriguez and Ricardo Salinas were not accident victims. Rather, they were law enforcement officers rendered helpless by the City's wrongful acts which allowed a powerful assault rifle to be placed into Ernest Moore's hands. The City again seeks to escape liability and responsibility for the murders of these law enforcement officers; this time by trying to reduce the Plaintiffs' damages to a mere fraction of what the jury determined should be appropriate compensation. Unlike the common accident scenario, these victims suffered brutality at the hands of a police officer's son, at a police officer's home, and the murder weapon was placed in his hands by a City police officer through the unacceptable, wrongful and negligent practices of the City. All of these aggravating facts complicate the grief and damages suffered by those who survived this brutality and are faced with putting the pieces of their fractured lives back together. The Defendant should not be allowed to escape such liability and responsibility by obtaining a new trial or remittitur.

**A.    The Jury's Awards to Gilberto and Megan Rodriguez, Stephen and Robyn Williams, and Arturo and Elisa Salinas are Not Excessive.**

**1.    Defendant Incorrectly Limits "Relevant Jurisdiction" for Application of "Maximum Recovery Rule" to the Fifth Circuit Cases.**

Based on the "maximum recovery rule" under *Salinas v. O'Neil*, 286 F.3d 827, 830 (5th Cir. 2002), *reh. denied*, ___ F.3d___ (2002) and *Thomas v. Tex. Dept. of Crim. Justice*, 2002 WL 1404709, *6 (5th Cir. July 1, 2002), Defendant argues that the damages, which the jury awarded to Gilberto and Megan Rodriguez, Stephen and Robyn Williams, and Arturo and Elisa Salinas, are excessive. (Motion at p. 10)  In making the argument, Defendant incorrectly asserts that "[f]or federal cases, the 'relevant jurisdiction' are federal cases decided within the Fifth Circuit. *Salinas*, 286 F.3d at 831." (Motion at p. 10)  The holding of *Salinas* was more limited.  *Salinas* held that "[t]he 'relevant jurisdiction for federal discrimination law can only mean cases decided by this court."  The holding of *Salinas* is limited to race discrimination and retaliations action under Title VII.

**2.    "Relevant Jurisdiction" for Application of "Maximum Recovery Rule" to the Civil Rights Cases Includes Texas State Cases**

These consolidated cases are civil rights actions under 42 U.S.C. § 1983.  42 U.S.C. § 1988 authorizes federal courts to extend the common law as modified by constitution and statutes of states wherein it sits when federal statutes for protection of civil rights do not provide suitable remedies.

The Fifth Circuit has followed § 1988 in civil rights cases, holding that federal courts should use that combination of federal law, common law and state law to facilitate and not to hinder proceedings in vindication of civil rights. *Brown v. City of Meridian*, 356 F.2d 602, 605 (5th Cir. 1966); *See, also, Lefton v. City of Hattiesburg, Miss.*, 333 F.2d 280, 284 (5th Cir. 1964). In *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 172 (5th Cir. 1985), the Fifth Circuit held that in 42 U.S.C. § 1983 action, the state law governed damages recoverable for the death of an

innocent victim, whom city police officers mistook for a fugitive and killed. Therefore, in applying the "maximum recovery rule" to civil rights actions, the "relevant jurisdiction" refers to not only federal cases but also to state cases in the pertinent jurisdiction.

### 3. The Jury's Awards to Gilberto and Megan Rodriguez, Stephen and Robyn Williams, and Arturo and Elisa Salinas are Allowed under "Maximum Recovery Rule."

Because the law described above was incorrectly interpreted, the Defendant failed to fulfill its ethical obligation to cite state cases for comparison. In *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1344 (5th Cir. 1990), the court held:

> Delta dismisses its obligation to cite all relevant authority, including adverse case law, under the theory that *Larsen* [*Larsen v. Delta Air Lines, Inc.*, 692 F.Supp. 714 (S.D.Tex. 1988)] was never appealed to the Fifth Circuit. That is, until awards are reviewed by the courts of appeal, they are legally insignificant for purposes of the maximum recovery rule. We dismiss this argument as frivolous and reaffirm the ethical obligation that all relevant state wrongful-death cases, and all such federal cases turning upon state substantive law, must be presented to the reviewing court where an award is challenged for excessiveness. [FN16] Awards imposed by district courts do not, as Delta suggest, serve as precedent only upon review.
>
> > FN16.    *See* Texas Code of Professional Responsibility, Ethical Consideration 7-23 ("Where a lawyer knows of legal authority in the controlling jurisdiction directly adverse to the position of his client, he should inform the tribunal of its existence unless his adversary has done so."). In other words, Delta's attorneys should have known better.

