246

United States District Court
Southern District of Texas
FILED

SEP 0 6 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-162 |
| | { | |
| CITY OF HARLINGEN | { | |
| | { | |
| and | { | |
| | { | |
| GILBERTO M. RODRIGUEZ, ET AL | { | |
| | { | |
| V. | { | CIVIL ACTION NO. B-98-163 |
| | { | |
| CITY OF HARLINGEN | { | |
| | { | |
| and | { | |
| | { | |
| RAUL RODRIGUEZ | { | CIVIL ACTION NO. B-99-70 |
| | { | |
| V. | { | |
| | { | |
| CITY OF HARLINGEN | { | |

---

## DEFENDANT'S MOTION TO RECONSIDER RENEWED MOTION FOR JUDGMENT AS MATTER OF LAW

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendant, **CITY OF HARLINGEN** and files this its Motion to

Reconsider Renewed Motion for Judgment as Matter of Law, and would show the Court as

follows:

## I. Certificate of Conference

Counsel for Defendant has conferred with counsel for Plaintiffs concerning the subject matter and relief requested and they are opposed.

## II. Status

The Court previously denied Defendant's Renewed Motion for Judgment as a Matter of Law (Dkt. # 217) and entered a judgment in favor of Plaintiffs. (Dkt. #s 228, 232). The Court is currently considering Defendant's Motion for Remittitur and/or for New Trial on Damages Alone (Dkt. # 234).

## III. Argument

On September 5, 2002, the 5th Circuit decided *McClendon v. City of Columbia*. See *McClendon v. City of Columbia*, ___ F.3d ___ (5th Cir. September 5, 2002) (attached as exh. 1). In short, the 5th Circuit affirmed the summary judgment granted for both defendants. The en banc majority determined that:

1.    There was no evidence that Defendant Carney, the police officer, was deliberately indifferent; Opinion p. 18;

2.    The 5th Circuit still has not adopted the "state created danger" doctrine and does not do so in *McClendon* because there is no evidence of deliberate indifference which is a minimum prerequisite for any Substantive Due Process claim; Opinion pp. 16-19;

3.    For a Substantive Due Process claim, deliberate indifference required that the official have actual knowledge of and disregard an excessive risk of harm to a specific person's health; it is insufficient that the official should have perceived the risk but did not; Opinion, p. 17, n. 8; and

4.    Deliberate entrustment of a handgun to an informant connected with gangs involved in drugs at a time when the informant was embroiled in a heated dispute with the plaintiff was not deliberate indifference and amounted to, at best, ordinary negligence; Opinion, p. 18.

At this time, this Court still has plenary jurisdiction to reconsider Defendant's Renewed Motion for Judgment as a Matter of Law. In light of the en banc opinion in *McClendon*, the court should grant relief. If Officer Carney's actions of knowingly entrusting a weapon to a gangland informant known to be involved with drugs was not deliberate indifference, then there is no evidence of deliberate of indifference in this case. Moreover, the en banc opinion returns the 5th Circuit to its original position that it has yet to recognize the "state created danger" theory and may not do so. Therefore, there is no recognized, valid theory to support Plaintiffs' claims under Substantive Due Process.

## IV.

Alternatively, the court should reconsider at least the renewed motion for judgment as a matter of law on the federal claim alone. Defendant Harlingen, does not waive its grounds to challenge state law relief, but the court has overruled those objections. Without

waiving those grounds, Defendant submits a proposed judgment *as to form only* awarding Plaintiffs $500,000.00 under state law and allocating it among them.  This proposed Judgment is submitted solely to memorialize the rulings the court has already made and does not waive the City's grounds for a rendition of judgment in its favor on the state law claims; the form of judgment has been submitted as to form only and Defendant reserves its objections and right to appeal any award under state law.  It is further without prejudice to Defendant's Motion for Remittitur and/or New Trial on Damages Alone.  Defendant does not waiver that motion and reserves the right to challenge in this court and on appeal the amount of damages found by the jury on the federal claims.

WHEREFORE, PREMISES CONSIDERED, Defendant City of Harlingen prays this Court reconsider its Renewed Motion for Judgment as a Matter of Law, grant it, vacate its earlier judgments and enter a judgment that Plaintiffs take nothing against Defendant City of Harlingen.  The City requests any other and further relief to which it may be entitled.

Respectfully submitted,

Defendant's Motion to Reconsider Renewed Motion for Judgment as a Matter of Law
[18-fmg] C:\Files\H1023\post trial\Mtn4JdgLaw

Page 4 of 6

By: _____

ROGER W. HUGHES
Admissions ID No. 5950
Texas State Bar No. 10229500
TOM LOCKHART
Admissions ID No. 2257
Texas State Bar No. 12473500
**ADAMS & GRAHAM, L.L.P.**
P.O. Drawer 1429
Harlingen, Texas  78551-1429
956/428-7495; FAX: 956/428-2954

Attorney-in-Charge for Defendant, CITY
OF HARLINGEN, TEXAS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing

document was forwarded on this 6th day of September, 2002, to the following counsel of

record and interested parties:

Attorneys of record for Plaintiffs, GILBERTO M. RODRIGUEZ, et al and
ARTURO GUILLERMO SALINAS, et al:

Mr. Broadus A. Spivey                       **CMRRR #7001 2510 0000 6098 2005**
Mr. Price Ainsworth
**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, Texas  78701-4320

Attorney of record for Plaintiff, RAUL RODRIGUEZ:

Mr. Ramon Garcia                    **CMRRR #7001 2510 0000 6098 2012**
Ms. Sonia Lopez
**LAW OFFICES OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, Texas  78539

ROGER W. HUGHES

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 00-60256

---

PETER CLAYTON MCCLENDON

Plaintiff-Appellant

v.

CITY OF COLUMBIA; ET AL

Defendants

CITY OF COLUMBIA; JAMES R CARNEY

Defendants-Appellees

---

Appeal from the United States District Court
for the Southern District of Mississippi

---

September 5, 2002

Before KING, Chief Judge, and JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, PARKER, DENNIS and CLEMENT, Circuit Judges.

PER CURIAM:[*]

In July 1993, Defendant-Appellee Detective James Carney, a City of Columbia police detective, loaned a gun to Kevin Loftin, an informant for the Columbia Police Department, to enable Loftin

---

[*]     This opinion is joined by Chief Judge King and Circuit Judges Jolly, Higginbotham, Davis, Jones, Smith, Barksdale, Benavides, Stewart, Dennis and Clement.

1

to protect himself from Plaintiff-Appellant Peter McClendon.
Loftin subsequently used the gun to shoot McClendon.  A panel of
this court held that Detective Carney thereby violated
McClendon's substantive due process rights and that the
unconstitutionality of Detective Carney's conduct was clearly
established at the time of his actions.  See McClendon v. City of
Columbia, 258 F.3d 432, 441-43 (5th Cir. 2001), vacated and reh'g
en banc granted, 285 F.3d 1078 (5th Cir. 2002).  We took this
case en banc to determine whether the panel's conclusions were
correct.  En banc review is also warranted to resolve conflicting
panel decisions addressing when a principle of law should be
deemed "clearly established" in the context of qualified immunity
analysis.  Because under the facts established by the summary
judgment record, viewed in the light most favorable to McClendon,
there is no constitutional violation, we find that Detective
Carney is entitled to qualified immunity.  We further find, in
the alternative, that even if those facts did establish a
constitutional violation under current law, Detective Carney is
nonetheless entitled to qualified immunity because his conduct
was not objectively unreasonable in light of the law that was
clearly established at the time of his actions.  Accordingly, we
AFFIRM the district court's summary judgment in favor of
Detective Carney on qualified immunity grounds.  In addition, we
AFFIRM the district court's summary judgment in favor of

2

Defendant-Appellee the City of Columbia, reinstating the portion of the panel opinion addressing this aspect of the district court's judgment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Because the district court awarded summary judgment to the Defendants-Appellees, we view the facts in the light most favorable to Plaintiff-Appellant Peter McClendon.  See Stults v. Conoco, Inc., 76 F.3d 651, 654 (5th Cir. 1996).  Between May of 1992 and December of 1993, Defendant-Appellee Detective James Carney ("Detective Carney") paid Kelvin Loftin to serve as an informant for the Columbia Police Department (the "CPD").  Loftin assisted Detective Carney and the CPD with drug enforcement investigations.  During the week prior to July 12, 1993, Loftin spoke to Detective Carney about a conflict that had developed between Loftin and McClendon.  Specifically, Loftin feared that McClendon might retaliate against Loftin for supplying a gun to an individual who subsequently shot McClendon's friend.  Loftin told Detective Carney that McClendon was "fixing to try [Loftin]," and that the situation between the two men was at a "boiling point."  Upon hearing about the situation, Detective Carney loaned Loftin a handgun so that Loftin could protect himself from McClendon.  This handgun, which Detective Carney retrieved from his desk drawer, was apparently seized by the CPD as evidence in an unrelated investigation.

3

On the evening of July 12, 1993, McClendon and Loftin encountered each other (apparently by chance) at the Hendrix Street Apartments, where Loftin was staying. An altercation ensued, and Loftin shot McClendon in the face with the handgun that Loftin had obtained from Detective Carney. McClendon is now permanently blind as a result of the incident.

On July 11, 1996, McClendon filed the instant 42 U.S.C. § 1983 action in federal district court against Detective Carney, the CPD, the City of Columbia ("the City"), City of Columbia Mayor Harold Bryant ("Mayor Bryant"), and CPD Chief of Police Joe Sanders ("Chief Sanders") (collectively, "the Defendants").[1] The complaint alleges that the Defendants violated McClendon's due process rights under the Fourteenth Amendment by knowingly and affirmatively creating a dangerous situation that resulted in injury to McClendon and by failing to take reasonable steps to diffuse this danger.[2] Regarding Detective Carney, the complaint specifically contends that in providing Loftin with a handgun, Detective Carney "created a serious danger" that "caused Peter McClendon harm and violated McClendon's due process rights." Regarding the City, the complaint further alleges: (1) that the City had a custom or practice of allowing unabated access to

---

[1]    Detective Carney, Mayor Bryant, and Chief Sanders were sued in both their individual and official capacities.

