

253

United States District Court
Southern District of Texas
FILED

MAR 1 3 2003  3:30p

Michael N. Milby, Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

Arturo Guillermo Salinas, et al., §
§
      **Plaintiffs** §
§   **CIVIL CASE NO. 98-162**
v. §   **(Consolidated with B-98-163 &**
§   **B-99-70)**
§
§
City of Harlingen, §
Defendant. §

United States District Court
Southern District of Texas
ENTERED

MAR 1 3 2003

Michael N. Milby, Clerk of Court
By Deputy Clerk ᴍ.ʟᴏᴘᴇᴢ

### ORDER

BE IT REMEMBERED that on March 13, 2003, the Court considered Defendant's Motion for Reconsideration of Renewed Motion for Judgment as a Matter of Law [Dkt. No. 246]. For the reasons that follow, the Court hereby **GRANTS** this motion.

### I.

### Factual Background

Plaintiffs filed complaints pursuant to 42 U.S.C. § 1983 against the City of Harlingen, Texas ("the City") for alleged violations of their constitutional rights under the Due Process Clause of the Fourteenth Amendment. Based on a theory of state created danger, Plaintiffs argued the City and Police Chief Scheopner, as a final policy maker, maintained unconstitutional policies and procedures and created a dangerous environment that allowed officers to possess certain weapons despite their lack of training on the use and storage of these weapons. Plaintiffs also filed state law claims against the City for ordinary negligence and negligent entrustment under section 1.01 of the Texas Tort Claims Act ("TTCA").

On July 7, 1998, Earnest Moore ("E. Moore") shot and killed Border Patrol agents Susan L. Rodriguez and Ricardo G. Salinas and seriously injured a Deputy Sheriff of Cameron County, Raul Rodriguez. This shooting spree occurred outside the

1

home of R.D. Moore, a Harlingen Police Department officer and detective. R.D. Moore was E. Moore's father. E. Moore was killed as a result of this incident when police officers and Border Patrol agents returned fire. The Plaintiffs in this lawsuit are the immediate relatives of the murdered Border Patrol agents as well as the Deputy Sheriff, Raul Rodriguez.

The weapon E. Moore used to shoot the officers was an AR-15 semi-automatic rifle that a private citizen had turned into the Harlingen Police Department for destruction. The Harlingen Police Department, rather than destroy or otherwise dispose of the weapon, allowed R.D. Moore to take the weapon home. R.D. Moore stored the weapon in a gun safe kept in his son's bedroom. R.D. Moore's assigned duties on the police force did not necessitate his possession of this weapon, nor had he received recent training or undergone certification for this weapon. R.D. Moore gave his son access to this weapon along with other weapons owned by both E. Moore and R.D. Moore. E. Moore had a key to the gun safe, despite the fact that he had a history of drug abuse, took prescribed Prozac, and possessed Nazi paraphernalia.

II.

## Procedural Background

In April 2000, the Court issued a Nunc Pro Tunc order in which it dismissed the federal claims against Defendants R.D. Moore and Chief Scheopner on the basis of qualified immunity.[1] In this order, the Court acknowledged the uncertainty of the state created danger theory as a basis for a Substantive Due Process claim in the Fifth Circuit [Dkt. No. 43]. Assuming this theory was viable in the Fifth Circuit, however, the Court held the state created danger theory was not clearly established at the time of the alleged violation, and therefore Defendants R.D. Moore and Chief Scheopner were entitled to qualified immunity. After the dismissal of these defendants, a federal claim against the City of Harlingen remained under the same theory of liability –a state

---

[1] The remaining state law claims against R.D. Moore and Jim Scheopner were dismissed pursuant to the parties' agreed motion [Dkt. No. 61].

created danger theory. In addition, Plaintiffs' claims under the Texas Tort Claims Act for negligence and negligent entrustment remained.

In August, 2001, the Court granted partial summary judgment for the City of Harlingen because the Court found the City's policies were not the proximate cause of the constitutional violations, and consequently the City could not be liable under 42 U.S.C. § 1983 [Dkt. No. 134]. In particular, the Court stated,

> "[a]lthough City policies allowed E. Moore access to the City-owned AR-15 semi-automatic rifle he ultimately used to murder Agents Rodriguez and Salinas and to attempt to murder Deputy Rodriguez, they did not thereby create an opportunity that otherwise would not have existed for E. Moore to commit those crimes. E. Moore had equal access to his own semi-automatic rifles and ammunition in the gun safe in his bedroom and there is no evidence to indicate that it was anything but happenstance that he selected a City-owned weapon instead of one of his own weapons.

See Summary Judgment Memorandum Opinion, at p. 29 [Dkt. No. 134].

In October, 2001, the Court granted the Plaintiffs' Motion for Reconsideration of the Partial Summary Judgment and withdrew its previous order as it applied to Plaintiffs' section 1983 Fourteenth Amendment Substantive Due Process claim, and denied Defendant's Motion for Summary Judgment [Dkt. No. 146]. The Court granted this Motion for Reconsideration on the basis of newly discovered evidence. In its Motion for Summary Judgment, the City had asserted that E. Moore randomly selected the gun used on the day of the shooting. Plaintiffs submitted the affidavit of E. Moore's former girlfriend, Julie Cox. The Court held this affidavit raised a material issue of fact concerning E. Moore's use of the AR-15, and whether this gun was his preferred weapon. Cox asserted in her affidavit that E. Moore had used the weapon in question may times before; E. Moore liked that gun; and R.D. Moore allowed his son, E. Moore, to use the gun on many occasions. The Court held E. Moore's preference of weapon impacted on "whether the state's lack of weapons policy which allowed him access to this weapon increased the danger to the victims, or whether he would have gone on a shooting spree had he never possessed this gun." See Court's Order granting Motion for Reconsideration, at p. 11 [Dkt. No. 146].

