# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 FEB 0 2 2004 |
| | § | |
| Vs. | § | Michael N. Milby |
| | § | Clerk of Court |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162 for all purposes) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162 for all pre-trial matters) |
| CITY OF HARLINGEN, TEXAS. | § | |

---

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO RECONSIDER
DENIAL OF JUDGMENT ON STATE LAW CLAIMS IN LIGHT OF
NEW TEXAS SUPREME COURT DECISION AND
PLAINTIFFS' MOTION TO RECONSIDER THE
COURT'S ORDER OF MARCH 13,2003**

---

Broadus Spivey
State Bar No. 00000076
Federal I.D. No. 11146
Price Ainsworth
State Bar No. 00950300
Federal I.D. No. 8065
Francis Pan
State Bar No. 15443300
Federal I.D. No. 26385
SPIVEY & AINSWORTH, P.C.
48 East Avenue
Austin, TX 78701

Richard Pena
Law Offices of Richard Pena, P.C.
Barton Oaks Plaza Two
901 MoPac, Suite 325
Austin, Texas 7746-5747

**ATTORNEYS–IN-CHARGE FOR PLAINTIFFS ARTURO G. SALINAS, ET AL and GILBERTO M. RODRIGUEZ, ET AL**

And

Mr. Ramon Garcia
Ms. Sonia I. Lopez
Law Offices of Ramon Garcia, P.C.
222 West University Drive
Edinburg, TX 78539
956+383-7441
956+381-0825 (fax)
**ATTORNEYS-IN-CHARGE FOR
PLAINTIFF RAUL RODRIGUEZ**

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................... iii

INDEX OF AUTHORITIES............................................................................................. iv

I. MOTION OPPOSED ..................................................................................................... 2

II. STATUS......................................................................................................................... 2

III. RELIEF REQUESTED BY PLAINTIFF ................................................................. 5

IV. ISSUES PRESENTED ............................................................................................... 5

V. ARGUMENT AND AUTHORITIES.......................................................................... 5

      A.     Recent Fifth Circuit Decisions Embrace the State-Created Danger Cause
            of Action .................................................................................................... 5

            1.     En Banc Decision in *McClendon*........................................... 5

            2.     Cases Decided After *McClendon* ......................................... 6

            3.     Cases Decided After *Scanlan* ............................................. 9

            4.     The Trial of This Case ....................................................... 12

      B.     The Texas Supreme Court's Decision in *San Antonio State Hospital v.*
            *Cowan* can be distinguished .......................................................... 15

            1.     Inherently Unsafe Property ................................................ 16

            2.     Ownership of the Personal Property . ................................... 18

            3.     "Use" is More Than Pulling a Trigger............................... 19

PRAYER .................................................................................................................. 22

# INDEX OF AUTHORITIES

**FEDERAL CASES**                                             **PAGE**

*Borrego v. City of El Paso*
964 S.W. 2d 954 (Tex. App – El Paso 1998, writ den.) .......................................... 20

*City of Waco v. Hester*
805 S.W.2d 807 (Tex. App. – Waco 1990, writ denied)................................... 21

*Delaney v. University of Houston*
835 S.W.2d 56, 60 (Tex. 1992)........................................................... 21

*Desert Place, Inc. v. Costa*
___ U.S. ___, 123 S.Ct. 2148, 156 L.Ed. 2d 84 (2003)................................... 13

*Doe v. Hillsboro Independent School District,*
113 F.3d 1412 (5th Cir. 1997)........................................................ 4, 5, 6, 10

*Grandstaff v. City of Borger,*
767 F.2d 161 (5th Cir 1985) ........................................................ 12

*John Doe v. Hillsboro I.S.D.,*
81 F.3d 1395, 1402 (5th Cir. 1996) ........................................................ 4, 6

*Kerrville State Hospital v. Clark*
923 S.W.2d 582, 585 (Tex. 1996)...................................................... 21

*McClendon v. City of Columbia*
305 F.3d 314 (5th Cir. 2002) ........................................................ 3, 4, 5, 8,
                                                    9, 10,11

*McKinney v. Irving Independent School District*
309 F.3d 308 (5th Cir. 2002)........................................................ 11

*Morin v. Moore,*
309 F.3d 316 (5th Cir. 2002) ........................................................ 7, 11

*Piotrowski v. City of Houston,*
237 F3d 567 (5th Cir. 2001) ........................................................ 11

*Rogers v. Missouri Pacific R. Co.*
352 U.S. 500, 508 (1957)........................................................... 13

*San Antonio State Hospital v. Cowan*
47 S. Ct. J. 221 (January 12, 2003) ……………………………………………..    5, 15, 18

*Scanlan v. Texas A&M University*
343 F.3d 573 (5th Cir. 2003) …………………………………………………..    5, 8

*Shows v. Jamison Bedding, Inc.*
671 F.2d 927 (5th Cir. 1982) ……………………………………………………..    13

*Salcedo v. El Paso Hospital District*
659 S.W. 2d 30,53 (Tex. 1983) ………………………………………………………    20

**TEXAS STATUES, AND RULES**            **PAGE**

Texas Tort Claims Act §101.023 …………………………………….………………    2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| Vs. | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL. | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-98-163 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS; | § | |
| | § | |
| And | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. B-99-70 |
| | § | (Consolidated with B-98-162) |
| CITY OF HARLINGEN, TEXAS. | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO RECONSIDER
DENIAL OF JUDGMENT ON STATE LAW CLAIMS IN LIGHT OF
NEW TEXAS SUPREME COURT DECISION AND
PLAINTIFFS' MOTION TO RECONSIDER THE
COURT'S ORDER OF MARCH 13,2003**

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW Plaintiffs Arturo G. Salinas, et al; Gilberto M. Rodriguez, et al; and

Raul Rodriguez and file this response to Defendant City of Harlingen's motion to

reconsider denial of judgment as a matter of law on State law claims in light of a new

Texas Supreme Court decision and Plaintiffs' motion to reconsider the Court's order of

March 13, 2003.

1

on the basis of the maximum recovery rule. Plaintiffs' response to this motion was filed on July 31, 2002, and Defendant's reply was filed on August 6, 2002. Dkt #236, 238. Plaintiffs' response demonstrated that the case law and evidence introduced at trial supported the jury's damage awards.

An order vacating the writ of mandamus was issued on September 6, 2002. On that same day the Defendant filed a renewed motion for judgment as a matter of law. Dkt #246. This motion cited as authority the en banc decision of the Fifth Circuit Court of Appeals in *McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002) (en banc). Plaintiffs filed a reply to the motion, and Defendants filed three supplemental briefs in support of the motion. Dkt #248, 249, 250, 251. On March 13, 2003, the court entered an order granting the Defendant's motion for reconsideration of renewed motion for judgment Dkt #253.

Plaintiffs filed a notice of appeal on April 7, 2003. Defendants filed a notice of appeal on April 14, 2003. A joint motion to dismiss the appeals was filed as the District Court had not yet entered a final judgment. The appeals were dismissed without prejudice on June 18, 2003.

The above recitation of various docket entries in this case is offered to demonstrate that, during the time since the jury returned a verdict in this case, this Court has considered new decisions from various courts that would appear to have some effect on shaping the law regarding the issues involved in this case. Of particular importance has been the development of the law regarding the "state-created danger" cause of action in the Fifth Circuit.

The Court will recall that prior to the jury trial in this case, the Fifth Circuit adopted the state-created danger cause of action in *McClendon v. City of Columbia*, 258 F.3d 432 (5th Cir. 2001). Previously the Fifth Circuit had repeatedly discussed the state-created danger cause of action but had not sustained liability because of factual deficiencies in each prior case. *Doe v. Hillsboro I.S.D.*, 113 F.3d 1412, 1414 (5th Cir. 1997) (en banc). The three judge panel's decision in *McClendon* was instructive in preparing the charge that was presented in this case. *See* Exhibit A-Final Jury Instructions.

After the verdict (and before judgment was entered) in this case, the Fifth Circuit granted rehearing en banc in *McClendon* on March 13, 2002. Fully aware that the granting of the en banc rehearing would vacate the panel's opinion and restore the state-created danger cause of action to pre-*McClendon* status, this Court rendered final judgment in favor of the Plaintiffs on both their federal and state-law claims on June 28, 2002. After the entry of the Fifth Circuit's en banc decision in *McClendon* on September 5, 2002 [*McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002)(en banc)], this Court entered an order on March 13, 2003 indicating that it would consider modifying its judgment on the Plaintiffs' federal claims.

In its most recent motion, the Defendant City of Harlingen asks that the Plaintiffs' state law claims be dismissed as well in light of a recent Texas Supreme Court decision. However, a careful reading of both the recent decisions of the Fifth Circuit and the Texas Supreme Court suggest that this Court should reinstate its Final Judgment of June 28, 2002, as modified by the Writ of Mandamus and Clarification of Judgment entered on July 11, 2002.

### III. Relief Requested by Plaintiffs

The Fifth Circuit's recent decision in *Scanlan v. Texas A&M University*, 343 F.3d 573 (5th Cir. 2003) supports the entry of judgment for Plaintiffs on their state-created danger cause of action.  Further, the factual circumstances of the case at bar can be distinguished from the facts considered by the Texas Supreme Court in *San Antonio State Hospital v. Cowan*, 47 Tex. S. Ct. J. 221 (Jan 12, 2004).  Plaintiffs request that the Court, in light of these recent decisions, reinstate its Final Judgment of June 28, 2002, as modified by the Writ of Mandamus and Clarification of Judgment entered on July 11, 2002.

### IV. Issues Presented

1.  Whether recent decisions of the Fifth Circuit have embraced the state-created danger cause of action; and

2.  Whether the facts of the instant case can be distinguished from the facts in *San Antonio State Hospital v. Cowan*, 47 Tex. S. Ct. J. 221 (January 12, 2004) such that the use of the AR-15 assault rifle in question gives rise to the Defendant City of Harlingen's liability under the Texas Tort Claims Act.

### V. Argument and Authorities

A.  Recent Fifth Circuit Decisions Embrace the State-Created Danger Cause of Action.

1.  En Banc Decision in *McClendon*.

After this Court had entered its Final Judgment on June 28, 2002 and its Writ of Mandamus and Clarification of Judgment on July 22, 2002, the Fifth Circuit issued its en banc decision in *McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2003)(en banc). That decision replaced the three-judge panel decision which had reversed a summary

judgment regarding the viability of the state-created danger cause of action.  In his dissent to the en banc opinion, Judge Robert M. Parker (joined by Judge Wiener and Judge DeMoss) asked the following question:

> So how does one read the majority opinion, particularly in light of the fact that the majority does not reject the state-created danger theory outright? The only way to explain the majority opinion is that it clearly reflects a court that aspires to be the only circuit in the country to reject the state-created danger theory but cannot bring itself to admit it.  Instead, the Court has embarked on a ten-year course of back-door rejection by assuming arguendo that the theory is viable and then finding that the victim has just not made the case...
>
> The majority's Achilles' heel is its unwillingness to either adopt or reject the state-created danger theory as the law of the Circuit.  Over the last ten years, at least seven state-created danger cases have arrived in our Circuit, but we have never taken a position on whether the state-created danger theory is a valid one, choosing instead to duck the issue.  We simply stated in each case (without explicitly adopting or rejecting the theory) that the evidence is insufficient to raise a genuine issue of material fact concerning one or more of the elements that comprise the theory.  Our methodological approach--assuming arguendo for the purposes of each case that the state-created danger theory is a valid one but never explicitly rejecting or adopting it--cannot be defended and leaves this area of circuit law in a perpetual state of confusion.

*Id.* at 334.

2.    Cases Decided After *McClendon.*

On October 18, 2002, the Fifth Circuit issued its opinion in *McKinney v. Irving Indep. School District*, 329 F.3d 308 (5th Cir. 2002).  The Court upheld the district court's dismissal of a bus driver's complaint for physical injury caused by a behaviorally challenged student.  The Court of Appeals in *McKinney* referenced the fact that "[i]n our recent rehearing of *McClendon* en banc...we neither adopted nor rejected the state-created danger theory."  *Id.* at 313.  The *McKinney* court held that, "regardless of the

theory of liability employed, the McKinneys failed to allege deliberate indifference by

IISD." *Id.*

On October 23, 2002, the Fifth Circuit decided a case that had at its roots many of

the same facts that have rise to the case at bar. In *Morin v. Moore*, 309 F.3d 316 (5th Cir.

2002), the Court of Appeals considered the actions of Ernest Moore in an earlier shooting

in Rio Hondo before returning home and taking the Harlingen-assigned assault rifle from

his room to commit the shootings in San Benito that form the basis for the at hand. The

District Court dismissed the *Morin* suit, but recognized that your Honor in the case at

hand had "distinguished *Rodriguez* (the case at bar) from previous state-created danger

case, based on the following:"

> [t]he plaintiffs have pled facts that indicate that the particular predicament
> faced by the decedent was not one normally faced by a Border Patrol
> Agent. The policies of the City of Harlingen allowed a civilian version of
> a military assault rifle to fall into the hands of a person who was not a
> police officer and who was extremely dangerous. It is reasonable to infer
> that [Ernest] would not have been able to cause the death of the decedent
> with a less powerful weapon and that a military style rifle would not have
> been available to [Ernest] if [Officer Moore] had not kept one in his home.
> In addition, one can reasonabl[y] infer that the police department's final
> policymaker, Defendant Schoepher, knew that [Ernest] posed a real threat
> to the decedent. Given that [Officer Moore] told the first person who
> walked up to his house that his son was on the verge of killing himself or a
> third person, had taken his father's missing weapon, and had committed a
> prior crime, it would be reasonable to infer that he conveyed the same
> information to Defendant Police Chief Schoepher, a long-time friend, in
> the telephone conversation they had before the decedent was killed. If
> Defendant Police Chief Schoeper knew of the real threat posed by [Ernest]
> before the decedent was killed, he could have avoided the danger created
> by warning the law enforcement team surrounding the house to take
> necessary precautions to secure their safety. *Id.* at 21-22.

