United States District Court
Southern District of Texas
ENTERED

DEC 2 1 2004

Michael N. Milby, Clerk of Court
By Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| Arturo Guillermo Salinas, et al, | § | |
| **Plaintiffs** | § | |
| | § | |
| v. | § | **CIVIL CASE NO. B-98-162** |
| | § | **(consolidated with B-98-163 & B-99-** |
| | § | **70)** |
| | § | |
| City of Harlingen, | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION

BE IT REMEMBERED that on December 21, 2004, having recently ruled on the last pending motion for reconsideration, the Court considered and *conditionally* ruled on Defendant City of Harlingen's Motion for New Trial on Damages, or in the Alternative, for Remittitur [Dkt. No. 234], pursuant to Federal Rule of Civil Procedure 50(c)(1).[1]  The Court **GRANTS in part and DENIES in part** Defendant's Motion [Dkt. No. 234].  The Court enters final judgment contemporaneously with this memorandum opinion.

## I. Background[2]

The jury returned a verdict in favor of Plaintiffs Gilberto Rodriguez, individually and on behalf of his minor daughter, Megan Suzanne Rodriguez and the estate of his wife, Susan Lynn Rodriguez, deceased; Stephen L. Williams and Robyn S. Williams,

---

[1]Federal Rule of Civil Procedure 50(c)(1) provides that "[i]f the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial.  If the motion for new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment."  Accordingly, the Court specifies the grounds for denying the motion for new trial on damages and granting and denying in part the alternative motion for remittitur.

[2]A detailed account of this case's procedural and factual background is contained in the Court's order granting the Motion to Reconsider the Renewed Motion for Judgment as a Matter of Law [Dkt. No. 253].

surviving parents of Susan Lynn Rodriguez, deceased; Arturo Guillermo Salinas and
Elisa Herrera Salinas, individually and on behalf of their son, Ricardo Guillermo Salinas,
deceased; and Raul Rodriguez.

The jury's award for damages totaled $35,000,000.00, and was awarded in lump
sums in the following break-down:[3]

| 1. Gilberto M. Rodriguez, Individually | $5,000,000.00 |
| 2. Gilberto M. Rodriguez, on behalf of his minor daughter, Megan Rodriguez | $10,000,000.00 |
| 3. Stephen Williams | $2,500,000.00 |
| 4. Robyn Williams | $2,500,000.00 |
| 5. Arturo Salinas | $2,500,000.00 |
| 6. Elisa Salinas | $2,500,000.00 |
| 7. Raul Rodriguez | $10,000,000.00 |

Defendant City of Harlingen moves for a new trial on damages alone, arguing the
jury's award was the result of passion or prejudice.  Alternatively, Defendant argues the
Court should remit the damages.  Plaintiffs argue the damage award was neither
excessive nor was the jury influenced by passion or prejudice, making both remittitur
and a new trial on damages inappropriate.

Consideration of the motion first requires the Court to determine whether the
$35,000,000.00 award for damages is so excessive that a new trial on damages is
required.  If excessive, the Court determines whether the excess can be eliminated by a
remittitur, and if necessary the amount of reduction to the award.  Although case law
dictates the Court should not substitute its judgment for that of the jury, there are
formulas for guidance, but no bright line rules for damage limitations.

---

[3]The jury was instructed: "[i]f you find for the plaintiffs, they are entitled to compensatory
damages for loss of services and support, loss of companionship, mental anguish, medical
expenses, and funeral expenses they have suffered because of the defendant's conduct. . . .
Damages are not allowed as a punishment and cannot be imposed or increased to penalize the
defendant." Jury Instructions, at pp. 14-15.

2

### A.    New Trial on Damages

A new trial on one or more particular issue may be appropriate if "it clearly appears that the issue to be retried is so distinct and separate from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Chamlin Ref. Co.*, 283 U.S. 494, 500 (1931).  Thus, once liability is established, a new trial on damages alone may be proper. *Westbrook v. General Tire & Rubber Co.*, 754 F.2d 1233, 1242 (5th Cir. 1985).

There is a strong presumption in favor of affirming a jury's damage award.  *See Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995).  A jury's award should not be disturbed unless there is a clear showing that it was excessive or influenced by passion or prejudice.  *Calderera v. Eastern Airlines Inc.*, 705 F.2d 778, 784 (5th Cir. 1983); *see also Martin v. City of New Orleans*, 678 F.2d 1321, 1327 (5th Cir. 1982) (holding a jury's award should not be considered excessive except "on the strongest of showings.").  A jury's award is "clearly excessive" when "the extent of distortion . . . '[is] so large as to shock the judicial conscience,' 'so gross or inordinately large as to be contrary to right reason,' so exaggerated as to indicate 'bias, passion, prejudice, corruption or other improper motive' . . . ." *Id*.  An excessive jury award can indicate that the award was the product of passion or prejudice.  *Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 684 (5th Cir. 1986) (holding new trial appropriate where reduction of a jury award by more than seven times reflected an award based on passion or prejudice and remittitur was not appropriate because the award no longer resembled the jury's award in any meaningful way); s*ee also Auster Oil & Gas v. Stream*, 835 F.2d 597 (5th Cir. 1988).