Had the Defendant's attorneys fulfilled their obligation, the Defendant would not have argued that the jury's awards to Gilberto and Megan Rodriguez, Stephen and Robyn Williams, and Arturo and Elisa Salinas are excessive because the awards are within the maximum amount of recovery allowed under the "maximum recovery rule." The operation of the rule is described in *Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002):

> "[W]e apply the loosely defined 'maximum recovery rule' when deciding whether a remittitur is in order. This judge-made rule essentially provides that we will decline to reduce damages where the amount awarded is not disproportionate to at least *one factually similar* case from the relevant jurisdiction." *Douglass*, 897 F.2d at 1344 (emphasis in original). [FN3]  The rule applies regardless of whether

4

the award was made by a jury. *Id. at* 1337, 1339 n. 3, 1344. The rule "does not necessarily limit an award to the highest amount previously recognized in the state;" indeed, the rule "does not become operative unless the award exceeds 133% of the highest previous recovery in the [relevant jurisdiction]" for a factually similar case. *Id.* at 1344 n. 14. Because the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited "if unique facts are present that are not reflected within the controlling caselaw." *Id.* at 1339. *See Wheat v. United States*, 860 F.2d 1256, 1260 (5th Cir. 1988); *Wakefield v. United States*, 765 F.2d 55, 59-60 (5th Cir. 1985).

The Fifth Circuit has increased the multiplier from 33% to 50% in *Salinas*, 286 F.3d at 831, n. 6. In other words, the "maximum recovery rule" does not become operative unless the award exceeds 150% of the highest previous recovery in the relevant jurisdiction for a factually similar case.

### a.    Megan Rodriguez

The jury awarded Megan Suzanne Rodriguez damages totaling $10,000,000 for loss of support and services; loss of companionship, instruction and guidance; mental anguish; and loss of inheritance. See Question 3.B of Final Jury Instructions.

While this figure is substantial, the jury award is not "entirely disproportionate to the injury sustained", nor is it so large as to "shock the judicial conscience," "so gross or inordinately large as to be contrary to right reason," so exaggerated as to indicate "bias, passion, prejudice, corruption, or other improper motive," or as "clearly exceed[ing] that amount that any reasonable man could feel the claimant is entitled to." *Caldarera*, 705 F.2d at 784. A young child lost her mother.

In *Atchison, Topeka, and Santa Fe Railway Co. v. Cruz*, 9 S.W.3d 173 (Tex. App.--El Paso 1999), three surviving children, whose parents and sibling were killed when their vehicle was struck by a train, brought a wrongful death suit against the railroad company and the engineer. After finding that the railroad's negligence proximately caused the accident, the jury

awarded the three children $14,147,000 for compensatory award of damages for pecuniary loss, loss of capacity, loss of society and companionship, and mental anguish.

The court in *Atchison* noted that "the awards in this case were large, but the plaintiffs here were all children at the time the cornerstone of their family was taken from them." *Cruz*, 9 S.W.3d at 184. Both the jury and the court made special note of the ages of the children in the calculation of damages.

Eddie Gutierrez (17 years old):
    Loss of companionship and society of Father:    $850,000
    Mental Anguish for the death of his Father:    $850,000
    Loss of companionship and society of Mother:    $850,000
    Mental Anguish for the death of his Mother:    $850,000

April Gutierrez (12 years old):
    Loss of companionship and society of Father:    $1,051,000
    Mental Anguish for the death of his Father:    $1,051,000
    Loss of companionship and society of Mother:    $1,260,000
    Mental Anguish for the death of his Mother:    $1,260,000

Jason Gutierrez (7 years old):
    Loss of companionship and society of Father:    $1,250,000
    Mental Anguish for the death of his Father:    $1,625,000
    Loss of companionship and society of Mother:    $1,500,000
    Mental Anguish for the death of his Mother:    $1,750,000

*Cruz*, 9 S.W.3d at 185. Here, the awards were larger for the younger Gutierrez children, reflecting the fact that they had lost their parents for a greater portion of their childhood; time which almost certainly would have been spent under the care of their parents. *Id.* at 185. By applying the logic set out in *Cruz*, one would expect Megan, who was 2 years old at the time that her mother was murdered, to receive an award larger than the amount awarded to the youngest of the Gutierrez children. Based on Jason Gutierrez's recovery and 50% multiplier in *Salinas*, 286 F.3d at 831, n 6, Megan's recovery of her loss of companionship and society and mental anguish resulting from her mother's death should be, at least, in the amount of $4,875,000.00 [($1,500,000.00 + $1,750,000.00) x 150% = $4,875,000.00].