[2]    The CPD, Mayor Bryant, and Chief Sanders were subsequently voluntarily dismissed as defendants.

4

evidence and evidence storage areas, which custom or practice proximately caused McClendon's injury by allowing Detective Carney to provide Loftin with the handgun used in the assault; and (2) that the City's failure to train Detective Carney regarding the use of informants displayed deliberate indifference to McClendon's rights and proximately caused McClendon's injury.

On December 31, 1998, Detective Carney moved for summary judgment, arguing that he did not violate McClendon's constitutional rights because his actions did not create the danger which resulted in McClendon's injuries. Detective Carney alternatively argued that he was entitled to qualified immunity from the suit because the unlawfulness of his actions was not clearly established as of July 12, 1993.

On April 20, 1999, the district court granted summary judgment to Detective Carney, holding that McClendon had not stated a viable constitutional claim. The court rejected McClendon's attempt to seek recovery from the state for injuries inflicted by a private actor under a "state-created danger" theory, explaining that the Fifth Circuit had not sanctioned such a theory of substantive due process liability. The court also found that, even if McClendon could maintain a viable constitutional claim based on a state-created danger theory, this claim would fail because Detective Carney "did not affirmatively place McClendon in a position of danger, stripping him of his

5

ability to defend himself, and he did not cut off McClendon's potential sources of private aid." In the alternative, the district court determined that Detective Carney was entitled to qualified immunity from suit because his conduct was "objectively reasonable under the circumstances in light of clearly established law" in July of 1993.

McClendon attempted to appeal from this April 20, 1999 order, but this appeal was dismissed because McClendon's claims against the City had not yet been adjudicated. The City subsequently obtained permission from the district court to file a motion for summary judgment out of time. The City filed this motion on November 2, 1999, arguing that McClendon had not shown a city policy or custom that produced his injury and had not shown that the City acted with deliberate indifference to his safety. On March 6, 2000, the district court granted summary judgment to the City, finding: (1) that McClendon had not pled the facts of his "dangerous custom or practice" claim with sufficient particularity and, alternatively, had not demonstrated a custom or practice (as opposed to an isolated incident) that resulted in a deprivation of federal rights; and (2) that McClendon had not properly established the elements of an "inadequate training" claim under <u>Gabriel v. City of Plano</u> because he failed to provide proof of "the possibility of recurring situations that present an obvious potential for

6

violation of constitutional rights and the need for additional or different police training." <u>Gabriel</u>, 202 F.3d 741, 745 (5th Cir. 2000).

McClendon appealed the district court's summary judgments in favor of Detective Carney and the City.  A panel of this court affirmed the summary judgment in favor of the City,[3] but reversed the summary judgment in favor of Detective Carney, finding that McClendon could state a viable substantive due process claim if Detective Carney used his authority to engage in affirmative conduct (1) that he knew would create a danger to McClendon, increase a danger to McClendon, or make McClendon more vulnerable to a pre-existing danger, and (2) that was causally connected to McClendon's injuries.  <u>See McClendon</u>, 258 F.3d at 435, 438.  The panel determined that McClendon had adduced sufficient evidence to create a genuine issue of material fact suggesting that Detective Carney had violated McClendon's constitutional rights.

The panel acknowledged that Detective Carney would nonetheless be entitled to qualified immunity if his conduct was objectively reasonable in light of the law that was clearly established at the time of his actions.  <u>Id.</u> at 438.  The panel also implicitly acknowledged that neither the Supreme Court nor

---

[3]    Because the portion of the panel opinion affirming summary judgment in favor of the City is soundly reasoned and does not implicate the same unsettled questions of law as the portions of that opinion addressing the claims against Detective Carney, we REINSTATE that portion of the panel opinion affirming summary judgment in favor of the City.  <u>See McClendon v. City of Columbia</u>, 258 F.3d 432, 441-43 (5th Cir. 2001).

this court had expressly sanctioned any "state-created danger" theory as of July 1993, when the relevant events took place.  Id. at 435, 438.  However, the panel found that this court's discussion of the state-created danger theory in Salas v. Carpenter, 980 F.2d 299, 309-10 (5th Cir. 1992), combined with (1) the fact that several circuits had explicitly adopted the state-created danger theory prior to 1993, and (2) the fact that no circuit had explicitly rejected the state-created danger theory prior to 1993, was sufficient to render that theory "clearly established" in July of 1993.[4]  Concluding that clearly established law put Detective Carney on notice that "a state actor creating a danger, knowing of that danger, and using his authority to create an opportunity for a third person to commit a crime that otherwise might not have existed was subject to liability for a violation of the victim's rights" resulting from that danger, the panel found that Detective Carney's actions were

---

[4]    Relying on Melear v. Spears, the panel explained that this court is not limited to examining only its own precedent and Supreme Court precedent in determining whether a principle of law was clearly established.  See 862 F.2d 1177, 1184 n.8 (5th Cir. 1989) ("As a general proposition, we will not rigidly define the applicable body of law in determining whether relevant legal rules were clearly established at the time of the conduct at issue. Relying solely on Fifth Circuit and Supreme Court cases, for example, would be excessively formalistic, but they will loom largest in our inquiries.") (internal citation omitted).  Thus, the panel found that a theory not explicitly adopted by this court could nonetheless constitute clearly established law based on "overwhelming authority" from other circuits at the time in question.  This discussion in Melear is in tension with our subsequent decision in Shipp v. McMahon, which holds that this court's inquiry into whether a principle of law was clearly established is "confined to precedent from our circuit or the Supreme Court."  234 F.3d 907, 915 (5th Cir. 2000) (citing Boddie v. City of Columbus, 989 F.2d 745, 748 (5th Cir. 1993)).

unreasonable in light of clearly established law, and that he was not entitled to qualified immunity. <u>McClendon</u>, 258 F.3d at 441.

To assess the correctness of the panel's holdings and to resolve the conflict in our circuit authority addressing what constitutes "clearly established law" for the purposes of qualified immunity analysis, we granted Carney's request to rehear the case en banc. We review the district court's grant of summary judgment in favor of Detective Carney de novo, applying the same standard as the district court. <u>See</u> <u>Rivers v. Cent. & S.W. Corp.</u>, 186 F.3d 681, 683 (5th Cir. 1999). Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## II.  THE QUALIFIED IMMUNITY FRAMEWORK

Section 1983 provides a cause of action for individuals who have been "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person or entity acting under color of state law. 42 U.S.C. § 1983 (1994). In the instant case, McClendon claims that Detective Carney violated McClendon's right to bodily integrity under the substantive component of the Due Process Clause of the Fourteenth Amendment because Carney's affirmative misconduct

9

enhanced the risk of harm to McClendon.[5]  Specifically, McClendon

argues: (1) that Detective Carney knowingly and affirmatively

created a dangerous situation by providing Loftin with a gun; (2)

that Detective Carney failed to take any reasonable steps to

diffuse the danger; and (3) that Detective Carney abused his

authority by creating an opportunity for Loftin to harm McClendon

that would not otherwise have existed.

Detective Carney maintains that he is entitled to summary

judgment because he is shielded from liability by the doctrine of

qualified immunity.  In Harlow v. Fitzgerald, the Supreme Court

established that "government officials performing discretionary

functions generally are shielded from liability for civil damages

insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person

would have known."  457 U.S. 800, 818 (1982).  The Court

subsequently clarified in Siegert v. Gilley, 500 U.S. 226, 232-34

(1991) that courts evaluating § 1983 claims based on allegedly

unconstitutional conduct by state actors should conduct a two-

prong inquiry to determine whether the state actors are entitled

to qualified immunity.  "[T]he first inquiry must be whether a

_____

[5]     This substantive component of the Fourteenth Amendment's Due
Process Clause "protects individual liberty against 'certain government
actions regardless of the fairness of the procedures used to implement them.'"
Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992) (quoting Daniels
v. Williams, 474 U.S. 327, 331 (1986)).  This court has recognized a
substantive due process right to be free from state-occasioned damage to a
person's bodily integrity in certain contexts.  See, e.g., Doe v. Taylor
Indep. Sch. Dist., 15 F.3d 443, 450-51 (5th Cir. 1994) (en banc).

10

constitutional right would have been violated on the facts alleged." <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (2001). "[I]f a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established." <u>Id.</u> at 201. Ultimately, a state actor is entitled to qualified immunity if his or her conduct was objectively reasonable in light of the legal rules that were clearly established at the time of his or her actions. <u>See Wilson v. Layne</u>, 526 U.S. 603, 614 (1999) (citing <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987)).

When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense. <u>See Bazan ex rel. Bazan v. Hidalgo County</u>, 246 F.3d 481, 489 (5th Cir. 2001). Because qualified immunity constitutes an "<u>immunity from suit</u> rather than a mere defense to liability," <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985) (emphasis in original), the defense is intended to give government officials a right not merely to avoid standing trial, but also to avoid the burdens of "such pretrial matters as discovery . . . as '[i]nquiries of this kind can be peculiarly disruptive of effective government.'" <u>Id.</u> (quoting <u>Harlow</u>, 457 U.S. at 817) (alterations in original). Thus, adjudication of qualified immunity claims should occur "at the earliest possible stage in litigation." <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991).