3

A jury returned a verdict in favor of Plaintiffs on both the federal and state law claims.  The jury found there was negligent use of the rifle by an employee of the Harlingen Police Department who was operating within the scope of his employment, and this negligence proximately caused the officers' deaths and injuries.  The jury also found a custom or policy was made or adopted by the City of Harlingen with deliberate indifference, which caused a state created danger that was the proximate cause of the deaths and injuries.  See Jury Verdict and Interrogatories [Dkt. No. 207].  The jury awarded the Plaintiffs a total of $35,000,000.00 (thirty-five million dollars).  The jury's damage awards did not differentiate between the state and federal claims.

The Court has previously denied two Motions for Judgment as a Matter of Law submitted by Defendants.  The first motion was heard at trial at the close of evidence, and the Court orally denied the motion.  In June, 2002, the Court also denied Defendant's written renewed Motion for Judgment as a Matter of Law [Dkt. No. 224].  Presently before the Court is Defendant's Motion for Reconsideration of Renewed Motion for Judgment as Matter of Law [Dkt. No. 246].   Defendants argue that in light of the Fifth Circuit's recent en banc decision of McClendon v. City of Columbia, 305 F.3d 314 (5th Cir. 2002) (en banc), there was no evidence presented at trial of deliberate indifference and "actual knowledge of and disregard of excessive risk of harm to a specific person's health"; and "it is insufficient that the official should have perceived the risk but did not."  See Defendant's Motion for Reconsideration, at p. 3 [Dkt. No. 246].[2]

The Court agrees.  The McClendon decision and other more recent decisions dictate that the Court set side the jury's verdict because evidence was not presented that could lead a jury to conclude the City acted with deliberate indifference to constitutional violations.

---

[2]  Defendants base their Motion for Reconsideration on the federal claims only.  This Court has previously determined the state claims survived Defendant's Motions for Judgment as a Matter of Law.  The Court does not, therefore, now revisit arguments concerning the state claims.  As a result, the jury verdict will stand on the state law claims.

III.

Reconsideration of Renew Motion for Judgment As A Matter of Law

A motion for judgment as a matter of law in an action tried by a jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict. See Cozzo v. Tangipahoa Parish Council–President Government, 279 F.3d 273, 280 (5th Cir. 2002) (citing Brown v. Bryan County, Okla, 219 F.3d 450, 456 (5th Cir. 2000)). As a result, this Court must consider the evidence "'drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party[,]'" Id. Great respect is given to a jury verdict, and should be reversed "'only if no reasonable jury could have arrived at its verdict.'" Id. (quoting Snyder v. Trepagnier, 142 F.3d 791, 795 (5th Cir. 1998)).

Motions for reconsideration are not recognized in the Federal Rules of Civil Procedure per se. See Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 173 (5th Cir. 1990), abrogated on other grounds by Little v. Liquid Air Corp., 37 F.3d 1069, 1075 n.14 (5th Cir. 1994). This motion was not served within 10 days of the final judgment or the Court's denial of Defendant's Renewed Motion for Judgment As a Matter of Law. Because Defendant seeks relief from the jury verdict, as opposed to a correction of a clerical error, the motion will be construed as a motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b). See Harcon Barge Co. v. D & G Boat Rentals, Inc., 784 F.2d 665, 667 (5th Cir. 1986). Rule 60(b)(6) allows a district court to exercise its discretion, and vacate a final judgment for "any other reason justifying relief from the operation of the judgment." Seven Elves, Inc. v. Eskenazi, 635 F.2d 396, 402 (5th Cir. 1981). Rule 60(b)(6) "is a residual or catch-all provision to cover unforeseen contingencies – a means to accomplish justice under exceptional circumstances." Edward H. Bohlin Co. v. Banning Co., 6 F.3d 350, 357 (5th Cir. 1993).

Defendant has not submitted its Motion for Reconsideration pursuant to any Federal Rule of Civil Procedure, stating only that this court has discretionary power to review and rule on the motion. Plaintiffs do not contest the Court's authority to consider this motion. See Plaintiffs' Response to Defendant's Motion for Reconsideration [Dkt. No. 248]. The basis of Defendant's Motion for Reconsideration is a newly rendered

5

Fifth Circuit decision, <u>McClendon v. City of Columbia</u>, 305 F.3d 314 (5th Cir. 2002) (en banc), which was decided several months after this Court issued its final judgment. Changes in the law, however, do not generally constitute "extraordinary circumstances" required for granting Rule 60(b)(6) relief -- the only subpart of Rule 60(b) that is applicable in this case. See <u>Hess v. Cockerell</u>, 281 F.3d 212, 216 (5th Cir. 2002). In the present case, however, Defendants have supplemented their Motion for Reconsideration with the recently decided case of <u>Morin v. Moore</u>, 309 F.3d 316 (5th Cir. 2002). Unlike the cases previously decided by the Fifth Circuit in which the Court has explained the circumstances that qualify as "extraordinary," this Court believes extenuating circumstances exist that warrant discretionary review of the Motion to Reconsider.