*Morin*, 309 F.3d at 322 (*quoting* Judge Tagle's nunc pro tunc order denying the

Defendant City of Harlengen's motion to dismiss as to the plaintiffs' state-created danger

claim; *Rodriguez v. City of Harlingen*; No. B-98-163 (S. Dist. Tex. April 11, 1999)).

7

In its order of March 13, 2003, the Court suggested that "[t]he *McClendon* decision and other more recent decisions dictate that the Court set aside the jury's verdict because evidence was not presented that could lead a jury to conclude the City acted with deliberate indifference to constitutional violations." Order, March 13, 2003, p.4.

Since *McClendon,* and since the Court's March 13, 2003 order, the Fifth Circuit has issued an opinion that supports recognition of the state-created danger cause of action. In *Scanlan v. Texas A&M University*, 343 F.3d 533 (5th Cir. 2003), the Fifth Circuit considered the trial court's dismissal of six separate actions brought by representatives of students injured or killed in the collapse of the Aggie bonfire stack that occurred on November 18, 1999.

> The Court of Appeals reversed the trial court's dismissal observing that:
>
> In stating their section 1983 claims, the plaintiffs included the language "deliberate indifference" to describe a particular University Official's conduct...
>
> If these allegations were construed in the light most favorable to the plaintiff, the district court should have determined the plaintiffs had pleaded sufficient allegations to show the bonfire construction environment was dangerous, the University Officials knew it was dangerous, and the University Officials used their authority to create an opportunity for the resulting harm to occur. As a result, the district court should have concluded that the plaintiffs stated a section 1983 claim under the state-created danger theory.

*Id.* at 538.

Clearly the Fifth Circuit in *Scanlan* recognizes the viability of the state-created danger cause of action. Just as important, the Fifth Circuit Court of Appeals looked to the State actor's deliberate indifference in creating a dangerous "environment" that created an "opportunity for the resulting harm to occur." *Id.* It appears in *Scanlan* that the Fifth Circuit is attempting to clear up the "perpetual state of confusion" described by

Judge Parker in his dissent in *McClendon* regarding the viability of the state-created danger cause of action. Importantly, en banc rehearing was denied in the *Scanlan* decision on October 31, 2003.

3.     Cases Decided After *Scanlan*.

The Fifth Circuit again addressed the contours of the emerging state-created danger cause of action in *Rivera v. Houston Ind. School Dist.*, 349 F.3d 233 (5th Cir. 2003). In *Rivera* the Court of Appeals upheld summary judgment for the state actor by noting a lack of evidence of the school board's knowledge of an alleged custom of tolerating gang activity on school grounds. Important to the instant case, however, was the Fifth Circuit's description of the "basic requirements of the state created danger theory" (while noting that the Plaintiffs in the *Rivera* case failed to meet these requirements):

> "First, a plaintiff must show that the state actors increased the danger to [him]. Second, a plaintiff must show that the state actors acted with deliberate indifference." *Piotrowski*, 237 F.3d. at 584. The "key to the state-created danger case ... {is] the state actors' culpable knowledge and conduct in affirmatively placing [the] individual in a position of danger, effectively stripping the person of [his] ability to defend [him]self, or cutting off potential sources of private aid." *Johnson*, 38 F3d at 201 (internal quotations omitted).

*Rivera*, 349 F3d at 249.

It should be noted that nine circuits have unequivocally sanctioned the state-created danger theory as a viable means of pursuing a §1983 claim. The D.C., Second, Third, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits "have each accepted the state-created danger theory as a viable means of protecting a citizen's substantive due process rights." *McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002). On September 5, 2002, the 5th Circuit Court of Appeals in *McClendon v. City of Columbia*,

305 F.3d 314 (5th Cir. 2002), did not reject the state-created danger theory that has been overwhelmingly recognized throughout the Circuits across the United States. Unlike the Fifth Circuit Court's findings in *McClendon* that the actions by the defendant in that case did not amount to "deliberate indifference," a jury empanelled to hear the instant action found that the Defendant City of Harlingen was deliberately indifferent to a certainty that a constitutional violation would result. Importantly, the jury was instructed that proof of simple or heightened negligence, alone, was not enough to prove deliberate indifference. *See* Exhibit A.

At the time Plaintiffs filed the present suits against Defendant under the "state-created danger" theory of recovery, Plaintiffs took the position that, though the theory had not been expressly adopted, the Fifth Circuit has repeatedly discussed the third-party exception based on a state-created danger. However before *Scanlan*, the Fifth Circuit had never sustained liability because of each prior case's own factual deficiencies. *Doe v. Hillsboro* I.S.D., 112 F. 3d 1412, 1414 (5th Cir. 1997)(en banc).

It is significant that all of the Fifth Circuit decisions regarding state created danger address cases in which motions to dismiss for failure to state a claim or motions for summary judgment had been granted. None of the cases involve a jury verdict finding liability.

The Fifth Circuit has applied the state-created danger doctrine and has "assumed arguendo that it recognizes the claim." *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521 (5th Cir. 1994). In subsequent cases quoting *Leffall*, the Court of Appeals simply found that the facts of those cases did not to fall within the state-created danger exception. *Doe v. Hillsboro I.S.D.*, 153 F.3d 1412, 1414 (5th Cir. 1997); *Johnson v. Dallas, I.S.D.*, 38

F.3d 198 (5th Cir. 1994); *Piotrowski v. City of Houston*, 237 F3d 567 (5th Cir. 2001) at fn. 33. Here, however, a jury determined that the evidence presented warranted the application of the state-created danger doctrine and gave rise to liability under 42 U.S.C. §1983.

While the Fifth Circuit in *McClendon* found that there was no "bright-line policy" regarding the state-created danger in 1993, at the time the Ernest Moore shot to death Susan Lynn Rodriguez and Ricardo Salinas and severely injured Raul Rodriguez, all but two Circuits had adopted the "state-created danger" theory. Interestingly, at the time this case was tried the "state-created danger" theory had been adopted and recognized by the Fifth Circuit. *McClendon v. City of Columbia*, 258 F3d 432, 441-43 (5th Cir. 2001). It was clearly established law at the time of the events in question that a great majority of the Circuits had expressly adopted the "state-created danger" theory of substantive due process liability. Accordingly, the jury's decision should not be second-guessed or reversed.

In the en banc opinion of *McClendon* and the subsequent ruling on *McKinney v. Irving Independent School District*, 309 F.3d 308 (5th Cir. 2002) and *Morin v. Moore*, 309 F.3d 316 (5th Cir. 2002), the Fifth Court left open the question of whether a state-created danger would be actionable in this circuit. *See McClendon*, 305 F.3d at 334 (Judge Parker pointed out in his dissenting opinion that "the majority opinion does not reject the state-created danger theory outright"); *McKinney*, 309 F.3d at 313 ("In our recent rehearing of *McClendon I* en banc, however, we neither adopted nor rejected the state-created danger theory"); *see also Morin*, 309 F.3d at 321 ("In our recent rehearing

of *McClendon I* en banc, however, we neither adopted nor rejected the state-created danger theory").

This case presents compelling facts which are far more egregious than those in *McClendon*. The *McClendon* situation of a state actor giving a gun to an informant for the city police department, who had no criminal history and "needed the capability of self-defense," is insignificant when compared with the present case. Here the City police department placed a Kevlar-piercing, rapid-fire assault rifle in the hands of a Nazi-crazed drug addict. This is the most flagrant official conduct and it does "shock the conscience." That the Harlingen police department did not even sanction the officers responsible only adds to the shocking nature of their deliberate indifference to the Plaintiffs. *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) (the disposition of the policymaker must be inferred circumstantially from conduct of the officer and the policymaker). Following any catastrophic and incompetent performance, where there are no reprimands, no discharges, no admissions of error, and no changes made in policy, the court and jury can accept that this is "the way things are done" in that municipality. *Id.*

4.     The Trial of This Case.

At the conclusion of the trial in the case at bar, this Court presented to the jury Its final jury instructions. *See* Exhibit A. Included among those instructions was the following instruction regarding circumstantial evidence:

> There are two types of evidence that you may consider in properly finding the truth as to the facts in the case. One is direct evidence -- such as testimony of an eye witness. The other is indirect or circumstantial evidence -- the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

*Id.* at p.2.   A recent decision by the United States Supreme Court highlights the importance of circumstantial evidence. In *Desert Place, Inc. v. Costa*, ___ U.S. ___, 123 S.Ct. 2148, 156 L.Ed. 2d 84 (2003) the Supreme Court reiterated the long-held notion that "[t]he reason for treating circumstantial and direct evidence alike is both clear and deep-rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.' *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508 (1957)."

In the case at hand, the jury was afforded the opportunity to hear both direct evidence and circumstantial evidence in reaching a verdict.   Such a situation differs substantially from either a trial court or an appellate court's review in determining whether or not a plaintiff has stated an actionable claim or whether sufficient evidence is presented to overcome summary judgment.   The previous state-created danger cases decided by the Fifth Circuit are limited to a review of the pleadings and, in a few instances, summary judgment proof.   Here a complete record of the state actor's conduct is reviewable along with an informed decision by a jury that has had the opportunity to evaluate the witnesses and their credibility.

Historically the Fifth Circuit has paid great deference to the decision of the trial court and jury.   The Fifth Circuit stated in *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982) that:

> When the trial judge has refused to disturb a jury verdict, all the factors
> that govern our review of his decision favor affirmance.   Deference to the
> trial judge, who has had an opportunity to observe the witnesses and to
> consider the evidence in the context of a living trial rather than upon a
> cold record, operates in harmony with deference to the jury's
> determination of the weight of the evidence and the constitutional
> allocation to the jury of questions of fact.

Here the Court's instructions to the jury were straight forward and unequivocal regarding the jury's evaluation of the evidence regarding the proof necessary to support a finding for the Plaintiffs on the state created danger cause of action generally and the deliberate indifference element specifically:

> Plaintiffs claim the City of Harlingen violated their substantive due process rights by creating a dangerous situation which was a proximate cause of the death of Susan L. Rodriguez and Ricardo G. Salinas and serious injury to Raul Rodriguez through arbitrary abuse of its governmental power, and the City of Harlingen violated their substantive due process rights through a "state-created danger."
>
> There is a "state-created" danger if:
>
> 1.    City officials increased the danger to Susan Lynn Rodriguez, Ricardo Salinas and Raul Rodriguez;
>
> 2.    City officials acted with deliberate indifference.   To establish deliberate indifference, the Plaintiffs must show:
>
> A.    The City officials created a dangerous environment;
>
> B.    The City officials knew it was dangerous; and
>
> C.    The City officials used their authority to create an opportunity that would otherwise not have existed for the third party's crime to occur.
>
>      Put otherwise, the City must have been at least deliberately indifferent to the plight of Susan Lynn Rodriguez, Ricardo Salinas, and Raul Rodriguez; and
>
> 3.    The City officials affirmatively placed Susan Lynn Rodriguez, Ricardo Salinas, and Raul Rodriguez in that dangerous environment, effectively stripping them of the ability to defend themselves or cutting off potential source of aid.

Exhibit A – Final Jury Instructions p. 11-12

The evidence of the City Officials' deliberate indifference was sufficient such that this Court denied summary judgment before trial and denied motions for directed verdict

during trial both at the close of the Plaintiffs' evidence and at the close of the case. Significantly, the jury found the evidence compelling enough, after proper instruction by the Court, to find that the officials acted with deliberate indifference in violating the Plaintiffs' constitutional rights. While it is probably not appropriate to delineate with specificity the pages in the transcript where evidence of deliberate indifference was presented (much less necessary given the Court's familiarity with the proof offered in this case), a general description of such evidence is set forth in the Plaintiffs' closing argument at Volume V of the transcript, pages 890 through 898. *See* Exhibit B. The Court held that the evidence was sufficient to warrant the entry of judgment and withdrew that judgment only when the Fifth Circuit Court of Appeals in the *McClendon* en banc opinion vacillated on whether or not it would recognize the state-created danger cause of action. Now that the Fifth Circuit in *Scanlan* has permitted a state-created complaint to go forward in the trial court, the state of the law is exactly as it existed after the original three-judge panel decision in *McClendon* -- that is the same situation that existed when this case at bar was submitted to the jury.

Given the current status of the law in this circuit regarding the state-created danger cause of action and the jury's verdict in this case, Plaintiffs request that the Court reconsider its order of March 13, 2003 and enter judgment in accordance with its Final Judgment of June 28, 2002 as modified by the Writ of Mandamus and Clarification of Judgment entered on July 11, 2002.

B.    The Texas Supreme Court's Decision in *San Antonio State Hospital v. Cowan* can be distinguished.

The Defendant City of Harlingen asks this court to reconsider its denial of judgment for the Defendant as a matter of law on the Plaintiffs' state law claims in light

15

of the Texas Supreme Court's recent decision in *San Antonio State Hospital v. Cowan*, 47 Tex. S. Ct. J. 221 (Jan 12, 2004). That case, brought under the Texas Tort Claims Act, involved allegations that the state had waived its sovereign immunity when a suicidal patient at a state hospital retained possession of his suspenders and walker which he used to kill himself. The Texas Supreme Court concludes in that case that "[b]ecause respondents failed to allege that Cowan's death was caused by the Hospital's use of property its immunity is not waived by [Tex. Civ. Prac. & Rem. Code] section 101.021(2)." *Id.* at 222.