When the jury's award is the result of passion or prejudice, the proper remedy is a new trial, not remittitur.  *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 278-79 (5th Cir. 1999); *see also Wells*, 793 F.2d at 683.  "On the other hand, damage awards which are merely excessive, that is, so large as to be contrary to right reason, are candidates for remittitur." *Wells*, 793 F.2d at 684 (citing *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233, 1241 (5th Cir. 1985)).  "However, at some point on the scale an excessive award becomes so large that it can no longer be considered merely

3

excessive. At that point, when an award is 'so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive,' *Caldarera*, 705 F.2d at 784, remittitur is inadequate and the only proper remedy is a new trial." *Wells*, 793 F.2d at 684. Although there is no bright line rule, the Fifth Circuit has held that reducing an award by more than an order of seven was so large a reduction that it reflected the jury's award was based on passion or prejudice, and thus a new trial was appropriate because the court-reduced award no longer resembled the original jury award. *See Wells*, 793 F.2d at 684.

Defendant argues the jury's award was not based on the verdict; rather, the size of the verdict itself shows that it was the result of passion or prejudice. Such prejudice, Defendant maintains, was a result of Plaintiffs' complaints of a cover-up, Plaintiffs' insinuations that the shootings were racially motivated, and Plaintiffs' request that the jury use its limited powers to award damages as a show of public support.

### 1. Size of the Verdict as Evidence of Passion or Prejudice

The Court determines excessiveness of the jury award by considering whether the award is commensurate with other similar cases. Rarely is there a case factually on all fours. Instead, the Court must look to analogous cases where the excessiveness of the award is at issue. The parties dispute from which pool of cases, or relevant jurisdiction, the Court must draw this analogy. Plaintiffs argue state cases, which include Texas wrongful death actions, are appropriate, while Defendant argues only federal Fifth Circuit case law should be compared.

As the Court discusses in more detail in the remittitur section of this opinion, the Court finds it is appropriate to compare the facts of this case with both state and federal law in order to determine the excessiveness of the jury's award. In doing so, the Court reviews cases that involved pain and suffering, survivors' statutes, and other damages at issue in this case. *See infra.*

### 2. Insinuations of Racial Motivation

The following is an excerpt from the closing argument made by Plaintiffs' attorney:

Now, I think another example of their deliberate indifference, of their arrogance, is the decoration that existed around that room. You saw the Nazi posters. You saw the photographs of Hitler. You saw the SS uniform hanging beside the other AR-15. Folks, you don't send an assault rifle home to a person that resides in that room unless you are consciously indifferent, deliberately indifferent to whatever consequences might happen.

Trial Transcript 5, at 896 (hereinafter "TT").

The Court agrees with Plaintiffs that this argument was made in the context of showing the deliberate indifference of the City when it allowed the weapon to be accessed by a person with the characteristics, inclinations or beliefs mentioned above. At no time during the cited argument did Plaintiffs insinuate that the crimes were racially motivated. Rather, Plaintiffs attempted to show that the City was deliberately indifferent to the dangerousness of Ernest Moore, a point that was directly related to their legal argument, and necessary to establish the elements of the cause of action.

### 3. Show of Public Support by the Jury

Defendants cited the following trial transcript excerpts from February 22, 2002, as an example of Plaintiffs' attempt to convey a clear message that "only great damages would communicate the public sympathy necessary to alleviate their suffering." [Dkt. No. 234 at 12].

Dr. Phyllis Silverman, Plaintiffs' human behavior expert, testified:

Q:     In a situation where there's been a violent death or a senseless death that need not have happened, can the community's reaction to that death assist the surviving family members in learning to cope with their loss?

A:     Oh, [on] many levels I would think that that would be true. Certainly it would seem to me that the simple outpouring of the community's support and compassion and empathy would be very important. I think that if they feel a communal indifference to their pain, I think that would be very painful. That would make it worse. That would make them feel more isolated, more alone. Sometimes I guess people in that kind of situation even think there's something wrong with me, Why am I feeling this way when everybody's expecting me to be–look after everything else that's going on? And I think that's a very painful position to be in that makes things worse.

Arturo Salinas testified:

5

Q: And you have definitely felt some bitterness, haven't you?
A: Oh, yes.
Q: Is it bitterness just over your son getting shot or is it because of other matters involved?
A; Would you repeat the question?
Q: Is it just because your son got shot in the line of duty? You know, that's a hazard that police officers, including border patrol face.
A: Yes. Well, it is not only that he got shot or that he was killed. It is the way it happened, the way the circumstances–the way that my son–here he was–I'm so proud of the fact that he and Susan brought honor to their badge while others didn't. And that's what aggravates me, that we had good cops and bad cops.
Q: Does it bother you?
A: It bothers me to no end.
Q: Does it bother you that–were you in here when Lieutenant Rubio testified about the coverup?
A: Yes, sir.
Q: And did you hear about them even getting him indicted or the association indicted?
A: Yes, sir, I heard that.
Q: Does it bother you that there may have been a coverup here?
A: It bothers me–I can't even find the word how bad–how bitter I am about this.
Q: I heard Mrs. Silverman say in answer to a question that Mr. Ainsworth asked her about the soothing effect of a sense of justice being done. You think that would help?
A: It is going to help me, but I will never forget. I will never–I'm going to carry this to the day I go at my own grave.
Q: But would it be of help to you and your wife and all survivors to have a sense of justice done?
A: Sure it will. Sure it will.

Stephen Williams testified:

Q: And would it be important to you as the father of Susan and important to you as the grandfather of Megan to see that justice is done in this case?
A: Absolutely. More than anything at this point.
Q: You understand that the jury can't order an investigation. They're not like this grand jury. They're very limited in their power. All they can do is award the damages that they feel is–are appropriate, if they find liability?
A: Yes, sir.