6

Although the damages awarded to Megan exceed those in *Cruz*, they should exceed that. Megan's recovery awarded by the jury is not excessive because Megan was 5 years younger than Jason and has sought two additional elements of damages of loss of support and services and instruction and guidance, which were not shown in *Cruz, Id.*   As the Court Noted in *Lebron*, "because the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited 'if unique facts are presented that are not reflected within the controlling case law.'" *Lebron*, 279 F.3d at 326 (citing to *Douglass*, 895 F.2d at 1339). Damages of loss of support and services and instruction and guidance are speculative and imprecise and are therefore best left to the jury's common sense and sound discretion.   *Cruz*, 9 S.W.3d at 180.   The jury was entitled to consider the original facts of these consolidated cases and rendered their verdict accordingly.

Megan was 2 years old when her mother, Susan Rodriguez, died.  4 RR 814 (ll. 21-23). Gilberto says Susan was a full-time mother. 4 RR 815.  Mrs. Williams also explained that Susan was a very attentive mother who wanted the best for her child.  4 RR 799.  Gilberto moved to Austin so that he could get help from his sister and parents and knows he needs their help because Megan is a little girl and needs female role models, i.e. his sister and mother, as well as Susan's sister Julie.  4 RR 815 – 816.  Gilberto, his wife, and daughter took several trips together prior to Susan's death. 4 RR 823 – 824.  Megan has problems and acts out to indicate that she misses her mom as Dr. Phyllis Silverman, Plaintiffs' human behavioral expert, testified.  4 RR 825–824.

In *Sanchez v. Schindler*, 651 S.W.2d 249, 252-53 (Tex. 1983), the court held that injuries to the familial relationship are significant and worthy of compensation and persons may recover damages for loss of society and mental anguish which flow from a wrongful death.  Therefore, the jury's damage award to Megan Rodriguez is not excessive and not subject to remittitur.

### b.     Gilberto Rodriguez

The jury awarded Gilberto Rodriguez damages in the amount of $5,000,000.00 for funeral expenses paid or incurred; loss of support and services; loss of companionship and society; and mental anguish. *See* Question 3.A of Final Jury Instructions.

After making a calculation for loss of support in the range between $810,000.00 and $600,000.00, Defendant argues that the balance of the jury award about $4.2 – 4.4 million for lost society, mental anguish, etc. is excessive in comparison with the award in *Douglass*, 895 F.2d at 1343, *Randall v. Chevron, U.S.A., Inc.*, 13 F.3d 888, 904 (5th Cir. 1994), and *Caldarera v. Eastern Airlines, Inc.* 705 F.2d 778, (5th Cir. 1983). However, again Defendant failed to include the state cases for comparison.

In *C & H Nationwide, Inc. v. Thompson*, 810 S.W.2d 259 (Tex. App.-- Hous. [1 Dist.], 1991, aff'd in part, rev'd in part, 903 S.W.2d 315), Mr. Thompson was killed when the car he was driving collided with a 40-foot length of 10 3/4 -inch pipe, which fell off a tractor-trailer. His wife and children filed wrongful death cause of action and survival cause of action against C & H Nationwide, Inc. and others. After the trial, the jury awarded the spouse the following damages

| | |
|---|---|
| pecuniary loss | 1,500,000.00 |
| loss of companionship | 2,000,000.00 |
| mental anguish | 2,000,000.00 |
| loss of inheritance | 200,000.00 |

*Thompson*, 810 S.W.2d at 265. The award was affirmed by the Texas Supreme Court (except the loss of inheritance, which was denied due to insufficiency of evidence). *C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315, 324 (Tex. 1994). The total award for loss of companionship and mental anguish was $4 million. Based on the holding of *Salinas*, *supra*, the "maximum recovery rule" does not operate to Gilberto's recovery because the $5 million award to his is less than 150% of $4 million ($6 million).