11

However, "the legally relevant factors bearing upon the <u>Harlow</u>
question will be different on summary judgment than on an earlier
motion to dismiss." <u>Behrens v. Pelletier</u>, 516 U.S. 299, 309
(1996). At the earlier stage, "it is the defendant's conduct <u>as</u>
<u>alleged in the complaint</u> that is scrutinized for "objective legal
reasonableness." <u>Id.</u> "On summary judgment, however, the
plaintiff can no longer rest on the pleadings . . . and the court
looks to the evidence before it (in the light most favorable to
the plaintiff) when conducting the <u>Harlow</u> inquiry." <u>Id.</u>

In the instant case, Detective Carney raised the defense of
qualified immunity in a motion for summary judgment after
significant discovery. Accordingly, this court's task is to
examine the summary judgment record and determine whether
McClendon has adduced sufficient evidence to raise a genuine
issue of material fact suggesting (1) that Detective Carney's
conduct violated an actual constitutional right; and (2) that
Detective Carney's conduct was objectively unreasonable in light
of law that was clearly established at the time of his actions.

### III.  DID DETECTIVE CARNEY'S CONDUCT VIOLATE AN ACTUAL CONSTITUTIONAL RIGHT?

In assessing whether the facts alleged demonstrate a
constitutional violation, we analyze the law using "the currently
applicable . . . standards." <u>Hare v. City of Corinth</u>, 135 F.3d
320, 326 (5th Cir. 1998) (quoting <u>Rankin v. Klevenhagen</u>, 5 F.3d
103, 106 (5th Cir. 1993)) (internal quotations omitted).

12

McClendon claims that Detective Carney violated McClendon's right to bodily integrity under the substantive component of the Due Process Clause of the Fourteenth Amendment.  While McClendon does not allege that Detective Carney directly injured McClendon in any way, McClendon maintains that Detective Carney's actions were nonetheless unconstitutional because Carney's conduct enhanced the risk that McClendon would be harmed by a private actor (i.e., Loftin).

Ordinarily, a state official has no constitutional duty to protect an individual from private violence.  See DeShaney v. Winnebago County Dep't of Soc. Servs. 489 U.S. 189, 197 (1989) (holding that, as a general matter, a state's "failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause").  In DeShaney, however, the Court clarified that this general rule is not absolute: "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals."  Id. at 198.  When the state, through the affirmative exercise of its powers, acts to restrain an individual's freedom to act on his own behalf "through incarceration, institutionalization, or other similar restraint of personal liberty," the state creates a "special relationship" between the individual and the state which imposes upon the state a constitutional duty to protect that individual from dangers,

13

including, in certain circumstances, private violence.  <u>Id.</u> at
200.

A number of courts have read the Court's opinion in <u>DeShaney</u>
to suggest a second exception to the general rule against state
liability for private violence.  <u>DeShaney</u> involved a § 1983
action brought on behalf of a child against state social workers.
The child, who suffered serious injuries as a result of parental
abuse, alleged that the social workers had violated his
substantive due process rights because they were aware of the
probability of abuse and failed to intervene to protect him or
remove him from his father's home.  <u>Id.</u> at 191.  In rejecting
this claim on the ground that there was no "special relationship"
between the child and the state, the Supreme Court also noted
that, "[w]hile the State may have been aware of the dangers that
[the child] faced in the free world, <u>it played no part in their
creation, nor did it do anything to render him any more
vulnerable to them</u>."  <u>Id.</u> at 201 (emphasis added).  Many of our
sister circuits have read this language to suggest that state
officials can have a duty to protect an individual from injuries
inflicted by a third party if the state actor played an
affirmative role in creating or exacerbating a dangerous
situation that led to the individual's injury.  Those courts
accepting some version of this "state-created danger" theory have

14

applied the exception in a variety of factual contexts,[6] and have

adopted a variety of tests in expounding the theory.[7]  While this

---

[6]    See, e.g., Butera v. District of Columbia, 235 F.3d 637, 651 (D.C. Cir. 2001) (adopting the state-created danger theory, but rejecting a § 1983 claim brought against a police department and individual officers on behalf of an individual who was shot while working as an undercover operative for the department); Kallstrom v. City of Columbus, 136 F.3d 1055, 1066-67 (6th Cir. 1998) (adopting the state-created danger theory in the context of a § 1983 claim brought by undercover police officers alleging that city officials released personal information from their personnel files to the drug conspirators that the officers were investigating); Kneipp v. Tedder, 95 F.3d 1199, 1201, 1208 (3d Cir. 1996) (adopting the state-created danger theory in the context of a § 1983 claim brought against a city and police officers on behalf of a woman who suffered brain damage when the officers allegedly left her alone to walk home on a cold night while she was intoxicated); Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995) (accepting the state-created danger theory, but rejecting a § 1983 claim brought against state mental health officials on behalf of an activity therapist who was killed by a mental hospital patient); Reed v. Gardner, 986 F.2d 1122, 1125 (7th Cir. 1993) (adopting the state-created danger theory in the context of a § 1983 claim brought by motorists who were injured in an automobile collision with an allegedly drunk driver against police officers who had previously failed to arrest the driver); Dwares v. City of New York, 985 F.2d 94, 98-99 (2d Cir. 1993) (adopting the state-created danger theory in the context of a § 1983 claim brought by demonstrators against police officers who allegedly conspired to permit a group of "skinheads" to assault the demonstrators with impunity); Freeman v. Ferguson, 911 F.2d 52, 54-55 (8th Cir. 1990) (adopting the state-created danger theory in the context of a § 1983 claim brought on behalf of a woman killed by her estranged husband against a police chief who allegedly directed his officers to ignore her pleas for police assistance); Cornelius v. Town of Highland Lakes, 880 F.2d 348, 356 (11th Cir. 1989) (adopting the state-created danger theory in the context of a § 1983 claim brought against town and prison officials by a town clerk who was abducted and terrorized by prison inmates assigned to a community work program); Wood v. Ostrander, 879 F.2d 583, 590 (9th Cir. 1989) (adopting the state-created danger theory in the context of a § 1983 claim brought against police officers by the passenger of an impounded vehicle who was raped after officers allegedly abandoned her on the side of the road).

[7]    See, e.g., Kallstrom, 136 F.3d at 1066 ("Liability under the state-created-danger theory is predicted upon affirmative acts by the state which either create of increase the risk that an individual will be exposed to private acts of violence. . . . [W]e require plaintiffs alleging a constitutional tort under § 1983 to show "special danger" in the absence of a special relationship between the state and either the victim or the private tortfeasor.  The victim faces "special danger where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large."); Kneipp, 95 F.3d at 1208 ("[C]ases predicating constitutional liability on a state-created danger theory have four common elements: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff;  (3) there existed some relationship between the state and the plaintiff;  (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.")

15

court has recognized the validity of the "special relationship"
exception to the general DeShaney rule that state officials have
no constitutional duty to protect individuals from private
violence, see, e.g., Walton v. Alexander, 44 F.3d 1297, 1299 (5th
Cir. 1995), we have not yet determined whether a state official
has a similar duty to protect individuals from state-created
dangers, see, e.g., Piotrowski v. City of Houston ("Piotrowski
II"), 237 F.3d 567, 584 (5th Cir. 2001) (noting that this court
has never adopted the state-created danger theory); Randolph v.
Cervantes, 130 F.3d 727, 731 (5th Cir. 1997) (same).

Regardless of the theory of liability that a plaintiff is
pursuing, in order to state a viable substantive due process
claim the plaintiff must demonstrate that the state official
acted with culpability beyond mere negligence.  The Supreme
Court's discussions of abusive executive action have repeatedly
emphasized that "only the most egregious official conduct can be
said to be arbitrary in the constitutional sense."  County of

_____

(quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1152 (5th Cir. 1995))
(internal quotations omitted); Uhlrig, 64 F.3d at 574 ("Plaintiff must
demonstrate that (1) [he] was a member of a limited and specifically definable
group; (2) Defendants' conduct put [him] and the other members of that group
at substantial risk of serious, immediate and proximate harm;  (3) the risk
was obvious or known; (4) Defendants acted recklessly in conscious disregard
of that risk; and (5) such conduct, when viewed in total, is conscience
shocking."); Reed, 986 F.2d at 1126 ("[P]laintiffs . . . may state claims for
civil rights violations if they allege state action that creates, or
substantially contributes to the creation of, a danger or renders citizens
more vulnerable to a danger than they otherwise would have been."); Freeman,
911 F.2d at 55 ("[A] constitutional duty to protect an individual against
private violence may exist in a non-custodial setting if the state has taken
affirmative action which increased the individual's danger of, or
vulnerability to, such violence beyond the level it would have been absent
state action.")

16

Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (quoting Collins, 503 U.S. at 129) (internal quotations omitted).  The Court has "spoken of the cognizable level of executive abuse of power as that which shocks the conscience."  Id.  In elaborating on "the constitutional concept of conscience shocking," the Court has "made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."  Id. at 848. "[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."  Id.

Consistent with these principles, courts applying both the "special relationship" exception to the DeShaney rule and the "state-created danger" exception to the DeShaney rule have generally required plaintiffs to demonstrate (or, at the motion-to-dismiss stage, to allege) that the defendant state official at a minimum acted with deliberate indifference toward the plaintiff.[8]  See, e.g., Butera v. District of Columbia, 235 F.3d 637, 652 (D.C. Cir. 2001) (state-created danger); Nicini v. Morra, 212 F.3d 798, 810 (3d Cir. 2000) (special relationship);

---

[8]    To act with deliberate indifference, a state actor must "know[] of and disregard[] an excessive risk to [the victim's] health or safety." Ewolski v. City of Brunswick, 287 F.3d 492, 513 (6th Cir. 2002) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)) (internal quotations omitted). The state actor's actual knowledge is critical to the inquiry.  A state actor's failure to alleviate "a significant risk that he should have perceived but did not," while "no cause for commendation," does not rise to the level of deliberate indifference.  Farmer, 511 U.S. at 837.

17

_Huffman v. County of Los Angeles_, 147 F.3d 1054, 1059 (9th Cir. 1998) (state-created danger).