At least some courts have viewed Rule 60(b)(6) to be a "'grand reservoir of equitable power to do justice in a particular case.'" <u>Van Skiver v. United States</u>, 952 F.2d 1241, 1244 (10th Cir. 1992) (citing <u>Pierce v. Cook & Co.</u>, 518 F.2d 720, 722 (10th Cir. 1975) (en banc) (quoting <u>Radack v. Norwegian Am. Line Agency, Inc.</u>, 318 F.2d 538, 542 (2d Cir. 1963)). In <u>Pierce</u>, the court distinguished between average post-judgment changes in law versus post-judgment changes in the law that occur in a related case. The <u>Morin</u> case was an outgrowth of the same facts and incidents underlying the present case. In this respect, rather than presenting a change in the law in the traditional sense, the <u>Morin</u> case actually provided the Fifth Circuit with an opportunity to analyze many of the facts of the <u>Salinas et al.</u> case currently before this Court and to determine whether the state created danger theory was applicable. Given the Fifth Circuit's determination in <u>Morin</u> and its interpretation of other newly decided cases, extraordinary circumstances have been presented that warrant reconsideration of the Court's previous Judgment As a Matter of Law rulings.

IV.

A. <u>Constitutional Violation Under the State Created Danger Theory</u>

The Due Process Clause of the Fourteenth Amendment does not generally require a governmental entity to protect citizens from the actions of private individuals. Further, it "generally confer[s] no affirmative right to governmental aid, even where such

6

aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual . . . [A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnegabo County Dep't of Social Servs., 489 U.S. 189, 196-97 (1989). Two basic exceptions to this rule are triggered when the state has a special relationship with the individual or the state exposes the individual to a danger the state created. See Piotrowski v. City of Houston ("Piotrowski II"), 237 F.3d 567, 584 (5th Cir. 2001). The basic requirements of the state created danger are: "[f]irst, a plaintiff must show that the state actors increased the danger to the [victims]. Second, a plaintiff must show that the state actors acted with deliberate indifference." See Piotrowski v. City of Houston ("Piotrowski I"), 51 F.3d 512, 515 (5th Cir. 1995).

Although not adopting the state created danger theory, the Fifth Circuit has enumerated four necessary elements: (1) the environment created by the state actors must be dangerous; (2) the state actors must know that it is dangerous; (3) the state actors must have used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur; and, (4) the state must have effectively stripped a person of her ability to defend herself, or cut off potential sources of private aid. See Johnson v. Dallas Indep. Sch. Dist., 38 F.3d 198, 201 (5th Cir. 1994).

Plaintiffs alleged the municipality violated the Fourteenth Amendment's Due Process Clause under the state created danger theory. In its most recent pronouncements on the state created danger theory, the Fifth Circuit has held that consistent with prior rulings, this circuit has neither adopted nor rejected the theory. See, e.g., McClendon, 305 F.3d at 314; McKinney v. Irving Independent School District, 309 F.3d 308 (5th Cir. 2002); Morin, 309 F.3d at 316. In light of these decisions, the Court will not now attempt to reconstruct the history of the state created danger theory. Instead, as it has done in its previous orders, the Court assumes the state created danger theory is a viable cause of action in this circuit. Rather, the Court grants Defendant's Motion because there was insufficient evidence presented at trial to demonstrate the facts of this case fit into the contours of the theory already elucidated by the Fifth Circuit. Namely, no reasonable jury could find the City, by virtue of the

7

actions of its policymakers, acted with deliberate indifference toward the officers' constitutional rights. As such the jury's verdict cannot stand.

### B. Deliberate Indifference Under the State Create Danger Theory

Because the facts and circumstances of the present case are a continuation of the facts in the Morin case, this Court is most persuaded that the Fifth Circuit's determination there guides this Court's analysis here. See Morin, 309 F.3d at 316. Morin v. Moore involved E. Moore's initial shootings, which triggered a manhunt and led to the eventual murders and injury to the officers in the present case. The Morins, immediate relatives of the victims killed by E. Moore in the first shooting spree, brought a section 1983 claim against the City of Harlingen and Officer Moore and Police Chief Scheopner. They alleged that R.D. Moore came into possession of an AK-47 assault rife with the permission of Police Chief Jim Scheopner. This assault rife, like the AR-15, had been turned over to the police department by a private citizen for destruction. The Morins brought suit against the city under the same theory of liability – they alleged the City and Police Chief created a dangerous environment and maintained unconstitutional policies and procedures that led to the murders of several individuals. See Morin, 309 F.3d at 318-19. The Fifth Circuit upheld the district court's dismissal of the section 1983 claims against the City because the allegations did not show specific knowledge of an imminent harm to a known victim. See Morin, 309 F.3d at 323

More specifically, in Morin the Fifth Circuit held the Plaintiffs had failed to demonstrate the officers acted with deliberate indifference despite the fact that Plaintiffs alleged Officer Moore (1) knew his son was psychologically unstable, (2) knew his son abused drugs, (3) knew his son was distraught because his ex-girlfriend had moved in with a new boyfriend, and (4) knew a confrontation between his son, the ex-girlfriend and new boyfriend would ensue. See id. at 324. Even in light of these allegations and the fact that R.D. Moore's son did in fact take the AK-47 from the gun safe in his bedroom and kill or injure several individuals, the allegations still did "not demonstrate that officer Moore 'used [his] authority to create an opportunity that would not otherwise have existed.'" Moore, 309 F.3d at 324 (citing Piotrowski II, 237 F.3d at 585). In this respect, the Court noted the similarities between Morin and Piotrowski II. In the latter,