A casual reading of the holding alone in the *San Antonio State Hospital* case might suggest that the Defendant City of Harlingen has stumbled upon a viable defense to the Texas Tort Claims Act allegations in the case at bar. A closer reading of the case, however, suggests that the ruling was based on facts entirely dissimilar to the *Hospital* case at hand. There are at least three significant reasons why the facts of the state hospital case distinguish it from *Rodriguez et al* such that the Texas Supreme Court's ruling is not controlling here: first, the property in question here is "inherently unsafe;" second, the property in question here belonged to the state actor rather than to the person committing the deadly act; and third, the placement of the rifle in the Moore home constituted a "use" by the city unlike the return of the suspenders and walker to the psychiatric patient.

1.    Inherently Unsafe Property.

First, the Texas Supreme Court notes that "[t]he issue here is whether merely providing someone with personal property that is not itself inherently unsafe is a "use" within the meaning of the [Texas Tort Claims] Act." *Id.* at 221. That court concludes

that Cowan's suspenders and walker (his personal items that he used to hang himself) were not inherently unsafe. That court is careful to point out that "respondents do not complain of the condition of Cowan's walker and suspenders. They do not assert, for example, that the walker and suspenders were defective or that they lacked some safety feature." *Id.*

Conversely, Plaintiffs in the case before this Court have offered substantial evidence about the inherent danger of the AR-15 military assault rifle that was used to perpetrate the horrendous acts made the basis of this suit. Such evidence included the testimony of Sylvia Pirtle, the private citizen who turned the gun over to the City for destruction because of her fear about what would happen if the gun were to fall into the wrong hands; the testimony of James Scheopner, the City's former police chief who testified about the deadly aspects of the weapon; the testimony of R.D. Moore, the City police detective who was purportedly assigned the weapon as a sharpshooter on the City's SWAT team; the testimony of Joe LaBeau, the City's Assistant City Manager, whose investigation revealed that the City Police Department had developed a custom and policy of ignoring safe-handling practices for deadly weapons; and the testimony of George Kirkham, the Plaintiffs' police practices expert that testified about the dangerous propensities of this particular weapon. Suffice it to say here, that the jury heard extensive testimony about the inherent lethality of this weapon. Mr. Ernest Moore did not emerge from the corn field across from his father's house and open fire on the Border Patrol Agents, sheriff's deputies, and other law enforcement officers (that had come to arrest him for the murders he had committed earlier in Rio Hondo) armed only with a pair of suspenders and a walker.

17

2.     Ownership of the Personal Property.

The second point of distinction between the facts of this case and the *San Antonio State Hospital* case concern the ownership of the property in question. In the *Hospital* case, the potentially suicidal patient was admitted to the facility and permitted to keep his suspenders and walker. The plaintiffs in that case attempted to buttonhole liability onto the State by arguing that, by returning these items to Cowan after he was admitted and by allowing him to keep them, the hospital was somehow providing the items so as to constitute a "use" within the meaning of the Texas Tort Claims Act. *See Id.* at 221. In this context, the Texas Supreme Court notes that "[i]f all 'use' meant were 'to make available' the statutory restriction would have very little force." *Id.* at 222.

In the case at hand, however, the weapon was not a piece of property that belonged to Ernest Moore which had been returned to him by the state actors. Instead, the weapon belonged to the Defendant, having taken custody of it from a private citizen. Rather than properly accounting for the weapon, securing it in the police evidence locker, or destroying it as promised, the assault rifle was permitted to be taken to the Moore home and stored in Ernest Moore's room. Rather than denying that the gun belonged to them, the City initially took the position that the gun was a sharp-shooting instrument assigned to Detective Moore for his SWAT team duties. Even when this ruse was rejected by the Assistant City Manager Le Beau and others, the City continued to maintain that the assault rifle belonged to the City (unlike the weapon involved in the *Morin* case discussed above). The suspenders and walker did not belong to the state actors. The assault rifle did belong to the Defendant City of Harlingen.

18

3.      "Use" is More Than Pulling a Trigger.

A third reason that the facts of the case at bar can be readily distinguished from the facts in the *San Antonio State Hospital* case concerns the use of the property in question.  As the Texas Supreme Court points out, "the [San Antonio State] Hospital's immunity can be waived only for its own use of Cowan's walker and suspenders and not by Cowan's use of them." *Id.* at 222.  Apparently, the Defendant here is relying upon this language to suggest that, simply because Ernest Moore (rather than a City official) pulled the trigger (repeatedly) on the Defendant City of Harlingen's assault rifle, the City cannot be liable under the Texas Tort Claims Act.  Such reasoning requires this Court to focus Its attention entirely upon the pulling of the trigger and to ignore the City's action in placing the deadly weapon into the shooter's hands.

The testimony in this case is that Captain Joseph Vasquez, Detective Moore's superior officer, was well aware that Detective Moore had appropriated the weapon and that he had relayed this information to the Police Chief Scheopner.  *See* Exhibit C-Excerpts of testimony from James Scheopner-Transcript Vol. II.  Rather than taking precautions to secure the weapon according to generally accepted safe-weapons-handling practices, the City permitted the gun to be taken to the Moore home where it was available to Ernest Moore.  *Id.*  Testimony revealed that Detective Moore had actually instructed Ernest Moore in how to use the gun during target practice in the family yard. *See* exhibit D-Excerpts of testimony of Detective R.D. Moore-Transcript Vol. II. Though Detective Moore was not periodically qualified by examination on the use of the weapon, it is clear from Chief Scheopner's testimony and others that the City Police

19

Department considered Detective Moore to have been assigned the weapon for use pursuant to his duties as City police officer. *See* Exhibit C.

"Use" has been defined in the context of the Texas Tort Claims Act as "to put or bring into action or service; to employ for or apply to a given purpose." *Texas Nat. Res. Con. Comm. v. White*, 45 S.W. 3d 864 (Tex. 2001); *Salcedo v. El Paso Hospital District*, 659 S.W. 2d 30,53 (Tex. 1983); *Dallas Area Rapid Transit v. Whitley*, 46 Tex. S. Ct. J. 595 (April 19, 2003).

There are several reported cases in which the state actor is using personal property when a third person causes an injury. For example in *Borrego v. City of El Paso*, 964 S.W. 2d 954 (Tex. App – El Paso 1998, writ den.), a motorist and his wife were involved in an accident. El Paso EMS responded to the incident. The wife was placed in the ambulance but the motorist was immobilized on a city-owned backboard in the middle of the road. A vehicle driven by a third party ran over the motorist lying in the road. The court held that the fact situation constituted a "use" of personal property.

In *Texas Department of Mental Health and Mental Retardation v. McClain*, 947 S.W.2d 694 (Tex. App. – Austin, 1997), Leta McClain had been involuntarily confined to Austin State Hospital. Ms. McClain was physically assaulted. The assault was most likely committed by a fellow patient, Roger Pugh. Pugh assaulted her with either a metal rod removed from a hospital locker or a metal foot pedal removed from his wheelchair. McClain suffered severe head injuries from the beating, and, died as a result of those injuries. *Id.* at 695.

Courts have long held that section 101.021(2) waives immunity for injuries proximately caused when a governmental employee negligently provides property that

20

lacks an integral safety component when the lack of the integral component led to the plaintiff's injuries. *Id.* at 696; *City of Waco v. Hester*, 805 S.W.2d 807 (Tex. App. – Waco 1990, writ denied) (injuries of plaintiff raped by fellow inmate caused by "use" of tangible or real property because jailers "used" day room to house plaintiff with other male inmates); *see also Kerrville State Hospital v. Clark*, 923 S.W.2d 582, 585 (Tex. 1996). That the violent death was undertaken by a third party does not relieve the state from liability for its employees' negligence in allowing psychiatric patients under its control access to items that could be used as weapons. *McClain*, 947 S.W.2d at 697; *see Delaney v. University of Houston*, 835 S.W.2d 56, 60 (Tex. 1992) (university that failed to repair dormitory door could be liable even though rapist was not university employee); *see alsoCity of Denton v. an Page*, 701 S.W.2d 831, 834-35 (Tex. 1986); (city could be held liable under Tort Claims Act if it owned or controlled real property, created a dangerous situation, or agreed to make safe a known dangerous situation).

Reading cases like *San Antonio State Hospital, Borrego*, and *McClain* together, it is clear that there must be a use of the personal property (a non-use will not suffice), but it is not necessary that the state actor directly cause the resulting injury. Here the assignment of the weapon to Detective Moore constitutes the "use" of the personal property belonging to the City. Failing to keep the weapon safe according to generally accepted safe-handling practices -- that is failing to assign properly the gun, failing to store securely the gun, and failing to restrict access to the weapon once it was assigned -- describes a mis-"use" of the property which resulted in great harm to the Plaintiffs in this case. *See* Exhibit E-LeBeau Memo of 10-14-98-Admitted as Exhibit 16 at Trial. Ernest's shooting of the weapon is not the use complained of in this case for purposes of

21

stating a claim under the Texas Tort Claims Act. Instead, the use of the weapon is the City's "put[ting] or bring[ing] [it] into action or service… employ[ing] for or apply[ing] the gun] to a purpose." When the City decided, through its custom or practice, to assign the weapon without safeguard for its security to Detective Moore, the City "used" the weapon as defined by the Torts Claims Act.

<b>Prayer</b>

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that this Court deny the Defendant City of Harlingen's motion to reconsider the Court's denial of judgment as a matter of law on State law claims, grant the Plaintiffs' motion to reconsider the Court's Order of March 13, 2003; and reinstate the Court's Final Judgment of June 28, 2002 as modified by the Writ of Mandamus and Clarification of Judgment entered on July 11, 2002.

Respectfully submitted,

**SPIVEY & AINSWORTH, P.C.**
48 East Avenue
Austin, TX 78701
512+474-6061
512+474-1605 (fax)

By _____
Broadus A. Spivey
State Bar No. 00000076
Federal I.D. No. 11146
Price Ainsworth
State Bar No. 00950300
Federal I.D. No. 8065

Richard Pena
Law Offices of Richard Pena, P.C.
Barton Oaks Plaza Two
901 MoPac, Suite 325
Austin, Texas 7746-5747
512+327-6884
512+327-8354 (fax)

**ATTORNEYS–IN-CHARGE FOR PLAINTIFFS
ARTURO G. SALINAS, ET AL and GILBERTO M.
RODRIGUEZ, ET AL**

And

Mr. Ramon Garcia
Ms. Sonia I. Lopez
Law Offices of Ramon Garcia, P.C.
222 West University Drive
Edinburg, TX 78539
956+383-7441
956+381-0825 (fax)

**ATTORNEYS-IN-CHARGE FOR
PLAINTIFF RAUL RODRIGUEZ**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the above and foregoing document was forwarded to following counsel of record via certified mail return receipt requested on this 26th day of January 2004:

Mr. Tom Lockhart
Mr. Roger W. Hughes
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429
ATTORNEYS-IN-CHARGE FOR
DEFENDANT CITY OF HARLINGEN

Broadus A. Spivey

3163P.073

23

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARTURO G. SALINAS, ET AL., | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-98-162 |
| | § | |
| CITY OF HARLINGEN, ET AL., | § | JURY DEMANDED |
| | § | |
| and | § | |
| | § | |
| GILBERTO M. RODRIGUEZ, ET AL., | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-98-161 |
| | § | |
| CITY OF HARLINGEN, ET AL., | § | |
| | § | |
| and | § | |
| | § | |
| RAUL RODRIGUEZ | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-99-70 |
| | § | |
| CITY OF HARLINGEN, ET AL., | § | |

**FINAL JURY INSTRUCTIONS**

MEMBERS OF THE JURY:

You have heard the evidence in this case. I will now instruct you on the law that you must apply. It is your duty to follow the law as I give it to you. On the other hand, you the jury are the judges of the facts. Do not consider any statement that I have made in the

-1-

course of trial or make in these instructions as an indication that I have any opinion about the facts of this case.

After I instruct you on the law, the attorneys will have an opportunity to make their closing arguments. Opening statements and closing arguments are not evidence and are not instructions on the law. They are intended only to assist the jury in understanding the evidence and the parties' contentions.

Answer each question from the facts as you find them. Do not decide who you think should win and then answer the questions accordingly. Your answers and your verdict must be unanimous.

You must answer all questions from a preponderance of the evidence. By this is meant the greater weight and degree of credible evidence before you. In other words, a preponderance of the evidence just means the amount of evidence that persuades you that a claim is more likely so than not so. In determining whether any fact has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them. You may not consider exhibits, testimony, or other evidence which during the trial you were instructed to disregard.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during the trial.

-2-

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget somethings or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case. One is direct evidence -- such as testimony of an eyewitness. The other is indirect or circumstantial evidence -- the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field (he or she is called an expert witness) is permitted to state his or her opinions on those technical matters. However, you

-3-

are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely upon it.

In deciding whether to accept or rely upon the opinion of an expert witness, you may consider any bias of the witness, including any bias you may infer from evidence that the expert witness has been or will be paid for reviewing the case and testifying, or from the evidence that he or she testifies regularly as an expert witness and his or her income from such testimony represents a significant portion of his or her income.

Additionally, do no assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case. Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

It is your sworn duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong. However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

Remember that in a very real way you are the judges-judges of facts. Your only interest is to seek the truth from the evidence in the case.

When you retire to the jury room to deliberate, you may take with you this charge and the exhibits that the Court has admitted into evidence. Select your Presiding Juror and conduct your deliberations. If you recess during your deliberations, follow all of the instructions that I have given you concerning your conduct during the trial. After you have reached your unanimous verdict, your Presiding Juror must fill in your answers to the

-4-

written questions and sign and date the verdict form.  Use one of the jury note forms to advise the Court Security Officer that you have reached a verdict.  You must never disclose to anyone, not even to me, your numerical division on any question.