. . .

Q: Did you also make it known that you were not satisfied with the investigation and that you felt that there was a coverup going on?

> A: Yes, I did. In fact at all levels, from Attorney General Reno right on down.
> Q: And did anybody out there in the City of Harlingen or the County of Cameron or the Texas Rangers or the Department of Public Safety come to you and say well, we'll check it out and see if there is a conspiracy?
> A:  Just the opposite. When I would contact them, they would tell me to listen, you know—made it clear that they were not going to do anything and that I was to—well, I've never experienced anything like it.

Gilberto Rodriguez testified:

> Q: What do you mean by frustrating?
> A: After listening to testimony and the things that went on, that's the frustrating part, to allow that sort of thing to happen at a police department.
> Q: Do you look forward to the opportunity to have the jury speak in this case?
> A; Absolutely.
> Q: Something I guess you have waited about three and a half years for?
> A: Something I've been waiting for is for some of the things that were brushed under carpet, so to speak, be revealed in public and for certain people that had covered their tracks to finally have to stand before or sit before a jury and expose their lies and all the stuff they tried to (sic).

The Court agrees that the jury was not asked to alleviate the suffering of Plaintiffs and award damages based on sympathy, nor was the jury urged to show public support. Plaintiffs asked the jury to do justice by compensating the Plaintiffs in this case. Plaintiffs' arguments and requests were not improper or prejudicial. The Court further agrees that Defendant did not object to those portions of the questioning of Arturo Salinas or of Gilberto Rodriguez, which they now state improperly prejudiced the jury.

Because Defendant has not presented the Court with "the strongest of showings" of jury prejudice or passion, *see Martin*, 678 F.2d 1321 at 1326, the Court **DENIES** the Motion for New Trial on damages based on passion or prejudice.

## II.  Remittitur

Courts "do not disturb a jury verdict for excessiveness except on the strongest of showings." *Gough v. Natural Gas Pipeline Co. of Am.*, 996 F.2d 763, 767 (5th Cir. 1993). Although pain and suffering are not easily quantified in monetary awards, and the jury has broad discretion, "[t]he sky is simply not the limit for jury verdicts."

*Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983) (stating the "maximum recovery" rule). The verdict will not stand if it is entirely disproportionate to the injury sustained. *Id.* "When a jury's award exceeds the bounds of any reasonable recovery, . . . [a court must] reduce the verdict to the maximum mount the jury could properly have awarded." *Gough*, 996 F.2d at 767. *See also Pressy v. Patterson*, 898 F.2d 1018, 1024 (5th Cir. 1990) (court may reduce award when it "'clearly exceeds that amount [to which] *any* reasonable man could feel the claimant is entitled . . . .'") (emphasis in original) (quotations omitted)). The decision to grant or deny a motion for remittitur lies within the sound discretion of the trial judge. *See Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233, 1241 (5th Cir. 1985).

For purposes of remittitur, "[courts] apply the loosely defined 'maximum recovery rule' when deciding whether remittitur is in order. This judge-made rule essentially provides that [courts] will decline to reduce damages where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction." *Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002) (citing *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1344 (5th Cir. 1990)); *see also Salinas v. O'Neill*, 286 F.3d 827, 830, reh'g and reh'g en banc denied, 37 Fed. Appx. 715 (5th Cir. 2002) (applying the "maximum recovery rule"); *Dixon v. International Harvester Co.*, 754 F.2d 573, 590 (5th Cir. 1985). The analysis involves a "rough" comparison to awards in other cases that involved similar injuries in the "relevant jurisdiction." *Id.* at 831; *see also Gough*, 996 F.2d at 767. The rule is triggered, and thus becomes operative, when the award exceeds 150% of the highest previous recovery in the relevant jurisdiction, as long as the previous award has not itself already been calculated using a multiplier. *See Salinas*, 286 F.3d at 831 & n.6; *see also Vogler v. Blackmore*, 352 F.3d 150, 156 (5th Cir. 2003) ("Courts look not only to actual awards, but may also apply a multiplier of fifty percent to past similar awards, so long as no multiplier was used in calculating those past awards."). Damages based in emotional distress or mental anguish, however, must be determined by both rational analysis, experience, and judgment. *See Gough*, 996 F.2d at 767. Thus, because every case is different, prior damage awards are not

8

always controlling, and the Court may depart from previous awards "if unique facts are present that are not reflected within the controlling caselaw." *Lebron*, 279 F.3d at 326.

Defendant argues that "[u]nder the maximum recovery rule, the 'relevant' jurisdiction is federal law, rather than Texas law." Defendant further states that "Plaintiffs' right to damages under 42 U.S.C. §1983 is a federal right measured by federal law in light of general common law rules." [Dkt. No. 238 at 2]. Defendant posits that *Salinas* stands for the proposition that the relevant jurisdiction for federal cases is the body of federal case law in the Fifth Circuit. Plaintiffs argue that 42 U.S.C. §1988 incorporates Texas law for the purpose of measuring the excessiveness of damages under §1983, and the holding in *Salinas* is limited to Title VII discrimination cases, as is the holding in *Thomas v. Tex. Dept. of Crim. Justice,* 2002 WL 1404709, at *6 (5th Cir. July 1, 2002). As a result, Plaintiffs contend Texas wrongful death and survivor law cases constitute the relevant jurisdiction.