8

Both of Susan's parents and her husband testified that Susan was very close to her parents and to her new family (Gilberto and Megan). Gilberto met his wife on Feb. 19, 1993—he remembers because that was the day he met her and shook her hand when she reported to the Harlingen station. Gilberto married Susan on March 18, 1995 and they had their daughter Megan in 1996. 4 RR 813 – 814. Gilberto and Mr. Williams both testified about family trips, especially one taken to San Antonio just before Susan died. 4 RR 810, 824. Gilberto could relate to Susan's progress in her career; Gilberto said Susan liked to volunteer for collateral duties – a way to elevate her career. 4 RR 815. Gilberto moved to Austin so he could get help from his sister and parents and knew he needed help because Megan was a little girl and needed female role models, i.e. his sister and mother, as well as Susan's sister Julie. 4 RR 815 – 816. Gilberto remembered that the night before Susan was getting ready for the midnight shift, she was folding clothes before she got dressed and he told her that he appreciated her because she was being a wife and going to work. 4 RR 816. On the day of the shooting, Gilberto went with his supervisor to the hospital and was told that he couldn't see Susan, so he pushed through and saw that she was motionless. 4 RR 817. Susan was life-flighted to the hospital and lived for a few hours after the shooting, but was never able to talk to Gilberto. 4 RR 818. Gilberto was planning a surprise birthday party for Susan on the weekend in Austin at his parents' home so he told her that they would go shopping in Austin for the weekend the night before the shooting. 4 RR 818. Gilberto and Susan also discussed having another baby in August—Susan was making plans for a new baby and was excited about it. 4 RR 818. Gilberto has lost the person with whom he had chosen to live the rest of his life. 4 RR 825. Gilberto and his wife talked to Megan about values, but now only Gilberto has that role—he's both her mother and her father. 4 RR 824 - 825. There are times when Gilberto doesn't feel as if he is able to provide everything that Megan needs. 4 RR 825. Megan understands her mom is gone but doesn't know the details.

Gilberto knows as if it is all going to hit Megan at an older age and that there is nothing he can do about it, even though he wants to stop it from happening. 4 RR 825 – 826.

In *Whittlesey v. Miller*, 572 S.W.2d 665, 667 (Tex. 1978), the Texas Supreme Court held that loss of affection, solace, comfort, companionship, society, assistance, and sexual relations were real, direct, and personal losses and said that these losses were not too intangible or conjectural to be measured in pecuniary terms. The jury's damage award to Gilberto Rodriguez is not excessive and not subject to remittitur.

### c.  Stephen and Robyn Williams and Arturo and Elisa Salinas

The jury awarded each of the parents $2.5 million for loss of support, loss of society, and mental anguish. *See* Question 3.C and D and Question 4 of Final Jury Instructions. Defendant does not dispute the amount of funeral expenses, which was included in Arturo Salinas' recovery.

Defendant attempts to rely on *Gutierrez v. Exxon Corp.*, 765 F.2d 399, 403 (5th Cir. 1985) to cut the jury's award to each parent to $500,000.00. Such attempt should fail.  In *General Chemical Corporation v. De La Lastra*, 852 S.W.2d 916 (Tex. 1993), two young shrimp fishermen died at sea from asphyxiation on a shrimp boat expedition after using a chemical preservative on their catch. Their parents brought a wrongful death cause of action against the manufacturer of the chemical and others. The jury awarded each parent $2.5 million for loss of companionship and society and $2.5 million for mental anguish. *De La Lastra*, 852 S.W.2d at 918. In *De La Lastra*, each parent recovered his or her damages for loss of companionship and society and mental anguish totaling to $5 million, which is double the size of each parent's recovery in the present, consolidated cases. According to the holding of *Salinas*, *supra*, the "maximum recovery rule" does not operate to reduce each parent's recovery because the $2.5 million award is less than 150% of $5 million ($7.5 million).

### (1)    Mr. And Mrs. Williams (Susan Rodriguez' Parents)

Both of Susan's parents and her husband testified that Susan was very close to her parents and to her new family.   When asked about the effect on Susan's parents, Gilbert Rodriguez testified that Susan's death has "inflicted such a permanent scar in their way of life and their world that I don't think they see the extent of it."  4 RR 823.  Susan's father, Stephen Williams, a Border Patrol Agent himself, testified that he was very close to Susan when she was growing up because she was his oldest child and that he was very proud of her decision to join the Border Patrol.  4 RR 807.  Mr. Williams also said that Susan and her mother, Robyn Williams, had a very special relationship and because of this, her mother is having a difficult time handling the grief.  4 RR 809-810.  Mrs. Williams, normally a healthy woman, is taking medication and seeing a psychologist.  4 RR 809-810.  Gilberto and Mr. Williams both talked about family trips, especially one taken to San Antonio just before Susan died.  4 RR 810, 824.  Susan's death has devastated her parents.  4 RR 822-823.  Mr. Williams has had self blaming toughts because he was also Border Patrol officer.  4RR 823.