Our examination of the summary judgment record reveals (in accordance with the conclusion of the district court) that McClendon has not adduced any evidence suggesting that Detective Carney acted with anything other than ordinary negligence in the instant case. While Detective Carney was informed that McClendon potentially posed a threat to Loftin's safety, there is no indication that Detective Carney was aware that Loftin had any violent intentions toward McClendon. Indeed, Loftin had no criminal history and had a longstanding, positive working relationship with Detective Carney as a confidential informant. Moreover, given that Detective Carney had no reason to anticipate that Loftin and McClendon would have a chance encounter at the Hendrix Street Apartments, Detective Carney could not have predicted that Loftin would have the opportunity to assault McClendon with the gun that Detective Carney loaned Loftin for self-protection. Thus, while Detective Carney's actions in providing Loftin with a gun were certainly inadvisable, there is no evidence in the record suggesting that he acted with knowledge that his conduct would pose a threat to McClendon's safety. Under these circumstances, no rational trier of fact could find that Detective Carney acted with any level of culpability beyond mere negligence.

Thus, under the facts established by the summary judgment record, viewed in the light most favorable to McClendon, there is no violation by Detective Carney of McClendon's substantive due process rights.  Negligent infliction of harm by a state actor does not rise to the level of a substantive due process violation, regardless whether the plaintiff's injury was inflicted directly by a state actor or by a third party.  Because the facts alleged by McClendon, as supplemented by the summary judgment record, do not demonstrate the violation of an actual constitutional right, Detective Carney is entitled to summary judgment on grounds of qualified immunity.

### IV.  WAS DETECTIVE CARNEY'S CONDUCT OBJECTIVELY UNREASONABLE IN LIGHT OF CLEARLY ESTABLISHED LAW?

Even if we were to find, contrary to our above conclusion, that McClendon had established a viable constitutional claim under current law, summary judgment in favor of Detective Carney on grounds of qualified immunity is nonetheless appropriate because Detective Carney's conduct was not objectively unreasonable in light of clearly established law at the time of his actions.[9]

---

[9]    Normally, we proceed to the second prong of the Siegert analysis only if we decide, under the first prong, that the defendant engaged in constitutionally impermissible conduct. See, e.g., Saucier, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); accord Roe v. Tex. Dep't of Protective and Regulatory Servs., 2002 WL 1575250, at *3 (5th Cir. July 17, 2002).  We make an exception for our alternative holding here, because of the need to articulate whether it is appropriate, when this circuit has not spoken to an issue, to look to the law

As noted above, "government officials performing discretionary functions generally . . . are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Wilson, 526 U.S. at 614 (quoting Harlow, 457 U.S. at 818). "What this means in practice is that whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the 'objective legal reasonableness' of the official's action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." Id. (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)).

McClendon concedes that, at the time of Detective Carney's allegedly unlawful conduct in July of 1993, neither the Supreme Court nor this court had expressly adopted the "state-created danger" theory of substantive due process liability.[10]  Indeed, as noted above, neither this court nor the Supreme Court has yet

---

of other circuits in determining whether a right was "clearly established." While this alternative holding is binding precedent, see Williams v. Cain, 229 F.3d 468, 474 n.5 (5th Cir. 2000) (noting that alternative holdings are binding precedent in this circuit), we emphasize that such alternative analysis should be rare in qualified immunity cases and should not be undertaken routinely by the panels of this court.

[10]     We note that if this court had expressly adopted or rejected the state-created danger theory prior to July of 1993 that would, of course, be the end of our inquiry.  See, e.g., Boddie, 989 F.2d at 748 (noting that, even when there is a split among federal appellate courts regarding the appropriate resolution of a question of law, "[o]ur [qualified immunity] inquiry ends, if we find from examining the decisions of the Supreme Court and our own decisions that the law was clearly established in this circuit").

determined whether a citizen has a constitutional right to be
free from state-created dangers.  However, McClendon contends
that the viability of the state-created danger theory was clearly
established law in July of 1993 because this court had discussed
the theory favorably in Salas v. Carpenter, 980 F.2d 299, 309
(5th Cir. 1992), and because a number of other federal circuits
had expressly adopted the theory.  In support of this argument,
McClendon relies on Melear v. Spears, 862 F.2d 1177 (5th Cir.
1989), in which a panel of this court indicated that it is
sometimes appropriate to look outside Fifth Circuit and Supreme
Court precedent in determining what constitutes clearly
established law.  The Melear court reasoned:

> As a general proposition, we will not rigidly
> define the applicable body of law in
> determining whether relevant legal rules were
> clearly established at the time of the
> conduct at issue.  Relying solely on Fifth
> Circuit and Supreme Court cases, for example,
> would be excessively formalistic, but they
> will loom largest in our inquiries.  In
> determining what the relevant law is, then, a
> court must necessarily exercise some
> discretion in determining the relevance of
> particular law under the facts and
> circumstances of each case, looking at such
> factors as the overall weight of authority,
> and the status of the courts that render
> substantively relevant decisions, as well as
> the jurisdiction of the courts that render
> substantively relevant decisions.

Id. at 1185 n.8 (internal citations omitted).

Detective Carney, in contrast, maintains that this court
must be guided exclusively by Fifth Circuit and Supreme Court

authority in assessing whether the state-created danger theory was clearly established law in July of 1993.  In support of this contention, he points to Shipp v. McMahon, in which a panel of this court found that "in determining whether a right is clearly established, we are confined to precedent from our circuit or the Supreme Court." 234 F.3d 907, 915 (5th Cir. 2000).  Detective Carney accordingly contends that he is entitled to qualified immunity because the state-created danger theory was not clearly established in this circuit in July of 1993.

To resolve this apparent conflict between Melear and Shipp, we look to the Supreme Court's qualified immunity cases addressing what constitutes clearly established law.  The most directly applicable authority is the Court's recent decision in Wilson v. Layne, 526 U.S. 603 (1999).  Wilson involved § 1983 actions and actions brought pursuant to Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971), by homeowners alleging that state and federal law enforcement officers violated the homeowners' Fourth Amendment rights by bringing members of the media into their home to observe and record the officers' attempted execution of an arrest warrant on the homeowners' son. The Fourth Circuit held that the officers were shielded from liability by the doctrine of qualified immunity.  See Wilson v. Layne, 141 F.3d 111, 115-17 (4th Cir. 1998).  On writ of certiorari, the Supreme Court initially concluded that the

22

officers' actions violated the plaintiffs' Fourth Amendment
rights under current law.  See 403 U.S. at 614.  The Court then
went on to consider whether a reasonable officer could have
believed that bringing members of the media into a private home
during the execution of an arrest warrant was lawful in light of
clearly established law in April of 1992.  While conceding that
there was no directly controlling Fourth Circuit or Supreme Court
authority establishing the illegality of such conduct, the
plaintiffs pointed to a decision issued five weeks prior to the
officers' actions in which the Sixth Circuit held that police may
not bring along third parties during an entry into a private home
pursuant to a warrant for purposes unrelated to those justifying
the warrant.  See Bills v. Aseltine, 958 F.2d 697 (6th Cir.
1992).  The plaintiffs contended that this decision was
persuasive authority sufficient to clearly establish the
unlawfulness of the officers' conduct.

The Supreme Court rejected this argument and held that the
officers were entitled to qualified immunity, finding that "the
law on third-party entry into homes was [not] clearly established
in April 1992."  Wilson, 526 U.S. at 617.  The Court reasoned:

> Petitioners have not brought to our attention
> any cases of controlling authority in their
> jurisdiction at the time of the incident
> which clearly established the rule on which
> they seek to rely, nor have they identified a
> consensus of cases of persuasive authority
> such that a reasonable officer could not have
> believed that his actions were lawful.

Id. (emphasis added).[11]

This language in Wilson clearly suggests that, in the absence of directly controlling authority, a "consensus of cases of persuasive authority" might, under some circumstances, be sufficient to compel the conclusion that no reasonable officer could have believed that his or her actions were lawful. See also Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992) ("Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."); Capoeman v. Reed, 754 F.2d 1512, 1514 (9th Cir. 1985) ("[I]n the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established . . . ."). Because the Supreme Court's method of analysis in Wilson is inconsistent with the rule predicated in Shipp, Shipp's statement that "we are confined to precedent from our circuit or the Supreme Court" in analyzing whether a right is clearly established for the purposes of qualified immunity analysis, see 234 F.3d at 915, is overruled.

---

[11]    The Wilson Court also suggested that the Sixth Circuit's decision in Bills was not controlling because that decision did not define the Fourth Amendment right invoked by the Wilson plaintiffs with sufficient specificity to clearly establish that the officers' conduct violated that right. Wilson, 526 U.S. at 615-17.

In light of <u>Wilson</u>, we must consider both this court's treatment of the state-created danger theory and status of this theory in our sister circuits in assessing whether a reasonable officer would have known at the time of Detective Carney's actions that his conduct was unlawful. As the Supreme Court recently explained in <u>Hope v. Pelzer</u>, 122 S. Ct. 2508 (2002), "qualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." <u>Id.</u> at 2515 (quoting <u>Saucier</u>, 533 U.S. at 206). Thus, the "salient question" under the second prong of the <u>Siegert</u> test is "whether the state of the law at the time of the state action gave [the state actors] fair warning that their alleged treatment of the plaintiff was unconstitutional." <u>Roe</u>, 2002 WL 1575250 at *9 (quoting <u>Hope</u>, 122 S. Ct. at 2515).