8

the Fifth Circuit held there was no demonstrated deliberate indifference even when the "jury-trial evidence revealed that members of the Houston Police Department had actually shielded and protected the plaintiff's wealthy boyfriend and his accomplices as they harassed the plaintiff and plotted to kill her." Id. at 573-75. The Appeals Court determined that "no matter what official protection [the assailants] received, the City actors did not create the danger [that the plaintiff] faced . . . [T]he city at most left her in an already dangerous position." Id. at 584.

A similar outcome was reached in McClendon v. City of Columbia.[3] In McClendon, a City of Columbia police detective loaned a police informant a gun after the informant told the detective he feared for his safety. The informant explained to the detective that he feared a particular individual, McClendon, whom the informant thought may retaliate against him because the informant had previously supplied a gun to an individual who shot McClendon's friend. After the detective gave the gun to the informant, the informant encountered McClendon and shot McClendon in the face, permanently blinding him. The Fifth Circuit held that mere negligence is not enough to trigger liability under the state created danger theory. See McClendon, 305 F.3d at 325. Additionally, the Fifth Circuit reiterated that the elements of the state created danger theory require the defendant to act with "deliberate indifference" toward the plaintiff. See id. at 326. In order to demonstrate deliberate indifference, the state actor must "'know [ ] of and disregard [ ] an excessive risk to [the victim's] health or safety.'" Id. at 326 n.8 (quoting Ewolski v. City of Brunswick, 287 F.3d 492, 513 (6th Cir. 2002) (other citation omitted). "A state actor's actual knowledge is critical to the inquiry. A state actor's failure to alleviate 'a significant risk that he should have perceived but did not,' while 'no cause for commendation,' does not rise to the level of deliberate indifference." Id. (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994). See also

---

[3] Although the plaintiffs in McClendon also brought claims against the City, the Court held that even if the policy of failure to properly train officers was sufficiently culpable, the plaintiffs had failed to prove a causal connection between this failure and the injury sustained. See McClendon, 305 F.3d at 319 (reinstating the panels' determination on the claims against the City).

Johnson v. Dallas Independent School District, 38 F.3d 198, 201 (5th Cir. 1994) (holding that in order to prove deliberate indifference, the state actors must have created the dangerous environment, they must have known it was dangerous, and they must have "used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur.").

In McClendon, the Fifth Circuit held that although the detective's actions were negligent, or even grossly negligent, his actions did not rise to the level of deliberate indifference. See id. at 326. The Court reasoned there was no indication the informant had any violent intentions toward McClendon. See id. Further, the detective had no reason to know the informant and McClendon "would have a chance encounter," and the detective had no reason to "predict[ ] that [the informant] would have the opportunity to assault McClendon with the gun that Detective Carney loaned [the informant] for self-protection." Id. Finally, the Court determined that although the detective's actions "were certainly inadvisable, there [was] no evidence in the record suggesting that he acted with knowledge that his conduct would pose a threat to McClendon's safety." Id. at 326. The Fifth Circuit, therefore, has made it clear even egregious actions in which it would be reasonable to infer or foreseeable that a particular injury will eventually occur is not enough to trigger liability under the state created danger theory.

Finally, the Fifth Circuit recently declined to extend the state created danger theory to an incident that occurred on a school bus transporting special needs children. See McKinney, 309 F.3d at 308. McKinney, a teacher and bus driver, documented frequent and serious behavioral problems on his school bus, which included students fighting, throwing objects at other motorists, and leaping from the emergency exit in the rear of the bus into traffic. At one point, McKinney even called 911 for assistance when he was unable to safely operate and monitor the students at the same time. These frequent and severe behavioral problems led McKinney to request from the school district that a monitor be placed on the bus to supervise the students and ensure the safety of all those on the bus. McKinney directed his requests to those who had authority to dispatch such a monitor. After the school district refused to assign a monitor to the bus, McKinney was attacked by a student on the bus and sprayed in the

10

eyes with a fire extinguisher. McKinney sustained injuries as a result of the attack, and he brought a Fourteenth Amendment claim against the city under the state created danger theory. The district court dismissed the claim, arguing that even if such a theory existed, the facts of that case did not fit into the contours of the state created danger theory. The Fifth Circuit affirmed the district court. See McKinney, 309 F.3d at 310-311. The McKinney court reiterated that "'[t]he key to the state-created danger cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid.'" McKinney, 309 F.3d at 314 (citing Johnson, 38 F.3d at 201).

Additionally, in McKinney the district court determined the plaintiffs failed to sufficiently allege deliberate indifference "because they had not shown that defendant's failure to place a monitor on the bus created an opportunity for the attack to occur which would not have otherwise existed." "'[T]he type of assault described in McKinney's pleadings could have occurred regardless of whether a monitor was placed on the bus.'" McKinney, 309 F.3d at 314. The Fifth Circuit held that being willfully blind that certain dangers existed, even in the face of McKinney's warnings that an attack would likely occur without the assistance of a monitor was not enough to satisfy the deliberate indifference element of the state-created danger. See id. Indeed, in Doe v. Hillsboro Independent School District, the Fifth Circuit stated, "post hoc attribution of known danger would turn inside out [the] limited exception [of the state created danger] to the [general] principle of no duty [to protect individuals from injury caused by private actors]." 113 F.3d 1412, 1415 (5th Cir. 1997) (en banc) (holding school district did not have prior knowledge that one of its students would be in danger of being raped, even though a number of its employees had criminal records).