If you want to communicate with me at any time, please give a written message to the Court Security Officer, who will bring it to me.  I will then respond as promptly as possible either in writing or by meeting with you in the courtroom.  I will always first show the attorneys your question and my response before I answer your question.

DONE this 25th day of February, 2002, at Brownsville, Texas.

Hilda G. Tagle
United States District Judge

## I. DEFINITIONS

"Negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances, or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

"Proximate cause" means that cause which, in a natural and continuous sequence, unbroken by any new and independent cause, produces an event, and without which cause such event would not have occurred.  In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom.  There may be more than one proximate cause of an event.

"New and independent cause" means the act or omission of a separate and independent agency, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question and thereby becomes the immediate cause of such occurrence.

There may be more than one proximate cause of an event, but if an act or omission of any person not a party to the suit was the "sole proximate cause" of an occurrence, then no act or omission of any other person could have been a proximate cause.

An "employee" is a person in the service of another with the understanding, express or implied, that such other person has the right to direct the details of the work and not merely the result to be accomplished.

-6-

An employee is acting "in the scope of his employment" if he is acting in the furtherance of the business of his employer.

## II. STATE LAW CLAIMS

Plaintiffs claim that the City of Harlingen was negligent and is therefore liable under the Texas Tort Claims Act for Chief Scheopner's and Detective Moore's alleged negligent and wrongful use of the AR-15 rifle in the scope and course of their employment. The City is liable for personal injury and death proximately caused by the negligent use of tangible personal property if the City would be liable to Plaintiffs if it were a private person.

Plaintiffs claim that negligent use of City property, the AR-15 rifle, by a City employee in the scope and course of his employment was the proximate cause of injury to Plaintiff Raul Rodriguez and the deaths of Susan Rodriguez and Ricardo Salinas.

As to Plaintiffs' claim that the rifle was negligently entrusted to Detective R. D. Moore by Chief Schoepner, "negligence" means entrusting the rifle to a reckless person whom the City knew or should have known was reckless. Such negligence is a proximate cause of death or injury if (1) the City knew or should have known R. D. Moore would use poor judgment in allowing another person to use the rifle, and (2) that person's negligent use of the rifle was the proximate cause of injury or death.

-8-

## III. FEDERAL LAW CLAIMS

The plaintiffs claim that the City of Harlingen is liable for depriving them of their rights under the United States Constitution. The plaintiffs claim that because of a "state created danger," they were deprived of certain substantive Due Process rights, that is, life or liberty, which are guaranteed to them under the Constitution. A City is liable for the deprivation of a constitutional right if

(1)     the deprivation was pursuant to a governmental custom, policy, ordinance, or regulation; or

(2)     for an action performed pursuant to a "custom" that, although it has not been formally adopted by a final policymaker of the City, is a persistent widespread practice that is so common and well-settled as to constitute a custom that fairly represents City policy; or

(3)     a final policymaker ratified a subordinate's decision by approving of the decision and the basis for it.

Therefore, if you find that plaintiffs were injured as the proximate or legal result of Harlingen's policy, custom, ordinance, regulation or decision as defined above, whether made by its lawmakers or by those officials whose edicts or acts may fairly be said to represent official policy, the City of Harlingen itself will be liable.

The Chief of Police is an official whose acts constitute final official policy of the City of Harlingen. Therefore, if you find that the acts of Chief of Police deprived the plaintiff of constitutional rights, the City of Harlingen is liable for such deprivations.

For an injury to be a proximate or legal result of a City policy there must be a direct causal link between the City's policy, custom, ordinance, regulation, or decision, and the

-9-

deprivation of the constitutional right. The policy, custom, ordinance, regulation, or decision must be the moving force behind the violation.

Plaintiffs claim they were injured as a result of one or more of the following policies, customs, regulations or decisions:

a.   the failure to enforce regulations requiring the demonstration of proficiency with assigned weapons;

b.   the assignment of the AR-15 rifle in question to Detective R.D. Moore;

c.   the failure to instruct or train police officers concerning storage, safeguarding, or assignment of weapons;

d.   the failure to have a policy requiring written assignment of weapons to officers; or

e.   the failure to destroy the AR-15 rifle in question.

Plaintiffs claim that their injuries resulted from a failure to have or enforce certain policies as described above. The failure to adopt a policy cannot qualify as a policy unless the failure amounts to an intentional choice and is not merely an unintentional oversight.

To find that the policy or custom caused a "state created" danger you must find:

A.   The policy, custom, or the failure to have a policy were so likely to result in the violation of constitutional rights, that the policymakers of the City can reasonably be said to have been deliberately indifferent to the certainty that a constitutional violation would result; and

B.   The actions were a proximate cause of injury to the plaintiffs.

Plaintiffs claim that they were injured as a result of the City of Harlingen's failure to properly train its officers as described above.

To find that a failure to train caused a "state created" danger you must find:

-10-

A. That the City's training program was inadequate to train its officers and employees to carry out their relevant duties;

B. The need for more training or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the City can reasonably be said to have been deliberately indifferent to the need for such training; and

C. The failure to provide proper training was a proximate cause of injury to the plaintiffs.

Proof of simple or heightened negligence, alone, is not enough to prove deliberate indifference. The official must be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and he must also draw that inference.

With respect to a failure to train, Plaintiffs may prove deliberate indifference in two ways: (1) by showing that the City's policymaker deliberately or consciously chose not to train the Harlingen police officers despite being on notice that the current training regimen had failed to prevent wrongful conduct by its officers, or (2) by proving a single incident of wrongful conduct with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training. Under the "single incident" test there must be a complete failure to provide any training or supervision and it should have been obvious that the failure to train was likely to lead to the injury.

Plaintiffs claim the City of Harlingen violated their substantive Due Process rights by creating a dangerous situation which was a proximate cause of the death of Susan L. Rodriguez and Ricardo G. Salinas and serious injuries to Raul Rodriguez through arbitrary

-11-

abuse of its governmental power, and that the City of Harlingen violated their substantive Due Process rights through a "state created danger." There is "state created" danger if:

1.   City officials increased the danger to Susan Lynn Rodriguez, Ricardo Salinas and Raul Rodriguez;

2.   City officials acted with deliberate indifference.   To establish deliberate indifference, Plaintiffs must show:

    A.   The City officials created a dangerous environment;

    B.   The City officials knew it was dangerous; and

    C.   The City officials used their authority to create an opportunity that would otherwise not have existed for the third party's crime to occur.

Put otherwise, the City must have been at least deliberately indifferent to the plight of Susan Lynn Rodriguez, Ricardo Salinas, and Raul Rodriguez; and

3.   The City officials affirmatively placed Susan Lynn Rodriguez, Ricardo Salinas, and Raul Rodriguez in that dangerous environment, effectively stripping them of the ability to defend themselves or cutting off potential sources of private aid.

The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution confers no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual.   The City's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause.

For the actions to be a "proximate cause," Plaintiffs must prove that:

1.   the deprivation of life or liberty was not too remote a consequence of the City's actions;

-12-

2.    the deprivation of life or liberty was the foreseeable result of those actions; and,

3.    the deprivation of life or liberty would not have occurred but for the constitutional violation.

## IV. DAMAGES

If any plaintiff has proven his or her claim against the defendant by a preponderance of the evidence, you must determine the damages to which the plaintiff is entitled. You should not interpret the fact that I have given instructions about the plaintiffs' damages as an indication in any way that I believe that the plaintiffs should, or should not, win this case. It is your task first to decide whether the defendant is liable. I am instructing you on damages only so that you will have guidance in the event you decide that the defendant is liable and that the plaintiffs are entitled to recover money from the defendant.

If you find that the defendant is liable to any plaintiff, then you must determine an amount that is fair compensation for all of that plaintiff's damages. These damages are called compensatory damages. The purpose of compensatory damages is to make the plaintiff whole—that is, to compensate a plaintiff for the damage that he or she has suffered. Compensatory damages are not limited to expenses that the plaintiff may have incurred because of his or her injury. If you find for the plaintiffs, they are entitled to compensatory damages for the physical injury, pain and suffering, mental anguish, lost earning capacity, and medical expenses that they have suffered because of the defendant's conduct.

If you find for the plaintiffs, they are entitled to compensatory damages for loss of services and support, loss of companionship, mental anguish, medical expenses, and funeral expenses they have suffered because of the defendant's conduct.

You may award compensatory damages only for injuries that the plaintiffs prove were proximately caused by the defendant's allegedly wrongful custom, policy, or practice, if they were indeed wrongful. The damages that you award must be fair compensation for all of the plaintiffs' damages, no more and no less. Damages are not allowed as a punishment and cannot be imposed or increased to penalize the defendant. You should

-14-

not award compensatory damages for speculative injuries, but only for those injuries which the plaintiffs have actually suffered or that the plaintiffs are reasonably likely to suffer in the future.

If you decide to award compensatory damages, you should be guided by dispassionate common sense. Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork. On the other hand, the law does not require that the plaintiffs prove the amount of their losses with mathematical precision, but only with as much definiteness and accuracy as the circumstance permits.

You must use sound discretion in fixing an award of damages if you award damages drawing reasonable inferences where you find them appropriate from the facts and circumstances in evidence.

You should consider the following elements of damage, to the extent you find them proved by a preponderance of the evidence:

A.    Damages Accrued

If you find for a plaintiff, he or she is entitled to recover an amount that will fairly compensate him or her for any damages he or she has suffered to date.

B.    Calculation of Future Damages

If you find that a plaintiff is reasonably certain to suffer damages in the future from his or her injuries, then you should award him or her the amount you believe would fairly compensate him or her for such future damages.

C.    Reduction of Future Damages to Present Value

An award of future damages necessarily requires that payment be made now for a loss that plaintiff will not actually suffer until some future date. If you should find that the

-15-

plaintiff is entitled to future damages, including future earnings, then you must determine the present worth in dollars of such future damages.

If you award damages for loss of future earnings, you must consider two particular factors:

1.  You should reduce any award by the amount of the expenses that the plaintiff would have incurred in making those earnings.

2.  If you make an award for future loss of earnings, you must reduce it to present value by considering the interest that the plaintiff could earn on the amount of the award if he or she made a relatively risk-free investment. The reason why you must make this reduction is because an award of an amount representing future loss of earnings is more valuable to the plaintiff if he or she receives it today than in the future, when he or she would otherwise have earned it. It is more valuable because the plaintiff can earn interest on it for the period of time between the date of the award and the date he or she would have earned the money. Thus you should adjust the amount of any award for future loss of earnings by the amount of interest that the plaintiff can earn on that amount in the future.

If you make any award for future medical expenses, you should adjust or discount the award to present value in the same manner as with the loss of future earnings.

However, you must not make any adjustment to present value for any damages you may award for future pain and suffering or future mental anguish.

A.    <u>Survivors' Damages</u>:

1.    <u>Lost Support and Services in the Past and Future Due to the Death of Susan Lynn Rodriguez</u>

-16-

You must determine the duration of any future loss suffered by Plaintiff, Gilbert Rodriguez by considering the joint life expectancy of Susan Rodriguez and Gilbert Rodriguez. Joint life expectancy means the number of years that both Susan Rodriguez and Gilbert Rodriguez could have been expected to be alive together, considering the ages and life expectancy of each at the time of Susan Rodriguez's death.

You must determine the duration of any future loss suffered by Plaintiff Megan Rodriguez by considering the joint life expectancy of Susan Rodriguez and Megan Rodriguez. Joint life expectancy means the number of years that both Susan Rodriguez and Megan Rodriguez could have been expected to be alive together, considering the ages and life expectancy of each at the time of Susan Rodriguez's death.

You must determine the duration of any future loss suffered by Plaintiff Stephen Williams by considering the joint life expectancy of Susan Rodriguez and Stephen Williams. Joint life expectancy means the number of years that both Susan Rodriguez and Stephen Williams could have been expected to be alive together, considering the ages and life expectancy of each at the time of Susan Rodriguez's death.

You must determine the duration of any future loss suffered by Plaintiff Robyn Williams by considering the joint life expectancy of Susan Rodriguez and Robyn Williams. Joint life expectancy means the number of years that both Susan Rodriguez and Plaintiff, Robyn Williams could have been expected to be alive together, considering the ages and life expectancy of each at the time of Susan Rodriguez's death.

2.    <u>Lost Support and Services in the Past and Future Due to the Death of Ricardo Salinas</u>

You must determine the duration of any future loss suffered by Plaintiff, Arturo Salinas considering the joint life expectancy of Ricardo Salinas and Arturo Salinas. Joint

life expectancy means the number of years that both Ricardo Salinas and Arturo Salinas could have been expected to be alive together, considering the ages and life expectancy of each at the time of Ricardo Salinas' death.

You must determine the duration of any future loss suffered by the Plaintiff, Elisa Salinas by considering the joint life expectancy of Ricardo Salinas and Elisa Salinas. Joint life expectancy means the number of years that both Ricardo Salinas and Elisa Salinas could have been expected to be alive together, considering the ages and life expectancy of each at the time of Ricardo Salinas' death.

In evaluating past and future loss of support and services, you must consider the Plaintiffs' relationship to Susan Rodriguez or Ricardo Salinas, the amount of Susan Rodriguez's and Ricardo Salinas' probable net income available for distribution to the Plaintiffs. "Support" includes contributions in kind as well as sums of money. "Services" means tasks that they had regularly performed that now will be a necessary expense to the Plaintiffs because of Susan Rodriguez's or Ricardo Salinas' death.

### 3.    Surviving Spouse

In determining the duration of the Plaintiff Gilbert Rodriguez's loss of companionship and protection, and his mental anguish that resulted from Susan Rodriguez's death, you must consider the join life expectancy of Susan Rodriguez and Gilbert Rodriguez.