The Fifth Circuit has been clear that "[w]hen evaluating jury awards, [the] Court reviews such awards in the context of awards in cases with similar injuries in the relevant jurisdiction." *Vogler v. Blackmore*, 352 F.3d 150, 156 (5th Cir. 2003) (citing *Salinas*, 286 F.3d at 831). "This Circuit has limited searches for *federal discrimination* law awards to the 'relevant jurisdiction' of the Fifth Circuit." *Id.* (emphasis added). The relevant jurisdiction in wrongful death cases is the state providing the substantive law for the claim. *See, e.g. Grandstaff v.City of Borger, Texas*, 767 F.2d 161, 171 (5th Cir. 1985) (looking to Texas law in section 1983 case for guidance on damages recoverable for loss of society and companionship and mental anguish for parent of innocent child who was killed by the police). Texas wrongful death cases and Fifth Circuit cases applying Texas law, therefore, comprise the relevant jurisdiction. As a result, Defendant's proposition that *Salinas* mandates the application of federal case law in every instance is incorrect, and the Fifth Circuit limited *Salinas's* application to the federal discrimination context. Thus, the Court should not limit its comparison to only other federal section 1983 cases, but rather should also examine awards under comparable state cases and laws. *See, e.g., Ismail v. Cohen*, 899 F.2d 183, 186 (1990) (comparing compensatory damage awards in state cases to section 1983 case

9

and holding the district court "improperly limited its frame of reference to federal [section] 1983 cases") (citing *Zarcone v. Perry*, 572 F.2d 52, 54-55 (2d Cir. 1978) ("in [section] 1983 cases, reference to analogous personal injury awards is proper")). This comparison is true for both Raul Rodriguez's and the other Plaintiffs' damages for their own constitutional injuries, as well as those section 1983 injuries where state survival statutes and wrongful death statutes have been applied to section 1983 actions through section 1988 . *See, e.g., Robertson v. Wegmann,* 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978); *Brazier v. Cherry,* 293 F.2d 401 (5th Cir.1961) *cert. denied,* 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961).

### 1. Gilberto M. Rodriguez, Individually:  $5,000,000.00

The jury awarded Gilberto Rodriguez the lump sum of $5,000,000.00 for funeral expenses[4] paid or incurred, loss of support and services, loss of companionship and society, and mental anguish.  Defendant argues the jury's award of between $4.2 and $4.4 million for lost society and mental anguish is excessive in light of the evidence. More specifically, Defendant argues the evidence is insufficient to support mental anguish because "Dr. Silverman's testimony concerned general observations about the general grieving process; she did not specifically describe Gilbert Rodriguez's reaction or progress." Def's Motion, at p. 18.

Damages for loss of companionship and society compensate for a loss of positive benefits that flowed to the family as a result of the decedent's contribution to the family—i.e. the decedent's having been part of the family. *Moore v. Lillebo*, 722 S.W.2d 683, 687-88 (Tex. 1986).  Companionship and society are the positive benefits flowing from the love, comfort, companionship and society the familial survivors would, in reasonable probability, experience if the decedent lived. *Id.* at 688.  Mental anguish represents an emotional response to the wrongful death itself. *Id.* at 687.  It is defined as the emotional pain, torment, and suffering the familial survivors would, in reasonable probability, experience from the death of a family member. *Id.* at 688.

---

[4]Defendant does not dispute that Plaintiff Gilberto Rodriguez is entitled to $10,222.00 in funeral expenses.  *See* Def's Motion, at p. 19 [Dkt. No. 234].

In awarding damages for mental anguish and loss of society and companionship in a wrongful death case, the jury considers "(1) the relationship between husband and wife, or a parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the beneficiary for extended periods; (4) the harmony of family relations; and (5) common interests and activities." *Russell v. Ramirez*, 949 S.W.2d 480, 486 (Tex. App.–Houston [14th Dist.] 1997, reh'g overruled) (citing *Moore v. Lillebo*, 722 S.W.2d 683, 688 (Tex. 1986). In a wrongful death case, it is no longer necessary to prove that mental anguish is physically manifested. *See Moore*, 722 S.W.2d at 688. Even though a mental anguish award need not be supported by evidence of a physical manifestation, there nevertheless must be sufficient evidence that Plaintiff experienced more than "'[h]urt feelings, anger, and frustration,'" which are part of life and are not the types of emotional harm that could support an award of damages. *Hitt v. Connell*, 301 F.3d 240, 250 (5th Cir. 2002) (emphasis in original) (citations omitted).

The Court compares the award in the present case with Texas state case law and Fifth Circuit cases applying the state law. Plaintiff argues the case *C & H Nationwide, Inc. v. Thompson*, 810 S.W.2d 259 (Tex. App.–Houston [1st Dist.], 1991), aff'd in relevant part, 903 S.W.2d 315 (Tex. 1994), is analogous to this case and should guide this Court's comparison. In *C & H*, the husband was killed in a car accident when a 40 foot 10 3/4 -inch pipe fell off a tractor-trailer and collided with his car. His wife and children filed wrongful death and survivor claims. The jury awarded the wife $2,000,000.00 for mental anguish and $2,000,000.00 for loss of companionship, which was upheld by the Texas Supreme Court. Plaintiff argues that applying the 50% multiplier, the total maximum amount allowed would be $6,000,000.00. Moreover, Plaintiff asserts that because the jury's award for Gilberto Rodriguez was $5,000,000.00, the maximum recovery rule is not triggered and the jury's award is not excessive. The Court notes that *C & H Nationwide* did not review the excessiveness of the jury award, nor was the sufficiency of the evidence challenged for the mental anguish and loss of companionship award.