### (2)    Mr. And Mrs. Salinas (Ricardo Salinas' Parents)

Arturo Salinas, testified that his son, Ricardo, was very close to his family and talked to his father and mother once a week.  4 RR 780.  Mr. Salinas also testified that he and his wife tried to visit Ricardo in Harlingen as often as their schedules allowed and spoke specifically of a recent trip down from San Antonio to celebrate Ricardo's birthday and to help him look for a house to purchase in Harlingen.  4 RR 780-782.  Mr. Salinas also remembered taking fishing trips with Ricardo and watching him play baseball and compete in karate tournaments when he was a child.  4 RR 788.  Mr. Salinas testified that his wife is very reserved with her emotions about the loss of her son, but she cries at night.  4 RR 785-786.  Mr. Salinas testified that Ricardo always wanted to be a law enforcement officer and hoped to use the border patrol as a way to

earn a higher office. 4 RR 779. Elisa Salinas, Ricardo's mother, testified that he worked at HEB and UPS throughout college, but his ultimate goal was to join a law enforcement agency. 4 RR 793-794. Mrs. Salinas explained that Ricardo was very close to his younger sister and his father; Ricardo would look out for his sister, and that he and his father went fishing and played baseball. 4 RR 794. Also, Mrs. Salinas testified that she cannot talk to her husband about the loss of their son because it becomes too painful and they both break down. 4 RR 795. Mrs. Salinas described how she used to stay up late until Ricardo came home from work at UPS so she could cook supper for him and watch late night television shows with him; she tries to do this to feel closer to her son. 4 RR 796-797. Mrs. Salinas described her son as "a good kid" who "always did the right thing." 4 RR 797.

In *Sanchez*, 651 S.W.2d at 252-53, the court held that injuries to the familial relationship are significant and worthy of compensation and persons may recover damages for loss of society and mental anguish which flow from a wrongful death. The jury's damage awards to Stephen and Robyn Williams and Arturo and Elisa Salinas are not excessive and not subject to remittitur.

### 4. Dr. Phyllis Silverman's Testimony Supports the Jury's Awards for Loss of Society and Mental Anguish

Under Texas law, no physical manifestation proof is needed to recover for mental anguish. *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 172 (5th Cir. 1985); *Channel 20, Inc. v. World Wide Towers Services, Inc.*, 607 F.Supp. 551, 556 (S.D. Tex. 1985).

Defendant argues that Dr. Silverman's testimony does not support or justify the jury awards for loss of society and mental anguish. (Motion at pp. 16 and 18). The Defendant mischaracterizes Dr. Silverman's entire theme and philosophy that the grieving process is individualized, and that one cannot put time limits on when someone will recover.

Dr. Silverman never defined "mental anguish" as merely an "acute sadness" as the Defendant intimates. In a direct question posed to Dr. Silverman about the length of a person's

mental anguish after the loss of a loved one, she described the loss not as an "acute sadness [that] lasts 6 months to two years," as the defendant incorrectly states, but as "a loss that goes on forever." 4 RR 772. Also, Dr. Silverman did not use the "6 months to two years" time period as one during which the pain will subside or lessen, but merely used these periods as examples for how long a grieving person may feel detached and disengaged from the rest of the world. 4 RR 764. Dr. Silverman specifically stated in the same sentence from which Defendant extracted the time frames of "six months" and "two years" that grieving is "not tied in a neat package in three months." 4 RR 764. If nothing else, Dr. Silverman's testimony, one that she reiterated throughout, is that one cannot place time restrictions on how quickly or slowly a person should grieve or feel the pain of the loss. 4 RR 753-754, 771-772. Also, Dr. Silverman stated that, although a grieving family member may, over a period of time, feel like they have some control over what has happened, the pain will come back to him and a "certain sadness" will "overwhelm [him] from time to time." 4 RR 772. Although Dr. Silverman did not interview or counsel Gilberto, she did testify specifically about what a newly widowed, single father of a young daughter would face in his new life without the wife with whom he had planned to spend a lifetime. 4 RR 762-763, 765-766. Dr. Silverman described the loss of a loved one as "an event that brings about major changes in how [the grieving family member] live[s] [his] life and [causes] an enormous upheaval in the way the world is organized." 4 RR 755.

**B.      The Verdict was Not Motivated by Passion and Prejudice**

In asserting that the verdict was motivated by passion and prejudice, the Defendant argues that the size of the verdict itself is a proof of jury bias and that Plaintiffs and their attorneys made improper statements and argument. Defendant's argument has no support of evidence. First, even though the size of the verdict is large, Plaintiffs have established that the verdict is not excessive and the Plaintiffs are entitled to the amount awarded by the jury under

the law as discussed above. Therefore, Defendant cannot rely on the size of the verdict itself to ask for a new trial or remittitur.