Prior to July of 1993, this court had only once considered a civil rights claim premised on a "state-created danger" theory. In <u>Salas v. Carpenter</u>, 980 F.2d 299 (5th Cir. 1992), this court considered a § 1983 suit brought by the estate of a slain hostage against the county sheriff who commanded the hostage rescue efforts. The victim claimed that the county sheriff deprived her of her life by preventing city officials from coming to her aid, using incompetent hostage negotiators, and failing to provide adequate weapons and communication equipment to handle the hostage situation. We found that the sheriff was entitled to

qualified immunity from suit.  In considering the victim's claim,
we recognized that some of our sister circuits had found "a
denial of due process when the state creates the . . . dangers"
faced by an individual, id. at 309 (citing Gregory v. City of
Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992); L.W. v. Grubbs, 974
F.2d 119, 121 (9th Cir. 1992); Wood v. Ostrander, 879 F.2d 583
(9th Cir. 1989); and White v. Rochford, 592 F.2d 381 (7th Cir.
1979)), and that at least one court had further found that "a
claim may exist when officials increase a person's vulnerability
to private violence by interfering with protective services which
otherwise would be available," id. (citing Freeman v. Ferguson,
911 F.2d 52 (8th Cir. 1990)).  However, we did not sanction these
courts' analyses.  Instead, we merely noted that the facts
underlying these decisions were distinguishable from the
situation facing the sheriff in Salas.  Unlike the state
officials at issue in Wood, Rochford, and Grubbs, the sheriff
"did not worsen [the victim's] position and abandon her to allow
events to run their course."  Id.  Determining that no court had
found a state official constitutionally liable on a state-created
danger theory in a situation sufficiently analogous to the facts
at hand, we concluded that the sheriff was entitled to qualified
immunity because the Salas plaintiffs had failed to state a
cognizable constitutional claim.

As we have recognized on numerous subsequent occasions, our decision in Salas did not address the viability of the state-created danger theory or define the contours of an individual's right to be free from state-created dangers.  See, e.g., Piotrowski I, 51 F.3d at 515; Lefall, 28 F.3d at 530-31.  Salas simply held that, even under the most expansive articulations of the state-created danger doctrine sanctioned by other courts at that time, the plaintiffs had not stated a cognizable claim. This discussion in Salas would not have provided a reasonable officer with "fair warning" that creating or increasing a danger to a known victim with deliberate indifference towards that victim violates the victim's substantive due process rights. Furthermore, our Salas decision was certainly insufficient to provide a reasonable officer with "fair warning" that Detective Carney's particular actions in loaning Loftin a gun would violate McClendon's substantive due process rights.

Turning to the law of our sister circuits, we note that six circuits had sanctioned some version of the state-created danger theory in July of 1993, at the time of Detective Carney's allegedly unlawful actions.  See, e.g., Dwares v. City of New York, 985 F.2d 94, 99 (2d Cir. 1993); Freeman v. Ferguson, 911 F.2d 52, 54-55 (8th Cir. 1990); Wood v. Ostrander, 879 F.2d 583, 596 (9th Cir. 1989); Cornelius v. Town of Highland Lake, 880 F.2d 348, 359 (11th Cir. 1989) (overruled on other grounds by White v.

27

_Lemacks_, 183 F.3d 1253, 1256 (11th Cir. 1999)); _Nishiyama v. Dickson County, Tenn._, 814 F.2d 277, 282 (6th Cir. 1987) (overruled on other grounds by _Lewellen v. Metro. Gov't of Nashville_, 34 F.3d 345, 349 (6th Cir. 1994)); _Bowers v. DeVito_, 686 F.2d 616, 618 (7th Cir. 1982).  Moreover, as McClendon correctly points out, no circuit had explicitly rejected the state-created danger theory in July of 1993.  While both of these factors are relevant to our determination whether there was a "consensus of cases of persuasive authority" sufficient to provide Detective Carney with "fair warning" that his acts were unlawful, the mere fact that a large number of courts had recognized the existence of a right to be free from state-created danger in some circumstances as of July, 1993 is insufficient to clearly establish the unlawfulness of Detective Carney's actions.

The Supreme Court has recognized on numerous occasions that the operation of the "clearly established" standard depends substantially upon the level of generality at which the relevant legal rule is defined.  _See, e.g., id._ at 614-15; _Anderson v. Creighton_, 483 U.S. 635, 640 (1987).  As the _Anderson_ Court explained:

> [T]he right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.  Much the same could be said of any other constitutional or

>statutory violation. But if the test of
>"clearly established law" were to be applied
>at this level of generality, it would bear no
>relationship to the "objective legal
>reasonableness" that is the touchstone of
>[the qualified immunity analysis]. . . . It
>should not be surprising, therefore, that our
>cases establish that the right the official
>is alleged to have violated must have been
>"clearly established" in a more
>particularized, and hence more relevant,
>sense: The contours of the right must be
>sufficiently clear that a reasonable official
>would understand that what he is doing
>violates that right.

Anderson, 483 U.S. at 640; accord Wilson, 526 U.S. at 614-15. As

Anderson and Wilson make clear, assessing the "objective legal

reasonableness" of an officer's actions in light of clearly

established law requires a court to consider not only whether

courts have recognized the existence of a particular

constitutional right, but also on whether that right has been

defined with sufficient clarity to enable a reasonable official

to assess the lawfulness of his conduct. See also Hope, 122

S.Ct. at 2515. Accordingly, in the instant case we must assess

whether those cases from our sister circuits recognizing the

existence of a substantive due process right to be free from

state-created danger established the contours of that right with

sufficient clarity to provide a reasonable officer in Detective

Carney's position with fair warning that providing Loftin with a

gun would violate McClendon's rights.

29

Those courts sanctioning some version of the state-created danger theory prior to 1993 might fairly be characterized, at a high level of generality, to be in agreement about the existence of a substantive due process right to be free from state-created danger.  However, these courts were not in agreement as to the specific nature of that right.  For example, these courts apparently disagreed as to the appropriate mental state required to hold a state actor liable for harms inflicted by third parties.  While most courts agreed that something more than "mere negligence" was required to support liability, the Ninth Circuit apparently favored a "deliberate indifference" standard, see Grubbs, 974 F.2d at 122-23, the Sixth Circuit used a slightly different "gross negligence" test, see Nishiyama, 814 F.2d at 282, and the Second Circuit hinted that intent to injure might be required, see Dwares, 985 F.2d at 99.  In addition, even those courts accepting the theoretical validity of the state-created danger doctrine admitted uncertainty as to its contours.  See, e.g., Freeman, 911 F.2d at 55 (noting that "[i]t is not clear, under DeShaney, how large a role the state must play in the creation of danger and in the creation of vulnerability before it assumes a constitutional duty to protect").  Thus, while a number of our sister circuits had accepted some version of the state-created danger theory as of July of 1993, given the inconsistencies and uncertainties within this alleged consensus

30

of authorities, an officer acting within the jurisdiction of this court could not possibly have assessed whether his or her conduct violated this right in the absence of explicit guidance from this court or the Supreme Court.[12]  Accord Butera, 235 F.3d at 653 (concluding that "as of 1997, the 'contours' of the rights created by the State endangerment concept were not settled among the circuits").

In addition, it is significant that no court in 1993 had applied the state-created danger theory to a factual context similar to that of the instant case.  As the Hope Court recently emphasized, state officials can still be on notice that their conduct violates established law, even in novel factual circumstances.  Hope, 122 S. Ct. at 2516.  The "clearly established" prong of the qualified immunity inquiry does not require that "the very action in question [must have] previously been held unlawful."  Anderson, 483 U.S. at 640.  Nonetheless, the unlawfulness of the state official's actions "must be apparent" in light of pre-existing law to preclude the official from invoking qualified immunity.  Id.

---

[12]    The reluctance of this court, in the ten years since Salas was decided, to embrace some version of the state-created danger theory despite numerous opportunities to do so suggests that, regardless of the status of this doctrine in other circuits, a reasonable officer in this circuit would, even today, be unclear as to whether there is a right to be free from "state-created danger."  Put differently, a strong consensus of authorities in other circuits is more likely to be determinative on a subject when this circuit is tabula rasa on that subject than when the landscape in this circuit is littered with opinions expressing varying levels of skepticism.

31

In the circumstances of the instant case, we cannot say that the unlawfulness of Detective Carney's particular actions should have been apparent to him in light of clearly established law in July of 1993.  The relatively few pre-1993 state-created danger cases that were brought against law enforcement officers (as opposed to child welfare officials or hospital officials) generally involved police officers who had deliberately ignored an individual's pleas for assistance, see, e.g., Dwares, 985 F.2d at 96-97; Freeman, 911 F.2d 53-54, or abandoned an individual in a dangerous situation, see, e.g, Gregory, 974 F.2d 1007-09; Wood, 879 F.2d 586.  None of these pre-1993 cases involved an officer whose alleged actions heightened a third party's ability to act in a dangerous manner, as in the instant case.  The fact that the state-created danger theory was recognized at a general level in these precedents did not necessarily provide Officer Carney with notice that his specific actions created such a danger.  While "general statements of the law are not inherently incapable of giving fair and clear warning," Hope 122 S. Ct. at 2516 (quoting United States v. Lanier, 520 U.S. 259, 269 (1997)), this is not a situation where "a general constitutional rule already identified in the decisional law . . . appl[ied] with obvious clarify to the specific conduct in question." Id. (quoting Lanier, 520 U.S. at

32

269).[13]  In such circumstances, qualified immunity should be granted "if a reasonable official would be left uncertain of the law's application to the facts confronting him."  Salas, 980 F.2d at 311 (citing Hopkins v. Stice, 916 F.2d 1029, 1031 (5th Cir. 1990)).

In summary, even if a "consensus" of circuits had adopted some version of the state-created danger theory in July of 1993, this consensus did not at that time establish the contours of an individual's right to be free from state-created danger with sufficient clarity to provide Detective Carney with fair warning that his conduct violated that right.  Accordingly, Detective Carney is entitled to qualified immunity from McClendon's § 1983 action.

### V.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's summary judgment in favor of Detective Carney.  We also AFFIRM the district court's summary judgment in favor of the City.

---

[13]    Indeed, general principles of the law are less likely to provide fair warning where, as here, applicability of the doctrine is highly context-sensitive.  Cf. Anderson, 483 U.S. at 640-41 (reasoning that the clearly established nature of the right to be free from warrantless searches was not necessarily sufficient to clearly establish that an officer's conduct was objectively unreasonable under the particular circumstances that the officer confronted).