IV.

### A. Municipal Liability Under Section 1983

Municipal liability was alleged in this case under 42 U.S.C. § 1983, which provides a mechanism for persons to seek redress for deprivations of federal constitutional rights caused by persons or local governmental entities acting under color

11

of state law.  See Monell v. Dept. of Soc. Services of City of New York, 436 U.S. 658,
689 (1978).  Plaintiffs' theory rests on a violation of the Fourteenth Amendment's
Substantive Due Process Clause and the right to bodily integrity.  In order to sustain a
claim against a municipality under section 1983 for the deprivation of a constitutional
right, the injury (constitutional violation) must occur pursuant to an official custom or
policy.  See Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir. 1984) (en banc).  All
policies, whether they are facially unconstitutional or innocuous, that are alleged to
have caused constitutional violations, must be the "moving force" or legal cause of the
constitutional violation.  See Monell, 436 U.S. at 694.  In short, municipal liability
requires the existence of three discreet components – (1) a policy maker; (2) a policy;
and (3) a policy that is the "moving force" behind the constitutional violation.  See
Piotrowski I, 237 F.3d at 578.  The Fifth Circuit has often explained the requirements
for proving municipal liability in the following way:

> [Board of Comm'rs of] Bryan County [v. Brown] underscores the need for Monell
> plaintiffs to establish both the causal link ("moving force") and the City's degree
> of culpability ("deliberate indifference" to federally protected rights).  These
> requirements must not be diluted, for '[w]here a court fails to adhere to rigorous
> requirements of culpability and causation, municipal liability collapses into
> respondeat superior liability.'

See Piotrowski II, 237 F.3d at 580; Snyder v. Trepagnier, 142 F.3d 791, 796 (5th Cir.
1998) (citing Board of Comm'rs of Bryan County v. Brown, 520 U.S. 397, 410 (1997)).
Stated differently, it is not enough that a particular individual, without policy making
authority, acted single-handedly to violate an individual's constitutional rights.  Plaintiffs
cannot demonstrate deliberate indifference by "showing . . . simple or even heightened
negligence."  Bryan County, 520 U.S. at 407.  Finally, plaintiffs must identify explicitly
each policy that allegedly caused the constitutional violation.  See Piotrowski II, 237
F.3d at 579-580.

　　　　In Piotrowski, a case of egregious police misconduct, a woman brought suit
against the city after she alleged her boyfriend attempted to kill her with the cooperation
of the police.  The woman alleged certain members of the police department prevented
follow-up to a tip concerning her attempted murder and prevented the police from

warning her.  Piotrowski alleged the City was liable because certain police officers moonlighted as private investigators and worked under Bell, the private investigator who ultimately arranged the murder contract on Piotrowski.  Piotrowski alleged the police department had a policy that amounted to acquiescence to the officers' moonlighting for Bell.  See Piotrowski II, 237 F.3d at 581.  Even under these circumstances, the Fifth Circuit held there was no evidence the policy was the "moving force" causing Piotrowski to be shot.  See id.  More importantly, the Court held that even though there was a widespread custom of allowing police officers to moonlight for Bell, abuses of the private investigator's services could not be equated with evidence that the City would be "deliberately indifferent to the likelihood that officers moonlighting for Bell would get involved in murder for hire . . . . [T]he policy of allowing improper moonlighting employment may have been culpable, but causation was not established."  See id. at 581.

Plaintiffs could demonstrate the City of Harlingen acted with deliberate indifference when it enacted, or failed to enact adequate policies and procedures to govern the possession and safeguarding of department weapons by showing that it deliberately or consciously chose not to enact these polices despite being on notice that the polices in place at the time had failed to prevent tortious conduct by its officers.  See McClendon, 258 F.3d at 442.  To establish the City acted with deliberate indifference, "[t]he environment created by the state actors must be dangerous; they must know it is dangerous; and . . . they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur."  Piotrowski II, 237 F.3d at 585 (quoting Johnson, 38 F.3d at 201).  Additionally, "[t]he key to the state-created danger cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively place an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid."  Id.

13

## B. Final Policy Maker

In their Motion for Judgment as a Matter of Law, the City does not contend that Chief Scheopner was not a final policy maker for the purpose of a section 1983 claim against the City.  Nor did the City raise this issue during the trial.  Although the identification of a final policymaker for a governmental entity is a question of state law to be determined by the Court, the Court need not revisit this issue and make determinations on an angle of defense not raised by Defendants. See Gros v. City of Grand Prairie, Tex., 181 F.3d 613, 615-17 (5th Cir. 1999).  Moreover, ample evidence was presented at trial demonstrating Chief Scheopner was delegated final policymaking authority over the Harlingen Police Department's policies concerning all aspects of weapons' assignments, safeguarding, and training.