### 4.    Surviving Minor Child

In determining the duration of the loss of parental companionship, instruction, and guidance, and the mental anguish Megan Rodriguez sustained because of Susan Rodriguez's death, you must consider the joint life expectancy of Susan Rodriguez and Megan Rodriguez.

-18-

5.    Loss of Companionship and Society

"Loss of companionship and society" means the loss of positive benefits flowing from the love, comfort, companionship and society:

      a.    Gilbert Rodriguez, Megan Rodriguez, Stephen Williams and Robyn Williams, respectively, would in reasonable probability have received from Susan Rodriguez had she lived; and

      b.    Arturo Salinas and Elisa Salinas, respectively, would in reasonable probability have received from Ricardo Salinas had he lived.

6.    Mental Anguish

"Mental Anguish" means the emotional pain, torment and suffering experienced by:

      a.    Gilbert Rodriguez, Megan Rodriguez, Stephen Williams and Robyn Williams, because of the death of Susan Rodriguez ;

      b.    Arturo Salinas and Elisa Salinas, respectively, because of the death of Ricardo Salinas.

7.    Estate Damages: Lost of Inheritance

"Loss of Inheritance" means the loss of net accumulations, that is, that part of the deceased's net income from salary after taxes, including pension benefits that the decedent after paying personal expenses and monies for the support of the decedent's survivors, would have remaining as part of the estate if the decedent had lived to his or her normal life expectancy.

B.    Bodily Injury Damages for Raul Rodriguez

You may award damages for any bodily injury that the Plaintiff Raul Rodriguez has sustained, any pain and suffering, disability, disfigurement, mental anguish and/or loss of capacity for enjoyment of life that he experienced in the past or will experience in the future

-19-

as a result of the bodily injury. No evidence of the value of intangible things, such as mental or physical pain and suffering has been or need be introduced. You are not trying to determine value, but an amount that will fairly compensate this plaintiff for the damages he has suffered. There is no exact standard for fixing the compensation to be awarded for these elements of damage. Any award that you make should be fair in the light of the evidence.

"Mental Anguish" means the emotional pain, torment and suffering experienced by Raul Rodriguez because of his injury.

You may award the reasonable expense of hospitalization and medical and nursing care and treatment that the Plaintiff Raul Rodriguez has incurred and will require because of his injuries which were caused by the defendant's wrongful conduct.

## V. INTERROGATORIES

### QUESTION NO. 1

Was any negligent use of the Harlingen Police Department rifle by an employee of the City of Harlingen in the scope of his employment for the City a proximate cause of the deaths of Susan Rodriguez and Ricardo Salinas and bodily injury to Raul Rodriguez?

Answer "Yes" or "No": _____ Yes _____

### QUESTION NO. 2

Did a custom or policy made or adopted by the City of Harlingen with deliberate indifference cause a "state created" danger that was a proximate cause of the deaths of Susan Rodriguez and Ricardo Salinas and bodily injury to Raul Rodriguez?

Answer "Yes" or "No": _____ Yes _____

If you answered "yes" to Question No. 1 or Question No. 2, then answer Question No. 3. Otherwise, do not answer Question No. 3.

## QUESTION NO. 3

What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiffs Gilbert Rodriguez, Megan Rodriguez, Stephen Williams and Robyn Williams for their injuries, if any, resulting from the death of Susan Rodriguez?

Consider the following elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element.

Answer separately, in dollars and cents, for damages, if any.

**A.    Gilbert Rodriguez**
Funeral expenses paid or incurred; loss of support and services; loss of companionship and society; and mental anguish:

Answer: $ _5,000,000._____

**B.    Megan Rodriguez**
Loss of support and services; loss of companionship, instruction and guidance; mental anguish; loss of inheritance:

Answer: $10,000,000._____

**C.    Stephen Williams**
Loss of support and services; loss of companionship and society; mental anguish:

Answer: $ _2,500,000._____

**D.    Robyn Williams**
Loss of support and services; loss of companionship and Society; mental anguish:

Answer: $ _2,500,000._____

**If you answered "yes" to Question No. 1 or Question No. 2, then answer Question No. 4. Otherwise, do not answer Question No. 4.**

## QUESTION NO. 4

What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiffs Arturo Salinas and Elisa Salinas for their injuries, if any, resulting from the death of Ricardo Salinas?

Consider the following elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element.

Answer separately, in dollars and cents, for damages, if any.

**A.    Arturo Salinas**
Funeral expenses paid or incurred; loss of support and services; loss of companionship and society; mental anguish:

Answer: $ _____2,500,000._____

**B.    Elisa Salinas**
Loss of support and services; loss of companionship and society; mental anguish

Answer: $_____2,500,000._____

**If you answered "yes" to Question No. 1 or Question No. 2, then answer Question No. 5. Otherwise, do not answer Question No. 5.**

## QUESTION NO. 5

What sum of money, if paid now in cash, would fairly and reasonably compensate Raul Rodriguez for his injuries, if any, resulting from the occurrence in question?

Consider the elements of damages listed below and none other.  Consider each element separately.  Do not include interest on any amount of damages you may find.

Answer in dollars and cents, for damages, if any.

Physical pain; mental anguish; loss of earning capacity; physical impairment; loss of enjoyment of life; physical disfigurement; medical care:

Answer: $ 10,000,000.

-24-

## VI. CERTIFICATE

**SO SAY WE ALL**

s/ Rachel Garcia Zuniga                    February 26, 2002
Presiding Juror                              Date



1                  IN THE UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                       BROWNSVILLE DIVISION

3       ───────────────────────────────  )
                                          )
ARTURO GUILLERMO SALINAS, ET AL    )
4                                         )
                                   ) CIVIL ACTION NO.
5       VS.                        ) B-98-162
                                   )
6       CITY OF HARLINGEN, ET AL           )
                                          )
7       ───────────────────────────────  )

8

9                            VOLUME V
                             JURY TRIAL
10            BEFORE THE HONORABLE HILDA G. TAGLE
                        FEBRUARY 25, 2002
11
        APPEARANCES:
12

13      For the Plaintiffs,         MR. BROADUS A. SPIVEY
        Salinas and Rodriguez:      MR. PRICE AINSWORTH
14                                  Attorneys at Law
                                    Austin, Texas
15
        For the Plaintiff,          MRS. SONIA LOPEZ
16      Rodriguez:                  MR. RAMON GARCIA
                                    Attorneys at Law
17                                  Edinburg, Texas

18      For the Defendants:         MR. TOM LOCKHART
                                    MR. ROGER HUGHES
19                                  Attorneys at Law
                                    Harlingen, Texas
20
        Transcribed by:            BRECK C. RECORD
21                                  Official Court Reporter
                                    600 E. Harrison, Box 16
22                                  Brownsville, Texas  78520
                                    (956)548-2510
23