Plaintiff presented some evidence of the nature, duration, and severity of his mental anguish and loss of society and companionship by his own testimony. The

evidence demonstrated Gilberto, Susan, and Megan Rodriguez were a close, happy family. Gilberto and Susan were planning to expand their family, and they specifically discussed having another baby. They enjoyed spending time together, which included family vacations. The closeness of their family was corroborated by the testimony of Susan's parents, Mr. and Mrs. Williams. After his wife's death, Gilberto moved to Austin to be closer to his sister and parents so they could help with Megan's upbringing and provide female role models in Megan's life. Megan's aunt, Susan's sister, Julie, also resides in the Austin area. *See* TT 4, at pp. 813-16. Gilberto provided evidence of the nature of his relationship with his wife concerning his connection to her and his appreciation of their relationship. *See id.* This included a description of Gilberto's conversation with Susan the night before she died. They talked about shopping in Austin for the weekend for Susan's upcoming birthday, and Gilberto was planning a surprise birthday party. Additionally, Gilberto testified regarding his reaction to Susan's death and the anxiety he experienced upon learning that she had been shot. *See id.* at 818. Gilberto testified that he does not feel he is able to provide everything Megan needs in Susan's absence. *See id.* at 818-26.

Defendant argues Gilberto's evidence is insufficient to support the large award of damages for mental anguish, which requires that testimony be "'particularized and extensive' enough" to meet the burden of demonstrating specific emotional damage, and the nature and extent of the emotional harm. *See Hitt v. Connell*, 301 F.3d 240, 250 (5th Cir. 2002) (citing *Brady v. Fort Bend County*, 145 F.3d 691, 720 (5th Cir. 1998). More specifically, Defendant argues Plaintiff Gilberto did not present corroborating evidence by a psychologist or psychiatrist, which although not always required, is often necessary. Defendant contends that although the evidence may support some award for these damages, over $4,000,000.00 is excessive.

Plaintiff concedes that Dr. Silverman, Plaintiffs' human behavioral expert, "did not interview or counsel Gilberto," but rather "she . . . testif[ied] specifically about what a newly widowed, single father of a young daughter would face in his new life without the wife with whom he had planned to spend a lifetime." Pls' Response to Def's Motion for New Trial, at p. 13 [Dkt. No. 236] (citing TT 4, at pp. 762-66).

The Court's analysis in this case is complicated by the fact that the jury awarded a lump sum to Plaintiff Gilberto M. Rodriguez. Thus, the award is not only for mental anguish, but also for loss of support and services and loss of companionship and society. Using cases in which the death of a spouse was sudden, leaving the survivor to raise a small child as a guide, the Court agrees with Plaintiff's analysis and finds the jury's award is not subject to remittitur. Moreover, although the evidence of mental anguish was not overwhelming, the jury's award was not unreasonable in light of Gilberto's own testimony. Additionally, the testimony of Dr. Silverman was tied to Gilberto and specifically the mental anguish that a newly widowed, single father of a young daughter would face in his new life without his wife. *See* TT 4, at pp. 762-66. Furthermore, the testimony of both Gilberto and Susan's parents concerning the nature of the couple's familial relationship cannot be described as conclusory or vague. In light of this, the Court will not supplant its view of the evidence for that of the jury's assessment. The jury observed Gilberto throughout the trial and heard his testimony along with the testimony of Susan's parents and Dr. Silverman. The Court concludes the evidence supporting loss of support and services, loss of companionship and society, and mental anguish was sufficient to support the jury's award, and remittitur is not appropriate.

### 2. Gilberto M. Rodriguez, on behalf of his minor daughter, Megan Rodriguez: $10,000,000.00

The jury awarded Megan Rodriguez $10,000,000.00 in a lump sum for loss of support and services, loss of companionship, loss of instruction and guidance, mental anguish, and loss of inheritance for her mother, Susan Rodriguez's death. Plaintiff argues that although this award is substantial, it "is not 'entirely disproportionate to the injury sustained . . . .'" Pl's Response, at p. 5 [Dkt. No. 236].

Defendant argues, and Plaintiff Gilberto Rodriguez does not dispute, there was no evidence presented for loss of inheritance. Loss of inheritance is "'the present value that *the deceased*, in reasonable probability, *would have added* to the estate and left at natural death to the statutory wrongful death beneficiaries but for the wrongful act causing the premature death.'" *Douglass*, 897 F.2d at 1340 (emphasis added in

13

*Douglas*) (quoting *Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630, 633 (Tex. 1986)). Not every wrongful death beneficiary sustains loss of inheritance damages. This is so particularly if the decedent would have earned no more than his family would use for support. Loss of inheritance is an issue for the jury to decide. *See Yowell*, 703 S.W.2d at 633. Under Texas law, damages for loss of inheritance are distinct from damages for pecuniary loss. "Pecuniary loss is generally defined as the care, maintenance, support, services, advice, counsel and reasonable contributions of a pecuniary value that the plaintiffs would, in reasonable probability, have received from the decedent had he lived." *Moorhead v. Mitsubishi Aircraft Int'l, Inc.*, 828 F.2d 278, 290 (5th Cir. 1987).