Second, in its motion, Defendant argues that "Ernest Moore's alleged 'neo-Nazi' beliefs were brought up repeatedly in questioning and in argument," but cite only one argument made by Plaintiffs' attorney, "See, e.g., 5 RR 896 (l. 17-24)." (Motion at p. 12)  In that argument, Plaintiffs' attorney used the decorations of Nazi memorabilia in Ernest Moore's room to prove the issue of deliberate indifference and he mentioned the Nazi memorabilia only once in argument. It cannot be shown that seven and one half lines of argument would incite the jury. For the Court's convenience to refer, the cited argument is reproduced:

> Now, I think another example of their deliberate indifference, of their arrogance, is the decoration that existed around that room. You saw the Nazi posters. You saw the photographs of Hitler. You saw the SS uniform hanging beside the other AR-15. Folks, you don't send an assault rifle home to a person that resides in that room unless you are consciously indifferent, deliberately indifferent to whatever consequences might happen.

Third, Plaintiffs' testimony cited by Defendant does not show that Plaintiffs ask the jury to award large damages to "alleviate their suffering" out of sympathy. (Motion at p. 12) For the Court's convenience, the excerpt of the cited testimony is attached hereto as Exhibit "A" and incorporated herein for all purposes as if fully set out. It should be noted that no objection by the Defendant was made to the testimony when it was offered. The Defendant only chooses to object to the testimony now that the jury has rendered its verdict. More importantly, Defendant did not object to the argument at the time, and should not be heard to complain about it now. An objection to an "improper argument" must be timely made in order to preserve error. *Fleming v. Harris*, 39 F.3d 905, 908 (8th Cir. 1994). And, a failure to object waives any such claimed error. *Johnson v. National Sea Products, Ltd.*, 35 F.3d 626, 631 (1st Cir. 1994).

## III. REQUEST FOR RELIEF

Plaintiffs request that this Honorable Court deny Defendant City of Harlingen's Motion for New Trial on Damages or in the Alternative, for Remittitur and grant any and all further relief that justice requires.

Respectfully submitted,

**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, TX 78701
512+474-6061
512+474-1605 (fax)

By _Broadus A Spivey_____
Broadus A. Spivey
State Bar No. 00000076
Federal I.D. No. 11146
Price Ainsworth
State Bar No. 00950300
Federal I.D. No. 8065
Francis Pan
State Bar No. 15443300
Federal I.D. No. 26385

Richard Pena
Law Offices of Richard Pena, P.C.
Barton Oaks Plaza Two
901 MoPac, Suite 325
Austin, Texas 7746-5747
512+327-6884
512+327-8354 (fax)

**ATTORNEYS–IN-CHARGE FOR PLAINTIFFS
ARTURO G. SALINAS, ET AL and GILBERTO M.
RODRIGUEZ, ET AL**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the above and foregoing document was forwarded on July 31, 2002, to counsel of record for Defendant via facsimile and U.S. mail:

Mr. Tom Lockhart
Mr. Jim Denison
Mr. Roger W. Hughes
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429
ATTORNEYS-IN-CHARGE FOR DEFENDANT CITY OF HARLINGEN

Mr. Ramon Garcia
Ms. Sonia I. Lopez
LAW OFFICES OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, TX 78539
ATTORNEYS-IN-CHARGE FOR PLAINTIFF RUAL RODRIGUEZ

Price Ainsworth    Broadus A Spivey

3163P.057

16

1        IN THE UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF TEXAS
2                BROWNSVILLE DIVISION

3    ────────────────────────────────  )

     ARTURO GUILLERMO SALINAS, ET AL    )
4                                       )
                                        )   CIVIL ACTION NO.
5    VS.                                )   B-98-162
                                        )
6    CITY OF HARLINGEN, ET AL           )
                                        )
7    ────────────────────────────────  )

8

9                         VOLUME IV
                          JURY TRIAL
10        BEFORE THE HONORABLE HILDA G. TAGLE
                      FEBRUARY 22, 2002
11
     APPEARANCES:
12

13   For the Plaintiffs,          MR. BROADUS A. SPIVEY
     Salinas and Rodriguez:       MR. PRICE AINSWORTH
14                                Attorneys at Law
                                  Austin, Texas
15
     For the Plaintiff,           MRS. SONIA LOPEZ
16   Rodriguez:                   MR. RAMON GARCIA
                                  Attorneys at Law
17                                Edinburg, Texas

18   For the Defendants:          MR. TOM LOCKHART
                                  MR. ROGER HUGHES
19                                Attorneys at Law
                                  Harlingen, Texas
20
     Transcribed by:             BRECK C. RECORD
21                               Official Court Reporter
                                 600 E. Harrison, Box 16
22                               Brownsville, Texas  78520
                                 (956)548-2510
23

24

25

         Captured and Transcribed by Computer - Eclipse

1   really, except I think what happens is you're changed and in the

2   changing this becomes a part of who you are.  So it is always

3   there and you kind of recognize it and acknowledge it and keep

4   it as a way of being connected to something that was so

5   precious.