E. GRADY JOLLY, Circuit Judge, concurring:

The majority has followed a plausible approach in deciding the qualified immunity issue in this case and I concur in the analysis and result reached.  However, I agree with Judge Parker's very convincing dissent to the effect that the most judicially responsible course for this en banc court to follow would be to decide the specific contours of the "state created danger" cause of action under the Due Process Clause.  I regret that the majority of the court has chosen to pretermit the resolution of this question once again, leaving the bench and bar in doubt as to whether and to what extent such a cause of action exists in this circuit.

EDITH H. JONES, Circuit Judge, joined by RHESA H. BARKSDALE, Circuit Judge, concurring:

I concur in the majority opinion but would emphasize two points. First, it is unnecessary for the court to reach any broad pronouncement on the state-created danger theory of § 1983 liability because, at the level of generality represented by the facts before us, no such theory would be viable. This is why it is imperative for courts carefully to address the first question in qualified immunity analysis: whether, under existing law, the plaintiff states a claim for violation of a clearly established federal right

Second, the panel seriously erred by disregarding ten years' precedents of this court refusing to adopt the theory and instead holding that theory "clearly established" by other circuits' decisions as of 1993. No matter what was clearly established elsewhere, that theory certainly was not and is not established in this court. Fidelity to circuit precedent demands granting qualified immunity whenever the law in this circuit has remained in flux before and after the events that give rise to a particular claim. Compare Butera v. District of Columbia, 235 F.3d 637 (D.C. Cir. 2001).

EMILIO M. GARZA, Circuit Judge, concurs in the judgment only.

See Walton v. Alexander, 44 F.3d 1297, 1306 (5th Cir. 1995)(en banc)("In sum, we hold that a 'special relationship' arises between a person and the state only when this person is involuntarily confined against his will through the affirmative exercise of state power.  Absent this 'special relationship,' the state has no duty to protect nor liability from failing to protect a person under the due process clause of the Fourteenth Amendment from violence at the hands of a private actor." (emphasis added)).

ROBERT M. PARKER, Circuit Judge, joined by Circuit Judges WIENER and HAROLD R. DeMOSS, JR., dissenting:

What would a reasonable person think would happen if a police officer in the course of his employment takes a pistol from the evidence locker or from his desk and gives it to a gang member with a history of drug involvement who needs it for a confrontation with a drug dealer? Any reasonable person would conclude that the state created or enhanced a dangerous situation when the officer gave the pistol to the gang member. There is no dispute that the gang member, Kevin Loftin, used the pistol provided by Detective Carney to shoot the drug dealer, McClendon.

So how does one read the majority opinion, particularly in light of the fact that the majority does not reject the state-created danger theory outright? The only way to explain the majority opinion is that it clearly reflects a court that aspires to be the only circuit in the country to reject the state-created danger theory but cannot bring itself to admit it. Instead, the Court has embarked on a ten-year course of back-door rejection by assuming arguendo that the theory is viable and then finding that the victim has just not made the case. Far better it would be if

37

this Circuit wants to embrace the extreme position of being the only circuit to reject the theory to simply say so.

In general, the majority correctly identifies two main issues in this case.[14]  However, these two issues need be addressed only if the state-created danger theory is a viable mechanism for recovery under § 1983 in this Circuit.  The majority once again fails to resolve this initial question.  Instead, it produces a convoluted opinion, compelling me to dissent.

## I.   IS THE STATE-CREATED DANGER THEORY A VIABLE THEORY IN THIS CIRCUIT?

The majority's Achilles' heel is its unwillingness to either adopt or reject the state-created danger theory as the law of the Circuit.  Over the last ten years, at least seven state-created danger cases have arrived in our Circuit, but we have never taken a position on whether the state-created danger theory is a valid one, choosing instead to duck the issue.  We simply stated in each case (without explicitly adopting or rejecting the theory) that the evidence is insufficient to raise a genuine issue of material fact concerning one or more of the elements that comprise the theory.[15]

---

[14] First, viewing the evidence in the light most favorable to McClendon, has McClendon raised a genuine issue of material fact concerning each of the elements of his state-created danger claim.  Second, if so, was it "clearly established" law at the time of the incident that a police officer who did what Carney did could be subject to liability for violating the Due Process Clause of the Fourteenth Amendment.

[15] *See Piotrowski v. City of Houston*, 237 F.3d 567, 584 (5th Cir. 2001)("*Piotrowski II*"); *Randolph v. Cervantes*, 130 F.3d 727, 731 (5th Cir. 1997); *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir. 1997); *Piotrowski v. City of Houston*, 51 F.3d 512, 515-17 (5th Cir.

38

Our methodological approach - assuming arguendo for the purposes of each case that the state-created danger theory is a valid one but never explicitly rejecting or adopting it - cannot be defended and leaves this area of circuit law in a perpetual state of confusion.[16]

To the untrained eye, the majority's methodological approach may appear slightly different from the tact taken by the previous seven panels that addressed state-created danger claims. Indeed, the *McClendon* majority never specifically states that it will assume arguendo, without deciding, that the theory is a viable one. However, that is precisely what the majority has done. It (1) implicitly assumes that the theory is a viable one without

---

1995)("*Piotrowski I*"); *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994); *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 530 (5th Cir. 1994); *Salas v. Carpenter*, 980 F.2d 299, 309 (5th Cir. 1992).

[16] The majority's methodological approach would perhaps be defensible if (1) this was the first time we were presented with the state-created danger theory, the theory was clearly without merit and as a consequence unlikely to be asserted again in the district courts; and (2) little or no legal authority existed on the viability of the theory. However, neither of these circumstances are present here. First, the state-created danger claim has been asserted by litigants in the district courts in our Circuit for more than a decade and will likely continue to be asserted absent our explicit rejection of it. In fact, we ourselves have addressed this theory on at least seven different occasions. Second, a wealth of federal authority exists in our sister circuits concerning the viability of this theory. The majority's approach is further questionable given my conclusion that a couple of the Circuit's prior decisions which analyze whether a plaintiff has made out a valid state-created danger claim are not above reproach. For example, while it is true that this case presents the worst state-created danger claim we have ever seen, the behavior of the police in the *Piotrowski* case was similarly galling. The *Piotrowski* facts were so bad that a jury awarded the plaintiff $20 million, however, we had no qualms reversing. *See Piotrowski II*, 237 F.3d at 572. Moreover, in *Johnson*, we affirmed the dismissal of a state-created danger claim on a Rule 12(b)(6) motion even though further discovery could have shed light on the actual knowledge and level of culpability of school district officials in creating an allegedly dangerous environment in which a high school student was shot and killed by a non-student in the school hallways during normal school hours. *See Johnson*, 38 F.3d at 205-08 (Goldberg, J., dissenting).

accepting or rejecting it outright; and (2) then finds that the facts do not amount to "deliberate indifference" as a matter of law.

Regardless of how the majority chooses to articulate it, this is the same analytical approach we have employed in the previous state-created danger cases and is the same analytical approach the Supreme Court has told us not to employ. The Circuit's *modus operandi* in these cases plays like a broken record - same approach, same result, and same confusion created for the district courts, state officials, and the general public concerning the Circuit's position on this important issue. In choosing to play this broken record yet again, the majority skirts the central issue in the case: Whether the substantive component of the Due Process Clause guarantees a citizen the right to be free from acts of violence inflicted by a third party when the state actor played an affirmative role in creating or exacerbating the dangerous situation that led to the citizen's injury. In failing to answer this fundamental question, the majority shirks its constitutional duty.

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." It is well-established that deprivations of due process can be substantive. The substantive component of the Due Process Clause "protects individual liberty

against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)(quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986). However, the Supreme Court has warned us that "substantive-due-process cases [require] a 'careful description' of the asserted fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (citation omitted). Here, the fundamental liberty interest at stake is McClendon's interest in his bodily integrity.

It is indisputable that there is a general substantive due process right to bodily integrity. *See e.g., Planned Parenthood v. Casey*, 505 U.S. 833 (1992). In a case involving sexual abuse of a public school child by her teacher, this Circuit clearly held that "[t]he right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process." *Doe v. Taylor Independent School District*, 15 F.3d 443, 450-51 (5th Cir. 1994)(*en banc*)(quoting *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir. 1981). The other circuits have also upheld the constitutional principle that there is a substantive due process right to be free from state-imposed violations of bodily integrity in cases involving rape and sexual harassment by police officers as well as cases involving sexual abuse of public school students by school employees. *See Rogers v. City of Little Rock*, 152 F.3d 790, 796 (8th Cir. 1998)(police

41

officer violated a woman's substantive due process right to bodily integrity when he used his position of power as a police officer to rape her); *Plumeau v. School District #40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)(public school students have a substantive due process right not to be sexually abused by school employees at school).

The particular question presented by the state-created danger theory is whether it is constitutionally permissible to find that a state actor's egregious conduct which creates a "special danger" that the citizen's bodily integrity will be physically violated by a third party is tantamount to the state actor "occasioning" the damage to the individual's bodily integrity even though the state does not commit the actual physical injury itself. In my view, the substantive due process right to bodily integrity can extend to cover such a situation as long as the state actor engages in affirmative conduct which creates the danger.

In *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001), the D.C. Circuit held that "under the State endangerment concept, an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that ultimately results in the

42

individual's harm."[17]  The implication from this holding is that the constitutional duty to protect the individual's bodily integrity only arises when the state takes affirmative steps to create the danger for the individual.  Thus, the actual constitutional violation occurs when the state fails to protect the individual from the dangers the state has made of its own creation.  In other words, the state "occasions" the damage to the individual's bodily integrity because it fails to protect the individual from a danger of its own creation.  The rationale for equating state acts which impose direct physical injury on an individual with affirmative conduct by the state which creates or increases the danger that a private party will impose direct physical injury to an individual is straightforward.  As the Seventh Circuit stated, "[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."  *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982).

Consequently, the linchpin for concluding that a substantive due process violation can be made out under the state-created danger theory is the "affirmative conduct" requirement.  The

---

[17] The D.C. Circuit is the last circuit to explain the rationale for recognizing a substantive due process right based upon the state-created danger theory.  The *Butera* opinion is lengthy, well-reasoned and constitutes persuasive authority.