## C. Policies of the Harlingen Police Department

Plaintiffs have identified several specific policies, which they allege resulted in a constitutional violation under the Substantive Due Process Clause.  The jury instructions enumerated these policies and procedures: the failure to enforce regulations requiring the demonstration of proficiency with assigned weapons; the failure to instruct or train police officers concerning storage, safeguarding, or the assignment of weapons; and the failure to have a policy requiring written assignment of weapons to the officers.  See Final Jury Instructions, p.10 [Dkt. No. 203].  At trial Plaintiffs presented evidence that the Harlingen Police Department failed to adopt or follow proper policies and procedures for the disposal of weapons; the assignment of weapons to officers; the proper storage of weapons; improper training; improper demonstration of proficiency for those weapons assigned, even informally, to officers; and failure to require proof of qualifications to use certain weapons before their assignment.  See, e.g., Testimony of Rodolfo Jaramillo, Texas Ranger, Tr. 02/19/02, at pp. 106-71 (testifying that verbally assigning weapons to officers is not good practice and violates national standards and that good practice requires that officers qualify to use weapons semi-annually).

Indeed, the then Chief of Police, Jim Scheopner, testified at trial that there were no written records of the assignment of two weapons--the AR-15 (or Olympic Arms)

14

semi-automatic weapon and the AK-47 semi-automatic weapon--to Moore. See Tr. 02/20/02, at p. 236. Scheopner specifically authorized Moore to keep the AR-15 at his home. Id. at 237. In fact, during this time, the Department only kept a written record or list of assignments for Baretta 92 models issued to police officers. Id. Scheopner never gave instructions to Moore regarding the safe keeping of the AR-15 and never specified that Moore should not allow family members to use the weapon. Id. at 240-41. The Chief acknowledged that Moore did not have a certificate qualifying him to use the AR-15, despite the fact that Moore's only known training on this type of weapon occurred in the 1970's. Id. at 249-50.[4]

Chief Scheopner acknowledged at trial that neither Moore nor Captain Vasquez, the officer who directly assigned the weapon to Moore, demonstrated proficiency for the AR-15 to the range master, as required by the Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE") guidelines. Id. at 283. Officer Vasquez never notified the Chief in writing that Moore had taken possession of the AR-15, but instead notified him verbally of the assignment. Id. at 262. The Chief discussed the report of James Roberson,[5] a consultant hired by the City Manager to study the managerial practices of the police department. Id. at 262. Mr. Roberson concluded in his report that the Chief made mistakes in the handling of the investigation of the Department's involvement in the shooting; Vasquez violated Department policy concerning the assignment of a weapon to an officer without requiring the officer to demonstrate his proficiency or providing a valid reason to make an exception; and Moore violated Department policies and exercised poor judgment. Id. at 267-68.

Officer R.D. Moore testified the AR-15 was not the only weapon assigned without a written assignment. Id. at 365. In fact, in his estimation, there existed a policy and custom of allowing officers to carry weapons without a certificate of qualification. Id. at

---

[4]  Chief Scheopner acknowledged during this testimony that he had previously concluded that no laws or policies had been violated. Tr. 02/20/02, at p. 283. He contended at trial, however, that certain procedures and policies were in fact violated. Id.

[5]  This report was admitted into evidence at trial.

15

367.  The custom to which he referred at trial involved an officer's ability to notify
Captain Vasquez of the officer's desire to have a particular weapon assigned to him.
Id.  Without written documentation and upon the permission of Captain Vasquez, the
officer could then take the weapon home.  Id.

   Joe LaBeau, Assistant City Manager, also conducted an investigation and review
of the administrative procedures in the Department at the behest of the City Manager,
Natalie Prim.[6]  LaBeau's findings echo those of Roberson.  In short, LaBeau found that
polices concerning safe guarding of weapons, the assignment of weapons, and the
maintenance of proficiency requirements and records were either disregarded as a
matter of custom in the Department or simply did not exist.  Tr. 02/21/02, at pp. 499-
507.  Additionally, he found the policies and procedures regarding weapons inventory
were inadequate, and the procedures concerning weapons in general were not in
compliance with both the Department's policies and those standards set by TCLEOSE.
Id.  See also Plaintiffs' Ex. 16 (LaBeau's Report to the City Manager).

   Similarly, the expert testimony and report of George Kirkham, a criminologist with
a specialization in the procedures and standards adopted and enforced in law
enforcement, indicates the Department either failed to adopt or failed to follow proper
procedures and policies regulating the assignment and safeguarding of weapons.
Specifically, Mr. Kirkham testified that he has been involved in the study of many cases
in which an officer's child injures or kills someone with a police department issued
weapon.  Tr. 02/21/02, at p. 42.  In all of these departments, there was no system of
policies or procedures or training regarding the safe maintenance of weapons.  Id.  Mr.
Kirkham concluded that Moore, Scheopner, and Vasquez violated policies and
procedures, and there were "clear and extremely serious violations of nationally
accepted law enforcement standards for this weapon."  Id. at 53.  He found there
existed in the Department unwritten policies that were contrary to standard policies and

---

[6] Joe LaBeau was unavailable to testify at trial. His testimony was presented via deposition
taken prior to trial.

16

procedures. Id. at 63. Finally, he concluded the actions of the officers involved and Chief Scheopner constituted gross incompetence. Id.