24

25

        Captured and Transcribed by Computer - Eclipse

```
 1                          I-N-D-E-X
                                                    Page No.
 2   Jury in        . . . . . . . . . . . . . . .      7
     Note:   Jury charge on file in the court documents . . .   7
 3   Judge continued to read the jury charge to the jury . .    7
     Judge continued to read the charge to the jury . . . .     8
 4   Judge read the interrogatories to the jury . . . . . .     8
     Jury out        . . . . . . . . . . . . . . .     63
 5   Court Reporter's Certificate  . . . . . . . . . . .       64

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                    Captured and Transcribed by Computer - Eclipse

1    theories and definitions in the embodiment of the question.  And

2    those definitions make their way into the court's instructions

3    that you'll have with you when you go back to deliberate this

4    case.  And you can refer back to them as you look through the

5    evidence and decide whether or not there has been a

6    state-created danger.

7        Remember when we talked about a week ago, I told you there

8    were two theories of recovery in this case.  The first is

9    negligence and the second is a state-created danger.  Now, my

10   answer, I suggest to that question -- and of course you will be

11   the ultimate Supreme Court on the facts of this case -- is that

12   yes, there was a state-created danger; that it was a proximate

13   cause of the death of Susan Rodriguez and Ricardo Salinas and

14   bodily injury to Raul Rodriguez; and that it was committed with

15   a deliberate indifference.  So, there are three or four things

16   we need to talk about when we look at Question No. 2.  The first

17   would be deliberate indifference.

18       Now, there's a definition that's set out in The Court's

19   instructions for you, but you know what deliberate indifference

20   when you read those definitions.  Deliberate indifference is an

21   arrogance, and an arrogance that was demonstrated time and time

22   again in this case.

23       When I sit down with my boys and watch all those Disney

24   movies that's stacked up over at the VCR player, one of the ones

25   we've watched in the past is Pinocchio.  You know, Pinocchio,



1    his nose grows each time he tells a story and the lie gets

2    bigger and bigger and finally towards the end of the movie,

3    about two-thirds of the way through, the angel comes in -- or

4    the lady with the wand anyway comes in and says, "Here's the

5    deal Pinocchio.  A lie becomes bigger and bigger until it is as

6    plain as the nose on your face."  Folks, what you have seen in

7    this case, whether you want to call it a lie or you want to call

8    it a -- what was it Joe LaBeau called it -- a situational

9    embellishment is a prevarication, an attempt to deflect those in

10   the community away from what the truth was.

11       What I'm talking about is how this weapon made its way into

12   R.D. Moore's home.  You know what I'm talking about as we look

13   at Exhibit 1-A was the AR-15 assault rifle.  That's the rifle

14   that was brought in by Mrs. Pirtle, believe it or not, so that

15   it would not find its way into the wrong hands.  What irony of

16   ironies that a weapon meant for destruction so that it would not

17   be used for the wrong purpose is ultimately used exactly for

18   that purpose because the police department had it.

19       Now, that's irony.  That's not what's supposed to happen.

20   And rather than saying That's right, Mrs. Pirtle brought that

21   weapon in for disposal and we forgot to dispose of it, today or

22   this past week from the witness stand, they still take the

23   position that disposal doesn't mean disposal.  It is like what

24   is the definition of is is.  Disposal means throw it away.

25   That's certainly what Mrs. Pirtle meant.  And when the city



Captured and Transcribed by Computer - Eclipse

1  investigated it, when they had Joe LaBeau look at it, that's
2  what he thought Mrs. Pirtle had intended.  And when they had
3  their own consultant James Robenson investigate it, that's what
4  he thought Mrs. Pirtle had intended.  And certainly none of us
5  would be here today if, in fact, Mr. Pirtle's intentions had
6  been followed.  She was also a concerned citizen.  But the
7  police, in their arrogance, in their deliberate indifference to
8  the potential consequences, accepted the rifle and did what they
9  would with it.  It is their very definition of disposal that
10  suggests deliberate indifference.  If you throw it away, you do
11  what Mrs. Pirtle says.  If you do whatever we desire to do with
12  it as the police department of Harlingen, you're acting with
13  deliberate indifference to potential consequences.  And that's
14  what they did.  Rather than dispose of the weapon, they put it
15  in the evidence locker.
16      And then the story goes -- and you decide whether or not you
17  believe any part of this story -- then the story goes that
18  because it was humid in there, we put it in R.D. Moore's little
19  office.  First we put it behind his desk, then we put it behind
20  the filing cabinet, eventually put it out in his pickup, then
21  took home from his pickup, put it in his house.  Didn't just
22  leave it anywhere around the house, put it in his son's bedroom
23  in a safe.  Now, whether or not you would call that a gun safe I
24  think is questionable if you give your son a key and you keep a
25  key and you know your son has gone to a mental institution for

1    cocaine abuse.  You know he abused alcohol and you're buying him

2    Prozac across the border, bringing it over here because nobody

3    will give him a prescription for it.  That's not the kind of

4    person you want to give a key to a gun safe to, much less access

5    to an assault rifle.  That is deliberate indifference.  It is,

6    "I don't care what the consequences are.  I have the arrogance

7    to say I know better than what Mrs. Pirtle ended.  I know better

8    than what the national standards require for how these weapons

9    are to be handled, what the state standards require, or what

10    even the written policies that the Harlingen Police Department

11    require."  It is, "I know better."

12        You heard Detective Moore testify.  And didn't he act like

13    if he had that weapon he could do great things with it.  Even

14    today he would tell you that he was part of an emergency

15    response team.  Rather than admitting, "We messed up."  Rather

16    than just saying, "We should have disposed of the weapon," they

17    maintained a level of arrogance that can only be described as

18    deliberate indifference to the consequences.

19        The idea that this gun was not disposed of and instead made

20    its way into the back of Mr. Ernest Moore's pickup is just

21    shocking.  It is not supposed to happen.  That's what Dr.

22    Kirkham said to you.  The guy from Florida State that spent his

23    life studying police departments and police procedure.  And he

24    said it was a clear violation of all standards and policies.

25    There is no countervailing evidence produced by the Defendant to



Captured and Transcribed by Computer - Eclipse

1    Dr. Kirkham.  There isn't some expert flown in from Florida

2    University or whatever their archrival is that's going to say,

3    "no, no, that's okay.  You can take a gun that's meant for

4    disposal.  You can put it in a pickup.  Take it over to the

5    house, leave it in the son's bedroom.  It is okay if he's got a

6    bad mental history and history of drug abuse.  That's okay."

7    There's not anybody gonna come tell you that, because it is not

8    right.  Only Dr. Kirkham spoke to the issue.  He said it was a

9    clear violation of public policy.

10        And you'll recall that when we talked to Ranger Jaramillo

11    that he said there was a brown rifle case as indicated here on

12    Exhibit 7-B found in Ernest Moore's pickup on day of the

13    shooting.  That there were shell cartridges found in that rifle

14    case that were returned back from the police examiner in Austin,

15    from the weapon's examiner in Austin, that it was not clear as

16    to whether or not those cartridge were in the rifle case after

17    the shooting but before Jaramillo went over to the rifle case or

18    if when he put the weapon in the rifle case he put a couple of

19    shells in the rifle case, as well.  That's important because it

20    demonstrates that Ernest Moore carried that rifle earlier.  He

21    wouldn't have had a chance after the shooting started to go over

22    and take empty shell cases to that rifle case.  And remember

23    that found in the inventory in the pickup at the time of the

24    shooting was a cotton sack in the front floorboard.  That cotton

25    sack had shells for both the AK-47 and the AR-15.  The AK-47

Captured and Transcribed by Computer - Eclipse

1  being the weapon that was used earlier up in the Rio Hondo

2  shootings, and the AR-15 being the weapon of choice that was

3  used down in the San Benito shootings.  Those cartridges, those

4  shells, were already in the pickup indicating to me evidence of

5  both a direct and circumstantial basis that this person intended

6  to use an AR-15.

7      Now, you're asked in this question, "Did a custom or policy

8  made or adopted by the City of Harlingen with deliberate

9  indifference cause a state-created danger that was a proximate

10  cause of the deaths of the plaintiffs and the injuries of Raul

11  Rodriguez."  Let's talk for just a minute about policy.  All

12  right?

13      Now as we discussed and as The Court has instructed you,

14  there are a couple of different ways to show policy.  One way to

15  show policy is by a written-down document.  Another way to show

16  policy is by where you have a rampant custom, a commonly

17  accepted custom that becomes grafted upon the policy.  A third

18  way is through ratification.  In this case, if you'll recall the

19  memorandum from Joe LaBeau, what they established was a policy

20  that superseded the written policy.  And that is you could take

21  weapons home.  You didn't have to have a written assignment with

22  them.  You don't have to have any type of demonstrated

23  proficiency.  In fact, they hired a consultant that, as we

24  discussed with Detective Moore, sat much in the same seat that

25  you're sitting in today and what he said was it is a violation,



Captured and Transcribed by Computer - Eclipse



1    and R.D. Moore and Chief Scheopner should be negatively

2    sanctioned.  Remember, they were described as committing a

3    situational embellishment by Joe LaBeau.  That's bureaucracy

4    speak.  And then they were accused of violations that warranted

5    negative sanctions.  But today, as we stand here before you

6    today, R.D. Moore has still not been sanctioned.  Chief

7    Scheopner stepped down, but he wasn't sanctioned either.  In

8    fact, they had the arrogance, rather than to fire R.D. Moore, to

9    hire his other son.  They are deliberately indifferent to all

10   law.  They don't follow their own standards.  They make up

11   standards as they go along.  In fact, you heard R.D. Moore

12   describe the fact that he went and bought another AR-15 for his

13   son, even though his son couldn't have qualified under the

14   federal law to buy the weapon.  These folks are arrogant.  They

15   are acting with deliberate indifference to the consequences and

16   the consequences sit on the front row before you.

17        Now, I think another example of their deliberate

18   indifference, of their arrogance, is the decoration that existed

19   around that room.  You saw the Nazi posters.  You saw the

20   photographs of Hitler.  You saw the SS uniform hanging beside

21   the other AR-15.  Folks, you don't send an assault rifle home to

22   a person that resides in that room unless you are consciously

23   indifferent, deliberately indifferent to whatever consequences

24   might happen.  What's gonna happen is that somebody's gonna get

25   hurt.  They can say, "Well, he could have used anyone of these

Captured and Transcribed by Computer - Eclipse

1    other 20 guns that were available to them." But we know that he

2    practiced with this gun with his own father. Practiced with his

3    AR-15 on at least one occasion is what the evidence is. And you

4    heard from Julie Cox, his girlfriend who said that he practiced

5    with the AR-15s for over a year. In fact, what she said is

6    that, "Do you know he practiced with the assault rifles more

7    than a month before the incident? Yes." And she goes on to

8    say, "Okay. Now that date, June the 7th, 1998, would that be

9    after you remember Mr. Moore practicing with an assault rifle?

10   Yes." Remember that's the date that the second assault rifle

11   was bought just 30 days before the incident. So, the rifle he

12   practiced with out at Julie's parent's house and in his own

13   front yard with just Julie and not his dad there was the AR-15

14   that was the Harlingen Police Department weapon.

15       But you know, folks, there's even more telling evidence that

16   this is the weapon he liked, that this is the weapon he liked to

17   practice with. Not just the fact that those cartridges were in

18   his car before the shooting. Remember Deputy Rodriguez, Deputy

19   Robert Rodriguez? He said that R.D. Moore told him that morning

20   before the border patrol agents were killed that he heard gun

21   fire. He practiced with the weapon on the morning before the

22   shooting. He had a level of proficiency that enabled him to

23   kill two people and seriously wound another one while he was

24   being shot at. He flipped out the clip, put in another one;

25   flipped out the clip, put in another way one. He aimed down

1   this way and aimed down this way and it could have been at

2   anyone of us, but it just happened to be that he aimed at the

3   people who ran into harm's way rather than those like us, like

4   myself, that would try to avoid harm's way.  The very people

5   that society ought to be protecting, because they have taken it

6   upon themselves to protect us, were put in where they would

7   exactly be harmed.  And when they let them in to look around the

8   house, R.D. Moore said, "No, my son's not an illegal alien.

9   Border Patrol agents, you stay outside."  And interestingly,

10  when the gun fire continued just 20 minutes later and when they

11  like there might be two other people out there in the field,

12  R.D. Moore goes and gets his dog and puts his dog in the bedroom

13  and locks it up and protects the dog from further gun fire.  He

14  treated the husbands and wives and kids of these border patrol

15  agents, these families, worse than he would treat a dog.  Now,

16  that's deliberate indifference and it ought to be met with when

17  you look at the damages in this case.

18      The damages questions follow -- and I'll be brief so that my

19  partner can finish up in closing and look more at the evidence

20  with you.  But the damage evidence is broken down into subparts.

21  The first one is No. 3.

22          THE COURT:  One minute.

23          MR. AINSWORTH:  Thank you, Your Honor.

24      It asks about Gilbert, Megan, Stephen Williams and Robyn

25  Williams.  What I suggest to you is that for Gilbert, you put

Captured and Transcribed by Computer - Eclipse

1    UNITED STATES DISTRICT COURT        *

2

3    SOUTHERN DISTRICT OF TEXAS          *

4         I, BRECK C. RECORD, Official Court Reporter, United States

5    District Court, Southern District of Texas, do hereby certify

6    that the foregoing is a correct transcript from the record of

7    proceedings in the above-entitled matter.

8         I certify that the transcript fees and format comply with

9    those prescribed by the Court and Judicial Conference of the

10   United States.

11

12   _3/11/02_              _Breck Record_
                            BRECK C. RECORD,
13                          Official Court Reporter
                            United States District Court
14                          Southern District of Texas

15

16

17

18

19

20

21

22

23

24

25

Captured and Transcribed by Computer - Eclipse

1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
2                      BROWNSVILLE DIVISION

3    ———————————————————————       )
     ARTURO GUILLERMO SALINAS, ET AL  )
4                                   )
                                    ) CIVIL ACTION NO.
5    VS.                            ) B-98-162
                                    )
6    CITY OF HARLINGEN, ET AL       )
     ———————————————————————       )
7

8

9                         VOLUME II
                          JURY TRIAL
10           BEFORE THE HONORABLE HILDA G. TAGLE
                      FEBRUARY 20, 2002
11
     APPEARANCES:
12

13   For the Plaintiffs,         MR. BROADDUS A. SPIVEY
     Salinas and Rodriguez:      MR. PRICE AINSWORTH
14                               Attorneys at Law
                                 Austin, Texas
15
     For the Plaintiff,          MRS. SONIA LOPEZ
16   Rodriguez:                  MR. RAMON GARCIA
                                 Attorneys at Law
17                               Edinburg, Texas

18   For the Defendants:         MR. TOM LOCKHART
                                 MR. ROGER HUGHES
19                               Attorneys at Law
                                 Harlingen, Texas
20
     Transcribed by:             BRECK C. RECORD
21                               Official Court Reporter
                                 600 E. Harrison, Box 16
22                               Brownsville, Texas  78520
                                 (956)548-2510
23

24

25

            Captured and Transcribed by Computer - Eclipse

```
1                           I-N-D-E-X

                                                         Page No.
2    Jury in          . . . . . . . . . . . . . . . . . .  232
     Jury out         . . . . . . . . . . . . . . . . . .  279
3    Recess taken     . . . . . . . . . . . . . . . . . .  279
     Jury in          . . . . . . . . . . . . . . . . . .  279
4    Jury out         . . . . . . . . . . . . . . . . . .  325
     Lunch recess     . . . . . . . . . . . . . . . . . .  326
5    Jury in          . . . . . . . . . . . . . . . . . .  327
     Jury out         . . . . . . . . . . . . . . . . . .  394
6    Recess taken     . . . . . . . . . . . . . . . . . .  394


7                       ALPHABETICAL INDEX

                                                         Page No.
8    MOORE, R.D.      . . . . . . . . . . . . . . . . . .  346
     SCHEOPNER, JAMES . . . . . . . . . . . . . . . . . .  232

9
                     CHRONOLOGICAL EXAMINATION
10   PLAINTIFF'S WITNESSES      Dir Dir   Crs  Rdir Rcrs FRdir   VrDire

11   JAMES SCHEOPNER           232 292   327  343

12   R.D. MOORE                    346

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Captured and Transcribed by Computer - Eclipse

1   Q    Was he designated in writing as a sharp shooter?

2   A    No, sir.

3   Q    How many rifles at the time of this shooting had been

4   "assigned" by the Harlingen Police Department to Detective

5   Moore?

6   A    Two.

7   Q    What were they?

8   A    One was Olympic arms .223 caliber semiautomatic and I don't

9   remember what the other one was.

10  Q    Was there a written record anywhere in the Harlingen Police

11  Department of the assignment of those two weapons to Detective

12  Moore?

13  A    No, sir.

14  Q    Were you aware at the time of the shootings that these

15  weapons "had been assigned to Detective Moore"?

16  A    Was I aware that the weapons had been assigned to him?

17  Q    Yes.

18  A    Yes, sir.

19  Q    At the time of the shooting?

20  A    Yes, sir.

21  Q    So you knew both the AR-15 in question had been assigned

22  "assigned" to Detective Moore?

23  A    I knew he was assigned two weapons and one of them was an

24  Olympic Arms and I can't remember what the other one was.

25  Q    You specifically, Chief Scheopner, authorized and approved

Captured and Transcribed by Computer - Eclipse

1   Q   Did you not know what I just read at the time you wrote this

2   memorandum?

3   A   Know what?

4   Q   You wrote what you "honestly believed," didn't you?

5   A   Yes, sir.  And whatever the day was, October?

6   Q   Yes, sir.

7   A   Yes, sir.

8   Q   This is your memorandum, isn't it?

9   A   Yes, sir.

10  Q   And you were aware and you stated that creating a policy, in

11  other words, you write it down and create a policy that

12  transforms a potential act from discretionary to ministerial?

13  A   Yes, sir.

14  Q   In addition to you not having anything in writing,

15  specifically Captain Vasquez never notified you in writing that

16  Detective Moore had taken possession of this AR-15 rifle, this

17  Plaintiff's Exhibit 1; isn't that correct?

18  A   That's right, verbal only.

19  Q   And you have read the Texas Ranger's report?

20  A   No, sir.

21  Q   Were you aware that even in the Texas Ranger's report, there

22  was a statement contained on Page 27 of that report, 93C,

23  paragraph 93C Foist, who is a police officer, wasn't he --

24  A   Yes, sir.

25  Q   -- at the time?

Captured and Transcribed by Computer - Eclipse

1  A    These state that the department range master must -- okay.

2  These state that the department range master must keep firearm

3  qualification records and make them available if requested to do

4  so during an audit check by the commission.  Also, every peace

5  officer must qualify once a year according to department

6  standards with firearms carried by that officer in an official

7  capacity on or off duty.

8  Q    Okay.  Now, let's go back to finding one by this independent

9  investigator retained by the City of Harlingen.  Finding one

10  says Chief Schoepner conducted a brief inquiry into an incident

11  that should have been thoroughly investigated.  And without

12  reading all of that, would you go to the last paragraph, please,

13  and read what that says?

14  A    The other police agencies were conducting criminal

15  investigations into the incident as well.  Administrative

16  investigations into their own employees.  Persons responsible

17  for investigating whether the involvement of the Harlingen

18  Police Department personnel and equipment was proper and correct

19  according to the professional directives and practices of the

20  City of Harlingen and this police department was chief of

21  police.  He did not conduct such an investigation.

22  Q    Then, if you would, turn to finding No. 5.  I'll read the

23  finding.  Captain Vasquez failed to notify Chief Schoepner in

24  writing of his action in assigning the gun to Detective Moore.

25  Captain Vasquez may have told the chief verbally.  Captain

1    Vasquez said he told the chief about his assigning the gun to

2    Detective Moore.  The chief did not recall the conversation.

3    Did I read that correctly?

4    A    Yes, sir.

5    Q    Read that last two sentences.

6    A    The situation is reiteration of a need for thorough

7    documentation in the investigation when there are allegations of

8    personnel misconduct.

9    Q    Now, let's go up to No. 4, which says Chief Schoepner failed

10    to take action against Captain Vasquez and/or Detective Moore

11    when he learned that the gun had been taken into the department

12    for disposal by Detective Moore, who later requested that

13    captain Vasquez assign it to him.  And read the statement under

14    that.

15    A    The gun had been retained instead of destroyed.  Captain

16    Vasquez had violated department directives and good police

17    practices by assigning it to Moore.  Moore was carrying the gun

18    without any qualifier.