Defendant concludes that assuming the jury did not discount the pecuniary loss to present value, the most it could have awarded Megan was between $360,000.00 and $720,000.00,[5] which is based on Susan Rodriguez's yearly salary of $45,000.00. This leaves the remaining award of approximately $9,500,000.00 for mental anguish and loss of society.[6]

Plaintiffs suggest the appropriate case comparison involving wrongful death and loss of companionship and society and mental anguish is *Atchison, Topeka, and Santa Fe Railway Co. v. Cruz.* 9 S.W.3d 173 (Tex. App. –El Paso 1999). Because Defendant argues the relevant jurisdiction for damage award comparisons is limited to federal cases,[7] it does not cite to any Texas state cases, nor does it dispute the applicability of *Atchison*, except to say that it is not a federal case. Because damage award

---

[5]Defendant's estimated figure is based on evidence that Susan Rodriguez earned $45,000.00 per year, and she would have earned $720,000.00 by Megan's 18th birthday before discounting for taxes or present value.

[6]Defendant contends that pecuniary loss should be based only on Susan Rodriguez's future earnings. "[T]he measure of pecuniary loss is 'speculative and imprecise and is therefore best left to the jury's common sense and sound discretion.'" *Atchison*, 9 S.W.3d at 180. Moreover, testimony on pecuniary loss is not limited to testimony of monetary valuation, but instead may include "testimony of the relationship between the parties and the deceased's behavior toward the beneficiary." *Id.* (citations omitted).

[7]Defendant does, however, cite federal cases in which state law was applied in diversity. Nevertheless, Defendant maintains this Court must exclude Texas case law that applies its own law in awarding damages. As the Court discussed previously, the appropriate case comparison includes Texas state cases.

comparisons are not an exact science, the Court does not find *Atchison* to be a sufficiently similar case from which to extract damage award comparisons. In *Atchison*, the youngest child of seven lost his mother and father suddenly and tragically when his parents' vehicle was struck by a train. A wrongful death suit against the railroad company and engineer led to a jury award for the youngest child of $1,500,000.00 for loss of companionship and society of the child's mother and $1,750,000.00 for mental anguish for the death of the child's mother. *See Atchison*, 9 S.W.3d at 185. Plaintiffs argue Megan's award is not excessive because she was five years younger than the youngest child in *Atchison* at the time of her mother's death. Additionally, Plaintiffs assert Megan sought two additional elements of damages –loss of support and services and loss of instruction and guidance. According to Plaintiffs, Megan's recovery for loss of companionship and society and mental anguish should at least be in the amount of $4,875,000.00. This amount matches the amount awarded to the youngest child (seven years-old) in *Atchison*, plus a 50% multiplier. Added to this amount, Plaintiffs argue the remaining amount of $5,125,000.000 is not excessive because Plaintiffs also sought damages for Megan's loss of support and services and loss of instruction and guidance.

Under the maximum recovery rule, using precedent as a guidepost, and taking the evidence of strong familial connection, and the strong involvement of Megan's mother in her life, the Court finds the jury's award should not be disturbed. "Where departures from precedent are evident, and such departures cannot be justified fairly by the novel facts presented by the case, remittitur of the trial court's award, or a new trial on the damages is appropriate." *Douglass*, 897 F.2d at 1340. The Court finds, however, a dearth of sufficiently analogous case law. Thus, the unique facts of this case justify a greater award amount when compared to the award in *Atchison* and other state cases. The award of $10,000,000.00 is not, therefore, excessive in light of the evidence presented, there is not the clearest of showings that the jury award was excessive, and the Court finds the jury's award should stand.

### 3. Stephen and Robin Williams and Arturo and Elisa Salinas: $2,500,000.00 each

The jury awarded a lump sum of $2,500,000.00 to each of Susan Lynn Rodriguez's parents and Ricardo Guillermo Salinas's parents. Plaintiffs argue the circumstances surrounding the damages awarded to the parents in this case are analogous to those in *General Chemical Corp. v. De La Lastra*, 852 S.W.2d 916 (Tex. 1993). In *General Chemical Corp.*, two young shrimp fisherman died from asphyxiation on a shrimp boat after using a chemical preservative on their catch. Their parents sought wrongful death damages against the manufacturer of the chemical preservative. In that case, the jury awarded each parent $2,500,000.00 for loss of companionship and society and $2,500,000.00 each for mental anguish, for a total of $5,000,000.00 each. *See General Chemical Corp.*, 852 S.W.2d at 918. Because the total awarded to each parent in *General Chemical Corp.* was twice the amount awarded to each parent in this case, Plaintiffs argue the maximum recovery rule is not applicable and thus remittitur is not appropriate.

Defendant argues there was no evidence to support loss of support. Consequently, Defendant's arguments presume the jury awarded the entire damage amount, $2,500,000.00, for mental anguish and/or loss of society. Defendant argues this amount is excessive, and the highest permissible amount would be $500,000 to each parent plus $4,455.00 for funeral expenses to Mr. Salinas. Here again, because Defendant believes the relevant jurisdiction for comparison cases are Fifth Circuit cases applying federal law, it does not include in its brief state and federal cases analyzing damages for wrongful death actions.