6   Q    In a situation where there's been a violent death or a

7   senseless death that need not have happened, can the community's

8   reaction to that death assist the surviving family members in

9   learning to cope with their loss?

10   A    Oh, on many levels I would think that that would be true.

11   Certainly it would seem to me that the simple outpouring of the

12   community's support and compassion and empathy would be very

13   important.  I think that if they feel a communal indifference to

14   their pain, I think that would be very painful.  That would make

15   it worse.  That would make them feel more isolated, more alone.

16   Sometimes I guess people in that kind of situation even think

17   there's something wrong with me.  Why am I feeling this way when

18   everybody's expecting me to be -- look after everything else

19   that's going on?  And I think that's a very painful position to

20   be in that makes things worse.

21   Q    Among those that have lost loved ones in a violent act or a

22   senseless killing, can they learn or be assisted in their

23   learning to cope when there is a sense of justice, that justice

24   has been done?

25   A    Oh, I think so.  I think that's a very important piece of

784

1    Q·  Now, you were present in the courtroom when the gentleman

2    representing the City of Harlingen made some references I

3    believe through the chief that maybe you had expressed some

4    bitterness or --

5    A    Oh, definitely, yes.

6    Q    And you have felt some bitterness, haven't you?

7    A    Oh, yes.

8    Q    Is it bitterness just over your son getting shot or is it

9    because of other matters involved?

10    A    Would you repeat the question?

11    Q    Is it just because your son got shot in the line of duty?

12    You know, that's a hazard that police officers, including border

13    patrol, face?

14    A    Yes.  Well, it is not only that he got shot or that he was

15    killed.  It is the way that it happened, the way the

16    circumstances -- the way that my son -- here he was -- I'm so

17    proud of the fact that he and Susan brought honor to their badge

18    while others didn't.  And that's what aggravates me, that we had

19    good cops and bad cops.

20    Q    Does it bother you?

21    A    It bothers me to no end.

22    Q    Does it bother you that -- were you in here when Lieutenant

23    Rubio testified about the coverup?

24    A    Yes, sir.

25    Q    And did you hear about them even getting him indicted or the

Captured and Transcribed by Computer - Eclipse

785

1    association indicted?

2    A    Yes, sir, I heard that.

3    Q    Does it bother you that there may have been a coverup here?

4    A    It bothers me -- I can't even find the word how bad -- how

5    bitter I am about this.

6    Q    I heard Mrs. Silverman say in answer to a question that

7    Mr. Ainsworth asked her about the soothing effect of a sense of

8    justice being done.  You think that would help?

9    A    It is going to help me, but I will never forget.  I will

10   never -- I'm going to carry this to the day I go at my own

11   grave.

12   Q    But would it be of help to you and your wife and all

13   survivors to have a sense of justice?

14   A    Sure, it will.  Sure, it will.

15   Q    Now, it is awful difficult to talk about the emotional

16   feelings that you felt, but I've got to ask you some questions.

17   A    Okay.

18   Q    And maybe you could tell me a little bit more about our

19   wife, since you and I share this macho problem.

20   A    Yes.

21   Q    Tell us how the death of your son has affected and still

22   affects your wife, if it does.

23   A    We're totally opposite.  I get involved in so many things to

24   vent my frustration and to seek answers and justice.  She, on

25   the other hand, is more reserved.  She keeps it in all.  She



1    just -- she wasn't just in the wrong place at the wrong time,

2    although she certainly was that, but there was -- it became

3    clear that there was -- the Rangers and the FBI were not

4    conducting an investigation.  They were just receiving memos and

5    receiving statements from people that were self-prepared

6    deputies and border patrol agents that were self-prepared and

7    preparing a report.  And they did not complete it as a crime

8    scene and --

9    Q    In your career as a police -- as a border patrolman, did you

10   have to perform some investigations?

11   A    Absolutely.  I spent four years as a criminal investigator.

12   Q    You heard the lady that came in, the first witness this

13   morning, Mrs. Prather?

14   A    No, I didn't hear her.  My wife had to go to the doctor this

15   morning, but --

16   Q    She said she was a neighbor across the street and that

17   nobody had even talked to her until a couple of months ago.

18   A    Well, I'm not surprised.  I know if they found out she's a

19   favorable witness, you know, that it's possible there might be

20   some involvement by R.D. Moore.  They will go out and discredit

21   her testimony, you know.  That's what they've been doing.

22   Q    And would it be important to you as the father of Susan and

23   important to you as grandfather of Megan to see that justice is

24   done in this case?

25   A    Absolutely.  More than anything at this point.

806

1   Q   You understand that the jury can't order an investigation.

2   They're not like this grand jury.  They're very limited in their

3   power.  All they can do is award the damages that they feel

4   is -- are appropriate, if they find liability?