"affirmative conduct" requirement prevents the state from being held liable for acts of omission.  Similarly, the theory's requirements that the state actor must know that his actions endanger a specific individual[18] and that a direct causal connection must exist between the state actor's conduct which increases the danger and the actual injury itself[19] are commensurate with the Supreme Court's recognition that the Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."  *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 195 (1989).[20]

In addition to the D.C. Circuit, the other circuits have confronted this issue and have determined that constitutional liability under § 1983 can exist "where the state creates a

---

[18] *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998)(finding that the state must have known or clearly should have known that its actions specifically endangered an individual).

[19] *See Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3rd Cir. 1996)(the harm ultimately caused by the state-created danger must be foreseeable and fairly direct).

[20] In the case at bar, the "affirmative action" element, "knowledge" element, and "causation" element are satisfied.  First, Detective Carney knew that Loftin intended to use the gun in any altercation with McClendon.  Thus, he had actual knowledge that McClendon was at substantial risk of injury. Second, Detective Carney engaged in affirmative conduct because he gave Loftin a deadly weapon which Loftin could use to shoot McClendon.  Third, there is a direct causal connection between the injury suffered and the affirmative conduct.  Detective Carney created the danger that McClendon would be shot in the face by giving Loftin the gun.  If Carney had not given Loftin the gun, Loftin would only have had his bare fists to use as weapons in any potential altercation with McClendon.  Thus, but for Carney giving Loftin the gun, Loftin likely could not have caused McClendon to suffer such severe injuries.

44

dangerous situation or renders citizens more vulnerable to danger." *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir.), *cert. denied*, 510 U.S. 947 (1993). As the majority notes, the Second, Third, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have each accepted the state-created danger theory as a viable means of protecting a citizen's substantive due process rights.[21]   My research further indicates that the remaining circuits (i.e., the First and Fourth Circuits) have expressed similar support for the theory.[22]   Consequently, the state-created danger theory is overwhelmingly accepted in today's federal jurisprudence.

In the face of such overwhelming authority, the majority cowers. It does not have the courage to be the only federal circuit court of appeals in the nation to explicitly reject the

---

[21] *See* Majority Opinion, *supra*, at notes 6-7.

[22] The First Circuit has adopted the state-created danger theory as a viable means of obtaining Section 1983 relief in rare and exceptional cases. *See Frances-Colon v. Ramirez*, 107 F.3d 62, 63-64 (1st Cir. 1997)(substantive due process interest in "bodily integrity" can support a personal injury claim under Section 1983 in the rare and exceptional cases when a government employee affirmatively acts to increase the threat of harm to the claimant). In addition, the Fourth Circuit considered a state-created danger claim and noted that there may be some "point on the spectrum between action and inaction" in which the state would be implicated in the harm caused by third parties. *See Pinder v. Johnson*, 54 F.3d 1169, 1175(4th Cir.)(en banc), *cert. denied*, 516 U.S. 994 (1995). This observation suggests the Fourth Circuit accepts the notion that a state actor who affirmatively acts to create a danger could be subject to constitutional liability. Indeed, in a subsequent unpublished opinion, the Fourth Circuit analyzed a state-created danger claim and indicated that the state can be liable for the acts of third parties when the state itself creates the danger. *See Stevenson v. Martin County. Bd. of Educ.*, No. 99-2685, 2001 WL 98358, *5 (4th Cir.), *cert. denied*, 122 S. Ct. 54 (2001).

45

state-created danger theory even though that is clearly what it wants to do. Although the majority refuses to take the road less traveled in a principled albeit unpopular way, it is perfectly willing to accomplish its objectives through subterfuge. The majority knows only too well how to play the game. If the Circuit never rules on whether this is a viable theory, the Circuit makes it exceedingly difficult for the district courts to rule that the Circuit law in state-created danger cases is "clearly established" for purposes of a qualified immunity analysis. Thus, state actors who engage in behavior that falls within the confines of the "state-created danger" theory will always escape liability under the majority's view no matter how egregious their behavior. That is an insidious approach to the law and I reject it outright.

The Circuit should quit hiding the ball from the public and make a decision one way or the other. It has refused.[23] However, I favor adopting, as has the rest of the country, the state-created danger theory as a viable mechanism for obtaining Section 1983 relief in this Circuit.

## II.   THE CONSTITUTIONAL VIOLATION AND QUALIFIED IMMUNITY ANALYSIS

The majority opinion arrives at several conclusions that I believe are patently absurd under the facts of this case. First,

---

[23] In refusing to make this decision, the majority attempts to create the illusion that no Circuit split exists in hopes of avoiding Supreme Court scrutiny.

the majority concludes that "while Detective Carney's actions in providing Loftin with a gun were certainly inadvisable . . . no rational trier of fact could find that Detective Carney acted with any level of culpability beyond mere negligence."[24]  Second, the majority concludes that "Detective Carney's conduct was not objectively unreasonable in light of clearly established law at the time of his actions."[25]  I will address each baseless conclusion in turn.

## A.    Carney's actions constitute deliberate indifference

I agree with the majority that in order to survive summary judgment on his substantive due process claim McClendon must produce sufficient facts from which a rational fact-finder could conclude that Detective Carney acted with culpability beyond mere negligence.    Because Detective Carney had plenty of time to "deliberate" as to whether he could properly give Loftin the gun, McClendon is only required to prove that Detective Carney acted with deliberate indifference.[26]  For two main reasons, I find that

---

[24] *See* Majority opinion at 18.

[25] See Majority opinion at 19.

[26] The majority correctly states that a plaintiff who asserts a substantive due process violation is required to show that the state's conduct "shocks the contemporary conscience."  However, in *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998), the Supreme Court intimated that the point of conscience shocking may be reached in some circumstances by proving "something more than negligence but 'less than intentional conduct, such as recklessness or gross negligence." (citation omitted).  The Court noted that the level of culpability which can constitute "conscience shocking" is a "matter for closer calls."  *Id*.  It then indicated that a state official's deliberate indifference can be "constitutionally shocking" in the context of a custodial prison situation if "actual deliberation is practical."  *Id*. at 851.  Thus,

McClendon has produced sufficient evidence from which a rational trier of fact could not avoid concluding that Carney acted with deliberate indifference to McClendon's substantive due process right.

First, McClendon gave Loftin a gun at a time when he knew the dispute between McClendon and Loftin was "at a boiling point." Detective Carney knew that Loftin wanted the gun because he desired to use it as a weapon in any altercation with McClendon. He knew that Loftin and McClendon were likely to meet at some point in time. It is true that he had no specific knowledge that they would see each other at the Hendrix Street Apartments on the night in question. However, this fact is largely irrelevant to our analysis. The "knowledge" inquiry under a deliberate indifferent analysis does not require such a level of specificity. Clearly, Detective Carney had actual knowledge that Loftin and McClendon would likely have an altercation and that violence would almost certainly ensue between the two.[27]

---

whether the deliberate indifference standard should be applied to the instant case depends upon whether Detective Carney had actual time to deliberate. *See Butera*, 235 F.3d at 652. Because deliberation was practical for Detective Carney, the deliberate indifference standard is applicable.

[27] The record reflects that Loftin asked Carney for a gun because his own gun had been seized by the City of Columbia police department as the result of an incident in which an individual either borrowed or stole Loftin's gun and used Loftin's gun to shoot McClendon's friend. Indeed, the genesis of the dispute between McClendon and Loftin appears to have been the fact that Loftin's gun was used by another person to shoot McClendon's friend. In any event, Carney did not give Loftin his own gun back, but instead gave him a different gun that had allegedly been seized by the City of Columbia as evidence pursuant to an unrelated investigation.

The majority inexplicably states that "While Detective Carney was informed that McClendon potentially posed a threat to Loftin's safety, there is no indication that Loftin had any violent intentions toward McClendon."[28] What does the majority think Loftin intended to do with the gun provided to him by Detective Carney - place it on his wall as a souvenir?  Of course not, gang members who ask for guns typically have violent intentions as any competent police officer knows.  The majority implies that Detective Carney was not aware that Loftin had any violent intentions towards McClendon because Detective Carney merely "loaned" the gun to Loftin for self-protection.  However, the majority's suggestion that Detective Carney believed that Loftin only intended to use the gun for self-protection belies common sense and is not a fact which a rational jury would be required to accept as true.  On the contrary, the record evidence indicates that Detective Carney did not give Loftin any specific instructions as to when and under what circumstances he could rightfully use the gun.  Detective Carney does not appear to have placed any limitations on Loftin's use of the gun.

In short, Loftin is a gang member who serves as a confidential informant because he is involved in the drug scene.  McClendon is a drug dealer.  Any officer with enough sense to be entrusted with a gun knows that if he gives a gun to a gang member with a history

---

[28] *See* Majority Opinion at p. 18.

49

of drug involvement who is anticipating a confrontation with a drug dealer, there is a strong likelihood that should an altercation arise the gang member will use that gun to shoot the drug dealer, with or without provocation.

Second, Detective Carney took property held by the City of Columbia(i.e., the gun) and gave it to a confidential informant. The majority characterizes this act as "inadvisable" or perhaps "negligent." I characterize the act as criminal. My determination that Detective Carney's actions violate Mississippi criminal law completely undermines the majority's conclusion that no rational trier of fact could find that Detective Carney's actions amount to deliberate indifference.