The testimony and exhibits discussed above and presented to the jury distinguish and outline specific policies and customs that in the aggregate show more than a single instance in which the Department failed to properly assign weapons, document and list weapons inventory , maintain records and require adherence to weapons proficiency testing and qualifications, and train officers on the safeguarding of weapons. From the evidence, it appears the police department through the actions of its policy maker, Chief Scheopner, acquiesced in the assignment of the AR-15 to Moore despite the before-mentioned lack of qualifications and more recent training. The evidence additionally shows a customary policy of allowing police officers to take home certain weapons without following proper procedures. The Fifth Circuit, however, has held that this kind of poor judgment is not facially unconstitutional. See Piotrowski II, 237 F.3d at 581. In order for the City to be liable, it must have been deliberately indifferent to known consequences. See id. Even then, the plaintiffs must prove the policy caused, or was the "moving force" behind a constitutional violation. Id.

## V.

### Did Plaintiffs Adduce Sufficient Evidence to Allow a Reasonable Jury to Find the City Acted with Deliberate Indifference Under a State Created Danger and the City's Policies were the Moving Force Behind the Constitutional Violation?[7]

---

[7] The Court limits its review of Defendant's Motion to the arguments presented -- namely that there was insufficient evidence presented to support a finding of deliberate indifference and "actual knowledge of and disregard to an excessive risk of harm." The Court does not delve into whether there was sufficient evidence to support the other elements of the state created danger or whether the City's policy was the proximate cause of the Plaintiffs' constitutional injuries. The Court makes this distinction because Defendants argued in their Motion for Summary Judgment that E. Moore had a choice between other assault rifles, and therefore his choice to use the AR-15 was by chance and not deliberate. Although in its order granting partial summary judgment to Defendants, this Court agreed, it later reversed this decision when Plaintiffs presented evidence that E. Moore chose the particular weapon used in the second shooting because this weapon was his favorite. Much of this evidence presented in the form of an affidavit, was recanted at trial. See Tr. 02/20/02, at 452-56. In light of the evidence presented at trial that revealed E. Moore had access to other assault

In <u>Morin</u>, the district court determined that Plaintiffs had failed to show deliberate indifference because specific knowledge of a harm to a known victim was not demonstrated. More specifically, the district court differentiated that case from the present case because it was presumed the Defendant, Police Chief Scheopner, had knowledge of the E. Moore's criminal intent based on the fact that he had already shot three victims in a previous shooting spree that led the manhunt and eventual deaths of the officers and Border Patrol agents. The Fifth Circuit referenced this Court's reasoning in its Nunc pro tunc order. Namely, this Court found the claims against the City under a state created danger theory survived dismissal because plaintiffs had pled facts in which it was:

> reasonable [to] infer that the police department's final policymaker, Defendant Schoepner [sic], knew that [Earnest] posed a real threat to the decedent. Given that [Officer Moore] told the first person who walked up to his house that his son was on the verge of killing himself or a third person, had taken his father's missing weapon and had committed a prior crime, it would be reasonable to infer that he conveyed the same information to Defendant Police Chief Schoepner [sic], a long-time friend, in the telephone conversation they had before the decedent was killed. If Defendant Police Chief Schopener [sic] knew of the real threat posed by [Earnest] before the decedent was killed, he could have avoided the danger he created by warning the law enforcement team surrounding the house to take necessary precautions to secure their safety.

<u>Morin</u>, 309 F.3d at 322 (quoting Nunc pro tunc order, at pp. 21-22).

As a result of the <u>Morin</u> decision, the question this Court must answer is whether there was sufficient evidence presented to the jury, which would support a finding that the City, by virtue of its policies, acted with deliberate indifference during the time that

---

weapons including another assault rifle that E. Moore privately purchased, it is not clear that the City affirmatively created the danger. "'[I]f the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed.'" <u>Piotrowski II</u>, 237 F.3d 567 (quoting <u>Armijo v. Wagon Mound Public Schools</u>, 159 F.3d 1253, 1263 n.7 (10th Cir. 1998).

lapsed between the first set of murders and the second shooting spree. Stated differently, the Fifth Circuit has already determined that as a matter of law, the facts leading up to the first shootings cannot support liability under the state created danger theory because the allegations did not show specific knowledge of a harm to a known victim. There was no evidence presented at trial that could support a jury's finding that the City and its policy maker actually had specific knowledge of a harm to a known victim *before* the first set of shootings, which could have bearing on whether the City had specific knowledge that the second set of shootings would occur. As a result, the Court now focuses on evidence presented at trial concerning the events that occurred during the lapse of time between the first set of shootings in Rio Hondo and the second set of shootings in which the agents and officer were killed and injured.

At various points in this litigation, Plaintiffs have argued the Defendants, and more particularly, Chief Scheopner, did not take an affirmative step to prevent the injuries and death to the agents. In Plaintiffs' Response to Defendant's Second Motion for Summary Judgment, they argue that once Chief Scheopner knew that E. Moore was a suspect in the Rio Hondo shootings, he did nothing to warn law enforcement officers, including Border Patrol agents Salinas and Rodriguez, of the missing AR-15. Additionally, they argue that Chief Scheopner knew of the dangerous position into which his actions placed the officers as a result of his failure to enact and enforce appropriate policies and procedures, he did nothing to warn or protect them from this specific danger. See Plaintiffs' Response, at p. 7 [Dkt. No. 106].