19           THE COURT:  Excuse me, sir.  Who is the range master?

20    Who had that position at the time that this weapon was assigned?

21           THE WITNESS:  At that time, Your Honor, I believe it was

22    Sergeant Ray Wisdom.

23           THE COURT:  Does he still hold that position?

24           THE WITNESS:  No, sir.  He's retired.

25           THE COURT:  Who holds that position now?

Captured and Transcribed by Computer - Eclipse

1    Q    So you, R.D. Moore and Captain Vasquez have been working for

2    the Harlingen Police Department now for in excess of 28 years?

3    A    Yes, ma'am.

4    Q    They have been working for the Harlingen Police Department

5    in excess of 30 years; isn't that correct?

6    A    Well, Moore quit at one point, went down to the sheriff's

7    department and came back.  So I don't know what his total tenure

8    is, but Captain Vasquez has been there 30 or 32 years.

9    Q    And that's how long you-all have known each other?

10   A    Yes, ma'am.

11   Q    And did that have any reason or was that the reason why

12   policies and procedure were violated, was because you-all had

13   known each other for such a long time that there was just a

14   disregard for policy and procedure?

15   A    No, ma'am.

16   Q    Were in effect policies and procedures violated by R.D.

17   Moore?

18   A    Procedures were, yes, ma'am.

19   Q    And were in effect policies and procedures violated by

20   Captain Vasquez?

21   A    Yes, ma'am.

22   Q    And were in effect policies and procedures violated by you?

23   A    No, ma'am.

24   Q    Is it your testimony to this jury that you issued the AR-15

25   that killed the two border patrol agents and seriously injured

1    Raúl Rodriguez because you had assigned R.D. Moore as a sharp

2    shooter team?

3    A    Yes, ma'am.

4    Q    I want to refer to what's been previously admitted and

5    marked as Plaintiff's Exhibit No. 46.  Under Section 4.04.001 of

6    the Harlingen Police Department -- 4.04, I'm sorry, authorized

7    weapons.  The department authorizes officers to carry certain

8    weapons and authorizes the use of those weapons only when

9    necessary to lawfully accomplish departmental goals.  Officers

10   carry and use only those weapons approved and authorized by the

11   department.

12   A    Yes, ma'am.  That's the policy, and the rest of the items

13   are procedures on how to accomplish the policy.

14   Q    Isn't it true, Mr. Schoepner, that there was no departmental

15   goal for adopting a sharp shooter team?

16   A    No, ma'am.

17   Q    Are you stating to this jury that there was such a

18   departmental goal?

19   A    Yes, ma'am.

20   Q    There was no documentation, was there, to support your

21   position that the department had a sharp shooter team?

22   A    I don't believe I ever put it in writing.

23   Q    And assistant city manager Joe LaBeau reviewed that and

24   found there was no documentation to support your position that

25   this AR-15 had been issued because there was some policy that

1    allowed for issuance of weapons for sharp shooting?

2    A    A little confusing there, but I don't know what he wrote.

3    We had a specific goal.  That's why the weapons were issued.

4    Q    And no goal that was documented as far as a sharp shooter

5    team existing?

6    A    No, ma'am.  If that's your question, no, ma'am.  I never put

7    it in writing.

8    Q    Now, I know that we've also talked about, first of all,

9    whether it was properly inventoried, was it even inventoried,

10    should it have been issued and training and proficiency.  You

11    state in your deposition that you told R.D. Moore the only

12    instructions that you gave him were to stay proficient; is that

13    correct?

14    A    I don't believe that was all I told him.

15    Q    What else did you tell him?

16    A    I told him that since I had abolished the -- they call it

17    the emergency response team, similar to a SWAT team, that my

18    predecessor had, since I got his staff, we were going to go back

19    and do what we had before.  We had that team and I was going to

20    assign Captain Vasquez and him to be on call in case we ever had

21    a situation where we needed a sharp shooter, to take the weapon,

22    stay proficient on it, train on it, stay available.  If I ever

23    needed him, I'd call him.

24    Q    Well, that's a good question.  Where did police officers for

25    Harlingen P.D. train?

1    A    We used to train out at the range out by the airport until

2    they bulldozed it down to make some additional room for airport

3    hangers.  And at that time we lost our outdoor range.  All we

4    had was -- we used a military academy indoor range.

5    Q    At the time of the incident in question, which range were

6    the police officers allowed to use?

7    A    For handgun, the MMA range.

8    Q    Were there any other facilities that any of the police

9    officers were allowed to use to train to shoot weapons?

10    A    No, ma'am.

11    Q    That was the only firing range that was available to shoot

12    weapons for HPD officers?

13    A    Yes, ma'am.

14    Q    And that range, that firing range, did not allow for the

15    shooting of rifles to take place?

16    A    That's correct.

17    Q    So if R.D. Moore had to train with this weapon, this AR-15

18    that killed these two border patrol agents and seriously injured

19    Raúl Rodriguez, he could not have trained at the only firing

20    range that police officers for Harlingen Police Department could

21    have utilized?

22    A    He practiced at his house.

23    Q    But the firing range that was the one where officers should

24    utilize in order to practice firing, he could not utilize?

25    A    Not with a rifle, that's right.

Captured and Transcribed by Computer - Eclipse

1   Q   And, in fact, if R.D. Moore had to demonstrate proficiency,

2   meaning that he could fire at certain distances or that he had

3   some sort of accuracy at certain distances, he could not

4   demonstrate proficiency to the Harlingen Police Department at

5   the firing range because the firing range didn't allow him to go

6   out there to shoot that rifle?

7   A   No, ma'am.

8   Q   Is that correct?

9   A   No, ma'am, that's not correct.

10  Q   Did they allow him to use that firing range?

11  A   He could have taken the range master out to his house and

12  shot there in the backyard.

13  Q   So you're telling this jury that you are relying on the fact

14  that R.D. Moore was gonna take the range master to his house to

15  demonstrate proficiency?

16  A   Yes, ma'am.  That's what he should have done.

17  Q   Am I correct in stating when you testified and you gave your

18  deposition, which is the same thing as you're doing today but

19  outside the presence of Your Honor and of the jurors, when you

20  testified under oath, you told us that you had authorized the

21  issuance of the AR-15 and one reason that you authorized it was

22  because R.D. Moore had previously trained with an AR-15?

23  A   I authorized that Olympic Arms.  I didn't say AR-15, but

24  yes, ma'am, I authorized him to carry that because he had

25  previously trained on the AR-15.

Captured and Transcribed by Computer - Eclipse

1   UNITED STATES DISTRICT COURT        *

2

    SOUTHERN DISTRICT OF TEXAS          *

3

4       I, BRECK C. RECORD, Official Court Reporter, United States

5   District Court, Southern District of Texas, do hereby certify

6   that the foregoing is a correct transcript from the record of

7   proceedings in the above-entitled matter.

8       I certify that the transcript fees and format comply with

9   those prescribed by the Court and Judicial Conference of the

10  United States.

11

12  _____                _____
                               BRECK C. RECORD,
13                             Official Court Reporter
                               United States District Court
14                             Southern District of Texas

15

16

17

18

19

20

21

22

23

24

25

                Captured and Transcribed by Computer - Eclipse

1              IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF TEXAS
2                   BROWNSVILLE DIVISION

3    ─────────────────────────────────
                                        )
     ARTURO GUILLERMO SALINAS, ET AL    )
4                                       )
                                        ) CIVIL ACTION NO.
5    VS.                                ) B-98-162
                                        )
6    CITY OF HARLINGEN, ET AL           )
                                        )
     ─────────────────────────────────

7

8

9                        VOLUME II
                         JURY TRIAL
10         BEFORE THE HONORABLE HILDA G. TAGLE
                     FEBRUARY 20, 2002
11
     APPEARANCES:
12

13   For the Plaintiffs,        MR. BROADDUS A. SPIVEY
     Salinas and Rodriguez:     MR. PRICE AINSWORTH
14                              Attorneys at Law
                                Austin, Texas
15
     For the Plaintiff,         MRS. SONIA LOPEZ
16   Rodriguez:                 MR. RAMON GARCIA
                                Attorneys at Law
17                              Edinburg, Texas

18   For the Defendants:        MR. TOM LOCKHART
                                MR. ROGER HUGHES
19                              Attorneys at Law
                                Harlingen, Texas
20
     Transcribed by:            BRECK C. RECORD
21                              Official Court Reporter
                                600 E. Harrison, Box 16
22                              Brownsville, Texas  78520
                                (956)548-2510
23

24

25


              Captured and Transcribed by Computer - Eclipse

```
 1                          I-N-D-E-X
                                                      Page No.
 2      Jury in          . . . . . . . . . . . . . . . .  232
        Jury out         . . . . . . . . . . . . . . . .  279
 3      Recess taken     . . . . . . . . . . . . . . . .  279
        Jury in          . . . . . . . . . . . . . . . .  279
 4      Jury out         . . . . . . . . . . . . . . . .  325
        Lunch recess     . . . . . . . . . . . . . . . .  326
 5      Jury in          . . . . . . . . . . . . . . . .  327
        Jury out         . . . . . . . . . . . . . . . .  394
 6      Recess taken     . . . . . . . . . . . . . . . .  394

 7                    ALPHABETICAL INDEX
                                                      Page No.
 8      MOORE, R.D.      . . . . . . . . . . . . . . . .  346
        SCHEOPNER, JAMES . . . . . . . . . . . . . . . .  232

 9
                    CHRONOLOGICAL EXAMINATION
10      PLAINTIFF'S WITNESSES    Dir Dir  Crs  Rdir Rcrs FRdir  VrDire

11      JAMES SCHEOPNER          232 292  327  343

12      R.D. MOORE               346
```

```
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Captured and Transcribed by Computer - Eclipse

1    Q    In this case it was easier to then assign the weapon to

2    yourself, correct?

3    A    Yes.

4    Q    Without telling Mr. -- the property custodian?

5    A    He wasn't there at that particular time.

6    Q    Okay.  Without getting any written assignment for the weapon

7    to you, correct?

8    A    I am not aware whether anything was written or not.  I went

9    through Captain Vasquez.  Captain Vasquez approved it.  He is

10   the captain.  I understood once he assigned that weapon to me,

11   whatever he did with it was up to him.  It wasn't up to me.

12   Q    And then eventually to let you carry the weapon without

13   having a yearly proficiency test with the weapon; is that right?

14   A    I was proficient with the weapon on numerous occasions.  Was

15   there an instructor there present to notify -- to jot down the

16   fact that I did shoot it, no, there wasn't.

17   Q    And at least one occasion you practiced with your son and I

18   think you indicated as such to Mr. Robenson; is that right?

19   A    Yes.

20   Q    Now, after he concluded his report, Mr. Robenson in making a

21   decision, not unlike that that the jury must consider in this

22   case, decided that -- and I'm looking there at the bottom next

23   to the last paragraph in the report, that Detective Moore

24   violated good police practice and used poor judgment by

25   permitting his son to fire his department authorized weapon.  He

Captured and Transcribed by Computer - Eclipse

392

1    can be negatively sanctioned.

2        In the paragraph above this, about midway through it says

3    Detective Moore should have procedurally and as a matter of good

4    professional practice notified the property custodian of the

5    process of the gun and the owner's request for destruction. He

6    was derelict in his responsibility as property custodian and can

7    be negatively sanctioned.

8        Going up to the paragraph above that, he failed to comply

9    with policy and recognizing that it was the authority of the

10   chief to make the decision on the assignment of the gun.  He

11   further failed to notify or make arrangements for protective or

12   to demonstrate his proficiency with the weapon.  He violated

13   Harlingen Police Department policies and it sets out the numbers

14   and good police management practices and can be negatively

15   sanctioned.

16       Now, the bottom line is, Detective Moore, you've not ever

17   been negatively sanctioned by the Harlingen Police Department

18   for any of these items that we've discussed today; isn't that

19   right?

20   A    I have.  I was given a verbal reprimand by Joe LaBeau.

21   Q    By Joe LaBeau, the assistant city manager --

22   A    Yes.

23   Q    -- at the time?

1   well, how would you describe it?

2   A   Reprimand.

3   Q   Reprimand.  And what was the extent of it, don't do that

4   again or what did he say?

5   A   Basically.

6   Q   Okay.  So in effect you would agree with me, wouldn't you,

7   that your actions have been accepted by the administration of

8   the police department?

9   A   My action as what?

10   Q   Well, the ones we just went through there when we went

11   through the conclusions to the Robenson report, the notion that

12   you didn't tell the custodian, the property custodian, about the

13   weapon.  You didn't have a written assignment of the weapon.

14   You didn't test with the weapon on a proficiency basis with the

15   range master on an annual basis and that -- and those items.

16   You were never sanctioned by the city for those, correct?

17   A   That's correct.

18   Q   I mean, by the police department for those.  And it is your

19   understanding that the police department has in effect accepted

20   what you did without thinking that anything was wrong; isn't

21   that right?

22   A   I don't believe that we did do anything wrong.

23   Q   Right.  And I mean that's the way the police department has

24   handled this, is to tell you in effect you didn't do anything

25   wrong; isn't that right?

Captured and Transcribed by Computer - Eclipse

1    A    Yes.

2         MR. AINSWORTH:  I think that's all I have right now,

3    Your Honor.

4         THE COURT:  Members of the jury, I'm going to recess you

5    for 20 minutes.  During this recess you are still under my

6    admonishment, that you must not form any opinion about the facts

7    of this case.  You're in recess for 20 minutes.  Thank you.

8         (Jury out.)

9         MR. SPIVEY:  Your Honor, may Mrs. Merriman be excused to

10    go back and type up the request that I made?

11         THE COURT:  Yes.  Also, I see -- sir, you may step down.

12    I don't have the report.  I just have the vita.  So I guess what

13    I was contemplating was looking at --

14         MR. SPIVEY:  I have highlighted, but I doubt that would

15    influence The Court, if that's okay.

16         THE COURT:  Whatever you have got so I can know what

17    you're going to be wanting to supplement.  Thank you.

18         (Recess taken.)

19         (Jury in.)

20         THE COURT:  You may proceed.

21         MRS. LOPEZ:  Thank you, Your Honor.

22                        DIRECT EXAMINATION

23    BY MRS. LOPEZ:

24    Q    Mr. Moore, did you remove any ammunition from Ernest Moore's

25    pickup on the morning of July the 7th of 1998?

              Captured and Transcribed by Computer - Eclipse

```
1   UNITED STATES DISTRICT COURT      *

2
    SOUTHERN DISTRICT OF TEXAS        *
3

4       I, BRECK C. RECORD, Official Court Reporter, United States

5   District Court, Southern District of Texas, do hereby certify

6   that the foregoing is a correct transcript from the record of

7   proceedings in the above-entitled matter.