### a. Mr. and Mrs. Williams (parents of Susan Rodriguez)

Plaintiffs presented evidence that Mr. and Mrs. Williams were close to Susan Rodriguez, and they suffered a devastating loss when their daughter was killed. Mrs. Williams now takes medication and sees a psychologist as a result of her daughter's death. Because Mr. Williams was a border patrol officer, he has had feelings of self-blame that his daughter became a border patrol officer.

16

### b. Mr. and Mrs. Salinas (parents of Ricardo Salinas)

Plaintiffs presented evidence that Ricardo Salinas was also close to his family, and he talked to his parents once a week on the phone. Mr. and Mrs. Salinas, who reside in San Antonio, visited Ricardo for his birthdays, and they were helping him to look for a house to purchase in Harlingen. Mr. and Mrs. Salinas have difficulty speaking about the loss of their son because it is so painful, and they "break down."

The Court finds the damage amount is not excessive and remittitur is not appropriate because the evidence supports the jury's award. Additionally, a comparison with case law, including the *General Chemical Corp* case Plaintiffs cite, demonstrate the maximum recovery rule is not triggered.

### 4. Raul Rodriguez: $10,000,000.00

The jury awarded $10,000,000.00 to Raul Rodriguez for physical pain, mental anguish, loss of earning capacity, physical impairment, physical disfigurement, medical care, and loss of enjoyment of life. Plaintiffs argue the jury award should not be disturbed because the damages are not "entirely disproportionate" to the injuries Raul Rodriguez sustained. *See* Pl's Response, at p. 5 [Dkt. No. 240] (citing *Caldarera*, 705 F.2d at 784). As support for this argument, Plaintiff analogizes this case to *Olin Corp. v. Smith*, 990 S.W.2d 789 (Tex. App.–Austin 1999, writ denied). In *Olin*, the minor Plaintiff's revolver discharged while he was reloading, resulting in the amputation of his leg below the knee. A jury awarded the plaintiff $5,580,000.00, and the court determined this award was not excessive for the plaintiff's physical pain, mental anguish, disfigurement, and physical disability. The evidence in *Olin* demonstrated the 16 year-old plaintiff had a life expectancy of 55.8 years, he had suffered extreme pain while doctors attempted to save his leg, he underwent multiple surgeries, he continued to suffer severe pain resulting from the amputation, evidence suggested he would require future surgeries, and he continued to experience "phantom pain" in his then amputated foot and severe blistering where his prosthesis was fitted.

Plaintiff Raul Rodriguez's main argument is that his injuries, unlike those in *Olin*, were life threatening, and more severe and traumatic. Plaintiff presented evidence that he suffered severe physical injuries that required life-saving procedures, extensive

17

surgery to repair injury to his heart and lung, months of recovery, which involved physical impairment and disfigurement to his chest, shoulder, arm, and hand. Raul provided extensive evidence of his injuries, including detailed information about his gunshot wounds to his chest, heart, lung, ribs, shoulder, and hand. *See* TT 4, at pp. 843-45, Pl's Ex. 40. Today, Raul still has a bullet in his abdomen, and he has decreased hypersensitivity in his left hand, reduced grip strength, a pain level of 4 out of 10, and decreased range of motion of his left index finger and thumb. *See* Pl's Ex. 40. Additionally, Plaintiff presented evidence of mental anguish and pain and suffering that occurred both during the incident and after he was shot. *See* TT 4, at pp. 843, 845. More specifically, Plaintiff described the affect his injuries and trauma had on his life, which included the end of a 14-year marriage. He described how he felt when he was being fired on with bullets from an AR-15, and how he believed he was going to die. Raul told another Cameron County Sheriff's Deputy that he feared he was dying, and he asked the deputy to tell his wife and kids that he loved them. *See* TT 4, at pp. 840-42. Raul described how he felt as he was transported to the hospital, and again explained his fear that he was dying. *See id.* Raul testified that as a result of the incident, he was no longer sociable or outgoing, he did not want to do activities with his family, and he was angry and bitter. *Id.* at 846-49. Raul suffers nightmares and states he is reminded of the traumatic event when he sees his scars. *See id.* at 846-47.

Plaintiff argues that based on the recovery in *Olin,* "and [the] 50% multiplier in *Salinas,* 286 F.3d at 831 n.6, [his] recovery [for] mental anguish, pain and suffering, physical impairment and physical disfigurement, and loss of enjoyment of life should be, at least in the amount of $8,370,000.00 ($5,580,000.00 X 150% = $8,370.000.00)." Pl's Response, at pp. 8-9 [Dkt. No. 240]. In this respect, Plaintiff seemingly concedes that remittitur is at least appropriate to the amount of $8,370,000.00, which is based on the damage award and multiplier in *Olin.*

Defendant argues that most of Rodriguez's jury award was for mental anguish, emotional distress, and physical disability. Furthermore, Defendant asserts that although Plaintiff suffered approximately $73,000.00 in lost wages and medical expenses, Plaintiff does not point out any evidence of "lingering physical impairment,

disability, or loss of earning capacity," continuing pain, lost/diminished wages, or physical disability after returning to work. Defendant suggests, then, that the jury must have awarded all but $73,000.00 of Rodriguez's damages for physical pain, mental anguish, disfigurement, and loss of enjoyment of life—that is, $9,927,000.00. Moreover, Defendant argues Plaintiff did not present sufficient evidence to support the high award for mental anguish. Defendant, in arguing that only federal cases comprise the relevant jurisdiction, cites several federal cases with varying degrees of factual similarity. Finally, Defendant asserts the maximum amount of recovery Rodriguez could receive is $400,000.00 plus medical bills and lost wages.