5   A   Yes, sir.

6   Q   But would it be important to you that the jury listen to all

7   of the evidence -- and by the way, have you appreciated the

8   opportunity to present this evidence in an open court?

9   A   More than anything.  More than anything.  It is the only

10  avenue that was left to us when the proper authorities refused

11  to conduct an investigation and protect the people that appeared

12  to be involved.

13  Q   Did you also make it known that you were not satisfied with

14  the investigation and that you felt that there was a coverup

15  going on?

16  A   Yes, I did.  In fact, at all levels, from Attorney General

17  Reno right on down.

18  Q   And did anybody out there in the City of Harlingen or the

19  County of Cameron or the Texas Rangers or the Department of

20  Public Safety come to you and say well, we'll check it out and

21  see if there is a conspiracy?

22  A   Just the opposite.  When I would contact them, they would

23  tell me to listen, you know -- made it clear that they were not

24  going to do anything and that I was to -- well, I've never

25  experienced anything like it.  I mean, it was -- they are very

1    Q    Now, when you found out that the weapon was, in fact,

2    brought in for disposal by a local citizen that didn't want it

3    to fall into the wrong hands, did you start in essence your own

4    investigation as to then what had happened?

5    A    Yes, sir.  I had some contacts here in Harlingen that helped

6    me try to gather some information as to what happened and why

7    that weapon was there.

8    Q    Has the trial been helpful?

9    A    Yes, it has.

10    Q    And getting to see the evidence as to what happened?

11    A    It's been helpful and it's been frustrating, been a roller

12    coaster.

13    Q    What do you mean by frustrating?

14    A    After listening to testimony and the things that went on,

15    that's the frustrating part, to allow that sort of thing to

16    happen at a police department.

17    Q    Do you look forward to the opportunity to have the jury

18    speak in this case?

19    A    Absolutely.

20    Q    Something I guess you have waited about three and a half

21    years for?

22    A    Something I've been waiting for is for some of the things

23    that were brushed under carpet, so to speak, be revealed in

24    public and for certain people that had covered their tracks to

25    finally have to stand before or sit before a jury and expose

Captured and Transcribed by Computer - Eclipse

1   their lies and all the stuff they tried to.

2   Q    Let me talk to you a little bit more about your wife and

3   your family.  All right.  We see here in the photograph that's

4   marked 35A Susan and Megan I guess on -- right at Megan's time

5   of birth; is that right?

6   A    That's when we took her home from the hospital.

7   Q    All right.  Now, I think you have explained to us that you

8   and Susan had intended to have another child?

9   A    Yes, sir.

10  Q    Okay.  And where was Megan born?

11  A    In Harlingen.

12  Q    And as we look through the pictures there, it looks like the

13  one Mr. Spivey showed us a moment ago as 35B is on Megan's

14  christening; is that right?

15  A    That was at her baptism.

16  Q    And did everybody come in for the celebration?

17  A    Yes, sir.

18  Q    We see there in the picture Mr. and Mrs. Williams?

19  A    Yes, sir.

20  Q    Now, as the son-in-law I guess you had the opportunity to

21  see, prior to Susan's death, the relationship between Susan and

22  her parents?

23  A    Yes, I have.

24  Q    And just as we asked earlier Mr. Salinas about how the death

25  of Mr. -- of Ricky had affected his mom and vice-versa, I guess

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS. | § | |

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

<u>**FRANCIS PAN'S AFFIDAVIT**</u>

Before me, the undersigned notary, on this day, personally appeared Francis Pan, a person whose identity is known to me.  After I administered an oath to him upon his oath, he said:

> My name is Francis Pan. I am one of the attorneys who represent Plaintiffs Gilberto M. Rodriguez, et al and Arturo Guillermo Salinas, et al in the above entitled and numbered causes. I am over 21 years of age, and am fully competent to make this affidavit.  Each and every fact contained in this affidavit is true and correct and within my personal knowledge.
>
> I certify that the attached as Exhibit "A" to Plaintiffs Gilberto M. Rodriguez, et al and Arturo G. Salinas, et al's Response to Defendant City of Harlingen's Motion

for New Trial on Damages or in the Alternative for Remittitur and Memorandum
in Support thereof is a true and correct copy of an excerpt of the Trial Transcript
of the above entitled and numbered causes.

_Francis Pan_

Francis Pan

SWORN TO AND SUBSCRIBED before me by the said Francis Pan on July 31, 2002.

KAM

_Kevin A. McCoy_

Notary Public in and for
the State of Texas

KEVIN A. McCOY
Notary Public, State of Texas
My Commission Expires 01-17-03

3163P.058