Mississippi law criminalizes embezzlement by police officers. Miss. Code Ann. § 97-11-25 (West 2001) makes it a crime for a city police officer to "unlawfully convert to his own use any money or other valuable thing which comes to his hands or possession by virtue of his office or employment." A conviction under this statute carries with it the possibility of as much as twenty (20) years incarceration.[29]

---

[29] § 97-11-25 states in total: "If any state officer or any county officer, or an officer in any district or subdivision of a county, or an officer of any city, town or village, or a notary public, or any other person holding any public office or employment, or any executor, administrator or guardian, or any trustee of an express trust, any master or commissioner, or receiver, or any attorney at law or solicitor, or any bank or collecting agent, or other person engaged in like public employment, or any other person undertaking to act for others and instrusted by them with business of any kind, or with money, shall unlawfully convert to his own use any money or other valuable thing which comes to his hands or possession by his virtue of office or employment, or shall not, when lawfully required to turn over such

In my view, Detective Carney's action in taking the gun from the evidence drawer/locker and giving it to Loftin constituted embezzlement by a public official in violation of § 97-11-25.[30] Detective Carney's position as a police officer made him a "public official" as defined by § 97-11-25. The gun was a "valuable thing" for purposes of § 97-11-25. Detective Carney had possession of the gun "by virtue of his employment" as a "public official" as required by § 97-11-25. Finally, Detective Carney "unlawfully converted" the gun to his own use when he gave the gun to Loftin because this act was adverse to the City's ownership interests in the gun. *See Board on Law Enforcement Officer Standards and Training v. Rushing*, 752 So. 2d 1085, 1087 (Miss. Ct. App. 1999)(deputy sheriff who took a firearm that was the property of the county and pawned it for $250 committed an act that was sufficiently adverse to the county's ownership rights in the property to constitute an act of embezzlement).

**B.    Qualified Immunity**

---

money or deliver such thing, immediately do so according to his legal obligation, he shall, on conviction, be committed to the department of corrections for not more than twenty (20) years, or be fined not more than five thousand dollars ($5,000.00)."

[30] As noted earlier, the gun had been seized as evidence in an unrelated investigation by the City of Columbia police department. Thus, the City exercised proper control over the gun but held it on behalf of the rightful owner of the gun and/or the public. *See Re: Inventory of Evidence Vaults*, Miss. Att'y Gen. Op. No. 2000-0081, 2000 WL 530411 (March 10, 2000)(noting that evidence held in the custody of a law enforcement department is held in trust for the rightful owner of such evidence, and/or ultimately for the benefit of the public should such evidence become the subject of a forfeiture). Because the gun belonged to the City, Detective Carney had no legal right to dispossess the gun from the City's control.

Because the majority determines that McClendon has not adduced sufficient facts to prove "deliberate indifference," the majority's opinion should come to a screeching halt at that point.  On the contrary, however, recognizing that its conclusion that no rational jury could find the deprivation of a constitutional right defies common sense, the majority seeks to further justify its decision by alternatively holding that Detective Carney is entitled to qualified immunity because the contours of the state-created danger theory were not "clearly established" at the time of the incident.

The majority reasons that Detective Carney should not have known that giving the gun to Loftin was unlawful because (1) we did not explicitly adopt the state-created danger theory in *Salas*; (2) our sister circuits which had recognized the theory by 1993 had slight variations concerning the mental state required to hold a state actor liable for harms inflicted by third parties; and (3) these circuits had not applied the theory to this precise factual situation.  I address each point in turn.

First, it is true that we had not explicitly adopted the state-created danger theory in July of 1993.  However, as the majority notes, we have indicated in the past that we will look to the overall weight of authority in determining whether the law is clearly established. *See Melear v. Spears*, 862 F.2d 1177, 1185 n.8 (5th Cir. 1989).  The Supreme Court has blessed this approach. *See Wilson v. Layne*, 526 U.S. 603, 617 (1999)(indicating that a

52

consensus of cases of persuasive authority is sufficient to put a police officer on notice of the lawfulness of his actions).

Second, the majority contends that the numerous cases which had adopted the state-created danger theory by 1993 do not constitute a "consensus of cases of persuasive authority" on this point of law because slight variations existed among the circuits concerning the level of culpability required to hold the state actor constitutionally liable. This conclusion strikes me as plainly inconsistent with the more liberal approach to the "clearly established law" inquiry as set forth in *Wilson*.

Third, the majority's suggestion that the law cannot be "clearly established" if no prior case exists which found the exact behavior engaged in by the police officer to be unlawful misconceives the purposes which underlie the "clearly established law" inquiry and is incongruent with our precedent. We explained in *Petta v. Rivera*, 143 F.3d 895, 899 (5th Cir. 1998):

> [F]or a right to be "clearly established" we require that its "contours . . . must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." It is not necessary, however, that prior cases have held the particular action in question unlawful; "but it is to say that in the light of preexisting law the unlawfulness must be apparent." (internal citations omitted).

By July of 1993, a consensus of cases of persuasive authority existed to put reasonable police officers on notice that they may

violate the Constitution if (1) they create or increase a danger to a known victim; and (2) act with deliberate indifference towards the known victim during the creation of such danger. The majority's conclusion that the unlawfulness of Detective Carney's actions should not have been apparent to him in light of the clearly established law in July of 1993 simply cannot be justified given the fact that (1) the majority of circuits had adopted the state-created danger theory by July of 1993; and (2) Detective Carney's actions violated Mississippi criminal law.

There are certain things any police officer should know will violate the Constitution even if no reported case exists which finds the action in question unlawful. As stated previously, any reasonable officer in Detective Carney's position would understand that providing Loftin with a gun created a danger that Loftin would shoot McClendon. In fact, any officer with enough sense to be entrusted with a gun knows that giving a gun to a gang member with a history of drug involvement who is anticipating a confrontation with a drug dealer is creating a dangerous situation. Thus, a reasonable officer would recognize that this type of action could result in a violation of McClendon's constitutional rights. Consequently, I would also hold that Detective Carney is not entitled to qualified immunity from McClendon's § 1983 action.

I dissent.

54

WIENER, Circuit Judge, concurring in Judge Parker's dissent and further dissenting from the en banc opinion:

I concur in Judge Parker's dissent, writing a few additional lines of my own just to emphasize one point and to advance another. First, I am as incredulous as Judge Parker that the majority can take the position that "McClendon has not adduced any evidence suggesting that Detective Carney acted with anything other than ordinary negligence in the instant case," and that "[t]here is no indication that Detective Carney was aware that Loftin had any violent intentions toward McClendon." Not only did Carney commit an overt act of commission — an unlawful one at that — by arming Loftin (whom Carney knew to be an intimate member of the illicit drug culture), but he did so in direct response to being informed by Loftin of an impending confrontation between Loftin and McClendon that only the most naive Pollyanna could expect would be anything other than physical and violent. Given all the information that Carney had, it is this court that is being naive about the sufficiency of the evidence amounting to considerably more than negligence: recklessness and, ultimately, deliberate indifference to McClendon's right to inviolate bodily integrity.

More importantly to me, however, is what — with the utmost respect — I view as a misapprehension of the central issue of this case — the kind of constitutional right proffered by McClendon that was required to have been clearly established at the time if

he were to avoid an adverse judgment grounded in qualified immunity. All the wrangling over "state-created danger" is a classic red herring which has led this court away from the proper analysis.

Long before the instant incident, the constitutional right to be free from state violation of bodily integrity was well established. It is that right that McClendon asserts: His bodily integrity was violated when he was ruthlessly shot in the face by Loftin with the very gun that had been unlawfully entrusted to him by Detective Carney. McClendon does not contend that Carney, as a state actor, created the danger that produced his blinding injury; he does contend — correctly — that (1) Carney had to be totally aware of the potential of a physically violent confrontation between McClendon and Loftin, (2) Carney had to know (or at least is presumed to have known) that the act of arming Loftin was unlawful under Mississippi law, (3) the overt, unlawful act of commission in arming Loftin was undeniably reckless and thus done with deliberate indifference, and (4) Carney's state act not only increased and enhanced the likelihood that McClendon's bodily integrity would be violated; it made it a virtual certainty.

This leaves as the only open issue not whether the danger was state created (or even state enhanced) but whether the reckless, deliberately indifferent act of Detective Carney, as a state actor, was a producing cause of the violation of McClendon's constitutional right. If this case presents any legal question, therefore, it is whether there is a sufficient nexus between the

56

deliberately indifferent state act and the violation of the citizen's right to bodily integrity. Stated differently, was the intervening action of the non-state actor, Loftin, which clearly violated the victim's bodily integrity, sufficiently causally connected to the behavior of the state actor, Detective Carney, as to constitute the legally actionable cause of the violation of McClendon's constitutional right?

We have previously held that a remote state actor can be denied qualified immunity when his deliberate indifference exposes the victim to a constitutional violation perpetrated by an interposed party, even in situations that would be non-custodial under DeShaney. For example, we denied qualified immunity to the school principal in Doe v. Taylor ISD[31] because his deliberate indifference, in light of information no more damning than that possessed by Detective Carney, not only increased the likelihood of the young schoolgirls' bodily integrity being violated by a third party (the predatory teacher/coach whom the principal's alleged recklessness allowed to continue in a position of predation); it made the violation possible. That the teacher/coach was himself a state actor and the instant confidential informant was not is a distinction without a difference to this taxonomy. In both cases, the interposed party acted precisely as the facts clearly known to the state actor — the school principal in Doe and Detective Carney here — would predict. The state actor's deliberate indifference was the sine qua non to the constitutional violation.

---

[31] 15 F.3d 443 (5th Cir. 1994)(en banc).

57

Because a genuine issue of material fact is presented in this case regarding the Detective's role in the violation of McClendon's clearly established constitutional right to an inviolate bodily integrity, I respectfully dissent from the grant of qualified immunity grounded in the spurious and inapplicable issue of state-created danger.  This is a garden variety case implicating the violation of a clearly established constitutional right, which violation flowed from the reckless and unlawful — deliberately indifferent —  behavior of a state actor that was objectively unreasonable under the plethora of facts known to him at the time. This case should go to trial to flesh out all the facts and let the jury determine whether the deliberate indifference of Detective Carney had a sufficient nexus with the constitutional violation suffered by McClendon, given the interposition of the confidential informant (not a state actor) who was armed by Carney and sent forth to a violent confrontation that Carney had to know was imminent.