The evidence adduced at trial revealed the Cameron County Sheriffs Department and Border Patrol agents were responding to a call that indicated E. Moore had been involved in the earlier shootings in Rio Hondo. Indeed, Plaintiff-Raul Rodriguez, a corporal in the patrol division of the Cameron County Sheriff's Department, requested the assistance of Border Patrol once he knew that E. Moore or a truck he was suspected to be driving, had left the scene of the first shootings in Rio Hondo. Tr. 02/22/02, at p. 851. At the time of this request for assistance, Border Patrol was advised to use caution because the suspect was "extremely armed and dangerous." Id.

19

While Plaintiff Raul Rodriguez made his way to R.D. Moore's residence, another Cameron County Deputy Sheriff, Robert Rodriguez, ("Officer Rodriguez") did the same. Officer Rodriguez was the first officer to arrive at R.D. Moore's residence. Tr. 02/21/02, at p. 662. Before the other officers arrived, R.D. Moore explained to Robert Rodriguez that his son was at large and could be found anywhere in the vicinity of his home. Id. R.D. Moore told Robert Rodriguez his son was armed with an AR-15 loaded with three magazines. Id. R.D. Moore even told Officer Rodriguez that he surmised his son was contemplating suicide and he would either kill the officers or force them to kill him. R.D. Moore explained that Officer Rodriguez's bullet proof vest would not stop the rounds fired from an AR-15. Id. at 668-69. With his supervisor's permission, Officer Rodriguez briefed the Border Patrol agents when they arrived. Officer Rodriguez explicitly warned Border Patrol Agent Susan Rodriguez that E. Moore was in the area and was armed with an assault rifle. Id. at 671.

When Plaintiff Raul Rodriguez arrived at R.D. Moore's residence he also spoke directly to R.D. Moore. Plaintiff Raul Rodriguez, along with Sargeant Saenz of the Cameron County Sheriff's Department, elicited more information from R.D. Moore. R.D. Moore stated he did not know where his son was, but that he was armed with an AR-15, which was missing from his gun safe, and his son was a very good shot. Tr. 02/22/02, at p. 848.

At the time of the shootings, therefore, Officer Robert Rodriguez had briefed the Border Patrol agents, and Plaintiff Raul Rodriguez had learned from R.D. Moore that his son was armed with an AR-15. Additionally, George Hupp, a Border Patrol agent, was briefed by Border Patrol Agent Susan Rodriguez. George Hupp testified that Border Patrol Agent Susan Rodriguez explained the suspect had already been involved in a couple of murders, was armed, and "could be as close as in the corn field beside the road where the border patrol unit was parked." Id. at 860.

Evidence was presented at trial that Chief Scheopner knew E. Moore had already been involved in the first shootings and had used an AK-47 assault weapon. Tr. 02/20/02, at p. 287. Evidence was not presented that he knew E. Moore was likely then armed with an AR-15. Based on the above testimony, it appears that regardless

of whether Chief Scheopner issued any warning to the officers and agents involved, they were aware that E. Moore was dangerous, unstable, likely to attack, and armed with an AR-15 assault rifle. Evidence was even presented that Border Patrol Agent Susan Rodriguez was aware that E. Moore could be hiding in the cornfield near the house. Any precautions the officers did or did not take, therefore, were not the result of Chief Scheopner's failure to warn, or mitigate a dangerous situation affirmatively created by the City. Therefore, assuming that Chief Scheopner possessed at least the knowledge that E. Moore had criminal intent based on the previous shootings, the evidence does not suggest that Chief Scheopner's failure to warn affirmatively placed the officers in a position of danger that they would not have otherwise faced. As a result of the officers' knowledge of the dangerous circumstances facing them at the Moore residence, Scheopner's actions did not strip the officers of their ability to defend themselves or cut off potential sources of private aid.[8]  See Piotrowski II, 237 F.3d at 584-85.

## VI.

## Conclusion

As a result of the above reasoning and analysis the Court **GRANTS** Defendant's Motion for Reconsideration of Motion for Renewed Judgment as a Matter of Law on the federal claims. The jury's verdict on the state law claims stands. The Court, therefore, **VACATES** its earlier judgment and will enter an amended judgment consistent with this memorandum decision. Defendant's Motion for New Trial on Damages and Remittitur

---

[8]The Fifth Circuit has indicated, although not specifically held, that stripping an individual of the opportunity to defend himself or cutting off sources of potential aid is generally reserved for facts similar to cases in which a woman was raped after police arrested a drunk driver, leaving her alone in the car at night in a high crime area, Piotrowski II, 237 F.3d at 585 (citing Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989), or when a female city employee was abducted by a prisoner with a violent criminal history who was placed in an inmate work program at the town hall where she worked, id. (citing Cornelius v. Town of Highland Lake, 880 F.2d 348 (11th Cir. 1989), or when police officers left children alone in a car after arresting the driver, id. (citing White v. Rochford, 592 F.2d 381 (7th Cir. 1979).

234

in the Alternative [Dkt. No. 238] [9] is rendered **MOOT** by this decision because Defendant's request pertained only to damages for the federal claims.

DONE this 13th day of March, 2003, at Brownsville, Texas.

Hilda G. Tagle
United States District Judge

---

[9] Defendant notes in its Motion for New Trial on Damages or Remittitur in the Alternative that remittitur is needed only for the damages under federal law because the damage award under the Texas Tort Claims Act is capped by statute at $500,000. Plaintiffs would, therefore, receive a proportionate share of $500,000.