8       I certify that the transcript fees and format comply with

9   those prescribed by the Court and Judicial Conference of the

10  United States.

11

12  _____                    _____
                                  BRECK C. RECORD,
13                                Official Court Reporter
                                  United States District Court
14                                Southern District of Texas

15

16

17

18

19

20

21

22

23

24

25
```

                Captured and Transcribed by Computer - Eclipse

# interoffice
# M E M O R A N D U M

**to:**    Natalie Flores Prim, City Manager

**from:**    Joseph D. LaBeau, Assistant City Manager

**re:**    Shooting Incident / Recommendations for Action

**date:**    October 14, 1998

On July 7, 1998, two Border Patrol agents were killed with a weapon belonging to the Harlingen Police Department. The basic facts surrounding this case are that Detective R. D. Moore had a Harlingen Police Department semi-automatic AR-15 rifle locked in a gun safe at his home. Sometime during the early morning hours of July 7, 1998 Detective Moore's 25 year old son, Ernest Moore, retrieved the department weapon from the gun safe and subsequently shot and killed the agents, possibly also wounding a Cameron County Deputy Sheriff.

**Representations by the Chief of Police**

On the day of the shooting the Chief of Police told the City Manager and the Assistant City Manager that Detective Moore was in possession of the weapon in order to respond to tactical situations as a part of his official responsibilities as a department sharp-shooter. Chief Scheopner also assured management that Detective Moore's practice was to carry weapon to and from work every day and secure it in the evening in his personal gun vault. Chief Scheopner prepared a memorandum on July 14, 1998 entitled, "Officer Involved Shooting," which stated that several agencies had reviewed the shooting and it had "been determined by everyone that no one did anything wrong at all, and that the only person that was responsible for this extraordinary tragedy was the assailant". The memorandum

1

goes on to say that the rifle was assigned to Detective Moore by Captain Vasquez to be carried by him for tactical purposes.  The memo further states that he is on call 24 hours a day, that he carries the rifle to and from work in his pick-up truck and that he secures it every evening in his gun vault at home.  The memo represents that Detective Moore went above and beyond normal procedures to secure the weapon and that Moore's son clandestinely stole a key to the gun vault and broke into the vault to obtain the weapons.

**Investigation by Assistant City Manager**

Due to a mutual concern about this very tragic event, the City Manager directed the Assistant City Manager to pursue the matter diligently and ensure that their was full accountability for departmental policies and procedures.  On July 15, 1998, the Assistant City Manager issued a memorandum entitled, "Officer Possession and Loss of Assault Rifle."  This memorandum made specific inquiry into the normal administrative documentation regarding equipment sign-out, assignment and duty, training and supervisory practices that would be expected to be found in a professionally administered local government department.

**Interview of Detective R. D. Moore and Supervisors**

This interview took place on July 21, 1998. Present were the Assistant City Manager, the Chief of Police, the Assistant Chief of Police, Captain Joseph Vasquez, Detective R. D. Moore,                              During the interview the following points emerged:

- The Chief had made no formal investigation of the matter and had allowed Moore to work without interruption or questioning.

- Captain Vasquez had allowed Moore to take the weapon home for the general purpose of a "duty weapon".

- There was no substantiation in practice or in documentation that Moore served the department in a "sharp-shooter role."

- Moore had had the weapon in his possession for over a year, and his possession of the weapon was undisciplined sometimes leaving it in his pick-up truck, other times behind the door of his office.

- The inventory procedures in the department were informal and not uniformly applied to all officers.

- Moore had not had formal training on the weapon since 1976.

3

- Moore did not qualify annually with the weapon, but instead practiced shooting it in his yard at home.

- On at least one occasion Moore had allowed his son to use the weapon.

- The weapon in question had been delivered to the department for "disposal".

- No records exist of training or actual call-out for Moore in his supposed duty as a sharp shooter.

- Departmental policies (see sections 4.04 - 4.04.006) appeared to this reviewer to have been violated.

- The Chief asserted that no departmental violation had been violated, nor had any TCLEOSE requirements been violated.

- The Chief presented an inventory which he represented as showing all weapons present and accounted for, except the AR-15 which had never been signed-out and was now in custody with other agencies as evidence.

## Inspection of the Department

Immediately following the interview on July 21, 1999, the Assistant City Manager inspected the Department evidence rooms, weapons, lockers, and Moore's office. The following findings were made:

- A handwritten inventory of weapons issued existed, but did not show Moore's sign-out of the AR-15.

4

- Hundreds of weapons, mostly handguns, were stored in stacked bins with tags which relate to case documentation. Many of these weapons have been in storage for years, some decades.

- A wide assortment of various rifles were stored in various secured rooms. Some of these were owned by the Department. Others were marked as "evidence".

- Over the years, some of the weapons have been put in service, usually with permission from the Chief.

- No current effort has been made to dispose of stock-piled weapons.

- It was Moore's practice to store the AR-15 behind his office door, even after he no longer had weapons safe-keeping duties.

**Officer Concerns**

On August 27, 1998 the Assistant City Manager met with Officer Rhonda Mitchell concerning a grievance she had about an assignment. During the meeting, Officer Mitchell raised the issue of the Chief's credibility and honesty. Among the examples raised by Officer Mitchell was her assertion that the Chief had lied about Moore's possession of the AR-15 and that there was no "sharp shooter" position, and that instead Moore's possession of the weapon was evidence of special treatment among a ring of good-ol-boys who were allowed to take department property for personal purposes. Officer Mitchell stated that there was an impression among members of the department that this group existed. She illustrated her point by presenting a copy of a newsletter entitled, "The Tainted Brass" in which the department is characterized as having an unprofessional approach to checking-out AR-15's from the evidence room. Officer Mitchell suggested that the Assistant City Manager verify her complaint by contacting Command Staff officers.

5

Within the next few days the Assistant City Manager separately interviewed Captain Luciano Rubio, Lieutenant Joe Rubio, Lieutenant Leal, and Lieutenant Vela and asked them if they had any knowledge of a swat/sharp shooter function in the department. Captain Rubio, Lieutenant Rubio and Lieutenant Vela each said that they did not have any knowledge of such a function and that should such a function exist, they as Senior Command Staff would certainly have been aware of it. Lieutenant Leal did recognize that Captain Vasquez might be called for such a duty, but had no knowledge that Detective Moore served in this capacity.

At a separate meeting on September 22, 1998 Lt. Jose Rubio advised the Assistant City Manager that TCLEOSE regulations had been violated.

6

**Follow-up Action**

On October 1, 1998 the Chief wrote a memo in which he specified follow-up action that he had taken with regards to departmental weapons.  In the memo the Chief once again asserts that the department adheres to its policies as well as TCLEOSE standards.  In the same memorandum the Chief reports an in-house audit indicates that seven officers

7

including R. D. Moore were not in compliance with annual firearm qualification requirements.

## Intimidation Complaints

On October 6, 1998 the City received notice that the Harlingen Police Association had made complaints that certain of their members had been threatened with termination if they reported departmental wrongdoing or impropriety. On October 9, 1998 the Assistant City Manager met with representatives of the Harlingen Police Officers Association and reviewed their concerns in detail. The only specific report of intimidation to arise from that meeting was a statement allegedly made by Captain Joseph Vasquez

that anyone speaking out about this case would be fired. On the same date I interviewed Captain Vasquez and informed him of the complaint. Captain Vasquez denied making this statement and said that he had said anyone who gave misinformation or undermined the ongoing criminal investigation should be fired. Captain Vasquez flatly denies that he in any way intimidated anyone from making good faith reports of factual information to any appropriate agency. Nevertheless, this group of HPOA officers vigorously assert that they were indeed threatened.

## Findings and Action

3.    A review of the departmental policies and procedures identifies a number of
      apparent violations:

> **4.04. Authorized Weapons:** *The Department authorizes officers to carry*
> *certain weapons, and authorizes the use of those weapons only when*
> *necessary to lawfully accomplish departmental goals. Officers carry and use*
> *only those weapons approved and authorized by the Department.*

> Captain Vasquez reported that he approved this weapon for R. D. Moore
> without written notification to the Chief.  However, the weapon was taken
> home and placed in a gun vault.  Also, R. D. Moore stated he would practice
> with the weapon by shooting it in the yard of his residence and on one
> occasion, R. D. Moore knew his son had discharged the weapon because
> he had allowed his son to do so.

> **4.04.001 Approved Weapons and Ammunition:** *The Department*
> *authorizes officers to carry and use only Department issued or approved*
> *handguns, shotguns, ammunition, chemical agents and batons. The chief*
> *approves all weapons and ammunition.  Under special conditions of limited*
> *duration, the Commanding Officer on duty may authorize the use of other*
> *weapons.  A commanding officer taking this action justifies the decision in*
> *writing to the Chief.*

> Captain Vasquez reported that he did not follow any procedure *(in issuing*
> *the weapon)* and did not obtain the Chief's approval. Captain Vasquez
> reported that he did not discuss with Detective Moore any specific duties
> when issuing the weapon.

> **4.04.002 Training:** *An officer must undergo Department approved training*

and display proficiency in the use of any authorized weapon the officer carries. Additionally, officers must comply with all <u>continuing proficiency training</u> required by the Department.

Detective Moore reported that he was last trained in 1976 for this type weapon. Detective Moore reported that he did not comply *with all continuing proficiency training required* by the Department and TCLEOSE standards (TAC, Title 37, Part VII, Chapter 211, Section 211.104).

4.  A review of departmental training requirements records shows no record of mandated annual training by Moore with the AR-15. In fact, Moore and several other officers have not event met annual proficiency requirements (TCLEOSE) for use of their side arms.

5.  It is clear there <u>are no detailed policies and procedures</u> for the handling of weapons, and there has been inadequate weapons practice and training. The <u>department lacks proper documentation</u> of weapons training and qualification. Weapons control and inventory practices are inadequate and unprofessional. In addition, there has been <u>no formal assignment</u> by any officer to duties of sharpshooter, although there may be a few officers who are proficient marksmen.

**Administration Actions**

Remedial action needs to be taken at once to improve Department practices:

•  The Chief has been directed to implement the <u>National Law Enforcement Standards</u>. This action will lead to national professional accreditation of the Department's policies and practices. This is a minimal first step toward preventing further exposure from any incidents arising due to inadequate standards and/or

10

unprofessional practices within the Department.

- Chief Jim Scheopner: Civil Service Law (Local Government Code Chapter 143, Subchapter A, paragraph 143.013 allows that an appointing official may remove the Department Head afterwhich, that person shall be placed in a position with a rank not lower than that held by the department head immediately before appointment.

Administrative action should be taken immediately regarding Chief Jim Scheopner. Clearly, Chief Scheopner failed to properly investigate and objectively report to the Assistant City Manager the facts surrounding this matter. Contradictions in Chief Scheopner's written and oral statements arose in meetings and in interviews, indicating the "sharp shooter duty" story is a major situation embellishment. The Chief is directly responsible for the undisciplined and unprofessional environment described in this report. Furthermore, the Chief has already been placed on a probationary performance status for a number of other performance discrepancies. These are detailed in a 9/15/98 memorandum entitled, "Performance Discrepancies / Improvement Plan." Key performance discrepancy areas noted are:

- Professionalism

- Responsiveness and Reliability, and

- Management Practices

In sum, it is clear that the Chief has an overwhelming loss of credibility with management and with the leadership of his own Department. Therefore:

11

- The Chief should be relieved of duty at once and appointed to his former rank of Lieutenant.

- An acting Chief of Police should be appointed immediately.  Due to the Departmental unrest, I would suggest that the acting Chief be removed from involvement in the incident and free from reputation for antagonistic, partisan practices in the Department.  Unfortunately, Assistant Chief Archer has himself reported that he wrote an inflammatory newsletter, entitled "The Blue Cow," which attacked labor interests in the Department.  Such past partisan activity makes it unlikely that he could be successful in restoring confidence among those most expressive of dissatisfaction. Therefore, I recommend Captain Luciano Rubio be appointed, as he is the ranking officer not involved and has demonstrated good police administrative skills, and has avoided partisan activities in his personal conduct.  Another prudent option would be for a credible professional outside of the Department to be appointed as interim Chief.  In any case, I would urge swift action be taken.

Captain Vasquez and Detective Moore:

These two individuals are alleged to have permitted or to have caused serous violations of policy and professional practice with regard to weapons.  Departmental unrest will persist and their work effectiveness will be curtailed until their conduct is subjected to proper disciplinary review.  For the sake of the morale and good-order of the Department, I recommend these individuals be placed on paid administrative leave pending the outcome of the disciplinary review (recommended below).

Disciplinary Actions

By Civil Service law, (Local Government Code Chapter 143, Subchapter D) only the "Department Head" (Chief of Police) may discipline members of a Civil Service