The Court has reviewed relevant case law—that is, cases from federal cases within the Fifth Circuit and Texas state cases. This research has not revealed any satisfactorily similar cases.[8] Among the many cases the Court reviewed are *Pressy v. Patterson*, 898 F.2d 1018 (5th Cir. 1990), in which a motorist brought a section 1983 action against the City of Houston and was awarded over $ 6.7 million in compensatory damages. Although this case was remanded for a new trial on liability, the Fifth Circuit preserved the jury's findings on damages and assessed whether the award was excessive. The City attacked the jury's award in a number of categories, for which the jury awarded distinct damage amounts, including pain and suffering, mental anguish, disfigurement, physical impairment, past and future lost earnings, and past and future personal care. In *Pressy*, the 30 year-old Plaintiff was shot in the head by a city police officer and sustained serious injuries, which included permanent brain damage. The Plaintiff had immediate brain surgery and remained in intensive care for one month with

---

[8]Defendant suggests several federal cases for comparison. *See, e.g., Tamez v. City of San Marcos, Texas,* 118 F.3d 1085, (awarding individual who was shot by police officer $25,000.00 in actual damages and $50,000 in emotional injury damages); *Gough v. Natural Gas Pipeline Co. of America,* 996 F.2d 763, 767 (5th Cir. 1993) (reducing jury award of $1,444,599, which was based on evidence of mental disability and mental anguish, to $600,000 for these damages); *Simeon v. T. Smith & Sons,* 852 F.2d 1421, 1425, 1427 (5th Cir. 1988) (reducing award of $1,250,000.00 to $600,000.00 for pain and suffering of deckhand whose foot was almost severed). The Court does not find these cases to be any more factually similar to the present case than the cases cited by Plaintiff. Likewise, the Court has not found any cases more factually similar. Because the task now before the Court involves determining the maximum amount a jury could properly award, the Court finds these cases unavailing.

19

rehabilitation therapy following the surgery and hospital stay. Additionally, Pressy's IQ dropped by approximately 40 points, and although he regained some functional abilities, he suffered judgmental deficiencies, memory loss, spatial disorientation, and difficulty controlling the left side of his body. *See id.* at 1024. As the recitation of facts from *Plessy* demonstrates, the injuries sustained in that case simply exceed the scope of the injuries Raul Rodriguez sustained. Additionally, the jury's award in *Plessy* was divided by category while the jury awarded Raul Rodriguez a lump sum amount.

As the Court stated earlier in this decision, "'[h]urt feelings, anger, and frustration are part of life' and are not the types of emotional harm that could support an award of damages. The plaintiff must instead present *specific* evidence of emotional damage: 'There must be a 'specific discernable injury to the claimant's emotional state,' proven with evidence regarding the 'nature and extent' of the harm." *Hitt v. Connell*, 301 F.3d 240, 250 (5th Cir. 2002) (emphasis in original) (citations omitted). "'The plaintiff's own testimony, standing alone, may be sufficient to prove mental damages but only if the testimony is 'particularized and extensive' enough to meet the specificity requirement discussed above: 'Neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages.'" *Id.* at 250-51 (citing *Brady v. Fort Bend County*, 145 F.3d 691, 718 (5th Cir. 1998)).

The Court finds that Raul Rodriguez presented sufficient evidence to support mental anguish, and the Court cannot substitute its own judgment for that of the jury. The task before the Court is made more difficult by the fact that the jury awarded a lump sum award. Thus, it is impossible for the Court to determine how much the jury awarded for mental anguish, as opposed to physical pain (for which there was considerable medical testimony), disfigurement (again for which testimony was presented), and loss of enjoyment of life. After consideration of all the evidence, and mindful that courts do not disturb a jury's verdict for excessiveness except on the strongest of showings, the Court nevertheless determines the jury's award for physical pain, mental anguish, loss of earning capacity, physical impairment, physical disfigurement, medical care, and loss of enjoyment of life should be remitted. Having found no cases with sufficiently similar

facts and injuries, but using the Court's judgment and case law as a rough guide, the Court determines the maximum amount the jury could properly award is $8,370,000.00. The Court arrives at this amount by taking the damage award in *Olin* for physical pain and mental anguish, disfigurement, and physical disability and applying the 50% multiplier. The Court recognizes that the injuries sustained by the minor in *Olin* were of a different nature than Raul's. Additionally, Raul was 20 years older than the minor at the time of the accident. Nevertheless, when the Court reviews all the evidence, including evidence concerning the highly subjective mental anguish award, the Court determines $8,370,000.00 is the maximum a jury could have properly awarded in this case for Raul Rodriguez's damages.

**III. Conclusion**

When a trial court feels remittitur is more appropriate, the court must first offer plaintiff a choice between accepting the reduction in damages or proceeding with a new trial. *See Higgins v. Smith International, Inc.*, 716 F.2d 278 (281 (5th Cir. 1983). As mentioned above, when it is clear the issue of damages is independent from liability issues, the new trial may be limited to damages only. *See Westbrook*, 754 F.2d at 1242 (citation omitted). Plaintiff, therefore, has the option of accepting the Court's remittitur or proceeding with a new trial on those damages on which the Court orders a remittitur.

DONE this 20th day of December, 2004, at Brownsville, Texas.

Hilda G. Tagle
United States District Judge